June 2023

# Eighth Report of the Federal Monitor

Covering the Period from October 2022 through March 2023

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

## Table of Contents

INTRODUCTION ..........................................................................................................................................4

    General Background on the Agreement and Monitoring Process ..................................................4
    Scope and Methodology..................................................................................................................5
    Monitoring Activities During CMR-8.............................................................................................6
    Key Findings of the Monitor's Eighth Report ................................................................................7

I. PROFESSIONALIZATION ..........................................................................................................................9

II. USE OF FORCE ......................................................................................................................................10

    1. General Provisions ...................................................................................................................12
    2. Specialized Tactical Units ........................................................................................................17
    3. Crowd Control Policies and Performance ................................................................................24
    4. Force Reporting........................................................................................................................30
    5. Force Review, Investigation, and Analysis ..............................................................................36
    6. Supervisory and FRB Reviews .................................................................................................39
    7. FIU Investigations and Force Reviews by SFRB ......................................................................45
    8. Use of Force Training ...............................................................................................................54
    9. Responding to Behavioral/Mental Health Crisis .....................................................................58

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY .....................................65

    1. Stops, Searches, and Seizures .................................................................................................67
    2. Investigatory Stops and Searches............................................................................................67
    3. Arrests .....................................................................................................................................73
    4. Searches ..................................................................................................................................84
    5. Training on Stops, Searches, and Seizures ..............................................................................87

IV. EQUAL PROTECTION AND NON-DISCRIMINATION .............................................................................88

    1. General Provisions ...................................................................................................................89
    2. Discriminatory Policing ...........................................................................................................93
    3. Sexual Assault and Domestic Violence ...................................................................................98

V. RECRUITMENT, SELECTION, AND HIRING...........................................................................................104

    1. Recruitment Plan ..................................................................................................................106
    2. Hiring Reforms ......................................................................................................................110

VI. POLICIES AND PROCEDURES .............................................................................................................116

VII. TRAINING ........................................................................................................................................117

    1. Pre-Service Education and Training .......................................................................................120
    2. Field Training Program...........................................................................................................126
    3. In-Service Training..................................................................................................................133
    4. Training Records ....................................................................................................................139

VIII. SUPERVISION AND MANAGEMENT ................................................................................................143

    1. Duties of Supervisors ............................................................................................................145
    2. Supervisor Training ...............................................................................................................156
    3. Performance Evaluation ........................................................................................................160
    4. Early Identification System ....................................................................................................162
    5. Internal Audits and Interagency Feedback............................................................................169

IX. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE .........................................177

1. CIVILIAN COMPLAINTS ........................................................................................................181
2. INTERNAL INVESTIGATIONS ..............................................................................................184
3. COMPLAINT INTAKE, CLASSIFICATION, ASSIGNMENT, AND TRACKING...............................188
4. INVESTIGATION OF COMPLAINTS.......................................................................................200
5. STAFFING, SELECTION, AND TRAINING REQUIREMENTS ....................................................220
6. PREVENTING RETALIATION ................................................................................................224
7. DISCIPLINE .......................................................................................................................225
8. OFFICER ASSISTANCE AND SUPPORT.................................................................................228

X. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION ..............................................234
1. COMMUNITY ORIENTED POLICING ...................................................................................240
2. COMMUNITY INTERACTION COUNCILS ..............................................................................250
3. PUBLIC INFORMATION .....................................................................................................259

XI. INFORMATION SYSTEMS AND TECHNOLOGY ..............................................................266

APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION ..........................................275

APPENDIX B: METHODOLOGY ..........................................................................................277
COMPLIANCE LEVELS..........................................................................................................277
SAMPLING METHODOLOGY .................................................................................................278
CMR-8 SAMPLES.................................................................................................................279

APPENDIX C: COMPLIANCE STATUS BY PARAGRAPH AND SUB-SECTION ...........................283

## Introduction

This report will outline the current compliance status of the Commonwealth of Puerto Rico (hereafter, the "Commonwealth") and the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, Parties, and residents of the Commonwealth about implementation status and levels of compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the Court, the Parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report.

## General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources needed to reform unconstitutional policing practices and bring the Bureau into line with generally accepted practices of constitutional policing and effective law enforcement. The Parties recognize that constitutional policing, effective law enforcement, and the community's trust in its police force are interdependent. Accordingly, full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop dynamic leadership and management skills within PRPB aimed at transforming the Bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the Parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

1. Professionalization;
2. Use of Force (UOF);
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations, and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, the Commonwealth developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor's Office.

4

During the capacity-building period, the Monitor's Office assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1 and since October 2018, the Monitor's Office has been assessing PRPB's compliance with the Agreement.

## Scope and Methodology

The Chief Monitor's Eighth Report covers the period between October 2022 and March 2023. CMR-8 covers nine of the eleven performance areas of the Agreement: 1) Use of Force (UOF), 2) Searches and Seizures, 3) Equal Protection and Non-Discrimination, 4) Recruitment, Selection and Hiring; 5) Training; 6) Supervision and Management, 7) Civilian Complaints, Internal Investigations, and Discipline, 8) Community Engagement and Public Information, and 9) Information Systems and Technology. Per the monitoring methodology agreed on by the Parties, 179 paragraphs were scheduled for assessment in CMR-8, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering Professionalization and Policies and Procedures as well as specific paragraphs throughout other sections that are assessed on an annual basis and were covered in CMR-7.

For each of these areas, the Monitor's Office presents its assessments based on the desk review of data that was provided by the Commonwealth, as well as interviews, questionnaires, site visits, observations, and the current state of IT (see below for more details on the activities conducted during CMR-8). The collection, analysis, reporting, and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely assessments as to compliance, as well as achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist the Commonwealth in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess the Commonwealth's compliance with the Agreement in the three areas of performance (policy, training, and implementation) selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel on the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide the Commonwealth with a detailed pathway towards achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's assessment as well as additional detail on the assessment and sampling methodologies are provided in Appendix B.

5

## Monitoring Activities During CMR-8

Over the past six months the Monitor's Office conducted six site visits to PRPB headquarters as well as various regions of the island including Aibonito, Utuado, Fajardo, Caguas, and Carolina. At each of these field visits the Monitor's Office visited the area command, district(s) within each area, Highway Patrol Units, and other units at each location. At each location the Monitor's Office met with executive command and PRPB personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF.

These field visits provided an opportunity for the Monitor's Office to hear directly from supervisors and officers on the front line, speak with members of the Commonwealth community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of over four thousand policies, documents, certifications, audio recordings, and case files and reports provided for review during the CMR-8 reporting period. While on site, team members also participated in eight system demonstrations on crime mapping, community policing, Police Training Management System (PTMS), body-worn cameras, handheld recording devices, Sexual Assault and Domestic Violence Modules, and the procedural interface between PPR 605.1 and the Force Investigation Unit (FIU).

During the CMR-8 reporting period, the Monitor's Office also reviewed 80 policies, forms (PPRs), and protocols under paragraph 229 of the Agreement. The policies included Manual de Descripción de Puestos del Sistema de Rango, 9001 Artículo 14 del Reglamento de Personal de la Policía de PR, OG 144 División de Liga Atlética Policiaca y sus formularios, OG 412 Grabaciones de Audio, among others.

The Monitor's Office also observed a PRPB community engagement effort as part of the 2023 Safety Fair in February 2023 as well as a meeting with the CIC coordinators to discuss the AHDatalytics, the Commonwealth's contractor, Reform Management dashboards soon to be released to the public. The Monitor's Office was also present at various demonstrations and protests during the CMR-8 reporting period. These demonstrations provided another avenue to assess PRPB's operations and practices to ensure that they are in line with the Agreement. The Monitoring Team also conducted a community meeting in November 2022. This meeting was attended by over 30 representatives from various organizations representing people with disabilities and provided the Monitor's Office with an opportunity to hear directly from the community about their concerns and interactions with PRPB.[1] Similar community meetings hosted by the Monitor's Office will be conducted periodically.

During this reporting period, Gartner Inc, the firm contracted by the Monitor's Office to conduct the IT Needs Assessment, completed their Assessment, which was filed with the Court. Subsequently the Parties worked together on an IT Corrective Action Plan (CAP) that outlined the specific initiatives and timelines with implementing the recommendations noted in the IT Needs Assessment.

In addition, during the CMR-8 reporting period, the Monitor's Office participated in one status conference. The status conference held in January 2023 focused on updates related to the CMR-7 report, sergeant promotions, Training Plan, IT CAP, the Supervision and Staffing Plan, the Equitable Sharing Program, and integrity audits. The Monitor's Office has continued to work closely with the Parties to

---

[1] A summary of this community meeting is included in our Winter 2022 Newsletter, found here: https://mailchi.mp/727d39b92277/winter-2022-newsletter-of-the-office-of-the-tca-puerto-rico.

finalize the plans and begin monitoring the Commonwealth's progress with implementing the various Plans filed with the court.

## Key Findings of the Monitor's Eighth Report

During the CMR-8 reporting period, the Commonwealth's achievements towards partial and/or substantial compliance with many of the paragraphs remained largely the same. Further, PRPB continues to demonstrate a regression in compliance as it relates to the conduct of in-service training. Repeated issues like poor documentation of probable cause and the use of boilerplate language on arrest reports, failures in supervision to issue corrective actions, and exceeding timelines in FIU investigations and Commissioner's Force Review Board (CFRB) evaluations of UOFs are just a few examples of issues continuously raised by the Monitor's Office in previous CMRs and noted again in this report.

Despite these challenges and continued stalled progress in compliance among many of the paragraphs in the Agreement, the Monitor's Office is encouraged by the Commonwealth and PRPB's progress in improvements to the UOF data and reporting, promotion of over 500 sergeants, development of compliance management dashboards, and efforts to develop and implement the IT CAP, as well as draft implementation plans for several other areas of the Agreement. Continued commitment and effort towards these initiatives will ensure progress towards improved compliance.

However, the Monitor's Office continues to stress to PRPB and the Commonwealth that it must also address the issues raised related to training. Training is an integral component of reform. The provision of resources, staffing, and increased commitment and action by leadership to implement the reform is imperative to complying with the Agreement. During the CMR-8 reporting period, the Commonwealth worked collaboratively with the Parties to develop and finalize a Training Plan. This Plan outlined the various initiatives, tasks, and associated timelines to address improvements to compliance and delivery of in-service training. It is the Monitor's hope that the Commonwealth will obtain the required resources for the Auxiliary Superintendency for Education and Training (SAEA) to implement this plan successfully.

Overall, the compliance assessment in this report demonstrates some progress in compliance, particularly in those paragraphs related to the reporting and tracking of UOF and continued stalled progress in the conduct of in-service training. Although PRPB continued to develop and/or revise various policies, procedures, manuals, and related forms, significant progress needs to be made in the training and practical application of these policies and procedures and in the improvement of related technologies, see figure one. Further, when examining the total paragraphs assessed in this report (N=179) in comparison to the previous report in which these sections and paragraphs were assessed (CMR-6; N=179), the Monitor's Office notes PRPB has achieved some progress during this reporting period. For example, 83 paragraphs met partial compliance and 56 paragraphs were rated not compliant during this reporting period, in comparison to 77 paragraphs rated as partially compliant and 61 as not complaint in CMR-6. Further, when reviewed comprehensively, almost 68% (N=121) of the paragraphs meet either partial, substantial, or full compliance in CMR-8 in comparison to 52% (N=93) in CMR-6.



*Figure 1. Rate of Compliance Over Time*

In the forthcoming report sections, the Monitor's Office provides the assessment and analysis produced by the subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting the Commonwealth in achieving a pathway to compliance.

## I. Professionalization

Professionalization is assessed on an annual basis. Paragraphs 12 -21 were assessed in CMR-7 and will be assessed again in CMR-9.

## II. Use of Force

In all previous CMRs the Commonwealth's progress towards achieving compliance with UOF has been hampered by its inability to validate its UOF numbers. This issue has been repeatedly raised as compliance assessments of several of the paragraphs within this section of the Agreement require a comprehensive review of UOFs. The Commonwealth and PRPB, working with USDOJ and the Monitor's Office, developed a Provisional UOF Plan to address the inconsistencies in its UOF tracking. PRPB formally implemented the Provisional UOF Plan in July 2022. The Provision UOF Plan increased supervisory layers of review to identify and correct errors and/or discrepancies in the UOF reporting forms within PRPB's GTE system. The Monitor's Office and USDOJ approved the interim plan. PRPB was reminded that a more comprehensive, less labor intensive system/plan needs to be developed.

As it relates to improving UOF reporting, during this reporting period, PRPB was able to demonstrate that it could provide accurate UOF numbers. What also aided PRPB in accomplishing this task was its contractor, AHDatalytics, which developed a UOF dashboard that helped identify discrepancies in UOF reporting within the GTE system. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps  were taken as part of the force reporting process in the field.

During this reporting period, PRPB reported 802 UOFs in 439 incidents. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRPB's GTE system is comprehensive. It should be noted that the Monitor's Office, in reviewing whether PRPB officers are preparing and submitting UOF reports (PPR 605.1) in the timeframe as outlined in Bureau policy, has determined that PRPB has made significant progress. In the 76 UOF reports reviewed 73 (96%) were prepared and submitted in the timeframe outlined in policy. In the remaining three incidents PRPB produced documentation showing that the reports were late - two were one day late and one was two days late. These are significant improvements that have resulted in improved compliance ratings. However, the Provisional UOF Plan is an interim plan while the Bureau develops a system that identifies discrepancies in real time and does not have to rely on various levels of review for identifying errors in the system and making the required corrections.

Consistencies in the UOF data largely affect many of the paragraphs in this section. Other topics such as the Force Investigation Unit (FIU), Force Review Boards (FRBs), Crisis Intervention Training (CIT), SWAT, and crowd control procedures also impact PRPB's overall compliance with this section. As it relates to FIU, the Monitor's Office continues to remain concerned regarding the length of time FIU is taking to complete its investigations. However, there was some improvement in the timeline as the Monitor's Office observed more cases completed within policy (18%), but in most cases reviewed the investigations were not completed within the 45-day requirement. Changes to FIU personnel (a newly designated commanding officer) which occurred in the latter part of the reporting period and PRPB's commitment to add much needed investigators as recommended by the Monitor's Office in previous CMRs is encouraging. Similarly, in the Monitor's Office's review of Commissioner Force Review Board (CFRB) evaluations, while the evaluations were objective, they also were not timely. CIT, like UOF, has also been an area of discussion and focus for the Court in the past few months. Despite the completion of PRPB's CIT pilot program in November 2020, the Bureau has lagged in its

efforts to complete an evaluation of the pilot and expand the program to other areas of the island. Due to these issues in January 2022, the Court requested that PRPB work with USDOJ and the Monitor's Office to establish an evaluation committee and move progress forward with expanding the program to other area commands. While PRPB has made some progress in these efforts, by producing a draft evaluation and interviewing potential CIT coordinators, its progress continues to lag due to recruitment and training challenges. At the end of the reporting period, PRPB noted that training of additional CIT officers was scheduled for May 2023.

Notwithstanding the issues noted above, the Commonwealth has demonstrated progress in many of the UOF paragraphs. Much of the efforts made in this reporting period can be attributed to PRPB's continued collaboration with AHDatalytics, the Commonwealth's contractor, who has helped PRPB develop several UOF related dashboards, which include "Compliance with Reports", "Use of Force Statistics", "Requests from the Monitoring Team", and "Specialized Tactical Unit Mobilizations." These dashboards are useful to the Monitor's Office as they serve as another tool in assessing PRPB's compliance with the Agreement. The positive efforts made in this reporting period will, if continued, prove beneficial in subsequent reporting periods.

Overall, the Commonwealth's compliance with the 36 paragraphs assessed during this reporting period within UOF reflects improvement in levels of compliance to what was noted in previous reports. In CMR-7, 56% of paragraphs (20 paragraphs) were assessed as partially compliant and 8% (3 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 58% of paragraphs (21 paragraphs) were found to be partially compliant and 25% (9 paragraphs) were found to be substantially compliant (paragraph 33 moved to fully compliant). See figure 3.



*Figure 3. Use of Force: Paragraph Compliance Status*

## Paragraph 22: Use of Force - General Provisions

*PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.*

11

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

As in previous CMRs, the Monitor's Office requested the following information: 1) number of incidents in which force was used and 2) how many officers used force in each incident. In response, PRPB provided information attesting that force was used 802 times in 439 incidents during this reporting period.

Of the 439 UOF incidents that occurred in this reporting period, the Monitor's Office randomly sampled and reviewed 76 UOF reports. An analysis of the reports by the Monitor's Office determined that the UOFs were in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, which prohibit the use of unreasonable force.

Further, during this reporting period, the Monitor's Office reviewed various policies and procedures related to UOF reporting. As previously noted, the Monitor's Office finds that PRPB's policies and procedures on UOF enable officers to rely primarily on non-force techniques to effectively police, use force only when necessary, and de-escalate the UOF at the earliest possible moment. Adherence to the policies in practice is also reflected in the Monitor's Office's review of UOF reports which verified that the levels of force were consistent with PRPB policies.

*Pathway Forward*

Now that PRPB has, via its Provisional UOF Plan, provided reliable data relating to UOF numbers, the Monitor's Office can thoroughly analyze the data. Further, this analysis is more representative of UOFs that occurred during this reporting period. However, PRPB should endeavor to develop a permanent system to report accurate UOF incidents, one that is not labor intensive and does not require several layers of review as in the Provisional UOF Plan to address and correct discrepancies in the data. This improved system should be woven into PRPB's efforts to implement its IT CAP and improvements to its record management system.

## 1. General Provisions

PRPB complies with applicable law and comports with generally accepted policing practices in its policy and training related to UOF, including training on less lethal weapons. The comprehensive UOF policy requires that PRPB categorize all reportable UOFs into multiple levels, grouped by degree of seriousness, and identify all force techniques used by officers. PRPB has provided the Monitor's Office with the requested case files for review under the applicable paragraphs.

PRPB has demonstrated continued compliance with several paragraphs in this subsection including the continued prohibition of CN gas, and qualifying personnel on the use of firearms.

### Paragraph 23: Use of Force - General Provisions

*PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

#### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met | ☐ Missed |

#### Compliance Assessment

PRPB has prepared comprehensive policies that categorize UOFs into multiple levels, grouped by degree of seriousness and describes each force level and the options available to officers as outlined in the Agreement. The policies are consistent with generally accepted police practices relating to UOF. The Monitor's Office reviewed 76 UOF incidents during this reporting period and determined that the force used by officers were accurately categorized into levels grouped by the degree of seriousness. During this reporting period, there were 802 UOF applications; of these instances, 267 were level 1 (33%), 188 were level 2 (24%), 263 were level 3 (33%), and 76 were level 4 (10%) UOFs.

*Pathway Forward*

The Monitor's Office looks forward to assessing PRPB's progress with improving data accuracy as it has implemented the Provisional UOF Plan and continues its work on the IT Needs Assessment and subsequent IT Action Plan.

## Paragraph 24: Use of Force - General Provisions

*PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met   ☐ Missed |
|---|---|

*Compliance Assessment*

PRPB has prepared comprehensive policies and revised them periodically as outlined in the Agreement. The policies are consistent with generally accepted policing practices relating to UOF. As noted above, while PRPB has incorporated the paragraph requirements into policy, all relevant personnel have not been trained on the requirements of the policy and implementation of this policy in practice is still lacking. During this reporting period the Monitor's Office reviewed the following GOs 601 (UOF), 602 (Electrical Control Device), 605 (Reporting and Investigating UOF), and 625 (Crowd Control).

*Pathway Forward*

Substantial compliance with this paragraph hinges on PRPB's ability to demonstrate its practical application of UOF policies. The Monitor's Office will continue to make a comprehensive assessment to determine if the UOF policies are in fact adhered to in practice. The Monitor's Office looks forward to reviewing PRPB's compliance with this paragraph and is hopeful that the implementation of the Provisional UOF Plan and IT Needs Assessment will improve PRPB's ability to accurately report and track UOFs.

## Paragraph 25: Use of Force - General Provisions

*PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policy prohibits use of CN gas. | ☑ Met | ☐ Missed |
| 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | ☑ Met | ☐ Missed |
| 3. No supply of CN gas is identified in armories or other locations through inspections. | ☑ Met | ☐ Missed |
| 4. CN gas is never used by STUs. | ☑ Met | ☐ Missed |

*Compliance Assessment*

As per the Agreement, PRPB continues to prohibit the use of CN gas. The Monitor's Office's site visits and observations of PRPB equipment rooms and documentation of its armory inspection reports submitted by PRPB continue to demonstrate PRPB's compliance with this paragraph. During the February 2023 SWAT site visit, no CN gas was present in the unit's arsenal. Moreover, the Monitor's Office verified that supervisors conduct a daily weapons inventory check and submit a quarterly report (documentation provided).

PRPB's full compliance is reflective of its efforts to meet the policy and implementation requirements of this paragraph.

## Paragraph 26: Use of Force - General Provisions

*PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2022 – March 2023 |

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | ☑ Met | ☐ Missed |
| 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | ☑ Met | ☐ Missed |
| 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | ☑ Met | ☐ Missed |
| 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | ☑ Met | ☐ Missed |
| 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | ☐ Met | ☑ Missed |

## Compliance Assessment

The Monitor's Office found that PRPB's policies relating to firearms qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the previous reporting period.

For the purpose of determining compliance with firearms training and qualification, the Monitor's Office requested data relating to yearly firearms training and qualifications. PRPB conducts firearms training and qualifications for all sworn members with Bureau issued firearms in both day and reduced light fire each calendar year. PRPB provided a list of 1,922 personnel who qualified with their service weapons during 2022 in day light fire. The daytime firing qualifications commenced in November 2022 and were not completed as required by the end of 2022.

The Monitor's Office selected a random sample of 119 officers from the list of officers who were listed as qualified and requested their certified training records to verify that officers were qualified with their service weapon for this reporting period. A review of the training files confirmed that all officers were qualified. The Monitor's Office also noted in documentation provided by PRPB that 275 officers required same day re-training to be certified and that no officer failed the qualification re-test or was relieved of operational duty according to PRPB documentation. The Auxiliary Superintendency for Professional Responsibility (SARP) also provided documentation that there were no investigations conducted relating to officers failing to qualify on their weapons. All officers with more than one regulation firearm were qualified on all firearms. Therefore, the Monitor's Office did not have the occasion to review whether officers are disciplined after failing to requalify on firearms training.

16

PRPB's IT Bureau and SAEA are developing a Shooter Module, which will generate global reports; however, as of the end of this reporting period, the module was not yet operational and has not been demonstrated to the Monitor's Office. The Monitor's Office anticipates reviewing an improved Shooter Module in the near future.

*Pathway Forward*

PRPB needs to qualify all sworn personnel on both day and reduced light fire each calendar year and must maintain records of this training in its Global Report. Further, the Monitor's Office stresses the importance of scheduling the training so that both segments are completed during the calendar year to ensure that all officers are qualified. Failing to do so will result in continued partial compliance.

## 2. Specialized Tactical Units

In relation to paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed UOF policies for specialized tactical units (STUs) and that these policies are consistent with PRPB's Bureau-wide UOF policy. A review of the tactical unit's (DOT) roll call documents verifies continued compliance with policies. Related to training on policy, PRPB DOT has also completed training. In practice, the Monitor's Office has verified that all STU officers meet eligibility requirements and that specialized units are not conducting general policing functions except for non-specialized preventive patrols in high crime areas. For these preventive patrols PRPB DOT provided documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire.

During this reporting period, the Monitor's Office reviewed documents and case files that attested to DOT conducting preventative patrols and other policing activities as outlined in the appropriate policies. In addition, DOT is appropriately documenting its activities and having supervisors review those activities and documentations. To that end, the Monitor's Office requested a random sample from the 741 DOT mobilizations which include preventive patrol (PPR 112.2 Record of Mobilization of STU) during this reporting period. PRPB provided a random sample of 71 mobilizations. A review of the files verified DOT's compliance with policy.

Using the dashboard created by AHDatalytics, the Commonwealth's contractor, in September 2022, PRPB now has a centralized database that captures all STU deployments Bureau-wide. This centralized database will help PRPB command staff determine DOT needs Bureau-wide.

### Paragraph 27: Use of Force - Specialized Tactical Units

*PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | October 2022 – March 2023 |

17

| | | Period | |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. All use of force training involving STUs is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | ☑ Met ☐ Missed |
| 4. 95% of uses of force by STU officers are within policy. | ☑ Met ☐ Missed |

*Compliance Assessment*

PRPB has developed policies on UOF by STU members. These policies are consistent with PRPB's Bureau-wide policy. A review of UOF training involving STUs has determined that it is consistent with PRPB policy. No updates to this policy were conducted during this reporting period. Further, a review of training records found that 95% of sampled officers have completed training on UOF policies involving STUs in the required timeframe. Despite broader issues with in-service training for the entire population of sworn personnel, the Monitor's Office concludes that all STU personnel met the special training requirements related to their specialized units.

There were two instances in which DOT was activated in an active capacity during the reporting period, January 29, 2023 and March 4, 2023, otherwise all other activations were for "standby" status or as preventive patrol. One of the two instances involved a demonstration at Old Sugar Pier in Aguadilla where DOT units removed protesters who were sitting down on private property. The second involved a demonstration at the Condomino Sol Playa in Rincon. These deployments and UOFs were consistent with policies relating to UOF by specialized units.

*Pathway Forward*

The Monitor's Office will continue to monitor UOFs by specialized units at demonstrations and protests to verify compliance with this paragraph. The Monitor's Office also notes that PRPB must continue to schedule and conduct training for all officers on UOFs involving STUs to move compliance forward.

## Paragraph 28: Use of Force - Specialized Tactical Units

*PRPD shall prohibit STUs from conducting general patrol and policing functions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| Training: | Implemented | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Presentation of data on STU deployments and activations. | ☑ Met | ☐ Missed |
| 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | ☑ Met | ☐ Missed |
| 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. In addition, 95% of STU officers are trained and certified on STU policies. The Police Training Management System (PTMS) does not allow supervisors to easily track which officers have received which training courses, so DOT supervisors have been maintaining their own internal tracking, which is not conducive to tracking long-term and on-going training requirements.

In relation to the policy requirements of paragraph 28, GO 112 (Tactical Operations Divisions) allows DOT officers to be assigned to preventive patrol but precludes DOT from operating as a specialized unit or equipping tactical gear when conducting patrol functions. GO 112 also requires that DOT members always keep specialized weapons and tactical equipment accessible in the event their unit is activated to respond to an authorized DOT event. During the February 2023 site visit to Metro DOT, the Monitor's Office was informed that officers assigned to preventive patrol continue to keep their specialized equipment in the trunk of their vehicle, accessible to the officers in the event they are mobilized. In addition, PRPB has previously modified PPR 112.2 (Record of Mobilization of STU) to capture this information as well as wearing the proper uniform. Verification of the changes to PPR 112.2 was confirmed by the Monitor's Office. The Monitor's Office has also confirmed that officers are using the modified PPR 112.2 as part of its review of the related case files and during site visits.

The Monitor's Office has verified in its review of related documents that specialized units are properly documenting their daily assignments in compliance with the Agreement. Specialized units do not conduct general policing functions apart from preventive patrols in high crime areas or at special events. During this reporting period over 641 preventive patrols were conducted. From that number the Monitor's Office requested a random sample of 38 records. Upon review of the deployment records, the Monitor's Office determined that deployments were consistent with the Agreement and PRPB policy.

*Pathway Forward*

The Monitor's Office will be able to ensure implementation of the revised PPR 112.2 (Record of Mobilization of STU) through case reviews and STU observations. These reviews and observations will ensure PRPB's continued compliance with the practical elements of this paragraph.

The Monitor's Office will continue to evaluate training records to ensure that required trainings are being delivered on time and in adherence with the Agreement.

## Paragraph 29: Use of Force - Specialized Tactical Units

*PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for evaluation boards is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of evaluation board members are trained. | ☑ Met | ☐ Missed |
| 4. All officers selected to STUs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | ☑ Met | ☐ Missed |
| 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies.

PRPB provided documentation that there are currently 185 personnel assigned to DOT units throughout PRPB. The breakdown of those personnel by rank is as follows:[2]

---

[2] At the time of report writing PRPB added an additional 17 officers to DOT units; however, this took place after the reporting period covered in this CMR and is not reflected in the above numbers.

- 1 Inspector
- 1 Captain
- 3 First Lieutenants
- 7 Second Lieutenants
- 16 Sergeants
- 157 Agents

PRPB has developed GO 112 (Tactical Operations Divisions) and 117 (Specialized Weapons and Tactics Division) which identify eligibility criteria and selection processes for specialized units. During the reporting period no additional officers were assigned to SWAT or DOT. The Monitor's Office reviewed DOT and SWAT personnel files for existing members and confirmed that the officers meet the requirements for assignment and have the required training. In addition, the Monitor's Office also reviewed the files of one sergeant and nine agents who applied for selection to SWAT. A review of the files revealed that they met the requirements as outlined in GO 117 (Specialized Weapons and Tactics Division). Upon successful completion of the requirements for the position they will be placed on a list and selected as needs arise to fill vacancies within the unit. As it relates to DOT the retention process for seven officers to remain in their existing position as outlined in GO 112 (Tactical Operations Divisions) has been initiated in compliance with Bureau policy.

It should be noted that during the reporting period two officers requested and received internal transfers from Metro DOT to Guayama DOT.

*Pathway Forward*

As noted above, the tenure limit of six years applies to STU officers. The Monitor's Office assesses that PRPB has completed the retention process for those DOT and SWAT officers it wished to retain. Moving forward, PRPB needs to continue this task as necessary and in a timely manner.

## Paragraph 30: Use of Force - Specialized Tactical Units

*PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

21

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | ☑ Met | ☐ Missed |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. A review of PRPB DOT operational plans indicated that in situations where the unit was given prior assignment notification, an operational plan was prepared as required by PRPB policy.

PRPB reported that during this reporting period there were 153 demonstrations or protests. Of the 153 demonstrations or protests, according to PRPB documentation, 94 were unplanned, 15 were planned, and 44 provided no indication if they were planned or unplanned.

PRPB reported that DOT units participated in 14 demonstrations or protests that occurred during the reporting period; however, in all but 2, DOT participated in a "standby" role. According to PRPB, SWAT did not participate in any demonstrations or protests during the reporting period. The Monitor's Office verified this through documentation provided by the Reform Unit.

PRPB provided documentation that there are currently 24 personnel assigned to SWAT. The breakdown of those personnel by rank is as follows:

- 1 First Lieutenant (temporarily reassigned)
- 1 Second Lieutenant
- 3 Sergeants
- 21 Agents

SWAT was activated 70 times during the reporting period. The Monitor's Office conducted site visits to SWAT to review documents and conduct visual inspections of equipment in December 2022 and February 2023.

In all cases reviewed, SWAT prepared a Mobilization Report (PPR 112.2) and After-Action Report (PPR 112.3). As noted in previous CMRs, SWAT's commanding officer reported that, in many instances relating to mobilization, no advance warning was received following the request to "back up" federal task forces or specialized units operationally. Therefore, no operational plans were prepared during the period for those events.

As stated in previous CMRs, SWAT has developed an internal form titled "Mission Evaluation." This internal form captures all aspects of the mission including what needs to be maintained, what could be done better, and final comments. The Monitor's Office previously commended the Commanding Officer of SWAT on the development, implementation, and use of the Mission Evaluation Form and emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety. This practice is also consistent with generally accepted policing

practices. PRPB has now memorialized the form and assigned it Bureau Report PPR 117.3. The Monitor's Office reviewed and approved this PPR in July 2022 and verified its use in February 2023.

Additional observations made by the Monitor's Office during this reporting period include the following:

- In the 70 cases reviewed by the Monitor's Office, SWAT reported using force in 47 incidents (67%). In all cases the force consisted of pointing a firearm, a Level 3 UOF.
- A comparison of reported UOFs by SWAT to PRPB's Global List revealed that all UOFs were reported in the PRPB Global List. However, one incident where two uses of force took place (2023-1-162-000783) was not attributed to SWAT in PRPB's Global List.
- The information provided by SWAT was cross-checked and verified with PPRs 112.2 (Mobilization Report) and SWAT's Global List for accuracy.
- In all instances, SWAT used the updated PPR 112.2.

Based on data provided by PRPB, 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors.

*Pathway Forward*

The Monitor's Office concludes that SWAT/DOT has taken the necessary steps to comply with the Agreement. Specialized units need to maintain current levels of compliance. The Monitor's Office will continue to assess compliance with this paragraph in CMR-9.

## Paragraph 31: Use of Force - Specialized Tactical Units

*PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | ☒ Met   ☐ Missed |

23

| 2. The STU tracking system is accurate and current; all deployments are tracked. | ☑ Met   ☐ Missed |
|---|---|

*Compliance Assessment*

It should be noted that near the end of the previous reporting period, AH Datalytics, the Commonwealth's contractor, began working with the PRPB Reform Unit to develop a dashboard that would centralize STU deployment data for tracking.

Using the dashboard created by AHDatalytics, the Commonwealth's contractor, in September 2022, PRPB now has a centralized database that tracks all STU deployments island-wide. This centralized database will help PRPB command staff determine DOT needs Bureau-wide.

*Pathway Forward*

To progress in compliance with this paragraph, PRPB must maintain the Bureau-wide tracking system. The development of the tracking system is the responsibility of the field operations unit that oversees STU operations. Furthermore, the data and report outputs of this system should be used to inform Bureau-wide DOT strategies and address gaps in resources and potential officer safety issues.

## 3. Crowd Control Policies and Performance

In general, PRPB has made significant progress in how it prepares for and operates during demonstrations and protests. The Monitor's Office has had the opportunity to observe PRPB providing strategic policing coverage at demonstrations and protests over the course of this reporting period. As reported in previous CMRs, PRPB's actions in response to demonstrations and protests have become increasingly consistent with generally accepted policing practices.

In response to demonstrations or protests during this reporting period, DOT units were activated only in a stand-by capacity except for two instances. The first involved a demonstration at the Old Sugar Pier in Aguadilla - DOT units removed protesters from private property who failed to comply with disbursement orders. The second involved a demonstration at the Condominio Sol Playa in Rincon. This is a significant finding given the number of demonstrations and protests responded to during the reporting period. In those instances where DOT units did not actively engage with demonstrators or protestors, after-action and self-assessment reports were not completed, except for PPR 112.2 (Mobilization of Specialized Tactics). Further, the Monitor's Office found that an incident commander was identified at every demonstration/protest regardless of STU activation status.

### Paragraph 32: Use of Force - Crowd Control and Incident Management

*PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2022 – March 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on crowd control and incident management is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of police responses to unplanned events are within policy. | ☑ Met | ☐ Missed |
| 5. 95% of police responses to planned events are within policy. | ☑ Met | ☐ Missed |
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |

## Compliance Assessment

The Monitor's Office has reviewed the crowd control and management policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has met the 95% threshold for the training of STU officers on the relevant crowd control training (REA 625). To date approximately 90% of officers have completed the yearly re-training as required. The remainder are scheduled for training on May 5, 2023 including the 17 recently assigned officers.

The Monitor's Office requested a list of all demonstrations and protests Bureau-wide for the CMR-8 reporting period. PRPB provided a list of 153 protests (94 unplanned, 15 planned, and the remaining 44 provided no indication). Upon review and as previously reported, it was evident that the data was not aggregated, but rather provided for each area.

PRPB should aggregate its data on planned and unplanned crowd control events Bureau-wide for the purpose of analyzing and identifying possible training needs as well as the distribution of personnel and resources.

PRPB has identified demonstrations and protests in 109 cases (71%) as planned or unplanned. However, despite its compliance with policy, in 44 demonstrations or protests (29%) PRPB did not identify if the demonstration or protest was planned or unplanned.  However, it should be noted that during the latter period of CMR-8 (January through March) only one demonstration did not have a designation.

25

During a site visit to Metro DOT and a review of data provided by the Reform Unit, the Monitor's Office reviewed reports relating to personnel deployments to demonstrations and protests where DOT was mobilized. The Monitor's Office learned that in instances where PRPB had determined in advance that the DOT Unit would be activated, an operations plan was developed by the unit. However, in instances where the determination to mobilize the unit was made at the time of the event, DOT prepared no such plan.

The Monitor's Office selected a random sample of 23 (mid-period) crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). PRPB provided 19 files, certifying that 4 cases from San Juan have not yet been submitted. PRPB's responses to the demonstrations were generally consistent with PRPB policy.

For the latter part of the period (January through March 2023) the Monitor's Office selected a random sample of 12 crowd control events to review operational plans, after action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). Some observations of the combined data are as follows:

Of the 31 files provided, PRPB reported that 18 (58%) were identified as unplanned. In four of the cases, even though unplanned, PPR 625.2 (Operations Plan) was prepared, it understandably had minimal information, given their unplanned status.

Of the six demonstrations/protests (19%) that were identified as planned, two had no operational plan, four files had complete information and appropriate reports, including PPR 625.2 (Operations Plan), PPR 625.3 (Report on Crowd Management and Control) and PPR 625.6 (Evaluation of Strategies for the Management and Control of Crowds). The other, which included the activation of DOT for the purpose of acting in reserve, only included PPR 112.1 (Request for Activations of the Specialized Tactical Divisions) and PPR 112.2 (Mobilization of the Specialized Tactical Divisions); however, no information relative to the demonstration was provided.

In two instances (6%), DOT was activated and effected an arrest.

In eight instances (26%) the demonstration did not have a designation of planned or unplanned; however, a review of the files by the Monitor's Office indicates that there is sufficient information to establish a designation of either planned or unplanned.

The Monitor's Office observed an improvement in PRPB's preparation of PPR 625.6 (Evaluation of Strategies for the Management or Control of Crowds) in this reporting period.

Regarding training on the relevant crowd control policies, PRPB provided documentation on DOT officers and supervisors current certification in these courses. The Monitor's Office reviewed the documentation provided by Metro DOT which verified that of the 185 members assigned to various DOTs throughout the Bureau all are trained on crowd control policies; this training requires yearly re-training and currently 90% are up to date. It should also be noted that the remaining DOT officers, including the 17 recently assigned are scheduled for training or re-training on May 5, 2023. In addition, the Commanding Officer of Metro DOT has received training on Incident Command.

PRPB submitted the quarterly reports (PPR 618.1) of STU supervisors who conducted inspections of armories as required by the Agreement. In a review of these quarterly reports, the Monitor's Office found them to be within policy and documented. The forms were also reviewed during site visits to STU facilities during armory inspections.

*Pathway Forward*

Although PRPB is partially compliant, the Bureau must maintain an aggregated list of all demonstrations, identifying them as either planned or unplanned, and classify them as such. Maintaining such a list will assist PRPB in maintaining greater awareness of related operations and determining needed resources throughout the island.

The Monitor's Office will continue to assess training compliance with target three through random training record reviews.

## Paragraph 33: Use of Force - Crowd Control and Incident Management

*The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

GO 625 (Crowd Management and Control) annotates that a ranking officer or other higher-level PRPB official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command, control, and provide approval prior to deploying force as a crowd dispersal technique. This policy was last submitted to the Monitor's Office for review during the CMR-8 reporting period.  In review of the demonstrations and STU activations, the Monitor's Office found that in all incidents of demonstrations or protests, a high-ranking member of PRPB was identified as incident commander. Crowd dispersal techniques were used during two protests/demonstrations. The Incident Commander was informed and approved of the use of these techniques prior to use.

## Paragraph 34: Use of Force - Crowd Control and Incident Management

*The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

### *Compliance Assessment*

The Monitor's Office has reviewed GO 625 (Management and Crowd Control) and found it to be compliant with the Agreement and general policing practices. PRPB used minimal force while responding to demonstrations and protests during this reporting period. Force was only used in instances where demonstrators/protesters were given lawful orders and failed to comply. Otherwise, demonstrators were allowed to assemble peacefully and lawfully.

For this reporting period, PRPB used DOT in response to two demonstrations/protests in Aguadilla and Rincon.  Aside from those incidents, DOT units were only mobilized in a stand-by or preventive patrol capacity in response to potential needs for crowd control activities.

The Monitor's Office considers this a significant finding, especially since PRPB responded to a substantial number of planned and unplanned demonstrations and protests during the reporting period. In all but the events mentioned above, DOT was ultimately kept in reserve and never interacted with demonstrators or protesters. The use of other crowd control techniques was within policy.

It is important to note that at a demonstration/protest during the previous reporting period, PRPB used its "Contingency Unit" to disperse unruly protesters. This was done at the direction of the Incident Commander. The Monitor's Office noted in its report that members of the "Contingency Unit" do not have the same level of training as DOT, therefore they should not have been used. Moving forward, the Monitor's Office recommended, where possible, that the dispersing of unruly protesters be conducted solely by DOT personnel or additional training be provided to officers of the "Contingency Unit".

In reviewing demonstration data for this reporting period, the Monitor's Office observed that PRPB identified the need to provide additional training for the "Contingency Unit" in PPR 625.6 (The Evaluation of Strategies for Crowd Management and Control). It is encouraging that PRPB quickly

identified the need and is taking the necessary steps to address the issue. Currently Contingency personnel are not authorized to disperse protesters at demonstrations/protests until they receive the additional training.

*Pathway Forward*

To achieve substantial compliance, PRPB needs to categorize all demonstrations and/or protests as planned or unplanned. The Monitor's Office recommends, where possible, that the dispersing of unruly protesters be conducted solely by DOT personnel or that additional training be provided to officers of the "Contingency Unit". The Monitor's Office will continue to assess PRPB's progress and compliance with policy, crowd control resource deployment, and training in CMR-9 through policy reviews and on-site observations.

## Paragraph 35: Use of Force - Crowd Control and Incident Management

*PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office reviewed numerous documents relating to mass demonstrations. These documents included a review of PRPB's work plans for demonstrations as well as its completion of PPR 112.1 (Request for Activation of the STU), PPR 112.2 (Record of Mobilizations of STU), and PPR 112.3 (Evaluation of Strategies of the STU). The Monitor's Office found that the STUs did not prepare any after-action reports when activated other than in those where they actively participated in crowd control.

The Monitor's Office concludes that PRPB's actions during demonstrations and protests (planned and unplanned) in the CMR-8 reporting period were consistent with generally accepted policing practices and PRPB policy. PRPB provided the Monitor's Office with Operation Plans (PPR 625.2) for the various planned demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Reports (PPR 625.3), which provided basic details of each event.

29

For this reporting period PRPB reported that it responded to 153 demonstrations and/or protests (planned and unplanned). The Monitor's Office requested a random sample of 35 cases for review. PRPB provided 31 of the 35 cases (89%) stating 4 had yet to be submitted.

The following observations are put forth regarding the reviewed files:

Of the 31 files provided, PRPB reported that 18 (58%) were identified as unplanned. In four of the cases, even though unplanned, PPR 625.2 (Operations Plan) was prepared - it understandably had minimal information, given their unplanned status; however, of the 6 demonstrations/protests (19%) that were planned, 2 (33%) had no Operations Plan.

In eight instances (26%) the demonstration did not have a designation of planned or unplanned.

It should be noted that the Monitor's Office was able to categorize those that were not classified as planned or unplanned.

It should be noted that area commanders, in the areas where demonstrations and protests took place, did provide self-assessment reports (PPR 625.6) with varying degrees of thoroughness assessing the police response. Overall, however, PRPB did not prepare a self-assessment for all demonstrations and/or protests reviewed for the reporting period. In total 19 self-assessments (61%) were prepared for the demonstrations and protests reviewed by the Monitor's Office.

The Monitor's Office observed an improvement in PRPB's preparation of PPR 625.6 (Evaluation of Strategies for the Management or Control of Crowds).

*Pathway Forward*
To achieve compliance, PRPB must ensure that DOT supervisors and area commanders thoroughly assess all law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd control situation to ensure compliance with applicable laws and PRPB policies and procedures.

This issue has been discussed with the Reform Unit previously. A variety of recommendations were provided including criteria to be assessed, debriefings with officers and the demonstrators and/or protestors, and the consistent use of after-action and self-assessment reports. Additionally, reference resources were also previously provided by the Monitor's Office.

## 4. Force Reporting

During the CMR-8 reporting period, PRPB reported a total of 802 UOFs. The Monitor's Office's assessment of PRPB's compliance with force reporting policies and procedures was based on the review of 76 randomly sampled UOF reports.

In all previous CMRs the Commonwealth's progress towards achieving compliance with UOF has been hampered by its inability to validate its UOF numbers. This issue has been raised several times by the Monitor's Office as compliance assessments of many of the paragraphs within this section of the Agreement require a comprehensive review of UOFs. The Commonwealth and PRPB, working with

USDOJ and the Monitor's Office, developed a Provisional UOF Plan to address the inconsistencies in its UOF tracking. The Provisional UOF Plan was implemented by PRPB in July 2022 and involved increased supervisory layers of review to identify and correct errors and/or discrepancies in the data entered into UOF reporting forms within PRPB's GTE system. The Provisional UOF Plan, which was reviewed and commented on by the Monitor's Office and USDOJ, was later submitted by the Commonwealth to the Court on September 22, 2022. As it relates to improving UOF reporting, during this reporting period, PRPB was able to demonstrate that it could provide accurate UOF numbers. What also aided PRPB in accomplishing this task was that AHDatalytics, the Commonwealth's contractor, developed a UOF dashboard that helped identify discrepancies within the GTE system. This assistance provided the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field and easily identified areas where UOF reporting quality was lacking.

The Monitor's Office continues to stress that adherence to reporting timelines, as established by policy, and proper report writing, are also important to ensuring PRPB moves forward with compliance. Increased staffing and supervision along with increased accountability for failing to adhere to policies, are integral to increased compliance with the paragraphs in this subsection.

## Paragraph 36: Use of Force - Force Reporting

*PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reporting is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | ☑ Met | ☐ Missed |
| 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | ☑ Met | ☐ Missed |

31

| | | |
|---|---|---|
| 4c. All failures to report use of force are referred to SARP for investigation. | ☑ Met | ☐ Missed |
| 4d. 95% of requests for medical services in connection with a use of force are within policy. | ☑ Met | ☐ Missed |
| 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | ☐ Met | ☑ Missed |
| 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | ☑ Met | ☐ Missed |
| 4g. All use of force reports are stored and maintained by SARP as required by policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the UOF policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. While training follows approved policies, no training was conducted during the reporting period.

The Monitor's Office reviewed UOF data in 76 reports during this reporting period, including STUs. It should be noted that the Monitor's Office requested 83 files; however, 7 incidents were assigned to FIU for investigation and the investigations are not complete, therefore the files were not provided.

In 74 of the 76 cases (97%) reviewed, the Monitor's Office determined that the level of force reported was consistent with the force used. The following observations are made of the report review:

- All the reports reviewed were complete except for three (4%) that had a box not checked relating to the level.
- In two cases (3%) the Monitor's Office discovered incorrect UOF levels - the levels were identified as level 1; however according to PRPB policy, they should have been level 2.
- In one incident (1%) an officer used an electronic control device twice to apply a stun and firing darts that did not make contact; however, it was recorded as a level 2 by the officer due to "no contact" in the UOF report.
- In another incident (1%) described as a UOF, it was correctly determined by the Commanding Officer that the actions of the officer did not constitute a UOF.
- In all but one case (99%) officers notified supervisors of a UOF in accordance with policy. In the exception incident two officers used justifiable force but did not report the force in a timely manner and never notified a supervisor. This case was referred to SARP.
- In the 76 UOF reports reviewed 73 (96%) were prepared and submitted in the timeframe outlined in policy. In the remaining three incidents (4%) PRPB produced documentation that the reports were flagged as late - two (3%) were one day late and one (1%) was two days late.
- All failures to report UOFs are reported to SARP for investigation.
- In all instances where medical aid was warranted, it was provided.
- The Monitor's Office can confirm that 72 reports (92%) were reviewed by a supervisor within 5 business days, as outlined in the Agreement.
- Supervisors responded to all serious UOFs.
- As it relates to STUs, 11 of the 12 reports (92%) were completed in the GTE system on time.

- All STU supervisors completed their investigation within the five-day timeframe identified in policy.

The Monitor's Office and USDOJ have continuously worked with PRPB to develop proactive measures that PRPB can undertake to ensure greater compliance moving forward.

PRPB's inability in the past to validate its UOF numbers has been a recurring problem, and one which the Monitor's Office had identified in all previous CMRs. PRPB along with the Commonwealth's contractor, AHDatalytics, has taken a positive first step to addressing this issue by taking the initiative, with the assistance of the Monitor's Office and USDOJ, to develop a Provisional UOF Plan. This plan, now implemented, places PRPB on track to having a reliable system to report valid UOF numbers, provided that all steps in the system and the layers of review built into the plan are followed.

PRPB has noted several discrepancies and errors that were found in the UOF data with the Provisional UOF Plan in place. However, PRPB working with the Commonwealth's contractor, AHDatalytics, addressed those issues. PRPB also identified several lessons learned to help remedy these errors and prevent them from occurring in the future, including:

- Holding bi-weekly meetings with the Auxiliary Superintendency of Field Operations (SAOC), Technology and Communications Bureau (NTC), the Reform Unit, FIU, and Command Center Directors.
- Providing guidance on how to complete PPR 126.2 (Complaint Card).
- Developing guidelines for when more than one unit is involved in a UOF incident.
- Continuing to improve GTE.
- Incorporating dashboards created by AH Datalytics, the Commonwealth's contractor.

It is clear from the Monitor's Office's review of the quality of force reporting in this reporting period that PRPB's implementation of the Provisional UOF Plan has resulted in some improvements.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has been encouraged with the implementation of the Provisional UOF Plan. PRPB currently has the tools to accurately track its UOFs. To continue to accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community. PRPB must continue to ensure the integrity of its UOF reporting. PRPB must also hold officers and supervisors accountable for entering UOF reports in the timeframes established by policy.

## Paragraph 37: Use of Force - Force Reporting

*The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of*

33

*the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

PRPB policy requires that all officers complete a UOF Report (PPR 605.1) in writing before the end of the shift. PRPB has made significant progress in ensuring that UOF incidents are entered into GTE on time.

PRPB has taken several positive steps towards reaching compliance with this paragraph, including:

- Implemented the following changes to UOF reporting: 1) when a member of PRPB assigned to any specialized unit is involved in a UOF incident, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2) PRPB has prohibited the use of complaint numbers with the prefix of the specialized unit in UOF incidents; and 3) PRPB's IT Bureau will take the corresponding steps to support compliance with the Commissioner's Directive. This will ensure that area commands are aware of each UOF incident in their jurisdiction.
- Implemented into practice that all UOF Reports (PPR 605.1) and Notification of UOF (PPR 605.3) be entered electronically into GTE.
- Adopted the Provisional UOF Plan with input from the Monitor's Office and USDOJ.
- Conducted an IT Needs Assessment.
- Contracted with AHDatalytics to carry out the implementation of the necessary structure identified in the Gap Analysis conducted in May 2021, as part of the PRPB reform process.

The Monitor's Office recognizes these actions by PRPB as positive steps that factored into the development of a mechanism by which PRPB can validate its UOF incident numbers.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has been encouraged with the implementation of the Provisional UOF Plan. PRPB currently has the tools to accurately track its UOFs. To continue to accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community.

## Paragraph 38: Use of Force - Force Reporting

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, whenever medical aid was warranted, it was received.

*Pathway Forward*

As previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has assessed the accuracy of the Provisional UOF Plan and has determined that PRPB is able to accurately track its UOFs in this reporting period. The Monitor's Office also assessed compliance regarding transportation and communication for medical aid.

## Paragraph 39: Use of Force - Force Reporting

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, a UOF report was submitted to the officer's immediate supervisor. The Monitor's Office determined that PRPB has made significant progress in submitting reports in the timeframe required by Bureau policy. In the 76 UOF reports reviewed 73 (96%) were prepared and submitted in the timeframe outlined in policy. In the remaining three incidents PRPB produced documentation that the reports were flagged as late - two were one day late and one was two days late. PRPB supervisors are also completing their investigation of a UOF in the time frame outlined in policy.

Regarding submission to SARP for the tracking and analysis of these UOF reports, PRPB has demonstrated that it has the capabilities to provide these functions. The Monitor's Office acknowledges PRPB's efforts towards addressing this issue with its Provisional UOF Plan which it implemented in July 2022, and the work of AHDatalytics, the Commonwealth's contractor.

*Pathway Forward*

All officers must continue to submit a copy of their UOF Reports (PPR 605.1) to their immediate supervisor and SARP for tracking and analysis. SARP must continue to maintain the data in a central location. PRPB has identified FIU to be the custodian of the UOF data.

## 5. Force Review, Investigation, and Analysis

PRPB meets the policy requirements for these paragraphs; however, PRPB's implementation in training and practice is hampered by persistent issues with its ability to track and deliver training. In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the reports

when they are deemed accurate by PRPB, which is when FIU makes a determination and enters them into the Global List.

## Paragraph 40: Use of Force - Force Review, Investigation, and Analysis

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Target #1 and bi-annually for all other Compliance Targets |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The policy incorporates all of the requirements of the policy. | ☑ Met | ☐ Missed |
| 2. Training on force reviews and investigations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 43-47 for level 1-3 uses of force.

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 48-52 for level 4 uses of force.

*Compliance Assessment*

The Monitor's Office has reviewed the policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. While training follows approved policies, 95% of officers have not been trained and certified (or are scheduled for training) in force review and investigation policies in the prescribed timeframe. Most of the reports in the reporting period, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out as per the Agreement. In these reports, pertinent information was included, fields were checked, and the reports were signed.

*Pathway Forward*

As stated in previous CMRs, UOF reports (PPR 605.1) should be consistently reviewed by SARP's FIU for completeness and accuracy as a matter of general practice. UOF reports should be closely scrutinized during the review process, given the past observations of the Monitor's Office regarding errors and omissions. Staffing has been a continuing problem within FIU. In past CMRs the Monitor's Office has

37

noted that with 18 investigators managing a substantial caseload, it is often difficult for this unit to also serve as a report review unit. The Monitor's Office was encouraged when it learned from the FIU Commanding Officer that 19 additional new personnel were assigned to the unit near the end of the reporting period. Periodic assessment of staffing within FIU should be conducted to ensure it has the adequate staffing needed to conduct level 4 UOF investigations and properly conduct quality UOF reviews.

## Paragraph 41: Use of Force - Force Review, Investigation, and Analysis

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Targets #1 and #2; annually for Compliance Target #3; and quarterly for Compliance Target #4 |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☒ Missed |
| 2. All uses of force are tracked in the tracking system. | ☒ Met | ☐ Missed |
| 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | ☒ Met | ☐ Missed |
| 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | ☒ Met | ☐ Missed |

### *Compliance Assessment*

PRPB's Provisional UOF Plan was implemented in July 2022 and based on a review of the data, PRPB has demonstrated to the Monitor's Office that it has a reliable tracking system for the CMR-8 reporting period; however, this effort needs to continue.

PRPB, in an effort to ensure UOF numbers were accurate for 2022, delegated AHDatalytics, the Commonwealth's contractor, to update and verify all numbers based on the dashboards they developed. This has allowed PRPB to provide the public with accurate information relating to UOF trends through an annual report. Further, near the end of the reporting period, the Monitor's Office

learned that AHDatalytics, the Commonwealth's contractor, was also working on a public facing UOF dashboard that would allow community members to interact with UOF data.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has assessed PRPB's compliance and implementation of the Provisional UOF Plan in this report. The Monitor's Office will continue to review the activities associated with this paragraph to ensure that the improvements made to UOF reporting and tracking are sustainable. Further, the Monitor's Office looks forward to the release of the public UOF dashboard.

### Paragraph 42: Use of Force - Force Review, Investigation, and Analysis

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations.

*Compliance Assessment*

As stated in previous CMRs, PRPB revised, but has not implemented, its Annual Performance Evaluation of the Rank System (PPR 310.1) form to include criteria for evaluating supervisory reviews of UOFs by members under their command or provided training on this matter. The UOF Section of the evaluation (Supervisors Section) addresses what is required in the Agreement per paragraph 42.

The related policy, GO 310 (Performance Evaluations), has been approved by the Commissioner, but training has yet to be provided, which means that the revised evaluation system has yet to be implemented, and therefore PRPB is not compliant.

*Pathway Forward*

This performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

39

## 6. Supervisory and FRB Reviews

This performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

### Paragraph 43: Use of Force - Supervisory and FRB Reviews

*A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

#### Compliance Targets

Note: This Paragraph is assessed with Paragraphs 48-52.

#### Compliance Assessment

Of the 76 UOF reports (PPR 605.1) reviewed by the Monitor's Office during the reporting period, the Monitor's Office found no instances in which a supervisor failed to respond to a serious UOF. The Monitor's Office acknowledges PRPB's efforts towards addressing this issue with the Provisional UOF Plan.

#### Pathway Forward

PRPB should continue to document that a supervisor responds to the scene of a serious UOF or allegation of excessive force involving an officer under his/her command upon notification of the incident. Furthermore, as previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate reliable and valid UOF data collection. The Monitor's Office will continue to assess PRPB's ability to track UOFs accurately in future CMRs.

### Paragraph 44: Use of Force - Supervisory and FRB Reviews

*The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

40

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met  ☐ Missed |
| 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | ☑ Met  ☐ Missed |
| 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met  ☑ Missed |
| 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | ☑ Met  ☐ Missed |
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | ☑ Met  ☐ Missed |
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met  ☐ Missed |
| 5a. 95% of reviews by Force Review Boards are within policy. | ☑ Met  ☐ Missed |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | ☑ Met  ☐ Missed |
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met  ☑ Missed |

*Compliance Assessment*

Policies incorporate all requirements of the paragraph. Training on force reviews and investigations for supervisors is also consistent with approved policies. 95% of supervisors are trained and certified in force reviews and investigation policies but have not been re-trained as outlined in the Agreement.

Of the 76 UOF reports (PPR 605.1) reviewed by the Monitor's Office, the Monitor's Office found no instances in which a supervisor failed to conform to what was required by policy. The Monitor's Office confirms that 95% of FRB reviews are within policy. The high level of compliance in properly assessing level of force and the quality review of force by supervisors in the sampled investigations reviewed, allows the Monitor's Office to verify the accuracy of the information related to UOFs provided by PRPB. However, the Monitor's Office was unable to confirm that SARP is analyzing FRB determinations and recommendations per the Agreement.

41

*Pathway Forward*

As noted in other related paragraphs, compliance with this paragraph is largely contingent on PRPB's ability to accurately track all UOFs, ensuring that the Monitor's review of UOFs is representative. As such, the Monitor's Office has assessed compliance with this paragraph in CMR-8. The Monitor's Office will continue to assess PRPB's compliance with UOF review procedures (meeting the five-business day review period) and ensuring that they contain the appropriate information and justifications.

## Paragraph 45: Use of Force - Supervisory and FRB Reviews

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

All the reports reviewed were conducted within the identified timeline and report content does align with PRPB policy and Agreement language.

*Pathway Forward*

PRPB must ensure all UOF incidents are investigated in the time allotted as required by GO 605 (Report and Investigation of UOF Incidents).

The Monitor's Office continues to stress the importance of re-training supervisors on their roles and responsibilities in conducting UOF reviews and increased accountability for failing to adhere to the policy.

## Paragraph 46: Use of Force - Supervisory and FRB Reviews

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

### *Compliance Assessment*

PRPB provided the Monitor's Office a list of 75 officers assigned to the 13 Area Command FRBs. As required by the Agreement, FRB members are of varying assignments and rank. The random sample included 1 commander, 1 inspector, 3 captains, 6 first lieutenants, and 11 second lieutenants. The Monitor's Office requested the training and certification records of 22 randomly selected officers from this list to determine if they are qualified to serve on these boards as outlined in GO 502 (Evaluation Boards of Incidents of UOF).  In 8 (36%) of the training files, FRB members had not been trained on GO 502. It should be noted that a review of the records of those who had training, and in some cases re-training, revealed that the training took place over three years ago.

In addition, the Academy has not finalized the training curriculum for FRB members. It was expected, based on the Monitor's Office's conversation with Academy personnel, that the training would be available in the latter part of 2022; however, a review of training indicates that no training has taken place. This training is necessary to ensure that FRB members are conducting evaluations as outlined in PRPB policy.

For the purposes of determining compliance with this paragraph, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command FRBs for the CMR-8 reporting period. PRPB provided a list of 113 UOF cases evaluated by FRBs, of which the Monitor's Office randomly selected 36 cases for review. Two of the cases were duplicates, bringing the requested number of case files to 34.

The Monitor's Office emphasizes that PRPB needs to develop a single source database for all UOF cases that are evaluated by the 13 Area Command FRBs. Currently global information on FRB evaluations is prepared upon request of the Monitor's Office for its CMRs.

In 22 of the 34 cases (69%) documentation was provided that the case was evaluated by the FRB. In these cases the Monitor's Office determined that the Board took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation.

The Monitor's Office offers the following additional assessments of the information provided:

- In three cases (14%) the Board ordered re-training.
- In 20 cases (91%) where the Board completed PPR 502.1 (Assessment of Incident of UOF) the Board's evaluations were unanimous.
- Two case files (9%) were returned by the Board due to missing or incomplete information.
- In one case (5%) PPR 502.1 was not provided.

Based on the review of the randomly selected Area Command FRB files, there were no reported referrals, nor was any such need uncovered. It should be noted that the Monitor's Office has seen improvement in the Area Command FRB's UOF evaluations. With the digitizing of files at the end of the previous reporting period, the information and data provided by PRPB, and its FRBs was very precise.

It should also be noted as per GO 502 (Evaluation Boards) that the FRB has 15 days, once the meeting convenes, to complete their evaluation. This period can be extended by 15 days if the report is returned. Based on the documents provided, the FRBs complied with the timeline to complete their evaluation in most cases. PRPB should ensure that the Area Command FRBs complete their evaluations within the timelines provided in GO 502 (Evaluation Boards of Incidents of UOF) for each evaluation.

During the reporting period the Monitor's Office conducted site visits to six area commands (Ponce, Aquadilla, Utuado, San Juan, Carolina, and Bayamon). The purpose of these visits was to meet with FRB Presidents. Some common concerns voiced by the members include:

- The need to identify and train alternate members for the boards.
- The need for retraining of current board members.
- The on-time preparation of the UOF Report (PPR 605.1). Many of the boards had trouble ascertaining when the UOF report was prepared as the date changes each time the report is amended. This issue was brought to the attention of PRPB IT by the Monitor's Office after the Monitor experienced similar issues.

### Pathway Forward
The Monitor's Office will review PRPB's updated training for FRB members and observe training once conducted to ensure that it adheres to the Agreement. Further, the Monitor's Office notes that compliance with this paragraph is also affected by PRPB's ability to accurately track and report on UOFs, as with many of the paragraphs in this section. PRPB needs to ensure that its record keeping relating to UOF evaluations by the FRB is complete and accurate.

## Paragraph 47: Use of Force - Supervisory and FRB Reviews

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 44.

### Compliance Assessment

PRPB policy clearly dictates the actions that the Board and FIU must take when reporting misconduct to the appropriate investigative unit or to PRDOJ. During the CMR-8 reporting period FIU referred one case to PRDOJ and its investigative arm, NIE. The Superintendent is being made aware of referrals as outlined in the Agreement.

The Monitor's Office reviewed nine cases involving an accidental discharge, four of which (44%) resulted in an officer sustaining an injury during the reporting period. In all these cases FIU recommended that an administrative investigation be conducted and forwarded the cases to SARP. These cases, when investigated by FIU, are categorized as non-use of force.[3]

### Pathway Forward

In the instances where FIU investigates a UOF and determines that it was an accidental discharge and not a UOF, the case must be immediately forwarded to SARP upon completion of the investigation, and the eventual disposition should be included in the FIU file. The designation of UOF should not be applied. The Monitor's Office also recommends that FIU continue to document all such cases.

## 7. FIU Investigations and Force Reviews by SFRB

As indicated in previous CMRs, FIU is required to investigate all serious UOF incidents, among other investigations across Puerto Rico, including both intentional and accidental firearm discharges involving

---

[3] Additional detail can be found in Section IX: Civilian Complaints, Internal Investigations, and Discipline

PRPB personnel. During the CMR-8 reporting period there were 72 UOF cases where investigations were initiated by FIU.

In previous CMRs, the Monitor's Office has voiced concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. In reviewing FIU investigations for CMR-8, the Monitor's Office has seen continued improvement in this area, including locating civilian witnesses, sketches of the crime scene, and locating and using camera evidence to make a determination. In addition, FIU, upon completion of their investigation into an accidental discharge, now immediately forwards the case to SARP for administrative investigation. Nevertheless, the Monitor's Office remains concerned regarding the amount of time FIU is taking to complete its investigations. Documentation provided by PRPB indicates that only 13 cases (18%) of the 72 investigations initiated during the CMR-8 reporting period were completed within the 45-day deadline as required in GO 113 (FIU). However, while still low, this is a significant increase in percentage from previous CMRs and was boosted by efforts of FIU personnel in the latter period of CMR-8 (January through March 2023) to increase the number of cases closed in the timeframe outlined in policy.

As in past CMRs, these delays in concluding FIU investigations have prevented the Monitor's Office from reviewing sufficient FIU investigations to reach a compliance assessment. FIU investigations tended to overrun the 45-day deadline, and thus were not closed in sufficient time to provide to the Monitor's Office for review during the same reporting period that the incident occurred. To address this issue, and to better determine if FIU was properly investigating serious UOFs, as outlined in the Agreement, the Monitor's Office pivoted to requesting FIU investigations that were closed during the reporting period, rather than investigations that were opened during the period. The Monitor's Office thus requested a list of all FIU investigations that were completed in the CMR-8 reporting period, irrespective of when the incident occurred that prompted the opening of the investigation. FIU reports indicate that during the reporting period, 60 cases were closed, 13 of the cases (22%) reviewed were completed within 45 days, and some dated back over two years to 2021. Limited staffing, along with reliance on external stakeholders to process evidence continues to be noted as contributing factors to the timeliness of these investigations. However, it should be noted that during the latter part of the period under review, an additional 19 officers were assigned to FIU. This addition of officers going forward should result in more investigations being completed in the time frame as outlined by policy.

As it relates to the CFRB, the Monitor's Office continues to have concerns about the Board's ability to complete its UOF evaluations within the timelines required in GO 502 (Evaluation Boards of Incidents of UOF). PRPB needs to ensure that all UOF evaluations are completed in a timely manner as per policy.

## Paragraph 48: Use of Force - FIU Investigations and Force Reviews by SFRB

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent,*

*his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for FIU officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4. All officers assigned to FIU meet eligibility requirements. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the UOF policies and found that they meet the requirements of the Agreement. Regarding FIU training, the Monitor's Office conducted a site visit to FIU in February 2023 and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices.

FIU is responsible for investigating serious UOFs, including a) accidental and intentional firearm discharges, b) UOF by supervisors above the rank of sergeant, c) UOF at protests, and d) any other UOF deemed appropriate by the Commissioner. The Monitor's Office confirmed that previously recommended additional training on intentional and accidental firearm discharge investigations had been developed and commenced. This was verified by documentation provided by the FIU Commanding Officer. However, to date 21 members of FIU have not been trained, which places PRPB below the 95% threshold. Nineteen of the twenty-one (90%) are recently assigned officers to FIU. To address this issue the FIU Commanding Officer has asked the Academy to schedule two training sessions this summer for FIU personnel.

All officers assigned to FIU meet appropriate eligibility requirements.

### Pathway Forward

PRPB should ensure that all FIU members are trained in a timely manner. The Monitor's Office will continue to review training records of newly assigned personnel to FIU to ensure that PRPB has trained all members on investigating intentional and accidental firearm discharges and all other required training and re-training.

## Paragraph 49: Use of Force - FIU Investigations and Force Reviews by SFRB

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | ☑ Met | ☐ Missed |
| 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | ☐ Met | ☑ Missed |
| 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |
| 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | ☑ Met | ☐ Missed |
| 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | ☐ Met | ☑ Missed |
| 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☑ Missed |

### Compliance Assessment

During the CMR-8 reporting period, FIU reported conducting 72 investigations of which 13 (18%) were completed within the 45 days as prescribed by policy.

### Accidental Discharge Investigations

The Monitor's Office conducted site visits to FIU in December 2022 and February 2023. During the visits, nine accidental discharge files were reviewed. The following is a breakdown of the incidents during the reporting period:

- In four of the incidents (44%) the officer suffered self-inflicted wounds.
- In four incidents (44%) the officer was carrying their weapon unholstered.
- One incident (13%) involved the use of an unapproved holster.
- All nine incidents (100%) took place outside of a police facility.

48

- In eight incidents (89%) the officer was off duty.
- All completed investigations have or will be referred to SARP by FIU for an administrative investigation.

As previously stated, the issue of accidental/negligent discharges has been a reoccurring problem identified in previous CMRs. While PRPB has taken appropriate actions in these cases it does not appear that it has looked at the underlying issues that contribute to the problem, such as training. It should also be noted that four of the incidents (44%) were in direct violation of Bureau policy and involved the carrying of a weapon unholstered.

## Closed FIU Investigations

To review cases closed by FIU, the Monitor's Office requested a random sample of 30 cases closed by FIU during the CMR-8 reporting period, five (17%) of which occurred in the CMR-8 reporting period.

The Monitor's Office reviewed the 30 investigations for the purpose of assessing FIU's compliance with the Agreement and with PRPB policies relevant to conducting investigations.

The following are general observations of the cases reviewed:

- In three cases (10%) the FIU investigation was completed within 45 days as outlined in policy.
- FIU continues to show significant improvement in how it conducts its investigations. FIU investigators made numerous efforts to locate cameras in the area and possible witnesses. In addition, sketches were provided on all firearm discharges.
- Accidental discharges are no longer categorized as a UOF by PRPB once investigated.
- All FIU UOF reviews and investigations reached reasonably justified conclusions on the officer's conduct in accordance with policy.
- The five intentional firearm discharge (Level 4) investigations reviewed by the Monitor's Office were found to be within Bureau policy and all required documents were in the files.

As previously stated, the fact that 27 of the cases (90%) requested for review by the Monitor's Office were not completed in the 45 days as outlined in GO 113 (FIU) is a concern to the Monitor's Office. The lack of closed files for the Monitor's Office to review relating to UOF cases that occurred during the reporting period also impacts the compliance ratings of paragraphs 49-51.

## CFRB Investigations

As it relates to CFRB meetings, many of the cases evaluated by the Board involve serious UOFs. PRPB needs to outline the protocol as to how these meetings should be conducted. The Monitor's Office recommends that each Board member should be fully versed in the details of the incident prior to the board meeting. This will allow for healthy discussion between the Board members. To that end, all Board members now have access to FIU investigation files which have been digitized for review purposes.

Another area of concern relating to FIU involves the investigation of UOF by members of the Bureau above the rank of sergeant, which by policy, requires FIU to conduct the investigation. In past CMRs it was stated that the lack of supervisors, specifically sergeants in the field, required lieutenants, to some

degree, to carry out the functions of a sergeant, one of which is assisting officers effecting arrest, and in doing so in some instances using lower levels of force. To some degree this will be addressed due to the promotion of 533 sergeants during the reporting period. However, the Monitor's Office still recommends that supervisors of a higher rank from the respective area commands investigate lower levels of force by supervisors from the rank of sergeant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRPB Members).

In the reporting period FIU investigated 11 cases where supervisors above the rank of sergeant used lower levels of force to effect an arrest. This number represents 15% of cases opened by FIU.

PRPB has not provided documentation that CFRB determinations and recommendations are tracked and analyzed by SARP.

*Pathway Forward*

PRPB must ensure that prompt notification is made to FIU in cases regarding their involvement. For the most part, this was the case. FIU must complete its UOF investigations within the 45-day time outlined in GO 113 (FIU). PRPB must also ensure that FIU has adequate personnel to conduct its investigations and that all personnel have completed all necessary training to meet timelines relating to investigating serious UOFs.

FIU has limited personnel to respond and investigate serious force by PRPB members throughout the Bureau, a possible option would be, as previously stated, that PRPB allow supervisors of a higher rank from the respective area commands to investigate lower levels of force by supervisors from the rank of sergeant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRPB Members).

CFRB must complete its reviews within the time allotted in GO 502 (Evaluation Boards of Incidents of UOF). PRPB should also consider having either the FIU Commanding Officer or the FIU Executive Officer attend all CFRB meetings for the purpose of presenting the case to Board members and to answer any questions members may have regarding the cases to be discussed. The Monitor's Office confirmed with the FIU Commanding Officer that personnel from the unit are attending the CFRB meetings.

## Paragraph 50: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

In all cases where FIU determined that the UOF may involve criminal conduct by an officer, PRDOJ was notified along with its investigative arm, NIE. The Monitor's Office confirmed through a review of FIU data that there was one such referral.

*Pathway Forward*

The Monitor's Office will continue to assess this paragraph in CMR-9. The review of referrals demonstrates compliance; however, the Monitor's Office would expect PRPB to demonstrate continued compliance with this paragraph. Further, the Monitor's Office will continue to review such cases to assess consistency in PRPB practice.

## Paragraph 51: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

For the CMR-8 reporting period PRPB reported that FIU conducted 72 UOF investigations. In only 13 of those cases (18%) had FIU completed its investigation in the 45-day timeline established by policy. Given the lack of completed investigations that occurred in the reporting period, the Monitor's Office can determine that FIU is not compliant with this paragraph. However, it should be noted that the percentage of cases closed within Bureau policy has increased significantly.

51

In further discussions with FIU, investigators noted that the root cause for failing to complete the investigation in the allotted time continues to be a delay in receiving the results of forensic and evidentiary material, e.g., video, photographs, and other evidence recovered at the scene of serious UOFs in a timely manner. This is the information FIU needs to make its determination. In these cases, FIU must rely on other PRPB units and DSP to complete their tasks before the investigation can be closed. In past reviews of FIU cases, the Monitor's Office has noted that FIU does make multiple requests for this information. This low level of data provision is of major concern to the Monitor's Office. The fact that 82% of cases investigated by FIU for the CMR-8 reporting period were not closed in the 45 days as outlined in policy clearly indicates that PRPB is not compliant with this paragraph. Once an investigation is complete, FIU does prepare the required report for CFRB review and analysis. To address this issue PRPB may want to consider providing FIU with the ability to make preliminary findings in those cases where the forensic results will not be pertinent in determining FIU's conclusion. These findings could have a statement attached indicating that it is preliminary and may change as information and analysis of evidence is completed.

*Pathway Forward*

PRPB should ensure that all FIU investigations are completed in 45 days, as outlined in GO 113 (FIU). PRPB must ensure that FIU has adequate staff and resources to complete these investigations. Further PRPB must work with internal DSP units and external stakeholders to address FIU's inability to receive forensic data in sufficient time to complete its investigations in 45 days as required by policy.

It should be noted that this issue has been ongoing since CMR-1 and PRPB continues to lag in the timeliness of its FIU investigations. As noted in the January 2022 status conference, compliance with the Agreement is not solely the responsibility of PRPB and falls on the shoulders of the entire Commonwealth and its government entities. The Commonwealth should examine the issues stemming from FIU's inability to close an investigation within 45 days and develop a plan to address such issues in the near term. This plan should be shared with the Monitor's Office and USDOJ. Failure to address this issue negatively affects compliance with various paragraphs in this subsection of the Agreement and will continue to stall PRPB's progress.

## Paragraph 52: Use of Force - FIU Investigations and Force Reviews by SFRB

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2022 – March 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

## Compliance Assessment

CFRB members have some training, but it is not current. SAEA has not updated the curriculum based on the revised GO 502 (Evaluation Boards). The Monitor's Office looks forward to reviewing the updated training curriculum and notes that the development of this updated curriculum has lagged substantially.

PRPB provided the Monitor's Office with documentation that FIU closed 60 investigations during the reporting period and forwarded the cases to CFRB for evaluation. The Monitor's Office requested a random sample of 29 cases evaluated by the Board for review. PRPB provided the case files for all cases except for two that the Board sent back to FIU for additional investigation; however, only 20 (72%) contained documentation the Board had evaluated the incident and completed their evaluation. Of those 20 cases reviewed, only 1 (5%) was within the 30 days as outlined in Bureau policy.

Based on documentation submitted for the remaining seven cases (24%), the CFRB has not completed their evaluation. In all cases evaluated, the Monitor's Office determined that the CFRB reviews were objective.

The following observations are put forth as a result of the review:

- Nineteen evaluations (95%) exceeded the 30-day timeline for evaluation identified in GO 502 (Evaluation Boards of Incidents of UOF).
- One evaluation (5%) was concluded within the 30-day timeline.
- All 20 cases (100%) requiring evaluation reports PPR 502.1 (Assessment of Incident of UOF) and PPR 502.2 (Determination of Incident of UOF) did include the required reports.
- Of the remaining seven cases (24%) where there was no PPR 502.1 or .2, the indication is that they have yet to be reviewed by the Board; therefore, a determination as to whether the cases had been discussed is not possible.
- In the 15 cases (75%) reviewed by the Monitor's Office the Board's findings were unanimous.
- There were six instances (30%) in which the CFRB directed re-training.
- In 27 of the 29 cases (93%) FIU provided a complete investigative file to CFRB for evaluation.
- Twenty cases (69%) had signed PPR 502.1s.
- Eight of the twenty cases reviewed (40%) were returned due to incorrect or incomplete and/or missing information.
- One case (5%) was referred to SARP for an administrative investigation.

- One case (5%) was identified as a non-UOF (a K-9 properly kenneled at the officer's house escaped and bit a construction worker in the vicinity of the officer's house.)

The Monitor's Office requested the training certification records of the three CFRB members, as well as any other person who may have served on the CFRB during the CMR-8 reporting period. This information serves to determine whether CFRB members are qualified to serve on the Board, as outlined in GO 502. The Monitor's Office was informed by PRPB personnel that the information provided to the Monitor's Office for the FRB members also applies to CFRB members which is that the training is still in development, therefore training has yet to be provided to Board members. In conversations with the Monitor's Office, PRPB has acknowledged its shortfalls in the evaluation of cases investigated by FIU. The Monitor's Office has also not received documentation that the CFRB is submitting completed evaluations to SARP for tracking and analysis.

*Pathway Forward*

Issues with the timeliness of these evaluations do not appear to be a result of staffing shortages. It is imperative that PRPB and CFRB members commit to completing these evaluations in the timelines established in policy. PRPB should also ensure that all officers serving on the CFRB have training certifications. The Monitor's Office will review the training curriculum developed based on the revised policy.

## 8. Use of Force Training

The Monitor's Office finds that PRPB is partially compliant with the paragraphs of this subsection of the Agreement which stipulates that all trainings must be consistent with policies and the Agreement and that all personnel must be trained and certified on UOF policies. While all training curriculums are consistent with policies and the Agreement, PRPB has not provided ample documentation to show that the training delivery compliance thresholds have been met. Regarding other training requirements, such as those noted in paragraphs 53 and 55, PRPB has not yet reached the 95% compliance threshold in the review of the random sample provided by PRPB.

### Paragraph 53: Use of Force - Use of Force Training

*PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:*

*a) legal standards for reasonable force;*

*b) PRPD's use of force policy;*

*c) reporting use of force, requesting medical service, and preserving evidence;*

*d) scenario-based training and interactive exercises that illustrate proper use of force decision-making;*

*e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;*

*f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

*g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;*

*h) factors to consider in initiating or continuing a foot pursuit; and*

*i) appropriate training on conflict management.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | ☒ Met ☐ Missed |
| 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☒ Missed |

### Compliance Assessment

PRPB recently updated all UOF policies and, as a result, developed new UOF training curriculums on these policies. The Monitor's Office's previous review of related training on UOF was found to be consistent with approved policies and requirements of the paragraph. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has not met the 95% threshold for the re-training of officers on the relevant UOF policies (REA 601 Rules for UOF and REA 605 Report and Investigation of UOF). According to documentation provided by PRPB, only one officer was retrained on UOF during 2022.The Agreement states that PRPB must re-train it's officers every year. PRPB also has not provided additional training on intentional firearm discharge investigations for FIU personnel.

### Pathway Forward

The Monitor's Office will review the updated UOF training curriculums and ensure continued compliance with this paragraph. The training on UOF, specifically the topics noted in this paragraph, should also be incorporated into in-person scenario-based training to ensure that officers understand the policy requirements and the practical application of such procedures.

## Paragraph 54: Use of Force - Use of Force Training

*PRPD shall provide an appropriate firearm training program that:*

*a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis;*

*b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms;*

*c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program;*

*d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and*

*e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | ☒ Met   ☐ Missed |
| 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | ☐ Met   ☒ Missed |

*Compliance Assessment*

The Monitor's Office notes that paragraph 54 establishes a high bar for compliance, and therefore requires full access to data on firearms training. The number of officers trained does not suffice to demonstrate that 100% of officers are trained and  certified on the use of firearms during 2022.

The Monitor's Office found that PRPB's policies relating to firearms qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the previous reporting period. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the previous reporting period. PRPB provided a list of 1,922 personnel who qualified with their service weapon during 2022 in day light fire. The daytime firing qualifications commenced in November 2022 and was not completed as required by the end of 2022.

The Monitor's Office selected a random sample of 119 officers and requested their certified training records to verify that officers were qualified with their service weapon for the CMR-8 reporting period. A review of the training files confirmed that all officers were qualified. The Monitor's Office also noted that 275 officers required re-training (same day) to be certified and that no officer failed the qualification re-test or was relieved of operational duty according to PRPB documentation. SARP also provided documentation that there were no investigations conducted relating to officers failing to qualify on their weapons. All officers with more than one regulation firearm were qualified on all firearms.

*Pathway Forward*

PRPB must create and maintain a "master list" which includes all sworn personnel and their status as it relates to firearm training. PRPB must work with the Monitor's Office to grant the Monitor direct access to PTMS or other structured data sources so that the Monitor's Office can directly verify rates of firearm certification and justifications for all officers that are not currently certified.

## Paragraph 55: Use of Force - Use of Force Training

*PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:*

*a) requesting medical services and determining the appropriate use of force reporting levels;*

*b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;*

*c) ensuring proper collection of evidence;*

*d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;*

*e) assessing the legality and appropriateness of a detention and subsequent arrest;*

*f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative*

*accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;*

*g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and*

*h) report writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Annually |

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

### Compliance Assessment

The Monitor's Office verified that 95% of supervisors, FIU personnel, and command personnel have not been re-trained on the relevant courses (REA 601 Rules for UOF and REA 605 Report and Investigation of UOF) within the last year as required by the Agreement.

Some FIU personnel have completed advanced training related to investigating intentional firearm discharges (Level 4 UOF). The FIU Commanding Officer informed the Monitor's Office that including recently assigned members, 21 require the additional training. The lieutenant further reported that to complete the training a request was made directly to the Academy.

This additional training was in response to the Monitor's Office's previous CMRs and recommendations, which identified significant deficiencies in FIU's firearm discharge investigations (Level 4 UOF).

### Pathway Forward

Given the nature of the important work conducted by FIU, it is imperative that they receive all required training and that this training is periodically updated as needed. The work of the CFRB plays a pivotal role in identifying the training needs of FIU as they evaluate all FIU investigations and are in the best position to uncover deficiencies in training. The Monitor's Office will continue to assess training compliance with target two through random training record reviews.

## 9. Responding to Behavioral/Mental Health Crisis

As stated in previous CMRs, it is critically important to have Crisis Intervention Team (CIT) trained officers throughout the 13 area commands. Since the conclusion of the pilot project, PRPB has yet to expand CIT coverage outside of Arecibo. Issues garnering personnel interest in the position has presented difficulties in creating CIT programs in other areas. One of the challenges is that currently the training (40 hours) for CIT certification is only conducted at the Academy, which may discourage potential volunteers from the outlying area commands. Officers from those commands may have as much as a two hour daily commute each way to complete the required training. PRPB has informed the Monitor's Office that it is considering offering the training program in the field across different parts of the island. To date, PRPB reports that 83 agents have been interviewed for the CIT officer position.

During the March 2023 site visit the Monitor's Office conferred with the Bureau-wide CIT Coordinator who related the following information:

- There have been no new CIT certified officers trained outside of those assigned to Arecibo.
- Of the 83 who applied to be CIT officers 62 (76%) received favorable evaluations from the psychologist. Others either did not follow through with the process or did not receive a favorable evaluation. This was also verified via a report sent to the Reform Unit.
- The curriculum for CIT training is currently under review.
- It is expected that the next expansion of CIT will take place in Carolina with San Juan, Humacao, Caguas, and Mayaguez to follow.
- Utuado has initially reported that 18 officers assigned to the area command have indicated an interest in becoming a CIT officer.
- The Academy has committed four weeks in May and June 2023 for CIT officer training, which was verified by the Academy training schedule. It is expected that during that period as many as 60 officers will be trained.
- Currently in Arecibo 3 of the 14 certified (21%) CIT Officers have been promoted to sergeant; however, they currently remain assigned to the area command and continue to serve as CIT officers. Three additional officers have been transferred to specialized units (two to the CIC investigative unit and one to motorized). They also continue to serve as CIT officers.

As PRPB expands its CIT program it should use the feedback and analysis of the pilot conducted in Arecibo to form its approach and implementation of CIT in other areas. In response to the January 2022 status conference, the Court ordered PRPB to establish a committee tasked with conducting an evaluation of the CIT pilot in Arecibo.

The expansion of CIT officers to other area commands and the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving individuals in crisis, especially those related to "Ley 408" (court ordered involuntary commitment).

Another concern is the reporting of interactions with individuals in crisis, specifically those involving Ley 408. Up to and including the CMR-7 reporting period, PRPB relied almost entirely on information provided in PPR 621.2 (Report of Other Incident of Services). PRPB is currently relying on PPR 628.1 (Crisis Intervention Incident Report) and the Commonwealth's contractor AHDatalytics' dashboard to identify interactions with persons in crisis. PRPB needs to ensure that PPR 628.1 (Crisis Intervention Incident Report) is prepared by all officers in incidents involving individuals in crisis. During the reporting period PRPB worked with AHDatalytics, the Commonwealth's contractor, to create an audit verifying whether a crisis intervention incident report (PPR 628.1) was created for any incident with a corresponding UOF report that had identified the subject as having a "mental/psychiatric history" or involved a 408 Ley Committal Order. The dashboard once implemented provided the Reform Office with 24/7 access to this information which is automatically updated daily and is broken down by area command, zone, precinct, and district.

PRPB needs to expand the system to where all PPR 621.2 (Other Information) that are not currently captured in a UOF or Ley 408 is queried to determine if the subject of the report is a person in crisis. Until that time, PRPB cannot demonstrate that they are reporting an accurate number of interactions with persons in crisis. This has been an area of discussion that the Monitor's Office and USDOJ have had with PRPB and the Commonwealth's contractor, AHDatalytics.

## Paragraph 56: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:*

*a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.*

*b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.*

*c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4. Training on crisis intervention for CIT officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | ☑ Met | ☐ Missed |
| 6. 100% of all officers assigned to CIT meet eligibility requirements. | ☑ Met | ☐ Missed |
| 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | ☐ Met | ☑ Missed |
| 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

The Monitor's Office has reviewed the CIT policies and trainings and found that they meet the requirements of the Agreement. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially, but it is also vital. The officers selected to be

certified as CIT officers (40 hours of training) will continue in their normal capacity as patrol officers. PRPB expects that approximately 180 additional officers will be selected and trained.

During the previous reporting period, USDOJ and the Monitor's Office observed a portion of the REA 628 (CIT) training. The Monitor's Office found the training to be dynamic, knowledge-based, and employed several adult learning techniques, including participation through questions and exercises. While the training has a strong foundation, USDOJ and the Monitor's Office did provide some recommendations to further strengthen the training, such as incorporating more experiences and scenarios from Puerto Rico and providing attendees with hardcopies of the PowerPoint presentation for note taking. If PRPB carries out its plan to train CIT officers in May and June 2023 as reported, the Monitor's Office will observe the training.

PRPB provided documentation that no training of officers on the basic "Intervention with Persons in Crisis" course took place during the CMR-8 reporting period. The Academy similarly reports that all PRPB officers have not yet received the eight-hour basic CIT training. As noted in various sections of this CMR, virtual training was halted when issues relating to the integrity of the training were brought forth. As such, no virtual training was conducted during the CMR-8 reporting period.
In February 2022 at a meeting with PRPB, facilitated by USDOJ, several aspects were discussed that needed to be part of the evaluation of the pilot project, including restatement of the objectives of the program, identification of the necessary skills of CIT officers, and the goals with which to evaluate the program.

PRPB worked with USDOJ and the Monitor's Office to establish an evaluation committee as ordered by the court for the purpose of identifying potential evaluation methods and performance measures to gauge the impact of the Arecibo Pilot Program and to assist in the implementation of CIT Bureau-wide. The evaluation committee is made up of members from PRPB along with outside personnel with experience in the mental health field. The Monitor's Office as well as USDOJ have participated in evaluation committee meetings.

In August 2022 PRPB provided the Monitor's Office and USDOJ with a draft prepared plan, Methodology and Evaluation of the Crisis Intervention Team, that outlines PRPB's efforts in developing crisis intervention teams within PRPB and the need for such services. Also discussed in the document was the Arecibo Pilot Program, which included the sections, Internal Analysis of Weakness of the CIT Pilot Program and Internal Analysis of Strengths of the CIT Pilot Program. While the Monitor's Office appreciates PRPB's efforts in developing the document, as it relates to the Arecibo Pilot Program, the information is not supported by data collected during the project, which the Monitor's Office considers to be a key requirement in identifying needs and expectations when the project is expanded to other area commands throughout the Bureau. USDOJ also provided several recommendations on the draft plan including more clearly articulating CIT goals, including external team members in CIT, and setting timelines, which the Monitor's Office concurred with.

While the CIT Pilot Program has not been expanded yet, the Monitor's Office has confirmed that all officers currently in a CIT role are trained and retrained in CIT and meet eligibility requirements.
For the CMR-8 reporting period, PRPB reported 254 cases of interactions with persons in crisis. A random sample of 57 cases was selected by the Monitor's Office for review. The source of data for

documenting the Bureau's interactions with persons in crisis consisted of PPR 628.1 (Crisis Intervention Incident Report). PRPB needs to review its data relating to interactions with persons in crisis to ensure accurate reporting. As a result of this case review, the Monitor's Office makes the below observations:

- Thirty-two cases (56%) involved Ley 408 (Court Ordered "Involuntary Commitment").
- In almost all cases 56 (98%), PPR 628.1 (Crisis Intervention Incident Report) was prepared.
- In one of those cases a PPR 628.1 (Crisis Intervention Incident Report) was not filled out.
- In the 57 cases reviewed none of the officers who handled the incidents were certified CIT officers.
- In 13 (23%) of the cases officers used force to subdue the subject. In most instances, electronic control devices were used.

*Pathway Forward*

The Monitor's Office looks forward to working with PRPB as it continues to evaluate the Arecibo CIT Pilot Program and expand the CIT program to the remaining areas. The Monitor's Office, as in previous CMRs, requests that PRPB provide documentation that cadets are being trained in CIT at the Academy as reported and that future classes will receive the 40-hour CIT training as part of required training to graduate. PRPB should develop a plan to weave some of these officers, as they gain patrol experience, into the CIT program. To date PRPB has provided training records for Academy Classes 227 through 233, verifying that they have successfully completed the 40-hour CIT training.

As previously stated, PRPB's policy to send district/precinct officers to comply with Act 408-2000 orders (involuntary admission to a hospital for psychiatric evaluation) by the court should be reviewed. In the random sample for the CMR-8 reporting period, 56% of calls for persons in crisis involved such orders and many have resulted in an electronic control device, or some other non-lethal weapon or force being used against the subject. Using a trained CIT officer in these circumstances may result in less UOF. The Monitor's Office recommends that once the CIT program has been expanded to other area commands, a protocol should be established that calls for service relating to involuntary committal (Ley 408) be handled by on-duty CIT officers, when possible.

PRPB currently has an insufficient number of CIT trained officers or applicants to expand the CIT program to the remaining 12 area commands. To address this issue the Monitor's Office continues to recommend PRPB consider adding a transfer component that would allow officers that agree to participate in the program, are subsequently accepted, and successfully complete the training, to select their area command of choice.

To this point, the only training provided to dispatchers is the 8-hour course provided for field personnel. PRPB needs to specify if it has developed a course specific to dispatchers regarding how to route crisis calls to on duty CIT officers.

## Paragraph 57: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of shifts have at least one CIT-trained and certified officer. | ☐ Met | ☑ Missed |
| 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Training on the CIT program for field operations officers is evaluated as part of the basic behavioral health training in Paragraph 56.

*Compliance Assessment*

As determined in previous CMRs, PRPB implemented a CIT Pilot Program in Arecibo which concluded in November 2020. Fifteen officers from Arecibo participated in the training as CIT officers. The training for CIT officers took place at the Academy during a previous reporting period. Officers were required to pass a written exam at which point they could proceed to the scenario-based training segment. The course, Intervention Team in Crisis (CITE 8061), consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office.

PRPB has also selected CIT coordinators in all area commands who are currently identifying prospective CIT officers. In addition, a Bureau-wide coordinator has been named. PRPB provided the Monitor's Office with the rating form that PRPB will use for prospective candidates to the program. In addition, the PRPB Commissioner issued a job posting for uniformed agents from the precincts and districts of the 13 police areas who may be interested in becoming a CIT officer. The job posting provides a job description, eligibility requirements, training description, and application instructions. To date, only 83 officers have interviewed for the position, while PRPB estimates that 180 officers will be needed.

The Monitor's Office is supportive of PRPB's intention of expanding the program to all areas; however, to date, little progress has been made. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially given that support services may not be available in the early stage in some areas. However, the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to Ley 408 (Involuntary Commitment Orders). Therefore, the Bureau must make a concerted effort to complete this task. Because this program has not been expanded Bureau-wide, PRPB has not met target one.

In the past PRPB has provided training to field personnel and dispatchers related to CIT; however, the training for dispatchers has not been specific to their work assignment. This training should be more in-line with the daily responsibilities of a dispatcher, including how to collect the appropriate information from the caller to provide to the responding officer.

In relation to the eight-hour basic training course which all PRPB field members are to receive, PRPB provided the Monitor's Office with the four training modules and the exam used to determine the level of proficiency in the material presented for review. To that end, PRPB provided information that no PRPB officers were trained during the CMR-8 reporting period. PRPB indicated that virtual training would resume in 2023, which has yet to occur. Current CIT trained personnel did receive re-training during the previous reporting period.

It should be noted that PRPB provided a list of CIT trained officers who could be called upon to respond if needed to a crisis intervention; however, this does not meet the requirement as outlined in this paragraph.

*Pathway Forward*

As noted above, PRPB must accelerate the expansion and subsequent training of CIT to the 13 area commands. The Monitor's Office is aware that PRPB is in the process of developing and reinstating its virtual training and expects that once completed, it will resume the virtual eight-hour basic CIT training course. Having developed a curriculum and training for the CIT program and having tested it in the field in Arecibo, the Monitor's Office expects PRPB to make substantial progress in implementing the program Bureau-wide. The training of officers to handle individuals with mental health issues so that such incidents do not escalate into confrontations in which PRPB members use force is paramount.

The Monitor's Office understands that the implementation of the eight-hour in-person Bureau-wide training was significantly impacted by the COVID-19 pandemic and difficulties with the virtual training platform. Nevertheless, the Monitor's Office expects to see significant progress in training all PRPB personnel in crisis intervention as the CIT pilot program is expanded to all area commands.

As previously stated, PRPB has not provided documentation that dispatchers have received specific training related to dispatching officers to "persons in crisis". In fact, to this point, the only training available to dispatchers is the eight-hour course provided to field personnel. PRPB needs to develop a course specific to dispatchers regarding routing crisis calls to on-duty CIT officers. All dispatchers should receive this training. Until this training is developed and conducted, PRPB will not be compliant with targets two or three.

## III. Searches and Seizures: Internal Controls and Accountability

Poorly written and incomplete filing of arrest reports continue to be a serious issue in PRPB despite several assessments from the Monitor's Office raising this issue. Many officers are still not properly documenting the particular facts in each arrest case, which has led, in many cases, to officers insistently using boilerplate, conclusive, and repetitive language in their reports. Officers constantly fail to include all the required forms in arrest files, and supervisors and commanders are failing to catch these deficiencies and take corrective action. Some arrest files, inconceivably, were submitted to the Monitor's Office without a police report. All these unaddressed issues have left the Monitor's Office with no other choice but to rate PRPB's performance in this area as not compliant. The Monitor's Office can confidently state that if PRPB officers, especially supervisors and commanders, were to do due diligence when completing arrest and search reports, the compliance rates would be significantly higher. Accountability for those failing to follow policy and properly document arrests is also necessary to move compliance forward.

When it comes to investigative stops and detentions, PRPB is not performing any better in this category. The Highway Patrol Division (HPD) submitted 13 randomly selected detention/stops files for review, and it failed to comply with policy requirements in more than half of the files, leaving the reader without a clear understanding on whether the police had more than reasonable suspicion when officers detained and/or arrested the subjects. Seized Property/Evidence forms are not completed or included with every arrest file. Some Property and Evidence rooms are not properly secured - lack of ventilation in some cases and size in some others.

The assessment of search files has always fared better, and this reporting period is no exception. Search warrant applications are being properly reviewed and approved by supervisors, and the resulting arrests are likewise being reviewed and evaluated by supervisors and commanders. Even when conducting consent searches, PRPB has shown progress compared to the last CMR. During the previous reporting period, the consent search form was missing from most files; this reporting period, all the consent search cases reviewed contained properly completed consent forms.

Finally, near the end of this reporting period, the Commonwealth, along with USDOJ and the Monitor's Office, began working on an Implementation Plan to address many of the issues raised in the Monitor's previous CMRs. The Monitor's Office looks forward to working with the Commonwealth and USDOJ to finalize this plan during the CMR-9 reporting period.

Overall, the Commonwealth's compliance with the 18 paragraphs assessed during this reporting period within Searches and Seizures reflect the same levels of compliance to what was noted in previous CMRs. In CMR-6, 83% of paragraphs (15 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where the same number of paragraphs were found to be partially compliant. See figure 4.



*Figure 4. Searches and Seizures: Paragraph Compliance Status*

## Paragraph 58: Searches and Seizures - General Provisions

*PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

The Monitor's Office analyzed 59 arrest files and 56 search files for this CMR. Thirty of the fifty-nine arrest files (51%) were rated not compliant, and 22 (37%) were rated partially compliant, for a total failure rate of 88%. Only seven files (12%) were rated substantially compliant. Eight of the fifty-six search files (14%) were rated not compliant, and twelve (21%) were rated partially compliant, for a combined failure rate of 36%, while 36 search files (64%) were rated substantially compliant.

All arrest files rated not compliant were missing required forms and/or had poor or no probable cause properly documented, as well as partially completed forms, such as PPR 631.1 (Booking Sheet) and PPR

621.1 (Police Report) (See complaint #2022-13-005-04143). Another one of those files, complaint #2022-10-037-4653, had a poorly written police report and the supervisor and director evaluation form (PPR 615.8) indicated the supervisor's evaluation was completed 5 days after the arrest, and the director's evaluation was completed 18 days after the arrest. The Agreement requires the supervisor's evaluation occur 12 hours after the arrest (paragraph 69) and the director's or command-level officer's review occur 7 days after the arrest (paragraph 71). The partially rated files included well-documented probable cause, but, again, lacked some forms, while other forms were incomplete (See complaint #2022-10-037-6146). The files rated substantially compliant were, obviously, well completed, and included all required forms, as well as detailed probable cause language.

A similar pattern can be observed in the analysis of the search files. All eight not compliant search files were missing forms, and two files did not include a police report (PPR 621.1) (complaint #s 2023-3-039-000420 and 2022-6-400-00195). Yet, a third search file contained documents from two different incidents (complaint #2023-7-070-000746). The partially rated files in this category were due to a combination of missing one form and/or a poorly written police report, such as in complaint #203-8-116-01051, and incomplete forms as in complaint #2022—7-070-0005263. On the other hand, the substantially rated files were very well put together and included all documentation as per policy.

Given the above information, the Monitor's Office can confidently state that if PRPB officers, especially supervisors and commanders, were to do due diligence when completing arrest and search reports, the compliance rates would be significantly higher in this section of the Agreement.

*Pathway Forward*

PRPB must implement regularly scheduled roll call training to impart onto officers the importance of properly prepared police reports and well completed arrest and search files. To help accomplish this, the Monitor's Office strongly advises PRPB to hold officers of all ranks accountable for their subordinates and mete out discipline as appropriate.

## 1. Stops, Searches, and Seizures

PRPB policy on search and seizure was last reviewed in 2022 and all related forms are up to date. The selected search warrant files are complete, have proper supervisory approvals and reviews, and almost all have started to fill out and include the Booking Sheet, something that was lacking last reporting period. However, all 14 consent search files submitted failed to include supervisory reviews, as required by the Agreement.

### Paragraph 59: Searches and Seizures - General Provisions

*Paragraph 59 is assessed annually and will be reviewed in CMR-9.*

## 2. Investigatory Stops and Searches

Most probable cause-based investigatory stops by PRPB are conducted by its HPD. A significant number of their arrest and detention reports are not well written, leaving the reader without a clear understanding of the facts that led them to believe they had more than just reasonable suspicion when

they intervened with, detained, and/or arrested the subjects in these cases. It bears to mention, as an example, the April 2021 case of five Dominican Republic nationals detained/arrested by PRPB's Ponce HPD during a motor vehicle traffic stop, in which they were all passengers. The driver, who was legally licensed, was arrested, and the five passengers detained were subsequently found to be undocumented immigrants. PRPB officers contacted Federal Immigration officials who responded to the HPD and took control of the five passengers. The Monitor's Office reviewed the case documentation provided by PRPB and found that it did not clearly state the reasoning for the arrest of the driver nor for the detention of the Dominican nationals. In addition, the Monitor's Office determined that these officers may have violated PRPB policy regarding immigration status of detained persons (GO 626) and the policy regarding probable cause (GO 615).[4] On May 31, 2021, the Monitor's Office recommended that PRPB open an administrative investigation to determine compliance with its policies and the Agreement. In May 2023, the Monitor's Office asked for the status of this investigation and was informed that no such investigation had been opened as of early May 2023; however, an administrative investigation was opened on May 16, 2023 (see case #202300658). The Monitor's Office will follow up with SARP and report the results of the investigation in the next report. The Monitor's Office has informed PRPB of the weaknesses found in arrest reports such as the above in several past CMRs.

The Monitor's Office has informed PRPB of these failures in several CMRs. The Monitor's Office believes that officers' failure to cite specific facts found in each case also leads them to use boilerplate and repetitive language. In addition, PRPB has not provided the HPD or any of its officers with a method to record demographic and geographic data for analysis, as required by the Agreement (paragraph 243).

### Paragraph 60: Searches and Seizures - Investigatory Stops and Searches

*PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

---

[4] See Appendix E in CMR-5.

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. | ☐ Met | ☑ Missed |
| 2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. | ☐ Met | ☑ Missed |

Note: PRPB has not authorized investigatory or Terry stops based on reasonable suspicion. For Paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause.

### Compliance Assessment

The HPD conducts most of the investigative stops and searches based on probable cause via motor vehicle traffic stops island-wide. In the random sample obtained by the Monitor's Office for this reporting period, there were 13 arrest files submitted by the HPD. Eleven of those files (85%) were rated not compliant and two were rated only partially compliant (15%), for a failure rate of 100%, as all files lacked some police forms, including two files that contained no police reports. Six arrest files were determined to have documented detailed probable cause; two files lacked probable cause details; two files were found to have just fairly described probable cause; and another one was rated as poor. Two files were undetermined because they lacked a police report (complaint #s 2023-10-199-000121 and 2023-10-199-000024). So, of the 13 files, 7 files (52%) left the reader without a clear understanding whether the police had more than reasonable suspicion when they intervened with and detained and/or arrested the subjects in these cases.

To attain compliance, the Agreement requires that PRPB must show probable cause in 100% of stops and searches but instead PRPB has shown compliance in only 48% of the sample cases reviewed. Moreover, PRPB still lacks a system to collect and analyze demographic and geographic data as required under paragraph 243. Therefore, PRPB is not compliant on all aspects of this paragraph.

### Pathway Forward

PRPB must enforce its own policies on stops and searches. Both GO 615 (Arrests and Citations) and GO 612 (Searches and Raids) contain all the guidance officers need to perform their duties properly and legally in this regard. Roll call and in-service training will accomplish much to improve compliance with the Agreement.

## Paragraph 61: Searches and Seizures - Investigatory Stops and Searches

*PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

PRPB prohibits the use of conclusory or boilerplate language and materially false or incorrect information by its officers, as stated in Section lll.D.4.g.xxviii.d. on page 22, and Section lll.D.5.f.ii on page 24 of the current GO 615 (Arrests and Citations).

Investigatory stops in PRPB are still not documented unless it is a motor vehicle traffic stop resulting in an arrest or citation. As reported in prior CMRs the data captured during these stops are minimal and not tracked by PRPB. Paragraph 243 of the Agreement calls for the collection, tracking, and analysis of specific demographic and geographic data, as well as other information; however, PRPB has yet to collect this data. This, in conjunction with the Monitor's determination that PRPB has failed to show probable cause in 52% of investigatory stop cases (see paragraph 60 above), results in a not compliant rating.

*Pathway Forward*

PRPB must implement proper training in completing reports and ensuring officers understand they must detail the elements of the charged crime to show probable cause. It is the Monitor's Office's conclusion that most arrest cases are approved by the District Attorney to go forward, and a judge finds cause for trial more often than not. This indicates that officers have the facts to show probable cause, but they simply do not document it in police reports. The Monitor's Office has been advised that officers tend to write facts of the case in their personal notebooks, which they then use in court to refresh their memory when called to testify. PRPB must instill in officers that they must also include the facts of the case in the official police report. In addition, officers and supervisors must be held accountable and disciplined when necessary.

## Paragraph 62: Searches and Seizures - Investigatory Stops and Searches

*A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or*

*that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

### *Compliance Assessment*

As stated in paragraph 60, PRPB's HPD submitted 13 investigatory stops arrest files for analysis. Supervisors responded to the scene or communicated with the arresting officers via radio in nine of those cases (69%) and submitted reviews in 12 cases (92%). However, the Monitor's Office rated five of those reviews (42%) as incomplete or unacceptable (rated "fair" or no "PC documented"). Although, officers failed to properly document probable cause in 52% of the 13 cases, the Monitor's Office saw no indication in the submitted arrest files that supervisors took any corrective action, such as counseling officers, or recommended any additional training or discipline. Again, these failures along with PRPB's lack of compliance with paragraph 60, positions PRPB in the Not Compliant category for this paragraph.

### *Pathway Forward*

The Monitor's Office has noted that many police reports, such as PPR 621.1, PPR 631.1 (Booking Sheet), as well as PPR 615.8 (Supervisor's Evaluation Form), are often poorly written (see complaint #s 2023-1-399-00120, 2023-7-392-0097, and 2023-9-199-0058). The Monitor's Office recommends that PRPB re-start in-service and roll call training to deal with officers' shortcomings regarding the proper completion of police reports in general. Another simple way of re-enforcing how to properly fill out police reports is to return to officers' reports determined to be poorly written and requiring that additional pertaining and important information be added.

## Paragraph 63: Searches and Seizures - Investigatory Stops and Searches

*A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

As was the case stated in paragraph 62 regarding supervisors, command-level officers took no corrective action when reviewing poorly written police reports and supervisory reviews (PPR 621.1 and PPR 615.8). Most simply agreed with and approved the immediate supervisor's review and officers' reports. As a result, the Monitor's Office rated commanders' reviews similarly to supervisors' reviews, with five reviews rated unacceptable. Additionally, PRPB provided no documentation that any corrective action was taken or recommended by anyone in the chain of command.

Also, PRPB supervisors and directors continue to violate policy and the Agreement when reviewing arrests. In complaint #2022-10-037-4653, the supervisor evaluation form (PPR 615.8) indicated the supervisor's review was completed 5 days after the arrest, and the director's review was completed 18 days after the arrest. The Agreement requires the supervisor review to occur within 12 hours after the arrest (paragraph 69) and the command-level officer's (director) review to occur within 7 days after the arrest (paragraph 71).

*Pathway Forward*

PRPB must ensure that supervisors and commanders adhere to policies and directives regarding the review of arrest reports, and, most importantly, must hold them accountable for dereliction of duty when appropriate.

## Paragraph 64: Searches and Seizures - Investigatory Stops and Searches

*At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

PRPB does not permit its officers to conduct investigatory stops or detentions (so-called Terry Stops) based on reasonable suspicion. Instead, they must be based on probable cause. However, the stops are not documented unless it is a motor vehicle traffic stop resulting in an arrest or citation. As reported in prior CMRs the data captured during these stops are minimal and not tracked by PRPB. Paragraph 243 of the Agreement requires the collection, tracking, and analysis of specific demographic and geographic data during the stops, as well as other information. However, PRPB has not yet implemented a system to collect and track this data. Therefore, there is no annual public report for review by the Monitor's Office. In addition, PRPB is also not compliant with the requirements of paragraph 60.

*Pathway Forward*

To get on the path to compliance, PRPB must develop a collection and tracking system and analyze the demographic and geographic data obtained during investigative stops and detentions and submit the results to the Monitor's Office and USDOJ for review. This system - or a separate one- should also collect the same data points from search warrants and arrests reports for analysis per paragraph 243.

## 3. Arrests

Poorly written arrest reports and not including all pertaining arrest forms in files continue to be a serious issue in PRPB despite several assessments from the Monitor's Office highlighting this issue. Many officers are still not properly documenting the particular facts in each case, which has led, in many cases, to officers insistently using boilerplate, conclusive, and repetitive language in their reports. Officers constantly fail to include all the required forms in arrest files, and supervisors and commanders are failing to catch these deficiencies and take corrective action. The forms left out of the files most often are the Seized Property Form and the Booking Sheet.

### Paragraph 65: Searches and Seizures - Arrests

*PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
|-----------|-----|---------------------|----------------------------------------------------------------|
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 65-71. | ☑ Met ☐ Missed |
| 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | ☐ Met ☑ Missed |
| 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

The current PRPB policy on arrests (GO 615) conforms to generally accepted policing practices and complies with applicable laws and the Agreement. However, PRPB has lagged in implementing the policy, as officers and supervisors routinely approve and submit arrest reports that lack many required forms. During the analysis of 59 arrest files, the Monitor's Office found that 43 files (73%) lacked one or more PPR police forms, with PPR 631.1 and 636.1 (Booking Sheet and Seized Property forms) being the most common left out of the package. These two forms are essential in reaching compliance, as the Booking Sheet is where supervisors record the health condition of the arrestee upon arrival at a police facility, and the Property Form is used to record and maintain chain of custody of evidence and personal property seized from arrestees. The methodology to reach compliance in this section requires that officers "…complete required arrest documentation in accordance with approved policies in 95% of selected arrests." PRPB complied in only 27% of arrests, well below the requirement.

Due to the lack of Booking Sheets in so many arrest files, the Monitor's Office is unable to determine whether supervisors inspected arrestees for injuries and, if found to be injured or sick, whether medical assistance was provided in these cases. Sixteen of forty-eight (33%) qualified arrest files and 8 of the 30 (14%) qualified search files examined did not provide a Booking Sheet.

In the 48 arrest files that qualified for supervisory review, supervisors and commanders failed to review 3 cases (6%) and failed address the lack of probable cause information in another 15 cases (31%). In this sample, that works out to supervisory reviews having been properly completed in only 63% (30 of 48) of arrest cases.

Supervisors and commanders reviewing arrests as a result of searches performed significantly better in the 30 search files that qualified for supervisory review. Only in two cases (7%) were supervisory reviews not submitted, for a 93% compliance in arrest reviews as a result of searches. But, taken as whole, of the 78 search and arrest files, PRPB accomplished compliance in only 74% (58 of 78) of arrest cases, short of the required 95% for compliance.

*Pathway Forward*

Supervisors and commanders must be held accountable for not adhering to the requirements of long-established PRPB policies regarding arrests and supervisory arrest review reports. Discipline in line with the Disciplinary Matrix must be meted out, if necessary, to force compliance with Bureau policies.

## Paragraph 66: Searches and Seizures - Arrests

*PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Dispatch Card (PPR 126.2) is where PRPB Command Center records all incidents and communications with officers and supervisors. When an arrest is made, that information is also recorded here, as well as when a supervisor is notified to respond to an incident. PRPB included 76 Dispatch Cards with the arrest and search files it provided to the Monitor's Office (12 files failed to include it and the rest were not applicable). However, most of these forms do not indicate when a supervisor is notified to

respond, nor whether he or she responded. However, supervisors indicated they responded to arrest situations in 33 arrest cases out of 46 qualified files (72%) reviewed and in 14 of the 43 search and arrest cases (33%) reviewed. Overall, supervisors responded to only 52% (47 out of 89) of qualified arrest and search cases, not reaching the 95% required for compliance. The selected random sample did not include arrests for obstructing justice or resisting an officer, so this category is not reported in this CMR.

### Pathway Forward

PRPB must implement the P-25 radio system that allows for recorded communication among officers and dispatchers island-wide, as required under the Agreement. Supervisors must also respond to all felony arrests and arrests for obstructing justice and resisting an officer in person or by radio to evaluate officers' decision to arrest, as allowed by policy and the Agreement. Supervisors failing to do so must face disciplinary consequences as appropriate. Dispatchers should also be properly trained to complete the Dispatch Card in its entirety to aid in complying with the Agreement, especially regarding the notification to supervisory personnel and their response.

## Paragraph 67: Searches and Seizures - Arrests

*When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

For this reporting period, PRPB did not report to the Monitor's Office whether it has a data system or mapping software to track officers' route of travel when transporting arrestees. Therefore, the Monitor's Office is unable to determine compliance in this area. Although space is provided on PPR 126.2 (Dispatch Card) to record mileage when officers transport arrestees, there was no mileage listed on any of the 76 Dispatch Cards supplied by PRPB. Only a very small number of police officers listed

mileage on the police report, as in case #2023-03-039-001127. Also, demographic information is not listed on the Dispatch Cards, although space is provided for this purpose.

As noted in paragraph 58, all arrest files rated not compliant were missing one or more required forms, and some contained only partially completed forms, such as PPR 631.1 (Booking Sheet) and PPR 621.1 (See complaint #2022-13-005-04143).

### Pathway Forward

PRPB must provide training to officers assigned to the Command Dispatch Center to solicit pertaining demographic information on arrestees and record the mileage to and from police facilities on the Dispatch Card, per policy and the Agreement. Supervisors should ensure during their review that all necessary demographic information is also recorded on all police reports.

### Paragraph 68: Searches and Seizures - Arrests

*At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

During the analysis of 59 arrest files, the Monitor's Office found that 43 files (73%) lacked one or more PPR police forms, with PPR 631.1 (Booking Sheet) being one of the most common left out of the package. A well completed Booking Sheet is essential in reaching compliance, as this form is where supervisors record the health condition of the arrestee upon arrival at a police facility. Sixteen of the forty-eight (33%) qualified arrest files and eight of the thirty (27%) qualified search files examined did not provide a PPR 631.1 (Booking Sheet). Due to the lack of Booking Sheets in these files, the Monitor's Office is unable to determine whether supervisors inspected arrestees for injuries or whether medical assistance was provided if an arrestee was found to be injured or sick. PRPB's compliance in this section is 69% (54 of 78 arrest cases).

*Pathway Forward*

On the advice of the Monitor's Office, in November 2022 PRPB implemented a new PPR 631.1 (Booking Sheet) and changed its title from "Ingress/Egress" to "Condition of Arrested Person" to avoid misunderstanding of when it must be filled out and requires officers to complete it regardless of if an arrest is made, precisely to record the arrestee's physical condition and medical aid provided if any, as well as record other required information. However, as pointed out above, many supervisors are still failing to complete and/or include the form in the files. Still many others fill it out but fail to indicate the health condition of the subject. PRPB must send a strong message to supervisors and officers, either through roll call training and/or a written directive followed by increased accountability that this form is to be completed every time an arrested or detained person is brought into a police facility, no matter whether the person is placed in a cell.

## Paragraph 69: Searches and Seizures - Arrests

*PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

PRPB GO 615 (Arrests and Citations), Section D.4.g.xi., (page 19) requires supervisors to personally review and approve bookings of arrested persons on PPR 631.1 (Booking Sheet). However, as pointed out in previous paragraphs, supervisors are not consistent in completing the Booking Sheet in all cases as required by policy and the Agreement. As stated in paragraph 68, the Monitor's Office found that 16 of the 48 (33%) qualified arrest files and 8 of the 30 (27%) qualified search files examined did not provide PPR 631.1 (Booking Sheet). Therefore, the Monitor's Office is unable to determine in these cases whether supervisors inspected arrestees for injuries or whether medical assistance was provided

in cases where the arrestee was found to be injured or sick. PRPB's compliance in this section stands at 69% (54 of 78 arrest cases).

Also, supervisors are failing to address police reports that lack articulation of the legal basis for the arrest in many cases. The Monitor's Office found 26 arrest files that had probable cause only fairly documented or not documented at all, and there was no indication in the files that supervisors took any corrective steps to address the issue with officers. In fact, some supervisors and commanders approved the arrest on PPR 615.8 (Arrest Evaluation Form) without addressing these deficiencies. Commanders and supervisors are not adhering to the allotted time to review arrests in most cases, which is 12 hours after the arrest for the supervisor and 7 days after the arrest for the commander. For example, in complaint #2022-10-037-4653, the supervisor evaluation form (PPR 615.8) indicated the supervisor's review was completed 5 days after the arrest, and the director's (commander) review was completed 18 days after the arrest.

Due to the lack of articulation of the legal basis for the arrest in many reports, officers tend to employ boilerplate and conclusory language in describing the circumstances that led to the arrest. For example, officers would write in the case of an arrest for domestic violence that, "Mr. Smith was arrested for violation of Law 54. Mr. Smith struck Mrs. Smith with his fist in the face area", and they leave out information on whether any interviews of the involved parties were conducted or attempted, what personal observations the officer made, and whether there were any witnesses interviewed. As stated above, the Monitor's Office found that probable cause language was either just fairly, poorly, or not at all documented in 26 arrest files, possibly leading to the aforementioned issues. Boilerplate and conclusory language can easily be avoided by simply stating the particulars in each case. In the randomly selected samples of arrest files for this reporting period, there were no arrests for resisting an officer, assaulting an officer, or interfering with an officer for the Monitor's Office to review.

### Pathway Forward

PRPB must provide training or orientation to supervisors and commanders that stresses the importance of adhering to the arrest review requirements and the proper visual inspection of arrestees brought to their attention at police facilities, as per policy and the Agreement, if PRPB is to move forward with compliance. This is especially important during arrests for obstruction of justice, resisting arrest, and/or assaulting an officer, as delineated in this paragraph.

### Paragraph 70: Searches and Seizures - Arrests

*As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

As noted in paragraph 65, in the 48 arrest files that qualified for supervisory review, supervisors and commanders failed to review 3 cases (6%) and failed to address the lack of probable cause in another 15 cases (31%). This means that they correctly reviewed and completed 30 of the 48 files, for a compliance rate of only 63%.

Supervisors and commanders reviewing arrests as a result of searches performed significantly better in the 30 search files that qualified for supervisory review. Only in two cases (7%) were supervisory reviews not submitted, for a 93% compliance in arrest reviews as a result of searches. But, taken as whole, of the 78 search and arrest files, PRPB has reached compliance for this period in only 74% (58 of 78) of arrest cases, short of the required 95% for compliance.

PRPB has not provided the Monitor's Office with evidence that the above shortcomings of supervisors are or have been taken into consideration regarding supervisors' performance evaluations.

*Pathway Forward*

As the Monitor's Office has reported in past CMRs and throughout this section, supervisory training and/or counseling would significantly and positively impact the results of supervisory reviews and re-direct the Bureau onto a path of compliance. Failure to achieve compliance will continue until PRPB starts holding supervisors accountable for their responsibilities and discipline is meted out when appropriate.

## Paragraph 71: Searches and Seizures - Arrests

*A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

80

| | | | |
|---|---|---|---|
| Training: | N/A | **Assessment Frequency** | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Commanders (district/unit directors) are not performing any better when it comes to reviewing arrest reports. As stated in paragraph 70 and paragraph 65, in the 48 arrest files that qualified for supervisory review, supervisors failed to review 3 cases (6%) and failed to address the lack of probably cause in another 15 cases (31%). Evidence shows that commanders, in evaluating these supervisory reviews, did not rebuke the supervisors and instead simply agreed with his or her recommendation and approved the reports as written. Thirty of the forty-eight arrest files correctly reviewed places PRPB at a compliance rate of only 63% in this category.

Commanders reviewing arrests as a result of searches performed significantly better in the 30 search files that qualified for supervisory review. Only in two cases (7%) were supervisory reviews not submitted, for a 93% compliance in arrest reviews as a result of searches. However, taken as whole, of the 78 search and arrest files (30 arrests and 48 searches), PRPB has reached compliance in only 58, or 74% of arrest cases, short of the required 95% for compliance.

PRPB has not provided the Monitor's Office with evidence that the above shortcomings of commanders are or have been taken into consideration regarding their performance evaluations, or that any corrective measures have been implemented.

*Pathway Forward*

As the Monitor's Office has reported in past CMRs and throughout this section, supervisory training and/or counseling would significantly and positively impact the results of supervisory reviews and re-direct the Bureau onto a path of compliance. Failure to achieve compliance will continue until PRPB starts holding supervisors accountable for their responsibilities and discipline is meted out when appropriate.

## Paragraph 72: Searches and Seizures - Arrests

*PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | **Review Period** | October 2022 – March 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Polices incorporate all of the requirements of Paragraphs 59 and 72. | ☑ Met | ☐ Missed |
| 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | ☐ Met | ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB conducted arrests in 78 search and arrest files submitted for this reporting period. Property/Evidence inventory forms (PPR 636.1) were missing from 40 files (51%). The Monitor's Office cannot discern from documents provided in these cases whether any property or evidence was seized, as officers also failed to list the property or evidence, if any, on the police report (PPR 621.1). (See Complaint #s 2022-5-050-011855 and 2022-3-077-003063). The absence of 40 property forms in the files places PRPB out of compliance with a 49% compliance rate (38 of 78), as opposed to the required 95%. However, to PRPB's credit, there has been improvement when comparing results from CMR-7 where arrest files lacked the form in 92% of cases, as opposed to 51% in this reporting period.

One issue that persists is that officers are still asking arrestees to place their signatures on PPR 636.1 (Property/Evidence) to confirm that the evidence seized belongs to them. This form often lists criminal evidence that potentially will be used against them in court. The Monitor's Office advised PRPB in the previous CMR that this may be a potential violation of the subjects' 5th Amendment Rights against self-incrimination.

As for complaints against officers for mishandling property or evidence, PRPB informed the Monitor's Office that there were 10 complaints filed this reporting period related to negligence/loss of property. However, a review of those files revealed that all were related to Bureau-issued equipment having been lost or damaged. This category does not fall under the Agreement, as it deals only with personal property belonging to arrested/detained persons and/or evidence seized.

There were five negligence/loss of property cases submitted to the Monitor's Office during the previous reporting period that were not finalized at the time. The five cases dealt with personal property or evidence that was mishandled by officers and have been completed and dispositions were as follows:

- Complaint #2022-0481 - Charges sustained against one officer and given four days suspension; and not sustained against the second officer.
- Complaint #2022-00458 - Charges not sustained against the officer.
- Complaint #2022-00549 - Closed file

- Complaint #2022-00506 - Charges not sustained.
- Complaint #2021-01224 - Charges sustained against 4 officers: suspensions of 40 days, 30 days, 30 days, and 4 days, respectively.

The Monitor's Office personally visited some evidence and property rooms throughout the Bureau during this reporting period. The Monitor's Office inspected two randomly selected cases at the San Juan Area Property Room (commonly known as "Bienes Advenidos") in Hato Rey: case #2022-1-162-004187 did not list the personal property on the police report, although the property was in the room and properly listed and tagged; and case #2022-1-162-00397 was a complete package and in order. However, the Monitor's Office found that the security of the premises was compromised, as there were no video cameras set up, no metal grates on glass windows, and a metal entry door was secured by a simple lock, and not a deadbolt lock as recommended. Inside, there were two walls made of sheetrock, instead of concrete as required. Further, the room had no ventilation and no air conditioner.

The Monitor's Office visited the Property Room at Carolina Police Area. There, three randomly selected cases were inspected and found to be in order. The facility was secured with a steel entry door, concrete walls, metal grates on windows, and a working security video camera. The room was well organized.

The Property Room in Bayamon was found to have an entry steel door, but not all walls were concrete inside, and the windows lacked metal grates. The Monitor's Office inspected two randomly selected cases and found them to be in order.

The Monitor's Office also visited Evidence Rooms in Fajardo and Carolina. Evidence officers at both locations were well organized and evidence was secured to the best of their abilities. However, there were some security issues that the officers have brought to the attention of commanders but had received no response. For example, in Fajardo CIC the evidence officer requested a steel door to replace a wooden entry door. He was told the door was available, but it had not been delivered as of that day. Also, the evidence room lacked ventilation. At the Fajardo Drug Unit Evidence Room, the entry door is made of hard wood but had a small thin plastic window in the middle, and the exterior windows lacked metal grates. The metal grates were requested on March 22, 2022, and had not been delivered as of that day. At an inspection of the Carolina CIC Evidence Room in March 2023, the Monitor's Office was informed that metal grates for several exterior windows were first requested in 2016 but have not been installed as of this date. The Monitor's Office recommended to the Evidence Officer that he should submit a new request and he agreed. At this location, the Monitor's Office inspected two randomly selected cases and found them to be in order.

### Pathway Forward

Supervisors should ensure that officers properly complete and submit Personal Property/Evidence forms in every applicable arrest case. The Monitor's Office recommends that PRPB require officers to list potentially criminal evidence on the police report form (PPR 621.1), and not ask arrestees to sign for them. PPR 636.1 (Booking Sheet) should be used to list personal property only.

## Paragraph 73: Searches and Seizures – Arrests

*Paragraph 73 is assessed annually and will be reviewed in CMR-9.*

## 4. Searches

The Search and Seizure GO (GO 612) was updated in March 2022. It conforms to generally accepted policing practices and criminal law. Poor arrest evaluations by supervisors continue to be a serious issue for PRPB, with search and arrest files lacking properly completed forms, and containing weak probable cause language in some cases, especially those conducted via voluntary consent. In addition, 9 of 14 consent searches (64%) resulted in no arrest and no contraband found.

### Paragraph 74: Searches and Seizures - Searches

*PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

#### Compliance Targets

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 74-77. | ☒ Met | ☐ Missed |
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | ☐ Met | ☒ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

#### Compliance Assessment

PRPB current policy on searches and seizures (GO 612) conforms to generally accepted policing practices and complies with applicable laws and constitutional mandates. It clearly defines all terms and specifies procedures for conducting searches with or without a warrant, and provides guidance for officers in securing, handling, recording, and taking custody of seized property and evidence. It was last reviewed and revised in early 2022.

The Monitor's Office reviewed 56 randomly selected search files submitted by PRPB for this reporting period. Included in the group were 14 searches by consent (25%) and the remaining 42 (75%) were searches authorized by a warrant. All but two searches authorized by warrants (95%) lacked a supervisory review and approval, while all 14 consent searches did not include a supervisor's review and approval. This works out to a compliance rate of only 71% (40 of 56), placing PRPB below the 95% threshold.

*Pathway Forward*

To comply with the Agreement, PRPB must require supervisors to document their review of warrant-less searches, such as searches by consent on PPR 612.3 (Approval of Request for Search or Arrest Warrants).

## Paragraph 75: Searches and Seizures - Searches

*PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

In the searches authorized by warrants, supervisors submitted 40 reviews and approvals out of 42 search warrants and affidavits (95%) received by the Monitor's Office. Approvals were documented on the Operational Plan and/or PRPB PPR 612.3 (Approval of Request for Search or Arrest Warrants) created for search warrant review and approval on July 27, 2022. The Monitor's Office noted that the form was used and included in only 12 of the 42 search warrant files reviewed (29%), the remaining warrant files were confirmed reviewed and approved on the Operational Plan (PPR 615.7).

*Pathway Forward*

PRPB created a comprehensive form, PPR 612.3 (Approval of Request for Search or Arrest Warrants) for supervisors to document their review and approval of search warrant applications and related affidavits. It is a useful tool, but it is not always used and included in the search files. As stated above, only 12 of the 42 search files (29%) contained the form. This is not acceptable. PRPB should ensure it is included in all search files, including consent and warrant searches, going forward. Periodic reviews to ensure this is being completed in accordance with policy should be regularly conducted on the Bureau's own initiative and any continued failure to do so should result in disciplinary action.

## Paragraph 76: Searches and Seizures - Searches

*PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Target #2. Annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☑ Missed |
| 2. All search warrants are tracked in the tracking system. | ☐ Met  ☑ Missed |
| 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | ☐ Met  ☑ Missed |

Note: Policy content is assessed as part of Paragraph 74. Training is assessed as part of Section E 78-79) regarding Training on Stops, Searches, and Seizures.

### Compliance Assessment

PRPB has not reported to the Monitor's Office whether it has a working search warrant tracking system as of this CMR. The Monitor's Office conducted several visits to various Criminal Investigations Corps (CIC) and Drug Units during this reporting period. The Monitor's Office asked commanders whether they were aware of such a tracking system and was told that no such system exists. Search warrant files are kept in folders in file cabinets at the CICs and Drug Units. The Investigative Bureau in command of all CICs and Drug Units, SAIC, does not have a Bureau-wide central system to document and analyze search warrants as required by GO 612 (Searches and Raids).

### Pathway Forward

PRPB should develop a centralized, electronic tracking system to collect and analyze search warrant data to detect deficiencies or training issues, as per policy, and to comply with the Agreement.

## Paragraph 77: Searches and Seizures - Searches

*PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |



| | | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Training: | N/A | | |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

Out of the 56 randomly selected search files submitted by PRPB for this reporting period, 14 were searches based on consent (25%). All 14 cases included the properly completed consent form (PPR 612.1) as authorized by PRPB. This shows progress when comparing this data to data in the previous CMR. However, because this paragraph is assessed together with paragraph 74, the Monitor's Office has rated it as not compliant.

*Pathway Forward*

To continue in compliance, PRPB must encourage and require that consent form PPR 612.1 be completed for every consent search, and that supervisors conduct reviews of these searches and document them on PPR 612.3 (Approval of Request for Search or Arrest Warrants) for easy review and analysis.

## 5. Training on Stops, Searches, and Seizures

*Paragraphs 78 and 79 are assessed annually and will be reviewed in CMR-9.*

## IV. Equal Protection and Non-Discrimination

The review of the documents and data provided to the Monitor's Office during this reporting period continued to demonstrate issues raised by the Monitor's Office in previous CMRs. As noted in previous CMRs, much of PRPB's progress in this area remains at partial or non-compliance. Of the 21 paragraphs within Equal Protection and Non-Discrimination, a limited number are assessed every six months. A comprehensive review of this entire section was provided in CMR-7 and will be provided again in CMR-9. For CMR-8, only 10 paragraphs (paragraphs 84 - 86, 88 - 90, 92 - 93, 96, and 99) are assessed in this report and, in most instances, only specific targets within these paragraphs are assessed biannually. The compliance targets assessed in this reporting period are **bolded** in the paragraphs identified above. The paragraph compliance targets assessed in this reporting period primarily focus on PRPB's efforts to demonstrate implementation of training and processes related to hiring, the civilian complaint system, performance evaluations, juvenile case management reporting, hate crime reporting, and bias-free policing training. There are no significant changes in PRPB's progress in meeting the compliance targets assessed in this reporting period as compared to CMR-7.

A review of 54 SAIC and SARP investigations involving PRPB members was conducted during this reporting period, per paragraph 99. All 54 cases were domestic violence (Ley 54 violations). No sexual assault cases involving PRPB members were submitted for review. Therefore, with no review of sexual assault investigations, the Monitor's Office is not able to assess whether PRPB documents the use of a trauma informed response method, consistently provide victims with available resources on support or safety, or follow-up in a timely manner with the victim, as required by paragraph 93. The Monitor's Office notes that changes to the manner that police reports are written, use of an investigative checklist, supervisor accountability, and increased training, as recommended in previous CMRs, will improve the Commonwealth's compliance with related paragraphs.

Several high-profile events and incidents occurred during this reporting period that have renewed the focus on domestic violence and sexual assault cases, particularly those involving PRPB members. The Monitor's Office reviewed 54 domestic violence SAIC and SARP investigation files and found that PRPB does follow its policy related to seizing officer weapons and referring the employee to the employee assistance program (EAP) when a PRPB member is involved. Findings made in CMR-7 stressed the importance of PRPB being consistent with policy in how it investigates cases involving PRPB members. PRPB should also consider how it assists its officers with dealing with the stressors of the job. The Monitor's Office emphasizes that cases must be accurately investigated and processed in a timely manner to provide transparency and accountability. The Monitor's Office also recommends that the Commonwealth develop a comprehensive response plan addressing the manner in how it deals with cases involving PRPB members.

On March 6, 2023, the Parties met to discuss the development of an implementation plan focused on PRPB compliance with the sexual assault and domestic violence provisions of the Agreement, specifically paragraphs 93 to 99, 80 to 82, and 84 to 86 (as they pertain to the administrative investigations of sexual assault or domestic violence allegations involving PRPB personnel). The objective of the Plan is to address many of the issues noted by the Monitor's Office and improve compliance. Issues such as training, the quality of the investigation files, victim centered practices, supervision, internal investigation practices,

as well as other issues related to staffing and resources will be addressed in this Plan. An initial outline of the draft implementation plan was provided to the Parties in March 2023. The Monitor's Office expects to review further drafts of the implementation plan in the early part of CMR-9.

Overall, the Commonwealth's compliance with the 10 Equal Protection and Non-Discrimination paragraphs reflects marginal progress in levels of compliance to what was noted in previous CMRs. In CMR-6 40% (4 paragraphs) of the 10 paragraphs assessed were partially compliant, in comparison to the current reporting period, where 60% of the 10 paragraphs (6 paragraphs) were found to be partially compliant. See figure 5.



*Figure 5. Equal Protection and Non-Discrimination Paragraph Compliance Status*

## Paragraph 80: Equal Protection and Non-Discrimination – General Provisions

*Paragraph 80 is assessed annually and will be reviewed in CMR-9.*

## 1. General Provisions

PRPB does develop and is continuously updating policies and procedures to better provide direction and accountability. However, the ability to practice the policies and procedures is directly related to the reporting systems that PRPB must still work on. Systems such as the National Incident-Based Reporting System (NIBRS) reporting, hate crime training, civilian complaint training, bias-free policing training, and ProMedia training. PRPB still remains in a state of stagnancy, leading to little or no change, advancement, or development of processes. PRPB must address these matters to increase its level of transparency and effectiveness. PRPB must work on its systems to fully achieve and accurately evaluate its efficacy and demonstrate compliance.

## Paragraphs 81 - 83: Equal Protection and Non-Discrimination – General Provisions

*Paragraph 81 – 83 are assessed annually and will be reviewed in CMR-9.*

## Paragraph 84: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews).** | ☐ **Met** | ☑ **Missed** |
| **4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection.** | ☐ **Met** | ☑ **Missed** |
| 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☐ Missed |
| 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☐ Missed |
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| **11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews).** | ☐ **Met** | ☑ **Missed** |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☑ Missed |

| Note: The requirement of this Paragraph that require PRPB to incorporate bias-free policing and equal protection into its hiring practices is assessed together with Paragraph 104 (Hiring Reforms). |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its performance assessment process is assessed together with Paragraph 145 (Performance Evaluation). |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its promotion assessment process is assessed together with Paragraph 14 (Promotions). |

*Compliance Assessment*

Only three of the compliance targets of this paragraph are assessed biannually and thus, assessed in this report. In review of compliance targets 3, 4, and 11, the Monitor's Office found these targets were not met. All other targets are assessed on an annual basis and will be evaluated in CMR-9. In assessing whether sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews), PRPB submits that no training related to the civilian complaint program, bias-free policing, and ProMedia was conducted. In reviewing recruit/cadet files, the Monitor's Office found that PRPB does not have a system to periodically evaluate its recruitment strategies and determine whether candidates were selected in a manner consistent with approved policies regarding bias-free policing and equal protection. The periodic evaluations will provide PRPB information on its hiring practices. The analysis helps determine whether current employment practices disadvantage people of color, gender, age, or even residential location. It will help determine if they treat candidates differently in any of the steps in the selection process. For example, the different running time scores for males and females on the physical fitness test. Also, the recruiters should be receiving training on this topic and the Monitor's Office found that this is not occurring. The recruiters should learn this in their training and understand the importance of not only a standardized process but an equitable one too.

*Pathway Forward*

PRPB must conduct timely training on the topics required by this paragraph; continued failure in conducting this training will stall PRPB's compliance. Training and refresher training on the requirements of this paragraph and its related compliance targets is not compliant due to poor management of training schedules, lack of training personnel, and insufficient training equipment. Further, PRPB should conduct periodic analysis of its recruitment efforts to determine if candidates are being selected equitably and/or if revisions to the recruitment and test program should be instituted.

### Paragraph 85: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | |

91

| Practice: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |
|---|---|---|---|

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. NIBRS training are consistent with approved policies and procedures. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in NIBRS.** | ☐ **Met** | ☑ **Missed** |
| 4. PRPB is using the NIBRS to collect and report crime data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Of the four compliance targets within this paragraph, only one is assessed biannually and, thus, assessed in this report. In review of compliance target three, the Monitor's Office found this target was not met. PRPB has neither instituted NIBRS reporting, nor has it submitted any documentation demonstrating that PRPB personnel are trained or certified in NIBRS. NIBRS training is occurring at the pre-service level; however, no in-service NIBRS training has been achieved during this reporting period. On August 2, 2022, the Monitor's Office reviewed a revised the NIBRS Manual and provided PRPB with revisions. Training on the updated NIBRS Manual has not been developed. All other targets are assessed on an annual basis and will be evaluated in CMR-9.

PRPB is working with OSM to address NIBRS implementation. The OSM submits that as of February 23, 2023, according to the Federal Bureau of Investigation's (FBI) NIBRS Unit, PRPB has 11 Originating Agency Identifier (ORI) numbers assigned by the FBI. The remaining police areas in need of ORI numbers are Utuado and Aibonito. Once ORI numbers are assigned to the two remaining areas, NIBRS will accept crime data from PRPB. However, two other targets that must be addressed are the initial and continual NIBRS training for PRPB agents that needs to be conducted. Further the capacity for PRPB to gain compliance in NIBRS reporting is built on its IT support and structure.

*Pathway Forward*

PRPB must continue to develop the NIBRS system, including training: one-time initial training for existing personnel, continuing training for each class of recruits, and periodic training when Commonwealth law or NIBRS is modified. PRPB must provide the budget and staff allocation for the associated NIBRS training and certification of personnel, and support to sustain NIBRS reporting. PRPB must address the staffing shortages that have extended the timeline to make changes to the forms and systems, including CAD and GTE. Further, the Monitor's Office also recommends that the Commonwealth conduct public outreach to inform the public about changes that are forthcoming in PRPB's transition to NIBRS.

## Paragraph 86: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #3. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | ☑ Met   ☐ Missed |
| 2. Criminal investigation trainings are consistent with approved policies. | ☐ Met   ☑ Missed |
| **3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews).** | ☐ Met   ☑ Missed |
| 4. PRPB notifies the FBI of all identified instances of hate crimes. | ☐ Met   ☑ Missed |
| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | ☐ Met   ☑ Missed |
| Note: The requirement of this Paragraph that requires PRPB to track hate crimes on an ongoing basis is assessed together with Paragraph 85. | |

### Compliance Assessment

Of the five targets within this paragraph, only one is assessed biannually, and thus, assessed in this report. In review of compliance target three, the Monitor's Office found this target was not met. In assessing whether 95% of sampled personnel are trained and certified on all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training), PRPB submits that no training on VICO 3081 (Hate Crime Training) was conducted during this reporting period.

### Pathway Forward

It is imperative that PRPB deliver the training for VICO 3081 (Hate Crime Training). This will help ensure that officers are trained to accurately assess cases to determine if the matter is a hate crime. Additionally, it is essential that supervisors attend training to assist officers in hate crime investigations and assessments. Officers without thorough hate crime investigation training can miss the details of a hate crime case and may misreport the matter. Supervisors are the next level of assessment and accountability in these matters and should also receive training on hate crime investigations. PRPB has a responsibility to better manage hate crimes, and it starts with training. With training, PRPB personnel will better understand the specific tenets of hate crimes and will classify crimes as such.

## 2. Discriminatory Policing

PRPB is making progress in this area and is now demonstrating its achievement in the delivery of services to the transgender or transsexual community. These interactions find that PRPB is providing services

that address transportation, processing, housing, and medical treatment. The areas that PRPB still needs to address are the assessment of programs, delivery of training requirements to personnel, and juvenile institution cases. Specifically, PRPB must confirm that personnel are trained and certified in discriminatory free policing. Further, PRPB must ensure that each criminal case originating in juvenile correctional facilities is referred to both PRDOJ and the Puerto Rico Department of the Family (PRDoF). PRPB does not meet the referral target in this reporting period.

## Paragraph 87: Equal Protection and Non-Discrimination – Discriminatory Policing

*Paragraph 87 is assessed annually and will be reviewed in CMR-9.*

## Paragraph 88: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB policies complied with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Trainings on discrimination free policing are consistent with approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in discrimination free policing.** | ☐ **Met** | ☑ **Missed** |
| 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | ☑ Met | ☐ Missed |
| Note: This Paragraph is assessed together with Paragraphs 81, 87, and 109 (Policies and Procedures). | | |

### *Compliance Assessment*

Of the four targets within this paragraph, only one is assessed biannually and, thus, assessed in this report. In review of compliance target three, the Monitor's Office found it not to be met. In the analysis of training course IGPD 5011 (Multi-themed Equal Protection and Non-Discrimination) the Monitor's Office found that PRPB did not achieve the 95% threshold for training. All other targets are assessed on an annual basis and will be evaluated in CMR-9.

*Pathway Forward*

To achieve substantial compliance PRPB should continue the educational effort regarding the Reform and its implications to the community. This can be achieved by updating the training schedules of its own members and expanding its community outreach efforts. PRPB officers' training should include updates to laws involving foreign nationals and diplomatic matters. PRPB must update training schedules in all areas to achieve the delivery of course IGPD 5011 (Multi-themed Equal Protection and Non-Discrimination) at the 95% threshold.

## Paragraph 89: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals.** | ☐ **Met** | ☑ **Missed** |
| **4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals.** | ☑ **Met** | ☐ **Missed** |

*Compliance Assessment*

Of the four targets within this paragraph, only two are assessed biannually and, thus, assessed in this report. In review of compliance target three, the Monitor's Office found it to be missed. The Monitor's Office received a certification attesting that PRPB did not conduct VITT 3081 (Interactions with Transgender or Transsexual Individuals) on a virtual platform. PRPB did deliver 8 sessions of REA 623 (Interactions with Transgender of Transsexual Individuals) in a face-to-face format. However, these 8 sessions were only delivered to 126 agents. The 95% threshold was not accomplished in this reporting period. This is a regression from CMR-6, where the analysis of training course REA 624 (Interactions with Transgender and Transsexual Individuals) found that 98% of the sampled personnel had completed this course.

In a review of compliance target four, PRPB reports eight interactions between PRPB personnel and transgender or transexual individuals. PRPB initially documented 14 interactions and then advised that it was only 8 after analyzing and evaluating the complaints in the GTE system. The rest of the complaints the investigators had marked the area of prejudice without corresponding further in the report. The eight cases involved harassment, robbery, lascivious acts, and domestic violence. The review found that PRPB does comply with policies regarding interactions with transgender or transsexual individuals. For example, PRPB personnel provided information on support services and medical attention. The Monitor's Office finds target four met the compliance standard.

*Pathway Forward*

PRPB must train and certify that PRPB personnel are trained regarding interactions with transgender and transexual individuals. PRPB should continue interacting with transgender and transexual individuals in the manner required by GO 624 (Interactions with Transgender and Transexual Individuals). For PRPB to measure policy quality and member interactions, the collection of gender identification, gender expression, transportation, processing, housing, and medical treatment are important performance measures to collect and analyze. These data fields are usually collected on the police report and should be analyzed to measure effectiveness and address any policy updates.

## Paragraph 90: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding biased-free policing;*

*b) community perspectives of discriminatory policing;*

*c) constitutional and other legal requirements related to equal protection and unlawful discrimination;*

*d) the protection of civil rights as a central part of the police mission;*

*e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;*

*f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;*

*g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;*

*h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and*

*i) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #5. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | ☐ Met | ☑ Missed |
| **5. 95% of sampled PRPB members are trained and certified in bias-free policing.** | ☐ **Met** | ☑ **Missed** |

Note: This Paragraph is assessed together with Paragraph 81 and 117 (Training).

### Compliance Assessment

Of the five targets within this paragraph, only one is assessed biannually and, thus, assessed in this report. In review of compliance target five, the Monitor's Office found it not to be met. In assessing whether 95% of sampled PRPB members are trained and certified in bias-free policing, the Monitor's Office found that PRPB personnel did not have training related to bias-free policing. Additionally, the Monitor's Office has been specifically requesting that PRPB identify the training course(s) it provides specific to bias-free policing. As of this reporting period the Monitor's Office has not received any information that PRPB is developing training sessions on bias-free policing.

All other targets are assessed on an annual basis and will be evaluated in CMR-9.

### Pathway Forward

As previously provided in CMR-6, PRPB should assess the International Association of Chiefs of Police (IACP) course on bias-free policing that was provided. PRPB can adapt the course for genuine application of PRPB's needs. Bias-free training is essential in certifying that PRPB officers understand all points associated with this paragraph. Training is essential to the implementation of bias-free policing practices and processes. Training on implicit bias, racial profiling, de-escalation, and communication skills are some of the topics that PRPB should develop coursework for to ensure that PRPB officers are equipped in their engagements with diverse communities.

## Paragraph 91: Equal Protection and Non-Discrimination – Discriminatory Policing

*Paragraph 91 is assessed annually and will be reviewed in CMR-9.*

## Paragraph 92: Equal Protection and Non-Discrimination - Discriminatory Policing

*Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment*

*originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| 1. All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | ☐ Met  ☑ Missed |
|---|---|

### Compliance Assessment

PRPB submitted eight cases to the Monitor's Office for review during the reporting period to determine if PRPB reports cases to PRDOJ and the Puerto Rico Department of Family (PRDoF) within five business days as required. PRPB reports categorized these reports as attempted suicide, assault, and intimidation. The report used to document the date of referral to PRDOJ and PRDoF is PPR 622.1 (Investigative Report), which is in the investigative file. There are specific fields within the report to document the proper referral. It was found that in only one assault case there was a referral to the PRDOJ. In all the other reports the report fields were crossed out and no other information on a referral to PRDOJ and the PRDoF was documented. The Monitor's Office is not able to determine if these six cases were referred as no notation or reporting mechanics indicate such.

### Pathway Forward

PRPB is reminded again, as noted previously in CMRs-5 and 7, that it must certify the total number of cases and validate that report fields noting date and time of case referral to PRDOJ and PRDoF are completed. PRPB followed through on the recommendation that a category noting referral date to PRDOJ and PRDoF be added to the body of the initial report. However, this category is often not filled out and is crossed out. It is PRPB's responsibility to notify the PRDOJ and PRDoF as those agencies have investigative and procedural responsibility as well. This will assist with information sharing, timelines, and responsiveness and be informative to both the Monitors in the police reform and the Monitors on the Juvenile Facilities reform.

## 3. Sexual Assault and Domestic Violence

PRPB's compliance with the paragraphs in this subsection remains the same as was reported in prior CMRs. Improvements to its processes relating to protecting victims of sexual assault and domestic violence, systems to track and collect dispositions, and the application of a victim centered approach in investigations, are necessary. Further, as was noted in other sections, many of the personnel, unit

specific included, lack the required training. Shortages in staff have also resulted in high caseloads among investigators, which has impacted the overall way investigations are conducted and in inconsistences in the investigatory files and folders. Turnover of leadership in both the Domestic Violence and Sexual Assault Investigation Units have also resulted in knowledge and process gaps. With no transition period between leadership, little to no information, including the initiatives and recommendations shared by USDOJ and the Monitor's Office to improve processes, appears to have been shared with new leadership. Irrespective, it is unclear the extent to which these recommendations were seriously considered prior to the leadership change.

PRPB and the Commonwealth need to increase their commitment to addressing the issues continuously noted in these CMRs. As highlighted by recent high-profile incidents of gender-based violence and domestic violence incidents involving PRPB personnel, addressing the improvements noted within the following paragraphs is even more imperative.

## Paragraph 93: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for the remaining Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | ☑ Met | ☐ Missed |
| 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies. | ☐ Met | ☑ Missed |
| 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 94, 98 and 99.

*Compliance Assessment*

Of the four targets within this paragraph, only three are assessed biannually, and thus, assessed in this report. In review of target one, on January 6, 2023, the Monitor's Office issued final approval on policies, manuals, and forms for GO 118 (Domestic Violence Division) and GO 627 (Investigation of Domestic Violence Incidents). These two policies aim to follow generally accepted policing practices.

In review of target two, PRPB self-reports that in reference to curriculum review updates, nothing was changed in REA 627R (Domestic Violence re-training). Also, in CMR-6, the Monitor's Office observed REA 627R (Domestic Violence re-training) and found the course delivered substantive learning objectives on domestic violence, such as identification, reporting, interviewing techniques, supporting resources/agency assistance, and follow-up techniques.

In review of compliance target three, the Monitor's Office found it not to be met. PRPB self-reports that it did not achieve a 95% threshold in training on the following training courses: REA 627R (Domestic Violence re-training), REA 627PM (Domestic Violence Involving Police Personnel), and REA 622 (Sexual Crimes Training). Consequently, PRPB has not reached the 95% compliance target during this reporting period on training related to sexual assault and domestic violence investigations. All other targets are assessed on an annual basis and will be evaluated in CMR-9.

*Pathway Forward*

Yet again, it is re-highlighted that PRPB must continue to make progress in the delivery of its domestic violence and sexual assault training to PRPB personnel. This specialized training provides competent initial response skills for such calls for service. PRPB must continue to deliver the training opportunities, resources, and support needed to effectively respond to these types of crimes.

## Paragraphs 94 and 95: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*Paragraph 94 and 95 are assessed annually and will be reviewed in CMR-9.*

## Paragraph 96: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually for the remaining Data Sources. |
| Practice: | Not Implemented | | |

100

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Training on response to sex crimes related calls is in accordance with approved policy. | ☐ Met | ☑ Missed |
| **3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls.** | ☐ Met | ☑ Missed |
| **4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes.** | ☑ Met | ☐ Missed |
| **5. The manned hotline provides the public access to the Sex Crimes Investigation Unit.** | ☑ Met | ☐ Missed |

*Compliance Assessment*

Of the five targets within this paragraph, only three are to be assessed biannually, and thus, assessed in this report. In review of compliance target three, the Monitor's Office neither received a list of all personnel assigned to the 24-hour hotline nor their training and certification records. Also, PRPB self-reports that there was no training on the hotline related to sex crimes related calls. Therefore, this target is missed.

For target four, PRPB is to staff a 24-hour a day hotline. In response to the Monitor's Office's request, PRPB submitted a 12-page log with dates from October 1, 2022, to December 31, 2022. During this period 304 calls were received through the hotline. The log indicates the date, time, type of incident, call taker, assigned investigator, district, case number, and the supervising agent. PRPB accurately supports that it maintains a staffed hotline 24-hours a day. However, it is pointed out that while the hotline is staffed 24-hours a day it is not verified that the call taker was trained during this reporting period. For target five, the Monitor's Office visited the hotline's offices in previous reporting periods and noted that the office is accessible to the public. PRPB's constraints as far as equipment (as noted in previous CMRs) such as a telephonic computer system and call center, limit its ability to always provide access to the Sexual Assault Crimes Unit. All other targets are assessed on an annual basis and will be evaluated in CMR-9.

*Pathway Forward*

PRPB must continue to make advances in its operations of the 24-hour hotline to ensure public access to the Sexual Assault Crimes Unit. Training is an essential part and very important because it certifies call takers. Training must occur and its records/certifications must be provided to the Monitor's Office to demonstrate compliance. The 24-hour hotline provides public access with immediate crisis intervention, helps the victim create a safety plan, finds emergency shelter, finds access to medical attention, and even provides referrals to other resources in the community. This is such a critical resource for the citizens of Puerto Rico and PRPB must continue to work diligently on this service.

### Paragraphs 97 and 98: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*Paragraphs 97 and 98 are assessed annually and will be reviewed in CMR-9.*

## Paragraph 99: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. | ☒ Met ☐ Missed |
| **2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph.** | ☒ Met ☐ Missed |

Note: This Paragraph is assessed with Paragraphs 93, 94, and 98. The conduct envisioned by this Paragraph may also fall within the purview of Paragraph 184.

### Compliance Assessment

Of the two compliance targets associated with this paragraph, only one is assessed every reporting period, and thus, is assessed in this report. In review of target two, the Monitor's Office reviewed cases involving PRPB members to assess that weapons were seized and that a psychological fit for duty was conducted. PRPB is required to provide a receipt of seized weapons. There are several forms that PRPB can use depending on what the Bureau is to collect from the agent. Forms such as PPR 605.4 (Receipt of Less Lethal Weapons), PPR 618.2 (Receipt for Loaded Regulation Weapons and Ammunition), PPR 618.4 (Certification of Receipt of Weapons and Ammunition), and/or PPR 618.13 (Receipt of Regulation Weapon). Additionally, the agent is to be referred to psychological services for an evaluation before returning to duty.

### Pathway Forward

It is imperative that PRPB establish a rigorous accountability system on the investigative management of criminal cases involving PRPB personnel. No person is above the law and while PRPB has both a duty and responsibility to assist the public, it must also follow the policy and procedures it outlines to policing its own. The seizing of weapons and a referral to psychological services when a PRPB member is involved in a domestic violence or sexual assault case is policy driven and must be enforced and documented. Both targets associated with this paragraph are assessed as part of a comprehensive review of how PRPB regulates itself and this is an area that PRPB can improve upon. The Monitor's Office will assess and

report on responding supervisory measures to calls involving PRPB members and whether an administrative and criminal case is initiated in the next reporting period.

# V. Recruitment, Selection, and Hiring

The most recent Paragraph 13 Committee Meeting presentation showed that 200 recruits will be added to the ranks of PRPB by July 2023. Police recruitment, selection, and retention are critical to the advancement of community policing and of the policing profession in general. However, recruitment and staffing shortfalls continue to plague law enforcement agencies across the United States. Nevertheless, PRPB provided data that demonstrates a concerted effort both to recruit qualified candidates, and to vet them thoroughly.

Overall, PRPB has put a tremendous effort into addressing these challenges with a comprehensive recruitment plan and effective recruitment programs that solicit recruits from a broad cross-section of the Puerto Rican community. However, gaps remain in the training of recruitment officers and the implementation of the recruitment plan in practice. The recruitment plan includes several strategies to attract diverse applicants.

During the reporting period, the Monitor's Office reviewed proposed updates to PRPB's Law 65 recruitment policy (GO 501 - Recruitment) and the 2022/2023 Recruitment Strategic Plan and gave feedback to PRPB). The Monitor's Office has also interviewed members of the Recruitment Division, HR Division, PRPB members, the Academy, and Paragraph 13 Implementation Plan committee members, and reviewed all pertinent forms and recruiting materials that are being used by the Bureau. It should be noted that as of March 31, 2023, the new recruitment regulations, and the general order of the Recruitment Office, which includes the implementation of Law 65, are on hold until further thought and planning on establishing a cadet program. Under Paragraph 13, a sustainability plan has been submitted to the Court. It is hoped by the Monitor's Office that a new Police Academy class (235) will be operational by CMR-9, to help fill the void of many retirements.

The Monitor's Office finds that PRPB is partially compliant with the Agreement regarding recruitment, selection, and hiring policies and procedures. PRPB has tried to recruit and hire qualified personnel and develop recruitment strategies that promote inclusive selection practices that better reflect a diverse cross-section of the Puerto Rican community. PRPB still needs to improve in certain areas, such as the development of training, continue to use CIT officers, as well as institutionalize many of these practices to achieve substantial compliance.

It should be noted that the Recruitment Division currently uses an INTERBORO platform that expedites the complete recruitment process. The Recruitment Division should also ensure that each recruitment officer in all areas in Puerto Rico be trained in recruitment and the use of the INTERBORO platform. The INTERBORO system makes PRPB more effective and efficient in recruitment and helps automate valuable information and statistics.

Overall, PRPB's compliance with the eight Recruitment, Selection, and Hiring paragraphs assessed during this reporting period reflect the same levels of compliance as what was noted in previous CMRs. In CMR-2, CMR-4, CMR-6, and CMR-8 all paragraphs were assessed as partially compliant. See figure 6.



*Figure 6. Recruitment, Selection, and Hiring: Paragraph Compliance Status*

## Paragraph 101: Recruitment, Selection, and Hiring - General Provisions

*PRPD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. PRPD shall develop a recruitment policy and program that establishes clear guidance and objectives for recruiting police officers and clearly and transparently allocates responsibilities for recruitment efforts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 102-108, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

During the reporting period, PRPB and the Recruitment Division have been cooperative in providing information and data on recruitment to the Monitor's Office. The information and data have included the pertinent regulations, GOs, and tools. It is recommended by the Monitor's Office that success stories and any failures involving recruitment should be documented in a recruitment Annual Report so that PRPB has concrete data to review when developing future recruitment strategies. It is also recommended that recruitment data be compared to past years, and this information be distributed to all PRPB members. Information provided by PRPB indicates that there is not a shortage of police recruits, which is different from the challenges experienced in the United States. The Interim Recruitment

105

Director has provided necessary data on prospective cadets who have been recruited and vetted. The gender and education composition of PRPB Academy Classes 233 and 234 are listed in the table below. The Interim Recruitment Director told members of the Monitor's Office that PRPB's goal is to add 200 more recruits which would become Class 235 in July 2023. It has not yet been determined where Class 235 will be holding their classes, since Class 234 has not yet completed their training.

## Education Level of Entering Cadets for Academy Classes

It is apparent that highly educated individuals are being attracted to the police profession in Puerto Rico. The following information verifies this fact. PRPB accepted 123 cadets into Class 233 and 391 cadets into Class 234. In Class 233, 37% of the cadets are women and 63% are men. In Class 234, 45% are women and 55% are men.

| Class Number | Gender | Highest Education Level Achieved | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Associate's Degree | Bachelor's Degree | Master's Degree | Doctor's Degree | Total |
| Class 233 | Women | 12 | 41 | 2 | 0 | 55 |
| | Men | 21 | 41 | 4 | 2 | 68 |
| Class 234 | Women | 40 | 90 | 14 | 0 | 144 |
| | Men | 114 | 126 | 7 | 0 | 247 |
| Total | Women | 52 | 131 | 16 | 0 | 199 |
| | Men | 135 | 167 | 11 | 2 | 315 |

*Table 1. Gender and Education Breakdown of Cadets*

The Interim Recruitment Director is a proponent of hiring as many women as possible who are qualified to be part of PRPB. He clearly understands the value of gender diversity in the workforce. He has mentioned that in Classes 233 and 234 women have constantly finished in the top 5 cadets who have completed the physical fitness tests and are rated extremely high in academic studies.

The Monitor's Office supports the efforts of PRPB to recruit qualified applicants from a broad cross-section of the Puerto Rican community, and to track recruitment performance thoroughly and provide that data to the Monitor's Office.

## Pathway Forward

The Agreement establishes inclusive selection practices as a clear goal for hiring reform, with the intention of promoting greater representation among PRPB personnel for the diversity of the Puerto Rican community. The Recruitment Division has been conducting outreach to the female and LGBTQIA+ communities to attract more interest in the profession within these communities. PRPB has taken steps to make recruitment and selection practices more inclusive, and these steps are beginning to produce positive results in terms of more female diversity in the hiring pool. PRPB has been authorized to hire new cadets in 2023, hopefully continuing the trend of increasing representation to a broad cross section of the Puerto Rican community. The Monitor's Office also encourages PRPB to reach out to underrepresented communities, such as the Dominican community, in its increased recruitment efforts.

106

PRPB should prepare an Annual Report on the recruitment process and distribute to all members of PRPB and the Puerto Rican community. The system should become completely automated to ensure accurate tracking of all recruits and the recruiting process. It is also recommended that PRPB train to their latest regulation once the Recruitment Strategic Plan and policy is approved.

## 1. Recruitment Plan

The Agreement establishes inclusive selection practices as a clear goal for hiring with the intention of promoting greater representation among PRPB personnel for the diversity of the Puerto Rican community. The Recruitment Division has been conducting outreach to the female and LGBTQIA+ communities to attract more interest in the profession within these communities. PRPB has taken steps to make recruitment and selection practices more inclusive, and these steps are beginning to produce positive results in terms of more female diversity in the hiring pool. PRPB has been authorized to hire new cadets in 2023, hopefully continuing the trend of increasing representation to a broad cross section of the Puerto Rican community. The Monitor's Office also encourages PRPB to reach out to the underrepresented communities, such as the Dominican community, in its increased recruitment efforts.

### Paragraph 102: Recruitment, Selection, and Hiring - Recruitment Plan

*PRPD shall develop a recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community. PRPD's recruitment plan shall establish and clearly identify the goals of PRPD's recruitment efforts and the duties of officers and staff implementing the plan.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies and recruitment plans incorporate all of the requirements of Paragraphs 101-103. | ☒ Met ☐ Missed |
| 2. Training on recruitment is consistent with approved policies. | ☒ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in recruitment policies and plans (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☒ Missed |
| 4a-d, f. PRPB's recruitment plan was developed, implemented, and evaluated in accordance with approved policies on recruitment. | ☒ Met ☐ Missed |
| 4e. 85% of activities required by the recruitment plan and directed at recruiting underrepresented groups were implemented, including any missed activities that are reasonably justified. | ☒ Met ☐ Missed |

*Compliance Assessment*

PRPB provided the Monitor's Office with a current copy of the Recruitment Plan for 2022-2023, which notes that one of the division's priorities is to train members of the Community Relations Bureau of the 13 police areas as recruiters. Though PRPB noted that its goal is to fully train recruiting officers throughout Puerto Rico in the future, gaps in training remain for the present reporting period. SAEA has not held a class on *How to be a Recruiter*, and PRPB did not provide evidence for the Monitor's Office to verify that 95% of sampled personnel have been trained and certified on recruitment policies and plans. The Monitor's Office notes that PRPB did meet their goals regarding training during CMR-6.

The Monitor's Office has not yet reviewed a training curriculum for recruitment personnel. However, the Monitor's Office is aware that the strategic plan continues to evolve and is involving other members of PRPB who are not assigned to the Recruitment Division. The Recruitment Office informed the Monitor's Office that a curriculum has been developed in line with policy to train recruiters on the Recruitment Plan and methods. However, this updated curriculum awaits approval from the Commissioner's Office, and as such cannot serve as evidence of compliance for the present CMR.

The Agreement states that PRPB's recruitment plan must involve steps to solicit and consider stakeholder suggestions in good faith, identifies barriers to recruiting underrepresented groups, and include initiatives to overcome those barriers. The Monitor's Office has determined that PRPB has developed a recruitment plan and recruiter positions that meet these requirements. Furthermore, the current Interim Recruitment Director has indicated that he and the Reform Unit are working on a series of community policing initiatives to improve the recruitment process.

The Monitor's Office also notes that the former Director of the Reform Unit, Captain Figueroa, sent correspondence to the Monitor's Office that on October 24, 2022, that the Strategic Recruitment Plan was sent, evaluated, and reviewed by CIC members.

On November 1, 2022, documentation was sent to the Monitor's Office confirming a community policing initiative was sent to all PRPB Community Relations offices.

Nevertheless, the Monitor's Office concludes that the Recruitment Plan requires modifications to include clear advertisement guidelines in alignment with community policing standards. The plan must highlight potential candidates' demonstrated qualifications or combination of skills in problem solving, critical thinking, leadership, interpersonal skills, mature judgment, communication, and strong ethics. Such modifications would lead to a higher assessment rating.

*Pathway Forward*

The Monitor's Office strongly recommends that a training curriculum be fully developed and approved as soon as possible but no later than CMR-10. Training for recruiters is evolving and the interim Recruitment Director has mentioned that he has forwarded a proposed training curriculum to the Reform Unit. It is also recommended that the training curriculum be approved by the PRPB Commissioner and the Director of DSP.

The Monitor's Office notes that there could be more outreach to CIC members and the Puerto Rican community for their assistance during past assessments. The recruitment plan should include provisions that PRPB consult with community stakeholders and obtain recommendations to ensure a

diverse candidate pool, including underrepresented communities in addition to women and Dominican nationals. The Monitor's Office again recommends solicitation of ideas from the Puerto Rican community. Working together will ensure partnerships and good working relations among all groups in Puerto Rico. The Recruitment Division should also be familiar with the surveys which were given to members of the community and continue to partner with CIC members.

## Paragraph 103: Recruitment, Selection, and Hiring - Recruitment Plan

*The recruitment plan shall include specific strategies for attracting a diverse pool of applicants including members of groups that have been historically underrepresented in PRPD. A "Recruitment Officer" will be responsible for the development of the plan, together with a working group that includes officers from diverse backgrounds. The working group will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. The plan will include both outreach to the general population and targeted outreach to populations currently underrepresented on the PRPD force including, but not limited to, women and the Dominican population, through media outlets, universities, community colleges, advocacy groups, and other community groups that serve or are likely to reach such populations. The "Recruitment Officer" and his or her staff, as determined by the Superintendent, will be responsible for the implementation of the plan.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 102.

### *Compliance Assessment*

The Recruitment Division has provided examples of ways in which their members have attempted to be inclusive and to reach out to the groups currently underrepresented in PRPB, including, women and people of Dominican descent. As an example, the Monitor's Office has continued to receive copies of recruiting promotions that have been shared with the Consulates in Puerto Rico. During the reporting period, the Monitor's Office received evidence of numerous recruitment efforts throughout the island in San Juan, Carolina, Bayamon, and Fajardo. Documentation was provided to the Monitor's Office demonstrating some work with CIC members and staff of various local universities to recruit from a wide range of Puerto Rican society.  As an example, there were recruiting trips to the University of Ana Melendez on February 15, 2023, and a Facebook article published on November 4, 2022.

*Pathway Forward*

The Monitor's Office recommends that PRPB should continue to hold conferences for the varied groups to whom it provides verbal and written information to promote the recruitment of candidates of diverse backgrounds. It should also continue to work with the Counsel of the Dominican Republic as well as other consulates and representatives of the LGTBQIA+ community to help promote recruitment in these communities. The PRPB Recruiting Team should be representative of the Bureau and be comprised of sworn and non-sworn members. Recruiting at PRPB should be creative and constantly evaluate which strategies are working and which are not and make changes when necessary to adapt and use new social media tools that are available. It is also recommended that when Law 65 is finalized, PRPB should make recruiting efforts in high schools like U.S. police agencies. The Monitor's Office feels that the above-mentioned recommendations should be added to the recruitment plan.

## 2. Hiring Reforms

The Monitor's Office concludes that PRPB has developed and implemented a recruitment selection system that meets most of the policy and practice requirements of paragraphs 104-107. Nevertheless, PRPB receives only partial compliance on paragraphs 104-107 due to lack of adequate training for recruitment officers. PRPB did not provide evidence demonstrating that SAEA has conducted trainings on How to be a Recruiter, and the Monitor's Office determined that 95% of sampled personnel involved in recruitment had not been trained and certified in recruitment policies and plans. Hopefully, training will begin during CMR-9.

### Paragraph 104: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall develop an objective system to select recruits to enter into UCCJ. The system will establish minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices that comport with generally accepted policing practice and anti-discrimination laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 104-07. | ☑ Met | ☐ Missed |
| 2. Training on the recruit selection process is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in all recruit selection process policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

110

| | |
|---|---|
| 4a. 100% of recruits meet qualifications required by policy. | ☒ Met   ☐ Missed |
| 4b. The recruit selection process was implemented in accordance with approved policies. | ☒ Met   ☐ Missed |

## Compliance Assessment

The Monitor's Office has reviewed numerous tools that PRPB uses to attract qualified applicants from a broad section of the community during this reporting period, including the current hiring brochure, and the Strategic Plan for Recruitment and Hiring. The Monitor's Office also reviewed the training on recruit selection to ensure that the training materials were consistent with approved policies. The Monitor's Office has concluded that the 2023 Recruitment Plan sets adequate goals and objectives for hiring qualified individuals and these goals have been met during this reporting period. PRPB provided lists of cadets for Academy Classes 233 and 234 and data on the acceptance rates for incoming cadets. Based on this data, the Monitor's Office concludes that recruits accepted during the reporting period meet minimum requirement standards required by paragraphs 104 and 105, and that the selection process meets requirements of paragraphs 104, 106, and 107.

PRPB provided documentation demonstrating that the Bureau continued to recruit adequate numbers of applicants for Academy Classes 233 and 234. The documentation provided has demonstrated that candidates undergo a rigorous assessment ahead of appointment, and that unqualified applicants are rejected. The current PRPB system does establish minimum standards for recruitment and an objective process for selection that comports with generally accepted policing practices. The Monitor's Office has not received information demonstrating that antidiscrimination/antibias training has been given to the Recruitment Division. This was also verified with the Monitor who is tasked with verifying training.

Information has been forwarded to the Monitor's Office about reasons for applicants failing and not moving forward in the process. The information provided by PRPB clearly shows those who applied from October 2022 through March 2023. The reasons include why the candidates failed the process and were not allowed to continue. The various categories include background investigations, polygraph, psychological examinations, medical examinations, and physical fitness examinations. Again, this information should be made public without the names of the applicants to ensure confidentiality and total transparency.

## Pathway Forward

PRPB should continue to ensure that their selection processes are consistent with generally accepted policing practices and continue their efforts in anti-bias and anti-discrimination policies. Though recruitment remains strong, PRPB must ensure continued compliance with the requirements of the Agreement by training all personnel on recruitment policies, especially recruitment officers. The Monitor's Office is optimistic that when relevant PRPB personnel are fully trained and operating the INTERBORO platform, their work will allow PRPB to better track information and outcomes for the recruitment process.

It is imperative that a training curriculum be developed for all members of PRPB on antidiscrimination and anti-bias and that all members who are doing recruiting be aware of the issues concerning these two topics.

## Paragraph 105: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall establish and publish qualifications for sworn personnel that are consistent with generally accepted policing practice. PRPD shall continue to require a two-year post-secondary degree, or its equivalent, as part of the requirements for sworn personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 104.

### Compliance Assessment

On December 23, 2021, Honorable Pedro Pierluisi, Governor of the Commonwealth of Puerto Rico, signed into law an amendment to articles 1.02, 1.11, and 2.07 of Act 20-2017 (Department of Public Safety Act) changing the hiring age for PRPB officers from 21 to 18. Although applicants are still required to obtain an associate degree, per the Agreement, this change in applicant age presents an opportunity for PRPB to establish a viable cadet program.

The Monitor's Office provided PRPB with many examples of cadet programs from police agencies across the country. The Monitor's Office notes that it is a widely accepted policing practice to accept cadets from the age of 18, with key restrictions on the functions they are allowed to perform and specific requirements they must meet on the pathway toward full police officer status. In keeping with the language of the Agreement, the jurisdiction of which supersedes Puerto Rican law, PRPB could explicitly require that cadets who enroll meet all requirements before being sworn in, including attaining at minimum a two-year post-secondary degree.

### Pathway Forward

PRPB's efforts toward establishing a cadet program have been discussed at several status conferences in 2022 but a policy has not been completed by PRPB at this point. The Monitor's Office recommends that PRPB review the cadet program guidance and overview materials provided. These materials are best practices for cadet programs used by law enforcement agencies across the country. The Monitor's Office looks forward to further collaboration with PRPB in the development of the cadet program.

The Monitor's Office urges PRPB to consider how a cadet program and lowering the age limit for hiring of police officers, with the stipulations of paragraph 105 that all recruits attain at minimum a two-year post-secondary degree before being sworn in could serve to align articles 1.02, 1.11, and 2.07 of Act 20-2017.

## Paragraph 106: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall require all candidates for sworn personnel positions to undergo a psychological, medical, and polygraph examination to assess their fitness for employment with PRPD.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 104.

### *Compliance Assessment*

PRPB requires that all candidates applying to become a PRPB officer undergo psychological, medical, and polygraph examinations to assess their fitness for employment. The Monitor's Office concludes that these examinations are consistent with policy and with the Agreement after conducting a variety of document reviews including the files of 78 recruits. The Monitor's Office reviewed a random sample of 58 candidate files. These files were sent by PRPB and cover October through December 2022. Additional files were sent by PRPB and cover January through March 2023. Of which the Monitor's Office drew a random sample of 20 candidate files.  A review by the Monitor's Office could not confirm that 95% of the recruitment files complied with policy and met the relevant targets of paragraphs 104-107. The Monitor's Office has requested additional files which will cover January through March 2023. In sample reviews, the Monitor's Office found files where the checklists were not filled out completely. In other cases, notes were written directly on the checklists. In some files there was no identifying photograph. There should be an identifying photograph in every file even if a candidate is excluded.

### *Pathway Forward*

PRPB should continue with the current system, as the representative samples of recruitment files appear to partially comply with policy. A recruitment curriculum should be developed as soon as possible so that members of PRPB in other police areas can conduct generally accepted recruitment policing practices. It is also suggested by the Monitor's Office that all checklists be filled out in the recruits' files. Further, a protocol should be developed to ensure that all recruit files contain the same information in the same order.

## Paragraph 107: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall assess and revise its policies and practices to ensure thorough, objective, and timely background investigations of candidates for sworn personnel positions based on generally accepted policing practice. PRPD's suitability determination shall include an assessment of a candidate's credit history, criminal history,*

*employment history, use and abuse of controlled substances, and ability to work with diverse communities and act without impermissible bias. Favorable suitability determinations shall expire six months after the determination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 104.

*Compliance Assessment*

The Recruitment Division gives the DSP Office of Safety and Protection the recruit files. The DSP Office of Safety and Protection performs the background investigation of each PRPB candidate. This includes an evaluation of each candidate's credit history, criminal history, employment history, use and abuse of controlled substances, ability to work with various communities, and to carry out duties without prejudice. During past CMRs, the USDOJ and the Monitor's Office reviewed the manual used by the Office of Safety and Protection and recommended changes to the manual. Among these recommendations, USDOJ and the Monitor's Office suggested that PRPB should request key records from national databases including the Criminal Record Returns from the USDOJ's Bureau of Criminal Identification and Investigation, the FBI Criminal Record Return document, and the USDOJ Firearms Eligibility Clearance Return in a timely manner. A review of the data from candidates' files in this reporting period demonstrates that background investigations are currently being completed in a timely manner. Background investigations are inclusive of an assessment of a candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with diverse communities and act without impermissible bias. Favorable suitability determinations shall expire six months after the determination. Currently, the interim director indicates that the system is working but would like to see the results of the background investigation faster.

*Pathway Forward*

The Monitor's Office recommends that PRPB continue to work with the DSP Office of Safety and Protection to implement the recommended revisions to the manual used in conducting background investigations on candidates. The Office of Safety and Protection should establish an information system that would allow it to efficiently request and review Criminal Record Returns. Once these data sources are accessible, their usage should be standardized in a revised manual which would include changes in policy and procedure.

## Paragraph 108: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD and the UCCJ shall revise and implement policies and practices related to hiring to ensure that PRPD recruits and cadets do not qualify for civil service employment protections until their aptitude and abilities are properly assessed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met   ☐ Missed |
|---|---|
| Note: This Paragraph is assessed, in part, with Paragraph 119. | |

### Compliance Assessment

The Monitor's Office has verified that PRPB has reviewed and implemented hiring-related policies and practices to ensure that PRPB recruits and cadets qualify for public service employment protections. These protections are only granted after a thorough evaluation of the candidate's skills and abilities. The Monitor's Office has reviewed the new Recruitment Regulation and found it to comply with the stipulations of the Agreement and with widely accepted policing practices. The Monitor's Office has verified that this regulation has been implemented in training and practice.

The PRPB HR Director confirmed that the current policy ensures that recruits qualify for public service employment protections before granting those protections and noted that this practice has been instituted. PRPB has also stated that candidates are subject to a probation period, which is required by PRPB. PRPB specialists review the rights of candidates during the probation period. In the February 2023 meeting with the HR Director, she confirmed the fact that PRPB candidates are subject to a probation period. The Monitor's Office notes that in May 2022, an updated Recruitment Regulation was provided for review; however, the Commissioner or Director of Public Safety have not yet signed this document.

### Pathway Forward

PRPB should continue to use the system that is in place, which defines the probation period and the rights of candidates. This information is noted in the regulation that establishes the standards and procedures for the recruitment of PRPB members. It is recommended that this same policy be approved by the PRPB Commissioner and the DSP Director as soon as possible. It is also recommended that Law 65 be finalized, which will change the age requirement for recruitment.

## VI. Policies and Procedures

Policies and Procedures is assessed on an annual basis. Paragraphs 109 – 116 were assessed in CMR-7 and will be assessed again in CMR-9.

# VII. Training

Police officer training is a fundamental developmental process that contributions to successful officer careers. While PRPB remains aware of the significance of this process, training continues to not be a priority. Specifically, PRPB did not achieve the mandatory 40-hour in-service training requirement that each officer is required to receive, per paragraph 129, during this training cycle.

The Training section of the Agreement is assessed annually and, in this report, covers the review period of April 2022 through March 2023. The Monitor's Office's assessment of PRPB's compliance with training is based on the training documents submitted by PRPB, interviews with staff assigned to the Academy, Field Training Officers (FTOs), FTO Coordinators, and others involved in the development and conduct of Academy, in-service, and FTO training. Over the last year, PRPB has had to adjust its training delivery due to the larger than usual pre-service academy - Class #233 had over 400 cadets. The development and delivery of the new sergeants' course to over 500 individuals also contributed to this adjustment. The shortage of training instructors to teach the pre-service and in-service training courses further hindered the Academy's ability to operate functionally. As noted in previous CMRs, the staffing shortages coupled with the Academy's inability to accurately document its training capabilities using the Police Training Management System (PTMS) must be addressed.

Much work remains for PRPB to achieve preliminary compliance with several of the paragraphs within this section. Specifically, the sections of in-service training, training record management, and curriculum development still need work to attain compliance. Within those areas, the provision of additional equipment to support training instructors in the delivery of scenario-based training and full use of PTMS to register, record, and evaluate training courses provided by PRPB needs improvement.

Although the Monitor's Office was able to meet with and interview various staff involved in the development and supervision of training, PRPB failed to submit the data and documentation necessary for the Monitor's Office to assess this area in a comprehensive manner. Documentation such as projected training calendars/schedules and course curriculum files were not provided. Additionally, despite the Monitor's Office's several requests for training calendars and schedules, none were provided in advance of the conduct of these trainings, and the Monitor's Office was limited to observing one pre-service class during this CMR reporting period. During this reporting period the Monitor's Office did receive and review supporting documents and related materials for the development of a comprehensive training program to supplement the 40-hour formal in-service training that is delivered at the beginning of shifts or tours of duty for all officers. These meetings are referred to as roll call training meetings.

Despite the challenges and issues noted above, PRPB continues to demonstrate its growth in the development and delivery of its FTO program. The FTO training program is modeled after national best practices and PRPB has demonstrated progress in the development, delivery, and practice of all aspects of this training program. PRPB must still find the resources for compensation or incentives for its FTO trainers. The FTO Program expanded its coverage of the island during this reporting period. The FTO Program is now in five districts: Bayamon, Caguas, Carolina, Fajardo, and San Juan. PRPB is commended on the progression of the FTO Program. It demonstrates PRPB's commitment to the development of a new agent's successful career.

117

In response to the Court, PRPB, in collaboration with the Parties, developed a Training Sustainability Plan.[5] Although the plan outlines PRPB's projected efforts to address the issues the Monitor's Office has noted in this and previous CMRs, much of these actions will not be taken and/or fully implemented until the end of 2024. The Monitor's Office continues to stress that it is imperative that PRPB address its current training efforts to advance its progress towards compliance.

Overall, PRPB's compliance with the 18 Training paragraphs assessed during this reporting period reflects substantial improvement in levels of compliance compared to what was noted in previous reports. In CMR-6 39%of paragraphs (7 paragraphs) were assessed as not compliant, in comparison to the current reporting period, where 100% of paragraphs (18 paragraphs) were found to be partially or substantially compliant. See figure 7.



*Figure 7. Training: Paragraph Compliance Status*

## Paragraph 117: Training - General Provisions

*PRPD shall ensure that every PRPD officer and employee receives effective and comprehensive training that ensures they understand their responsibilities, the scope of their authority, and PRPD policy, and are able to fulfill these responsibilities and police effectively. Qualified trainers and instructors shall deliver instruction through generally accepted methods and techniques that are approved by UCCJ and are designed to achieve clear and articulated learning objectives. Trainers and instructors shall utilize generally accepted evaluation methods approved by UCCJ to assess proficiency and competency.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Annually |

---

[5] See Case 3:12-cv-02039-FAB Document 2379-1.

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

## Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | ☑ Met   ☐ Missed |
| 2. Training for trainers and instructors is consistent with approved policies. | ☐ Met   ☑ Missed |
| 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | ☐ Met   ☑ Missed |
| 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | ☐ Met   ☑ Missed |
| 5. Evaluation methods are used and documented in accordance with policy in 95% of selected training course files. | ☐ Met   ☑ Missed |

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 117-134, and (2) the results of outcome assessments, pursuant to Paragraph 243.

## Compliance Assessment

During this reporting period, the Monitor's Office found that PRPB continues to fall short on its training efforts and ability to establish a consistent training process, though efforts were made to achieve this goal. Training of PRPB personnel is categorized into two areas: pre-service and in-service. While PRPB has made strides in the pre-service area, much is yet to be accomplished in the in-service area. Therefore, this paragraph is partially compliant. PRPB must continue to give more attention to instructor assessments, full PTMS use for centralized training records, use of technology, use of appropriate equipment, and learning comprehension assessments. PRPB still does not accurately keep training records, therefore it is not able to conduct full evaluations and validate the qualifications of its instructional staff or track the training needs of its personnel. Further, PRPB continues to provide certifications noting the courses essential to the Agreement have not been delivered to PRPB personnel, such as VRUF 3081: UOF for Agents; VITT 3081: Transgender and Transsexual Interactions; VUAR: Firearms Training: and VRAF 3081: UOF for Supervisors. On January 17, 2023, the Monitor's Office was provided with a system demonstration of PTMS by personnel from the IT Bureau and Academy. The consensus was that the Academy provided IT with the changes needed to PTMS and IT would move forward with making those changes to PTMS. At the end of this reporting period, PRPB advises that they are working on PTMS programming issues. Currently, the enrollment module for admission of grades and certification for promotion training has been changed and a report on training to identify which staff have not received training is being added to the system.

In conducting interviews with Academy staff, the Monitor's Office found that the in-service training operations are not adequately supported. The overwhelming load that has recently been placed on SAEA, which is understaffed, includes a larger pre-service Academy and the new sergeants promotional and training process. It is not unusual for the Academy to have officers recruited to other parts of the Bureau. This puts a strain on an already sizeable workload obligation. PRPB must allocate the needed resources for training staff, equipment, and reporting processes, otherwise it continues to neglect its training obligations.

*Pathway Forward*

PRPB must be in sync with both pre-service and in-service training. The documentation for both levels of training is critical. The sustainable processes of PTMS are needed for PRPB to adequately document the certifications and qualifications of all its instructional staff. Additionally, instructor evaluations should be used in a manner that allows for thorough assessment. Ultimately, PRPB must identify the underlying expertise of its instructors to determine that its new agents receive a focused education on tactics and techniques. PTMS can store instructor credentials. PRPB could use PTMS in the evaluation process to determine that the instructors deliver the best training possible. PRPB is currently developing a Training Sustainability Plan with specifications on how to achieve compliance with this paragraph and other training paragraphs. The Monitor's Office looks forward to assessing PRPB's adherence to the Training Sustainability Plan and progress in achieving compliance.

## 1. Pre-Service Education and Training

Pre-service training has often been cited as one of the most important responsibilities in any law enforcement agency. Agencies are constantly being held legally accountable for the actions of their personnel and for not providing initial or remedial training. The PRPB Police Academy's role is to provide foundational police training. A firmly built foundation with proper materials by quality instructors will directly affect the structural integrity and success of the entire department. This must include training in policy, procedures and directives, standards, assessment tools, centralized training records, core curriculum, appropriate equipment, and guidelines on the use of technology.

It should be noted that PRPB operates the Police Academy through SAEA, which is tasked with providing the necessary training. PRPB has taken over all implementation and compliance responsibilities previously assigned to the University College of Criminal Justice (UCCJ). PRPB was negotiating an academic relationship with the University of Puerto Rico (UPR) to assist in academic delivery; however, that has not developed and SAEA now does individual contractual work with UPR instructors.

### Paragraph 118: Training - Pre-Service Education and Training

*UCCJ shall provide pre-service education and training to candidates for sworn personnel positions in PRPD in accordance with its enabling statute and regulations. To the extent that UCCJ will confer Associate or equivalent degrees recognized by nationally or regionally accredited institutions of higher learning in the continental United States, UCCJ shall maintain its license in good standing from the Puerto Rico Council on Education and attain full accreditation from the Middle States Association of Colleges and Schools within two years of the decision to confer such degrees.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |

| Training: | Not Implemented | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 118-121. | ☑ Met ☐ Missed |
| 2. The pre-service training program, including curriculum and related training materials, is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. Training plans and standards are consistent with approved policies. | ☑ Met ☐ Missed |
| 4. 95% of personnel who complete the pre-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with training plans, standards, and policy. | ☑ Met ☐ Missed |
| 5. The pre-service training curriculum is reviewed and revised in accordance with policy. | ☑ Met ☐ Missed |
| 6. Findings and recommendations of bi-annual reviews of the pre-service training curriculum are submitted to the Commissioner in written reports. | ☑ Met ☐ Missed |
| 7. Needs assessments are conducted in accordance with policy. | ☐ Met ☑ Missed |

### Compliance Assessment

PRPB is no longer in an MOU agreement with UCCJ. PRPB has delivered the pre-service training to sworn personnel training internally, without academic oversight. PRPB is initiating an academic process to confer Associate or equivalent degrees for pre-service training (if the cadet does not already have an Associate or equivalent degree), but no university has been officially identified to partner with PRPB. During this reporting period, the Monitor's Office found that PRPB's ability to provide an Associate degree level education is limited due to its lack of an academic relationship with an institute of higher education.

For target two, the PRPB pre-service curriculum is consistent with approved policies. The Academy staff have stated repeatedly that curriculum changes are conducted when a new or updated policy has been received. However, the curriculum update report to the Commissioner states that during this reporting period no changes to the curriculum were made. For target three, the training plans and standards are consistent with policy since no policy changes have occurred; however, the Monitor's Office was advised of several policy updates on March 20, 2023. For example, GO 310 (Performance Evaluations) was signed by the Commissioner. These updates should result in curriculum changes to the related courses.

For target four, and specifically for pre-service training, a 95% threshold was achieved. PRPB is delivering a pre-service education to new agents that is in accordance with training plans, standards, and policy. During this reporting period the Monitor's Office was provided with a training schedule and plans for course delivery. These documents comply with current policies. For targets five and six, the Monitor's Office received and reviewed the 2022 Annual Curriculum Revision Report. The report contained notations on which pre-service Academy courses were modified and which courses remained the same. For example, POL 1007 (Ethics) had a change to the audio-visual materials used in

the course, and POL 1010 (Civil Rights) had no changes made to the course. These changes are noted in the official report to the PRPB Commissioner. For target seven, PRPB as part of the Training Sustainability Plan to the Court, is proposing that a thorough needs assessment be conducted. However, during this reporting period no training needs assessment was initiated. Overall, PRPB complies with its reporting of curriculum changes in this reporting period. Academy staff wait for approved policy or procedural changes before implementing any curriculum changes.

### Pathway Forward

PRPB must conduct a needs assessment to identify where gaps exist between organizational and individual performance goals. The assessment must include a measurement of current skills and knowledge levels for pre-service training. Identified gaps may include changes in laws or policy, the need for new equipment, and/or lack of awareness of information on non-discrimination practices. The goal is to assess training needs more accurately, and efficiently provide the knowledge and skills needed by PRPB officers.

## Paragraph 119: Training - Pre-Service Education and Training

*Once candidates meet all educational requirements and eligibility criteria, UCCJ shall establish and provide a pre-service training program for PRPD cadets consisting of at least 900 hours of instruction that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed together with Paragraph 118.

### Compliance Assessment

The Recruitment, Selection, and Hiring Committee provides information on eligibility qualifications for PRPB cadets. During this reporting period PRPB had over 400 cadets in training. These cadets represent Class #233 and have been approved by the Recruitment, Selection, and Hiring Committee, allowing the cadets to be eligible for the pre-service program. The pre-service training program currently consists of 1,310 hours, exceeding the 900-hour minimum. During this reporting period the curriculum and related training materials were found to be consistent with approved policies. PRPB provided a training schedule for Class 232 through March 5, 2023.

*Pathway Forward*

For PRPB to meet compliance requirements, the entire training schedule for the pre-service training Academy must be submitted to the Monitor's Office. Review of the topics that have been added will provide for a quality content review of these new topics. Further, observation of the training will allow the Monitor's Office to observe the training in practice and allow PRPB to demonstrate operational implementation of this paragraph.

## Paragraph 120: Training - Pre-Service Education and Training

*PRPD and UCCJ shall review and revise its pre-service training curriculum to ensure quality, consistency, and compliance with applicable law, PRPD policy, and this Agreement. PRPD and UCCJ shall conduct regular subsequent reviews, at least semi-annually, and submit their findings and recommendations in written reports to the Superintendent.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

*Compliance Assessment*

PRPB complied with its reporting of curriculum changes during this reporting period. PRPB reviewed 43 pre-service courses during CMR-8. The modifications resulting from these reviews were then reported to the Commissioner. During this reporting period 14 courses remained the same. Twenty-nine courses had curriculum changes. For example, learning objectives, definition clarification, and scenario example updates for courses on Arrest and Citations and Sexual Assault Investigations were made. At all other times, Academy staff wait for policy approval or procedural changes before implementing any curriculum changes. During this reporting period no policy/procedural changes were received by the Academy.

*Pathway Forward*

To achieve full compliance PRPB must establish an academic oversight relationship with an institution of higher education. Since PRPB no longer has an affiliation with UCCJ there is no outside review process. This is important because an institution of higher education can provide a research foundation to improve lawfulness and legitimacy in policing activities. During the pre-service training program, this is essential to the development of an officer's ability and authority to perform effectively with community members.

## Paragraph 121: Training - Pre-Service Education and Training

*PRPD and UCCJ shall develop an appropriate training plan and standards including, but not limited to, establishing appropriate passing criteria, attendance, and participation requirements, and valid evaluation methods, to ensure that cadets and officers attain necessary knowledge, skills, and competencies to implement all requirements in this Agreement. PRPD and UCCJ shall conduct regular needs assessments to ensure that training related to the implementation of this Agreement is responsive to the knowledge, skills, and abilities of the cadets and officers being trained.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

### *Compliance Assessment*

PRPB self-reports that a needs assessment was not conducted during this reporting period. However, in the Training Sustainability Plan submitted to the Court on March 31, 2023, PRPB submits that it will conduct a thorough needs assessment of its training capabilities by June 2023.

### *Pathway Forward*

PRPB must conduct a needs assessment to identify where gaps exist between organizational and individual performance goals. The assessment must also include a measurement of current skills and knowledge levels for pre-service training. Assessment of police training needs can provide critical information on the practical tools and curriculum needed for PRPB officers to be the most responsive to citizens. The goal is to assess training needs more accurately, and efficiently provide the clarifications and skills needed by PRPB officers.

## Paragraph 122: Training - Pre-Service Education and Training

*PRPD and UCCJ shall select and train qualified officer and academic instructors and shall ensure that only mandated objectives and approved lesson plans are taught by instructors. Instructors shall engage students in meaningful dialogue, role playing, and test taking, as appropriate, regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios.*

| Compliance Status | Assessment Schedule |
|---|---|

124

| Substantially Compliant | | Review Period | April 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | ☑ Met | ☐ Missed |
| 2. Training for trainers and instructors is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | ☑ Met | ☐ Missed |
| 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office's on-site visits provided an opportunity to interview 8 police instructors and review the records for 36 instructors. These files documented that each had been trained in INS 108 (Instructor Training Course). This course follows adequate adult learning teaching methods and provides instructors with the essential fundamentals needed in the classroom. PRPB also submits that there are seven instructors who are teaching that have not taken INS 107. PRPB submitted a certification letter stating these instructors are scheduled to take this training in "the immediate future." In the instructor list for Class #233, there are 262 certified instructors teaching at the Academy. These instructors are qualified and certified and teach courses specific to their areas of subject matter expertise. For target three, PRPB achieved the 95% threshold of qualified and certified instructors.

For target four, the Monitor's Office observed pre-service training in June 2022. The instructors teaching domestic violence, report writing, traffic enforcement, and equal protection support the selection process of qualified well-suited instructors for training. After applying to the Academy, instructors are interviewed and given an opportunity to demonstrate teaching proficiency. After reviewing all the information, the Committee decides which candidate is the most suitable for the instructor position. Most training topics are initially taught in a train-the-trainer method. New trainers are evaluated and assessed to determine if they should continue teaching that topic. Each instructor receives a certification upon completion. Topics that these instructors are teaching include criminology, community relations, laws (juvenile and special), ethics, interactions with transsexual and transgender persons, UOF (Taser, baton), CIT training, FTO, mentoring, vehicle driving, mechanics of arrest, and de-escalation.

### Pathway Forward

PRPB should continue these methods and practices to ensure that training meets mandated objectives and approved lesson plans are taught by qualified instructors. PRPB's Training Sustainability Plan will

125

address the need for additional training personnel. Therefore, it must continue its rigorous selection of obtaining the best instructors for the applicable topic. PRPB must not fall into a quick fix of just finding anyone to teach. That approach will not provide agents with the meaningful knowledge that skilled instructors would provide, such as engaging students in meaningful dialogue, role playing, and test actual incidents involving PRPB officers, with the goal of educating students regarding the legal and tactical issues raised by such scenarios.

## 2. Field Training Program

PRPB has developed a comprehensive Field Training Officer (FTO) Program for all new agents. PRPB acknowledges the FTO Program as an important and essential program within the Bureau. PRPB's FTO Program mission is to provide training that can lead to transformational change from within and create a department that is professional, ethical, and oriented to meet the common good of society. PRPB has established itself in supporting the operation of the program. The FTO Program was initially started in 2019. Prior to this specific training program very little existed to teach policing practice to apprentice agents. The PRPB Code of Ethics (GO 617) is the foundation for the FTO Program.

The PRPB FTO Program has been designed to improve the overall quality of police officers. The program provides practitioner training and evaluation oversite to probationary officers. It provides a measure of the performance level of probationary officers and documentation for the decision regarding their retention in the department. As part of this process, the FTO is authorized to train the apprentice agent placing maximum emphasis on post-Academy and on-the-job training. The program provides a standardized guide to the Bureau's FTOs on the initial orientation and field training of newly assigned apprentice agents.

The FTO Program curriculum is devised to assist FTOs in teaching apprentice officers to transition what they learned in the Academy to performing general law enforcement patrol duties competently in the field. The FTO curriculum also considers management responsibilities while weighing legal issues raised by the courts. Court decisions regarding the negligent appointment/retention of employees and vicarious liability of the department mandate that management makes every effort to hire and retain only qualified employees.

While the FTO program is promising, it continues to lack compensation or incentives for FTOs. FTOs are designated following the selection process outlined by policy GO 701 (FTO Program). The FTO is assigned an apprentice to train and is compensated for teaching time. The FTO is compensated $150 per phase with a total of four phases. The FTO is compensated only when they are in actual mentoring mode. The compensation can be between $150 to $600 for the training. It is important to note that no compensation has been administered to any FTO as of this report writing. The last received correspondence was a certification, dated March 16, 2021, from Interim Director Michelle M. Moure Torres stating and certifying that the human resources database of the Appointments and Changes Division does not reflect any type of compensation and/or additional bonus to the salary of officials who serve as mentors to PRPB cadets. This is a major concern to the soundness of the program. FTOs should receive compensation for their time, attention, accountability, and responsibilities of mentoring apprentice agents.

During this reporting period, the FTO program expanded its coverage of the island to now include five districts: Bayamon, Caguas, Carolina, Fajardo, and San Juan. PRPB is commended for the progression of the FTO Program. It demonstrates PRPB's commitment to the development of a new agent's successful career.

The FTO program was included in the Training Sustainability Plan submitted to the Court on March 30, 2023. The overall general training processes of the FTO Program are achieving the objectives of continued post-Academy training.

## Paragraph 123: Training - Field Training Program

*PRPD shall develop a field training program that consists of at least 800 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the substantive requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 123, 126. | ☑ Met | ☐ Missed |
| 2. The field training program, including curriculum and related training materials, is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of personnel who complete the field training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

The Monitor's Office received and reviewed GG 701 (FTO Program) in December 2022. The Monitor's Office submitted comments that specifically raised the issue of compensation for FTOs. The policy as submitted to the Monitor's Office was not approved. The other sections of the policy support that PRPB has developed and is currently applying the Field Training Program in accordance with the requirements of the Agreement. Review of the FTO program curriculum is found to be reflective of generally accepted policing practices. PRPB has developed its own FTO Program except for the parts of the program that are like the San Jose Field Training Program, which is considered a national standard for field training. It is not uncommon for many agencies to adopt some modified version of the San Jose model. PRPB's model adequately assesses apprentice agents' safety, professionalism, and performance.

*Pathway Forward*

PRPB must continually enhance the professionalism of its officers and ensure that the FTO Program receives the resources necessary to support the mission of PRPB. It is promising that in three years PRPB has established this level of validity in its field training practices.

## Paragraph 124: Training - Field Training Program

*PRPD's policies and procedures on field training shall delineate the criteria and methodology for selecting Field Training Officers ("FTOs"). PRPD shall permit only qualified officers to serve as FTOs. To determine qualifications, PRPD shall consider officer experience, disciplinary history, and demonstrated leadership skills, among other factors. PRPD shall strive to assemble FTOs that represent a broad cross-section of the community.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Selection devices used by the FTO evaluation boards are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Selected FTOs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 4. All FTOs who do not maintain eligibility are removed as FTOs in accordance with approved policies. | ☑ Met | ☐ Missed |

*Compliance Assessment*

During this reporting period, the Monitor's Office found that PRPB's FTO selection processes follow policy. PRPB self-reports it has 354 FTOs assigned to conduct training. For target one, policy GO 701 (FTO Program) was reviewed in December 2022. The policy satisfactorily provides the criteria of the selection process and requirements of being selected as an FTO. However, comments were submitted that addressed FTO compensation.

For target two, a review of 54 personnel folders contained eligibility documentation of officers proposed to serve in the FTO Program. These folders contained training completion documents, performance evaluations, and the administrative complaints, internal investigations, and discipline files for each FTO candidate.

For target three, from October 1, 2022, to March 31, 2023, SARP provided 49 personal records of administrative complaints and 5 negative certifications of administrative investigations of the 54

individuals selected. It is noted that the information provided is from October 1, 2022, the date the records were issued.

After selection they are trained with a 40-hour FTO curriculum. The FTO curriculum is still up to date and no curriculum changes have been made during this reporting period. It is upon completion of that training that they are assigned an apprentice agent.

For target four, there is a system in place to remove an FTO if needed. The removal process is initiated at the supervisory level and is then moved up to the commander rank. The Police Commissioner has final authority on the removal of an FTO from service. During this reporting period there were no FTO removals reported.

Overall, and in accord with the documentation provided and review of the FTO files, all FTOs meet eligibility requirements and PRPB has had no incidences in which FTOs needed to be removed from the program.

*Pathway Forward*

PRPB must secure the FTO Program from any manipulation or unsubstantiated changes. The FTO Program is currently the only major training program, separate from pre-service training, that is delivered in the most efficient and effective manner. PRPB should be commended for the FTO Program it has developed. PRPB should continue the FTO processes in accordance with policy and practice.

## Paragraph 125: Training - Field Training Program

*PRPD shall ensure that all FTOs receive training in the following areas: management and supervision; community-oriented policing; effective problem solving techniques; and field communication, among others. FTOs shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing community-oriented policing, and solving problems effectively.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of this Paragraph. | ☒ Met | ☐ Missed |
| 2. Training for FTOs is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of personnel who complete the training for FTOs are certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies | ☒ Met | ☐ Missed |

129

*Compliance Assessment*

During the CMR-6 reporting period, the FTO Program curriculum and processes associated with the FTO Program were found to be compliant with the Agreement. The FTO curriculum does follow generally accepted policing practices. For this reporting period PRPB submits that no curriculum changes have been conducted. Therefore, the Monitor's Office finds target two to be met. For target three, PRPB is ensuring that FTOs receive the necessary training on topics to properly train and mentor apprentice agents. Document and file folder reviews of 54 FTOs assigned in Bayamon, Caguas, Carolina, Fajardo, and San Juan, found that training on management/supervision, community-oriented policing, problem solving, and field communications were completed. Additionally, the 54 FTO files reviewed contained the certification of completion of FTO training, which meets the requirements of the Agreement.

*Pathway Forward*

PRPB should continue to re-evaluate the FTO Program as it currently does. This will assist PRPB in determining whether any adaptations to the program are necessary. FTO adaptations to training processes and implementation should continuously be reviewed to maintain compliance with FTO programming. It is important that PRPB maintain the FTO refresher course, as they are the critical link between the pre-service training program and policing practice. FTOs must stay apprised of all new FTO training practices.

## Paragraph 126: Training - Field Training Program

*PRPD shall ensure that recruits in the field training program are trained in a variety of geographic areas within Puerto Rico; in a variety of shifts; and with several FTOs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 123.

*Compliance Assessment*

PRPB recognizes the significance of apprentice agents training and does follow GO 701 (FTO Program) in the coordination and delivery of the FTO Program. During the February 2023 site visit to the FTO administrative office in Centro Mando, the Monitor's Office reviewed 32 apprentice agent files. These apprentices are assigned to the five regions conducting FTO training: Bayamon (12), Caguas (2), Carolina (5), Fajardo (2), and San Juan (11). The Monitor's Office found that the files thoroughly documented the entire training period and followed policy driven processes. One noted finding is that

PRPB advises that they are in the process of expanding the FTO Program to allow apprentice agents to receive additional training in various geographic areas of Puerto Rico. The documents support one FTO per apprentice. There were no multiple apprentices assigned to a single FTO. Apprentice agents are trained in four phases with different FTOs for each phase. One apprentice had five FTOs due to retraining issues. The agent successfully completed the training process in part to the concentrated attention of the FTOs. This is a good example of why FTO training is essential in helping the apprentice understand and learn policing techniques in a learning environment.

*Pathway Forward*

PRPB should continue to follow the FTO policy and procedures in place to maintain compliance with this paragraph. It would be beneficial for PRPB to continue to use the monthly FTO meetings for information exchanges between the ranks. The Monitor's Office stresses the importance of resolving the issue around FTO compensation. Not addressing this issue can impact morale, staffing, and potentially negatively affect the effectiveness and success that PRPB has seen in its FTO Program. The FTO incentive is a major concern that should be addressed by the Bureau. Applicable pay must start, and retroactive pay for FTO work should be disseminated.

## Paragraph 127: Training - Field Training Program

*PRPD shall develop a program to assess FTO performance using appropriate evaluation tools. PRPD shall review and evaluate the performance of FTOs, with re-certification dependent on strong prior performance and feedback from other staff. Any recommendation from a FTO to terminate a trainee during their field training program shall be reviewed and evaluated by the chain of command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The FTO performance assessment program incorporates all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for supervisors evaluating the performance of FTOs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of performance assessments for selected FTOs are within policy. | ☑ Met | ☐ Missed |
| 4. 95% of personnel files for selected FTOs who were recertified to serve as FTOs are within policy. | ☑ Met | ☐ Missed |
| 5. 95% of recommendations by FTOs to terminate a trainee from the field training program are reviewed and evaluated by the chain of command. | ☐ Met | ☐ Missed |

*Compliance Assessment*

During this reporting period PRPB reported having 354 FTOs trained and working. The Monitor's Office reviewed a sample of 54 FTO personnel folders and found that the performance assessment required for this paragraph has been met. PRPB does assess its FTOs through supervisor evaluations. For target two, PRPB reports that the supervisor's course (FTOS 2061) was delivered to 12 supervisors who received instruction on evaluation methods. For target three, the 54 FTO files contained performance assessments with both scoring and feedback to the FTO. For target four, the Monitor's Office found that re-certification is conducted after a comprehensive review by supervisors. To comply with FTO status the FTO must be re-certified and attend an 8-hour FTO refresher course. PRPB submits that the course (FTO 9061) was delivered to 142 FTOs. This 8-hour course contains information on communication skills, management, law, policy updates, and problem-solving. Review of FTO evaluations finds that the FTOs are selected and re-certified satisfactorily.

For target five, it is not known how PRPB uses the recommendations by an FTO to terminate an apprentice agent. In this reporting period PRPB has either not had an issue with an apprentice agent or no documentation was presented. The review process for any remedial action or termination of an agent follows the chain of command to the FTO Commander, who will then forward his/her recommendation to the Commissioner for final determination.

*Pathway Forward*

PRPB met compliance with all but one of the targets in this paragraph. Documentation on apprentice agent termination needs to be presented to determine compliance with target implementation. While the process is understood the documentation will confirm that the processes are followed.

## Paragraph 128: Training - Field Training Program

*PRPD shall create a mechanism for recruits to provide confidential feedback regarding the quality of their field training and their FTO, including the extent to which their field training was consistent with what they learned, and suggestions for changes to training based upon their experience in the FTO program.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for relevant personnel includes training on the feedback mechanism. | ☑ Met | ☐ Missed |
| 3. All relevant personnel are trained on the feedback mechanism. | ☑ Met | ☐ Missed |

| | |
|---|---|
| 4. Feedback and suggestions of recruits is considered when reviewing and revising the field training program. | ☑ Met   ☐ Missed |

*Compliance Assessment*

For this reporting period the Monitor's Office reviewed a sample of 32 apprentice agents' files. The Monitor's Office reports that PRPB does incorporate the requirements of this paragraph and is within the scope of GO 701 (FTO Program). For targets two and three, training on the feedback mechanism has been provided. One hundred and forty-two FTOs have received course FTO 9061 (FTO Refresher Training). Further, the policy specifically states that upon completion of the FTO Program the apprentice agent will fill out PPR 701.5 (Evaluation by Apprentice Agent on their Assigned FTO) to provide confidential feedback on what they learned during their FTO experience. It requests information from the apprentice on if their FTO training was consistent with what they learned in the Academy. They are to provide any recommendations for improvement based on their personal experiences in the FTO Program. This information is noted and was found in the apprentice files. The feedback form is reviewed by the FTO Commanding Officer and staff to determine if any FTO Program elements need to be revised. The Monitor's Office also interviewed staff who can attest if comments and suggestions are considered when reviewing and modifying the FTO Program. No recommendations for program enhancement were offered during this reporting period.

PRPB continues to use the monthly FTO meetings for information exchange between ranks. The Monitor's Office's review of the monthly meetings found dissemination of department changes in policies and procedures. FTO leadership should make sure these important meetings continue. These monthly meetings also captured the concerns surrounding FTO service compensation. The Monitor's Office again stresses the importance for PRPB to resolve this issue. Not addressing this issue can impact morale, staffing, and potentially negatively affect the effectiveness and success that PRPB has seen in its FTO Program.

*Pathway Forward*

PRPB should, in accordance with policy and practice, continue the FTO processes as recorded by the Monitor's Office. The monthly FTO meetings and the apprentice agents' evaluations should continue to be given the full attention of command staff. This feedback should continue to be internally reviewed for any program changes or modifications. FTO compensation is a major concern and should be addressed by the Bureau. Justifiably, applicable pay must start, and retroactive pay for FTO work must be disseminated. PRPB should continue to use the feedback mechanism in its consideration of any FTO Program changes. This feedback mechanism is in policy and is also included in the FTO Training Manual. It is essential that the feedback be used in conjunction with any additional sources of information to review and improve the program.

## 3. In-Service Training

Per paragraph 129, PRPB is required to conduct annual in-service training of at least 40 hours for all officers. During the CMR-6 reporting period PRPB presented various training pauses largely due to COVID-19, resulting in a low number of personnel receiving the required in-service training. However, PRPB responded with the development of some online courses to meet this challenge. In the CMR-8 reporting period, PRPB continues to deliver a low number of in-service training hours. The Monitor's

Office's assessment of PRPB's compliance with training is based on the training documents submitted by PRPB and interviews with staff assigned to the Academy and others involved in the development/delivery of in-service training. Over the last year, PRPB has had to adjust its training delivery due to the larger than usual pre-service Academy - Class #233 which had over 400 cadets. The immediate training course development and delivery of the new sergeants' course to over 500 new sergeants were addressed in an expedited manner. There continues; however, to be a lack of sufficient training personnel available to meet the overall PRPB training responsibilities.

It is imperative that PRPB conduct the 40-hour annual training requirement for all agents. PRPB has stated it can achieve this requirement through online training. However, during the reporting period, PRPB self-reported that it is no longer in negotiations with UPR for the development phase of the virtual online training platform. The training would have been conducive to a 24-hour a day 7-day a week availability. Academy staff reports that online courses will be developed in-house and that it is in discussion/collaboration with PRPB IT personnel to move in this direction. Online training is a viable method to support PRPB in required training mandates; however, the IT Bureau already has a high-work load, and it is not known if this objective is a priority.

Once the virtual training is established it will assist in achieving compliance. Completed training documentation, annual in-service training plans, instructor evaluations, and a substantive curriculum development process, with stakeholder feedback, are all still at a critical juncture for PRPB in its delivery of in-service training. PRPB must expand its pedagogical process to include these important points to ensure the quality, liability, and accountability measures are in accordance with the Agreement.

### Paragraph 129: Training - In-Service Training

*PRPD shall establish a mandatory annual in-service training program that consists of at least 40 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

#### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 129-131. | ☒ Met | ☐ Missed |
| 2. The in-service training program, including curriculum and related training materials, is consistent with approved policies. | ☒ Met | ☐ Missed |

134

| | | |
|---|---|---|
| 3. 95% of personnel who complete the in-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | ☐ Met | ☑ Missed |
| 4. The in-service training program includes training tracks in accordance with approved policies and the Agreement. | ☐ Met | ☑ Missed |
| 5. Reviews and revisions of the in-service training program are based on multiple factors in accordance with approved policies and the Agreement. | ☐ Met | ☑ Missed |

*Compliance Assessment*

This paragraph is partially compliant due to PRPB's inability to provide required trainings. In review of compliance targets one and two, the Monitor's Office finds these targets have been met. PRPB self-reports that there have been no curriculum updates or modifications to courses during this reporting period. Policy drives curriculum updates and new course development.

For target three, PRPB did not achieve the mandatory 40-hour requirement that each officer is required to receive during this training cycle. In PRPB's 2021 global training report, no in-service training courses were delivered at the 95% threshold. However, because PRPB lacks a system to comprehensively track and document completion of its virtual training courses, it is not known how many virtual or traditional course offerings were delivered and whether any officer received 40 hours of training in 2021.  In 2022 this disregard continued and even regressed.  PRPB's 2022 global training report documented far less courses achieving the 95% threshold, including UOF, search and seizure, and equal protection. Again, PRPB was not able to submit documentation to demonstrate that any officer received the mandated 40 hours of in-service training.

For target four, the Monitor's Office recommended in CMR-6 and again during a site visit in November 2022 that PRPB create agent training tracks. Developing training tracks is more than just monitoring officers as they complete their training requirements. Training tracks ensure that PRPB gets the best training results. There are many benefits to training, such as increasing motivation, performance, and retention rates, but providing training is only one part of the process. The other part is tracking how officers receive the training and what benefits it provides the officers and agency. This also includes seeing if officers are receiving the necessary and mandated training for their current assignment. This has still not been achieved. Therefore, the Monitor's Office finds that this target has not been met.

For target five, there were no reviews and revisions of in-service training programs to determine if they are based on multiple factors, such as generally accepted best practices, stakeholder input, and policy updates. Therefore, the Monitor's Office finds that this target has not been met.

Currently PRPB has not reached the 95% compliance threshold for in-service training. The Monitor's Office is unable to determine what courses are mandatory for PRPB personnel. However, the 95% training threshold was not achieved for any course offered in 2022.  Further, PRPB should use PTMS to document all in-service training. The current practice is that each area Training Coordinator maintains their own tracking sheet for their areas, which is not saved in PTMS. The sheet is created and maintained by the coordinator - its siloed and no one outside of him/her and the area command has access. Additionally, course material is sometimes saved in PTMS by SAEA, but the training records for which agent received or is due for the training are maintained at the area command level. Another

issue noted from the site visits is when officers are transferred in/out of areas. The training coordinator must manually add/update that agent's training record.

*Pathway Forward*

Again, PRPB is prompted to build a detailed training track process for its personnel. This process helps keep officers in compliance with agency and state regulations. Specialized training helps officers develop a knowledge or skillset based on prevailing trends specific to their role within the agency. A training track process is aimed at identifying and meeting the needs of PRPB personnel and the Bureau. The failure to train in essential areas of a job scope is a liability issue. Policing problems can be addressed through a model of professional development in the form of specific in-service training programs prior to an issue presenting itself. In-service training models should be individually created based on the officer, rank, job scope, and experience. Training track processes should include all mandated training as well as relevant training objectives to the officer's current assignment or role. PRPB must develop a process to review and revise training curricula. The process must be an effort to establish the most effective pedagogical content for PRPB officers. The review should identify the related theory, demonstration, or practice. It should assess learning objectives to ensure they appropriately fit the course. Competency skillsets should be created for each training. Training should not be viewed as a cycle that rolls towards the attainment of specific goals, but a continuous learning interaction promoting effective skill acquisition.

## Paragraph 130: Training - In-Service Training

*PRPD shall create in-service training tracks for the following groups, including, but not limited to, command staff; lieutenants and sergeants; detectives; narcotics and vice investigators; specialized units; and professional responsibility investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 129.

*Compliance Assessment*

PRPB provided the same document that had been submitted for previous CMRs, which is a listing with general information on offered training to projected personnel between October 1 to December 31, 2022. This document is information aimed at the 2022 training period that is titled "Training Tracks for PRPB Groupings". However, PRPB only noted that the training course will be provided to the "different licenses" within PRPB and conducted between October 1 to December 30, 2022. There was no detailed

136

classification of what personnel ranks would receive the training. Indicating that the "different licenses" would receive training is not a sufficient training track process. PRPB did not provide detailed documentation of in-service training tracks for any specific policing groups or units.

The Monitor's Office recommended in CMR-6 and again on a site visit in November 2022 that training tracks be created. Training tracking is more than just monitoring officers. Training tracking is created to ensure that PRPB gets the best training results. There are many benefits to training, such as increasing motivation, performance, and retention rates, but providing training is only one part of the process. The other part is tracking how officers receive the training and what benefits it provides the officers and agency. This also includes seeing if the officers are receiving the necessary and mandated training for their current assignment. This has still not been achieved. Therefore, the Monitor's Office finds that only partial compliance with this paragraph has been achieved.

*Pathway Forward*

The objective of a training track system is to ensure that appropriate training requirements are aligned for each officer. PRPB has continuously not achieved compliance levels in its in-service training. This is largely due to the incapacity of PTMS. However, for PRPB to understand the requirements of training, training leadership must understand what courses are required and necessary for certain personnel. PRPB must move forward with the development of a training track process. Training tracks are individualized for each officer. This will provide each officer with information of mandated and career development goals. For specialized units, training tracks may include investigative techniques for investigators, tactical procedures for SWAT, or warrant service training for warrant officers. Training tracks will help the department with efficiently planning training seminars and with the allocation of resources.

## Paragraph 131: Training - In-Service Training

*PRPD shall identify critical in-service training topic areas based on an analysis of factors that include but are not limited to officer safety issues, community concerns, use-of-force statistics, internal affairs statistics, court decisions, research reflecting the latest law enforcement trends, individual precinct needs, and input from members at all levels of the Department, the Superintendent's Citizens' Interaction Committee ("CIC") and members of the community.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 129.

*Compliance Assessment*

The Monitor's Office received and reviewed the report that designates members of the design committee by training topic. While these committees have been identified on paper, PRPB has not used the committees in the manner this paragraph specifies, such as in curriculum development processes. No other documents or forms were submitted to show that PRPB identifies critical in-service training topic areas based on an analysis of factors. It was suggested in CMR-6 that after-action reports would assist in this area. PRPB has not initiated the use of after-action reports in its in-service training scenarios. After action reports would provide training opportunities that identify officer safety issues, community concerns, UOF practices, and internal affairs operations. The use of statistical data on UOF, internal affairs conclusions, court decisions, and research on the latest law enforcement trends should be considered in the development of training topics. Individual precinct needs and input from members at all levels of the Bureau is most essential and would help identify timely and relevant topics. The Superintendent's Citizens' Interaction Committee (CIC) and members of the community must not be overlooked in this process as they bring the citizen perspective to enriching police training.

*Pathway Forward*

PRPB is again reminded that the Agreement states that PRPB should collaborate with stakeholders, community members, and/or specialized organizations in review processes. The aim of stakeholder input is to engage the community in co-constructing and validating community priorities. Some of the work can be accomplished through curriculum analysis, interviews, and focus group discussions. Findings then support any modifications to curriculums that will make it relevant to all stakeholders, internal and external to PRPB. One example is the development of the CIT Program and the handling of individuals with behavioral issues and intellectual impairments. CIT is a police mental health collaborative program. A community task force comprised of law enforcement, mental health, addiction professionals, and mental health advocates that should work together to develop the CIT model and any subsequent revisions to training. PRPB gains a keener comprehension from those directly impacted and knowledgeable of ways to divert persons with mental illnesses from the criminal justice system to mental health treatment, thereby increasing officer safety in these encounters. Once PRPB establishes a procedure of curriculum revisions that includes various stakeholders, this process can be used in all curriculum reviews.

## Paragraph 132: Training - In-Service Training

*PRPD shall develop a comprehensive training program to supplement the 40-hour formal in-service training that is delivered at the beginning of shifts or tours of duty for all officers. Training may include special topics selected by UCCJ and precinct or unit Commanders that address constitutional policing, officer safety, readiness, community concerns, or departmental procedural matters.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |

| Training: | Implemented | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Monthly meetings are consistent with approved policies and the Agreement. | ☐ Met | ☑ Missed |
| 3. 95% of selected monthly meetings comply with approved policies. | ☐ Met | ☑ Missed |

### Compliance Assessment

In this reporting period the Monitor's Office received and reviewed supporting documents and related materials for the development of a comprehensive training program to supplement the 40-hour formal in-service training that is delivered at the beginning of shifts or tours of duty for all officers. Documents such as agendas, sign-in rosters, and teaching objectives were reviewed. These meetings are referred to as roll call training meetings. However, PRPB self-reports that there were no roll call meetings in units such as SAEA and IT since these units were preparing for the new supervisor training course. PPR 704.1 (Agenda for the Monthly Meetings) is the form used to document the elements of roll call meetings. It was observed that PPR 704.1 (Agenda for the Monthly Meetings) is not filled out to accurately reflect the date and time of the training. The time field is often left blank. Therefore, there is no notation on how long the meeting lasted, which results in inaccurate recording of training credit hours.

### Pathway Forward

Roll call training meetings do assist PRPB in supplementing the 40-hour training requirements. To accurately justify the training that is conducted and the hours that each agent has earned PRPB must ensure full documentation. Training records must be filed out in their entirety, including the agenda, learning objectives, data, time, and attendee names. This information should then be entered into PTMS for record retention.

## 4. Training Records

Training greatly influences and shapes the knowledge and skills of officers, ranks, and units. While liability concerns should not be the overarching concern in police matters, it is accurate to state that liability should be a major concern. PRPB must establish a process of training record management. By not keeping precise training records it subjects PRPB to negligence. Training keeps the liability low. PRPB uses PTMS as its training record repository. However, that is the extent of PTMS as it currently functions. A training management system should allow both administrators and officers to track, measure, and evaluate training modules. The integration of training information between PTMS and the old system has not been completed as of this reporting period. There has been no migration of training systems to allow for one general repository location of all PRPB training hours.

## Paragraph 133: Training - Training Records

*PRPD shall electronically maintain complete and accurate records of current curricula, lesson plans, and other training materials in a central, commonly-accessible, and organized file system.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on the storage and preservation of training records and materials is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. Training records and materials are stored and preserved in accordance with approved policies in 95% of selected courses. | ☐ Met | ☑ Missed |

### Compliance Assessment

PRPB uses PTMS to maintain training records but does not fully use the system otherwise. PRPB is still in the process of integrating training curricula/materials into the system. During a site visit the Monitor's Office had the opportunity to access PTMS. The Monitor's Office found some training hours for some officers, but not complete records for all officers. PTMS does not allow for tracking of training by course, or alert supervisors to agents that are missing training requirements. PTMS is also unable to aggregate training records and create reports on Bureau-wide training compliance. The full integration of training records is still not complete as two training record management systems are being used. The Academy registrar has its own record files and the various field training coordinators maintain the area command's training records in Excel documents specific to each area command. Ultimately, as of this reporting period, PTMS does not completely record, maintain, or store training course materials. The implementation of this system is important to report what training has been accomplished and what training is still needed. For example, PRPB's 2022 global training report notes that no course was provided to the 95% threshold. This report is missing important data points. Further breakdown of categories would be useful in this global report, such as by format, rank, date, and location, is valuable information for training leadership to understand. Effective police training records can protect an agency by ensuring that all officers have completed the required training, reduced training costs, and demonstrate compliance with the Agreement.

### Pathway Forward

PRPB must proceed with full implementation of PTMS. PTMS should include a configuration and customization which includes the integrated training applications and the tracking of training, classes,

seminars, and courses both internal and external, such as the Federal Bureau of Investigation (FBI) National Academy. It is essential to track both internal and external training that officers have attended and achieved. PRPB has stated that any external training officers attend has not been vetted by SAEA therefore it does not qualify for internal training credit. External training should not be underestimated. There is value in training externally and exploring valuable generally accepted policing practices. The opportunity of implementing a new idea or practice from another agency is possible. To not allow external training just continues to have PRPB operate in its own silo.  PTMS should also be able to recall this information accurately and in real time allowing the Bureau to effectively discern any potential training gaps or needs. Further, all PRPB personnel should be trained in the use of PTMS prior to its complete implementation.

## Paragraph 134: Training - Training Records

*PRPD shall track, maintain, and report detailed, real-time training records and statistics. PRPD shall develop an electronic database to create and maintain records for each recruit and each sworn and unsworn member of the PRPD, including a standard electronic training record and electronic copies of certificates and other materials. The training records shall include the following information: the course description and duration, curriculum, location of training, and name of instructor. PRPD will provide the Superintendent with annual reports, or more often as needed, on training attendance and testing results.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. The electronic database accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All training records and statistics are tracked in the electronic database. | ☐ Met | ☑ Missed |
| 3. Training reports provide current and accurate information to the Commissioner. | ☑ Met | ☐ Missed |

### Compliance Assessment

PRPB self-reports that since PTMS is still under development it is not able to fully report the extent of evaluations and qualifications of instructional staff. In January 2023, the Monitor's Office was provided with a demonstration of PTMS with both IT and Academy personnel present. The consensus was that the Academy staff provided IT with the needed changes to PTMS and IT would move forward with making those changes to PTMS. At the end of this reporting period, PRPB advises that they are working on PTMS programming issues. Currently, the enrollment module for admission of grades and

certification for promotion training has been changed. In addition, a report on training to identify which staff have not received training is being added.

The Monitor's Office found that the global training report to the Commissioner is aggregated reporting and provides no specific details on the courses attended. The accuracy of the training is problematic. The report indicates numerous courses with unknown locations or training hours. This global report could also be used to adequately identify training allocations.

The Monitor's Office found that the 2022 global training report was provided to the Commissioner as required by the Agreement. While the document is accurate and has current 2022 training numbers, it is concerning that no adjustments to in-service training were made. The 2022 report documents even lower numbers than 2021. To this end it is imperative that PRPB address how it will achieve in-service training compliance.

*Pathway Forward*

The compilation of training information in an electronic database is essential. PRPB must work towards full application of PTMS, which will provide PRPB with this capability thereby providing methods to conduct training analysis and assessments. The most accurate way to evaluate the curriculum and instructor effectiveness is through a thorough evaluation which PTMS can provide. PTMS can also provide an overall view of training requirements. Training greatly influences and shapes the knowledge and skills of officers, units, and ranks. Training records should accurately document every policing function in the organization. Therefore, the data found in a training database, such as PTMS, will be beneficial for budgeting, training forecasting, training records documentation, and delivery. These records should provide officer training accountability and can assist in training liability questions. PRPB, in collaboration with the Parties, has developed a Training Sustainability Plan. Although the plan outlines PRPB's projected efforts to address the issues the Monitor's Office has noted in this and previous CMRs, many of these actions will not be taken and/or fully implemented until the end of 2024. The Training Sustainability Plan also outlines the process that PRPB will use to address in-service training gaps in 2023 and 2024. The Monitor's Office continues to stress that it is imperative that PRPB improve its current training efforts to advance its progress towards compliance.

## VIII. Supervision and Management

During this reporting period, the Commonwealth continued to struggle with achieving compliance with the Agreement due to the quantity and quality of its first-line supervisors, inconsistent supervision, poor management of promotional processes, failure to develop and institutionalize adequate information technology systems to support supervision (i.e., Early Intervention System (EIS)), and developing an effective comprehensive performance evaluation system. During the latter part of the reporting period, PRPB was able to develop a first-line supervisors promotion test. The Monitor's Office was involved with all components of test development and approval. The test was administered in December 2022 to 1,414 members of PRPB. During grading it was determined that six questions needed adjustment, which resulted in 562 officers becoming eligible candidates for promotion. In February 2023, 533 officers were promoted to sergeants. It was also reported that all 533 new sergeants received the 40-hour required training at the Academy. After the promotion of sergeants, PRPB made substantial progress in moving compliance forward that will begin to be realized in CMR-9. In addition, in the February 2023 Staffing Plan, PRPB submitted a redistribution of personnel that should take effect during the 2022 – 2023 fiscal year. The Staffing Plan notes the Commonwealth's efforts to comply with the related court order to implement the Staffing Plan and initial work on the development of the Integrity Unit policies and procedures.

As part of the Staffing Plan described in paragraph 13, PRPB identified that 740 supervisors for 110 precincts were needed based on a ratio of 6 first-line supervisors and a relief per unit. During CMR-7, PRPB reported that 103 officers were promoted to sergeants and an additional 533 were promoted to sergeants in CMR-8, for a total of 636, leaving a shortage of 104 supervisors. Furthermore, in this Staffing Plan, the Commonwealth identified the need for 68 positions within the ranks of inspectors and colonels. PRPB submitted that during this reporting period, interviews, evaluations, and identifications of qualified officers took place. PRPB reports that a promotion ceremony will take place in May 2023 to promote the identified 68 high ranking positions.

During this reporting period, the Commonwealth named a board responsible for designing a promotion system, which included the administration of examinations and other more objective measures, complying with their goal. However, as reported in the past, officers interviewed continue to note issues with PRPB's transfer policy, GO 305 (Rank System Transfer Transactions).

Further, the Monitor's Office found that no new efforts have been made regarding EIS. Regarding Inspections and Audits, only four audits were completed during this reporting period. Although an Annual Report was produced and reviewed, the Monitor's Office notes concerns over the lengthy timelines to complete and certify these inspections. No additional work has been conducted on Integrity Audits as the Commonwealth is working with the OSM to draft related policies and protocols.

Overall, the Commonwealth's compliance with the 24 Supervision and Management paragraphs assessed during this reporting period reflect slightly improved levels of compliance to what was noted in previous CMRs. In CMR-6, 29% of the 24 paragraphs (7 paragraphs) were assessed as partially compliant and 8% of the 24 paragraphs (2 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 25% of the 24 paragraphs (6 paragraphs) were

found to be partially compliant and 17% of the 24 paragraphs (4 paragraphs) were assessed as substantially compliant.  See figure 8.



*Figure 8. Supervision and Management: Paragraph Compliance Status*

## Paragraph 135: Supervision and Management - General Provisions

*PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

During this reporting period, the Monitor's Office drew random samples of staffing documents for precincts and units within eight PRPB areas. Further, PRPB provided the Monitor's Office with PPR 373 (Distribution of Personnel) for all units and precincts. During this reporting period, PRPB provided a more accurate and real-time understanding of operational activities and staffing challenges across the Bureau. However, PRPB still needs to develop a better system of identifying operational activities and staffing

144

needs. Based on the interviews of high-Ranking officers, there is a lack of communication between themselves and the administration. The Monitor's Office is recommending that more effective communication of needed resources take place and that the concerns and needs provided by the high-ranking officials in the field be heavily taken into consideration.

After the promotion of the 533 sergeants, PRPB should be able to comply with the Agreement requirement of supervisors not supervising more than 8 officers. Before the promotion it was confirmed during interviews with personnel, supervisors, and supervisees that supervision loads where unequal across the Bureau and that supervisors were assigned to supervise more than eight officers due to the shortage of supervisors. This situation should be corrected or alleviated with the promotion of the 533 sergeants, and it should be reflected during the CMR-9 reporting period. A 90-day status report on the implementation of the Updated Staffing Plan was submitted on February 2, 2022.

*Pathway Forward*

During this reporting period, the Parties and the Monitor's Office continued to work on the implementation of the updated Staffing Plan. The Monitor's Office will continue to review the 90-day status reports to assess the Commonwealth's progress to achieve compliance with the staffing and supervision requirements of the Agreement.

During this reporting period the Monitor's Office continued to assist and monitor PRPB's implementation of the updated Staffing Plan in accordance with the Staffing Plan filed with the Court. The Monitor's Office has highlighted the importance of developing a consistent and accurate system to account for staffing allocations to the Department of Public Safety (DSP) and PRPB. Specifically, after the promotion of 533 sergeants, PRPB should be able to address the lack of supervision by assigning the sergeants as identified in the Staffing Plan, and more importantly, by monitoring their development. To accomplish this, PRPB needs to update their tracking system.

## 1. Duties of Supervisors

First line supervisors must provide effective leadership and consistent supervision of subordinates under their command. Supervisors should be able to motivate their officers to perform their duties lawfully, safely, and effectively. During this reporting period, training was more effective due to the ability to conduct it in person. However, during the initial stages of this reporting period, PRPB struggled to maintain the quality and quantity of first-line supervisors needed to provide effective management over officers in the field across all shifts in all command areas. This should be alleviated by the promotion of 533 officers to the rank of sergeant bringing PRPB closer to compliance with this paragraph. Furthermore, the promoted officers received the 40-hour training required by the Agreement. While these additional sergeants will lessen the shortage, PRPB will need to continue to work on establishing recurring and effective promotional cycles to achieve and maintain substantial levels of compliance even after the Agreement is completed.

PRPB still needs to be able to provide the Monitor's Office with more accurate, updated, and consistent reports to confirm that officers and supervisors are receiving trainings, schedules, and assignments consistent with the supervision policies as well as the Staffing Plan, which specifies the ratio of officers and supervisors per units. PRPB must understand that the goal of the Staffing Plan is not only to comply

with the Agreement, but also to help PRPB become a more effective organization that has the respect and credibility of the community.

## Paragraph 136: Supervision and Management - Duties of Supervisors

*All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 136-140. | ☒ Met | ☐ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | ☐ Met | ☒ Missed |
| 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | ☐ Met | ☒ Missed |
| 6. 95% of interviewed personnel perceive that supervision is close and effective. | ☐ Met | ☒ Missed |
| 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | ☐ Met | ☒ Missed |

### *Compliance Assessment*

During this reporting period, based on the Staffing Plan as well as GO 310 (Performance Evaluations) approval, it was determined that current policies incorporate all requirements established in paragraphs 136-140. This was also confirmed during interviews with a random sample of PRPB supervisors. Supervision training is consistent with approved policies. Scheduling the required supervision trainings not only to comply with policies, but also to improve the Bureau's quality of supervision must be made a priority. The Agreement stipulates that supervisors must receive approved training before they are allowed to assume their positions in PRPB. Supervisor training curriculum has been reviewed by the Monitor's Office and has been implemented by PRPB. PRPB produced reports that the 533 sergeants promoted in February 2023 attended the mandatory 40-hour training at the Academy, consistent with

146

approved policies. PRPB should continue to offer supervisor trainings on a consistent basis and ensure that all supervisors receive the required trainings on a yearly basis.

Improvement of officer and supervisor schedules, assignments, and ratios were identified during this reporting period. In the Staffing Plan PRPB submitted the redistribution of personnel that should take effect during the 2022 – 2023 fiscal year. However, during interviews, it was determined that several of the recently promoted sergeants are still not assigned or deployed in accordance with the approved supervision policies. The Monitor's Office believes that after the promotion of the 533 sergeants, the assignments and deployments should be addressed as identified with the approved policies. Once this identified deficiency is addressed, the low morale problems with PRPB members, units, and precincts should greatly improve. Approximately 60% of interviewed personnel believe that supervision is close and effective, though some supervisor interviewees, as in the past, disagreed. Also, 80% of interviewed personnel stated that supervisors are committed to following policies and law consistent with the Agreement.

During this reporting period PRPB continued to not be compliant largely due to the lack of personnel and supervisors. In the Paragraph 13 Implementation Plan report dated August 31, 2022, PRPB reported identifying the need for an additional 740 supervisors for 110 precincts. During the CMR-7 reporting period PRPB reported that 103 officers were promoted to sergeants and during this reporting period reported an additional 533 promotions. This very positive accomplishment brought the total to 636 new supervisors, which is a great improvement, but still short of the established proposed goal. Another positive sign for improvement is that DSP and PRPB are expecting to promote 68 high ranking officials in May 2023. These substantial improvements should be reflected in the next reporting period and help close the gap to compliance by CMRs-9 and 10.

### Pathway Forward

During this reporting period DSP and PRPB leadership took extensive measures to offer a promotion test and promoted 533 supervisors, demonstrating how important it is for the organization to address the critical shortfall of supervisors within PRPB.   These substantial improvements should be reflected in the next reporting period and help close the gap to compliance by CMRs-9 and 10. The Monitor's Office will continue to evaluate PRPB's compliance with this paragraph in CMR-9 in light of the recent promotions.

### Paragraph 137: Supervision and Management - Duties of Supervisors

*First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | October 2022 – March 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

During this reporting period, PRPB demonstrated their commitment to comply with the Staffing Plan required by paragraph 13. PRPB recognized the need for compliance with the Agreement and how much the department will improve its professionalism. In addition, by increasing its level of professionalism, the Bureau will gain the respect and confidence of the community. During the CMR-7 reporting period, PRPB self-reported that 103 officers were promoted to sergeants and during this reporting period, PRPB reported that an additional 533 officers were promoted to sergeants, bringing the number to 636, closing the gap of complying with the identified estimated 740 supervisors needed for every precinct and department at a minimum rate of 6 sergeants per precinct.

PRPB provided the Monitor's Office with PPR 373s (Distribution of Personnel) for all 13 areas. The PPR 373s, about five percent of which are still completed by hand, indicate that supervisors should not have more than eight individuals under their command. However, during interviews, supervisors and supervisees still indicated that supervision loads are unequal across the Bureau, and that supervisors are regularly assigned to supervise more than eight officers. It was also reported that supervisors may supervise officers in as many as three different area commands due to the shortage of first-line supervisors.

As in the past, supervisors who were interviewed reported inequality in assigned supervisees. One supervisor may supervise only two to four officers as part of their team while other supervisors may have over eight officers to supervise due to lack of staffing and supervisors. Due to the identified lack of first-line supervisors, PRPB has a clear deficiency with the assignment of supervisors. Also, again, it was reported that sometimes more than one lieutenant or captain is assigned to the same unit when other units have none assigned, an indication of a deficiency with assignments.

Also, it was determined that most sergeants still do not consistently work the same shift as the officers they supervise. In several units within the 13 precincts, interviewees noted that sergeants sometimes work shifts in multiple precincts or units to make up for the supervisor shortage. However, the PPR 373s (Distribution of Personnel) are concerning due to the discrepancy with the information obtained during interviews. The information provided in the PPR 373s should be updated with the information provided by their personnel. There is no reason to continue to report not having issues with assignments when there are still significant issues present. With a total of 636 promotions to supervisors, all the identified issues should be addressed and resolved. It is expected that after these promotions, CMRs-9 and 10 should reflect the improvement in supervision leading to compliance with these paragraphs. Considering

that currently the issues with supervision, training, and policy continues, the Monitor's Office finds that PRPB is currently not compliant with paragraph 137.

### Pathway Forward

During this reporting period, the Monitor's Office once again identified minimal improvements in PRPB's IT system. PRPB needs a data processing system that enables them to provide the Monitor's Office with more accurate and efficient staffing data. A proper data system will make PRPB more effective and efficient at monitoring supervision practices and workloads and improve their upper management team and overall supervision within the organization. The Monitor's Office as well as DSP and PRPB management are currently working with an independent contracted private company to develop and implement an accurate automated system that should make it effortless for PRPB to generate data from the 13 area command to account for their personnel, including the management responsibilities for each the departments.

### Paragraph 138: Supervision and Management - Duties of Supervisors

*PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

### Compliance Assessment

During this reporting period, PRPB did not meet compliance with paragraph 138 due to the lack of first-line supervisors. It is expected that after the promotion of 533 sergeants in February 2023, PRPB will be able to provide more effective supervision to the field that will lead to compliance with paragraph 138 and satisfying the needs of the Bureau. After the distribution of the 533 sergeants, PRPB commanders and deputy commanders will have sufficient first-line supervisors to cover supervisory absentees, which has been a challenge in the past. There will be no need for acting supervisors, lieutenants, and captains to cover first-line supervisor's duties in the field. With the promotion of the 533 sergeants, DSP and PRPB demonstrated their commitment to making the Staffing Plan their highest priority.

In the Staffing Plan, PRPB identified that 740 supervisors in 110 precincts were needed to have a supervision ratio of 6 supervisors per unit to cover 3 shifts with an additional relief. A total of 636 first-line supervisors were promoted during CMRs-7 and 8, approaching compliance with paragraph 138.

149

PRPB has yet to submit the official distribution of the promoted supervisors to comply with staffing needs. PRPB also advised that 68 high ranking officials will be promoted in May 2023 in compliance with the Staffing Plan. The Monitor's Office recognizes DSP and PRPB's commitment and determination to bringing the supervisory staff up to the identified needed levels that will make PRPB effective, efficient, credible, and most importantly, earn the needed community admiration and respect.

### Pathway Forward

The lack of an updated and effective automated system continues to prevent PRPB's ability to account for statistics that will keep the Bureau's personnel and information updated and accrued. PRPB needs to develop an updated automated platform and system that will simplify records within the Bureau. As previously stated, the Monitor's Office, DSP, and PRPB are currently working with Gartner Inc., an independent contracted company, to develop and implement an effective automated system. PRPB must account for information, statistics, workload, and crime analysis data for all investigative divisions. This automated system will enable the Bureau to be more effective, efficient, and credible in addition to complying with the Agreement.

Furthermore, PRPB's promotional efforts as defined in the Staffing Plan will achieve the adequate number of needed supervisors identified during the needs assessment. As a result of the Staffing Plan, PRPB has made some improvements in capturing and tracking UOF reporting. The Monitor's Office continues to work with PRPB as it implements the initiatives identified in the Staffing Plan.

### Paragraph 139: Supervision and Management - Duties of Supervisors

*Precinct and unit commanders shall closely and effectively supervise the officers under their command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

### Compliance Assessment

During this reporting period, the Monitor's Office interviewed a random sample of approximately 25 supervisors and 39 supervisees. Although information gathered from these interviews is noted throughout this CMR, the Monitor's Office also acknowledges the limitations in our ability to provide a comprehensive analysis based on these interviews. Common themes in feedback gained from these interviews continued to be very similar to what has been reported in past CMRs. The following comments were also made or repeated by interviewees:

## The Agreement

As a normal trend during officer interviews, officers advised being familiar with the Agreement, but no one had completely read the Agreement. However, they reported reading the UOF section. The main reason provided for not reading or being familiar with the entire Agreement was the many assignments and responsibilities due to the shortage of personnel. Furthermore, over 95% of respondents expressed favorable and positive comments on the entire PRPB organization, giving credit to the Agreement. Consistent statements made by officers as well as supervisors include the following:

> *"The Agreement has made us a professional organization, has provided more effective and better guidance for management as well as for officers. Among the skills developed are better decision making, training, equipment, and organizing and planning. The civilian communities are starting to understand and accept our responsibilities, risks, and dedication to making the island a better place. We are starting to feel better support from our management as well as from the communities. Some sections of the Agreement like the UOF are discussed during the monthly meetings known as "Academia."*

The following is a sentiment expressed by several officers:

> *"The Agreement is good, but sometimes officers will over think during UOF situations positioning themselves, partners, civilians, and sometimes, the victims at risk."*

## Consistent Supervision

The promotion of 103 first-line supervisors during 2022 and 533 in 2023 increased PRPB's ability to comply with the Staffing Plan, the Agreement, and most importantly, to become a better, more effective and respected organization. Interviewed supervisors expressed that they have been able to do their jobs while supervising and evaluating 10 or less officers, usually. However, they advised that when supervisors retire, transfer, go on sick leave or vacation, they must evaluate officers that they do not directly supervise. Also, during interviews, it was advised that lieutenants will help supervise and evaluate officers due to the shortage of first-line supervisors. Another alternative is assigning senior agents to provide supervision in the field. However, these acting/senior supervisors cannot write their evaluations. Several interviewees indicated that supervision assignments and responsibilities are inconsistent, negatively impacting the quality of first-line supervision. The Monitor's Office believes that if the recently promoted 533 sergeants are assigned as identified in the Staffing Plan, the above stated deficiencies will be addressed, making supervision effective and compliant with the Agreement.

As stated above, the following identified deficiencies or issues with supervision should improve: sergeants working long hours on the streets; proper and effective supervision; and sergeants able to concentrate on performing their official duties. Also, there will be no need for acting supervisors in the field. Solving all the reported issues will address the lack of communication among high-ranking officers, which was also reported as a problem. Instructions or directives will be distributed timely, properly, and correctly, prompting officers to minimize mistakes and properly comply with orders.

The following information has been and continues to be reported by interviewees during all CMRs:  many officers have been disarmed and are conducting civilian administrative work but getting paid regular

151

officer salary. Some of the reported assignments for the disarmed officers include physical maintenance, building repairs and vehicle maintenance, while again, still getting paid as a sworn officer. Interviewees stated that it is well known within management that some officers will report having emotional or personal problems to purposely get disarmed and be put on light duty, at times for long periods of time, while still getting their regular pay. The Monitor's Office has expressed in the past and continues to do so that this system needs to be reviewed and managed in a way that officers abusing the system can be correctly identified and medically assessed to determine when they can return to duty or if incapable of performing law enforcement duties, be re-assigned to a civilian position and be compensated accordingly. The Monitor's Office believes this is fundamentally unfair to all concerned and is a significant issue for the morale within PRPB.

## Promotions

Again, a significant number of officers interviewed during this reporting period had no interest in seeking a promotion. However, one of the reasons given in the past for officers' lack of interest in promotions – the lack of a reasonable amount of time to prepare for the sergeant test – was corrected during this reporting period as officers acknowledged and recognized that before the last test was offered in December 2022, PRPB provided reasonable time to prepare and reviews and guidance. Other reasons for the lack of interest continued to be the same: supervisors not motivating personnel, low salary increases with more responsibilities, and more importantly, the fear of being transferred out of their current region.

## Equipment

Interviewed officers reported being pleased with the personal equipment received (tasers, bullet-proof vests, flashlights, etc.). Officers, however, continue to express the need for specialized vehicles such as SUVs to cover difficult terrains within their territories. Furthermore, as during CMR-7, officers continued to advise that most of the patrol cars contain no computers, or if they have computers they do not work, forcing officers to return to the office to complete reports. In addition, officers reported an insufficient number of computers at the office, which forces officers to spend unproductive time at the office instead of performing their duties in the field.

Officers reported difficulties performing their duties during vehicle stops as they could not access vehicle and personal records from their vehicles. The lack of computers in vehicles forces officers to call the office or "Centro de Mando" and wait until someone is available to run the requested records. They advised that the entire process, starting from the moment they stop the vehicle until the end of the intervention, could take up to 30 minutes. They advised experiencing situations in which after issuing a ticket, officers do not know if people in the car had an arrest warrant or a criminal record, which is a security risk. Another issue discussed was the need for better handheld radios for communication. Officers identified their personal cell phones as the most reliable communication tool. Several highway patrol officers reported not having enough or reliable speed radar equipment, making it nearly impossible to justify a ticket for speeding. They stated that most tickets issued are for reckless driving and illegal use of cellphones. Another unjustifiable issue identified during interviews was that officers use their own money to repair official vehicles. Such repairs included brake pads, air conditioning systems, tires, and other minor repairs. Also, some repairs are done by the officers themselves. Officers

reported that the Bureau's budget for repairs is very low, leaving vehicles disabled for months, years, or sometimes forever.

## Evaluations

As reported in the past, 99% of interviewed officers continue to have no confidence in performance evaluations and believe evaluations have no significance. Most simply agree and sign their evaluation. The general opinion or perception by officers is that evaluations have no relevance to their job or their future careers. Personnel continues to report that most supervisors will not discuss evaluations with officers unless officers challenge them. Over 95% of officers interviewed advised that they received evaluation ratings ranging between 4 and 5 out of 5, indicating a significant score inflation. Officers believe that supervisors will evaluate officers highly, so they do not have to deal with complaints and avoid meeting in person. Officers advised that supervisors emailed them their evaluations for signature and never met to discuss performance or career advancement opportunities. Several officers advised being evaluated by someone who had not worked with them. Several officers stated that the inflation of scores is affecting PRPB morale. Under the updated policy, GO 310 (Performance Evaluations), supervisors are required to discuss evaluations with their officers in-person, regardless of rating.

## Transfers

During this reporting period, all interviewed officers again advised that the transfer system does not work as advertised. Officers expressed that transfers take too long and are influenced by friendships, connections, and politics. Officers believe that the transfer program is not a fair system. Interviewees stated that the transfer system is a morale problem among officers trying to transfer closer to home. Regional transfers can take up to 15 years and sometimes longer. Interviewees stated that it is well known that some officers are being transferred from the bottom of the seniority list, which is unfair for officers using the system as designed. Over 95% of the officers expressed that the transfer policies and system is a well-known problem that is not acknowledged by upper management.

## Community Relations

Regardless of their assignments, interviewed officers advised that each department or precinct has representative personnel to engage with the community. They further advised that it is solely this representative's responsibility to participate and represent PRPB during any community events. Officers advised having too many responsibilities and assignments to directly participate in community activities. They also advised that normally, community engagement is not encouraged by supervisors. Officers advised that it was the upper management who decided to create specialist units or assignments to represent PRPB within the community, taking the responsibility away from officers so that they can dedicate their time to daily investigative work.

## General Observations
- Positive areas that were mentioned:
    - The Agreement is generally seen as a positive and a necessity;
    - Communication amongst officers;
    - Younger supervisors are becoming more professional and committed;
    - Payment for overtime hours has improved;
    - Steps to get better pay has improved;

- o Supervisors are open to considering new ideas and change;
- o Approval of the Commissioner;
- o Increased and enhanced professional instruction from supervisors;
- o Working conditions, training, and equipment have improved.
- o The required 40-hour training, when available, has become easier to schedule.
- Areas needing improvement that were mentioned:
  - o Increase the number of front-line supervisors and personnel;
  - o Written communication: Most interviewees stated that communication was primarily verbal. The perception is that written communications can be an issue for supervisors;
  - o Supply shortages were not only reported but noted during precinct visits;
  - o Increased and enhanced recruitment and retention programs to help with the lack of personnel;
  - o Removal of political influence from PRPB, especially relating to transfers;
  - o Improvement of the pension plan and benefits, which will in turn attract better candidates;
  - o Some of those interviewed stated that cars and equipment are somewhat accessible, but PRPB needs to increase the budget for the purchasing of equipment, car parts, and the ability of repairing cars as quick as possible to better equip officers;
  - o Shortage of qualified police candidates. Good incentives have to be in place to attract better candidates;
  - o Supervisors are supportive of virtual training but believe that in-person training is needed and more effective;
  - o Officers reported working additional shifts or hours to cover the lack of officers. In many cases, the lack of officers is causing PRPB members to be overworked, affecting morale, and causing burnout;
  - o Supervisors and officers complained about the Judicial System, which they feel needs to be more consistent and effective in the application of the law; and
  - o Recognition of outstanding work sometimes does not occur.

### *Pathway Forward*

PRPB upper management should give a higher weight to officers' feedback and move to correct and improve all identified deficiencies in addition to continue or better the strengths. Several officers and personnel have reported that they feel that upper management does not appreciate being criticized and will respond with retaliations. During this reporting period, DSP and PRPB addressed some supervisory staffing shortages by promoting 533 sergeants and preparing to promote 68 high ranking officials. These promotions will greatly address accountability and morale, increasing upper management credibility among the entire personnel. DSP and PRPB are aggressively committing to make PRPB more effective and professional. The Monitor's Office will assess PRPB as they continue efforts to implement and comply with the Staffing Plan, per paragraph 13.

### Paragraph 140: Supervision and Management - Duties of Supervisors

*All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

The Monitor's Office reviewed examples of staffing documents submitted electronically and during several site visits, such as to Bayamon, Carolina, Arecibo, Aguadilla, Fajardo, Utuado, Humacao, and Mayaguez. The reviewed documents and interviews confirmed the necessity for first-line supervisors; however, this issue is expected to improve after the aggressive work by DSP and PRPB of promoting 533 sergeants during this reporting period. After the completion of the assignments for the promoted sergeants, PRPB will have an effective supervision line that is able to provide guidance in addition to promoting professionalism, prioritizing community policing and problem solving, and most importantly, identifying, correcting, and preventing misconduct. As recommended in the past, the Monitor's Office determined that PRPB is in need of the development of an EIS, the conduct of personnel integrity audits, and ensuring the implementation of inter-agency feedback systems. These critical elements are essential to achieve compliance with this paragraph. Good supervision is the basis for any successful organization and PRPB should not be the exception. Significant and considerable responsibilities are expected of PRPB supervisors making them responsible for ensuring that officers under their command comply with Bureau policy, the Agreement, and the law. The vast majority of interviewed personnel stated supporting their supervisors and felt that they provided the necessary supervision, guidance, and support to comply with Bureau policy, the Agreement, and the law. However, a few of the personnel interviewed believed that their supervisors need improved and more effective training as well as a better communication with the next level of supervision.

*Pathway Forward*

Interviewed officers stated that one area in which supervisors can improve is having a better knowledge and understanding of the evaluation system. In addition, they mentioned an improved and more open line of communication with upper management as another area of improvement. Further, they do not oppose receiving evaluations via email for review but advised that supervisors should spend time meeting in person with their supervisees to discuss their performances, goals, and objectives, as well as their careers in PRPB. Performance evaluations are the most effective tool to ensure that supervisors and officers are complying with PRPB policies. The approval of GO 310 (Performance Evaluations) should address the identified issues with the evaluation system.

## 2. Supervisor Training

During this reporting period, the Monitor's Office determined that PRPB provided the required 40 hours of in-service training to current and recently promoted supervisors. The training complied with the accepted policing practices in leadership and management. PRPB demonstrated their commitment to comply not only with the Agreement, but also for the benefit of the much-needed professionalism for the Bureau. PRPB must continue efforts to ensure all future supervisors receive the required training before taking over their responsibilities as supervisors. PRPB should also understand that this training is not the end of the requirement and should continue to promote and develop additional training to keep all supervisors up to date with successful management methodologies used by other government agencies as well as within the private industry.

### Paragraph 141: Supervision and Management - Supervisor Training

*Each supervisor shall receive mandatory management, supervisory, leadership, and command accountability training, tailored to each level of supervision and command, of no fewer than 40 hours in duration, prior to assuming supervisory responsibilities. Each supervisor shall receive no fewer than 40 hours of in-service training annually thereafter.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 141-143. | ☑ Met | ☐ Missed |
| 2. Supervisor trainings are consistent with Paragraphs 141-143. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in supervision requirements (or scheduled for training, in the case of mid-year reviews). With respect to Paragraph 142, 100% of PRPB personnel serving as supervisors on or before July 17, 2013, were trained and certified in supervision requirements by October 8, 2018. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office conducted a comprehensive analysis of policies related to supervisor training and concluded that the training materials employed by PRPB are consistent with policy and generally accepted policing practices. All current and new PRPB supervisors sampled have received the supervisor training developed pursuant to the Agreement. All interviewees during this reporting period continued to confirm that officers are not permitted to take on new supervisory roles until they have completed all required trainings.

156

*Pathway Forward*

Additional interviews after the recent promotions will be conducted to verify that the policies and training are conducted and implemented accordingly. With the new 533 sergeants, PRPB should not need acting supervisors.

## Paragraph 142: Supervision and Management - Supervisor Training

*All current PRPD supervisors shall receive the supervisor training developed pursuant to this Agreement within 18 months after it is developed and first implemented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | One-Time Compliance |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 141.

*Compliance Assessment*

After the recent promotion of 533 sergeants and receiving the required training before taking over their new positions, the Monitor's Office assessed and reviewed all provided supervision training records. After the Monitor's Office's review and approval of the required training, the Monitor's Office continues to find that all supervisors have received the supervisory training as required by this paragraph.

*Pathway Forward*

Following the implementation of the Staffing Plan and the promotion of new supervisors, the Monitor's Office will continue to review and assess updated training curricula and records to ensure that all supervisors receive all required training.

## Paragraph 143: Supervision and Management - Supervisor Training

*The supervisory training program shall include, but not be limited to, instruction in the following topics:*

*a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;*

*b) de-escalating conflict;*

*c) evaluation of written reports;*

*d) investigating officer uses of force;*

*e) responding to and investigating allegations of officer misconduct;*

*f) risk assessment and risk management;*

*g) evaluating officer performance;*

*h) appropriate disciplinary sanctions and non-punitive corrective action; and*

*i) using EIS to facilitate close and effective supervision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 141.

*Compliance Assessment*

Current and recently promoted supervisors have received training in all of the above listed topics. Most of the interviewed officers as well as supervisors were not familiar with EIS. Management should recognize that EIS is a tool that has not been used properly and must make efforts to explain and clarify how EIS is meant to be used.

*Pathway Forward*

The EIS should be fully developed as soon as possible, and every level of supervision needs to be trained and have complete knowledge of the related policies and use of the system. The Monitor's Office welcomes the opportunity to review this training and provide the necessary recommendations to PRPB.

## Paragraph 144: Supervision and Management - Supervisor Training

*Officers appointed to the rank of Lieutenant Colonel, Colonel, commanding officer to a PRPD superintendency or unit, and any other supervisors must receive Equal Employment Opportunity ("EEO") training on PRPD's policies and federal and Commonwealth anti-discrimination laws. This training shall include protocols for supervisors to follow in the event they are made aware of complaints involving discrimination and/or harassment. The training shall also include instruction on PRPD policies prohibiting retaliation against any individual opposing the alleged discrimination or harassment and/or participating in a proceeding or investigation of discrimination or harassment. Supervisors receiving the EEO training shall be evaluated in part based on their knowledge and implementation of the policies, guidance, and laws covered in that training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| **Training:** | Implemented | **Assessment Frequency** | Annually |
| **Practice:** | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in EEO and anti-discrimination laws (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Supervisor evaluations and SARP investigations indicate that supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files. | ☑ Met | ☐ Missed |

*Compliance Assessment*

A full review of all provided related policies, training curricula, and training certificates specifically related to supervision was conducted by the Monitor's Office. The Monitor's Office drew a proportional random sample of 92 sworn personnel, with a slight over-representation of the higher ranks that have significantly lower frequencies in the population. Table 3 shows the full breakdown of the random sample by rank:

| Rank | Number | % of Sworn Personnel | Proportional Sample Size |
|---|---|---|---|
| **Coronel** | 6 | 0.05% | 0 |
| **Teniente Coronel** | 26 | 0.22% | 1 |
| **Comandante** | 29 | 0.24% | 1 |
| **Inspector** | 43 | 0.36% | 1 |
| **Capitan** | 75 | 0.63% | 2 |
| **Teniente I** | 140 | 1.18% | 3 |
| **Teniente II** | 573 | 4.83% | 5 |
| **Sargento** | 1055 | 8.90% | 8 |
| **Agente** | 9158 | 77.26% | 71 |

*Table 2: Sample by Rank*

The Monitor's Office requested all training and disciplinary records for the sampled officers, as well as personnel evaluations covering the reporting period. Information on the sampling frame used can be found in Appendix B.

The Monitor's Office found that all related policies incorporated the requirements of this paragraph and that the supervisory training is consistent with approved policies. Furthermore, during the assessment of personnel records and documentation provided by PRPB, the Monitor's Office found that 95% of sampled personnel are trained and certified in equal employment opportunity (EEO) and anti-discrimination laws. In addition, PRPB provided documentation related to supervisory evaluations and

SARP investigations, which indicate that supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files.

*Pathway Forward*

It is imperative that PRPB continues to highlight to all personnel, including civilians, the importance of receiving and understanding the EEO training and anti-discrimination laws.

## 3. Performance Evaluation

During this reporting period, PRPB continued to use ProMedia as their evaluation system, GO 310 (Performance Evaluations) was also updated and signed by the Commissioner in February 2023. The Monitor's Office believes that if the ProMedia system is used as it is meant to be, it will be very effective within the Bureau. Some of the revisions include: expanding the performance categories measured and the requirement of supervisors meeting with supervisees in person to provide clear, detailed, and good justifications for each element of the evaluation system. Supervisors are to be knowledgeable of criteria, policies and procedures, and more importantly, be specific with strategies that will help employees improve and be more effective. Supervisors must be prepared with plans to follow through with their guidance. Supervisors were supportive of ProMedia during interviews, nevertheless they demonstrated a lack of evaluation knowledge in their answers as well as during the review of training records. The Monitor's Office believes that after supervisors receive the proper training and develop expertise with the system, they will be able to effectively supervise their subordinates to better accomplish the Bureau's mission.

### Paragraph 145: Supervision and Management - Performance Evaluation

*PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 145-146. | ☑ Met   ☐ Missed |

160

| 2. Training on performance evaluations is consistent with approved policies. | ☑ Met | ☐ Missed |
|---|---|---|
| 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | ☑ Met | ☐ Missed |
| 5. 95% of sampled performance evaluations adhere to approved policies. | ☐ Met | ☑ Missed |

*Compliance Assessment*

During this reporting period, the Monitor's Office determined that supervisory trainings were consistent with policies, meeting the requirements of the Agreement. However, during the officer and supervisor interviews, it was reported and determined that performance evaluations are still being provided via email. It was advised that unless there is a challenge with the evaluation, no in-person dialogue takes place. Also, as in the past, the Monitor's Office's review of performance evaluations during the reporting period raises concerns due to the apparently inflated ratings being provided to officers.

It was reported to the Monitor's Office that GO 310 (Performance Evaluations) was revised and that it is a requirement that every PRPB supervisor meet with their supervisees in-person to discuss evaluations regardless of the rating. However, during the personnel interviews very few officers and supervisors acknowledged that in-person meetings take place, unless a challenge is brought forth. It is important for supervisors to understand how critical these meetings are. This is the most effective way to discuss performances, expectations, respective goals, and career paths.

It was reported at the end of the reporting period that GO 310 (Performance Evaluations) was approved and signed with an effective date of February 15, 2023. After this approval and implementation, additional training will need to be developed and delivered.

*Pathway Forward*

The Monitor's Office continues to keep track of the implementation of the recently approved GO 310 and related forms. Supervisors as well as the supervisees need continued training to make the Bureau more effective and professional. The revision of these policies and procedures is crucial for the implementation of this paragraph. PRPB needs to understand and adjust the ProMedia evaluation system so that executives and HR can monitor and audit the evaluations according to policy.

## Paragraph 146: Supervision and Management - Performance Evaluation

*As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 145.

*Compliance Assessment*

A review of performance evaluations conducted by the Monitor's Office revealed that performance evaluations are completed on time and formalized, but still in need of a better completely automated system. A concerning issue was identified in which a systemic inflation of ratings was detected on a very high percentage of the evaluations. During the officer interviews it was stated that supervisors will rate subordinates high during their evaluations to avoid dealing with challenges from their employees. The performance evaluation system and policy (GO 310) were approved in February 2023. One of the changes to this policy requires supervisors to meet one-on-one with their employees, regardless of their ratings. During this meeting career goals and objectives will be discussed.

Officers continued to report that they receive their evaluations via email and that no one-on-one meetings take place. The Monitor's Office, as stated in the past, advised that conducting evaluations via email is not conducive to proper supervision or management of personnel. The need for first-line supervisors has always been identified as a significant contributing factor for performance evaluations being conducted over email. This is another issue that should be addressed with the recent promotion of 533 sergeants and approval of the revised GO 310 (Performance Evaluations).

*Pathway Forward*

The ProMedia evaluation system is in use by supervisors; however, the Monitor's Office believes that the system should be modified to a more advanced automated system, including tracking mechanisms for supervisory reviews of subordinates. The system should provide alerts when evaluations are due. Also, as recommended by the Monitor's Office, supervisors must meet with their subordinates to discuss performance as well as goals, objectives, performance challenges, and areas for growth. Supervisors must develop a system to document and keep track of their performance evaluation discussions.

## 4. Early Identification System

As noted in previous CMRs, PRPB has developed various modules within its EIS. However, upon examination of these modules and further discussion with PRPB personnel, the Monitor's Office noted that the current EIS in use by PRPB requires further development to ensure it serves as a non-punitive, proactive method for identifying agents that may need training, counseling, or other intervention before issues arise involving agent misconduct. The modules within EIS, as referred to by PRPB, serve as case management for complaints, sexual assault investigations, domestic violence investigations, and is not used as an EIS, in the traditional sense, to track officer performance and conduct.

On August 22, 2022, the Monitor's Office participated in an operational system demonstration of the Supervision Module and the No Punitive Fouls Module. These two modules were shown to be

operational, and PRPB approved these systems in October 2022. When EIS is operational, the No Punitive Fouls Module will be used for referrals to EIS.

Although PRPB has participated in some virtual meetings to discuss EIS, much of the work in this area is being tabled and will be addressed as part of the implementation of the IT Corrective Action Plan (CAP). Both projects will inform the state and quality of the data that will be used to develop EIS. PRPB can only be considered compliant with paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all datapoints required by the Agreement and PRPB policy, and 2) PRPB leadership and third-party overseers are able to conduct data analysis of policing practices and outcomes using EIS.

As a result of further work needed to improve its EIS and PRPB's inability to demonstrate an operational use of EIS in a comprehensive manner, the Monitor's Office must rate the below related paragraphs as not compliant.

Because much of the work in this area is contingent on other projects, PRPB has also not developed the policies and procedures related to EIS. The Monitor's Office looks forward to assessing PRPB's progress in this area after the completion of the IT CAP and AHDatalytics' work.

## Paragraph 147: Supervision and Management - Early Identification System

*PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 147-153. | ☐ Met | ☑ Missed |
| 2. Training on EIS is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | ☐ Met | ☑ Missed |

163

| | | |
|---|---|---|
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | ☐ Met | ☑ Missed |
| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

As noted above and in previous CMRs, there currently is no EIS developed and/or in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB has noted that it is awaiting recommendations from the IT CAP and results of AHDatalytics' work to begin developing EIS. EIS will be heavily reliant on the data and modules that are currently being reviewed and/or developed as part of these two projects. As such, it is most efficient for PRPB to wait until these projects have been completed until it begins delving into EIS development.

### *Pathway Forward*

PRPB must develop an EIS that encompasses a range of clearly defined information and ensures that corrective action is based on appropriate evaluation, and not reserved for a mere accumulation of violations. Currently, the EIS platform is under development and is not available for use by supervisors. EIS is a critical component of risk assessment and management systems and should be a priority for PRPB. PRPB must ensure that EIS provides a non-punitive, proactive method for identifying agents that may need training, counseling, or other intervention before issues arise involving agent misconduct. PRPB should continue to develop the platform so that supervisors can use the information from EIS data and records. This will mean that EIS can become an effective supervisory tool that addresses potentially problematic behavior in a timely and non-punitive manner.

### Paragraph 148: Supervision and Management - Early Identification System

*The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:*

*a) all uses of force;*

*b) injuries to and deaths of persons in custody;*

*c) all complaints and their dispositions;*

*d) data compiled under the stop data collection mechanism;*

*e) all criminal proceedings initiated, as well as all civil or administrative*

*claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;*

*f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;*

*g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;*

*h) all disciplinary action taken against employees;*

*i) all non-punitive corrective action required of employees;*

*j) all awards and commendations received by employees;*

k) training history for each employee; and

l) identifying information for each PRPD officer and employee and;

m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

### *Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

### *Pathway Forward*

The Monitor's Office looks forward to assessing the developments of this work in its upcoming CMRs and stresses to PRPB the importance of ensuring that EIS, once developed, captures the requirements of this paragraph.

## Paragraph 149: Supervision and Management - Early Identification System

*PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

As noted above, there currently is no EIS developed and/or in use by PRPB. Although PRPB has identified personnel that will lead EIS development efforts and its related policies and procedures, as noted above, any work related to this has been placed on hold until the IT CAP and AHDatalytics' work is completed. The results and recommendations from these two projects will be used to inform EIS development.

*Pathway Forward*

The Monitor's Office looks forward to assessing PRPB's progress in this area as part of its implementation of the IT Corrective Action Plan (CAP).

## Paragraph 150: Supervision and Management - Early Identification System

*PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB has not made significant progress in the development of an EIS, and most of the supervisors and agents who were interviewed were unaware of what constitutes an EIS. Those that know how to use EIS nevertheless report not being able to access the system. The Monitor's Office has been told in interviews that equipment such as logbooks, administrative supplies, laptops/iPads, and computers are not available for PRPB supervisors to use to access and review EIS data. The Monitor's Office notes that investment in such equipment is a prerequisite for providing supervisors with a mechanism for accessing and reviewing EIS once its development is completed.

*Pathway Forward*

The Monitor's Office notes that PRPB must take equipment needs into consideration as it works towards promoting new supervisors in the coming months. Further, PRPB should leverage the IT Needs Assessment and CAP to inform the status of its ability to provide supervisors and commanders with the equipment necessary to access supervisory and management systems like EIS.

## Paragraph 151: Supervision and Management - Early Identification System

*PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in its upcoming CMRs.

## Paragraph 152: Supervision and Management - Early Identification System

*PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.*

| Compliance Status | Assessment Schedule |
|---|---|

167

| Not Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in its upcoming CMRs.

## Paragraph 153: Supervision and Management - Early Identification System

*Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in its upcoming CMRs.

## 5. Internal Audits and Interagency Feedback

PRPB ensures that audit work is conducted in a consistent, fair, and professional manner. The PRPB Audit Division provides transparency and gains public trust through accountability, quality, and continuous improvement. The audit system identifies operational deficiencies, analyzes the causes and contributing factors, and implements effective corrective measures. These audits help ensure that all areas of Puerto Rico receive adequate levels of service delivery. Policies reviewed by the Monitor's Office related to this subsection meet paragraph requirements. The internal audits reviewed by the Monitor's Office demonstrate that commanders are developing a plan of action for the deficiencies identified by the Audit Division.

### Paragraph 154: Supervision and Management - Internal Audits and Interagency Feedback

*As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 154-156. | ☑ Met | ☐ Missed |
| 2. Training on internal audits and inspections are consistent with approved policies. | ☑ Met | ☐ Missed |

169

| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
|---|---|---|
| 4. 95% of selected internal audits and inspections comply with policy. | ☐ Met | ☑ Missed |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | ☑ Met | ☐ Missed |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | ☑ Met | ☐ Missed |

*Compliance Assessment*

In assessing PRPB's compliance with this paragraph, the Monitor's Office finds that related policies incorporate the requirements of paragraphs 154-156. Trainings on internal audits and inspections are consistent with approved policies. However, the Monitor's Office does not find that 95% of sampled personnel have completed or will complete the required training and certification on the auditing and inspections system in the required timeframe for this reporting period.

Based on conversations with members of the inspection division in November 2022 and February 2023, PRPB is using the auditing system to identify operational deficiencies and their causes and contributing factors so that effective remedial action may be implemented. It is noted by the Monitor's Office that the Inspections Manual and Guide is comprehensive and has been well received by PRPB supervisors. It should also be noted that these two documents were revised and have been reviewed by the Monitor's Office as part of paragraph 229 and comments were provided.

*Pathway Forward*

The Monitor's Office commends PRPB for its work on this paragraph and will continue to assess PRPB's compliance with this paragraph. Based on this review, PRPB is found to be using the auditing system to identify operational deficiencies, so that effective remedial action may be implemented. The revised Inspections Manual will be more comprehensive for inspections and will be reviewed during CMR-9. Further training should be conducted on the auditing and inspections systems and PRPB should ensure that its internal audits and inspections are conducted according to policy.

## Paragraph 155: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop a protocol for conducting operational audits related to the material terms of this Agreement. The protocol shall establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Command Areas. Audits shall assess, where appropriate, operational consistency among similar units throughout PRPD to ensure that all geographic areas are provided with appropriate levels of service delivery. PRPD shall summarize in an annual report the conclusions and recommendations of audits conducted during the time period covered by the report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 154.

*Compliance Assessment*

As noted above, PRPB provided information to the Monitor's Office regarding the results of individual sampled audits completed during the reporting period. PRPB has provided the schedule and examples of audits for CMR 8, and as noted above, the audits are scheduled regularly for all PRPB units, locations, and personnel.

The Inspection Division has documented the conclusions and recommendations of all audits conducted. This will help other areas prepare for their audit and make use of the data that comes from previous audits. This information will also help other supervisors review management, supervisory, and other practices to ensure they follow PRPB policies and goals.

The 2023 Annual SARP Audits Report, which covered the period of January 1 to December 31, 2022, was provided to the Monitor's Office. The Scope of Operational Audits included administration, retén, human resources (MNPPR), official vehicles, and physical plant. It should be noted that the Monitor's Office requested records of individual audits conducted by the Inspection Division. The Monitor's Office received the requested information and after reading the 2023 Annual SARP Audits Report determined there were 65 non-punitive infractions and corrective measures with 0 referrals for investigation. All of these were reviewed and signed by the Commissioner, which is compliant with the paragraph. The 2023 Annual SARP Audits Report was well written, concise, and supported the above conclusions, which will be beneficial to PRPB. It is further recommended by the Monitor's Office that more complete explanations be given of the exact deficiencies in each individual audit report and the 2023 Annual SARP Audits Report.

*Pathway Forward*

The Monitor's Office recommends that PRPB's Manual of Operational and Administrative Inspections be revised with new policies, regulations, and guidelines, as determined by PRPB. After the revisions are completed, it is recommended by the Monitor's Office that a revised training curriculum and class be developed based on the Manual of Operational and Administrative Inspections. This manual should be required reading for all supervisors, both at the administrative and operational levels.

## Paragraph 156: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 154.

## Compliance Assessment

The Monitor's Office has received information from the Inspection Division indicating that audits are consistently planned and conducted. Also, the Monitor's Office was provided with documentation to demonstrate that the Commissioner reviews each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. Documentation was provided to demonstrate that the commander of each precinct or specialized unit reviewed all audit reports regarding employees under their command and, if appropriate, took non-punitive corrective or disciplinary action.

PRPB provided a list of 13 operational audits conducted from October to December 2022 and a list of 24 operational audits conducted from January to March 2023, for a total of 37 audits during the reporting period. Going forward, the Monitor's Office requests that PRPB send only completed audits for the Monitor's review.

The Monitor's Office received two lists of audits conducted by the Inspection Division from October 2022 through March 2023. Unfortunately, only four inspections were completed during this reporting period. It is anticipated by the Monitor's Office, that more inspections will be completed during CMR-9. The Monitor's Office appreciates the work that was done by the Inspection Division on these audits. These audits were comprehensive, clear, and concise. During the review of these four inspection audits, there were repeated deficiencies noted by the auditors. These include the following:

• Failure to perform weekly arc testing of tasers.

• Lack of emergency plans.

• Lack of plans to make arrests or apprehension searches and raids.

• Lack of policy reference to crisis intervention.

• Lack of certification of fire extinguishers.

• Lack of information kept concerning work hours.

• Lack of proper reference photographs of PRPB employees.

• Lack of proper uniform.

• Lack of available vehicles.

172

- Failure to issue tasers to 13 agents.

- Failure to update training records.

It is noted by the Monitor's Office that those in charge of each of the four locations resolved all issues identified by the Inspection Division within 30 days. In only one location was there evidence of non-punitive sanctions being administered by the person in charge - this applied to two individuals and was clearly identified in the audit report. PRPB is commended for the inspections which were completed; these reports are extensive and involve hundreds of pages of documentation and analysis. In each of these inspections, proper advance notice was given to those in command in preparation for their efforts.

*Pathway Forward*

PRPB should work on developing an automated system whereby the Commissioner and commanders produce memos or other evidence to track and demonstrate that they have thoroughly read relevant audits and have developed strategies and corrective actions based on the results of those audits. These strategies and corrective actions should be published so that other commanders can see successful resolutions. The Monitor's Office has been provided with the Annual Audit Report issued in January 2023. The Monitor's Office suggests that the Annual Audit Report be required reading for all supervisors in PRPB and this information be included in future promotional examinations of sworn personnel.

During a past site visit to Guayama, the Monitor's Office received a Random Inspection Certification form that is being used by supervisors in Guayama. This form included an inspection of drivers' licenses, lethal and less lethal weapons, gun belts, ammunition, magazines, tasers, batons, and gas. This form could be used by other supervisors in PRPB. The form is very similar to what is used in the United States during roll call training and inspections.

It is recommended by the Monitor's Office that the roll call concept be instituted uniformly across the Bureau. This is important for proper preparation for duty, officer safety, and formalizing the role of the supervisor. The roll call setting and the ad hoc inspections process, together with this type of tracking form is beneficial to ensure and document readiness for duty and performance. This form also provides a record of documentation that will be required and gives officers and supervisors the ability to familiarize themselves with the requirements of inspections in advance. The practice of having a formal roll call, ad hoc inspections, and the use of this form would assist in better preparing officers for duty, help with administration of non-punitive discipline, and ultimately assist with officer safety.

Further, the Monitor's Office recommends that the inspection of the Guanica Maritime Division be used as a model. This inspection audit was streamlined and very efficient due to the orderly and organized methods used to track the information and equipment.  Specifically, all equipment was numbered and the records were organized by numerical order to easily identify the corresponding equipment. This included equipment such as portable radios, computer equipment, bullet proof vests, tasers, weapons, vehicles-organized by VIN, model, and make, ballistic shields, etc. It is hoped by the Monitor's Office that the other areas could review and establish a similar tracking system to prepare for future audits.

## Paragraph 157: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential*

173

*criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☑ Missed |
| 2. Training on integrity audits is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | ☐ Met | ☑ Missed |
| 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB is currently developing a plan for organizing and executing regular, targeted, and random integrity audits (the protocol to perform integrity tests). On September 8, 2022, PRPB submitted a preliminary draft of its integrity audit policy and protocol and participated in a meeting with the Parties to discuss the drafts and assistance from OSM. As such, PRPB has not begun training relevant personnel and conducting integrity audits based on the associated policy and protocol. The Monitor's Office looks forward to reviewing the policy and protocol for integrity audits when formally submitted.

A request was made by the Monitor's Office for the following data:

> "Global list (in excel or CSV format) of integrity audits pursuant to Paragraph 157 closed/concluded Bureau-wide during the assessment period, irrespective of when the audit was initiated. (If no integrity audits were implemented, please provide a certification stating as such.)"

No data was provided by PRPB during the reporting period; therefore, the Monitor's Office was unable to complete a random sample of integrity audits.

174

*Pathway Forward*

The Monitor's Office looks forward to the implementation of these materials during CMR-9. PRPB and OSM are continuing to collaborate on the development of the integrity audit policy and is hopeful that it will be completed during CMR-9.

## Paragraph 158: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall establish an executive-level liaison committee consisting of high-level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Quarterly |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Agreements and protocols incorporate all the requirements of this Paragraph. | ☒ Met | ☐ Missed |
| 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | ☒ Met | ☐ Missed |

*Compliance Assessment*

In past CMRs, the Monitor's Office determined that the relevant agreements and protocols incorporated all the requirements of this paragraph. Furthermore, based on the Monitor's Office's assessment of paragraphs related to civilian complaints and internal investigations, the Monitor's Office determined that other members of the criminal justice system have stepped forward and become part of the local criminal justice meetings. PRPB refers all allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation.

Documentation on the work of the feedback committees provided by PRPB illustrates that the committees are following the requirements of the paragraph consistently in the areas of San Juan, Ponce, and Bayamon, but less consistently in other areas. The documentation provided includes meeting agendas, attendee lists, and minutes, all of which provide evidence of participation by representatives of federal and local criminal justice components in all regions of Puerto Rico, including judicial courts,

175

prosecutors, universities, and the municipal police department. The Monitor's Office deems PRPB as being partially compliant with the paragraph due to the strong performance of the feedback committees in the aforementioned police areas but requires further evidence of consistent performance across all police areas to assess PRPB as being substantially compliant.

During past CMRs, the Monitor's Office noted that the area meetings conducted in larger cities, such as San Juan and Ponce could be used as examples for other areas. The committee meetings in these areas had broad participation with representatives of federal and local criminal justice components, a purposeful agenda and related discussion topics, and noted recommendations for action items and next steps for improving police services and the quality of investigations. It is noted that the information regarding this paragraph, even though requested early-on, was not forwarded in a timely manner; therefore, the Monitor's Office requests this data be forwarded in a timely fashion for CMR-9.

### Pathway Forward

The Monitor's Office recommends that PRPB continue to use protocols for maintaining related documentation not only as a means of demonstrating compliance with the Agreement, but more broadly to document the outcomes and action items from these meetings to ensure follow-through and accountability. A protocol has been developed and other criminal justice agencies in Puerto Rico have responded to or ratified the protocols developed by PRPB. Now, PRPB should develop an automated system to obtain copies, agreements, and protocols related to criminal justice committees and verify that these materials incorporate all requirements to improve compliance. It is also suggested by the Monitor's Office that a PRPB member be appointed to take concise and complete notes during these meetings.

176

## IX. Civilian Complaints, Internal Investigations, and Discipline

The Monitor's Office now fully employs a bifurcated analysis of SARP investigation files into Phase I and Phase II. Phase I is the Monitor's Office's contemporary assessment of PRPB's compliance with respect to the internal investigation of PRPB members. Phase II is the Monitor's Office's assessment of the adjudication phase of the case, which follows most investigations where a sustained finding has been entered. Phase I shows limited improvement. Phase II reviews of SARP case adjudications; however, have shown little to no improvement.

The Monitor's Office's deep concern over extensive delays in SARP case adjudication continues undiminished, despite having been pointed out repeatedly. Not only has there been absolutely no remedial response as of this CMR, the Monitor's Office learned that shortly after publication of CMR-7, which like CMR-6 also pointed out the acute lack of competent legal staff at Office of the Legal Advisor (OAL) and its negative impact on adjudication timelines, yet another staff attorney was transferred out of OAL to DPS with no replacement.[6]

The Monitor's Office finds that most internal investigations were conducted well and were eventually adjudicated in accordance with facts uncovered by the investigator. There remains considerable room for improvement to achieve a greater level of compliance. SARP continues to struggle with adequate investigations of anonymous complaints, most particularly those that are clearly internally generated or "whistleblower" complaints.  To assess this problematic category of complaints, the Monitor's Office selected a purposive sample of 15 recently concluded anonymous complainant investigations to conduct an analysis. Out of the 15, the Monitor's Office found that 6 were not compliant, mostly because the accused officer(s) were never interviewed by the investigator, which should be done in all cases where the accusation, albeit anonymous, establishes a potential violation of a very serious nature, which on its face cannot be completely ruled out by independent, established facts.[7]

There is yet another glaring and persistent concern over administrative investigation practices where serious wrongdoing has been alleged against PRPB employees by known complainants. When sworn police witnesses provide diametrically opposed versions of material fact(s) in a case involving serious

---

[6] As of this writing, OAL is now lacking seven qualified attorneys, four in the main OAL office as well as a lawyer in each of the following police areas: Carolina, Fajardo, and Humacao. OAL is also in need of equipment to facilitate its work, which had been previously requested for some quite some time.

[7] In Case 2021-0951, a sergeant was accused of using extreme vulgarity and aggression in a meeting with his subordinates and thus creating a hostile work environment. Due to conflicting witness testimony the case was recommended as filed - leaving behind sworn witnesses that directly contradicted the accused. In Case 2022-1114, an anonymous neighbor reported that two PRPB officers went on vacation while using sick leave. No one ever interviewed the accused. In case 2022-0661, a whistleblower complained of a PRPB officer stealing hours of work and accused two other officers of covering this up. Written statements were used to interview a lieutenant instead of face-to-face interviews. Records indicate use of sick time during the days in question. Neither the alleged contractor nor the officers were interviewed. In Case 2022-1213, a PRPB officer was accused of spending hours on duty outside of a business while physically involved with a female employee. The officer was briefly interviewed and said that he goes to the business periodically while on duty. The investigator never asked the accused officer if he knew anyone at the business (i.e., the woman in question). In Case 2022-1015, an anonymous complainant alleged that a police officer reported for duty while intoxicated, and that he also abuses his parents. The parents were interviewed together instead of separately, and the accused officer was never interviewed. In Case 2022-0967, an anonymous citizen alleged that two PRPB officers accosted her in a sexual manner, one of whom allegedly exposed himself.  She identified one officer involved in Arecibo. Both defendants were working on that day and had stopped many motorists for infractions. Only two were women.  The superior officer said both were disciplined, responsible officers. Neither officer was ever interviewed concerning these very serious allegations.

police misconduct - especially cases of alleged corruption, collusion, or reprisal, such a case should not be closed without interviewing all witnesses, including the accused officer(s). In these cases, irreconcilable differences between sworn officers concerning material facts call for exhaustive attempts, including polygraph examination(s) on the part of the investigator, to attempt to resolve opposing versions of fact. Moving forward, the Monitor's Office has grave doubts about whether PRPB will ever reach substantial compliance so long as this practice persists. Any PRPB employee, irrespective of rank, who is found, based upon a preponderance of the evidence, to have been untruthful during any SARP investigation must be held accountable, irrespective of whether that employee was originally cited as a complainant, witness, or the accused party.[8]

Some progress has been noted in documenting SARP case milestones, assignment dates, conclusion dates, supervisory review dates, and area command review dates. This progress should be rapidly improved by creating the ability to include digital signatures within the SARP casefile database, like many major mainland police agencies. The Monitor's Office continues to find a substantial number of cases where SARP commander's approval of the case findings is either absent or left undated. Digital signatures could be used to approve 30-day extensions in administrative investigations at the SARP supervisory or area command level, which should eliminate frequent delays for approval (between 3 to 10 days) while the paper copy of the request circulates to SARP Central Command. Adoption of a commander's digital signature with a time stamp may help reduce or even eliminate this problem.

The Monitor's Office questions PRPB's use of PPR 441 to give *actual notice* (in-hand) as opposed to using other alternate means of notification of a member's final case outcome or when a disciplinary action is upheld. The Monitor's Office has observed that this policy frequently leads to months, and at times, well over a year of unnecessary delay by mandating that a PRPB superior officer *physically* hand a copy of the PPR 441 containing the officer(s) case findings (sustained/not sustained/exonerated or unfounded). The Monitor's Office strongly recommends the use of alternate means of notification which may include physical delivery to the last and usual address, delivery through PRPB email, delivery by the U.S. Mail (either certified or ordinary correspondence), or to the officer's registered residence.

Training continues to be an area of poor performance for the entire organization in general, especially in SARP. That said, the Monitor's Office is very impressed by SARP's earnest partnership with SAEA and its recent gains in restructuring formative training (SAEA Course REA 114 – SARP Investigations) for its

---

[8] The most brazen example of this issue was uncovered in CMR-4, wherein two SARP investigators independently accused their direct superior of meddling in cases, which not only involved collusion with and/or protection from her superiors in SARP, but also retaliation against one of the investigators once their identity became known to the accused. These grave accusations were later self-denounced by SARP Command, and a new internal investigation was launched (SARP 2021-0997). After waiting an appropriate amount of time for the case to be closed officially, the Monitor's Office requested a copy of the entire case file for analysis in CMR-8. After substantial review and analysis, the Monitor's Office found that this case was administratively closed while leaving diametrically opposed versions of fact made by sworn members, which went to the heart of the underlying allegations. Even more egregious, it appears that no investigative interview was ever conducted with the accused superior officer. Serious administrative cases involving contradictory versions of relevant facts among PRPB members, especially those that hint at corruption, collusion, or retaliation should never be closed without first interviewing all witnesses, to include the accused PRPB member. In serious administrative cases, SARP must exhaust all legal means (including the use of polygraph examinations) to attempt to determine which of the sworn officers were telling the truth and which were not. The cited case involves alleged corruption and collusion among PRPB officers of rank, as well as subsequent reprisal against the original complainant, who was and remains an agent of PRPB. It has not escaped the Monitor's Office's notice that, due to these glaring omissions, the two accusations raised by the original complainant – that she was actually a victim of retaliation by her superiors *and* that the SARP superior officer in question enjoys unscrupulous influence within the SARP hierarchy, are both actually *reinforced*.

new investigators, including addressing many recently adopted changes in its methodology, rules, and procedures. Although the capacity building phase of the Agreement has long since passed, the Monitor's Office's expertise and substantial experience in this area was requested by this partnership during a meeting at the Academy, in which the Monitor's Office participated. The Monitor's Office looks forward to seeing the results in the form of a modified formative curriculum for SARP investigators. Formative training aside, PRPB has not yet addressed the dearth of annual in-service training for current SARP investigators. As pointed out repeatedly in the past, SARP has not seen a yearly in-service training component as mandated by the Agreement since the monitoring phase of the Agreement commenced. The Monitor's Office takes this opportunity to urge the SARP/SAEA partnership to begin working on the annual re-trainer concurrently with the revamp of REA 114 (SARP Investigations), as both should contain similar content and pedagogy.

In the future, it is foreseeable that SARP annual re-trainers could take advantage of synchronous eLearning technology to both deliver content and promote helpful exchange of best practices among SARP practitioners. However, due to the ongoing and extensive changes in its methodology, rules, and investigative procedures, the Monitor's Office has serious reservations concerning the use of eLearning to effectively educate its current workforce in the voluminous number of official changes to their daily practice. To cite one example, the Monitor's Office's recommendations concerning practical interviewing techniques, which have been well-received by SARP, do not in any way lend themselves to a remote learning format. Therefore, at least over the short term, the Monitor's Office concludes that the annual re-trainer mandated by the Agreement be presential and include practical components. Once this year's annual re-trainer addresses the numerous changes in SARP methodology, rules, and procedures, ensuing in-service re-training might then be delivered remotely, if feasible. At a minimum, the Monitor's Office expects to see a plan to address the current need for SARP in-service training during the CMR-9 reporting period.

Adequacy of resources, both human and tangible, continues to remain a concern. The Monitor's Office is encouraged by the addition of desperately needed investigators for the FIU, which the Monitor's Office had found to be acutely problematic in terms of staffing. The lack of human resources across other SARP entities, while less acute than FIU, is still an area of concern. In the Monitor's Office's private interviews of over 95% of active SARP investigators, nearly 90% of these investigators expressed concerns over the case workload and the deficiency in human resources needed to effectively manage it. The Monitor's Office encourages SARP leadership to meet regularly with its field investigators and supervisors in listening sessions, in much the same way as the Monitor's Office has, to gain insight into their needs for resources, both human and otherwise.

While the Monitor's Office has seen some incremental developments in the SARP vehicular fleet and the delivery of some requested hardware, the continuing dearth of adequate resources not only affects the quality and timeliness of investigations, but it also has a far greater negative impact on the adjudicative timeline of an internal investigation. As predicted in the previous CMR, the Monitor's Office has heard from multiple sources that this inability to adjudicate open SARP cases in a timely manner has resulted in recent promotional candidates being passed over for promotion. The Monitor's Office's concern does not end here. Not a single Internal Affairs office has been relocated away from police facilities despite the Monitor's Office's longstanding finding that this practice must end without unnecessary delay. The

Monitor's Office takes note that SARP has been earnest in their ongoing efforts to identify suitable locations for Internal Affairs Bureau (NAI) delegations in settings not associated in any way with law enforcement. Site identification; however, is only the first step in the process and must be followed up by contracting and procurement. As DSP now has both visibility and ultimate authority over procurement for PRPB in general, the Monitor's Office will follow procurement closely to ensure that it is timely, unimpeded, and suitable to the task.

Lastly, the Monitor's Office has taken note of recent and very positive developments concerning the PRPB Employee Assistance Program (PAE). Not only have more PRPB members voluntarily sought out PAE for help, PAE has also worked together with PRPB to proactively address institutional changes that may create uncertainty, doubt, and anxiety among the entire membership. The initiatives also include building awareness of mental wellness, physical wellness, and habits that promote both. As any veteran police official knows, fear of and resistance to change is not uncommon in most enterprises but is especially acute within police and other public safety agencies. PAE has also collaborated to publish several recent publications concerning change management and resulting internal fear of change within PRPB.  The Monitor's Office hails this proactive innovation.

Overall, the Commonwealth's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflect a slight progression in compliance to what was noted in previous reports. In CMR-7, 48% of paragraphs (22 paragraphs) were assessed as partially compliant and 35% (16 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 46% of paragraphs (21 paragraphs) were found to be partially compliant and 26% (12 paragraphs) were found to be substantially compliant (3 paragraphs moved to fully compliant. Two paragraphs (4%) were noted as deferred in CMR-8. See figure 9.



*Figure 9. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

### Paragraph 159: Civilian Complaints, Internal Investigations, and Discipline - General Provisions

*PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall*

*develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

The Monitor's Office continues to bifurcate the analysis of SARP investigation files into Phase I and Phase II, the former an assessment of compliance with respect to the internal investigation itself, the latter an assessment of the adjudication process that ends with the Commissioner's final resolution. This model allows the Monitor's Office to assess any recent improvements in SARP investigations in close to real time, while also allowing the Monitor's Office to contrast SARP performance in much older investigations. The Phase II analysis allows the Monitor's Office to assess the adjudicative process from the end of an investigation through various levels of internal management and legal review, up to its final resolution.  This process, performed by members of the Office of the Legal Advisor (OAL) is frequently delayed by a diminishing number of qualified attorneys assigned to OAL.

The Monitor's Office continues to note that while SARP leadership has been quite diligent in requesting equipment, vehicles, tools, and human resources from PRPB to cure deficiencies previously mentioned by the Monitor's Office, much remains to be done, especially in the aforementioned OAL. The Monitor's Office has noted some limited improvement in the allocation of new resources such as adding investigators to the once-critically understaffed FIU. The Monitor's Office has observed that several new FIU investigators have been assigned to that unit and that other candidates were being interviewed as late as March 2023.

*Pathway Forward*

PRPB, working with DSP as its procurement agent, must deliver the resources SARP needs to conduct its investigations and reach legally defensible conclusions in a thorough and timely manner, to include the Commissioner's final resolution of any given case. Moving forward, where and when unexplained delays in this procurement process occur, the Monitor's Office will determine and point out where the delay occurred so that the Commonwealth or the court may take decisive action to remedy it.

## 1. Civilian Complaints

In all paragraphs mentioning an obligatory training component, PRPB has either not forwarded the evidence required or the documentation produced indicated a subpar level of training compliance. The Monitor's Office urges PRPB to use every effort to achieve the training requirements of either 95% of the sworn force or 95% of the unit membership as required, depending on the relative paragraph.

The cross section of actual complaints reviewed by the Monitor's Office demonstrates that public awareness of the ability to complain concerning a PRPB member, the clarity of the complaint form, and the existence and use of multiple viable complaint entry mechanisms are all in accordance with the Agreement.[9]

### Paragraph 160: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 160-162. | ☑ Met | ☐ Missed |
| 2. Civilian complaint program trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB policy and training on receiving civilian complaints and internal complaints as well as its implementation have not changed since the Monitor's Office's last review where it was found to be compliant with the spirit and letter of the Agreement.

However, PRPB has not reached the required 95th percentile of training and certification of Press Office and SARP personnel as required by this paragraph.

---

[9] A variety of complaint inputs were observed during the Monitor's Office's current analysis, including physically tendering complaints at a PRPB facility, receipt of complaints via telephone, U.S. Mail, and PRPB's Internet complaint portal (commonly referred to as *Interfaz*).

As demonstrated by the form and number of actual complaints received, PRPB's use of a variety of mechanisms to inform members of the public about their ability to complain against a PRPB member, either as a named person or anonymously, continues to be successful. The Monitor's Office observed informational material about the complaint program publicly posted at each of the area commands and precincts visited. The Monitor's Office urges PRPB to continue to proactively emphasize this accessibility in its open community meetings held across the island.

The Monitor's Office's interviews of nearly all SARP investigators shows an awareness of SARP's shared responsibility to educate and proactively communicate the existence of the PRPB civilian complaints program to members of the communities that they serve.

### Pathway Forward

PRPB must demonstrate that it has provided its Press Office and SARP personnel with training and certification on all policies related to the civilian complaint program.

### Paragraph 161: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Content of complaint forms is consistent with civilian complaint program policies. | ☑ Met | ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

### Compliance Assessment

PPR 311.1 (Master Complaint Form) has not been amended since CMR-6, where it was found to be substantially compliant with the Agreement.

### Pathway Forward

The Monitor's Office recommends that SARP inspectorate officers performing site inspections of PRPB facilities ensure that deployed police officers are carrying PPR 311.1 (Master Complaint Form) with them. PRPB should follow its internal discipline procedure when learning that an officer is not using this form.

## Paragraph 162: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | ☑ Met | ☐ Missed |
| 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | ☑ Met | ☐ Missed |
| 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | ☑ Met | ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

### Compliance Assessment

Continued spot checking of PRPB facilities have shown substantial compliance with posting appropriate signage instructing people of their ability to file a complaint against an officer. Spot checking of officers on patrol continues to show an acceptable level of compliance with officers carrying a copy of PPR 311.1 (Master Complaint Form) with them or in their vehicle.

### Pathway Forward

In a step towards self-monitoring, the Monitor's Office repeats the recommendation that SARP inspectorate officers conducting PRPB facility site inspections check to ensure that each public reception area has an accessible and legible copy of the PRPB Complaint Policy prominently displayed in both Spanish and English. The addition of this component to the SARP inspection must be added to the inspection checklists used by inspectorate officers. When a PRPB facility is found without these postings or cases where postings are not legible by a member of the public or are not plainly visible, it must be documented as part of the inspection and reported to PRPB as well as to the Monitor's Office on a quarterly basis. Local commanders should be held accountable in cases where this rule is not being followed.

184

## 2. Internal Investigations

SARP leadership continues to pay close attention to areas where the Monitor's Office has made recommendations of training, policy, and procedural changes. This spirit of SARP collaboration and collegiality with the Monitor's Office permeates top SARP leadership.

Despite this willingness on the part of SARP leadership, they cannot possibly reach this goal on their own as additional staff and equipment are still needed. The Monitor's Office has seen some response to SARP procurement requests made in 2022, consisting in delivery of some requested vehicles to FIU, as well as the NAA (Anti-Discrimination Investigators) and the assignment of new investigators to FIU, with more being recruited for FIU at the time of report writing.

In addition to procurement, and as pointed out in multiple previous CMRs, SARP NAI is still hampered by its present location within police facilities, which creates a strong disincentive for a citizen to report a crime alleged to have been committed by a police officer who may in fact work at that same facility. Recent discussions with SARP reveal that suitable NAI locations are being identified across the island, after which it will fall upon DSP to procure these sites and make them both secure and suitable for the purpose of conducting the NAI mission.

SARP's adjudicative process for serious violations of the code of conduct relies upon OAL, which not only performs the key legal analysis of the facts and conclusions of a given case, but also assists the Office of the Police Commissioner (OPC) in making final disciplinary decisions, which by statute pertain solely to OPC. Rather than injecting desperately needed human resources into OAL, a glaring depletion of its legal staff continues, with yet another staff attorney transferred to DSP less than a week following the publication of CMR-7.  Not surprisingly, PRPB may soon find itself defending causes of action from candidates for promotion who were denied that opportunity due to the failure of PRPB/OAL to adjudicate or "clear" pending administrative cases against them in a timely manner, which then acts as an absolute bar to promotional consideration.

### Paragraph 163: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of the paragraph. | ☒ Met   ☐ Missed |
| 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | ☒ Met   ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☒ Missed |
| 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | ☒ Met   ☐ Missed |

Note: Implementation of the portion of this Paragraph regarding discipline is assessed with Paragraphs 177 (Data Source #4), 198, and 199.

### Compliance Assessment

Universal training components for sworn members of PRPB as well as underlying policy regarding complaint reporting procedures have not changed from PRPB's previously substantially compliant versions.

PRPB has failed to demonstrate that it has reached the 95th percentile in training and certification of its personnel concerning relevant policies and procedures.

The Monitor's Office finds that PRPB has met the burden of showing that reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP and, therefore, achieving the corresponding compliance target.

### Pathway Forward

To move compliance forward, PRPB must ensure that its personnel are trained and certified in relevant policies related to reporting and internal investigations.

### Paragraph 164: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

186

| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
|---|---|---|---|
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | ☒ Met | ☐ Missed |
| 2. Training on supervisory review of minor policy violations is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. 95% of selected supervisory reviews and responses comply with approved policies. | ☐ Met | ☐ Missed |
| 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | ☐ Met | ☐ Missed |
| 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | ☐ Met | ☐ Missed |

### Compliance Assessment

In the past, the Monitor's Office has commented on the underuse of non-punitive discipline to address minor disciplinary issues at the base level of the agency. It was posited at that time that a key factor in this underuse was attributable to a serious lack of field supervision. This has been somewhat alleviated by the recent promotion of hundreds of new sergeants, many of whom have been assigned as first-line field supervisors. These new sergeants will transition to a digital system to write and record these incidents of non-punitive discipline, which not only should increase the use of this valuable tool but will make it far easier for the Monitor's Office to locate and review these records for the purposes of measuring compliance. The Monitor's Office looks forward to reviewing and measuring the effectiveness of this new capability in CMR-9. Until such a time, the Monitor's Office defers assessing a compliance level for targets four through six.

As noted above and in previous CMRs, the underlying policies incorporate all the requirements of paragraphs 164 and 165.

PRPB has failed to demonstrate that it has reached the 95th percentile in training and certification of its personnel concerning relevant policies and procedures.

### Pathway Forward

PRPB should ensure that supervisors are trained and certified on policies related to supervisory review of minor policy violations. PRPB should also anticipate a thorough examination of the new digital non-punitive disciplinary file system by the Monitor's Office to ensure compliance.

## Paragraph 165: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 164.

*Compliance Assessment*

The Monitor's Office's review of all cases for this reporting period has revealed only a few SARP cases where tactical, training, policy, or procedural deficiencies were mentioned, either at the unit, area, or SARP command level.

In CMR-5, the Monitor's Office made a recommendation for each SARP investigative report to include an obligatory analysis and mention identified inadequacies in training, policy, or supervision, which may have been a proximate or contributory cause of the incident at hand. The Monitor's Office's bifurcated analysis conducted in this CMR reaffirms that this recommendation is still not being followed. It should be added however that SARP and SAEA are well-cognizant of this needed component. New SARP investigative rules are anticipated soon, which will require an investigator to identify training, policy, or supervision oversights that may have had a causative effect on the underlying incident.[10]

*Pathway Forward*

PRPB recently proposed substantive changes to its investigative policy as well as the SARP Investigator's Manual. These changes were reviewed and approved by the Monitor's Office. One of the areas of positive change in both documents involves the investigator's duty to identify any faults in training,

---

[10] The investigator's analysis may be rudimentary in nature, especially in cases where the complained of behavior or activity has no obvious nexus to training, policy, or supervisory deficiencies. In these cases, a check box form on the SARP investigators report would suffice. In other cases; however, and in particular cases reported prior to the promotion of a large group of first-line supervisors, the Monitor's Office has noticed that training, policy, or supervisory deficiencies were either a proximate or contributing cause to alleged misconduct. In these cases, the investigator would check the box in the affirmative category and then elaborate specifically in his/her report concerning the proximate or contributing cause relating to deficiencies of training, policy, or supervision.

supervision, or policy as a proximate or contributory cause of the underlying misconduct. These noted deficiencies must be shared in a timely manner with other parts of PRPB (e.g., SAEA and Field Operations). PRPB is expected to address identified training, policies and procedures, or supervisory shortcomings to remedy them.

## 3. Complaint Intake, Classification, Assignment, and Tracking

Complaint intake, classification, assignment, and tracking continues to be one of the best areas of SARP performance. SARP's database digitally captures and tracks all incoming complaints, investigations, and reports. It has been in broad use for some time. This system allows the SARP Commander to determine timelines including when extensions are granted and when any given case is overdue for completion.

### Paragraph 166: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall train all officers in how to properly handle complaint intake.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 166-176. | ☑ Met | ☐ Missed |
| 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

*Compliance Assessment*

Records clearly indicate that accepted policies and related training curriculum are unchanged from previous CMRs. The training content on complaint intake, classification, assignment, and tracking as previously approved by the Monitor's Office continues to be consistent with policies.

PRPB has not met the 95th percentile threshold for training related to this paragraph.

*Pathway Forward*

PRPB must ensure that officers are trained and certified on relevant policies related to complaint intake, classification, assignment, and tracking.

189

## Paragraph 167: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Target #1. Bi-annually as to Compliance Target #2. |
| Practice: | Implemented | | |

### Compliance Targets

Note: Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199.

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

Unlike in previous CMRs, the Monitor's Office has not seen a case where a complainant claims to have been discouraged or turned away from filing a complaint. However, the Monitor's Office's experience has demonstrated that, in cases where a police officer discourages or "redirects" a case to another area, that the complainant will often not mention this so long as the complaint is eventually received. The citizen may have had to travel to a different police station, but in the end is successful in this endeavor.

Knowing that the complaint was ultimately received and investigated thoroughly is not enough. The Monitor's Office needs assurances built into the system to detect possible frustration and/or redirection of cases. The solution is simple.

### Pathway Forward

PRPB must identify all cases where a complainant has alleged that his/her complaint was either refused or discouraged by a PRPB member and then thoroughly investigate the allegation. The Monitor's Office strongly recommends that SARP investigators proactively ask each complainant at the beginning of their interview, "Did any PRPB member try to dissuade you from filing this complaint?" and "Did any PRPB member refuse to accept this complaint?"  This should elicit information from the complainant who may have been subjected to discouragement or outright refusal on the part of any PRPB member to accept their complaint. Investigators who encounter this accusation from any source should be directed to either address the allegation directly in their investigative report or refer the allegation to a separate investigator for a thorough investigation.

PRPB members who have been found, based upon a preponderance of evidence, to have discouraged a complainant from filing a complaint or to have refused to accept a complaint must be identified and disciplined.

190

## Paragraph 168: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

Over the course of the reporting period, the Monitor's Office has consistently observed a significant number of complaints submitted either via U.S. Mail or the Internet (SARP Interfaz) within the review samples. Some of these complaints are submitted anonymously either by civilians, or more often by anonymous insiders or whistleblowers. In previous CMRs, the Monitor's Office had detected a practice related to anonymous complaints of serious misconduct, which are predominantly received from internal sources and occasionally from outside of the institution. These whistleblower cases usually have a criminal dimension in addition to an administrative one. As pointed out by the Monitor's Office several reporting cycles ago, the peculiar way these whistleblower investigations are conducted raises serious concerns about their thoroughness. Rather than call in witnesses as well as the accused for an in-person interview, SARP investigators had frequently resorted to having these individuals, including the accused, fill out an "hoja de entrevista," which is merely a unilateral written declaration of the person's version of the events in question. These declarations are neither tested nor followed up upon in a face-to-face interview setting. They are often accepted at face value, and unsurprisingly, the case is often administratively closed and filed. In other cases, the Monitor's Office has found and continues to find a reticence to interview the accused officer(s) in the case.

For this reporting period, the Monitor's Office chose to select a purposive sample of contemporary, anonymous cases filed against PRPB members either by third parties or by those apparently working in

191

PRPB. The results were less than satisfying. At least six of these cases (43%) were found to contain serious defects in the ensuing investigation.[11]

While the Monitor's Office has seen some improvement via the number of these cases found in the sample, the fact that this is still occurring frequently and in the recent past is disconcerting.

*Pathway Forward*

In all cases where the identity of the complainant is unknown and the alleged conduct involves either potential criminal and/or serious administrative violations, SARP investigators from their respective Bureaus - Internal Affairs, Anti-Discrimination, and Administrative Affairs must conduct in-person, face-to-face interviews of all parties involved, including PRPB members who are under accusation and all members who may have witnessed the alleged conduct. The use of an "hoja de entrevista," by itself, is not an acceptable investigative tool in this category of internal investigation.[12]  Furthermore, cases of a purported criminal nature must be investigated simultaneously by both NIA (Administrative Investigation) and NAI. Under no circumstances should an NIA investigator be assigned to investigate a case administratively once his/her criminal investigation into the same incident has concluded.

## Paragraph 169: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[11] In Case 2021-0951, a sergeant was accused of using extreme vulgarity and aggression in a meeting with his subordinates and thus creating a hostile work environment. Due to conflicting witness testimony the case was recommended as filed - leaving behind sworn witnesses that directly contradicted the accused. In Case 2022-1114, an anonymous neighbor reported that two PRPB members went on vacation while using sick leave. No one ever interviewed the accused. In case 2022-0661, a whistleblower complained of a PRPB member stealing hours of work and accused two other officers of covering this up. Written statements were used to interview a lieutenant instead of face-to-face interviews. Records indicate use of sick time during the days in question. Neither the officers nor the alleged contractor was interviewed. In Case 2022-1213, a PRPB member was accused of spending hours on duty outside of a business while physically involved with a female employee. The officer was briefly interviewed and said that he goes to the business periodically while on duty. The investigator never asked the accused officer if he knew anyone at the business (i.e., the woman in question). In Case 2022-1015, an anonymous complainant alleged that a police officer reported for duty while intoxicated, and that he also abuses his parents. The parents were interviewed together instead of separately, and the accused officer was never interviewed. In Case 2022-0967, an anonymous citizen alleged that two PRPB officers accosted her in a sexual manner, one of whom allegedly exposed himself. She identified one officer involved in Arecibo. Both defendants were working on that day and had stopped many motorists for infractions. Only two were women. The superior officer said both were disciplined, responsible officers. Neither officer was ever interviewed concerning these very serious allegations.

[12] It should be noted that the Monitor's Office does not object to the use of the *hoja de entrevista*, per se. Rather the Monitor's Office's objection is limited to circumstances where this document stands as the only official record of the officer's statement and is not followed up with an in-person interview of the subject to both probe and reaffirm its content.

| Substantially Complaint | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Intake protocol was followed in 95% of sampled investigations. | ☑ Met  ☐ Missed |
| 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

### Compliance Assessment

Within the case files examined, the Monitor's Office has yet to see evidence of an "on-site" complaint against a PRPB officer alone, or a case where a supervisor was summoned to accept such a complaint. The absence of such cases in the Monitor's Office's review samples supports the conclusion that this is most likely not occurring. PRPB should take proactive steps to ensure that "on-site" complaints are actually a viable input method and are not discouraged in any way.

### Pathway Forward

The finding of substantial compliance in this paragraph should not be taken by PRPB as a sign that its work is complete in terms of complaint intake protocol. Ongoing efforts must be taken to ensure that no PRPB member either outrightly refuses to accept a complaint or attempts to dissuade a person from filing a complaint. Even though the PRPB member allegedly involved in dissuasion has not been cited by the complainant as one of the parties complained against, in all cases where this activity is alleged to have occurred by any individual, the investigator must amplify and amend the case to include the alleged PRPB dissuader as an accused party in the complaint.

The Monitor's Office has recommended a measure in paragraph 167, which is designed to proactively identify any case where a PRPB officer has either allegedly refused to accept a complaint or attempted to dissuade a person from filing a complaint. If that conduct has been proven to have occurred based upon a preponderance of evidence, then the officer(s) involved must be disciplined accordingly.

## Paragraph 170: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented.*

| Compliance Status | Assessment Schedule |
|---|---|

193

| Substantially Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | ☑ Met | ☐ Missed |
| 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | ☑ Met | ☐ Missed |
| 2b. 95% of such SARP reviews are documented in accordance with approved policies. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 158.

## Compliance Assessment

The Monitor's Office has seen no diminution of PRPB's management of incoming civil causes of action and investigating, where appropriate, issues with a member's underlying performance or behavior. In the case of a civil cause of action, OAL appears to be informing SARP upon receipt of service of process. In the case of a criminal allegation involving a PRPB member, the Superintendency of Crime Investigations (SAIC) investigator also appears to be informing SARP of potential criminal wrongdoing, which would allow a corresponding SARP investigation of administrative misconduct to proceed without delay.

The Monitor's Office received a list of both civil causes of action and potential acts of criminality allegedly committed by PRPB members, all of which have been referred to SARP from either OAL or SAIC for assessment. Interestingly, one civil suit alleges that the plaintiff's internal complaint for hostile work environment and reprisal was turned away by two top PRPB commanders, and that relief external to PRPB is now being sought via lawsuit naming a PRPB inspector and a colonel among others.[13]  Most of the other cases in this sample allege improper seizure and confiscation of motor vehicles.

## Pathway Forward

While the Monitor's Office has seen evidence to indicate that SARP is being informed of civil lawsuit and criminal allegations from OAL, PRDOJ, and SAIC, it remains to be seen whether SARP criminal and

---

[13] While the Monitor's Office is more interested in the actual compliance indicators as expressed in the Agreement, it reserves the right to examine this individual case ([Lieut.] Juan PACHECO v. [Inspector] Elexis TORRES, et. al) and any such similar cases in CMR-9 to determine whether PRPB is compliant with paragraph 197.

administrative investigations are being conducted simultaneously,[14] and that information is being shared between investigators.

Any lawsuit by a PRPB member against any other fellow member, especially one in which the complainant alleges any irregularity whatsoever in SARP or any reprisal from within the PRPB/DSP structure may be analyzed by the Monitor's Office for future analysis and comment.[15]

## Paragraph 171: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. SARP administers a centralized numbering and tracking system for all misconduct complaints. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 178.

*Compliance Assessment*

The Monitor's Office's examination of the SARP database leads to a conclusion that it functions as a centralized numbering and tracking system as mandated by the Agreement.

## Paragraph 172: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[14] The Monitor's Office has proposed one exception to this general rule. In cases where a PRDOJ or USDOJ prosecutor has requested a delay in a signed writing, a limited delay for the concurrent administrative investigation of criminal conduct is acceptable.

[15] Such an analysis will include whether the facts of said cases support or undermine a compliance finding not only with respect to this paragraph, but also with paragraphs 173, 175, 180, 186, 192, and 197.

| Substantially Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | ☑ Met | ☐ Missed |
| 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 136, Data Sources #6 and #7.

### Compliance Assessment

The analysis of current case files and cases overall shows that PRPB regularly forwards complaints to SARP within the prescribed timeframe, usually via internal email. Cases generated by field supervisors were included in the investigative files received during the reporting period. In these cases, supervisors forwarded relevant information and evidence to SARP in a timely manner. The Monitor's Office's minor concern in this paragraph has been a few situations where PPR 311.1 (Master Complaint Form) were used for internal SARP complaints instead of non-punitive discipline. These instances were related to the Monitor 's Office anecdotally during SARP investigator interviews.

In the case of rudimentary and minor violations of the PRPB Code of Conduct, such as repeated absence, instances of not following orders, lateness, uniform violations, and other very minor disciplinary issues, supervisors must first turn to non-punitive discipline to help the employee adequately address these deficiencies instead of passing this responsibility to SARP. The Monitor's Office expects to see increasingly fewer incidents of this nature due to the addition of hundreds of new field supervisors with access to a new, digital, non-punitive disciplinary process.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future CMRs.

### Paragraph 173: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | ☐ Met   ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

By using a bifurcated model of case analysis, the Monitor's Office continues to see a portion of complaints that were not assigned to respective components of SARP for investigation within the five-day timeline. Most of these cases exceeded the five-day timeline by a matter of days, and on rare occasions, for even longer.

While the COVID-19 pandemic most probably caused some of these delays, the pandemic is now on the wane and therefore no longer a factor. The Monitor's Office has seen cases of a criminal nature being investigated solely by NAI and not referred to an administrative investigator (NIA) for concurrent investigation. At present, there seems no apparent justification to delay the assignment of allegations of PRPB criminal wrongdoing for a separate concurrent investigation conducted by an administrative investigator.[16]

Any delay in proceeding on both fronts simultaneously brings with it certain risks; over time memories fade, the willingness of witnesses to talk may diminish, physical evidence may be lost, and witnesses may prove to be harder or even impossible to locate.

### Pathway Forward

Cases of a criminal nature involving possible misconduct by a PRPB member, which come to the attention of PRPB through *any* source, including but not limited to, PRDOJ, USDOJ, civilian complainants, witnesses, anonymous sources, whistleblowers, media accounts, NAI investigators, etc., must be concurrently assigned to a SARP administrative investigator for administrative investigation within five days of receiving this information, unless the prosecution requests in a signed writing to hold the administrative investigation in abeyance for a defined period of time.

The Monitor's Office continues to recommend that PRPB develop capability to electronically file both internal administrative and internal criminal investigations under the same case number, perhaps with a letter variant that indicates whether the file concerns the NIA investigation or the corresponding NAI

---

[16] There is one exception to the general rule - cases where a USDOJ or PRDOJ criminal prosecutor has requested a pause of the concurrent administrative investigation in a signed writing.

investigation. If the possibility of creating case files with the same number investigated concurrently by NAI and NIA is not attainable, the Monitor's Office is open to other possible solutions that would allow anyone to quickly locate, analyze, and comment on both the concurrent criminal and administrative investigations.

## Paragraph 174: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. SARP classifies complaints in accordance with policy. | ☐ Met | ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | | |

### *Compliance Assessment*

As mentioned in paragraph 173, the Monitor's Office continues to see cases in which alleged criminal misconduct is sent first for internal criminal investigation and, only after that criminal investigation has concluded, are assigned for administrative investigation. This must change. All cases involving both criminal and administrative violations, irrespective of the source of the complaint, should be classified and investigated concurrently from both a criminal and rules violation perspective by two separate branches of SARP – NAI and NIA.

### *Pathway Forward*

In the absence of a written and signed correspondence from a USDOJ or PRDOJ prosecutor a PRPB member that alleges misconduct that could be classified as both criminal and administrative in nature, the case must be assigned for separate and concurrent criminal and administrative investigation in accordance with established timelines.

## Paragraph 175: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy.*

198

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

The Monitor's Office has yet to find a case where a PRPB member alleged to have been involved in misconduct has taken an investigative role in the corresponding internal investigation.

### Pathway Forward

The Monitor's Office will review this area for continued substantial compliance.

### Paragraph 176: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

The Monitor's Office has personally viewed the SARP Module (internally referred to as the EIS system)[17] on multiple occasions and having viewed countless documents extracted from this system in response to its requests for document production, the Monitor's Office is satisfied that this tracking system maintains accurate and reliable data on SARP cases from start to finish.

While the system itself is both capable and functional, the Monitor's Office has noticed that the system is not being used to its full potential to track the timing of certain crucial events. The Monitor's Office's case file analysis has revealed multiple exceptions to the 5-Day Rule, as well as some cases that exceed the 90-Day Investigative Rule without having appropriate written extensions in place. Even in cases where the investigator has requested either one or multiple 30-day extensions, there is often a lag of multiple days between the date of the request and the date the extension was granted. These lags add up and create further case delays. Because some of these "lagged" extensions occurred recently, the global pandemic cannot be blamed.

# 4. Investigation of Complaints

The Monitor's Office has had the opportunity to measure SARP investigative performance trends over time. While there have been some positive developments, the Monitor's Office remains concerned about the conduct of administrative investigations.

The Monitor's Office has consistently encountered SARP cases that were closed with minimal, if any, effort to resolve direct and material contradictions in members' versions of the same incident. In CMR-4, the Monitor's Office made note of an accusation by several SARP administrative investigators regarding interference, collusion, retaliation, and possible cover-ups of administrative investigations against their immediate supervisor and perhaps even higher figures within PRPB. These allegations involved a multitude of alleged internal misconduct of a particularly alarming nature. The Monitor's Office gave PRPB ample time to thoroughly investigate and finalize the various complaints prior to performing its Phase I/Phase II analysis.

When sworn police witnesses offer diametrically opposed versions of material fact(s) in a case involving an allegation of grave police misconduct, such a case may not be closed without interviewing all witnesses and the accused. These irreconcilable differences demand exhaustive attempts, including polygraph examination(s), on the part of the investigator to reconcile these diametrically opposing versions. There is absolutely <u>no</u> possible scenario where the Monitor's Office can find substantial compliance with the Agreement as long as this practice persists. Any PRPB employee who is found, based upon a preponderance of evidence, to have been untruthful during any SARP investigation must be held accountable, irrespective of whether the employee was originally cited as a complainant, witness, or accused. [18]

---

[17] Refer to the IT section of CMR-8 for a detailed discussion of EIS.

[18] The most brazen example of this issue was from CMR-4, when two SARP investigators independently accused their direct superior of meddling in cases, which not only involved collusion with and/or protection from her superiors in SARP, but also retaliation against one of

There is continuing confusion regarding the 'preponderance of evidence' standard of proof, which under the Agreement is required to be applied in 100% of SARP cases. During 90% of interviews with SARP investigators from all bureaus, an overwhelming number said that they declined to look at an officer's disciplinary history until *after* their investigation had concluded. When asked why, the overwhelming majority responded that they wanted to avoid prejudicing themselves against the officer.

An officer's previous record of accusations – both sustained and not sustained – can offer important evidence, especially in closely decided cases. PRPB must work with SARP, SAEA, and OAL to make it clear how and when this sort of evidence should be used. Practical examples of cases where this evidence proved to be pivotal should be provided to investigators through both formative and in-service training.

In fairness to SARP, the process of modifying its rules of operation is ongoing. The Monitor's Office expects to see a modified Investigator's Manual, corresponding redesigned formative training (REA 114), and a roll out of the annual re-trainer consisting of at least eight hours of training for all active investigators.[19] The Monitor's Office hopes that PRPB takes heed of its suggestions to enhance that course.

## Paragraph 177: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Complaint | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Bi-annually |

---

the investigators once their identity became known to the accused superior. These grave accusations were later self-denounced by SARP Command, and a new internal investigation was launched (SARP 2021-0997). After waiting an appropriate amount of time for the case to be closed officially, the Monitor's Office requested a copy of the entire case file for analysis in CMR-8. After substantial review and analysis, the Monitor's Office found that this case was administratively closed while leaving diametrically opposing versions of fact made by sworn members unresolved, each of which went to the heart of the underlying allegations. Even more egregious, there was no interview of the accused superior officer in the SARP case file or the investigative report.  Serious cases involving contradictory versions of relevant facts among PRPB, especially those that hint at corruption, collusion, or retaliation should never be closed without first interviewing all witnesses, including the accused PRPB member. In serious administrative cases, SARP must exhaust all legal means (including the use of polygraph examinations) to attempt to determine which of the sworn officers were telling the truth and which were not. As this particular case involves alleged corruption and collusion among PRPB officers of rank, as well as subsequent reprisal against the original complainant, who was and remains an agent of PRPB, it has not escaped the Monitor's Office's notice that, because this accused superior officer was never interviewed, that the officer continues to have corrupt influence within the SARP hierarchy, and that the original complainant was actually a victim of retaliation by her superiors.

[19] With so many changes in procedure and technique, SARP investigators will most likely need more than eight hours of in-service training to adequately grasp and employ the changes. Once that goal has been reached, ideally in the first iteration, then the annual re-trainer could be reduced to an eight-hour timeframe.

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☑ Met | ☐ Missed |
| 2. Investigation of complaints trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | ☐ Met | ☑ Missed |

### Compliance Assessment

Except for a SARP Internal Affairs (criminal) case, the standard of proof to be applied to any given case is that of a "preponderance of evidence." This standard is delineated throughout SARP formative training as well as the Instructor's Manual.  Despite the frequent mention of this standard, there remains a persistent level of confusion among SARP investigators over the practical application of a concept that is basic and yet difficult for many SARP investigators to grasp. The simplest way to explain a preponderance of evidence is to describe it numerically as 50.1 versus 49.9.

### Pathway Forward

PRPB must ensure that all new SARP investigators have received an updated version of REA 114 (SARP Investigator Training). In a related area PRPB must strive to ensure that all SARP investigators receive yearly in-service training to include changes in policy, procedure, and investigative technique. One example of a key change is to clarify and emphasize the "preponderance of evidence" standard of proof in all its administrative investigations. The curriculum developer(s) should devote special attention to define and distinguish "preponderance of evidence," with other commonly used standards of proof used by PRPB including, "probable cause" and "guilt beyond a reasonable doubt". Efforts must be made to point out the relevance of prior accusations of remarkably similar conduct by the accused officer, even if the case was eventually adjudicated as "not sustained". Actual case examples should be used to illustrate and delineate these important differences.[20]

### Paragraph 178: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[20] Of particular interest are cases where there are no witnesses other than the complainant and the accused, and where the PRPB member involved had been accused of strikingly similar misconduct and/or *modus operandi* in the past.

| Partially Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | ☐ Met  ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

For this reporting period, the Monitor's Office requested a sample of completed investigations where the identity of the complainant was unknown. The Monitor's Office was provided with 14 cases. Of the 14 cases, 9 (65%) were administratively filed without any further action taken beyond a very cursory inquiry by Internal Affairs. The reader should not necessarily infer that these cases were not investigated properly from a criminal standpoint, rather the question remains over whether the alleged misconduct was ever investigated and adjudicated from an administrative standpoint and by an NIA investigator. Most of these files contain no information that this is indeed occurring or has occurred.

Administrative closure in the context of a *criminal* internal investigation must be reserved only for allegations that – even if proven,

1. Could not possibly amount to any crime committed by the employee, or
2. Cases that are duplicated within the system, or
3. Cases that do not involve any PRPB employee[21]

Administrative closure in the context of an *administrative* internal investigation must be reserved only for allegations that – even if shown based on a preponderance of evidence that it,

1. Could not possibly rise to the level of any PRPB administrative violation on the part of any member,
2. Cases that are duplicated within the system, or

---

[21] The most glaring example of a grave administrative case being improperly closed administratively is mentioned in Section 4, *supra*, as well as the Introduction to Section IX, *supra* (SARP Case 2021-0997).  There are other examples however; 2021-0951 where PRPB witnesses directly contradict one another over hostile work environment, 2022-1114 where two PRPB members are accused of misusing time off for a vacation – neither was ever interviewed, 2022-0661 where the defendant and other witnesses were never interviewed, 2022-1213 where the interview of the defendant lacked any questioning concerning the woman he was supposed to have been with, 2022-1015 where everyone was interviewed except for the defendant, and 2022-0967 where a woman accused two PRPB members of sexually inappropriate behavior, and the officers were never interviewed.

3.  Cases that do not involve any PRPB employee[22]

*Pathway Forward*

To help address the situation of NAI cases (and NAA cases involving alleged crimes, e.g., domestic violence) being administratively closed with no indication of an ensuing administrative investigation of the underlying incident, the PRPB must conduct concurrent criminal and administrative investigations of all allegations of misconduct against its members that could possibly be considered criminal in nature. The Monitor has recommended a formal mechanism to be employed by prosecutors to delay such an administrative investigation in highly specialized circumstances.

Administrative closure in the context of an administrative investigation must be reserved <u>only</u> for allegations that – even if proven,

1.  Could not possibly rise to the level of a PRPB administrative violation,
2.  Cases that are duplicated within the system, or
3.  Cases that do not involve any employee of the PRPB.

PRPB must demonstrate that the SARP database has a relational tracking capability to allow both SARP and the Monitor's Office to follow concurrent NAI (including criminal NAA) cases as well NIA cases that arise from the same allegation.

## Paragraph 179: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

204

*Compliance Targets*

| | |
|---|---|
| 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | ☐ Met  ☑ Missed |
| 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | ☐ Met  ☑ Missed |
| 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

The Phase I/Phase II analysis allows the Monitor's Office to accurately assess, in close to real time, SARP's adherence to investigative deadlines.

The Monitor's Office found multiple examples where the 5-day assignment rule, the 90-day investigative deadline rule, and the 3 30-day extension rule were not appropriately followed. The Monitor's Office expected to see post-pandemic improvement, but that was not the case.

To begin with, there were multiple cases reviewed by the Monitor's Office where the five-day rule had not been followed.[23]

As for the 90-day rule and the extension mechanism, the record shows that the majority of SARP investigators are cognizant of these deadlines and most seek extensions where indicated. Notwithstanding this, there have been multiple incidents of repeated, legitimate requests for extensions that were delayed prior to eventual approval by the SARP Command. These repeated delays ranged from a matter of days to well over a week. In fairness, all signs point to the investigator continuing the investigation in earnest while awaiting written approval for the extension.

While minor cases of misconduct are adjudicated within SARP by SEAQA,  the Monitor's Office has consistently  observed deeply troubling delays in the adjudicative phase of serious complaints, which according to PRPB Rule 9088 (Processing of Administrative Complaints), must be conducted by OAL.[24] The rule assigns a 30-day period to complete the process of adjudicating a SARP administrative finding after the case file has been completed and forwarded by the investigator to either the Auxiliary Commissioner of Professional Responsibility (SEAQA) or OAL. Not only are the authorities limited to 30 days to adjudicate, the 30 days also includes notification of the parties about the underlying complaint.[25] Compliance with these deadlines is spotty at best.

While PRPB is making some headway in improving the performance of SEAQA (which analyzes cases of a less-serious nature), the Monitor's Office continues to be concerned with the chronically understaffed OAL. As the government entity now in charge of both Human Resources and Recruitment and Procurement, DSP must be held responsible for this situation in OAL.

---

[23] See Cases 2022-0967, 2022-1030, 2020-0439, 2019-1617, 2020-0980, 2021-1102, and 2022-0476 as examples of this delay for assignment.

[24] See PRPB Rule 9088, Article XII, s.5.

[25] ibid, Article XII, s.2. Also, see previous comments on the superfluous practice of notifying officers in hand via PPR 441.

*Pathway Forward*

As PRPB continues to roll out digital signatures, and possibly a supervisor/commander dashboard of assigned cases, the Monitor's Office expects to see improvement in compliance with the time limitations and extensions. SARP investigators facing a 90-day deadline must receive a decision concerning their request within 24 hours. This means that the power to grant such an extension may have to be delegated to Area Command, or perhaps to the supervisory level. A simple check and balance system for *post facto* review may be employed to ensure the ongoing integrity of this extension process.

As the agency responsible for PRPB Human Resources and Procurement, DSP must adequately staff OAL and PRPB must adequately staff SARP SEAQA to help ensure that the self-imposed 30-day limit for adjudication and notification is met. Compensation of OAL lawyers and paralegals must be commensurate with and reflect their level of professional and academic achievements.

To further any attempt at achieving substantial compliance, the Monitor's Office recommends that DSP draft a strategic plan to increase OAL hiring, retain OAL staff through adequate compensation, and develop a timeline to bring PRPB into compliance with its own 30-day adjudicative deadline.

Further, the Monitor's Office also recommends that PRPB consider documenting requests for any extensions in its digital case management system and that the system record when such an extension has not been reviewed by the appropriate granting authority within 24 hours. This could be accomplished using a "push" feature to alert the granting authority via email or text of the pending review.

## Paragraph 180: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of selected investigations are thorough and findings are consistent with the facts | ☐ Met | ☒ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

Over the short term, the Monitor's Office expects to see only modest improvement in this paragraph. The Monitor's Office is aware of policy and procedural changes officially proposed by SARP to help achieve compliance with this paragraph. These changes include audio recording of all interviews (upon consent), as well as the creation of a faithful and accurate transcript by transcription experts.

While the majority of SARP case findings are in tenor with the facts revealed in an investigation, the Monitor's Office continues to call into question the SARP investigative methodology as it is both taught and used. As such, the investigative findings upon which the ultimate finding is based may be less than thorough. As mentioned previously in this report, SARP is aware of the need for an updated basic training course (REA 114 SARP Investigations) and is nearing the point of finalizing that new curriculum, which incidentally includes multiple suggestions by the Monitor's Office as an internal investigations subject matter expert.

The Monitor's Office has also long criticized the interviewing techniques employed by most SARP investigators, specifically as they relate to establishing a conversational rather than legalistic tone. The latter usually results in abrupt and often short, self-serving answers to interview questions, while the former is designed to place the interviewee somewhat at ease and thereby extract more information – effectively generating more investigative leads.  Especially at the beginning stages of an interview, conversational interviewing should be used in all SARP cases. Near the end of an interview, direct questioning should be employed to directly confront a witness with contravening evidence to obtain information from a recalcitrant/hostile witness or for otherwise tying up any other loose ends in the investigation. It is expected that the new version of REA 114 will address these practice "gaps" within SARP.

Internal Affairs investigators often still rely upon a variant of an "hoja de entrevista,"[26] which at times contains an investigator's transcription of the witnesses' statement, and at other times is just handed out to the witness to write an unchallenged statement in their own hand. The Monitor's Office continues to object over the use of "hojas de entrevista" as a stand-alone tool for conducting an interview. These one-sided and unchallenged declarations by any party to an internal investigation are of limited use and are often self-serving.

*Pathway Forward*

SARP is currently hard at work rewriting its rules and procedures with an eye towards addressing these deficiencies. REA 114 is also being rewritten to reflect changes in policy as well as practice. Current SARP members will also require substantive in-service training on the policy and practice changes made.

Regarding recommended changes, the Monitor's Office continues to recommend that:

1. The use of *hojas de entrevista* is limited to "locking in" and memorializing the version of a PRPB member at any time before an actual in-person interview (either by NAI, NIA, or NAA) of the same subject. The interviewed should use the *hoja de entrevista* prior to and during the in-person interview to ask questions and to clear up any areas left unclear or in doubt.

---

[26] *Hojas de Entrevista* also refer to a one-sided, unchallenged written version of the subject's account of the incident, which has been observed frequently in Internal Affairs (internal criminal) investigations in the past. This particular use of *hojas de entrevista* was previously and stridently criticized by the Monitor's Office.

2. All SARP interviews are digitally recorded upon written consent of the interviewee. Said recordings should be transcribed by a professional transcriber and not the investigator.

3. SARP interview practice must shift away from the legalistic style and focus more on a conversational style. Open-ended questioning must predominate, especially in the first part of the interview, to place the subject at ease. The words, *le pregunto*, should be avoided as part of the conversational interview style, but may be employed later in the interview to deal with recalcitrant/hostile witnesses, or to clarify answers and thus eliminate ambiguity.

4. In cases where there is a preponderance of evidence that a PRPB member, whether complainant, witness, or accused, has attempted to deceive a SARP investigator, that member must receive a 'sustained' finding for untruthfulness, irrespective of whether the PRPB member was involved in the misconduct alleged in the complaint.

5. Anonymous whistleblower complaints must be investigated as if the person making the complaint is both known and reliable, at least until such time as the complainant's reliability has been substantially called into question by facts.

### Paragraph 181: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

#### *Compliance Targets*

| | | |
|---|---|---|
| 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | ☒ Met | ☐ Missed |
| 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | ☐ Met | ☒ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

#### *Compliance Assessment*

Summonsing PRPB officers to appear before a SARP investigator of any kind continues to be problematic during the compliance monitoring phase of this Agreement. While officers invariably appear and sit for

interviews, the content of these interviews may vary in terms of quality. Occasionally, when asked direct questions that go to the heart of an allegation of wrongdoing by another officer, some officers may claim a faulty memory of the event itself, seemingly to avoid implicating that officer in alleged misconduct. "I don't recall," is perhaps the most common contemporary manifestation of the code of silence, as the officer feels as if s/he has neither lied to the investigator nor implicated a fellow officer in misconduct. In worst cases, directly contradicting information between fellow officers in cases of a grave nature are left unreconciled.

*Pathway Forward*

As mentioned repetitively in this report, the Monitor's Office recommends that no case be closed when officers directly contradict one another concerning a material fact in a serious internal misconduct case of any kind.[27]  In the case of those officers whose memory allegedly fails when asked a direct question regarding their observations of another officers' alleged misconduct, the SARP investigator should employ some additional questioning to test just how poor the officers' memory is concerning other events that happened contemporaneously. In nearly all the cases involving memory examined by the Monitor's Office, including several more recent cases, this "poor memory" assertion by an officer is invariably left untested by the investigator.

These declarations must not be allowed to remain on the record without proper challenge, e.g., "Officer, you remember handcuffing the man, so how could you not remember your partner removing the man's watch at the same time?"  Additional follow up questions may include, "Why don't you remember?"; "Is there anything that would refresh your memory on this?"; "Are there any documents that could help you remember?"; "Who might know the answer?"; "How would you get the answer to this question?"; and "Do you have any reason to dispute the version of the complainant?" Negative answers to some or all these questions may be used by the investigator to determine the declarant's level of veracity when claiming a lack of memory to answer certain questions and not others that may be exculpatory to the officer or his/her peer(s).

Where two or more PRPB officers offer statements that are diametrically opposed over a material fact in an investigation involving very serious misconduct, the investigator should request a polygraph interview and examination to help further indicate the reliability of an officer's statement of material fact. Once any declarant's veracity has been effectively called into question on any question of material fact, then the declarant's version of the event in question is effectively undermined.

## Paragraph 182: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have*

---

[27] In an Internal Affairs (internal criminal) scenario, witness officers with no possible criminal exposure whatsoever cannot fail to answer an investigator's questions concerning any fact at issue, as the 5th Amendment to the U.S. Constitution generally does not apply to witnesses unless they have potential exposure to criminal prosecution. In an administrative scenario, with no criminal exposure whatsoever (or in the case of <u>Garrity</u>, where there *may* exist criminal exposure on the part of any party), the declarant must answer all questions truthfully, or otherwise be subject to dismissal from the agency. In the case of <u>Garrity</u>, such declarations and their derivatives may not be shared with Internal Affairs, nor with any criminal prosecutor.

209

*consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

PRPB has been placed on notice in multiple CMRs that it must create and enact a policy that follows the rule established in <u>Garrity</u>. For this reporting period, the Monitor's Office has not yet found any use of a <u>Garrity</u> warning to compel an officer to make an administrative account of his conduct while simultaneously being subjected to a related criminal investigation for the same incident. While still not compliant with this paragraph, the Monitor's Office is quite aware of PRPB rules and procedural changes to bring the agency in line with the Garrity rule. In fact, near the end of this reporting period, the Monitor's Office provided input on the draft "Garrity Warning" form to be used to achieve this end.

The Monitor's Office will follow this in CMR-9 to determine if and to what extent PRPB is complying with this paragraph.

### Pathway Forward

SARP has demonstrated to the Monitor's Office that they are working on a policy change concerning <u>Garrity</u>.

The Monitor's Office is also aware of forthcoming PRPB rules and procedural changes to proscribe a criminal internal investigation from being investigated administratively by the same investigator.

### Paragraph 183: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review | October 2022 – March 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

For the entire compliance monitoring phase, including CMR-1 to CMR-8, the Monitor's Office has not uncovered a single instance of a PRPB member being Mirandized where no possible criminal jeopardy could have arisen from the facts as alleged.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 184: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

211

| | | |
|---|---|---|
| 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | ☑ Met | ☐ Missed |
| 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### *Compliance Assessment*

The Monitor's Office has yet to see evidence that an internal case was investigated criminally and administratively at the same time by different investigators, despite the Agreement's provision. The Monitor's Office has seen and approved drafted changes to policy and procedure to make this an obligatory practice in most cases.

### *Pathway Forward*

Internal criminal and administrative case investigations must be conducted concurrently and by separate corresponding branches of SARP, e.g., NAI and NIA.

### Paragraph 185: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | ☐ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### *Compliance Assessment*

SARP has shown that it is in the process of developing a policy and procedure in tenor with <u>Garrity</u>.

## Pathway Forward

The Monitor's Office foregoes assessing a compliance level until such time as the rules and procedures have changed, that SARP investigators are trained on the new rule, and that the rule is being practiced across the board.

## Paragraph 186: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor's Office remains convinced, based upon his multiple interviews of SARP investigators and analysis of case samples, that circumstantial evidence in the form of prior remarkably similar allegations of misconduct on file with PRPB, is still not being routinely considered by SARP investigators and has not been mentioned in any investigative report during the reporting period.[28]

---

[28] To cite some of the more glaring examples of ignorance of an officer's prior record, in case 2022-0681 concerning an allegation of verbal and physical abuse by the complainant, the officer had 2 prior complaints for excessive force and 3 prior complaints for verbal abuse of women, 1 of which occurred in a traffic setting. None of this was mentioned by the investigator, who erroneously declared the defendant as Exonerated. In case 2022-0763, the complainant alleged that the police refused to take his complaint of threats and treated him as if he were the criminal.  There were no other witnesses. The officer has multiple prior accusations for negligence, but the case was declared Not Sustained. The worst example may be found in case 2022-0998, where a motorist accused a Transito officer of mistreatment during a traffic stop. The case was undermined when the complainant refused to cooperate with the investigation.  Notwithstanding this development, the officer, who was declared Exonerated had <u>17</u> prior complaints of a similar nature over 17 years <u>including 3 in 2022</u>. The Monitor's Office is utterly perplexed at how an "exonerated" officer was sent for a PAE evaluation as well as recommended for retraining.

Secondly, as pointed out in paragraph 181, most SARP investigators accept an officer's assertion of a memory lapse in their internal investigations without further questioning.

*Pathway Forward*

In the newly designed REA 114 (SARP Investigator Training) as well as in any in-service SARP training, the Monitor's Office expects to see ample and practical discussion of the standard of proof used and the types of circumstantial information that may tilt the balance away from a tie and towards a finding in favor of either party.

SARP investigators must be trained to analyze a member's *history* in a closely decided case to determine whether the accused's alleged misconduct in the past is uncannily like the case under investigation, especially when this evidence may effectively push the probability of occurrence from 50-50 to 51-49 or higher, which should then result in a sustained finding against the member.

A SARP investigator must not blindly accept a declaration of, "I do not recall," from a PRPB member in response to a question of material fact in a SARP investigation. Instead, the investigator should question that member's level of recall with a series of follow up questions.[29]

## Paragraph 187: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

---

[29] See paragraph 181, *supra*.

*Compliance Assessment*

The Monitor's Office has yet to observe a case that had been closed because a complaint was withdrawn, the alleged victim failed to cooperate, or the complainant was found guilty of any offense.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 188: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

*a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;*

*b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

*c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*

*d) "Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | ☐ Met   ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor's Office has seen several cases in this reporting period where the SARP investigator, the Area Commander, and the SARP Commander left an inappropriate finding in place.[30]  This commonly

---

[30] In case 2022-0355, the conduct alleged could neither be proven nor disproven. Rather than exoneration, a not sustained finding was indicated. In cases 2020-1427 and 2022-0681, the officer was also exonerated instead of a not sustained finding. Case 2022-0998 (discussed previously) also contains an erroneous exonerated finding. Case 2022-0112 also should have been found as not sustained rather than exonerated. Conversely in case 2022-0575, a not sustained finding was entered in a case where the facts demonstrated that the conduct both actually occurred and was in tenor with the rules. An exonerated finding should have been entered.

manifests itself as a confusion between a "not sustained" and "exonerated" finding. Simply put, all must understand that the findings of exoneration apply only when the preponderance of evidence reveals that the conduct did occur, and that the conduct was in accordance with PRPB rules, policies, and/or procedures.

*Pathway Forward*

The Monitor's Office urges SARP to clarify the difference between its four factual case findings among all staff.

The Monitor's Office will continue to reassess PRPB's compliance in future reports.

### Paragraph 189: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor's Office had previously raised concern regarding supervisory and area command oversight vis a vis the signed form developed by PRPB to memorialize their written approval. Fewer case files lack a date attached to this approval form, making it clearer for the Monitor's Office to reach a conclusion as to case flow and exact timing of milestones. While this has been a persistent problem for SARP, the Monitor's Office believes that the adoption of digital signatures and time stamps will make substantial inroads into the problem and the level of compliance.

216

*Pathway Forward*

The Monitor's Office recommends that PRPB begin to look at digital signatures for supervisory and area command case approvals indicating the date of their approval. Digital signatures by SARP area commanders will also help minimize delays in granting investigative extensions under permissible scenarios. Area commanders should be empowered to grant these immediate digital approvals of extensions.

## Paragraph 190: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☒ Met | ☐ Missed |
| 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☒ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

*Compliance Assessment*

The Monitor's Office finds that the OPC reviews and resolves complaints in tenor with the paragraph in at least 95% of the cases examined. Further the Monitor's Office also found that the SARP commander reviews and resolves the complaint in accordance with the paragraph.

*Pathway Forward*

The Monitor's Office recommends that, when a finding is changed at the SARP command, OAL, or the OPC levels, that the initial investigator not only be informed of such a change, but also receive a brief rationale for said change.

217

## Paragraph 191: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s).*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 178.

### Compliance Assessment

The Monitor's Office has examined cases investigated during the reporting period for the inclusion of the following observations on the part of the investigator:

(a) Compliance with training and legal standards;

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome;

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action; or

(d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

The results of this analysis are clear. In the vast majority of SARP cases reviewed for this reporting period, the investigator did not mention any of these observations in their final reports.

### Pathway Forward

In its rewrite of REA 114, (SARP Investigator's Formative Training), the Investigator's Manual, and any related policy, PRPB must emphasize the inclusion of observations (a) through (d) as noted above in every case file. This could be accomplished on their cover sheet "checklist" as checked boxes indicating that the analysis was made and was concluded as "negative" or "not applicable". In the case where the observation was made in the investigation, the investigator must specifically elaborate on the observation in his/her report.

218

To reach the current body of SARP investigators, the Monitor's Office recommends the use of in-service training where appropriate to ensure that all SARP staff understand the new policy and procedures.

## Paragraph 192: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | ☑ Met   ☐ Missed |
| 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | ☑ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

In all closed cases reviewed with a known complainant, the complainant received timely notification of the status and outcome of the SARP investigation. Additionally in these same cases, all complainants were notified of their ability to appeal a finding to CIPA.

## Paragraph 193: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | October 2022 – March 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | ☑ Met | ☐ Missed |
| 2. PRPB's document retention practices comply with approved policies. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

## Compliance Assessment

On-site document reviews conducted by the Monitor's Office indicate disciplinary files relating to officers separated from service are maintained by PRPB and that PRPB's document retention practices comply with approved policies.

## Pathway Forward

The Monitor's Office will continue to assess PRPB's compliance with this paragraph and conduct additional on-site reviews to ensure that this practice continues.

## 5. Staffing, Selection, and Training Requirements

Owing in part to the COVID-19 pandemic, PRPB has had difficulty ensuring that all its investigators have been formatively trained and certified. Now that the pandemic has subsided enough to allow presential learning, PRPB is now focused on ensuring that all its investigators are formatively trained via an updated version of REA 114 (SARP Investigator Training).[31]

As policies and investigative techniques continue to change, PRPB must ensure that all current investigators are familiar with and can demonstrate their familiarity with these new procedures.

Assessments in general, and those involving SARP investigators and staff, should contain a presential component. Supervisors should meet with subordinates to privately discuss areas where the subordinate is excelling, and areas where a subordinate may improve their performance. Specific advice or coaching should be given to the subordinate.

Performance assessments between the 4.8 and 5.0 level should be a relatively rare occurrence, and an added explanation of such an exceptional performance level should be included in the record.

---

[31] Not only has PRPB recently revisited the SARP Investigative Manual, they have also submitted newly drafted general orders, investigative procedures, methodologies, use of recording devices, and indications of whether a lack of supervision, training, or adequate policy was/were contributing factors to any given complaint.

## Paragraph 194: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☑ Met | ☐ Missed |
| 2. Trainings for the internal investigation unit are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | ☐ Met | ☑ Missed |
| 5a. Internal investigation unit personnel serve three-year terms. | ☑ Met | ☐ Missed |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office received no documentation indicating that all its members have been formatively trained via REA 114 (SARP Investigator Training).

Similarly, the Monitor's Office has not received documentation indicating that any member of SARP has received in-service training over the past year that specifically relates to their duties as SARP investigators.

From extensive interviews with SARP members, the Monitor's Office continues to find that the decision process to extend an investigator's service period appears to be *ad hoc* in practice. The evaluation process in general, and particularly as it relates to SARP investigators, is flawed and in need of revision.[32]

---

[32] It is the Monitor's Office's expert opinion that employee evaluations ranging from 4.8 to 5.0 out of 5.0 possible points ought to be a rare occurrence, especially as it approaches a perfect score of 5.0. Evaluations should always be conducted with the goal of improving the subordinate and their performance. Additionally, PRPD in general, and SARP in particular, should promote private face-to-face delivery of these evaluations in the hopes of beginning a dialogue that will effectively improve communication between supervisor and subordinate

The Monitor's Office has reviewed recent procurement requests from SARP command and has found that some of the requested personnel and resources have been delivered. However, there is still a need for off-site NAI office space, additional investigators, and improvements to the vehicular fleet.

*Pathway Forward*

The Monitor's Office expects DSP to give SARP requests for human resources, equipment, and office space its highest priority and to deliver these resources without any unnecessary further delay.

Having absorbed the procurement function of PRPB, DSP must now procure adequate office spaces to house NAI investigators. Aside from being located outside of any PRPB facility, this space must contain adequate infrastructure (secure/alarmed premises, sufficient Internet access, secure communications, desks, chairs, cubicles, private interview space, etc). These are all required for a substantial compliance finding for this paragraph.

In addition, PRPB must remedy existing training deficiencies and execute a uniform and transparent evaluation process for SARP members that includes mandatory supervisory feedback for every member at the end of every evaluation period.

## Paragraph 195: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

Most SARP investigators describe a rigorous and competitive process to join the unit and all who extended their service described having received flattering reviews by their superiors.[33] Very few SARP investigators describe, a conversation with their superior(s) over whether they would choose to stay in SARP or transfer to another section after their three years of service. After interviewing virtually every

---

and to help the subordinate work on performance areas that are less than perfect. While acceptance of a member's review can remain "digital," the discussion of said performance assessment should be in person.

[33] See Paragraph 194, *supra*.

SARP investigator, the Monitor's Office is prone to conclude that most investigators, if given a choice, would stay in the unit. Nevertheless, they should be asked every three years.

*Pathway Forward*

Re-appointment of SARP investigators for additional three-year terms should not be an automatic practice, but rather one based upon a series of <u>objective</u> performance reviews. PRPB should execute a uniform and transparent evaluation process for its members including mandatory supervisory feedback in every evaluation period. SARP members who, on their own volition, unilaterally transfer out of SARP should do so via an exit interview conducted by the Area Commander. This interview may help SARP determine what, if anything, led to the investigator's decision to voluntarily leave the unit. This well-recognized management procedure often develops actionable information in terms of recruitment, morale, and retention of investigators.

### Paragraph 196: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

The Monitor's Office did not receive documentary proof that all investigators have been formatively trained. Similarly, the Monitor's Office has seen no documentary proof that all SARP investigators have received required annual in-service training specifically related to SARP investigations.

SARP has partnered with SAEA and has consulted with the Monitor's Office as a subject matter expert to rewrite formative and (presumably) annual specialized training content. The Monitor's Office is awaiting final curricula changes to address the training gaps created by new policies, rules, and procedures.

*Pathway Forward*

PRPB must show conclusive evidence that all SARP investigators have been formatively trained.

In the case of veteran SARP investigators, PRPB must show conclusive evidence that all SARP investigators have received annual specialized SARP in-service training.

SARP and SAEA must work together expeditiously towards a goal of formatively training and certifying all SARP investigators while also ensuring that all current SARP investigators receive their annual re-training.

## 6. Preventing Retaliation

In the present SARP file sample requests, complaints specifically involving retaliation usually comprise a small percentage of cases within the given sample. The Monitor's Office has some fears concerning a case[34] and is keenly aware of two sensitive ongoing cases involving what may possibly amount to intimidation, coercion, or fear of reprisal among lower ranking agency members.  The Monitor's Office will be scrutinizing these cases very carefully once complete. It also bears mentioning that the Monitor's Office reserves the right in the future to draw a purposive sample of SARP cases that specifically feature such allegations to ensure a statistically relevant assessment for future CMRs.

### Paragraph 197: Civilian Complaints, Internal Investigations, and Discipline - Preventing Retaliation

*PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Retaliation trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

---

[34] See Case 2021-0997, *supra*.

| 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | ☐ Met | ☑ Missed |
|---|---|---|
| 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office saw only one case involving an allegation of retaliation.[35]

As previously mentioned, the Monitor's Office will be meticulously examining high profile cases involving possible retaliation. Furthermore, the Monitor's Office will also draw a purposive sample of these cases to ensure that they were properly and thoroughly investigated, and that the outcome and findings are adequately supported by the facts.

*Pathway Forward*

PRPB must ensure that every single one of its investigators has both successfully completed REA 114 (SARP Investigator Training) as well as an annual re-trainer specifically designed for active SARP investigators.

SARP investigators must analyze the accused officer's *history* in every case, especially those cases that involve repeated allegations of remarkably similar behavior involving similar complainants. Irrespective of whether this analysis supports a finding of *sustained* or *not sustained*, the investigator should mention the accused's past record of having been accused of remarkably similar conduct by remarkably similar types of people. The investigator must also determine whether their investigation and the record of prior similar accusations by similar complainants reaches the 51% burden of proof for a sustained finding or not.

As retaliation cases often have an acutely negative impact on morale at all levels of a police agency, SARP investigators must exhaustively investigate these allegations. No investigation involving reprisal within PRPB should be filed administratively, nor should any such case be considered complete when leaving untested and diametrically opposing versions of the facts between sworn PRPB members in place. In these serious cases, which have vast implications for institutional morale and discipline, every tool must be employed to determine who is being truthful and who is not. Only once every legal avenue to determine the truth has been exhausted may such a case be considered complete and closed.

## 7. Discipline

The use of a Phase I/Phase II analysis has assisted the Monitor's Office in focusing on the adjudicative and resulting disciplinary process of many types of complaints.

The Monitor's Office continues to see that discipline is applied in accordance with the PRPB Code of Conduct and related disciplinary matrix.

---

[35] See Case 2022-0575, *supra*.

As is the case with many other areas contained within this section and mentioned previously, training records must be provided to the Monitor's Office to show proof that the requisite number of PRPB members have been appropriately trained.

## Paragraph 198: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 198-199. | ☑ Met ☐ Missed |
| 2. Discipline trainings are consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☑ Missed |
| 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | ☑ Met ☐ Missed |
| 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | ☑ Met ☐ Missed |

*Compliance Assessment*

The Monitor's Office bases this assessment on a Phase II examination of multiple closed cases, each of which received a Final Resolution during the reporting period.  While this group of cases was far more dated than those subjected to a Phase I analysis, the Monitor's Office may conclude that PRPB is using its disciplinary matrix as it was designed to be used.

The Monitor's Office remains impressed with PRPB's application of its progressive disciplinary matrix. In 95% of the cases reviewed, discipline is taken and documented in response to sustained misconduct complaints.

The Monitor's Office finds that PRPB acts within the scope of its progressive disciplinary matrix in meting out discipline.

The Monitor's Office does suggest that when the Police Commissioner deviates from the disciplinary matrix, which most often involves a downward departure on the number of days an implicated party is suspended, there should be a short reason as to why the change was made. The absence of any

226

explanation for downward (or even upward) changes from the disciplinary code sanctions creates fertile ground for accusations of favoritism, influence, nepotism, or political interference, all of which are devastating to institutional morale.

*Pathway Forward*

PRPB must show that all relevant members have been trained and certified on discipline policies to reach substantial compliance.

### Paragraph 199: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 198.

*Compliance Assessment*

The Monitor's Office's Phase II review of cases deemed closed within the reporting period reveals a complete review of alleged infractions of laws as well as PRPB rules and procedures. The Monitor's Office continues to find abundant evidence that PRPB's progressive disciplinary matrix is being used as it was designed. There is one area of concern however.[36]

### Paragraph 200: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2022 – March 2023 |

---

[36] See related comments in Paragraph 198.

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☒ Met | ☐ Missed |
| 2. PRPB's drug testing program trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | ☒ Met | ☐ Missed |

### Compliance Assessment

Examination of PRPB's random controlled substance testing clearly shows dramatic improvement over all previous reporting periods. This improvement concerns the number of random drug screening tests performed on active members as well as candidates for police cadet positions. For this reporting period, PRPB performed screenings of 1,824 persons, nearly 3 times the tally of the CMR-7 reporting period. Of the 1,824, 104 were candidates for police cadets. Interestingly, PRPB randomly drug tested 21 of its undercover operations officers, which is a very significant number.[37]  PRPB seems ever closer to performing 4,000 random screenings a year to help ensure that every active PRPB member is screened at random at least once every 3 years, which is the ideal.

Out of 632 tested persons, both candidates and sworn, there were no positive results for proscribed substances.[38]

There were also no training records forwarded to the Monitor's Office concerning drug testing.

### Pathway Forward

The Monitor's Office is pleased to see significant progress in PRPB's controlled substance testing program relating to the aggregate number of persons tested annually.

From the tables supplied by PRPB, and except for cadets and cadet candidates, it is not possible to determine how long the active PRPB members had gone without prior testing. The Monitor's Office

---

[37] This demonstrates commendable foresight on the part of PRPB. By virtue of his lengthy career, the Monitor's Office is deeply familiar with clandestine investigations and the use of undercover agents. Aside from the obvious dangers associated with these operations, the risk of an undercover officer being exposed to controlled substances and thereby becoming compromised is higher than the risk for an average uniformed patrol officer.

[38] As of this report writing there are no positive results. There are some indications that several tests are delayed in process. Understanding the PRPB procedures to verify tests independently as well as the time involved to do so, it would not surprise the Monitors Office if several of the most recent exams result in a positive finding.

continues to recommend that PRPB prioritize testing sworn officers who have not been tested in the last five years.

The Monitor's Office recommends that, wherever possible, controlled substance testing be performed on all applicants for any position within PRPB, *prior* to being contracted for employment and certainly before entering the police academy.[39]   The Monitor's Office also reaffirms that the aggregate number of tests conducted annually be increased to approximately 4,000 members, both active as well as incoming cadets. Extrapolating the data supplied, PRPB is closing in on the quantitative goal of 4,000 persons.  The Monitor's Office remains open to suggestions from and collaboration with PRPB to make this process more innovative, efficient, and effective.

PRPB must forward aggregate training records for any given reporting period to indicate personnel are trained and certified on PRPB's drug testing program policies.

## 8. Officer Assistance and Support

If there is any portion of this section that has been well-designed, clearly codified within PRPB rules, and well-executed by the corresponding branch of PRPB, then PAE is such an example.

While the Monitor's Office had previously expressed some concern in the past regarding the placement of PAE offices (all of which are located either in Headquarters or in area commands), that concern has been alleviated through multiple interviews with actual PAE service providers. These providers describe a growing caseload of officers who are self-referred for a variety of mental health or wellness issues. While there is still a sizeable percentage of PRPB members who have been referred to PAE for mental wellness assessments focusing on their ability to perform as an armed police officer, that percentage of patients has remained static. On the other hand, most PAE service providers describe a growing number of self-referred sworn officers, spouses, domestic partners, and family members. While the location of these treatment offices is still of some concern to the Monitor's Office, according to nearly every single mental health professional interviewed, this has not been an impediment to receiving mental health care.

As part of PRPB, PAE is not a net-reactive program. Recently the Monitor's Office learned of some innovative and proactive programs developed by PAE to help overcome resistance to, as well as anxiety provoked by fundamental changes within PRPB. This new initiative places PAE among the vanguard of some of the mainland police employee assistance programs with which the Monitor's Office is familiar.

### Paragraph 201: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to:*

---

[39] While drug testing has a cost in terms of human resources as well as the test itself, that cost is minimal compared to performing a full-spectrum background investigation. The Monitor's Office notes that 26 persons on this list were tested as cadets already enrolled in the Police Academy. To perform such an in-depth investigation only to later discover that the candidate tested positive for a controlled substance implies a less than efficient use of candidate screening resources.

*readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 201-204. | ☑ Met | ☐ Missed |
| 2. Officer assistance and support trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | ☑ Met | ☐ Missed |
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | ☑ Met | ☐ Missed |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has interviewed every professional assigned to provide PRPB officers with mental health and wellness assistance and support. The Monitor's Office finds that PAE service providers are both objectively competent and highly credentialed. All are conscious of their Health Insurance Portability and Accountability Act (HIPAA) confidentiality duties.

The Monitor's Office reports that PAE accessibility is robust and that PRPB members are more prone than ever to seeking mental health wellness counseling unilaterally. The Monitor's Office heard multiple examples of spouses and dependents of PRPB members seeking assistance from PAE, which is also very positive.

A host of motivations for PRPB officers to self-refer have been cited by PAE providers. They run the course of what any officer, especially those in an urban environment, would encounter in their normal duties. These motivations include, but are not limited to, stress, anxiety, panic, post-traumatic stress disorder, and other related mood disorders often relating directly to the normal challenges of policing, as well as bystander trauma commonly associated with alarming or horrific first-hand observations of PRPB officers during their normal course of duty. It is uncommon for any person to witness the death of a child, a defenseless person, or a colleague and not feel profoundly distraught by these observations.

If an officer has PTSD or any other mental disorder or unwellness and that officer is left untreated, the ramifications for the officer and his/her loved ones may last for years, if not a lifetime.

Unlike some of the programs on the mainland, PAE treats family-related issues that may extend to PRPB members and members of their family. PAE also either treats or makes professional referrals for chemical abuse or self-medication issues (drugs and/or alcohol), depending upon the circumstances of the misuse.

The Monitor's Office remains conscious of the fact that the location of these offices may create some disincentive for these self-referred PRPB dependents, and especially PRPB members themselves, from taking better advantage of the program. However, the Monitor's Office has learned that Telehealth visits for mental health and wellness clients are authorized, though not widely used. The Monitor's Office urges PAE to use Telehealth to help to overcome any remaining reticence on the part of possible PAE clients.

A substantially compliant rating for this reporting period would have been given if PRPB supplied training and certification records for officer assistance and support policies.

*Pathway Forward*

PRPB must include documentary proof that personnel are trained and certified in officer assistance and support policies.

### Paragraph 202: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

Documentary evidence submitted to the Monitor's Office by PRPB demonstrates that fewer than 95% of PRPB officers are up to date on the Professional Burnout and Risks to Wellness course (TSDP).

*Pathway Forward*

PRPB must ensure that all who are required to take the TSDP course have taken it for the next reporting period.

## Paragraph 203: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall involve mental health professionals in developing and providing in- service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

This is an area that has never proven problematic since beginning the monitoring phase of the Agreement. The Monitor's Office continues to find PAE providers as highly credentialed and objectively capable of performing their assigned duties. The Monitor's Office has also reviewed the training curricula produced by these professionals and found it to be comprehensive in nature. This has not changed since the Monitor's Office's last report.

*Pathway Forward*

The Monitor's Office will continue to assess this paragraph to ensure that it meets the requirements of this paragraph.

## Paragraph 204: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

232

| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

The Monitor's Office continues to find no evidence suggesting that PAE is not HIPAA compliant. All PAE professionals interviewed described scrupulous efforts to maintain patient record confidentiality. The PRPB Telehealth documentation specifically mentions HIPAA.

*Pathway Forward*

The Monitor's Office will continue to assess this paragraph to ensure that it meets the requirements of this paragraph.

# X. Community Engagement and Public Information

Community Engagement together with Community Policing and Public Information include 13 paragraphs in the Agreement; 4 of which are assessed annually (Paragraphs 208-210 and 213). A complete review of all 13 paragraphs was captured in CMR-6 and is provided again in this report.

As in previous CMRs, achieving compliance with the Community Engagement and Public Information section of the Agreement has been challenging for PRPB. This has been primarily due to the need of continued competence training and development, which involves problem solving through the implementation of the SARA Model and the development and sustainment of meaningful and goal-oriented interactions with community stakeholders through alliances and outreach. These deficits are notably highlighted by inconsistent supervision resulting from staffing challenges, primarily for agents and first line supervisors, insufficient and varying community policing approaches, straggled efforts to develop a comprehensive performance evaluation system, and the need to efficiently document strategic planning and follow through in community engagement. These, coupled with deficient communication to the public and failure to develop and institutionalize adequate information technology systems to support public transparency around crime statistics, gender violence, UOF, and effective program audits, have set PRPB behind all efforts to achieve substantial compliance during this reporting period.

During this reporting period, the Monitor's Office met and interviewed various members of PRPB directly involved in community engagement, community policing, and outreach at the district, precinct, and area command levels in 8 police areas, 3 specialized units, the Director of Recruitment, and members of the Community Interaction Committee (CIC), who represent the community within the 13 police areas. Additionally, the Monitor's Office attended and observed a Conversatorio, a community meeting hosted by the Guayama CIC, two CIC Central spokespersons' meetings, and a training session on Community Policing for the newly promoted sergeants held at the Academy.

The Monitor's Office also reviewed related policies and manuals including GO 125 (Press Office Structure), GO 127 (Multimedia), GO 704 (Monthly Meetings) including its corresponding PPRs (704.1 and 704.2), GO 144 (Athletic League), and the Protocol to Report Incidents with Transgender Individuals.

During the second quarter of CMR-7, on July 1, 2022, PRPB launched its community policing module: Sistema de Policia Comunitaria (Community Policing System). These modules were developed by PRPB to record and evaluate direct initiatives and programming by capturing formal alliances, outreach, quality of life issues, informal alliance reports, and problem-solving under the SARA Model. Through this system PRPB intends to comply with paragraph 208 of the Agreement, wherein community partnership development and sustainability, outreach, and problem-solving effectiveness can be measured. The Reform Office introduced agent facilitators and some first-line supervisors to the system by demonstrating the uploading and coding of initiatives. However, no formal training has been given through SAEA in support of the institutionalization of community policing.

The Monitor's Office received a briefing on the module from the Reform Office during the October 2022 site visit, and a system demonstration during the December 2022 site visit. A review of the system indicates that it is operationally flawed. There is a need for established data quality protocols and

234

guidelines, along with mechanisms to determine accuracy and effective measuring standards. PRPB must be responsible for conducting its own audits to ascertain the reliability of its data for legitimacy, quality, and soundness.

The three-cycle technical community policing assistance program through the Reform Office including field implementation of the SARA Model and the integration between PRPB, the CICs, and the Community Safety Councils (CSCs) for collaboration came to a halt through most of this reporting period to accommodate training the instructors at SAEA and to facilitate training for the newly appointed supervisors in January 2023. As a result, it remains unclear to the Monitor's Office how this training, while reflective of best practices in community policing, relates to the Academy's efforts to conduct training on community policing Bureau-wide. Moreover, it also remains unclear to the Monitor's Office how many of PRPB's personnel have received training from the Reform Office.

The Monitor's Office received no evidence in support of training through SAEA in line with policy nor did PRPB provide supporting evidence to prove meeting the 95% threshold of trained personnel during this reporting period.

Community participation through its CICs continues to fluctuate per police area. The CICs are instrumental in providing recommendations to PRPB on policies, recruitment, and implemented strategies based on the experiences and needs of their communities. However, confirming new members remains a longstanding issue directly attributed to the lack of prepared multi-themed workshops, which is a requirement. The lack of required workshops hinders PRPB's ability to perform its duties and is a contributing factor to the most recent turnover and participation withdrawal. The success of any law enforcement agency is dependent upon its policy and training. Police agencies must have the ability to provide services to the community in a safe and reasonable manner.

Improvement in PRPB's dissemination of public information is notable during this reporting period. However, PRPB has primarily focused on police activities and criminal interventions due to recent crime waves across the island. PRPB has demonstrated increased use of social and mass media in efforts to solve crime more frequently, proving good results. In addition to these efforts, public meetings are needed to strengthen awareness, educate, coordinate referral services, and to inform the public of the Reform's progress.

PRPB has not been as effective at using multimedia and internal resources to educate and bring public awareness to community policing, organizational transformation through community participation, crime trends, gender violence, UOF, and non-discriminatory practices among other topics to improve the community's quality of life. PRPB struggles to report crime statistics, hate crimes, monthly statistics for domestic and gender-based violence, sexual offenses, and child abuse in an adequate, accurate, and efficient manner.

PRPB must proactively work to define and employ consistent and reliable procedures, training, and accountability measures. The targets assessed in this reporting period continue to be unmet and are fundamental to demonstrating progress in community policing implementation, practices, and institutionalization.

Overall, the Commonwealth's compliance with the thirteen Community Engagement and Public Information paragraphs assessed during this reporting period, reflect similar levels of compliance noted during previous reporting periods. In CMR-6 the last CMR in which all paragraphs were reviewed, 46% of paragraphs (6 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 38% (5 paragraphs) were found to be partially compliant while 8 other paragraphs are noted as not compliant. See figure 10.



*Figure 10. Community Engagement and Public Information: Paragraph Compliance Status*

## Paragraph 205: Community Engagement and Public Information - General Provisions

*PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

## Compliance Assessment

### Community Policing in Policy

PRPB's policy for community policing (GO 803) was finalized and approved by the Commissioner on October 31, 2021.

### Community Policing Training

Although the policy was finalized in 2021 and technical assistance has been offered by the Reform Office, training on the policy through SAEA remains pending implementation as has been the case in previous CMRs. The Monitor's Office received no evidence of PRPB's compliance with the 95% threshold of trained personnel under the newly approved policy in community policing nor the previous policy.

The technical assistance training through the Reform Office focuses on assistance and support for strategies in problem-solving and the development of community alliances, targeting the implementation of the SARA Model in the field and to increase collaboration between PRPB, the CICs, and the CSCs. However, during CMR-8, such technical assistance was postponed throughout the 13 police areas to train the instructors at SAEA and to support training for the newly appointed supervisors during the month of January 2023. Based on the recent schedule received from the Reform Office, there are three police areas on the schedule for Cycle II technical assistance through March 2023 and thereafter, while six police areas remain pending training on Cycle III. According to the calendar provided, all 13 police areas have received their technical assistance training in Cycle I, specialized units excluded. The Reform Office has scheduled to begin Cycle I for the specialized units of Narcotics, Stolen Vehicles, FURA, and Explosives under the Auxiliary Superintendency of Special Operations (SAOE), and for Crimes against Women under the Auxiliary Superintendency for Criminal Investigations Corps (SAIC), from March through June - which will be assessed during CMR-9. There is no doubt that the continued lack of training hampers PRPB's ability to establish reliable data in support of compliance in this area.

### Community Policing in Recruitment

PRPB has made improvements in its recruitment practices. It has been internally developing strategies and streamlined processes to secure candidates with qualifications in alignment with community policing, problem solving skills, critical thinking, leadership, soft skills, mature judgment, communication skills, and strong ethics. PRPB has developed and submitted to the Reform Office an amended recruitment regulation. The regulation included community stakeholders' consultation through the Central level CICs. PRPB, however, has not submitted evidence of recruitment efforts. Additional strategies or structured plans involving recruitment efforts through consulates on the island, colleges, universities and technical schools, CIC members, and job fairs or through internal resources such as the Press Office and multimedia were not submitted to the Monitor's Office for review in support of compliance assessment. PRPB has failed to take advantage of these stakeholders' resources to supplement its recruitment efforts as recommended during previous reporting periods. Additionally, the Monitor's Office has yet to review a finalized recruitment plan. Such a plan must reflect consistent guidelines in alignment with community policing standards and must include broader stakeholders'

participation and recommendations geared towards securing a cross-sectional community representation through articulated workplans.

Based on the Monitor's Office's interviews with PRPB's Director of Recruitment, CIC members, and representatives of the 13 police areas, consultation and participation in PRPB's recruitment processes has been limited to the review of internal documents for recommendations. A recent independent survey conducted through IPSOS revealed that recruitment should be widely publicized to inform the public of PRPB's efforts to secure a diverse workforce. The Monitor's Office recognizes the recent recruitment efforts made by PRPB through the written press.  Such efforts must be expanded to include multimedia resources in support of broader information to the public.

## Community Policing in Management and Performance Evaluations

During CMR-7, the Monitor's Office provided recommendations for revision to PRPB's uniform method to objectively evaluate PRPB members, Promedia under GO 310 (Performance Evaluations). The revisions included adding performance measures related to community engagement, arrests, UOF, and report writing.  The subsequent policy was finalized in February 2023. PRPB must accommodate revisions to the process and streamline the system's ability for leadership and managing officers to review and audit evaluations to ensure that performance evaluations are carried out according to policy. Proactive leadership involvement is conducive to accountability, supportive professional development, and fundamental to improving compliance levels.

## Community Interaction Committees

The challenge to securing full community representation through the CICs remains. Full community representation through CICs fluctuates throughout the 13 police areas. During this reporting period the Monitor's Office found that there is only one CIC fully established, while three others are missing one member each to reach full representation. Seven police areas need two members to be fully constituted, while the police areas of Utuado, Arecibo, and Bayamon need eight, five, and four community members respectively, to reach full community representation.

The confirmation of new members remains an issue directly attributed to the lack of programmed and deliverable multi-themed workshops required per policy. Interviews conducted by the Monitor's Office with CIC members and agent facilitators indicate that although new members have been secured, the unavailability of required workshops hinder their ability to perform their duties. Those interviews also revealed that such needed training is a contributing factor to the most recent turnover and participation withdrawal. It should be noted that per policy, confirmation is contingent upon members' completion of the multi-themed workshops, facilitated through SAEA. As in preceding CMRs, CMR-5 through CMR-8, the multi-themed workshops remain pending implementation through SAEA. The Monitor's Office further notes that GO 801 (CICs) was revised, finalized, and approved on November 1, 2021; therefore, it is SAEA's ultimate responsibility to deliver training pursuant to policy.

## Community Policing and Collaborative Problem Solving

Progress in support of compliance with paragraphs 206 and 207 remains parallel and within the same levels of compliance as noted during CMRs-6 and 7. Although PRPB has implemented its community policing policy (GO 803) in 2021, PRPB has yet to develop and deliver related training and retraining

courses through SAEA; relying on the Reform Office's technical assistance program on community policing which is unable to comply with certifying processes for its workforce as required by the Agreement. Additionally, PRPB's implementation of its Staffing Plan and its staffing allocation for personnel redeployment in support of community policing and problem-solving is yet to materialize, preventing PRPB from successfully achieving the objectives of problem solving and developing alliances conducive to improving the quality of life of community residents.

Pursuant to the Agreement, the districts and precincts must inform the public on their rights regarding: unreasonable searches and seizures; UOF; filing civilian complaints to report allegations of police misconduct, discrimination, or officer commendation in the performance of their duties; report on Reform progress; and other topics of interest to the community through at least one open meeting yearly; namely, "Encuentros Comunitarios".  The related policy (G0 805) was finally approved on January 13, 2023.

During CMR-8, the Monitor's Office found that only two police areas, Caguas and Humacao, held their Community Encounters, but failed to submit comprehensive evidence. PRPB failed to submit suitable evidence supporting the Agreement or standing policy within all 13 police areas.

Community Encounters must be held yearly in all 13 police areas to meet compliance. For there to be community representation, meetings must be publicized. The Monitor's Office notes that since 2020 PRPB has been not compliant with these meetings and paragraphs 215 and 216 of the Agreement.

## Public information

Public dissemination of PRPB's information has improved. The information has mainly focused on police activities and criminal interventions due to a heightened crime wave. PRPB uses mass media and social media to help solve crimes, proving effective. Those efforts must be expanded and inclusive of partnered initiatives with community stakeholders for awareness, education, and coordinated referral services. As in previous CMRs and validated through a recent independent community survey conducted through IPSOS, PRPB continues to ineffectively use the media and internal resources to educate and deliver public awareness on community policing, organizational transformation through community participation, crime trends, gender violence, UOF, and non-discriminatory practices among other topics to improve the community's quality of life. The Monitor's Office finds that PRPB needs to improve reporting crime statistics and hate crimes. Statistics must be accurately collected and readily available to the public. PRPB struggles to report crime statistics and hate crimes, as well as monthly statistics for domestic and gender-based violence, sexual offenses, and child abuse. The insufficient progress in this area, assessed during CMRs-6 and 7 is carried through to this reporting period.

### *Pathway Forward*

The Monitor's Office reiterates its recommendations that community policing begins at the recruitment stages. The revised recruitment plan must establish that candidates demonstrate fundamental values in community policing. Additionally, the recruitment plan must include active community stakeholders' involvement and articulate strategies for securing a diverse workforce. Performance evaluations must include measures relevant to community policing activities, work assignments, implementation of

problem solving through the SARA Model, and any other tasks or notable work performed in support of community policing. The performance evaluation should include mutually established goals and objectives resulting from prior discussions about professional development through supervisory coaching. To implement community policing effectively, partnerships with external agencies, community advocates, and key stakeholders must demonstrate strategies focusing on problem-solving and enhanced crime prevention. Providing PRPB with the necessary tools for consistent and appropriate services requires training implementation, delivery, and documentation in alignment with the current community policing policy. Staffing allocation and deployment of personnel, including specialized personnel, must be reassessed to ensure that core operations support community policing and problem-solving strategies. Addressing technological deficiencies to keep the public informed about statistics on crime, including gender violence, sexual offenses, child abuse, and hate crimes, and expanding efforts to inform the public on partnered initiatives with community stakeholders for awareness, education, coordinated referrals, and to inform the public on Reform progress, must be prioritized to reach substantial compliance moving forward. The Monitor's Office, however, is optimistic that added training, revisions to the performance evaluation system, improved recruitment efforts, along with increased staffing, supervision, and resources, will address the issues highlighted throughout this section.

## 1. Community Oriented Policing

Progress in support of compliance with paragraphs 206 and 207 remain at the same levels as noted during CMRs-6 and 7. Despite the implementation of PRPB's Community Policing policy (GO 803) in 2021, training and retraining courses through SAEA are still pending. The needed staffing allocation and personnel redeployment is pending the implementation of PRPB's plan in support of securing organizational objectives in community policing and proactive problem-solving while continuing to develop and sustain alliances through meaningful partnerships to improve the quality of life of community residents.

### Paragraph 206: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem- solving approach.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraph 206. | ☑ Met   ☐ Missed |
| 2. Community policing and problem solving trainings are consistent with approved policies. | ☐ Met   ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | ☐ Met   ☑ Missed |
| 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | ☐ Met   ☑ Missed |
| 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | ☐ Met   ☑ Missed |
| Note: This paragraph is assessed together with Paragraph 13 of the Agreement. | |

*Compliance Assessment*

GO 803 (Community Policing) became effective on October 31, 2021, during the CMR-6 reporting period. This policy is required to be revised every two years and is subject to compliance assessment in CMR-9. The Monitor's Office's review of GO 803 found that it meets the requirements of this paragraph.

Community policing requires outreach, the development of purposeful community alliances, and problem solving. PRPB members must be certified in community policing based primarily on the SARA Model. The Monitor's Office has not received evidence of PRPB's compliance with the 95% threshold of trained personnel, under the newly approved policy from 2021. Training delivery on the policy through SAEA remains pending implementation. In the interim, the Reform Office has offered technical assistance through an in house developed training program. The program focuses on assistance and support for strategies on problem-solving and the development of community alliances, targeting the implementation of the SARA Model in the field and to increase collaboration between PRPB, the CICs, and CSCs under a three-cycle program. However, during this reporting period, such technical assistance was postponed throughout the 13 police areas to train the instructors at SAEA and in support of training the newly appointed supervisors during the month of January.

Based on the recent schedule received from the Reform Office, there are three police areas scheduled for technical assistance on Cycle II through March 2023 and thereafter, while six police areas remain pending training in Cycle III. According to the calendar, all 13 police areas received their technical assistance training on Cycle I, specialized units excluded. The Reform Office has scheduled to begin its Cycle I for the specialized units of Narcotics, Stolen Vehicles, FURA, and Explosives, under SAOE and for Crimes against Women, under SAIC from March through June 2023 which will be assessed during CMR-9. The lack of continued training hampers PRPB's ability to ensure reliable data for problem-solving and alliance development.

During this reporting period, the Monitor's Office interviewed PRPB members, including area commanders, precinct officers, district directors, and agent facilitators from the police areas of Caguas, Bayamon, Utuado, Lares Precinct, Angeles Precinct, Carolina/Trujillo Alto District, Humacao District, San Juan District, Fajardo District, Yaboucoa District, specialized narcotics unit from Aibonito, Carolina highway patrol, Caguas Criminal Investigations Corps, and the domestic-gender and youth violence units for Aibonito, Utuado, and Ponce. Most interviewees reported significant challenges preventing PRPB

241

from fully implementing the SARA Model, including insufficient personnel on shifts, redeployment to other duties, training needed to carry out programming, and a rise in criminal activity since November 2022.

In February 2023, the Reform Office submitted a certificate directing the Monitor's Office to review and obtain data for compliance assessment in community policing through the "Sistema de Policia Comunitaria." Although PRPB's effort is commendable and highly encouraging to the Monitor's Office, a review of the system indicates that it is operationally flawed. There is a need for established data quality protocols and guidelines, along with needed mechanisms to determine accuracy and effective measuring standards to meet the requirements of the Agreement.

The Monitor's Office finds that PRPB must be responsible for conducting its own audits to ascertain the reliability of its data for legitimacy and quality to meet compliance. Among salient operational deficiencies, the Monitor's Office found that the system is not operationally functional to retrieve data per police area per reporting period. Although parameters can be established to filter searches by date, only global numbers are available. Under this operation, the need to search for individual control numbers is required to determine dates for review, which requires ascertaining if such control numbers belong to a given reporting period. Once such criteria are determined, the Monitor's Office looks for evidence, defined objectives, implemented strategies, and operational practices to determine compliance. Hence, the current operational functionality of this system does not provide for an efficient way of information retrieval or to effectively conduct random sampling for compliance assessment. Moreover, the system does not capture all superintendencies in the search, limiting it to SAOC and SAIC for activities related to problem-solving. There is no data collected for SAEA, SAOE, or SARP. Consistent shortcomings revealed that searches bring the user back to the first page upon each completed search. Despite these deficiencies, the Monitor's Office searched for control numbers for this reporting period in an effort to assess progress made in the implementation of problem solving through the SARA Model. However, the Monitor's Office found that most deficiencies outlined during CMRs-6 and 7 remain significantly unimproved. Based on the total of 126 models implemented for this reporting period throughout the Bureau, the Monitor's Office randomly reviewed various documents uncovering that the model was implemented at SAOC and SAIC, while other auxiliary superintendencies, failed to report any problem-solving strategies through the model.[40] Among primary deficiencies and flawed implementation practices the Monitor's Office found incomplete forms that lacked or were missing general objectives, problem identification, undefined problems triangles[41], documents to demonstrate supplemental information on efforts, supporting documents prior to employing a plan of action, assessments finalized when the reported implementation is listed as "in progress" or at "initial" stages were not yet completed. The Monitor's Office notes that PRPB needs to develop tailored responses that are directly linked and focused on the findings from the analysis phase of the project.

The Monitor's Office notes that these deficiencies are strong indicators of the need to establish required data quality protocols, effective mechanisms to determine accuracy, and efficient operational measuring standards including proactive supervisory practices. PRPB must be responsible for conducting its own

---

[40] This is fundamental for administrative and operational practices improvement; GO 803§IV(C)(3)(a).
[41] To include offender, location, and victim.

audits to ascertain the reliability of its data for legitimacy, quality, and soundness to meet substantial compliance. Substantial compliance is measured on the quality of implemented practices and less on volume or quantity. Moreover, PRPB must explore program procedures, organizational arrangements, staffing patterns, communication, and training including supervisory coaching and mentoring support to determine the efficient implementation of problem solving through the model. Nevertheless, the Monitor's Office notes that the implementation of problem solving through the SARA Model has continued.

According to the available global report within the community policing system at the time of the Monitor's Office's review, 52 problem solving strategies were implemented during this reporting period in 12 of the 13 police areas not including all precincts/districts and zones. These 52 initiatives are at different phases of implementation, classified within the system as initial phase, in process, or completed. The Monitor's Office randomly reviewed the initiatives at the different phases for the police areas of Ponce, Utuado, Caguas, Carolina, Aibonito, and Mayaguez. Most of these initiatives were centered on quality-of-life situations referencing abandoned vehicles, illegal landfills, scraps, and environmental barriers. The Monitor's Office notes that during the closing of the first quarter of 2023 PRPB implemented the SARA Model at Barriada Morales in Caguas, because of a homicide of an innocent victim, a retired schoolteacher, provoked by the drug war between rival area gangs. The implemented model is in progress throughout the police area under a comprehensive approach including community outreach and developed alliances between PRPB and city hall in coordination with the municipal police and social service agencies, as previewed by the Monitor's Office during a recent meeting with the Reform Office. However, related documents in support of the project were not submitted to the Monitor's Office during this reporting period and did not fall under the randomly selected documents for review because the system stores documents per control number and not per initiative. The Monitor's Office also notes that a similar project is at the initial phase of implementation at El Tuque in Ponce, because of the murder of an innocent victim. The Monitor's Office is enthusiastic and motivated by PRPB's proactive engagement and encourages the continued use of multiple resources including crime mapping and community intelligence to implement problem-solving strategies prospectively and proactively.

On the other hand, on February 22, 2023, the Monitor's Office received information on PRPB's intentions to consider implementing the problem-solving model in a hybrid format. This stemmed from concerns shared at the November 2022 Status Conference. The Reform Office reported that there may be remote areas where the model may not work, becoming necessary to develop a hybrid model. The Monitor's Office has not received any formal proposal for review other than a presentation offered through the Reform Office. Moreover, during a follow up discussion held with the Reform Office ion March 2023, the Monitor's Office learned that there were no changes to the implementation of the model or the delivery of training for trainers.

The SARA Model is a step-by-step problem-solving process that can be easily taught to officers and community residents. Research suggests that police agencies prefer the SARA Model over any other

available option[42]; however, the assessment element within the model must be an ongoing process.[43] During the validation process supervisors must proactively assist officers in the analytical process to determine appropriate and direct responses. PRPB has updated some of its community engagement policies to demonstrate accountability; however, the ability to put such policies into practice is related to training, competency development, and follow-up, which are of serious concern to the Monitor's Office because of the direct impact on all areas of the Agreement.

### Pathway Forward

The recommendations made by the Monitor's Office during CMR-7 are carried forward into this reporting period. The implementation processes are in initial stages and must undergo continual internal evaluation with appropriate delivery of training to ensure success. Additionally, adopting a substantial geographic deployment of resources through staffing plan reassessment is critical to implement community policing and problem solving in practice. The Monitor's Office looks forward to PRPB's implementation of its updated Staffing Plan.

There is a need to improve deficiencies in the implementation of the SARA Model. PRPB should employ guided practices for full competency development and supervisory coaching[44] to assist in the analytical process[45] of the SARA Model in the field. The designation of mentors or peers as support may prove beneficial, along with supervisory coaching to assist in the analytical process for officers' performance measuring and professional development. The deficiencies must be rectified to ensure the validity of the data collected. PRPB must be responsible for conducting its own audits to ascertain the reliability of its data for legitimacy and quality.

### Paragraph 207: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

---

[42] Sidebottom & Tilley, 2010, pp. 17-18.

[43] Eisenberg & Glasscock, 2010, p. 1.

[44] Community policing: A first-line supervisors' perspective: https://cops.usdoj.gov/RIC/Publications/cops-w0877-pub.pdf.

[45] Using Analysis for Problem-Solving: A Guidebook for Law Enforcement: https://cops.usdoj.gov/RIC/Publications/cops-p018-pub.pdf.

| 1. Policies incorporate all the requirements of Paragraph 207. | ☑ Met | ☐ Missed |
|---|---|---|
| 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | ☐ Met | ☑ Missed |
| 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | ☐ Met | ☑ Missed |

*Compliance Assessment*

GO 803 (Community Policing) became effective on October 31, 2021, during the CMR-6 reporting period. This policy is required to be revised every two years and is subject to compliance assessment in CMR-9. The current policy GO 803, as reviewed, satisfies the requirements of this paragraph.

Alliances and outreach are fundamental elements in community policing. The policy directs PRPB to develop partnerships and alliances with the public and private sectors, faith-based groups, academia, and the media to improve its relationship with the community; strengthen support and social networks; consolidate initiatives to improve quality of life; reduce criminal activity; and increase crime solving rates. The Agreement requires reaching out to stakeholders to establish problem-solving partnerships and develop collaborative strategies.

As in previous reporting periods, the compliance target for training under this paragraph remains unmet. Continued education, professional development, and demonstrated compliance with certifying processes is SAEA's responsibility as the sole certifying unit for PRPB. Despite a curriculum developed and delivered by the Reform Office on this policy, training delivery remains past due. The Monitor's Office has not received evidence of PRPB's compliance with the 95% threshold of trained personnel, under the newly approved policy.

During this reporting period, the Monitor's Office did not receive any evidence supporting outreach efforts. Instead, the Reform Office provided a certificate referring the Monitor's Office to retrieve the data for compliance assessment from the electronic modules. The same deficiencies reported in the above paragraph within this new system, were replicated for information retrieval on outreach activities. The available filters to search per topic, service program, and unit yielded no data for this reporting period. Nevertheless, the Monitor's Office review of these activities collected within the outreach module globally indicates 5,570 outreach activities were conducted. However, out of those 5,570 activities, only 159 (3%) were classified as outreach for education. Other activities falling under the category of outreach included unspecified cultural activities (456; 8%), recreational (64; 1%), socialization with the community (194; 3%), and sports activities (4,697; 84%).

Under this system, the Monitor's Office found that some modules were used to record precinct monthly meetings, coded as outreach activities without any supporting documents to determine if such efforts constituted outreach. In most cases, there was no personnel to validate the efforts listed, other than the agent uploading the information. There was no agenda nor evidence of topic discussion[46]. In addition,

---

[46] Per policy, monthly meetings are governed by GO 704 (Monthly Meetings and Newsletters) and are to be recorded on PPR 704.1 (Agenda for the Monthly Meetings).

activities regarding meetings for technical assistance in technology and information for district commanding areas were reported as outreach for orientation. Activities such as assisting citizens in changing a vehicle's tire were classified under outreach as well as internal trainings. Other outreach documents reviewed lacked supporting evidence such as topic discussion, targeted groups, presentation, attendance sheets, didactic material, and outcome reports, beyond uploaded photographs as the sole evidence in support of efforts in most cases. This coupled with the need of supervisory signature to validate the effort or initiative, provide coaching, and facilitate continuity continue. Documentation is integral to the quality of efforts to determining compliance.

Specialized units such as the K-9 unit and the drugs and weapons division under SAOE engaged in outreach activities for education and prevention. SARP listed an outreach activity for awareness via Zoom on administrative complaints and commendations (GO 311) for a local faith-based group. The activity was classified as cultural and educational but did not meet compliance as it was not in the current reporting period. No other outreach activity was conducted through SARP for this reporting period. The same applies for SAEA, wherein orientation was offered to CIC members on the body-worn cameras regulations manual.

The Monitor's Office does recognize efforts to conduct outreach through its auxiliary superintendencies of SAOC, SAIC, and SAOE on a variety of topics. The Monitor's Office recommends that such efforts become inclusive of all auxiliary superintendencies to comply with the 95% threshold for districts, precincts, and units conducting outreach Bureau-wide. It is further recommended that those efforts become strategically delivered through structured initiatives. PRPB must demonstrate to stakeholders that it understands the value of working with the community in the areas of prevention, education, and intervention.

Documents reviewed under the module in support of formal alliances reflect an MOU or collaboration agreement as the sole evidence in some cases with no additional supporting documents, regardless of in progress or completed status. Control numbers in support of these alliances failed to include required plans to reach objectives, objectives were unspecified, and provided no evidence on meetings associated with the alliance by way of minutes despite reported meetings held. In most cases, the reviewed alliances lacked operational definitions on activities in support of identified problems, steps taken toward resolution, and evidence on follow through in support of alliance sustainment or recommendations for further improvement.

Further review reveals that community contact individuals were often not listed. In some cases, individuals were listed by either first or last name without any further information, or the contact information was for the agent facilitator. Additionally, the Monitor's Office found that orientation activities, preventive patrols, and funeral escorts including one for a child murdered in the metropolitan area, were coded, or classified under alliances, denoting deficiencies in recording and supervisory processes according to policy. Similar findings are noted for the informal alliances' modules, including the need to support endeavors with specified objectives, agendas, work plans, outcome reports, attendance sheets, community contacts, and supervisory signatures. Notably, recorded under informal alliances as well, are orientations on crime incidence and services offered by PRPB; orientations to CSCs

on the use of radio communications during emergencies - all without supporting evidence for compliance determination.

Field interviews conducted by the Monitor's Office with PRPB facilitators and zone and area commanders for Caguas, Utuado, Humacao, and Fajardo, and district/precinct directors for the police areas of Caguas, Bayamon, Utuado, Carolina, Humacao, San Juan, and Fajardo along with specialized narcotics units from Aibonito, Carolina highway patrol, and Caguas Criminal Investigations Corps indicate that formalizing alliances within their areas have been difficult. Reportedly, most of the alliances formed are informal, including food distribution for the elderly, escorts, and police awareness as allied for children among others. Conversely, securing formal alliances remain a challenge and were reported as almost null. Interviewees reported most stakeholders feel hesitant and discouraged about formalizing agreements through MOUs and the legal divisions, as required by policy.

According to the system modules, only 39 formal alliances were reported by SAOC: 1 for SAIC, and none for the other auxiliary superintendencies.

During CMR-7, SAEA reported an alliance with Homeland Security (ICE), geared towards officers' education on child pornography, wherein materials and resources were to be facilitated by Homeland Security Investigations (HSI) for in-house training and subsequent training replication throughout the 13 police areas. However, evidence on these efforts was not produced for the Monitor's Office's review. On the other hand, the Monitor's Office's review of a formal alliance through SAOC Ponce, for the district of Yauco between PRPB and students from the Vocational and Technical School to provide work experiences to vocational students through internship placement with PRPB in exchange of official vehicles' auto body repairs under the direct supervision of school personnel, met the criteria of a goal-oriented alliance developed with meaningful and purposeful objectives worth replicating in other police areas. The reported alliance was not supported by an MOU, meeting minutes, evidence on activities, or recommendations for future alliances. The Monitor's Office recommends engaging the faculty, students, and guardians in focused orientations for prevention, awareness, and education (cybercrime, fraud, domestic violence, immigration, child abuse, hate crimes, crime trends, PRPB's body-worn cameras, and the Reform among relevant topics).

The Monitor's Office finds that formalizing alliances must be expanded through all auxiliary superintendencies, while still placing and assessing value on informal alliances, for presence, community integration, sustained credibility, trust, and demonstrated organizational transformation.

Reported alliances during this reporting period is substantially limited or poorly established, strong indicators of unsuccessful, vested, and structured efforts in the development of meaningful and long-lasting partnerships, far from substantial compliance with the Agreement. As in previous CMRs, the Monitor's Office also finds that these deficiencies are highly associated to acquisition and development of necessary competencies through training and practice. Formal alliances must be purposeful, goal directed, and mutually beneficial. The Monitor's Office will continue to review these activities in support of the institutionalization of community policing and compliance determination through proactive and well documented efforts to mobilize resources, and emerging networks to collectively solve problems.

*Pathway Forward*

Community organizations, the public and private sectors, faith-based groups, academia, other key stakeholders and resources must be directly tapped into, to work on organized strategies to achieve results.  The police have the responsibility to coordinate partnerships and lead problem-solving efforts where the community can come together to address these problems. PRPB must reach out to stakeholders to initiate contacts, demonstrate openness, interest, and availability. PRPB must develop its own directory through internal resources and assistance from the Bureau of Community Relations, CSCs, and CICs for comprehensive resources. The Monitor's Office recommends developing partnerships with mental health and social service organizations and practitioners. Taking this approach will enable coordinated efforts to reach vulnerable groups such as those experiencing mental health issues, gender violence, substance abuse, and underrepresented communities. Such partnerships should have structured actions plans and progressive outcome reports for uniform and effective outcome measuring. In light of recent criminal activity, the Monitor's Office encourages connecting with marginalized community advocates to engage in prevention, education, and extensive problem-solving alliances.

## Paragraph 208: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | ☐ Met | ☑ Missed |
| 2. 100% of PRPB annual reports are made publicly available. | ☐ Met | ☑ Missed |
| 3. Annual report incorporates all the requirements of Paragraph 208. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Community Policing (GO 803) policy incorporates all the requirements of this paragraph. It also establishes the development of community partnerships and alliances as core elements of community policing. Additionally, all outreach must be documented and captured electronically in accordance with

the policy. The development and sustainability of formal and informal alliances and the implementation of problem-solving through the SARA Model must be consistent with the Agreement. The Agreement also requires established mechanisms to measure community partnerships and problem-solving strategies and assess their effectiveness.

In July 2022, PRPB launched its community policing module: Sistema de Policia Comunitaria (Community Policing System). These modules were developed by PRPB to record and evaluate direct initiatives and programming by capturing formal alliances, outreach, quality of life issues, informal alliance reports, and problem-solving under the SARA Model. PRPB intends to comply with paragraph 208 of the Agreement, wherein the development and sustainability of community partnerships as well outreach and problem-solving can be ultimately measured for effectiveness. Personnel currently involved in community policing (primarily agent facilitators and some first-line supervisors) were introduced to the system through the Reform Office and received a walkthrough for uploading and coding initiatives within the system. However, field interviews conducted by the Monitor's Office indicate that no formal training has been offered. The Monitor's Office received a briefing on the module from the Reform Office in October 2022, and a system demonstration in December 2022. Although PRPB's effort is commendable and highly encouraging to the Monitor's Office, a review of the system indicates that it is operationally flawed as a reliable tool to determine compliance. There is a need for established data quality protocols and guidelines, along with mechanisms to determine accuracy for effective measuring standards. The Monitor's Office notes that PRPB must be responsible for conducting its own audits to ascertain the reliability of its data for legitimacy, quality, and soundness.

A review of the module uncovered that some modules have been used to record precinct monthly meetings, which were coded as outreach activities, without any supporting documents to fully determine if such efforts constitute outreach. There is no contact person to validate the effort other than the agent uploading the information and no agenda or evidence of topic discussion were included as required by policy (GO 704 Monthly Meetings and Newsletters).

Activities such as assisting citizens in changing a vehicle's tire or internal training sessions have been uploaded in the module and classified as outreach. Additional documents reviewed and classified under outreach activities lack supporting evidence such as topic discussion, targeted groups, presentation, attendance sheets, didactic material, and outcome reports, beyond uploaded photographs as the sole evidence in support of outreach in most cases. This coupled with the need of supervisory signature to validate the effort or initiative, provide coaching, and facilitate follow through on demand continue. The Monitor's Office notes that leadership involvement leads to increased accountability and is fundamental to improving compliance levels. The Monitor's Office also found duplicity in reported efforts or initiatives whenever activities are carried through by one or more agents through different control numbers, affecting the reliability of the data collected. These findings have been validated through field interviews.

The only evidence supporting formal alliances is an MOU or collaboration agreement. Control numbers in support of these alliances failed to include required plans to reach objectives in most instances the objectives are unspecified. There is no evidence of meetings associated with the alliance by way of minutes, lack of operational definitions on activities in support of identified problems, steps taken toward resolution, and evidence in support of sustainment or recommendations for further

improvement. Community contacts are often not listed. In some cases, individuals were listed by either first or last name without any further information, or contact listed is for the agent facilitator. Additionally, classified or coded under alliances, the Monitor's Office also found orientation activities, preventive patrols, and funeral escorts, denoting deficiencies in recording and supervisory processes. Similar findings are noted within the modules for informal alliances, including the need to support the endeavors with specified objectives, agendas, execution plans, attendance sheets, outcome reports, community contacts, and supervisory signatures. Offered orientations on crime incidence and services, as well as orientations to CSCs on radio communications during emergencies, lack evidence to support compliance.

PRPB must publish an annual report on the developed alliances. The annual report is due to the Assistant Commissioner's Office on or before January 31st of each year and must include meetings and activities conducted, problems addressed, obstacles encountered, steps taken toward resolution of problems, and recommendations for improvement. The Monitor's Office review of PRPB's Alliances Annual Report within the Virtual Library revealed that that the last report was published on January 10, 2020. PRPB did not provide evidence of having developed, rendered, and published a report for 2022. The Monitor's Office concludes that PRPB is not compliant with this paragraph.

*Pathway Forward*
Compliance with this paragraph requires PRPB to demonstrate consistent, accurate, and reliable data collection, and to develop adequate standards to measure implementation effectiveness. PRPB personnel must be proficient in the use of the system with assistance of expedited training. The training should ensure the reliability and validity of the data entered in the modules and stress the importance of consistency and accuracy in compiling substantive information and evidence, including activities conducted in support of initiatives, defined objectives, problems addressed, obstacles encountered, steps taken towards resolution of problems, and recommendations gathered for improvement or replication, including outcome reports. Officers and supervisors must be held accountable for the information entered in the system. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that the information conveyed to the public is reliable and dependable.

## 2. Community Interaction Councils

The CICs are community members, most of them professionals representing diverse members of the community among the 13 police areas. Per GO 803 (Community Policing), the CICs advise, review, and provide recommendations to PRPB on policies, recruitment, and implemented strategies to address crime and safety issues, based on representative community perspectives. CICs also advise the Commissioner on ways to keep the public informed and increase transparency in the dissemination of public information.

The CICs have a spokesperson who represents the 13 police areas at the central level. Those spokespersons, together with the CSC's president, the Executive Director, and a representative from a civil rights organization appointed by the Commissioner, constitute the Central CIC.

During CMR-7, the Monitor's Office found some improvement in CIC's efforts to secure full community representation within the 13 police areas. However, during this reporting period, the committees were substantially impaired by a considerable decrease in representation and difficulties recruiting and securing new members. The Monitor's Office found that the required multi-themed workshops facilitated through SAEA were not being provided. These workshops are required for the confirmation of new members. As reported during field interviews, such required training is a contributing factor to the most recent turnover and participation withdrawal. As a result, there is only one police area where the CIC is fully constituted, and three police areas in critical need of five to eight members to reach full community representation.

PRPB needs to take proactive measures to ensure organizational commitment at all levels to jointly develop strategies and work plans focused on the needs of each police area and document all such efforts.

## Paragraph 209: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PPRB policies require it maintain the CIC and they meet at least every three months. | ☑ Met | ☐ Missed |
| 2. PRPB maintains CICs as required by this Paragraph. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The CIC policy (GO 801), finalized and approved on November 1, 2021, is due for revision. However, it does meet the requirements of this paragraph. The CICs must hold monthly meetings to discuss initiatives and work plans relevant to each of the 13 police areas.

PRPB failed to submit evidence supporting compliance assessment for target one. However, the Monitor's Office was able to obtain the necessary information through its interviews of personnel and CIC members. Despite many challenges encountered by the committees to secure community representation, 12 CICs were able to meet the Agreement requirements within this paragraph. The Utuado CIC encountered the most difficulties, motivated by the lack of quorum and illnesses within its

membership. Other committees met at least twice, (Bayamon and Guayama) during this reporting period, while the remaining 10 committees held between 3 and 11 meetings. It is commendable that the Aguadilla and Humacao CICs held 11 meetings. The Mayaguez CIC held 10 meetings. Although other police area CICs were unable to fully comply with the meeting requirements pursuant to policy, the Monitor's Office recognizes that during this reporting period the island was impacted by hurricane Fiona interrupting basic services on the island and disrupting the communities' daily affairs.

Most CICs were effective in coordinating, delivering, and facilitating their "conversatorios." The Monitor's Office received no evidence by ways of publicity, work plans, and outcome results from the Reform Office. The CIC Annual Report reviewed by the Monitor's Office indicates that the CICs from Aguadilla, Guayama, Fajardo, Ponce, and San Juan held the two required "conversatorios." The Humacao CIC held three "conversatorios" through Radio Victoria 840, a local radio station. Additionally, the CICs for Aibonito, Arecibo, Bayamon, Mayaguez, and Utuado held one "converstorio" each. The report reflects that the CICs for Caguas and Carolina did not comply with the GO as they did not hold any "converstorios" during this reporting period. The Monitor's Office finds that the topics chosen by the committees for community discussions during this reporting period are of trend, and high relevance within the community. The CICs were able to identify the need to increase community knowledge through direct contacts for education and prevention. Among the topics chosen were: selfcare, emotions, and healthy life; cybercrime; identity theft; child pornography; zero tolerance to violence; community programs; how PRPB manages functional diversity; LGBTTQ communities; equal protection and non-discrimination; elderly financial fraud; and the Reform Office.  The Monitor's Office encourages the CICs and PRPB to jointly facilitate discussions on gender and domestic violence including coordinated referral services, the role of COPOP (Centro de Operaciones de Ordenes de Proteccion), public policy (including PRPB's internal resources as discussion facilitators), crime trends, and how to avoid becoming a target.

As it relates to target two, the Monitor's Office found that there is only one fully constituted CIC, while two others (Aguadilla and Mayaguez) are missing one member each to reach full representation. Also, there are seven police areas (Humacao, Fajardo, Guayama, San Juan, Carolina, Caguas, and Aibonito) in need of two members to be fully constituted. The police areas of Utuado, Arecibo, and Bayamon need eight, five, and four community members respectively to reach full community representation.

The confirmation of new members remains a longstanding issue directly associated with the lack of programmed and deliverable multi-themed workshops. Interviews conducted by the Monitor's Office with CIC members and agent facilitators indicate that although new members have been secured, the required workshops hinder their ability to perform their duties. Those interviews also revealed that such needed training is a contributing factor to the most recent turnover and participation withdrawal. It should be noted that confirmation is contingent upon members' completion of the multi-themed workshops, facilitated through SAEA. Proactive measures must be taken by PRPB to resolve this noncompliance.

### Pathway Forward

PRPB is instrumental in bridging the gap for CICs to overcome the challenge of securing a representative membership. PRPB must reconnect with the community through the CICs by becoming more supportive of the committees' recruitment efforts. The Monitor's Office recommends that PRPB add a discussion

252

topic focused on spreading the word among PRPB through CIC participation including agent facilitators in support of recruitment to its monthly meeting agendas. PRPB should also use multimedia, social platforms, the Press Office, and community encounters to boost its recruitment efforts of CIC members. The Monitor's Office reiterates previous recommendations for securing potential candidates through local groups, community organizations, referrals, school personnel, parents/guardians, and faith-based groups. The police areas are encouraged to hold meetings at communal centers, public schools, or city halls. The Guayama CIC is the only committee holding its meetings at a local public school, facilitated through the City Hall.

## Paragraph 210: Community Engagement and Public Information - Community Interaction Councils

*In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | ☑ Met | ☐ Missed |
| 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The CIC has its mechanisms for selecting its members. GO 801 (CICs) and CIC Regulations outline the mechanisms for compliance. The policy must be revised annually and was due for revision this reporting period; however, the Monitor's Office did not receive any documents for review regarding CIC policy or CIC candidate referrals. The policy requires the publication and advertisement of openings through the press and mass media for 30 consecutive days every 2 years from the last open announcement. It must specify the positions available and who can apply. Interviewed CIC members, facilitators, and some area commands indicated that they are relying on informal referrals, recruitment fairs, and other internal efforts to bridge the gap to secure full community representation because the policy presents challenges and has proven ineffective to secure new members. Biennial recruitment means that open recruitment is not available to fill vacancies when needed, pressing the committees to rely on its own resources and innovative processes.

*Pathway Forward*

During CMR-6, the Monitor's Office recommended amending the policy to project recruitment based on each police area's needs and demands. The recommendation is reaffirmed for CMR-8. This added flexibility would facilitate CICs' ability to close the gap in securing full community representation providing more sustainable and practical alternatives. The Monitor's Office relies on PRPB's proactivity to assist and support the committees in seeking new candidates through its own outreach activities, community alliances, and open meetings (Encuentros Comunitarios).

### Paragraph 211: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies related to CICs incorporate the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. CIC orientation course is consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. PRPB makes CIC orientation available to all members of the CICs. | ☐ Met | ☒ Missed |
| 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | ☐ Met | ☒ Missed |

*Compliance Assessment*

GO 801 (CICs) as approved during CMR-6 and satisfied the requirements of this paragraph. However, the policy must be reviewed on a yearly basis and was due for revision during this reporting period.

PRPB failed to provide evidence of CIC training and the multi-themed workshops developed by SAEA.

Field interviews conducted by the Monitor's Office with CIC facilitators and committee members from Carolina, Humacao, Bayamon, Fajardo, Caguas, Aibonito, and San Juan reveal that even members who joined their respective committees during the past year (two previous reporting periods) remain pending confirmation to fulfill their mission due to the unavailability of the required multi-themed workshops. They also reported that PRPB's discussions at the Central CIC level contemplated providing the workshops virtually to facilitate training and confirmation.

In support of the Monitor's Office request to determine compliance, SAEA submitted a certificate indicating that the Reform Office had been tasked with the design and development of a virtual training for CICs (VCICS 101). SAEA informed the Monitor's Office that the training package was completed as of December 2, 2022, and is waiting for the Bureau of Technology's (BT) availability and opening of the virtual platform. No other supporting documents or course syllabus was submitted for the Monitor's Office's review or in support of compliance assessment. PRPB has not demonstrated sufficient efforts to make orientations available to all CIC members to facilitate fulfilling their mission.

PRPB did not submit evidence in support of any of its CICs' possessing means, staffing, and access necessary to fulfill their mission during this reporting period. Interviews with CIC facilitators and CIC members indicate that they possess the necessary means and resources to fulfill their mission. However, the Monitor's Office learned through some agent facilitators and area commands that sharing vehicles within the Bureau remains an endured and unaddressed issue, limiting their ability to provide continuity to initiatives and/or attend simultaneous engagements.

During CMR-7, the CICs for the police areas of Guayama and Bayamon formalized their request for needed resources to perform their duties; contrary to the certificate received for the area. The Monitor's Office received no information indicating if these requests were addressed during CMR-7 or within this reporting period. The Monitor's Office notes that the request for resources made by these committees is an integral part of the comprehensive community policing approach to collaboratively and proactively facilitate the implementation of strategies to address crime and safety concerns.

The Monitor's Office received no information about PRPB's operating budget for the CICs, nor that the information has been shared or consulted with the committees as outlined in the Agreement. Interviewed CIC members asserted not having knowledge about the current CIC operating budget or partaking in any discussions with PRPB.

*Pathway Forward*

The Monitor's Office stresses the value of a comprehensive instructional program and training in alignment with the GO and the Agreement. Expedited attention is warranted from PRPB for CIC training delivery under this newly adopted approach. The Monitor's Office also reiterates its recommendation for SAEA to facilitate CIC training through other police areas for productivity and efficiency since training will be available in a virtual format.

### Paragraph 212: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:*

*a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;*

*b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;*

255

*c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;*

*d) providing information to the community and conveying feedback from the community to PRPD;*

*e) advising the Superintendent on recruiting a qualified, diverse workforce; and*

*f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – March 2023 |
| 🛡 Policy: | Implemented | | |
| 👥 Training: | Not Implemented | Assessment Frequency | Annually |
| 🛡 Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | ☐ Met | ☑ Missed |
| 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs.. | ☐ Met | ☑ Missed |
| 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB failed to provide sufficient, pertinent, and detailed evidence in support of the development of a comprehensive community policing approach in collaboration with the CICs. Interviews of randomly selected CIC members and agent facilitators revealed limited input or participation sought from PRPB in assessing strategies and priorities related to community policing, discriminatory practices, search and seizure, victim services, and community feedback. The public needs to be provided with transparent, understandable statistics and information regarding compliance with this paragraph.

PRPB submitted evidence for the Monitor's Office review for the police areas of Aguadilla, Ponce, Aibonito, Humacao, Fajardo, Bayamon, SAEA, and the Community Relations Bureau. The evidence submitted by Aguadilla and Ponce by way of work plans failed to include information or evidence on initiatives carried out through CIC participation and consultation for compliance determination. During CMR-7, on July 7, 2022, the Reform Office provided guidance to the 13 police areas to comply with the requirements of this paragraph, including a compliance certificate internally designed in support of compliance assessment. None of the police areas submitted such certifications during this reporting period. The Monitor's Office notes that topics such as the International Day for Suicide Prevention, sergeants exam training and observation course (Aguadilla), active shooter, Law 154 for Animal Protection and Wellbeing, UOF, and community policing and the Reform (Ponce) were among the topics

256

these two areas engaged in. Bayamon shared three policies with its CIC: GO 626 (Intervention with Individuals with Undefined Migrant Status), GO 311 (Administrative Complaints and Commendations), and GO 312 (Emergency Management). Humacao submitted evidence in support of paragraph 209 that did not meet the requirements. Fajardo shared its workplan focusing on preventive patrolling and readjustment of work shifts for the holidays and the sergeant's exam training and observation course. Other evidence submitted by Fajardo was unrelated to compliance assessment for this paragraph.

PRPB's submitted documentation on behalf of SAEA was subject to compliance assessment during CMR-7, which the Monitor's Office found to be not compliant. The Community Relations Bureau submitted evidence by way of referring the Monitor's Office to review control numbers[47]; however, out of those documents within the outreach module referenced, three of them did not meet the assessment requirements for this reporting period as they pertained to the months of May, June, and September 2022. The only one covering this reporting period was for a meeting held in Ponce classified as an outreach activity but had no relationship with the activity reported based on the sole evidence found in the referral control (a memorandum from the Reform Office addressed to its director regarding a request made by the PRPB Psychology Department). As previously noted by the Monitor's Office and the shortfalls within the implemented modules, the documents failed to include supporting evidence by way of agenda, minutes, work plans, or an approving supervisory signature.

The publication of the CICs report captured a more comprehensive snapshot of the policies reviewed by the CICs than the evidence submitted by PRPB. According to the report, the CICs reviewed GO 150 (Emergency Management Office), GO 312 (Regulations for Emergency Management), GO 309 (Seizures), GO 413 (Digital Platform for Weapons Tracing), GO 601 (Regulations in the UOF), GO 602 (Taser), GO 604 (Pepper Spray), GO 620 (DTE Specialized Weapons), GO 625 (Crowd Control), GO 641 (Animal Protection and Wellbeing Investigations), Recruitment Plan, Body-worn Cameras poster, and body-worn cameras video evaluation. However, the Monitor's Office was unable to review the recommendations made by the CICs because the report did not contain recommendations as requested by the Reform Office and noted in the report. Additionally, no evidence was made available for the Monitor's Office review by PRPB. A follow-up conducted by the Monitor's Office revealed that the CIC's Annual Report was removed from the Virtual Library and no longer accessible to the public.

The Monitor's Office is aware that some participation was requested from the CICs in recruitment, but was limited, and no official evidence was provided by PRPB. The adoption or rejection of recommendations made by the CICs is unknown to them and the Monitor's Office due to the lack of available evidence. From the CIC report reviewed during the first quarter of this reporting period, the Monitor's Office gathered that the CICs participated in the selection of PRPB's "Value of the Year" awards, promotions exam orientation, and sergeants' exam onsite observations.

There were no structured initiatives or work plans available for the Monitor's Office's review for most of PRPB's police areas and specialized units in collaboration with CICs. This has been a consistent finding during the past three reporting periods, and now in CMR-8. Communication between PRPB and CICs is important for identifying and implementing structured strategies. These exchanges enhance community engagement and transparency. The Monitor's Office reiterates that CICs' resourcefulness, expertise, and

[47] 3611, 3612, 1589, and 2921 within Sistema Policia Comunitaria (Orientation and Outreach Modules).

availability to assist in bridging the gaps between the community and PRPB is only constructive if the engagement is demonstrated, articulated, and validated by PRPB.

*Pathway Forward*

PRPB must document contributions made by the CICs in any purposeful and meaningful initiatives engaged within area commands, including developed approaches to address specific issues of concern, work plans, and any other jointly undertaken activities to address crime and safety. PRPB must capitalize on CIC's field knowledge and expertise and be fully integrated for a successful implementation in community policing. Additionally, informing the CICs about PRPB's compliance with the Agreement should be the standard.

As part of the Monitor's Office's recommendations, specific attention for joint initiatives focusing on nondiscriminatory practices, issues of domestic and gender violence, and sexual assault including availability of resources for support and safety for the community and PRPB's officers and personnel should be given. The Monitor's Office further encourages incorporating CIC participation in PRPB's promotions for added diversity and transparency to the process which would strengthen community trust in the system.

## Paragraph 213: Community Engagement and Public Information - Community Interaction Councils

*CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB published 100% of CICs annual public report with recommendations included are available on web pages of the Commonwealth of Puerto Rico and the PRPB. | ☐ Met | ☑ Missed |
| 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | ☐ Met | ☑ Missed |

*Compliance Assessment*

GO 801 (CICs) and the Agreement require that the Executive Director and the Office of Professional Standards (SARP) generate an annual report establishing all recommendations made by the CICs

258

regarding developed or reviewed policies throughout the calendar year, making it available to the public through the Virtual Library on or before the 31st of January of each year. The GO also requires that the CICs render a public report memorializing all recommendations made to PRPB throughout the previous year. This report compiles all activities and recommendations made per police area from the semiannual reports (December and June), including challenges and obstacles encountered to reach their objectives. The policies reviewed by the CICs and recommendations made are to be captured in an annual report by the Reform Office that must be available to the public through the Virtual Library.

PRPB failed to submit any evidence or certificate for determining compliance. However, several CIC members and agent facilitators interviewed by the Monitor's Office attested to having rendered and signed the report for publication. A search conducted through the Virtual Library validated the publication of the annual report. The Monitor's Office review of the report indicates that recommendations were not included pursuant to directives from the Reform Office. Therefore, compliance target one for this paragraph does not meet the established assessment criteria. The Monitor's Office also notes that because the report did not contain any recommendations, the protection on the disclosure of sensitive law enforcement information to determine compliance is not met.

*Pathway Forward*

The Monitor's Office recommends full publication of the CIC Annual Report, recommendations included. If CIC recommendations include sensitive information, it could be redacted or limited during the report's drafting and approval process. This in turn, would facilitate the Reform Office's compliance with its own report.

## 3. Public Information

Keeping the public informed about new policies and directives in a transparent way is essential for a police agency to establish and maintain its credibility, develop community trust, and demonstrate accountability. The Agreement is very specific requiring public dissemination of accurate and updated monthly crime statistics, including statistics on hate crimes, gender and domestic violence, and child abuse. PRPB's dissemination of public information has been notable during this reporting period. However, PRPB has primarily focused on police activities and criminal interventions because of a heightened crime wave across the island. PRPB has demonstrated increased use of social and mass media in efforts to solve crime more frequently, proving effective and positive results. Nevertheless, those efforts must be expanded and inclusive of partnered initiatives with key community stakeholders in open-public meetings for awareness, education, coordinated referral services, and to inform the public of Reform progress. Maximizing the use of multimedia and internal resources to educate and bring public awareness on community policing, organizational transformation through community participation, crime trends, gender violence, UOF, and non-discriminatory practices among other topics to improve the community's quality of life, remains deficient. PRPB struggles to report crime statistics, hate crimes, monthly statistics for domestic and gender-based violence, sexual offenses, and child abuse in an adequate, accurate, and efficient manner to meet compliance. The insufficient progress in this area, assessed during CMRs-6 and 7, is carried through to this reporting period validated through an independent community survey recently conducted by IPSOS.

PRPB is yet to fully transition into a unified system to officially and formally keep the public informed. The Bureau has continued to rely on two systems, PRPB's website and the Virtual Library, which are not interconnected for easy access and streamlined information. PRPB launched its Virtual Library in October 2021 with the intention of providing a central location for all policies and procedures, including general and administrative orders, internal rules and regulations, the Agreement, compliance methodologies, action plans, public reports such as the Annual Report on Community Alliances and CIC reports, UOF reports, the Monitor's Office's reports, and a calendar of community events and activities per police area, including PRPB's open meetings, namely "Encuentros Comunitarios." These two systems are managed by the Press Office and BT.  However, informing the public is a discharged responsibility onto the Press Office under GO 125 (Press Office). The Press Office is responsible for organizing, directing, and controlling the efforts of disseminating information to the public through public broadcasts, social media platforms, PRPB's website, mass media, press releases, and conferences. The BT supports the Virtual Library, and PRPB's website. Currently, the website holds some information not found in the Virtual Library and vice versa, specifically on crime statistics and citizen services.

During this reporting period, the Monitor's Office found that PRPB has been more efficient at publishing standing policies as approved, including the 2022 CIC Annual Report through its Virtual Library. However, action plans to comply with the Reform are dated 2016 and the UOF Analysis Report is dated 2019. The Monitor's reports although current have the header in Spanish, but the report itself is in English. Moreover, there was not information readily available on open recruitment announcements and documents from the Academy including syllabus and curriculum materials or community activities calendars including the calendar for open meetings or community encounters. Markedly notable as it holds a direct effect on compliance with the Agreement, crime statistics could only be found on PRPB's website and were not updated (reflecting Type I crime statistics globally through October 2022, and for sexual offenses and domestic violence, for 2021). There is no information on hate crimes or child abuse in either system. PRPB's longstanding problems and ineffective mechanisms remain operationally unresolved. In the interim, PRPB must strategically use its internal resources including the Press Office, public services announcements, and multimedia accounts to report monthly crime statistics with transparency. The Monitor's Office further recommends to use the same resources to inform the public through capsules, tips, and podcasts on crime prevention including what the community can and should do to help police, public education on regulations, advise the public on their rights to file administrative complaints/commendations on PRPB members, individuals' rights to decline voluntary searches, convey strategies to fight crime, report crime trends, invite community participation through structured programming and focus groups, review policies and practices, and to communicate the Bureau's progress on the Reform.

### Paragraph 214: Community Engagement and Public Information - Public Information

*PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | October 2022 – March 2023 |

| | | | |
|---|---|---|---|
| Policy: | Not Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | ☐ Met | ☑ Missed |
| 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | ☐ Met | ☑ Missed |
| 3. 95% of the meetings were widely publicized at least one week before such meeting. | ☐ Met | ☑ Missed |
| 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | ☐ Met | ☑ Missed |
| 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | ☐ Met | ☑ Missed |
| 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | ☐ Met | ☑ Missed |
| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in Worksheets # 3. | ☐ Met | ☑ Missed |

## Compliance Assessment

The policy for Community Encounters (GO 805) was finalized and approved on January 13, 2023. Some of the recommendations made by the Monitor's Office were accepted, while others were rejected including incorporating a resource from SARP to facilitate public orientation about complaints and commendations. The Monitor's Office further recommended the availability of printed material on victims' advocacy services, immigration rights, CSCs and CICs (including meeting dates and locations), diverse functionality information, children and family services programs, community mental health resources, and addiction and rehabilitation services for a broader community outreach. Nevertheless, during a recent meeting with the Reform Office the Monitor's Office was informed that compliance with the GO and Community Encounters would be at the discretion of the area commands including topic selection and guided discussions. This is based on the Reform Office's concerns that the meetings would become overly extensive if inclusive of informing the public on the Agreement, PRPB's progress, individuals' rights to decline consent to voluntary searches, and audit reports. The Monitor's Office notes that these compliance targets are inclusive of the Agreement.

During this reporting period PRPB only submitted a global list of the Community Encounters (Encuentros Comunitarios) per police area with dates and no additional information. PRPB failed to include any supporting evidence for compliance determination by way of publicity, work plans, agendas, crime and administrative complaint statistics, attendance sheets, Q&A sections, written materials, and outcome reports. Moreover, none of the events submitted by PRPB could be found on PRPB's website or its Virtual Library to inform the public. The Monitor's Office notes that incomplete documentation demonstrates

PRPB's inability to fulfill this paragraph's requirements in the Agreement or the GO. Therefore, the Monitor's Office finds that PRPB continues to not be compliant.

Results from the independent community survey through IPSOS validate consistent findings made by the Monitor's Office during previous reporting periods, which continue in this CMR. Among individuals surveyed, they lacked knowledge and information about the Reform, statistics, immigration, partnerships, searches and seizures, UOF, and non-discriminatory practices. This indicates the need for structured and guided campaigns to inform and educate the public about the Reform.

*Pathway Forward*
The Monitor's Office reiterates that without the required training and institutionalization of community policing, including strategic efforts for inclusion and a demonstrated vested interest to keep the public informed, PRPB's efforts will continue rendering insufficient.

The recommendations made during CMR-7 are carried forward in efforts to assist and facilitate PRPB's compliance and increase PRPB's participation. These recommendations include developing a streamlined and uniform presentation through SAEA in coordination with the Reform Office to fulfill the primary requirements in the Agreement, including its progress on the Reform and compliance throughout the 13 police areas. Additional recommendations include education on an individual's right to decline consent to voluntary searches, consistent with paragraph 77 of the Agreement, rights to file administrative complaints or commend officers in the performance of their duties consistent with GO 311 (Public Information on Complaints and Acknowledgements), non-discriminatory practices, and UOF. The availability of this uniform presentation may facilitate each police area in supplementing the local presentation with its own statistics on crime per police area and incorporate the topics of discussion, resources, CIC and CSC's information and participation, along with any other outreach activity including community partnerships/alliances developed in the area. Using multi-media sources, the Press Office, and the Virtual Library in a consistent and accessible manner to publicize coordinated events a month in advance will assist in meeting compliance. These meetings are essential to address areas of community concern and inform the public about PRPB's progress in meeting the requirements of the Agreement.

## Paragraph 215: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

262

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

*Compliance Assessment*

PRPB failed to submit assessment evidence to determine compliance as indicated in paragraph 214. Compliance with policy also requires the publication of a calendar in advance to inform the public of these events, which PRPB has failed to do. Publicizing events using internal resources, the Press Office, and the multi-media division would assist PRPB in meeting compliance.

*Pathway Forward*

The Reform Office may assist each police area in the development of an outlined workplan for scheduling each Community Encounter. Proposed dates must include time, place, and discussion topics. A calendar must be made accessible and available to the public on PRPB's Virtual Library and the event should be publicized through PRPB's multi-media platforms, regardless of the police area holding the event.

## Paragraph 216: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

*Compliance Assessment*

During CMR-7, only 2 of the 13 police areas held the required Community Encounters, and none of them met the compliance requirements on public information meetings based on the documents submitted for review. Neither meeting included summaries of all audits and reports completed, any policy changes

made, or any other significant action taken by PRPB. Further, it did not include public education on Reform progress or an individual's right to decline consent to voluntary searches, consistent with paragraph 77 of this Agreement.

*Pathway Forward*

The Monitor's Office will continue to assess PRPB's compliance with this paragraph. It is important to include summaries of all audits and reports, any policy changes made, along with any other significant actions taken by PRPB during its community outreach meetings.

## Paragraph 217: Community Engagement and Public Information - Public Information

*PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB disseminates crime statistics on a monthly basis. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | ☐ Met | ☑ Missed |
| 3. 100% of hate crimes were publicly disseminated once they occurred. | ☐ Met | ☑ Missed |
| 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | ☐ Met | ☑ Missed |

Note: The portion of this paragraph that requires that PRPB maintain updated crime statistics is assessed together with Paragraph 219 of the Agreement (Information Systems and Technology), and Paragraph 148 (Early Identification System).

*Compliance Assessment*

The established policy to record crime incidents is GO 621 (Management of Incident Reports or Police Services). Per policy, these incidents are recorded on forms PPR 621.1 and PPR 615.8, as applicable. The Monitor's Office is aware that the Auxiliary Superintendency of Management Services (SASG) administers the information system based on the incidents recorded in NIBRS, which results in the management and production of crime statistics. During previous reporting periods, the Crime Statistics Division reported that statistics were collected and recorded but were not publicly available.

During this reporting period, PRPB submitted a certification to the Monitor's Office indicating that the agency collects hate crimes in an application designed for said purposes. No further information was

264

provided to the Monitor's Office for compliance assessment. The Monitor's Office notes that incident reports are of public domain, except for victim information, sexual assaults, if individuals involved suffer from mental health issues, and/or are juveniles.

Additionally, information to the public on crime statistics could only be found on PRPB's website. The information available is not current and does not meet the requirements of monthly reporting as stipulated in the Agreement. PRPB's website continues to reflect Type I crime statistics globally through October 2022 and sexual offenses and domestic violence statistics for 2021. There is no information on hate crimes or child abuse in the Virtual Library or PRPB's website. PRPB's longstanding problems and ineffective mechanisms remain operationally and technologically unresolved. Pertinent documentation must be made available to the Monitor's Office for assessment, including complete investigation reports, NIBRS statistical reports, and hate crime reports to the FBI, including interactions with transexual or transgender individuals.

In the interim, PRPB must strategically use its internal resources including the Press Office, public service announcements, and multimedia accounts to report monthly crime statistics including hate crimes, domestic violence, and child abuse with transparency and straightforwardly.

### Pathway Forward

The recommendations made during CMR-7 are carried through into this CMR as there has been no improvement to the operational and technical limitations previously reported, which prevents the public from being informed, as validated by the Community Survey conducted by IPSOS. PRPB must strategically place itself in an advantageous position by developing a campaign to inform the public through its internal resources and public service announcements. This should include information on crime statistics and Reform progress among other related issues for demonstrated transparency and accountability. Additionally, mass media and all communication resources should be used to publicly convey strategies to fight crime, crime trends, and quality of life issues for education, awareness, and prevention.

# XI. Information Systems and Technology

Technology revision and adaptation remains slow. During the reporting period data accuracy issues persisted in GTE further complicating UOF data currency and accuracy by supervisory review latency.

Procedurally, IT change management continues to be insufficient, an example of which, acknowledged by the Bureau of Technology (BT), are the needed changes and revisions for PTMS. Overall PRPB's technology management acumen lacks rigor presumably due to the lack of experienced staff and practice. This is a key concern given the scale of the submitted Corrective Action Plan (CAP) goals and tasks. As important, current governance practices do not exist institutionally to affect optimal outcomes nor de-conflict priorities and issues between stakeholders. For example, requirements management processes lack formality for reconciling and documenting needed changes in GTE, PTMS, EIS, and other systems.

Regarding contracted subject matter experts, AHDatalytics, the Commonwealth's contractor, continues to contribute to situational awareness by working through critically needed data analysis and its portability to dashboards. The Gartner Inc. deliverables have validated prior observations by the Monitor's Office and their collaboration with the Parties contributed to the draft CAP. Neither of these activities could have been provided solely by the Commonwealth. Unfortunately, and ancillary to these efforts, although contributions were made by AHDatalytics and Gartner Inc., PRPB's lack of technology progress during the reporting period may be attributed to their pausing of IT efforts and actions pending completion of the Gartner Inc. IT Needs Assessment and CAP. Thus, given the continuing deficits they have in technology implementation, the Commonwealth's efforts to improve during the reporting period were again insufficient.

Notable, PRPB's cyber security stance was not evaluated during the reporting period. For that reason, with the baselining that will occur in the CAP, the Commonwealth, USDOJ, and the Monitor's Office should assess for cyber hardening and risk mitigation.

Positively, two applications (Sexual Assault and Domestic Violence Modules) moved forward and have been acknowledged as substantially compliant by the Monitor's Office. EIS, however, continues to languish in development. BT eventually received a requirements statement from the Academy and has committed to revising PTMS before the end of 2023. Yet, while positive, the Monitor's Office was not provided with a discreet schedule for PTMS revision nor the functionality to be delivered. The continuing lack of transparency and poor traceability of documented requirements does not support a premise that management capacity or governance has changed for the positive.

Finally, during the reporting period Body-Worn Camera (BWC) operations were briefed showing promise but the Commonwealth must do better. As briefed, there is not a GO and for that reason PRPB is not fully proofing the technology and concept of operations. The two need not be serial. If the GO is delayed, the Commonwealth should consider splitting administrative tasks so as not to hinder the technical adaptation or experience gained while BWCs are being piloted. Although the CIO noted he could not resolve supervisory failure to follow through on GTE review, no solutions were offered nor "murphy-

proofing" notifications that could be automated. As recently as November 2022 the Monitor's Office was told by agents that they had "no faith" in GTE due to data latency.

Results from the June 2022 Community Survey published during the reporting period show:

- Overall 75% of respondents do not feel that PRPB has the needed technology.
- 70% of community respondents say that PRPB does not adequately publish statistics.
- Only 54% think training frequency is adequate.
- Only 54% think training is sufficient for proper use of IT.
- 60% of agents say that PRPB does not have an adequate early warning system.

Looking forward much remains to be done. This includes:

- Data purification to sustain any level of compliance and data accuracy.
- Implementation of the CAP.
- AH Datalytics contributions are valid and informative and must continue.
- Leverage crime mapping.
- Adequate training by SAEA.
- A cyber assessment should be conducted.

For the above reasons, the Commonwealth's ability to maintain a self-sustaining technology transformation remains in question and is unachievable without contracted experts.

Overall, the Commonwealth's compliance with the six Information Systems and Technology paragraphs is unchanged from CMR-7 where 33% of paragraphs (two paragraphs) were found to be partially compliant and 66% of paragraphs (four paragraphs) were found to be not compliant. This holds true for the CMR-7 reporting period. See figure 11.



*Figure 11. Information Systems and Technology: Paragraph Compliance Status*

## Paragraph 218: Information Systems and Technology

*PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

PRPB is partially compliant regarding technology. Procedural and data inconsistencies continue. Recurring dialog during the reporting period centered primarily on data collection issues in GTE occurring with UOF, and functionality of domestic violence and sexual abuse modules, ProMedia, and PTMS operational functionality. Further, the Monitor's Office notes that there have been no revisions to the existing assessment criteria for this paragraph.

| System | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|
| Project Management System | Substantial | Substantial |
| CAD/CAD Mobile | Partial | Partial |
| NIBRS | Minimally Partial | Not Compliant |
| NCIC – National Crime Information Center | Minimally | Not Compliant |
| GTE | Partial | Partial |
| Promedia (Performance Evaluation System) | Partial | Partial -- ↑ |
| PTMS – Store digitized files, records, curricula and Teaching Plans | Partial | Partial -- ↑ |
| Formal Community Partnerships / Alliances – distribute data and information | Minimally ↓ | Not Compliant |
| EIS | Not Compliant | Not Compliant |
| Supervisory Module | Partial | Not Compliant |
| Domestic Violence and Sex Crimes | Substantial | Substantial -- ↑ |
| Inspections – Operational, Investigative & Administrative | Substantial | Deferred |
| Crime Mapping | Substantial | Partial -- ↑ |
| SAEC – Computerized Analysis and Statistics | Substantial | Deferred |

| System | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|
| Virtual Library – publish policies, procedures, forms, implement n PRPB Website | Substantial | Substantial |
| UOF | Partial | Partial |
| Recording Devices | Partial -- ↑ | Deferred |
| Body Worn Camera | Partial -- ↑ | Deferred |

*Table 3. Information Systems and Technology Systems Reviewed During the Reporting Period*

## Pathway Forward

During CMR-9, PRPB must overcome its continuing lack of adequate management capacity, acumen, governance, oversight, and development issues if it is to achieve a self-sustaining capability to successfully develop, manage, and maintain its technology enterprise. As significant, the Commonwealth must implement the recommendations of Gartner Inc. and AH Datalytics, the Commonwealth's contractors, and take action to implement the CAP and address cyber security and hygiene by initiating if not completing cyber assessments.

## Paragraph 219: Information Systems and Technology

*PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | ☑ Met | ☐ Missed |
| 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | ☐ Met | ☑ Missed |
| 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | ☐ Met | ☑ Missed |
| 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | ☐ Met | ☑ Missed |

269

| | |
|---|---|
| 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | ☐ Met   ☑ Missed |

Note: Review frequency, consistent with the periodicity of assessments in areas III through XII and XIV.

*Compliance Assessment*

From the Community Survey Report[48],

> *"It is a nightmare to search for documents within given periods, …It does not provide any detailed information per reporting period for initiatives per police areas.*
>
> *PRPB intends to comply with par. 208 of the Agreement, wherein community partnerships…can be ultimately measured for effectiveness...PRPB is far from that. We have no information…the data produced is not reliable. PRPB must be responsible for its own audits, and it is not happening as of yet.*
>
> *PRPB must be able to ascertain the reliability of its data for legitimacy, quality, soundness and in alignment with the methodology approved by the parties and the Court to meet compliance."*

In summation although PRPB is partially and in some cases substantially compliant regarding technology (see paragraph 218), operationally the Commonwealth remains affected by data errors and inconsistencies within systems which must be resolved. Overall, their processes are neither predictable nor stabilized sufficiently. Training capacity and delivery by SAEA in support of BT's technology delivery effort is ambiguous at best. Progress is slow and because of its weak compliance operationally, the Commonwealth is not yet compliant.

*Pathway Forward*

PRPB must continue to improve data collection procedures, resolve staffing inefficiencies, master the data analytic methods developed by AHDatalytics, the Commonwealth's contractor, and improve its management and oversight rigor. There is promise but not without the skills brought to bear specifically by AHDatalytics. PRPB must also improve administrative management and control practices, maintain its inventory of documentation, and revise artifacts like the Data Dictionary to ensure currency and alignment with progress to date and to prepare for future revisions. Modernization and future capabilities and functional definition will rely on a well-managed data inventory baseline and properly managed and configured technical and requirements artifacts. The CAP must be resourced and implemented.

## Paragraph 220: Information Systems and Technology

*PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[48] The survey results can be found on the Monitor's Office's website: https://fpmpr.org/tca-surveys?lang=en_US

| Not Compliant | | Review Period | October 2022 – March 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 219.

### Compliance Assessment

Although PRPB is partially compliant with regard to technology reporting and data publishing (see paragraph 218), the operationalization of such technology remains not compliant. The Virtual Library as a platform has been functional and available; however, as noted in this and previous CMRs, the Community Engagement and Public Information and Policies and Procedures sections, continue to be not compliant (See paragraph 219 above). NIBRS practice and functionality is incomplete, and operationalization is not clear. This status is unchanged from CMR-7.

### Pathway Forward

PRPB must complete the development of tools and protocols for collecting, analyzing, and reporting the information required by the Agreement. As examples NIBRS, Community Engagement, and EIS must be fully operationalized. All activities moving forward must be reconciled with the CAP.

## Paragraph 221: Information Systems and Technology

*PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | ☐ Met   ☑ Missed |

271

*Compliance Assessment*

The It Needs Assessment and collaborative activities involving development of the CAP completed by Gartner Inc., the Commonwealth's contractor, bear out that PRPB's CAD and GTE do not perform the functions of a Record Management System (RMS) capably. While not a new reflection, the fact that the Monitor's Office, USDOJ, AHDatalytics, and Gartner Inc. agree is distinction enough that PRPB must take action to acquire a new RMS.

*Pathway Forward*

The Commonwealth should apply its fullest focus on the CAP and take action to implement it. The acquisition of the necessary resources and funding to implement the CAP will be essential to moving compliance forward with this and the other paragraphs within this section.

## Paragraph 222: Information Systems and Technology

*PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Handheld recording device trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaint and witness statements are recorded in 95% of use of force reviews. | ☐ Met | ☑ Missed |
| 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | ☐ Met | ☑ Missed |
| 6. All sampled units had access to functional handheld recording equipment. | ☐ Met | ☑ Missed |

*Compliance Assessment*

As was the case in the previous reporting period, PRPB is not compliant with this paragraph. During the CMR-7 reporting period, the Monitor's Office reviewed GO 123 (Negociado de Tecnología y Comunicaciones) and provided comments to PRPB, which included streamlining and simplifying the GO and clarifying the roles and responsibilities of the personnel assigned to leadership in the division. This

272

policy was subsequently approved and signed by the Commissioner in the CMR-8 reporting period. Further, training will need to be developed and conducted for PRPB to demonstrate improved compliance.

Although not operational, BT has made technology progress with the assets and infrastructure and demonstrated some functional proficiency during the reporting period. Much more remains to be operationally compliant.

### Pathway Forward

As noted in previous CMRs, PRPB must provide evidence of their efforts to comply with the Agreement. PRPB should prepare for and brief its plan for development, operations, training, and support to the Monitor's Office. Operational evidence will require that archiving and retrieval of data and audio is consistent and repeatable.

### Paragraph 223: Information Systems and Technology

*All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. NCIC data trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. NCIC data is considered in 95% of patrol interventions and investigations. | ☐ Met | ☑ Missed |
| 5. All sampled units had access to NCIC data. | ☐ Met | ☑ Missed |
| 6. PRPB safeguards appropriately protect sensitive data. | ☐ Met | ☑ Missed |

### Compliance Assessment

This assessment has not changed from the previous CMR. PRPB is not compliant with this paragraph. As noted in previous CMRs, all officers have not received National Crime Information Center (NCIC) training. Access to NCIC is limited operationally. Officers that need NCIC information must relay their requests to the Centro de Mandos. Although relay of information is typically timely, as observed by the

Monitor's Office during past site visits, direct access to NCIC information in the field is essential to increasing officer, citizen and overarching public safety.

### Pathway Forward

PRPB must continue integrating and implementing NCIC to ensure roll out beyond headquarters and the Area Centro de Mandos. Availability to all authorized and trained officers must be achieved and be in alignment with NCIC operational use criteria. Additionally, effective training throughout PRPB is required from SAEA and BT.

## Paragraph 224: Information Systems and Technology

Nothing in this Agreement shall be construed as prohibiting PRPD from contracting services related to technology and data collection, entry, and analysis.

### Compliance Assessment

As noted in previous CMRs, PRPB is compliant with the allowances of this paragraph. PRPB has contracted with analytic experts from AHDatalytics who are assisting with the development of dashboards and improvements to the auditing capabilities with the Reform Unit. Further, the Monitor's Office contracted with Gartner Inc. to assist with conducting the IT Needs Assessment and collaborating with PRPB to develop the IT Action Plan.

The Commonwealth must consider contracting with other external sources for subject matter experts in the cyber security and hygiene areas as well as program management and support staff for the execution and implementation of the CAP.

## Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures, and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; and d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRPB, and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding UOF and a wide range of other substantive areas; 2) the training of all appropriate officers in the new UOF policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to UOF, UOF to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While the Commonwealth did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of

275

these good faith negotiations. In July 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the U.S. District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB and the Commonwealth during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB and the Commonwealth were expected to develop policies, procedures, and technologies to address serious deficiencies within the Bureau. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. The Commonwealth, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the 11 performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policies and procedures, UOF, and IT. CMR-1 found broad compliance on policy and procedure and certain areas of UOF, but nevertheless found a series of key lapses in UOF investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB's performance, covering a significantly larger number of Consent Decree paragraphs. The format and comprehensiveness of our CMRs has evolved with each report. CMR-5 represents the first full comprehensive assessment and report and the first report in which PRPB's status in the implementation of policy, training, and practice was documented. As such, CMR-5 provided a model for Monitor's reports going forward. As some areas, and paragraphs, of the Agreement are only assessed biannually, CMR-6 along with CMR-7 jointly provide the most comprehensive assessment provided by the Monitor's Office thus far.

# Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative research methods to assess the Commonwealth's compliance with the Agreement in the areas of performance selected for this report. These methods include but are not limited to 1) document reviews of forms that PRPB uses in the daily conduct of its activities; 2) content analysis of policies, training materials, internal investigation files, and other documents that provide detailed evidence of PRPB's efforts to comply with the Agreement; 3) interviews with sworn and civilian PRPB personnel, members of the public who can directly verify PRPB's community outreach and public information activities, personnel from other criminal justice components within Puerto Rico, and additional stakeholders in the reform process; 4) site visits to PRPB facilities, patrol locations, crowd control incidents, CIC meetings, and public information sessions; and 5) analysis of PRPB's data systems and the knowledge management practices that make use of these systems.[49]

## Compliance Levels

Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. PRPB and the Commonwealth's status in the implementation of policy, training, and practice are noted for each paragraph assessed, see figure 11. For those paragraphs where training is not a requirement of the paragraph training is listed as not applicable (N/A).



*Figure 12. Implementation Status: Policy, Training, Practice*

The compliance levels are defined as follows:

- **Fully Compliant**: Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;

---

[49] The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

- **Substantially Compliant**: Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;
- **Partially Compliant**: Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant**: Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Rating Deferred**: Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with a given paragraph, due to no fault on the part of PRPB.

The court draws a clear distinction between a deferred rating and a rating of not compliant due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB and the Commonwealth failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRPB or the Commonwealth, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

## Sampling Methodology

The Monitor's Office uses a variety of sampling methods to draw valid and representative samples for the data sources noted above. These sampling methods include the following:

1. Simple random sampling: Used for large datasets such as arrest reports and search/seizure incidents that occur in very large volumes each reporting period.
2. Stratified random sampling: Used for large but varied datasets such as training, performance, and disciplinary records for sworn PRPB personnel who are stratified by rank.
3. Purposive sampling: Used for datasets that require intentional selection to investigate key topics and cover all stakeholders over the course of successive CMRs, such as interviews with CIC members, training and counseling staff, and PRPB personnel assigned to specialized units.
4. Full enumeration: Used for sources that must be reviewed exhaustively, such as revisions to policies and training curricula, exemplars of forms that PRPB uses to interact with the public, and records for critical incidents such as deployment of chemical agents to disperse crowds.

In addition, the Monitor's Office uses a rolling sampling method for key data sources that require analyzing significant amounts of data on a tight deadline, such as arrests and searches, internal investigations, UOF incidents, etc. These data sources present a significant workload for the Monitor's Office, and for PRPB, because the relevant incidents either occur in large volumes during each reporting period or involve large amounts of documentation per incident. The Monitor's Office has addressed the

tradeoff between sample frequency, sample size, and margin of error, by adapting a "rolling" sampling method that the U.S. Census Bureau has developed for the American Community Survey.[50]

Using this method, the Monitor's Office draws quarterly samples for large data sources that are reviewed biannually. Sample sizes are calculated for each quarter by examining the past six months of incidents and drawing a proportional number of cases for the present quarter. Sample size is determined so that the margin of error for two years of combined data (consistent with the above definition of full compliance) is under 5%, allowing the Monitor's Office to state confidently whether PRPB has maintained substantial compliance on a given paragraph for the past two years and has therefore achieved full compliance. As such, the sample sizes below were determined not only on the number of cases stated for the present CMR, but on the basis of the past two years of data inclusively.

## CMR-8 Samples

The Monitor's Office requested the following samples from PRPB for CMR-8:

| Paragraph(s) | Primary Section | Data Source |
|---|---|---|
| **Common** | Common | Training records (SAEA) for a purposive sample of 12 in-service trainings to be conducted during the reporting period, drawn from a population of 12. |
| **Common** | Common | Training records (PTMS), performance evaluations, and disciplinary records for a random sample of 92 personnel, drawn from a drawn from a population of 11,787. |
| **84, 136-140, 144-153** | Common | Training records for a random sample of 65 civilian personnel, drawn from a population of 677. |
| **25** | Use of Force | PPR 605.1 and PPR 605.2 for a total of 4 reported incidents in which STUs deployed chemical agents. |
| **23-24, 27, 32-35** | Use of Force | PPR 605.1 and PPR 605.2 for a random sample of 12 UOF incidents by STU officers, drawn from a population of 62. |
| **25, 32-35** | Use of Force | Inspection reports for a random sample of 12 armory inspections, drawn from a population of 19. |
| **26** | Use of Force | Documentation for a random sample of 49 officers who failed to qualify after re-test on the same day that would demonstrate that they are relieved of operational duty, disarmed of all authorized firearms (including personal firearms), and summoned for re-training as required by policies, drawn from a population of 274. |
| **28** | Use of Force | Activation/deployment records for a random sample of 89 STU deployments for preventive patrol and policing functions, drawn from a total of 443 incidents. |

---

[50]   United States Census Bureau, American Community Survey Design and Methodology, January 2014, https://www.census.gov/history/pdf/acsdesign-methodology2014.pdf

| 28 | Use of Force | Deployment records for a random sample of 41 STU officers assigned to general patrol and policing functions, drawn from a population of 691. |
|---|---|---|
| 27-29, 32-35, 145-146 | Use of Force | Training and performance records for a random sample of 45 STU members, drawn from a population of 217. |
| 30 | Use of Force | Activation/deployment records for a random sample of 89 STU activations, drawn from a total of 443 incidents. |
| 32-35 | Use of Force | Incident reports and after-action reports for a random sample of 35 planned and unplanned incidents involving crowds, drawn from a total of 153 incidents. |
| 36-39, 41, 44-47 | Use of Force | PPR 605.1, PPR 605.2, PPR 605.3, and PPR 126.2 for a random sample of 71 UOF incidents, as well as PPR 113.2 for any UOF incidents investigated by FIU, drawn from a population of 776. |
| 40, 48, 55 | Use of Force | Training records, performance evaluations, and disciplinary records for a random sample of 13 FIU investigators, drawn from a population of 20. |
| 41, 49, 51, 52 | Use of Force | Investigation files for a random sample of 39 FIU investigations, drawn from a population of 73. |
| 41, 49, 51, 52 | Use of Force | Evaluation files for a random sample of 8 use of CFRB reviews, drawn from a population of 48. |
| 44-47, 222 | Use of Force | FRB evaluation files for a random sample of 36 UOF incidents classified as Level 2-3 with injuries, drawn from a total of 114 incidents. |
| 44-47 | Use of Force | Training records and certificates for the indicated random sample of 22 FRB members, drawn from a population of 80. |
| 56 | Use of Force | Incident reports for a random sample of 62 incidents involving persons in mental health crisis, drawn from a total of 252 incidents. |
| 56 | Use of Force | Training records and additional relevant data for a random sample of 10 CIT officers/coordinators demonstrating that the personnel met all eligibility criteria, drawn from a population of 14. |
| 60-64, 74-76 | Searches and Seizures | Incident reports, search warrants, property seizure receipts and related documents for a random sample of 59 consensual searches and searches based on probable cause, drawn from a population of 710. |
| 65-72, 223 | Searches and Seizures | Arrest reports and related incident reports for a random sample of 63 arrests, drawn from a total of 9,184 incidents. |
| 72 | Searches and Seizures | Investigation files for 11 administrative investigations involving seized property. |
| 89 | Equal Protection and Non-Discrimination | Reports from a random sample of 18 reported PRPB interactions with transgender or transsexual individuals, drawn from a population of 19. |

| 92 | Equal Protection and Non-Discrimination | Investigation files for a sample of eight incidents involving allegations of abuse and mistreatment originating in secure correctional facilities, drawn from a population of eight. |
|---|---|---|
| 96 | Equal Protection and Non-Discrimination | Call records for a sample of 55 hotline complaints, drawn from a total of 576. |
| 99 | Equal Protection and Non-Discrimination | SARP and SAIC Investigation files for a random sample of 26 SARP investigations involving allegations of sexual assault and domestic violence against PRPB personnel, drawn from a population of 31. |
| 84, 104-107 | Recruitment, Selection, and Hiring | Recruitment office files for a random sample of 20 recruited candidates, drawn from a population of 58. |
| 114-116, 132 | Training | Documents demonstrating that a purposive sample of 74 precincts and units held monthly academies and/or in-service training meetings delivered at the beginning of shifts or tours of duty, drawn from a population of 436. |
| 117, 129-131, 133 | Training | Course materials and completed course evaluations from the most recent session of a sample of 9 in-service trainings, drawn from a population of 12. |
| 117, 122 | Training | Training records and selection documents for a random sample of 36 trainers, including documents detailing selection device and criteria for new trainer, drawn from a population of 262. |
| 124, 125, 127, 128 | Training | Training records, performance evaluations, disciplinary records, and additional documents for a random sample of 55 FTOs, drawn from a population of 364. |
| 118-121 | Training | Pre-service training records, credentials, certificates, and/or state licenses for a sample of 64 mentees in the FTO program, drawn from a population of 255. |
| 123, 126-128 | Training | Apprenticeship files for a sample of 64 mentees in the FTO program, drawn from a population of 255. |
| 78, 79, 129-131 | Training | Reports and supporting materials from a sample of 19 trainings, drawn from a population of 20. |
| 13, 81, 136-140, 205, 207 | Supervision and Management | Two months of staffing documents for a random sample of forty-five PRPB precincts and units, demonstrating that all agents report to a single supervisor, and supervisors manage no more than ten agents, drawn from a population of two hundred and eighteen. |
| 60-64, 154-156 | Supervision and Management | Records and reports for a random sample of 8 operational audits, assessments, and inspections, drawn from a population of 13. |

281

| 154-156 | Supervision and Management | Training records for a random sample of 13 operational auditors, indicating that all auditors have received training on internal audits and inspection, drawn from a population of 22. |
|---|---|---|
| 12, 163-165, 168-170, 172-175, 180-189 | Civilian Complaints, Internal Investigations, and Discipline | Supervisory reviews and initial investigation files for a random sample of 71 misconduct complaints that have completed their initial investigation, drawn from a total of 899 investigations. |
| 170 | Civilian Complaints, Internal Investigations, and Discipline | SARP investigation files and related data and communications for a purposive sample of 11 civil lawsuits and criminal prosecutions filed involving PRPB personnel, drawn from a total of 44 lawsuits. |
| 160, 166, 177, 194-196 | Civilian Complaints, Internal Investigation, and Discipline | Training records, performance assessments, and disciplinary records for a random sample of 40 members of the internal investigations' unit, drawn from a population of 172. |
| 177-179, 190, 192, 193, 198-199 | Civilian Complaints, Internal Investigations, and Discipline | SARP investigation files and related data for a random sample of 74 closed misconduct investigations, sustained and not sustained, including investigations that were not completed within prescribed timeframe, drawn from a population of 324. |
| 200 | Civilian Complaints, Internal Investigation, and Discipline | Test results and related records for a random sample of 72 PRPB personnel who were drug tested during the reporting period, drawn from a population of 1,824. |
| 206, 207 | Community Engagement and Public Information | PPR forms and related materials for a random sample of 79 precincts that would demonstrate that each indicated precinct/unit used the SARA Model and collaborated with a broad cross-section of community stakeholders to establish problem solving strategies drawn from a population of 436. |
| 211, 212 | Community Engagement and Public Information | Documents for a purposive sample of five CICs that would demonstrate that the CICs possess the means, staffing, training, and access necessary to fulfill their mission and the requirements of this Agreement, and that PRPB sought collaboration with the CICs, drawn from a population of 14. |
| 214-216 | Community Engagement and Public Information | Advertisements, meeting agendas and minutes, outcome reports, and other pertinent documents for a sample of two open community outreach meetings, drawn from a population of two. |

*Table 4. CMR-7 Data Samples*

## Appendix C: Compliance Status by Paragraph and Sub-Section

The following sections were assessed in this report:

### I.  Use of Force

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 1 | 3 | 0 | 0 |
| Specialized Tactical Units | 0 | 5 | 0 | 0 | 0 |
| Crowd Control | 1 | 0 | 3 | 0 | 0 |
| Force Reporting | 0 | 0 | 4 | 0 | 0 |
| Force Review & Investigation | 0 | 0 | 2 | 1 | 0 |
| Supervisory and FRB Reviews | 0 | 2 | 3 | 0 | 0 |
| FIU Investigations & SFRB Reviews | 0 | 1 | 2 | 2 | 0 |
| Use of Force Training | 0 | 0 | 3 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 0 | 1 | 1 | 0 |
| **Total** | **2** | **9** | **21** | **4** | **0** |

### II.  Searches & Seizures

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Investigatory Stops and Searches | 0 | 0 | 5 | 0 |
| Arrests | 0 | 0 | 8 | 0 |
| Searches | 0 | 2 | 2 | 0 |
| **Total** | **0** | **3** | **15** | **0** |

### III. Equal Protection and Non-Discrimination

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 2 | 0 |
| Discriminatory Policing | 0 | 2 | 2 | 0 |
| Sexual Assault and Domestic Violence | 0 | 3 | 0 | 0 |
| **Total** | **0** | **6** | **4** | **0** |

### IV.  Recruitment, Selection, and Hiring

| Recruitment, Selection, and Hiring Sub-Section | Count of Paragraphs per Section by Compliance Status |
|---|---|

283

| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
|---|---|---|---|---|
| General Provisions | 0 | 1 | 0 | 0 |
| Recruitment Plan | 0 | 2 | 0 | 0 |
| Hiring Reforms | 0 | 5 | 0 | 0 |
| **Total** | **0** | **8** | **0** | **0** |

## V.  Training

| Training Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Pre-Service Education and Training | 1 | 4 | 0 | 0 |
| Field Training Program | 6 | 0 | 0 | 0 |
| In-Service Training | 0 | 4 | 0 | 0 |
| Training Records | 0 | 2 | 0 | 0 |
| **Total** | **7** | **11** | **0** | **0** |

## VI.Supervision and Management

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 1 | 0 |
| Duties of Supervisors | 0 | 0 | 5 | 0 |
| Supervisor Training | 3 | 1 | 0 | 0 |
| Performance Evaluation | 0 | 2 | 0 | 0 |
| Early Identification System | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 1 | 3 | 1 | 0 |
| **Total** | **4** | **6** | **14** | **0** |

## VII.Civilian Complaints, Internal Investigations, and Discipline

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 2 | 0 | 0 |
| Civilian Complaints | 0 | 2 | 0 | 0 | 0 |
| Internal Investigations | 0 | 0 | 2 | 0 | 1 |
| Complaint Intake & Handling | 2 | 4 | 3 | 2 | 0 |
| Investigation of Complaints | 1 | 4 | 8 | 3 | 1 |
| Staffing, Selection, & Training Requirements | 0 | 0 | 2 | 1 | 0 |
| Preventing Retaliation | 0 | 0 | 1 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| Discipline | 1 | 0 | 2 | 0 | 0 |
| Officer Assistance and Support | 0 | 2 | 1 | 1 | 0 |
| **Total** | **4** | **12** | **21** | **7** | **2** |

## VIII.   Community Engagement and Public Information

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Community Oriented Policing | 0 | 2 | 1 | 0 |
| Community Interaction Councils | 0 | 2 | 3 | 0 |
| Public Information | 0 | 0 | 4 | 0 |
| **Total** | **0** | **5** | **8** | **0** |

## IX.   Information Systems and Technology

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 4 | 0 |