**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL NO. 12-2039 (FAB) |
| Plaintiff, | ) | |
| | ) | STATUS CONFERENCE |
| vs | ) | |
| | ) | |
| COMMONWEALTH OF PUERTO RICO, | ) | |
| et al., | ) | |
| Defendants. | ) | |

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE THE HONORABLE JUDGE FRANCISCO A. BESOSA
SAN JUAN, PUERTO RICO
Thursday, June 29, 2023

APPEARANCES:

For the United States:   JORGE M. CASTILLO
                         LUIS E. SAUCEDO

For the Commonwealth:    GABRIEL A. PEÑAGARICANO-BROWN
                         RAFAEL E. BARRETO-SOLA

For the Office of the Governor:
                         MARIA DEL MAR ORTIZ

For the Office of OMB:  HECARIAN MARTINEZ-MARTINEZ

For the FOMB:           KEVIN BORJA

For the PRITS:          NANNETTE MARTINEZ-ORTIZ
                        ANTONIO RAMOS-GUARDIOLA

For the GSA:            EDGARDO GONZALEZ-CANDELARIO

Produced by mechanical stenography; computer-aided
transcription

Joe Reynosa, CSR, RPR
Official Court Reporter

```
 1

 2   For the OATHR:          GUSTAVO CARTAGENA

 3

 4   For the DPS:            ALEXIS TORRES - SECRETARY
                             ARTURO GARFFER
 5                           MIGUEL E. BERMUDEZ-MANGUAL
                             JOSE DIAZ
 6

 7   For the PRBP:           ANTONIO LOPEZ-FIGUEROA - COMMISSIONER
                             ROLANDO TRINIDAD - LIEUTENANT
 8                           ANGEL DIAZ
                             CAONABO VICENTE
 9                           RAFAEL MELENDEZ-BURGOS - LIEUTENANT

10
     For the Federal Monitor's Office:
11                           JOHN ROMERO - CHIEF
                             GARY LOEFFERT
12                           GILBERTO BALLI
                             THOMAS PETROWSKI
13                           MERANGELIE SERRANO

14

15   For the Finincial Oversight Office:
                             CHRISTOPHER GRAHAM
16

17

18

19

20

21

22

23

24

25
```

Joe Reynosa, CSR, RPR
Official Court Reporter

```
 1              (PROCEEDINGS COMMENCED AT 9:30 A.M.)

 2

 3              THE COURT:  Good morning.

 4              You may be seated, please.

 5              THE COURTROOM DEPUTY CLERK:  Good morning, Judge.

 6              THE COURT:  Would you please let me know who is

 7    here.

 8              THE COURTROOM DEPUTY CLERK:  Yes, Judge.

 9              This is Civil Case No. 12-2039, the United States

10    of America versus the Commonwealth of Puerto Rico.  This is a

11    hearing.

12              On behalf of the United States, Trial Attorneys

13    Jorge M. Castillo and Luis E. Saucedo.

14              Representing the Commonwealth, Gabriel A.

15    Peñagaricano and Rafael Barreto-Sola.

16              As per ECF 2413, Judge, the following persons are

17    present for today's hearing:

18              From the Office of the Governor, Maria del Mar

19    Ortiz.

20              From the Office of Management and Budget, Hecrian

21    Martinez.

22              From the FOMB, Kevin Borja.

23              From the Puerto Rico Innovation and Technology

24    Service, Nannette Martinez and Antonio Ramos.

25              From the General Services Administration, Edgardo
```

 1  Gonzalez.

 2          From the Office for the Administration and

 3  Transformation of Human Resources, Gustavo Cartagena.

 4          From the Department of Public Safety, Secretary

 5  Alexis Torres, Arturo Garffer, Miguel Bermudez and Jose Diaz.

 6          For the Puerto Rico Police Bureau, Commissioner

 7  Antonio Lopez-Figueroa, Lieutenant Colonel --

 8          THE COURT:  No, colonel.  He was just promoted.

 9          THE COURTROOM DEPUTY CLERK:  Lieutenant Colonel

10  Rolando Trinidad.

11          THE COURT:  No, Colonel Rolando Trinidad.  You can

12  count the stars on his shoulder.

13          THE COURTROOM DEPUTY CLERK:  Angel Diaz Camarero,

14  Caonabo Vicente, Angel Diaz, and Lieutenant Rafael

15  Melendez-Burgos.

16          THE COURT:  Lieutenant Melendez, are you still a

17  lieutenant?

18          LIEUTENANT MELENDEZ-BURGOS:  Yes.

19          THE COURT:  A lot of promotions recently, so I just

20  wanted to know.

21          THE COURTROOM DEPUTY CLERK:  Counsel for the

22  Commonwealth, Gabriel Peñagaricano and Rafael Barreto.

23          For the United States, as mentioned before, Luis

24  Saucedo and Jorge Castillo.

25          From the Federal Monitor's Office, John Romero,

```
1    Denise Rodriguez and Roberto Abesada.

2              Judge, the Monitor's Team, they are here.  I don't

3    have the names, but they will be in the minutes.

4              THE COURT:  That's okay.

5              THE COURTROOM DEPUTY CLERK:  And the Office from

6    the Special Master, Dr. Alejandro del Carmen, Gary Loeffert,

7    Gilberto Balli, Thomas Petrowski.

8              From the Financial Oversight Officer, Christopher

9    Graham.

10             We are ready to proceed, Judge.

11             THE COURT:  Is there anything -- anybody here from

12   AH Datalytics?

13             MR. ROMERO:  Yes, Your Honor.

14             THE COURT:  Way in the back, hiding.

15             We will start, as we always do, with the overview

16   of the latest CMR, which is No. 8.  The Monitor has provided

17   me with a list of the paragraphs in CMR-8 that are not

18   compliant, but we will start with an overview.

19             Mr. Romero?

20             By the way, Mr. Romero, who has a copy of this that

21   you sent me?

22             MR. ROMERO:  Who has a copy?  We provided the

23   parties.

24             THE COURT:  You provided it to the parties?

25             MR. ROMERO:  Yes.
```

1           THE COURT:  Okay.  Thank you.

2           Go ahead, please.

3           MR. ROMERO:  Good morning, Your Honor.

4           THE COURT:  Let's start with, as you indicated in

5    your list, with use of force.  You have four items.  Go

6    ahead.

7           MR. ROMERO:  So shall I do an overview of the

8    section and then go into the four paragraphs that are

9    noncompliant?

10          THE COURT:  Well, give me an overview of the

11   section, and then we can talk a little bit about each

12   paragraph.

13          MR. ROMERO:  I understand, Your Honor.  Thank you.

14          Good morning, Your Honor.

15          The Monitor's Office would like at this time to

16   provide the Court an overview of its 8th Compliance Report.

17          The Monitor's Office Assessment of Compliance

18   involved lengthy and detailed reviews of policies, training

19   materials, protocols, case files, use of force reports,

20   complaints, arrests and program developed.

21          THE COURT:  How many paragraphs did you review?

22          MR. ROMERO:  We have reviewed 179, Your Honor.

23          THE COURT:  Out of how many?

24          MR. ROMERO:  There are 212 paragraphs in the

25   agreement.  And nine areas were identified in this particular

1  report; use of force, search and seizure, equal protection,

2  recruitment selection and hiring, training, supervision and

3  management, civilian complaints, community engagement, and

4  information technology systems.

5          In addition to review of documents and data, the

6  Monitor Team also conducted regular field visits to various

7  areas commands, specialized units, precincts and districts,

8  and bureau headquarters.  These field visits call for a

9  number of activities, including listening sessions with the

10 community, interviews with Puerto Rico Police Bureau of

11 Personnel, system demonstrations, and training and operation

12 observations.

13         As I indicated, Your Honor, there are 212

14 paragraphs.  However, not all paragraphs are assessed every

15 six months.  So for CMR-8, 179 paragraphs were assessed for

16 compliance with the agreement.

17         For purposes of determining compliance, CMR-8 was

18 compared to CMR-6, which assessed the same paragraphs.

19         The following summarizes the current overall status

20 compliance as of March 31, 2023, the end of the CMR-8

21 reporting period.

22         PRPB had demonstrated progress in achieving

23 substantial or partial compliance with 68 percent of the

24 paragraphs, 121 of 179, an improvement of over 52 percent

25 where in CMR-6 were 93 of 179.

1          However, it should be noted that 21 paragraphs in

2    CMR-6 had a deferred rating.  Many of those paragraphs in

3    CMR-8 have been rated with some level of compliance.  The

4    issues of paragraphs not in compliance only improved by

5    8 percent in the last 12 months, from 61 to 56.

6          In the first section, Use of Force, Your Honor, the

7    Monitor observed similar levels of compliance as in previous

8    reports.  However, most notable difference being that a

9    number of paragraphs in CMR-6 that were rated "deferred" now

10   have a compliance rating of "partial" or "substantial".

11         PRPB, with the assistance of the United States

12   Department of Justice, the Monitor's Office and

13   AH Datalytics, have developed a provisional use of force plan

14   to address inconsistencies in its use of force tracking and

15   has fully implemented the plan.

16         In addiction, with the assistance of AH Datalytics,

17   Use of Force Reports, as well as Supervisory Investigations,

18   are now completed in a timeline established by policy.  This

19   had led to improved rating in this area.  However, we

20   continue to have concerns with the length of time the Force

21   Investigation Unit, FIU, is taking to complete its

22   investigation.  In most cases, the investigations were not

23   completed within the 45 days as required.

24         The Commissioner's Force Review Board, which

25   evaluates FIU investigations, while accurate, were generally

1  not completed within the timeline established by policy.

2         As it relates to dealing with personal crisis, PRPB

3  has yet to add additional CIT, Crisis Intervention Team,

4  officers to its ranks.  PRPB is conducting interviews of

5  potential Crisis Intervention Team officers, but this process

6  continued to lag due to recruitment and subsequent training.

7  PRPB has yet to expand CIT coverage outside of the Arecibo

8  command.

9         As it relates to training, PRPB has not provided

10 documentation to show that the trained delivery compliance

11 threshold has been met.  Specifically, Your Honor, we are

12 talking about the 40-hour in-service training for its

13 members.  And that's an overview of the section.

14         In this section, Your Honor, there were four

15 paragraphs that were identified as noncompliant.  If you

16 would like, I could go through them.

17         THE COURT:  Please.

18         MR. ROMERO:  Paragraph 42, which requires the

19 quality of force review force investigations reviews shall be

20 taken in account in the performance evaluation of the

21 officers performing such evaluation and reviews.

22         We know that PRPB has reviewed and revised its

23 general order.  I believe it's 310 evaluations, but has not

24 been implemented yet, which has affected this paragraph.  So

25 we had to mark it as noncompliant.

1          THE COURT:  But it's noncompliant because general

2    order 310 has been revised.

3          MR. ROMERO:  It's been revised, but implementation

4    into the evaluations is not there yet, Your Honor.

5          THE COURT:  Okay.

6          MR. ROMERO:  The second paragraph that is not in

7    compliance is paragraph 49.

8          A supervisor responding to a serious use of force

9    allegation or excessive force shall immediately notify FIU.

10   FIU shall respond to the scene and commence an investigation.

11   FIU may decline a respond to the scene following consultation

12   approval by FIU.

13         THE COURT:  To make the record clear, FIU is the

14   Force Investigation Unit.

15         MR. ROMERO:  Force Investigation Unit, correct,

16   Your Honor.  That's right.

17         The pathway forward for -- I am getting ahead of

18   myself, Your Honor.

19         The pathway forward for paragraph 42, the one we

20   just spoke about, the evaluations, this performance

21   evaluation process must be outlined in the evaluation policy

22   and procedures and incorporated into supervisory training.

23   To do so reiterates the value of such work in officer's

24   performance, encourages higher quality investigation work,

25   and identifies ways in which investigations can seek to

1    improve year to year.

2         So we provided PRPB with the pathway forward as to

3    what they need to do to be in compliance with that paragraph.

4         As I indicated in 49, the pathway for a supervisor

5    responding to a serious use of force or allegation of

6    excessive force shall immediately notify FIU, Force

7    Investigation Unit.  FIU shall respond to the scene and

8    commence an investigation.  FIU may decline to respond to the

9    scene following consultation and approval by the FIU

10   supervisor.  Declaration shall be documented in writing.

11        We didn't see many of this thing -- that happening

12   actually in the data provided to us.

13        The pathway forward; PRPB must ensure that prompt

14   notification is made to FIU in cases regarding their

15   involvement.  For the most part, this was the case.  FIU must

16   complete its use of force investigation within the 45 days.

17   And that's the issue for this paragraph.

18        We understand there is a lot of work into closing

19   an investigation.  FIU, they investigate serious use of

20   force.  However, the department has outlined in its policy

21   that its 45 days to complete it.  And we have seen progress

22   since CMR-8, Your Honor.  Especially in the second half of

23   CMR-8.  Our expectation is that that number should increase

24   in terms of closing cases within the 45 days.

25        The next paragraph, Your Honor, paragraph 51, which

1  states that, FIU shall complete its administrative use of

2  force investigation within the 45 days of use of force,

3  absent exceptional circumstances.

4         At the conclusion of each use of force

5  investigation, FIU shall prepare a report on the

6  investigation and shall forward the report to the CFRB, which

7  is the Commissioner's Force Review Board, for review and

8  tracking.  We have not observed that happening at this point.

9         Our pathway forward; PRPB should ensure that all

10  FIU investigations are completed in 45 days as outlined in

11  General Order 113.

12         PRPB must ensure that FIU has adequate staff and

13  resources to complete these investigations.

14         Further, PRPB must work with internal DSP Units and

15  external stakeholders to address FIU's inability to receive

16  forensic data in sufficient time to complete the

17  investigation in 45 days as required.

18         Your Honor, on a note, I would just like to say

19  that, in the second part of CMR-8, PRPB has increased -- has

20  double the size at FIU.  Something we have recommended in a

21  number of reports, and we are encouraged to see that

22  additional -- the doubling of the members there.  We thought

23  it was understaffed initially.

24         The fourth paragraph, Your Honor --

25         THE COURT:  When you say that FIU was doubled in

1    size, from what to what?

2             MR. ROMERO:  It had approximately 18 to 19 members

3    before.  Now it's doubled to 37.  I think it's 37.

4             And now that was a welcome for us because we

5    understood they handle all the cases throughout the island,

6    and the 18 to 19 people they had were insufficient to

7    complete that task.

8             The fourth paragraph is paragraph 57.  PRPB shall

9    train field operation unit officers in CIT program -- CIT

10   being Crisis Intervention Team -- and shall ensure that CIT

11   trained officers are assigned to each shift, each policy

12   region.

13            PRPB shall provide crisis intervention training to

14   all dispatchers to enable them to identify calls for services

15   and involve behavioral -- that which involved behavioral or

16   mental health crisis.

17            As noted above, PRPB must accelerate the expansion

18   and subsequent training of CIT to 13 area command.

19            At this point, Your Honor, a pilot project was

20   established in Arecibo which completed in November 2020.

21   However, it has not been expanded beyond that point since

22   then.

23            THE COURT:  Has anybody in any of the other area

24   commands been trained in this?

25            MR. ROMERO:  My understanding, not in the period of

1    CMR-8.  However, 11 people were trained.  I believe it was

2    eight from Carolina, two from San Juan and one from Humacao.

3    And an additional 11 are scheduled to be trained from those

4    same areas, same numbers in July as well.  So there is --

5            THE COURT:  July meaning next month?

6            MR. ROMERO:  Yes.

7            So those are the four noncompliant paragraphs,

8    Your Honor.

9            THE COURT:  Mr. Peñagaricano, any comments on what

10   the Monitor said on use of force and the noncompliant

11   paragraphs?

12           MR. PEÑAGARICANO:  Yes, Your Honor, plenty.

13           THE COURT:  Don't tell me, "Oh, we are working on

14   it."

15           MR. PEÑAGARICANO:  No.  More than that.  More than

16   that.

17           THE COURT:  And, please, I know you are a tall

18   person, but try to use the microphone.

19           MR. PEÑAGARICANO:  Sure.

20           Your Honor, first and foremost -- and I think

21   Mr. Romero clearly explained it -- we must not lose sight of

22   the fact that a comparison in this section of the consent

23   decree from the CMR-6 to the CMR-8 shows vast improvement in

24   use of force in this consent decree case.

25           THE COURT:  Do you agree, Mr. Romero?  Vast

```
1    improvement?

2            MR. ROMERO:  Your Honor, they are in compliance in

3    many of the paragraphs.  Not total compliance in all of them,

4    but I have seen significant improvement, Your Honor.

5            THE COURT:  Okay.

6            MR. PEÑAGARICANO:  Significant.

7            And, Your Honor, we think that's due to the fact

8    that Your Honor ordered, approved a use of force data plan

9    that was fully implemented, as the Monitor said,

10   successfully, and that shows in the CMR-8, and also to the

11   collaboration of the Monitor with the bureau's contractor

12   AH Datalytics with the dashboards.  Just to give two examples

13   of things that we think are really working in the use of

14   force.

15           Now, of course, it's a continuous process, and

16   there is still a lot of work to do.  These are four

17   paragraphs that are with zero compliance.

18           THE COURT:  I requested that Mr. Romero give me the

19   paragraphs that were noncompliant, but, obviously, there are

20   some paragraphs that are fully in compliance and some

21   paragraphs that are partially in compliance.  But if we went

22   through all of that, we will be here till the 4th of July.

23           MR. PEÑAGARICANO:  Right.

24           And I think there are things in motion, Your Honor,

25   precisely because it's a continuous process, and
```

1    AH Datalytics continue to work with the Monitor regarding

2    some of those paragraphs that are there.  And also the

3    training is in process through the training plan and the

4    in-service training.

5            And, also, I will let Colonel Trinidad expand a

6    little bit on some of these items, especially on the CIT

7    paragraph there.

8            THE COURT:  Before I hear from Colonel Trinidad,

9    Mr. Romero, tell me a little bit about training overall.

10           MR. ROMERO:  Training overall -- our biggest

11   concerned, Your Honor, in the area of training was, PRPB is

12   required to train all its personnel in core policies, 40

13   hours every year.  In 2022, that just didn't --

14           THE COURT:  By every year, you mean every calendar

15   year.

