

December 2023

# Ninth Report of the Federal Monitor

Covering the Period from April 2023 through September 2023

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero

Federal Monitor

1

## Table of Contents

INTRODUCTION ................................................................................................................................ 4

    General Background on the Agreement and Monitoring Process ............................................... 4
    Scope and Methodology ........................................................................................................... 5
    Monitoring Activities During CMR-9 ........................................................................................ 6
    Key Findings of the Monitor's Ninth Report ............................................................................ 7

I. PROFESSIONALIZATION ............................................................................................................. 9

    1. Staffing and Community Policing ...................................................................................... 12
    2. Promotions ........................................................................................................................ 14
    3. Commander Corps ............................................................................................................ 24

II. USE OF FORCE ......................................................................................................................... 26

    1. General Provisions ............................................................................................................ 29
    2. Specialized Tactical Units ................................................................................................. 33
    3. Crowd Control Policies and Performance ......................................................................... 40
    4. Force Reporting ................................................................................................................. 46
    5. Force Review, Investigation, and Analysis ....................................................................... 52
    6. Supervisory and FRB Reviews ......................................................................................... 55
    7. FIU Investigations and Force Reviews by SFRB .............................................................. 61
    8. Use of Force Training ........................................................................................................ 71
    9. Responding to Behavioral/Mental Health Crisis .............................................................. 75

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY ................... 83

    1. Stops, Searches, and Seizures ........................................................................................ 85
    2. Investigatory Stops and Searches .................................................................................... 86
    3. Arrests .............................................................................................................................. 92
    4. Searches .......................................................................................................................... 102
    5. Training on Stops, Searches, and Seizures ..................................................................... 106

IV. EQUAL PROTECTION AND NON-DISCRIMINATION ................................................................ 110

    1. General Provisions ............................................................................................................ 114
    2. Discriminatory Policing ..................................................................................................... 124
    3. Sexual Assault and Domestic Violence ............................................................................ 134

V. RECRUITMENT, SELECTION, AND HIRING ............................................................................. 149

VI. POLICIES AND PROCEDURES ............................................................................................... 150

VII. TRAINING ............................................................................................................................... 161

VIII. SUPERVISION AND MANAGEMENT ..................................................................................... 162

    1. Duties of Supervisors ....................................................................................................... 164
    2. Supervisor Training .......................................................................................................... 175
    3. Performance Evaluation ................................................................................................... 175
    4. Early Identification System ............................................................................................... 178
    5. Internal Audits and Interagency Feedback ....................................................................... 184

IX. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE .......................... 192

    1. Civilian Complaints ........................................................................................................... 195
    2. Internal Investigations ...................................................................................................... 198
    3. Complaint Intake, Classification, Assignment, and Tracking ........................................... 202
    4. Investigation of Complaints .............................................................................................. 213

5. Staffing, Selection, and Training Requirements ........................................................................... 234

6. Preventing Retaliation........................................................................................................................ 237

7. Discipline .............................................................................................................................................. 239

8. Officer Assistance and Support ....................................................................................................... 243

**X. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION** ...........................................................**246**

1. Community Oriented Policing ........................................................................................................... 252

2. Community Interaction Councils ..................................................................................................... 258

3. Public Information .............................................................................................................................. 263

**XI. INFORMATION SYSTEMS AND TECHNOLOGY**..............................................................................**270**

**APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION** .....................................................**279**

**APPENDIX B: METHODOLOGY** ........................................................................................................**281**

Compliance Levels .................................................................................................................................. 281

Sampling Methodology ......................................................................................................................... 282

CMR-9 Samples........................................................................................................................................ 283

**APPENDIX C: COMPLIANCE STATUS BY PARAGRAPH AND SUB-SECTION**......................................**289**

## Introduction

This report will outline the current compliance status of the Commonwealth of Puerto Rico (hereafter, the "Commonwealth") and the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, Parties, and residents of the Commonwealth about implementation status and levels of compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the Court, the Parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report.

### General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources needed to reform unconstitutional policing practices and bring the Bureau into line with generally accepted practices of constitutional policing and effective law enforcement. The Parties recognize that constitutional policing, effective law enforcement, and the community's trust in its police force are interdependent. Accordingly, full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop dynamic leadership and management skills within PRPB aimed at transforming the Bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the Parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

1. Professionalization;
2. Use of Force (UOF);
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations, and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, the Commonwealth developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor's Office.

4

During the capacity-building period, the Monitor's Office assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1 and since October 2018, the Monitor's Office has been assessing PRPB's compliance with the Agreement.

## Scope and Methodology

The Chief Monitor's Ninth Report covers the period between April and September 2023. CMR-9 covers 9 of the 11 performance areas of the Agreement: 1) Use of Force (UOF), 2) Searches and Seizures, 3) Equal Protection and Non-Discrimination, 4) Policies and Procedures; 5) Professionalization; 6) Supervision and Management, 7) Civilian Complaints, Internal Investigations, and Discipline, 8) Community Engagement and Public Information, and 9) Information Systems and Technology. Per the monitoring methodology agreed on by the Parties, 177 paragraphs were scheduled for assessment in CMR-9, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering Recruitment, Selection, and Hiring and Training as well as specific paragraphs throughout other sections that are assessed on an annual basis and were covered in CMR-8.

For each of these areas, the Monitor's Office presents its assessments based on the desk review of data that was provided by the Commonwealth, as well as interviews, questionnaires, site visits, observations, and the current state of IT (see below for more details on the activities conducted during the CMR-9 reporting period). The collection, analysis, reporting, and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely assessments as to compliance, as well as achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist the Commonwealth in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess the Commonwealth's compliance with the Agreement in the three areas of performance (policy, training, and implementation) selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel on the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide the Commonwealth with a detailed pathway towards achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's assessment as well as additional detail on the assessment and sampling methodologies are provided in Appendix B.

## Monitoring Activities During CMR-9

Over the past six months the Monitor's Office conducted five site visits to PRPB headquarters as well as various regions of the island including Aibonito, Mayaguez, Ponce, Humacao, and Arecibo. At each of these field visits the Monitor's Office visited the area command, district(s) within each area, Highway Patrol Units, and other units at each location. At each location the Monitor's Office met with executive command and PRPB personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF.

These field visits provided an opportunity for the Monitor's Office to hear directly from supervisors and officers on the front line, speak with members of the Commonwealth community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of over 4,000 policies, documents, certifications, audio recordings, and case files and reports provided for review during the CMR-9 reporting period. While on site, team members also participated in five system demonstrations on various dashboards, GTE and Sexual Assault Module Interface System, and the Supervisory Module. The Monitor's Office also acquired access to these systems as part of its efforts to streamline monitoring efforts.

During the CMR-9 reporting period, the Monitor's Office also reviewed 53 policies, forms (PPRs), and protocols under paragraph 229 of the Agreement. The policies included GO 409 Biblioteca Virtual, GO 623 Persecuciones Policiacas, GO 403 Normas Para el Uso de Sistemas Computadorizado, GO 410 Querellas Administrativas, among others.

The Monitor's Office also observed one community engagement hosted by PRPB and the CICs. The Monitor's Office was also present at various demonstrations and protests during the CMR-9 reporting period, including the May 1st demonstration. These demonstrations provided another avenue to assess PRPB's operations and practices to ensure that they are in line with the Agreement. The Monitoring Team also conducted a community townhall meeting in September 2023. This meeting was attended by over 130 representatives from the community, PRPB, and the Department of Public Safety (DSP). Similar community meetings hosted by the Monitor's Office will be conducted quarterly.

During this reporting period, Gartner Inc. was contracted by the Monitor's Office to continue its work with the Commonwealth. The new contract includes support for the implementation of the new Record Management System (RMS) and the Project Management Office (PMO). The Commonwealth also finalized and submitted implementation plans on Searches and Seizures and Domestic Violence and Sexual Assaults to the court as well as status updates on the Training Plan and Staffing Plan. Relatedly, the Commonwealth, with assistance from the USDOJ, began drafting an implementation plan for Crisis Intervention Training and Community Engagement.

In addition, during the CMR-9 reporting period, the Monitor's Office participated in one status conference. The status conference held in June 2023 focused on updates related to the CMR-8 report, sergeant promotions, the Training Plan, the IT Corrective Action Plan (CAP), the Supervision and Staffing Plan, Provisional UOF Plan, and the Domestic Violence/Sexual Assault Plan. The Monitor's Office has continued to work closely with the Parties to monitor the Commonwealth's progress with implementing the various plans filed with the court.

## Key Findings of the Monitor's Ninth Report

During the CMR-9 reporting period, the Commonwealth's achievements towards partial and/or substantial compliance with many of the paragraphs positively increased. This positive increase in compliance is largely due to the completion of the various tasks and initiatives related to several implementation plans including UOF, Professionalization, and Supervision and Management. The promotion of executive leadership as well as over 500 sergeants has improved the ratio of supervisors to officers across nearly all the area commands. The Monitor's Office expects that with these promotions and complementary updates to GO 310 (Performance Evaluations) the issues in supervisory accountability will also be improved. Further, improvements to the tracking and recording of UOFs have also propelled the Bureau forward in its ability to provide accurate UOF data. These improvements will be further solidified once the new RMS is in place. Other areas of progress included movements forward in procuring a new RMS, establishing an IT PMO, and incremental improvements to stop and arrest reports, community engagement and the publication of crime data, the quality of domestic violence and sexual assault investigations, and the initiation of in-service training in related areas.

Further, as a result of the assistance provided by AH Datalytics, the Commonwealth's contractor, the Reform Unit has made incremental improvements in its internal auditing and monitoring processes. These improvements have increased the unit's ability to identify and address instances where internal reporting fails to meet the requirements of the Agreement.

Although overall largely promising progress has been made, the Monitor's Office continues to note issues like poor documentation of probable cause and the use of boilerplate language in some arrest and stop reports, failures in supervision to issue corrective actions, and exceeding timelines in the adjudication of internal investigations and Commissioner's Force Review Board (CFRB) evaluations of UOFs. These issues have been raised by the Monitor's Office in previous CMRs and are noted again in this report.

As noted above, when examining the total paragraphs assessed in this report (N=177) in comparison to the previous report in which these sections and paragraphs were assessed (CMR-7; N=177), the Monitor's Office notes that PRPB has achieved significant progress during this reporting period. For example, 101 paragraphs met partial compliance and 37 paragraphs were rated not compliant during this reporting period, in comparison to 77 paragraphs rated as partially compliant and 61 as not complaint in CMR-7. Further, when reviewed comprehensively, almost 77% (N=137) of the paragraphs meet either partial, substantial, or full compliance in CMR-9 in comparison to 59% (N=104) in CMR-7.



*Figure 1. Rate of Compliance Over Time*

In the forthcoming report sections, the Monitor's Office provides the assessment and analysis produced by the subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting the Commonwealth in achieving a pathway to compliance.

8

## I. Professionalization

With respect to Professionalization, the Monitor's Office concludes that the Commonwealth has made progress towards compliance since the previous reporting period in which this area was assessed, CMR-7. The development of policies for promotions, staffing, career development, performance evaluations, and integrity audits have been completed or are in progress. Those policies that have been implemented and/or recently finalized incorporate the requirements of the paragraph(s). Further, although training in many of the areas of the Agreement had regressed during the CMR-7 reporting period, training on the Code of Ethics and Conduct is consistent with approved policies and has been delivered, as noted by the Monitor's Office review of training records. While the Commonwealth has begun implementing many paragraphs of the Agreement in policy and training, the Bureau has not yet consistently demonstrated the application of these policies and training in practice with respect to Professionalization.

Two issues caused concern to the Monitor's Office regarding Professionalization. First, the Monitor's Office again notes the need to ensure that supervisors themselves are evaluated and promoted based on their work and the quality of the evaluations they perform of their supervisees. Second, during the recent round of promotions, a number of eligible officers were passed over for promotion due to open administrative complaints that in some cases were years behind schedule for resolution. This delay in attaining final resolution on internal investigations could significantly hold back careers and lifetime earnings. PRPB may be opening itself up to potential litigation for lost lifetime earnings from officers who are ultimately cleared of misconduct allegations but nevertheless missed a promotion opportunity due to these unresolved complaints. See the Civilian Complaints, Internal Investigations, and Discipline section for additional information.

During 2023, a total of 565 candidates were promoted to the rank of sergeant. The Monitor's Office recognizes PRPB's efforts in promoting good candidates for the rank of sergeant. Nonetheless, there were a total of 590 candidates that obtained passing grades in the same promotional exam, and a total of 26 candidates that were still "pending promotion" when the Monitor's Office received the information of the promoted personnel. These discrepancies between the numbers of eligible personnel and the actual promotions should be reviewed and explained by PRPB. The Monitor's Office recommends PRPB investigate the reasons behind these occurrences because, as mentioned above, there might be a cause for potential lawsuits.

As part of the Staffing Plan described in Paragraph 13, PRPB identified that 740 supervisors for 110 precincts were needed based on a ratio of 6 first-line supervisors and a relief per unit. As reported, after a total of 565 officers were promoted to sergeants during the first half of FY 2023, based on the needed number of supervisors identified by PRPB in their Staffing Plan, they still have a shortage of 175 supervisors. The Commonwealth also identified the need for 68 positions within the ranks of inspectors and colonels. During May 2023, 40 officers were promoted to inspector, 12 to commander, 12 to lieutenant colonel, and 4 to colonel for a total of 68, meeting the identified amount needed. PRPB is currently working on a captain promotion test with the goal of promoting the much-needed captains by August 2024. Also reported in the Staffing Plan was the re-assignment of personnel using the following breakdown: SAIC 20%, SAOE 10%, and Auxiliary Superintendency of Professional

Responsibility (SARP) 5%, demonstrating compliance. A Project Manager was also identified to ensure compliance and the sustainability of initiatives. This position is a great strategy that will positively advance the entire reform related to this area .

As reported in the past, the Commonwealth has a board responsible for designing a promotion system, which includes the administration of examinations and other objective measures, complying with their goal. The Monitor's Office remains confident that the Commonwealth will carry out the activities and timelines noted in the updated Staffing Plan as agreed which was filed with the Federal Court on September 5, 2023. The Monitor's Office will continue to monitor the Commonwealth's progress in future CMRs and looks forward to reviewing the promotional process for captains.

Overall, the Commonwealth's compliance with the 10 paragraphs within Professionalization reflects substantial progress to what was noted in previous CMRs. In CMR-7 50% of paragraphs were found to be partially and substantially compliant and 50% were rated as deferred, where 100% of paragraphs were found to be partially compliant and no paragraphs were rated deferred in the current reporting period. See figure 2.



*Figure 2. Professionalization: Paragraph Compliance Status*

## Paragraph 12: Professionalization - General Provisions

*PRPD shall develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges; consistently and uniformly apply constitutional police practices; build public confidence; and strengthen its institutional structures. PRPD shall promote continuous performance improvement among all PRPD personnel that regularly identifies problems or challenges, assesses causal or contributing factors, and takes reasonable measures to achieve performance expectations in areas related to this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |

10

| | | | |
|---|---|---|---|
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on the code of ethics and conduct is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in the code of ethics and conduct (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of sampled administrative investigation outcomes are within policy. | ☐ Met | ☑ Missed |
| 5. 95% of sampled integrity audit outcomes are within policy. | ☐ Met | ☑ Missed |

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

### Compliance Assessment

PRPB policies related to this paragraph have been revised since the Monitor's Office last assessment. PRPB continues to incorporate the requirements of Paragraph 12 and has supplied documentation that indicates over 95% of its workforce is currently trained on the Code of Ethics and Conduct. Regarding administrative investigations, the Monitor's Office noted several areas where PRPB uses the findings of the investigations in relation to professional advancement. However, the Monitor's Office found that less than 95% of sampled administrative investigation outcomes complied with GO 617 (Code of Ethics for Members of the Puerto Rico Police Bureau), and no integrity audits have been conducted.

Non-compliance generally resulted from evidence that PRPB is not following through or providing evidence of the actions and discipline noted in administration investigations. Investigation files for complaints against PRPB personnel show a several areas where greater consistency in discipline could enhance professionalization of the workforce, including a) more consistent recommendations for re-training where appropriate, and b) consistently documented supervisor review of full investigation files before they are adjudicated, c) consistent discipline of officers that disregard civilian complaints, and d) greater use of psychological evaluations in adjudication and recommendations or mandates that officers avail themselves of counseling services provided by PRPB when appropriate.[1] Further, as noted in previous CMRs, PRPB continues to work on developing its policies and procedures related to integrity audits. As such there are no integrity audits for the Monitor's Office to assess for compliance with target five.[2]

### Pathway Forward

Going forward, PRPB must create an automated system or revise its current SARP system to allow the Monitor's Office the ability to verify what discipline was imposed and when it was completed or produce documentation that provides this information for the administrative investigations requested. Similarly,

---

[1] An example of a complete and thorough investigation file is that associated with complaint #202300018. An example of a file that is not complete because of the failure of supervisors to review is #20200639.
[2] See Paragraph 157 for additional information.

once developed, the integrity audit process should include a review process that would allow PRPB and the Monitor's Office the ability to review audit outcomes in a comprehensive manner.

The Monitor's Office will continue to track PRPB's progress in developing an Integrity Unit and its related policies and procedures. Specific recommendations and feedback on the preliminary drafts of the policy were submitted at the end of the reporting period and are provided in the pathway forward for Paragraph 157.

While the planned Integrity Audit Unit is a step towards substantial compliance, the unit should also contemplate a proactive element to allow spot field inspections of PRPB paperwork pertaining to administrative investigations, to include both punitive and corrective actions, across the island. Such a capability would allow PRPB to self-ensure compliance with its procedures at all levels of the organization. The Monitor's Office notes that OSM is currently assisting PRPB with developing related protocols and procedures for the Integrity Audit Unit and looks forward to the developments resulting from this assistance.

## 1. Staffing and Community Policing

As noted above, PRPB recently submitted an updated plan to the Court to implement the Staffing Plan and the initial activities associated with the Staffing Plan. During the reporting period, PRPB established related committees and assigned project leads to each of the initiatives noted in the Staffing Plan. Evaluations of Paragraph 13 implementation have determined that the Staffing Plan shows positive signs of being consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. The Monitor's Office is hopeful that this will also offer PRPB members the opportunity to more substantively serve the communities in which they live.

The Monitor's Office is encouraged by PRPB's renewed effort to develop and align technological resources to this and other areas of the Bureau. Effective use of technology will produce timely data, which in turn will enhance PRPB's performance and strategy. The ability to produce this data quickly and accurately will further assist the Monitor's Office in assessing levels of compliance.

### Paragraph 13: Professionalization – Staffing and Community Policing

*PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPD shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1. PRPD conducted a Staffing Allocation and Resource Study to assess appropriate number of personnel. | ☑ Met   ☐ Missed |
| 2. The Staffing and Resource Allocation Plan is consistent with the requirements of the paragraph and the Staffing Allocation and Resource Study. | ☑ Met   ☐ Missed |
| 3. 95% of sampled units are staffed consistent with the Agreement and the Staffing and Resource Allocation Plan. | ☐ Met   ☑ Missed |
| 4. 85% of the initiatives in the Staffing and Resource Allocation Plan are implemented. | ☐ Met   ☑ Missed |

## Compliance Assessment

In 2022, PRPB conducted a Staffing and Resource Allocation study and developed a Staffing Plan. This plan was consistent with the requirements of the paragraph. Unfortunately, not all planned activities associated with the Staffing Plan were implemented. In September 2023, the Parties entered a joint stipulation that noted this and made efforts to implement the Staffing Plan's key recommendations. On August 31, 2023, PRPB released an updated Staffing Allocation and Resource Study as part of the Staffing Plan it submitted to the Monitor's Office. This updated plan outlines the tasks, activities, committees, and project leads associated with the implementation of each initiative noted in the Staffing Plan. Upon review of the plan, the Monitor's Office found that it meets the requirements of this paragraph. However, PRPB only began to implement the Staffing Plan in 2022 and many of the tasks are not expected to be completed until 2024. As such PRPB has not met the requirements of target 4 for Paragraph 13.

The Staffing Plan has been designed to comply with Paragraphs 13 and 135-140 of the Agreement regarding staffing and supervision. The proposed Staffing Plan is in accordance with the Stipulated Order entered by the Federal Court on April 18, 2022. It should be noted that an updated Staffing Plan for the implementation of Paragraph 13 for Sustainable PRPB Reform FY 2023-2024 was filed with the Federal Court on September 5, 2023. This updated plan sought to address the tasks and activities that had not been completed in the 2022 Staffing Plan.

PRPB has provided evidence to the Monitor's Office that indicates PRPB has assigned the Commonwealth's contractor, AH Datalytics, to design a digital solution for the analysis of every PRPB unit through the lens of the Staffing Plan. This solution, when available, should assist the Monitor's Office in accurately determining PRPB's compliance with the updated Staffing Plan for Paragraph 13.

## Pathway Forward

PRPB should continue its efforts to implement its updated Staffing Plan. The Monitor's Office will track the progress of the updated Staffing Plan.

The Monitor's Office continues to stress the importance of allocating resources and project management staff to this effort. Implementing the updated Staffing Plan will not only improve PRPB's compliance with Paragraph 13 but will garner progress in several of the paragraphs related to Supervision and

Management. Further, not only will this achieve compliance, but also improve PRPB's management of personnel and resources, and improve operations and place PRPB on a path towards sustainable reform. The Monitor's Office notes that PRPB has also implemented a lateral program, which has allowed it to hire 53 former municipal police officers who also underwent 600 hours of additional Academy training. The Monitor's Office verified that all 53 lateral hires met the requirements.

## 2. Promotions

The Monitor's Office acknowledges PRPB's improvement in the selection of mid-level management officers. It is hopeful that PRPB will continue to ensure transparent, fair, and merit-based promotions at all ranks. The Monitor's Office will remain vigilant, along with the Puerto Rico Human Resources (HR) Department, to ensure that this process of fair and merit-based promotions will continue to be the standard for all ranks. PRPB's efforts to establish related committees, identify project leads, and begin working on related materials and protocols have begun and will continue to be assessed.

On December 17, 2022, 1,414 members of PRPB took the exam for promotion to the rank of sergeant. Immediately thereafter, the Board initiated the process for the correction of the exam, and the evaluation of the process, in general. To that end, the Board met on December 28, 2022 to reach their final determinations and submit their final recommendations regarding the exam results. The minutes of that meeting were provided by the Board to the Parties, Monitor's Office, and OSM.

In accordance with its authority under the Agreement, and as recognized by GO 504 (Promotion Examinations Board), the Monitor's Office scrutinized the process related to this examination. The sole purpose of this monitoring process was to give a proper and thorough review of both (1) the preparation and (2) the scoring of the exam, to ensure both were properly done subject to the guidelines provided by GO 504 (Promotion Examinations Board) and the Official Announcement. The Monitor's Office's assessment of the exam itself can be found under Paragraph 17. The assessment of the perception among promotional applicants as to the fairness and objectivity of the promotions process can be found under Paragraph 16.

The Monitor's Office looks forward to PRPB's continued progress and in working with PRPB as it develops the related promotional tools. Due to the current state of activities, the Monitor's Office expects demonstrable progress in this subsection in the CMR-11 reporting period.

### Paragraph 14: Professionalization – Promotions

*PRPD's promotion practices shall be merit-based and comply with equal opportunity employment principles.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | | Annually |

|  Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

Note: This paragraph is assessed with Paragraph 16.

### Compliance Assessment

As noted in Paragraph 16, promotion policies incorporate the requirements of Paragraphs 14 and 16-20. The promotion trainings are consistent with approved policies. During the reporting period, the Monitor's Office again reviewed the information leaflet for the Sergeant Promotion Exam, the Protocol of Promotions for Ranks of Inspector to Colonel, related exams and interview guides, and the Special Call for Promotions to the Ranks from Inspector to Colonel. These promotional practices are merit-based and comply with equal opportunity employment principles. During the September 2023 site visit, PRPB indicated that it was undecided where the lateral transfers from municipal police departments will be stationed.

The Monitor's Office reviewed and subsequently approved GO 504 (Promotion Examinations Board), a policy on the promotions examination board governing promotions through the rank of captain. Revisions to this GO were made by PRPB as part of its efforts to implement the updated Staffing Plan. The policy was approved by the Monitor's Office on October 11, 2022.

As reported in the past, the Commonwealth has a board responsible for designing a promotion system, which includes the administration of examinations and other more objective measures, complying with their goal. However, officers interviewed continue to note issues such as favoritism and failure to answer transfer requests with PRPB's transfer policy, GO 305 (Rank System Transfer Transactions). During the August 2023 site visit, the Monitor's Office met with the PRPB HR Director in reference to this problem. The Monitor's Office will continue to meet monthly with the HR Director to resolve problems with the transfer policy and its implementation.

### Pathway Forward

PRPB has completed a full cycle of test preparation, written testing, interviews, and promotional trainings through the rank of colonel. The promotional process should continue to be designed to evaluate qualifications that are job related. It is incumbent upon PRPB to change its transfer policy to be fair and equitable for all employees of PRPB. The PRPB HR Director indicated to members of the Monitor's Office that the transfer policy was currently being re-evaluated by members of the command staff in order to achieve a fair and equitable system.

## Paragraph 15: Professionalization – Promotions

*PRPD shall publish detailed job descriptions for each rank among sworn personnel, specifying the duties, responsibilities, and minimum qualifications for each position. PRPD shall develop the job descriptions in consultation with the TCA based on generally accepted policing practices.*

| Compliance Status | Assessment Schedule |
|---|---|

| Substantially Compliant | | Review Period | October 2022 – September 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Job descriptions for each rank among sworn personnel are: (a) based on generally accepted policing practices and (b) are detailed, specify duties, responsibilities, and minimum qualifications | ☑ Met | ☐ Missed |
| 2. Job descriptions for each rank among sworn personnel are published. | ☑ Met | ☐ Missed |

### Compliance Assessment

In review of this paragraph, PRPB provided a copy of its Rank Structure: Functions, Duties, and Responsibilities to the Monitor's Office through a Certification, which has not changed since the Monitor's Office last review in 2022. According to a certification provided to the Monitor's Office on April 27, 2023, this most recent review did not result in any revisions of the manual. This manual has not been revised since April 2020. The Monitor's Office strongly encourages PRPB to update its manual in a timely manner.

### Pathway Forward

Although the current copy of the Rank Structure policy meets compliance for this paragraph, the Monitor's Office recommends that PRPB update the Rank Structure policy and specific job descriptions, including civilians, as needed once PRPB has implemented a career path policy. Substantial compliance with this paragraph will be contingent on PRPB's practical application of the career path and related job descriptions.

## Paragraph 16: Professionalization – Promotions

*PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas. PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion. These criteria should account for experience, civil rights and discipline record, training, and skills.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |

| Training: | Implemented | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Promotion policies incorporate the requirements of Paragraphs 14, 16-20. | ☑ Met  ☐ Missed |
| 2. All promotion trainings are consistent with approved policies. | ☑ Met  ☐ Missed |
| 3. 95% of sampled promotions committee personnel are trained and certified in all promotions policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met  ☐ Missed |
| 4. Selection devices comply with promotion policies. | ☑ Met  ☐ Missed |
| 5. 95% of selected promotion files comply with policy. | ☐ Met  ☑ Missed |
| 6. 95% of interviewed candidates perceive the promotion process as merit-based, fair, non-discriminatory and objective. | ☐ Met  ☑ Missed |

### Compliance Assessment

Compliance with this paragraph is contingent on PRPB's ability to train and certify that the personnel assigned to the promotions committees and the selection process complied with the policy. Further compliance is also contingent on the perceptions of this process offered by the candidates. The Monitor's Office has determined that promotion policies incorporate the requirements of Paragraphs 14 and 16-20, and all promotion training is consistent with approved policies. The Monitor's Office was able to assess the implementation of such policies and trainings in practice. The Monitor's Office was able to conduct a review of a portion of the sergeant promotional applicant files due to the large number of applicants.

The Monitor's Office later conducted interviews with several candidates that passed the examination but who have not yet been promoted because of ongoing SARP investigations. These shortcomings in the promotions process have serious implications on the careers of these police officers and on PRPB's supervision capabilities and are sufficiently widespread to withhold a rating of substantial compliance. Details of these outstanding SARP investigations are provided under the analysis of Paragraph 17. The Monitor's Office has not yet begun to conduct interviews with those individuals who did not pass the sergeants examination due to non-receipt of their names and applicant files.

Overall, many of the interviewees felt that the test was fair and non-discriminatory, and they agreed that the test was a useful tool to predict those individuals who should be promoted to sergeant. They also stated that the test questions were relevant to the Reform Agreement and community-oriented policing.

### Pathway Forward

The development of policies for promotions, staffing, career development, and performance evaluations have been completed. The Monitor's Office has also verified through training records that the promotions committee personnel have complied with training requirements. It is incumbent upon PRPB that the promotions process be merit-based, fair, non-discriminatory, and objective. The Monitor's

Office is looking forward to receiving the applicant files of those individuals who did not pass the sergeants examination.

### Paragraph 17: Professionalization – Promotions

*PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job related and consistent with business necessity. PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

On December 17, 2022, 1,414 members of PRPB took the exam for promotion to the rank of sergeant. This process occurred in accordance with the Official Announcement by the Promotion Examination Board for the Ranks of Sergeant to Captain pursuant to GO 504 (Promotion Examinations Board). Prior to the examination, the Monitor's Office was provided the opportunity to review a sample of the pool of test questions and determined that the questions were relevant to the topics covered and that, at a minimum, questions were based on documents and materials a sergeant in PRPB should be expected to know. The Monitor's Office also confirmed that the exam questions had already been reviewed and assessed by a private company with expertise in standardized exams, and that this expert third party ascertained that exam questions were pedagogically appropriate for the candidates.

On the other hand, the Monitor's Office recently received relevant information about PRPB's 2015 captain promotional examination that on October 30, 2023, PRPB signed a settlement agreement in *Pérez Colón vs. Negociado de la Policía de PR*, 2016-01-0563. The Monitor's Office learned that a second settlement agreement was reached in a similar case (case number currently unknown). These cases are 2 of 12 (17%) separate and active administrative appeals before the Public Service Appeals Commission (CASP) that were raised because of the denial by CASP to reconsider the scores of the appellants in the written section of the 2015 captain promotional examination. The Commonwealth did not notify the Monitor's Office, OSM, or USDOJ about the facts secondary to these appeals, or the settlement agreements.

During a November 20 videoconference, the Commonwealth explained the events that had transpired regarding the appeals to the 2015 captain promotional exam. The Commonwealth explained that the 12 appeals remained unresolved under CASP for almost 8 years. During these eight years, CASP imposed several sanctions on PRPB, such as entries of default against PRPB. These sanctions were done for various reasons, including failure to prosecute and to comply with CASP's orders. In essence, DPS feared that the loss of these appeals would have an unfavorable fiscal impact upon PRPB, such as being ordered to retroactively award back pay to the appellants for eight years. Given these facts, DPS negotiated settlement agreements with the appellants, whereby each appellant would be awarded up to six points, thus obtaining a passing grade, and in exchange the appellants would waive any rights to continue with their claims of back pay. This would allow PRPB to promote the appellants to the rank of captain and avoid further litigation.

Upon being made aware of this information, USDOJ, OSM, and the Monitor's Office raised their concerns with potential violations to Paragraph 17 of the Agreement. In particular, Paragraph 17 states that "…examinations shall conform to generally-accepted professional standards for test validity…" During the videoconference, the Monitor's Office was informed that no substantive criteria was taken into consideration when granting each appellant the necessary points to pass the 2015 captain promotional examination. In other words, appellants were arbitrarily granted a passing grade and awarded additional points in fear of unfavorable fiscal effects.

After the November 20 videoconference, the Monitor's Office requested that the Commonwealth produce a memorandum explaining its factual and legal contentions on whether the settlement agreements were in conflict with Paragraph 17 by December 1, 2023. As of December 7, 2023, the memorandum has not been received.

The Monitor's Office disagrees with the Commonwealth's expressions when stating that the examination conformed to "generally accepted professional standards," and the Monitor's Office believes that the events mentioned above are in conflict with Paragraph 17.

Although two settlement agreements have already been signed, PRPB has not promoted any personnel to the rank of captain at this time.

The Monitor's Office notes that Paragraph 17 was previously rated in this report as having Substantial Compliance before being made aware of this situation. The Monitor's Office now rates this paragraph as being in Partial Compliance. If the appellants are promoted to captain before the date of December 15, 2023, the paragraph will be rated as being Not Compliant and if the appellants are not promoted to the rank of captain before the mentioned date, then the paragraph will remain partially compliant.

*Pathway Forward*

The Monitor's Office is working with PRPB to review and revise, if needed, its promotional exams as required by this paragraph. PRPB has completed a full cycle of test preparation, written testing, interviews, promotional trainings, and promotions through the rank of colonel. The Monitor's Office is available to review any additional test materials. PRPB should continue to develop these examinations in consultation with the Monitor's Offices based on generally accepted policing practices and in compliance with anti-discrimination laws. The promotional process should continue to be designed to evaluate qualifications that are job related.

## Paragraph 18: Professionalization - Promotions

*All appointments to ranks above Captain shall be based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

The following details the Monitor's efforts to assess the Commonwealth's compliance with Paragraphs 18 and 20 of the Agreement. The Monitor's Office completed a review of the various aspects associated with the process of promoting command level personnel. The Monitor's review of compliance of this process included the following:

1. Review of a sample of candidate records that applied for promotion.
2. Review of interview/exam related materials and observation of interviews with candidates.
3. Review of a sample of candidate records for those that passed step 2 for promotion.
4. Review of the recommendation list prepared by the Promotions Evaluation Panel ("Panel") by rank.
5. Review of the list received by the Commissioner with recommendations by the Panel.
6. Review of the recommendations list prepared by the Commissioner's Office for Submission to the Secretary of DSP.
7. Review of the recommendation list prepared by the Secretary's Office for submission to the Governor.

The Monitor's Office completed its review of all the steps listed above and a memorandum was drafted to the Commonwealth.

The purpose of the review was to ascertain whether the promotions process from the ranks of inspector to colonel complied with the Promotions Process Protocol enacted by PRPB and DSP on August 16, 2022, and which was previously approved by the Monitor's Office and the parties. In addition, the Monitor's Office performed this assessment to verify whether PRPB and DSP had complied with Paragraphs 18 and 20 of the Agreement.

The Monitor's Office reviewed the command level promotional process to assess its compliance with the related protocol and paragraphs as noted in the Agreement. In its review, the Monitor's Office found the Commonwealth adhered to the protocol.

Although the Commonwealth adhered to the protocol, the Monitor's Office stressed the importance for the Commonwealth to thoughtfully consider gender diversity when selecting its executive leadership ranks. See Paragraph 16 which states that PRPB shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. As noted by the Monitor's Office in previous CMRs, women make up a small percentage of sworn officers and leadership in police agencies across the country. This underrepresentation of women in policing not only affects public safety but can also negatively impact perceptions of legitimacy among officers within the agency and the community it serves.

It should be noted that while the Commonwealth has made strides to promote officers and leaders after many years where no promotions had been conducted because of previous issues with the integrity in the process, overlooking gender diversity in the selection of leaders can undermine the perception of equity and overall success of this new process and protocol.

Furthermore, the current protocol stipulates that the Governor can receive the full list of eligible candidates upon request. In an effort to ensure that the Governor is able to make an informed decision, the Monitor's Office recommends that the protocol be revised to provide that the Governor receive both the recommendation list prepared by the DSP Secretary and the Commissioner as well as the full list of eligible candidates.

### *Pathway Forward*

PRPB's substantial compliance with this paragraph is contingent on its ability to operationalize the policy. The Monitor's Office assessed PRPB's compliance with this paragraph after the policy was implemented. The Monitor's Office reviewed candidate files, selected and not selected, to determine if the appointments were based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties. In future promotional processes, it is expected that PRPB will continue to ensure that all appointments to ranks above captain shall be based on objective criteria that account for the abilities to perform core management, supervisory, and leadership duties.

### Paragraph 19: Professionalization – Promotions

*PRPD shall establish procedures that govern the removal of officers from consideration for promotion for disciplinary action related to serious misconduct.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |



| Training: | N/A | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As was noted in Paragraph 16, PRPB has met the related policy compliance targets. In review of this paragraph, PRPB submitted a copy of Rule 4216 (Puerto Rico Police Personnel Regulations) in 2022. This rule provides for the disqualification of a candidate for promotion based upon relevant and objective data relating to misconduct. Specifically, a promotion candidate is disqualified from promotion for a sustained finding of a serious administrative misconduct for one year after that finding. In cases of minor misconduct, the disqualification period is six months.

During the recent round of promotions, a number of eligible officers were passed over for promotion due to open administrative complaints that are, in some cases, years behind schedule for resolution. This delay in attaining final resolution on internal investigations could significantly hold back careers and lifetime earnings. PRPB may be opening itself up to potential litigation for lost lifetime earnings from officers who are ultimately cleared of misconduct allegations but nevertheless missed a promotion opportunity due to these unresolved complaints.

Recently, the Monitor's Office has been informed of at least one cause of action filed against PRPB resulting from a recent promotional candidate being passed over for promotion. PRPB policy creates an absolute bar for the promotion of a sworn member while that member has an open case pending in SARP. The Monitor's Office is aware of PRPB members who were denied promotion in rank due to the existence of a SARP complaint against them. More specifically, if a candidate has not been promoted because of an ongoing administrative investigation that has surpassed the 5-day, 30-day, or 90-day thresholds, then the Monitor's Office is concerned that there is a cause for potential lawsuits. As is pointed out in the analysis of Paragraph 179 (see the Civilian Complaints, Internal Investigations, and Discipline section for more detail), PRPB has shown a pattern of delays when investigating complaints, mainly because of not properly adjudicating serious complaints that were filed against PRPB members. In addition, the Civilian Complaints, Internal Investigations, and Discipline section clearly shows pervasive problems when adequately investigating administrative complaints. These conclusions reinforce the serious worries raised above.

*Pathway Forward*

PRPB's compliance with this paragraph is contingent on its ability to operationalize the policy. The Monitor's Office will continue to assess PRPB's compliance with this paragraph. It should be noted that the Monitor's Office in its review of candidate files was not given access to determine which candidates had on-going long-term active SARP investigations. Officers passed over for promotion due to unresolved administrative complaints could be held back in their careers and PRPB could be open to potential

22

litigation for lost lifetime earnings. It is incumbent upon PRPB to hire more staff to review and adjudicate cases and determine if the candidate should be eligible to take the promotional examination.

## Paragraph 20: Professionalization – Promotions

*PRPD shall establish specific criteria for the promotion of officers in direct supervisory roles. Officers in supervisory roles shall not be rendered ineligible for promotion based solely on the number of civil complaints filed against officers under their supervision. The nature and type of civil complaints, particularly those complaints that are investigated and substantiated by evidence, shall also be weighed when considering an officer for promotion. Promotions of officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall be held in abeyance until the investigation or disciplinary action is resolved.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted above, PRPB submitted a copy of Rule 4216 (Puerto Rico Police Personnel Regulations). This rule provides for the disqualification of a candidate for promotion based upon relevant and objective data relating to misconduct. Specifically, a promotion candidate may not receive a promotion if she/he has a case pending in SARP. If and only if a case is concluded in favor of the accused officer may such an officer be promoted. This aspect of the policy complies with the intent of Paragraph 20. As noted under multiple paragraphs; however, the fair execution of this policy is being hampered by delays in concluding internal investigations.

As noted above, during interviews held by the Monitor's Office with those individuals who had recently passed the sergeants exam, several interviewees stated that the complaints against them had not been resolved and therefore they were not able to be promoted even though they had passed the exam. These issues were not clearly pointed out in the file review and were anecdotal information. The Monitor's Office feels that there may be the potential for litigation for lost lifetime earnings due to the unresolved complaints years behind schedule. (see Paragraph 179 and the Civilian Complaints, Internal Investigations, and Discipline section for more detail).

In addition to this related policy, PRPB is working on establishing its Early Intervention System (EIS), which will allow PRPB to review the nature and type of civilian complaints and any related disciplinary action more effectively as part of the promotional consideration process.

*Pathway Forward*

The Monitor's Office looks forward to assessing the practical application of Rule 4216 (Puerto Rico Police Personnel Regulations), as well as further EIS developments. The training, use, and practice of these policies and systems will allow the Monitor's Office to assess PRPB's compliance with this paragraph more comprehensively. It is incumbent upon PRPB to hire more staff to review and adjudicate cases. PRPB should incorporate a process that would identify those individuals who have an active long-term on-going SARP investigation and determine if the candidate should be eligible to take the promotional examination.

## 3. Commander Corps

As mentioned previously, the policies related to career paths reflect that they are fair, transparent, and free of bias or political interference, which is essential to the creation of a credible, effective, and competent command staff. During the prior reporting period, the Monitor's Office reviewed GO 213 (Professional Career Development Program). PRPB's substantial compliance with the paragraphs under this subsection is contingent upon its ability to apply its policy into practice. During the reporting period, the Monitor's Office was not provided evidence that the Commander Corps program is being used.

### Paragraph 21: Professionalization - Commander Corps

*PRPD shall provide a developmental career path for officers aspiring to the command ranks that emphasizes leadership, ethics, community-oriented policing, educational achievement, and constitutional policing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Deferred. See Jt. Mot., ECF No. 1095 at 9 (proposing Special Master assist developing plan in accordance with Paragraph 21); Order, ECF No. 1102 at 2 (approving same).

*Compliance Assessment*

The Monitor's Office previously reviewed and subsequently approved GO 213 (Professional Career Development Program) in September 2022. PRPB must work on reviewing and/or developing the associated training to incorporate aspects of this policy into supervisor training and any training related to performance evaluations. As such, the career path has not been fully implemented in practice and compliance with Paragraph 21 remains partial.

More broadly, as part of its review of GO 213 (Professional Career Development Program), the Monitor's Office provided additional considerations for PRPB related to implementing the new policy. The considerations included meet both the needs of PRPB and its employees, increasing productivity and confidence, motivating employees, providing incentives, retaining professionally oriented employees with career goals, providing promotional opportunities, attracting more qualified employees, and retaining more trained and technically competent employees. Substantial compliance is dependent on PRPB's development of related training and practical application of the policy and procedures established.

The Monitor's Office stresses the importance of implementing GO 213 (Professional Career Development Program) and incorporating this policy and the requirements of this paragraph into training, specifically training related to supervision and performance evaluations. The considerations provided by the Monitor's Office during the policy review process included noting that GO 213 should be implemented together with GO 310 (Performance Evaluations). The Monitor's Office acknowledges the planned changes to performance evaluations as noted in the most recently revised GO 310 dated February 15, 2023, and its related forms. If not implemented in conjunction with GO 310, PRPB will face difficulty operationalizing GO 213 due to the need to improve the current performance evaluation program. As noted by the Monitor's Office in previous CMRs, performance evaluations as currently conducted do not provide a good foundation for promotional decisions. Additional considerations for implementation include developing a feedback process that includes SAEA, auditing the performance evaluation process, and retraining current supervisors and training newly promoted supervisors.

*Pathway Forward*

As recommended by the Monitor's Office, supervisors must meet with their subordinates to discuss performance as well as goals, objectives, performance challenges, and areas for growth. Supervisors must develop a system to document and keep track of their performance evaluation discussions. During the July 2023 site visit, members of the Monitor's Office met with the HR Director regarding performance evaluations. Members of the Monitor's Office suggested that a training program be developed using ProMedia. The HR Director agreed that a training program needed to be developed in order to prepare sergeants in developing new skills to supervise and evaluate employees. Meetings will continue to be held on a monthly basis with the HR Director concerning performance evaluations. There is also the need to ensure that supervisors themselves are evaluated and promoted based on the quality of the evaluations they perform of their supervisees.

## II. Use of Force

PRPB formally implemented its Provisional UOF Plan in July 2022. The Provisional UOF Plan increased supervisory layers of review to identify and correct errors and/or discrepancies in the UOF reporting forms in PRPB's GTE system. As in the previous CMR, the Monitor's Office has determined that the Provisional UOF Plan produces accurate numbers; however, PRPB was reminded that a more comprehensive, less labor-intensive system/plan needs to be developed.

As it relates to improving UOF reporting during this reporting period, PRPB has been able to demonstrate that it has continued to provide accurate UOF numbers. What has also aided PRPB in accomplishing this task was the Commonwealth's contractor, AH Datalytics, which continues to develop and improve the UOF Dashboard that helps identify discrepancies in UOF reporting in the GTE system. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field. One issue that the Monitor's Office was made aware of during its July 2023 site visit was that PRPB currently does not have the ability to migrate information in the GTE system to the UOF Platform. This is time-consuming and results in the duplication of work.

During this reporting period, PRPB reported 928 instances of UOFs in 526 incidents. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRPB's GTE system is comprehensive. It should be noted that the Monitor's Office, in reviewing whether PRPB officers are preparing and submitting UOF reports (PPR 605.1) in the timeframe as outlined in Bureau policy, has determined that PRPB has made significant progress. In the 84 UOF reports (PPR 605.1) reviewed by the Monitor's Office all but one was prepared and submitted in the timeframe outlined in policy. In addition, as outlined in the policy, supervisors must complete their investigation within five business days. These are significant improvements that have resulted in improved compliance ratings. However, the Provisional UOF Plan is an interim plan while the Bureau develops a system that identifies discrepancies in real time and does not have to rely on various levels of review for identifying errors in the system and making the required corrections.

Consistencies in the UOF data largely affect many of the paragraphs in this section. Other topics such as the Force Investigation Unit (FIU), Force Review Boards (FRBs), Crisis Intervention Training (CIT), SWAT, and crowd control procedures also impact PRPB's overall compliance with this section. As it relates to FIU, the Monitor's Office continues to have some concern regarding the length of time FIU is taking to complete its investigations. However, during the latter part of CMR-8 there was a leadership change in FIU. The new commanding officer was able to secure additional personnel (investigators) resulting in the doubling of personnel in the unit. With the changes made in FIU, the Monitor's Office observed significant improvement in investigation timelines as the Monitor's Office observed more cases completed within policy (44%), but there are still a number of cases where the investigation was not completed within the 45-day requirement.

In the Monitor's Office's review of Commissioner Force Review Board (CFRB) evaluations, while the evaluations were objective, they also were not timely. It should be noted that during the month of

July a member of the Monitor's Office attended a CFRB meeting. The meeting was conducted professionally. During that visit the members of the Board shared with the Monitor's Office given the size of the file for each UOF case (hundreds of pages) it takes many hours to review, thus impacting the number of cases they can evaluate in the allotted time provided in policy and the Agreement.

Crisis Intervention Teams (CIT), like UOF, has also been an area of discussion and focus for the Court in the past few months, including during the June 2023 Status Conference. Despite the completion of PRPB's CIT pilot program in Arecibo (completed in November 2020), the Bureau has lagged in its efforts to expand CIT to all remaining area commands. However, during the reporting period PRPB made an effort to address this issue, 65 additional PRPB officers have been trained and certified as CIT officers bringing the number of CIT officers Bureau-wide to 83. With this influx of officers PRPB has been able to expand the CIT program beyond Arecibo to an additional five areas commands (Caguas, Bayamon, Carolina, Humacao, and San Juan).

Notwithstanding the issues noted above, the Commonwealth has demonstrated progress in many of the UOF paragraphs. Much of the efforts made in this reporting period can be attributed to PRPB's continued collaboration with AH Datalytics, the Commonwealth's contractor, who has helped PRPB develop several UOF related dashboards, which include "Compliance with Reports", "Use of Force Statistics", "Requests from the Monitoring Team", and "Specialized Tactical Unit Mobilizations." These dashboards are useful to the Monitor's Office as they serve as another tool in assessing PRPB's compliance with the Agreement. The positive efforts made in this reporting period will, if continued, prove beneficial in subsequent reporting periods.

Overall, the Commonwealth's compliance with the 36 paragraphs assessed during this reporting period within UOF reflects improvement in levels of compliance to what was noted in previous reports. In CMR-8, 58% of paragraphs (21 paragraphs) were assessed as partially compliant and 25% (9 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 61% of paragraphs (22 paragraphs) were found to be partially compliant and 31% (11 paragraphs) were found to be substantially compliant. Two paragraphs (6%) were rated as fully compliant, and one paragraph was rated as deferred (6%). See figure 3.



*Figure 3. Use of Force: Paragraph Compliance Status*

## Paragraph 22: Use of Force - General Provisions

*PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

As in previous CMRs, the Monitor's Office requested the following information: 1) number of incidents in which force was used and 2) how many officers used force in each incident. In response, PRPB provided information attesting that force was used 928 times in 526 incidents during this reporting period.

Of the 928 UOF incidents that occurred in this reporting period, the Monitor's Office randomly sampled and reviewed 84 UOF reports. An analysis of the reports by the Monitor's Office determined that the UOFs were in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, which prohibit the use of unreasonable force.

Further, during this reporting period, the Monitor's Office reviewed various policies and procedures related to UOF reporting. As previously noted, the Monitor's Office finds that PRPB's policies and procedures on UOF enable officers to rely primarily on non-force techniques to effectively police, use force only when necessary, and de-escalate the UOF at the earliest possible moment. Adherence to the policies in practice is also reflected in the Monitor's Office's review of UOF reports which verified that the levels of force were consistent with PRPB policies.

### *Pathway Forward*

Now that PRPB has, via its Provisional UOF Plan, provided reliable data relating to UOF numbers, the Monitor's Office can thoroughly analyze the data. Further, this analysis is more representative of UOFs that occurred during this reporting period. However, PRPB should endeavor to develop a permanent

system to report accurate UOF incidents, one that is not labor intensive and does not require several layers of review as in the Provisional UOF Plan to address and correct discrepancies in the data. This improved system should be woven into PRPB's efforts to implement its IT Corrective Action Plan (CAP) and improvements to its record management system.

## 1. General Provisions

PRPB complies with applicable law and comports with generally accepted policing practices in its policy and training related to UOF, including training on less lethal weapons. The comprehensive UOF policy requires that PRPB categorize all reportable UOFs into multiple levels, grouped by degree of seriousness, and identify all force techniques used by officers. PRPB has provided the Monitor's Office with the requested case files for review under the applicable paragraphs.

PRPB has demonstrated continued compliance with several paragraphs in this subsection including the continued prohibition of CN gas.

### Paragraph 23: Use of Force - General Provisions

*PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☒ Met | ☐ Missed |

*Compliance Assessment*

PRPB has prepared comprehensive policies that categorize UOFs into multiple levels, grouped by degree of seriousness and describes each force level and the options available to officers as outlined in the Agreement. The policies are consistent with generally accepted policing practices relating to UOF. The Monitor's Office reviewed 84 UOF incidents during this reporting period and determined that the

force used by officers were accurately categorized into levels grouped by the degree of seriousness. During this reporting period, there were 928 UOF applications; of these instances, 307 were level 1 (33%), 242 were level 2 (26%), 335 were level 3 (36%), and 41 were level 4 (4%) UOFs.

*Pathway Forward*

The Monitor's Office looks forward to assessing PRPB's progress with improving data accuracy as it has implemented the Provisional UOF Plan and continues its work on the IT Needs Assessment and subsequent IT CAP.

## Paragraph 24: Use of Force - General Provisions

*PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met ☐ Missed |
|---|---|

*Compliance Assessment*

PRPB has prepared comprehensive policies and revised them periodically as outlined in the Agreement. The policies are consistent with generally accepted policing practices relating to UOF. As noted above, while PRPB has incorporated the paragraph requirements into policy, all relevant personnel have not been trained on policy requirements and implementation of this policy in practice is still lacking. During this reporting period the Monitor's Office reviewed GO 623 (Police Pursuits), GO 608 (Negotiators), GO 145 (Maritime Surveillance Division).

*Pathway Forward*

Substantial compliance with this paragraph hinges on PRPB's ability to demonstrate its practical application of UOF policies. The Monitor's Office will continue to make a comprehensive assessment to determine if the UOF policies are in fact adhered to in practice. The Monitor's Office looks forward to reviewing PRPB's compliance with this paragraph and is hopeful that the implementation of the

Provisional UOF Plan and IT Needs Assessment will improve PRPB's ability to accurately report and track UOFs.

## Paragraph 25: Use of Force - General Provisions

*PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Policy prohibits use of CN gas. | ☑ Met ☐ Missed |
| 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | ☑ Met ☐ Missed |
| 3. No supply of CN gas is identified in armories or other locations through inspections. | ☑ Met ☐ Missed |
| 4. CN gas is never used by STUs. | ☑ Met ☐ Missed |

### *Compliance Assessment*

As per the Agreement, PRPB continues to prohibit the use of CN gas. The Monitor's Office's site visits and observations of PRPB equipment rooms and documentation of its armory inspection reports submitted by PRPB continue to demonstrate PRPB's compliance with this paragraph. During the July 2023 SWAT site visit, no CN gas was present in the unit's arsenal. Moreover, the Monitor's Office verified that supervisors conduct a daily weapons inventory check and submit a quarterly report (documentation provided).

PRPB's full compliance is reflective of its efforts to meet the policy and implementation requirements of this paragraph.

## Paragraph 26: Use of Force - General Provisions

*PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | April 2023 – September 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | ☑ Met | ☐ Missed |
| 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | ☑ Met | ☐ Missed |
| 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | ☑ Met | ☐ Missed |
| 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | ☑ Met | ☐ Missed |
| 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor's Office found that PRPB's policies relating to firearms qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the previous reporting period.

For the purpose of determining compliance with firearms training and qualification, the Monitor's Office requested data relating to yearly firearms training and qualifications. PRPB is required to conduct firearms training and qualifications for all sworn members with Bureau issued firearms in both day and reduced light fire each calendar year.

PRPB provided a list of 10,226 personnel who qualified with their service weapon during the daylight fire segment. However, it should be noted that the daytime firing qualifications commenced in November 2022 and carried over into March 2023. While PRPB has trained over 95% of its officers in daylight fire, it still needs to train 95% of its officers on night fire before the end of the calendar year to be compliant with the Agreement.

The Monitor's Office selected a random sample of 76 officers from the list of officers who were listed as qualified and requested their certified training records to verify that officers were qualified with their service weapon for this reporting period. A review of the training files confirmed that all officers were qualified. The Monitor's Office also noted in documentation provided by PRPB that 839 officers required same day re-training to be certified and that no officer failed the qualification re-test or was relieved of operational duty according to PRPB documentation. SARP also provided documentation

that there were no investigations conducted relating to officers failing to qualify on their weapons. All officers with more than one regulation firearm were qualified on all firearms. Therefore, the Monitor's Office did not have the opportunity to review whether officers are disciplined after failing to requalify for firearms training.

PRPB's IT Bureau and Auxiliary Superintendency for Education and Training (SAEA) are developing a Shooter Module, which will generate global reports; however, as of the end of this reporting period, the module was not yet operational and has not been demonstrated to the Monitor's Office. The Monitor's Office anticipates reviewing an improved Shooter Module in the near future.

*Pathway Forward*
PRPB needs to qualify all sworn personnel on both day and reduced light fire each calendar year and must maintain records of this training in its Global Report. Further, the Monitor's Office stresses the importance of scheduling the training so that both segments are completed during the same calendar year to ensure that all officers are qualified. Failing to do so will result in continued partial compliance.

## 2. Specialized Tactical Units

In relation to Paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed UOF policies for specialized tactical units (STUs) and that these policies are consistent with PRPB's Bureau-wide UOF policy. A review of the tactical unit's (DOT) roll call documents verifies continued compliance with policies. Related to training on policy, PRPB DOT has also completed training. In practice, the Monitor's Office has verified that all STU officers meet eligibility requirements and that specialized units are not conducting general policing functions except for non-specialized preventive patrols in high crime areas. For these preventive patrols PRPB DOT provided documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire.

During this reporting period, the Monitor's Office reviewed documents and case files that attested to DOT conducting preventative patrols and other policing activities as outlined in the appropriate policies. In addition, DOT is appropriately documenting its activities and having supervisors review those activities and documentations. To that end, the Monitor's Office requested a random sample from the 739 DOT and SWAT mobilizations which include preventive patrol (PPR 112.2 Record of Mobilization of STU) during this reporting period. PRPB provided a random sample of 48 mobilizations. A review of the files verified DOT and SWAT's compliance with policy.

Using the dashboard created by AH Datalytics, the Commonwealth's contractor, PRPB now has a centralized database that captures all STU deployments Bureau-wide. This centralized database will help PRPB command staff determine DOT needs Bureau-wide.

### Paragraph 27: Use of Force - Specialized Tactical Units

*PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All use of force training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4. 95% of uses of force by STU officers are within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB has developed policies on UOF by STU members. These policies are consistent with PRPB's Bureau-wide policy. A review of UOF training involving STUs has determined that it is consistent with PRPB policy. No updates to this policy were conducted during this reporting period. Further, a review of training records found that 95% of sampled officers have completed training on UOF policies involving STUs in the required timeframe. Despite broader issues with in-service training for the entire population of sworn personnel, the Monitor's Office concludes that all STU personnel met the special training requirements related to their specialized units.

There was one instance in which DOT was mobilized in an active capacity during the reporting period. The event was a demonstration that took place in Lajas on July 9, 2023, where 10 UOFs were reported (pepper spray and mk-9 gas were used). All other activations were for "standby" status. These deployments were consistent with policies relating to UOF by specialized units.

*Pathway Forward*

The Monitor's Office will continue to monitor UOFs by specialized units at demonstrations and protests to verify compliance with this paragraph. The Monitor's Office also notes that PRPB must continue to schedule and conduct training for all officers on UOFs involving STUs to move compliance forward.

## Paragraph 28: Use of Force - Specialized Tactical Units

*PRPD shall prohibit STUs from conducting general patrol and policing functions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review | April 2023 – September 2023 |

34

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Presentation of data on STU deployments and activations. | ☑ Met | ☐ Missed |
| 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | ☑ Met | ☐ Missed |
| 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. In addition, 95% of STU officers are trained and certified on STU policies. The Police Training Management System (PTMS) does not allow supervisors to easily track which officers have received which training courses, so DOT supervisors have been maintaining their own internal tracking, which is not conducive to tracking long-term and on-going training requirements.

In relation to the policy requirements of Paragraph 28, GO 112 (Tactical Operations Divisions) allows DOT officers to be assigned to preventive patrol but precludes DOT from operating as a specialized unit or equipping tactical gear when conducting patrol functions. GO 112 also requires that DOT members always keep specialized weapons and tactical equipment accessible in the event their unit is activated to respond to an authorized DOT event. During the July 2023 site visit to Metro DOT, the Monitor's Office was informed that officers assigned to preventive patrol continue to keep their specialized equipment in the trunk of their vehicle, accessible to the officers in the event they are mobilized. In addition, PRPB has previously modified PPR 112.2 (Record of Mobilization of STU) to reflect this information as well as wearing the proper uniform. Verification of the changes to PPR 112.2 was confirmed by the Monitor's Office.

The Monitor's Office has verified in its review of related documents that specialized units are properly documenting their daily assignments in compliance with the Agreement. Specialized units do not conduct general policing functions apart from preventive patrols in high crime areas or at special events. During this reporting period over 739 preventive patrols were conducted. From that number the Monitor's Office requested a random sample of 48 records. Upon review of the deployment records, the Monitor's Office determined that deployments were consistent with the Agreement and PRPB policy.

*Pathway Forward*

Reviews of deployment records and observations will ensure PRPB's continued compliance with the practical elements of this paragraph. The Monitor's Office will continue to evaluate training records to ensure that required trainings are being delivered on time and in adherence with the Agreement.

## Paragraph 29: Use of Force - Specialized Tactical Units

*PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for evaluation boards is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of evaluation board members are trained. | ☑ Met | ☐ Missed |
| 4. All officers selected to STUs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | ☑ Met | ☐ Missed |
| 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies.

PRPB provided documentation that there are currently 182 personnel assigned to DOT units throughout PRPB. The breakdown of those personnel by rank is as follows:

- 1 Commander
- 1 Inspector
- 2 First Lieutenants
- 8 Second Lieutenants
- 23 Sergeants
- 147 Agents

PRPB developed GO 112 (Tactical Operations Divisions) and GO 117 (Specialized Weapons and Tactics Division) which identify eligibility criteria and selection processes for specialized units. During the reporting period, with the exception of a new SWAT commanding officer, no additional officers were assigned to SWAT or DOT; however, three SWAT members were transferred, as well as two DOT members.

The Monitor's Office reviewed DOT and SWAT personnel files for existing members and confirmed that the officers meet the requirements for assignment and have the required training. As it relates to DOT, the retention process for fifteen officers to remain in their existing position as outlined in GO 112 (Tactical Operations Divisions) has been initiated in compliance with Bureau policy. SWAT does not have any members currently in the retention process.

*Pathway Forward*

As noted above, the tenure limit of six years applies to STU officers. The Monitor's Office assesses that PRPB DOT has commenced the retention process for those DOT and SWAT officers it wishes to retain. Moving forward, PRPB needs to continue this task as necessary and in a timely manner.

## Paragraph 30: Use of Force - Specialized Tactical Units

*PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | ☑ Met | ☐ Missed |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. A review of PRPB DOT

37

operational plans indicated that in situations where the unit was given prior assignment notification, an operational plan was prepared as required by PRPB policy.

PRPB reported that during this reporting period there were 224 demonstrations or protests. Of the 224 demonstrations or protests, according to PRPB documentation, 155 were unplanned (69%), 62 were planned (28%), and 7 provided no indication if they were planned or unplanned (3%).

PRPB reported that DOT units participated in 34 demonstrations or protests that occurred during the reporting period; however, except for one, all DOT participation was in a "standby" role. According to PRPB, SWAT participated (standby) in the May 1st demonstration that occurred during the reporting period. The Monitor's Office verified this through documentation provided by the Reform Unit.

PRPB provided documentation that there are currently 23 personnel assigned to SWAT. The breakdown of those personnel by rank is as follows:

- 1 First Lieutenant (Commanding Officer)
- 2 Sergeants
- 20 Agents

SWAT was activated 76 times during the reporting period. The Monitor's Office conducted site visits to SWAT to review documents and conduct visual inspections of equipment in May, July, and September 2023.

In all cases reviewed, SWAT prepared a Mobilization Report (PPR 112.2) and After-Action Report (PPR 112.3). As noted in previous CMRs, SWAT's commanding officer reported that, in many instances relating to mobilization, no advance warning was received following the request to "back up" federal task forces or specialized units operationally. Therefore, no operational plans were prepared during the period for those events.

As stated in previous CMRs, SWAT has developed an internal form titled "Mission Evaluation." This internal form captures all aspects of the mission including what needs to be maintained, what could be improved, and final comments. The Monitor's Office previously commended SWAT on the development, implementation, and use of the Mission Evaluation Form and emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety. This practice is also consistent with generally accepted policing practices. PRPB memorialized the form and assigned it PPR 117.3. During a site visit to SWAT in July 2023 the Monitor's Office was notified by the SWAT Commanding Officer that they had not been using the form but continued conducting critiques. However, he stated they would reinstitute the form. During a site visit to SWAT in September 2023 the Monitor's Office confirmed the form was being prepared.

Additional observations made by the Monitor's Office during this reporting period include the following:

- In the 76 cases reviewed by the Monitor's Office, SWAT reported using force in 33 incidents (43%). In all but two cases the force consisted of pointing a firearm, a Level 3 UOF.

- In two cases SWAT used an electronic control device. Both cases involved an armed individual (machete) threatening suicide.
- A comparison of reported UOFs by SWAT to PRPB's Global List revealed that all UOFs were reported in the PRPB Global List. However, there were three incidents where a UOF that took place was not attributed to SWAT in PRPB's Global List, and one attributed to SWAT on the Global list was not listed on SWAT's Record of Mobilization.
- The information provided by SWAT was cross-checked and verified with PPRs 112.2 (Mobilization Report) and SWAT's Global List for accuracy.

Based on data provided by PRPB, 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors.

### *Pathway Forward*

The Monitor's Office concludes that SWAT and DOT have taken the necessary steps to comply with the Agreement. Specialized units need to maintain current levels of compliance. The Monitor's Office will continue to assess compliance with this paragraph in CMR-10.

## Paragraph 31: Use of Force - Specialized Tactical Units

*PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | ☑ Met | ☐ Missed |
| 2. The STU tracking system is accurate and current; all deployments are tracked. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

It should be noted that near the end of the previous reporting period, AH Datalytics, the Commonwealth's contractor, began working with the PRPB Reform Unit to develop a dashboard that would centralize STU deployment data for tracking.

Using the dashboard created by AH Datalytics, the Commonwealth's contractor, in September 2022, PRPB now has a centralized database that tracks all STU deployments island wide. This centralized database will help PRPB command staff determine DOT needs Bureau-wide.

*Pathway Forward*
To progress in compliance with this paragraph, PRPB must maintain the Bureau-wide tracking system. The development of the tracking system is the responsibility of the field operations unit that oversees STU operations. Furthermore, the data and report outputs of this system should be used to inform Bureau-wide DOT strategies and address gaps in resources and potential officer safety issues.

## 3. Crowd Control Policies and Performance

In general, PRPB has made significant progress in how it prepares for and operates during demonstrations and protests. The Monitor's Office has had the opportunity to observe PRPB providing strategic policing coverage at demonstrations and protests over the course of this reporting period. As reported in previous CMRs, PRPB's actions in response to demonstrations and protests have become increasingly consistent with generally accepted policing practices.

In response to demonstrations or protests during this reporting period, DOT units were activated only once during a demonstration at Lajas on July 9, 2023, otherwise its participation was in a stand-by status. This is a significant finding given the number of demonstrations and protests responded to during the reporting period. In those instances where DOT units did not actively engage with demonstrators or protestors, after-action and self-assessment reports were not completed, except for PPR 112.2 (Mobilization of Specialized Tactics). Further, the Monitor's Office found that an incident commander was identified at every demonstration/protest regardless of STU activation status.

### Paragraph 32: Use of Force - Crowd Control and Incident Management

*PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |

40

| | | |
|---|---|---|
| 2. Training on crowd control and incident management is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of police responses to unplanned events are within policy. | ☑ Met | ☐ Missed |
| 5. 95% of police responses to planned events are within policy. | ☑ Met | ☐ Missed |
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the crowd control and management policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has met the 95% threshold for the training of STU officers on the relevant crowd control training (REA 625). To date DOT officers have completed the yearly retraining as required.

The Monitor's Office requested a list of all demonstrations and protests Bureau-wide for the CMR-9 reporting period. PRPB provided a list of 224 protests (155 unplanned (69%), 62 planned (28%), and the remaining 7 provided no indication (3%). Upon review and as previously reported, it was evident that the data was not aggregated, but rather provided for each area.

PRPB should aggregate its data on planned and unplanned crowd control events Bureau-wide for the purpose of analyzing and identifying possible training needs as well as the distribution of personnel and resources.

PRPB has identified demonstrations and protests in 217 cases (97%) as planned or unplanned. However, despite its compliance with policy, in seven demonstrations or protests (3%) PRPB did not identify if the demonstration or protest was planned or unplanned. With the exception of one protest, PRPB identified all protests as planned or unplanned that occurred in the latter part of the reporting period (July through September 2023).

During a site visit to Metro DOT and a review of data provided by the Reform Unit, the Monitor's Office reviewed reports relating to personnel deployments to demonstrations and protests where DOT was mobilized. The Monitor's Office learned that in instances where PRPB had determined in advance that the DOT Unit would be activated, an operations plan was developed by the unit. However, in instances where the determination to mobilize the unit was made at the time of the event, DOT prepared no such plan.

The Monitor's Office selected a random sample of 53 crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). PRPB provided 42 files (79%), certifying that 9 cases from San Juan have not yet been

submitted. Two additional cases were eliminated because one occurred outside of the period and the other file did not relate to a demonstration. PRPB's responses to the demonstrations were generally consistent with PRPB policy.

The Monitor's Office observed continued improvement in PRPB's preparation of PPR 625.6 (Evaluation of Strategies for the Management or Control of Crowds) in this reporting period.

Regarding training on the relevant crowd control policies, PRPB provided certification that DOT officers and supervisors are current in these courses. The Monitor's Office reviewed the documentation provided by Metro DOT which verified that members assigned to various DOTs throughout the Bureau are all trained in crowd control policies; this training requires yearly re-training.

PRPB submitted the quarterly reports (PPR 618.1) of STU supervisors who conducted inspections of armories as required by the Agreement. In a review of these quarterly reports, the Monitor's Office found them to be within policy and documented. The forms were also reviewed during site visits to STU facilities during armory inspections.

*Pathway Forward*

Although PRPB is partially compliant, the Bureau must maintain an aggregated list of all demonstrations, identifying them as either planned or unplanned, and classify them as such. In addition, PRPB should develop a Bureau-wide system/module where all information relating to protest/demonstrations occurring island-wide is stored and available for review. Maintaining such a list will assist PRPB in maintaining greater awareness of related operations and determining needed resources throughout the island.

The Monitor's Office will continue to assess training compliance with target three through random training record reviews.

## Paragraph 33: Use of Force - Crowd Control and Incident Management

*The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

GO 625 (Crowd Management and Control) annotates that a ranking officer or other higher-level PRPB official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command, control, and provide approval prior to deploying force as a crowd dispersal technique. This policy was last submitted to the Monitor's Office for review during the CMR-8 reporting period.  In review of the demonstrations and STU activations, the Monitor's Office found that in all incidents of demonstrations or protests, a ranking member of PRPB was identified as incident commander.

## Paragraph 34: Use of Force - Crowd Control and Incident Management

*The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office reviewed GO 625 (Management and Crowd Control) and found it to be compliant with the Agreement and general policing practices. The one recommendation provided on this policy was to re-consider deploying the Motorcycle Unit to disperse unruly protestors. This should only be conducted by DOT personnel that have the relevant training or the training should be provided to the Motorcycle Unit.  PRPB used minimal force while responding to demonstrations and protests during this reporting period. Force was only used in instances where demonstrators/protesters were given lawful orders and failed to comply. Otherwise, demonstrators were allowed to assemble peacefully and lawfully.

For this reporting period, with the exception of one incident, a demonstration at Lajas on July 9, 2023, DOT units were only mobilized in a stand-by or preventive patrol capacity in response to potential needs for crowd control activities.

The Monitor's Office considers this a significant finding, especially since PRPB responded to a substantial number of planned and unplanned demonstrations and protests during the reporting period. The use of crowd control techniques was within policy.

It is important to note that at a demonstration/protest during previous reporting periods, PRPB used its "Contingency Unit" to disperse unruly protesters. This was done at the direction of the Incident Commander. The Monitor's Office noted in its CMR at the time that members of the "Contingency Unit" do not have the same level of training as DOT, therefore they should not have been used. Moving forward, the Monitor's Office recommended, where possible, that the dispersing of unruly protesters be conducted solely by DOT personnel or additional training be provided to officers of the "Contingency Unit". PRPB provided documentation that 295 members of the Motorized Unit (also referred to as Contingency Unit) were trained in MACM 3041 (Motorized Division), however a review of the documentation shows that only 7 (2%) were trained in 2023. The remainder received training dating back as far as 2019. DOT trains their officers yearly and the training provided is more comprehensive than that provided to the Motorized Unit. As it relates to less-than-lethal weapons training, Motorized Units only receive training on rigid baton. In addition, the necessary training the Monitor's Office points as required, relates to dispersing unruly crowds which should only be conducted DOT.

In reviewing demonstration data for this reporting period, the Monitor's Office observed that PRPB identified the need to provide additional training for the "Contingency Unit" in PPR 625.6 (The Evaluation of Strategies for Crowd Management and Control). It is encouraging that PRPB quickly identified the need and is taking the necessary steps to address the issue. Currently "Contingency Unit" personnel are not authorized to disperse protesters at demonstrations/protests until they receive the additional training. This additional training would require training in dispersing unruly crowds beyond the police lines.

*Pathway Forward*

To achieve substantial compliance, PRPB needs to categorize all demonstrations and/or protests as planned or unplanned. The Monitor's Office recommends, where possible, that the dispersing of unruly protesters be conducted solely by DOT personnel or that additional training be provided to officers of the "Contingency Unit". The Monitor's Office will continue to assess PRPB's progress and compliance with policy, crowd control resource deployment, and training in CMR-10 through policy reviews and on-site observations.

## Paragraph 35: Use of Force - Crowd Control and Incident Management

*PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

44

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office reviewed numerous documents relating to mass demonstrations. These documents included a review of PRPB's work plans for demonstrations as well as its completion of PPR 112.1 (Request for Activation of the STU), PPR 112.2 (Record of Mobilizations of STU), and PPR 112.3 (Evaluation of Strategies of the STU). The Monitor's Office found that the STUs did not prepare any after-action reports when activated other than in those where they actively participated in crowd control.

The Monitor's Office concludes that PRPB's actions during demonstrations and protests (planned and unplanned) in the reporting period were consistent with generally accepted policing practices and PRPB policy. PRPB provided the Monitor's Office with Operation Plans (PPR 625.2) for the various planned demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Reports (PPR 625.3), which provided basic details of each event.

For this reporting period PRPB reported that it responded to 224 demonstrations and/or protests, planned and unplanned. The Monitor's Office selected a random sample of 53 crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). PRPB provided 42 files (79%), certifying that 9 cases from San Juan have not yet been submitted. Two additional cases were eliminated because one occurred outside of the period and the other file did not relate to a demonstration.

Of the 42 files reviewed, PRPB reported that 33 (79%) were identified as unplanned. In half of the cases, even though unplanned, PPR 625.2 (Operations Plan) was prepared, it understandably had minimal information, given their unplanned status; however, of the 13 demonstrations/protests that were planned, 3 (23%) was missing an Operations Plan.

It should be noted that area commanders, in the areas where demonstrations and protests took place, did provide self-assessment reports (PPR 625.6) with varying degrees of thoroughness assessing the police response. Overall, however, PRPB did not prepare a self-assessment for all demonstrations and/or protests reviewed for the reporting period. In total 26 self-assessments (62%) were prepared for the demonstrations and protests reviewed by the Monitor's Office.

The Monitor's Office observed an improvement in PRPB's preparation of PPR 625.6 (Evaluation of Strategies for the Management or Control of Crowds).

*Pathway Forward*

To achieve compliance, PRPB must ensure that DOT supervisors and area commanders thoroughly assess all law enforcement activities following each response to a mass demonstration, civil

disturbance, or other crowd control situation to ensure compliance with applicable laws and PRPB policies and procedures.

This issue has been discussed with the Reform Unit previously. A variety of recommendations were provided including criteria to be assessed, debriefings with officers and the demonstrators and/or protestors, and the consistent use of after-action and self-assessment reports. Additionally, reference resources were also provided by the Monitor's Office.

## 4. Force Reporting

PRPB formally implemented its Provisional UOF Plan in July 2022. The Provisional UOF Plan increased supervisory layers of review to identify and correct errors and/or discrepancies in the UOF reporting forms within PRPB's GTE system. As in the CMR-8 reporting period, the Monitor's Office has determined that the Provisional UOF Plan continues to produce accurate numbers; however, PRPB was reminded that a more comprehensive, less labor-intensive system/plan needs to be developed.

As it relates to improving UOF reporting, during this reporting period, PRPB has been able to demonstrate that it continues to provide accurate UOF numbers. What has also aided PRPB in accomplishing this task was the Commonwealth's contractor, AH Datalytics, which continues to develop and improve the UOF Dashboard that helped identify discrepancies in UOF reporting within the GTE system. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field. One issue that the Monitor's Office was made aware of during its July 2023 site visit was that PRPB currently does not have the ability to migrate some information in the GTE system to the UOF Dashboard. This requires the manual migration of data which is time-consuming and results in the duplication of work.

During this reporting period, PRPB reported 928 UOFs in 526 incidents. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRPB's GTE system is comprehensive. It should be noted that the Monitor's Office, in reviewing whether PRPB officers are preparing and submitting UOF reports (PPR 605.1) in the timeframe as outlined in Bureau policy, has determined that PRPB has made significant progress. In the 84 UOF reports reviewed all but one was prepared and submitted in the timeframe outlined in policy. In addition, as outlined in the policy, supervisors completed their investigation of UOFs within five business days. These are significant improvements that have resulted in improved compliance ratings. However, the Provisional UOF Plan is an interim plan while the Bureau develops a system that identifies discrepancies in real time and does not have to rely on various levels of review for identifying errors in the system and making the required corrections.

The Monitor's Office continues to stress that adherence to reporting timelines, as established by policy, and proper report writing, are important to ensuring PRPB moves forward with compliance. Increased staffing and supervision along with increased accountability for failing to adhere to policies, are integral to increased compliance with the paragraphs in this subsection.

46

## Paragraph 36: Use of Force - Force Reporting

*PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reporting is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | ☑ Met | ☐ Missed |
| 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | ☑ Met | ☐ Missed |
| 4c. All failures to report use of force are referred to SARP for investigation. | ☑ Met | ☐ Missed |
| 4d. 95% of requests for medical services in connection with a use of force are within policy. | ☑ Met | ☐ Missed |
| 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | ☐ Met | ☑ Missed |
| 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | ☑ Met | ☐ Missed |
| 4g. All use of force reports are stored and maintained by SARP as required by policy. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

The Monitor's Office has reviewed the UOF policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. Training of the required 40 hours for all officers was conducted during the reporting period. PRPB has committed to training 75% of its sworn force before the end of the calendar year. A review of training records at the end of the reporting period reveals that PRPB was on pace to meet its goal. The Monitor's Office will report if this goal was accomplished in the next CMR.

The Monitor's Office reviewed UOF data in 84 reports during this reporting period, including STUs. In the 84 cases reviewed, the Monitor's Office determined that the level of force reported was consistent with the force used. The following observations are made of the report review:

- All the reports reviewed were complete except for three (4%) that had a box not completed relating to medical aid. However, the information was in the narrative.
- In only one case (1%) did the Monitor's Office discover an incorrect UOF level (a subject was taken to the ground which constitutes a level 2; however, it was listed as a level 1 soft hands).
- In all cases officers notified supervisors of a UOF in accordance with policy
- In the 83 cases (99%), the reports were prepared and submitted in the timeframe outlined in policy.
- In all instances where medical aid was warranted, it was provided.
- The Monitor's Office can confirm that all 84 reports were reviewed by a supervisor within 5 business days, as outlined in the Agreement.
- Supervisors responded to all serious UOFs.
- As it relates to STUs, 8 reports (100%) were completed in the GTE system on time.
- All STU supervisors completed their investigation within the five-day timeframe identified in policy.

The Monitor's Office and USDOJ have continuously worked with PRPB to develop proactive measures that PRPB can undertake to ensure greater compliance moving forward.

In the past, PRPB's inability to validate its UOF numbers has been a recurring problem, and one which the Monitor's Office had identified in all previous CMRs. PRPB along with the Commonwealth's contractor, AH Datalytics, has taken a positive step to addressing this issue by taking the initiative, with the assistance of the Monitor's Office and USDOJ, to develop a Provisional UOF Plan. This plan, now implemented for two CMR periods, places PRPB on track to having a reliable system to report valid UOF numbers, provided that all steps in the system and the layers of review built into the plan are followed.

PRPB has noted several discrepancies and errors that were found in the UOF data with the Provisional UOF Plan in place. However, PRPB working with AH Datalytics, the Commonwealth's contractor, addressed those issues. PRPB also identified several lessons learned to help remedy these errors and prevent them from occurring in the future, including:

- Holding bi-weekly meetings with the Auxiliary Superintendency of Field Operations (SAOC), Technology and Communications Bureau (NTC), the Reform Unit, FIU, and Command Center Directors.
- Providing guidance on how to complete PPR 126.2 (Complaint Card).
- Developing guidelines for when more than one unit is involved in a UOF incident.
- Continuing to improve GTE.
- Incorporating dashboards created by AH Datalytics.

It is clear from the Monitor's Office's review of the quality of force reporting in this reporting period that PRPB's implementation of the Provisional UOF Plan has resulted in some improvements.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office is encouraged with the implementation of the Provisional UOF Plan. PRPB currently has the tools to accurately track its UOFs. To continue to accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community. PRPB must continue to ensure the integrity of its UOF reporting. PRPB must also hold officers and supervisors accountable for entering UOF reports in the timeframes established by policy.

## Paragraph 37: Use of Force - Force Reporting

*The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

PRPB policy requires that all officers complete a UOF Report (PPR 605.1) in writing before the end of the shift. PRPB has made significant progress in ensuring that UOF incidents are entered into GTE on time.

PRPB has taken several positive steps towards reaching compliance with this paragraph, including:

- Implemented the following changes to UOF reporting: 1) when a member of PRPB assigned to any specialized unit is involved in a UOF incident, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2)

49

PRPB has prohibited the use of complaint numbers with the prefix of the specialized unit in UOF incidents; and 3) PRPB's IT Bureau will take the corresponding steps to support compliance with the Commissioner's Directive. This will ensure that area commands are aware of each UOF incident in their jurisdiction.

- Implemented into practice that all UOF Reports (PPR 605.1) and Notification of UOF (PPR 605.3) be entered electronically into GTE.
- Adopted the Provisional UOF Plan with input from the Monitor's Office and USDOJ.
- Conducted an IT Needs Assessment.
- Contracted AH Datalytics to carry out the implementation of the necessary structure identified in the Gap Analysis conducted in May 2021, as part of the PRPB reform process.

The Monitor's Office recognizes these actions by PRPB as positive steps that factored into the development of a mechanism by which PRPB can validate its UOF incident numbers.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office is encouraged with the implementation of the Provisional UOF Plan. PRPB currently has the tools to accurately track its UOFs. To continue to accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community.

## Paragraph 38: Use of Force - Force Reporting

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

50

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, whenever medical aid was warranted, it was received. The Monitor's Office also assessed compliance regarding transportation and communication for medical aid.

*Pathway Forward*

As previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has assessed the accuracy of the Provisional UOF Plan and has determined that PRPB is able to accurately track its UOFs in this reporting period.

### Paragraph 39: Use of Force - Force Reporting

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, a UOF report was submitted to the officer's immediate supervisor. The Monitor's Office determined that PRPB has made significant progress in submitting reports in the timeframe required by Bureau policy. In the 84 UOF reports reviewed all but one (1%) was prepared and submitted in the timeframe outlined in policy. PRPB supervisors are also completing their UOF investigation in the time frame outlined in policy.

Regarding submission to SARP for the tracking and analysis of these UOF reports, PRPB has demonstrated that it has the capabilities to provide these functions. The Monitor's Office acknowledges PRPB's efforts towards addressing this issue with its Provisional UOF Plan which it implemented in July 2022, and the work of AH Datalytics, the Commonwealth's contractor.

*Pathway Forward*

All officers must continue to submit a copy of their UOF Reports (PPR 605.1) to their immediate supervisor and SARP for tracking and analysis. SARP must continue to maintain the data in a central location. PRPB has identified FIU to be the custodian of the UOF data.

## 5. Force Review, Investigation, and Analysis

PRPB meets the policy requirements for these paragraphs; however, PRPB's training and practice implementation is hampered by persistent issues with its ability to track and deliver training. In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the UOF reports when they are deemed accurate by PRPB, which is when FIU makes a determination and enters them into the Global List.

### Paragraph 40: Use of Force - Force Review, Investigation, and Analysis

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Target #1 and bi-annually for all other Compliance Targets |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The policy incorporates all of the requirements of the policy. | ☑ Met | ☐ Missed |
| 2. Training on force reviews and investigations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 43-47 for level 1-3 uses of force.

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 48-52 for level 4 uses of force.

*Compliance Assessment*

The Monitor's Office has reviewed the policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. While training follows approved policies, PRPB has been unable to meet the threshold of 95% of officers trained and certified

52

in force review and investigation policies in the prescribed timeframe. However, PRPB continues to move forward in providing the training, and reports that by the end of the calendar year they will reach their required goal of 75%, with a plan to reach 95% compliance in 2024.

Most of the UOF reports in the reporting period, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out as per the Agreement. In these reports, pertinent information was included, fields were checked, and the reports were signed.

*Pathway Forward*

As stated in previous CMRs, UOF reports (PPR 605.1) should be consistently reviewed by SARP's FIU for completeness and accuracy as a matter of general practice. UOF reports should be closely scrutinized during the review process, given the past observations of the Monitor's Office regarding errors and omissions. Staffing has been a continuing problem within FIU. In past CMRs the Monitor's Office has noted that with 18 investigators managing a substantial caseload, it is often difficult for this unit to also serve as a report review unit. The Monitor's Office was encouraged when it learned from the FIU Commanding Officer that 19 additional new personnel were assigned to the unit near the end of the last reporting period, with an additional member added in this reporting period.

A periodic assessment of staffing within FIU should be conducted to ensure it has the adequate staffing needed to conduct level 4 UOF investigations and properly conduct quality UOF reviews.

## Paragraph 41: Use of Force - Force Review, Investigation, and Analysis

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Targets #1 and #2; annually for Compliance Target #3; and quarterly for Compliance Target #4 |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☑ Met ☐ Missed |
| 2. All uses of force are tracked in the tracking system. | ☑ Met ☐ Missed |

| | | |
|---|---|---|
| 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | ☑ Met | ☐ Missed |
| 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB's Provisional UOF Plan was implemented in July 2022 and based on a review of the data, PRPB has demonstrated to the Monitor's Office that it has a reliable tracking system for the previous period and this reporting period; however, this effort needs to continue. This plan is a provisional plan that is labor intensive and requires several levels of review to detect and correct errors and/or omissions which can lend itself to errors. While it has been effective, it is not, nor should it be PRPB's final system. The RMS, once developed, will enhance PRPB's ability to track its use of force accurately in a less labor intensive manner.

PRPB, in an effort to ensure UOF numbers are accurate for 2023, delegated AH Datalytics, the Commonwealth's Contractor, to work with PRPB personnel and verify all UOF numbers. This has allowed PRPB to provide the public with accurate information relating to UOF trends through a regular report. Further, near the end of the previous reporting period, the Monitor's Office learned that AH Datalytics was also working on a public facing UOF Dashboard that would allow community members to interact with UOF data.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has assessed PRPB's compliance and implementation of the Provisional UOF Plan in this CMR. The Monitor's Office will continue to review the activities associated with this paragraph to ensure that the improvements made to UOF reporting and tracking are sustainable. Further, the Monitor's Office looks forward to the release of the public UOF Dashboard.

## Paragraph 42: Use of Force - Force Review, Investigation, and Analysis

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations.

*Compliance Assessment*

PRPB has revised its Annual Performance Evaluation of the Rank System (PPR 310.1) form to include criteria for evaluating supervisory reviews of UOFs by members under their command. The UOF Section of the evaluation (Supervisors Section) addresses what is required in the Agreement per Paragraph 42.

The related policy, GO 310 (Performance Evaluations), has been approved and signed by the Commissioner, but training has yet to be provided, which means that the revised evaluation system has yet to be implemented. In addition, PRPB has changed their evaluation process from twice a year to yearly, therefore, January 2024 will be the first evaluation under the revised policy.

*Pathway Forward*

This performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

## 6. Supervisory and FRB Reviews

### Paragraph 43: Use of Force - Supervisory and FRB Reviews

*A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 48-52.

*Compliance Assessment*

Of the 84 UOF reports (PPR 605.1) reviewed by the Monitor's Office during the reporting period, the Monitor's Office found no instances in which a supervisor failed to respond to a serious UOF. The

Monitor's Office acknowledges PRPB's efforts towards addressing this issue with the Provisional UOF Plan.

*Pathway Forward*

PRPB should continue to document that a supervisor responds to the scene of a serious UOF or allegation of excessive force involving an officer under his/her command upon notification of the incident. Furthermore, as previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate reliable and valid UOF data collection. The Monitor's Office will continue to assess PRPB's ability to track UOFs accurately in future CMRs.

## Paragraph 44: Use of Force - Supervisory and FRB Reviews

*The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | ☑ Met | ☐ Missed |
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | ☑ Met | ☐ Missed |
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |
| 5a. 95% of reviews by Force Review Boards are within policy. | ☑ Met | ☐ Missed |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | ☑ Met | ☐ Missed |

| | | |
|---|---|---|
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Policies incorporate all requirements of the paragraph. Training on force reviews and investigations for supervisors is also consistent with approved policies. 95% of supervisors are trained and certified in force reviews and investigation policies but have not been re-trained as outlined in the Agreement.

As it relates to supervisors serving on the area command Force Review Boards (FRBs), some have received the initial training for purposes of serving on the board but have not been retrained as required by policy.

Of the 84 UOF reports (PPR 605.1) reviewed by the Monitor's Office, the Monitor's Office found no instances in which a supervisor failed to conform to what was required by policy. As it relates to area command FRBs, the Monitor's Office confirms that 95% of FRB reviews are within policy. The high level of compliance in properly assessing level of force and the quality review of force by supervisors in the sampled investigations reviewed, allows the Monitor's Office to verify the accuracy of the information related to UOFs provided by PRPB. However, the Monitor's Office was unable to confirm that SARP is analyzing FRB determinations and recommendations per the Agreement.

*Pathway Forward*

As noted in other related paragraphs, compliance with this paragraph is largely contingent on PRPB's ability to accurately track all UOFs, ensuring that the Monitor's review of UOFs is representative. The Monitor's Office will continue to assess PRPB's compliance with UOF review procedures (meeting the five-business day review period) and ensuring that they contain the appropriate information and justifications.

## Paragraph 45: Use of Force - Supervisory and FRB Reviews

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
|  Training: | N/A | **Assessment Frequency** | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

All the reports reviewed were conducted within the identified timeline and report content does align with PRPB policy and Agreement language.

*Pathway Forward*

PRPB must ensure all UOF incidents are investigated in the time allotted as required by GO 605 (Report and Investigation of UOF Incidents).

The Monitor's Office continues to stress the importance of re-training supervisors on their roles and responsibilities in conducting UOF reviews and increased accountability for failing to adhere to the policy.

## Paragraph 46: Use of Force - Supervisory and FRB Reviews

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | **Review Period** | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | **Assessment Frequency** | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRPB provided the Monitor's Office a list of 76 officers assigned to the 13 Area Command FRBs. As required by the Agreement, FRB members are of varying assignments and rank. The random sample included 1 commander, 1 inspector, 1 captain, 5 first lieutenants, and 14 second lieutenants. The Monitor's Office requested the training and certification records of 22 randomly selected officers from this list to determine if they are qualified to serve on these boards as outlined in GO 502 (Evaluation Boards of Incidents of UOF). It should be noted that a review of the records of those who had training in serving on the FRB, and in some cases re-training, revealed that the training took place three to six years ago. None had updated re-training.

In addition, the Academy has not finalized the training curriculum for FRB members. It was expected, based on the Monitor's Office's conversation with Academy personnel, that the training would be available in the latter part of last year; however, a review of training indicates that no training has taken place. This training is necessary to ensure that FRB members are conducting evaluations as outlined in PRPB policy.

For the purposes of determining compliance with this paragraph, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command FRBs for the CMR-9 reporting period. PRPB provided a list of 210 UOF cases evaluated by FRBs, of which the Monitor's Office randomly selected 77 cases for review. Four of the cases were duplicates (5%), one case was quadruplicated (1%), and two (3%) were forwarded to FIU bringing the number of case files provided to 68. In 34 of the case files (50%) there was insufficient information to determine if the FRB completed its evaluation of the incident (PPRs 502.1 (Assessment of Incident of UOF and 502.2 were not provided in the files).

The Monitor's Office emphasizes that PRPB needs to develop a single source database for all UOF cases that are evaluated by the 13 Area Command FRBs. Currently global information on FRB evaluations is prepared upon request of the Monitor's Office for its CMRs.

The Monitor's Office determined in the cases reviewed that the FRBs took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation.

The Monitor's Office offers the following additional assessments of the information provided:

- In three cases (9%) the FRB ordered re-training.
- In all cases where the FRB completed PPR 502.1 (Assessment of Incident of UOF) the Board's evaluations were unanimous.
- Only one case file (3%) was returned by the FRB due to missing or incomplete information.
- Levels of force were accurate in all cases evaluated by the Board.

Based on the review of the randomly selected Area Command FRB files, there were no reported referrals to PRDOJ or NIE, nor was any such need uncovered. It should be noted that the Monitor's Office has seen improvement in the Area Command FRB's UOF evaluations. With the digitizing of files at the end of the previous reporting period, the information and data provided by PRPB, and its FRBs was very precise in those cases where complete files were supplied.

It should also be noted as per GO 502 (Evaluation Boards) that the FRB has 15 days, once the meeting convenes, to complete their evaluation. This period can be extended by 15 days if the report is returned. Based on the documents provided, the FRBs complied with the timeline to complete their evaluation in most cases. PRPB should ensure that the Area Command FRBs complete their evaluations within the timelines provided in GO 502 (Evaluation Boards of Incidents of UOF) for each evaluation.

In July 2023 the Monitor's Office conducted a site visit to Ponce to meet with the FRB President. Some of the concerns voiced by President include:

- The need to identify and train alternate members for the FRB.
- The need for retraining of current FRB members.
- The on-time preparation of the UOF Report (PPR 605.1). Many of the FRB members had trouble ascertaining when the UOF report was prepared as the date changes each time the report is amended. This issue was brought to the attention of PRPB IT by the Monitor's Office after the Monitor experienced similar issues.
- PRPB needs to ensure that all required documents are in each case folder.

*Pathway Forward*

The Monitor's Office will review PRPB's updated training for FRB members and observe training once conducted to ensure that it adheres to the Agreement. Further, the Monitor's Office notes that compliance with this paragraph is also affected by PRPB's ability to accurately track and report on UOFs, as with many of the paragraphs in this section. PRPB needs to ensure that its record keeping relating to UOF evaluations by the FRB is complete and accurate.

## Paragraph 47: Use of Force - Supervisory and FRB Reviews

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

60

*Compliance Assessment*

PRPB policy clearly dictates the actions that the Board and FIU must take when reporting misconduct to the appropriate investigative unit or to PRDOJ. During this reporting period one case was referred to PRDOJ.

The Monitor's Office reviewed 10 cases involving an accidental discharge, 4 (40%) of which resulted in a self-inflicted injury during the reporting period. FIU recommended that an administrative investigation be conducted and forwarded the cases to SARP. These cases, when investigated by FIU, are categorized as non-use of force.

*Pathway Forward*

In the instances where FIU investigates a UOF and determines that it was an accidental discharge and not a UOF, the case must be immediately forwarded to SARP upon completion of the investigation, and the eventual disposition should be included in the FIU file. The designation of UOF should not be applied. The Monitor's Office also recommends that FIU continue to document all such cases.

## 7. FIU Investigations and Force Reviews by SFRB

As indicated in previous CMRs, FIU is required to investigate all serious UOF incidents, among other investigations across Puerto Rico, including both intentional and accidental firearm discharges involving PRPB personnel. During the CMR-9 reporting period there were 72 UOF cases where investigations were initiated by FIU.

In previous CMRs, the Monitor's Office has voiced concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. In reviewing FIU investigations for this reporting period, the Monitor's Office has seen continued improvement in this area, including locating civilian witnesses, sketches of the crime scene, and locating and using camera evidence to make a determination. In addition, the FIU Commanding Officer in conjunction with the Reform Unit has established a procedure whereby FIU now has access to files in order to view photographs relating to UOFs. The ability of FIU investigators to access these files should improve the time it takes to complete an investigation. In addition, upon completion of their investigation into an accidental discharge, FIU now immediately forwards the case to SARP for administrative investigation. The Monitor's Office also recommends that digital recording devices should be issued to all FIU investigators for purposes of memorializing civilian witnesses' statements.

The Monitor's Office has observed considerable improvement regarding the amount of time FIU is taking to complete its investigations. Documentation provided by PRPB indicates that of the 72 investigations opened during the reporting period, 54 (75%) would have been required to be completed by the end of the reporting period. A review of documentation provided by PRPB indicates that in 24 cases (44%) the investigation was deemed closed in 45 days as required by the Agreement. While FIU did not meet the 95% threshold required, it needs to be noted that the progress from previous CMRs where only 18% of cases were closed during the reporting is significant and demonstrates PRPB is moving towards full compliance in this area.

As an added note, PRPB is working with the Commonwealth's contractor, AH Datalytics, to develop a color-coded dashboard that will identify all open case statuses. As an example, 1 to 20 days will appear green, 21 days to 45 days will appear orange, cases beyond the 45 days mark will appear in red.

As in past CMRs, delays in concluding FIU investigations have prevented the Monitor's Office from reviewing sufficient FIU investigations to reach a compliance assessment. FIU investigations in the past tended to overrun the 45-day deadline, and thus were not closed in sufficient time to provide to the Monitor's Office for review during the same reporting period that the incident occurred. To address this issue, and to better determine if FIU was properly investigating serious UOFs, as outlined in the Agreement, the Monitor's Office pivoted to requesting FIU investigations that were closed during the reporting period, rather than investigations that were opened during the period. The Monitor's Office thus requested a list of all FIU investigations that were completed in the CMR-9 reporting period, irrespective of when the incident occurred that prompted the opening of the investigation. FIU reports indicate that during the reporting period, 159 cases were closed. Moving forward, based on the completion rate of cases closed in this reporting period, it is expected that the Monitor's Office will be able to request closed cases from the current period under review.

In the past limited staffing along with reliance on external stakeholders to process evidence continued to be a contributing factor. However, PRPB has now doubled the size of FIU (20 new personnel). This and the accessibility of photographic evidence to FIU has resulted in an increase of cases closed during the reporting period and within the 45-day requirement as outlined in the Agreement.

As it relates to the CFRB, the Monitor's Office continues to have concerns about the Board's ability to complete its UOF evaluations within the timelines required in GO 502 (Evaluation Boards of Incidents of UOF). PRPB needs to ensure that all UOF evaluations are completed in a timely manner as per policy.

## Paragraph 48: Use of Force - FIU Investigations and Force Reviews by SFRB

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Bi-annually |

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for FIU officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4. All officers assigned to FIU meet eligibility requirements. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the UOF policies and found that they meet the requirements of the Agreement. Regarding FIU training, the Monitor's Office conducted a site visit to FIU in July 2023 and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices.

FIU is responsible for investigating serious UOFs, including a) accidental and intentional firearm discharges, b) UOFs by supervisors above the rank of sergeant, c) UOFs at protests, and d) any other UOF deemed appropriate by the Commissioner. The Monitor's Office confirmed that previously recommended additional training on intentional and accidental firearm discharge investigations had been developed and commenced. This was verified by documentation provided by the FIU Commanding Officer. However, to date 21 members of FIU have not been trained, which places PRPB below the 95% threshold. Twenty of the twenty-one (95%) are recently assigned officers to FIU. To address this issue the FIU Commanding Officer has asked the Academy to schedule two training sessions for FIU personnel.

All officers assigned to FIU meet appropriate eligibility requirements.

### Pathway Forward

PRPB should ensure that all FIU members are trained in a timely manner. The Monitor's Office will continue to review training records of newly assigned personnel to FIU to ensure that PRPB has trained all members on investigating intentional and accidental firearm discharges and all other required training and re-training.

## Paragraph 49: Use of Force - FIU Investigations and Force Reviews by SFRB

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review | April 2023 – September 2023 |

63

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | ☑ Met | ☐ Missed |
| 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | ☐ Met | ☑ Missed |
| 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |
| 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | ☑ Met | ☐ Missed |
| 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | ☐ Met | ☑ Missed |
| 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☑ Missed |

## Compliance Assessment

During the reporting period, FIU reported conducting 72 investigations, of which 24 (44%) were completed within the 45 days as prescribed by policy Of the 72 cases opened during the period, 54 (75%) would have required investigation completion by the end of the period of CMR-9.

The investigation breakdown is as follows:

- 19 firearm discharges
- 17 UOFs by a supervisor above the rank of sergeant
- 11 electronic control devices
- 10 accidental discharges
- 5 Level 4 electronic control device uses to the head
- 3 demonstrations/protests
- 2 negligent discharges of an electronic control device
- 2 less-than-lethal arms uses
- 1 canine bite
- 1 apparent criminal conduct
- 1 Level 4 grab by the neck

## Accidental Discharge Investigations

The Monitor's Office conducted site visits to FIU in April 2023 and September 2023. During the visits, ten accidental discharge files were reviewed. The following is a breakdown of the incidents during the reporting period:

- In four of the incidents (40%) the officer suffered self-inflicted wounds.
- In five incidents (50%) the officer was carrying their weapon unholstered.
- One incident (10%) involved a discharge from a rifle.
- Four incidents (40%) took place outside of a police facility.
- In three incidents (30%) the officer was off duty.
-  In seven incidents (70%) the officer was on duty.
- All completed investigations have or will be referred to SARP by FIU for an administrative investigation.

As previously stated, the issue of accidental/negligent discharges has been a reoccurring problem identified in previous CMRs. While PRPB has taken appropriate actions in these cases it does not appear that it has sufficiently looked at the underlying issues that contribute to the problem, such as training. It should also be noted that five of the incidents (50%) were in direct violation of Bureau policy and involved the carrying of a weapon unholstered. Another area of concern is that seven incidents (70%) occurred while on duty.

## Closed FIU Investigations

To review cases closed by FIU, the Monitor's Office requested a random sample of 34 cases closed by FIU during the current reporting period. The Monitor's Office reviewed the 34 investigations for the purpose of assessing FIU's compliance with the Agreement and PRPB policies relevant to conducting investigations.

The following are general observations of the cases reviewed:

- In 9 cases (26%) the FIU investigation was completed within 45 days as outlined in the Agreement; however, it should be noted that 15 cases (44%) reviewed by the Monitor's Office occurred in 2022 or before and preceded the arrival of the current FIU Commanding Officer, who is in the process of closing long standing investigations.
- FIU continues to show significant improvement in how it conducts its investigations. FIU investigators made numerous efforts to locate cameras in the area and possible witnesses. In addition, sketches were provided on all firearm discharges.
- Accidental discharges are no longer categorized as a UOF by PRPB once investigated.
- All FIU UOF reviews and investigations reached reasonably justified conclusions on the officer's conduct in accordance with policy.
- Of the 16 intentional firearm discharge (Level 4) investigations reviewed by the Monitor's Office, 13 (81%) were found to be within Bureau policy and all required documents were in the files.
- Three firearm discharges, which occurred outside the period of review, were identified as possible criminal conduct and resulted in referrals to PRDOJ. It should be noted that when FIU arrives at a UOF scene that has a possible criminal conduct, it does a quick referral to PRDOJ NIE.

65

FIU then conducts a preliminary analysis to proceed with the eventual administrative investigation of the case. An administrative referral is sent directly to SARP to then proceed according to their corresponding procedures. Nonetheless, SARP may wait for PRDOJ to conclude their criminal investigation, before they undertake the administrative one.

FIU has made considerable progress in closing cases in the time outlined as per the Agreement. The Montor's Office is encouraged by the efforts of FIU in this regard; however, the lack of closed files for the Monitor's Office to review relating to UOF cases that occurred during the reporting period impacts the compliance ratings of Paragraphs 49-51.

## CFRB Investigations

As it relates to CFRB meetings, many of the cases evaluated by the Board involve serious UOFs. PRPB needs to outline the protocol as to how these meetings should be conducted. As previously stated, the Monitor's Office recommends that each CFRB member should be fully versed in the details of the incident prior to the board meeting. This will allow for healthy discussion between members. To that end, all CFRB members now have access to FIU investigation files which have been digitized for review purposes.

Another area of concern relating to FIU involves the investigation of UOFs by members of the Bureau above the rank of sergeant, which by policy, requires FIU to conduct the investigation. In past CMRs it was stated that the lack of supervisors, specifically sergeants in the field, required lieutenants, to some degree, to carry out the functions of a sergeant, one of which is assisting officers effecting arrest, and in doing so in some instances using lower levels of force. To some degree this has been addressed with the promotion of over 500 sergeants during the previous reporting period. However, the Monitor's Office still recommends that supervisors of a higher rank from the respective area commands investigate lower levels of force by supervisors from the rank of sergeant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRPB Members). PRPB has also not provided documentation that CFRB determinations and recommendations are tracked and analyzed by SARP.

In the reporting period FIU investigated 17 cases (36%) where supervisors above the rank of sergeant used lower levels of force to effect an arrest.

## *Pathway Forward*

PRPB must ensure that prompt notification is made to FIU in cases regarding their involvement. For the most part, this was the case. FIU must complete its UOF investigations within the 45-day timeline outlined in the Agreement. PRPB must also ensure that FIU has adequate personnel to conduct its investigations and that all personnel have completed all necessary training to meet timelines relating to investigating serious UOFs.

FIU has limited personnel to respond and investigate serious force by PRPB members throughout the Bureau, a possible option would be, as previously stated, that PRPB allow supervisors of a higher rank from the respective area commands to investigate lower levels of force by supervisors from the rank of

sergeant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRPB Members).

The CFRB must complete its reviews within the time allotted in GO 502 (Evaluation Boards of Incidents of UOF). Previously, the Monitor's Office recommended having either the FIU Commanding Officer or the FIU Executive Officer attend all CFRB meetings for the purpose of presenting the case to Board members and to answer any questions members may have regarding the cases to be discussed, which PRPB has implemented.

It should be noted that the Parties have agreed to develop a compliance measure that is tailored to the specific requirements of Paragraph 49 as part of the compliance plan filed with the court on November 3, 2023. This is intended to ensure that this paragraph is assessed properly.

## Paragraph 50: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

### Compliance Assessment

In all cases where FIU determined that the UOF may involve criminal conduct by an officer, PRDOJ was notified along with its investigative arm, NIE. The Monitor's Office confirmed through a review of FIU data that there was one such referral during this reporting period.

### Pathway Forward

The Monitor's Office will continue to assess this paragraph in CMR-10. The review of referrals demonstrates compliance; however, the Monitor's Office would expect PRPB to demonstrate continued compliance with this paragraph. Further, the Monitor's Office will continue to review such cases to assess consistency in PRPB practice.

## Paragraph 51: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

For the CMR-9 reporting period PRPB reported that FIU opened 72 UOF investigations, of which 54 (70%) would have required the investigation be completed by the date of this CMR. Of those 54 cases, 24 (44%) were completed by FIU in the 45-day timeline established by the Agreement. The Monitor's Office can determine that FIU is not fully compliant with this paragraph; however, it should be noted that the percentage of cases closed within the time identified in the Agreement has increased significantly from 18%.

It should also be noted that during this reporting period the Monitor's Office met multiple times with FIU personnel. During discussions with FIU, it was learned that FIU was operating under the premise that the 45 days to complete their investigation as per policy was 45 business days. However, a review of GO 605 (Report and Investigation of UOF Incidents) states that the amount of time FIU has to complete its investigation is 45 days, and it should be noted that in GO 113 (FIU) there are two sections that contradict themselves regarding timeline.

The Monitors Office recommends that the Parties discuss this issue and modify GO 113 (FIU) to correspond with language in the Agreement and GO 605 (Report and Investigation of UOF Incidents).

In further discussions with FIU, investigators noted that in the past the root cause for failing to complete the investigation in the allotted time was delays in receiving the results of forensic and evidentiary material, e.g., video, photographs, and other evidence recovered at the scene of serious UOFs in a timely manner. This is the information FIU needs to make its determination. In many of these cases, FIU must rely on other PRPB units and DSP to complete their tasks before the investigation can be closed. One major step taken during this reporting period is that FIU investigators now have access

to photographic evidence in digital files and no longer must wait to receive the videos and pictures to complete their investigation.

Once an investigation is complete, FIU does prepare the required report for CFRB's review, analysis, and evaluation of the force.

*Pathway Forward*

PRPB should ensure that all FIU investigations are completed in 45 days, as outlined in GO 113 (FIU) and GO 605 (Report and Investigation of UOF Incidents). PRPB must ensure that FIU has adequate staff and resources to complete these investigations. Further PRPB must work with internal DSP units and external stakeholders to address FIU's inability to receive forensic data in sufficient time to complete its investigations in 45 days as required by policy.

It should be noted that this issue has been ongoing since CMR-1 and PRPB continues to lag in the timeliness of its FIU investigations. However, as previously stated, the Monitor's Office has seen significant improvement in the percentage of investigations closed in 45 days. Compliance with the Agreement is not solely the responsibility of PRPB, it falls on the shoulders of the entire Commonwealth and its government entities. The Commonwealth should continue to examine the issues stemming from FIU's inability to close an investigation within 45 days and develop a plan to address such issues in the near term. This plan should be shared with the Monitor's Office and USDOJ. Failure to address this issue negatively affects compliance with various paragraphs in this subsection of the Agreement and will continue to stall PRPB's progress.

## Paragraph 52: Use of Force - FIU Investigations and Force Reviews by SFRB

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

CFRB members have some training, but it is not current. SAEA has not updated the curriculum based on the revised GO 502 (Evaluation Boards). The Monitor's Office looks forward to reviewing the updated training curriculum and notes that the development of this updated curriculum has lagged substantially.

PRPB provided the Monitor's Office with documentation that FIU opened 72 investigations during the reporting period and forwarded the closed cases to CFRB for evaluation. During the mid-period (April through June 2023) the Monitor's Office requested a random sample of 23 cases evaluated by the Board for review. PRPB provided the case files for all cases except for three, two of which were determined to be apparent criminal conduct and were referred to NIE (one of which occurred outside of the reporting period). The remaining case, according to the FIU Commanding Officer, was incorrectly assigned to FIU. In the 20 case files provided only 5 (25%) contained documentation that the CFRB had evaluated the incident. Only four evaluations were completed as one case was returned due to missing information. Fifteen cases (75%) provided no documentation that the CFRB evaluated the FIU investigation. In the four cases evaluated, the Monitor's Office determined that the CFRB reviews were objective; however, none of the evaluations were concluded within the 30 days as outlined by policy.

For the remaining months of the reporting period (July through September 2023) the Monitor's Office requested five evaluations of FIU investigations. Of the five requested, PRPB provided documentation that four of the cases (80%) were evaluated by the CFRB.

The following observations are put forth as a result of the review:

- All eight evaluations exceeded the 30-day timeline.
- In all eight cases the evaluation of the investigation was objective.
- All evaluations included forms PPR 502.1 (Assessment of Incident of UOF) and PPR 502.2.
- There were no instances where retraining was directed.

The Monitor's Office requested the training certification records of the three CFRB members, as well as any other person who may have served on the CFRB during the reporting period. This information serves to determine whether CFRB members are qualified to serve on the Board, as outlined in GO 502 (Evaluation Boards). The Monitor's Office was informed by PRPB personnel that the information provided to the Monitor's Office for the FRB members also applies to CFRB members which is that the training is still in development, therefore training has yet to be provided to Board members. In conversations with the Monitor's Office, PRPB has acknowledged its shortfalls in the evaluation of cases investigated by FIU. The Monitor's Office has also not received documentation that the CFRB is submitting completed evaluations to SARP for tracking and analysis.

*Pathway Forward*

Issues with the timeliness of these evaluations do not appear to be a result of staffing shortages. However, FIU has made a concerted effort to close old cases resulting in an inordinate number of cases sent to the CFRB for evaluation. It is imperative that PRPB and CFRB members commit to completing

these evaluations in the timelines established in policy. PRPB should also ensure that all officers serving on the CFRB have training certifications. The Monitor's Office will review the training curriculum developed based on the revised policy.

It should also be noted, that if PRPB's lack of progress with CFRB evaluations continues, it runs the risk of falling back to Not Compliant in CMR-10.

## 8. Use of Force Training

The Monitor's Office finds that PRPB is partially compliant with the paragraphs of this subsection of the Agreement which stipulates that all trainings must be consistent with policies and the Agreement and that all personnel must be trained and certified on UOF policies. While all training curriculums are consistent with policies and the Agreement, PRPB has not provided ample documentation to show that the training delivery compliance thresholds have been met. Regarding other training requirements, such as those noted in Paragraphs 53 and 55, PRPB has not yet reached the 95% compliance threshold in the review of the random sample provided by PRPB.

### Paragraph 53: Use of Force - Use of Force Training

*PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:*

*a) legal standards for reasonable force;*

*b) PRPD's use of force policy;*

*c) reporting use of force, requesting medical service, and preserving evidence;*

*d) scenario-based training and interactive exercises that illustrate proper use of force decision-making;*

*e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;*

*f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning*

*reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

*g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;*

*h) factors to consider in initiating or continuing a foot pursuit; and*

*i) appropriate training on conflict management.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2023 – September 2023 |

| | | | |
|---|---|---|---|
| **Policy:** | Implemented | **Period** | |
| **Training:** | Not Implemented | **Assessment Frequency** | Bi-annually |
| **Practice:** | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | ☑ Met   ☐ Missed |
| 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☑ Missed |

### Compliance Assessment

PRPB recently updated all UOF policies and, as a result, developed new UOF training curriculums on these policies. The Monitor's Office's previous review of related training on UOF was found to be consistent with approved policies and requirements of the paragraph. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has not met the 95% threshold for the re-training of officers on the relevant UOF policies (REA 601 Rules for UOF and REA 605 Report and Investigation of UOF). According to documentation provided by PRPB it expects to have trained 75% of its officers by the end of 2023. The Agreement states that PRPB must re-train it's officers every year. PRPB also has not provided additional training on intentional firearm discharge investigations for all FIU personnel.

### Pathway Forward

The Monitor's Office will review the updated UOF training curriculums and ensure continued compliance with this paragraph. The training on UOF, specifically the topics noted in this paragraph, should also be incorporated into in-person scenario-based training to ensure that officers understand the policy requirements and the practical application of such procedures.

## Paragraph 54: Use of Force - Use of Force Training

*PRPD shall provide an appropriate firearm training program that:*

*a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis;*

*b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms;*

*c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program;*

*d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and*

*e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | ☑ Met   ☐ Missed |
| 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | ☐ Met   ☑ Missed |

*Compliance Assessment*

The Monitor's Office found that PRPB's policies relating to firearms qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) in a previous reporting period.

For the purpose of determining compliance with firearms training and qualification, the Monitor's Office requested data relating to yearly firearms training and qualifications.

PRPB provided a list of 10,226 personnel who qualify with their service weapon during the daylight fire segment. However, it should be noted that the daytime firing qualifications commenced in November 2022. While PRPB has trained over 95% of its members in daylight fire, it will need to train 95% of its members on night fire before the end of 2023 to be compliant with the Agreement.

The Monitor's Office selected a random sample of 76 officers from the list of officers who were listed as qualified and requested their certified training records to verify their qualifications. A review of the training files confirmed that all officers were qualified. The Monitor's Office also noted in documentation provided by PRPB that 839 officers required same day re-training to be certified and that no officer failed the qualification re-test or was relieved of operational duty according to PRPB documentation. SARP also provided documentation that there were no investigations conducted relating to officers failing to qualify on their weapons. All officers with more than one regulation firearm were qualified on all firearms. Therefore, the Monitor's Office did not have the occasion to review whether officers are disciplined after failing to requalify for firearms training.

*Pathway Forward*

PRPB must create and maintain a "master list" which includes all sworn personnel and their status as it relates to firearm training. PRPB must work with the Monitor's Office to grant the Monitor direct access

to PTMS or other structured data sources so that the Monitor's Office can directly verify rates of firearm certification and justifications for all officers that are not currently certified.

## Paragraph 55: Use of Force - Use of Force Training

*PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:*

*a) requesting medical services and determining the appropriate use of force reporting levels;*

*b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;*

*c) ensuring proper collection of evidence;*

*d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;*

*e) assessing the legality and appropriateness of a detention and subsequent arrest;*

*f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative*

*accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;*

*g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and*

*h) report writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

74

*Compliance Assessment*

The Monitor's Office verified that 95% of supervisors, FIU personnel, and command personnel have been trained on the relevant courses (REA 601 Rules for UOF and REA 605 Report and Investigation of UOF) within the last year as required by the Agreement.

Some FIU personnel have completed advanced training related to investigating intentional firearm discharges (Level 4 UOF). The FIU Commanding Officer informed the Monitor's Office that given the influx of new personnel into FIU, all members will be trained and/or retrained on the advanced training course. The lieutenant further reported that to complete the training a request was made directly to the Academy.

This additional training was in response to the Monitor's Office's previous CMRs and recommendations, which identified significant deficiencies in FIU's firearm discharge investigations (Level 4 UOFs).

*Pathway Forward*

Given the nature of the important work conducted by FIU, it is imperative that they receive all the required training and that this training is periodically updated as needed. The work of the CFRB plays a pivotal role in identifying the training needs of FIU as they evaluate all FIU investigations and are in the best position to uncover deficiencies in training. The Monitor's Office will continue to assess training compliance with target two through random training record reviews.

## 9. Responding to Behavioral/Mental Health Crisis

As stated in previous CMRs, it is critically important to have CIT trained officers throughout the 13 area commands. Since the conclusion of the pilot project in November 2020, PRPB had lagged in expanding its CIT coverage outside of Arecibo until this reporting period. Issues garnering personnel interest in the position have presented difficulties in creating CIT programs in other areas. One of the challenges is that currently the training (40 hours) for CIT certification is only conducted at the Academy, which may discourage potential volunteers from the outlying area commands. Officers from those commands may have as much as a two hour daily commute each way to complete the required training. The Monitor's Office has recommended and PRPB is considering offering the training program in the field across different parts of the island. PRPB reports that 83 agents have been interviewed for the CIT officer position and 66 (80%) continued to the next step (psychiatric evaluation for the position). Of that number, 62 (94%) were deemed qualified; however, only 43 (69%) were interested in continuing the process and subsequent training. Interviews of interested officers continued through August and September, increasing the number of acceptable candidates.

During the July, August, and September 2023 site visits the Monitor's Office conferred with the Bureau-wide CIT Coordinator who related the following information:

- There are 65 new CIT certified officers trained outside of those assigned to Arecibo. Training for the new CIT Officers took place during the months of June through September 2023. These officers are assigned to:
    - Carolina

- ○ San Juan
- ○ Humacao
- ○ Caguas
- ○ Bayamón
- The curriculum for CIT training has been revised and was provided to the Monitor's Office.
- Mayaguez will be the next to receive CIT certified officers.
- Currently in Arecibo, 3 of the 13 certified CIT officers (21%) have been promoted to sergeant; however, they currently remain assigned to the area command and continue to serve as CIT officers. Three additional officers have been transferred to specialized units (two to the CIC investigative unit and one to motorized). They also continue to serve as CIT officers.

As PRPB expands its CIT program it should use the feedback and analysis of the pilot conducted in Arecibo to form its approach and implementation of CIT in other areas. In response to the January 2022 status conference, the Court ordered PRPB to establish a committee tasked with conducting an evaluation of the CIT pilot in Arecibo.

The expansion of CIT officers to other area commands and the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving individuals in crisis, especially those related to "Ley 408" (court ordered involuntary commitment).

PRPB is currently relying on PPR 628.1 (Crisis Intervention Incident Report) and PPR 621.2 (Other Information) to identify incidents involving a person in crisis. PRPB needs to ensure that PPR 628.1 (Crisis Intervention Incident Report) is prepared by all officers in incidents involving individuals in crisis. The Commonwealth's contractor, AH Datalytics', dashboard identifies interactions with persons in crisis and verifies whether a crisis intervention incident report (PPR 628.1) was created for any incident with a corresponding UOF report that had identified the subject as having a "mental/psychiatric history" or involved a Ley 408 Committal Order. The dashboard has provided the Reform Office with 24/7 access to this information which is automatically updated daily and is broken down by area command, zone, precinct, and district.

PRPB needs to ensure that the system captures all PPR 621.2s (Other Information) that are not currently captured in a UOF or Ley 408 and query the system to determine if the subject of the report is a person in crisis. This has been an area of discussion that the Monitor's Office and USDOJ have had with PRPB and the Commonwealth's contractor, AH Datalytics.

## Paragraph 56: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:*

*a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.*

*b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.*

*c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4. Training on crisis intervention for CIT officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | ☑ Met | ☐ Missed |
| 6. 100% of all officers assigned to CIT meet eligibility requirements. | ☑ Met | ☐ Missed |
| 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | ☐ Met | ☑ Missed |
| 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the CIT policies and trainings and found that they meet the requirements of the Agreement. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially, but it is also vital. The officers selected to be certified as CIT officers (40 hours of training) will continue in their normal capacity as patrol officers. PRPB expects that eventually 180 officers will be selected and trained throughout the 13 area commands.

During previous reporting periods, USDOJ and the Monitor's Office observed a portion of the REA 628 (CIT) training. The Monitor's Office found the training to be dynamic, knowledge-based, and employed several adult learning techniques, including participation through questions and exercises. While the training has a strong foundation, USDOJ and the Monitor's Office did provide some recommendations

to further strengthen the training, such as incorporating more experiences and scenarios from Puerto Rico and providing attendees with hardcopies of the PowerPoint presentation for note taking.

PRPB provided documentation that no training of officers on the basic "Intervention with Persons in Crisis" course took place during this reporting period. The Academy similarly reports that all PRPB officers have not yet received the eight-hour basic CIT training. As noted in various sections of this CMR, virtual training was halted when issues relating to the integrity of the training were brought forth. As such, no virtual training was conducted during the reporting period.

In February 2022 at a meeting with PRPB, facilitated by USDOJ, several aspects were discussed that needed to be part of the evaluation of the pilot project, including restatement of the objectives of the program, identification of the necessary skills of CIT officers, and the goals with which to evaluate the program.

PRPB worked with USDOJ and the Monitor's Office to establish an evaluation committee as ordered by the court for the purpose of identifying potential evaluation methods and performance measures to gauge the impact of the Arecibo Pilot Program and to assist in the implementation of CIT Bureau-wide. The evaluation committee is made up of members from PRPB along with outside personnel with experience in the mental health field. The Monitor's Office as well as USDOJ have participated in evaluation committee meetings.

In August 2022 PRPB provided the Monitor's Office and USDOJ with a draft prepared plan, Methodology and Evaluation of the Crisis Intervention Team, that outlines PRPB's efforts in developing crisis intervention teams within PRPB and the need for such services. Also discussed in the document was the Arecibo Pilot Program, which included the sections titled Internal Analysis of Weaknesses of the CIT Pilot Program and Internal Analysis of Strengths of the CIT Pilot Program. While the Monitor's Office appreciates PRPB's efforts in developing the document, as it relates to the Arecibo Pilot Program, the information is not supported by data collected during the project, which the Monitor's Office considers to be a key requirement in identifying needs and expectations when the project is expanded to other area commands throughout the Bureau. USDOJ also provided several recommendations on the draft plan including more clearly articulating CIT goals, including external team members in CIT, and setting timelines, which the Monitor's Office concurred with.

During this reporting period the CIT Program was expanded to include San Juan, Carolina, Caguas, Humacao, and Bayamon.

The Monitor's Office has confirmed that all officers currently in a CIT role are trained and retrained in CIT as required and meet eligibility requirements.

For this reporting period, PRPB reported 377 cases of interactions with persons in crisis. A random sample of 77 cases was selected by the Monitor's Office for review. The source of data for documenting the Bureau's interactions with persons in crisis consisted of PPR 628.1 (Crisis Intervention Incident Report) and 621.2 (Other Information). As a result of this case review, the Monitor's Office makes the below observations:

- 50 cases (65%) involved Ley 408 (Court Ordered "Involuntary Psychiatric Examination").
- In all but one case (99%), PPR 628.1 (Crisis Intervention Incident Report) was prepared.
- In the 77 cases reviewed only 11 (14%) were handled by certified CIT officers.
- In 17 cases (22%) officers used force to subdue the subject. In five instances (29%), electronic control devices were used.
- There were several PPR 628.1 (Crisis Intervention Incident Report) reports which had incomplete boxes, six involved Ley 408 boxes which were not checked even though it was clear based on the narrative that Ley 408 was involved.
- In three cases (4%) the subjects were armed with knives.
- In 34 cases (44%) the notification of "person in crisis" involved Centro Mando.
- In 33 cases (43%) the notification of "person in crisis "involved Retens (Desk Officers). Since many notifications of a person in crisis originate through field commands, PRPB should consider adding a section to GO 628 that outlines the information that should be obtained before officers are sent on a "person in crisis" call. In addition, this information should be added to the curriculum of the eight-hour course.
- In 10 cases (13%) the origin of notification was not provided.

*Pathway Forward*

The Monitor's Office looks forward to working with PRPB as it expands its CIT Program to other area commands.

PRPB provided documentation that cadets are being trained in CIT at the Academy as reported and that future classes will receive the 40-hour CIT training as part of required training to graduate. PRPB should develop a plan to weave some of these officers, as they gain patrol experience, into the CIT program. To date PRPB has provided training records for Academy Classes 227 through 233, verifying that they have successfully completed the 40-hour CIT training. Those officers, if selected, would only require a modified retraining course.

As previously stated, PRPB's policy to send district/precinct officers to comply with Ley 408 orders (involuntary admission to a hospital for psychiatric evaluation) by the court should be reviewed. In the random sample for the reporting period, 65% of calls for persons in crisis involved such orders and some resulted in the use of non-lethal weapons being or force against the subject. Using a trained CIT officer in these circumstances may result in less UOF. The Monitor's Office recommends that as the CIT Program is expanded to other area commands, a protocol be established that calls for service relating to involuntary committal (Ley 408) be handled by on-duty CIT officers, when possible. It should be noted that some area commands have established an "On Call" list of CIT officers in their areas that can be called in the event the presence of a CIT officer is necessary.

PRPB currently has an insufficient number of CIT trained officers or applicants to expand the CIT Program to the remaining six area commands. To address this issue the Monitor's Office continues to recommend PRPB consider adding a transfer component that would allow officers that agree to participate in the program, are subsequently accepted, and successfully complete the training, to select their area command of choice.

To this point, the only training provided to dispatchers is the eight-hour course provided for field personnel. PRPB needs to specify if it has developed a course specific to dispatchers regarding how to route crisis calls to on duty CIT officers.

### Paragraph 57: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of shifts have at least one CIT-trained and certified officer. | ☐ Met | ☑ Missed |
| 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Training on the CIT program for field operations officers is evaluated as part of the basic behavioral health training in Paragraph 56.

*Compliance Assessment*

As determined in previous CMRs, PRPB implemented a CIT Pilot Program in Arecibo which concluded in November 2020. Fifteen officers from Arecibo participated in the training as CIT officers. The training for CIT officers took place at the Academy during a previous reporting period. Officers were required to pass a written exam at which point they could proceed to the scenario-based training segment. The course, Intervention Team in Crisis (CITE 8061), consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office. To date 13 CIT trained officers remain in Arecibo. An additional 65 officers from San Juan, Humacao, Caguas, Fajardo, Guayama, and Carolina have been trained and certified.

PRPB has also selected CIT coordinators in all area commands who are currently identifying prospective CIT officers. In addition, a Bureau-wide coordinator has been named. PRPB has provided the Monitor's Office with the rating form that PRPB will use for prospective candidates to the program. In addition, the PRPB Commissioner issued a job posting for uniformed agents from the precincts and districts of the 13 police areas who may be interested in becoming a CIT officer. The job posting provides a job description, eligibility requirements, training description, and application instructions. PRPB continues

to interview officers for the position. It is estimated that PRPB will need approximately 100 additional officers to expand the CIT Program to the remaining 6 area commands.

The Monitor's Office is supportive of PRPB's intention of expanding the program to all areas and is encouraged by the progress PRPB has made. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially given that support services may not be available in the early stage in some areas. However, the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to Ley 408 (Involuntary Commitment Orders). Therefore, it is imperative that the Bureau make a concerted effort to complete this task.

In the past PRPB has provided training to field personnel and dispatchers related to CIT; however, the training for dispatchers has not been specific to their work assignment. This training should be more in-line with the daily responsibilities of a dispatcher, including how to collect the appropriate information from the caller to provide to the responding officer.

In relation to the eight-hour basic training course which all PRPB field members are to receive, PRPB provided the Monitor's Office with the four training modules and the exam used to determine the level of proficiency in the material presented for review. To that end, PRPB provided information that no PRPB officers were trained during the reporting period. PRPB indicated that virtual training would resume in 2023, which has yet to occur. Current Arecibo CIT trained personnel did receive re-training during the previous reporting period as well as all 65 new officers that were added to the ranks of CIT during this reporting period.

PRPB also provided the Monitor's Office with documentation of CIT officer's shift assignments in the field to verify that the Bureau is in partial compliance with Paragraph 57 which requires CIT trained officers be assigned to each shift in each police region. The documentation verified that the following area commands have CIT officers assigned to each shift.

- San Juan
- Arecibo
- Humacao
- Fajardo
- Bayamon
- Carolina
- Caguas
- Guayama – There are not enough CIT trained officers to provide coverage during all shifts.

*Pathway Forward*

The Monitor's Office is aware that PRPB is in the process of developing and reinstating its virtual training and expects that once completed, it will resume the virtual eight-hour basic CIT training course for all members.

As noted above, PRPB must accelerate the expansion and subsequent training of CIT to the six remaining area commands. Having developed a curriculum and training for the CIT Program, having tested it in the field in Arecibo, and expanded to additional area commands, the Monitor's Office expects PRPB to continue implementing the program Bureau-wide. The training of officers to handle individuals with mental health issues is of paramount importance. Having a trained officer to deal with persons in crisis

can help minimize those incidents that can escalate into confrontations in which PRPB members may be required to use force.

The Monitor's Office expects to see significant progress in the training of PRPB personnel in crisis intervention as the CIT Program is expanded to all area commands.

As previously stated, PRPB has not provided documentation that dispatchers have received specific training related to dispatching officers to "persons in crisis". In fact, to this point, the only training available to dispatchers is the eight-hour course provided for field personnel. PRPB needs to develop a course specific to dispatchers regarding routing crisis calls to on-duty CIT officers. All dispatchers should receive this training. In addition, PRPB should also consider adding an additional section to GO 628 identifying information that should be obtained and provided to officers before sending them to Ley 408 calls. Often officers assigned to the position of "Reten" (Precinct/District Desk Officer) are approached by family members of subjects of Ley 408 Orders requesting that officers carry out the involuntary commitment order.

# III. Searches and Seizures: Internal Controls and Accountability

Although the Monitor's Office has noted some progress during this reporting period with PRPB officers clearly articulating probable cause in arrest reports, the number of poorly written reports and incomplete arrest files continues to be a concern. Many police reports do not specifically detail probable cause, as required for each arrest case, while other arrest files were rated not compliant for because of missing required forms. It is the Monitor's contention that the lack of specificity in arrest cases leads officers to inevitably employ boilerplate, conclusive, and repetitive language in many cases. Also, there is no indication that supervisors and commanders are addressing these deficiencies or taking any type of corrective action as they review these arrest reports.

On the other hand, PRPB supervisors are performing much better in the areas of arrest reviews, responding to scenes of arrests, and inspecting arrestees for injuries upon arrival at police facilities.

It is well established that PRPB does not allow its officers to conduct investigatory stops and searches, known as Terry Stops, other than stops resulting from traffic violations. However, traffic stops are recorded only when there is a citation issued or an arrest made. These traffic stops are not being tracked, collected, or reviewed by PRPB. The Agreement requires that ALL stops and searches be tracked, recorded, and reviewed.

Seized property/evidence forms are still missing from many arrest files, and officers, against the advice of the Monitor's Office, continue to improperly ask arrestees to confirm they own potentially incriminating evidence seized from them by signing the evidence inventory form. This could potentially lead to a claim of 5th Amendment violations.

The Monitor's Office inspected several property and evidence rooms throughout the island during this reporting period and found many to be improperly secured and lacked proper ventilation in some cases. The size of these rooms was inadequate in other cases.

Search warrant applications are being properly reviewed and approved by supervisors, and the resulting arrests are also being reviewed and evaluated by supervisors and commanders. There has been meaningful progress in the area of consent searches: all but one consent search case reviewed contained properly completed consent forms. However, a significant number of these searches ended in finding no incriminating evidence.

The Commonwealth, USDOJ, and the Monitor's Office continue to collaborate on a Search and Seizure Implementation Plan to address many of the issues raised here. PRPB has stated to the Monitor's Office that the plan will be finalized, and implementation will begin by the end of 2023.

Overall, the Commonwealth's compliance with the 22 paragraphs assessed during this reporting period within Searches and Seizures reflects improved levels of compliance to what was noted in previous CMRs. In CMR-7, 77% of paragraphs (17 paragraphs) were assessed as not compliant and 23% (5 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 45% of paragraphs (10 paragraphs) were found to be not compliant and 50% of paragraphs (11 paragraphs) were found to be partially compliant. See figure 4.



*Figure 4. Searches and Seizures: Paragraph Compliance Status*

## Paragraph 58: Searches and Seizures - General Provisions

*PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

PRPB still does not allow officers to conduct investigatory stops and searches, known as Terry Stops, other than stops resulting from traffic stops. However, traffic stops are recorded only when there is a citation issued or an arrest is made, although the Agreement requires that ALL stops and searches be tracked, recorded, and reviewed. But even those traffic stops resulting in arrest or citations are not tracked, collected, or reviewed by supervisors, hence they are not analyzed and reported on, as required by Paragraph 243.

In addition, although there has been some progress, a significant number of arrest reports lack specificity when describing probable cause. This was the case in 32 of 63 arrest files reviewed, for a 51% failure rate (there were 67 arrest files submitted, but 2 files were not found- #2023-13-023-01284, and 2023:2-034:03545; and 2 did not involve an arrest - #2023-6-700-00542, and #2023:4-036:004023, for a total of 63 files reviewed). For an example of files with poor probable cause documented, see complaint #2023:13-010:001618, and #2023-13-199-00362. However, it bears to state here that PRPB has made some progress in this area: the arrest files were submitted in 2 batches of 29 and 34 reviewable files, covering April 1 through June 30, 2023, and July 1 through September 30, 2023, respectively. In the first batch there were 18 files out of 29, or 62%, that lacked probable cause; while in the second batch, there were 14 files out of 34, or 41% lacking probable cause. Although it is not the progress expected, it is still very significant progress when considering past performance. Not coincidentally, the Bureau has added hundreds of newly promoted supervisors and partially re-started in-service training on the subjects of Arrests and Summons and Searches and Seizures during this reporting period.

*Pathway Forward*

PRPB must create a system to collect, track, and analyze all investigative stops and prepare a report with the results as per Paragraph 243 and make it public. The continuation of in-service training based on GO 615 (Arrests and Summons), GO 612 (Searches and Seizures), and GO 636 (Evidence Rooms) must remain consistent to achieve compliance.

## 1. Stops, Searches, and Seizures

PRPB policy on searches and seizures and all related forms are up to date as of this reporting period. There were search warrant files submitted to the Monitor's Office for review that did not contain copies of search warrants and affidavits (four cases in this sample), and missing related forms, such as PPR 631.1 (Booking Sheet), PPR 636.1 (Property/Evidence Seized Form), and PPR 128 (Motor Vehicle Inventory Form), which is required when a vehicle is seized or comes into police custody for any reason. PRPB has not yet instituted a method to record demographic and geographic data for analysis, as required by the Agreement (Paragraph 243). Some arrest and search files also lacked required forms and police reports and probable cause documentation.

### Paragraph 59: Searches and Seizures - General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on stops, searches, and arrests; provide training; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy. PRPD policies shall define all terms clearly and provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop, detention, or search.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |



| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Implementation is assessed as part of the compliance reviews for Sections B (Paragraphs 60-64), C (Paragraphs 65-73), and D (Paragraphs 74-77) on Investigatory Stops and Searches, Arrests, and Searches, respectively.

Note: The policy requirements of this paragraph is assessed with Paragraphs 65, 72, 74, and 78.

Note: Training is assessed as part of Section E (Paragraphs 78-79) on Training on Stops, Searches, and Seizures.

*Compliance Assessment*

In March 2022, PRPB revised and approved GO 612 (Searches and Seizures) and GO 615 (Arrests and Summons), which was approved in October 2022. These policies are in the process of annual revision for 2023 (February and September, respectively). These policies cover all the legal and procedural topics on arrests, detentions, and searches for PRPB personnel to follow. However, full in-service training on these policies has been behind schedule over the last few years, but PRPB reports that training on these policies has begun and should be at 75% Department-wide completion by the end of 2023.

Police arrest reports lacking probable cause has been an on-going problem, and PRPB has placed blame on the lack of training and supervisors. However, most veteran officers and supervisors received basic training at the Academy and in-service training over the years on these subjects, and should, at a minimum, know the basic requirements for recognizing, establishing, and documenting probable cause. When properly guided, officers tend to reach back to their training and perform their duties accordingly. What is most concerning to the Monitor's Office is the lack of responsibility placed on officers and supervisors by PRPB for ensuring that police reports comply with Commonwealth laws and Bureau policies. Supervisors must be held accountable.

*Pathway Forward*

Re-training and accountability are key to addressing the above issues. Supervisors must return defective reports to officers with instructions for properly correcting them. However, if a supervisor determines that an officer lacks probable cause for a particular arrest, the supervisor must release the arrestee immediately and evaluate whether the arresting officer needs re-training or if discipline is in order. Change will happen only when those who infringe the rules are held accountable.

## 2. Investigatory Stops and Searches

Most probable cause-based investigatory stops by PRPB are conducted by its Highway Patrol Division (HPD). In the past, a significant number of their arrest and detention reports were not well written and left the reader without a clear understanding of the facts that led to the intervention and/or arrest. The Monitor's Office believes that officers' failure to cite specific facts found in individual cases also

inevitably leads them to the use of boilerplate and repetitive language. However, the Monitor's Office has observed improvement in this area in the CMR-9 sample data submitted, as 9 out of 11 detention reports (82%) by HPD contained properly described probable cause, thus avoiding the use of repetitive and boilerplate language.

Demographic and geographic data is not being collected because PRPB has not yet developed a system to collect and analyze such data, as required by the Agreement in Paragraphs 60 and 243.

## Paragraph 60: Searches and Seizures - Investigatory Stops and Searches

*PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. | ☐ Met | ☑ Missed |
| 2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. | ☐ Met | ☑ Missed |

Note: PRPB has not authorized investigatory or Terry stops based on reasonable suspicion. For Paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause.

*Compliance Assessment*

PRPB still does not allow officers to conduct investigatory stops and searches, known as Terry Stops, other than stops resulting from traffic stops. However, traffic stops are recorded only when there is a citation issued or an arrest is made. Although the Agreement requires that ALL stops and searches be tracked, recorded, and reviewed, a review of CMR-9 data reveals that PRPB still does not properly track,

collect, and analyze demographic and geographic data resulting from investigatory stops and searches as required by this paragraph.

PRPB's HPD conducts most of the investigative stops and searches based on probable cause via motor vehicle traffic stops. In the random sample obtained by the Monitor's Office for this reporting period, there were 11 arrest files submitted by the HPD. All but two files (18%) were determined to have well established probable cause, which shows an improvement over the same type of files reviewed in the prior reporting period, although not yet at 100% as required. One file had poorly described probable cause, complaint #2023-12-076-000946, and one completely failed to document probable cause, complaint #2023-13-199-00362. However, 10 of the 11 files (91%) were rated not compliant or partially compliant due to missing PPR 636.1 (Seized Property Form) and PPR 128 (Motor Vehicle Inventory Form) (see complaint #s 2023:11-199-0258, and 2023-2-199-00753), which must be completed when a vehicle is seized by the police or when it comes into police custody for any reason. In addition, three of these arrest files (27%) contained poorly completed PPRs 631.1 (Booking Sheet). All lacked information on the health condition of the subjects, and one contained no booking sheet.

PRPB did not report any other type of detention to the Monitor's Office.

*Pathway Forward*

PRPB must create a collection and tracking system to analyze investigative stops and searches and it must enforce its own policies to comply with the Agreement. Both GO 615 (Arrests and Summons) and GO 612 (Searches and Seizures) contain all the guidance officers need to perform their duties properly and legally. Reinforcing departmental policy and rule requirements through roll call and in-service training would improve compliance with the Agreement. PRPB has informed the Monitor's Office that it is implementing roll call training as part of its Search and Seizure Implementation plan to be rolled out later this year. However, the Monitor's Office believes that roll call training on this subject can be implemented immediately. Missing required file forms, such as PPR 128 (Motor Vehicle Inventory Form) and PPR 636.1 (Seized Property Form), is inexcusable. The Monitor's Office is inclined to believe that officers did fill out the forms in question but failed to include it in the file. It is PRPB's responsibility to ensure that complete arrest files are submitted to the Monitor's Office when requested.

## Paragraph 61: Searches and Seizures - Investigatory Stops and Searches

*PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 60.

### Compliance Assessment

PRPB prohibits the use of conclusory or boilerplate language and materially false or incorrect information by its officers, as stated in Section lll.D.4.g.xxviii.d. on page 22, and Section lll.D.5.f.ii on page 24 of the current GO 615 (Arrests and Citations).

The Monitor's Office had reported in the past about PRPB's HPD's practice of using repetitive and boilerplate language in arrest reports, caused mostly by their inclination of not properly describing probable cause. However, in this reporting period, there has been improvement in this area. In the CMR-9 sample data reviewed, 9 out of 11 detention reports (82%) by HPD contained properly described probable cause, and the Monitor's Office saw no use of repetitive or boilerplate language in the mentioned reports, for an 18% failure rate (see Paragraph 60 above). This shows a great improvement over the reported failure rate of 52% in the prior reporting period. This appears to be due to the re-starting of in-service training in arrests and citations and the promotion of several hundred new supervisors, leading to better supervision.

### Pathway Forward

Proper training and supervision are essential for officers to effectively perform their duties, as evidenced in the statements above. PRPB must realize this and must be consistent and persistent in providing its officers the proper tools and resources to ensure compliance with the Agreement.

### Paragraph 62: Searches and Seizures - Investigatory Stops and Searches

*A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |



| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

The Monitor's Office reviewed 11 randomly selected investigatory stop arrest files submitted by PRPB's HPD for analysis. Supervisors responded to the scene or communicated with the arresting officers via radio in five cases (45%). However, all 11 cases were reviewed by supervisors on PPR 615.8 (Arrest Review). All stops were determined to be within PRPB policy and the Agreement. However, because PRPB is in partial compliance with Paragraph 60 and Paragraphs 62 and 60 are assessed together, this places Paragraph 62 in partial compliance as well.

*Pathway Forward*

PRPB must comply with Paragraph 60 to reach compliance with this paragraph. As noted above, PRPB must work towards documenting all its stops and searches to achieve increased compliance in the paragraphs related to this subsection. Despite the improved progress noted by the Monitor's Office above, the lack of documentation of all stops and searches inhibits the Commonwealth's ability to achieve overall improved compliance.

## Paragraph 63: Searches and Seizures - Investigatory Stops and Searches

*A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

Commanders reviewed and approved supervisors' review of 11 motor vehicle stops/detentions that led to arrests by PRPB's HPD (see Paragraph 62). Nine of those reviews (82%) found that officers performed as trained during the stops/detentions. In the other two stops (18%), one review was rated poor, complaint #2023-12-076-000946, meaning probable cause was not clearly documented, and the other had a fairly rated review, complaint #2023-8-199-001156. However, because PRPB is in partial compliance with Paragraph 60 and Paragraphs 63 and 60 are assessed together, this places Paragraph 63 in partial compliance as well.

*Pathway Forward*

PRPB must ensure supervisors and commanders keep reviewing all arrest, stop, and detention reports, especially those conducted by its HPD, to ensure that officers are complying with the Bureau's policies. PRPB also must meet compliance with Paragraph 60 to obtain compliance with this paragraph.

## Paragraph 64: Searches and Seizures - Investigatory Stops and Searches

*At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

Officers in PRPB are not allowed to conduct investigatory stops and searches, also known as Terry Stops, other than stops resulting from traffic stops. However, traffic stops are recorded only when there is a citation issued or an arrest is made. Although the Agreement requires that ALL stops and searches be tracked, recorded, and reviewed, a preliminary review of the CMR-9 sample data reveals that PRPB is not properly tracking, collecting, and analyzing demographic and geographic data resulting from investigatory stops and searches, as required by this paragraph and Paragraph 243. PRPB has reported to the Monitor's Office that it is working on a Search and Seizure Implementation Plan to address the issues raised in this section of the Agreement, as well as in other sections.

*Pathway Forward*

PRPB must develop a collection and tracking system and analyze the demographic and geographic data obtained during investigative stops and detentions and submit the results to the Monitor's Office and USDOJ for review. This system should also collect the same data points from search warrants and arrests reports for analysis per Paragraph 243. A final report should then be available to the public as per the Agreement.

## 3. Arrests

Although there has been some progress, a significant number of arrest reports lack specificity when describing probable cause. Brief and vaguely written arrest reports along with missing arrest forms in arrest files have continued to permeate PRPB records despite having been advised in the past by the Monitor's Office. Many officers are still not properly documenting the particularity of each case, leading officers to use boilerplate, conclusive, and repetitive language in some of their reports. There is no evidence that supervisors and commanders have taken any steps to correct these deficiencies, nor are they being held accountable by the Bureau.

### Paragraph 65: Searches and Seizures - Arrests

*PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 65-71. | ☑ Met | ☐ Missed |
| 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | ☑ Met | ☐ Missed |
| 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | ☑ Met | ☐ Missed |
| 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |

| | | |
|---|---|---|
| 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

### Compliance Assessment

In the area of policy development and review, PRPB generally does a good job of keeping them up to date. Such is the case with GO 615 (Arrests and Summons). It conforms to generally accepted policing practices and complies with the Agreement between the Commonwealth and USDOJ. Although PRPB supervisors conducted reviews in 54 of 55 eligible (8 cases were not applicable warrant or misdemeanor arrests) arrest reports submitted to the Monitor's Office, 42 of those files lacked required forms (see complaint #s 2023:7-211-03084 and 2023-12-299-000102) and supervisors approved and allowed them to be entered into the Bureau's computerized system without taking any action to rectify the issue. As a result of the above, the Monitor's Office rated 19 of those files not compliant, 8 partially compliant, and 15 substantially compliant. Those rated substantially compliant were due to lacking only one form but had well established probable cause and were complete otherwise.

### Pathway Forward

The Monitor's Office has noted that supervisors and commanders have completed supervisory reviews of arrest reports in all but one case. This is a big difference when compared to past CMRs. However, supervisors are still failing to ensure that all arrest files contain all required and properly completed arrest forms per Bureau policy. The Monitor's Office rated many files not compliant or partially compliant due to this negligence. PRPB must address this issue with its supervisors through training and/or its Disciplinary Matrix.

### Paragraph 66: Searches and Seizures - Arrests

*PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2023 – September 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

## Compliance Assessment

PRPB Communication Command Centers use PPR 126.2 (Dispatch Card)to record all communications, including communication between officers and supervisors. When an arrest is made, that information is also recorded here, as well as when a supervisor is notified to respond to an incident. In the 61 arrest files eligible for submission, 56 files (92%) contained fairly rated PPRs 126.2 (see compliant #2023:4-078:000589 and 2023:4-044:00398) due to lacking important information, such as whether a supervisor was notified and responded, and 5 files did not include PPR 126.2 (see complaint #s 2023-2-700-000737 and 2023:7-026-1607). However, supervisors reported that they responded to 36 of 41 eligible (felony and obstruction of justice and/or resisting arrest) arrest cases, for 88% compliance, just short of the 95% required. Supervisors also responded to all four cases submitted in the sample that involved obstruction of justice and/or resisting arrest, as required.

However, supervisors are still failing to address deficiencies in officers' arrest determinations at a disappointing rate. Although there has been some progress, a significant number of arrest reports lack specificity when describing probable cause. This was the case in 32 of 63 arrest files reviewed, for a 51% failure rate, and there has been no indication in the files submitted that this deficiency was addressed in any manner by supervisors or commanders.

## Pathway Forward

PRPB reported to the Monitor's Office during site visits that it has implemented the P-25 radio system that allows for recorded communication among officers and dispatchers island-wide, as required under the Agreement. The Monitor's Office has attempted to listen to recorded radio communications and found it to be very difficult to decipher due to the lack of control and coordination by dispatchers, and officers not adhering to communication protocols regarding identifying themselves with call signs. Proper coordination and control of radio communications is essential and paramount to an officer's safety. Dispatchers should be properly trained to take control of all radio communications, require that officers follow proper protocols, and complete the PPR 126.2 (Dispatch Card) in its entirety, especially regarding notification to supervisory personnel and their response, to aid in complying with the Agreement.

Supervisors must be held accountable for failing to properly review arrest reports for deficiencies and failing to use department resources to address them.

## Paragraph 67: Searches and Seizures - Arrests

*When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

PRPB has not yet reported to the Monitor's Office whether it has a data system or mapping software to track officers' route of travel when transporting arrestees. Therefore, the Monitor's Office rates this area not compliant for this reporting period. Although space is provided on PPR 126.2 (Dispatch Card) to record mileage when officers transport arrestees, there was mileage listed on only 1 of the 56 cards reviewed (2%). Five other arrest cases (9%) did not contain PPR 126.2. PPR 126.2 also provides space for demographic data on each arrestee, but this information was also missing from all cards (see complaint #s 2023:4-199:000215 and 2023:7-024-1484).

Also, in reviewing the arrest samples for this reporting period, the Monitor's Office found the same pervasive issues as in past CMRs: officers are failing to complete all required arrest forms. In 55 eligible arrest files submitted to the Monitor's Office, 42 lacked one or more required forms (76%), mostly PPR 636.1 (Seized Property Form), PPR 631.1 (Booking Sheet), and PPR 128 (Motor Vehicle Inventory Form).

### Pathway Forward

To comply with the Agreement PRPB must implement a system to collect demographic and geographic data, as well as route mileage when transporting arrestees. PRPB also must provide training to officers assigned to the Command Dispatch Center to solicit pertaining demographic information on arrestees and record the mileage to/from police facilities on PPR 126.2 (Dispatch Card), per policy and the Agreement. Supervisors should ensure during their review that all necessary demographic information is recorded on all police reports before they process them.

## Paragraph 68: Searches and Seizures - Arrests

*At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

### *Compliance Assessment*

Out of 88 eligible arrest and search sample files in this reporting period, in 3 cases (3%) supervisors failed to note the health condition of the arrestee on PPR 631.1 (Booking Sheet) where such notation is usually reported by supervisors (see complaint #s 2023-07-111-04209, 2023:11-199-0258, and 2023:11-199-0282), and in 7 cases (8%) they failed to include PPR 631.1 (see complaint #s 2023:7-211-03084 and 2023-1-282-08110), for a compliance rate of 89% (10 of 88), short of the 95% rate required. Although PRPB's compliance rate of 89% is short of the 95% required rate, it shows an improvement over the prior reporting period rate of 69% (54 of 78 arrest cases).

### *Pathway Forward*

In November 2022 PRPB implemented a new PPR 631.1 (Booking Sheet) and changed its title from "Ingress/Egress" to "Condition of Arrested Person" to avoid misunderstanding of when it must be filled out. It also requires officers to always complete it when an arrest is made or a person is detained and to record the arrestee's physical condition and medical aid provided, if any, as well as record other required information. Despite this mandate, a few supervisors are still failing to include the form in some files; others fill it out but fail to indicate the health condition of the subject. PRPB must continue to emphasize the importance of properly completing and including this form in all arrest and detention files. Those supervisors failing to comply must be held strictly accountable.

## Paragraph 69: Searches and Seizures - Arrests

*PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the*

96

*legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

PRPB GO 615 (Arrests and Summons), Section III.D.4.e. (page 17) requires supervisors to personally review and approve arrest reports on PPR 615.8 (see also pages 24 and 25). Although PRPB supervisors conducted reviews in 79 of 83 eligible arrest and search reports (95%) submitted to the Monitor's Office, a review by the Monitor's Office revealed that only 60 of the supervisory reviews had well-articulated probable cause (76%), 17 had poorly articulated probable cause (see complaint #s 2023-7-211-04316 and 2023-3-758-007020), and 2 lacked articulation of the legal basis for the arrest (see complaint #s 2023-7-111-07154 and 2023-9-199-000345). This lack of legal basis articulation in arrest reports is the major reason the Monitor's Office rated several reports not compliant. On the other hand, supervisors properly reviewed and approved all four cases submitted in the sample that involved obstruction of justice and/or resisting arrest, as required, and probable cause was well established in these reports.

*Pathway Forward*

PRPB must provide training or orientation to supervisors and commanders that stresses the importance of adhering to the arrest review requirements and the proper way to establish probable cause per policy and the Agreement. This is especially important during arrests for obstruction of justice, resisting arrest, and/or assaulting an officer. Those supervisors and commanders not complying with policy must be held accountable.

## Paragraph 70: Searches and Seizures - Arrests

*As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

One notable area of improvement is that PRPB supervisors are reviewing arrest reports at a higher rate during this reporting period. However, although PRPB supervisors conducted reviews at a 95% rate (79 of 83 eligible arrest and search reports), a review by the Monitor's Office revealed that 60 (76%) of the supervisory reviews had well-articulated probable cause, 17 (21.5%) had poorly articulated probable cause, and 2 (2.5%) lacked articulation of the legal basis for the arrest. Yet supervisors took no action to address this issue with officers. There is also no evidence that either the Bureau or commanders addressed these shortcomings or that the quality of supervisory reviews were taken into account in supervisor's performance evaluations (see Paragraph 69).

*Pathway Forward*

Supervisory training and/or counseling could significantly and positively impact the results of supervisory reviews and re-direct the Bureau onto a path of compliance. Failure to achieve compliance will continue until PRPB starts holding supervisors accountable and discipline is meted out when appropriate.

## Paragraph 71: Searches and Seizures - Arrests

*A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review | April 2023 – September 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

The Monitor's Office has found that too often many command-level officers readily agree with supervisors' evaluations of arrest reports, apparently, without closely examining the details of the arrest. As a result, they continually fail to take any action regarding faulty arrest reports that fail to document probable cause or to complete and include all the required arrest forms. Although PRPB supervisors and commanders conducted reviews at a 95% rate (79 of 83 eligible arrest and search reports), a review by the Monitor's Office revealed that only 60 (76%) of the supervisory reviews had well-articulated probable cause, 17 (21.5%) had poorly articulated probable cause, and 2 (2.5%) lacked articulation of the legal basis for the arrest. The Monitor's Office saw no evidence in the files submitted that command-level officers questioned the supervisors' determination or took any action to address the issue. Also, the Bureau did not provide any evidence that these shortcomings were addressed in any manner. (see Paragraph 69).

### Pathway Forward

Commander training and/or counseling could significantly and positively impact the results of command-level officers' reviews and re-direct the Bureau onto a path of compliance. PRPB must start holding commanders accountable for their responsibilities and apply the Disciplinary Matrix when appropriate.

## Paragraph 72: Searches and Seizures - Arrests

*PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

99

*Compliance Targets*

| | |
|---|---|
| 1. Polices incorporate all of the requirements of Paragraphs 59 and 72. | ☑ Met   ☐ Missed |
| 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | ☐ Met   ☑ Missed |
| 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | ☐ Met   ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB GO 636 (Evidence Rooms) requires officers to inventory evidence and seized property on PPR 636.1 (Seized Property Form). In this reporting period PPR 636.1 was missing in 45 of 101 eligible arrest and search files, or 45% of files (see complaint #s 2023-2-107-02815 and 2023-2-700-000737). This gives PRPB a 55% compliance rate, a slight improvement over the 49% rate reported in the prior reporting period, but well below the required 95% rate. Due to the absence of this many property forms and the lack of documenting seized property otherwise, the Monitor's Office is unable to determine whether property was seized and/or returned in these cases.

A concerning issue to the Monitor's Office is that PRPB officers are still asking arrestees to sign PPR 636.1 to confirm that they own the property and/or evidence seized from them or at a location. This form often lists personal property together with incriminating evidence that will potentially be used against them in court. The Monitor's Office has advised PRPB against this practice in previous CMRs because it may be a potential violation of the subjects' 5th Amendment Rights protections against self-incrimination. Another issue is that there is no consistency as to how seized evidence is treated. Some officers list seized evidence on the police report, PPR 621.1, "Bienes" section (see complaint #2023-1-400-00347), while others list it on both forms (see complaint #2023-7-400-000276).

SARP reported to the Monitor's Office that the investigation for complaint #2023-00266 regarding a lost portable police radio was completed and the disposition was not sustained. However, the following complaints regarding lost or mishandled personal property were filed during this reporting period and are under investigation:

- Complaint #2023-00359 - Seized firearm
- Complaint #2023-00433 - Property in seized motor vehicle and damage to same
- Complaint #202300615 - Mishandling of seized drugs
- Complaint #2023-00719 - Seized firearm
- Complaint #2023-00444 - Damage to seized cellphone

The Monitor's Office will follow up with the dispositions of these investigations in the next CMR.

*Pathway Forward*

Supervisors should ensure that officers properly complete and submit Personal Property/Evidence forms in every applicable arrest case. The Monitor's Office recommends that PRPB require officers to list potentially criminal evidence on the police report form (PPR 621.1), and not ask arrestees to sign

for them. PPR 636.1 (Seized Property Form) should be used to list returnable personal property only. Officers then can ask arrestees to sign for this property when seized and when returned. In any case, PRPB must soon come up with a solution to this serious issue.

## Paragraph 73: Searches and Seizures – Arrests

*PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback. In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Interagency agreements and policies incorporate the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. PRPB officers seek and obtain feedback from criminal justice agencies and entities as required by approved agreements and policies. | ☒ Met | ☐ Missed |
| 3. 100% of alleged misconduct noted in protocol documentation corresponds with a SARP investigation. | ☒ Met | ☐ Missed |

### Compliance Assessment

PRPB's Reform Office created and submitted the Feedback Committee Protocol to the Monitor's Office. PRPB also created a form for the participating agencies to complete when filing a complaint against an officer. The Protocol fulfills the requirements of the Agreement. While interviewing committee members during this reporting period, it was brought to the attention of the Monitor's Office that the Protocol failed to include the Public Defenders' Office as an agency that should be invited to the committee meetings. The Monitor's Office confirmed this and determined there was an oversight and notified the PRPB Reform Office for correction. The Monitor's Office followed up with the Reform Office, which reported that a revised protocol has been drafted during this reporting period and will be distributed soon.

During this reporting period, the following Area Feedback Committees submitted documents about meetings held thus far: Aguadilla, Arecibo, Bayamon, Caguas, Carolina, Fajardo, Humacao, Mayagüez, Ponce, Guayama, and Utuado. The documents submitted and reviewed by the Monitor's Office include attendance sheets, meeting minutes, and agendas. They all appear to be in order, with minutes

showing comments made by various attendees, including the Administrative Judge in each area, as well as District Attorneys or their representatives. Other attendees include the Municipal Police Department Commissioners and PRPB Court Liaison officers, among others. Interviews with SARP and committee members revealed there have been no misconduct complaints filed during this reporting period.

*Pathway Forward*

The Monitor's Office suggests that each attending member be specifically identified, including his/her affiliation, for compliance with the Agreement. The Public Defenders' Office must also be invited to the table as per the Agreement. The Monitor's Office realizes there was a mistake on the Protocol, which left the Public Defender's Office off as an invitee. Also, minutes of meetings should be submitted along with any complaints filed and dispositions reached.

## 4. Searches

The GO 612 (Searches and Seizures) was last updated in March 2022. It is due for revision, which is in process. However, as it exists, it conforms to generally accepted policing practices and appears to comply with criminal statutes of the Commonwealth. However, poor arrest evaluations by some supervisors continue to be a serious issue for PRPB, with search files lacking properly completed forms in some cases, and some voluntary consent searches contain weak probable cause language and no supervisory review in most cases.

### Paragraph 74: Searches and Seizures - Searches

*PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 74-77. | ☒ Met | ☐ Missed |
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | ☐ Met | ☒ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB current GO 612 (Searches and Seizures) conforms to generally accepted policing practices and complies with applicable laws and constitutional mandates. It clearly defines all terms and specifies procedures for conducting searches with or without a warrant, and provides guidance for officers in securing, handling, recording, and taking custody of seized property and evidence. It was last reviewed and revised in March 2022. It is currently being reviewed pending the implementation of the PRPB Search and Seizure Implementation Plan, which has been issued in draft form as of this writing.

PRPB's searches authorized by search warrants are generally well executed and all but a few reports are properly completed. For example, of 49 eligible searches by search warrants, 40 were rated substantially compliant (82%), only 5 were rated partially compliant (10%) due to missing one or two forms, such as PPR 128 (Motor Vehicle Inventory Form) or PPR 631.1 (Booking Sheet), and 4 were not compliant for missing two forms (8%), including a copy of the search warrant in one case (complaint #2023-7-400-000326), another one was missing all forms related to the arrest (complaint #2023-7-074-02949). The compliance rate for search warrants is 82%.

Consent searches present more concern for the Monitor's Office. The Monitor's Office reviewed 27 consent or warrantless search files and rated 8 files not compliant or partially compliant (30%), due to missing the consent form (complaint #2023-9-199-000345), missing many forms and a copy of the search warrant (complaint #s 2023-09-056-000877 and 2023-07-211-04316). In addition, 16 consent searches (59%) did not contain a supervisor's review and approval of the search (see complaint #s 2023-13-022-001445 and 2023-3-031-001368). Supervisory approval of searches were missing in 16 out of 76 searches (49 warrants and 27 consent searches) for a compliance rate of 79% (see complaint #s 2023-8-015-002670 and 2022-7-026-00032). PRPB needs to comply in at least 95% of the cases to be compliant with the Agreement.

*Pathway Forward*

To comply with the Agreement, PRPB must require supervisors to document reviews of all warrant-less searches, such as searches by consent on the PRPB's PPR 612.3 (Approval of Request for Search or Arrest Warrants).

## Paragraph 75: Searches and Seizures - Searches

*PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |



| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

A review of 49 qualified search warrant files revealed that supervisors submitted their review and approval in 40 cases (82%), with 9 cases lacking review and approval (18%), well short of the required 95%, per Paragraph 74. Although, in July 2022, PRPB created a form, PPR 612.3 (Approval of Request for Search or Arrest Warrants), to document supervisors' review and approval of requests for search or arrest warrants, most reviews and approvals are being unnecessarily documented on the Operational Plans (PPR 615.7). That was the case in 30 of the 49 search warrant cases this term (see complaint #s 2023-1-700-0127 and 2023-12-061-002746); only 10 cases were reviewed on PPR 612.3. The remaining nine had no documented review/approval.

*Pathway Forward*

PRPB created a useful and comprehensive form, PPR 612.3 (Approval of Request for Search or Arrest Warrants), for supervisors to document their review and approval of arrest, searches, and search warrant applications and related affidavits. However, it is not being used and included in the search files. This is not acceptable. PRPB should ensure it is included in all search files, including consent searches, and arrest and search warrant applications, going forward. Periodic reviews to ensure this is being completed in accordance with policy should be regularly conducted on the Bureau's own initiative and any continued failure to do so should result in disciplinary action.

## Paragraph 76: Searches and Seizures - Searches

*PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Target #2. Annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

104

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All search warrants are tracked in the tracking system. | ☐ Met | ☑ Missed |
| 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | ☐ Met | ☑ Missed |

Note: Policy content is assessed as part of Paragraph 74. Training is assessed as part of Section E 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

During this reporting period, the Monitor's Office conducted several visits to various Criminal Investigations Corps (CIC) and Drug Units, the units that conduct almost all search warrants in PRPB. The Monitor's Office inquired whether a search warrant tracking system existed, and the answer was always in the negative. It was reported that search warrant files are kept in folders in file cabinets at these units and are not analyzed in any significant manner. The Reform Office has informed the Monitor's Office that this issue is being addressed in the Search and Seizure Implementation Plan being developed in partnership with the Monitor's Office and USDOJ.

*Pathway Forward*

PRPB should develop a centralized, electronic tracking system to collect and analyze search warrant data to detect deficiencies or training issues, as per policy, and to comply with the Agreement. PRPB informed the Monitor's Office that it is in the process of creating an implementation plan to address issues dealing with searches and arrests.

## Paragraph 77: Searches and Seizures - Searches

*PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

PRPB submitted 70 sample search files for this reporting period, and 27 were searches by consent. All but one consent search was documented on PRPB's PPR 612.1 (Consent Search Form), for a compliance rate of 97%, above the required 95% rate. Only one out of this group was rated poorly completed because it stated that a cell phone was to be searched, yet in the narrative, it described a motor vehicle, not a cell phone (see complaint #2023-7-271-02720). Although PRPB has made major progress in this area, this paragraph is assessed with Paragraph 74, which is rated not compliant and as such leaves this paragraph as partially compliant.

*Pathway Forward*

To continue compliance, PRPB must continue to require officers to complete PPR 612.1 (Consent Search Form) for every consent search; supervisors must also conduct reviews of these searches and document their approval/disapproval on PPR 612.3 (Approval of Request for Search or Arrest Warrants) for easy review and analysis.

## 5. Training on Stops, Searches, and Seizures

PRPB has fallen behind on training generally, but more specifically training on stops, searches, and seizures. As of this writing, the Bureau is about halfway through in-service training on GO 612 (Searches and Seizures), the order that addresses this type of training. PRPB has developed a training plan that projects to train 100% of personnel by the end of 2023. The Monitor's Office will report on PRPB's progress in this area when the next annual training assessment is due in CMR-11.

### Paragraph 78: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all PRPD officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all PRPD officers with training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on stops, searches, and seizures as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the*

*United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding stops, searches, and seizures;*

*b) the Fourth Amendment and related law;*

*c) examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, consent and non-consent searches, and arrests. These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and voluntary consent from mere acquiescence to police authority; and*

*d) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | October 2022 – September 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on stops, searches and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-78. | ☐ Met | ☑ Missed |
| 2. 95% of officers are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Policies for training on stops and searches and seizures (GOs 612 and 615) were reviewed and approved by the Monitor's Office and PRPB approved and signed them in March and October 2022, respectively. These policies conform with generally accepted policing practices and constitutional mandates. However, training related to these policies has just begun during this reporting period, but is still behind schedule, especially in the scenario-based training, an area required by the Agreement. The present in-service training for these courses stands at 43% for arrests and summons, and 38% for searches and seizures. The Monitor's Office has audited some of this in-service training and found that it properly adheres to generally accepted policing practice. Nevertheless, it is unclear to the Monitor's Office whether the training materials in this class have been properly reviewed and updated.

*Pathway Forward*

In-person scenario-based training is required by this paragraph and PRPB must ensure that officers of all ranks receive this training so that they understand policy requirements and the practical application of such procedures. PRPB has notified the Monitor's Office that the virtual training system has been partially re-activated and scenario-based training will follow.

## Paragraph 79: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all supervisors and command officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all supervisors and command officers with training on reviewing subordinates' stops, searches, and seizures at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training on stops, searches, and seizures for supervisors and command officers shall include the following topics:*

*a) requesting medical services and questioning detainees and arrestees for pain or injury;*

107

b) *report writing, including reviewing reports on stops, searches, and seizures for completeness, accuracy, and quality, including recognizing boilerplate language and how to document discrepancies;*

c) *assessing the legality and appropriateness of a stop, search, or seizure;*

d) *legal standards governing searches and seizures, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; and*

e) *recommending and administering proper discipline and non-punitive corrective action related to searches and seizures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on stops, searches, and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-77, and 79. | ☐ Met | ☑ Missed |
| 2. 95% of supervisors and commanders are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Policies for training on stops and searches and seizures (GOs 612 and 615) conform with generally accepted policing practices and constitutional mandates. They were reviewed and approved by the Monitor's Office and signed by PRPB in March and October 2022, respectively. However, training for supervisors and commanders related to these policies has just begun during this reporting period and is still behind schedule, especially in the scenario-based training, an area required by the Agreement. The present in-service training for these courses stands at 43% for arrests and summons, and 38% for searches and seizures. Further, it is unclear to the Monitor's Office whether training materials have been properly reviewed and updated.

The Monitor's Office has pointed out throughout this CMR that supervisors and commanders have demonstrated a need for training, as they fail to detect and correct arrest reports that lack probable cause documentation and fail to ensure that officers complete all required arrest and search forms. Once the above training began earlier this year, the Monitor's Office noticed progress being made in this area. With its continuation, the Monitor's Office expects to see great improvement moving forward.

108

*Pathway Forward*

In-person scenario-based training is required by Paragraph 78, as well as other paragraphs throughout the Agreement. PRPB must ensure that officers of all ranks receive this training so that they understand policy requirements and the practical application of such procedures. PRPB has notified the Monitor's Office that the virtual training system has been partially re-activated and scenario-based training will follow. The Monitor's Office looks forward to auditing some of these courses.

# IV. Equal Protection and Non-Discrimination

The review of the documents and data provided to the Monitor's Office during this reporting period continued to demonstrate issues raised by the Monitor's Office in previous CMRs. Much of PRPB's progress in this area remains in partial or non-compliance. The paragraph compliance targets assessed in this reporting period primarily focus on PRPB's efforts to demonstrate implementation of training and processes related to hiring, the civilian complaint system, performance evaluations, juvenile case management reporting, hate crime reporting, and bias-free policing training. There are no significant changes in PRPB's progress in meeting the compliance targets assessed in this reporting period as compared to CMR-7. Nevertheless, it is worth highlighting that in September 2023 the court approved a comprehensive Sexual Assault and Domestic Violence (SA/DV) Plan that will effectively address numerous issues previously identified by the Monitor's Office once implemented. This plan, with identified timelines, serves as a catalyst for PRPB to proactively confront these critical concerns.

During the reporting period, the Monitor's Office conducted a comprehensive review, provided feedback, and granted approval for various policies and procedures in connection with this section. These documents included GO 633 (Interventions with Minors), GO 310 (Performance Evaluations), GO 645 (Elderly Incident Investigations), GO 630 (Identification and Investigation of Hate Crimes and/or Incidents), the Manual on Hate Crime Identification and Investigations, GO 644 (Domestic Violence Incident Investigations of Employees), GO 627 (Domestic Violence Investigations), GO 616 (Documentation of Vehicular and Pedestrian Stops), GO 635 (Abuse or Neglect in Juvenile Institutions), GO 607 (Incidents of Sexual Crimes Committed by Employees), GO 622 (Investigations of Incidents of Sexual Crimes and Child Abuse), GO 118 (Domestic Violence Division), GO 624 (Interaction with Transgender and Transsexual People), and GO 626 (Intervention with Foreign Persons).

A significant portion of the Monitor's suggested revisions to the policies assessed during the reporting period centered on the establishment of clear timelines for updates on investigations. Additionally, the Monitor's Office recommended that PRPB members ensure the provision of support services information to SA and DV victims. To enhance the DV policy, the Monitor's Office advised including a trauma-informed investigation method statement and the integration of the Coordination of Protection Order Program (COPOP) procedures into the policy. These updates will subsequently be incorporated into the relevant training courses.

Furthermore, upon reviewing the documents and data submitted to the Monitor's Office during this reporting period, persistent issues previously highlighted by the Monitor's Office in prior CMRs became evident. An examination of non-PRPB officer involved cases was reviewed- 91 DV investigations and 70 SA investigations revealed several shortcomings:

1. PRPB fails to adequately document the use of a trauma-informed response method.
2. Consistent provision of available resources and safety information to domestic violence victims is lacking.
3. Timely follow-up with victims is not consistently achieved by PRPB.

The Monitor's Office underscores that implementing changes such as refining the way police reports are drafted, using an investigative checklist, holding supervisors accountable, and enhancing training protocols will be instrumental in enhancing PRPB's compliance with the relevant paragraphs and addressing these recurring concerns.

Incidents and events that have transpired during this reporting period have once again placed a spotlight on SA and DV cases involving PRPB members. Upon examining these investigations, PRPB does adhere to its established policy regarding the confiscation of officers' weapons and their referral to an employee assistance program when a PRPB member is implicated. The Monitor's Office continues to emphasize the critical need for PRPB to consistently apply its policies when investigating cases involving PRPB members. It is also recommended that PRPB take proactive steps to support its officers in coping with the stressors inherent to their job.

Additionally, the Monitor's Office underscores the importance of transparency and accountability for all parties involved. To achieve this, it is essential that cases are thoroughly and promptly investigated and processed. A comprehensive response plan is strongly recommended for PRPB to address the way it handles cases involving PRPB members, ensuring a more effective and accountable approach.

On March 6, 2023, a meeting was convened between the Parties to discuss the formulation of an implementation plan centered on ensuring PRPB's compliance with the sexual assault and domestic violence provisions stipulated in the Agreement. This plan specifically targets Paragraphs 80 to 82, 84 to 86, and 93 to 99, focusing on their relevance to the administrative investigations of SA or DV allegations involving PRPB personnel. The overarching objective of this plan is to address and rectify many of the issues that have been identified by the Monitor's Office, ultimately leading to enhanced compliance.

The plan will encompass a range of critical areas, including training, the quality of investigation files, the adoption of victim-centered practices, improved supervision, refining internal investigation procedures, and addressing staffing and resource-related concerns. An initial draft outline of this implementation plan was presented to the Parties in March 2023. The SA/DV Plan was formally submitted to the court and approved in September 2023. The Monitor's Office anticipates the commencement of the plan's implementation stages in the early part of CMR-10. This forward progress marks a significant step toward ensuring PRPB's adherence to the Agreement's provisions regarding sexual assault and domestic violence cases.

In summary, the Commonwealth's compliance with the Equal Protection and Non-Discrimination paragraphs reveals progress compared to what was previously observed in prior CMRs. In CMR-7 52% (11 paragraphs) of paragraphs assessed were partially compliant and 10% (2 paragraphs) of paragraphs assessed were substantially compliant, in comparison to the current reporting period, where 48% of paragraphs (10 paragraphs) were found to be partially compliant and 19% (4 paragraphs) of paragraphs assessed were substantially compliant. See figure 5.



*Figure 5. Equal Protection and Non-Discrimination Paragraph Compliance Status*

## Paragraph 80: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall ensure that police services are delivered equitably, respectfully, and free of unlawful bias, in a manner that promotes broad community engagement and supports effective crime prevention. In conducting its activities, PRPD shall ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation, and in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of Paragraphs 81 – 100, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

### *Compliance Assessment*

In the evaluation of data and documents provided by PRPB, the Monitor's Office has identified several areas that require substantial improvement, each accompanied by its own set of challenges. The materials received included case files, staffing logs, records from regional site visits, and interviews conducted with PRPB personnel.

Regarding PRPB's compliance with training on various topics within this section, it is evident that PRPB fell short of meeting the 95% compliance threshold stipulated by the Agreement. This regression can be attributed to ongoing issues related to the mismanagement of training schedules and priorities, delays in the development of virtual training programs, schedule adjustments, and lack of instructors. However, a significant milestone was reached on April 10, 2023, as PRPB successfully implemented a comprehensive Training Plan designed to rectify this training deficit.

Furthermore, there are notable deficiencies in the systems supporting National Incident Based Reporting System (NIBRS) reporting, hate crime management, and performance evaluations within PRPB. Nevertheless, there has been commendable progress in PRPB's community outreach efforts concerning immigrant law education. During the CMR-7 reporting period, PRPB produced and disseminated a document titled "Foreign Nationals Rights," which serves as an informative and educational pamphlet for both residents and visitors to Puerto Rico.

When evaluating PRPB's SA and DV processes, it is evident that these procedures lack consistency. While it is acknowledged that each case is unique, there is also a noticeable variation in procedures across different regions of Puerto Rico. For instance, different police report forms are employed throughout the territory. However, PRPB has made significant advancements with the implementation of SAFEKIT, a tracking system that empowers victims to monitor the status of forensic analysis, providing them with timely information about their cases. PRPB is also making significant progress in implementing COPOP, an electronic system designed to document the status of protective orders throughout the entire island. This initiative is an important step forward in enhancing the efficiency and effectiveness of protective order management within Puerto Rico.

During this reporting period, PRPB has attained substantial compliance in 3 paragraphs, shown partial compliance in 11 paragraphs, and exhibited non-compliance in 7 paragraphs. Consequently, the assessment for this reporting period concludes that PRPB is partially compliant in the Equal Protection and Non-Discrimination section of the Agreement.

*Pathway Forward*

PRPB submitted documents that reflect its commitment to achieving compliance. However, it is important to note that due to incomplete documentation, PRPB has not fully demonstrated its capability to effectively deliver critical police responses. Nonetheless, PRPB is making commendable progress in taking the necessary steps to develop training programs and implement best practices. Training, both in virtual and face-to-face formats, is currently in the developmental phase. Furthermore, the implementation of data-driven processes for collecting and analyzing incidents is also a work in progress. To facilitate a comprehensive compliance assessment, PRPB should provide the following essential information:

1. Complete Investigation Reports: PRPB should ensure that all investigation reports are comprehensive and contain all relevant details.
2. Program Evaluations with Documentation of Community Engagement: PRPB should conduct program evaluations and maintain documentation that reflects its engagement with the community.

3. NIBRS Reporting: PRPB should establish robust procedures for NIBRS reporting to ensure accurate and comprehensive reporting of incidents.
4. Hate Crime Documentation with Reporting to the Federal Bureau of Investigation (FBI): PRPB should maintain thorough records of hate crimes and ensure they are reported to the FBI in accordance with established protocols.
5. Documentation of Interactions with Transsexual or Transgender Individuals: PRPB should document its interactions with transsexual or transgender individuals to ensure equitable and respectful treatment.

By providing these elements for assessment, PRPB can enhance its transparency and accountability in measuring compliance with established standards.

## 1. General Provisions

PRPB demonstrates a commitment to policy development and continuous refinement to provide clear direction and accountability. However, the practical application of these policies and procedures is closely linked to the reporting systems that PRPB is actively working to improve. Key systems, such as NIBRS reporting, hate crime training, civilian complaint training, bias-free policing training, and ProMedia training, still require attention and development.

PRPB currently faces challenges stemming from a state of stagnancy in these areas, resulting in limited progress, advancement, or process development. Addressing these issues is crucial to increasing transparency and effectiveness within PRPB. To achieve and accurately assess its efficacy and compliance, PRPB must prioritize the improvement of these systems. This will facilitate better reporting, monitoring, and evaluation of its practices and policies.

PRPB is actively working on plans that are either in the implementation phase or the design stage, with the aim of addressing and improving its organizational reporting systems and methods. These plans reflect PRPB's commitment to enhancing its ability to collect, manage, and report data more effectively. By developing and implementing these plans, PRPB is taking proactive steps toward improving its reporting systems, which will contribute to better transparency and accountability in its operations.

### Paragraph 81: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing; provide training as described in this Agreement; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |

114

| Training: | Not Implemented | Assessment Frequency | Annually |
|-----------|-----------------|---------------------|----------|
| Practice: | Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1. Policies and procedures comply with applicable law and comport with generally accepted policing practices on bias-free policing. | ☑ Met  ☐ Missed |
| 2. Trainings comply with applicable law and comport with generally accepted policing practices on bias- free policing. | ☐ Met  ☑ Missed |
| 3. 95% of reviewed supervisory and field records indicate that officers are supervised consistently. | ☑ Met  ☐ Missed |

Note: The requirement of this Paragraph regarding PRPB's development of policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing, is assessed together with Paragraphs 87, 88 and 109 of the Agreement.

Note: The requirement of this Paragraph that relates consistent supervision is assessed together with Paragraphs 135 (Supervision and Management), and 140 (Duties of Supervisors).

Note: The requirement of this Paragraph that relates to holding officers accountable for complying with applicable law and policy is assessed together with Paragraph 159 (Civilian Complaints, Internal Investigations, and Discipline).

Note: The requirement of this Paragraph that requires training as described in this Agreement is assessed together with Paragraphs 90, 117 (Training), 118 (Pre- Service Training), 123 (Field Service Training), and 129 (In- Service Training).

## Compliance Assessment

During the reporting period, PRPB provided the Monitor's Office with various policies and procedures related to this paragraph for review, including GO 626 (Interactions with Foreign Nationals).

In addition, PRPB submitted supporting documentation in the form of PPR 373 (Daily Assignment Log Sheet), which serves as clear evidence of consistent officer supervision during their duty hours. The documentation contains essential information, including the individual's name, ID number, assigned district or area, and a weapon identifier. This documentation aligns with policy requirements, confirming that the implementation of these policies has been successfully carried out. However, it is crucial to note that training related to the courses associated with this paragraph and the principles of bias-free policing has not been provided to officers either during the current reporting period or within the mandated training timeframes.

## Pathway Forward

With the introduction of the Training Plan, PRPB is obligated to proactively identify and mandate comprehensive training for all personnel. This training program should encompass a broad spectrum of well-established policing practices related to bias-free policing. It must address essential topics, including but not limited to implicit bias and racial profiling.

115

PRPB should maintain the practice of documenting this information using PPR 373 (Daily Assignment Log Sheet), as it serves to confirm that supervisors are diligently overseeing their personnel. The ongoing continuation of this process is of utmost importance.

## Paragraph 82: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall revise its complaint classification policies to effectively capture and track civilian complaints alleging discriminatory policing, even if the complainant does not specifically label the misconduct as such.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB classification policies comply with the requirements of the Paragraph. | ☒ Met | ☐ Missed |
| 2. PRPB classifies and tracks allegations of discriminatory policing in accordance with policy and this Paragraph. | ☒ Met | ☐ Missed |

Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking).

### Compliance Assessment

PRPB has furnished documents and evidence via SARP, showcasing its adherence to prevailing regulations and policies in the classification and documentation of discrimination allegations. Notably, PRPB submitted a comprehensive tracking report encompassing the period from April to June 2023, containing a total of 451 SARP cases. During this same timeframe, the Monitor's Office conducted reviews of seven SARP cases, extracting crucial case data such as case number, type, date, status date, investigation commencement date, assigned investigator, disposition, missing information, and the source of the complaint. This meticulous data collection and reporting exemplifies PRPB's effective approach to appropriately categorizing and monitoring allegations of discriminatory policing.

### Pathway Forward

PRPB should maintain its current level of documentation, which ensures the proper classification and tracking of discriminatory policing allegations. The Monitor's Office will continue to monitor this aspect to verify that PRPB consistently and comprehensively categorizes and records discrimination allegations accurately.

## Paragraph 83: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall revise all documentation produced in relation to officer and civilian interactions, including documentation related to arrests, traffic stops, investigatory stops and detentions, searches, property seizures,*

*and civilian complaints, so that it permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. All documentation produced in relation to officer and civilian interactions permits officers to accurately record the demographic information of all involved persons | ☐ Met  ☑ Missed |

Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking).

### Compliance Assessment

To demonstrate adherence to this paragraph, PRPB presented the Monitor's Office with a list of forms in GTE, accompanied by their revision dates ranging from December 2018 (PPR 621.1 and 621.2) to August 2019 (PPR 126.2(Compliant Card), 605.1, 605.2, 605.3) as evidence of compliance. However, it is worth noting that this represents a regression in this paragraph's requirements. This regression is evident when compared to the CMR-7 reporting period when PRPB submitted an updated traffic stop card for review. That updated card included specific categories designed to capture demographic data. In most of the forms listed, demographic information is collected in a standardized manner, encompassing fields for the individual's last name, mother's last name, legal name, initial, preferred name, age, gender, race, and nationality.

PRPB had previously revised PPR 126.2 in 2021 to incorporate ethnicity as a data point. However, PRPB acknowledged that challenges with GTE (presumably a data entry or tracking system) had hindered officers from accurately recording an individual's race in the form. In response to this issue, PRPB carried out subsequent revisions to GTE during the late summer of 2022 with the specific aim of addressing this problem. Additionally, a directive was issued to officers to ensure proper use of the revised system.

To ensure compliance with paragraph requirements, it is crucial to maintain consistency in the collection of demographic data. The Monitor's Office has observed that PRPB is actively working on addressing remaining issues related to the consistent recording of demographic information. These efforts are reflected in recent revisions made to the arrest reports and the latest version of the traffic stop card. Upon reviewing search warrants and arrests, it is evident that PRPB is collecting demographic data in most instances. However, limitations in GTE prevent this data from being easily searchable. Consequently, individuals must manually review each report to locate specific data points. This limitation means that the use of demographic data for public information purposes is currently impractical and not readily accessible.

The IT CAP and the work carried out by the Commonwealth's contractor, AH Datalytics, hold promise in resolving the challenges associated with consistent data capture and enhancing the Bureau's capacity for data aggregation and analysis.

*Pathway Forward*

To ensure a comprehensive record of all activities and interactions, PRPB is required to generate documentation encompassing officer and civilian encounters, arrest records, traffic stops, investigatory stops, detentions, searches, property seizures, and civilian complaints. This documentation should be structured in a manner that enables officers to accurately document the demographic information of all individuals involved, including alleged subjects and victims. Specifically, these data fields should encompass details such as names, ages, genders, races, nationalities, and ethnicities.

Furthermore, PRPB is tasked with the establishment of systems capable of aggregating and facilitating data analysis. The capacity for such analysis is not only essential for informing and enhancing operational procedures but also for promoting transparency and accountability to the public.

## Paragraph 84: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☑ Missed |
| 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |

118

| | | |
|---|---|---|
| 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | ☑ Met | ☐ Missed |
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| 11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | ☑ Met | ☐ Missed |
| Note: The requirement of this Paragraph that require PRPB to incorporate bias-free policing and equal protection into its hiring practices is assessed together with Paragraph 104 (Hiring Reforms). | | |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its performance assessment process is assessed together with Paragraph 145 (Performance Evaluation). | | |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its promotion assessment process is assessed together with Paragraph 14 (Promotions). | | |

## Compliance Assessment

During the reporting period, the Monitor's Office conducted assessments for all 12 compliance targets. Evaluation of target one revealed that PRPB has successfully adhered to the policies and procedures concerning their hiring processes. This is consistent with findings in previous CMRs, where the Monitor's Office determined that the previously approved policies and procedures met the standards outlined in this paragraph. It is worth noting that PRPB has taken proactive steps to revise several policies, including those related to GO 310 (Performance Evaluations) and promotions. For target two, PRPB submitted 92 PTMS training records, detailing agents' training history. Regrettably, these records lacked any notations regarding training courses on hiring practices. Consequently, target two remains missed. As for target three, PRPB has neither provided training nor scheduled training sessions to certify its agents in all policies linked to the civilian complaint program. Therefore, target three is missed. On a more positive note, target four was successfully achieved. PRPB provided verification annotations for the recruits, and these detailed annotations confirm that PRPB meticulously reviewed candidates, ensuring their selection aligned with the approved policies regarding bias-free policing and equal protection.

For target five, PRPB effectively promoted over 500 sergeants in accordance with its promotional policy during this reporting period. Consequently, this target is successfully met. Turning to target six, it is regrettable that PRPB has neither initiated nor scheduled promotion assessment training that aligns with the principles of bias-free policing and equal protection, as outlined in the approved policies.

Thus, target six remains missed.  Likewise, target seven is missed as PRPB has not taken steps to provide training or schedule training sessions aimed at certifying its agents in all policies related to the civilian complaint program.

In contrast, target eight is satisfactorily met. PRPB has undertaken promotions across various ranks, and the Monitor's Office's review confirms that these promotions were carried out in alignment with the approved policies concerning bias-free policing and equal protection. For target nine, it is worth noting that the policies and procedures related to performance assessment fully align with the requirements stipulated in the paragraph. Specifically, GO 310 (Performance Evaluations) received approval during the prior reporting period (January 3, 2023). Consequently, target nine was successfully met. However, with respect to target 10, PRPB has not taken the necessary steps to conduct or schedule performance assessment training that adhere to the provisions of bias-free policing and equal protection outlined in the approved policies. As such, target 10 remains missed. For target 11, a thorough review of the 92 PTMS training records revealed an absence of documentation indicating that ProMedia, the performance evaluation training, was administered to the pool of agents. This omission raises concerns regarding the completion of this training for agents. Consequently, PRPB falls short of achieving the target of having 95% of sampled personnel trained and certified in all policies related to performance evaluations, as per target 11. However, it is important to note that PRPB provided self-reported information in a certification letter dated July 24, 2023. According to this letter, PRPB plans to implement a new evaluation process in accordance with GO 310 titled "Evolution of Performance." This revamped evaluation process is set to transition to an annual evaluation period, replacing the previous semi-annual system. This transition is slated to commence in 2024, encompassing the months from January to December 2023, with completion expected in January 2024. Despite this promising development, target 11 remains unmet. For target 12, the Monitor's Office's review of the 92 performance evaluations indicates that these evaluations were completed numerically. However, they still lack the crucial elements of goal setting and qualitative feedback. It is the Monitor's Office's expectation that the implementation of the new evaluation process will address these shortcomings and improve the overall evaluation process. Nevertheless, target 12 remains missed.

Overall, while PRPB has demonstrated compliance with policies and procedures concerning the hiring process, there remain significant aspects of this paragraph that require attention and implementation. Regarding the assessment of whether sampled personnel are adequately trained and certified in all policies related to the civilian complaint program (including mid-year reviews), PRPB has reported that no training related to the civilian complaint program, bias-free policing, and ProMedia was conducted. Additionally, upon reviewing recruitment and cadet files, the Monitor's Office identified a notable absence of a system for periodic evaluation of recruitment strategies. This absence means that PRPB lacks a mechanism to assess whether candidates were selected in accordance with the approved policies concerning bias-free policing and equal protection. The introduction of periodic evaluations would furnish PRPB with valuable insights into its hiring practices. Such evaluations would help determine whether current employment practices may unintentionally disadvantage individuals based on factors such as race, gender, age, or residential location. These evaluations would also be instrumental in identifying any disparities in the treatment of candidates throughout the selection process. For instance, disparities in running time scores for males and females on the physical fitness

test could be uncovered and addressed. Furthermore, it's essential for recruiters to receive training on these matters, yet the Monitor's Office has identified a gap in this regard. Recruiters should be equipped with the knowledge and understanding of not only a standardized hiring process but also an equitable one. This training is pivotal in ensuring fairness and equal treatment throughout the recruitment and selection process.

### Pathway Forward

It is imperative that PRPB takes immediate action to ensure compliance with the requirements of this paragraph. Failure to conduct timely training on the necessary topics outlined in this paragraph jeopardizes PRPB's overall compliance efforts. The current deficiency in training and refresher training related to this paragraph and its associated compliance targets stems from various issues, including inadequate management of training schedules, a shortage of training personnel, and insufficient training equipment. These shortcomings need to be promptly addressed and rectified to ensure that PRPB can meet its compliance obligations. Moreover, PRPB should establish a system for conducting periodic analyses of its recruitment efforts. This evaluation process should aim to determine whether candidates are being selected equitably, in accordance with approved policies regarding bias-free policing and equal protection. If disparities or biases are identified, PRPB should be prepared to make necessary revisions to its recruitment and testing programs to rectify these issues. PRPB must take proactive measures to address the deficiencies in training and compliance efforts, as well as to establish a robust system for evaluating recruitment practices. These steps are essential to ensure that PRPB can maintain and improve its compliance with the requirements outlined in this paragraph.

### Paragraph 85: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. NIBRS training are consistent with approved policies and procedures. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in NIBRS. | ☐ Met | ☑ Missed |
| 4. PRPB is using the NIBRS to collect and report crime data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

In review of compliance target one, PRPB does have policies and procedures for the implementation of a NIBRS reporting system outlined in the NIBRS manual. Regarding targets 2 and 3, PRPB once again submitted 92 PTMS agent training records. However, these records did not contain any notations related to NIBRS training. The absence of NIBRS training documentation in these records raises questions about compliance with these targets. As for target four, PRPB has not yet established the reporting process required for reporting crimes through the NIBRS. This indicates a lack of compliance with this target. Furthermore, PRPB has not provided any documentation demonstrating that its personnel are trained or certified in NIBRS. Although NIBRS training is being conducted at the pre-service level, there has been no in-service NIBRS training achieved during this reporting period. It is important to note that on August 2, 2022, the Monitor's Office reviewed a revised NIBRS Manual and provided PRPB with revisions. However, as of now, training on the updated NIBRS Manual has not been developed.

It is certainly worth highlighting that PRPB is actively collaborating with OSM to address the implementation of NIBRS. As of February 23, 2023, according to information from the FBI's NIBRS Unit, PRPB has made substantial progress by obtaining 11 Originating Agency Identifier (ORI) numbers assigned by the FBI. The only remaining areas in need of ORI numbers are Utuado and Aibonito. Once these ORI numbers are secured, PRPB will be able to commence the submission of crime data to NIBRS, marking a significant step toward compliance. However, it is important to emphasize that there are two critical targets that require immediate attention in this process. First and foremost, PRPB must ensure the completion of both initial and ongoing NIBRS training for its agents. This training is essential to equip PRPB personnel with the necessary knowledge and skills to effectively use NIBRS. Furthermore, the success of PRPB's compliance efforts in NIBRS reporting relies heavily on its IT support infrastructure and overall system architecture. Building a robust IT support structure and ensuring that the necessary technological infrastructure is in place are pivotal factors in achieving and sustaining compliance with NIBRS reporting requirements. While there has been notable progress in obtaining ORI numbers, PRPB must continue its collaborative efforts with OSM to address the remaining targets related to agent training and IT support. These steps are essential to ensure the successful implementation of NIBRS reporting and long-term compliance.

*Pathway Forward*

PRPB must continue to develop the NIBRS system, including training: one-time initial training for existing personnel, continuing training for each class of recruits, and periodic training when Commonwealth law or NIBRS is modified. PRPB must provide the budget and staff allocation for the associated NIBRS training and certification of personnel, and support to sustain NIBRS reporting. PRPB must address the staffing shortages that have extended the timeline to make changes to forms and systems, including CAD and GTE. Further, the Monitor's Office also recommends that the Commonwealth conduct public outreach to inform the public about changes that are forthcoming in PRPB's transition to NIBRS. There are notable gaps in compliance with these targets, including the absence of required documentation and the lack of progress in implementing NIBRS reporting and related training. Addressing these issues is crucial to achieving full compliance in these areas.

## Paragraph 86: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | Review Period | April 2023 – September 2023 |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #3. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #3. Annually for all other Compliance Targets. |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Criminal investigation trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. PRPB notifies the FBI of all identified instances of hate crimes. | ☐ Met | ☑ Missed |
| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | ☐ Met | ☑ Missed |

Note: The requirement of this Paragraph that requires PRPB to track hate crimes on an ongoing basis is assessed together with Paragraph 85.

### *Compliance Assessment*

During this reporting period, all five compliance targets were assessed. In a certification letter dated April 20, 2023, PRPB stated that SAIC units have not reported having investigated incidents or complaints involving hate crimes or hate crime complaints filed and/or concluded during this reporting period. In review of target one, on September 30, 2023, PRPB did approve the Hate Crimes Manual. This 35-page document outlines definitions, investigative aspects of a hate crime, guide to an effective initial response, collection and preservation of evidence, recognized prejudices in the United States and Puerto Rico, and general provisions. This manual adequately outlines the agent's responsibilities in response to a hate crime incident.

The review of compliance targets two through five reveals important findings and challenges: targets two and three are missed. PRPB reported that no training on VICO 3081 (Hate Crime Training) was conducted during the reporting period. This indicates a lack of progress in training personnel on policies related to identifying, collecting, and reporting hate crimes. Addressing this training deficiency is critical to achieving compliance in this area. PRPB did not provide any documentation indicating that it has reported hate crimes to the FBI during the reporting period, nor did it confirm the absence of

hate crimes. As a result, target four remains unfulfilled. Reporting hate crimes accurately and comprehensively is essential for both compliance and addressing hate-related issues within the jurisdiction. For target five, the Monitor's Office did not receive any investigative files to assess whether hate crimes were accurately identified as such. This absence of documentation raises concerns, especially considering the size and population of Puerto Rico. It is important to acknowledge that the lack of reported hate crimes may be attributed to various factors, including the possibility that agents are not adequately trained to recognize the elements of a hate crime. Another potential factor is the adequacy of supervision in responding to such crimes. The presence of effective supervision, along with ongoing training, may lead to different outcomes in the future.

*Pathway Forward*

Addressing the deficiencies in training, reporting, and investigation related to hate crimes is crucial for PRPB to achieve compliance in this area. This includes providing comprehensive training, ensuring accurate reporting, and improving the identification and handling of hate crimes within the jurisdiction. It is imperative that PRPB deliver the training for VICO 3081 (Hate Crime Training). This will help ensure that officers are trained to accurately assess cases to determine if the matter is a hate crime. Additionally, it is essential that supervisors attend training to assist officers in hate crime investigations and assessments. Officers without thorough hate crime investigation training can miss the details of a hate crime case and may misreport the matter. Supervisors are at the next level of assessment and accountability in these matters and should also receive training on hate crime investigations. PRPB has a responsibility to better manage hate crimes, and it starts with training. With training, PRPB personnel will better understand the specific tenets of hate crimes and will classify crimes as such. To help address the concerns with this paragraph, PRPB developed the DV/SA Implementation Plan which prioritizes training and monitoring gender-based hate crimes and the IT CAP which includes an initiative to streamline the sharing of hate crimes with the FBI.

## 2. Discriminatory Policing

PRPB is demonstrating progress in delivering services to the transgender and transsexual communities. These interactions reveal that PRPB is actively providing services related to transportation, processing, housing, and medical treatment, which is a positive development. Nonetheless, PRPB continues to encounter challenges in agent training related to interactions with the transgender and transsexual community. It remains imperative for PRPB to address this deficiency by implementing suitable training programs for its personnel. Such training is crucial to equip PRPB agents with the necessary knowledge and skills to interact with and provide effective services to the transgender and transsexual communities.

Additionally, PRPB needs to focus on assessing its programs, delivering the required training to its personnel, and handling cases originating in juvenile correctional facilities. Specifically, PRPB must confirm that its personnel are trained and certified in discriminatory-free policing, and it should prioritize ensuring that each criminal case originating in juvenile correctional facilities is promptly referred to both PRDOJ and the Puerto Rico Department of the Family (PRDoF). Unfortunately, PRPB did not meet the compliance target for these cases in the current reporting period.

To attain full compliance with the relevant paragraphs, PRPB should continue its positive efforts in serving the transgender and transsexual communities while addressing the remaining areas of concern. This comprehensive approach will help ensure that all aspects of the paragraphs' requirements are met effectively.

## Paragraph 87: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall apply and administer all programs, initiatives, and activities without discriminating based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation. PRPD shall develop policies and practices to prohibit selective enforcement or non-enforcement of the law based on these characteristics. These policies and practices shall comply with applicable law and comport with generally accepted policing practice.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of PRPB programs, initiatives, and activities conform to the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. 95% of selected PRPB programs, initiatives, and activities are consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☑ Missed |

Note: The section of this Paragraph that requires PRPB to develop policies and practices to conform to the requirements of this Paragraph is assessed together with Paragraphs 81, 88, and 109 (Policies and Procedures).

*Compliance Assessment*

During this reporting period, PRPB did not provide any documentation pertaining to programs, initiatives, or activities related to this paragraph. In contrast, when comparing to the CMR-7 reporting period, where PRPB had submitted documentation covering 127 programs, initiatives, and activities related to this paragraph, a notable increase from the 58 submitted in the CMR-5 reporting period. Additionally, PRPB did not submit any work plans that cover the 11 regions of Puerto Rico.

Furthermore, comprehensive data collection on various aspects, such as interactions that do not lead to citations or arrests, and encounters with individuals in crisis, is lacking. This limitation makes it challenging for the Monitor's Office to perform a comprehensive assessment regarding PRPB's application and administration of all programs, initiatives, and activities without any form of discrimination based on factors such as race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation.

*Pathway Forward*

Significant efforts are required to demonstrate that all PRPB programs align with the requirements outlined in this paragraph. PRPB has shown commendable progress in the development and coordination of bias-free policing and equal protection programs, initiatives, and activities through the Community Engagement Division. However, as previously mentioned, there is a need for further enhancements to improve the quality of PRPB's data and its analytical capabilities.

These improvements will enable PRPB and the Monitor's Office to effectively assess whether its activities align with the stipulations of this paragraph, as well as other related paragraphs, such as Paragraph 91. In upcoming CMRs, a comprehensive review of a diverse selection of programs will be conducted to determine ongoing compliance with this paragraph. Additionally, the Monitor's Office will collaborate with PRPB to identify which specific programs, initiatives, and activities should be evaluated as part of this paragraph's compliance assessment.

## Paragraph 88: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB policies complied with the requirements of the Paragraph. | ☒ Met | ☐ Missed |
| 2. Trainings on discrimination free policing are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled PRPB members are trained and certified in discrimination free policing. | ☐ Met | ☒ Missed |
| 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | ☐ Met | ☒ Missed |
| Note: This Paragraph is assessed together with Paragraphs 81, 87, and 109 (Policies and Procedures). | | |

*Compliance Assessment*

For this paragraph PRPB submitted a global list of 399 people, with phone numbers, email addresses (if known), and areas they represent for review. For targets two and three, PRPB submitted 92 agent training records. However, in these records it is found that IGPD 5011 (Multi-Themed Equal Protection

126

and Non-Discrimination), IGPD 5011SC (Supervisors Course Multi-Themed Equal Protection and Non-Discrimination), and IGPD 5011R (Refresher Multi-Themed Equal Protection and Non-Discrimination) are all blank. This course is part of PRPB's 40-hour training plan with plans to deliver this course in the future.  There is no other documentation received to address training on discrimination free policing. No documentation that policies on pertinent immigration-related law were widely disseminated to the public or received by the Monitor's Office.

However, during the CMR-8 reporting period, only target three was assessed biannually, and it was found not to be met. A more in-depth analysis of the training course IGPD 5011 (Multi-themed Equal Protection and Non-Discrimination) showed that PRPB did not meet the 95% training threshold for this course. This highlights the need for ongoing efforts to improve compliance with training requirements in this area.

### Pathway Forward

To attain substantial compliance, PRPB should enhance its educational efforts regarding the Reform and its impact on the community. Expanding community outreach initiatives is crucial. PRPB officers' training should be updated to include relevant information on laws pertaining to foreign nationals and diplomatic matters. PRPB should also revise training schedules across all areas to ensure the delivery of course IGPD 5011 (Multi-themed Equal Protection and Non-Discrimination) reaches the 95% threshold. The implementation of PRPB's Training Plan will be instrumental in achieving these goals and fostering greater compliance with the Reform's requirements.

### Paragraph 89: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | ☒ Met | ☐ Missed |
| 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | ☐ Met | ☒ Missed |

127

| | |
|---|---|
| 3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals. | ☐ Met  ☒ Missed |
| 4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals. | ☒ Met  ☐ Missed |

*Compliance Assessment*

PRPB submitted various documents to meet all four targets. Specifically, for target one, GO 624 (Interactions with Transgender and Transexual Persons) was reviewed and approved on August 2, 2023. Recommendations to the policy were made in the areas of definitions, agent interactions, rules, and procedures. PRPB made those changes, and the policy was approved. In review of compliance target two, the Monitor's Office has not reviewed the most updated/revised version of REA 624 (Interactions with Transgender and Transsexual Individuals) or VITT 3081 (Virtual Training-Interactions with Transgender and Transsexual Individuals). Therefore, it is not known if PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. The Monitor's Office requests that this curriculum be made available to review the revisions as they relate to the updated policy. For target three, PRPB submitted 92 agent training records which documents that REA 624 (Interactions with Transgender and Transsexual Individuals was administered to agents between the years 2016 and 2018. While PRPB does partially meet the target that REA 624 was administered to its agents, no training documents indicate that there has been current REA 624 training with the new policy updates. Therefore, target three remains missed in this reporting period.

In a review of compliance target four, PRPB reports two interactions between PRPB personnel and transgender or transsexual individuals. This is a stark contrast to the CMR-8 reporting period, where PRPB reported eight interactions between PRPB personnel and transgender or transsexual individuals. The two cases involved DV and aggravated assault. The review found that PRPB does comply with policies regarding interactions with transgender or transsexual individuals. For example, PRPB personnel provided information on support services, medical attention, and a domestic violence escape plan. The Monitor's Office finds target four met the compliance standard.

*Pathway Forward*

PRPB has a vital responsibility to provide training and certification to ensure that its personnel are well-versed in interactions with transgender and transsexual individuals. Moreover, PRPB should maintain and strengthen its ongoing interactions with transgender and transsexual individuals in accordance with the requirements laid out in GO 624 (Interactions with Transgender and Transsexual Individuals).

To gauge the quality of its policies and the effectiveness of member interactions, PRPB should establish a robust data collection system encompassing essential performance metrics. These metrics should include data on gender identification, gender expression, transportation, processing, housing, and medical treatment. Typically, these data points are captured in police reports and should be subjected to thorough analysis. This analysis will not only help in measuring the effectiveness of PRPB's policies but also inform any necessary updates or improvements to these policies.

## Paragraph 90: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding biased-free policing;*

*b) community perspectives of discriminatory policing;*

*c) constitutional and other legal requirements related to equal protection and unlawful discrimination;*

*d) the protection of civil rights as a central part of the police mission;*

*e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;*

*f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;*

*g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;*

*h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and*

*i) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #5. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | ☐ Met | ☑ Missed |
| 5. 95% of sampled PRPB members are trained and certified in bias-free policing. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraph 81 and 117 (Training).

*Compliance Assessment*

All five targets within this paragraph have been assessed in this reporting period, and regrettably, the Monitor's Office found that none of the targets were met during the reporting period. However, it is worth noting that in June 2022, the Monitor's Office observed the delivery of IGDP 5011 (Multi-thematic Equal Protection and Non-Discrimination) in Aguadilla and found the training to be in alignment with policy, guided by defined learning objectives, and engaging for participants.

For the current reporting period, IGDP 5011R (Refresher- Multi-thematic Equal Protection and Non-Discrimination) is part of the training plan initiative. However, no training curriculum has been received for review, nor has the training been scheduled, to meet all the targets specified in this paragraph.

PRPB is aware of this situation and has prioritized IGPD 5011R as one of the core courses in the 40-hour block of mandatory instruction. This strategic placement of the course is intended to address the requirements of this paragraph effectively. It is anticipated that there will be positive outcomes in CMR-10 and affirmative progress in CMR-11 regarding compliance with these targets.

*Pathway Forward*

As the curriculum for IGPD 5011R (Refresher- Multi-thematic Equal Protection and Non-Discrimination) is being revised, it is advisable that PRPB assesses the International Association of Chiefs of Police (IACP) course on bias-free policing, which has been provided previously (as mentioned in CMR-6). PRPB can tailor this course to suit its specific needs and ensure its genuine applicability. Comprehensive bias-free training is crucial for certifying that PRPB officers have a thorough understanding of all aspects related to this paragraph.

Effective training is pivotal in the successful implementation of bias-free policing practices and processes. PRPB should consider developing coursework on various topics, including implicit bias, racial profiling, de-escalation techniques, and communication skills. These topics are essential for equipping PRPB officers with the necessary knowledge and skills to engage effectively with diverse communities and uphold the principles of bias-free policing.

## Paragraph 91: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall assess its operational programs, initiatives, and activities at least every two years to ensure that they are applied or administered in a manner that guarantees equal protection. As part of its assessment, PRPD shall specifically include an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs. PRPD shall also assess its operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. PRPD shall base its assessment of programs, initiatives, and activities on accurate, complete, and reliable data, including data contained in the EIS, stop and detention data, use of force analyses, and operational planning and after-action reports. PRPD shall make this assessment publicly available.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | October 2022 – September 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of reviewed programs, initiatives, and activities were assessed by PRPB at least every two years. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed assessments conducted by PRPB included an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs, operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. | ☐ Met | ☑ Missed |
| 3. 95% of reviewed assessments of program initiatives and activities were based on accurate, complete, and reliable data, as required by the Paragraph. | ☐ Met | ☑ Missed |
| 4. 95% of reviewed assessments were made publicly available by PRPB. | ☐ Met | ☑ Missed |

Note: The section of this Paragraph that requires reliance on PRPB assessment of programs, initiatives, and activities on accurate, complete, and reliable data is assessed together with Paragraph 219 (Information Systems and Technology) and 148 (Early Intervention System) as to Use of Force.

Note: The section of this Paragraph that requires that operational programs, initiatives, and activities be reviewed every two years and be made publicly available, shall be assessed together with Paragraph 113 (Policies and Procedures).

*Compliance Assessment*

Once again, in the reporting period, there has been no observable progress in the implementation of this paragraph. Similarly, no advancements were noted in CMR-7. The most recent update regarding this paragraph was in a PRPB memorandum dated September 30, 2021. This memorandum indicated that PRPB is actively working on fulfilling the requirements outlined in this paragraph and is in the process of collaborating with OSM to develop an assessment work plan.

PRPB has undertaken efforts to modify forms, including demographic data elements, as mandated by Paragraph 91. These modifications aim to ensure that all forms used by police officers include the collection of demographic data for individuals who have received services. This collected information will serve the dual purpose of evaluating and monitoring the provision of services to ensure they are offered in a non-discriminatory manner.

During this reporting period, PRPB has not submitted any documentation related to programs or activities, in contrast to the CMR-7 reporting period when PRPB provided documentation for 26 programs and activities. These initiatives encompassed activities such as "Café Con Mis Policias" (Coffee with My Cop), memorials and ceremonies, community meetings, and health fairs. While these activities represent positive outreach efforts, it is essential that PRPB use outreach data to assess their effectiveness and, consequently, their compliance with this paragraph.

This paragraph mandates that PRPB assess the effectiveness of these activities by conducting a data analysis, which should include a two-year program assessment report. Unfortunately, these requirements have not been fulfilled, resulting in PRPB's non-compliance with this paragraph. To achieve compliance, PRPB must ensure that it not only conducts these outreach activities but also rigorously evaluates their impact through data analysis and reporting.

*Pathway Forward*

PRPB should continue to develop and refine its processes to ensure it has access to valuable evaluation data, which is instrumental in guaranteeing that all police activities and interactions with citizens are administered in a manner that upholds equal protection principles. It is imperative that the data collected is accurate, comprehensive, and dependable.

While the initiative to deliver programs is commendable, it is equally crucial to assess whether these programs effectively meet the needs they are designed to address. This assessment can be achieved through various means, such as program surveys, follow-up interviews, or focus groups. The goal should be to ensure that programs are not only delivered but also assessed for their impact and effectiveness.

This paragraph mandates that the assessment of relevant programs, initiatives, and activities should be conducted every two years. This goes beyond merely reporting the activities that have been conducted. After each event or initiative, a comprehensive assessment should be carried out to evaluate the quality of the work performed and its alignment with the intended objectives. By consistently evaluating the impact of its activities, PRPB can enhance its service delivery and meet the demands of the community more effectively.

## Paragraph 92: Equal Protection and Non-Discrimination - Discriminatory Policing

*Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | ☐ Met  ☑ Missed |
|---|---|

### Compliance Assessment

During this reporting period, PRPB submitted five cases to the Monitor's Office for review, with the objective of determining whether PRPB complies with the requirement to report cases to PRDOJ and PRDoF within five business days, as stipulated. All five cases originated from the Department of Institutional Corrections for Juveniles located in Ponce. Upon review of these cases, PRPB does consult with PRDOJ; however, all the cases were over the five-day notification period. There was no notation in any of the case files that PRDoF was notified. Therefore, with no documented evidence to suggest that this case was referred to PRDoF, PRPB has not met this specific target.

To achieve compliance with this paragraph, PRPB must prioritize and complete the critical assessment process with precision within the specified timeframes, adhering to the outlined indicators. This will help ensure the timely and accurate reporting of cases to the relevant authorities as required by this paragraph.

The report designated for documenting the date of referral to PRDOJ and PRDoF, namely PPR 622.1 (Investigative Report), is included within the investigative report document. Within this report, there are specific fields provided for documenting the appropriate referral details. However, it has been consistently observed that PRPB has failed to make any notations regarding the referral dates to PRDOJ and PRDoF in these fields.

To improve compliance with the requirements of this paragraph, PRPB must ensure that these critical notations are consistently made in the designated fields of PPR 622.1 (Investigative Report). This will facilitate accurate and timely reporting to PRDOJ and PRDoF, aligning with the specified guidelines and helping to meet the compliance standards of this paragraph effectively.

### Pathway Forward

PRPB is once again reminded, as previously noted in CMRs-5 and 7, of its responsibility to certify the total number of cases and ensure that report fields indicating the date and time of case referral to PRDOJ and PRDoF are consistently completed and validated. Although PRPB implemented the recommendation to include a category in the initial report for noting the referral date to PRDOJ and PRDoF, it is regrettable to observe that this category is often left empty or crossed out.

An alternative location where this critical information can be documented is PPR 118.3 (Case File Checklist) which is a valuable document used in the investigative units. This checklist can be expanded to include notification indicators for PRDOJ and PRDoF. By actively notifying these agencies, PRPB can enhance information sharing, adhere to established timelines, improve responsiveness, and provide valuable information to both the Monitors overseeing police reform and the Monitors focusing on juvenile facilities reform.

It remains PRPB's responsibility to promptly notify PRDOJ and PRDOF, as these agencies hold investigative and procedural responsibilities. This collaborative approach will not only assist in meeting

compliance requirements but also contribute to better information sharing and coordination among relevant stakeholders. Moreover, it is important to emphasize in this report that the DV/SA Implementation Plan involves a thorough evaluation and improvement of the Sex Crimes and Child Abuse Module. This module holds the potential to automate referrals or, at a minimum, integrate triggers for supervisory review. Consequently, this will contribute to supervisor oversight in instances where reports are not fully completed with all pertinent information.

## 3. Sexual Assault and Domestic Violence

PRPB's lack of adherence to the provisions outlined in this subsection remains consistent with previous CMRs. However, there is a pressing need for enhancements in various areas, including safeguarding victims of SA and DV, establishing robust systems for tracking, gathering case dispositions, and adopting a victim-centered approach to investigations. Additionally, as highlighted in other sections, a substantial number of personnel, both in specific units and across the board, lack the requisite training. Staff shortages have further exacerbated the issue, leading to heavy caseloads for investigators and resultant inconsistencies in investigative procedures and documentation.

PRPB and the Commonwealth must heighten their dedication to addressing the ongoing concerns outlined in these CMRs. Recent high-profile cases involving gender-based violence and domestic violence incidents with PRPB personnel have underscored the urgency of implementing the improvements highlighted in the subsequent paragraphs.

### Paragraph 93: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for the remaining Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | ☑ Met ☐ Missed |

134

| | | |
|---|---|---|
| 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies. | ☑ Met | ☐ Missed |
| 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |
| Note: This Paragraph is assessed together with Paragraphs 94, 98 and 99. | | |

*Compliance Assessment*

In review of compliance target one, in August 2022 the Monitor's Office reviewed and approved GO 118 (DV Division) and found that the policy does comply with applicable law and generally accepted policing practices. This policy review is still within the timeline review parameters. Related to target two, the Monitor's Office observed REA 627-R (DV Refresher) and found the course delivered substantive learning objectives on DV, such as identification, reporting, interviewing techniques, supporting resources/agency assistance, and follow-up techniques. The course was found to be consistent with the approved policy. In review of compliance target three, PRPB submitted 92 agent training records. The Monitor's Office sufficiently found that the agents had received REA 627 (DV), which was followed up in 2012, 2022, and 2023, with REA 627R. PRPB did train these agents, and it seems that PRPB recognizes the importance of this training topic.

During interviews conducted with SA and DV investigators, it was evident that these agents recognized the significance of employing a trauma-informed, victim-centered approach in the investigative processes and procedures. However, supervisors of these units expressed lingering concerns. One key issue raised is the inadequacy of office space for conducting confidential interviews. The lack of dedicated interview rooms sometimes places victims in environments that do not facilitate the gathering of personal or case-related information effectively.

Another recent development of concern is the unilateral decision by commanders to prohibit investigative officers from wearing civilian clothing. Some lieutenants noted that there are instances where conducting victim interviews while wearing civilian clothing can be more conducive to establishing a positive interviewing experience and presenting the officer in a neutral manner. However, this option has been restricted. Additionally, there is a shortage of suitable vehicles to transport victims to safe havens. Although some units have received regular patrol vehicles like Dodge Chargers, these vehicles are not ideal for transporting victims, their family members, and personal belongings, leading to logistical challenges and multiple trips. Another concern expressed is the variance in understanding and application of trauma-informed care between investigative agents and first-line officers. Supervisory agents have encountered situations where first-line officers did not exhibit the same level of willingness to implement such practices, resulting in supervisory agents dispatching investigative agents to the scene. This disconnect between first-line officers and investigative agents is a major concern, and supervisors hope it will improve with the introduction of newly promoted supervisors.

During the reporting period, PRPB conducted 4,113 domestic violence investigations and 201 sexual assault investigations. The Monitor's Office randomly selected and reviewed 91 domestic violence cases and 70 sexual assault cases for evaluation.

In the assessment of the 91 DV cases, PRPB demonstrated a 63% level of compliance in its overall approach to investigating DV cases, as mandated by the Agreement. It was noted that 58% of these cases exhibited evidence of a documented victim-centered approach. Approximately 84% of the cases included the provision of next-step information or resources to the victims. Conversely, 74% of the time, PRPB initially gathered case report information in a manner that provided the investigative unit with key investigative details. Overall, PRPB managed domestic violence cases in accordance with paragraph requirements approximately 63% of the time.

One contributing factor to this outcome is the heavy caseload carried by investigators, with supervisors reporting an average of 40 to 50 domestic violence cases per month. This caseload has implications for the quality of investigations and the ability to consistently implement a victim-centered approach.

*Pathway Forward*

In the scope of SA and DV investigations, there is currently a SA/DV Plan being developed. Authored by PRPB, the plan is aimed at addressing the findings and recommendations outlined in previous CMRs. The primary objective of this initiative is to establish investigative procedures that enable PRPB to be more responsive in its approach to handling SA and DV cases. To achieve this, it is imperative that PRPB maintains its commitment to enhancing the delivery of SA and DV training to its personnel. This specialized training equips the team with the necessary skills for an effective initial response to such incidents. Ensuring the continued provision of training opportunities, resources, and support is paramount in the mission to effectively prevent these types of crimes.

## Paragraph 94: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's sexual assault policies and procedures shall provide clear and detailed guidelines for each stage of PRPD's response to a reported sexual assault, including (a) dispatch response; (b) initial officer response; (c) initial and follow-up victim interviews; and (d) on-scene and follow-up investigation. These protocols shall be based on recognized models and guidelines on forensic examinations, such as, for example, the National Protocol for Sexual Assault Medical Forensic Examinations issued by DOJ's Office of Violence Against Women.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. PRPB's sexual assault policies and procedures comply with the requirements of the Paragraph. | ☑ Met    ☐ Missed |
|---|---|
| 2. 95% of reviewed sexual assault investigations complied with requirements of the Paragraph. | ☐ Met    ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 93, 98 and 99.

*Compliance Assessment*

During the reporting period, a comprehensive review of 70 SA case files revealed a concerning lack of consistency in file organization and document completion. These files appeared disordered, with haphazardly assembled materials. Furthermore, there was a notable disparity in the level of detail and interview techniques employed across cases. Some interviews were handwritten by the victims, while others were transcribed by the investigating officers. Regrettably, the Monitor's Office observed a recurring failure to follow up on corroborating evidence when victims reported instances of stalking or harassment. Even when victims disclosed additional related crimes, it appeared that no subsequent investigation occurred. The focus remained solely on the reported case elements. Notably, in cases where victims did not cooperate with the officer or did not express a desire to pursue charges, an immediate closure of the case ensued, with no subsequent follow-up. These issues persistently echo concerns previously highlighted by the Monitor's Office in prior CMRs.

In the assessment of the 70 SA cases, PRPB demonstrated a 64% level of compliance in its overall approach to investigating SA cases, as mandated by the Agreement. It was noted that 73% of these cases exhibited evidence of a documented victim-centered approach. Approximately 82% of the cases included the provision of next-step information or resources to the victims. Conversely, 98% of the time, PRPB initially gathered case report information in a manner that provided the investigative unit with key investigative details. Overall, PRPB managed SA cases in accordance with paragraph requirements approximately 64% of the time.

PRPB's interview techniques in these cases require a significant shift towards adopting a victim-centered approach. It is essential to prioritize the well-being of the victim throughout the investigative process, which should include providing them with the support of an advocate. Unfortunately, this critical element is presently absent from PRPB case files. In some instances, the Monitor's Office observed that certain files had obtained supervisor approval, accompanied by signed documentation confirming the supervisor's endorsement of the report. This practice is a commendable measure that should be upheld and consistently applied. It serves as an effective mechanism for maintaining accountability among supervisors, ensuring thorough follow-up, and upholding the overall completeness and quality of investigative reports.

During the reporting period, PRPB continued to make significant progress in the use of SAFEKIT, a rape kit tracking system. This innovative tool enables victims to track the various stages of their rape kit analysis online, starting from its collection at the hospital, through its retrieval by law enforcement, all the way to its delivery to the crime lab for analysis, and subsequently back to law enforcement. SA

supervisors who were interviewed during this reporting period have expressed their belief that this new process plays a pivotal role in fostering trust and ensuring transparency in SA investigations.

In interviews and meetings with PRPB sergeants and lieutenants in the SA and DV Units, it was discovered that they have indeed implemented certain recommendations stemming from an investigative process assessment conducted by a subject matter expert from the USDOJ. A report outlining findings and recommendations from this assessment was delivered to PRPB on February 21, 2022. Notably, this report included an investigative checklist along with processing recommendations. As a direct result of this assessment, PRPB has taken proactive steps by creating PPR 118.3 (Investigative Checklist) that delineates the tasks and responsibilities associated with the investigative process. This development represents a positive outcome arising from the process assessment.

In interviews with PRPB sergeants and lieutenants, another pressing concern that emerged is the insufficient number of available investigators. This issue underscores the necessity of establishing a retention and workforce sustainability model that ensures timely filling of vacant positions. The urgency of investigations involving SA and DV makes it imperative to have a consistently staffed and capable team in place. The lack of a sustainable workforce model has far-reaching implications, not only for the safety and well-being of both the investigators and victims but also for the legal aspects of these cases. Maintaining a fully staffed and trained team is crucial in ensuring that justice is served and that the rights of all parties involved are protected throughout the investigative process.

*Pathway Forward*

In the path ahead, PRPB is on track to establish a court-approved SA and DV Plan, which is specifically designed to address the findings and recommendations identified in previous CMRs. To further enhance the effectiveness of these efforts, the Monitor's Office continues to advocate for close collaboration between PRPB and community advocates, in alignment with the Agreement. One promising approach that PRPB could consider is the formation of a multi-disciplinary group responsible for shaping the handling of SA cases. This group should ideally include representatives from various key stakeholders, such as law enforcement, prosecutors, medical professionals, and community advocates. Each of these parties plays a vital role in different aspects of the case, and their collaboration can be instrumental in establishing comprehensive protocols. By convening this multi-disciplinary group, PRPB can actively contribute to the development of protocols and training programs that prioritize victim-centered service delivery. Additionally, this collaborative effort can serve as a platform to expand on various victim service initiatives, further strengthening the overall response to SA and DV cases.

Effective training is pivotal for PRPB in equipping its personnel with the essential tools for consistently delivering appropriate services to crime victims. It is equally important to foster collaboration with partner agencies, ensuring a unified and victim-centered approach while setting a high standard of professionalism. To facilitate this training and collaborative effort, there are numerous programs and associations dedicated to enhancing interviewing techniques and case management. PRPB could greatly benefit from conducting multidisciplinary collaborations involving professionals, allies, subject matter experts, and the public as part of its investigative initiatives. As previously suggested, one such organization that holds significant potential is End Violence Against Women International (EVAWI). EVAWI's mission revolves around training those who respond to gender-based violence, providing

them with the knowledge and tools necessary to support victims and hold perpetrators accountable. Their annual conferences and online academy of training sessions offer valuable resources that can assist PRPB in strengthening its approach to handling SA and DV cases.

## Paragraph 95: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall re-assess and revise, where needed, its classification protocols for crimes involving sexual assaults. PRPD shall track all reports of felony sexual assault based on the UCR definitions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPB is appropriately classifying crimes involving sexual assault as required by the Paragraph. | ☒ Met ☐ Missed |
| 2. PRPB's classification and tracking of felony sexual assault crimes comply with the Paragraph. | ☐ Met ☒ Missed |
| Note: This Paragraph is assessed together with Paragraph 82. | |

### Compliance Assessment

For this reporting period the Monitor's Office received a Certification dated April 27, 2023 stating that the manual for the management of incident reports or police services (NIBRS-2018 edition) is the document that is used for the classification of data related to SA. The Certification stated that the manual is currently under review. The Certification also stated that GOs for the Investigation of Cases of Sexual Crimes and Abuse of Minors (GO 115), GO 607 (Incidents of Sexual Crimes Committed by Employees of PRPB), and GO 622 (Investigation of SA Incidents) were approved and have been signed by the Commissioner and are published on the Virtual Library in February 2023. Additionally, PRPB states that the following were sent to the Monitor's Office for approval: GO 118 (Division of Gender Violence and Juvenile Affairs), which contemplates the union of the Divisions of DV, Sexual Crimes and Child Abuse, and Juvenile Affairs, in a single GO.

The Monitor's Office has also received a comprehensive list of all active supervisors and directors who possess knowledge, responsibility, and/or have actively participated in the evaluation and review of protocols concerning SAs. This includes their involvement in assessments and reviews conducted in accordance with Uniform Crime Reporting (UCR) definitions, as well as their roles in monitoring and analyzing the outcomes of SA investigations.

While the processes outlined in the paragraph are indeed noteworthy, a significant gap becomes apparent with the absence of a SA tracking report. The missing documentation pertains to UCR reports, which are essential for verifying the accurate classification and tracking of SA crimes. As a result, the Monitor's ability to evaluate and review target two is compromised due to the absence of the necessary tracking documentation. This represents a notable area of concern in the monitoring process.

*Pathway Forward*

The adoption of a new record and report management system signifies the importance of designing the system to effectively capture the classification protocols for crimes involving SA. It is imperative that this system possesses the capability to comprehensively track all reports of felony SAs in accordance with UCR definitions. Statistical accuracy holds significant weight, especially concerning public reporting, as it directly impacts PRPB's transparency.

The precision of data is paramount, and PRPB should consistently strive to ensure that the reported numbers are accurate. The use of the UCR reporting method is invaluable in providing the clarity necessary for both the public and stakeholders. It sets clear expectations regarding how PRPB handles and reports on this critical matter, reinforcing transparency and accountability in the process.

## Paragraph 96: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually for the remaining Data Sources. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Training on response to sex crimes related calls is in accordance with approved policy. | ☑ Met | ☐ Missed |
| 3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls. | ☑ Met | ☐ Missed |
| 4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes. | ☑ Met | ☐ Missed |

| 5. The manned hotline provides the public access to the Sex Crimes Investigation Unit. | ☑ Met | ☐ Missed |
| --- | --- | --- |

*Compliance Assessment*

In review of compliance target one, the Monitor's Office received and approved GO 118 (Violence Division of Gender and Youth Affairs) that guides the Sex Crimes Investigation Units. For target two, the Monitor's Office received course documentation that adequality outlines the scope of responsibilities for those agents assigned to SA Investigative Units and for manning the 24-Hour Hotline (LVVS 622). REA 115 (SA Investigations by Special Agents) has learning objectives that adequately define the concepts related to the topic of incident investigation. The course covers legal, intervention protocols, due process in handling a sexual abuse scene, identifying signs and symptoms of trauma, and appropriate interviewing techniques. For target three, the Monitor's Office received a listing of all call takers who have received LVVS 622, which is the 24-Hour Hotline training. Additionally, certifications to this training were also attached.

For target four, PRPB's commitment to maintaining a 24-hour hotline is evidenced by the submission of 34 files, covering the period from April through June 2023. These files contained detailed information such as the date, time, type of incident, call taker, assigned investigator, district, case number, and the supervising agent. This documentation clearly and accurately demonstrates PRPB's compliance with the requirement to staff and maintain a hotline available around the clock, 24 hours a day.

Regarding target five, the Monitor's Office had previously visited the hotline's offices during past reporting periods and observed that the hotline office does provide public access to the Sex Crimes Investigation Units. However, it is important to acknowledge that PRPB faces constraints, as highlighted in previous CMRs, particularly related to equipment such as a telephonic computer system and call center. These limitations restrict PRPB's ability to confidentially provide access to the SA Crimes Unit.

Considering these constraints, it remains crucial to identify and secure office space that can ensure both the call taker and the information provided can be handled in a private and confidential manner. This step is essential for safeguarding sensitive information and maintaining the integrity of investigations related to sexual assault cases.

*Pathway Forward*

Maintaining the 24-hour hotline is of paramount importance for PRPB to ensure continuous public access to the SA Crimes Unit. Training is an integral part of this service, as it plays a crucial role in certifying call takers. It is imperative that PRPB conducts regular training and keeps records of certifications to demonstrate compliance with the standards set forth.

The 24-hour hotline serves as a lifeline, offering immediate crisis intervention, aiding victims in creating safety plans, facilitating access to emergency shelter, providing guidance on seeking medical attention, and offering referrals to other community resources. This vital resource is indispensable for the citizens of Puerto Rico, and PRPB must remain dedicated to its ongoing provision, ensuring the well-being and support of those in need.

## Paragraph 97: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of sexual assault investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track sexual assaults by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☑ Met | ☐ Missed |

*Compliance Assessment*

During this reporting period, PRPB has made significant strides in enhancing its reporting capabilities. The introduction of the EIS SA Module has enabled the production of a comprehensive system report that includes a) the status of all SA investigations, regardless of when the initial incident occurred or when the investigation commenced during the reporting period and b) the disposition of all completed investigations.

Additionally, PRPB has made commendable progress by integrating gender and age indicators into its data collection and reporting procedures. This enhancement significantly enhances the depth of insight into SA cases, fostering a more thorough understanding of the complexities and demographics associated with these incidents.

Another notable achievement is the uniform collection and reporting of SAs across the 13 areas of Puerto Rico, including San Juan, Arecibo, Ponce, Humacao, Mayaguez, Caguas, Bayamon, Carolina, Guayama, Aguadilla, Utuado, Fajardo, and Aibonito. These areas now provide data on key variables such as probable cause for arrest, initiation of investigations within specialized units, consultation with the Public Ministry, convictions, trial stages, magistrates' determinations of probable cause for charging, and the Public Ministry's decisions to archive or appeal cases.

The SA Status Report received for the reporting period spanning from January 1, 2022, to December 31, 2022, reveals a total of 1,467 cases. This comprehensive report effectively categorizes these

incidents by region and disposition. Particularly, the report appears to be module prepared, demonstrating the use of a systematic and organized approach to data collection and reporting.

It is important to highlight that this paragraph demonstrates compliance with reporting requirements. It provides essential indicators, including gender breakdowns and information on cases involving the arrest of more than one participant. Such data enrichment is crucial for a thorough understanding of SA incidents and supports transparency and accountability in reporting practices.

### Pathway Forward

PRPB should continue to prioritize the expansion of its incident tracking system to incorporate disposition tracking data in its RMS. This approach enhances the organization's ability to comprehensively monitor and analyze the outcomes of SA investigations, which is essential for accountability and improvement.

As PRPB proceeds with public dissemination of SA dispositions, including such critical information as gender-based data, arrests, prosecutorial decisions, and convictions, it should be prepared for the community's response. Public awareness of these dispositions will likely trigger community interest and scrutiny regarding PRPB's capabilities in managing these cases.

To maximize the impact of this reporting and data collection, PRPB could greatly benefit from expanding its report to include data analysis. Such analysis could provide valuable insights and strategies for addressing changes or issues within the system. For instance, it could help inform resource allocation in high-crime areas or guide the development of advocacy outreach efforts in regions with higher reporting numbers. This data-driven approach enhances PRPB's ability to adapt and respond effectively to evolving challenges in addressing SA cases.

### Paragraph 98: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's domestic violence policies and procedures shall clearly delineate the duties of all PRPD officers and staff and provide clear and detailed guidelines for each stage of PRPD's response to a report of domestic violence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB's policies and procedures regarding domestic violence meet the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of reviewed domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |
| Note: This Paragraph is assessed with Paragraphs 93, 94 and 99. | | |

*Compliance Assessment*

In the reporting period the Monitor's Office reviewed and approved GO 644 (DV Investigations Involving Employees), GO 627 (DV Incident Investigations), and GO 118 (DV Division). These policies meet the requirements of the paragraph and follow generally accepted policing practices.

Case reviews during this reporting period continue to yield similar findings as those discovered in previous CMRs. The Monitor's overarching assessment of DV cases mirrors that of SA investigations. PRPB faces a pressing need to enhance the management of the quality, content, and accuracy of crime or incident records. Within the scope of case file evaluations during this reporting period, inconsistencies have been identified in file organization and the use of forms. The files display a lack of structure and appear to be haphazardly assembled. Furthermore, there is an observed discrepancy in the depth of detail and interview techniques employed across cases. Some victim interviews are handwritten by the victims themselves, while others are transcribed by officers. Most notably, investigations appear to focus solely on the case elements initially reported. In cases where victims did not cooperate with the officer or declined to press charges, the cases were promptly closed, and no subsequent follow-up was conducted.

The provision of DV advocacy referrals to victims has been inconsistent within PRPB. While some cases did indicate that investigators provided victims with "next step" information, a form used by PRPB to guide victims on finding a safe location away from the abuser, not all cases contained documentation of advocacy referrals.

Additionally, PRPB's interview techniques in these types of cases require attention, as they presently lack a victim-centered approach. This includes the assignment of an advocate for the victim's support. If PRPB is indeed incorporating this element into the investigative process, it is not consistently noted in the case files. However, it's crucial to emphasize that PRPB still needs to bolster its agents' capabilities in conducting trauma-informed interviews, indicating that further progress is required in this specific area.

The examination of DV reports has revealed that each region of the island employs its own distinct police report template. Specifically, four different report styles were reviewed, namely Aibonito, Arecibo, Bayamon, and Fajardo. Notably, while some reports were computer-generated, the majority were handwritten, which contributed to challenges in readability and comprehension.

Interestingly, certain files included evidence of supervisor approval, accompanied by signed documentation indicating their endorsement of the reports. This practice represents a commendable measure aimed at maintaining accountability among supervisors for follow-up actions and ensuring the thoroughness of the reports.

144

A notable positive outcome stemming from previous recommendations was the development of an investigative checklist, a suggestion made to enhance the management of investigations. The USDOJ extended its support to PRPB in this regard, offering technical assistance on this important topic. On November 17, 2021, the USDOJ furnished PRPB with a checklist and associated resources to facilitate the investigative process, particularly in SA cases. As a result, PPR 118 (Investigative Checklist) tailored for use by DV investigators, was created. This document is recognized as a valuable resource, and its introduction was noted as a positive step in this reporting period.

*Pathway Forward*

Consistent with recommendations from previous CMRs, training should equip PRPB with the essential tools to consistently provide appropriate services to victims of DV crimes. The primary goal of the police response should be to collaborate effectively with partner agencies when assisting victims and serve as a model of professionalism in delivering victim-centered services. Educating officers about techniques and available resources should also be a crucial component of their initial response.

Presently, PRPB's police reports include two noteworthy processes: an orientation notification, which clarifies to the victim or reporting party that the questions asked during the call will not hinder PRPB's response or the assistance they will receive, and a victim escape plan. While these notations are important in a police report, they do not alone characterize PRPB's role and interactions with victims as a fully victim-centered approach. Further efforts in the interview techniques and training are needed to achieve that goal.

For a comprehensive list of resources in Puerto Rico, individuals can refer to the following link.[3] This information can be invaluable in connecting victims with the support they need to navigate the challenging circumstances of domestic violence.

The implementation of a standardized report template throughout PRPB is imperative. PRPB already uses an RMS for generating police reports and enforcing uniformity in police reporting will yield several benefits. First, it ensures the accurate collection of information and guarantees that all essential components of the case are consistently provided. For instance, in the computer-generated report, there is a section dedicated to recording the services provided to the victim, which is not present in other report templates. This inclusion is pivotal as it fosters continuity of services for the victim. Moreover, a standardized report template provides investigative officers with a comprehensive document detailing all the pertinent facts, circumstances, and timelines of the events associated with the incident. This not only enhances the quality of investigations but also streamlines the process for officers, making it more efficient and effective.

Additionally, the recent court approved SA/DV Plan is poised to greatly assist PRPB in responding to the intricacies and mechanics of these investigations in a highly professional manner. This plan will serve as a valuable framework, providing PRPB with clear guidance and procedures for addressing SA and DV

---

[3] https://www.womenslaw.org/find-help/pr/advocates-and-shelters/local-programs

cases. It will contribute significantly to enhancing PRPB's overall response and approach to these critical matters.

## Paragraph 99: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. ☒ Met ☐ Missed

2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph. ☒ Met ☐ Missed

Note: This Paragraph is assessed with Paragraphs 93, 94, and 98. The conduct envisioned by this Paragraph may also fall within the purview of Paragraph 184.

### Compliance Assessment

In review of target one, the Monitor's Office reviewed and approved GO 607 (Incidents of Sex Crimes Committed by Employees) and GO 644 (Investigation of Employee DV Incidents). These policies were approved December 20, 2022, and the Monitor's Office found the policies to adequality address SA and DV cases that involve PRPB members.

In review of target two, the Monitor's Office reviewed 17 cases involving PRPB members to assess that weapons were seized and that a psychological fit for duty was conducted. PRPB is required to provide a receipt of seized weapons. There are several forms that PRPB can use depending on what the Bureau is to collect from the agent. Forms such as PPR 605.4 (Receipt of Less Lethal Weapons), PPR 618.2 (Receipt for Loaded Regulation Weapons and Ammunition), PPR 618.4 (Certification of Receipt of Weapons and Ammunition), and/or PPR 618.13 (Receipt of Regulation Weapon). Additionally, the agent is to be referred to psychological services for an evaluation before returning to duty. It was noted in the 17 cases that PRPB does adhere to this stipulation of the policy.

Upon reviewing the 17 cases, the Monitor's Office observed a consistent pattern wherein the initiation of a criminal case involving a PRPB member is accompanied by the initiation of a corresponding

146

administrative case. This practice is in line with PRPB policy, which outlines the appropriate supervisory measures to be taken in response to incidents involving PRPB members.

## Pathway Forward

Maintaining a stringent accountability system for the management of criminal cases involving PRPB personnel is of paramount importance. It is crucial to emphasize that no one is above the law, and while PRPB bears the duty and responsibility of assisting the public, it must equally adhere to the policies and procedures it has established for policing its own ranks. Specifically, the policy-driven actions of seizing weapons and referring PRPB members to psychological services when they are implicated in SA or DV cases must be consistently enforced and thoroughly documented. These measures are critical to upholding the integrity and professionalism of the police force. Both targets associated with this paragraph are integral components of a comprehensive review aimed at evaluating how PRPB governs itself. This represents an area in which PRPB can make substantial improvements to ensure transparency, accountability, and compliance with its own policies.

## Paragraph 100: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of domestic violence investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track domestic violence arrests by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☑ Met   ☐ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☑ Met   ☐ Missed |

### Compliance Assessment

PRPB provided a document in its annual report that provides a breakdown of victim details by gender, the number of arrests, the cases where an investigation led to an arrest, the instances where a prosecutor ratified a charge, and the number of convictions. This report covers the 2022 reporting period and specifically addresses SA and DV cases. This comprehensive reporting not only offers insight into the gender distribution of victims but also tracks the progress of investigations and legal outcomes related to these critical matters.

147

*Pathway Forward*

PRPB should maintain the practice of publishing its disposition tracking system, which encompasses both the collection and final disposition of information related to cases. It is imperative that PRPB includes public dissemination of DV dispositions as a component of its annual report. This should encompass essential details such as arrests, whether the prosecutor decided to charge the suspect, and whether convictions were achieved.

Furthermore, the annual report should continue to provide comprehensive information about DV assaults categorized by gender, shedding light on the gender dynamics involved in these incidents. Incidents in which more than one participant is arrested should also be documented and included in the report. This level of transparency in reporting ensures that the public is well-informed about the outcomes of DV cases and the efforts being made to address them.

## V. Recruitment, Selection, and Hiring

Recruitment, Selection, and Hiring is assessed on an annual basis. Paragraphs 101 – 108 were assessed in CMR-8 and will be assessed again in CMR-10.

# VI. Policies and Procedures

For the twelve-month period covering CMR-8 and CMR-9 (October 1, 2022 through September 30, 2023) the Monitor's Office reviewed and, in some cases, approved 119 policies, manuals, regulations, and guides under Paragraph 229. Forty-two of those documents were signed and approved by the Police Commissioner and published in PRPB's Virtual Library, while 18 remained unpublished. As noted by the Monitor's Office in previous CMRs, PRPB policies routinely direct its personnel of the need to abide by the Bureau's rules and regulations, as well as Commonwealth laws and constitutional guarantees. Personnel are also instructed to report any policy violations they observe or are aware of; the policies also detail the consequences for failure to abide by the policies and/or failure to report violations by others. PRPB provides new and revised policies to its personnel through a web-based Virtual Library system, which is also available to the general public through its website.

The Monitor's Office often accesses the Virtual Library for its own work and continues to find it to be easily accessible and searchable by subject, title, or keyword. However, the Monitor's Office has observed that often updated or new policies and procedures are not published in a timely manner, as required by the Agreement.

PRPB has stated to the Monitor's Office that, in addition to the Virtual Library, PRPB personnel learn of new and revised policies and procedures via Policia Informa, Outlook emails, and through monthly trainings held at each Police Area. Although PRPB does not yet have the technology in place to be able to verify or confirm that officers open and read the policies sent via Policia Informa and Outlook, it has stated that it is working on developing an electronic system to accomplish this goal. In interviews with the PRPB Policy Development director, the Monitor's Office was informed that PRPB looked into purchasing an off the shelf system to maintain and track policies, but decided against it as it was cost prohibitive. Instead, they are planning to develop an in-house system and will present it to the Monitor's Office for review when developed.

As noted in previous CMRs, training on and the implementation of a number of policies continues to be behind schedule. An example of this is GO 310 – Performance Evaluations. This policy was approved and signed by the Commissioner in February 2023, but training has not yet been developed, despite the expectation that the new evaluation process will be implemented in January 2024. However, PRPB has informed the Monitor's Office that it is developing its own virtual training system, and they are hoping to be on track with training by the next reporting period.

Overall, the Commonwealth's compliance with the eight paragraphs within Policies and Procedures reflects similar progress to what was noted in previous CMRs. In CMR-7, 75% of paragraphs (6 paragraphs) were assessed as partially compliant and 25% of paragraphs (2 paragraphs) were assessed as substantially compliant. This holds true for the CMR-9 reporting period. See figure 6.



*Figure 6. Policies and Procedures: Paragraph Compliance Status*

## Paragraph 109: Policies and Procedures – General Provisions

*Policies and procedures shall reflect and express PRPD's core values and priorities, and provide clear guidance to ensure that officers and civilian employees lawfully, effectively, and ethically serve the community. PRPD shall develop comprehensive and agency- wide policies and procedures to ensure consistency with, and full implementation of, each requirement of this Agreement. These policies and procedures shall define terms clearly, comply with applicable law, and comport with generally accepted policing practice. PRPD shall apply policies uniformly and hold officers accountable for complying with policies and advancing PRPD's core values and priorities.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 110-116, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

PRPB has created policies that comply with the Agreement and generally accepted policing practices. To achieve full compliance; however, PRPB must ensure that the policies are implemented with proper training, that it improves its ability to verify policy compliance in the field, and demonstrate this through the outcome assessments conducted as part of Paragraph 243.

151

During this reporting period, PRPB provided minimal in-service training to its officers, reaching an average course completion rate of 34% in five courses: Community Policing (43%), Arrests and Summons (43%), Search and Seizure (38%), Equal Protection/Non-Discrimination (21%), and Equal Employment Opportunities (26%). Training compliance requires that PRPB reach at least a 95% threshold on all policies. PRPB has reached that goal on only one course, REA 617/VCEP 3081 (Code of Ethics). Because training on policies is seriously lacking, policy implementation is also not in compliance.

Further complicating the above, is the Monitor's Office's continued finding that PRPB fails to hold its personnel accountable for failing to follow policies as evident in arrest reports the Monitor's Office has analyzed in previous and current reporting periods. As noted in the Search and Seizure section, a significant number of arrest reports reviewed during this reporting period failed to properly document probable cause, a requirement under PRPB GO 615 Arrests and Summons. Further, in all cases reviewed by the Monitor's Office, supervisors signed off on these reports and appeared to take no steps to address these policy violations.

Despite the above, PRPB has generally maintained a good pace in new policy creation and in the review and updating of existing policies, forms, guides, and manuals. However, due to its slow pace in training and implementation of existing policies, the Monitor's Office rates this paragraph partially compliant.

### *Pathway Forward*

PRPB should accelerate much-needed in-service trainings and practical exercises to reach substantial compliance with the Agreement. PRPB should also leverage its monthly training sessions conducted at the Area Commands, its virtual training system, and begin shift roll call sessions to train officers on recently revised policies. Not all revisions to policy require comprehensive training courses or extensive updates to training materials.

### Paragraph 110: Policies and Procedures - General Provisions

*PRPD shall develop and publish a department-wide policy and procedure manual that will include all policies, procedures, and regulations governing all administrative and operational aspects of PRPD. The manual shall be organized by subject-matter and indexed for reference.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| 1. The Policy and Procedures Manual is complete, organized, and indexed, as required by the Agreement. | ☑ Met ☐ Missed |
|---|---|
| 2. The current Policy and Procedures Manual is accessible to officers in 95% of selected precincts and units. | ☑ Met ☐ Missed |

*Compliance Assessment*

PRPB's Virtual Library (GO 409) has been deployed since late 2021 and is listed on the PRPB website for easy access by officers and the public using a computer or smartphone and is searchable by subject, keyword, and title. It contains all PRPB approved policies, forms, guides, and manuals. Thus, it qualifies as the Policies and Procedures Manual. For this reporting period, PRPB's Policies and Procedures Office submitted 119 items to the Monitor's Office for review and approval. Forty-two were signed and published on PRPB's Virtual Library, and 18 remained unpublished. Despite the lag in publishing the latest updates of policies onto the Virtual Library, as noted in previous CMRs the Monitor's Office finds that the Policy and Procedures Manual is complete.

*Pathway Forward*

PRPB's Virtual Library system is a great tool and has helped the Bureau to reach partial compliance with this paragraph of the Agreement. However, if PRPB continues to lag in its publishing of recently revised policies, then compliance will be negatively impacted.

PRPB must ensure that all policies, procedures, and manuals are reviewed as required, kept up to date, and listed on the Virtual Library for consumption by officers and the public.

## Paragraph 111: Policies and Procedures - General Provisions

*PRPD's unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. PRPD shall develop unit-level policy and procedure manuals for, at a minimum, the following PRPD units or functions:*

*a) Field operations, including patrol, special and tactical operations, field support, special weapons and tactics, canines, supervision task forces, and mass demonstration or event policing;*

*b) SPR, including case and records management, administrative investigations, confidential investigations, parallel criminal and administrative investigations, FIU investigations, audits, and officer drug testing;*

*c) Use of Force Reporting, Investigation, and Review, including both Supervisory and Serious Use of Force Investigations and Review; and In- Custody Death Reviews;*

*d) Criminal investigations, including sub-units assigned to investigate homicides, sexual assaults, domestic violence, narcotics, vice, and illegal firearms; and*

*e) Recruitment and Training, including training provided by UCCJ and in- service training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | | Annually |

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Unit-wide policies and procedures are collected in manuals for each of the five areas specified in the Agreement. | ☑ Met | ☐ Missed |
| 2. The current unit-level policy and procedures manual is accessible to officers in 95% of selected precincts and units. | ☑ Met | ☐ Missed |

### Compliance Assessment

PRPB created a Virtual Library (GO 409) that is available to all through its website. It contains all required policies, procedures, and manuals and made them easily accessible to all PRPB personnel and to the public via an internet connection, including unit-wide policies. This digitized system makes searching documents by subject, keyword, and/or title an effortless process. The Monitor's Office has tested the system several times over the last two years, using a computer from the continental United States, searching for unit-level manuals and unit-wide policies, and the system has responded quickly with the requested information every time. Also, all four-unit level policies (GOs 608 (Negotiators), 645 (Investigation of Elderly Incidents), 145 (Maritime Surveillance Division), and 412 (Audio Recordings)) approved and signed by the Commissioner this term, have been published on the Virtual Library.

### Pathway Forward

PRPB's Virtual Library is a useful tool that provides easy access to policies, procedures, and manuals via the PRPB website. For the most part, PRPB has been diligent in keeping the Virtual Library up to date and thus is on a good path to full compliance.

## Paragraph 112: Policies and Procedures - General Provisions

*PRPD shall review each newly developed policy after it is issued and revise the policy as necessary to ensure that it provides effective guidance to PRPD personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies on policy development incorporate the requirements of the paragraphs. | ☑ Met | ☐ Missed |
| 2. Orientation on policy development protocols is consistent with approved protocols. | ☑ Met | ☐ Missed |
| 3. 95% of policies and procedures due for review during the evaluation period are reviewed and, as necessary, revised. | ☐ Met | ☑ Missed |

154

| | | |
|---|---|---|
| 4. Stakeholder comments are reviewed and considered as part of the policy review process. | ☐ Met | ☑ Missed |
| 5. Internal comments and recommendations are reviewed and considered as part of the policy review process. | ☐ Met | ☑ Missed |
| 6. Policies are posted online in a timely manner or otherwise made available to the public as required by approved policies. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB uses Appendix A (Policy and Procedure Development Process) of the approved Action Plans dated June 22, 2017as a policy development protocol that aids in developing policies that comport to generally accepted policing practices, Commonwealth laws, and constitutional guarantees. All policies are developed by the Policies and Procedures Section of the Reform Office, which is composed of attorneys and civilians and incorporate the requirements of the Agreement.

One hundred and nineteen policies, manuals, guides and regulations were reviewed by the Monitor's Office during the twelve-month period encompassing CMRs-8 and 9 (October 1, 2022 to September 30, 2023). Of these 119, 42 (35%) were approved and signed by the Commissioner and published in the Virtual Library as of the end of this reporting period. To comply with this paragraph, PRPB must reach at least 95% of policies reviewed and/or revised. PRPB also submitted documentation (Document #CMR9-1.1-28abril-23-PP-192) to the Monitor's Office certifying that all comments on policies received directly from work units by email are discussed during meetings with units affected by these policies and regulations. PRPB stated they receive comments from other stakeholders and the public through the Virtual Library. They added that all recommendations and comments are considered during policy development. However, PRPB stated they have not received comments from Citizen Interaction Committees (CICs) on any of the policies sent to them for review during this reporting period. The Monitor's Office checked the Virtual Library and observed that all public policies, regulations, and manuals are linked to a page where comments can be provided by anyone.

The Policy Development Director is also working on developing an online calendar that will facilitate quick and timely access for the Parties' reviews and comments. It is in the early stages of development.

Further, as noted in previous paragraphs, per GO 409 (Virtual Library), updated policies must be posted to the Virtual Library within two days of its approval (Section VII.B.1.g). The Monitor's Office found that in 18 instances policies and other documents were not published according to this policy requirement.

*Pathway Forward*

PRPB must accelerate policy review and approval, as well as the posting of approved policies on the Virtual Library in a timely manner to achieve compliance.

## Paragraph 113: Policies and Procedures - General Provisions

*PRPD shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of a policy deficiency, and biannually thereafter. PRPD will develop a schedule for the biannual review. PRPD shall make revisions as necessary to ensure that policies and procedures remain consistent with this Agreement, generally accepted policing practice, and current law. All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner. Reasonable exceptions shall apply to policies and procedures that are law enforcement sensitive.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed together with Paragraph 112.

### Compliance Assessment

PRPB generally creates new policies and reviews existing ones in a timely manner. However, for this reporting period, PRPB is somewhat behind on policy review and approval, as some 18 policies, manuals, guides, and regulations reviewed by the Monitor's Office have not yet been posted. For example, GO 612 (Searches and Seizures) and GO 615 (Arrests and Citations), have been delayed pending the completion of PRPB's Search and Seizure Implementation Plan, which is in development as of this report writing. One hundred and nineteen policies, manuals, guides, and regulations were reviewed and/or approved by the Monitor's Office during this reporting period, of which 42 were signed by the Commissioner and published in the Virtual Library.

The calendar provided by PRPB on policy review lacks some important details and PRPB is working on its improvement. The Policy Development Director is working on an online calendar of all the policies and their review due dates and will produce it for the Parties for review and comment. However, it is in the early stages of development.

As noted in previous paragraphs, PRPB's Virtual Library is available to the public and anyone with a computer or smartphone and internet service and it can be searched by subject, title, or keyword. The Monitor's Office has used the Virtual Library for its own work and found it to be easy to use and responsive to searches.

Due to the lack of timely approval and publishing of policies and failure to review all policies due for review this reporting period, and PRPB's partial compliance with Paragraph 112, the Monitor's Office also rates this paragraph as partially compliant.

### Pathway Forward

PRPB must accelerate policy review and timely approval and publication of policies. It must make an effort to create and maintain an efficient policy calendar listing details, such as when a policy is due for review, date approved, and date posted for public consumption.

## Paragraph 114: Policies and Procedures - General Provisions

*Within a reasonable period of time, PRPD shall ensure that all relevant PRPD personnel have received, read, and been trained on all new or amended policies or procedures as necessary to fulfill their role as required by policies and procedures, including the obligation to report any policy or procedure violation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate the requirements of the paragraphs. | ☑ Met  ☐ Missed |
| 2. Training on information systems and agency communications is consistent with approved policies. | ☐ Met  ☑ Missed |
| 3. 95% of selected officers received and opened all agency transmittals with policies that were approved and issued during the evaluation period. | ☐ Met  ☑ Missed |
| 4. 95% of selected precincts or units notified personnel of new or revised policies related to the Agreement that were approved and issued during the evaluation period through monthly academies. | ☑ Met  ☐ Missed |
| 5. 95% of selected personnel received notification of policies advising that they may be subject to discipline, possible criminal prosecution, and/or civil liability for violating PRPB policy. | ☑ Met  ☐ Missed |

Note: Compliance with the training requirements in Paragraphs 114-115 will be based on the assessments for Paragraph 119 regarding pre-service training for new recruits and Paragraph 129 regarding in-service training for existing personnel.

### Compliance Assessment

All policies and procedures created by PRPB generally comply with paragraph requirements. Training on information systems has been lacking, especially for tenured officers. During site visits conducted this reporting period, the Monitor's Office interviewed several front desk officers at various districts and units. Part of the duties for front desk officers (or Retens) is to operate the Bureau's GTE and CAD systems for complaint/incident report intake. Many tenured officers assigned the task of front desk duty stated that they had to learn to use the system on their own or through another officer who also had learned it on his/her own. They received no formal training from PRPB. Such was the case in the districts of Carolina Oeste/Norte and Vega Alta. Only recently graduated officers had formal training on the systems (Districto Turistico and Levittown District as examples).

Reform Office officials stated that officers learn of new and revised policies via Policia Informa and Outlook emails and through monthly academies held at each police area. Roll calls held before each shift

are also methods of instruction used throughout the Bureau. Although, PRPB is not yet able to verify or confirm that officers open and read the messages sent via Policia Informa and Outlook, PRPB stated that it is working on developing a system to do so. In interviews with the Policy Development Director, the Monitor's Office was informed that the Bureau investigated buying an off the shelf system to accomplish this task but decided it was cost prohibitive. Instead, they are planning to develop an in-house system and will present it to the Monitor's Office for review when ready.

Training on policy is behind schedule as is the implementation of those policies. As of the end of the reporting period, PRPB has achieved only a 34% overall rate in in-service training on five courses this reporting period, well behind the required 95% rate. However, PRPB has informed the Monitor's Office that it is in the process of developing an in-house virtual training system and they are hoping to catch up with training by the next reporting period. However, the system has experienced some delays and the practical exercises that must be conducted concurrent with some of the trainings, such as training on GO 615 (Arrests and Citations), GO 310 (Performance Evaluations), and GO 612 (Searches and Seizures), have not yet been scheduled. Additionally, the Monitor's Office has been informed by commanders during site visits to districts and units conducted during this reporting period that very few of their officers have received training on computer systems, including the GTE module, which is used often to enter incident information and obtain incident/complaint numbers.

*Pathway Forward*
PRPB must ensure it provides the required training (virtual, in-person, and practical) to comply with the Agreement. Further, PRPB must verify that all officers are opening and reviewing newly revised and newly created policies and procedures.

### Paragraph 115: Policies and Procedures - General Provisions

*PRPD shall document that each relevant PRPD officer or other employee has received, read, and been trained appropriately regarding PRPD's policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 114.

*Compliance Assessment*
As stated in Paragraph 114 above, the Director of the Policy Development Office and command officers interviewed at various Area Commands can only guarantee that PRPB personnel are notified of new or

revised policies through their "Policia Informa" system, emails, roll calls, and monthly academies. The Policy Development Director informed the Monitor's Office that the Bureau researched purchasing an off the shelf system to verify when officers open their emails but decided it was cost prohibitive. Instead, they are planning to develop an in-house system and will present it to the Monitor's Office for review when ready.

Training on policy is seriously behind schedule, as is the implementation of those policies. However, PRPB has informed the Monitor's Office that its virtual training system is back online, and they are hoping to catch up with training by the next reporting period. At the end of the reporting period, PRPB informed the Monitor's Office that they have achieved only a 34% overall rate in in-service training on five courses, well behind the required 95% threshold.

*Pathway Forward*

Compliance with this paragraph is assessed together with Paragraph 114, and as noted above, the Monitor's Office stresses the importance for PRPB to either develop or procure a policy management system to demonstrate compliance with this paragraph. PRPB must also promptly address the lack of policy review, training, and implementation.

## Paragraph 116: Policies and Procedures - General Provisions

*PRPD shall advise all officers that taking police action in violation of PRPD policy may subject officers to discipline, possible criminal prosecution, and/or civil liability.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | NA | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 114.

*Compliance Assessment*

PRPB policies routinely advise personnel of the need to abide by the Bureau's rules and regulations, as well as Commonwealth laws and constitutional guarantees. Personnel are also directed to report any violation of policy they observe or are aware of; the policies also detail the consequences for failure to abide by the policies and/or failure to report violations by others. These statements are generally posted in the "General Dispositions" sections of each policy.

Follow through and accountability with failures to abide by policy are lacking within PRPB. As noted throughout this CMR, poor supervision and accountability continue to be a problem. While the policies make it clear that policy violations may lead to disciplinary action, the failure of supervisors to take note

and address these violations lead to systemic issues across other areas of the Agreement, such as Searches and Seizures.

*Pathway Forward*

Compliance with this paragraph is assessed together with Paragraph 114. PRPB must ensure its officers and supervisors adhere to the requirements of its own policies, rules, and guidelines to reach compliance.

## VII. Training

Training is assessed on an annual basis. Paragraphs 117 – 134 were assessed in CMR-8 and will be assessed again in CMR-10.

## VIII. Supervision and Management

During this reporting period, the Commonwealth continued to struggle with achieving compliance with this section of the Agreement. Although the Commonwealth promoted over 500 sergeants during this and previous reporting periods and was able to secure the 1 to 8 ratio in nearly all precincts and districts, lack of follow through in supervisory accountability, and a failure to develop and institutionalize adequate information technology systems to support supervision (i.e., Early Intervention System, EIS) continue to hinder PRPB's progress towards substantial compliance.

In addition to the sergeant promotions, in May 2023, 40 officers were promoted to inspector, 12 to commander, 12 to lieutenant commander and 4 to colonel for a total of 68 promotions, meeting the identified amount noted in the Staffing Plan. PRPB is currently working on a captain, 1st lieutenant, and 2nd lieutenant promotion test with the goal of promoting the much-needed ranks by August 2024. The Monitor's Office looks forward to reviewing this promotional process.

The development of EIS continues to be dependent on the implementation of the IT Corrective Action Plan (CAP). Inspections and audits also continue to be a concerning issue due to lengthy inspection completion and certification times. It was reported that the Commonwealth is still working with the OSM to draft policies and protocols related to Integrity Audits.

During officer and supervisor interviews, concerns were raised regarding the transfer unit, assignments, evaluations, and shortages of vehicles and low budgets for vehicle repairs. Several meetings with the personnel responsible for Staffing Plan updates, human resources personnel, and high-ranking officials, confirmed that they were aware of these concerns and noted that they are currently working towards solutions. PRPB needs to provide the proper updated supporting documentation showing progress towards these solutions to the Monitor's Office. Another issue identified during the interviews was the lack of roll call meetings. The main reason given was the lack of supervisors and personnel. It is the hope that with the increase in supervisory personnel, PRPB can re-establish these training meetings and roll calls.

PRPB has also yet to provide training on the new evaluation policy, which is scheduled to take effect in January 2024. This training should direct supervisors how to determine fair and effective scores and, more importantly, how to write the summaries supporting the scores. This training is imperative to the success of the new policy. Providing the proper training to the recently promoted 565 sergeants and 68 high ranking officials should alleviate the evaluation crisis.

Overall, the Commonwealth's compliance with the 19 Supervision and Management paragraphs assessed during this reporting period reflects improved levels of compliance to what was noted in previous CMRs. In CMR-7, 16% of the 19 paragraphs (3 paragraphs) were assessed as partially compliant and 5% of the 19 paragraphs (1 paragraph) were assessed as substantially compliant, in comparison to the current reporting period, where 42% of the 19 paragraphs (8 paragraphs) were found to be partially compliant and 5% of the 19 paragraphs (1 paragraph) were assessed as substantially compliant. See figure 8.



*Figure 8. Supervision and Management: Paragraph Compliance Status*

## Paragraph 135: Supervision and Management - General Provisions

*PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

Precincts and units in 8 of the 13 PRPB areas (62%) provided the Monitor's Office with PPR- 373 (Distribution of Personnel) for all units and precincts. During this reporting period, due to improved reporting and tracking, PRPB provided a more accurate and real-time understanding of operational activities and staffing challenges across the Bureau. Based on the interviews of high-ranking officers, there is a lack of communication between themselves and the administration. The Monitor's Office recommends that more effective communication of needed resources take place and the concerns and needs provided by the high-ranking officials in the field be heavily taken into consideration.

After the promotion of 565 sergeants, PRPB should be able to close the gap to comply with the Agreement requirement that supervisors not supervise more than 8 officers. As noted in the last status report on Staffing Plan implementation, nearly all areas have been assigned supervisors to address and meet the eight to one ratio.

Interviews with personnel, supervisors, and supervisees confirmed that supervision loads have improved to over 95% across the Bureau. It is expected that by FY 2024 PRPB should reach 100% compliance, which would be reflected during the CMR-10 reporting period. A 90-day status report on the implantation of the Staffing Plan was submitted on September 5, 2023. The promotion of the 565 sergeants should address issues identified as not compliant, such as: supervisors developing the ability to identify, detect, and prevent misconduct, to provide better direction and guidance to assist officers in becoming more effective in performing their duties, and the successful application of accepted policing practices.

*Pathway Forward*

During this reporting period, the Parties and the Monitor's Office continued to work on the implementation of the updated Staffing Plan. The Monitor's Office will continue to review the 90-day status reports to assess the Commonwealth's progress to achieve compliance with the staffing and supervision requirements of the Agreement and the initiatives and activities noted within the Staffing Plan.

PRPB needs to understand the importance of providing more accurate, updated, and consistent reports to confirm that officers and supervisors are receiving trainings, schedules, and assignments consistent with supervision policies and the Staffing Plan, which specifies the ratio of officers and supervisors per unit. Documentation, such as staffing logs, should be provided to the Monitor's Office.

## 1. Duties of Supervisors

First line supervisors must provide effective, clear, and consistent supervision of subordinates under their command. Supervisors should be able to motivate their officers to perform their duties lawfully, safely, and effectively. During this reporting period, training continues to improve as it is conducted in person. PRPB also has demonstrated its commitment to comply with the effectiveness of first-line supervisors by recently promoting supervisors, and more importantly, by providing training before taking over their duties. With this accomplishment, PRPB will provide effective management over officers in the field across all shifts in all area commands. During the CMR-9 reporting period, PRPB moved to partial compliance with these paragraphs. However, PRPB needs to continue to work on establishing recurring and effective promotional cycles to achieve and maintain substantial levels of compliance even after the Agreement is complete.

PRPB must develop and implement an updated and effective automated technology system in support of statistical records of their personnel to provide the Monitor's Office with a more accurate, updated, and consistent report to confirm that officers and supervisors are receiving trainings, schedules, and assignments consistent with the supervision policies.

## Paragraph 136: Supervision and Management - Duties of Supervisors

*All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 136-140. | ☑ Met | ☐ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | ☑ Met | ☐ Missed |
| 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | ☑ Met | ☐ Missed |
| 6. 95% of interviewed personnel perceive that supervision is close and effective. | ☐ Met | ☑ Missed |
| 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | ☑ Met | ☐ Missed |

### Compliance Assessment

During this reporting period, based on the Staffing Plan and the approval of GO 310 (Performance Evaluations), it was determined that current policies incorporate all requirements established in Paragraphs 136-140. This was also confirmed during interviews with a random sample of PRPB supervisors. Supervision training is consistent with approved policies. Scheduling the required supervision trainings not only to comply with policies, but also to improve the Bureau's quality of supervision must be made a priority. The Agreement stipulates that supervisors must receive approved training before they are allowed to assume their positions in PRPB. Supervisor training curriculum has been reviewed by the Monitor's Office and has been implemented by PRPB. PRPB produced reports that the 565 sergeants promoted between February and June 2023 attended the mandatory 40-hour training at the Academy, consistent with approved policies. PRPB should continue to offer supervisor trainings on a consistent basis and ensure that all supervisors receive the required trainings on a yearly basis.

165

During this reporting period, it was determined that there was improvement in officer and supervisor schedules, assignments, and ratios. In a recent Staffing Plan status report, PRPB stated that the redistribution of personnel should be completed by the end of FY 2023. After the reported assignments and deployments of new supervisors, the low morale issues experienced by PRPB members, units, precincts, and the agency as a whole, should improve and make the agency more professional and effective.

While several officers were promoted during the reporting period, PRPB is still not compliant due to the recognized issue of lack of personnel and supervisors throughout the reporting period. The recent promotions should alleviate supervision challenges and be demonstrable in the CMR-10 reporting period; however, the overall understaffing of personnel will continue to be a challenge. The Staffing Plan reflected that the Fiscal Oversight Board approved a total of 377 cadets during the current fiscal year. PRPB reported 200 of the approved 377, were hired on June 30, 2023, which should help address the lack of officers. PRPB also reported the development of a system to promote recruitment and create incentives, retention, and professional development strategies to increase the number and quality of personnel. PRPB needs to continue to work towards improving the recruitment methods to attract candidates to the organization and create incentives to retain current officers. In the Staffing Plan, PRPB reported identifying the need for 740 supervisors for 110 precincts. With the 565 new supervisors, PRPB will be able to close the gap of the identified 740 needed supervisors. This is a great improvement and demonstrates the commitment PRPB has to comply with the Agreement. Another significant achievement was the promotion of the 68 high ranking officials in May 2023. These substantial improvements should be reflected in the next reporting period and help close the gap to compliance by CMRs-10 and 11.

*Pathway Forward*

During the past 6 months, DSP and PRPB leadership promoted 565 sergeants and 68 high ranking officers. Both demonstrated how important it is for DSP, PRPB, and the Puerto Rican Government to address the lack of supervisors and administrative issues within PRPB. The impact of these improvements should be reflected in the next reporting period and help close the gap to compliance by CMRs-10 and 11. The Monitor's Office will continue to evaluate PRPB's compliance with this paragraph in CMR-10 considering the recent promotions.

### Paragraph 137: Supervision and Management - Duties of Supervisors

*First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2023 – September 2023 |



| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

## Compliance Assessment

During this reporting period, PRPB demonstrated their commitment and determination to comply with the Staffing Plan required by paragraph 13. PRPB recognized that being compliant with the Agreement, will not only satisfy the requirement, but will also gain the respect and confidence of the community and, more importantly, will increase the department's professionalism. With the promotion of the sergeants and high-ranking officials, PRPB is heading towards compliance. These promotions will make a major impact on the Bureau's supervision system.

PRPB provided the Monitor's Office with PPR-373s (Distribution of Personnel) for 8 areas. The PPR-373s indicate that supervisors should not supervise more than 8 individuals. PRPB provided the Monitor's Office with documents demonstrating that of 106 identified units and districts only 7 are not meeting the ratio, which meets the Agreement requirements. However, during interviews, supervisors and supervisees are reporting that a few supervisors are still assigned to supervise more than eight officers, but this is not being reported as frequently as in prior reporting periods. In the past it was reported that supervisors supervised officers in at least three different area commands, but that is not the case during this reporting period, showing improvement.

Supervisors interviewed during this reporting period reported equality in assigned supervisees. None of the interviewed supervisors reported supervising more than eight supervisees, demonstrating improvement in the Bureau's supervision due to the recently promoted sergeants. Also, during this reporting period, it was not reported that a lieutenant or a captain was assigned to the same unit when other units have none assigned. This issue has been reported in the past, indicating that PRPB has made improvement with better and more effective assignments.

During this reporting period it was determined that most sergeants are consistently working the same shift as the officers they supervise, an improvement from the past. For the first time the PPR-373s (Distribution of Personnel) are starting to be consistent with what is being reported by the interviewed personnel. It is expected that after these promotions, CMRs-10 and 11 should reflect enough improvement in supervision that will lead PRPB to compliance with these paragraphs. However, this is only the beginning, PRPB still must address issues related to supervision, training, and policy. The Monitor's Office recognizes PRPB's efforts so far, but still finds that PRPB is only partially compliant with Paragraph 137 in part due to the lack of an adequate information technology system to support supervision, especially as is relates to reporting accurate and efficient staffing data.

*Pathway Forward*

As in the past reporting period, PRPB continues to show minimal improvement in IT systems. The Monitor's Office continues to have issues identifying accurate and efficient staffing data. During the Monitor's Office site visits, several IT demonstrations were presented to the team. Some of these demonstrations show improvement, but others do not. PRPB needs to develop a consistent and effective data processing system that enables them to provide the Monitor's Office with more accurate and efficient staffing data. If developed and implemented, this data system will make PRPB effective and efficient at monitoring supervision practices and workloads and improve the upper management team and overall supervision within the organization. The Monitor's Office as well as DSP and PRPB management are currently working with Gartner Inc., an independent contracted company, to develop and implement an accurate automated system that should make it effortless for PRPB to generate data from the 13 area commands to account for their personnel, including the management responsibilities for each of the departments.

## Paragraph 138: Supervision and Management - Duties of Supervisors

*PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

During this reporting period, PRPB promoted 522 sergeants in February 2023 and an additional 43 in June 2023, for a total of 565 sergeants. Furthermore, in May 2023, they promoted 40 inspectors, 12 commanders, 12 lieutenant colonels, and 4 colonels for a total of 68 high ranking officers. Based on these promotions and their strategic assignments, PRPB will be able to provide more consistent, effective, and professional supervision to their officers, which will improve compliance for this paragraph. More importantly, in addition to satisfying the needs of the Bureau, it will promote a sense of security and respect by the community. After the distribution of the promoted supervisors, PRPB leadership will have sufficient first-line supervisors to cover supervisory absences, which has been a challenge in the past. The need for acting supervisors, lieutenants, and captains covering first-line supervisor duties will not be necessary. With this accomplishment, DSP and PRPB have demonstrated their commitment to making the Staffing Plan their highest priority.

In the Staffing Plan, PRPB identified that 740 supervisors in 110 precincts were needed to have a supervision ratio of 6 supervisors per unit to cover 3 shifts with an additional relief. The promotion of 565 first-line supervisors closes a significant gap. PRPB submitted an official distribution of the promoted supervisors to comply with staffing needs. The Monitor's Office recognizes and commends DSP and PRPB's commitment to bringing the supervisory staff up to the identified needed levels that will make PRPB effective, efficient, credible, and most importantly, earn the needed community admiration and respect. PRPB recognized the need for an updated and effective automated technology system in support of statistical records of their personnel but has yet to develop this system.

*Pathway Forward*

During this reporting period, the Monitor's Office continues to identify the lack of an updated and effective automated system that allows PRPB to track statistics that will keep the Bureau's personnel and information updated and accurate. As previously reported, the Monitor's Office, DSP, and PRPB are currently working and coordinating with Gartner Inc., an independent contracted company, to develop and implement an effective automated system. PRPB recognizes the need and is aggressively working to establish an effective system that will help them correctly account for information, statistics, workload, and crime analysis data for all investigative divisions. This automated system will enable the Bureau to be effective, efficient, and credible in addition to complying with the Agreement.

Furthermore, PRPB's promotional efforts as defined in the Staffing Plan will achieve the adequate number of needed supervisors identified during the needs assessment. As a result of the Staffing Plan, PRPB has made some improvements in capturing and tracking UOF reporting. The Monitor's Office will continue to work with PRPB as it implements the initiatives identified in the Staffing Plan.

## Paragraph 139: Supervision and Management - Duties of Supervisors

*Precinct and unit commanders shall closely and effectively supervise the officers under their command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

During this reporting period, the Monitor's Office interviewed a random sample of approximately 8 supervisors, 46 supervisees, and reviewed limited documentation. The Monitor's Office acknowledges

169

the limitations in our ability to provide a comprehensive analysis based solely on this information. The lack of an adequate information technology system to support this information is noted. However, at this point and based on the information provided, the Monitor's Offices has to conclude that PRPB management is providing close and effective supervision. The recently promoted supervisors support this conclusion and should provide further confirmation in CMR-10. Common themes in feedback gained from these interviews continued to be very similar to what has been reported in past CMRs. The following comments were also made or repeated by interviewees:

## The Agreement

During officer interviews, officers advised being familiar with the Agreement, but only five officers reported completely reading the Agreement. However, all interviewed officers reported reading and being familiar with the UOF section. As in the past, the reason provided for not reading or being familiar with the Agreement was the lack of time, too many assignments, and responsibilities due to the shortage of personnel. Furthermore, over 95% of respondents expressed favorable and positive comments on the entire PRPB organization, giving credit to the Agreement. Consistent statements made by officers as well as supervisors include the following:

"The Agreement has made us a professional organization, has provided more effective and better guidance for management as well as for officers. Among the skills developed are better decision making, training, equipment, and organizing and planning. The civilian communities are starting to understand and accept our responsibilities, risks, and dedication to making the island a better place. We are starting to feel better support from our management as well as from the communities. Some sections of the Agreement like the UOF are discussed during the monthly meetings known as "Academia."

## Consistent Supervision

The promotion of sergeants and high-ranking officials in 2023 increased PRPB's ability to comply with the Staffing Plan, the Agreement, and become a more effective and well-respected organization. Interviewed supervisors expressed that the promotion of new sergeants has allowed them to do their jobs more effectively and only be responsible for a maximum of eight officers. They also advised that evaluating eight or fewer officers will give them adequate time to conduct a more fair and effective evaluation of each officer. In addition, they will not have to evaluate officers that they do not directly supervise when a supervisor retires, transfers, goes on sick leave, or vacation. Also, during interviews, it was advised that with the new supervisors, lieutenants or captains will not have to perform sergeant duties and there is no need for assigning senior agents to provide supervision in the field. The Monitor's Office believes that with the recently promoted sergeants, supervision at PRPB will be more consistent and effective leading to compliance with the Agreement.

As stated above, the deficiencies or issues identified with supervision should improve and there should be no reason for sergeants to work long hours on the streets, but instead to focus on performing their official duties. However, if needed, sergeants should be available provide assistance in the field. Also, there will be no need for acting supervisors. Addressing all identified issues will alleviate the lack of communication among high-ranking officers, which was also reported as a challenge. Instructions or

directives will be distributed in a timely, proper, and correct manner, which will minimize mistakes and increase compliance with orders.

Like in other CMRs, interviewees continued to report issues with many disarmed officers conducting civilian administrative work but getting paid regular officer salary. The assignments for the disarmed officers are physical maintenance, building repairs, and vehicle maintenance, while again, still getting paid as a sworn officer. Interviewees reported that it is well known within management that some of those officers' report having emotional or personal problems to purposely get disarmed and be put on light duty, at times for long periods, while still getting regular pay. The Monitor's Office has and continues to express that this system needs to be reviewed and managed in a way that officers abusing the system can be correctly identified and medically assessed to determine when they can return to duty or if incapable of performing law enforcement duties, be re-assigned to a civilian position, and be compensated accordingly. The Monitor's Office believes this is fundamentally unfair to all those concerned and is a significant issue for morale within PRPB. In the Staffing Plan, it was reported that approximately 674 officers have been identified as having medical issues and assigned to administrative duties. It was also reported that on January 30, 2024, 323 of these officers (48%) are scheduled to be examined by a Medical Board to determine their availability to return to officer duties.

## Promotions

During this reporting period, a significant number of interviewed officers stated no interest in seeking a promotion. The main reasons provided for the lack of interest continued to be the same: supervisors not motivating personnel, low salary increases with more responsibilities, and most importantly, the fear of being transferred out of their current region. According to the provided assignments of the recently promoted sergeants, a majority were assigned within their territory. This action by the PRPB administration will diminish the concerns of being assigned out of their territories if promoted. Qualified and competent officers will gain interest in promotions, helping PRPB to get the best and most competent candidates for supervision.

## Equipment

Once again, interviewed officers reported being pleased with their received personal equipment (tasers, bullet-proof vests, flashlights, etc.). However, officers continue to express the need for specialized vehicles such as SUVs to cover difficult terrains within their territories. It was reported that during the first week of September 2023, PRPB provided 900 new vehicles to the force, which should alleviate the shortness of reported vehicles. Furthermore, as during past CMRs, officers continued to advise that most of the patrol cars do not contain computers, or if they have computers, they do not properly work, forcing officers to return to their offices to complete reports. In addition, officers reported an insufficient number of updated computers at the office, which forced officers to spend unproductive time at the office instead of performing their duties in the field.

The lack of proper and working computers in the vehicles prevented officers from accessing vehicle and personnel records during traffic stops that can, on some occasions, turn into a safety issue. Officers are forced to call the office or "Centro de Mando" and wait for the requested records. The interviewed officers stated that sometimes the process starting from the moment they stop the vehicle until the end of the intervention could take up to 30 minutes, which can upset the civilian and turn into

171

another safety issue. They also stated there have been situations where after issuing a ticket, officers do not know if the driver or others had an arrest warrant or a criminal record, another security issue. Officers identified their personal cell phones as the most reliable communication tool. Another inexcusable issue, again identified during interviews, was that officers use their own money to repair official vehicles. Such repairs included brake pads, air conditioning systems, tires, and other minor repairs. Also, some repairs are done by the officers themselves. Officers reported that the excuse is always budget constraints. They stated that sometimes disabled vehicles can be parked for months, years, or sometimes forever.

## Evaluations

CMR-9 has not revealed any changes to the evaluation system. Officers continue to report not having any confidence in the performance evaluation system and believe that the evaluations have no relevance to their job or future careers. Most stated that they just agree and sign their evaluation. Officers stated that most supervisors will not discuss evaluations with officers unless officers challenge the score. Over 95% of officers interviewed advised that they received evaluation ratings no lower than a 4. PRPB provided 92 performance evaluation samples and only 1 had a score of below four, indicating a major significant score inflation. The perception by officers is that supervisors will evaluate high, so they do not have to deal with complaints or issues. Officers explained that supervisors emailed them their evaluations for signature and never met to discuss performance or career advancement opportunities. Several officers stated that the inflation of scores is a major issue for PRPB morale. Under the updated policy, GO 310 (Performance Evaluations), supervisors are required to discuss evaluations with their officers in-person, regardless of rating. The updated performance evaluation policy is scheduled to take place in January 2024, evaluations will occur once a year and will require supervisors to meet in person with their personnel. A meeting with HR in August 2023 revealed that PRPB has not provided any training or guidance on the implementation of the updated performance evaluation policy and process.

## Transfers

During this reporting period, all interviewed officers continue to believe that the transfer system is not what the policy promotes. First, they believe transfers take too long and that it's influenced by friendships, connections, and politics. They believe that it is a not a fair program. Interviewees believed that the transfer program is one of the biggest morale problems among officers. Regional transfers can take up to 15 years and sometimes longer. Interviewees continued to advise that it is well known that some officers are being transferred from the bottom of the seniority list, contradicting what the program was created for. It is unfair for officers using the system as designed and getting passed over. Over 95% of the officers expressed that the transfer policies and system is a well-known problem that needs to be acknowledged by upper management.

## Community Relations

Interviewed officers acknowledged that each department or precinct has designated personnel to engage with the community. Several of the interviewed officers believe that it is solely this designated personnel's responsibility to participate and represent PRPB during any community events. Officers advised that due to personnel shortages, they have too many responsibilities and assignments to directly participate in community activities. Officers advised that it was the upper administrative

172

leaders who created specialty units or assignments to represent PRPB in the community, taking the responsibility away from officers so that they can dedicate their time to daily investigative work.

## General Observations

- Positive areas that were mentioned:
    - The Agreement is generally seen as a positive and a necessity;
    - Communication among officers;
    - Younger supervisors are becoming more professional and committed;
    - Payment for overtime hours has improved;
    - Steps to get better pay has improved;
    - Supervisors are open to considering new ideas and change;
    - Approval of the Commissioner;
    - Increased and enhanced professional instruction from supervisors;
    - Working conditions, training, and equipment have improved;
    - The required 40-hour training, when available, has become easier to schedule.
- Areas needing improvement that were mentioned:
    - Written communication: Most interviewees stated that communication was primarily verbal. The perception is that written communications can be an issue for supervisors;
    - Supply shortages were not only reported but noted during precinct visits;
    - Increased and enhanced recruitment and retention programs to help with the lack of personnel;
    - Removal of political influence from PRPB, especially relating to transfers;
    - Improvement of the pension plan and benefits, which will in turn attract better candidates;
    - Some of those interviewed stated that cars and equipment are somewhat accessible, but PRPB needs to increase the budget for the purchasing of equipment, car parts, and the ability of repairing cars as quick as possible to better equip officers;
    - Shortage of qualified police candidates. Good incentives have to be in place to attract better candidates;
    - Supervisors are supportive of virtual training but believe that in-person training is needed and more effective;
    - Officers reported working additional shifts or hours to cover the lack of officers. In many cases, the lack of officers is causing PRPB members to be overworked, affecting morale, and causing burnout;
    - Supervisors and officers complained about the Judicial System, which they feel needs to be more consistent and effective in the application of the law; and
    - Recognition of outstanding work sometimes does not occur.

## *Pathway Forward*

PRPB executive leadership should give a higher weight to officers' feedback and move to correct and improve all identified deficiencies in addition to continuing to improve the strengths. Several officers and personnel have reported they feel that upper management does not appreciate being criticized and will respond with retaliations. During this reporting period, DSP and PRPB addressed some supervisory staffing shortages by promoting sergeants and high-ranking officials. These promotions will greatly

address accountability and make PRPB more effective and professional. The Monitor's Office will continue to assess PRPB as they continue to implement efforts related to the Staffing Plan, per Paragraph 13.

## Paragraph 140: Supervision and Management - Duties of Supervisors

*All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

The Monitor's Office reviewed examples of staffing documents submitted electronically and during several site visits for the areas of Mayaguez, Carolina, Aibonito, Aguadilla, Humacao, Utuado, and Arecibo. Based on the documents reviewed, officers interviewed, and new supervisors, supervision is reaching a higher level of compliance. Senior supervisors and officers that were overworked in the past with assignments and responsibilities are now returning to normal activities and assignments in accordance with their job descriptions. Currently, PRPB is able to provide the necessary guidance and is improving professionalism, prioritizing community policing, and problem solving. Other very important issues identified during other CMRs were the identification, correction, and prevention of misconduct, which should also improve and be reflected by CMRs -10 and 11.

The Monitor's Office continues to recommend that PRPB develop an EIS, conduct personnel integrity audits, and ensure the implementation of inter-agency feedback systems. PRPB was able to demonstrate an EIS module in July 2023. However, PRPB has not implemented policy, training, or practice of the EIS system. The Monitor' Office expects that as soon as this system is approved and implemented, compliance with this paragraph will improve. Effective and professional supervision is a skill set that any successful organization needs to possess. Significant and considerable responsibilities are expected of PRPB supervisors making them responsible for ensuring that officers under their command comply with Bureau policy, the Agreement, and the law. During this reporting period, 90% of the interviewed personnel fully support their supervisors and believe that they provide effective and necessary supervision, guidance, and support to comply with Bureau policy, the Agreement, and the law. However, 10% of the personnel interviewed stated that their supervisors could benefit from more

174

effective training that will make them better communicators, especially with the next level of supervision.

*Pathway Forward*

Supervisors must acquire a better and more effective understanding of the evaluation system. Starting in January 2024, evaluations will occur annually and will require mandatory meetings regardless of the received scores. Training for GO 310 (Performance Evaluations) needs to be developed and provided. Supervisors will need to fully understand this system before it is implemented. They should understand that their writeups must justify the scores. In those writeups, the supervisor should refer to specific cases or duties the officers participated in and their roles. They should also give credit to any additional accolades achieved by the officer. The scores should not be taken lightly, and officers need to understand that the scores need to be earned. Furthermore, communication with upper management needs to improve. Instructions or orders at all levels of management needs to be clear and consistent to be effective.

## 2. Supervisor Training

*Paragraphs 141 - 144 are assessed annually and will be reviewed in CMR-10.*

## 3. Performance Evaluation

PRPB has continued to use ProMedia as the evaluation system. GO 310 (Performance Evaluations) was also updated and signed by the Commissioner in February 2023. Starting in January 2024, the evaluations will take place annually and supervisors are mandated to meet with their personnel regardless of score. The Monitor's Office understands that if the ProMedia system is implemented, it will be a very effective tool within the Bureau. In addition to the annual evaluation and mandatory meetings, the expansion of the measured performance categories will be essential in providing clearer and detailed justifications for each element of the evaluation process. PRPB has not implemented the proper training and practice, but the Monitor's Office is anticipating that as soon as both are approved and in place, it will make supervision effective. Supervisors need to acquire the proper knowledge of criteria, policies, and procedures and develop better communication skills to be specific with strategies that will help employees improve, making them more professional and effective. Supervisors need to develop better organization and planning skills that will help them provide clear plans to follow through with their guidance. During interviews, supervisors were supportive of ProMedia; however, they demonstrated a lack of evaluation knowledge in their answers as well as training. The Monitor's Office believes that with the proper training and guidance, supervisors will develop all the necessary supervisory skills making them effective and better prepared to accomplish the Bureau's mission.

### Paragraph 145: Supervision and Management - Performance Evaluation

*PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in*

*inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 145-146. | ☑ Met | ☐ Missed |
| 2. Training on performance evaluations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | ☑ Met | ☐ Missed |
| 5. 95% of sampled performance evaluations adhere to approved policies. | ☐ Met | ☑ Missed |

### Compliance Assessment

The Monitor's Office determined that supervisory trainings were consistent with policies, meeting the requirements of the Agreement. It was also determined that the recently promoted supervisors attended the 40-hour mandatory training at the Academy before taking over their duties. However, during officer and supervisor interviews, it was reported and determined that performance evaluations are still an issue for both supervisors and employees. The lack of training and knowledge of the system is noticeable for both. It was again reported that during evaluations, no meetings between supervisors and employees take place unless a score is challenged. Also, based on the interviews and the provided sample of 92 evaluations, the apparently inflated ratings reported in the past continues.

The Monitor's Office confirmed that GO 310 (Performance Evaluations) dated February 15, 2023, was revised, and will be implemented starting in January 2024. Evaluations will occur annually, and it is a requirement that every PRPB supervisor meets with their supervisees in-person to discuss the evaluations regardless of the rating. However, during a meeting with HR, it was determined that no training or guidance has yet to be developed or approved. PRPB needs to make this a high priority, the performance evaluation system is the most effective way to discuss performances, expectations, respective goals, and career paths. Without the proper training and guidance, the updated GO 310 (Performance Evaluations) will not be effective and personnel within the Bureau will continue to view evaluations as unimportant.

*Pathway Forward*

The Monitor's Office continues to track the implementation of the recently approved GO 310 (Performance Evaluations) and related forms. Supervisors and supervisees need continued training to make the Bureau more effective and professional. The revision of these policies and procedures is crucial for the implementation of this paragraph. PRPB needs to understand and adjust the ProMedia evaluation system so that executives and HR can monitor and audit the evaluations according to policy.

## Paragraph 146: Supervision and Management - Performance Evaluation

*As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 145.

*Compliance Assessment*

A review of performance evaluations samples and interviews conducted by the Monitor's Office revealed that performance evaluations are completed on time and formalized. This program will greatly benefit from a better automated system, which has been reported as a project in progress. The systemic inflation of evaluation ratings continues to be a concerning issue. This was confirmed by interviews as well as by the analysis of provided samples. As in the past, interviewed officers stated that supervisors will rate subordinates high during their evaluations to avoid dealing with challenges from their employees. The revised GO 310 (Performance Evaluation) policy was approved in February 2023 and is expected to be implemented in January 2024. The Monitor's Office believes that after the proper training and guidance is approved and provided, the performance evaluation system will be effective, helping the Bureau become a more professional institution. In addition, the recent promotion of 565 supervisors will give the system additional support to make it effective.

The Monitor's Office believes that after the system is implemented and the new supervisors gain the necessary experience, the system will reach compliance by January 2025.

*Pathway Forward*

The Monitor's Office continues to keep track of the implementation of the recently approved GO 310 (Performance Evaluation) and related forms. Supervisors as well as the supervisees need continued

training to make the Bureau more effective and professional. The revision of these policies and procedures is crucial for the implementation of this paragraph. PRPB needs to understand and adjust the ProMedia evaluation system so that executives and HR can monitor and audit the evaluations according to policy.

## 4. Early Identification System

As noted in previous CMRs, PRPB has developed various modules within its EIS. However, upon examination of these modules and further discussion with PRPB personnel, the Monitor's Office noted that the current EIS in use by PRPB requires further development to ensure it serves as a non-punitive, proactive method for identifying agents that may need training, counseling, or other intervention before issues arise involving agent misconduct. In the past, the EIS modules, as referred to by PRPB, serve as case management for complaints, sexual assault investigations, domestic violence investigations, and is not used as an EIS, in the traditional sense, to track officer performance and conduct.

On August 22, 2022, the Monitor's Office participated in an operational system demonstration of the Supervision Module and the Non-Punitive Module. These two modules were shown to be operational, and PRPB approved these systems in October 2022. On September 21, 2023, a meeting was held with SARP personnel, and they indicated that the Non-Punitive Module was working well. During an additional conversation with the SARP Commander on September 27, 2023, he confirmed that the Non-Punitive Module was efficient and effective. When EIS is operational, the Non-Punitive Module will be used for referrals to EIS.

Although PRPB has participated in some virtual meetings to discuss EIS, much of the work in this area is being tabled and will be addressed as part of the implementation of the IT CAP. Both projects will inform the state and quality of the data that will be used to develop EIS. PRPB can only be considered compliant with Paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all data points required by the Agreement and PRPB policy, and 2) PRPB leadership and third-party overseers are able to conduct data analysis of policing practices and outcomes using EIS.

As a result of further work needed to improve its EIS and PRPB's inability to demonstrate an operational use of EIS in a comprehensive manner, the Monitor's Office must rate the below related paragraphs as not compliant.

Because much of the work in this area is contingent on other projects, PRPB has also not developed the policies and procedures related to EIS. The Monitor's Office looks forward to assessing PRPB's progress in this area during CMR-10 after the completion of the IT CAP and AH Datalytics', the Commonwealth's contractor's, work.

On July 24, 2023, the Monitor's Office received a Certification from the Reform Office stating that an EIS module has been created and is being tested. PRPB stated that they are working on the identification of suitable people to form the EIS Unit. The EIS Unit will be in charge of working on the module, examining its operation, and requesting required changes in programing and functionality for its full and effective operation. PRPB states that once the module is fully operational, records and reports will be generated and shared with the Monitor's Office.

## Paragraph 147: Supervision and Management - Early Identification System

*PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 147-153. | ☐ Met | ☑ Missed |
| 2. Training on EIS is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | ☐ Met | ☑ Missed |
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | ☐ Met | ☑ Missed |
| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | ☐ Met | ☑ Missed |

### Compliance Assessment

As noted above and in previous CMRs, there currently is no EIS developed and/or in use by PRPB. In the past, PRPB was misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB has noted that it is awaiting recommendations from the IT CAP and results of AH Datalytics', the Commonwealth's contractor's, work to begin developing EIS. EIS will be heavily reliant on the data and modules that are currently being reviewed and/or developed as part of these two projects. As such, it is most efficient for PRPB to wait until these projects have been completed until it begins delving into EIS development.

### Pathway Forward

PRPB must develop an EIS that encompasses a range of clearly defined information and ensures that corrective action is based on appropriate evaluation, and not reserved for a mere accumulation of violations. Currently, the EIS module is under development and is not available for use by supervisors. EIS is a critical component of risk assessment and management systems and should be a priority for

PRPB. PRPB must ensure that EIS provides a non-punitive, proactive method for identifying agents that may need training, counseling, or other intervention before issues arise involving agent misconduct. PRPB should continue to develop the platform so that supervisors can use the information from EIS data and records. This will mean that EIS can become an effective supervisory tool that addresses potentially problematic behavior in a timely and non-punitive manner.

## Paragraph 148: Supervision and Management - Early Identification System

*The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:*

*a) all uses of force;*

*b) injuries to and deaths of persons in custody;*

*c) all complaints and their dispositions;*

*d) data compiled under the stop data collection mechanism;*

*e) all criminal proceedings initiated, as well as all civil or administrative*

*claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;*

*f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;*

*g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;*

*h) all disciplinary action taken against employees;*

*i) all non-punitive corrective action required of employees;*

*j) all awards and commendations received by employees;*

*k) training history for each employee; and*

*l) identifying information for each PRPD officer and employee and;*

*m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

On July 24, 2023, the Monitor's Office received a Certification from the Reform Office stating that an EIS module has been created and is in testing. PRPB stated that they are working on the identification of suitable people to form the EIS Unit. The EIS Unit will be in charge of working on the module, examining its operation, and requesting required changes in programing and functionality, for its full and effective operation. PRPB states that once the module is fully operational, records and reports will be generated and shared with the Monitor's Office. As such, the Monitor's Office concludes that there is no related policy and no related system and PRPB cannot be considered compliant with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-10, and stresses to PRPB the importance of ensuring that EIS, once developed, captures the requirements of this paragraph.

### Paragraph 149: Supervision and Management - Early Identification System

*PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

As noted above, there is an EIS module that has been created and is in testing. PRPB has not provided the Monitor's Office with a list of identified personnel that will lead EIS development efforts and its related policies and procedures. As noted above, any work related to this has been placed on hold until the IT CAP and AH Datalytics', the Commonwealth's contractor's, work is completed. The results and recommendations from these two projects will be used to expedite EIS development.

*Pathway Forward*

The Monitor's Office looks forward to assessing PRPB's progress in this area as part of its implementation of the IT CAP.

## Paragraph 150: Supervision and Management - Early Identification System

*PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB has made some progress in the development of an EIS module, but most of the supervisors and agents who were interviewed were unaware of what constitutes an EIS. Those that know how to use EIS nevertheless report not being able to access the system. The Monitor's Office has been told in interviews that equipment such as logbooks, administrative supplies, laptops/iPads, and computers are not available for PRPB supervisors to use to access and review EIS data. The Monitor's Office notes that investment in such equipment is a prerequisite for providing supervisors with a mechanism for accessing and reviewing EIS once its development is completed.

*Pathway Forward*

The Monitor's Office notes that PRPB must take equipment needs into consideration as it works towards promoting new supervisors in the coming months. Further, PRPB should leverage the IT Needs Assessment and CAP to inform the status of its ability to provide supervisors and commanders with the equipment necessary to access supervisory and management systems like EIS.

## Paragraph 151: Supervision and Management - Early Identification System

*PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | April 2023 – September 2023 |

182

| | | | |
|---|---|---|---|
| Policy: | Not Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is an EIS module that has been created and is in testing, but PRPB still does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-10.

## Paragraph 152: Supervision and Management - Early Identification System

*PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is an EIS module that has been created and is in testing, but PRPB still does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-10.

## Paragraph 153: Supervision and Management - Early Identification System

*Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is an EIS module that has been created and is in testing, but PRPB still does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-10.

## 5. Internal Audits and Interagency Feedback

In review of the paragraphs within this subsection, the Monitor's Office found that PRPB ensures that audit work is conducted in a consistent, fair, and professional manner. The PRPB Audit Division provides transparency and gains public trust through accountability, quality, and continuous improvement. The audit system identifies operational deficiencies, analyzes the causes and contributing factors, and implements effective corrective measures. These audits help ensure that all areas of Puerto Rico receive adequate levels of service delivery. Policies reviewed by the Monitor's Office related to this subsection meet paragraph requirements. During this reporting period, 18 submitted internal audits were reviewed by the Monitor's Office and they demonstrate that commanders are developing a plan of action for the deficiencies identified by the Audit Division. The Monitor's Office notes that lack of staff and resource allocation has resulted in a low number of internal audits being conducted each reporting period.

## Paragraph 154: Supervision and Management - Internal Audits and Interagency Feedback

*As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 154-156. | ☑ Met | ☐ Missed |
| 2. Training on internal audits and inspections are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of selected internal audits and inspections comply with policy. | ☑ Met | ☐ Missed |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | ☑ Met | ☐ Missed |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | ☑ Met | ☐ Missed |

### Compliance Assessment

In assessing PRPB's compliance with this paragraph, the Monitor's Office finds that related policies incorporate the requirements of Paragraphs 154-156. Trainings on internal audits and inspections are consistent with approved policies. However, the Monitor's Office finds that 95% of sampled personnel have completed the required training and certification on the auditing and inspections system in the required timeframe for this reporting period, though the most recent round of training on Operational and Administrative Inspections for Compliance Inspectors (Inspeccionesoperacionales y Administrativas para Inspectores de Cumplimiento) was conducted in 2020.

Based on conversations with members of the Inspection Division in July 2023, PRPB is using the auditing system to identify operational deficiencies and their causes and contributing factors so that effective

remedial action may be implemented. The Monitor's Office notes that the Inspections Manual and Guide is comprehensive and has been well received by PRPB supervisors. It should also be noted that these two documents were revised and have been reviewed by the Monitor's Office as part of Paragraph 229 and comments were provided.

The details from the Monitor's Office review of completed audits are included under Paragraph 156. These audits were comprehensive, clear, and concise. PRPB is commended for the inspections that were completed – the reports were extensive and involve hundreds of pages of documentation and analysis.

### Pathway Forward
The Monitor's Office commends PRPB for its work to update and conduct a new round of training on administrative inspections for compliance inspectors, and will continue to assess PRPB's compliance. Based on this review, PRPB is found to be using the auditing system to identify operational deficiencies, so that effective remedial action may be implemented. The revised Inspections Manual has resulted in more comprehensive inspections. Further training should be conducted on the auditing and inspections systems and PRPB should ensure that its internal audits and inspections are conducted according to policy.

## Paragraph 155: Supervision and Management – Internal Audits and Interagency Feedback

*Paragraph 155 is assessed annually and will be reviewed in CMR-10.*

## Paragraph 156: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 154.

### Compliance Assessment
The Monitor's Office has received information from the Inspection Division indicating that audits are consistently planned and conducted. Also, the Monitor's Office was provided with documentation to

186

demonstrate that the Commissioner reviews each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. Documentation was provided to demonstrate that the commander of each precinct or specialized unit reviewed all audit reports regarding employees under their command and, if appropriate, took non-punitive corrective or disciplinary action.

The following list indicates the 18 operational audits completed during this reporting period (April to September 2023):

- Yauco Drug Division
- Manatí Highway Patrol
- Humacao Stolen Vehicles Division
- Humacao Drug Division
- Vega Baja Maritime Division
- Cataño
- Capitol Police
- Arecibo Drugs, Narcotics, Vice, and Illegal Firearms Division
- Utuado Transportation Division
- Arecibo Explosives Division
- Aguadilla Technical Recordings Unit
- West Section Canine Division
- Aguadilla Community Interactions Division
- Aguadilla Police Athletic League Division
- Mayagüez Community Interactions Division
- Aguadilla Area Command
- Aibonito Drug Division
- Ponce Drug Unit

The following list contains the most commonly identified violations found during the 18 inspection audits:

- Taser Violations (No Weekly Test, No Training or Re-Training): 277
- Employee Records Violations: 255
- Office Records Violations: 189
- Gas Violations (No Training or Re-Training): 140
- Baton Violations (No Training or Re-Training): 139
- Non-Compliant/No Picture Violations: 107
- Uniform Violations: 121

Although some divisions and units had considerably less violations than others, the Monitor's Office acknowledges the efforts done by each division and unit in rectifying their violations, especially when the audits are done in a timely manner. The audits show that most of the divisions and units were able to correct the violations reported by the Inspection Division, and the Monitor's Office recognizes the initiative taken by PRPB personnel. Audits are important for PRPB divisions and units because they pinpoint the areas that need attention, and the Monitor's Office will continue to acknowledge the divisions and units that display initiative in correcting their violations.

During the May and July 2023 site visits, the Monitor's Office recommended that more operational audits should be completed during the reporting period. The Monitor's Office appreciates the work that was done by the Inspection Division on these 18 completed audits compared to 4 completed audits in CMR-8.

It is noted by the Monitor's Office that those in charge of each of the 4 locations resolved all issues identified by the Inspection Division within 30 days. In each of these inspections, proper advance notice was given to those in command in preparation for their efforts.

Further, the Monitor's Office recommends that the inspection of the Guanica Maritime Division completed during CMR-8 be used as a model. This inspection audit was streamlined and very efficient due to the orderly and organized methods used to track the information and equipment. Specifically, all equipment was numbered, and the records were organized by numerical order to easily identify the corresponding equipment. This included equipment such as portable radios, computer equipment, bullet proof vests, tasers, weapons, vehicles-organized by VIN, model, and make, ballistic shields, etc. It is hoped by the Monitor's Office that the other areas could review and establish a similar tracking system to prepare for future audits.

*Pathway Forward*

PRPB should work on developing an automated system whereby the Commissioner and commanders produce memos or other evidence to track and demonstrate that they have thoroughly read relevant audits and have developed strategies and corrective actions based on the results of those audits. These strategies and corrective actions should be published so that other commanders can see successful resolutions. The Monitor's Office has been provided with the Annual Audit Report issued in January 2023. The Monitor's Office suggests that the Annual Audit Report be required reading for all supervisors in PRPB and this information be included in future promotional examinations of sworn personnel.

It is again recommended by the Monitor's Office that the roll call concept be instituted uniformly across the Bureau. This is important for proper preparation for duty, officer safety, and formalizing the role of the supervisor. The roll call setting and the ad hoc inspections process is beneficial to ensure readiness for duty and performance. The practice of having a formal roll call and ad hoc inspections will assist in better preparing officers for duty, help with administration of non-punitive discipline, and ultimately assist with officer safety.

## Paragraph 157: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☑ Missed |
| 2. Training on integrity audits is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | ☐ Met | ☑ Missed |
| 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB is currently developing a plan for organizing and executing regular, targeted, and random integrity audits (the protocol to perform integrity tests), in conjunction with OSM. On September 8, 2022, PRPB submitted a preliminary draft of its integrity audit policy and protocol and participated in a meeting with the Parties to discuss the drafts and assistance from OSM. As such, PRPB has not begun training relevant personnel and conducting integrity audits based on the associated policy and protocol.

No data was provided by PRPB during the reporting period due to the policy still being in development; therefore, the Monitor's Office was unable to complete a review of a random sample of integrity audits.

On July 24, 2023, the Monitor's Office received the following Certification from the Reform Office: GO 649, entitled: Integrity Testing Protocol. After several exchanges of revised versions of GO 649 (Integrity Testing Protocol), the Reform Office sent OSM a new amended version on April 27, 2023. OSM provided comments on July 13, 2023. On July 14, 2023, the Reform Office sent a new revised version with the comments that had already been received in April, for the review and comments of OSM. The Special Master is currently working on the policy with PRPB.

OSM indicates that they will be finalizing comments and then recommending the policy move forward through the Paragraph 229 review process.

*Pathway Forward*

The Monitor's Office looks forward to the implementation of these materials during a future CMR. PRPB and OSM are continuing to collaborate on the development of the integrity audit policy and the Monitor's Office is hopeful that it will be completed soon.

## Paragraph 158: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall establish an executive-level liaison committee consisting of high- level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Quarterly |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Agreements and protocols incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | ☐ Met | ☑ Missed |

*Compliance Assessment*

In past CMRs, the Monitor's Office determined that the relevant agreements and protocols incorporated all the requirements of this paragraph. Furthermore, based on the Monitor's Office's assessment of paragraphs related to Civilian Complaints, Internal Investigations, and Discipline, the Monitor's Office determined that other members of the criminal justice system have stepped forward and become part of the local criminal justice meetings. PRPB refers all allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation.

Documentation on the work of the feedback committees provided by PRPB illustrates that the committees are following the requirements of the paragraph consistently in some areas but less consistently in other areas. The documentation provided included meeting agendas, attendee lists, and minutes, all of which provide evidence of participation by representatives of federal and local criminal justice components in all regions of Puerto Rico, including judicial courts, prosecutors, universities, and the municipal police department. The Monitor's Office deems PRPB as being partially compliant with the paragraph due to the strong performance of the feedback committees in the police areas reviewed but requires further evidence across all police areas to assess PRPB as being substantially compliant.

During past CMRs, the Monitor's Office noted that the area meetings conducted in larger cities, such as San Juan and Ponce could be used as examples for other areas. The committee meetings in these areas had broad participation with representatives of federal and local criminal justice components, a purposeful agenda and related discussion topics, and noted recommendations for action items and next steps for improving police services and the quality of investigations. It is noted by the Monitor's Office that the following areas did not submit documentation on the work of the feedback committees:

- Bayamon
- Guayama
- Humacao

190

- San Juan

In summary, the Monitor's Office recognizes that all of the area commands reviewed submitted the written summaries of the area meetings in a timely manner; the only areas that did not submit proof of the meeting were Bayamón, Guayama, Humacao, and San Juan. Furthermore, when inspecting the written summaries of meetings, the Monitor's Office recognizes that Aibonito, Carolina, Fajardo, and Ponce provided excellent summaries of their meetings. All of these summaries display an awareness of the challenges faced by each area command, and meaningful discussion of the problem's nature, and the status of solutions. The Monitor's Office applauds Ponce's discussion of mental health issues. Fajardo displayed great communication between judges and PRPB in addressing criminal cases, and the summary also included a discussion of the problems involving domestic violence. The Monitor's Office notes that some of the participants were not properly identified in the summaries, which is necessary for the Monitor's ability in determining compliance.

## Pathway Forward

The Monitor's Office recommends that PRPB continue to use protocols for maintaining related documentation not only as a means of demonstrating compliance with the Agreement, but more broadly to document the outcomes and action items from these meetings to ensure follow-through and accountability. A protocol has been developed and other criminal justice agencies in Puerto Rico have responded to or ratified the protocols developed by PRPB. Now, PRPB should develop an automated (digital) system to obtain copies, agreements, and protocols related to criminal justice committees and verify that these materials incorporate all requirements to improve compliance. It is also suggested by the Monitor's Office that a PRPB member be appointed to take concise and complete notes during these meetings.

## IX. Civilian Complaints, Internal Investigations, and Discipline

Under its own rules, which were approved by the Court and supervised by the Monitor, OAL has a 30-day limit for *analysis, recommendation, and determination,* of administrative complaints that must be notified both to the complainant and accused.[4]  The Monitor continues to observe multiple cases that continue to take months and some over three years.

After nearly two years of highlighting the impact of shortages in staff in OAL, the Commonwealth's only response to this issue was to add <u>one</u> lawyer to OAL.

As it relates to the investigatory process, the Monitor's Office finds that most internal investigations were conducted well and were eventually adjudicated in accordance with facts uncovered by the investigator. Nevertheless, improvements must be made to achieve the overall goal of substantial compliance.

Training continues to be an area of poor performance for the entire organization in general, and SARP is no exception.  While the Monitor Team is well aware of lingering training delay issues brought about by COVID-19, we take this opportunity to urge the SARP/SAEA partnership to begin working on the annual SARP re-training.  The vast majority of SARP personnel deployed to the field will likely be unfamiliar with very recent and substantial changes in policy, investigative methodology, protocol, and practice.  Due to these changes, the Monitor recommends a minimum of two full days of "in-service" training for each SARP member for this first iteration of SARP in-service training.  This extended class time will be needed to address the large volume of changes made by the PRPB concerning SARP.  Furthermore, this training must be presential and incorporate practical and participative pedagogy.   In the future, annual re-trainers to address changes in SARP methodology, rules, and procedures, could possibly be delivered remotely via eLearning, if feasible and if the subject matter lends itself to virtual learning. At a minimum, the Monitor's Office expects to see a plan to address the current need for SARP in-service training during the CMR-10 reporting period to extend into 2024.  The Monitor strongly recommends that this plan be completed and shared with the Monitor's Office prior to the end of calendar year 2023.

The Monitor is pleased to report that the once-dire circumstances of the FIU, especially regarding its human resource component, have in large part been remedied. While this is indeed good news, the lack of human resources across SARP entities other than FIU continues to concern the Monitor.

As part of the accepted methodology, the Monitor has endeavored to privately interview every single active SARP investigator and has nearly reached that goal.  As of this date, the Monitor has interviewed over 150 current and former SARP investigators. The majority of active SARP investigators have expressed concerns over case workload and a deficiency in human resources needed to effectively manage their given caseloads. The impact of the problem ranges from minor to severe, depending upon the delegation.  The Monitor discovered that in some offices, it is not uncommon for one investigator to have over one dozen cases open at any given time.  Some of these cases may have been reported in

---

[4] See PRPB Rule 9088, Page 40, paragraph 3.

other delegations, meaning that the investigator or witnesses must travel across jurisdictions to be interviewed.

In each of these 12 open cases, the clock is ticking down to its 90-day limit and additional cases are assigned as they come in.  It is important to understand that under SARP rules, 'case overload' is unacceptable as an excuse to grant any extension.  Unrealistic expectations such as these make the job of a SARP investigator more about juggling precious and limited investigative time rather than about the overall quality of an investigation.   The Monitor's Office encourages SARP Command to meet regularly with its field investigators and supervisors – not just its Area Commanders - in listening sessions, in much the same way as the Monitor's Office has, to gain insight into their needs for resources, both human and otherwise.  Better oversight of caseload and human resources at the level of each Area command is paramount, as is PRPB's response to these needs.

As predicted in previous CMRs, the Monitor's Office has been informed of at least one a cause of action filed against the PRPB resulting from a recent promotional candidate being passed over for promotion.[5] The Monitor is well aware of various members of the PRPB who were denied promotion in rank due to the existence of a SARP complaint against them.  Some of these cases have awaited adjudication for <u>years</u>.[6]

The Monitor's Office's concern does not end here. Not one Internal Affairs office has been relocated away from police facilities despite the Monitor's Office's longstanding finding that this practice must end without further delay.  The Monitor's Office takes notice that SARP has been earnest in its ongoing efforts to identify suitable locations for Internal Affairs Bureau (NAI) delegations in settings not associated in any way with law enforcement. Site identification, however, is only the first step in the process and must be followed up by contracting and procurement.

Overall, the Commonwealth's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflects a progression in compliance to what was noted in previous reports. In CMR-8, 46% of paragraphs (21 paragraphs) were assessed as partially compliant and 26% (12 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 52% of paragraphs (24 paragraphs) were found to be partially compliant and 15% (7 paragraphs) were found to be substantially compliant (4 paragraphs moved to fully compliant). Two paragraphs (4%) were noted as deferred in CMR-9. See figure 9.

---

[5] PRPB policy creates an absolute bar for promoting of a sworn member while that member has an open case pending in SARP.

[6] PRPB Internal Policy mandates *a maximum of 180 days* for an administrative case to be investigated by SARP, followed by *a maximum of 30 days for adjudication and notice* to the parties.  Practical application of this rule is impossible given the resource limitations on the Office of Legal Affairs, who is responsible for timely adjudication of serious allegations. (See PRPB Rule 9088, *supra*)



*Figure 9. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

## Paragraph 159: Civilian Complaints, Internal Investigations, and Discipline - General Provisions

*PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

The Monitor's Office bifurcates the analysis of SARP investigation files into Phase I and Phase II, the former an assessment of compliance with respect to the internal investigation itself, the latter an assessment of the adjudication process that ends with the Commissioner's final resolution. This analysis model allows the Monitor's Office to assess any recent improvements in SARP investigations in close to real time, while also allowing the Monitor's Office to contrast SARP performance in much older

194

investigations. The Phase II analysis allows the Monitor's Office to assess the adjudicative process from the end of an investigation through various levels of internal management and legal review, up to its final resolution.

The Monitor's Office continues to note that while SARP leadership has been quite diligent in requesting equipment, vehicles, tools, and human resources from PRPB to cure deficiencies previously mentioned by the Monitor's Office, much remains to be done, especially in the OAL. The Monitor's Office has noted some limited improvement in the allocation of new resources such as adding investigators to the once-critically understaffed FIU. The Monitor's Office has observed that several new FIU investigators have been assigned to that unit and that other candidates were being interviewed as late as Spring of 2023.

*Pathway Forward*

PRPB, working with DSP as its procurement authority, must deliver the resources SARP needs to conduct its investigations and reach legally defensible conclusions in a thorough and timely manner, to include the Commissioner's final resolution of any given case. Moving forward, where and when delays in this procurement process occur, the Monitor's Office will determine and point out where the delay occurred so that the Commonwealth may take decisive action to remedy it.

## 1. Civilian Complaints

In all paragraphs mentioning an obligatory training component, PRPB has either not forwarded the evidence required or the documentation produced indicated a subpar level of training compliance. The Monitor's Office urges PRPB to use every effort to achieve the training requirements of either 95% of the sworn force or 95% of the unit membership as required, depending on the relative paragraph.

The cross section of actual complaints reviewed by the Monitor's Office demonstrates that public awareness of the ability to complain concerning a PRPB member, the clarity of the complaint form, and the existence and use of multiple viable complaint entry mechanisms are all in accordance with the Agreement.[7]

### Paragraph 160: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |

---

[7] A variety of complaint inputs were observed during the Monitor's Office's current analysis, including physically tendering complaints at a PRPB facility, receipt of complaints via telephone, U.S. Mail, and PRPB's Internet complaint portal (commonly referred to as *Interfaz*).

| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
|---|---|---|---|
| Practice: | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 160-162. | ☒ Met  ☐ Missed |
| 2. Civilian complaint program trainings are consistent with approved policies. | ☒ Met  ☐ Missed |
| 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☒ Missed |
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | ☒ Met  ☐ Missed |

### *Compliance Assessment*

PRPB policy and training on receiving civilian complaints and internal complaints as well as its implementation have not changed since the Monitor's Office's last review where it was found to be compliant with the spirit and letter of the Agreement.

However, PRPB has not demonstrated the required 95th percentile of training and certification of Press Office and SARP personnel as required by this paragraph.

As demonstrated by the form and number of actual complaints received, PRPB's use of a variety of mechanisms to inform members of the public about their ability to complain against a PRPB member, either as a named person or anonymously, continues to be successful. The Monitor's Office observed informational material about the complaint program publicly posted at each of the area commands and precincts visited. The Monitor's Office urges PRPB to continue to proactively emphasize this accessibility in its open community meetings held across the island.

The Monitor's Office's interviews of nearly all SARP investigators shows an awareness of SARP's shared responsibility to educate and proactively communicate the existence of the PRPB civilian complaints program to members of the communities that they serve.

### *Pathway Forward*

PRPB must demonstrate that it has provided its Press Office and SARP personnel with training and certification on all policies related to the civilian complaint program.

### Paragraph 161: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible.*

| Compliance Status | Assessment Schedule |
|---|---|

196

| Fully Compliant | | Review Period | April 2023 – September 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Content of complaint forms is consistent with civilian complaint program policies. | ☑ Met   ☐ Missed |
| Note: Policies and Trainings is assessed with Paragraph 160. | |

### Compliance Assessment

PPR 311.1 (Master Complaint Form) has not been amended since CMR-6, where it was found to be substantially compliant with the Agreement.

### Paragraph 162: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | ☑ Met   ☐ Missed |
| 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | ☑ Met   ☐ Missed |

| | |
|---|---|
| 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | ☑ Met   ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

*Compliance Assessment*

Continued spot checking of PRPB facilities shows substantial compliance with posting appropriate signage instructing people of their ability to file a complaint against an officer. Spot checking of officers on patrol shows an acceptable level of compliance with officers carrying a copy of PPR 311.1 (Master Complaint Form) with them or in their vehicle.

## 2. Internal Investigations

SARP leadership continues to pay close attention to areas where the Monitor's Office has made recommendations of training, policy, and procedural changes. This spirit of SARP collaboration and collegiality with the Monitor's Office permeates top SARP leadership.

Despite this willingness on the part of SARP leadership, they cannot reach this goal on their own. Additional staff and equipment are still needed. The Monitor's Office has seen some responses to SARP procurement requests for both human and tangible resources. So much more needs to be tasked or procured.

In addition to procurement, and as pointed out in multiple previous CMRs, SARP NAI is still hampered by its present location within police facilities, which creates a strong disincentive for a citizen to report a crime alleged to have been committed by a police officer who may in fact work at that same facility. Recent discussions with SARP reveal that suitable NAI locations are being identified across the island. The Monitor expects DSP to not only procure suitable sites, but to also make them secure for the purpose of conducting the NAI mission without further unnecessary delay.

SARP's adjudicative process for serious violations of the code of conduct relies upon OAL, which not only performs the key legal analysis of the facts and conclusions of a given case, but also assists the Office of the Police Commissioner (OPC) in making final disciplinary decisions, which by statute pertain solely to OPC. PRPB has already found itself as the defendant in a cause of action based upon a for promotional candidate denied promotion due to PRPB/OAL failure to adjudicate or "clear" pending administrative cases against them in a timely manner.  In the PRPB, having an open administrative case against an officer acts as an absolute bar to consideration for promotion.

### Paragraph 163: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported.*

198

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Training: | Not Implemented | | |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☑ Missed |
| 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | ☑ Met ☐ Missed |

Note: Implementation of the portion of this Paragraph regarding discipline is assessed with Paragraphs 177 (Data Source #4), 198, and 199.

### Compliance Assessment

Universal training components for sworn members of PRPB as well as underlying policy regarding complaint reporting procedures have not changed from PRPB's previously substantially compliant versions.

PRPB has failed to demonstrate that it has reached the 95th percentile in training and certification of its personnel concerning relevant policies and procedures.

The Monitor's Office finds that PRPB has met the burden of showing that reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP and, therefore, achieving the corresponding compliance target.

### Pathway Forward

To move compliance forward, PRPB must ensure that its personnel are trained and certified in relevant policies related to reporting and internal investigations.

### Paragraph 164: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation.*

199

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | ☒ Met ☐ Missed |
| 2. Training on supervisory review of minor policy violations is consistent with approved policies. | ☒ Met ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☒ Missed |
| 4. 95% of selected supervisory reviews and responses comply with approved policies. | ☐ Met ☐ Missed |
| 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | ☐ Met ☐ Missed |
| 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | ☐ Met ☐ Missed |

*Compliance Assessment*

The Monitor's Office has been critical in the past concerning the underuse of non-punitive discipline to address minor disciplinary issues across the island. According to interviews of SARP investigators, they occasionally receive administrative complaints for investigations that should have been handled non-punitively at first.  While many of the SARP investigators reporting this were interviewed prior to mid-2023, there are still the occasional investigators who will cite a recent case anecdotally that should have been handled using this valuable tool.

While the roll out of this non-punitive disciplinary portal has been rolled out commensurate with the deployment of approximately 500 sergeants just prior to the reporting period, what is left unclear is,

- Whether the system is effective at discerning non-punitive sanctionable behavior from that which should be investigated, proven, and acted upon by the PRPB.
- Whether the system acts in conjunction with other data sets/tables that would help illustrate and flag a pattern of problematic conduct in the case of any PRPB member.

These questions cannot be answered completely without looking at the actual system entries, the metadata within those entries, and perhaps even the algorithm that governs specified actions within this platform.  Safe to say, none of these questions may be thoroughly answered virtually.

As noted above and in previous CMRs, the underlying policies incorporate all the requirements of paragraphs 164 and 165.

PRPB has failed to demonstrate that it has reached the 95th percentile in training and certification of its personnel concerning relevant policies and procedures.

*Pathway Forward*

The Monitor plans to examine the software solution, the data contained within, and the algorithm used to process data during upcoming Monitor field visits.

PRPB should ensure that supervisors are trained and certified on policies related to supervisory review of minor policy violations. PRPB should also anticipate a thorough examination of the new digital non-punitive disciplinary file system by the Monitor's Office to ensure compliance.

### Paragraph 165: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 164.

*Compliance Assessment*

The Monitor's Office's continuing review of all cases for the current reporting period has revealed no SARP cases where specific tactical, training, policy, or procedural deficiencies were mentioned, either at the unit, area, or SARP command level. As much as some SARP investigators are overtasked with their caseloads, SARP must ensure that the investigator looks at each case and answers the following questions.

- Could a fault in our training be a contributing cause or factor in this complaint?
- Was this complaint caused by or aggravated by a defective PRPB policy?
- Was inadequate (or non-existent) supervision a contributing cause or factor in this complaint?

*Pathway Forward*

PRPB is expected to address identified training, policies and procedures, or supervisory shortcomings as they may apply to each complaint.

## 3. Complaint Intake, Classification, Assignment, and Tracking

Complaint intake, classification, assignment, and tracking continues to be one of the best areas of SARP performance. SARP's database digitally captures and tracks all incoming complaints, investigations, and reports. It has been in broad use for many reporting periods. This system now allows the SARP Commander to track timelines including when extensions are granted and when any given case is overdue for completion.

### Paragraph 166: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall train all officers in how to properly handle complaint intake.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 166-176. | ☑ Met  ☐ Missed |
| 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | ☑ Met  ☐ Missed |
| 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☑ Missed |

### Compliance Assessment

Records clearly indicate that accepted policies and related training curriculum are unchanged from previous CMRs. The training content on complaint intake, classification, assignment, and tracking as previously approved by the Monitor's Office continues to be consistent with policies.

PRPB has not met the 95th percentile threshold for training related to this paragraph.

### Pathway Forward

PRPB must ensure that officers are trained and certified on relevant policies related to complaint intake, classification, assignment, and tracking.

## Paragraph 167: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Target #1. Bi-annually as to Compliance Target #2. |
| Practice: | Implemented | | |

### Compliance Targets

Note: Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199.

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

The Monitor's Office has not seen a case in this present CMR where a complainant claims to have been discouraged or turned away from filing a complaint. The Monitor has seen such examples in the past, however.  The Monitor's experience shows, in cases where a police officer discourages or "redirects" a case to another area or jurisdiction, that the complainant will often not mention this so long as the complaint is eventually received and acted upon by the agency. The citizen may have had to needlessly travel to a different police station, without knowing that their complaint should have been accepted on the spot by any PRPB member.  If the person is not asked whether someone refused to accept the complaint or tried to sway their decision against it.

Knowing that the complaint was ultimately received and investigated thoroughly is not enough. The Monitor's Office needs assurances built into the system to detect possible frustration and/or redirection of cases. The solution is relatively simple.

### Pathway Forward

PRPB must identify all cases where a complainant has alleged that his/her complaint was either refused or discouraged by a PRPB member, then register and investigate the allegation. The Monitor's Office strongly recommends that SARP investigators proactively ask each complainant at the beginning of their interview, "Did any PRPB member try to dissuade you from filing this complaint?" and "Did any PRPB member refuse to accept this complaint?"  This short line of questioning is useful to elicit information from those who may have been subjected to discouragement or outright refusal on the part of any PRPB to accept their complaint. Investigators who encounter this accusation from any source should be directed to mention the allegation directly in their investigative report and either address the allegation in the present report, or in the alternative, refer the allegation for a separate and thorough investigation.

PRPB members who have been found, based upon a preponderance of evidence, to have either discouraged a complainant from filing a complaint or to have refused to accept a complaint must be identified and disciplined appropriately.

## Paragraph 168: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

*Compliance Assessment*

Within the general sample of Phase I and Phase II analyses, the Monitor's Office has consistently observed a significant number of complaints submitted either via U.S. Mail or the Internet (SARP *Interfaz*) within the review samples. Some of these complaints are submitted anonymously either by civilians, or more often by anonymous insiders or whistleblowers. In the past, the Monitor has requested a special list of all Phase I cases where the identity of the complainant is unknown. Unfortunately, such a list was not provided to the Monitor's Office to allow the Monitor to select a representative sample of such cases for individual analysis.

From past analyses, these whistleblower cases often have a criminal dimension in addition to an administrative one. The peculiar way these whistleblower investigations are conducted raises serious concerns about their thoroughness. Rather than call in witnesses as well as the accused for an in-person interview, SARP criminal investigators had frequently resorted to having these individuals, including the accused, fill out an "hoja de entrevista," which is merely a unilateral, unchallenged declaration of a person's version of the events. These declarations are rarely followed up upon or challenged in a face-to-face interview setting. Rather, they are often accepted at face value, the case is often administratively closed and filed. In other cases, the Monitor's Office has found and continues to find a reticence to interview the accused officer(s) in the types of important cases. With numerous problems cited in previous CMRs and no current information available to measure progress,

unfortunately the Monitor is left with no choice except to find no change in PRPB non-compliance with this paragraph.


*Pathway Forward*

PRPB must forward requested lists and sample cases on request. In all cases where the identity of the complainant is unknown and the alleged conduct involves either potential criminal and/or serious administrative violations, SARP investigators from their respective Bureaus - Internal Affairs, Anti-Discrimination, and Administrative Affairs must conduct in-person, face-to-face interviews of all parties involved, including PRPB members who are under accusation and all members who may have witnessed the alleged conduct. The use of an "hoja de entrevista," by itself, is not an acceptable investigative tool in this category of internal investigation either by administrative or criminal internal investigators. Cases of a purported criminal nature must be investigated simultaneously by both NIA (Administrative Investigation) and NAI (Internal Investigations). Under no circumstances should an NAI investigator be assigned to investigate a case administratively once his/her criminal investigation into the same incident has concluded.

### Paragraph 169: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Complaint | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Intake protocol was followed in 95% of sampled investigations. | ☑ Met | ☐ Missed |
| 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | | |

205

*Compliance Assessment*

Within the case files examined, the Monitor's Office has yet to see evidence of an "on-site" complaint against a PRPB officer alone, or a case where a supervisor was summoned to accept such a complaint. The absence of such cases in the Monitor's Office's review samples supports the conclusion that this is most likely not occurring. PRPB should continue to use proactive steps to ensure that "on-site" complaints are actually a viable input method and are not discouraged in any way.

*Pathway Forward*

The finding of substantial compliance in this paragraph should not be interpreted by PRPB as a sign that its work is complete in terms of complaint intake protocol. Ongoing efforts must be taken to ensure that no PRPB member refuses to accept a complaint or otherwise attempts to dissuade a person from filing a complaint. Even though the PRPB member allegedly involved in dissuasion has not been cited by the complainant as one of the parties complained against, in all cases where this activity is alleged to have occurred by any individual, the investigator must either amplify and amend the case, or in the alternative file a separate case to investigate the alleged PRPB wrongdoing.

The Monitor's Office has recommended a measure in paragraph 167, which is designed to proactively identify any case where a PRPB officer has either allegedly refused to accept a complaint or attempted to dissuade a person from filing a complaint. If that conduct has been proven to have occurred based upon a preponderance of evidence, then the officer(s) involved must be disciplined accordingly.

## Paragraph 170: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | ☒ Met | ☐ Missed |
| 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | ☒ Met | ☐ Missed |
| 2b. 95% of such SARP reviews are documented in accordance with approved policies. | ☒ Met | ☐ Missed |

206

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 158.

*Compliance Assessment*

PRPB's management of incoming civil causes of action and its corresponding action taken continues to demonstrate robust compliance with this provision.  In the case of a civil cause of action, OAL appears to be informing SARP upon receipt of service of process. In the case of a criminal allegation involving a PRPB member, the Superintendency of Crime Investigations (SAIC) investigator also appears to be informing SARP of potential criminal wrongdoing, which would allow a corresponding SARP investigation of administrative misconduct to proceed without delay.

The Monitor's Office received a list of both civil causes of action and potential acts of criminality allegedly committed by PRPB members, all of which have been referred to SARP from either OAL or SAIC for assessment.

*Pathway Forward*

While the Monitor's Office has seen evidence to indicate that SARP is being informed of civil lawsuit and criminal allegations from OAL, PRDOJ, and SAIC, it remains to be seen whether SARP criminal and administrative investigations are being conducted simultaneously as a default measure,[8] and that information is being shared between investigators appropriately.

Any lawsuit by a PRPB member against any other fellow member, especially one in which the complainant alleges any irregularity whatsoever in SARP or any reprisal from within the PRPB/DSP structure may be analyzed by the Monitor's Office for future analysis and comment.[9]

## Paragraph 171: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

---

[8] The Monitor's Office has proposed one exception to this general rule. In cases where a PRDOJ or USDOJ prosecutor has requested a delay in a signed writing, a limited delay for the concurrent administrative investigation of criminal conduct is acceptable.

[9] Such an analysis will include whether the facts of said cases support or undermine a compliance finding not only with respect to this paragraph, but also with paragraphs 173, 175, 180, 186, 192, and 197.

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| 1. SARP administers a centralized numbering and tracking system for all misconduct complaints. | ☑ Met  ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 178.

### Compliance Assessment

The Monitor's Office's examination of the SARP database leads to a conclusion that it functions as a centralized numbering and tracking system as mandated by the Agreement.

## Paragraph 172: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | ☑ Met  ☐ Missed |
|---|---|
| 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 136, Data Sources #6 and #7.

### Compliance Assessment

The analysis of current case files and cases overall shows that PRPB regularly forwards complaints to SARP within the prescribed timeframe, usually via internal email. Cases generated by field supervisors were included in the investigative files received during the reporting period. In these cases, supervisors forwarded relevant information and evidence to SARP in a timely manner. The Monitor's Office's minor concern in this paragraph has been a few situations where PPR 311.1 (Master Complaint Form) were

used for internal SARP complaints instead of non-punitive discipline. These instances were related to the Monitor 's Office anecdotally during SARP investigator interviews.

In the case of rudimentary and minor violations of the PRPB Code of Conduct, such as repeated absence, instances of not following orders, lateness, uniform violations, and other very minor disciplinary issues, supervisors must first turn to non-punitive discipline to help the employee adequately address these deficiencies instead of passing this responsibility to SARP. The Monitor's Office expects to see increasingly fewer incidents of this nature due to the addition of hundreds of new field supervisors with access to a new, digital, non-punitive disciplinary process.

### *Pathway Forward*
PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future CMRs.

## Paragraph 173: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | ☐ Met | ☒ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### *Compliance Assessment*
By using a bifurcated model of case analysis, the Monitor's Office continues to see a portion of complaints that were not assigned to respective components of SARP for investigation within the five-day timeline. Most of these cases exceeded the five-day timeline by a matter of days, and on rare occasions, for even longer.

While the COVID-19 outbreak most probably caused some of these delays, the pandemic is now nearly completely resolved. The Monitor's Office has seen cases of a criminal nature being investigated solely by NAI and not referred to an administrative investigator (NIA) for concurrent investigation. At present,

there seems no apparent justification to delay the assignment of allegations of PRPB criminal wrongdoing for a separate concurrent investigation conducted by an administrative investigator.[10]

Any delay in proceeding on both fronts simultaneously brings with it certain risks; over time memories fade, the willingness of witnesses to talk may diminish, physical evidence may be lost, and witnesses may prove to be harder or even impossible to locate.

*Pathway Forward*

Cases of a criminal nature involving possible misconduct by a PRPB member, which come to the attention of PRPB through *any* source, including but not limited to, PRDOJ, USDOJ, civilian complainants, witnesses, anonymous sources, whistleblowers, media accounts, NAI investigators, etc., must be concurrently assigned to a SARP administrative investigator for administrative investigation within five days of receiving this information, unless the prosecution requests in a signed writing to hold the administrative investigation in abeyance for a defined period of time.

The Monitor's Office continues to recommend that PRPB develop capability to electronically file both internal administrative and internal criminal investigations under the same case number, perhaps with a letter variant that indicates whether the file concerns the NIA investigation or the corresponding NAI investigation. If the possibility of creating case files with the same number investigated concurrently by NAI and NIA is not attainable, the Monitor's Office is open to other possible solutions that would allow anyone to quickly locate, analyze, and comment on both the concurrent criminal and administrative investigations.

## Paragraph 174: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. SARP classifies complaints in accordance with policy. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

---

[10] There is one exception to the general rule - cases where a USDOJ or PRDOJ criminal prosecutor has requested a pause of the concurrent administrative investigation in a signed writing.

*Compliance Assessment*

As mentioned in paragraph 173, the Monitor's Office continues to see cases in which alleged criminal misconduct is sent first for internal criminal investigation and, only after that criminal investigation has concluded, are assigned for administrative investigation. All cases involving both criminal and administrative violations, irrespective of the source of the complaint, should be classified and investigated concurrently from both a criminal and rules violation perspective by two separate branches of SARP – NAI and NIA.

*Pathway Forward*

In the absence of a written and signed correspondence from a USDOJ or PRDOJ prosecutor a PRPB member that alleges misconduct that could be classified as both criminal and administrative in nature, the case must be assigned for separate and concurrent criminal and administrative investigation in accordance with established timelines.

### Paragraph 175: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| 1. All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | ☑ Met   ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

The Monitor's Office has yet to find a case where a PRPB member alleged to have been involved in misconduct has taken an investigative role in the corresponding internal investigation.

*Pathway Forward*

The Monitor's Office will review this area for continued substantial compliance.

## Paragraph 176: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

The Monitor's Office has personally viewed the SARP Module (internally referred to as the EIS system)[11] on multiple occasions and having viewed countless documents extracted from this system in response to its requests for document production, the Monitor's Office is satisfied that this tracking system maintains accurate and reliable data on SARP cases from start to finish.

While the system itself is both capable and functional, the Monitor's Office has noticed that the system is not being used to its full potential to track the timing of certain crucial events. The Monitor's Office's case file analysis has revealed multiple exceptions to the 5-Day Rule, as well as some cases that exceed the 90-Day Investigative Rule without having appropriate written extensions in place. Even in cases where the investigator has requested either one or multiple 30-day extensions, there is often a lag of multiple days between the date of the request and the date the extension was granted. These lags add up and create further case delays. Because some of these "lagged" extensions occurred recently, the global pandemic cannot be blamed.

---

[11] Refer to the IT section of CMR-8 for a detailed discussion of EIS.

## 4. Investigation of Complaints

The Monitor's Office has had the opportunity to measure SARP investigative performance trends over time. While there have been some positive developments, the Monitor's Office remains concerned about the conduct of administrative investigations.

The Monitor's Office has consistently encountered SARP cases that were closed with minimal, if any, effort to resolve direct and material contradictions in members' individual versions of the same incident. In previous reports, the Monitor's Office has made note of SARP administrative investigators alleging interference, collusion, retaliation, and possible cover-ups of administrative investigations against their immediate supervisor and perhaps even higher figures within PRPB. These allegations involved a multitude of alleged internal misconduct of a particularly alarming nature. The Monitor's Office will continue to follow these investigations in future Phase I/Phase II analyses.

When sworn police witnesses offer diametrically opposed versions of material fact(s) in a case involving an allegation of serious police misconduct, such a case should not be closed without interviewing all witnesses and the accused. These irreconcilable differences demand exhaustive attempts, including polygraph examination(s), on the part of the investigator to reconcile these diametrically opposing versions. There is no possible scenario where the Monitor's Office can find substantial compliance with the Agreement as long as this practice continues unchecked. Any PRPB employee who is found, based upon a preponderance of evidence, to have been untruthful during any SARP investigation must be held accountable, irrespective of whether the employee was originally cited as a complainant, witness, or accused.

After interviewing nearly all active SARP investigators, the Monitor is now convinced that the 'preponderance of evidence' standard of proof, which under the Agreement is required to be applied in 100% of SARP cases, is largely misunderstood by a significant percentage of SARP investigators. As an example, in most interviews an overwhelming number of SARP investigators said that they declined to look at an officer's disciplinary history until *after* their investigation had concluded. When asked why, the overwhelming majority responded that they wanted to avoid prejudicing themselves against the officer.

An officer's previous record can offer important evidence, especially in closely decided cases. PRPB must work with SARP, SAEA, and OAL to make it clear how and when this sort of evidence should be counted upon. Practical examples of cases where this evidence proved to be pivotal should be provided to investigators through both formative and in-service training.

## Paragraph 177: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Complaint | | Review Period | April 2023 – September 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met | ☐ Missed |
| 2. Investigation of complaints trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | ☐ Met | ☒ Missed |

## Compliance Assessment

Except for a SARP Internal Affairs (criminal) case, the standard of proof to be applied to any given case is that of a "preponderance of evidence." This standard is delineated throughout SARP formative training as well as the Instructor's Manual.  Despite the frequent mention of this standard, there remains a persistent level of confusion among SARP investigators over the practical application of a concept that is basic and yet difficult for many SARP investigators to grasp. The simplest way to explain a preponderance of evidence is to describe it numerically as 50.1 versus 49.9.

## Pathway Forward

PRPB must ensure that all new SARP investigators have received the updated version of REA 114 (SARP Investigator Training). PRPB must also strive to ensure that all SARP investigators receive yearly in-service training to include changes in policy, procedure, and investigative technique. One example of a key change is to clarify and emphasize the "preponderance of evidence" standard of proof in all its administrative investigations. The curriculum developer(s) should devote special attention to define and distinguish "preponderance of evidence," with other commonly used standards of proof used by PRPB including, "probable cause" and "guilt beyond a reasonable doubt". Efforts must be made to point out the relevance of prior accusations of remarkably similar conduct by the accused officer, even if the case was eventually adjudicated as "not sustained". Actual case examples should be used to illustrate and delineate these important differences.[12]

## Paragraph 178: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

---

[12] Of particular interest are cases where there are no witnesses other than the complainant and the accused, and where the PRPB member involved had been accused of strikingly similar misconduct in the past.

*PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | ☐ Met  ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor continues to find outlier cases that are of poor investigative quality.  In one such example, PRPB members in Rio Grande and Fajardo point the finger elsewhere concerning $7,700 in cash seized by PRPB in February 2020 and missing from a PRPB secure lockup facility since August 2020. After NIE (criminal investigators answering to DSP) came up empty in its criminal investigation, which concluded that $7,700 was illegally taken from a PRPB secure lockup between June 24 and August 25th, 2020, by someone who accessed this secure area to steal it - the case was assigned for administrative investigation.  According to NIE, there were multiple irregularities concerning supervision, oversight, and administrative controls.[13] [14]

To begin with, the administrative investigation was obviously not conducted concurrently as the Agreement stipulates, but rather after a more than a two-year delay.  That is the *least serious* criticism of this case that the Monitor can offer.  Turning to areas of even greater concern, the Monitor notes that during the administrative investigation, not one member of the PRPB was called to submit to a polygraph examination concerning the truth of their declarations, which is standard practice in police jurisdictions where such internal crimes have been discovered and where use of the device is permitted by law.  Only lower ranking officers were later administratively sanctioned for what NIE described as, "…a lack of supervisory and administrative control," which resulted in a theft of such a

---

[13] See SARP **2020-0959**, closed by SARP NIA on May 18, 2023.

[14] The NIE relied on "hojas de entrevista" which are one-sided and uncontested versions proffered by PRPB officers to explain what happened.  As in all preceding CMRs, the Monitor has excoriated the continued use of these self-serving reports, none of which may be relied upon exclusively to determine facts in question.  *To achieve substantial compliance, every single relevant detail in these one-sided statements must be put to the test in a face-to-face interview setting,* where the investigator relies not on yes/no lines of inquiry but rather on responses to open questioning.  See SARP **2020-0959,** *ibid***.**

large amount of money from a "secure" PRPB lockup. The Lieutenant supervising this incident had his complaint inappropriately "administratively closed" because he had died from COVID-19 prior to the administrative investigation.[15]  Every single PRPB member who was present in that facility during the time that money disappeared should have been ordered to submit to a polygraph examination.[16]  The Monitor's final observation of this case is that it unjustly leaves a cloud of suspicion over a deceased member of the PRPB, when a more thorough and effective investigation may have actually cleared that deceased member from responsibility.

After criticizing this over countless prior CMRs, the Monitor continues to find ample evidence that the PRPB continues in its practice of "administratively filing" SARP investigations inappropriately, without conducting a sufficient investigation to determine which of the three circumstances for administrative closure applied. The Monitor has seen multiple cases where the PRPB fails to follow its own criteria.

For CMR-9, one case in particular illustrates this misapplication of administrative closure.[17]  Not only does the record clearly show that this officer has a clear history of sustained cases involving remarkably similar gravely inappropriate conduct towards women, it also shows that on at least five separate occasions, the PRPB has suspended this officer for *identical* conduct.[18]  This officer's disciplinary records also indicate that he has received what may have once been considered multiple 'lifelines' in the form of administrative closures repeatedly during his 10-year career.  This case, along with many others similar cases cited in past CMRs, illustrates the pressing need for the immediate deployment of an EIS system within the PRPB.

This case also contains other errors that have been pointed out repeatedly in prior CMRs.  The investigator used legalistic and closed questioning of the defendant (e.g., *le pregunto*…), which as stated repetitively in preceding CMRs, is not an effective interviewing practice in most circumstances,

---

[15] PRPB rules concerning administrative closure do not seem to apply to the case fact pattern.  This should have been a sustained finding irrespective of the fact that the lieutenant expired after the theft was alleged to have occurred. See SARP **2020-0959**, *ibid*.

[16] According to her interview synopsis, at least one officer under suspicion asked to be placed under polygraph testing to clear her name. The SARP investigator never followed up on such an examination, SARP **2020-0959**, *ibid*.

[17] In SARP Case **2022-1212**, an officer was accused of making inappropriate remarks of a romantic nature to a female arrested party while in the cellblock. Although the complainant was not willing to appear and give her statement to SARP, a quick check of the accused officer's *historial* reveals multiple prior accusations describing conduct on his part that is nearly identical to the case at hand (See SARP **2016-0029** – inappropriate behavior towards a woman - sustained 5 day suspension, **2010-0159** – sexual harassment – sent to OAL in 2010 with no further data, **2010-0142** – sexual harassment of 5 other MNPPRs – not sustained, **2010-0160** –internal sexual harassment complaint – administratively filed, **2010-0158** - internal sexual harassment complaint – administratively filed, **2010-0161** - internal sexual harassment complaint – not sustained, **2010-0113** – inappropriate contact with a victim of domestic violence – sustained 15 day suspension, **2010-0135** – inappropriate contact with a party to domestic violence – sustained 90 day suspension, The last of these two allege a compelling tendency on the part of this officer to attempt to start a dating relationship with the female party involved in a domestic violence situation.  In **2015-0048**, the complainant (possibly a fellow PRPB) accuses the officer of making profane statements and threats to him – sustained 20-day suspension, **2016-0029** – inappropriate conduct towards a store cashier – sustained 5-day suspension.   This 10-year veteran's record contains 9 references to inappropriate conduct of a romantic nature towards women coming into contact with this officer in an official setting (it does appear that 5 of these cases were consolidated into one). Had SARP done its job from the outset, this officer might have been separated from service years ago instead of being allowed to continue in this pattern of intolerable behavior for years under color of law.  Instead, not only has he been left in his position, but he continues unhindered in this apparent cycle of asking women in domestic violence cases if they wish to date him.  The fact that this uniformed public servant is allowed by the Commonwealth to continue to deliver police services **for years** to women in general, and in particular to women involved in domestic violence situations, is nothing less than appalling.

[18] See Agreement Between the US DOJ and the Commonwealth of Puerto Rico, Paragraph 178, which states, … *Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

including during this interview of the accused.  In his use of this discredited approach, the investigator offers up softball yes/no questions to the accused instead of seeking the identity of unknown witnesses or other facts unknown to the investigator that might tend to prove or disprove the allegations.  Not a single question by the investigator involved the accused's conversation with the actual complainant – the estranged husband of the accuser - who reportedly told the defendant that he only filed the complaint because the officer had tried to ask his estranged wife out on a date while she was being held under PRPB custody.  This egregious level of neglect is unacceptable in any investigation but is particularly unacceptable given the record of the officer's alleged conduct and the extraordinary similarity of this accusation to his prior accusations, most of which were proven, sustained, and had discipline imposed by the PRPB.

For this reporting period, the Monitor's Office requested a sample of completed investigations where the identity of the complainant was unknown. The Monitor's Office received no data. The reserves the right to make and report findings in the absence of this crucial data requested from the PRPB.

*Pathway Forward*

If the subject of anonymous complaints were the only measure of compliance under this paragraph, then the Monitor would have made a sweeping non-compliant assessment for the PRPB failure to forward pertinent evidence identified and asked for by the Monitor.  This lack of data is even more troubling considering the numerous irregularities found in the past complaints where the identity of the complainant is unknown to the PRPB.  Over the past two years, very few of these types of complaints have been handled by the PRPB in tenor with the Agreement.  This evidence alone commands a non-compliant assessment.  However, as the Agreement stipulates, there are other criteria such as policy and training that also must be considered in making this particular paragraph assessment.  It is for this reason alone that the Monitor has elected to make a finding of partial rather than non-compliance.

PRPB must forward samples of anonymous complainant generated complaints within the period stipulated.

Administrative closure in the context of an administrative investigation must be reserved **only for allegations that – even if proven**,

1. Could not possibly constitute a PRPB administrative violation, or
2. Cases that are duplicated within the system, or
3. Cases that do not involve an employee of the PRPB.

Any case that is administratively closed by SARP must contain a reference to the applicable rule above, as well as explain in detail why this case has been administratively closed. Good examples would contain the following terminology,

a. …upon investigation, the allegations, even if proven to true, cannot possibly rise to the level of an administrative or criminal violation committed by a member of the PRPB due to…, or,
b. …this case is an exact duplicate of SARP 20xx-xxxx, which is registered within EIS, or,
c. …the accused is not a member of PRPB.

Any case sent to SARP Command for administrative closure without this specific language *and* facts establishing the truth of the matter must be reviewed by SARP Command immediately and returned to the original investigator with instructions that the archival of this case has been **denied** and that a thorough investigation must continue within the timeframe stipulated by the parties with an appropriate and supported finding *of sustained, not sustained, exonerated or unfounded*.[19]

From this date onward, *historial* entries containing reference to administrative closure from CMR-10 forward <u>must</u> contain a reference as to which of the three valid reasons cited above were applied to the facts in each and every case that has been administratively closed.

The mere fact that the complainant's identity is unknown to the PRPB is **never** an acceptable reason or motive to administratively file **any** complaint against a PRPB.

Lastly, the Monitor has pointed out time and again that the PRPB must properly investigate all complaints where the complainant's identity is unknown.  Any investigation not meeting any of the three administrative closure criteria above must be investigated by SARP NIA (and possibly NAI) as if the complainant were a known individual with some level of credibility.  No case of either administrative or criminal misconduct should be administratively closed unless it meets the PRPB's own administrative closure criteria cited above.

The continued use of inappropriate techniques, incomplete investigations, cases archived counter to PRPB rules, mishandled or poorly investigated anonymous complaints, and the non-concurrence of administrative and criminal internal investigations effectively bar any hope of achieving substantial compliance with this paragraph.

## Paragraph 179: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | April 2023 – September 2023 |

---

[19] Obviously, the problematic cases cited in this report must be returned for thorough re-investigation, if OAL has not already returned these cases to SARP for amplification.  Erroneous findings must be replaced with facts based upon evidence uncovered, findings must be analyzed at the Area, SARP Command and OAL level to ensure that the investigation was thorough and that the conclusions are supported by said facts.

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | ☐ Met  ☑ Missed |
| 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | ☐ Met  ☑ Missed |
| 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

The Phase I/Phase II analysis allows the Monitor's Office to accurately assess, in close to real time, SARP's adherence to investigative deadlines.

While there has been some marginal improvement, the Monitor's Office found several examples where the 5-day assignment rule, the 90-day investigative deadline rule, and the 3x30-day extension rule were not appropriately followed. There were also cases that lacked the paperwork memorializing these time deadlines.  Unfortunately, the number of cases encountered was greater than the 5% threshold.

As for the 90-day rule and the extension mechanism, and where the entire record of a case file is complete - the record shows that the majority of SARP investigators are cognizant of these deadlines and most seek extensions where indicated.  Notwithstanding this, there have been multiple incidents of repeated, legitimate requests for extensions that were delayed prior to eventual approval by the SARP Command. These repeated delays ranged from a matter of days to well over a week. In fairness, all signs point to the investigator continuing the investigation in earnest while awaiting written approval for the extension.

While minor cases of misconduct are adjudicated within SARP by SEAQA, the Monitor's Office has observed persistent delays in the adjudicative phase of serious complaints, which according to PRPB Rule 9088 (Processing of Administrative Complaints), must be conducted by OAL within a thirty-day time period.[20] Not only are OAL and SEAQ limited to 30 days limit to adjudicate, the 30 days also includes notification of the parties about the disposition of the underlying complaint.[21] Compliance with these self-imposed deadlines is the exception, and not the rule.

---

[20] See PRPB Rule 9088, Article XII, s.5.
[21] ibid, Article XII, s.2. Also, see previous comments on the superfluous practice of notifying officers in hand via PPR 441.

For nearly two years, the Monitor has stridently criticized the PRPB OAL Office for having been effectively gutted in terms of its staffing and resources.  It has also come to the Monitor's attention that SEAQA, (the SARP bureau that adjudicates less-serious offenses) is also woefully understaffed and overtasked at present.

As the government entity now in charge of both Human Resources and Recruitment and Procurement, DSP should be held responsible to remedy these chronic deficiencies before publication of CMR-10.  In the near future, the Monitor will interview *oficiales examinadores*, (PRPB members who conduct due process disciplinary hearings), to ensure that the number of these essential members is adequate to perform these duties in a timely and efficient manner.

*Pathway Forward*

As the agency responsible for PRPB Human Resources and Procurement, DSP must adequately staff PRPB/OAL and SARP-SEAQA to ensure that the self-imposed 30-day limit for adjudication and notification is met. Compensation of OAL lawyers and paralegals must be commensurate with and reflective of their professional and academic achievements.

To further any attempt at achieving substantial compliance, the Monitor's Office recommends that DSP draft a strategic plan to increase OAL hiring, retain OAL staff through adequate compensation, and develop a timeline to bring PRPB into compliance with its own 30-day adjudicative deadline.  This strategic plan should be shared with the Monitor no later than the Monitor's first 2024 visit to the island – in mid-January 2024.

## Paragraph 180: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. 95% of selected investigations are thorough and findings are consistent with the facts | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

220

*Compliance Assessment*

Over the short term, the Monitor's Office expects to see only modest improvement in this paragraph. The Monitor's Office is aware of policy and procedural changes officially proposed by SARP to help achieve compliance with this paragraph. These changes include audio recording of all interviews (upon consent), as well as the creation of a faithful and accurate transcript by transcription experts, and not, as the PRPB has suggested – by its overtasked SARP investigators.

The Monitor's Office has also long criticized the interviewing techniques employed by most SARP investigators, specifically as they relate to establishing a conversational rather than legalistic tone. The latter usually results in abrupt and often short, self-serving answers to interview questions, while the former is designed to place the interviewee somewhat at ease and extract more information, which in turn generates more investigative leads.   Especially at the beginning stages of an interview, conversational interviewing should be used in all SARP cases. Near the end of an interview, direct questioning should be employed to directly confront a witness with contravening evidence to obtain information from a recalcitrant/hostile witness or for otherwise tying up any other loose ends in the investigation.

Internal Affairs investigators still often rely upon a variant of an "hoja de entrevista,"[22] which at times contains an investigator's transcription of the witnesses' statement, and at other times is just handed out to the witness to write an unchallenged statement in their own hand. The Monitor's Office continues to object over the use of "hojas de entrevista" as a stand-alone tool for conducting any interview of any kind, but especially SARP interviews.

Lastly and for the record, the Monito is foursquare opposed to the suggested practice of having PRPB SARP investigators create their own transcripts of future recorded SARP interviews.  From what the Monitor has heard in over a hundred and fifty private interviews, most SARP investigators presently handle a robust caseload.  In fact, some investigators are handling over a dozen open cases at once, with additional cases assigned each week.

Multiply this caseload of twelve by a factor of at least two witnesses per case and now we've reached a time commitment of well over a week of full-time work merely for the investigator listen to and transcribe these interviews. To ask such an investigator to conduct at least twenty-four one-hour interviews and then spend well more than double the same amount of time to create a transcript of these interviews is a waste of valuable and scarce investigative resources.

*Pathway Forward*

Current SARP members will require substantive in-service training once policy and practice changes are finalized.

Regarding recommended changes, the Monitor's Office continues to recommend that:

1. The use of *hojas de entrevista* only for "locking in" and memorializing the version of a PRPB member at any time before an actual in-person interview (either by NAI, NIA, or NAA) of the same

---

[22] *Hojas de Entrevista* also refer to a one-sided, unchallenged written version of the subject's account of the incident, which has been observed frequently in Internal Affairs (internal criminal) investigations in the past. This particular use of *hojas de entrevista* was previously and stridently criticized by the Monitor's Office.

subject. The interviewer should use the *hoja de entrevista* prior to and during the in-person interview to ask questions and to clear up any areas left unclear or in doubt.

2.  All SARP interviews are digitally recorded upon written consent of the interviewee. Said recordings should be transcribed by a professional transcriber and not the investigator.

3.  SARP interview practice must be rooted in an open style rather than legalistic style. Open-ended questioning must predominate, especially in the first part of the interview, to place the subject at ease. The words, *le pregunto*, should be avoided as part of the conversational interview style, but could be employed later in the interview to deal with recalcitrant/hostile witnesses, or to clarify answers and thus eliminate ambiguity.

4.  In cases where there is a preponderance of evidence that a PRPB member, whether complainant, witness, or accused, has attempted to deceive a SARP investigator, that member must receive a 'sustained' finding for untruthfulness, irrespective of whether the PRPB member was involved in the misconduct alleged in the complaint in any way.

5.  Anonymous whistleblower complaints must be investigated as if the person making the complaint is both known and reliable, at least until such time as the complainant's reliability has been substantially called into question by known facts.

## Paragraph 181: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | ☑ Met | ☐ Missed |
| 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

222

*Compliance Assessment*

While SARP investigator interviews indicate that PRPB officers show up for interviews, the content of these interviews may vary in terms of quality. Occasionally, when asked direct questions that go to the heart of wrongdoing by another officer, some officers may claim a faulty memory of the event itself, seemingly to avoid implicating that officer in alleged misconduct. "I don't recall," is perhaps the most common contemporary take on the notorious code of silence, as the officer feels as if s/he has neither lied to the investigator nor implicated a fellow officer in misconduct. In some of the worst examples, directly contradicting information between fellow officers in serious cases are left unreconciled.

*Pathway Forward*

As mentioned repetitively in this report, the Monitor's Office recommends that no case be closed when officers directly contradict one another concerning a material fact in a serious internal misconduct case of any kind.[23]  In the case of those officers whose memory allegedly fails when asked a direct question regarding their observations of another officers' alleged misconduct, the SARP investigator should employ some additional questioning to test just how poor the officers' memory is concerning other events that happened contemporaneously. In nearly all the cases involving memory examined by the Monitor's Office, including several more recent cases, this "poor memory," or "I'm not sure," assertion by an officer is invariably left untested by the investigator.

These declarations must be properly challenged, e.g., "Officer, you remember handcuffing the man, so how could you not remember your partner removing the man's watch at the same time?"  Additional follow up questions may include,

1.  "Why don't you remember?"
2.  "Is there anything that would refresh your memory on this?"
3.  "Are there any documents that could help you remember?"
4.  "Who might know the answer?"
5.  "How would <u>you</u> get the answer to this question?" and
6.  "Do you have any reason to dispute the complainants' version of the incident?"

Negative answers to some or all these questions may be used by the investigator to determine the declarant's level of veracity when claiming a lack of memory to answer certain questions and not others that may be exculpatory to the officer or his/her peer(s).

Where two or more PRPB officers offer statements that are diametrically opposed over a material fact in an investigation involving very serious misconduct, the investigator should request a polygraph interview and examination to help further indicate the reliability of an officer's statement of material fact. Once any declarant's veracity has been effectively called into question on any question of material fact, then the declarant's version of the event in question is effectively undermined.

## Paragraph 182: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

---

[23] In an administrative scenario, with no apparent criminal exposure (or in the case of <u>Garrity</u>, where there *may* exist criminal exposure on the part of any party), the declarant must answer all questions truthfully, or otherwise be subject to dismissal from the agency. In the case of <u>Garrity</u>, such declarations and their derivatives may not be shared with Internal Affairs, nor with any criminal prosecutor.

*The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

Working closely with the Monitor, the PRPB has crafted an acceptable Garrity policy. As this was a recent occurrence, the Monitor's Office has not yet found any use of a <u>Garrity</u> warning to compel an officer to make an administrative account of his conduct while simultaneously being subjected to a related criminal investigation for the same incident. The Monitor will be looking for cases that meet these requirements beginning in CMR-10.

*Pathway Forward*

SARP has demonstrated to the Monitor's Office that they now possess an acceptable <u>Garrity</u> policy, which is the condition precedent for achieving any level of compliance in the future.

PRPB must now train its investigators to understand how and when to use the new policy.

### Paragraph 183: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

For the entire compliance monitoring phase, including CMR-1 to CMR-9, the Monitor's Office has not uncovered a single instance of a PRPB member being Mirandized where no possible criminal jeopardy could have arisen from the facts as alleged.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 184: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | ☑ Met   ☐ Missed |

225

| 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | ☐ Met  ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

While the Monitor's Office has seen and approved changes to PRPB policy and procedure to make this practice standard in most cases, the Monitor's Office has yet to see conclusive evidence that internal cases are investigated criminally and administratively at the same time by different investigators.

### Pathway Forward

Internal criminal and administrative investigations must be conducted concurrently and by separate corresponding branches of SARP, e.g., NAI and NIA. Internal Affairs (NAI) investigators are not to be conducting administrative investigations of any kind, much less be assigned to re-investigate their own cases from an administrative angle. So long as this unacceptable practice lingers, it creates an effective bar to achieving any status beyond that of "partial compliance."

## Paragraph 185: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Compliant | | |

### Compliance Targets

| 1. Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | ☐ Met  ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

SARP has developed a policy and procedure in tenor with <u>Garrity</u>. As of this date, the Monitor has seen no evidence that SARP investigative workforce has been trained in said policy. The Monitor is also unaware as to when the policy will be effectively implemented.

### Pathway Forward

226

SARP investigators must all be trained on the new rule, whereupon the Monitor will look for compliance based upon the investigative file reviews.

## Paragraph 186: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

Based upon multiple interviews of SARP investigators and analysis of case samples, the Monitor has seen precious little evidence that circumstantial evidence (especially prior remarkably similar allegations of misconduct on file with PRPB), is being routinely considered by SARP investigators.

Secondly, as pointed out in paragraph 181, most SARP investigators accept an officer's assertion of a memory lapse in their internal investigations without further questioning. While pursuing this line of questioning may be uncomfortable for the SARP investigators, it is essential that the SARP investigator do everything in his/her power to get to the truth of the matter.

### Pathway Forward

The Monitor's Office expects to see ample and practical discussion of the standard of proof used and the types of circumstantial information that may tilt the balance away from a tie and towards a finding in favor of either party.

SARP investigators must be trained to analyze a member's *historial* in a closely decided case to determine whether the accused's alleged misconduct in the past is uncannily like the case presently under

investigation. This is especially important when this evidence may push the probability of occurrence from 50-50 to 51-49 or higher, which should then result in a sustained finding against the member.

A SARP investigator must not blindly accept a declaration of, "I do not recall," from a PRPB member in response to a question of material fact in a SARP investigation. Instead, the investigator should question that member's level of recall with a series of follow up questions.

## Paragraph 187: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

1. 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.  ☒ Met  ☐ Missed

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor's Office has yet to observe a case that had been closed because a complaint was withdrawn, the alleged victim failed to cooperate, or the complainant was found guilty of any offense.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 188: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

*a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;*

228

b) *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

c) *"Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*

d) *"Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | ☐ Met   ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### *Compliance Assessment*

The Monitor's Office has seen several cases in this reporting period where the SARP investigator, the Area Commander, and the SARP Commander left an incongruous finding in place. This commonly manifests itself as a confusion between a "not sustained" and "exonerated" finding.

Simply put, all must understand that the findings of exoneration apply only when the preponderance of evidence reveals that the conduct did occur, and that the conduct was proper (in accordance with PRPB rules, policies, and/or procedures). If there is any substantial doubt that the incident occurred, then the appropriate finding would be "unfounded."

### *Pathway Forward*

The Monitor's Office urges SARP to clarify the difference between its four factual case findings among all staff during all scheduled training events.

### Paragraph 189: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor has learned during the monitoring period that digital signatures and time stamps have now been incorporated into current SARP cases under investigation and entered into the EIS system.

### Pathway Forward

The Monitor's Office understands that this change has been made mid-course and will continue to check for compliance in this area in future CMRs.

### Paragraph 190: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

230

| 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☒ Met    ☐ Missed |
|---|---|
| 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☐ Met    ☒ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

The Monitor's Office finds that the OPC eventually reviews and resolves complaints in tenor with the paragraph in at least 95% of the cases examined. However, there remains no doubt whatsoever that severe understaffing of both OAL and SEAQA has had a deleterious impact on the *timing* of these final results by the Commissioner. Indeed, the Monitor has found numerous examples of cases that took months, even years after the case was originally forwarded to OAL or SEAQA, for that Commissioner to sign a "final resolution," on the case, effectively closing it and imposing discipline where required.

According to the PRPB's own policy, once an investigation has been concluded, then either OAL (in serious matters) and SEAQA (in less-serious matters) has thirty days to reaffirm said finding and notify the parties. The Monitor's review clearly indicates that compliance in this particular area is more the exception than the rule.

*Pathway Forward*

For two years, the Monitor has pointed out the absence of sufficient resources in OAL, SEAQA and OPC dealing with case adjudications and notice to the parties as PRPB rules demand. In the June 2023 hearing before the Court, the Commonwealth represented to the Court that the process to identify and contract these lawyers without any further and unnecessary delay. The Monitor made diligent attempts to confirm this representation made before the Court and has discovered no information whatsoever in the public record that such an announcement had been made or has since been made.

For so long as the DSP/PRPB fails to cure this *resolution lag*, it will become impossible for the PRPB to achieve "substantial compliance." It is unjust and likely unconstitutional to either hold or deny a police officer's promotion due to their agency's inability to follow its own rules.

The Monitor's Office recommends that, when a finding is changed at the SARP command, OAL, or the OPC levels, that the initial investigator not only be informed of such a change, but also receive a brief rationale for said change. To add a brief explanation to the file and to grant access to these findings permits the investigators to follow their investigative results as they are adjudicated and helps to instill transparency and clarity in findings.

## Paragraph 191: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s).*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 178.

*Compliance Assessment*

The Monitor's Office has examined cases investigated during the reporting period for the inclusion of the following observations on the part of the investigator:

(a) Compliance with training and legal standards.

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome;

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action; or

(d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

The results of this analysis are clear. In the vast majority of SARP cases reviewed for this reporting period, the investigator did not mention any of these observations in their final report.

*Pathway Forward*

PRPB must emphasize the inclusion of observations (a) through (d) as noted above in every case file. This could be accomplished on their cover sheet "checklist" as checked boxes indicating that the analysis was made and was concluded as "negative" or "not applicable." In the case where the observation was made in the investigation, the investigator must specifically elaborate on the observation in his/her report.

To reach the current body of SARP investigators, the Monitor's Office recommends the use of in-service training where appropriate to ensure that all SARP staff understand the new policy and procedures.

## Paragraph 192: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review*

232

*of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | ☑ Met | ☐ Missed |
| 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

In all closed cases reviewed with a known complainant, the complainant received timely notification of the status and outcome of the SARP investigation. Additionally in these same cases, all complainants were notified of their ability to appeal a finding to CIPA.

## Paragraph 193: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

233

| | |
|---|---|
| 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | ☑ Met  ☐ Missed |
| 2. PRPB's document retention practices comply with approved policies. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

On-site document reviews conducted by the Monitor's Office indicate disciplinary files relating to officers separated from service are maintained by PRPB and that PRPB's document retention practices comply with approved policies.

## 5. Staffing, Selection, and Training Requirements

PRPB continues to have difficulty across the board ensuring that all its investigators have been formatively trained and certified. Now that presential learning is back, PRPB is now focused on ensuring that all its investigators are formatively trained via an updated version of REA 114 (SARP Investigator Training).

As policies and investigative techniques continue to change, PRPB must ensure that all current investigators are familiar with and can demonstrate their familiarity with all of these new procedures.

All assessments in general, and those involving SARP investigators and staff, should contain a presential component. Supervisors should meet with subordinates to privately discuss areas where the subordinate is excelling, and areas where a subordinate may improve their performance. Specific advice or coaching should always be given to the subordinate with a goal of improving the employee's performance and job satisfaction.

Performance assessments between the 4.8 and 5.0 level should less frequent. In categories where this performance level has been assessed, an added explanation of such an exceptional performance level in any category should be included in the record.

### Paragraph 194: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | |

234

| Practice: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☑ Met | ☐ Missed |
| 2. Trainings for the internal investigation unit are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | ☐ Met | ☑ Missed |
| 5a. Internal investigation unit personnel serve three-year terms. | ☑ Met | ☐ Missed |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office received no documentation indicating that all of its members have been formatively trained via REA 114 (SARP Investigator Training).

Similarly, the Monitor's Office has not received documentation indicating that any member of SARP has received in-service training over the past year that specifically relates to their duties as SARP investigators.

From extensive interviews with SARP members, the Monitor's Office continues to find that the decision process to extend an investigator's service period appears to be *ad hoc* in practice.

The Monitor's Office has reviewed recent procurement requests from SARP command and has found that some of the requested personnel and resources have been delivered. However, there is still a need for off-site NAI office space, additional investigators, and improvements to the vehicular fleet.

### Pathway Forward

The Monitor's Office expects DSP to address SARP requests for human resources, equipment, and office space at its highest priority and to deliver these resources without any unnecessary further delay.

Having absorbed the procurement function of PRPB, DSP must now procure adequate office spaces to house NAI investigators. Aside from being located outside of any PRPB facility, this space must contain adequate infrastructure (securely alarmed premises, sufficient Internet access, secure communications, desks, chairs, cubicles, private interview space, etc.). These are all prerequisites for a substantial compliance finding for this paragraph.

### Paragraph 195: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation.*

| Compliance Status | Assessment Schedule |
|---|---|

235

| Partially Compliant | | Review Period | April 2023 – September 2023 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

Very few SARP investigators describe a conversation with their superior(s) over whether they would choose to stay in SARP or transfer to another section after their three years of service. After interviewing virtually every SARP investigator, the Monitor's Office concludes that most investigators, if given a choice, would choose to stay in the unit. Nevertheless, every SARP member should be asked every three years if they'd like to be assigned to another part of the agency.

*Pathway Forward*

Re-appointment of SARP investigators for additional three-year terms should not be an automatic practice, but rather one based upon a series of <u>objective</u> performance reviews. The three-year period should be looked at as an opportunity to shift out investigators who are burned out or unmotivated. It should also be looked at as a career-improvement measure.  If SARP asks its highly productive members if they're content, those members invariably will provide needed insight into workplace conditions and morale.  SARP members who on their own volition unilaterally transfer out of SARP should do so via an exit interview conducted by the Area Commander. This interview may help SARP determine what, if anything, led to the investigator's decision to voluntarily leave the unit. Exit interviews develop actionable information on recruitment, morale, and retention of investigators.

PRPB should execute a uniform and transparent evaluation process for its members including mandatory supervisory feedback in every evaluation period.

## Paragraph 196: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | April 2023 – September 2023 |

| | | Period | |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

The Monitor's Office did not receive documentary proof that all investigators have been formatively trained. Similarly, the Monitor's Office has seen no documentary proof that all SARP investigators have received required annual in-service training specifically related to SARP investigations.

SARP has partnered with SAEA and has consulted with the Monitor's Office as a subject matter expert to rewrite formative and annual specialized training content. The Monitor is presently in possession of the new course textbook.

*Pathway Forward*

PRPB must show conclusive evidence that all SARP investigators have been formatively trained.

In the case of veteran SARP investigators, PRPB must show conclusive evidence that all SARP investigators have received annual specialized SARP in-service training.

SARP and SAEA must work together expeditiously towards a goal of formatively training and certifying all SARP investigators while also ensuring that all current SARP investigators receive their annual re-training.

Lastly, SARP and SAEA should work together to address any of the following areas of observation made by a SARP investigator in any SARP report,

(a) Compliance with training and legal standards, or

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome, or

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action, or

(d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

## 6. Preventing Retaliation

In the present SARP file sample requests, complaints specifically involving retaliation usually comprise a small percentage of cases within the given sample. The Monitor's Office has some fears concerning investigations that are ongoing as of this writing and will be scrutinizing these cases very carefully once

they are declared to be complete. The Monitor's Office reserves the right in the future to draw a purposive sample of SARP cases that specifically feature such allegations to ensure a statistically relevant assessment for future CMRs.

## Paragraph 197: Civilian Complaints, Internal Investigations, and Discipline - Preventing Retaliation

*PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Retaliation trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | ☐ Met | ☑ Missed |
| 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

The Monitor's Office will be meticulously examining high profile cases, which often involve possible retaliation, to ensure that they were properly and thoroughly investigated, that the outcome and findings were adequately supported by the facts, and that the findings were adjudicated expeditiously in accordance with PRPB policy.

### *Pathway Forward*

PRPB must ensure that every single one of its investigators has both successfully completed REA 114 (SARP Investigator Training) as well as an annual re-trainer specifically designed for active SARP investigators.

SARP investigators must review the accused officer's *history* in every case, especially those cases that involve repeated allegations of remarkably similar behavior involving similar complainants. Irrespective of whether this analysis supports a finding of *sustained* or *not sustained*, the investigator should mention the accused's past record of having been accused of remarkably similar conduct by similar types of people. The investigator must also determine whether their investigation and the record of prior similar accusations by similar complainants reaches the 51% burden of proof for a sustained finding or not.

As retaliation cases often have an acutely negative impact on morale at all levels of a police agency, SARP investigators must exhaustively investigate these allegations. No investigation involving reprisal within PRPD should be filed administratively, nor should any such case ever be considered complete when untested and diametrically opposing versions of the facts remain between sworn PRPB members. In these serious cases, which have severe implications for institutional morale and discipline, every legal tool must be employed to determine who is being truthful and who is not – irrespective of the ranks of the persons involved. Only once every legal avenue to the truth has been tested may such a case be considered completed and closed.

## 7. Discipline

The use of a Phase I/Phase II analysis has assisted the Monitor's Office in focusing on the adjudicative and resulting disciplinary process of many types of complaints.  The Monitor has discovered a disturbing practice of delay in adjudicating serious allegations of PRPB misconduct in the time prescribed by their own rule.  These delays are considerably beyond the 30-day limit, and in many cases the Monitor has seen frequent delays of months to beyond three years.  All during this period of time, the accused officer is effectively barred from promotion. It is in these cases that the Commonwealth is denying economic opportunity to a person who, if everyone performed their roles according to PRPB's own rules, would have been promoted in rank *and salary*. The Monitor has been informed of due process lawsuits filed against the Commonwealth under this theory of recovery.

The Monitor's Office continues to see that discipline is applied in accordance with the PRPB Code of Conduct and related disciplinary matrix.

As is the case with many other areas contained within this section and mentioned previously, training records must be provided to the Monitor's Office to show proof that the requisite number of PRPB members have been appropriately trained.

### Paragraph 198: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2023 – September 2023 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 198-199. | ☑ Met ☐ Missed |
| 2. Discipline trainings are consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☑ Missed |
| 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | ☑ Met ☐ Missed |
| 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | ☑ Met ☐ Missed |

### Compliance Assessment

The Monitor's Office bases this assessment on a Phase II examination of multiple closed cases, each of which received a Final Resolution during the reporting period. While this group of cases was far more dated than those subjected to a Phase I analysis, the Monitor's Office may conclude that PRPB is using its disciplinary matrix as it was designed to be used. This does not mean that the PRPB is anything close to meeting its own rules requirements with respect to adjudication or notice to the parties, as has been repeatedly stated in this report.

The Monitor's Office finds that PRPB acts within the scope of its progressive disciplinary matrix in meting out discipline.

The Monitor's Office continues to suggest that, when the Police Commissioner deviates from the disciplinary matrix, which most often involves a downward departure on the number of days an implicated party is suspended, there should be a short reason as to why such deviation was made. The absence of any explanation for downward (or even upward) changes from the disciplinary code sanctions creates fertile ground for accusations of favoritism, influence, nepotism, or political interference, all of which may be devastating to institutional morale.

### Pathway Forward

PRPB must show that all relevant members have been trained and certified on discipline policies to reach substantial compliance.

No internal investigative case either of a criminal or administrative nature should be closed when the investigation leaves in place a direct contradiction between versions of sworn PRPB officials of any rank without first exhausting all attempts to reconcile the discrepancy.

In cases where the Final Resolution findings depart from the original investigator's findings, said investigator should be able to access these findings online and find a brief, written rationale for the

240

deviation from the SARP investigator's findings.  This helps maintain transparency within SARP as well as provide helpful feedback for investigators.

## Paragraph 199: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 198.

*Compliance Assessment*

The Monitor's Office has seen multiple cases where a deviation was made from an investigator's finding, either resulting in a downward departure in discipline, or changing the finding, (e.g., from 'exonerated' to 'not sustained').  The usually happens at the level of the Police Commissioner, who by stature is the ultimate arbiter of internal discipline under *Ley 20* as presently annotated.

## Paragraph 200: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB's drug testing program trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | ☑ Met | ☐ Missed |

## Compliance Assessment

Examination of PRPB's random controlled substance testing clearly shows a minor decline from the previous reporting period. For this reporting period, PRPB performed screenings of 1,549 persons versus 1,824 persons last reporting period.  PRPB needs to trend closer towards 4,000 random screenings a year to help ensure that every active PRPB member is screened at random at least once every 3 years, which is the ideal.

There were also no training records forwarded to the Monitor's Office concerning drug testing.

## Pathway Forward

The Monitor's Office is pleased to see significant progress in PRPB's controlled substance testing program relating to the aggregate number of persons tested annually.

From the tables supplied by PRPB, and except for cadets and cadet candidates, it is not possible to determine how long the active PRPB members had gone without prior testing. The Monitor's Office continues to recommend that PRPB prioritize testing sworn officers who have not been tested in the last five years.

The Monitor's Office recommends that, wherever possible, controlled substance testing be performed on all applicants for any position within PRPB, *prior* to being contracted for employment and certainly before entering the police academy.[24]   The Monitor's Office also reaffirms that the aggregate number of tests conducted annually be increased to approximately 4,000 members, active as well as incoming cadets. Extrapolating the data supplied, PRPB is not trending towards the quantitative goal of 4,000 persons.  The Monitor's Office remains open to suggestions from and collaboration with PRPB to make this process more innovative, efficient, and effective.

PRPB must forward aggregate training records for any given reporting period to indicate personnel are trained and certified on PRPB's drug testing program policies.

---

[24] While drug testing has a cost in terms of human resources as well as the test itself, that cost is minimal compared to performing a full-spectrum background investigation. The Monitor's Office notes that 26 persons on this list were tested as cadets already enrolled in the Police Academy. To perform such an in-depth investigation only to later discover that the candidate tested positive for a controlled substance implies a less than efficient use of candidate screening resources.

## 8. Officer Assistance and Support

If there is any portion of this section that has been well-designed, clearly codified within PRPB rules, and well-executed by the corresponding branches of the PRPB, then PAE, the PRPB's employee assistance plan, is that example.

The Monitor's Office continues to find the PAE program to be highly effective and thus in substantial compliance with the Agreement. Where a lower level of compliance is assessed in the foregoing, it is due to the lack of trainings held in the subject matter area, and not a failure of PAE in any way.

### Paragraph 201: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 201-204. | ☑ Met | ☐ Missed |
| 2. Officer assistance and support trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | ☑ Met | ☐ Missed |
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | ☑ Met | ☐ Missed |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

243

A substantially compliant rating for this reporting period would have been given if PRPB supplied training and certification records for officer assistance and support policies.

*Pathway Forward*

PRPB must include documentary proof that personnel are trained and certified in officer assistance and support policies.

### Paragraph 202: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

Documentary evidence submitted to the Monitor's Office by PRPB demonstrates that fewer than 95% of PRPB officers are up to date on the Professional Burnout and Risks to Wellness course (TSDP).

*Pathway Forward*

PRPB must ensure that all who are required to take the TSDP course have taken it for the next reporting period.

### Paragraph 203: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall involve mental health professionals in developing and providing in- service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |



| | | | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

The Monitor's Office will continue to assess this paragraph to ensure that it meets the requirements of this paragraph.

### Paragraph 204: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*


*Pathway Forward*

The Monitor's Office will continue to assess this paragraph to ensure that it meets the requirements of this paragraph.

# X. Community Engagement and Public Information

Of the 13 paragraphs within Community Engagement and Public Information, a limited number are assessed every six months. A comprehensive review of this entire section was provided in CMR-8 and will be provided again in CMR-10. For CMR-9, only 9 paragraphs (Paragraphs 205 - 207, 211 - 212, and 214 - 217) are assessed in this report and, in most instances, only specific targets within these paragraphs are assessed biannually. The compliance targets assessed in this reporting period are bolded in the paragraphs identified above.

The paragraphs assessed during this reporting period center primarily on PRPB's efforts to establish and demonstrate effective practices in the implementation of community policing. Such practices encompass 1) the recruitment of a diverse and representative workforce; 2) performance appraisals; 3) personnel deployments in response to community engagement efforts; 4) collaborative problem-solving activities through the implementation of the SARA Model; 5) meaningful outreach activities purposely focused on education, prevention, and awareness; and 6) improving the community's quality of life through strategic and structured planning for vested community interactions. Public Information requires keeping the public informed about new policies, police practices, and the dissemination of accurate and updated monthly crime statistics, including hate crimes, gender and domestic violence, and child abuse. Public information thus facilitates direct communication channels for transparency and accountability in the Bureau's exchanges.

Partial progress has been achieved in community engagement and public information during this reporting period. However, these strides are at the administrative level which are currently in the developmental stages for continued implementation. Those changes must be progressively demonstrated through structured strategies, organized initiatives, work plans, established timelines, and evidence for compliance assessment moving forward.

During this reporting period, the Monitor's Office re-reviewed GO 127 (Multimedia), and interviewed PRPB members directly involved in community policing and outreach at various levels within the districts, precincts, and area commands. Interviewees spanned 8 police areas, 4 specialized units, and members of the Community Interaction Committee (CIC), who represent the community within all 13 police areas. Additionally, the Monitor's Office attended a Conversatorio, a community meeting held in Guayanilla hosted by the Ponce CIC and a Central CIC meeting held in Aguadilla. Finally, the Monitor's Office observed a validation exercise at the executive level as part of a training session on community policing for PRPB facilitated by the Reform Office.

The Monitor's Office also held a community meeting in Hato Rey where community stakeholders within the Metro area had the opportunity to share concerns from their representative perspectives and voiced the need for PRPB to become directly involved to improve the community's quality of life and actively engage in problem solving initiatives through articulated and structured plans. Additionally, the Monitor's Office held a Townhall meeting in Ponce through joint efforts with PRPB. Approximately 130 community members and stakeholders including Community Safety Councils (CSCs), representatives from various municipalities, and CIC representatives attended this meeting. The Honorable Francisco A. Besosa, US District Judge for the District of Puerto Rico, addressed the group along with guest speakers

Alexis Torres, DSP Director; PRPB Commissioner Antonio Lopez, and USDOJ representative Luis Saucedo, Esq.

Progress towards substantial compliance is hampered by lapses in training in community policing through SAEA. Progress requires greater commitment to capacity building for a comprehensive approach in community policing, including best practices in the implementation of the SARA Model for problem solving, community outreach through public education, awareness, and prevention, and the development and sustainment of meaningful community alliances.

On the positive side, the Monitor's Office saw significant improvement in securing CIC members in each police area during this reporting period. The CICs are instrumental in providing recommendations to PRPB on policies, recruitment, and implemented strategies based on the perspectives, experiences, and needs of their representative communities. However, PRPB continues to struggle to deliver all training required to confirm these members. Training CIC members to perform their required duties remains a longstanding and unresolved issue for PRPB. Moreover, PRPB must expand its joint efforts with the community to develop and deliver a comprehensive community policing approach that collaboratively identifies and implements evidence-based strategies to address crime and safety issues within each of the 13 area commands and the CICs. CICs input must be sought in all functions established by policy, including policing practices, victim services, community feedback and training, compliance with the Agreement, and disseminating information to the public with added transparency.

Key areas of non-compliance with community outreach practices, as outlined in the Agreement, include 1) reaching out to the community and delivering information to the public through open meetings (Encuentros Comunitarios) to address issues of community concerns, 2) reporting on Agreement progress, and 3) educating the public on topics outlined by the Agreement, including crime statistics, UOF, nondiscriminatory practices, administrative complaints and commendations, individuals' rights to decline consent to voluntary searches, among other topics. The Bureau's struggles to deliver these meetings remain unchanged from previous CMRs. The Agreement and PRPB policy require holding these meetings at least once per year in each of the 13 police areas. However, evidence reviewed revealed that only one police area held its open meeting, and even in that case documentation in support of the activity was incomplete. Four other police areas submitted documentation for assessment; however, they did not meet compliance targets, as the activities submitted as evidence were documentation of "Conversatorios," which are initiatives carried out by the CICs.

Community dashboards were made available to the public on May 18, 2023, allowing the public to obtain criminal statistics through public reports. This is a significant milestone reached by the Bureau in efforts to facilitate public information in a more transparent and public-friendly format, to the extent allowable by law. However, the dashboards currently do not suffice to render a substantially compliant rating. The reports do not contain statistics on hate crimes, gender violence, including violence against transgender individuals, or child abuse. PRPB also redesigned its website by incorporating a sign language interpreter to the Commissioner's message on the website and will employ closed captioning through its multi-media resources to help keep the deaf community informed, in the absence of a sign language interpreter for added sensitivity towards diversity and inclusion within the community.

247

These gains notwithstanding, PRPB's efforts to reach out to and educate the public remain insufficient to date. PRPB must maximize use of internal resources, including multimedia tools and the Press Office, to educate the public and convey awareness to the community about participation in community policing. The public should be aware of opportunities to participate in focus groups, provide input on strategies to fight crime, inform crime trends, review policies and practices, communicate the Bureau's progress on the Reform, and address issues in domestic and gender violence and non-discriminatory practices, among other topics. Expanded and targeted efforts should include the development of informational campaigns through videos and podcasts for dissemination.

Overall, the Commonwealth's compliance with the nine Community Engagement and Public Information paragraphs assessed during this reporting period reflect similar levels of compliance noted during previous reporting periods. In CMR-7, the last CMR in which all this subset of paragraphs, were reviewed, 44% of the paragraphs (4 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 67% (6 paragraphs) were found to be partially compliant. See figure 10.



*Figure 10. Community Engagement and Public Information: Paragraph Compliance Status*

## Paragraph 205: Community Engagement and Public Information - General Provisions

*PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |



| Training: | Not Implemented | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

### Community Policing in Policy

GO 803 (Community Policing) has been in effect since October 31, 2021. This policy requires revision every two years and is subject to compliance assessment in CMR-10. The Monitor's Office's review of the standing GO 803 meets requirements thus far.

### Community Policing Training

As in previous CMRs, and consistent within this reporting period, PRPB's progress towards substantial compliance is hampered by incomplete training in comprehensive approaches to community policing through SAEA. The curriculum must include 1) best practices in the implementation of problem-solving through the SARA Model, 2) community outreach through education, prevention, and awareness, and 3) the development and sustainment of meaningful and purposeful alliances. Additional challenges arose from factors including 1) personnel redeployment due to promotions, attrition, or retirement, and 2) limited capacity of supervisors to coach subordinates in community policing, strategic planning, structured initiatives, and follow through in community engagement.

### Community Policing in Recruitment

Recruitment and personnel retention are fundamental to institutionalizing community policing practices. PRPB has made efforts to address these challenges through a comprehensive recruitment plan, but the plan has fallen short in practice. The Monitor's Office recognizes that the recruitment unit and its director understand the value of diversity and are committed to securing qualified applicants that represent a broad cross section of the community. During CMR-8, the Monitor's Office concluded that PRPB's recruitment plan required modifications in alignment with community policing to secure potential candidates with demonstrated fundamental values in community policing and qualifications in problem solving, critical thinking, interpersonal communication skills, mature judgment, and strong ethics. These modifications to the plan are pending to date. Consultation with community stakeholders and recommendations to secure a diverse candidate pool require still more proactivity for execution by PRPB.

### Community Policing in Management and Performance Evaluations

Performance evaluations should include added measures relevant to community policing activities, problem solving through the SARA Model, work assignments, and significant work performed in support of community policing. During this reporting period as in prior periods, the Monitor's Office recommends that performance evaluations include mutually established goals and objectives resulting from field observations and discussions for continued professional development through supervisory coaching.

## Community Interaction Committees

The Monitor's Office found significant improvement in securing CIC members for each police area. Those members are instrumental in providing recommendations to PRPB on policies, recruitment, and implemented strategies based on the perspectives, experiences, and needs of their representative communities. They also work closely with PRPB to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues.

Per policy, each committee is constituted by 11 community representatives from diverse community sectors. During this reporting period, most committees secured 9 of the 11 representative members; 2 committees are missing 1 member, and 1 of them is fully constituted. Nevertheless, PRPB still struggles to meet the requirement to deliver CIC training orientation courses to all members to facilitate performance of their duties as required in the policy. The Monitor's Office notes that this unresolved issue has been a contributing factor for members' declining participation in the past and warrants expedited attention to retain current gains in membership participation.

## Community Policing and Collaborative Problem Solving

Problem solving initiatives through the implementation of the SARA Model substantially decreased throughout the 13 police areas including districts and/or precincts. During CMR-7, PRPB strived to implement at least one problem-solving project per district/precinct per area. This objective has not been achieved as of CMR-9 despite the technical assistance program implemented by the Reform Office. During this reporting period, only 41 problem-solving initiatives were recorded in the Community Policing system throughout the 13 police areas.

The Monitor's Office finds only marginal improvements in implementation deficiencies found in the prior CMR. Those deficiencies remain strongly associated with the need for 1) capacity building through training and supervisory coaching and 2) data quality protocols and efficient operational measuring. Sampled initiatives reflect a lack of definition in the nature of the problem, and little if no analysis conducted to implement appropriate responses. Better implementation requires 1) better documentation of efforts through work plans and assessments of results and 2) increased community involvement to identify problems and cooperate on effective responses. Supervisory review and approval through signatures reflect minor improvement. However, serious concerns about implementation processes and practices remain, including the need for proactive supervision through coaching, mentoring, and performance standards measuring. In summary, the Monitor's Office finds that progress in collaborative problem solving remains limited and overall levels of compliance with Paragraphs 206 and 207 remains largely unchanged from past CMRs.

## Public Information

During this reporting period, PRPB worked on facilitating information to the public in a transparent and public-friendly format, to the extent allowable by law. On May 18, 2023, PRPB made its statistics on crime available to the community through public reports and community dashboards. This is a significant milestone in public information.

These reports are available to the public through PRPB's website, but not through the Virtual Library. The public can now conduct searches based on set parameters for dates, offenses/crimes, type of crime,

police area, and complaint number. However, the dashboard does not contain statistics on hate crimes, gender violence including transgender, or crimes directly related to child abuse. The Monitor's Office recommends that the dashboards be linked to the Virtual Library to facilitate a streamlined and more cohesive search tool for public information. The reports should be renamed and classified for public access under statistics because the available dashboards cover statistics on UOF, personnel, and Reform status.

PRPB could also achieve significant strides towards compliance by improving public knowledge in the delivery of community policing for organizational transformation. Public knowledge could be increased through targeted campaigns to inform the public on community participation, crime trends, gender and domestic violence, UOF, and non-discriminatory practices, among other topics in the Agreement. Efforts must include partnered initiatives with key community stakeholders for awareness, education, and coordinated referrals.

*Pathway Forward*

The Monitor's Office reaffirms the value of securing potential personnel candidates in recruitment through evidence of implemented strategies in alignment with community policing best practices, inclusive of cross-sectional community representation and underrepresented groups. It is imperative that PRPB expand and document its efforts to partner with colleges, universities, technical schools, faith-based groups, and key community stakeholders to secure a diverse workforce. Community stakeholders may prove beneficial for alliances in recruitment through Memorandums of Understanding (MOUs). The Monitor's Office also recommends supplemental recruitment efforts to establish visibility within communities through multi-media campaigns targeted at individuals with abilities in problem solving, critical thinking, interpersonal communication skills, mature judgment, and strong ethics.

PRPB can meet training certification requirements and increase capacity for community policing by delivering timely trainings that comply with policy and best practices in key areas of community policing, including the implementation of the SARA Model, community outreach through education, and the development and sustainment of community alliances. The Monitor's Office reaffirms past observations that performance evaluations must include mutually established goals and objectives resulting from field observations by supervisors, as well as discussions for continued professional development through supervisory coaching. Implementing performance standards and methods that consider community policing priorities ensures accountability and assists in the institutionalization of community policing. Though challenges with staffing allocation and personnel redeployment remain pending continued reorganization, the Monitor's Office is optimistic that restructuring will increase opportunities for agents to serve the communities in which they are personally involved.

Continued technological improvements are critical to ensuring greater public information. PRPB must improve its ability to communicate monthly statistics on crime, gender violence, sexual offenses, child abuse, and hate crimes. PRPB must also expand its efforts to inform the public on partnered initiatives with community stakeholders. Progress towards substantial compliance relies on these steps toward more effective public communication for awareness, education, coordinated referrals, and Reform progress.

## 1. Community Oriented Policing

PRPB has made inconsistent progress in support of compliance with Paragraphs 206 and 207 during this reporting period. Despite the implementation of PRPB's Community Policing policy (GO 803) in 2021, limited training and retraining on the policy by SAEA has hampered effective implementation practices in community policing. Although PRPB has recently resumed its in-service training through SAEA, full delivery is pending completion. During the mid-period review, only 2% of PRPB personnel were certified as having completed training in community policing. Most recently, the Bureau reported having reached 43% of trained personnel. However, the Bureau did not submit evidence in support of this statement for the present reporting period.

The staffing allocation and personnel redeployment plan similarly awaits full implementation. Some police areas continue reporting a limited number (1-2) of PRPB members directly assigned to community policing, while remaining responsible for other police duties on post. PRPB has yet to finalize a plan to secure organizational objectives in community policing and proactive problem-solving, nor to develop and sustain alliances through meaningful partnerships to improve the quality of life of community residents. Thus, while some progress is notable, it does not suffice to support a substantially compliant rating thus far.

### Paragraph 206: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem- solving approach.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 206. | ☒ Met | ☐ Missed |
| 2. Community policing and problem solving trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | ☐ Met | ☒ Missed |
| 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | ☐ Met | ☒ Missed |
| 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | ☐ Met | ☒ Missed |

252

Note: This paragraph is assessed together with Paragraph 13 of the Agreement.

*Compliance Assessment*

GO 803 (Community Policing) has been in effect since October 31, 2021. This policy requires revision every two years and will be subject to compliance assessment in CMR-10. The Monitor's Office's review of the standing GO 803 currently meets the requirements of this paragraph.

During this reporting period, PRPB set a goal of resuming the delivery of training and providing its personnel with the mandatory 40 hours of annual in-service training, including community policing. However, as of the mid-period review, only 2% of its personnel have been certified and validated as having completed training on community policing. Most recently, PRPB reported having reached 43% of personnel trained on community policing, but certification was not submitted to the Monitor's Office for review. Therefore, PRPB has not met the 95% compliance threshold of trained personnel as the Agreement requires. No timeline was submitted by PRPB for training on community policing to meet compliance targets during this reporting period. Additionally, the Monitor's Office is unaware if the technical assistance program offered by the Reform Office in the interim has recommenced, or if it has been discontinued, considering that PRPB recently resumed its 40 hours of mandatory in-service training through SAEA.

PRPB launched its community policing module, Sistema de Policia Comunitaria (Community Policing System), on July 1, 2022. The module is available to all PRPB members including commissioners and auxiliary superintendencies. This system is intended to record and evaluate direct initiatives and programming by capturing problem-solving initiatives at the district/precinct levels within the 13 police areas. The initiatives the system is intended to capture include efforts to implement the SARA Model, engagement with formal and informal community alliances, responses to quality-of-life issues, and outreach for education, awareness, and prevention. It is through these modules that PRPB intends to measure effective implementation practices as a mechanism to comply with Paragraph 208 of the Agreement. However, during CMR-8, the Monitor's Office found the system operationally flawed, and in need of data quality protocols including guidelines and mechanisms to determine the accuracy and effectiveness of measurement standards.

During this reporting period, PRPB improved its community policing module by providing users with additional self-paced resources, including FAQs and suggested readings. The Monitor's Office notes; however, that data errors and inconsistencies continue to occur in the system, negatively impacting the validity and reliability of the data collected. The Reform Office also reported working on the development of a methodology proposal for effective measurement standards through a designated project manager. However, the Monitor's Office did not receive any evidence demonstrating that a methodology had been developed, nor has a timeline been proposed for the completion of a methodology.

The Staffing Plan has continued evolving since its introduction in September 2022, including revisions earlier this year, but a full rollout remains pending. PRPB has yet to meet the requirements of target 4 under Paragraph 13, which is assessed together with Paragraph 206. As a result, some police areas continue reporting a limited number (1-2) of PRPB members directly assigned to community policing,

while remaining responsible for other duties on post, in most cases, including specialized units. These officers (a substantial number of interviewed agents newly appointed to these functions), are designated as agent facilitators in districts and precincts without the required training. They facilitate outreach activities, and engage in problem-solving initiatives, while covering other police duties on post. Their responsibility to investigate complaints, attend court, or serve as back-up limits their ability and availability to directly engage in community policing and document their efforts.

As in previous reporting periods, interviewed agents also reported that their limited availability for community interactions compromises their ability to provide continuity to implemented efforts. Some agent facilitators also reported that the problem is exacerbated once discouraged community stakeholders become completely disengaged. The Monitor's Office is aware that several police areas are currently undergoing headquarters reorganization and restructuring as part of the Staffing Plan. Consequently, the Monitor's Office expresses optimism that PRPB may offer agents increased opportunities to serve the communities in which they are substantially involved. However, stronger, and more efficient staffing allocation strategies must be put in place to further the institutionalization of community policing.

The Monitor's Office found that problem solving initiatives through the implementation of the SARA Model decreased substantially throughout the districts and precincts. During this reporting period, a total of 41 problem solving initiatives were recorded in the Community Policing system throughout the 13 police areas. Of those initiatives, 8 are currently at the initial stages, 11 are in progress, and 21 are classified as completed. However, the Monitor's Office found that implementation deficiencies noted during CMR-8 are unchanged. These deficiencies strongly indicate a need for capacity building through training and supervisory coaching, including training on data quality protocols and efficient operational measurement.

The sampled initiatives reviewed by the Monitor's Office reflect a series of shortcomings, including a lack of definition in the nature of the problem, little or no analysis conducted to implement appropriate responses, the need for work plans, no assessment or results data, and limited community involvement in identifying problems or implementing effective responses.[25] Requiring supervisory review and approval through signatures has led to only a minor improvement. However, serious concerns about implementation processes prevail, including the need for proactive supervision for coaching, mentoring, and measuring performance standards.

The Monitor's Office notes that during the previous reporting period, PRPB implemented a problem-solving project using the SARA Model at Barriada Morales in Caguas, due in part to the homicide of a retired schoolteacher. This incident was provoked by the drug war between rival area gangs. Despite being aware of this project, the Monitor's Office was unable to assess the project in support of PRPB's compliance rating for this paragraph because the system does not facilitate easy recall of information about the initiative. The system stores documents per control number, and control numbers are not associated in the system with distinct initiatives. The Monitor's Office faced similar limitations in reviewing a project implemented in the police area of Ponce at El Tuque.

---

[25] See 2023-391, 2023-392, 2023-407, 2023-410, 2023-419, 2023-435, 2023-436, 2023-442, 2023-454, and others.

Due to these system limitations, the Monitor's Office relies on a randomly selected sample of control numbers for compliance assessment. Those activities did not fall within the random sample, nor did PRPB take initiative to submit information on these two projects for the Monitor's consideration. The Monitor's Office also found that recorded efforts in the system are solely attributable to the Assistant Superintendency of Field Operations (SAOC). The Monitor's Office found one problem-solving initiative recorded for the Assistant Superintendency of Criminal Investigations Corps (SAIC), which appears to be for a partnership with a Head Start program in Fajardo for orientations regarding gender-based violence (verified through an MOU[26]). However, no problem-solving initiatives were recorded for SARP, SAOE, or SAEA. This absence of recorded initiatives from these other superintendencies provides a strong indicator that community policing has yet to be institutionalized and supported at the organizational level.

*Pathway Forward*

The Monitor's Office reaffirms recommendations made during previous reporting periods. PRPB is encouraged to undertake a dynamic internal evaluation of implementation processes, identifying both lessons learned for continual improvement of practices and successes for replication. PRPB must also implement a full rollout of the Staffing Plan to achieve progress in community policing practices and constructive problem solving. The central focus of in-service training delivery should be to build personnel capacity in the implementation of problem-solving through the SARA Model. Supervisory reviews and coaching should further reinforce the guided practices in the SARA Model provided by these trainings. The deficiencies outlined above must be remedied to ensure greater validity and reliability of the data collected in the Community Policing module. The Monitor's Office stresses the value of community inclusion along with other technological and sophisticated law enforcement tools for prospective and proactive problem-solving strategies.

## Paragraph 207: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 207. | ☑ Met | ☐ Missed |

---

[26] See Control 2022-461.

| 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
|---|---|---|
| 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | ☐ Met | ☒ Missed |
| 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | ☐ Met | ☒ Missed |

*Compliance Assessment*

GO 803 (Community Policing) became effective on October 31, 2021, and requires revision biennially; subject to compliance assessment in CMR-10. The current policy GO 803, as reviewed, satisfies the requirements of this paragraph.

Per policy, central to community policing and the Agreement, PRPB, must conduct outreach and establish alliances with community stakeholders, the public, and private sectors, faith-based groups, academia, and the media. The objective of these outreach efforts is to improve relations, strengthen support, expand social networks, facilitate mutual respect and trust, and foster joint initiatives to improve quality of life through extensive problem-solving partnerships and collaborative strategies. As with the preceding paragraph, PRPB missed compliance targets two and three for community partnerships and problem-solving strategies trainings delivery and certification. Only 43% of PRPB's personnel have been reported as trained, and only 2% are certified and validated as having completed training on community policing. This includes training on outreach and partnerships/alliances. PRPB did not provide established timelines for training on community policing to meet compliance targets during this reporting period, but committed to delivering meeting its 40 hours of in-service trainings in general for 75% of its personnel by December 2023.

As in CMR-8, the Monitor's Office retrieved outreach data for compliance assessment from the electronic modules, as directed by PRPB. Reviews of this data and field interviews confirmed that PRPB's outreach activities were largely responses to community requests, primarily from schools. PRPB did not reach out to community stakeholders with efforts targeted at audience expansion to facilitate outreach activities or develop alliances for awareness, education, and prevention through structured programming.

During this reporting period, there was an increase in participation from specialized police units and assistant superintendencies other than the SAOC and the Community Relations Bureau. However, some of the activities recorded in the system were directly related to police functions, such as 318 activities for technical assistance through the Reform Office, the police band, recruitment, pre-service/in-service training, and Virtual Library content. These activities did not fully qualify as community outreach efforts aimed at direct prevention, awareness, and education to the public. A total of 13,106 outreach activities were recorded through this reporting period, of which 7,066, (4,913 in person contacts), were conducted throughout the 13 police areas. Out of the 13,106 activities recorded, 2,100 were classified as outreach for education. Other activities falling under outreach included unspecified cultural activities (819), recreational (5,970), socialization with the community (1,920), and sports activities (7,340). The Monitor's Office was unable to obtain a report per police area/superintendency on topics/themes for prevention and education, in spite of its availability in the outreach module. Nonetheless, the Monitor's Office notes that to comply with the 95% threshold for districts, precincts, and units conducting outreach Bureau-wide, such efforts must be inclusive of all auxiliary superintendencies (SARP, SAEA, SAOE, and

256

SAIC, beyond the Domestic Violence Division and Cybercrime Units). Evidence of structured outreach strategies and programming must be provided to support these efforts. Additionally, the Monitor's Office further notes that outreach activities within the context of sports and recreation must include an educational component emphasizing awareness and prevention.

As in the CMR-8 reporting period, the system's available filters for conducting searches based on educational topics, service programs, and units did not yield any data or appeared to be nonfunctional. PRPB has not addressed these issues and deficiencies in data collection to support outreach implementation practices. Several essential elements for producing quality data and demonstrating compliance were missing, including evidence supporting discussions on specific topics, information about contact person(s), details about educational materials used, presentation materials, attendance records, and outcome reports. In many cases, the only supporting evidence for these efforts was some uploaded photographs. While there was an improvement in the validation of efforts through supervisory signatures, it is important to note that supervisory practices in the validation process should also encompass revisions for data quality, coaching, providing constructive feedback, and setting performance measurement standards.

During this reporting period, PRPB reported a limited number of formal alliances, totaling 41. These alliances were established through the efforts of three units: SAOC, SAIC, and DSP. Among these 41 recorded alliances, the majority (29) were attributed to SAOC, with 2 under SAIC), 9 under DSP, and 1 for SARP. However, the Monitor's Office could not find the control number or information associated with this newly developed SARP alliance. Out of the 13 police areas, Carolina, Guayama, Aguadilla, and Aibonito failed to engage in the development of any alliances for this reporting period. Many of these reports lacked essential components such as details on targeted groups, work plans, meeting minutes, agendas, outcome reports, and any interviews or focus groups conducted during development and implementation. Furthermore, six of the recorded activities did not meet the criteria for classification as alliances and should have been categorized as outreach activities.[27] Only one alliance was identified through a supported MOU or collaborative agreement, but it failed to include other necessary supporting documents and lacked certification.[28]

These marked deficiencies are consistent with the Monitor's Office's findings during CMR-8 and past reporting periods going back to CMR-6.  Additionally, the Monitor's Office found that no alliances were reported for SAEA or SAOE. Efforts to address these deficiencies should involve training and field support. Furthermore, the Monitor's Office recommends that each police area actively seeks out and identifies local community stakeholders, including government entities, non-profit organizations, academic institutions, the media, and community advocates. Engaging these stakeholders can help establish direct contact and facilitate the development and maintenance of cooperative strategies, referral mechanisms, and the exchange of mutually beneficial resources.

*Pathway Forward*

Training and field support will assist in easing the deficiencies outlined above. The Monitor's Office also recommends that each police area engages in identifying local community stakeholders including

---

[27] See control numbers.: 213, 217, 227, 245, 237, 243.
[28] See control number 231.

government agencies, not for profit organizations, academia, faith-based groups, the media, local radio stations, and community advocates. Once identified, PRPB can use those resources to facilitate direct community engagement, assist in the development and sustainment of constructive interactions through cooperative strategies, and exchange mutually beneficial referrals and resources for crime prevention, education, and problem-solving.

The Monitor's Office strongly encourages a review of a formal alliance involving SAOC Ponce and the district of Yauco between PRPB and students from the Vocational and Technical School. This alliance, previously reviewed in CMR-7, provided valuable work experiences for vocational students by placing them in internships with PRPB in exchange for auto body repair services on official vehicles, all while being supervised by school personnel. This arrangement resulted in the development of a goal-oriented alliance and the achievement of meaningful and purposeful objectives. The significance of this partnership cannot be overstated, and it is worth considering its resumption and replication in other police areas. To support such efforts, it is essential to have MOUs or collaborative agreements in place, along with well-defined work plans, detailed meeting minutes, and documentation of any challenges encountered. Furthermore, the Monitor's Office recommends that PRPB explore the possibility of partnerships with federal agencies that have established community programs with proven positive outcomes, such as Homeland Security (ICE), the FBI, and the US Attorney's Office, as well as other similar agencies.

## Paragraph 208: Community Engagement and Public Information - Community Oriented Policing

*Paragraph 208 are assessed annually and will be reviewed in CMR-10.*

## 2. Community Interaction Councils

CICs are constituted by community members, most of them professionals representing diverse members of the community throughout the 13 police areas. Per policy, each committee consists of 11 community representatives from diverse community sectors. Those members are instrumental in providing recommendations to PRPB on policies, recruitment, and implemented strategies based on the perspectives, experiences, and needs of their representative communities. They must also work closely with PRPB to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. The CICs also advise the Commissioner on ways to keep the public informed and increase transparency in the dissemination of public information.

The Monitor's Office finds that proactive measures to ensure organizational commitment must be put in place at all levels to close the gap in meeting CIC needs, training, and membership confirmation. Work plans and timelines for implementation must be developed capitalizing on CIC resourcefulness, expertise, and availability to achieve substantial compliance with the Agreement. CIC participation is only practical if engagement is demonstrated and validated consistently.

## Paragraphs 209 - 210: Community Engagement and Public Information – Community Interaction Councils

*Paragraphs 209 and 210 are assessed annually and will be reviewed in CMR-10.*

## Paragraph 211: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies related to CICs incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. CIC orientation course is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. PRPB makes CIC orientation available to all members of the CICs. | ☐ Met | ☑ Missed |
| 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | ☐ Met | ☑ Missed |

*Compliance Assessment*

GO 801 (CICs) was approved during the CMR-6 reporting period and found to have met the paragraph requirements. However, this policy has not been reviewed since 2021 and was due for review during the CMR-8 reporting period. The Monitor's Office stresses the importance of reviewing policies as required by the Agreement and stipulated within departmental policy.

During the CMR-8 reporting period the Reform Office reported and SAEA certified that CIC training was available for delivery in a virtual format. However, as of this reporting period, the Monitor's Office did not receive any additional information on the status of CIC training delivery. The Monitor's Office learned through the review of CIC monthly meeting minutes that training was returned to SAEA after the Bureau of Technology (BT) was unable to create user accounts, thereby negatively impacting compliance as in prior reporting periods. Most recently, the Reform Office informed the Monitor's Office that accounts were successfully established for training, but PRPB failed to provide evidence of CIC training or

established timelines for the delivery of multi-themed workshops developed by SAEA, nor did it submit any evidence of the training curriculum for the Monitor's review.

Field interviews conducted by the Monitor's Office with CIC agent facilitators and committee members throughout Caguas, Utuado, Humacao, Aguadilla, Aibonito, Bayamon, Guayama, San Juan, and Ponce presented great concerns about the availability of CIC training. This issue was also reported as a topic of discussion at the Central Committee, which fears losing members due to training delays after expanding such efforts to secure them. Those CIC members interviewed further indicated that because new members cannot be confirmed without training, they cannot receive their identification to reach out to the community in the discharge of official duties. The Monitor's Office notes the urgency for providing training along with identification cards to CIC members to facilitate conducting official business and legitimate processes with the community and its stakeholders.

During this reporting period, PRPB failed to provide any evidence in support of CICs possessing the means, staffing, and access to fulfill their mission, missing the compliance targets required by the Agreement. PRPB reported that there is no operating budget in place for CICs, though the Monitor's Office notes that PRPB still has an obligation to seek input from CICs when discussing and revising the Bureau's operating budget to promote transparency and facilitate the CICs' ability to inform the public about PRPB's resource allocation, such as PRPBs' equipment, vehicles, in-service training, and resources devoted to community policing for outreach, problem-solving, and Community Encounters through open meetings. PRPB must dedicate adequate resources to ensure that CICs have everything they require, including staffing, access, and training. It is important to balance these needs with the CIC's justifiable requirements to fulfill their mission. This is a crucial component in the development of a broader community policing approach, which aims to work collaboratively and proactively to implement strategies addressing crime and community safety concerns. As a result, funding should be allocated to meet these needs for equipment or supplies as necessary.

*Pathway Forward*

As in previous CMRs, there is a pressing need for PRPB to pay more attention to the importance of a comprehensive instructional program and training delivery that aligns with GO 801 (CICs) and the Agreement. Should the virtual training approach as proposed by PRPB during the CMR-8 reporting period prove untenable, the Monitor's Office reiterates its former recommendation for SAEA to facilitate CIC training through other police areas or regional clusters to maximize efficiency and expedite membership confirmation. The Monitor's Office also recommends revising and discussing the Bureau's operating budget with the CICs to promote transparency and facilitate the CIC's ability to keep the public informed about PRPB's allocation of resources.

## Paragraph 212: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:*

a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;

b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;

c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;

d) providing information to the community and conveying feedback from the community to PRPD;

e) advising the Superintendent on recruiting a qualified, diverse workforce; and

f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – September 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | ☐ Met  ☒ Missed |
| 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs.. | ☐ Met  ☒ Missed |
| 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | ☒ Met  ☐ Missed |

*Compliance Assessment*

The process of implementing a comprehensive community policing program in collaboration with the CICs across all 13 police areas is still in its early stages of development. In this reporting period, PRPB did not provide any evidence demonstrating the establishment of a comprehensive program or guidance through a collaborative effort with the CICs. This effort should involve the development of strategies to address crime and safety issues, but such evidence was lacking.

As in prior reporting periods, PRPB failed to produce detailed evidence demonstrating the development of a comprehensive community policing approach in collaboration with the CICs, wherein implemented strategies have been developed to address crime and safety issues. Interviews conducted by the Monitor's Office revealed that most committees feel that area commands did not sufficiently seek their contributions and input into the review or assessment of plans for developing a robust community policing program. These findings underscore the need for jointly developed strategies that include training, victim services, advocacy, and the recruitment of a diverse workforce, among other relevant

topics required by the Agreement. The committees also related that they are tasked primarily with the review of policies PRPB submits electronically. They continue reporting that little if no feedback is received from PRPB on the recommendations they render, nor is confirmation as to whether their recommendations were adopted or rejected provided.

The Monitor's Office has been made aware that the committees reviewed several policies during this reporting period: GO 626 (Intervention with Immigrants), GO 624 (Interaction with Transgender and Transexual Individuals), and GO 801 (CICs). However, based on the data submitted by PRPB in support of compliance for target three, Fajardo was the only area actively involved in outreach, orientations, and "Conversatorios" (meetings and Radio station orientations and outreach). Additional documents submitted for Ponce appeared to be in support of policy reviews, but evidence of compliance was insufficient. The documentation only contained policies reviewed without direct CIC participation or recommendations. Mayaguez submitted a certificate indicating not having engaged in any activities. PRPB submitted no additional evidence to demonstrate that the Bureau had sought recommendations from CICs on these policies. There were no work plans, structured initiatives, or jointly undertaken activities available for the Monitor's compliance assessment during this reporting period. The lack of sufficient evidence submitted by PRPB (provided by two out of four sampled police areas) indicates that compliance target 3 has not been met.

Some CIC members have also shared a concern that area commanders have not been meeting with the committees as required or holding the meetings at all. Additional concerns were voiced regarding the cancellation of committee activities by commanders after plans were well underway or at the last minute, as well as holding activities without seeking CIC involvement or participation.

CIC and PRPB interviews revealed that only 2 of the 13 police areas (15%) made plans and concerted joint efforts to support a more comprehensive approach to community policing. However, PRPB failed to produce documents in support of those assertions.

Communication and synergy between CICs and PRPB at all levels, including area commands, is critical for the successful implementation of strategic programming to address crime and community safety concerns. These efforts are also fundamental to the institutionalization of community policing at the organizational level. These interactions promote and enhance community engagement, transparency, and accountability, while also improving compliance with the Agreement.

*Pathway Forward*

The Monitor's Office reiterates recommendations made during previous CMRs. PRPB must document CIC engagement within area commands. Compliance with the paragraph relies on documentation of the committees' contributions in any purposeful and meaningful ways on work plans, innovative activities, and initiatives, and any other joint and concerted efforts to address crime and safety concerns. PRPB must develop processes to capitalize on and fully integrate CICs' field knowledge and expertise if they are to successfully implement a comprehensive community policing approach. Moreover, the Monitor's Office recommends that PRPB resume the practice implemented during CMR-7, wherein guidance was provided to the 13 police areas to comply with the requirements of this paragraph, including a compliance certificate internally designed by PRPB in support of compliance assessment.

262

## Paragraph 213: Community Engagement and Public Information - Community Interaction Councils

*Paragraph 213 is assessed annually and will be reviewed in CMR-10.*

## 3. Public Information

Public information gives PRPB the opportunity to be transparent about its interactions and demonstrate to the community the issues the agency faces daily, while assisting with establishing and sustaining its credibility, as well as developing community trust and demonstrating accountability. The right to access public information is a tool in which citizens not only oversee the Bureau, but also an integral part of community policing to bridge gaps and affect effective police practices. Within the context of the Agreement, public information encompasses the dissemination of accurate and updated monthly crime statistics, including statistics on hate crimes, gender and domestic violence, and child abuse. Comprehensive public information also involves keeping the public abreast of the Bureau's Reform progress, addressing community concerns, and engaging in co-development of problem-solving strategies to improve the community's quality of life.

During this reporting period, PRPB worked on facilitating information to the public in a transparent and public-friendly format, to the extent allowable by law. On May 18, 2023, PRPB made its statistics on crime available to the community through public reports and community dashboards, which is a significant milestone and represents progress to achieving compliance with the Agreement. The community dashboards enable the public to conduct searches based on set parameters for dates, offenses/crimes, type of crime, police area, and complaint number. The Monitor's review of the community dashboard on crime statistics is now inclusive of monthly reports. However, these reports do not contain statistics on hate crimes, gender violence including transgender, or child abuse.

These reports are available to the public through PRPB's website, but not through the Virtual Library. The Monitor's Office recommends that the dashboards must be linked to the Virtual Library to facilitate a streamlined and more cohesive search tool for public information. The reports should be renamed and classified for public access under statistics, because the available dashboards cover statistics on UOF, personnel, and Reform status.

The community dashboards currently supplement the Virtual Library, launched in October 2021, which provides a central location for more comprehensive information that PRPB makes available to the public. The library provides access to all PRPB's policies and procedures, general and administrative orders, internal rules and regulations, the Agreement, compliance methodologies, action plans, public reports such as the Annual Report on Community Alliances and CIC reports, UOF reports, Monitor's Office's reports, and a calendar of community events and activities per police area. The Virtual Library should ultimately be linked to PRPB's website as the repository of PRPB's public information, but that step remains a work in progress.

The Monitor's Office also recognizes that PRPB redesigned its website for added sensibility to diversity and inclusion. PRBP incorporated a sign language interpreter to the Commissioner's message on the website and will employ closed captioning through its multi-media resources to keep the deaf community

informed, in absence of a sign language interpreter. The Monitor's Office looks forward to re-assessing in CMR-10 when the finalized project should become available to the public.

These gains notwithstanding, PRPB's efforts to reach out to and educate the public remain insufficient to date. PRPB must maximize use of internal resources, including multimedia tools and the Press Office, to educate the public and convey awareness to the community about participation in community policing. The public should be aware of opportunities to participate in focus groups, provide input on strategies to fight crime, inform crime trends, review policies and practices, communicate the Bureau's Reform progress, and address issues in domestic and gender violence and non-discriminatory practices, among other topics. Expanded and targeted efforts should include the development of informational campaigns through webinars and podcasts for dissemination.

## Paragraph 214: Community Engagement and Public Information - Public Information

*PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | ☐ | ☑ |
| 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | ☐ | ☑ |
| 3. 95% of the meetings were widely publicized at least one week before such meeting. | ☐ | ☑ |
| 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | ☐ | ☑ |
| 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | ☐ | ☑ |
| 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | ☐ | ☑ |
| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in Worksheets # 3. | ☐ | ☑ |

*Compliance Assessment*

The policy for Community Encounters (GO 805) was finalized and approved during the CMR-8 reporting period. However, PRPB continues to struggle with reaching out to the community and delivering information to the public through open meetings. Per policy, these meetings constitute the primary mechanism for PRPB to report progress on meeting the requirements in the Agreement, to address issues of community concern, and to educate the public on topics required by the Agreement, including 1) individuals' right to decline consent to voluntary searches, 2) the process for submitting administrative complaints and commendations, and 3) statistics on UOF and nondiscriminatory practices, etc. The Agreement and policy require this program in each of the 13 police areas. These open meetings (Encuentros Comunitarios) must be held once per year in each command area (as approved by USDOJ during the CMR-6 reporting period) and must be widely publicized at least a week in advance through print media, social platforms, and public service announcements, to secure attendance. PRPB has consistently struggled to schedule and document these meetings as required for compliance assessment.

During the CMR-8 reporting period, PRPB submitted a global list of the Community Encounters (Encuentros Comunitarios) per police area with dates for each encounter but did not include additional information that would allow the Monitor's Office to determine compliance. At the time, none of these events could be found on PRPB's website or in its Virtual Library. Some improvements in the publication of these meetings in the Virtual Library were noted during this reporting period, but these improvements do not suffice to meet the 95% compliance target. The calendar needs continuous updates.

During this reporting period, PRPB submitted a global list of 7 "Community Encounters" held, out of 13 police areas (54%). The review of submitted evidence revealed that only one police area (Aibonito) held its open meeting. Nevertheless, documentation in support of the encounter was incomplete, and did not include outcome reports, summaries of audits, or other documentation required by the Agreement.  The other police areas failed to meet compliance targets due to lack of supporting evidence. The evidence submitted for two other police areas supported that "Conversatorios" were held and carried out by CICs – not open meetings organized by the police. The Monitor's Office also notes that the calendar for "Community Encounters" in the Virtual Library announced encounters for Caguas, but no evidence was submitted demonstrating that these encounters were carried out.

To comply with this paragraph PRPB is required to include widely publicized meeting announcements through mass media and its website, including the Virtual Library, at least a week before each event. PRPB must also provide various supporting materials related to the event, including an agenda, work plans developed in concert with the CIC, crime and administrative complaint statistics, attendance sheets, Q&A sections, written materials (presentation included), and outcome reports. The Monitor's Office finds that incomplete evidence is indicative of PRPB's inability to document and support efforts in fulfilling the requirements of this paragraph and of GO 805 (Community Encounters). Moreover, the community survey conducted during the last reporting period revealed that the community is still lacking knowledge and information about the Reform, statistics, community policing, problem-solving, partnerships, searches and seizures, UOF, and non-discriminatory practices. Compliance requires strong indicators demonstrating that information is being provided to the public through these meetings, as well as evidence of structured and targeted campaigns geared to inform and educate the public about all aspects of the Reform.

*Pathway Forward*

Resuming in-service policy training on community policing may assist PRPB in achieving and retaining the necessary competencies to fulfill this paragraph's requirements. PRPB requires both greater capacities to keep the public informed, and greater understanding of the value of keeping the public informed for increasing transparency, trust, and accountability. The Monitor's Office recommends using PRPB's internal resources (multimedia) to develop structured and guided campaigns with the assistance of SAEA and the Reform Office geared toward informing and educating the public on all aspects of the Reform, including open meetings, policy, and audits.

The Monitor's Office also encourages PRPB to reexamine the prior recommendation to develop a streamlined and uniform presentation through SAEA in coordination with the Reform Office. The availability of this uniform presentation may assist PRPB in facilitating local presentations, supplementing the PRPB-wide presentation with information pertinent to each area command, including the a) area's own statistics on crime, b) their chosen discussion topics and resources, c) information on CIC and CSC participation, and d) information on outreach activities conducted or community alliances developed within the area, etc.

Consistent with the Agreement requirements, the Monitor's Office recommends that this streamlined presentation include information on a) an individual's right to decline consent to voluntary searches (in alignment with Paragraph 77 of the Agreement), b) the right to file administrative complaints or commend officers in the performance of their duties (per GO 311, Public Information on Complaints and Acknowledgements), c) non-discriminatory practices, and d) UOF incidents and responses. The Monitor's Office also advises PRPB to incorporate a resource from SARP to lead the public orientation on how to file complaints and commendations. The entire audio-visual presentation should also contain closed captions to address the needs of functionally diverse individuals, including the availability of sign language interpreters, in support of equal rights, non-discriminatory practices, and public policy. Printed material should include information on a) victims' services, b) immigration rights, c) CSCs and CICs (including meeting dates and locations), d) diverse functionality information, e) children and family services programs including LAP, f) community mental health resources, g) addiction and rehabilitation services, and other area advocacy services for broader community outreach.

## Paragraph 215: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |



| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 214.

### Compliance Assessment

As indicated in Paragraph 214, PRPB failed to submit evidence that would allow the Monitor's Office to determine a compliance level other than Not Compliant. Compliance with policy also requires the publication of a calendar in advance to inform the public of these events. As noted in the previous paragraph, there has been some improvement in the publication of these meetings in the Virtual Library. However, since there is no evidence of these meetings having been held as required, those efforts rendered do not suffice to meet the 95% compliance target. The calendar requires continuous updating to keep the public informed, motivated, and engaged. In addition to the Virtual Library, events should be publicized through PRPB's existing resources (e.g. the Press Office and multi-media units) and through any additional mechanisms to assist PRPB in meeting compliance moving forward.

### Pathway Forward

The Monitor's Office reiterates recommendations made during CMR-8. Assistance in the development of an outlined workplan for scheduling from each police area may be obtained through the Reform Office in coordination with the Press Office. The work plan with proposed dates must include time, place, and discussion topics. The calendar must be made accessible and available to the public on PRPB's Virtual Library and through internal resources including multi-media. The calendar must be publicized through PRPB's multi-media platforms, regardless of the police area holding the event.

## Paragraph 216: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

267

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

*Compliance Assessment*

During CMR-7, only 2 of the 13 police areas (15%) held the required Community Encounters. During this reporting period although seven police areas were reported having held the required open meetings, only one met required Community Encounters criteria, but none of them met the compliance requirements on public information meetings based on the insufficient documents submitted for the Monitor's review. Evidence regarding public education on Reform progress or individuals' right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement is necessary to determine compliance. The Monitor's Office also notes that neither meeting included summaries of all audits and reports completed, or policy revisions nor any other significant action taken by PRPB throughout this reporting period.

*Pathway Forward*

PRPB's compliance with this paragraph requires summaries of all audits and reports, policy changes and any other significant actions taken by PRPB. Those summaries should be available for open meetings. PRPB has consistently failed to submit summaries of all audits and reports for compliance assessment. The Monitor's Office will continue to assess this paragraph which the Reform Office may be instrumental in facilitating this process for the Bureau.

## Paragraph 217: Community Engagement and Public Information - Public Information

*PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – September 2023 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB disseminates crime statistics on a monthly basis. | ☑ Met | ☐ Missed |
| 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | ☐ Met | ☑ Missed |
| 3. 100% of hate crimes were publicly disseminated once they occurred. | ☐ Met | ☑ Missed |
| 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | ☐ Met | ☑ Missed |

268

Note: The portion of this paragraph that requires that PRPB maintain updated crime statistics is assessed together with Paragraph 219 of the Agreement (Information Systems and Technology), and Paragraph 148 (Early Identification System).

*Compliance Assessment*

PRPB worked on facilitating information to the public in a more transparent and public-friendly format, to the extent allowable by law during this reporting period. The Bureau made community dashboards available to the public to obtain crime statistics through public reports. Although a commendable effort on PRPB's part, a review of the community dashboard on crime statistics revealed that the dashboard fails to include statistics on hate crimes, gender violence including transgender crimes, or child abuse.

Type I crimes and other offenses throughout the 13 police areas are available monthly. However, those statistics lag by a month and a half. The Monitor's Office further found the need to link these dashboards to the Virtual Library to facilitate public searches. Additionally, public reports on which the dashboards are based should be renamed and classified for public access under statistics, because they provide statistics on UOF, personnel, and Reform progress.

In summary, the longstanding issue to report crime statistics including statistics on hate crimes, child abuse, and gender violence remains unresolved despite the launching of these dashboards. The Monitor's Office raises the concern that PRPB still needs to comply with crime reporting to NIBRS, as well as complying with reporting hate crimes to the FBI. PRPB has yet to secure sustainable systems to adequately support these processes from a technological standpoint. PRPB must address these matters for increased transparency and efficiency to keep the public informed while demonstrating compliance.

*Pathway Forward*

The Monitor's Office recommends moving swiftly to rectify the apparent technological flaws in the community dashboards for added transparency and accountability. In the interim, it is advisable that PRPB use its internal resources, public service announcements, the Press Office, and multimedia to report monthly crime statistics straightforwardly, including statistics on hate crimes, gender violence, and child abuse. Using these additional resources may place PRPB in a better position in future compliance assessments.

# XI. Information Systems and Technology

The Commonwealth's compliance with the six Information Systems and Technology paragraphs has moved toward the positive from what was reported in CMR-8 when 33% of systems were found to be partially compliant. As of this report writing, separate from operational and procedural compliance, Paragraphs 218 - 221 are considered partially compliant for technology. This status indicates a level of compliance that is headed in the right direction, but it should not be mistaken as satisfaction of the October 2019 Compliance Targets. In that respect, 7 of 18 systems (39%) remain not compliant or deferred. See table 3 below. Long term sustainability of PRPB's managerial compliance efforts remains to be proven.

The Commonwealth has been helpful in moving forward to address the IT CAP following the involvement of the Monitor's Office and the Commonwealth's contractor, Gartner Inc. To do so the Monitor's Office allocated staff to lead the drafting of the contract documents and their contents. Further, AH Datalytics, the Commonwealth's contractor, consistently provided the only substantial subject matter experts capable of collecting data and developing digital dashboards. PRPB, USDOJ, and the Monitor's Office are all pleased with the progress being made, but a reconciliation of data analyzed versus an actual inventory of data on hand is required to assess the veracity and quality of data captured and qualified by AH Dataytics, the Commonwealth's contractor.

Operational obstacles to achieving consistent, repeatable use of systems remains elusive. For example, during the July site visit to Ponce, it was noted that staff were capably recording SA data in GTE but could not seamlessly search the data once loaded. Further, data was also tracked manually in spreadsheets potentially disassociating edits from what was captured in GTE. Doing so is not a "best practice." And although the manually tracked contextual data was more granular and descriptive in the SA module, the data was not shareable with GTE. Therefore, the Commonwealth should establish a project to review the accuracy of the data collected (see the observations below for additional detail).

Generally speaking, during the reporting period, the following observations and areas of concern were noted:

## Observations

- Contrary to the status provided during CMR-8, further demonstration of SA and DV Modules indicates that they are still in development and the data is not reliable. This could drop the compliance rating from substantial to partial.
- Contracting with Gartner Inc. was a laborious endeavor that would not have been completed without the contracting support provided by the Monitor's Office.
- Exhaustive inputs were needed from the Monitor's Office, USDOJ, and Gartner Inc., the Commonwealth's contractor, WRT to the eventual contracting documents and artifacts needed to contract with Gartner Inc.
- After working with the Commonwealth on workshops for the RMS procurement and establishment of the PMO, Gartner Inc., the Commonwealth's contractor, experts have expressed concern regarding PRPB 's lackluster responsiveness to tasking and scheduling as

270

well as their lack of urgency regarding the pace of the activity required. This could add a minimum of two weeks to these projects.

- Ponce noted that after incident reports are tallied and reported to headquarters that they receive them back to insert SA and DV data because the data cannot be properly captured initially in CAD/GTE.  This is similar to the inadequacy of the UOF data originally collected.

Areas of Concern

- Although noted in multiple instances, PRPB has not engaged in serious dialog regarding cyber security, a plan for hardening, or conduct of an assessment to estimate the lack of crime reporting to NIBRS and hate crime reporting to the FBI.
- Progress is being made in areas of IT development, but sustaining any progress is reliant on the fact that intervention was necessary by the Governor's Office, PRITS, USDOJ and the Monitor's Office.
- Tracking of Community Engagement data remains inadequate.
- The Commonwealth's unwillingness to embrace a leadership role to resolve document translation service needs is troubling and high risk to the overall RMS and PMO projects.

As noted during the CMR-8 reporting period, PRPB's cyber security capabilities and practices could not be evaluated. For that reason, baselining will occur in the IT CAP, the Commonwealth, USDOJ, and the Monitor's Office should commence an assessment of cyber hardening and risk mitigation.

Looking forward, much remains to be done as was also cited during CMR-8. This includes:

- Data purification to sustain any level of compliance and data accuracy.
- Implementation of the CAP.
- Adequate training by SAEA.
- A cyber assessment should be conducted.

For the above reasons, the Commonwealth's ability to maintain a self-sustaining technology transformation remains in question and is unachievable without contracted experts.

Overall, the Commonwealth's compliance with the six Information Systems and Technology paragraphs shows marginal progress from CMR-8 where 33% of paragraphs (two paragraphs) were found to be partially compliant and 67% of paragraphs (four paragraphs) were found to be not compliant compared to the current reporting period were 67% of paragraphs (four paragraphs) were found to be partially compliant and 33% of paragraphs (two paragraphs) were found to be not compliant. See figure 11.



*Figure 11. Information Systems and Technology: Paragraph Compliance Status*

## Paragraph 218: Information Systems and Technology

*PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

PRPB is partially compliant regarding technology. Procedural and data inconsistencies continue but progress is positive. Recurring dialog during the reporting period centered primarily on continuing to develop solutions and engage in IT CAP and Gartner Inc., the Commonwealth contractor's, tasks.

| System | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|
| Project Management System | Substantial | Substantial |
| CAD/CAD Mobile | Partial | Partial |

| System | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|
| NIBRS | Minimally Partial | Not Compliant |
| NCIC – National Crime Information Center | Minimally | Not Compliant |
| GTE | Partial | Partial |
| Promedia (Performance Evaluation System) | Partial | Partial |
| PTMS – Store digitized files, records, curricula and Teaching Plans | Partial | Partial |
| Formal Community Partnerships / Alliances – distribute data and information | Minimally | Not Compliant |
| EIS | Not Compliant | Not Compliant |
| Supervisory Module | Partial | Not Compliant |
| Domestic Violence and Sex Crimes | Substantial | Substantial |
| Inspections – Operational, Investigative & Administrative | Substantial | Deferred |
| Crime Mapping | Substantial | Partial |
| SAEC – Computerized Analysis and Statistics | Substantial | Deferred |
| Virtual Library – publish policies, procedures, forms, implement n PRPB Website | Substantial | Substantial |
| UOF | Substantial -- ↑ | Substantial -- ↑ |
| Recording Devices | Partial | Deferred |
| Body Worn Camera | Partial | Deferred |

*Table 1. Information Systems and Technology Systems Reviewed During the Reporting Period*

## Pathway Forward

During CMR-10, PRPB must demonstrate its ability to lead remediation efforts and its engagement with Gartner Inc., the Commonwealth's contractor, on RMS and PMO development.

## Paragraph 219: Information Systems and Technology

*PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | ☑ Met | ☐ Missed |
| 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | ☑ Met | ☐ Missed |
| 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | ☐ Met | ☑ Missed |
| 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | ☐ Met | ☑ Missed |
| 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | ☐ Met | ☑ Missed |
| Note: Review frequency, consistent with the periodicity of assessments in areas III through XII and XIV. | | |

*Compliance Assessment*

The Commonwealth must continuously seek improvement in all of its IT efforts. Even in the most mature of organizations, continuous pursuit of improvement must be an expectation. Training capacity and delivery by SAEA in support of BT's technology delivery effort is ambiguous at best. Progress is slow and because of its weak compliance operationally, the Commonwealth is not yet compliant. The Training Academy's commitment to being able to train should be tested often.

*Pathway Forward*

These criteria are unchanged from CMR-8 and are still relevant.  PRPB must continue to improve data collection procedures, resolve staffing inefficiencies, master the data analytic methods developed by AH Datalytics, the Commonwealth's contractor, and improve its management and oversight rigor. There is promise but not without the skills brought to bear specifically by AH Datalytics, the Commonwealth's contractor. PRPB must also improve administrative management and control practices, maintain its inventory of documentation, and revise artifacts like the Data Dictionary to ensure currency and alignment with progress to date and to prepare for future revisions. Modernization and future capabilities and functional definition will rely on a well-managed data inventory baseline and properly managed and configured technical and requirements artifacts. The IT CAP must be resourced and implemented.

## Paragraph 220: Information Systems and Technology

*PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |

| | | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Training: | N/A | | |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 219.

*Compliance Assessment*

Although PRPB is partially compliant regarding technology reporting and data publishing (see Paragraph 218), the procedural operationalization of said technology remains not compliant and questionable.

*Pathway Forward*

These criteria are unchanged from the CMR-8 reporting period and are still relevant. PRPB must complete the development of tools and protocols for collecting, analyzing, and reporting the information required by the Agreement. As examples NIBRS, Community Engagement, and EIS must be fully operationalized. All activities moving forward must be reconciled with the IT CAP.

## Paragraph 221: Information Systems and Technology

*PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☑ Missed |

*Compliance Assessment*

The IT CAP must be implemented. The establishment of the PMO will facilitate managerial sufficiency and the RMS will enable a generational leap forward in recording and processing data.

*Pathway Forward*

These criteria are unchanged from the CMR-8 reporting period and are still relevant. The Commonwealth should apply its fullest focus on the IT CAP and take action to implement it. The

275

acquisition of the necessary resources and funding to implement the IT CAP will be essential to moving compliance forward with this and the other paragraphs within this section.

## Paragraph 222: Information Systems and Technology

*PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Handheld recording device trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaint and witness statements are recorded in 95% of use of force reviews. | ☐ Met | ☑ Missed |
| 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | ☐ Met | ☑ Missed |
| 6. All sampled units had access to functional handheld recording equipment. | ☐ Met | ☑ Missed |

### Compliance Assessment

Although not operational, BT has made technological progress with assets and infrastructure and demonstrated some functional proficiency during the reporting period. Much more remains to be operationally compliant.

### Pathway Forward

As noted in previous CMRs, PRPB must provide evidence of their efforts to comply with the Agreement. PRPB should prepare for and brief its plan for development, operations, training, and support to the Monitor's Office. Operational evidence will require that archiving and retrieval of data and audio is consistent and repeatable.

## Paragraph 223: Information Systems and Technology

*All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data.*

276

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – March 2023 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. NCIC data trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. NCIC data is considered in 95% of patrol interventions and investigations. | ☐ Met | ☑ Missed |
| 5. All sampled units had access to NCIC data. | ☐ Met | ☑ Missed |
| 6. PRPB safeguards appropriately protect sensitive data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

This assessment has not changed from the previous CMR. PRPB is not compliant with this paragraph. As noted in previous CMRs, all officers have not received National Crime Information Center (NCIC) training. Access to NCIC is limited operationally. Officers that need NCIC information must relay their requests to the Centro de Mandos. Although relay of information is typically timely, as observed by the Monitor's Office during past site visits, direct access to NCIC information in the field is essential to increasing officer, citizen, and overarching public safety.

*Pathway Forward*

PRPB must continue integrating and implementing NCIC to ensure roll out beyond headquarters and area Centro de Mandos. Availability to all authorized and trained officers must be achieved and be in alignment with NCIC operational use criteria. Additionally, effective training throughout PRPB is required from SAEA and BT.

## Paragraph 224: Information Systems and Technology

Nothing in this Agreement shall be construed as prohibiting PRPD from contracting services related to technology and data collection, entry, and analysis.

*Compliance Assessment*

The Commonwealth must consider contracting with other external sources for subject matter experts in the cyber security and hygiene areas as well as program management and support staff for the execution and implementation of the IT CAP.

As noted in previous CMRs, PRPB is compliant with the allowances of this paragraph. PRPB has contracted with analytic experts from AH Datalytics who are assisting with the development of dashboards and improvements to the auditing capabilities with the Reform Unit. Further, the Monitor's Office contracted with Gartner Inc. to assist with conducting the IT Needs Assessment and collaborating with PRPB to develop the IT CAP.

# Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures, and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; and d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRPB, and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding UOF and a wide range of other substantive areas; 2) the training of all appropriate officers in the new UOF policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to UOF, UOF to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While the Commonwealth did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of

these good faith negotiations. In July 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the U.S. District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB and the Commonwealth during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB and the Commonwealth were expected to develop policies, procedures, and technologies to address serious deficiencies within the Bureau. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. The Commonwealth, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the 11 performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policies and procedures, UOF, and IT. CMR-1 found broad compliance on policy and procedure and certain areas of UOF, but nevertheless found a series of key lapses in UOF investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB's performance, covering a significantly larger number of Consent Decree paragraphs. The format and comprehensiveness of our CMRs has evolved with each report. CMR-5 represents the first full comprehensive assessment and report and the first report in which PRPB's status in the implementation of policy, training, and practice was documented. As such, CMR-5 provided a model for Monitor's reports going forward. As some areas, and paragraphs, of the Agreement are only assessed biannually, CMR-6 along with CMR-7 jointly provide the most comprehensive assessment provided by the Monitor's Office thus far.

## Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative research methods to assess the Commonwealth's compliance with the Agreement in the areas of performance selected for this report. These methods include but are not limited to 1) document reviews of forms that PRPB uses in the daily conduct of its activities; 2) content analysis of policies, training materials, internal investigation files, and other documents that provide detailed evidence of PRPB's efforts to comply with the Agreement; 3) interviews with sworn and civilian PRPB personnel, members of the public who can directly verify PRPB's community outreach and public information activities, personnel from other criminal justice components within Puerto Rico, and additional stakeholders in the reform process; 4) site visits to PRPB facilities, patrol locations, crowd control incidents, CIC meetings, and public information sessions; and 5) analysis of PRPB's data systems and the knowledge management practices that make use of these systems.[29]

### Compliance Levels

Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. PRPB and the Commonwealth's status in the implementation of policy, training, and practice are noted for each paragraph assessed, see figure 11. For those paragraphs where training is not a requirement of the paragraph training is listed as not applicable (N/A).



*Figure 12. Implementation Status: Policy, Training, Practice*

The compliance levels are defined as follows:

- **Fully Compliant**: Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;

---

[29] The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

- **Substantially Compliant**: Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;
- **Partially Compliant**: Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant**: Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Rating Deferred**: Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with a given paragraph, due to no fault on the part of PRPB.

The court draws a clear distinction between a deferred rating and a rating of not compliant due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB and the Commonwealth failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRPB or the Commonwealth, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

## Sampling Methodology

The Monitor's Office uses a variety of sampling methods to draw valid and representative samples for the data sources noted above. These sampling methods include the following:

1. Simple random sampling: Used for large datasets such as arrest reports and search/seizure incidents that occur in very large volumes each reporting period.
2. Stratified random sampling: Used for large but varied datasets such as training, performance, and disciplinary records for sworn PRPB personnel who are stratified by rank.
3. Purposive sampling: Used for datasets that require intentional selection to investigate key topics and cover all stakeholders over the course of successive CMRs, such as interviews with CIC members, training and counseling staff, and PRPB personnel assigned to specialized units.
4. Full enumeration: Used for sources that must be reviewed exhaustively, such as revisions to policies and training curricula, exemplars of forms that PRPB uses to interact with the public, and records for critical incidents such as deployment of chemical agents to disperse crowds.

In addition, the Monitor's Office uses a rolling sampling method for key data sources that require analyzing significant amounts of data on a tight deadline, such as arrests and searches, internal investigations, UOF incidents, etc. These data sources present a significant workload for the Monitor's Office, and for PRPB, because the relevant incidents either occur in large volumes during each reporting period or involve large amounts of documentation per incident. The Monitor's Office has addressed the

tradeoff between sample frequency, sample size, and margin of error, by adapting a "rolling" sampling method that the U.S. Census Bureau has developed for the American Community Survey.[30]

Using this method, the Monitor's Office draws quarterly samples for large data sources that are reviewed biannually. Sample sizes are calculated for each quarter by examining the past six months of incidents and drawing a proportional number of cases for the present quarter. Sample size is determined so that the margin of error for two years of combined data (consistent with the above definition of full compliance) is under 5%, allowing the Monitor's Office to state confidently whether PRPB has maintained substantial compliance on a given paragraph for the past two years and has therefore achieved full compliance. As such, the sample sizes below were determined not only on the number of cases stated for the present CMR, but on the basis of the past two years of data inclusively.

## CMR-9 Samples

The Monitor's Office requested the following samples from PRPB for CMR-8:

| Paragraph(s) | Primary Section | Data Source |
|---|---|---|
| **Common** | Common | Training records for a random sample of 46 in-service trainings conducted during the period, drawn from a population of 107. PRPB provided 98% of the request. |
| **Common** | Common | Training records (PTMS) for a random sample of 92 sworn personnel, drawn from a population of 11193. PRPB provided 100% of the request. |
| **Common** | Common | Training records, performance evaluations, disciplinary records, and any SARP investigations for a random sample of 19 supervisors and command officers, drawn from a population of 2378. PRPB provided 100% of the request. |
| **Common** | Common | Training records for a random sample of 64 civilian personnel, drawn from a population of 646. PRPB provided 98% of the request. |
| **13, 81, 136-140, 205** | Professionalization; Equal Protection and Non-Discrimination; Supervision and Management; Community Engagement and Public Information | Two months of staffing documents for a random sample of 33 PRPB precincts and units demonstrating that all agents report to a single supervisor, and supervisors manage no more than 10 agents, drawn from a population of 133. PRPB provided 100% of the request. |

---

[30] United States Census Bureau, American Community Survey Design and Methodology, January 2014, https://www.census.gov/history/pdf/acsdesign-methodology2014.pdf

| **16-20, 84** | Professionalization; Community Engagement and Public Information | Training records for a random sample of 8 promotions committee personnel, drawn from a population of 10. PRPB provided 100% of the request. |
|---|---|---|
| **25** | Use of Force | PPR 605.1 and PPR 605.2 for a total of 3 incidents in which STUs deployed chemical agents. PRPB provided 100% of the request. |
| **26, 54** | Use of Force | Weapons training certificates for a random sample of 76 officers, demonstrating that each officer successfully qualified with all weapons that they are authorized to carry, drawn from a population of 10,263. PRPB provided 100% of the request. |
| **26** | Use of Force | Disciplinary referrals for all officers who failed to qualify on firearms after retraining, including documentation of the resolution of those referrals. |
| **23-24, 27, 32-35** | Use of Force | PPR 605.1 and PPR 605.2 for a random sample of 8 UOF incidents by STU officers, drawn from a population of 37. PRPB provided 100% of the request. |
| **36-39, 41, 44-47** | Use of Force | PPR 605.1, PPR 605.2, PPR 605.3, and PPR 126.2 for a random sample of 78 UOF incidents, as well as PPR 113.2 for any UOF incidents investigated by FIU, drawn from a population of 928. PRPB provided 97% of the request. |
| **27, 28, 29, 32-35, 145-146** | Use of Force, Supervision and Management | Training records, performance evaluations, disciplinary records, and any SARP investigations, for a random sample of 19 officers assigned to STUs and STU evaluation boards, drawn from a population of 202. PRPB provided 100% of the request. |
| **28** | Use of Force | Activation/deployment records for a random sample of 50 STU deployments for preventive patrol and policing functions, drawn from a population of 412. PRPB provided 94% of the request. |
| **28** | Use of Force | Deployment records for a random sample of 33 STU officers assigned to general patrol and policing functions, drawn from a population of 436. PRPB provided 88% of the request. |
| **30** | Use of Force | Activation/deployment records for a random sample of 49 STU activations, drawn from a population of 226. PRPB provided 98% of the request. |
| **32-35** | Use of Force | Incident reports and after-action reports for a random sample of 57 planned and unplanned incidents involving crowds, drawn from a population of 224. PRPB provided 77% of the request. |
| **44-47, 222** | Use of Force; Information Systems and Technology | FRB evaluation files for a random sample of 78 FRB evaluations, drawn from a population of 213. PRPB provided 96% of the request. |

| 44-47 | Use of Force | Training records and certificates for a sample of 22 FRB members to determine whether all board members are fully trained and certified to serve on the FRB, drawn from a population of 76. PRPB provided 50% of the request. |
|---|---|---|
| 40, 48, 55 | Use of Force | Training records, performance evaluations, and disciplinary records for a sample of 37 FIU investigators, drawn from a population of 170. PRPB provided 100% of the request. |
| 41, 49, 51, 52 | Use of Force | Investigation files for a random sample of 36 FIU investigations, drawn from a population of 161. PRPB provided 94% of the request. |
| 41, 49, 51, 52 | Use of Force | Evaluation files (including PPR 502.1 and PPR 502.2) for a random sample of 28 CFRB reviews, drawn from a population of 67. PRPB provided 96% of the request. |
| 56 | Use of Force | Incident reports for a random sample of 81 incidents involving persons in mental health crisis, drawn from a population of 377. PRPB provided 96% of the request. |
| 60-64, 74-76 | Searches and Seizures | Incident reports, search warrants, property seizure receipts and storage documentation (where relevant), and related documents and CAD data for a random sample of 76 consensual searches and searches based on probable cause, drawn from a population of 927. PRPB provided 93% of the request. |
| 60-64, 84, 145-146, 205 | Searches and Seizures; Equal Protection and Non-Discrimination; Supervision and Management; Community Engagement and Public Information | Performance evaluations and disciplinary records for a random sample of 92 sworn personnel, drawn from a population of 11,193. PRPB provided 98% of the request. |
| 60-64, 154-156 | Searches and Seizures; Supervision and Management | Records and reports for a random sample of 18 operational audits, assessments, and inspections, drawn from a population of 24. PRPB provided 100% of the request. |
| 65-72, 223 | Searches and Seizures; Information Systems and Technology | Arrest reports and related incident reports for a random sample of 71 arrests, drawn from a population of 9,090. PRPB provided 93% of the request. |

| | | |
|---|---|---|
| **117, 129-131, 133** | Training | Completed course evaluations from the most recent session of 20 in-service trainings. PRPB provided 100% of the request. |
| **114-116, 132** | Policies and Procedures; Training | Documents demonstrating that a random sample of 33 precincts and units held monthly academies and/or in-service training meetings delivered at the beginning of shifts or tours of duty, drawn from a population of 133. PRPB provided 97% of the request. |
| **154-156** | Supervision and Management | Training records for a random sample of 13 operational auditors, indicating that all auditors have received training on internal audits and inspections, drawn from a population of 21. PRPB provided 92% of the request. |
| **72** | Searches and Seizures | Investigation files for a total of three administrative investigations involving seized property. PRPB provided 67% of the request. |
| **78, 79, 129-131** | Equal Protection and Non-Discrimination; Training | Reports and supporting materials from the most recent review of three trainings. PRPB provided 100% of the request. |
| **82, 197** | Equal Protection and Non-Discrimination; Civilian Complaints, Internal Investigations, and Discipline | Investigation files for a random sample of 13 misconduct complaints involving allegations of unequal protection, including allegations of discriminatory policing and retaliation, drawn from a population of 50. PRPB provided 92% of the request. |
| **84, 104-107** | Equal Protection and Non-Discrimination; Recruitment, Selection, and Hiring | Recruitment office files for a random sample of 82 recruited candidates, drawn from a population of 326. PRPB provided 98% of the request. |
| **84, 102-107** | Equal Protection and Non-Discrimination; Recruitment, Selection, and Hiring | Training records for a random sample of 34 personnel involved in recruitment and hiring, drawn from a population of 138. PRPB provided 100% of the request. |
| **89** | Equal Protection and | Reports from a random sample of four reported PRPB interactions with transgender or transsexual individuals, drawn from a population of four. PRPB provided 100% of the request. |

| | Non-Discrimination | |
|---|---|---|
| **92** | Equal Protection and Non-Discrimination | Investigation files for a sample of five incidents involving allegations of abuse and mistreatment originating in secure correctional facilities, drawn from a population of five. PRPB provided 100% of the request. |
| **93, 94** | Equal Protection and Non-Discrimination | Investigation files for a random sample of 69 sexual assault investigations, including supplemental reports and/or the prosecutor's findings, drawn from a population of 201. PRPB provided 90% of the request. |
| **93, 98** | Equal Protection and Non-Discrimination | Investigation files for a random sample of 139 domestic violence investigations, including supplemental reports and/or the prosecutor's findings, drawn from a population of 4,113. PRPB provided 100% of the request. |
| **96** | Equal Protection and Non-Discrimination | Call records for a sample of 64 hotline complaints, drawn from a population of 602. PRPB provided 94% of the request. |
| **96** | Equal Protection and Non-Discrimination | Training records and selection documents for a sample of 22 PRPB personnel who attend the 24-hour hotline for sexual crimes, drawn from a population of 76. PRPB provided 91% of the request. |
| **99** | Equal Protection and Non-Discrimination | SARP and SAIC investigation files for a random sample of 24 SARP investigations involving allegations of sexual assault and domestic violence against PRPB personnel, drawn from a population of 33. PRPB provided 100% of the request. |
| **12, 163-165, 168-170, 172-175, 180-189** | Civilian Complaints, Internal Investigations, and Discipline; Information Systems and Technology | Supervisory reviews and initial investigation files for a random sample of 72 misconduct complaints that have completed their initial investigation, drawn from a population of 880. PRPB provided 93% of the request. |
| **170** | Civilian Complaints, Internal Investigations, and Discipline | SARP investigation files and related data and communications for a purposive sample of 20 civil lawsuits and criminal prosecutions filed involving PRPB personnel, drawn from a population of 87. PRPB provided 100% of the request. |
| **177-179, 190, 192, 193, 198-199** | Professionalization; Civilian Complaints, Internal | SARP investigation files and related data for a sample of 58 closed misconduct investigations, sustained and not sustained, including investigations that were not completed within prescribed timeframes, drawn from a population of 233. PRPB provided 100% of the request. |

| | Investigations, and Discipline | |
|---|---|---|
| **160, 166, 177, 194-196** | Civilian Complaints, Internal Investigations, and Discipline | Training records, performance assessments, and disciplinary records for a sample of 42 members of the internal investigation unit, drawn from a population of 192. PRPB provided 95% of the request. |
| **200** | Civilian Complaints, Internal Investigations, and Discipline | Test results and related records for a random sample of 65 PRPB personnel who were drug tested during the assessment period, drawn from a population of 1,549. PRPB provided 94% of the request. |

*Table 2. CMR-9 Data Samples*

# Appendix C: Compliance Status by Paragraph and Sub-Section

The following sections were assessed in this report:

## I. Professionalization

| Professionalization Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Staffing & Community Policing | 0 | 1 | 0 | 0 |
| Promotions | 1 | 6 | 0 | 0 |
| Commander Corps | 0 | 1 | 0 | 0 |
| **Total** | **1** | **10** | **0** | **0** |

## II.  Use of Force

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 2 | 2 | 0 | 0 |
| Specialized Tactical Units | 0 | 5 | 0 | 0 | 0 |
| Crowd Control | 1 | 0 | 3 | 0 | 0 |
| Force Reporting | 0 | 0 | 4 | 0 | 0 |
| Force Review & Investigation | 0 | 1 | 1 | 0 | 1 |
| Supervisory and FRB Reviews | 0 | 2 | 3 | 0 | 0 |
| FIU Investigations & SFRB Reviews | 0 | 1 | 4 | 0 | 0 |
| Use of Force Training | 0 | 0 | 3 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 0 | 2 | 0 | 0 |
| **Total** | **2** | **11** | **22** | **0** | **1** |

## III.  Searches & Seizures

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 0 | 0 |
| Investigatory Stops and Searches | 0 | 4 | 1 | 0 |
| Arrests | 1 | 3 | 5 | 0 |
| Searches | 0 | 2 | 2 | 0 |
| Training on Stops, Searches, and Seizures | 0 | 0 | 2 | 0 |
| **Total** | **1** | **11** | **10** | **0** |

## IV. Equal Protection and Non-Discrimination

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 3 | 3 | 0 |
| Discriminatory Policing | 0 | 3 | 3 | 0 |
| Sexual Assault and Domestic Violence | 3 | 4 | 1 | 0 |
| **Total** | **4** | **10** | **7** | **0** |

## V. Policies and Procedures

| Consent Decree Section/Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | **2** | **6** | **0** | **0** |

## VI. Supervision and Management

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Duties of Supervisors | 0 | 3 | 2 | 0 |
| Performance Evaluation | 0 | 2 | 0 | 0 |
| Early Identification System | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 1 | 2 | 1 | 0 |
| **Total** | **1** | **8** | **10** | **0** |

## VII. Civilian Complaints, Internal Investigations, and Discipline

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 2 | 0 | 0 |
| Civilian Complaints | 2 | 0 | 0 | 0 | 0 |
| Internal Investigations | 0 | 0 | 2 | 0 | 1 |
| Complaint Intake & Handling | 2 | 4 | 3 | 2 | 0 |
| Investigation of Complaints | 2 | 2 | 10 | 2 | 1 |
| Staffing, Selection, & Training Requirements | 0 | 0 | 2 | 1 | 0 |
| Preventing Retaliation | 0 | 0 | 1 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| Discipline | 1 | 0 | 2 | 0 | 0 |
| Officer Assistance and Support | 1 | 1 | 2 | 0 | 0 |
| **Total** | **8** | **7** | **24** | **5** | **2** |

## VIII.   Community Engagement and Public Information

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Community Oriented Policing | 0 | 2 | 0 | 0 |
| Community Interaction Councils | 0 | 1 | 1 | 0 |
| Public Information | 0 | 2 | 2 | 0 |
| **Total** | **0** | **6** | **3** | **0** |

## IX.   Information Systems and Technology

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 4 | 2 | 0 |