16           MR. ROMERO:  Every calendar year.

17           THE COURT:  So if someone is trained this month,

18   June of 2023, the next training should be in June of 2024.

19           MR. ROMERO:  That would be the case, yes,

20   Your Honor.

21           THE COURT:  You can't wait until the end of 2024 to

22   train that particular person.

23           MR. ROMERO:  Every officer should be trained within

24   a one-year period.  And what we found that in 2022, the

25   40-hour training was kind of nonexistent.  We understand they

1    were putting through a number of academy classes.  However,

2    the agreement requires 40 hours in-service training.

3              We work with PRPB.  The initial plan was that in

4    2024 they would get up to 100 percent.  We agreed with USDOJ

5    that we needed to do that immediately.  We couldn't wait till

6    2024.  And PRPB agreed by the end of calendar year 2023 to

7    have trained 75 percent.  And we have just checked with them

8    and --

9              THE COURT:  This is the 40-hour in-service

10   training.

11             MR. ROMERO:  Right.

12             At this point, they are on pace to meet that

13   75 percent threshold.  And for 2024, it needs to be

14   100 percent going forward.

15             THE COURT:  By the end of 204.

16             MR. ROMERO:  The end of 2024, the entire department

17   needs to be trained.  And going forward, beyond that, every

18   year.

19             THE COURT:  And what about specialized training?

20             MR. ROMERO:  Specialized training are conducted by

21   the units themselves with the sanction of the academy.  And

22   that's been okay.  We looked at DOT.  We looked at -- there

23   is some training in FIU.  Granted, they have just received --

24   they doubled in size.  So some of those officers don't have

25   the training that we requested that they have, involving

1    firearm discharges.

2            When I was in NYPD Firearm Discharges, I headed up

3    a team.  I conducted all the investigations for Manhattan,

4    Manhattan North Borough Command of Firearm Discharges,

5    irrespective of whether it was at an animal, whether it was

6    at a person.  Just a firearm discharge.  And when we looked

7    at the reports initially back when we first started

8    compliance a couple years ago, we noticed that the FIU

9    officers needed additional training in that area.

10            Many have received it.  But now with the influx of

11   new members, they are not all trained.  But my understanding

12   is that the academy has set up the date to train all officers

13   in all requirements of FIU.

14            THE COURT:  Thank you.

15            Mr. Peñagaricano, you said that Colonel Trinidad

16   was going to expand.

17            MR. PEÑAGARICANO:  Yes, sir.

18            THE COURT:  Colonel, please.

19            Because you will be speaking in Spanish, please

20   speak slowly and please pause if the interpreter needs to

21   translate your comments.

22            Please go ahead.

23            COLONEL TRINIDAD:  Agreed.

24            Good morning.

25            THE COURT:  By the way, first of all,

1    congratulations on your promotion.

2           Go ahead.

3           COLONEL TRINIDAD:  Thank you very much, sir.

4           In paragraph 42, obviously, the policy was recently

5    approved last week, the form.  So, obviously, we acknowledge

6    we are not complying in that area because this was a revised

7    policy that was recently implemented.  We believe that for

8    the next semester of assessment we will be in a better

9    position to demonstrate compliance in this area.

10          As to paragraph 49, as Monitor John well stated,

11   the Commissioner has acknowledged that the amount of

12   personnel assigned to the Use of Force Investigation Unit,

13   known as FIU, required additional assignment of personnel.

14   And to this end, additional investigative personnel, and

15   supervisors were assigned.  I am informed the unit is now

16   comprised of 44 people, divided in regions, in order to be

17   able to adequately attend to incidents.

18          This assignment and change in the configuration of

19   the unit, which includes a new director, will result in

20   better performance.

21          THE COURT:  Who is the new director?

22          COLONEL TRINIDAD:  That is Lieutenant Cosme Oliver.

23          THE COURT:  Please go ahead.

24          COLONEL TRINIDAD:  And as to the delay, obviously,

25   attending to complaints in the term of 45 days has been

1   dragging since the situations, obviously, that occurred in

2   2019-2020.  We believe though that the investigations that

3   are now being received recently are being attended to within

4   the term, while the attention to these is being dealt with as

5   to the delays and request for extension of time.

6           In terms of the Crisis Intervention Team, although

7   it is true that in 2019, between November 4 and 18, a new

8   pilot team was trained in Arecibo, we have attended to the

9   request to continue the expansion in the police regions.  And

10  a course was offered to 11 people from June 12 to 16 of this

11  year of the police regions of San Juan, Carolina and Humacao.

12  And there is a second group of 20 additional candidates to be

13  trained between July 10 and 14 of this year.

14          There are other people already going through the

15  selection process and by which the central coordinator,

16  Lieutenant Edgar Lugo, is asking the academy additional dates

17  for their training, thereby to continue the expansion of the

18  Crisis Intervention Teams in all 13 regions that comprise the

19  regions of the police bureau.

20          THE COURT:  Excuse me, Colonel.  How many

21  instructors are there under Lieutenant Lugo?

22          COLONEL TRINIDAD:  He is the central coordinator of

23  the Crisis Intervention Teams.  And the instructors belong to

24  the Puerto Rico Police Academy, not Lieutenant Lugo.

25          THE COURT:  Let me ask you -- maybe Mr. Romero can

1    also answer the question -- you have people trained already

2    in Arecibo and you have people who were just trained this

3    month in San Juan, Carolina and Humacao.

4            Can those trained people or officers be utilized as

5    instructors, Mr. Romero?

6            MR. ROMERO:  Your Honor, I don't think they the

7    accreditation to be identified as an instructor, certified,

8    at this point.  I think the academy has a process that

9    certifies their instructors.

10           THE COURT:  You are going to have to speak a little

11   slower because she can't follow you, the interpreter can't

12   follow you.

13           MR. ROMERO:  I don't think, Your Honor, at this

14   point that the 12 or 13 that are in Arecibo have the

15   designation as instructors.  I think that the process at PRPB

16   follows for that.

17           Another note, Your Honor, I would just like to

18   point out that I believe the last five or six classes of

19   recruits took that CIT course.  Now, I understand why PRPB

20   would not take someone right out of the academy and make them

21   a CIT trained officer.  They are still in the process of

22   learning.

23           THE COURT:  But at least they have the knowledge.

24           MR. ROMERO:  However, some of those people received

25   that training two years ago.  They have now two years on

1  patrol.  Some of those people could very well, with a

2  refresher source, be CIT certified officers, I think.  And we

3  recommended that in our report.  Granted, not the newer

4  officers who just came out of the academy, but some of the

5  officers who might have come out two years ago could very

6  well be --

7            THE COURT:  You think that with a refresher course.

8            MR. ROMERO:  Right.  I mean, they took the course

9  two years ago.  They didn't get a refresher course, but they

10 wouldn't be required to take the entire process, I think.

11 That would be an option.

12           THE COURT:  Is that possible, Colonel?

13           COLONEL TRINIDAD:  Yes.  Obviously, to impart

14 instructions as part of the agreement, there is a 40-hour

15 training to develop instructors in accordance with the

16 subject matter that they will be providing teaching on.

17           Certainly, the Puerto Rico Police Bureau has

18 carried out two or three announcements, job announcements,

19 and the result of this obviously has been the people that we

20 have recruited for the expansion in the 13 areas.

21           THE COURT:  But what Mr. Romero says is that there

22 are people who, as part of their basic academy, have had

23 instruction in crisis intervention.  And his suggestion -- I

24 don't know if it's possible -- is that those people, not that

25 they become instructor, but that they are knowledgeable

1  enough to become crisis intervention officers with a

2  refresher course, if they took the course sometime ago and

3  have experience on patrol.

4       COLONEL TRINIDAD:  Your Honor, in that sense, we

5  would have to evaluate, because the requirements for a person

6  to work in crisis intervention obviously has to be evaluated

7  by our department of psychology.  Also, they have to be

8  evaluated in terms of their attitude, obviously, and that

9  they also be willing or wishing to belong to the team, make

10  sure they are a good resource.  Because we know that not

11  everybody has certain abilities that allow the person to

12  resolve problems in the most peaceful way possible, which is

13  the intent when intervening with a person in crisis and avoid

14  the use of force.

15       THE COURT:  Anything else on that paragraph?

16       COLONEL TRINIDAD:  As to that paragraph, no.

17       However, I would like to mention that within the

18  plan of 40hours in-service, this includes five core topics,

19  that is, the topic of the use of force, the topic of searches

20  and seizures, arrests and citations, and also protection and

21  nondiscrimination.  And also we are going to include in that

22  equal protection employment and what is community police.

23       The Puerto Rico Police agreed under the plan to

24  train 75 percent of its members on these subject matters

25  during this year.  And we agreed that by June 30,

1    specifically regarding the topic of use of force, we would

2    have achieved 42 percent of the totality of the members of

3    the Puerto Rico Police Bureau.

4            THE COURT:  That's the day after tomorrow.

5            COLONEL TRINIDAD:  That is correct.  And as of

6    today, we have 89.54 percent of compliance in that training.

7    And our projection is that, by June 17, we will start

8    implementation of the other trainings that we committed to.

9            That is all, Your Honor.

10           THE COURT:  Thank you.

11           Mr. Saucedo, any comments on use of force?

12           MR. SAUCEDO:  Yes, Your Honor, good morning.

13           We wanted to mention that on use of force for

14    CMR-7, the seventh report, there were six paragraphs that

15    were noncompliance, and the Commonwealth was able to move two

16    into partial compliance.  They were paragraphs 41 and 45, and

17    those relate to tracking use of force and also completing use

18    of force reports on time, as the Monitor mentioned.

19           On paragraph 42, which remains a noncompliance, we

20    agreed that the revised policy on performance evaluations

21    explicitly includes having supervisors and command staff

22    review the supervisory reviews of use of force.  In other

23    words, the use of force paragraph 42 requires that

24    supervisors be held accountable for the quality of their use

25    of force reviews, and that is now going to be included as

1    part of the annual performance evaluation process.

2         THE COURT:  Supervisors you mean at what level?

3         MR. SAUCEDO:  There are roles at every level, but

4    the first-line supervisor sergeant has the first

5    responsibility to make sure use of force reports are complete

6    and they are timely.  So the evaluation of that supervisor,

7    which would be done by a lieutenant of that sergeant would

8    need to ask those questions.  "Was the sergeant being

9    diligent in reviewing use of force reports?"

10         51 and 57 have been discussed, and we commend the

11    Commonwealth for adding additional Force Investigation Unit

12    investigators to the unit.  There has also been a change in

13    leadership in that unit.

14         I think the things that are still needed is, one of

15    the reasons that investigations take more than 45 days is

16    because investigators from FIU need -- depend or other units

17    to get pictures, to get forensic evidence of a use of force,

18    especially if it's a complex scene with firearm discharges.

19    So, in addition to the staffing, FIU really needs the support

20    of all of the other units, and it was mentioned by the

21    Monitor's report as part of the path forward, to include

22    support from PRPB and DPS units to make sure that FIU is able

23    to complete its investigations within those 45 days.

24         THE COURT:  Well, Colonel Trinidad said that recent

25    investigations are being completed within those 45 days and

1    that they are working on getting up to date on the previous

2    ones that are late.

3           MR. SAUCEDO:  That's good news.  I think it's

4    subject to validation by the Monitor during CMR-9 for the

5    next evaluation period.

6           Finally, just to note, on paragraph 57, with regard

7    to Crisis Intervention Teams, we agree that this is an area

8    that needs a lot of work.  Only one of the 13 areas has a

9    functional team made up of direct first-responders who can go

10   to the scene and deescalate a crisis intervention.

11          THE COURT:  Is that working in Arecibo?  Is it

12   working well.

13          MR. ROMERO:  Yes, Your Honor.

14          THE COURT:  It is?  Okay.

15          Who is the commander in Arecibo?

16          COLONEL TRINIDAD:  That would be Lieutenant Colonel

17   Jose Rosario Polanco.

18          MR. SAUCEDO:  Colonel Trinidad mentioned that the

19   training plan includes benchmarks and goals in five areas,

20   including use of force.

21          THE COURT:  Yes, he mentioned them.

22          MR. SAUCEDO:  Yes.

23          We would like to add to that that the training plan

24   also requires that specialized units be trained at

25   100 percent in 2023 and 2024.

1    So while we have these benchmarks of 75 percent in

2  2023, during the same year in 2023, we expect all specialized

3  units to be trained at 100 percent.  And that includes --

4    THE COURT:  You are talking about crisis

5  intervention?

6    MR. SAUCEDO:  That includes the Crises Intervention

7  Teams.  It includes others, as well as Crisis Intervention

8  Team.

9    Training is an important part of a CIT program, but

10  there are other parts that are just as important.

11  Officers -- having a dedicated unit builds experience in

12  handling some of the most toughest calls that officers need

13  to respond.  Sometimes these are family members that have a

14  mental health diagnosis, haven't taken their medication,

15  maybe threatening a family member, and family members are

16  calling police for help.  And officers need to make

17  split-second decisions when they arrive on the scene.

18    It's important to get as much information to those

19  responding officers as possible.  So we need cooperation from

20  call-takers, from dispatchers, to get that information to the

21  CIT officers to make sure that when they arrive they have as

22  much information as possible.

23    We are concerned that this area has lagged.  It

24  stalled.  We heard this week that people were trained this

25  month and will be trained next month.

1          What we would like to do is engage with the

2    Commonwealth to come up with an implementation plan for this

3    area where we would structure -- and answer the questions

4    that Your Honor has posed today.  You know, can existing CIT

5    officers be trainers?  I think we need to explore ways of

6    accelerating, getting more areas online and getting those

7    teams assigned.  And we believe that having a coordinated

8    structured plan with deadlines, with people responsible is

9    the way to go here.

10          Finally, Your Honor, I wanted to mention that the

11   Monitor was able to move six deferred paragraphs from CMR-7

12   into partial compliance, because, for the first time ever,

13   the Commonwealth has been able to produce to the Monitor

14   accurate information on use of force.  That was made

15   possible, as Mr. Romero and Mr. Peñagaricano mentioned, all

16   of that as a direct result of collaborative work that took

17   place starting last year on a use of force data plan.

18          As this Court may remember, the Court wanted us to

19   take June of 2020 and examine it and make adjustments to it.

20   That was all done.  And for CMR-8, for the first time in this

21   case, the Monitor has reported that PRPB has accurate use of

22   force data.  That's important because the Monitor can now

23   take representative samples to look at other paragraphs.

24          So as we were hopeful that other types of

25   implementation plans are going to have similar success, we

1    just need to make sure that we meet all the deadlines and

2    that we are trying it back to compliance.  But we wanted to

3    make sure that we highlighted that achievement in this

4    particular report.

5              THE COURT:  Thank you.

6              Dr. Del Carmen, is there any comment that you would

7    like to make?

8              DR. DEL CARMEN:  No, Your Honor.

9              THE COURT:  No?  All right.

10             Well, let's go on to search and seizure,

11   Mr. Romero.

12             MR. ROMERO:  Your Honor, I can give a quick

13   overview of the search and seizures.

14             THE COURT:  Slowly.

15             MR. ROMERO:  The Monitor's subject matter expert is

16   here, if the Court needs further details into as to what's

17   going on, but I can provide an overview.

18             Overall, the Commonwealth's compliance with the 18

19   paragraphs assessed during this reporting period within

20   search and seizure reflect the same levels of compliance as

21   what was noted in CMR-6.  Fifteen of the 18 paragraphs were

22   assessed as noncompliant.  They have a large number of the

23   noncompliance.

24             We observed some improvement as it relates to

25   search warrants where applications are being properly

1   reviewed and approved by supervisors.  The resulting arrest

2   are likewise being reviewed and evaluated by supervisors and

3   commanders.  However, we have concerns involving the

4   following:  Poorly written and incomplete filing of arrest

5   reports continue to be a serious issue.  Also, the not

6   properly documenting the particular facts in each arrest

7   case.  Some arrest files submitted to the Monitor's Office

8   for review and analysis were not complete.  Many of the files

9   reviewed contained weak, probable cause language, especially

10  those conducted via voluntary consent.

11         It should be noted that the Commonwealth has begun

12  working on an implementation plan to address many of the

13  issues raised in the Monitor's report.

14         As I indicated, Your Honor, there are 15 paragraphs

15  in this section, search and seizure.

16         THE COURT:  Who is the expert?

17         MR. ROMERO:  Rafael Ruiz.  I will defer to Rafael

18  Ruiz.

19         THE COURT:  Come forward, please.  Let us know what

20  you can say about searches and seizures.

21         MR. RUIZ:  Good morning, Your Honor.

22         Basically, I can summarize three or four points

23  that indicate why these 15 paragraphs are noncompliance, and

24  those are, as the Monitor said, Monitor John Romero, a lack

25  of proper language to establish probable cause in police

```
 1    reports.  That's been consistent over the last, I say, four
 2    or five CMRs that we have submitted to the Court.
 3              THE COURT:  By that, do you mean use of boilerplate
 4    language?
 5              MR. RUIZ:  What happens is, by not establishing
 6    probable cause in each case, that leads to boilerplate
 7    repetitive language.  And I have indicated that to the Police
 8    Department many times.
 9              As the Monitor said, John Romero, also incomplete
10    files, arrest files submitted to the Monitor, many times --
11    in some cases, even the police report itself is not included
12    in the file.  And I just don't understand that.
13              Besides that, forms that are required by the police
14    policies are not included in the files.
15              And the other issue is a lack of --
16              THE COURT:  When you say "the file," you mean the
17    file that's going to be presented to the Court?
18              MR. RUIZ:  Well, exactly.  They submit to the
19    Monitor a file that's supposed to contain the police report.
20    Every police form that is required for that incident should
21    be submitted to the Monitor for review.
22              In so many cases, forms are not -- a copy of the
23    forms is not in the file.  And, like I said, in a couple of
24    cases, the police report itself is not included in the file.
25              In general, a lack of training, especially
```

1    in-service training, is also leading to this noncompliance in

2    this section, sir.

3            There has been progress, as the Monitor said.

4    There was some issue with one form, which is the

5    ingress/egress form or the booking sheet when they make an

6    arrest.  It's been modified, as recommended by the Monitor.

7    And now officers are required to include it in the files,

8    whether they ingress, they put somebody in a cell or not.

9            In the past, if an arrest was made and the arrestee

10   was not put in a cell, officers would not fill out that form.

11   And that form is really very important that it be completed

12   and submitted to the Monitor.  But there has been some

13   progress in that case.

14           And also, as John said, there's an action plan that

15   we are working with the Police Department and with the

16   Department of Justice to try to address these issues.  So we

17   should be reporting to you in the next hearing on the

18   progress of that action plan.

19           THE COURT:  Mr. Peñagaricano, please.

20           MR. PEÑAGARICANO:  Thank you, Your Honor.

21           Your Honor, in the last hearing we had in January,

22   the parties signaled to the Honorable Court that this was

23   certainly an area that needed big work.  And as a result of

24   that, the parties informed that they would be working on an

25   action plan that would cover the 18 paragraphs of searches

1    and seizures of the consent decree.  And over the last few

2    months, the parties have been working on that document.

3              In March, the first draft was prepared by the

4    Bureau and it was delivered to the parties.  Both the Monitor

5    and -- the parties commented the document, returned it.  The

6    Bureau has been working on that document.  There were several

7    conferences between the parties, discussing the documents,

8    and more work that the draft needed to be included.

9              As a result of those discussions more recently, the

10   Commonwealth decided to assign the project to a project

11   manager.

12             THE COURT:  Who is?

13             MR. PEÑAGARICANO:  As of today, it's Hailey Molina,

14   who is here present.

15             And we have agreed with Plaintiff DOJ that we will

16   deliver a more complete draft completed by the project

17   manager by July 20th.  And we hope that after the parties

18   reveal that draft, the parties would be ready to file it with

19   the Court by August.

20             THE COURT:  By August what?

21             MR. PEÑAGARICANO:  31st.

22             THE COURT:  I knew you were going to say that.

23             Anything else?

24             Colonel, anything on search and seizure?

25             COLONEL TRINIDAD:  Yes.

1    As we well acknowledge, we have been working to
2    train personnel in development to include in the statistical
3    report the elements under Rule 11 of criminal procedure that
4    allow us to conduct arrests and searches without a warrant,
5    and that these well-founded motives be well articulated in
6    the 621 reports drafted.
7    THE COURT:  When you say "arrests and seizures
8    without a warrant," that would include consent?
9    COLONEL TRINIDAD:  Yes, Your Honor that is one of
10   the exceptions.
11   Also, we have discussed this with Commissioner
12   Lopez-Figueroa and Secretary Alexis Rio about creating
13   regional compliance monitoring groups that would allow us to
14   carry out inspections and assessments to detect any
15   compliance and noncompliance before the arrival of the
16   Monitor's team, that way we could correct these.
17   Also with the team from the Datalytics, we are
18   developing score cards and monitoring through the dashboards,
19   which allows us to oversee or supervise from closer up any
20   compliance.
21   With responsibility requests, and I received
22   approval for a universal license so that all members of the
23   Puerto Rico Police Bureau, we will be sharing this with the
24   Office of the Special Master, the Monitor and DOJ so that
25   they will have access to the information from the dashboards

1   so that each area commander and his or her supervisory team

2   can observe compliance, their compliance.

3            There have been several measures we have taken in

4   the bureau in order to improve our compliance in these

5   aspects, including training of staff.

6            THE COURT:  Now, Mr. Ruiz has indicated that some

7   of the police -- sometimes police reports are not included in

8   what the Monitor has reviewed, which appears that that report

9   is not included when you go before a judge for probable

10  cause, and that some -- at least what Mr. Romero has told me,

11  that sometimes an agent will testify based on his personal

12  notes.

13           I don't know if that's happening or not, but it's

14  important to have all documentation to the Court and that

15  appropriate language be used that would support probable

16  cause after a search and seizure or an arrest.

17           There has been a problem for a while now with

18  boilerplate language.  I would like to make a suggestion.

19  It's up to you whether you want to follow it.  I have seen

20  some of this language when there is a case brought before

21  this court based on an arrest done by the Puerto Rico Police.

22  And some of that language is difficult -- it's not difficult

23  to understand, but it's -- well, let's put it this way:

24  People don't talk that way.

25           So what I suggest is that the agent who writes out

 1    these reports read it out loud, because sometimes they use

 2    language that you don't use normally.  You try to dress it up

 3    a little bit, and it doesn't turn out that well.  If you just

 4    write the way you talk, then it will be easier for everyone

 5    to understand.  That's a suggestion.

 6              Thank you very much, Colonel.

 7              Mr. Saucedo, on searches and seizures, please.

 8              MR. SAUCEDO:  Your Honor, this is an area of

 9    serious --

10              THE COURT:  What is your -- how do you see this

11    regional compliance monitoring group?

12              MR. SAUCEDO:  The auditors that would be --

13              THE COURT:  I don't know -- he mentioned regional

14    compliance monitoring groups that are being set up.

15              MR. SAUCEDO:  I think that's a great idea.  That's

16    part of the Commonwealth's plan to accelerate compliance to

17    have reform managers assigned from the reform office working

18    hand-in-hand with points of contact in the field to address

19    deficiencies and compliance in every case so that they would

20    know in real-time if there is a problem in certain areas and

21    go trouble shoot.  So that would be fantastic.  And I know

22    it's in the agenda, a status update on reforming the reform

23    office, which includes bringing these resources to that unit.

24              But, Your Honor, this is an area of serious

25    concern.  This is an area that has stalled.  As Mr. Ruiz and

1    Mr. Romero mentioned, a lot of work has gone into developing

2    a corrective action plan.  We do hope to have it done before

3    August 31st.

4              THE COURT:  August 30.

5              MR. SAUCEDO:  August 30th.  Well, no, not

6    August 30th.  But we agree that it's important --

7              THE COURT:  If you are going to get it by July 20,

8    you may be able to get it to the Court by mid-August.

9              MR. SAUCEDO:  Well, Your Honor, part of the impetus

10   in getting this plan out is, we wanted to start having an

11   impact in CMR-9 so that we can see an effect, because CMR-9

12   ends in September.  So the longer we wait, less of an impact

13   is going to get detected, and then we are going to have to

14   wait another six months before we know whether we are making

15   progress.

16             THE COURT:  I have something to say about that at

17   the end of this meeting.

18             MR. SAUCEDO:  Your Honor, one of the areas that we

19   are also concerned here is documenting when an officer stops

20   or detains an individual without an arrest.  There needs to

21   be enough information there to be able to assess whether that

22   stop was legal or not, whether there was sufficient reason to

23   make the stop.  And sometimes that information is not there

24   when there is no arrest or no citation.  So we need to make

25   sure that we are addressing that issue.

1          THE COURT:  So we are talking about searches and

2    seizures, arrests and stops when there is no arrest.

3          MR. SAUCEDO:  Correct, Your Honor.

4          Part of this implementation plan or corrective

5    action plan will obviously address staffing and training.

6    Those are key components.  But along the lines of these

7    regional auditors, what this plan will do is it will audit

8    not just the officer's initial arrest report, but it has to

9    also audit that first-line supervisor's report and the

10   commander's report.  Each has a responsibility.

11         So if we are getting boilerplate language, getting

12   through first-line of supervision, second-line of

13   supervision, to the Monitor, that's a problem.  So part of

14   what this plan wants to do is put these auditing parts in

15   place to make sure that every step of the way is working to

16   make sure that these reports are complete.

17         THE COURT:  As long as we are talking about the

18   language that has to be in this report, one thing that the

19   immediate supervisors can do when they review these reports

20   and they come up with this, what we call the boilerplate

21   language, is that, the supervisor should ask the agent, "Read

22   this out loud.  Do you speak that way?"

23         So, you know, the simpler the language, the better

24   it is for everyone.  The agent, the supervisor, up the chain

25   of command, and, importantly, for the judge who is going to

1    read it.  Okay?

2            Dr. Del Carmen, anything on searches and seizures,

3    please?

4            DR. DEL CARMEN:  Thank you, Your Honor.  Good

5    morning, Your Honor.

6            A couple of things here.  First of all, search and

7    seizures are a very intricate part of bias-based policing and

8    racial profiling.  As you may recall, Your Honor, in this

9    particular case, one of the findings that was made by USDOJ

10   early on was that there were patterns related to some

11   discriminatory practices by the Police Department.

12           And so we picked up a pilot study that our office

13   followed up on, and on beta data, basically data that's being

14   collected through a special program through the Department of

15   Transportation that PRPB is collecting throughout the island.

16   We were really, really hopeful that this data was going to

17   show -- at least have the variables that we needed in order

18   to measure some degree of pattern as it relates to who is

19   being stopped, the race, the ethnicity of the person, the

20   location of the stop, the aftermath of the stop, as it

21   relates to searches, contraband seized.

22           Upon reviewing the data that we were given, which,

23   by the way, it took months to get, and that is -- and I want

24   to make the record clear.  That's not the fault of PRPB, as

25   much as it was because of the bureaucracy that existed

1    between the Department of Transportation and the Police

2    Department.

3            Once we were able to review the data, I found,

4    Your Honor, that the data is so limited.  I couldn't even

5    tell you one-fifth of the information that I wanted to

6    present to the Court and hopefully replicate across the

7    island.

8            I had a conversation with Juan Carlos, who I know

9    is not here today, about this matter some months ago, and he

10   understands that we need more information as it relates

11   particularly to the race, to the ethnicity of the individual

12   that's being stopped.

13           And so that's in the works right now.  But,

14   obviously, our concern continues.  And we are still focused

15   in this particular project.

16           THE COURT:  Mr. Saucedo, would you like to comment

17   on that?

18           MR. SAUCEDO:  Yes, Your Honor.

19           The pilot review that was done was to try and

20   further paragraph 91, which is part of the equal protection

21   section of the consent decree, and that requires that Puerto

22   Rico look at its programs to ensure that it's not having a

23   despaired impact against any particular group.  And the hope

24   was, as Dr. Del Carmen mentioned, was to able to mine some of

25   the date that was being collected through electronic

1  citations to see if it would provide useful information for

2  PRPB in trying to determine whether its traffic stops were

3  biased or not, trying to identify trends or patterns.

4         That not being the case, PRPB still needs to

5  include in its reports demographic data that would show

6  whether those disparities exist.  Those are some things that

7  we are working on as part of the information technology plan.

8         There is a new record management system that needs

9  to be developed.  Those forms will include demographic data

10  that needs to be collected.  It's also part of complying with

11  NIBRS, which is the National Incident-Based Reporting System.

12         THE COURT:  That has to be provided to the FBI.

13         MR. SAUCEDO:  That's correct, Your Honor.

14         Data related to any crime, both victim and subject,

15  needs to be collected and transferred for analysis, to look

16  at crime trends across the country.

17         THE COURT:  Are you talking about discrimination,

18  or about everything?

19         MR. SAUCEDO:  What I am talking about is --

20         THE COURT:  You know, the type of person who is

21  arrested or charged with a crime.

22         MR. SAUCEDO:  NIBRS requires a collection of a lot

23  of different -- a lot of different information related to the

24  subject, to the victim, to the incident, which includes

25  demographic data.  And that data is both useful for national

1    comparisons --

2          THE COURT:  Does that include demographic data, for

3    example, of the arresting officer?

4          MR. SAUCEDO:  Yes, it does include demographic data

5    of the arresting officer.

6          THE COURT:  Okay.

7          MR. SAUCEDO:  And that information is also

8    important for the police to have as part of its own analysis.

9          So this is -- a lot of this emanates as part of

10   paragraph 91.  PRPB needs to make sure that its own programs

11   are not being --

12         THE COURT:  Didn't this case start because of that

13   problem, that precise problem?

14         MR. SAUCEDO:  Your Honor, we had allegations of

15   discriminatory policing.  And part of the problem in

16   identifying a specific violation was the lack of data.

17   Because a lot of these patterns only emerge when you look at

18   data and you look at a collection of traffic stops or arrests

19   to determine whether there is selective enforcement or

20   nonenforcement in particular communities.  And in this case,

21   we found that there was both a racial and national origin

22   component to it, as well as a gender component to it.

23         But, you know, with the traffic stop -- with the

24   Department of Transportation data not being as useful as was

25   anticipated, we have to redouble our efforts to make sure

```
1    PRPB is collecting the right information.

2          THE COURT:  So the police had to do by itself what

3    the Department of Transportation didn't do, basically.  That

4    has led to this situation; not at the point where it should

5    be today.

6          MR. SAUCEDO:  Your Honor, maybe Dr. Del Carmen can

7    provide a little more information about that.

8          It may be that what the Department of

9    Transportation was collecting was self-reported data from

10   applicants who get a license or an identification card.

11         THE COURT:  I see.

12         MR. SAUCEDO:  That by nature is going to be

13   limiting the data.

14         THE COURT:  That's a huge universe.

15         MR. SAUCEDO:  I think that's why there was the hope

16   that it would be useful.  That PRPB would be able to import

17   some of this data and use it instead of having to collect

18   this data fresh in every incident that occurs.

19         THE COURT:  Doctor.

20         DR. DEL CARMEN:  That's exactly right, Your Honor.

21   The data, you know, we were very helpful that it was going to

22   give us some insights.

23         But, Your Honor, let me put this in perspective for

24   you.  You know, for the past maybe 26 years, I have devoted

25   my career to work on the civil rights area of law
```

1    enforcement, especially on this topic.  And I will tell you

2    that, throughout the United States, for the most part, you

3    find that out of the 29,000 law enforcement agencies in the

4    U.S. right now, about 90 percent of them are collecting data

5    specific to who the officer stops, the gender of that

6    individual, the race, the ethnicity, the outcome of the stop.

7            In Texas, we have what's called the Sandra Bland

8    Act, which is a very, very data field requirement.

9            In Puerto Rico currently, that information, none of

10   that is being collected in a way that anyone, someone like me

11   or someone perhaps that is internally focused on determining,

12   you know, the pattern of who the officers are stopping, the

13   outcome of these, and whether or not civil rights are being

14   violated.  That cannot be done right now.

15           If the data is not being collected, we cannot make

16   any inferences one way or another.  And that's a huge

17   problem.  And so we have been trying and we were hopeful, as

18   Mr. Saucedo indicated, that this sort of universal data was

19   going to give us at least some insight, because they had

20   actually done it electronically.  So they were using some

21   electronic devices.  And all of that has turned out to be

22   basically nothing but an approximation of reality.

23           THE COURT:  But with the lack of assistance from

24   the Department of Transportation, does the Police Department

25   have to do this by indicating this information on every

1    person that they stop, arrest or search or seize?

2            DR. DEL CARMEN:  Absolutely, Your Honor.  And that

3    is done throughout the entire United States right now.   In

4    the CAD systems, which are the systems where they collect

5    data, police officers are to enter all of that information,

6    in some cases manually and in other cases it's automated once

7    the driver's license is swept on a card reader.

8            So that's the data that they are collecting right

9    now.

10           THE COURT:  So let's say Pedro Perez is stopped and

11   the officer says, "white male," let's say.  But if he

12   doesn't, there should be a way to get Pedro Perez's driver's

13   license and get that information from the driver's license.

14           DR. DEL CARMEN:  Technically, yes.  The problem is

15   some states in the U.S., for instance, don't collect race.

16   Like in Texas, we don't collect that information in the

17   driver's license.  And so the officer is required by law to

18   depict what the officer sees that person to be.

19           However, here in Puerto Rico, it would be something

20   that could be collected technically if in fact the technology

21   existed to be able to capture that information.

22           THE COURT:  Taking a look at my own driver's

23   license, it's got the gender and color of eyes.  That's it.

24           DR. DEL CARMEN:  Right.

25           THE COURT:  So that's not going to help.

1          DR. DEL CARMEN:  No.  But, again, most of the

2    States in the U.S., they put that burden on the officer to

3    determine as best as the officer can what the race or

4    ethnicity of that person is.  And although in Puerto Rico you

5    have the uniqueness of the fact that you have many Puerto

6    Ricans that live in Puerto Rico that would have sort of a

7    similar background, you do have the variables that would

8    be -- if you want to call it, that would go outside of the

9    norm, such as Dominicans, people that are from the

10   Dominican Republic, or people that are from other parts of

11   the world that live in Puerto Rico that may not necessarily

12   have the background that others have.

13          THE COURT:  So, assuming an agent stops someone who

14   is of Dominican descent and assuming that that person is a

15   citizen of the United States, his driver's license isn't

16   going to say that he is Dominican.

17          DR. DEL CARMEN:  That's right, Your Honor.  It will

18   not.

19          THE COURT:  Unless the agent can tell by his

20   accent.  I mean, it's tough.  It may not be that tough in the

21   United States, but it's tough here.

22          DR. DEL CARMEN:  I think it's tough everywhere.

23          Our point, Your Honor, is that, by collecting the

24   data, at least in approximation to the truth, we would have

25   some degree of baseline in which to compare it.

 1          THE COURT:  I've taken a look at other IDs that I

 2    have, and just color of eyes and gender.

 3          Mr. Peñagaricano, is there anything on this

 4    particular matter?  I mean, it's in the agreement, but I can

 5    tell that it's going to be very difficult to comply with this

 6    agreement based on the specific characteristics here in

 7    Puerto Rico.  Do you agree?

 8          MR. PEÑAGARICANO:  I agree, Your Honor.

 9          But while we recognize the importance of collecting

10    this data, as the Special Master indicated, we also must

11    recognize, and I think Mr. Saucedo pointed out to this fact,

12    that there is an IT corrective action plan that has the

13    record management system component that would take care of

14    collecting some of this data.  And that is something that is

15    in the works.  And I think we are going to discuss later

16    today that plan.

17          THE COURT:  All right.  Thank you.

18          Equal protection and nondiscrimination, Mr. Romero.

19          MR. SAUCEDO:  Your Honor, could I just real quick

20    on the data collection.  We understand it's difficult.

21          There are some initiatives at the Federal level to

22    make sure that there is demographic data that's usable by

23    local law enforcement.  And so there are some initiatives.

24    There were some recent reports issued from the Federal

25    Government on equity and law enforcement data collection use

1    and transparency.  So I think there are a lot of people

2    trying to figure out how to get this right, and I think we

3    can draw on those things, and try and incorporate what makes

4    sense here so that we are able to move parts of this consent

5    decree forward.  And if we aren't, that we bring those to

6    you, Your Honor, with a solution on how we address them.

7            THE COURT:  I appreciate that because I know it's

8    going to be a tough road to hoe.

9            Mr. Romero, please.

10            MR. ROMERO:  Equal Protection and

11    Nondiscrimination.  Overall, the Commonwealth's compliance

12    with the 10 paragraphs in this area reflect marginal progress

13    in the levels of compliance to what was noted in previous

14    CMRs.

15            In CMR-6, four paragraphs of the 10 paragraphs

16    assessed were partially compliant in comparison to the

17    report, the current report, where six of the 10 paragraphs

18    were found to be partially in compliant.

19            The Monitor's Office has noted PRPB has developed

20    and is continuously updating policies and procedure to better

21    provide direction and accountable.

22            PRPB is also making progress in the delivery of

23    services to transgender and transsexual communities,

24    Auxiliary Superintendencia for Criminal Investigations, SAIC,

25    and SARP, Auxiliary Superintendencia for Professional

1  Services.  Investigation files show that PRPB does follow its

2  policies related to seizing officers' weapons and referring

3  the employee to Employee's Assistance, EAP, when a PRPB

4  member is involved.

5         Some of the Monitor's concerns.  Many of the

6  personnel in the specialized units relating to this area lack

7  the required training.  Shortage in staff has resulted in

8  high caseloads among investigators which has impacted the

9  overall way investigations are conducted and cause

10  inconsistencies in the investigatory files.

11         PRPB is in the process of the development of an

12  implementation plan focused on PRPB's compliance with sexual

13  assault, domestic violence provisions of the agreement.

14         Your Honor, in this area, four paragraphs were

15  listed as noncompliant.  If you would like, I can list what

16  they are.

17         THE COURT:  Go through them.  We have four,

18  correct?  Go ahead.

19         MR. ROMERO:  Paragraph 86, PRPB shall collect

20  accurate and reliable data on hate crimes on an ongoing basis

21  and shall submit the data to the Federal Bureau of

22  Investigations, FBI, for analysis and publication in the FBI

23  hate crime static report in accordance with the FBI

24  submission requirements.

25         We have indicated a pathway forward.  It's

1    imperative that PRPB deliver the training in course 3081,

2    hate crime training.  This will ensure that officers are

3    trained to accurately assess cases to determine if the matter

4    is a hate crime.

5            Additionally, it's essential that supervisors

6    attend training to assist officers in hate crime

7    investigations and assessments.

8            Officers without thorough hate crime investigation

9    training can miss the details of a hate crime case and may

10   misreport the matter.

11           Supervisors are the next level of assessment and

12   accountability in these matters --

13           THE COURT:  Slowly, slowly.

14           MR. ROMERO:  I'm sorry.

15           Supervisors are the next level of assessment in

16   accountability in these matters and should also received

17   training on hate crime investigations.

18           PRPB has the responsibility to better manage hate

19   crime, and it starts with training.

20           PRPB personnel will better understand the specific

21   tenets of hate crime and will classify the crime as such.

22           The second paragraph, paragraph 90.

23           THE COURT:  That covers the different areas of

24   training.

25           MR. ROMERO:  Right.

1          THE COURT:  And 92 is the --

2          MR. ROMERO:  Paragraph 92, within five business

3    days, PRPB shall prepare and provide PR DOJ and the Puerto

4    Rico Department of Family and preliminary investigation

5    report prepared in response to each allegation of abuse and

6    mistreatment originating in secure juvenile correctional

7    facilities.  Such allegation includes physical and mental

8    abuse, juvenile on juvenile assault, staff on juvenile abuse,

9    and excessive use of force by staff.

10          The pathway forward we provided is that PRPB is

11    reminded again, as noted previously in CMR-5 and 7, that it

12    must certify the total number of cases and validate that

13    report fields noting dates and times of cases, referral to

14    PRPB DOJ and are completed.

15          PRPB followed through our recommendation that the

16    category noting "referral data to PR DOJ" be added to the

17    body of the initial report.  However, this category is often

18    not filled out and it's crossed out.

19          It is PRPB responsibility to notify PR DOJ as those

20    agencies have investigation and procedural responsibility as

21    well.  This will assist with information sharing, timeline

22    responsiveness and information to both the Monitor in the

23    Police Reform and the Monitor in the Juvenile Facility

24    Reform.

25          THE COURT:  Mr. Peñagaricano, before you get into

1  the specifics of each paragraph, has the Bureau -- has the

2  Department of Corrections provided the Bureau with

3  information on any allegation of abuse or mistreating within

4  the juvenile correction facilities?

5           I mean, they mention the Department of Justice and

6  the Department of the Family, but nothing from the Department

7  of Corrections.  And, as you know, you and I are involved in

8  that consent decree also.

9           MR. PEÑAGARICANO:  Yes, Your Honor.  Not that I am

10 aware of.

11          THE COURT:  Does anybody know?

12          Colonel Trinidad, do you know if the people from

13 corrections are informing the Bureau of any abuse or

14 mistreatment of juveniles in the juvenile corrections

15 facilities?

16          COLONEL TRINIDAD:  Yes, Your Honor.

17          When I directed the investigative branch, the Child

18 Abuse and Mistreatment Division is responsible for

19 investigating the incidents where there are assaults among

20 the population in juvenile institutions, and also to give

21 follow up to what is PREA.

22          So we believe that, yes, this has been established

23 that way, and we continue to attend to any reports of

24 incidents in juvenile institutions.

25          THE COURT:  Thank you.

1          Mr. Peñagaricano, please, your remarks as to what

2   Monitor Romero has indicated on equal protection and

3   nondiscrimination.

4          MR. PEÑAGARICANO:   Thank you, Your Honor.

5          I will mention just a couple of things.  And I am

6   going to allow Mr. Trinidad to go in a little deeper into it.

7          But, as Your Honor pointed out, generally, as

8   Mr. Romero pointed out, a comparison from CMR-6 to CMR-8

9   shows at least a slight improvement in the ratings.  The

10  rating improved from four to six paragraphs to partial

11  compliance.  And those that were not in compliance decreased

12  from six to four.  It is a slight improvement, but I just

13  wanted to point out that fact.

14         The second thing I wanted to mention is that, just

15  as I explained with searches and seizures, that there was a

16  plan that is in the works, the same occurred with a

17  particular plan that covers some of the paragraphs that were

18  reviewed in CMR-8, and that is the sexual aggression and

19  domestic violence plan that attempts to achieve compliance in

20  a lot of these paragraphs.

21         Now, that plan was submitted to the parties for

22  review on June 15, and we are already discussing their

23  comments, et cetera.  And we think we are going to be able to

24  also deliver a draft for the Court's approval by August as

25  well.

```
 1              So we hope that that plan will achieve compliance

 2    as to a lot of paragraphs and that we are going to see that

 3    improvement by perhaps CMR-9 or CMR-10.

 4              So, Mr. Trinidad, please.

 5              THE COURT:  Colonel.

 6              COLONEL TRINIDAD:  Yes.  With regards to the topic

 7    of paragraph 86, which speaks of the compiling of hate crime

 8    data, there certainly is an established policy, 606(30), that

 9    establishes the form and manner in which members of the

10    Puerto Rico Police Bureau must evaluate and identify any

11    signs, data, or evidence that lead us to determine that the

12    matter that is being investigated involves discrimination.

13              The personnel of the Puerto Rico Police Bureau as

14    part of their training do receive training with regard to

15    this topic.  And within the 40-hour service plan, that is one

16    of the topics that will be addressed.

17              Certainly, when a crime occurs that involves a

18    person from a certain special community, or the properties

19    thereof, this always raises questions as to whether this may

20    be a hate crime.  However, in the investigation, it is the

21    investigation that establishes, based on the evidence

22    collected, whether in fact this crime was committed as a

23    result of prejudice or for other reasons.

24              And to this end, the police maintains within the

25    investigative branch personnel that is specially trained to
```

1    conduct such investigations.

2            At the end of the way, it is the Department of

3    Justice, once the process is included, if found guilty, that

4    will use these elements to seek for aggravating circumstances

5    in the imposition for the sentencing purposes.

6            THE COURT:  Are there situations, Colonel, when you

7    take the position that it's a hate crime, when the Prosecutor

8    will not?

9            COLONEL TRINIDAD:  No.  Obviously, we conduct our

10   investigation hand-in-hand with the Prosecutor.

11           THE COURT:  All right.  Okay.

12           COLONEL TRINIDAD:  Also, with regard to the

13   five-day notification to the Department of the Family and

14   with regard to any physical or mental abuse, we will verify

15   obviously the allegations and mal findings of the Monitor.

16   And, if necessary, we will be taking the corresponding

17   corrective actions.

18           We must mention that the information modules

19   regarding both gender violence and sex crimes, there was no

20   redundance with these and report 621.1, which was the initial

21   report, where the personnel had to make entries both in the

22   report module and the report.  We made the corresponding

23   efforts with the GTAs system.  As of May 15th, the problem

24   was resolved.  Therefore, the databases obtaining the proper

25   information that allows us to gather information and

1    statistics, that is much more accurate.

2            That is all, Your Honor.

3            THE COURT:  Mr. Saucedo, please, or Mr. Castillo.

4            MR. CASTILLO:  Good morning, Your Honor.

5            One paragraph that was indicated as not compliant

6    that we haven't talked about is related to NIBRS, but that

7    was --

8            THE COURT:  Well, it was talked about before.

9            MR. CASTILLO:  So I just wanted to flag that it is

10   part of the section, but it is being addressed on multiple

11   fronts.

12           With respect to paragraph 86 on hate crimes, as the

13   Monitor's report notes, that the issues seem -- the way

14   forward for addressing the noncompliance here is ensuring

15   that all officers receive the appropriate training, that

16   supervisors receive that appropriate training, and that

17   supervisor vigilance help those officers develop to identify

18   the indicators of hate crime.  And those, as Colonel Trinidad

19   indicated, are partially being addressed by the training plan

20   that is going to include a component on this.  As the

21   training plan develops, it will continue to identify the

22   needs.

23           It also should be addressed in part by the staffing

24   plan, which increased the supervisors that are available.

25   And as those supervisors become trained, developed, and

1  assume positions across the island, that should allow for

2  closer supervision to help this develop.  So this is

3  something that some of the implementation plans that we have

4  been working on already is hopefully going to have an impact,

5  and that we might be able to see some of those impacts, if

6  not in CMR-9, then certainly by CMR-10.

7          With the paragraph 92, the abuse in the juvenile

8  facilities, you know, both Your Honor and the Commonwealth

9  recognize its connection to the juvenile facilities reform

10  case.  And Colonel Trinidad pointed to a technological shift

11  that should amplify the supervisors' and the investigators'

12  ability to identify where these things are occurring and make

13  the proper reporting.

14          So that shift, as we heard, happened in May.  And

15  so hopefully we will be able to see the impacts of that in

16  CMR-9, but we will also be hopeful that the trainings that

17  are being rolled out, because, as Mr. Saucedo pointed before,

18  100 percent of the specialized units, which include the

19  domestic violence unit, and the sex crime and child abuse

20  unit, are going to be retrained this year.  This is an issue

21  that those trainings will help identify these things so that

22  there are timely reporting going forward.

23          THE COURT:  Mr. Peñagaricano, you and I are working

24  with the juvenile institution consent decree.

25          MR. PEÑAGARICANO:  Yes, Your Honor.

1          THE COURT:  Do you think that some of the things

2     that are happening in that consent decree, especially

3     recently, should be shared with the police?

4          MR. PEÑAGARICANO:  It might.  I am not just -- I am

5     not aware of it, but, as I understand, it may happen.  And I

6     know Counsel Maria del Mar Ortiz has some information, and

7     she can share with the Court.

8          THE COURT:  Well, she is involved, too.

9          MR. PEÑAGARICANO:  Yes, she is.

10          THE COURT:  Ms. Ortiz, please.

11          MS. ORTIZ:  Yes, Your Honor.

12          I can explain the process.  The PRPB has a liaison

13     for each of the institutions in Villa Alba and Ponce.  If an

14     incident happens, the liaison goes there, gets the

15     information, and then goes to the prosecutors to start the

16     investigation.

17          THE COURT:  Does Ms. Tandy know about this?

18          MS. ORTIZ:  Of course, because then it goes through

19     Carmen Malave, the division that she was heading, and that's

20     where they continue with the investigation; if it's against

21     an officer, or follow up with the police.

22          THE COURT:  Okay, thank you.  That clears up a lot.

23          Dr. Del Carmen, anything on equal protection and

24     nondiscrimination?

25          DR. DEL CARMEN:  No, Your Honor.

```
1              THE COURT:  Thank you.

2              MR. ROMERO:  Your Honor, the next section is

3    recruitment, selection and hiring.

4              Overall, PRPB's compliance with the eight

5    paragraphs in this section assessed during this reporting

6    period reflect the same levels of compliance that was noted

7    in all previous reports, partially compliant.

8              PRPB has made efforts to recruit and hire qualified

9    personnel, and develop recruitment strategies that promote

10   inclusive selection practices that better reflect the diverse

11   cross-section of the Puerto Rican community.

12             PRPB has taken steps to make recruitment and

13   selection practice more inclusive.  These steps are beginning

14   to produce positive results in terms of more female diversity

15   in a hiring pool.  However, PRPB still needs to improve the

16   development of training and ensure that each recruitment

17   officer in all areas command be trained in recruitment,

18   especially on the interval platform, which assists in

19   training.

20             Your Honor, this section had no paragraphs that

21   were noncompliant.

22             THE COURT:  That's good to know.

23             MR. ROMERO:  Yes.

24             THE COURT:  Now, the next one I have here on your

25   report is supervision and management.
```

```
 1              MR. ROMERO:  I think the next one was training,

 2    right, Your Honor?

 3              THE COURT:  I am sorry.

 4              MR. ROMERO:  I think the next one was training.

 5              THE COURT:  Equal protection and nondiscrimination

 6    that we just covered.

 7              MR. ROMERO:  Yes.

 8              THE COURT:  The next one on page 10 is supervision

 9    and management.

10              MR. ROMERO:  Okay.  I have it here.

11              Overall, the Commonwealth's compliance with the 24

12    paragraphs of supervision and management assessed during this

13    reporting period reflect a slight improvement levels of

14    compliance towards noted in previous reports.

15              In CMR-6, nine paragraphs were assessed as

16    partially compliant or substantially compliant, in comparison

17    to the current reporting period where ten paragraphs were

18    found to be partially compliant or substantially compliant.

19              During the period of CMR-8, PRPB developed a

20    first-line supervision supervisors promotional test.  As a

21    result, in February 2023, 533 agents were promoted to the

22    rank of sergeant.

23              General Order 310, which we discussed earlier,

24    performance evaluation, was also updated and signed by the

25    Commissioner in February 2023.
```

1          Prior to this action, PRPB was lagging in its

2    efforts to develop a comprehensive performance evaluation

3    system.

4          PRPB is working with the Special Master's Office to

5    draft related policy and protocols relating to integrity

6    audits.

7          PRPB is also complying with all related court

8    orders to implement the staffing plan.

9          Area of concern.  Failure to develop and

10   institutionalize adequate information technology systems to

11   support supervision.  For example, as we indicated earlier,

12   early intervention system.  And a need for improved accuracy

13   to confirm that officers and supervisors are receiving

14   training and assignments as outlined in the staffing plan.

15         Your Honor, in this particular area, there were 14

16   paragraphs of noncompliant.

17         THE COURT:  Correct me if I am wrong, but there

18   should be a one-to-eight ratio of first-line officers to

19   agents.

20         MR. ROMERO:  It should be, Your Honor.  And our

21   understanding with a meeting with PRPB, which we need to

22   confirm yet with data, they have indicated, for the most

23   part, that's the case.  But there are 11 locations in the

24   field that have not met that criteria.

25         Again, we haven't reviewed the data, so we can't

```
 1    testify as to the accuracy.  But we were provided that
 2    information, that 11 locations are still...
 3              And I believe there are 120 locations, to begin
 4    with.  So the percentage would be rather high in compliance,
 5    if that's the case.
 6              THE COURT:  By "location", do you mean precinct?
 7              MR. ROMERO:  Precinct and districts.  I believe
 8    there are about 120-something in the field.
 9              THE COURT:  And that's per shift.
10              MR. ROMERO:  That's correct, Your Honor, to be in
11    compliance.  Each shift would require a one-to-eight ratio or
12    less.
13              THE COURT:  Any of the paragraphs that you
14    mentioned in your report that you want to emphasize?
15              MR. ROMERO:  Well, perhaps it might be best if I
16    turn it over to the subject matter expert who is familiar
17    with this particular area.
18              THE COURT:  Slowly, slowly.
19              MR. ROMERO:  It might be best to turn it over to
20    the subject matter expert in this category to identify the
21    high points anyway, at least.
22              THE COURT:  All right.  Who is the expert?
23              MR. ROMERO:  We have two here.  We have Hipolito
24    Castro and Al.
25              MR. CASTRO:  Good morning, Your Honor.
```

```
 1              THE COURT:  Good morning.

 2              Out of the paragraphs that are listed in

 3    Mr. Romero's report, is there any particular one that you

 4    want -- you would like to focus on.

 5              MR. CASTRO:  Yes.  There are two of them that I

 6    think we should bring these topics here.  One is, finally and

 7    hopefully, with these 500-plus sergeants taking over and also

 8    the 67 high officials also being promoted, some of these

 9    issues will be resolved.  One is having a direct supervisor

10    work in the same shift that his officers.  So, obviously,

11    they will be responsible for their evaluations, which we

12    believe the evaluations, as we know, it's very important.

13    But based on our interviews, evaluations in the department

14    have not been taken seriously.  And I am basing this on our

15    interviews and stats that we see inflating their scores in

16    their evaluations.

17              I can give you an example, sir.  In the last couple

18    of days, we interviewed ten officers.  The lowest one was a

19    4.5.  And I can say that in the last two-plus years, every

20    time we interview people, never lower than a 4.  So I know

21    for a fact that that cannot be possible in any department.

22              So the excuses or reasons that I get obviously is

23    because they are short of people.  And whoever is writing the

24    evaluations, they don't want to deal with issues so they will

25    give a high score.  They provide the evaluation, they sign
```

1    it, they return it, and it's over.  And no discussions

2    actually during these evaluations, regardless if it's good or

3    bad.

4         If there is any claim that they are not happy with

5    that, maybe there is some kind of conversation, but there is

6    not any type of discussions.  Like, we believe the evaluation

7    should be a part where you recognize a good employee versus a

8    non-good employee, and that creates a morale issue.  Because

9    if I am a hardworking or more aggressive agent, and I am a

10   4.5, and then I see others that -- like we know in every

11   agency and every department, we have the good employees and

12   we have the little bit lower, I don't want to use "bad" word,

13   it creates a morale issue.  Because then I will be, like,

14   "Wait a minute.  I work all this time.  I do all these amount

15   cases, and I am getting the same evaluation as this person."

16        So hopefully all these issues will be solved when

17   all these new sergeants they got just took over.  We have

18   been able to see by CMR-9 and 10 some of these issues solved.

19        Other than that, those are the two topics that I

20   think was very important, at least for me, when I am

21   conducting this type of investigation.

22        MR. YOUNGS:  Yes, Your Honor.  Good morning.

23        One of the things --

24        THE COURT:  Would you please state your name so we

25   have the record clear.

1    MR. YOUNGS:  Certainly, sir.  Allan Youngs,

2    Y-O-U-N-G-S.

3         One of the things that we saw in our interviews was

4    the fact that many of these employees did want to talk to

5    their supervisor about their evaluation.  They wanted to

6    bring forth their goals and objectives and make them aware of

7    it.  And I think in several of the systems that we are all

8    familiar with, that's a good thing in that the employee feels

9    respected, he or she feels wanted by the agency to move

10   forward, up the process, et cetera.  So that's one thing that

11   is going to change with the new evaluation system, in that

12   the employee will meet with the supervisors.  So that's a

13   good change in that particular --

14        THE COURT:  Have you seen -- well, brand new

15   sergeants.  But have you seen in the past any reluctance by a

16   supervisor to speak with an agent who wants to speak with the

17   supervisor?

18        MR. YOUNGS:  No, we are not.

19        Basically, since the system is so inflated, a 5,

20   and they basically -- the supervisor said, "Do you need to

21   talk to me about your evaluation?"  Well, the supervisor is

22   basically setting that employee up by saying, "You already

23   got a 5.  You don't really need to talk to me about it, do

24   you?"  So, no, I have not seen it, and I don't believe Polo

25   has either.

1    The second piece of this, since we split up

2    supervision, and Polo takes paragraphs 135 to 147, which I

3    then take over, which is the early intervention system.  This

4    is a system that I think would be very valuable for the PRPB.

5    And I know that the people themselves are very interested in

6    finding out more about that system.

7    In the States, I think it salvages a lot of

8    careers.  It has some very good points that are indicated in

9    the paragraphs and talk about the fact that there are ways to

10    salvage employees, give them the benefit of some assistance

11    in help, et cetera, and keep them on the right track.  And

12    that's what we all hope for.

13    So I think that's one thing that we are very

14    behind, and we feel like it should be implemented as soon as

15    possible.  There is a platform that is being developed.  And

16    I think once that gets moving and the supervisor can utilize

17    those tools that will be given to them through the EIS system

18    that will see some excellent results.

19    Then, lastly, one of my paragraphs was the

20    integrity audits, and that is that, as part of the auditing

21    system, which PRPB has done some excellent work in, this is

22    the office of the Special Masters involved, were involved,

23    and PRPB in putting together this system of integrity audits.

24    By that I mean, when some employees are identified

25    as being dishonest, as having some discrimination issues, or

1    prejudice issues, or basically, as we say, shaking down

2    someone on the street for money or other items, then there is

3    a system that can identify those people through the records,

4    and zero in on them and see you know what they are doing,

5    watch them, et cetera.  And it's a checks and balances that

6    will help PRPB become a better agency, like we all want to

7    happen.

8                So those are the main points, Your Honor.

9                THE COURT:  Thank you.

10               Mr. Peñagaricano, could you elaborate on those

11   points.

12               MR. PEÑAGARICANO:  Yes, Your Honor.

13               I will again mention a few items, and then I will

14   pass the baton to Colonel Trinidad to expand on some of them.

15               We are discussing jointly recruitment and

16   supervision and staffing, two different sections of the

17   consent decree, we are discussing jointly because they are

18   related, of course.

19               I would like to say first that we agree with what

20   the Monitor and its subject experts have mentioned.  And we

21   think these sections are good examples of sections that are

22   in transition to compliance.  Because, as they have

23   mentioned, there are several things, several components in

24   them that are objects of implementation plans that we are

25   going to see results in CMR -- if not CMR-9, CMR-10, in the

1    coming year.

2              And, also, it is important to mention that both

3    sections are related to paragraph 13, which was the object of

4    a plan that Your Honor approved last year that has been

5    running for one year, that is part of the agenda today, and

6    we have the project manager of that plan here, Ms. Molina,

7    who will make a presentation in due time.  And I think it's

8    important to know that the achievements that have been

9    attained with that plan.

10             Third, regarding what Mr. Youngs indicated, the

11   integrity audits, which we know they are so important, and we

12   agree with him.  The Office of the Special Master has been

13   working with the reform team in developing the policy.  The

14   policy is in advance stages of its preparation.  It's

15   virtually ready.

16             Yesterday we had our 253 meeting.  All parties met

17   at the bureau, and that topic was discussed.  I indicated

18   that we wanted to do a meeting with the Commissioner and the

19   parties to discuss some observations that the Commissioner

20   had on the integrity audits.  We were able to discuss it

21   between yesterday and today between Secretary Torres and the

22   Commissioner.  And I have been authorized to inform that

23   we -- that the Commonwealth is going to go full speed ahead

24   with the integrity audits without any other reservation, and

25   that the Commissioner has requested only to make a few

1    amendments, redactions to the policy.  And we hope to submit

2    it to the parties and to the Special Master for final review

3    within ten days.

4              THE COURT:  Mr. Saucedo, please.

5              MR. SAUCEDO:  Yes, Your Honor.

6              We did get a preview where the Commonwealth is in

7    this area earlier this week from the project manager,

8    Ms. Molina, and we know that there will be a presentation

9    this morning on this.

10             The parties and the Monitor and the Special Master,

11   everyone has been working hard on the staffing and

12   supervision plan.  And of the six initiatives that were

13   there, there are some that have not been completed.  And

14   during our monthly meeting this week, we discussed the need

15   to update that plan.

16             We were pleased to hear that PRPB now has a

17   majority of its precents in compliance with the one-to-eight

18   ratio.  The thing is, the 500 new sergeants that were

19   promoted earlier this year and trained were not deployed

20   until the end of CMR-8.  And so we hope to see in CMR-9 that

21   those people have been deployed out to the different

22   precincts and that the ratios are becoming more compliant.

23             So that would impact many of these paragraphs that

24   are noncompliance.  135 to 140 require close and effective

25   supervision by first-line supervisors.  So that we expect to

 1    move forward.

 2             Early intervention system, paragraphs 147 to 153,

 3    we agree this is a critical accountability program, but most

 4    of all, it's a preventive measure.  It's supposed to identify

 5    for supervisors people who may have a problem, potential

 6    problems, and offer them support and other training to course

 7    correct.

 8             So this early intervention system is not intended

 9    to wait until a tragedy occurs but to be able to offer that

10    officer support and assistance.  In many ways, it's just a

11    check-in from the supervisor to see how the officer is doing.

12             THE COURT:  That doesn't necessarily have to occur

13    if something happens.

14             MR. SAUCEDO:  Well, the system is based on a series

15    of --

16             THE COURT:  It could be that the supervisor says,

17    "Agent so-and-so, I would like to talk to you."

18             MR. SAUCEDO:  That's true, Your Honor, except not

19    all supervisors do that.  Not all supervisors are good,

20    effective supervisors.

21             THE COURT:  I know that.

22             MR. SAUCEDO:  Your Honor, what this EIS system is

23    supposed --

24             THE COURT:  "How are you doing?  Are you happy?  Is

25    there anything that I can help you with?"

1    MR. SAUCEDO:  Your Honor, the early intervention

2  system is intended to make all supervisors good supervisors

3  by giving them just very basic information they should have.

4  How many absences this officer has had, uses of force, other

5  problems that might be occurring.  The system is intended to

6  trigger for the supervisor a check-in.

7    Your Honor, most good supervisors are going to

8  check in, like you said, with their officers to see if they

9  are okay.  But we just want to make sure that there is a

10  system in place to make sure all supervisors do that, and

11  that's part of the value of this system.

12    In our experience --

13    THE COURT:  Do they have a roll call every morning,

14  or at the beginning of every shift?

15    MR. SAUCEDO:  My understanding is that they do.

16    Maybe the Colonel can give a more definitive

17  answer.

18    THE COURT:  Colonel, is there a roll call at the

19  beginning of every shift before the agents go out?

20    COLONEL TRINIDAD:  Yes.  The supervisor certainly

21  does a roll call of the personnel That is on duty and assigns

22  them their work for their shift.  There are duty lists.  And

23  the integrated attendance system, known as CITA, biweekly,

24  the information is updated as to the shifts, the personnel

25  assigned to each shift, and the supervisor for each shift, so

```
1    that the supervisor will know how many personnel he will have

2    available during that shift in order to be able to assign the

3    work to be done during each shift.

4              THE COURT:  Thank you.

5              MR. SAUCEDO:  Your Honor, just to conclude.

6              In DOJ's experience doing police consent decrees

7    across the country, the early intervention systems tend to be

8    the last paragraphs to come into compliance because they

9    really require a lot of subsystems to work optimally.  You

10   need to have the right data systems, the right number of

11   supervisors, and you also have to have support services.

12             If supervisors intervene with an officer, but there

13   is no support system, mental health or other counseling that

14   could be provided, then it's not working where it should.

15             So a lot of the groundwork needs to be put in

16   place.  Even when we do expect these paragraphs to come into

17   compliance later, the groundwork happens now to make sure

18   that all of those work together once the system is in

19   compliance.

20             THE COURT:  Thank you.

21             MR. PEÑAGARICANO:  Your Honor, if I may.

22             THE COURT:  Yes, of course.

23             MR. PEÑAGARICANO:  Could we address the Court

24   through Colonel Trinidad regarding EIS, briefly.

25             THE COURT:  Of course.
```

```
 1              Colonel, please.
 2              COLONEL TRINIDAD:  Yes.  In relation to the topic
 3    of early intervention, we have already held several meetings.
 4    And Commissioner Antonio Lopez-Figueroa has agreed on Monday
 5    with me to assign an area to us in the general police
 6    headquarters to assign to the technology an office team and
 7    the necessary human resources in order to commence the
 8    implementation of the early intervention system,
 9    acknowledging that the early detection of any person who has
10    any problem related to their personal life or work, a member
11    of the police bureau, if it is detected early on, then the
12    necessary steps to provide that person assistance can be
13    taken, whether it is through the social work or psychology
14    areas of the police bureau, or the chaplain's unit,
15    retraining, or any other, whether they are nonpunitive
16    measures, in that attending to that situation the member is
17    presenting with to avoid that any more significant situations
18    be triggered in the future.
19              There should be no doubt that the Puerto Rico
20    Police Bureau and the Public Safety Department does address
21    the personnels' situations in a timely and responsible
22    manner.
23              Thank you very much.
24              THE COURT:  So it appears that you do have,
25    Colonel, the support for any person who may have a situation
```

 1    which has to be attended to at the time, immediately.

 2              COLONEL TRINIDAD:  That is correct.

 3              THE COURT:  Dr. Del Carmen, anything on supervision

 4    and management, please.

 5              DR. DEL CARMEN:  Yes, Your Honor.

 6              If we can hear briefly from Mr. Balli, who has

 7    been -- is one of our team members who has been leading the

 8    efforts related to integrity checks, I would appreciate

 9    Your Honor's time.

10              THE COURT:  Certainly.

11              DR. DEL CARMEN:  I also wanted to tell the Court

12    that the integrity checks continue to be our priority,

13    Your Honor, and they are a crucial component of what we are

14    doing.  And I believe the path forward is within our sight,

15    as Mr. Balli will tell you.

16              THE COURT:  Please, Mr. Balli.  This is on the

17    integrity audit.

18              MR. BALLI:  That is correct, Your Honor.

19              THE COURT:  Go ahead, please.

20              MR. BALLI:  Up until about 45, 60 days, we have had

21    a very healthy exchange with the Commonwealth, specifically

22    the Reform Office, on this policy that's been mentioned,

23    making edits, suggestions, recommendations.

24              As I mentioned, up until about 45, 60 days, they

25    have taken those recommendation.  It's been very healthy.

```
 1              Two concerns have been expressed on behalf of the
 2    Reform Office.  One regarding staffing issues, funding
 3    issues.  They have gone as far as stating that they would
 4    like to propose a plan to be able to create this unit.  It
 5    won't be a specialized unit.  It would be within the current
 6    SARP.
 7              And to this day, we have been asking for that plan
 8    and what that might look like for us to consider.  We haven't
 9    received it.
10              The second one is --
11              THE COURT:  Would you, for the record, tell us what
12    SARP is.
13              MR. BALLI:  It is their version of internal
14    investigations.
15              So the second matter that's been brought to our
16    attention, a concern on behalf of PRPB, is some legal
17    matters, specifically entrapment.  And this was brought
18    forth, this concern, at the executive level.  And so we have
19    made efforts to have meetings to resolve both the legal
20    matters, as well as the staffing and funding issues, and how
21    that might look like to go forward with this policy.  And so
22    we are waiting for that response.
23              THE COURT:  What do you mean by entrapment?
24              MR. BALLI:  Well, I wouldn't be able to go into
25    details, Your Honor.
```

```
 1                THE COURT:  The general --

 2                MR. BALLI:  That is a concern that PRPB brought

 3    forth that, creating integrity audits unit, there might be

 4    some concerns under entrapment.

 5                THE COURT:  I don't understand.

 6                MR. PEÑAGARICANO:  Your Honor, if I may.

 7                THE COURT:  This may be a legal matter.

 8                MR. PEÑAGARICANO:  Yes, Your Honor, but trying to

 9    be as productive as possible, as I said a few minutes ago,

10    the good news is that I think the Commonwealth was able to

11    sort out its position on this.  And I had conversations as

12    early as this morning with both Secretary Torres and

13    Commissioner Lopez, and I think we have sort of passed the

14    legal situation.  And we are going to go toward with the

15    policy without any entrapment allegations.

16                Commissioner Lopez has only requested a few days to

17    do a final revision to the policy, and we will submit what

18    Mr. Balli is -- what we owe him, we owe him that, and we will

19    submit that in ten days.  That is our respectful request.

20                MR. SAUCEDO:  Your Honor, can I just --

21                THE COURT:  Yes, sir, Mr. Saucedo.

22                MR. SAUCEDO:  Just to elaborate on integrity checks

23    or integrity audits, because we have used these in other

24    consent decrees.  We had them successfully implemented in

25    Los Angeles.  They are being implemented in New Orleans.
```

1  These are sort of proactive operations that would be done by

2  PRPB.  So they need to be highly -- done by highly trained

3  individuals with very clear rules and parameters.

4          But this could be a situation where there are

5  allegations that an officer is not assisting someone with a

6  civilian complaint.  Because under the consent decree, they

7  are required to assist someone to provide -- by providing the

8  information on filing a civilian complaint, and it could be a

9  situation where they are not doing that.

10         There could be more serious types of allegations,

11 where it could be that property is being turned into an

12 officer and you are checking to see whether they are going to

13 bring it back, or reported and log it in.  And so these need

14 to be done in a way that will be legal, that are controlled,

15 and that are properly supervised.  And I think that's in part

16 why we want to make sure all the pieces are in place for it.

17 But this is an initiative that has been successfully

18 implemented in other consent decrees.

19         THE COURT:  Thank you.

20         Anything else, Mr. Balli?

21         MR. BALLI:  No, Your Honor.

22         THE COURT:  Thank you.

23         MR. BALLI:  Thank you.

24         THE COURT:  The next item that I have or that is on

25 Mr. Romero's list starts on page 16, civilian complaints,

1    internal investigations and discipline.

2            Mr. Romero, please.

3            MR. ROMERO:  Civilian complaints.  Overall, the

4    Commonwealth's compliance with the 46 paragraphs assessed

5    during this reporting period within civilian complaints,

6    internal investigations, and discipline reflect a slight

7    progression in compliance in what was noted in previous

8    reports.

9            In CMR-7, 38 paragraphs were assessed as partially

10   in complaint or in substantial compliant, in comparison to

11   the current CMR-8 report where 36 paragraphs were found to be

12   partially in compliant or substantially in compliant, with

13   three additional paragraphs moving into the full compliant

14   phase.  Two paragraphs are still noted as deferred in CMR-8.

15           The Monitor's Office determined that internal

16   investigations were conducted well and were eventually

17   adjudicated in courts with facts uncovered by the

18   investigator.

19           PRPB is now more focused on ensuring that all its

20   investigators are properly trained, be it in updated SARP

21   investigator training course.

22           Some areas of concern.  There are still extensive

23   delays in SARP case adjudication.  Lack of sufficient

24   qualified legal staff at the office of legal adviser, PRPB

25   continues to struggle with adequate investigations of

1    anonymous complaints.

2           SARP has not seen a yearly in-service training

3    component as mandated by the agreement since the monitoring

4    phase of the agreement commenced.

5           THE COURT:  Let me ask you about these anonymous

6    complaints.  If something comes in anonymously, it's got to

7    be either by telephone or by --

8           MR. ROMERO:  Written communication, Your Honor.

9           THE COURT:  -- an unsigned written complaint.

10           If they are by telephone, Mr. Saucedo, is this

11    something that the officer who receives this call has to set

12    out?

13           Mr. Castillo, please.

14           MR. CASTILLO:  Yes.  There is no wrong door for

15    filing a civilian complaint.

16           THE COURT:  I realize that.  But I call the police

17    and say, "Something happened that I want to complain about,"

18    whether it's true or not, whoever takes that call has to put

19    it in writing so that the process can proceed.

20           MR. CASTILLO:  That's correct, Your Honor.

21           THE COURT:  Has that been a problem?

22           MR. CASTILLO:  The problem that has been identified

23    in this aspect of the monitoring report is whether those

24    anonymous complaints, especially those that seem to be

25    anonymous whistleblower complaints, are getting that thorough

1    investigation such that it's truly being intaked and

2    investigated.

3          THE COURT:  By whistleblower, you mean something

4    internal.

5          MR. CASTILLO:  Yes, Your Honor.

6          THE COURT:  Please continue, Mr. Romero.

7          MR. ROMERO:  Your Honor, in this area, there were

8    seven paragraphs that were noted as noncompliant.

9          If the Court permits, I would like Donald Gosselin

10   to summarize those seven paragraphs.

11         THE COURT:  Certainly.

12         Good morning.  Please state your name so the record

13   is clear.

14         MR. GOSSELIN:  Good morning, Your Honor.  My name

15   is Donald Gosselin, G-O-S-S-E-L-I-N.

16         With respect to the comments mad by the Chief,

17   Your Honor, there are two paragraphs in particular that are

18   deeply disturbing and do not show much sign of progress.

19   And, in fact, in reality, it's shown definite signs ever of

20   And I refer to paragraph 168 and 179.

21         As the Chief pointed out, Your Honor, particularly

22   with regard to whistleblower complaints, it has become very

23   clear to me that at least half of them come from within the

24   institution.  And it invariably raises a set of allegations

25   that are not only administrative in nature but also possible

1    criminal in nature.

2           What I have seen during my period of analysis of

3    these complaints, in CMR-8 I actually requested 15 of these

4    anonymous complaints.  Those are complaints that were

5    received by the Bureau where the identity of the complainant

6    is unknown.

7           Of those 15 complaints, Your Honor, I will say that

8    at least six of them were -- had significant issues,

9    significant problems regarding improper investigative

10   procedure.  Let me elaborate on that for a minute.

11          When you have a complaint like that coming in, in a

12   well-developed police organization, you have a criminal

13   investigation of the allegations that have been made, and you

14   also have an administrative investigation of the allegations

15   that were made.  They should be done concurrently.

16          The reason why they should be done concurrently is

17   because criminal investigations often take quite an amount of

18   time.  And if you wait for the criminal side to become

19   resolved one way or the other, then there is a massive delay

20   on the administrative side.  That still exists.

21          So, accordingly --

22          THE COURT:  What still exists?

23          MR. GOSSELIN:  The pushing it over to the criminal

24   side and not assigning a simultaneous administrative

25   investigation.

1    Your Honor, quite frequently, in these types of

2    cases, there are very rapidly resolved on the administrative

3    side, particularly in gross and serious allegations where you

4    were able to actually establish by a preponderance of the

5    evidence that the officer involved is responsible.  And,

6    therefore, they face discipline commensurate with that

7    violation.

8    With respect to what the Chief mentioned concerning

9    adjudication, I have mentioned this -- I have written in

10   CMR-7 -- I believe in 6, 7 and also 8, about the deficiency

11   in the ability of the PRPB to adjudicate complaints, in

12   particular, Your Honor, those of a serious or criminal

13   nature.

14   There is a 30-day limit.  Once the investigation is

15   concluded, Your Honor, there as 30-day limit, according to

16   the Bureau's established policy, for them to adjudicate,

17   analyze and adjudicate the facts of the complaint.

18   If it's a minor complaint, it's adjudicated by an

19   organization under the umbrella of SARP, or their internal

20   investigation unit.  SICUA (phon) attends and adjudicates

21   minor violations.

22   On the more serious, in all criminal allegations,

23   they are adjudicated by the Office of Legal Affairs.  I

24   pointed out repeatedly in CMRs, Your Honor, that the Office

25   of Legal Affairs has been, for lack of a better word, gutted.

```
 1   They have lost attorneys.  They have had attorneys leave on
 2   their own accord.  They have had attorneys who have been
 3   transferred unilaterally to the DSP, and they have not been
 4   replace, Your Honor.  So, therefore, the problem has actually
 5   gotten much worse.
 6           And the problem doesn't end there, Your Honor.
 7   Recently, there were a large group of sergeants promoted.  In
 8   fact, there were promotions at a number of different ranks.
 9   It has come to my attention, Your Honor, that people lost the
10   opportunity to be promoted because of this unnecessary delay
11   in adjudication of these serious complaints.  Not only does
12   this officer have to live under a cloud of uncertainty, they
13   also lose an opportunity to become promoted, which in my
14   mind, Your Honor, raises a due process issue.
15           What I recommended as a pathway forward,
16   Your Honor, in CMR-8 is that -- it's understood that DSP is
17   responsible for procurement and human resources.  What I
18   suggested as a pathway forward is that DSP draft a strategic
19   plan to increase OAL hiring and staffing, to retain the staff
20   that they have, and to pay them adequately in accordance with
21   their level of education and experience.
22           And, lastly, to bring that -- with the ultimate
23   goal of bringing the adjudication process of these serious
24   issue within the 30-day window as prescribed by their own
25   rules and procedures.
```

 1          THE COURT:  You mentioned that any criminal and

 2    administrative investigation should run simultaneous.

 3          MR. GOSSELIN:  Yes, sir.

 4          THE COURT:  And there are different burdens

 5    involved; beyond a reasonable doubt for criminal and

 6    preponderance of the evidence for administrative.

 7          MR. GOSSELIN:  That is correct, Your Honor.

 8          THE COURT:  It seems to me that -- and one of the

 9    things that I saw here is that not everybody is being

10    interviewed.

11          MR. GOSSELIN:  That is correct, Your Honor.

12          THE COURT:  But my question is, if there is

13    something that is criminal or appears to be criminal, it may

14    not be possible in an administrative procedure to interview

15    the person being complained of because of Fifth Amendment

16    problems.

17          MR. GOSSELIN:  That's a very good point,

18    Your Honor, and let me speak directly to that point.

19          In 1969, *Garrity v. the United States* established

20    the Black Letter law, that has remained black letter law for

21    the past 54 years, and it stands for the principle that, if

22    as an administrative investigator I call in the accused

23    officer and I make a coercive statement according to a

24    certain set of rules, that you must answer these questions

25    and you must answer them completely and truthfully.  And if

1    you do not answer those questions completely and truthfully,

2    or if you refuse to answer them entirely, you are subject to

3    separation from the institution.  That's the Black Letter law

4    established in *Garrity*.

5             *Garrity* also stands for the principle that nothing

6    that I say as the accused in this environment, in this

7    interview may be used against me in any criminal proceeding

8    that involves me.

9             THE COURT:  Is the person warned of that?

10            MR. GOSSELIN:  Yes, Your Honor.

11            In fact, there is a form that is used nearly

12   universally on the mainland, and it's been used for many

13   years.  Some States have modified *Garrity* to include higher

14   protection, including transactional and sometimes complete

15   immunity.  Puerto Rico is not one of those jurisdictions, to

16   my knowledge.

17            The form is signed.  The officer understands.  They

18   must answer.  There are consequences attached to not

19   answering.  And that these words, nor the fruit of that

20   information, may be used by a criminal investigator, may be

21   used by a prosecutor, or introduced as evidence in the case

22   in chief against that person.  So, therefore, the Fifth

23   Amendment issue is dealt.

24            THE COURT:  I have got to read that case because it

25   doesn't -- I don't know whether there has been some...

 1           MR. GOSSELIN:  I'd be happy to supply the Chief

 2      with some citations, Your Honor.

 3           THE COURT:  Yes, please, because I would like to

 4      take a look at what courts have said since then.

 5           MR. ABESADA:  Judge Besosa, if I may, Roberto

 6      Abesada.  There is a recent case that Mr. Gosselin and I

 7      reviewed, and the citation is *United States v. Cook*.  It's a

 8      case from the District of Columbia, 2007, 526 F. Supp 2d,

 9      page 1.

10           THE COURT:  District of the District of Columbia.

11      And what does the judge -- is that on appeal?

12           MR. ABESADA:  No.  It's a District Court level

13      case.

14           THE COURT:  But is it on appeal?  Has it been

15      appealed?

16           MR. ABESADA:  No.

17           THE COURT:  So what does it say?

18           MR. ABESADA:  It's a case of a Deputy United States

19      Marshal that was accused of using excessive force against an

20      inmate.  And there was an administrative investigation

21      against the U.S. Marshal, but there was no parallel criminal

22      investigation, and he was asked to make a report.  He did the

23      report.  And then after he was criminally accused, he was

24      stating that, under *Garrity*, those statements he made in the

25      report were not admissible.  And the Court found that, since

1    there was no parallel criminal investigation done at the time

2    the administrative charges were made, it was far too tenuous

3    and speculative to conclude that those -- that report --

4    those statements made in the report were not admissible.

5          THE COURT:  All right.  What you are saying is

6    that, in that case, in the *Cook* case, there was no prior

7    criminal investigation.

8          MR. ABESADA:  And no parallel criminal

9    investigation.

10          THE COURT:  But what Mr. Gosselin is saying is that

11   both investigations should go on at the same time, which is a

12   bit different from what *Cook* says.  Because this marshal, you

13   know, he didn't know that there was a criminal investigation.

14   And from what I gather from what Mr. Gosselin says, I guess

15   you have to tell the person when he comes in for an

16   administrative investigation that there is a criminal

17   investigation also ongoing.

18          Is that the situation?

19          MR. GOSSELIN:  Your Honor, they have actually

20   submitted a draft form, which I have helped them with and

21   modified to become completely in compliance with *Garrity*.

22          THE COURT:  I would like to see that as soon as

23   possible.

24          MR. GOSSELIN:  Absolutely, Your Honor.  I will

25   supply it to the Chief.

```
 1            MR. SAUCEDO:  Your Honor, can I just add real
 2   quick?
 3            THE COURT:  Sure.
 4            MR. SAUCEDO:  I don't want to make this more
 5   complicated.
 6            THE COURT:  It already is.
 7            MR. SAUCEDO:  It is a very complicated area.
 8            We did reach some agreement in the consent decree
 9   over parallel investigations.  So there is a requirement for
10   parallel investigations.
11            There are safeguards to make sure that we are not
12   violating officers' Fifth Amendment rights.  And the rule
13   applies when there is a compelled statement on the
14   investigative side.
15            And what the consent decree requires is that the
16   investigation should run forward, but the compelled statement
17   should be a deliberate decision that's being made.
18            THE COURT:  Kind of like when you give a Miranda
19   warning.
20            MR. SAUCEDO:  That's correct, Your Honor.
21            And the administrative side may be able --
22            THE COURT:  But in the Miranda warning, if you
23   don't say what you did, I mean, fine.  But here, if you don't
24   say what you did, you are fired.
25            MR. SAUCEDO:  The officer needs to know that they
```

1    are being compelled to give a statement.

2            THE COURT:  I understand that.

3            MR. SAUCEDO:  And in those situations, there is a

4    Fifth Amendment protection that is triggered.

5            But there are ways of successfully doing parallel

6    investigations, the benefits of which Mr. Gosselin mentioned,

7    that you don't want to lose the opportunity to take

8    disciplinary action, prompt disciplinary action in a very

9    serious case.  Maybe someone lied on a report.

10            THE COURT:  I would like to see that, whatever it

11    is that you've prepared, okay?

12            MR. GOSSELIN:  Yes, Your Honor.

13            THE COURT:  Mr. Peñagaricano, any comments on what

14    Mr. Gosselin has brought up?

15            MR. PEÑAGARICANO:  Yes, Your Honor.

16            THE COURT:  It's something that concerns me quite a

17    bit.

18            MR. PEÑAGARICANO:  Yes, Your Honor.

19            While we believe there are many, many areas of this

20    consent decree cases that are aggressively attacked for

21    compliance over the last year, year and a half, no question

22    that this area is an area that needs work, to use the phrase

23    that you mentioned at the beginning of this hearing.  No

24    question.

25            Yet, while that is true, we must also not lose

1    sight of the fact that the conclusion of the Monitor in the

2    CMR-8 is that, even this area, and I quote, had slight levels

3    of progression compared to CMR-6.

4            THE COURT:  I understand that.

5            MR. PEÑAGARICANO:  There are many, many, fully --

6    not many -- four fully compliant paragraphs.  There are

7    20-something partially compliant and around 17 substantially

8    compliant paragraphs.  So, yes, this area needs a lot of

9    work, Your Honor.

10           And I note that Colonel Trinidad has a few things

11   he would like to mention as well.

12           THE COURT:  Okay.

13           Dr. Del Carmen, any -- I am sorry.

14           Colonel, please.

15           COLONEL TRINIDAD:  Yes.  As part of the attention

16   that has been given to the topics we are addressing right

17   now, the parties have in their possession the draft of Order

18   114, which is the one that establishes the investigative

19   operation of internal investigations.

20           Also, on July 10, the academy will begin the

21   training of personnel assigned to SARP, professional

22   responsibility.

23           And, also, certainly, we have not been able to

24   clearly establish how we will be addressing the invocation of

25   the Fifth Amendment by members of the Puerto Rico Police

 1    Bureau who are under investigation, both at the

 2    administrative and at the criminal level.

 3            An immense majority of them do not refuse to give a

 4    statement.  And their defense team recommends that their

 5    criminal procedure be addressed first, and then that they

 6    confront the administrative procedure.

 7            Nonetheless, the Commissioner does have the

 8    authority and does exercise such authority to use the method

 9    in cases involving gender violence or criminal accusations of

10    summary termination of employment while the corresponding

11    procedures continue.

12            So we are currently discussing the policy that will

13    be implemented, guaranteeing both what are the Miranda rights

14    in criminal cases and Garrity rights in administrative

15    procedures.

16            Obviously, as a team, the Government is committed

17    to properly addressing the processes in a transparent manner.

18    So we continue to discuss the policy that will be

19    implemented.

20            Thank you very much.

21            And also -- I am sorry -- we acknowledge that we

22    must address the number of attorneys available to evaluate

23    administrative complaints, and we are committed to address

24    this in order to minimize the amount of time that it takes to

25    resolve these.

1            Thank you very much.

2            THE COURT:  How many attorneys are you missing in

3      the Bureau?

4            COLONEL TRINIDAD:  Attorney Carmen Diaz has

5      informed in a communication that sixth to eight attorneys are

6      needed.

7            THE COURT:  And how many do you have now?

8            COLONEL TRINIDAD:  I believe the legal affairs

9      office of the police bureau has seven attorneys.

10           THE COURT:  Dr. Del Carmen, do you have anything?

11           DR. DEL CARMEN:  No, Your Honor.

12           THE COURT:  Mr. Castillo.

13           MR. CASTILLO:  Your Honor, one thing -- a couple of

14     things to point out briefly is, first, you know, it is

15     important, and in a positive aspect, that the SARP personnel

16     are cued up.  Part of the training plan to get trained, there

17     are aspects of the general investigative process that

18     Mr. Gosselin and Mr. Romero have pointed out, even in

19     partially compliant areas.

20           However, this issue needs to be worked out before

21     its trained on the issues of compelled statements.  This

22     needs to be established, the path forward, before the people

23     who are actually going to implement that path are going to be

24     trained on it.

25           So I want to flag that, and I also want to flag

1   that we all need to be protective of the constitutional

2   rights of all persons, including officers accused of -- or

3   potentially accused of criminal misconduct that could lead to

4   criminal charges.  And the consent decree in its requirement

5   for parallel proceedings, both administrative and criminal

6   proceedings, is intended to ensure that those rights are

7   protected and also balanced with the other interests that

8   attend to making sure that there is prompt and effective

9   internal accountability systems, the interests of victims of

10   misconduct that might be under an administrative

11   investigation.

12        And so all of that, it's important to flesh out

13   that there are interests as well that -- and it's part of the

14   reason why there was a coming together on ensuring that the

15   standard be parallel proceedings, while still ensuring that

16   all the constitutional protections are going to be adequately

17   covered.

18        The last point I want to make is that, as

19   Mr. Peñagaricano previously stated in the equal protection

20   section, we are working on a plan to come into compliance

21   with all of the provisions related to investigating domestic

22   violence and sexual assault accusations.  That includes

23   accusations that were made against the personnel of the

24   police bureau.  And in so doing, that is going to implicate

25   the general investigative processes of internal

1    investigations, as well as how they will interact in parallel

2    criminal and administrative proceedings.  And those are going

3    to be explicitly addressed through this plan so that we

4    can -- while we may not attend to all of the issues that are

5    outlined in some of the noncompliant provisions, it is

6    intended to be a step forward toward compliance in those

7    areas here.

8              MR. PEÑAGARICANO:  Your Honor.

9              THE COURT:  Yes.

10             MR. PEÑAGARICANO:  General Counsel for DSP,

11    Attorney Miguel Candelario, updated the attorney question.

12             Did you pose nine are currently there?

13             THE COURT:  Where?  At DSP?

14             MR. PEÑAGARICANO:  No, SARP.

15             THE COURT:  Okay.

16             MR. PEÑAGARICANO:  And then five are closing

17    contracts added to the team.

18             THE COURT:  You think that's enough?

19             MR. PEÑAGARICANO:  No.  I think he told me that

20    they are opening a job announcement for more.

21             THE COURT:  For how many?

22             MR. PEÑAGARICANO:  Eight more.

23             THE COURT:  What is the entrance salary of these

24    attorneys?

25             MR. PEÑAGARICANO:  It was recently increased from

```
1    $3,200 to a little bit over $5,000.

2              THE COURT:  Per month?

3              MR. PEÑAGARICANO:  Per month.

4              THE COURT:  We will break for ten minutes.

5              (PROCEEDINGS SUSPENDED AT 12:10 P.M.)

6              (PROCEEDINGS RESUMED AT 12:25 P.M.)

7              THE COURT:  Please be seated.

8              We have two items two cover.  The first one is

9    community engagement and public information.

10             Mr. Romero.

11             MR. ROMERO:  Yes, Your Honor.

12             Community engagement.  Overall, the Commonwealth

13   compliance with the 13 community engagement and public

14   information paragraphs assessed during this reporting period

15   reflect similar levels of compliance noted during the

16   previous reporting period.

17             CMR-6, the last CMR in which all paragraphs were

18   reviewed, six paragraphs were assessed as partially

19   compliant, in comparison to the current reporting period,

20   where five paragraphs were found to be partially in

21   compliant, while eight other paragraphs are noted as

22   noncompliant.

23             During the reporting period, PRPB's examination of

24   public information has improved.  PRPB has demonstrated

25   increase use of social and mass media in an effort to solve
```

1    crime with positive results.

2            The Monitor's Office found that PRPB has been more

3    efficient at publishing standing policies as approved,

4    including 2022 community interaction committee annual report

5    to its virtual library.

6            Areas of concern.  No formal training has been

7    given through the police academy in support of community

8    policing.  There is a need for established data quality

9    protocols and guidelines, along with a mechanism to determine

10   accuracy and effective measuring standards for the community

11   policing system module.

12           The Monitor's Office found that the community

13   participation through its CICs continue to fluctuate per

14   police area.  PRPB has not been effective at using multimedia

15   and internal resources to educate and bring public awareness

16   to community policing.

17           Your Honor, if I may, there are eight paragraphs

18   that are in noncompliance.  If I may call the subject matter

19   expert, Merangelie Serrano, to address the issues.

20           THE COURT:  Is there anything of those paragraphs

21   that you would like to focus on?

22           MR. ROMERO:  I would ask somebody.  She is the

23   subject matter expert.

24           THE COURT:  Subject matter expert.

25           MS. SERRANO:  Good afternoon, Your Honor.  May it

1    please the Court.

2            Regarding --

3            THE COURT:  Could we have your name for the record.

4            MS. SERRANO:  Merangelie Serrano.

5            Your Honor, regarding the development of alliances

6    for PRPB, if you were to reflect on the prior report, and

7    specifically for 208, which is rendered noncompliant, I think

8    we need to look into the fact that the community plays a

9    crucial and critical aspect to be able to develop good

10   partnerships and eventually also engage in solving problems.

11           THE COURT:  Have you noticed any communities that

12   have not provided help to the police in their community

13   engagement?  Because, I agree with you, it's clear that they

14   are the ones who know the community.

15           MS. SERRANO:  It's important to know that there is

16   a great need for the community to work in solving situations,

17   in improving their quality of life.  But there is no doubt

18   that there is also a great need for PRPB to take the step

19   forward and be the one seeking those organizations so that

20   they feel comfortable enough to work together and,

21   specifically in their areas, begin developing plans,

22   exchanging resources, ideas, and jointly, really, focus on

23   the areas that need critical attention.

24           THE COURT:  I guess that was my question.  Have you

25   come across any community who has indicated to you that they

1    are not comfortable working with the police?

2        MS. SERRANO:  There are multiple organizations.  We

3    held a meeting on Thursday.  And the organizations were there

4    because they have the need to communicate to PRPB their

5    concerns, their problems, and do not find an outlet or a

6    place where they can openly express, be heard, and find

7    alternatives.

8        I will be glad to share with PRPB those

9    organizations' names.  But I think beyond that, it's

10   important not to wait for the development of the alliances on

11   demand.  And I see that PRPB has a lot on their plate, but

12   they also need to be more diligent and activity in seeking

13   out the organization's nonprofit, faith-based, even

14   Government organizations, so that they know more about the

15   organizational transformation.  And that involves community

16   policing.

17       An independent survey conducted through IPSAS yield

18   an 85 percentage of the community survey that did not know

19   what was community policing all about.  PRPB could be the

20   best public relation agent for themselves.  And they need to

21   advertise and in a sense of promoting, educating, getting --

22   letting people know what is community policing all about.

23       They have internal resources that have not been

24   maximized, and that is the Press Office, not only to report

25   incidents, but also to let the community know about

1   recruitment, let the community know what are the crime trends

2   that be concerning them.

3          And when you start educating people, you also bring

4   openness and trust in the organization so that they can come

5   forward.  Because there are a lot of people out there, either

6   common citizens, as well as organizations, that feel they are

7   left out, unattended and unheard.  And that has to change.

8          THE COURT:  When you say recruitment, you mean

9   recruitment for police?

10         MS. SERRANO:  Police officers to recruit a diverse

11  workforce representative of the community.  And I know that

12  the office is working.  Within the scope of my area, where I

13  see it, the recruitment office is working out -- is out

14  there.  I am not going to undermine what they are doing.  But

15  if they were to resort to advertising closely, utilizing

16  their social platforms, they have a Twitter account, they

17  have a Press Office, multimedia services.  They need to

18  engage in a campaign where these education, starting from the

19  recruitment efforts, take place.

20         Participation --

21         THE COURT:  When you talk about crime trends, I

22  mean, the community itself should know what the crime trend

23  is in that community.

24         MS. SERRANO:  Then, after identifying that, how can

25  we work together to avoid or perhaps minimize becoming a

 1  victim of those.  That is also part of engagement and the

 2  development of partnerships within the community, to work

 3  together so that they feel safer.  We all feel safer then as

 4  a result.

 5          And I am not saying it's not happening, but there

 6  was a decrease.  Even when you are to compare CMR-6 with the

 7  current one, at some point we got a report from the different

 8  alliances that were developed, that did not happen within

 9  this time period.  So the Monitor never knew whether these

10  alliances or partnerships were sustained.

11          Some of them were very valuable in the sense of

12  providing services to victims, victims of gender violence,

13  the homeless community.  And they were critical in the

14  process.  And PRPB had engaged with these organizations, but

15  we didn't hear or learned or received any evidence about it.

16          So there has to be a continuum in this progression.

17  I am not going to say that everything is tied into training,

18  but training plays an integral part in the ability of the

19  officers and the organization to have the proficiency to be

20  able to carry out these initiatives and programs.

21          So if people do not know how to develop an alliance

22  or a partnership, they are not going to feel comfortable to

23  seek out individuals or organizations to work together.  And

24  that's an example.

25          THE COURT:  Do public housing projects, do you

1    consider them a community?

2              MS. SERRANO:  Of course.

3              Public housings, there are also a lot of community

4    members, there are leaders there, that through community

5    safety councils, if they are developed within that area, feel

6    some connection, but there is no connection if that doesn't

7    exist.  And the police does not go out there just with

8    athletic league, if there was a chapter, but not every area

9    has a chapter.  There needs to be more productivity beyond

10   the community relations bureau.

11             We are looking at this as an organizational

12   transformation.  It has to start from the top to the very

13   bottom.  I feel pleased that I have just learned that

14   supervisors and upper management began engaging with

15   St. Petersburg College to receive -- and in coordination with

16   HIDTA.  So we should be able to see some fruit for CMR-9.

17   But as we are discussing it right now, partnerships, the

18   development of alliances; there is a lot of work that needs

19   to take place.

20             I do also, on the other hand, have to recognize

21   that the ability for PRPB to measure the effectiveness of

22   these contacts is in the works.  And they have begun by the

23   development of a system through modules.

24             As the Monitor was pointing out, there are some

25   flaws that we found that they are working.  And I learned as

 1    of yesterday that they have made a lot of modifications to

 2    the modules, so we have a lot to look forward in the data

 3    collection.  And they are working in the development of

 4    protocols to present to the parties, including the Special

 5    Master and the Monitor's Office, for final approval, and then

 6    to be able to utilize it.

 7             Because one of the ultimate requirements that

 8    paragraph 208 has is how effective are you out there in

 9    engaging these communities and working together to solve

10    problems, and handle and improve quality of life.

11             So within that area, I think that CMR-9 may give us

12    a better outlook to it.

13             THE COURT:  Thank you.

14             Mr. Peñagaricano.

15             MR. PEÑAGARICANO:  Thank you.

16             Your Honor, before I pass it Colonel Trinidad, in

17    the process of discussing with the Reform Office the

18    restructuring of the Reform Office and the different

19    components to it, and discussing the different project

20    managers that have been added to the office, Colonel Trinidad

21    is considering assigning a project manager to this area in

22    trying to bring it together and make a compliance plan

23    specific to achieve compliance in all paragraphs of this

24    important section of the consent decree.

25             Of course, we are concerned that out of the 13

1    paragraphs that were reviewed in CMR-8, those in partial

2    compliant decreased by a paragraph and those not compliant

3    increased by a paragraph.  That is obviously concerning, and

4    I think this is an area where a full compliance plan may be

5    of benefit to address all of the things that the subject

6    matter expert has raised.

7            THE COURT:  Colonel Trinidad, anything?

8            COLONEL TRINIDAD:  Yes, Your Honor.

9            With regard to paragraph 211, where it is pointed

10   out that the Reform Office does not have a budget assigned

11   for the citizen interaction item, it is true that there is no

12   budget assigned to each committee to be managed by the

13   committee itself.  However, there are coordinators in every

14   police area and at the central level who are responsible for

15   providing to them the materials and equipment so that they

16   can adequately perform their function.

17           And this topic was discussed at the 253 meeting

18   yesterday with the parties.  And, obviously, it is

19   acknowledged that there is no budget to be assigned to them

20   for them to manage.

21           Also, we acknowledge that the citizen integration

22   committees are waiting or training.  We are in the final

23   phase of design for Lieutenant Eric Marrero.  He believes

24   that within two weeks, when the design of the training is

25   completed, can grant access to the members of the committees

1    to then receive the training that they are waiting on.

2         Also, with regard to the community police training

3    topic, the academy has commenced training of the cadets.

4    They are offered 40 hours regarding community policing topic.

5         And in active members of the police force, their

6    training has been designed already.  And the upper

7    management, members of the upper management of the Police

8    Department have already begun to receive their trainings, and

9    this will continue in July through to December.  We have

10   committed to training 75 percent of the members of the bureau

11   in said period.

12        Furthermore, we have to mention that we have a

13   module that includes all the information received from the

14   different community approaches.  This includes more than

15   6,000 activities carried out by the Bureau and that can be

16   contacted in the different jurisdictions that comprise the

17   Puerto Rico Police Bureau.

18        It can be from faith-based communities, schools,

19   special populations, whether it is through the use of the

20   police athletic league, community relations groups, citizen

21   integration committees, programs such as Experience, which

22   are dedicated to informing on all the components of

23   first-responders assigned to the Public Safety Department.

24   And this has already produced many members who, after going

25   through the experience, show an interest for belonging to the

1    different bureaus of the Police Department.

2          We already have candidates that are ready,

3    available to enter into the police force.  And I believe one

4    or two have already graduated as firemen.

5          So this program has had great success in attending

6    to the younger population.  And although we acknowledge that

7    there is much more to do, the work is certainly being done.

8          We also have the dashboards which Datalytics will

9    be presenting that provide public information and that can be

10   accessed by any citizen through the police website.

11         Also, we are working on the updating and

12   modernization of the police bureau's virtual web page and a

13   reorganization of the virtual library so that citizens can

14   more easily find the information they need by topics.

15         Though certainly by using a project manager who can

16   organize the routes that we must follow and with a very well

17   established plan, there is no doubt in our mind that for the

18   next evaluation, we will have much better results.

19         Thank you very much.

20         MS. SERRANO:  The Monitor feels very enthusiastic

21   and looks forward for CMR-9.

22         I just wanted to pick up on what Colonel Trinidad

23   mentioned regarding the CICs.  We did receive information as

24   part of the resources to perform their duties, training is

25   also a critical aspect of it.  And we learned that there is a

 1    virtual training being prepared and that it was concluded, a

 2    certificate was received, but is in the works to be made

 3    available through the virtual -- on a virtual mode.  However,

 4    the Monitor has not received a course work to review it

 5    before it's implemented.

 6             And the other concern we have is about timeline, as

 7    far as making it available for the CICs.  Because I think we

 8    need to put into perspective that, for the CICs to be able to

 9    do their work, they need to be confirmed.  And the policy

10    contemplates that for them to be confirmed, they must have

11    taken the multi-theme workshops or orientation workshops.

12             So we have no information.  Do we know about the

13    timeline?

14             COLONEL TRINIDAD:  Yes.  I must mention that right

15    now, we are not giving trainings to the members of the

16    citizen integration committees.  We are in the process of

17    developing the design.  We have already provided all of the

18    email addresses of all the members.  However, we have not

19    implemented this yet.  And we believe that by the end of

20    August, we may begin to offer these.

21             MS. SERRANO:  The Monitor's Office appreciates the

22    clarification because during CMR-8, we received a certificate

23    from SAEA -- the Auxiliary Superintendency for Education and

24    training, SAEA -- indicating that the training packet had

25    been already prepared and turned over to the Bureau of

1  Technology for implementation.  That was the reason for the

2  concern, as far as the course work was concerned.

3          THE COURT:  Mr. Saucedo, anything on -- or

4  Mr. Castillo.

5          MR. CASTILLO:  Very briefly, Your Honor.

6          First, acknowledging that the community is an

7  integral part, both of public safety and accountability.  I

8  feel compelled to note that there are some members of the

9  community with us here today at the status conference.

10          We look forward to working with the Commonwealth in

11  developing these plans and charting that path forward with

12  them and with the help of the Monitor's Office.

13          I also want to note briefly that, in addition to

14  the project manager, some other aspects of the Reform Office

15  restructuring might impact some aspects of this.

16          And with the public reporting of crime statics and

17  data, this is also something that is going to be, in addition

18  to the work that's focused for this area, will be supported

19  by the IT data plans infrastructurally.  And then for data

20  quality, the training and staffing plans should also have an

21  impact on this.

22          Thank you.

23          THE COURT:  Dr. Del Carmen, anything on this

24  matter?

25          DR. DEL CARMEN:  Nothing else, Your Honor.

```
 1                    THE COURT:  Thank you, Ms. Serrano.

 2                    MS. SERRANO:  Thank you.

 3                    THE COURT:  Mr. Romero, we have the last topic,

 4        which is IT.

 5                    MR. ROMERO:  Your Honor, one final word on the last

 6        topic.

 7                    THE COURT:  Of course.

 8                    MR. ROMERO:  PRPB has talked about an

 9        implementation plan for community engagement.  They have a

10        number of plans going on right now, and that's a good thing.

11                    There is at least 35 paragraphs -- if you include

12        the eight more, it will be 43 paragraphs that are in

13        noncompliance right now.  That would be in the areas under

14        implementation plans.  PRPB needs to tie them directly to the

15        paragraphs and what's required in the methodology.  And if

16        they do that, as they did in the use of force plan, that's

17        going to result in paragraphs going from noncompliant to some

18        levels of compliant.  So that's a key point there.

19                    THE COURT:  Anything on IT?

20                    Anybody here from Datalytics?  Anybody?

21                    In the back.

22                    Go ahead, Mr. Romero.

23                    MR. ROMERO:  I will be brief in my comments.  Then

24        I will turn it over to technical.

25                    Overall, the Commonwealth's compliance with the six
```

1  information systems and technology paragraphs is unchanged

2  from CMR-7, where two paragraphs were found to be partially

3  compliant and four paragraphs were found to be not compliant.

4          AH Datalytics, the Commonwealth's contractor,

5  continues to contribute situational awareness by working

6  through critical needed data and analysis and its portability

7  to dashboards.

8          Two applications, sexual assault and domestic

9  violence modules, moved forward and have been acknowledged as

10  substantially compliant by the Monitor's Office.

11          The Monitor's Office found technology revisions and

12  adoptions remains slow.  As previously stated, lack of an EIS

13  development is a major concern.

14          The other issue, the ability to maintain a

15  self-sustaining technology transformation remains in question

16  and is unachievable without contracted experts.

17          So, Your Honor, if I may.  At this time, I would

18  like to turn it over to Scott Craig, who is our IT

19  specialist.

20          THE COURT:  Please.

21          Mr. Craig, state your name for the record, please.

22          MR. CRAIG:  Good afternoon, Your Honor.  Scott

23  Craig to provide comments on information technology.

24          What I would like to do to help this maybe

25  understanding is to frame my comments in a conventional way

1  commonly used in IT, and that's to discuss this in terms of

2  people, processes, and technology.

3         The Monitor just referred to the progress that's

4  been made.  Of the six paragraphs for information technology,

5  the four that are not compliant involve data, protocols and

6  procedures, recording devices, and NCIC.

7         The two paragraphs that have been recognized as

8  being partially compliant, we have used a fairly liberal

9  interpretation of what compliance is in those areas, and

10  that's because there are tools or technology that do exist.

11  But at this point in time, they are inadequate.  And an

12  example of that is the RMS system.  I will get to that.

13         So with regard to the comments that you have heard

14  much about today and the other areas regarding people and

15  staffing, processes, protocols that yield data, that leads to

16  some of the noncompliant.  A good example of that is with

17  GTE.

18         The Commonwealth's -- or PRPB's ability to collect

19  data consistently, predictably, that is adequate for the

20  purposes of understanding and gaining situational awareness

21  of what's happening with their processes and outcome

22  incidents has continued to be a problem.

23         Examples of that are that the data that is being

24  collected in GTE and in CAD remains inconsistent.  There are

25  errors that continue to recur, and there are timeliness

1    issues.

2            So, on the one hand, now using technology as an

3    example, and you will hear a little bit from AH Datalytics,

4    that technology exists today.  The process for collecting

5    data and understanding and analyzing it is becoming more

6    evident, all of which is positive.

7            However, procedurally, there is inconsistency in

8    the collection of the data and the representation of the

9    data.  And when that's coupled with the lack of staff, you

10   have a timeliness problem.  Therefore, although we have

11   dashboards that have been built by AH Datalytics, very

12   positively for the Commonwealth, the information about use of

13   force is often suspect.

14           So, again, people, processes and technology, in the

15   best of circumstances, you should have all three.  With

16   regard to use of force, we have breakdowns in processes.  We

17   have shortages in people and staff, supervisors, to fulfill

18   those processes, although we have technology.

19           And so, in that context, when you look at the other

20   systems that are currently available, although there is a

21   CAD, it does not adequately capture the data that's required

22   to understand all incidents and the circumstances to provide

23   situational awareness adequate for the transformation.

24           The staff shortages will continue.  As recently as

25   Monday of this week, I had a very good conversation with the

1    technologist in the Bureau of Technology.  We acknowledged

2    that they do not have subject matter experts to fulfill

3    program and project management roles to lead these endeavors

4    to a fruitful conclusion whereby technology would be

5    provided, processes and protocols would be changed, and

6    adequate numbers of staff would be available.

7          Where else is that seen?  In the IT corrective

8    action plan, we did make progress.  We continue to make

9    progress.  We are actually contracting right now on behalf of

10   the Commonwealth to secure experts like Gartner.  You have

11   heard about Gartner before; that's a consulting company.

12         The Monitor's Office also secured -- I should

13   reframe that.  The Monitor's Office also contributed to

14   securing AH Datalytics last year.  And so my point here is,

15   again, not technology now but people, where the Commonwealth

16   has been unable to fulfill its needs with regard to subject

17   matter experts, the Monitor's Office, the DOJ, and most

18   recently as well the Governor's Office and DSP have all

19   rallied to provide experts and people to augment and

20   supplement the shortages that exist in PRPB.

21         That will continue.  We will contract.  We will

22   continue to bring experts in.  There is more work to do in

23   addition to the work that's occurring today.

24         Ultimately, in question, and you have heard this

25   already earlier today, is whether or not the PRPB and the

1    Commonwealth can sustain its efforts independently to

2    continue this journey.  I am not prepared at this point in

3    time, sir, to tell you that they can.  And for that reason,

4    we need to continue to assist their efforts to respond to the

5    decree.

6            And, finally, what we are also seeing, as we

7    continue down this path of providing technology, there are

8    additional shortages or deficits that include, for example,

9    PRPB's ability to understand its infrastructure and its cyber

10   status.  And what I mean by that is cyber hygiene and cyber

11   hardening.

12           Now, we all collectively responded to bring in

13   analytics.  That's where AH Datalytics came from.  We all

14   collectively responded to bring in Gartner to do an IT

15   assessment, and they will now be involved in the actions that

16   come to that assessment that led to a corrective action plan,

17   that require a project management office to stood up, as well

18   as a replacement of the RMS system.

19           In my opinion, we need to continue to pursue other

20   issues, deficits, challenges that will continue to confront

21   PRPB, such as, what is their status and what is their ability

22   to react to cyber threats that exist today, as well as their

23   ability to understand their infrastructure and how it can

24   evolve over time to meet the needs that are going to be

25   generated by the new IT systems that need to be brought

1    forth.

2           So, in sum, Your Honor, people, processes and

3    technology, you must have all three.  Puerto Rico, or PRPB

4    and the Commonwealth are often confronted with at least two

5    deficits in each area that we've see.

6           Beyond all of that, there has been progress.  I

7    don't want to be -- I don't want to come across as totally

8    negative.  There is progress being made.  But to sustain the

9    progress that has been made, carry it forward, there needs to

10   be a change in rituals and traditions, management rigor in

11   the technology space.  And there needs to be continuous

12   management intervention to ensure that this progress

13   continues.

14          With that, sir, I will conclude my comments, and

15   I'll make myself available for questions.

16          THE COURT:  Thank you.

17          Mr. Peñagaricano.

18          MR. PEÑAGARICANO:  Your Honor, briefly, we

19   appreciate Mr. Scott identifying the problem.  I think we

20   have identified the problem in many, many hearings over the

21   past two or three years.

22          I think the more important discussion is what's

23   been done to address that issue, that problem.  And I think

24   we can all agree -- Plaintiff, Monitor, and its subject

25   matter experts, Special Master -- that over the last two

 1   years, since the parties agreed to hire a contractor to do a

 2   needs assessment, what was the needs for IT in this case,

 3   since that moment till today, there has been leaps and bounds

 4   improvements in the process to achieve the ultimate goal of

 5   having a technology-sustainable transformation in the police

 6   bureau.

 7           And I think we can all agree that the process is in

 8   the precise, correct path to achieve that goal.  And other

 9   than that, I know Colonel Trinidad wants to make some brief

10   remarks.

11           THE COURT:  Well, Mr. Craig mentions that, of the

12   assistance that these experts are giving, and he is

13   concerned, as should everybody, as to whether the police will

14   have that expertise once those experts leave.

15           MR. PEÑAGARICANO:  Well, Your Honor, that is

16   something that has been addressed through the process, and

17   the Bureau and DSP has put all available resources to assist,

18   together with the expert of Plaintiff Maggie Goodridge and

19   Scott Craig, and others, starting from Mr. Bulkers, who

20   unfortunately cannot be here, who is taking a more active

21   role.

22           THE COURT:  I am glad that that has reached that

23   level.

24           MR. PEÑAGARICANO:  It definitely has.  It

25   definitely has.

```
 1              And not only that, DSP and the Bureau has started
 2   contracting managers to specifically deal with IT.  And we
 3   appreciate Budget and Management Office for their assistance
 4   in supplying them.  There has been meetings with these
 5   managers and all of the parties here more than once.
 6              So it's an ongoing process, and the Commonwealth is
 7   trying to put all available resources.  And I have no doubt
 8   that when -- as this progresses, the Commonwealth will have
 9   in place the experts it needs to sustain the goal of
10   achieving technology here.
11              THE COURT:  Because it's not just Mr. Völckers.
12   Ms. Martinez-Ortiz at the PRITS office is available, as is
13   her staff.  So...
14              MR. PEÑAGARICANO:  Yes, Your Honor.
15              THE COURT:  Like I said at the last meeting and as
16   Mr. Romero has admitted, IT is something that should have
17   been dealt with at the beginning of this case.  Now we are
18   behind the eight ball, but thanks to Mr. Craig and
19   Mr. Gartner and AH Datalytics and the IT people in the Puerto
20   Rico Government, we are making progress.
21              I know this is going to take some time because of
22   the technology involved and the personnel that the PRPB
23   needs.  I mean, I don't know if you are going to need what
24   has been said here before.
25              Colonel, in the last meeting, Captain Figueroa said
```

1    that, in the IT office, there were, like, 11 people.  Is that

2    still the case?

3            COLONEL TRINIDAD:  Yes.  Certainly, the number of

4    people in the different police areas and the central office

5    continue to be the same number.  However, we know that this

6    is a core topic in the reform process, and we take on this

7    challenge to address it personally.

8            And we have addressed the recommendations made by

9    the experts that have been placed at our disposal, both by

10   the Monitor's Office, such as Mr. Craig, and the DOJ's

11   office.  We've held meetings with personnel from the Budget

12   and Management Office and Fortaleza, the Governor's Office,

13   on technology and budget because this requires money.  And so

14   we have been able to submit a plan, which is already in the

15   phase of hiring, through the Monitor's Office, Gartner, who

16   was the company that performed the needs assessment, for them

17   to provide us assistance, to provide the bases for the

18   development of a project manager office and seven

19   initiatives, as well as the development of processes and

20   procedures, which includes the request for proposals to

21   select the company that will take care of the execution.

22           So certainly this is a topic that, as you very well

23   stated, should have been addressed from the beginning.  This

24   is an area that we are committed to taking action in.  And we

25   acknowledge that, once we are able to implement a good

1    technological system, as a result of a domino effect, many

2    paragraphs of the agreement will then become compliant.

3              And that plan includes the area of communications

4    in the Puerto Rico Police.  And with regard to this topic, we

5    have made substantial progress in the assignment of portable

6    radios to each and every member of the Puerto Rico Police

7    Bureau.

8              We have 10,955 active members in the police force.

9    Of those, 9,317 already have a radio assigned, which

10   represents 85 percent.  Pending still are 1,638 members.

11             However, we already have a program and ready for

12   delivery 922 radios, which are delivered day after day to the

13   personnel.  And we have 1,700 radios that are in the process

14   of being programmed and assigned a property number so that

15   they can be delivered to our staff.  The excess of 2,622

16   radios that we have to cover 100 percent of our personnel

17   with radios, cadets that are currently receiving training and

18   the 200 that will soon be joining.  And then we have an

19   additional 405 spare radios.

20             Likewise, we have requested the allocation of funds

21   through the Public Safety Office to modernize our

22   communication network.  This includes the change of antennas,

23   transformers, switches, wiring, and this will allow us to

24   achieve greater conference of 75 percent up to 95 percent.

25             And the Budget and Management Office has already

1    allocated $16.3 million to us for that.  We are in the

2    process of receiving authorization in order to submit an

3    order to the supplier.  And once all the materials are

4    received, technicians from the Puerto Rico Police Bureau, in

5    coordination with the company, will be the people in charge

6    of modernizing our network.  And in the worst of cases, our

7    estimate is that we will be able to achieve this in one year.

8              So there is no doubt that this will help a great

9    deal not only for the security of our own staff but also for

10   purposes of the services that we provide to our citizens.

11             For more details about the plan regarding

12   technology, we have Diaz-Camarero, the project manager, and

13   Violeta.  We them as both Gabriels.  They are the ones

14   working day-to-day with the implementation of the plan

15   submitted.

16             Thank you very much.

17             THE COURT:  The two Gabriels because of the horn?

18             COLONEL TRINIDAD:  It's just that both of their

19   first name is Gabriel.

20             THE COURT:  Well, I am glad this is progressing.  I

21   know this is going to take a long time, and it's going to

22   take a lot budget.  So I am glad that the Office of

23   Management and Budget is involved.

24             I would like the Financial Board to also get

25   involved because this is, like we said, something that had to

1   be done from the beginning.  And I agree with Colonel

2   Trinidad that, once this is done, a lot of these paragraphs

3   that are noncompliant will come into compliance.  Mr. Craig

4   said that, and I agree with it.

5         So we need to get this done, not just what Colonel

6   Trinidad said about the radios and the network, but

7   everything having to do with getting a good IT system, which

8   would involve -- it's going to involve some people with

9   expertise.  You are going to have to pay for that expertise.

10  There is no ands, buts about it.

11        Mr. Saucedo, please.

12        MR. SAUCEDO:  Yes, Your Honor.

13        Gartner, the company that was brought in to do the

14  independent IT needs assessment, confirmed that years of

15  ad hoc planning and implementation of technology made things

16  worse for police officers out on the street.  It made things

17  less safe because there are now systems that didn't have the

18  bugs worked out, or weren't properly trained, pushed out to

19  officers who had to now use these systems.

20        The good news, Your Honor, is that, as the

21  Commonwealth has said, we have been working hand-in-hand over

22  the last year with this implementation plan.  The United

23  States has seen evidence of the Commonwealth -- PRPB not

24  being alone anymore, trying to achieve in monumental task of

25  upgrading and modernizing its IT systems.

1          We have seen the Governor's office involved.  We

2     have seen the Office of Management and Budge, General

3     Services.  We have seen -- PRITS has also been involved, the

4     Puerto Rico Innovation and Technology Services.  The

5     Department of Public Safety.  It really has been a

6     collaborative effort, everybody working on this.

7          The United States brought in two subject matter

8     experts who were CIOs, chief information officers, and

9     innovation managers at the Los Angeles Police Department that

10    successfully implemented a lot of the IT systems that led to

11    compliance in that case.

12         Your Honor, you may remember that at our first

13    status conference, when we found out that IT Bureau had 11

14    people.  LAPD has about 400 people, not just IT but doing

15    support.

16         THE COURT:  I don't know if we are going to need

17    400 people, but we are going to need more than 11, I can tell

18    that you much.

19         MR. SAUCEDO:  That's correct, Your Honor.

20         And I think one of the reasons why we are

21    optimistic about this is because we have been thinking about

22    how we make this sustainable.  And we do have seven ambitious

23    initiatives.  One of them being radios.  You know, part of it

24    is getting equipment.

25         THE COURT:  I sure am glad about the radio, because

1  I hate to have these police officers get out of their patrol
2  car and have to use their own iPhone or smartphone to have
3  communication with -- not only with the patrol car but with
4  everybody else.
5          MR. SAUCEDO:  And the second part of that,
6  Your Honor, is the $16 million that were allocated to improve
7  the network so that the radios have something to connect to
8  and that the system -- that this equipment actually work.
9          So, Your Honor, we share the Commonwealth's
10 optimism in this area.  It is going to take a lot of work.
11 It is going to take a lot of project management, a lot of
12 outside expertise to get us kicked off.
13         Gartner has agreed to stay on, and the discussions
14 are coming to a close to engage them.  They will help the
15 Commonwealth set up the project management office over each
16 of these seven initiatives.  And, in addition to that, they
17 are going to take on the project management of the record
18 management system replacement.  So they will be modeling how
19 to properly project manage a system of this scale to help
20 with sustainability.
21         The hope is that, through Gartner's help, PRPB will
22 be able to stand up a project management office with local
23 resources, local talent here on the island, to be able to
24 sustain these efforts over the long haul.
25         We do hope to have an RMS, a record management

1    system, some basic form of it, next year, 2024.  But a lot of

2    work needs to go into it this year and next year.

3              THE COURT:  Thank you.

4              MR. SAUCEDO:  Just a last point, Your Honor.

5              The implementation plan we filed with the Court in

6    March includes all of the paragraphs we expect to move

7    forward through all of the upgrades that will happen in this

8    plan.

9              We also have committed to producing -- the

10   Commonwealth has committed to producing a 90-day report to

11   let the Court know about its progress throughout the

12   implementation.

13             THE COURT:  I appreciate that.

14             Dr. Del Carmen, anything on this topic?

15             DR. DEL CARMEN:  Nothing to add, Your Honor.

16             THE COURT:  Before I forget, Mr. Graham, are you

17   here?

18             MR. GRAHAM:  Yes, Your Honor.

19             THE COURT:  I just want to say that the certified

20   translation of the draft procurement protocol and comments to

21   the draft protocol were supposed to be provided by July 14.

22   That date has passed.  When is the new date?

23             MR. GRAHAM:  If I may, Your Honor.

24             THE COURT:  Of course.

25             MR. GRAHAM:  As the Court is aware, we are

1    currently working on a revised protocol document with the

2    collaboration of all the parties and the stakeholders.

3              The certified translation that was recently filed

4    with a deadlined was an original protocol document that the

5    Court rejected, rightly so.  And, therefore, the need to

6    respond to that and a deadline has been essentially overcome

7    by events and the progress that we are making right now.

8              THE COURT:  So when do you think you will get a

9    draft of the new one?

10             MR. GRAHAM:  We are making incredible progress.

11   There is I think a meeting of the minds.  There is no

12   significant gaps or differences of opinion as we are moving

13   forward.  And by mid-July, late July, no later than the end

14   of the July.  So we will need --

15             THE COURT:  I will give you the benefit of the

16   doubt, late July.

17             MR. GRAHAM:  We will meet that deadline,

18   Your Honor.

19             THE COURT:  July 31st is a Monday.  That's fine.

20             MR. GRAHAM:  We will meet that deadline,

21   Your Honor.

22             THE COURT:  Thank you.

23             MR. GRAHAM:  Thank you.

24             THE COURT:  Before we adjourn, Commissioner Lopez,

25   is there anything you would like to say?

```
 1              COMMISSIONER LOPEZ:  No.

 2              THE COURT:  What about you, Secretary Torres?

 3              SECRETARY TORRES:  We are good, sir.

 4              THE COURT:  Thank you.

 5         I want to apologize for taking so long and going

 6    through everybody's lunch hour.  I haven't had a cup of

 7    coffee since this morning, but I appreciate everyone's

 8    presence here.

 9              One thing I do want to say, I have heard a lot of

10    plans, a lot of things that have to be done, and mentioning

11    the next CMR, which would be CMR-9.  What I would like is

12    reports before CMR-9.  And to that effect, I would like the

13    Monitor, the Special Master and their teams, the Department

14    of Justice, and the Commonwealth to work together and provide

15    me with any problems that they come up with so that I can

16    help on, or tell me that you are moving along, and that

17    such-and-such paragraph that has been noncompliant or

18    partially compliant has become fully compliant or partially

19    compliant, or things like that.  Because I would like to

20    know, have knowledge of what's going on earlier than every

21    six months.

22              Is that okay with everybody?

23              Mr. Saucedo?

24              MR. SAUCEDO:  Yes, Your Honor.

25              I think these interim check-ins with --
```

1          THE COURT:  It doesn't really matter when.  Just

2    something maybe even informal.

3          MR. SAUCEDO:  Yes, Your Honor.

4          The only thing I would mention is the Monitor's

5    six-month reports really are the most complete.

6          THE COURT:  I know that.  I know that.

7          MR. SAUCEDO:  The interim reports, we agree would

8    be helpful.

9          THE COURT:  It doesn't even have to be something

10   formal.  Just something informal.  Say, "Look, Judge,

11   remember that we talked about paragraph so-and-so, this is

12   the progress that we have made."

13         MR. SAUCEDO:  Yes, Your Honor.

14         THE COURT:  I would appreciate that because this

15   consent decree is going to take some time.  I remember the

16   Governor said that we are going to finish it up this year,

17   and everybody knows that that's not going to be possible.

18   But I appreciate everybody's work.

19         Colonel Trinidad, you are new in the *barrio*, but

20   welcome, and thank you for your help.

21         Mr. Peñagaricano, please.

22         MR. PEÑAGARICANO:  Just very briefly, for the

23   record, Your Honor, you mentioned that today and in other

24   hearings we are talking about these plans and plans and

25   plans.  But I really would like the record to reflect and

1    clarify that these are not just plans that we are making.

2            THE COURT:  I understand that these plans -- you

3    have been working hard on these plans.

4            MR. PEÑAGARICANO:  But, Your Honor, a little bit

5    more than that; that they have been executed with success so

6    far, some of them, like use of force, IT, paragraph 13,

7    supervision and staffing, they are working.  We are working

8    hard on them, and they are rendering results in the Monitor's

9    reports.

10           THE COURT:  I appreciate that.  But, like I said, I

11   would like more reports that are prepared, even informally,

12   more often so I know what's going on, and I don't have to

13   wait for every six months to see what's going on.

14           Anything else by anybody?

15           MR. SAUCEDO:  No, Your Honor.

16           THE COURT:  Thank you for your presence, and excuse

17   me for taking so long.

18           THE COURTROOM DEPUTY CLERK:  All rise.

19

20           (PROCEEDINGS ADJOURNED AT 1:30 P.M.)

21

22

23

24

25

REPORTER'S CERTIFICATE


       I, JOE REYNOSA, Official Court Reporter for the

United States District Court for the District of Puerto Rico,

appointed pursuant to the provisions of Title 28, United

States Code, Section 753, do hereby certify that the

foregoing is a true and correct computer-aided transcript of

proceedings had in the within-entitled and numbered cause on

the date herein set forth; and I do further certify that the

foregoing transcript has been prepared by me or under my

direction.



                         S/Joe Reynosa

                         _____
                         JOE REYNOSA, CSR, RPR
                         United States Court Reporter
                         Federico Degetau Federal
                         Building, Room 150
                         150 Carlos Chardon Street
                         San Juan, Puerto Rico 00918-176
                         (787) 772-3480