

June 2024

# Tenth Report of the Federal Monitor

Covering the Period from October 2023 through March 2024

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

1

## Table of Contents

INTRODUCTION ...................................................................................................................................4

    General Background on the Agreement and Monitoring Process .................................................4
    Scope and Methodology ...........................................................................................................5
    Monitoring Activities During CMR-10.........................................................................................6
    Key Findings of the Monitor's Tenth Report.................................................................................7

I. PROFESSIONALIZATION ....................................................................................................................9

II. USE OF FORCE..............................................................................................................................10

    1. General Provisions ...........................................................................................................13
    2. Specialized Tactical Units ................................................................................................17
    3. Crowd Control Policies and Performance ..........................................................................24
    4. Force Reporting...............................................................................................................29
    5. Force Review, Investigation, and Analysis .........................................................................35
    6. Supervisory and FRB Reviews ..........................................................................................38
    7. FIU Investigations and Force Reviews by SFRB .................................................................45
    8. Use of Force Training ......................................................................................................55
    9. Responding to Behavioral/Mental Health Crisis .................................................................59

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY ....................................66

    1. Stops, Searches, and Seizures .........................................................................................68
    2. Investigatory Stops and Searches.....................................................................................68
    3. Arrests ...........................................................................................................................74
    4. Searches ........................................................................................................................82
    5. Training on Stops, Searches, and Seizures ........................................................................87

IV. EQUAL PROTECTION AND NON-DISCRIMINATION ..........................................................................88

    1. General Provisions ...........................................................................................................89
    2. Discriminatory Policing ....................................................................................................94
    3. Sexual Assault and Domestic Violence .............................................................................100

V. RECRUITMENT, SELECTION, AND HIRING.......................................................................................105

    1. Recruitment Plan ............................................................................................................109
    2. Hiring Reforms ...............................................................................................................112

VI. POLICIES AND PROCEDURES ........................................................................................................119

VII. TRAINING ..................................................................................................................................120

    1. Pre-Service Education and Training ...................................................................................122
    2. Field Training Program.....................................................................................................128
    3. In-Service Training...........................................................................................................134
    4. Training Records .............................................................................................................139

VIII. SUPERVISION AND MANAGEMENT ..............................................................................................143

    1. Duties of Supervisors ......................................................................................................145
    2. Supervisor Training .........................................................................................................156
    3. Performance Evaluation ...................................................................................................160
    4. Early Identification System ...............................................................................................163
    5. Internal Audits and Interagency Feedback..........................................................................170

IX. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE ..........................................179

1. CIVILIAN COMPLAINTS ............................................................................................................182
2. INTERNAL INVESTIGATIONS ...................................................................................................185
3. COMPLAINT INTAKE, CLASSIFICATION, ASSIGNMENT, AND TRACKING.............................189
4. INVESTIGATION OF COMPLAINTS............................................................................................199
5. STAFFING, SELECTION, AND TRAINING REQUIREMENTS ......................................................219
6. PREVENTING RETALIATION ....................................................................................................222
7. DISCIPLINE .............................................................................................................................224
8. OFFICER ASSISTANCE AND SUPPORT ....................................................................................227

**X. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION ...................................................... 231**
1. COMMUNITY ORIENTED POLICING ........................................................................................236
2. COMMUNITY INTERACTION COUNCILS ..................................................................................244
3. PUBLIC INFORMATION ...........................................................................................................255

**XI. INFORMATION SYSTEMS AND TECHNOLOGY ............................................................................ 262**

**APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION ................................................... 270**

**APPENDIX B: METHODOLOGY .......................................................................................................... 272**
COMPLIANCE LEVELS.................................................................................................................272
SAMPLING METHODOLOGY .......................................................................................................273
CMR-10 SAMPLES......................................................................................................................274

**APPENDIX C: COMPLIANCE STATUS BY PARAGRAPH AND SUB-SECTION ................................. 279**

## Introduction

This report will outline the current compliance status of the Commonwealth of Puerto Rico (hereafter, the "Commonwealth") and the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, Parties, and residents of the Commonwealth about implementation status and levels of compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the Court, the Parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report.

## General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources needed to reform unconstitutional policing practices and bring the Bureau into line with generally accepted practices of constitutional policing and effective law enforcement. The Parties recognize that constitutional policing, effective law enforcement, and the community's trust in its police force are interdependent. Accordingly, full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop dynamic leadership and management skills within PRPB aimed at transforming the Bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the Parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

1. Professionalization;
2. Use of Force (UOF);
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations, and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, the Commonwealth developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor's Office.

4

During the capacity-building period, the Monitor's Office assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1 and since October 2018, the Monitor's Office has been assessing PRPB's compliance with the Agreement.

## Scope and Methodology

The Chief Monitor's Tenth Report covers the period between October 2023 and March 2024. CMR-10 covers 9 of the 11 performance areas of the Agreement: 1) Use of Force (UOF), 2) Searches and Seizures, 3) Equal Protection and Non-Discrimination, 4) Training; 5) Recruitment, Selection, and Hiring; 6) Supervision and Management, 7) Civilian Complaints, Internal Investigations, and Discipline, 8) Community Engagement and Public Information, and 9) Information Systems and Technology. Per the monitoring methodology agreed on by the Parties, 179 paragraphs were scheduled for assessment in CMR-10, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering Professionalization and Policies and Procedures as well as specific paragraphs throughout other sections that are assessed on an annual basis and were covered in CMR-9.

For each of these areas, the Monitor's Office presents its assessments based on the desk review of data that was provided by the Commonwealth, as well as interviews, questionnaires, site visits, observations, and the current state of IT (see below for more details on the activities conducted during the CMR-10 reporting period). The collection, analysis, reporting, and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely compliance assessments, as well as achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist the Commonwealth in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess the Commonwealth's compliance with the Agreement in the three areas of performance (policy, training, and implementation) selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel on the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide the Commonwealth with a detailed pathway towards achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's assessment as well as additional detail on the assessment and sampling methodologies are provided in Appendix B.

## Monitoring Activities During CMR-10

Over the past six months the Monitor's Office conducted five site visits to PRPB headquarters as well as various regions of the island including Aguadilla, Bayamon, Guayama, and Carolina. At each of these field visits the Monitor's Office visited the area command, district(s) within each area, Highway Patrol Units, and other units at each location. At each location the Monitor's Office met with executive command and PRPB personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF.

These field visits provided an opportunity for the Monitor's Office to hear directly from supervisors and officers on the front line, speak with members of the Commonwealth community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of over 4,000 policies, documents, certifications, audio recordings, and case files and reports provided for review during the CMR-10 reporting period. While on site, team members also participated in five system demonstrations on various sytems, including the Inspections Module, Community Engagement Module, Non-Punitive Discipline Module, Tracking Module, ProMedia, and Early Intervention System (EIS). The Monitor's Office also acquired access to these systems as part of its efforts to streamline monitoring efforts.

During the CMR-10 reporting period, the Monitor's Office also reviewed 51 policies, forms (PPRs), and protocols under Paragraph 229 of the Agreement. The policies included General Orders (GOs) 118 (Domestic Violence), GO 624 (Interactions with Transgender and Transexual Individuals), GO 704 (Monthly Meetings and Newsletters), GO 305 (Transfer Transactions of the Rank System), among others.

The Monitor's Office also observed various community engagement events hosted by PRPB and the CICs. The Monitoring Team also conducted a community townhall meeting in March 2024. This meeting was attended by over 130 representatives from the community, PRPB, and the Department of Public Safety (DSP). The community meetings hosted by the Monitor's Office are conducted quarterly.

During this reporting period, Gartner Inc., contracted by the Monitor's Office, continued its work with the Commonwealth. The current contract includes support for the acquisition and implementation of the new Record Management System (RMS) and the Project Management Office (PMO). The Commonwealth also finalized and submitted its status updates on the Implementation Plans. Further, during this reporting period, the Commonwealth and the Monitor's Office began conducting biweekly compliance status updates for each of the areas of the Agreement. Conversations on modifications to the methodologies of various areas were also conducted during this reporting period, though no changes have been formally submitted to the court as of the end of the reporting period.

In addition, during the CMR-10 reporting period, the Monitor's Office participated in one status conference. The January 2024 status conference focused on updates related to the CMR-9 report, the IT Corrective Action Plan (CAP), and the Supervision and Staffing Plan. The Monitor's Office continues to work closely with the Parties to monitor the Commonwealth's progress with implementing the various plans filed with the court.

## Key Findings of the Monitor's Tenth Report

During the CMR-10 reporting period, the Commonwealth's achievements towards partial and/or substantial compliance with many of the paragraphs continued to positively increase. This improvement in compliance is largely due to the completion of the various tasks and initiatives related to several implementation plans including UOF, Training, and Supervision and Management. The improvement of tracking and reporting of UOFs, the implementation of a revised performance evaluation process, improvements in the reports of arrests, the publication of crime data, the use of self-monitoring dashboards, and the implementation of important and necessary in-service training are some examples. Although these areas of improvement represent significant progress, much remains to be done to demonstrate substantial compliance. The selection of an RMS vendor and implementation of a new RMS, with eventual integration of computer-aided dispatch (CAD), GTE, and data specific dashboards; improvements to supervisory training on performance evaluations; the establishment of an Early Intervention System (EIS); continued promotions; improvements to community policing strategies, activities, and tracking of these activities; establishment of an associate's degree program in the Academy; and increases in staffing to the Auxiliary Superintendency of Professional Responsibility (SARP) and the Office of Legal Affairs (OAL) are just a few of the areas that need to be addressed for the Commonwealth to propel forward in compliance with the Agreement.

It should be noted that while not scheduled for assessment, Professionalization Paragraphs 16 and 17 of the Agreement went from partially compliant to not compliant based on DSP's actions related to arbitrarily awarding points without merit to 12 applicants who failed the 2015 captains' examination. This was done for the purpose of obtaining a passing grade.

Over the next few reporting periods, the Commonwealth must continue to work towards addressing these areas along with others outlined in its non-compliance implementation tracker. The Monitor's Office also stresses to the Commonwealth that for it to continue experiencing improvements to training, in particular in-service training, it must begin working towards developing the 2024 Annual Training Plan. Training plans like those produced in Chicago, Illinois and Baltimore, Maryland are just a few examples of comprehensive training plans that include all aspects of the training program along with required community engagement. Failure to establish a Training Plan will again result in regressions in compliance with the conduct of in-service training and unit specific training, which span all areas of the Agreement.

Allocation of the necessary resources to community policing, SARP, OAL, the Commissioner's Force Review Board (CFRB), and Force Review Board (FRB) is also an area that needs to be addressed and considered instrumental in progressions of compliance. Further, as established in Court Order 2644, the Monitor's Office, in collaboration with OSM will undertake additional oversight activities to ensure that the promotions process is fair, equitable, and in compliance with the Agreement. Over the next reporting periods the Monitor's Office will work with OSM to complete the required tasks as stipulated in the Court Order.

As noted above, when examining the total paragraphs assessed in this report (N=179) in comparison to the previous CMR in which these sections and paragraphs were assessed (CMR-8; N=179), the Monitor's Office notes that PRPB has achieved significant progress during this reporting period. For example, 94 paragraphs met partial compliance and 19 paragraphs were rated not compliant during this reporting

period, in comparison to 83 paragraphs rated as partially compliant and 56 as not complaint in CMR-8. Further, when reviewed comprehensively, almost 88% (N=158) of the paragraphs meet either partial, substantial, or full compliance in CMR-10 in comparison to 68% (N=121) in CMR-8.



*Figure 1. Rate of Compliance Over Time*

In the forthcoming report sections, the Monitor's Office provides the assessment and analysis produced by the subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting the Commonwealth in achieving a pathway to compliance.

## I. Professionalization

Professionalization is assessed on an annual basis. Paragraphs 12 -21 were assessed in CMR-9 and will be assessed again in CMR-11. However, as noted in the Introduction, an assessment of Professionalization Paragraphs 16 and 17 of the Agreement was conducted and the Monitor's Office found that these paragraphs went from Partially Compliant to Not Compliant based on DSP's actions related to arbitrarily awarding points without merit to 12 applicants who failed the 2015 captains' examination, for the purpose of obtaining a passing grade. Please see Appendix D for the Monitor's Office's assessment of Paragraphs 16 and 17.

## II. Use of Force

PRPB formally implemented its Provisional Use of Force (UOF) Plan in July 2022. The Provisional UOF Plan, which has been in place for nearly two years, coupled with the increase of sergeants in the field, has resulted in improved reporting of UOF incidents in the reporting period. Thus, the Monitor's Office has determined that the Provisional UOF Plan has produced accurate numbers Bureau-wide. Nevertheless, the plan will change with the introduction of PRPB's new records management system (RMS).

In addition, the Commonwealth's contractor, AH Datalytics, continues to help develop and improve the various UOF related dashboards. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field. These data dashboards should also assist first-line supervisors with managing workflow and ensuring officer compliance.

During this reporting period, PRPB reported 1,029 instances of UOFs in 509 incidents. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRPB's GTE system is comprehensive. It should be noted that the Monitor's Office has determined that PRPB continues to make progress in the preparation and submission of UOF reports (PPR 605.1) in the timeframe outlined in PRPB policy. In the sample of 79 UOF reports (PPR 605.1) reviewed by the Monitor's Office all but 1 (1%) was prepared and submitted in the timeframe outlined in policy. In addition, as stipulated in the policy, supervisors completed their investigation within five business days. These improvements have resulted in continued positive compliance ratings.

Improved consistencies in the UOF data largely affect many of the paragraphs in this section. Other topics such as the Force Investigation Unit (FIU), Force Review Boards (FRBs), Crisis Intervention Training (CIT), SWAT, and crowd control procedures also impact PRPB's overall compliance with this section. As it relates to FIU, the Monitor's Office has observed significant improvement in meeting established timelines. The Parties and the Monitor's Office have agreed to temporarily update the 45 calendar days requirement that FIU has to complete UOF investigations for CMRs-10 and 11 to 60 calendar days. With the timeframe update for completing FIU investigations, the Monitor's Office observed that 98% of cases were completed within the agreed upon timeframe of 60 days. The additional personnel recently added to FIU have and will continue to contribute to improved compliance.

In the Monitor's Office's review of Commissioner Force Review Board (CFRB) evaluations over the course of its CMRs, while the evaluations were objective, they were not timely. To address this issue during the reporting period, PRPB modified the process by updating and creating new forms associated with the FIU (PPR 113.1 through PPR 113.12). PRPB has also created new forms, PPR 502.7 (Review of Field Investigations of UOF Incidents Investigated by the FIU Use of Force Investigations Division) and PPR 502.8 (Final Determination of the Incident).

To address the backlog of cases with the CFRB for review (114 cases), PRPB has created additional temporary boards headed by board members from the original CFRB who have received training on GO

502 and have been designated as presidents of these newly formed boards. The remaining members of these boards are drawn from the area commands' command staff who have also received the training. PRPB has indicated that the existence of these boards is for the sole purpose of reducing the backlog of cases. A review of the backlogged cases conducted by the Monitor's Office indicates that all cases have been closed. PRPB has yet to outline how they intend to maintain compliance in this area moving forward.

Adding to the extensive workload currently undertaken by the CFRB, in an effort to reduce the number of open investigations from previous periods, the FIU has closed a number of older cases adding to the case load of the CFRB.

In the area of Responding to Behavioral/Mental Health Crisis it is critically important to have CIT trained officers throughout the 13 area commands. Since the conclusion of the pilot project in November 2020, PRPB had lagged in expanding its CIT coverage outside of Arecibo until the last reporting period. PRPB made significant progress in CMR-9, adding personnel, and expanding the program to five additional areas. By the end of the current reporting period PRPB had trained an additional 111 officers as CIT officers bringing the total of trained officers to 189 and expanded the CIT program to all 13 areas.

PRPB also reported that during the month of February 2024 a new CIT Bureau Coordinator who holds the rank of Inspector was assigned to lead the expansion efforts to other area commands. The assigned inspector has experience in this area, holding a doctoral degree in Psychology.

Notwithstanding the issues noted above, the Commonwealth has demonstrated progress in many of the UOF paragraphs. Much of the efforts made in this reporting period can be attributed to PRPB's continued collaboration with AH Datalytics, the Commonwealth's contractor, who has helped PRPB develop several UOF related dashboards, which include "Compliance with Reports", "Use of Force Statistics", "Requests from the Monitoring Team", and "Specialized Tactical Unit Mobilizations." These dashboards are useful to the Monitor's Office as they serve as another tool in assessing PRPB's compliance with the Agreement. In addition, PRPB's efforts in training members as CIT officers and in expanding the CIT Program to all area commands has been identified by the Monitor's Office as a major step. The positive efforts made in this reporting period have proven beneficial in increasing PRPB's compliance ratings in this section.

Overall, the Commonwealth's compliance with the 36 paragraphs assessed during this reporting period within UOF reflects substantial improvement in levels of compliance to what was noted in previous reports. In CMR-9, 61% of paragraphs (22 paragraphs) were assessed as partially compliant and 31% (11 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 28% of paragraphs (10 paragraphs) were found to be partially compliant and 61% (22 paragraphs) were found to be substantially compliant. Three paragraphs (8%) were rated as fully compliant, and one paragraph was rated as deferred (3%). See figure 2.



*Figure 2. Use of Force: Paragraph Compliance Status*

## Paragraph 22: Use of Force - General Provisions

*PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

As in previous CMRs, the Monitor's Office requested the following information: 1) number of incidents in which force was used and 2) how many officers used force in each incident. In response, PRPB provided information attesting that force was used 1,029 times in 509 incidents during this reporting period.

Of the 1,029 UOF incidents that occurred in this reporting period, the Monitor's Office randomly sampled and reviewed 79 UOF reports. An analysis of the reports by the Monitor's Office determined that the UOFs were in accordance with the rights, privileges, and immunities secured or protected by the

Constitution or laws of the United States and the Commonwealth of Puerto Rico, which prohibit the use of unreasonable force.

Further, during this reporting period, the Monitor's Office reviewed various policies and procedures related to UOF reporting. As previously noted, the Monitor's Office finds that PRPB's policies and procedures on UOF enable officers to rely primarily on non-force techniques to effectively police, use force only when necessary, and de-escalate the UOF at the earliest possible moment. Adherence to the policies in practice is also reflected in the Monitor's Office's review of UOF reports which verified that the levels of force were consistent with PRPB policies.

*Pathway Forward*

Now that PRPB has, via its Provisional UOF Plan, provided reliable data relating to UOF numbers, the Monitor's Office can thoroughly analyze the data. Further, this analysis is more representative of UOFs that occurred during this reporting period. However, PRPB should endeavor to develop a permanent system to report accurate UOF incidents, one that is not labor intensive and does not require several layers of review as in the Provisional UOF Plan to address and correct discrepancies in the data. This improved system should be woven into PRPB's efforts to implement its IT Corrective Action Plan (CAP) and improvements to its RMS.

## 1. General Provisions

PRPB complies with applicable law and comports with generally accepted policing practices in its policy and training related to UOF, including training on less lethal weapons. The comprehensive UOF policy requires that PRPB categorize all reportable UOFs into multiple levels, grouped by degree of seriousness, and identify all force techniques used by officers. PRPB has provided the Monitor's Office with the requested case files for review under the applicable paragraphs.

PRPB has demonstrated continued compliance with several paragraphs in this subsection including the continued prohibition of CN gas.

### Paragraph 23: Use of Force - General Provisions

*PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met ☐ Missed |
|---|---|

*Compliance Assessment*

PRPB has prepared comprehensive policies that categorize UOFs into multiple levels, grouped by degree of seriousness and describes each force level and the options available to officers as outlined in the Agreement. The policies are consistent with generally accepted policing practices relating to UOF. The Monitor's Office reviewed 79 UOF incidents during this reporting period and determined that the force used by officers were accurately categorized into levels grouped by the degree of seriousness. During this reporting period, there were 1,029 UOF applications; of these instances, 373 were level 1 (36%), 266 were level 2 (26%), 312 were level 3 (30%), and 73 were level 4 (7%) UOFs. After review, five were deemed as non-UOFs.

*Pathway Forward*

The Monitor's Office looks forward to assessing PRPB's progress with improving data accuracy as it has implemented the Provisional UOF Plan and continues its work on the IT Needs Assessment and subsequent IT CAP.

## Paragraph 24: Use of Force - General Provisions

*PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met ☐ Missed |
|---|---|

*Compliance Assessment*

PRPB has prepared comprehensive policies and revised them periodically as outlined in the Agreement. The policies are consistent with generally accepted policing practices relating to UOF. As noted above, while PRPB has incorporated the paragraph requirements into policy, all relevant personnel have not been trained on policy requirements and implementation of this policy in practice is still lacking. During this reporting period the Monitor's Office reviewed GO 628 (Intervention with People in Crisis), GO 623 (Police Pursuits), and forms relating to GO 113 (FIU).

*Pathway Forward*

Substantial compliance with this paragraph hinges on PRPB's ability to demonstrate its practical application of UOF policies. The Monitor's Office will continue to make a comprehensive assessment to determine if the UOF policies are in fact adhered to in practice. The Monitor's Office looks forward to reviewing PRPB's compliance with this paragraph and is hopeful that the implementation of the Provisional UOF Plan and IT Needs Assessment will improve PRPB's ability to accurately report and track UOFs.

## Paragraph 25: Use of Force - General Provisions

*PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policy prohibits use of CN gas. | ☑ Met | ☐ Missed |
| 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | ☑ Met | ☐ Missed |
| 3. No supply of CN gas is identified in armories or other locations through inspections. | ☑ Met | ☐ Missed |
| 4. CN gas is never used by STUs. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-7 and as such is no longer conducting assessments of this paragraph.

15

## Paragraph 26: Use of Force - General Provisions

*PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | ☑ Met | ☐ Missed |
| 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | ☑ Met | ☐ Missed |
| 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | ☑ Met | ☐ Missed |
| 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | ☑ Met | ☐ Missed |
| 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

The Monitor's Office found that PRPB's policies relating to firearms qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the previous reporting period.

To determine compliance with firearms training and qualification, the Monitor's Office requested data relating to yearly firearms training and qualifications. PRPB is required to conduct firearms training and qualifications for all sworn members with Bureau issued firearms in both day and reduced light fire every 12 months.

PRPB commenced the day and reduced light fire training during the reporting period (2,689 trained on reduced light and 1,544 trained on day fire). Previously, PRPB conducted the two training courses at different times of the year. If PRPB continues conducting training in this manner it can expect to meet compliance with the 12-month training requirement in CMR-12.

16

The Monitor's Office selected a random sample of 183 officers from the list of officers who were listed as qualified (night fire) and requested their certified training records to verify that officers were qualified with their service weapon for this reporting period. A review of the training files confirmed that all officers were qualified. However, in 249 instances, officers required additional testing on site for either day, night fire shooting, or both. The Monitor's Office also noted in documentation provided by PRPB that nine officers failed the on-site requalification and required training and re-testing to be certified. Eight of the officers (89%) successfully completed the training and subsequently qualified with their firearm. One officer failed the retesting after multiple instructions and retesting. The officer was disarmed and PRPB is assessing his status as a possible medical condition, which is why the matter has not been referred to SARP for investigation. SARP also provided documentation that there were no investigations conducted relating to officers failing to qualify on their weapons. Therefore, the Monitor's Office did not have the opportunity to review whether officers are disciplined after failing to requalify for firearms training.

PRPB's IT Bureau and Auxiliary Superintendency for Education and Training (SAEA) are developing a Shooter Module, which will generate global reports; however, as of the end of this reporting period, the module was not yet operational and has not been demonstrated to the Monitor's Office. The Monitor's Office anticipates reviewing an improved Shooter Module soon.

*Pathway Forward*
PRPB needs to qualify all sworn personnel on both day and reduced light fire within a 12-month period and must maintain records of this training in its Global Report. Further, the Monitor's Office stresses the importance of scheduling the training so that both segments are completed during a 12-month period to ensure that all officers are qualified.

## 2. Specialized Tactical Units

In relation to Paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed UOF policies for specialized tactical units (STUs) and that these policies are consistent with PRPB's Bureau-wide UOF policy. A review of the tactical unit's (DOT) roll call documents verifies continued compliance with policies. Related to training on policy, PRPB DOT has also completed training. In practice, the Monitor's Office has verified that all STU officers meet eligibility requirements and that specialized units are not conducting general policing functions except for non-specialized preventive patrols in high crime areas. For these preventive patrols PRPB DOT provided documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire.

During this reporting period, the Monitor's Office reviewed documents and case files that attested to DOT conducting preventative patrols and other policing activities as outlined in the appropriate policies. In addition, DOT is appropriately documenting its activities and having supervisors review those activities and documentations. To that end, the Monitor's Office requested a random sample from 1,091 activations DOT and SWAT mobilizations which include preventive patrol (PPR 112.2 Record of Mobilization of STU) during this reporting period. PRPB provided a random sample of 108 mobilizations. A review of the files verified DOT and SWAT's compliance with policy.

17

Using the dashboard created by AH Datalytics, the Commonwealth's contractor, PRPB now has a centralized database that captures all STU deployments Bureau-wide. This centralized database will help PRPB command staff determine DOT needs Bureau-wide.

## Paragraph 27: Use of Force - Specialized Tactical Units

*PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All use of force training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4. 95% of uses of force by STU officers are within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB has developed policies on UOF by STU members. These policies are consistent with PRPB's Bureau-wide policy. A review of UOF training involving STUs has determined that it is consistent with PRPB policy. No updates to this policy were conducted during this reporting period. Further, a review of training records found that 95% of sampled officers have completed training on UOF policies involving STUs in the required timeframe. The Monitor's Office concludes that all STU personnel meet the special training requirements related to their specialized units.

There were no instances in which DOT was mobilized in an active capacity during the reporting period. All activations were for "standby" status. These deployments were consistent with policies relating to UOF by specialized units.

*Pathway Forward*

The Monitor's Office will continue to monitor UOFs by specialized units at demonstrations and protests to verify compliance with this paragraph. The Monitor's Office also notes that PRPB must continue to schedule and conduct training for all officers on UOFs involving STUs.

18

## Paragraph 28: Use of Force - Specialized Tactical Units

*PRPD shall prohibit STUs from conducting general patrol and policing functions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Presentation of data on STU deployments and activations. | ☑ Met | ☐ Missed |
| 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | ☑ Met | ☐ Missed |
| 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. In addition, 95% of STU officers are trained and certified on STU policies. The Police Training Management System (PTMS) does not allow supervisors to easily track which officers have received which training courses, so DOT supervisors have been maintaining their own internal tracking, which is not conducive to tracking long-term and on-going training requirements.

In relation to the policy requirements of Paragraph 28, GO 112 (Tactical Operations Divisions) allows DOT officers to be assigned to preventive patrol but precludes DOT from operating as a specialized unit or equipping tactical gear when conducting patrol functions. GO 112 also requires that DOT members always keep specialized weapons and tactical equipment accessible in the event their unit is activated to respond to an authorized DOT event. During the January 2024 site visit to Metro DOT, the Monitor's Office was informed that officers assigned to preventive patrol continue to keep their specialized equipment in the trunk of their vehicle, accessible to the officers in the event they are mobilized. In addition, PRPB has previously modified PPR 112.2 (Record of Mobilization of STU) to reflect this information as well as wearing the proper uniform. Verification of the changes to PPR 112.2 was confirmed by the Monitor's Office.

19

The Monitor's Office has verified in its review of related documents that specialized units are properly documenting their daily assignments in compliance with the Agreement. Specialized units do not conduct general policing functions apart from preventive patrols in high crime areas or at special events. During this reporting period over 1,191 preventive patrols/other specialized deployments were conducted. From that number the Monitor's Office requested a random sample of 108 records. The Monitor's Office received some degree of documentation for most of the mobilizations requested. However, in the cases involving the Fajardo DOT no "Mobilization Record of the Specialized Tactics Division" (PPR 112.2) were included in their 23 files. Some additional files from the request were also missing PPR 112.2. Upon review of the files and deployment records that included the form, the Monitor's Office determined that deployments were consistent with the Agreement and PRPB policy.

*Pathway Forward*

Reviews of deployment records and observations will ensure PRPB's continued compliance with the practical elements of this paragraph. The Monitor's Office will continue to evaluate training records to ensure that required trainings are being delivered on time and in adherence with the Agreement.

## Paragraph 29: Use of Force - Specialized Tactical Units

*PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for evaluation boards is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of evaluation board members are trained. | ☑ Met | ☐ Missed |
| 4. All officers selected to STUs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | ☑ Met | ☐ Missed |
| 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies.

PRPB provided documentation that there are currently 182 personnel assigned to DOT units throughout PRPB. The breakdown of those personnel by rank is as follows:

- 1 Commander
- 1 Inspector
- 2 First Lieutenants
- 8 Second Lieutenants
- 23 Sergeants
- 147 Agents

PRPB developed GO 112 (Tactical Operations Divisions) and GO 117 (Specialized Weapons and Tactics Division) which outline eligibility criteria and selection processes for specialized units. During the reporting period, no additional officers were assigned to DOT. However, 21 officers (47%) from a group of 45 who met the requirements for possible assignment, passed the required physical agility test. These 21 officers will be transferred to various DOTs throughout the Bureau in the coming months.

SWAT reports that there has been no increase in personnel; however, eight candidates are awaiting eligibility review of their files by the review board. After verification of eligibility, the officers will be required to successfully complete SWAT physical agility test requirements before assignment to SWAT.

The Monitor's Office reviewed DOT and SWAT personnel files for existing members and confirmed that the officers meet the requirements for assignment and have the required training. As it relates to DOT, the retention process for 15 officers to remain in their existing position as outlined in GO 112 (Tactical Operations Divisions) has been initiated in compliance with Bureau policy. SWAT does not have any members currently in the retention process.

*Pathway Forward*

As noted above, the tenure limit of six years applies to STU officers. The Monitor's Office assesses that PRPB has commenced the retention process for those DOT and SWAT officers it wishes to retain. Moving forward, PRPB needs to continue this task as necessary and in a timely manner.

## Paragraph 30: Use of Force - Specialized Tactical Units

*PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Fully Compliant | Review | October 2023 – March 2024 |

| | | Period | |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

## *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | ☑ Met | ☐ Missed |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | ☑ Met | ☐ Missed |

## *Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. A review of PRPB DOT operational plans indicated that in situations where the unit was given prior assignment notification, an operational plan was prepared as required by PRPB policy.

PRPB reported that during this reporting period there were 117 demonstrations or protests. Of the 117 demonstrations or protests, according to PRPB documentation, 67 were unplanned (57%) and 50 were planned (43%).

PRPB reported that DOT units participated in 28 demonstrations or protests that occurred during the reporting period; participation was in a "standby" role. According to PRPB, SWAT did not participate in any demonstration/protest that occurred during the reporting period. The Monitor's Office verified this through documentation provided by the Reform Unit.

PRPB provided documentation that there are currently 17 personnel assigned to SWAT. The breakdown of those personnel by rank is as follows:

- 1 Second Lieutenant (Commanding Officer)
- 2 Sergeants
- 14 Agents

Two officers left SWAT during the reporting period. One officer was transferred to the FBI Task Force and the other to the Bureau's Firearms Range as a Range Officer.

SWAT was activated 60 times during the reporting period. The Monitor's Office conducted site visits to SWAT to review documents and conduct visual inspections of equipment in November 2023 and January 2024.

22

In all cases reviewed, SWAT prepared a Mobilization Report (PPR 112.2) and After-Action Report (PPR 112.3). As noted in previous CMRs, SWAT's commanding officer reported that, in many instances relating to mobilization, no advance warning was received following the request to "back up" federal task forces or specialized units operationally. Therefore, no operational plans were prepared during the reporting period for those events.

As stated in previous CMRs, SWAT has developed an internal form titled "Mission Evaluation." This internal form captures all aspects of the mission including what needs to be maintained, what could be improved, and final comments. The Monitor's Office previously commended SWAT on the development, implementation, and use of the Mission Evaluation Form and emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety. This practice is also consistent with generally accepted policing practices. PRPB memorialized the form and assigned it PPR 117.3. During site visits to SWAT in November 2023 and January 2024 the Monitor's Office confirmed that SWAT was preparing the form and conducting critiques.

Additional observations made by the Monitor's Office during this reporting period include the following:

- SWAT reported 60 mobilizations during the period.
- In 19 incidents (32%) SWAT reported using force 20 times.
- In all but three cases (85%) the force consisted of pointing a firearm, a Level 3 UOF.
- In one case (5%) SWAT used an electronic control device.
- In one case (6%) SWAT used an electronic control device.
- In two cases (11%) SWAT used a "Flash Bang,"; one was to apprehend an individual wanted in connection with three murders.
- A comparison of reported UOFs by SWAT to PRPB's Global List revealed that all UOFs were reported in the PRPB Global List.
- The information provided by SWAT was cross-checked and verified with PPRs 112.2 (Mobilization Report) and SWAT's Global List for accuracy.

Based on data provided by PRPB, 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors.

## Paragraph 31: Use of Force - Specialized Tactical Units

*PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | October 2023 – March 2024 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | ☑ Met  ☐ Missed |
| 2. The STU tracking system is accurate and current; all deployments are tracked. | ☑ Met  ☐ Missed |

*Compliance Assessment*

Using the dashboard created by AH Datalytics, the Commonwealth's contractor, in September 2022, PRPB now has a centralized database that tracks all STU deployments island wide. This centralized database will help PRPB command staff determine DOT needs Bureau-wide.

*Pathway Forward*

PRPB must maintain the Bureau-wide tracking system. The development of the tracking system is the responsibility of the field operations unit that oversees STU operations. Furthermore, the data and report outputs of this system should be used to inform Bureau-wide DOT strategies and address gaps in resources and potential officer safety issues.

## 3. Crowd Control Policies and Performance

In general, PRPB has made significant progress in how it prepares for and operates during demonstrations and protests. The Monitor's Office has had the opportunity to observe PRPB providing strategic policing coverage at demonstrations and protests over the course of this reporting period. As reported in previous CMRs, PRPB's actions in response to demonstrations and protests have become increasingly consistent with generally accepted policing practices.

In response to demonstrations or protests during this reporting period, DOT participation was in a stand-by status only. This is a significant finding given the number of demonstrations and protests responded to during the reporting period. In those instances where DOT units did not actively engage with demonstrators or protestors, after-action and self-assessment reports were not completed, except for PPR 112.2 (Mobilization of Specialized Tactics). Further, the Monitor's Office found that an incident commander was identified at every demonstration/protest regardless of STU activation status.

### Paragraph 32: Use of Force - Crowd Control and Incident Management

*PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training on crowd control and incident management is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. 95% of police responses to unplanned events are within policy. | ☒ Met | ☐ Missed |
| 5. 95% of police responses to planned events are within policy. | ☒ Met | ☐ Missed |
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☒ Met | ☐ Missed |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☒ Met | ☐ Missed |

## Compliance Assessment

The Monitor's Office has reviewed the crowd control and management policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has met the 95% threshold for the training of STU officers on the relevant crowd control training (REA 625). DOT officers have completed the yearly retraining as required.

The Monitor's Office requested a list of all demonstrations and protests Bureau-wide for the reporting period. PRPB provided a list of 117 protests - 67 unplanned (57%) and 50 planned (43%). Upon review and as previously reported, it was evident that the data was not aggregated, but rather provided for each area.

PRPB should aggregate its data on planned and unplanned crowd control events Bureau-wide for the purpose of analyzing and identifying possible training needs as well as the distribution of personnel and resources.

PRPB has identified demonstrations and protests in all cases as planned or unplanned and in no instance was a demonstration/protest not properly classified.

During a site visit to Metro DOT and a review of data provided by the Reform Unit, the Monitor's Office reviewed reports relating to personnel deployments to demonstrations and protests where DOT was mobilized. The Monitor's Office learned that in instances where PRPB had determined in advance that the DOT Unit would be activated, an operations plan was developed by the unit. However, in instances where the determination to mobilize the unit was made at the time of the event, DOT prepared no such plan.

The Monitor's Office selected a random sample of 34 crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). PRPB provided 34 files (100%). PRPB's responses to the demonstrations/protests were consistent with PRPB policy.

The Monitor's Office observed continued improvement in PRPB 's preparation of PPR 625.6 (Evaluation of Strategies for the Management or Control of Crowds) in this reporting period. All cases reviewed had a properly prepared PPR 625.6.

Regarding training on the relevant crowd control policies, PRPB provided certification that DOT officers and supervisors are current in these courses. The Monitor's Office reviewed the documentation provided by Metro DOT which verified that members assigned to various DOTs throughout the Bureau are all trained on crowd control policies; this training requires yearly re-training.

PRPB submitted the quarterly reports (PPR 618.1) of STU supervisors who conducted inspections of armories as required by the Agreement. In a review of these quarterly reports, the Monitor's Office found them to be within policy and documented. The forms were also reviewed during site visits to STU facilities during armory inspections.

### Pathway Forward

Although PRPB is partially compliant in this area (not all members of PRPB are trained on GO 625 (Management and Crowd Control)), the Bureau must maintain an aggregated list of all demonstrations/protests, identifying them as either planned or unplanned, and classify them as such. In addition, PRPB should develop a Bureau-wide system/module where all information relating to protests/demonstrations occurring island-wide is stored and available for review. Maintaining such a list will assist PRPB in maintaining greater awareness of related operations and determining needed resources throughout the island.

The Monitor's Office will continue to assess training compliance with target three through random training record reviews, which also requires all PRPB officers to be trained on GO 625.

## Paragraph 33: Use of Force - Crowd Control and Incident Management

*The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.*

| Compliance Status | Assessment Schedule |
|---|---|

| Fully Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-8 and as such is no longer conducting assessments of this paragraph.

## Paragraph 34: Use of Force - Crowd Control and Incident Management

*The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office reviewed GO 625 (Management and Crowd Control) and found it to be compliant with the Agreement and general policing practices. The dispersing of unruly protestors after the application of gas or other less-than-lethal weapons should continue to be conducted only by DOT personnel that have the relevant training. PRPB used minimal force while responding to demonstrations and protests during this reporting period. Force was only used in instances where demonstrators/protesters were given lawful orders and failed to comply. Otherwise, demonstrators were allowed to assemble peacefully and lawfully.

For this reporting period, DOT units were only mobilized in a stand-by or preventive patrol capacity in response to potential needs for crowd control activities. It should be noted that when force was used at demonstrations/protests it was by non-STU officers from area commands assigned to the demonstration/protest.

The Monitor's Office considers this a significant finding, especially since PRPB responded to a substantial number of planned and unplanned demonstrations and protests during the reporting period. The use of crowd control techniques was within policy.

*Pathway Forward*

To achieve substantial compliance, PRPB needs to continue to categorize all demonstrations and/or protests as planned or unplanned. The Monitor's Office recommends, where possible, that the dispersing of unruly protesters be conducted solely by DOT personnel. The Monitor's Office will continue to assess PRPB's progress and compliance with policy, crowd control resource deployment, and training in CMR-11 through policy reviews and on-site observations.

## Paragraph 35: Use of Force - Crowd Control and Incident Management

*PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office reviewed numerous documents relating to mass demonstrations. These documents included a review of PRPB's work plans for demonstrations/protests as well as its completion of PPR 112.1 (Request for Activation of the STU), PPR 112.2 (Record of Mobilizations of STU), and PPR 112.3 (Evaluation of Strategies of the STU). The Monitor's Office found that the STUs did not prepare any after-action reports when activated other than in those where they actively participated in crowd control.

The Monitor's Office concludes that PRPB's actions during demonstrations and protests (planned and unplanned) in the reporting period were consistent with generally accepted policing practices and PRPB policy. PRPB provided the Monitor's Office with Operation Plans (PPR 625.2) for the various planned

28

demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Reports (PPR 625.3), which provided basic details of each event. In all cases reviewed a PPR 625.6 (Evaluation of Strategies for the Management and Control of Crowds) was completed and provided to the Monitor's Office.

For this reporting period PRPB reported that it responded to 117 demonstrations and/or protests, planned and unplanned. The Monitor's Office selected a random sample of 34 crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). PRPB provided all the files requested for review.

Of the 34 files reviewed, PRPB reported that 17 (50%) were identified as unplanned. In all but three of the cases (82%), PPR 625.2 (Operations Plan) was prepared, it understandably had less information, given its unplanned status; however, of the 11 (32%) demonstrations/protests that were planned none were missing an Operations Plan. PRPB has made considerable progress in this area and needs to continue this effort.

*Pathway Forward*

To achieve compliance, PRPB must continue to ensure that DOT supervisors and area commanders thoroughly assess all law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd control situation to ensure compliance with applicable laws and PRPB policies and procedures.

This issue has been discussed with the Reform Unit previously. A variety of recommendations were provided including criteria to be assessed, debriefings with officers and the demonstrators and/or protestors, and the consistent use of after-action and self-assessment reports. Additionally, reference resources were also provided by the Monitor's Office.

## 4. Force Reporting

PRPB formally implemented its Provisional UOF Plan in July 2022. The Provisional UOF Plan, which has been in place for well over a year, coupled with the increase in sergeants in the field has resulted in improved UOF reporting for the reporting period. Thus, the Monitor's Office has determined that the Provisional UOF Plan has produced accurate numbers Bureau-wide. Nevertheless, the plan will change with the introduction of PRPB's new RMS.

PRPB has been able to demonstrate that it has continued to provide accurate UOF numbers. In addition, the Commonwealth's contractor, AH Datalytics, continues to help develop and improve the various UOF related dashboards. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field.

During this reporting period, PRPB reported 1,029 UOFs in 509 incidents. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRPB's GTE system is comprehensive. In reviewing whether PRPB officers are preparing and submitting UOF reports (PPR 605.1) in the timeframe as outlined in Bureau policy, the Monitor's

Office determined that PRPB has made significant progress. In the 79 UOF reports reviewed, all but 4 (95%) were prepared and submitted in the timeframe outlined in policy. The complaint numbers of those not completed as outlined in policy are as follows, 2024:03-029:000517, 2024:05-050:001429, 2024:13-005:000641, and 2023:13-010:003892. In addition, as outlined in the policy, supervisors completed their investigation of UOFs within five business days (97%), with the exception of two cases: 2024:07-075:000991 and 2024:07-111:000684. These are significant improvements that have resulted in improved compliance ratings.

The Monitor's Office continues to stress that adherence to reporting timelines, as established by policy, and proper report writing, are important to ensuring PRPB moves forward with compliance. Increased staffing and supervision, along with increased accountability for failing to adhere to policies, are integral to increased compliance with the paragraphs in this subsection.

## Paragraph 36: Use of Force - Force Reporting

*PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reporting is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | ☑ Met | ☐ Missed |
| 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | ☑ Met | ☐ Missed |
| 4c. All failures to report use of force are referred to SARP for investigation. | ☑ Met | ☐ Missed |
| 4d. 95% of requests for medical services in connection with a use of force are within policy. | ☑ Met | ☐ Missed |
| 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. | ☐ Met | ☑ Missed |

30

| | |
|---|---|
| Mileage discrepancies are identified and addressed by supervisors as required by policy. | |
| 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | ☑ Met ☐ Missed |
| 4g. All use of force reports are stored and maintained by SARP as required by policy. | ☑ Met ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the UOF policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. Training of the required 40 hours for all officers was conducted during the reporting period. PRPB has committed to training 75% of its sworn force before the end of 2023. A review of training records at the end of the reporting period reveals that PRPB has surpassed the 95% trained threshold.

The Monitor's Office reviewed UOF data in 79 reports during this reporting period, including STUs. In all the cases reviewed, the Monitor's Office determined that the level of force reported was consistent with the force used. The following observations are made of the report review:

- All the reports reviewed were complete.
- In all the cases reviewed, the Monitor's Office determined the UOF levels were correct.
- In all but four cases (95%) officers notified supervisors of a UOF in accordance with policy.
- In all instances where medical aid was warranted, it was provided.
- The Monitor's Office can confirm that in the 79 cases reviewed, 97% of the reports were reviewed by a supervisor within 5 business days, as outlined in the Agreement.
- Supervisors responded to all serious UOFs.
- In only three cases (4%) were starting and ending milage reported.
- As it relates to STUs, all reports were completed in the GTE system on time.
- All STU supervisors completed their investigation within the five-day timeframe identified in policy.

The Monitor's Office and USDOJ have continuously worked with PRPB to develop proactive measures that PRPB can undertake to ensure greater compliance moving forward.

In the past, PRPB's inability to validate its UOF numbers had been a recurring problem, and one which the Monitor's Office had identified in all previous CMRs. PRPB, along with AH Datalytics, the Commonwealth's contractor, has taken a positive step in addressing this issue by taking the initiative, with the assistance of the Monitor's Office and USDOJ, to develop a Provisional UOF Plan. This plan, now implemented for three reporting periods, places PRPB on track to having a reliable system to report valid UOF numbers, provided that all steps in the system and the review layers built into the plan are followed.

In an effort to prevent discrepancies and errors in UOF data PRPB is:

- Holding bi-weekly meetings with the Auxiliary Superintendency of Field Operations (SAOC), Technology and Communications Bureau (NTC), the Reform Unit, FIU, and Command Center Directors.
- Providing guidance on how to complete PPR 126.2 (Complaint Card).

- Developing guidelines for when more than one unit is involved in a UOF incident.
- Continuing to improve GTE.
- Incorporating dashboards created by AH Datalytics, the Commonwealth's contractor.

It is clear from the Monitor's Office's review that PRPB's implementation of the Provisional UOF Plan has resulted in improvements in UOF reporting quality.

### Pathway Forward

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office is encouraged with the implementation of the Provisional UOF Plan. PRPB currently has the tools to accurately track its UOFs. To continue to accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community. PRPB must continue to ensure the integrity of its UOF reporting. PRPB must also hold officers and supervisors accountable for entering UOF reports in the timeframes established by policy.

## Paragraph 37: Use of Force - Force Reporting

*The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: This paragraph is assessed with paragraph 36.

### Compliance Assessment

PRPB policy requires that all officers complete a UOF Report (PPR 605.1) before the end of the shift. PRPB has made significant progress in ensuring that UOF incidents are entered into GTE on time.

32

PRPB has taken several positive steps towards reaching compliance with this paragraph, including:

- Implemented the following changes to UOF reporting: 1) when a member of PRPB assigned to any specialized unit is involved in a UOF incident, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2) PRPB has prohibited the use of complaint numbers with the prefix of the specialized unit in UOF incidents; and 3) PRPB's IT Bureau will take the corresponding steps to support compliance with the Commissioner's Directive. This will ensure that area commands are aware of each UOF incident in their jurisdiction.
- Implemented into practice that all UOF Reports (PPR 605.1) and Notification of UOF (PPR 605.3) be entered electronically into GTE.
- Adopted the Provisional UOF Plan with input from the Monitor's Office and USDOJ.
- Conducted an IT Needs Assessment.
- Contracted with AH Datalytics to carry out the implementation of the necessary structure identified in the Gap Analysis conducted in May 2021, as part of the PRPB reform process.

The Monitor's Office recognizes these actions by PRPB as positive steps that factored into the development of a mechanism by which PRPB can validate its UOF incident numbers.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office is encouraged with the implementation of the Provisional UOF Plan. PRPB currently has the tools to accurately track its UOFs. To continue to accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community.

## Paragraph 38: Use of Force - Force Reporting

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Bi-annually |

|  Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

Note: This paragraph is assessed with paragraph 36.

### Compliance Assessment

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, whenever medical aid was warranted, it was received. The Monitor's Office also assessed compliance regarding transportation and communication for medical aid.

### Pathway Forward

As previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has assessed the accuracy of the Provisional UOF Plan and has determined that PRPB is able to accurately track its UOFs in this reporting period.

## Paragraph 39: Use of Force - Force Reporting

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: This paragraph is assessed with paragraph 36.

### Compliance Assessment

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, a UOF report was submitted to the officer's immediate supervisor. The Monitor's Office determined that PRPB has made significant progress in submitting reports in the timeframe required by Bureau policy. In the 79 UOF reports reviewed all but four (95%) were prepared and submitted in the timeframe outlined in policy. PRPB supervisors are also completing their UOF investigation in the timeframe outlined in policy.

Regarding submission to SARP for the tracking and analysis of these UOF reports, PRPB has demonstrated that it has the capabilities to provide these functions. The Monitor's Office acknowledges PRPB's efforts towards addressing this issue with its Provisional UOF Plan, and the work of AH Datalytics, the Commonwealth's contractor.

*Pathway Forward*

All officers must continue to submit UOF Reports (PPR 605.1) to their immediate supervisor and SARP in GTE for tracking and subsequent analysis. SARP must continue to maintain the data in a central location. PRPB has identified the Office of Legal Affairs (OAL) to be the custodian of the UOF data.

## 5. Force Review, Investigation, and Analysis

PRPB has successfully met the policy and training requirements of these paragraphs. Most of the UOF reports in the reporting period, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out as per the Agreement. In these reports, pertinent information was included, fields were checked, and the reports were signed. Staffing, which had been a problem within FIU has improved significantly. The Monitor's Office was encouraged when it learned that PRPB added 20 additional new personnel to the unit, doubling the size of FIU.

The Provisional UOF Plan, which has been in place for well over a year, coupled with the increase in sergeants in the field has resulted in improved UOF reporting for the reporting period. Nevertheless, PRPB is reminded that a more comprehensive, less labor-intensive system/plan needs to be developed. While it has been effective, it is not, nor should it be PRPB's final system. The RMS, once developed, should enhance PRPB's ability to track its UOFs accurately. The Monitor's Office also looks forward to the release of a public facing UOF Dashboard that will allow community members to interact with UOF data.

While PRPB has revised its Annual Performance Evaluation of the Rank System (PPR 310.1) form to include criteria for evaluating supervisory reviews of UOFs by members under their command, the performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

### Paragraph 40: Use of Force - Force Review, Investigation, and Analysis

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| **Training:** | Implemented | **Assessment Frequency** | Annually for Compliance Target #1 and bi-annually for all other Compliance Targets |
| **Practice:** | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The policy incorporates all of the requirements of the policy. | ☑ Met  ☐ Missed |
| 2. Training on force reviews and investigations is consistent with approved policies. | ☑ Met  ☐ Missed |
| 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | ☑ Met  ☐ Missed |

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 43-47 for level 1-3 uses of force.

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 48-52 for level 4 uses of force.

*Compliance Assessment*

The Monitor's Office has reviewed the policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. PRPB has been able to meet the threshold of 95% of officers trained and certified in force review and investigation policies in the prescribed timeframe.

Most of the UOF reports in the reporting period, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out as per the Agreement. In these reports, pertinent information was included, fields were checked, and the reports were signed.

*Pathway Forward*

As stated in previous CMRs, UOF reports (PPR 605.1) should be consistently reviewed by SARP's FIU for completeness and accuracy as a matter of general practice. UOF reports should be closely scrutinized during the review process to identify possible errors and/or omissions. Staffing, which had been a problem within FIU has improved significantly. In past CMRs the Monitor's Office has noted that with 18 investigators managing a substantial caseload, it is often difficult for this unit to also serve as a report review unit. The Monitor's Office was encouraged when it learned that PRPB added 20 additional new personnel to the unit, doubling the size of FIU.

An assessment of FIU staffing should be conducted periodically to ensure it has the adequate staffing needed to conduct level 4 UOF investigations and properly conduct quality UOF reviews.

## Paragraph 41: Use of Force - Force Review, Investigation, and Analysis

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Targets #1 and #2; annually for Compliance Target #3; and quarterly for Compliance Target #4 |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☑ Met  ☐ Missed |
| 2. All uses of force are tracked in the tracking system. | ☑ Met  ☐ Missed |
| 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | ☑ Met  ☐ Missed |
| 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | ☑ Met  ☐ Missed |

*Compliance Assessment*

PRPB formally implemented its Provisional UOF Plan in July 2022. The Provisional UOF Plan, which has been in place for well over a year, coupled with the increase in sergeants in the field has resulted in improved UOF reporting for the reporting period. Thus, the Monitor's Office has determined that the Provisional UOF Plan has produced accurate numbers Bureau-wide. Nevertheless, PRPB is reminded that a more comprehensive, less labor-intensive system/plan needs to be developed. While it has been effective, it is not, nor should it be PRPB's final system. The RMS, once developed, will enhance PRPB's ability to track its UOFs accurately.

PRPB, in an effort to ensure UOF numbers are accurate for 2023, delegated AH Datalytics, the Commonwealth's contractor, to work with PRPB personnel and verify all UOF numbers. This has allowed PRPB to provide the public with accurate information relating to UOF trends through a regular report. Further, the Monitor's Office learned that AH Datalytics was also working on a public facing UOF Dashboard that would allow community members to interact with UOF data.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has assessed PRPB's compliance and implementation of the Provisional UOF Plan in this CMR. The Monitor's Office will continue to review the activities associated with this paragraph to ensure that the improvements made to UOF reporting and tracking are sustainable. Further, the Monitor's Office looks forward to the release of the public UOF Dashboard.

## Paragraph 42: Use of Force - Force Review, Investigation, and Analysis

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations.

### *Compliance Assessment*

PRPB has revised its Annual Performance Evaluation of the Rank System (PPR 310.1) form to include criteria for evaluating supervisory reviews of UOFs by members under their command. The UOF Section of the evaluation (Supervisors Section) addresses what is required in the Agreement per Paragraph 42. However, PRPB has yet to identify how it can verify its compliance with this paragraph requirement.

### *Pathway Forward*

This performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

## 6. Supervisory and FRB Reviews

PRPB has made substantial progress in this area of the Reform. Supervisors consistently respond to the scenes of serious UOFs or allegations of excessive force. The high level of compliance in supervisor assessments of levels of force and the quality review of force in the sampled investigations reviewed, allows the Monitor's Office to verify the accuracy of the information related to UOFs provided by PRPB. All supervisory review timelines are being adhered to; however, PRPB needs to continue to maintain training consistency and quality.

While FRB training commenced during the reporting period, the 95% threshold has not been reached. The Monitor's Office also emphasizes that PRPB needs to develop a single source database for all UOF cases that are evaluated by the 13 Area Command FRBs. Currently global information on FRB evaluations is prepared upon request of the Monitor's Office for its CMRs. When reviewing FRB cases, the Monitor's

Office determined that the FRBs took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation.

PRPB policy clearly dictates the actions that the FRBs and FIU must take when reporting misconduct to the appropriate investigative unit or to PRDOJ.

## Paragraph 43: Use of Force - Supervisory and FRB Reviews

*A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 48-52.

### *Compliance Assessment*

Of the 79 UOF reports (PPR 605.1) reviewed by the Monitor's Office during the reporting period, the Monitor's Office found no instances in which a supervisor failed to respond to a serious UOF. The Monitor's Office acknowledges PRPB's efforts towards addressing this issue with the Provisional UOF Plan.

### *Pathway Forward*

PRPB should continue to document that a supervisor responds to the scene of a serious UOF or allegation of excessive force involving an officer under his/her command upon notification of the incident. Furthermore, as previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate reliable and valid UOF data collection. The Monitor's Office will continue to assess PRPB's ability to track UOFs accurately in future CMRs.

## Paragraph 44: Use of Force - Supervisory and FRB Reviews

*The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

39

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met ☐ Missed |
| 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | ☑ Met ☐ Missed |
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | ☑ Met ☐ Missed |
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met ☐ Missed |
| 5a. 95% of reviews by Force Review Boards are within policy. | ☑ Met ☐ Missed |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | ☑ Met ☐ Missed |
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☑ Met ☐ Missed |

*Compliance Assessment*

Policies incorporate all requirements of the paragraph. Training on force reviews and investigations for supervisors is also consistent with approved policies. 95% of supervisors are trained and certified in force reviews and investigation policies.

As it relates to supervisors serving on the area command Force Review Boards (FRBs), some have received the training for purposes of serving on the board. PRPB reports that the curriculum relating to the training of Area Command FRBs was completed by February 2024. Training of board members commenced in March 2024, starting with the presidents of the boards of the 13 area commands and those members of the Commissioner's Force Review Board (CFRB). The initial training was then followed up with the training of 22 additional members of various area command boards in March 2024. Another 26 were subsequently trained at a later date. Of the remaining 55, 20 (36%) have scheduled training dates with the rest awaiting training assignment.

40

In the 79 UOF reports (PPR 605.1) reviewed by the Monitor's Office, 2 (3%) contained instances in which a supervisor failed to conform to what was required by policy, which was to complete their investigation of a UOF within 5 business days. As it relates to area command FRBs, the Monitor's Office confirms that 95% of FRB reviews are within policy. The high level of compliance in properly assessing level of force and the quality review of force by supervisors in the sampled investigations reviewed, allows the Monitor's Office to verify the accuracy of the information related to UOFs provided by PRPB. The Monitor's Office was able to confirm that SARP is analyzing FRB determinations and recommendations per the Agreement.

*Pathway Forward*

As noted in other related paragraphs, compliance with this paragraph is largely contingent on PRPB's ability to accurately track all UOFs, ensuring that the Monitor's review of UOFs is representative. The Monitor's Office will continue to assess PRPB's compliance with UOF review procedures (meeting the five-business day review period) and ensuring that they contain the appropriate information and justifications.

## Paragraph 45: Use of Force - Supervisory and FRB Reviews

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

Reports reviewed were conducted within the identified timeline and content does align with PRPB policy and Agreement language.

41

*Pathway Forward*

PRPB must ensure all UOF incidents are investigated in the time allotted as required by GO 605 (Report and Investigation of UOF Incidents).

The Monitor's Office continues to stress the importance of re-training supervisors in their roles and responsibilities in conducting UOF reviews and increased accountability for failing to adhere to the policy.

## Paragraph 46: Use of Force - Supervisory and FRB Reviews

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRPB provided the Monitor's Office with a list of 78 officers assigned to the 13 Area Command FRBs. As required by the Agreement, FRB members are of varying assignments and rank. The random sample included 1 commander, 3 inspectors, 1 captain, 5 first lieutenants, and 12 second lieutenants. The Monitor's Office requested the training and certification records of 22 randomly selected officers from this list to determine if they are qualified to serve on these boards as outlined in GO 502 (Evaluation Boards of Incidents of UOF). It should be noted that a review of the records of those who had training in serving on the FRB, and in some cases re-training, revealed that the training took place three to six years ago. Starting in March 2024 updated training was provided to FRB members. SAEA reports 64 certifications to serve on the boards.

PRPB reports that the curriculum relating to the training of Area Command FRBs was completed by February 2024. As previously stated, training of board members commenced in March 2024, starting with the presidents of the boards of the 13 area commands and those members of the CFRB. The initial training was then followed up with the training of 22 additional members of various area command boards in March 2024. Another 26 were subsequently trained at a later date. Of the remaining 55, 20 (36%) have scheduled training dates with the rest awaiting training assignment.

For the purposes of determining compliance with this paragraph, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command FRBs for the reporting period. PRPB provided a list of 181 UOF cases evaluated by FRBs, of which the Monitor's Office randomly selected 59 cases for review.

PRPB provided 56 case files (95%). PRPB stated that one file requested (2023-7-026-004938) did not apply since it was a level 1 UOF with no injury and no file was provided. Two additional files were not provided (2023:6-067:003854 and 2023:6-067:003872). Of the 56 files provided, 5 files (9%) (2024-5-012-00162, 2024:6-013:000554, 2024:6-013:001261, 2024:6-013:001755, and 2024:6-067:000462) were initially missing PPR 502.1 (Assessment of Incidents of UOF). PRPB subsequently provided the missing information to the Monitor's Office.

The Monitor's Office emphasizes that PRPB needs to develop a single source database for all UOF cases that are evaluated by the 13 Area Command FRBs. Currently global information on FRB evaluations is prepared upon request of the Monitor's Office for its CMRs.

The Monitor's Office determined in the cases reviewed that the FRBs took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation.

The Monitor's Office offers the following additional assessments of the information provided:

- In 5 cases (9%) the FRB ordered re-training.
- In all cases the Board's evaluations were unanimous.
- No cases were returned by the FRB due to missing or incomplete information.
- Levels of force were accurate in all cases evaluated by the Board.
- In one instance PPR 605.1 (Use of Force Report) was not submitted in accordance with the timeframe outlined in policy. The violation was referred to SARP for investigation.
- Of the 59 requested files, as previously stated, 1 (2%) did not require an FRB review. Of the remaining 58, only 2 files were not provided, therefore PRPB's compliance rate was 56 of 58 cases (97%).

Based on the review of the randomly selected Area Command FRB files, there were no reported referrals to PRDOJ or NIE, nor was any such need uncovered. It should be noted that the Monitor's Office has seen improvement in the Area Command FRB's UOF evaluations. With the digitizing of files at the end of the previous reporting period, the information and data provided by PRPB, and its FRBs was very precise in those cases where complete files were supplied.

It should also be noted as per GO 502 (Evaluation Boards of UOF Incidents) that the FRB has 15 days once the meeting convenes to complete their evaluation. This period can be extended by 15 days if the report is returned. Based on the documents provided, the FRBs complied with the timeline to complete their evaluation in most cases. PRPB should ensure that the Area Command FRBs complete their evaluations within the timelines provided in GO 502 for each evaluation.

During the reporting period the Monitor's Office conducted site visits to area commands to meet with the FRB presidents. Some of the concerns voiced by the presidents include:

- The need to train and/or re-train board members of the various area command FRBs. PRPB initiated this training during the reporting period.
- The on-time preparation of the UOF Report (PPR 605.1). Many of the FRB members had trouble ascertaining when the UOF report was prepared as the date changes each time the report is amended. This issue was brought to the attention of PRPB IT by the Monitor's Office after the Monitor experienced similar issues.
- PRPB needs to ensure that all required documents are in each case folder.

### *Pathway Forward*

The Monitor's Office will review PRPB's updated training for FRB members and observe training once conducted to ensure that it adheres to the Agreement. Further, the Monitor's Office notes that compliance with this paragraph is also affected by PRPB's ability to accurately track and report on UOFs, as with many of the paragraphs in this section. PRPB needs to ensure that its record keeping relating to UOF evaluations by the FRB is complete and accurate.

### Paragraph 47: Use of Force - Supervisory and FRB Reviews

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

44

*Compliance Assessment*

PRPB policy clearly dictates the actions that the Board and FIU must take when reporting misconduct to the appropriate investigative unit or to PRDOJ. During this reporting period five cases were referred to PRDOJ.

The Monitor's Office also reviewed 10 cases involving an accidental discharge, 4 (40%) of which resulted in a self-inflicted injury during the reporting period. FIU recommended that an administrative investigation be conducted and forwarded the cases to SARP. These cases, when investigated by FIU, are categorized as non-UOFs.

*Pathway Forward*

In the instances where FIU investigates a UOF and determines that it was an accidental discharge and not a UOF, the case must be immediately forwarded to SARP upon completion of the investigation, and the eventual disposition should be included in the FIU file. The designation of UOF should not be applied. The Monitor's Office also recommends that FIU continue to document all such cases.

## 7. FIU Investigations and Force Reviews by SFRB

As indicated in previous CMRs, FIU is required to investigate all serious UOF incidents, among other investigations across Puerto Rico, including both intentional and accidental firearm discharges involving PRPB personnel. During the reporting period there were 89 UOF cases where investigations were initiated by FIU.

In previous CMRs, the Monitor's Office has voiced concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. In reviewing FIU investigations for this reporting period, the Monitor's Office has seen continued improvement in this area, including locating civilian witnesses, sketches of the crime scene, and locating and using camera evidence to make a determination. In addition, the FIU Commanding Officer in conjunction with the Reform Unit has established a procedure whereby FIU now has access to files to view photographs relating to UOFs. The ability of FIU investigators to access these files has improved the time it takes to complete an investigation. In addition, upon completion of their investigation into an accidental discharge, FIU now immediately forwards the case to SARP for administrative investigation. The Monitor's Office recommends that digital recording devices should be issued to all FIU investigators for the purpose of memorializing civilian witnesses' statements.

The Monitor's Office has observed considerable improvement regarding the amount of time FIU is taking to complete its investigations. Documentation provided by PRPB indicates that of the investigations conducted during the reporting period all have been closed within the required 60-day timeframe. FIU has met the 95% threshold required.

As an added note, PRPB is working with AH Datalytics, the Commonwealth's contractor, to develop a color-coded dashboard that identifies all open case statuses. This dashboard has been modified to reflect the change to 60 days to complete an investigation.

As in past CMRs, delays in concluding FIU investigations have prevented the Monitor's Office from reviewing sufficient FIU investigations to reach a compliance assessment. FIU investigations in the past

tended to overrun the 45-day deadline, and thus were not closed in sufficient time to provide to the Monitor's Office for review during the same reporting period that the incident occurred. To address this issue, and to better determine if FIU was properly investigating serious UOFs, as outlined in the Agreement, the Monitor's Office pivoted to requesting FIU investigations that were closed during the reporting period, rather than investigations that were opened during the period. The Monitor's Office thus requested a list of all FIU investigations that were completed in the reporting period, irrespective of when the incident occurred that prompted the opening of the investigation. FIU reports indicate that during the reporting period, 152 cases were closed. Moving forward, based on the completion rate of cases closed in this reporting period, it is expected that the Monitor's Office will be able to request closed cases from the current period under review.

In the past limited staffing along with reliance on external stakeholders to process evidence were a contributing factor. However, PRPB has now doubled the size of FIU (20 new personnel). This and the accessibility of photographic evidence to FIU has resulted in an increase in cases closed during the reporting period and within the 60-day requirement as agreed upon by the Parties.

As it relates to the CFRB, the Monitor's Office continues to have concerns about the Board's ability to complete its UOF evaluations within the timelines required in GO 502 (Evaluation Boards of Incidents of UOF). PRPB needs to ensure that all UOF evaluations are completed in a timely manner as per policy.

## Paragraph 48: Use of Force - FIU Investigations and Force Reviews by SFRB

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for FIU officers is consistent with approved policies. | ☑ Met | ☐ Missed |

46

| | | |
|---|---|---|
| 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4. All officers assigned to FIU meet eligibility requirements. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the UOF policies and found that they meet the requirements of the Agreement. Regarding FIU training, the Monitor's Office conducted a site visit to FIU in January 2024 and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices. All FIU members have completed the required advanced training for conducting investigations (FIUC 8041).

FIU is responsible for investigating serious UOFs, including a) accidental and intentional firearm discharges, b) UOFs by supervisors above the rank of sergeant, c) UOFs at protests, and d) any other UOF deemed appropriate by the Commissioner. The Monitor's Office confirmed through the Reform Unit that all FIU investigators have completed the 40-hour investigative training provided to Criminal Investigative Units (CIC) personnel. This was also verified by the FIU Commanding Officer. While the CIC training will be helpful in providing additional investigative knowledge to FIU personnel, the course will need to be tailored to the specific needs of FIU personnel.

All officers assigned to FIU meet appropriate eligibility requirements.

*Pathway Forward*

PRPB should ensure that all FIU members are trained in a timely manner. The Monitor's Office will continue to review training records of newly assigned personnel to FIU to ensure that PRPB has trained all members on investigating intentional and accidental firearm discharges and all other required training and re-training.

## Paragraph 49: Use of Force - FIU Investigations and Force Reviews by SFRB

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |

47

| | | |
|---|---|---|
| 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | ☑ Met | ☐ Missed |
| 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | ☑ Met | ☐ Missed |
| 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |
| 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | ☑ Met | ☐ Missed |
| 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | ☑ Met | ☐ Missed |
| 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☑ Met | ☐ Missed |

## Compliance Assessment

During the reporting period, FIU reported conducting 89 investigations, of which all (100%) were completed within 60 days as agreed upon by the Parties.

The investigation breakdown is as follows:

- 29 firearm discharges
- 23 UOFs by a supervisor above the rank of sergeant
- 10 accidental discharges
- 9 apparent criminal conduct
- 6 electronic control devices
- 2 less-than-lethal arms use
- 2 Strike Force
- 2 suicides
- 2 deaths in custody
- 2 SWAT
- 1 choke hold
- 1 police pursuit

## Accidental Discharge Investigations

The Monitor's Office conducted a site visit to FIU in March 2024. During the visit, 10 accidental discharge files were reviewed. The following is a breakdown of the incidents during the reporting period:

- In four of the incidents (40%) the officer suffered self-inflicted wounds.
- In three incidents (30%) the officer was carrying their weapon unholstered (no holster present).
- In two incidents (20%) the officer was cleaning their weapon.
- Five incidents (50%) took place within a police facility.
- In five incidents (50%) the officer was off duty.
- In five incidents (50%) the officer was on duty.
- All completed investigations have been referred to SARP by FIU for an administrative investigation.

48

As previously stated, the issue of accidental/negligent discharges has been a reoccurring problem identified in previous CMRs. While PRPB has taken appropriate actions in these cases it does not appear that it has sufficiently looked at the underlying issues that contribute to the problem, such as training. It should also be noted that three of the incidents (30%) were in direct violation of Bureau policy and involved the carrying of a weapon unholstered. The Monitor's Office verified with SARP that officers found to have violated Bureau policy as it relates to negligent discharges are receiving a 40-day suspension. Another area of concern is that five incidents (50%) occurred while on duty.

## Closed FIU Investigations

To review cases closed by FIU, the Monitor's Office requested a random sample of 35 cases closed by FIU during the current reporting period. The Monitor's Office reviewed the 35 investigations for the purpose of assessing FIU's compliance with the Agreement and PRPB policies relevant to conducting investigations.

The following are general observations of the cases reviewed:

- All cases that were opened in the period were closed within 60 days.
- FIU continues to show significant improvement in how it conducts its investigations. FIU investigators made numerous efforts to locate cameras in the area and possible witnesses. In addition, sketches were provided on all firearm discharges.
- Accidental discharges are no longer categorized as a UOF by PRPB once investigated.
- All FIU UOF reviews and investigations reached reasonably justified conclusions on the officer's conduct in accordance with policy.
- Of the 15 intentional firearm discharge (Level 4) investigations reviewed by the Monitor's Office, 13 (87%) were found to be within Bureau policy and all required documents were in the files.
- In one incident an officer was found to have violated Bureau policy in that he fired his service weapon at a fleeing suspect. In the other instance three officers discharged their weapons having lost clear sight of the subject.
- It should be noted that when FIU arrives at a UOF scene that has possible criminal conduct, it does a quick referral to PRDOJ NIE. FIU then conducts a preliminary analysis to proceed with the eventual administrative investigation of the case. An administrative referral is sent directly to SARP to then proceed according to their corresponding procedures. Nonetheless, SARP may wait for PRDOJ to conclude their criminal investigation before they undertake the administrative one.

FIU has made considerable progress in closing cases in the time outlined as per the Agreement. The Monitor's Office is encouraged by the efforts of FIU in this regard.

## CFRB Investigations

As it relates to CFRB meetings, many of the cases evaluated by the Board involve serious UOFs. PRPB needs to outline the protocol as to how these meetings should be conducted. As previously stated, the Monitor's Office recommends that each CFRB member be fully versed in the details of the incident prior to the board meeting. This will allow for healthy discussion between members. To that end, all CFRB members now have access to FIU investigation files which have been digitized for review purposes.

Another area of concern relating to FIU involves the investigation of UOFs by members of the Bureau above the rank of sergeant, which by policy, requires FIU to conduct the investigation. In past CMRs it was stated that the lack of supervisors, specifically sergeants in the field, required lieutenants, to some degree, to carry out the functions of a sergeant, one of which is assisting officers effecting arrest, and in doing so in some instances using lower levels of force. To some degree this has been addressed with the promotion of over 500 sergeants during the previous reporting period. However, the Monitor's Office still recommends that supervisors of a higher rank from the respective area commands investigate lower levels of force by supervisors from the rank of sergeant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRPB Members).

In the reporting period FIU investigated 14 cases (16%) where supervisors above the rank of sergeant used lower levels of force to effect an arrest.

*Pathway Forward*

PRPB must ensure that prompt notification is made to FIU in cases regarding their involvement. For the most part, this was the case. PRPB must also ensure that FIU has adequate personnel to conduct its investigations and that all personnel have completed all necessary training to meet timelines relating to investigating serious UOFs.

FIU has limited personnel to respond and investigate serious force by PRPB members throughout the Bureau, a possible option would be, as previously stated, that PRPB allow supervisors of a higher rank from the respective area commands to investigate lower levels of force by supervisors from the rank of sergeant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRPB Members).

The CFRB must complete its reviews within the time allotted in GO 502 (Evaluation Boards of Incidents of UOF). Previously, the Monitor's Office recommended having either the FIU Commanding Officer or the FIU Executive Officer attend all CFRB meetings for the purpose of presenting the case to Board members and to answer any questions members may have regarding the cases to be discussed. It is the Monitor's Office's understanding that PRPB to some degree has implemented this process.

It should be noted that the Parties have agreed to develop a compliance measure that is tailored to the specific requirements of Paragraph 49 as part of the compliance plan filed with the court in November 2023. This is intended to ensure that this paragraph is assessed properly.

## Paragraph 50: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

| Compliance Status | Assessment Schedule |
|---|---|

| Substantially Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

In all cases where FIU determined that the UOF may involve criminal conduct by an officer, PRDOJ was notified along with its investigative arm, NIE. The Monitor's Office confirmed through a review of FIU data that there were five such referrals during this reporting period.

*Pathway Forward*

The Monitor's Office will continue to assess this paragraph in CMR-11. The review of referrals demonstrates compliance; however, the Monitor's Office would expect PRPB to demonstrate continued compliance with this paragraph. Further, the Monitor's Office will continue to review such cases to assess consistency in PRPB practice.

## Paragraph 51: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

51

*Compliance Assessment*

For the reporting period PRPB reported that FIU opened 89 UOF investigations, and of those cases, all that were required to be closed in 60 calendar days were closed in conformance with the timeline agreed upon by the Parties. The Monitor's Office can assess that FIU is currently in compliance with this paragraph; however, it should be noted PRPB must continue this effort going forward.

It should also be noted that during this reporting period the Monitor's Office met multiple times with FIU personnel. During discussions with FIU, it was learned that FIU was operating under the premise that the 45 days to complete their investigation as per policy was 45 business days. However, a review of GO 605 (Report and Investigation of UOF Incidents**)** states that the amount of time FIU must complete its investigation is 45 days, and it should be noted that in GO 113 (FIU) there are two sections that contradict themselves regarding timeline.

In January 2024, the Parties met along with the Monitor's Office to discuss the timeline discrepancy. During the meeting it was agreed upon by the Parties that for CMRs-10 and 11, the 45-day timeline would be amended to 60 days.

In further discussions with FIU, investigators noted that in the past the root cause for failing to complete the investigation in the allotted time was delays in receiving the results of forensic and evidentiary material, e.g., video, photographs, and other evidence recovered at the scene of serious UOFs in a timely manner. This is the information FIU needs to make its determination. In many of these cases, FIU must rely on other PRPB units and DSP to complete their tasks before the investigation can be closed. One major step taken is that FIU investigators now have access to photographic evidence in digital files and no longer must wait to receive the videos and pictures to complete their investigation. This has aided PRPB in completion of their investigations within policy.

Once an investigation is complete, FIU does prepare the required report for CFRB's review, analysis, and evaluation of the force.

*Pathway Forward*

PRPB should ensure that all FIU investigations are completed in 60 days, as agreed upon by the Parties. PRPB must ensure that FIU has adequate staff and resources to complete these investigations. Further PRPB must work with internal DSP units and external stakeholders to address FIU's inability to receive forensic data in sufficient time to complete its investigations in 60 days.

It should be noted that compliance with the Agreement is not solely the responsibility of PRPB, it falls on the shoulders of the entire Commonwealth and its government entities. The Commonwealth should continue to examine the issues stemming from FIU's ability to close an investigation within 60 days and develop a plan to address such issues in the near term. This plan should be shared with the Monitor's Office and USDOJ.

## Paragraph 52: Use of Force - FIU Investigations and Force Reviews by SFRB

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify*

*the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

CFRB members had some training, but it was not current. The Monitor's Office was informed by PRPB personnel that the information provided to the Monitor's Office for the FRB members also applies to CFRB members, which was that the curriculum for training was still in development with the expectation that it will be completed by the end of February and shared with the Monitor's Office. The curriculum was subsequently completed and the training for board members commenced in March 2024.

PRPB provided the Monitor's Office with documentation that FIU opened 89 investigations during the reporting period and forwarded 152 cases (this includes investigations that were opened outside of this reporting period) that were closed to CFRB for evaluation during the period (October 2023 through March 2024).

The Monitor's Office requested a random sample of 55 cases evaluated by the Board for review. PRPB provided 47 case files (85%) along with a certification that two files had yet to be evaluated by the Board. Four additional files were not provided (2019-07-211-009865, 2020-06-013-010816, 2021-08-716-000068, and 2022-12-061-0043500). Two additional files (2024-08-116-000136 and 2022-12-061-004350) did not contain PPR 502.1 (Assessment of Incidents of UOF). In the remaining 47 cases evaluated, the Monitor's Office determined that the CFRB reviews were objective; however, only four of the 53 evaluations (8%) were concluded within the 30 days as outlined by policy.

The following observations are put forth as a result of the review:

- In 47 cases (89%) the evaluation of the investigation was objective.
- With the exception of two (4%), all evaluations included PPR 502.1 (Assessment of Incidents of UOF).

- In addition, four case files were not provided, therefore the Monitor's Office's overall assessment of FRB reviews is determined to be at partial compliance at best.
- There were two instances (4%) where retraining was directed.
- There were two cases (4%) involving policy violation (accidental discharge and firing in the air), both were referred to SARP for administrative investigation.
- None were returned due to incomplete information.
- All evaluations were unanimous.

The Monitor's Office requested the training certification records of the four CFRB members, as well as any other person who may have served on the CFRB during the reporting period. This information serves to determine whether CFRB members are qualified to serve on the Board as outlined in GO 502 (Evaluation Boards of UOF Incidents). PRPB provided the Monitor's Office with personnel documentation verifying that the four members of the CFRB were trained and certified (J:UFC 2061) in March 2024.

In an effort to address the backlog of cases, PRPB temporarily divided the four members of the CFRB (three members and one alternate) into four different boards and designated these individuals as the president, backfilling the remaining positions on the board with other ranking members of PRPB who have been trained/certified to serve on FRBs.

While this may have been effective in eliminating the backlog, it is not consistent with GO 502. The general order requires all members of the CFRB to hold the rank of captain or above and that there is one board. Currently GO 502 provides the Commissioner with the power to reorganize the CFRB and or replace its members when he deems it necessary.

In addition, the Monitor's Office, based on previous CMRs, has determined that during the reporting periods FIU will generally open between 80-90 investigations. Based on experience, this is more than what one board can address, bearing in mind that assignment to the CFRB is in addition to the members other assigned duties.

In conversations with the Monitor's Office, PRPB has acknowledged its shortfalls in the evaluation of cases investigated by FIU. On a positive note, the Monitor's Office has received documentation that the CFRB is submitting completed evaluations to SARP for tracking and analysis.

*Pathway Forward*

Issues with the timeliness of these evaluations, to some degree, appear to be a result of staffing shortages. It is also due in part to the fact that FIU has made a concerted effort to close old cases resulting in an inordinate number of cases sent to the CFRB for evaluation. It is imperative that PRPB and CFRB members commit to completing these evaluations in the timelines established in policy. PRPB should also ensure that all officers serving on the CFRB have training certifications. The Monitor's Office will review the training curriculum developed and the training provided.

## 8. Use of Force Training

The Monitor's Office finds that PRPB is partially compliant with the paragraphs of this subsection of the Agreement which stipulates that all trainings must be consistent with policies and the Agreement and that all personnel must be trained and certified on UOF policies. While all training curriculums are consistent with policies and the Agreement, PRPB has not provided ample documentation to show that the training delivery compliance thresholds have been met. Regarding other training requirements, such as Crowd Control, Persons in Crisis, FRBs etc., PRPB has not kept up with the training and retraining as required even though PRPB has reached the 95% compliance threshold relating to the 40-hour in-service training.

### Paragraph 53: Use of Force - Use of Force Training

*PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:*

*a) legal standards for reasonable force;*

*b) PRPD's use of force policy;*

*c) reporting use of force, requesting medical service, and preserving evidence;*

*d) scenario-based training and interactive exercises that illustrate proper use of force decision-making;*

*e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;*

*f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning*

*reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

*g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;*

*h) factors to consider in initiating or continuing a foot pursuit; and*

*i) appropriate training on conflict management.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | ☑ Met    ☐ Missed |
| 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | ☐ Met    ☑ Missed |

*Compliance Assessment*

PRPB recently updated all UOF policies and, as a result, developed new UOF training curriculums on these policies. The Monitor's Office's previous review of related training on UOF was found to be consistent with approved policies and requirements of the paragraph. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has met the 95% threshold for the re-training of its officers on all relevant UOF policies. According to documentation provided by PRPB, it provided in-service training to 95% of its officers by the end of 2023. The Agreement states that PRPB must re-train it's officers every year.

*Pathway Forward*

The Monitor's Office will review the updated UOF training curriculums and ensure continued compliance with this paragraph. The training on UOF, specifically the topics noted in this paragraph, should also be incorporated into in-person scenario-based training to ensure that officers understand the policy requirements and the practical application of such procedures.

## Paragraph 54: Use of Force - Use of Force Training

*PRPD shall provide an appropriate firearm training program that:*

*a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis;*

*b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms;*

*c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program;*

*d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and*

*e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Bi-annually |

56

| 🛡 Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

## Compliance Targets

| 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | ☑ Met ☐ Missed |
|---|---|
| 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | ☐ Met ☑ Missed |

## Compliance Assessment

The Monitor's Office selected a random sample of 183 officers from the list of officers who were qualified (night fire) to verify that officers were qualified with their service weapon for this reporting period. A review of the training files confirmed that all officers were qualified. However, 249 required additional testing on site. The Monitor's Office also noted in documentation provided by PRPB that nine officers failed the on-site requalification and required retraining and re-testing to be certified. Eight of the officers (89%) completed the training successfully and subsequently qualified with their firearm. One officer failed the retesting after multiple instructions and retesting. The officer was disarmed and PRPB is assessing his status as a possible medical condition. SARP also provided documentation that there were no investigations conducted relating to officers failing to qualify on their weapons. Therefore, the Monitor's Office did not have the opportunity to review whether officers are disciplined after failing to requalify for firearms training.

The Monitor's Office found that PRPB's policies relating to firearms qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) in a previous reporting period.

## Pathway Forward

PRPB must create and maintain a "master list" which includes all sworn personnel and their status as it relates to firearm training. PRPB must work with the Monitor's Office to grant the Monitor direct access to PTMS or other structured data sources so that the Monitor's Office can directly verify rates of firearm certification and justifications for all officers that are not currently certified.

## Paragraph 55: Use of Force - Use of Force Training

*PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:*

*a) requesting medical services and determining the appropriate use of force reporting levels;*

*b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;*

*c) ensuring proper collection of evidence;*

*d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;*

*e) assessing the legality and appropriateness of a detention and subsequent arrest;*

*f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative*

*accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;*

*g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and*

*h) report writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office verified that 95% of supervisors, FIU personnel, and command personnel have been trained on the relevant courses (REA 601 Rules for UOF and REA 605 Report and Investigation of UOF) within the last year as required by the Agreement.

Some FIU personnel have completed advanced training related to investigating intentional firearm discharges (Level 4 UOF). The FIU Commanding Officer informed the Monitor's Office that given the influx of new personnel into FIU, all members will be trained on an advanced training course currently provided to CIC personnel. This additional training was in response to the Monitor's Office's previous CMRs and recommendations, which identified significant deficiencies in FIU's firearm discharge investigations (Level 4 UOFs).

### Pathway Forward

Given the nature of the important work conducted by FIU, it is imperative that they receive all the required training and that this training is periodically updated as needed. The work of the CFRB plays a pivotal role in identifying the training needs of FIU as they evaluate all FIU investigations and are in the best position to uncover deficiencies in training. The Monitor's Office will continue to assess training compliance with target two through random training record reviews.

## 9. Responding to Behavioral/Mental Health Crisis

As stated in previous CMRs, it is critically important to have CIT trained officers throughout the 13 area commands. Since the conclusion of the pilot project in November 2020, PRPB had lagged in expanding its CIT coverage outside of Arecibo until the last reporting period. Issues garnering personnel interest in the position have presented difficulties in creating CIT programs in other areas. One of the challenges is that currently the training (40 hours) for CIT certification is only conducted at the Academy, which may discourage potential volunteers from the outlying area commands. Officers from those commands may have as much as a two hour daily commute each way to complete the required training. PRPB reports that 114 personnel have been interviewed for the CIT officer position and 76 (67%) continued to the next step (psychiatric evaluation). Of that number, 73 (96%) were deemed qualified; however, only 53 (73%) were interested in continuing the process and subsequent training. However, with additional recruiting, by the end of the reporting period PRPB had trained an additional 111 officers bringing the total number of trained officers to 189.

During the March 2024 site visit the Monitor's Office conferred with the Bureau-wide CIT Coordinator who related the following information:

- During the last reporting period the CIT Program was expanded to include San Juan, Carolina, Caguas, Humacao, and Bayamon. In the current reporting period with the addition of newly trained officers the CIT program was expanded to all area commands.
- Current staffing levels in the 13 area commands are as follows:
  - Aguadilla – 14
  - Aibonito – 12
  - Arecibo – 17
  - Bayamón – 16
  - Caguas – 20
  - Carolina – 16
  - Fajardo – 12
  - Guayama – 12
  - Humacao – 13
  - Mayagüez – 13
  - Ponce – 7
  - San Juan – 25
  - Utuado – 16
- The curriculum for CIT training has been revised and provided to the Monitor's Office.
- Currently in Arecibo, 3 of the 13 certified CIT officers (21%) have been promoted to sergeant; however, they currently remain assigned to the area command and continue to serve as CIT officers. Three additional officers have been transferred to specialized units (two to the CIC investigative unit and one to motorized). They also continue to serve as CIT officers.

PRPB reported that in February 2024 a new CIT Bureau Coordinator who holds the rank of inspector had been assigned to lead the expansion efforts to other area commands. The inspector has experience in this area and possesses a doctoral degree in Psychology.

The expansion of CIT officers to other area commands and the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving individuals in crisis, especially those related to "Ley 408" (court ordered involuntary commitment).

PRPB is currently relying on PPR 628.1 (Crisis Intervention Incident Report) and PPR 621.2 (Other Information) to identify incidents involving a person in crisis. PRPB needs to ensure that PPR 628.1 is prepared by all officers in incidents involving individuals in crisis. AH Datalytics', the Commonwealth's contractor's, dashboard identifies interactions with persons in crisis and verifies whether a crisis intervention incident report (PPR 628.1) was created for any incident with a corresponding UOF report that had identified the subject as having a "mental/psychiatric history" or involved a Ley 408 Committal Order. The dashboard has provided the Reform Office with 24/7 access to this information which is automatically updated daily and is broken down by area command, zone, precinct, and district.

PRPB needs to ensure that the system captures all PPR 621.2s (Other Information) that are not currently captured in a UOF or Ley 408 and query the system to determine if the subject of the report is a person in crisis. This has been an area of discussion that the Monitor's Office and USDOJ have had with PRPB and the Commonwealth's contractor, AH Datalytics.

## Paragraph 56: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:*

*a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.*

*b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.*

*c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | ☑ Met | ☐ Missed |

60

| | | |
|---|---|---|
| 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4. Training on crisis intervention for CIT officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | ☑ Met | ☐ Missed |
| 6. 100% of all officers assigned to CIT meet eligibility requirements. | ☑ Met | ☐ Missed |
| 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | ☐ Met | ☑ Missed |
| 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the CIT policies and trainings and found that they meet the requirements of the Agreement. PRPB along with the Monitor's Office understands that establishing CIT teams in all areas in an expedited manner is vital. The officers selected to be certified as CIT officers (40 hours of training) will continue in their normal capacity as patrol officers. PRPB now has 189 officers trained and certified as CIT officers throughout the 13 area commands.

During previous reporting periods, USDOJ and the Monitor's Office observed a portion of the REA 628 (CIT) training. The Monitor's Office found the training to be dynamic, knowledge-based, and employed several adult learning techniques, including participation through questions and exercises. While the training has a strong foundation, USDOJ and the Monitor's Office did provide some recommendations to further strengthen the training, such as incorporating more experiences and scenarios from Puerto Rico and providing attendees with hardcopies of the PowerPoint presentation for note taking.

PRPB provided documentation that no training of officers on the basic "Intervention with Persons in Crisis" course took place during this reporting period. The Academy similarly reports that all PRPB officers have not yet received the eight-hour basic CIT training. As noted in various sections of this CMR, virtual training was halted when issues relating to the integrity of the training were brought forth. As such, no virtual training was conducted during the reporting period.

PRPB worked with USDOJ and the Monitor's Office to establish an evaluation committee as ordered by the court for the purpose of identifying potential evaluation methods and performance measures to gauge the impact of the Arecibo Pilot Program and to assist in the implementation of CIT Bureau-wide. The evaluation committee is made up of members from PRPB along with outside personnel with experience in the mental health field. The Monitor's Office as well as USDOJ have participated in evaluation committee meetings.

The Monitor's Office has confirmed that all officers currently in a CIT role are trained and retrained in CIT as required and meet eligibility requirements.

For this reporting period, PRPB reported 752 cases of interactions with persons in crisis. A random sample of 116 cases was selected by the Monitor's Office for review. The source of data for documenting the Bureau's interactions with persons in crisis consisted of PPR 628.1 (Crisis Intervention Incident

Report) and 621.2 (Other Information). As a result of this case review, the Monitor's Office makes the below observations:

- 76 cases (66%) involved Ley 408 (Court Ordered "Involuntary Psychiatric Examination").
- In all cases (100%), PPR 628.1 (Crisis Intervention Incident Report) was prepared; however, two cases initially deemed a person in crisis were later reported as prepared in error (Case #s 2023-6013-015505 and 2024:3-858:000046).
- In the 116 cases reviewed only 14 (12%) were handled by certified CIT officers.
- In 11 cases (9%) officers used force to subdue the subject. This is a significant reduction in force used as reported in previous CMRs.
- There were several PPR 628.1 (Crisis Intervention Incident Report) reports which had incomplete boxes, 14 (12%) including the origin of the call field. Two reported calls originated within Radio Control.
- In 28 cases (24%) the notification of "person in crisis" involved Centro Mando.
- In 71 cases (61%) the notification of "person in crisis "involved Retens (Desk Officers). Since many notifications of a person in crisis originate through field commands, PRPB should consider adding a section to GO 628 (Interventions with Persons in Crisis) that outlines the information that should be obtained before officers are sent on a "person in crisis" call. In addition, this information should be added to the curriculum of the eight-hour course.

*Pathway Forward*

The Monitor's Office looks forward to working with PRPB as it expands the number of CIT officers throughout the Bureau.

PRPB provided documentation that cadets are being trained in CIT at the Academy as reported and that future classes will receive the 40-hour CIT training as part of the required training to graduate. As previously stated, PRPB should develop a plan to weave some of these officers into the CIT program as they gain patrol experience. To date PRPB has provided training records for Academy Classes 227 through 233, verifying that they have successfully completed the 40-hour CIT training. Those officers, if selected, would only require a modified retraining course.

As mentioned in previous CMRs, PRPB's policy to send district/precinct officers to comply with Ley 408 orders (involuntary admission to a hospital for psychiatric evaluation) by the court should be reviewed. In the random sample for the reporting period, 66% of calls for persons in crisis involved such orders and some resulted in the use of non-lethal weapons or force against the subject. Using a trained CIT officer in these circumstances may result in less UOF. The Monitor's Office recommends that a protocol be established that calls for service relating to involuntary committal (Ley 408) be handled by on-duty CIT officers, when possible.

To this point, the only training available to dispatchers is the eight-hour course provided for field personnel. PRPB needs to specify if it has developed a course specific to dispatchers regarding how to route crisis calls to on duty CIT officers.

## Paragraph 57: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. 95% of shifts have at least one CIT-trained and certified officer. | ☐ Met | ☑ Missed |
| 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Training on the CIT program for field operations officers is evaluated as part of the basic behavioral health training in Paragraph 56.

### Compliance Assessment

PRPB has implemented a CIT Program in all areas. The training for CIT officers took place at the Academy. Officers were required to pass a written exam at which point they could proceed to the scenario-based training segment. The course, Intervention Team in Crisis (CITE 8061), consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office. To date, 189 officers from the Bureau have been trained and certified.

PRPB has also selected CIT coordinators in all area commands who are currently identifying prospective CIT officers. In addition, a Bureau-wide coordinator has been named. PRPB has provided the Monitor's Office with the rating form that PRPB will use for prospective candidates to the program. In addition, the PRPB Commissioner has issued several job postings for uniformed agents from the precincts and districts of the 13 police areas who may be interested in becoming a CIT officer. The job postings provide a job description, eligibility requirements, training description, and application instructions. PRPB continues to interview officers for the position.

The Monitor's Office is encouraged by the progress PRPB has made in establishing a CIT program in all area commands. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner was difficult initially, given that support services may not have been available in the early stage in some areas. However, the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to Ley 408.

63

In the past PRPB has provided training to field personnel and dispatchers related to CIT; however, the training for dispatchers has not been specific to their work assignment. This training should be more in-line with the daily responsibilities of a dispatcher, including how to collect the appropriate information from the caller to provide to the responding officer.

In relation to the eight-hour basic training course which all PRPB field members are to receive, PRPB provided the Monitor's Office with the four training modules and the exam used to determine the level of proficiency in the material presented for review. To that end, PRPB provided information that no PRPB officers were trained during the reporting period. PRPB indicated that virtual training would resume in 2023; however, it has yet to occur.

PRPB also provided the Monitor's Office with documentation of CIT officer shift assignments in the field to verify that the Bureau is in partial compliance with Paragraph 57 which requires CIT trained officers be assigned to each shift in each police region. The documentation verified that the following area commands have CIT officers assigned to each shift:

- San Juan
- Arecibo
- Bayamon

Guayama reported that it has CIT officers on all shifts; however, no documentation was provided with the certification.

The following area commands reported that they have officers; however, they are not on all shifts:

- Aguadilla
- Aibonito
- Ponce
- Utuado

The following area commands did not provide any documentation relating to deployment of CIT officers.

- Humacao
- Fajardo
- Carolina
- Caguas
- Mayaguez

*Pathway Forward*

The Monitor's Office is aware that PRPB is in the process of developing and reinstating its virtual training and expects that once completed, it will resume the virtual eight-hour basic CIT training course for all members.

Having developed a curriculum and training for the CIT Program, having tested it in the field in Arecibo, and expanded to all area commands, the Monitor's Office expects PRPB to continue adding to the program Bureau-wide. The training of officers to handle individuals with mental health issues is of

paramount importance, having a trained officer to deal with persons in crisis can help minimize those incidents that can escalate into confrontations in which PRPB members may be required to use force.

The Monitor's Office expects to see significant progress in the training of PRPB personnel in crisis intervention as the CIT Program adds more personnel.

As previously stated, PRPB has not provided documentation that dispatchers have received specific training related to dispatching officers to "persons in crisis". In fact, to this point, the only training available to dispatchers is the eight-hour course provided for field personnel. PRPB needs to develop a course specific to dispatchers regarding routing crisis calls to on-duty CIT officers. All dispatchers should receive this training. In addition, PRPB should also consider adding an additional section to GO 628 (Intervention with People in Crisis) identifying information that should be obtained and provided to officers before sending them to Ley 408 calls. Often officers assigned to the position of "Reten" (Precinct/District Desk Officer) are approached by family members of subjects of Ley 408 Orders requesting that officers carry out the involuntary commitment order. In a review of 116 PPR 628.1 (Crisis Intervention Incident Report) it was determined that in 71 cases (61%) the request for assistance was made directly to the Reten.

## III. Searches and Seizures: Internal Controls and Accountability

A preliminary analysis of CMR-10 data revealed that PRPB officers are now consistently articulating probable cause in arrest reports. It also shows that a high number of reports found not compliant due to poor documentation of probable cause are being returned to officers for correction, an indication that officers and supervisors are being held accountable. Still, there is a minimal number of poorly written reports that supervisors must address. Incomplete arrest files continue to be of some concern, although not on the scale of past CMRs. Properly describing probable cause in arrest situations has led to the almost complete elimination of the use of boilerplate, conclusive, and repetitive language in most cases.

PRPB supervisors are also being held accountable for their responsibilities, as evidenced by their performance in the areas of arrest reviews, crime scene response during felony arrests, and properly inspecting arrestees for injuries.

Investigatory stops, searches, and traffic stops are not yet tracked, collected, and reviewed by PRPB, as required by the Agreement. However, PRPB has submitted to the court and the Monitor's Office a Search and Seizure Implementation Plan that promises to start addressing these issues by the end of 2024.

Seized Property Forms (PPR 636.1) are still missing from some arrest files, and some officers continue to improperly ask arrestees to sign these forms listing potentially incriminating evidence, an action that could lead to a claim of 5th Amendment violations.

During this reporting period, the Monitor's Office inspected several temporary property/evidence rooms housed in police district stations and two permanent evidence rooms (CIC and Drug Unit evidence rooms that hold evidence for much longer terms) and found all district property/evidence rooms to be compliant. However, one major evidence room lacked proper ventilation and the commanders from both specialized units complained that the space provided was too small, given the amount of evidence stored. In addition, video-recording devices were not functioning properly in both units at the time of inspection.

Supervisors and commanders continue to properly review and approve search warrant applications and arrests. Officers continue to properly complete consent search forms; however, in a couple of cases in this sample, the forms were not included in the file folders submitted. The progress in this area can be directly attributed to the fact that PRPB has caught up with its in-service training schedule in arrest and search and seizure courses, reaching 99% of officers.

Overall, the Commonwealth's compliance with the 18 paragraphs assessed during this reporting period within Searches and Seizures reflects the significantly improved levels of compliance to what was noted in previous CMRs. In CMR-8, 83% of paragraphs (15 paragraphs) were assessed as not compliant and 17% (3 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 11% of paragraphs (2 paragraphs) were found to be not compliant and 56% of paragraphs (10 paragraphs) were found to be partially compliant. See figure 3.



*Figure 3. Searches and Seizures: Paragraph Compliance Status*

## Paragraph 58: Searches and Seizures - General Provisions

*PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

PRPB officers are prohibited from conducting investigatory stops and searches, also known as Terry Stops. Only stops resulting from traffic violations based on probable cause are allowed; however, these are not recorded unless a citation has been issued or an arrest is made. The Agreement requires that "...ALL stops and searches...", including pedestrian and traffic stops, be tracked, recorded, and reviewed. PRPB is not yet there, but procedures to comply are listed on the Search and Seizure Implementation Plan with an associated timeline.

In addition, the Monitor's Office will work with PRPB to ensure that evidence that these stops are part of an effective crime prevention strategy consistent with community priorities as the Agreement requires are provided in future data request processes.

However, there has been significant progress by officers when describing probable cause during investigatory stops and arrest situations. In this regard, all arrest reports reviewed by the Monitor's Office received a minimum rating of partially compliant (46% partial and 54% substantial), as opposed to the 51% of arrest reports that received a failing grade in the last CMR. It is evident that officers and supervisors are adhering to the rules of arrest and investigatory stops. This can be attributed to the 99% of officers who have received in-service training based on GO 615 (Arrests and Summons) and GO 612 (Searches and Seizures) as reported by PRPB.

*Pathway Forward*

To obtain substantial compliance with this paragraph, PRPB must continue to adhere to the training schedule and hold officers and supervisors accountable when they fail to comply with Bureau policies. PRPB must also provide evidence, such as concerns raised during community meetings, quality of life issues raised by elected officials and individuals at Community Interaction Committee (CIC) meetings, etc., to show that the Bureau is addressing community needs when it conducts operations to impact criminal activity in neighborhoods. PRPB must also accelerate the creation of a tracking, collecting, and recording system to analyze geographic and demographic stop data points. This is in compliance with Paragraph 243 of the Agreement.

## 1. Stops, Searches, and Seizures

*Paragraph 59 is assessed annually and will be reviewed in CMR-11.*

## 2. Investigatory Stops and Searches

In its preliminary analysis, the Monitor's Office has observed a great improvement by PRPB officers in documenting probable cause-based investigatory stops and searches, which has led to the elimination of repetitive and boilerplate language in arrest and investigatory stops reports, as per policy.

Demographic and geographic data is not yet collected by PRPB because it lacks a system to collect and analyze such data as required by the Agreement in Paragraphs 60 and 243. PRPB has advised the Monitor's Office that this issue is being addressed in the new Search and Seizure Implementation Plan submitted to the court. As part of this plan, PRPB has provided in-service training on arrest and searches to virtually 100% of its personnel. The reported rate is 99% with the remaining 1% of officers on leave of one type or other. According to the plan, collection and tracking systems are scheduled to start in December 2024.

### Paragraph 60: Searches and Seizures - Investigatory Stops and Searches

*PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to*

*document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. | ☑ Met | ☐ Missed |
| 2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. | ☑ Met | ☐ Missed |

Note: PRPB has not authorized investigatory or Terry stops based on reasonable suspicion. For Paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause.

### Compliance Assessment

According to PRPB policy, officers do not conduct investigatory stops and searches, also known as Terry Stops. Only stops resulting from probable cause-based traffic stops are allowed, but they are not recorded unless there is a citation issued or an arrest is made. GO 612 (Searches and Seizures) addresses investigatory stops in general terms (traffic stops based on probable cause, see Section lll.B.18. and 19). It also addresses the issue of collecting and tracking investigatory stop data, as the Agreement requires, in Section V.B. "Compliance" of the policy. However, PRPB has not yet created a system to properly track, collect, and analyze demographic and geographic data resulting from investigatory stops and searches as per Paragraph 243. Although, PRPB reports in its Searches and Seizures Implementation Plan the creation of graphical dashboards and scorecards for the analysis of the data on searches and seizures, arrests, and detentions, it has not yet created such a system as per Paragraph 243.[1]

Terry Stops by PRPB officers must be based on probable cause per policy. In the random sample obtained by the Monitor's Office for this reporting period, there were 16 cases of investigatory detentions or stops reported to the Monitor's Office (traffic stops by PRPB Highway Patrol Division). In 14 cases (88%) officers

---

[1] See Case 3:12-cv-02039-FAB Document 2570-1 Filed 01/31/24 Page 12 of 288.

articulated probable cause either well or very well. In the remaining two cases (12%), probable cause was fairly articulated. Once again, PRPB is showing progress toward substantial compliance.

*Pathway Forward*

PRPB must create a collection and tracking system to analyze investigatory stops and searches (including traffic stops) as required by Paragraph 243 of the Agreement, and report to the Monitor's Office through a public report any deficiencies found and how they are being addressed. The Monitor's Office is aware of PRPB's Searches and Seizures Implementation Plan that includes the creation of graphical dashboards and score cards, scheduled for July 2024, for the analysis of this data from a revamped GTE system scheduled to be implemented in June 2024.[2]

## Paragraph 61: Searches and Seizures - Investigatory Stops and Searches

*PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

PRPB prohibits the use of conclusory or boilerplate language and materially false or incorrect information by its officers, as stated in Section lll.D.4.g.xxviii.d, and Section lll.D.5.f.ii of the current GO 615 (Arrests and Summons).

The Monitor's Office had indicated in past CMRs that many PRPB officers failed to properly document probable cause in their arrest reports, a practice that more than likely led to the inevitable use of repetitive and boilerplate language. For the prior reporting period, the Monitor's Office observed that PRPB had made great improvement in this area. That trend continued in this reporting period.

In this analysis, the Monitor's Office found that all arrest reports showed properly documented probable cause, thus systematically avoiding repetitive and boilerplate language. PRPB reported to the Monitor's

---

[2] See the Commonwealth's Consolidated Status Report 2, page 13, and Appendix 2 pp. 2-5.

Office that by mid-December 2023 it had provided in-service training to 99% of officers, supervisors, and commanders on arrests and summons, emphasizing proper report writing that included the elements of the crime and clear delineation of probable cause, which, the Monitor's Office believes contributed to the improvement in report writing shown this reporting period. In 43 of 46 eligible arrest files (93%), officers properly described and documented the elements of the crime charged, thereby establishing proper probable cause and avoiding the use of repetitive and boilerplate language. Only 3 cases (7%) showed poor articulation of probable cause (Complaint #s 2024-2-107-00189, 2024-7-232-000073, and 2023-4-044-003431), and 11 others were arrests by warrant or search warrant. Also, the promotion of several hundred new supervisors has led to better supervision and a higher level of accountability, which more than likely helped in providing officers with timely and proper guidance when preparing reports.

*Pathway Forward*

GO 615 (Arrests and Summons) is comprehensive, and effectively provides good guidance for officers in arrest situations. Proper training and supervision are essential for officers to effectively perform their duties and abide by the rules, as evidenced in the statements above. PRPB must continue on the path it is on now to ensure it maintains substantial compliance with this paragraph and others going forward. Although the vast majority of arrest reports were rated substantially compliant, there were three reports that did not meet the requirements, something that can be easily addressed with the attention of supervisors.

## Paragraph 62: Searches and Seizures - Investigatory Stops and Searches

*A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

71

*Compliance Assessment*

Investigatory stops and searches by PRPB officers must be based on probable cause per policy. The random sample obtained by the Monitor's Office for this reporting period contained 16 probable cause-based investigatory detentions or stops. Fourteen had well-documented probable cause (88%) and two (12%) were fairly articulated, but no violation of policies was observed. PRPB's Auxiliary Superintendency of Professional Responsibility (SARP) submitted a certification (#SARP-DA-40-011) stating that no complaints were found arising from these arrests.

*Pathway Forward*

As noted above, PRPB must work towards documenting all its stops and searches, especially traffic stops, to achieve increased compliance with the paragraphs related to this subsection. Despite the improved progress noted by the Monitor's Office in past CMRs, PRPB's failure in documenting all traffic stops (whether an arrest is made or citation issued) and other stops and searches, inhibits the Commonwealth's ability to achieve overall continued compliance, especially with Paragraph 243.

## Paragraph 63: Searches and Seizures - Investigatory Stops and Searches

*A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

In past CMRs, commanders have been found to have properly reviewed and approved supervisors' review of motor vehicle stops/detentions. The arrest random samples obtained by the Monitor's Office for this reporting period contained 16 cases of investigatory detentions or stops (traffic stops). Thirteen traffic stop arrests which involved detentions (81%) were reviewed by supervisors and in three of these traffic stops (19%) no supervisory reviews were submitted. Supervisors did not find or report any violations by officers in any of their reviews, therefore, no corrective actions were recommended. In its review of all 16 files, the Monitor's Office could not discern from the documents provided any misdeeds

by officers. Commanders also reviewed the same 13 files and reported no issues. However, all commanders' reviews occurred well past the required three business days per policy in events involving detentions, including traffic stops (See complaint #s 2024-1-199-0008, 2024-13-010-000869, and 2024-5-050-003131).

*Pathway Forward*

PRPB must ensure supervisors and commanders review all stop and detention reports, and especially traffic stops, to ensure that officers are complying with the Bureau's policies. The collection and analysis of this data is essential to comply with the Agreement's Paragraph 243 regarding Outcome Assessments. Commanders must also comply with the three-business days requirement for review.

### Paragraph 64: Searches and Seizures - Investigatory Stops and Searches

*At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

Officers in PRPB are not allowed to conduct investigatory stops and searches, also known as Terry Stops, other than stops resulting from traffic stops. However, traffic stops are recorded only when there is a citation issued or an arrest made. Although the Agreement requires that ALL stops and searches be tracked, recorded, and reviewed, PRPB has not provided the Monitor's Office any evidence that a system to process and analyze this data has been created. PRPB reported in its Searches and Seizures Implementation Plan the creation of graphical dashboards and scorecards for the analysis of the data on searches and seizures, arrests, and detentions; however, it has not yet created such a system as per Paragraph 243 and this paragraph.[3]

*Pathway Forward*

PRPB must develop a collection and tracking system and analyze the demographic and geographic data obtained during investigative stops and detentions, including traffic stops, and submit the results to the Monitor's Office and USDOJ for review. This system should also collect the same data points from search

---

[3] See Case 3:12-cv-02039-FAB Document 2570-1 Filed 01/31/24 Page 12 of 288.

warrants and arrests reports for analysis per Paragraph 243. A final report should then be available to the public as per the Agreement. PRPB reports that it is developing systems, such as dashboards and scorecards to meet compliance.

## 3. Arrests

The Monitor's Office reported in the last CMR that PRPB was making significant progress in getting officers to properly document probable cause in arrest and detention situations. An analysis of CMR-10 arrest data supplied by PRPB reveals that the trend continues. Although some arrest files are missing required forms, the number has been greatly reduced. With the acceleration of in-service training on arrests and searches, that also included how to properly prepare an arrest report, and better supervision, the Monitor's Office has great expectation that compliance will improve going forward.

### Paragraph 65: Searches and Seizures - Arrests

*PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 65-71. | ☑ Met | ☐ Missed |
| 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | ☑ Met | ☐ Missed |
| 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☑ Met | ☐ Missed |
| 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☑ Met | ☐ Missed |
| Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures. | | |

*Compliance Assessment*

GO 615 (Arrests and Summons) conforms to generally accepted policing practices and complies with the Agreement. This policy was last revised and approved in October 2022.

This reporting period the Monitor's Office reviewed 57 eligible sample files and 36 files (63%) were found to lack some of the required PPR arrest forms: 33 lacked PPR 636.1 (58%) and 10 lacked PPR 128 (18%) (See complaint #s 2024-7-232-00073, 2024-5-199-000169, 2024-2-199-000338, and 2024-5-199-000346). Additionally, supervisors failed to inspect and/or list the arrestees' physical condition on PPR 631.1 (Arrested Person Recording) in 8 cases out of 56 (one case was not applicable) eligible arrest cases (See complaint #s 2024-4-199-000050, and 2024-9-199-00104). Another two files failed to include the form (See complaint #s 2024-5-050-003131, and 2024-1-766-000225). The completed compliance rate is 82% and the Agreement requires a 95% compliance rate. There were 49 arrest files eligible for supervisor and commander reviews. Forty-six files were properly reviewed (94%) and three had no PPR-615.8, included (See complaint #s 2024-5-199-0000169, 2024-5-199-000346, and 2024-299-000090).

*Pathway Forward*

Moving forward, PRPB must ensure all files contain properly completed forms, including the essential PPR 631.1(Arrested Person Recording), as well as PPR 636.1. Those in violation should be held accountable. But for the lack of these forms, this paragraph would have been rated substantially compliant instead of partially compliant.

## Paragraph 66: Searches and Seizures - Arrests

*PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Implemented | | |

75

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

PRPB Communication Command Centers use PPR 126.2 (Dispatch Card) to record all radio communications, including communication between officers and supervisors. When an arrest is made, that information is also recorded on that form, as well as when a supervisor is notified to respond to an incident. However, all but 4 of the 54 PPR 126.2 submitted this term failed to note this information (3 forms were missing from the files). PRPB has implemented the P-25 radio system island-wide, which records communication on all channels between officers and dispatchers. The Monitor's Office's attempts at listening to recorded communications have proven fruitless because of confusion due to the lack of coordination between dispatchers and officers. Proper coordination and control of radio communications is essential and paramount to an officer's safety, as well as effective communication.

Nevertheless, PRPB supervisors reported in their review report, PPR 615.8, that they responded to all but 3 of the 49 eligible felony arrest situations in the data analyzed. Also, there were 11 obstruction of justice arrests among the 49 reported. Supervisors responded to 9 of the 11 cases, either in person or by radio, for an 82% compliance. According to their reviews, there were no unjustified arrests or any deficiency noted in these cases. Additionally, SARP reported that they received no administrative or criminal complaints during this reporting period emanating from these arrest cases (See SARP Document # SARP-DA-40-011).

*Pathway Forward*

PRPB must provide training to dispatchers to ensure the Dispatch Form (PPR 126.2) is completed properly, recording notification and response of supervisors, and to ensure officers follow proper communication protocols. Supervisors must understand that, per PRPB policy and the Agreement, they must respond either in person or by radio to all arrests involving a charge for a felony, obstruction of justice, or resisting an officer.

## Paragraph 67: Searches and Seizures - Arrests

*When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | | |

|  Practice: | Not Implemented | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

The Monitor's Office is not aware of the existence of a system or mapping software to track officers' route of travel when transporting arrestees. Additionally, only 4 of 54 dispatch cards (PPR 126.2) submitted included mileage, but none included demographic data. Four contained only the arrestee's name and date of birth. PRPB is presently developing graphical dashboards and scorecards to capture and analyze this data.[4]

The Monitor's Office also found that in 36 arrest cases officers failed to include one or more required arrest forms (See Paragraph 65 above).

*Pathway Forward*

To comply with the Agreement PRPB must implement a system to collect demographic and geographic data, as well as mileage to and from when transporting arrestees to police facilities or other locations. Command Dispatch Center officers must be properly trained to solicit pertaining demographic information on arrestees and record the mileage to/from police facilities on PPR 126.2 (Dispatch Card), as required by policy and the Agreement. During their review, supervisors must ensure that all required information is recorded on all police reports before approval.

## Paragraph 68: Searches and Seizures - Arrests

*At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Implemented | | |

*Compliance Targets*

---

[4] See Case 3:12-cv-02039-FAB Document 2570-1 Filed 01/31/24 Page 12 of 288.

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

PRPB supervisors reported on PPR 631.1 (Booking Sheet) that they inspected arrestees for injuries on 46 arrest cases out of 56 eligible arrests (82%) during this reporting period and provided medical aid when necessary. However, there were eight cases where supervisors submitted the form but did not indicate whether the arrestees were inspected for injury; in two other cases no PPR 631.1 was submitted.

*Pathway Forward*

The implementation of a new Booking Sheet (PPR 631.1) with the new title "Condition of Arrested Person" has helped tremendously to prevent misunderstanding of when it must be completed. That said, PRPB must continue to emphasize the importance of properly completing and including this form in all arrest files.

## Paragraph 69: Searches and Seizures - Arrests

*PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

GO 615 (Arrests and Summons), Section III.D.4.e. (page 17) requires supervisors to personally review and approve arrest reports on PPR 615.8). An analysis of the 49 eligible arrest files revealed that supervisors reviewed 46 arrest reports on PPR 615.8 (3 files contained no review forms; the remaining 8 arrest files did not qualify for supervisory review because they were warrant arrests). The sample reviewed contained 11 arrests for obstruction of justice, and all were reviewed by responding supervisors.

However, most supervisory reviews were not completed within the 12-hour time frame required under this paragraph (See Complaint #s 2023-3-858-008903, 2024-2-107-01515, and 2024-1-766-000225). As reported in previous paragraphs, the Monitor's Office did not find any evidence of the use of boilerplate or conclusory language, inconsistent information, or other indicia that the information in the reports or forms is not authentic or correct, nor did supervisors report finding any issues with these arrests (See also SARP-DA-40-011).

In 43 of 46 eligible arrest files (93%), officers properly described and documented the elements of the crime charged, thereby establishing proper probable cause and avoiding the use of repetitive and boilerplate language. Only 3 cases (7%) showed poor articulation of probable cause (See Complaint #s 2024-2-107-00189, 2024-7-232-000073, and 2023-4-044-003431), and eleven others were arrests by warrant.

### Pathway Forward

The addition of hundreds of new supervisors has enabled PRPB to ensure there is supervisory presence during felony arrests and at serious crime scenes, as well as ensuring that all applicable arrests are reviewed and approved by supervisors. However, PRPB must also ensure that supervisors review all booking recommendations within the 12-hour period required by this paragraph and that all eligible arrests are reviewed.

## Paragraph 70: Searches and Seizures - Arrests

*As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

CMR-10 data shows that PRPB supervisors continue to review arrest reports at a higher rate than in past CMRs. This time, supervisors reviewed 46 of 49 eligible arrest files, for a 94% compliance rate on PPR 615.8 submitted for this reporting period. Only three arrest reports (6%) lacked sufficient information to

clearly establish probable cause. It appears that supervisors did not take steps to correct these reports or call it to the attention of the officers involved.

*Pathway Forward*

PRPB supervisors conducted reviews in 94% of applicable arrest cases in the sample submitted. PRPB must ensure this trend continues to reach the required 95% compliance rate, and that all arrests are properly evaluated in a timely manner to remain compliant. Those supervisors not adhering to policy must be called to task during performance evaluations.

## Paragraph 71: Searches and Seizures - Arrests

*A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Commanders reviewed 94% of arrest reports, or 46 of 49 eligible arrest files, on PPR 615.8. Only three arrest reports (6%) lacked sufficient information to clearly establish probable cause. However, it appears that the commanders did not call it to the attention of the involved supervisors for corrective action. Eleven of the reviews were conducted outside the required 7-day period (See complaint #s 2024-1-162-001583, 2024-1-199-0008, and 2024-1-262-001380). Supervisors and commanders reported no findings of wrongdoing by officers this reporting period (See SARP certification letter # SARP-DA-40-011 reporting no complaints filed regarding these arrests).

*Pathway Forward*

PRPB has been performing well in completing reviews of arrests. It has thus attained improved compliance with this paragraph and others. However, to continue the path to substantial compliance,

PRPB commanders must adhere to the seven-day time requirement for review in arrest cases and report any referrals made for found misconduct to the Monitor's Office.

## Paragraph 72: Searches and Seizures - Arrests

*PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Polices incorporate all of the requirements of Paragraphs 59 and 72. | ☑ Met ☐ Missed |
| 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | ☑ Met ☐ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB officers inventory evidence and seized property on PPR 636.1 (Seized Property Form). Various other forms, such as PPR 636.2, are used to track and keep the chain of custody by PRPB officers. In this sample, PRPB officers included a PPR 636.1 in 83 of 122 combined arrest and search files for a 68% compliance rate, well shy of the 95% required compliance rate.

SARP reported to the Monitor's Office that the following complaints regarding seized property/evidence investigations are at different stages in the investigative process: 202300433, 202300765, 202301002, 202301200, and 202301351. The Monitor's Office will report on the status of these cases in future CMRs.

One serious issue the Monitor's Office has reported on in past CMRs is the inadequate space at some PRPB evidence rooms and the lack of supplies to properly pack, mark, and store evidence. During this reporting period, the Monitor's Office visited the Bayamon CIC and the Metro Drug Unit Evidence Rooms. In Bayamon the Monitor's Office observed several firearms, bags, and boxes stored on the floor due to lack of space. Per PRPB policy firearms must be stored in a separate secured room or metal cabinet. The

81

size of the Metro Drug Unit Evidence Room was also inadequate. Photos taken by the Monitor's Office are available.

Another on-going issue is that PRPB officers continue to ask arrestees to sign PPR 636.1 to confirm that they own the property and/or evidence seized from them. This form often lists personal property together with incriminating evidence that will potentially be used against arrestees in court. The Monitor's Office has advised PRPB against this practice in previous CMRs because it may be a potential violation of the subjects' 5th Amendment Rights or protection against self-incrimination.

*Pathway Forward*

Supervisors should ensure that officers properly complete and submit Personal Property/Evidence forms whenever applicable. The Monitor's Office recommends that PRPB require officers to list potentially incriminating evidence on the police report form (PPR 621.1) or create a form for such purpose, and not require arrestees to sign it. PPR 636.1 (Seized Property Form) should be used to list returnable personal property only. Officers then may ask arrestees to sign for this personal property when seized and when returned. The Monitor's Office understands that GO 636 (Evidence Rooms) instructs officers to ask arrestees to sign PPR 636.1, regardless of whether evidence or property is listed. The GO should be modified to clarify that the arrestee's signature is required only when personal, returnable property is seized and listed. This issue will also be further discussed during the June Paragraph 253 Meeting amongst the parties. Further, the Monitor's Office also expects that this issue will be addressed with the projected revisions as part of the implementation of a new RMS.

## Paragraph 73: Searches and Seizures – Arrests

*Paragraph 73 is assessed annually and will be reviewed in CMR-11.*

## 4. Searches

GO 612 (Searches and Seizures) was last updated in March 2022. Its latest review has been held back awaiting implementation of the newly created Searches and Seizures Implementation Plan, as it is one of its major components. However, as it exists, it conforms to generally accepted policing practices and appears to comply with the criminal statutes of the Commonwealth, its Constitution, as well as the Constitution of the United States. Searches by search warrant and by consent are generally being properly conducted and documented by officers. Arrest evaluations by supervisors and commanders continue to improve since the promotion of several hundred new sergeants and the re-instatement of in-service training on arrests, stops and searches, as well as the proper documentation of arrest situations.

## Paragraph 74: Searches and Seizures - Searches

*PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 74-77. | ☑ Met | ☐ Missed |
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | ☐ Met | ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB's current GO 612 (Searches and Seizures) conforms to generally accepted policing practices and complies with applicable laws and constitutional mandates. It clearly defines all terms and specifies procedures for conducting searches with or without a warrant, and provides guidance for officers in securing, handling, recording, and taking custody of seized property and evidence. It was last reviewed and revised in March 2022 and is currently being reviewed during the implementation of the PRPB Searches and Seizures Implementation Plan, which is, according to PRPB, in full force as of this writing.

PRPB officers generally perform well when conducting searches authorized by search warrants.  In this random sample of 65 searches, 52  were rated substantially compliant (80%); 5  were rated as partially compliant for missing  forms (7%), such as  PPR 128 (See Complaint # 2023-3-858-10085) PPR 636.1, and PPR 631.1 (See Complaint # 2023-5+050-013035 and 2023-13-005-005407B); and  8 were rated not compliant due to missing copies of essential forms (12%), such as the search warrant, affidavits, and/or consent search form (See complaint #2023-9-199-00353, and 2023-3-758-013838). All search warrant searches were reviewed and approved by supervisors. The compliance rate for search warrant-based searches this reporting period is 88%%, or 57 of, short of the 95% required threshold.

In addition, in a review of  29 consent or warrantless search files, the Monitor's Office rated  24 as compliant (83%); 2) were rated as not compliant due to missing subject's signature on PPR 612.1 and lacking required forms (8%) (See Complaint #s 2023-3-069-001578 and 2023-2-207-03916 ); 3 files were rated partially compliant due to missing several forms, such as PPR 128, 636.1, and 631.1 (Arrested Person Recording) (13%) (See Complaint #s 2023-5-050-013035, 2023-3-758-12602, and 2023-5-063-002894). The compliance rate for consent searches is 93.

Eighteen consent search files had no evidence of supervisory approval either before or after the search. On 11 files, supervisors provided their approval on PPR 615.8, PPR 612.3 (Approval of Request for Search or Arrest Warrants), PPR 615.7, or a certification was submitted. The Monitor's Office understands that

consent searches are conducted in the field at a moment's notice and usually out of the presence of a supervisor. However, supervisors must at least review those searches after the fact to ensure officers adhered to Bureau policies. The files submitted to the Monitor's Office contained no evidence that supervisors reviewed and approved the consent searches either before or after the fact.

*Pathway Forward*

To comply with the Agreement, PRPB must require supervisors document reviews of all searches, and especially searches by consent by using, for example, PPR 612.3 (Approval of Request for Search or Arrest Warrants) or any other official PRPB form.

### Paragraph 75: Searches and Seizures - Searches

*PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

The Monitor's Office reviewed 36 searches by search warrant and found that only 29 search warrant affidavits and/or applications were reviewed and approved by supervisors on either PPR 615.7 (Operational Plan), PPR 612.3 (Approval of Request for Search or Arrest Warrants), or a signed letter certifying review and approval, for an 81% compliance rate. The remaining seven search warrant files contained no evidence of whether the affidavits and warrant applications were reviewed and approved by supervisors.

Most PRPB supervisors have been issuing approval of search warrant applications and affidavits either on PPR 615.7 or on a signed letter certifying they reviewed and approved the application, while a few others fail to submit any documentation. There is no consistency in how these approvals are documented. However, the Monitor's Office reviewed and approved a search/arrest warrant application review form (PPR 612.3, titled "Approval of Request for Search or Arrest Warrants") created by PRPB in August 2022. Since then, many supervisors have included it in search files and the Monitor's Office has found it to be useful, easy to use, and consistent. To the Monitor's Office, the form appears to properly

serve its purpose of documenting reviews and approvals of all searches, whether the review happens before or after the event. However, it is not widely used. PRPB has informed the Monitor's Office that PPR 612.3 has not yet been officially approved for use by PRPB supervisors. The Monitor's Office believes that the inclusion of this form would provide a consistent mechanism to review and approve searches, as well as greatly aid supervisors in complying with the Agreement and PRPB policy.

*Pathway Forward*

The Monitor's Office highly recommends that PRPB approve PPR 612.3 (Approval of Request for Search or Arrest Warrants) in its present form for supervisory search approvals or modify it to the Bureau's satisfaction. It will help PRPB attain compliance in approvals of affidavits and warrant applications, especially when conducting consent searches.

## Paragraph 76: Searches and Seizures - Searches

*PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Target #2. Annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All search warrants are tracked in the tracking system. | ☐ Met | ☑ Missed |
| 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | ☑ Met | ☐ Missed |

Note: Policy content is assessed as part of Paragraph 74. Training is assessed as part of Section E 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

The Monitor's Office conducted site visits to the following Criminal Investigations Corps (CIC) and Drug Units: Bayamon CIC, Metro Drug Unit, and Guayama Drug Unit. These units are responsible for conducting most search warrant searches within their assigned police areas. All directors stated that they do not have a system to track search warrants. The Monitor's Office observed that search warrant files are organized numerically and by year for easy access in folders in file cabinets, and no significant analysis is ever conducted. The PRPB Searches and Seizures Implementation Plan, which is in full force

according to PRPB, is addressing this issue by updating its GTE system. PRPB has informed the Monitor's Office that it has begun to demo-test some components of the system. [5]

*Pathway Forward*

PRPB stated it is working to develop a centralized, electronic tracking system to collect and analyze search warrant data, as per the Agreement. This system is included in the Searches and Seizures Implementation Plan. The Monitor's Office looks forward to reviewing this and other systems slated for development under this plan.

## Paragraph 77: Searches and Seizures - Searches

*PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

In a review of 29 consent or warrantless search files, the Monitor's Office rated  24 as compliant (83%); 2 as not compliant due to missing subject's signature on PPR 612.1 (Consent Search Form)  and lacking one or two required forms (7%) (See complaint #s 2023-3-069-001578 and 2023-2-207-03916); 3 files were rated partially compliant due to missing several forms, such as PPR 128, PPR 636.1, PPR 631.1 (Arrested Person Recording) (10%) (See complaint #s 2023-5-050-013035, 2023-3-758-12602, and 2023-5-063-002894). The compliance rate for consent searches stands at 93. This is good progress for PRPB, but still short of the 95% compliance threshold required under Paragraph 74.

*Pathway Forward*

To continue compliance, PRPB must ensure officers properly complete PPR 612.1 (Consent Search Form) for every consent search. Supervisors must conduct reviews of these searches, whether before or after the fact, and document their approval/disapproval on PPR 612.3 (Approval of Request for Search or Arrest Warrants), or other official form, for easy review and analysis.

---

[5] See Case 3:12-cv-02039-FAB Document 2570-1 Filed 01/31/24 Pages 53-57 of 288.

## 5. Training on Stops, Searches, and Seizures

*Paragraphs 78 and 79 are assessed annually and will be reviewed in CMR-11.*

# IV. Equal Protection and Non-Discrimination

In this CMR, only 10 paragraphs (Paragraphs 84 - 86, 88 - 90, 92 - 93, 96, and 99) are evaluated. Typically, specific targets within these paragraphs are assessed biannually. The compliance targets reviewed in this reporting period are bolded within the paragraphs. The targets mainly revolve around PRPB's initiatives concerning the implementation of training and procedures related to hiring, the civilian complaint system, performance evaluations, juvenile case management reporting, hate crime reporting, and bias-free policing training.

The Parties collaborated on a Sexual Assault and Domestic Violence (SA/DV) Plan, which received court approval on September 5, 2023. This plan has proven instrumental in addressing various issues such as training enhancements, improvements in the quality of investigation files, adoption of victim-centered practices, enhancements in supervision, refining internal investigation procedures, and staffing and resource-related challenges.

The working group responsible for this section is currently progressing through the associated tasks outlined in the SA/DV Plan. Developed by PRPB, this plan has led to the creation of an investigation checklist. The workgroup remains dedicated to addressing findings and recommendations from previous CMRs. The primary objective of this initiative is to establish investigative procedures that enhance PRPB's responsiveness in handling SA and DV cases. To achieve this, it is crucial for PRPB to maintain its commitment to improving SA and DV training for its personnel. This specialized training equips the team with the necessary skills for an effective initial response to such incidents. However, in this reporting period, PRPB falls short of meeting its training compliance target of 95%. Ensuring the continued provision of training opportunities, resources, and support is paramount in the mission to effectively investigate these types of crimes.

Overall, the Commonwealth's compliance with the 10 Equal Protection and Non-Discrimination paragraphs reflects marginal progress in levels of compliance to what was noted in previous CMRs. In CMR-8 60% (6 paragraphs) of the 10 paragraphs assessed were partially compliant, in comparison to the current reporting period, where 60% of the 10 paragraphs (6 paragraphs) were found to be partially compliant and 10% of the 10 paragraphs (1 paragraph) was found to be substantially compliant. See figure 4.



*Figure 4. Equal Protection and Non-Discrimination Paragraph Compliance Status*

## Paragraph 80: Equal Protection and Non-Discrimination – General Provisions

*Paragraph 80 is assessed annually and will be reviewed in CMR-11.*

## 1. General Provisions

In this CMR Paragraph 84 (Targets 3, 4, and 11), Paragraph 85 (Target 3), and Paragraph 86 (Target 3) are evaluated. These specific targets within these paragraphs are assessed biannually. The compliance targets reviewed in this reporting period are bolded within the paragraphs.

PRPB's dedication to policy development and continual refinement is evident in its efforts to provide clear guidance and ensure accountability. However, the practical application of these policies relies heavily on robust reporting systems, an area PRPB is actively enhancing. Systems such as National Incident-Based Reporting System (NIBRS) reporting, hate crime training, civilian complaint training, bias-free policing training, and ProMedia training are undergoing refinement and development. Selecting a robust RMS is crucial to fulfilling reporting requirements outlined in the Agreement.

PRPB is currently executing plans to enhance its organizational reporting systems. These initiatives demonstrate PRPB's commitment to improving data collection, management, and reporting for greater effectiveness. By proactively implementing these plans, PRPB is actively enhancing its reporting infrastructure, fostering transparency, and reinforcing accountability within its operations.

## Paragraphs 81 - 83: Equal Protection and Non-Discrimination – General Provisions

*Paragraph 81 – 83 are assessed annually and will be reviewed in CMR-11.*

## Paragraph 84: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's*

*documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews).** | ☐ Met | ☑ Missed |
| **4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection.** | ☐ Met | ☑ Missed |
| 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | ☑ Met | ☐ Missed |
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| **11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews).** | ☐ Met | ☑ Missed |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | ☑ Met | ☐ Missed |
| Note: The requirement of this Paragraph that require PRPB to incorporate bias-free policing and equal protection into its hiring practices is assessed together with Paragraph 104 (Hiring Reforms). | | |

Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its performance assessment process is assessed together with Paragraph 145 (Performance Evaluation).

Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its promotion assessment process is assessed together with Paragraph 14 (Promotions).

### Compliance Assessment

During the reporting period, the Monitor's Office conducted assessments for targets 3, 4, and 11. Evaluation of Target three revealed that PRPB has not trained and certified personnel on the civilian complaint program (ESAL 201: Process on Handling Administrative Complaints and Non-Punitive Discipline). PRPB self-reports that 141 agents received the training in 2023, which is below the 95% compliance level. Therefore, Target three is missed. The Monitor's Office notes that while the IGPD Multitemático Igual Protección y No Discrimen course provided as part of the in-service training delivered in 2023 and 2024 references the civilian complaint policy, it does not adequately train agents on the process, procedures, or outcomes and thus cannot be used to account for compliance for this target.

For Target four, the Monitor's Office reviewed a global list (dated April 2, 2024) of all those who have applied for entry and are still in the recruitment process. There are 502 candidates in various stages of the recruitment process. However, from the list it is hard to determine what specific selection processes verify that the candidates are selected according to policy regarding bias-free policing and equal protection. Candidates' names appear on the list two or three times. Therefore, Target four is missed.

For Target 11, over 95% of PRPB personnel have received an introductory course (30 minutes) on ProMedia. This is an introductory course only and does not help the evaluator fully understand the process and evaluation implications that are rendered to an employee.

### Pathway Forward

To address the missed targets assessed during the reporting period, PRPB will implement a strategic pathway forward, including, identifying the course number for the civilian complaint program training and developing a comprehensive training program covering all relevant aspects, ensuring certification upon completion. Secondly, the recruitment process must include specific selection processes verifying candidates according to bias-free policing and equal protection policies, ensuring transparency and clear documentation. Selection processes such as background checks, psychological testing, and education levels should be submitted to the Monitor's Office for review moving forward. Lastly, the development and implementation of a detailed ProMedia training program for all personnel, focusing on in-depth understanding and practical application to improve evaluation implications. These steps will not only help PRPB meet the missed targets but will also enhance overall training, recruitment, and ProMedia understanding within PRPB.

### Paragraph 85: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | Review Period | October 2023 – March 2024 |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. NIBRS training are consistent with approved policies and procedures. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in NIBRS.** | ☐ Met | ☑ Missed |
| 4. PRPB is using the NIBRS to collect and report crime data. | ☐ Met | ☑ Missed |

### Compliance Assessment

Collaboratively, the Monitor's Office, PRPB, and OSM are actively engaged in implementing the NIBRS system. In March 2024, a meeting was held with NIBRS personnel to deliberate on an implementation strategy. This initiative not only aims to streamline reporting processes but also holds the promise of facilitating hate crime reporting to the Federal Bureau of Investigation (FBI). Notably, PRPB has reported no hate crimes during this reporting period.

PRPB had previously committed to various steps regarding its NIBRS certification. The Monitor's Office recognizes the efforts done by PRPB in showing various modules to the Monitor's Office while awaiting the acquisition of an RMS, which the Parties determined would be a causal step for obtaining the NIBRS certification. Nonetheless, according to the dates outlined in the Action Plan approved by the Parties on September 5, 2023, PRPB should have evaluated proposals and selected an RMS during this reporting period. The Monitor's Office has not received any information regarding PRPB's acquisition of an RMS, nor documentation showing the execution of the previous steps before the acquisition of an RMS.

### Pathway Forward

PRPB's focus on developing the NIBRS system must encompass several key areas, including providing initial training for existing personnel, ongoing training for new recruits, and periodic updates whenever there are changes to Commonwealth law or NIBRS protocols. Further, PRPB could use the FBI's NIBRS resources to inform and educate the public on the use and benefits of NIBRS reporting.[6] Allocating budget and staff resources for NIBRS training and certification is essential, as is ensuring ongoing support to sustain NIBRS reporting.

---

[6] https://le.fbi.gov/informational-tools/ucr/nibrs-resources

## Paragraph 86: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #3. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | | |
|---|---|---|---|
| 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Criminal investigation trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews).** | ☐ Met | ☑ Missed |
| 4. PRPB notifies the FBI of all identified instances of hate crimes. | ☐ Met | ☑ Missed |
| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | ☐ Met | ☑ Missed |

Note: The requirement of this Paragraph that requires PRPB to track hate crimes on an ongoing basis is assessed together with Paragraph 85.

### Compliance Assessment

During this reporting period PRPB reports that no Hate Crime training (VICO 3081) was conducted. Collaboratively, the Monitor's Office, PRPB, and OSM are actively engaged in implementing the NIBRS system. This initiative not only aims to streamline reporting processes but also holds the promise of facilitating hate crime reporting to the FBI. Notably, PRPB has reported no hate crimes during this reporting period.

As mentioned in the previous paragraph, prior to training personnel on hate crimes to achieve FBI certification, PRPB had committed to a series of tasks with due dates. All of these tasks were collaboratively developed and approved by the Parties to obtain FBI certifications and be NIBRS compliant. The Monitor's Office has not been provided with any documentation showing that Target three for this paragraph has been met.

### Pathway Forward

Addressing deficiencies in training, reporting, and investigation related to hate crimes is crucial for PRPB to achieve compliance in this area. This includes providing comprehensive training, ensuring accurate

93

reporting, and improving the identification and handling of hate crimes within the jurisdiction. It is imperative that PRPB delivers the training for VICO 3081 (Hate Crime Training) to ensure officers are adept at accurately assessing cases to determine if they qualify as hate crimes. Additionally, supervisors must attend training to support officers in hate crime investigations and assessments, as they play a crucial role in accountability and oversight. PRPB's responsibility to better manage hate crimes starts with training, as it enables personnel to understand the specific tenets of hate crimes and appropriately classify them. To address these concerns, PRPB has developed the SA/DV Implementation Plan, prioritizing training, and monitoring gender-based hate crimes, along with the IT CAP initiative aimed at streamlining hate crime data sharing with the FBI.

## 2. Discriminatory Policing

In this CMR Paragraph 88 (Target 3), Paragraph 89 (Targets 3 and 4), Paragraph 90 (Target 5), and Paragraph 92 (Target 1) are evaluated. These specific targets within these paragraphs are assessed biannually. The compliance targets reviewed in this period are highlighted in bold within the paragraphs.

In this reporting period, the focus has primarily been on training mandates and community interactions. PRPB has made significant progress in delivering services to the transgender and transsexual communities, covering areas such as transportation, processing, housing, and medical treatment, which is a positive development. However, challenges persist in agent training related to interactions with these communities.

It remains crucial for PRPB to address this deficiency by implementing suitable training programs for its personnel. Such training is essential to equip PRPB agents with the necessary knowledge and skills to effectively interact with and serve the transgender and transsexual communities.

### Paragraph 87: Equal Protection and Non-Discrimination – Discriminatory Policing

*Paragraph 87 is assessed annually and will be reviewed in CMR-11.*

### Paragraph 88: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |

| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB policies complied with the requirements of the Paragraph. | ☑ Met ☐ Missed |
| 2. Trainings on discrimination free policing are consistent with approved policies. | ☑ Met ☐ Missed |
| **3. 95% of sampled PRPB members are trained and certified in discrimination free policing.** | ☑ Met ☐ Missed |
| 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | ☐ Met ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 81, 87, and 109 (Policies and Procedures).

*Compliance Assessment*

For this paragraph, PRPB provided a comprehensive list of training sessions attended by its personnel globally. Specifically addressing Target 3, PRPB submitted records for 92 agents' training. These records indicate that personnel participated in IGPD 5011 (Multi-Themed Equal Protection and Non-Discrimination), IGPD 5011SC (Supervisors Course Multi-Themed Equal Protection and Non-Discrimination), and IGPD 5011R (Refresher Multi-Themed Equal Protection and Non-Discrimination). Notably, these courses are integral components of PRPB's 40-hour training plan, which is slated for continuation into 2024. A closer examination of IGPD 5011 revealed that PRPB successfully met the 95% training threshold for this course as part of its comprehensive training strategy. Furthermore, IGPD 5011SC for sergeants and above, which constitutes a 4-hour session was completed. Additionally, EEO 2061C a 4-hour course was also attended by sergeants and above.

*Pathway Forward*

In addressing training needs, PRPB has taken proactive steps by providing a comprehensive list of global training sessions attended by its personnel. Specifically addressing Target three, PRPB has documented training records for 92 agents, highlighting their participation in essential courses such as IGPD 5011 (Multi-Themed Equal Protection and Non-Discrimination), IGPD 5011SC (Supervisors Course Multi-Themed Equal Protection and Non-Discrimination), and IGPD 5011R (Refresher Multi-Themed Equal Protection and Non-Discrimination). These courses are integral to PRPB's compliance and should continue to being delivered to PRPB personnel.

## Paragraph 89: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2023 – March 2024 |

95

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | ☒ Met | ☐ Missed |
| 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | ☐ Met | ☒ Missed |
| **3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals.** | ☐ Met | ☒ Missed |
| **4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals.** | ☒ Met | ☐ Missed |

## Compliance Assessment

During the reporting period, the Monitor's Office conducted assessments for Targets three and four. PRPB reports that 336 members received training on Interactions with Transgender and Transexuals (REA 624) and that no virtual training on Interactions with Transgender and Transexuals (VITT 3081) was conducted, which does not meet the 95% compliance threshold. Furthermore, PRPB contended that while IGPD 5011 (Multi-Themed Equal Protection and Non-Discrimination) provided some training on interactions with transgender and transsexual individuals, it fell short of meeting the requirements for compliance with Target 3. The instruction in IGPD 5011, which mainly references the policy regarding this community, lacks depth and comprehensive coverage. To effectively address this compliance target, it is crucial to go beyond mere acknowledgment of policies and ensure active involvement of members from the transgender and transsexual community in both the development and delivery of training materials. This inclusive approach not only enhances understanding but also fosters meaningful engagement and sensitivity in interactions with these communities. Therefore, a more robust and inclusive training program specifically tailored to address the unique needs and challenges faced by transgender and transsexual individuals is necessary to achieve full compliance with Target three.

The Monitor's Office received a certificate documenting six interactions with transgender individuals, one of which involved the arrest of a citizen under Law 408-2000 "Mental Health Law of Puerto Rico." This arrest has been misclassified in the GTE and lacks the requisite supervisor's signature. These six interactions are reported to have taken place in the first three months (October – December 2023) of the reporting period. For the last three months (January - March 2024) PRPB certifies that there were no reports on interactions with transgender or transexual persons.

The review of the six contacts found that PRPB does comply with policies regarding interactions with transgender or transsexual individuals. For example, PRPB personnel provided information on support services, medical attention, and a domestic violence escape plan. The Monitor's Office finds Target four met the compliance standard.

*Pathway Forward*

PRPB's pathway forward involves a crucial responsibility to provide training and certifications ensuring personnel competence in interactions with transgender and transexual individuals. This includes maintaining and enhancing ongoing interactions per GO 624 (Interactions with Transgender and Transexual Individuals). To assess policy quality and member interactions, PRPB must establish a robust data collection system. This system will encompass vital performance metrics like gender identification, expression, transportation, processing, housing, and medical treatment data. These metrics, usually part of police reports, should undergo rigorous analysis. This analysis not only measures policy effectiveness but also guides updates and improvements as necessary on how to better serve the transgender and transexual community.

## Paragraph 90: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding biased-free policing;*

*b) community perspectives of discriminatory policing;*

*c) constitutional and other legal requirements related to equal protection and unlawful discrimination;*

*d) the protection of civil rights as a central part of the police mission;*

*e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;*

*f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;*

*g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;*

*h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and*

*i) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #5. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | ☐ Met  ☑ Missed |

97

| | | |
|---|---|---|
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | ☐ Met | ☒ Missed |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | ☐ Met | ☒ Missed |
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | ☐ Met | ☒ Missed |
| **5. 95% of sampled PRPB members are trained and certified in bias-free policing.** | ☒ Met | ☐ Missed |
| Note: This Paragraph is assessed together with Paragraph 81 and 117 (Training). | | |

*Compliance Assessment*

During the reporting period, IGPD 5011R (Refresher Multi-thematic Equal Protection and Non-Discrimination) has been incorporated into the training plan initiative. The training curriculum has been received and reviewed. The course does ensure fulfillment of all targets outlined in this paragraph. PRPB was fully cognizant of this development and has accorded high priority to IGPD 5011R as a fundamental component of the 40-hour mandatory instruction block. This deliberate placement of the course was designed to efficiently address the requirements specified in this paragraph.

In the aforementioned Action Plan, PRPB committed itself to train 100% of its employees in IGPD 5011R (Refresher Multi-thematic Equal Protection and Non-Discrimination) by December 31, 2024. The Monitor's Office received documentation certifying that more than 95% of all PRPB members had received this course earlier than planned and fulfilled the compliance target.

*Pathway Forward*

PRPB should continue to prioritize IGPD 5011R (Refresher Multi-thematic Equal Protection and Non-Discrimination) within its training plan initiative. The received training curriculum has been thoroughly reviewed and ensures the fulfillment of all targets outlined in this paragraph. Recognizing the importance of IGPD 5011R, PRPB has given it high priority as a fundamental component of the mandatory 40-hour instruction block. This strategic placement of the course was specifically designed to efficiently meet the requirements specified in this paragraph.

PRPB has indicated its intention to use a virtual platform to deliver IGDP (Multi-Themed Equal Protection and Non-Discrimination) training. It is recommended that PRPB use an educational method where both hard and soft skills can be assessed. For example, legal updates, policy revisions, and/or support services identification can be delivered online whereas response and interview techniques should be delivered in person to better facilitate calls for service response.

## Paragraph 91: Equal Protection and Non-Discrimination – Discriminatory Policing

*Paragraph 91 is assessed annually and will be reviewed in CMR-11.*

## Paragraph 92: Equal Protection and Non-Discrimination - Discriminatory Policing

*Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

1. All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family.    ☐ Met  ☑ Missed

### *Compliance Assessment*

During this reporting period, PRPB documented 11 cases occurring in juvenile correctional facilities, with 7 in Ponce and 4 in Villalba. However, PRPB failed to provide the preliminary investigation report to both PRDOJ and the Puerto Rico Department of the Family (PRDOF) within the mandated five business days in any of these instances. Following the March 2024 site visit and in collaboration with the reform working group, a new reporting mechanism has been established to improve data reporting and measurement. This initiative is expected to significantly enhance the reporting processes. To validate the accuracy of this report, PRPB will now provide monthly reports and case reports for thorough analysis. This proactive step demonstrates a positive move towards compliance. The true measure of success lies in the field where reports are generated, ensuring timely and accurate reporting practices are consistently upheld. In this reporting period PRPB submitted monthly reports for October through December 2023 and January 2024. These reports will provide for timely and thorough analysis of the reporting measures required in this paragraph.

### *Pathway Forward*

Per the Action Plan, PRPB committed itself to submit monthly results of monitoring meetings. The Monitor's Office has not received any documentation of these meetings. The Monitor's Office was able to see a demonstration of the module for allegations of abuse and mistreatment in juvenile correctional facilities and is optimistic that these allegations are reported to the PRDOJ and PRDOF.

## 3. Sexual Assault and Domestic Violence

In this CMR Paragraph 93 (Target 3), Paragraph 96 (Targets 3- 5), and Paragraph 99 (Target 2) are evaluated. These specific targets within these paragraphs are assessed biannually. The compliance targets reviewed in this reporting period are bolded within the paragraphs.

PRPB has consistently maintained its commitment to improving various aspects outlined in this subsection despite some challenges noted in previous CMRs. However, there is a clear recognition of the need for further enhancements in several target areas. This includes strengthening support for tracking and gathering case reporting to external stakeholders, SA and DV mandated training, and how cases involving PRPB personnel are managed. These are all necessary for consistent investigative procedures and documentation.

### Paragraph 93: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for the remaining Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | ☒ Met  ☐ Missed |
| 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | ☒ Met  ☐ Missed |
| **3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies.** | ☐ Met  ☒ Missed |
| 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | ☐ Met  ☒ Missed |

Note: This Paragraph is assessed together with Paragraphs 94, 98 and 99.

*Compliance Assessment*

PRPB submitted 92 agent training records for review. However, the Monitor's Office confirmed that these agents did not attend REA 627R (DV) training in 2023. Although PRPB fulfilled the mandatory 40-hour training requirement, it did not include DV training. This oversight results in PRPB falling short in this aspect, leading to a missed target in this reporting period.

Furthermore, by March 30, 2024, PRPB had committed to revise and train all PRPB members on the new GO for SA and DV, including the technological component of the training. Although the Monitor's Office has not seen any documentation related to the acquisition of an RMS by PRPB, the Monitor's Office did review a SA and DV module, which was still not available to all PRPB members because it was still in the developmental and testing stages.

*Pathway Forward*

PRPB must conduct SA and DV training for its personnel to strengthen their understanding and response capabilities in handling these critical situations effectively. This training is required to be conducted annually and strategic coordination is critical in establishing the training sessions.

## Paragraphs 94 and 95: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*Paragraphs 94 and 95 are assessed annually and will be reviewed in CMR-11.*

## Paragraph 96: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually for the remaining Data Sources. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Training on response to sex crimes related calls is in accordance with approved policy. | ☑ Met | ☐ Missed |

| | |
|---|---|
| **3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls.** | ☐ Met  ☑ Missed |
| **4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes.** | ☑ Met  ☐ Missed |
| **5. The manned hotline provides the public access to the Sex Crimes Investigation Unit.** | ☑ Met  ☐ Missed |

## Compliance Assessment

During the reporting period, the Monitor's Office conducted assessments for Targets 3- 5. According to GO 115 (Division of Sexual Crimes and Child Abuse) the requirements for personnel who work the hotline for counseling victims of sexual crimes states that *"The line will always be operated by personnel assigned to the Sexual Crimes and Child Abuse Divisions."* It is the responsibility of the directors of said divisions to ensure that the personnel who operate them have been trained. The personnel assigned to the orientation line must have been trained in the following trainings: REA 622 (Investigative Aspects in Sexual Crime Incidents for Operators), REA 115 (Investigation of Incidents of Sexual Crimes for Specialized Unit Participants), and LVVS 622 (Guidance Line for Victims of Sexual Violence). In the case of reservist personnel, they must have completed LVVS 622.

For Target 3, 23 training documents were received and found to be compliant with REA 115 (Investigation of Incidents of Sexual Crimes for Specialized Unit Participants). However, there is no notation of these call takers having taken REA 622 (Investigative Aspects in Sexual Crime Incidents for Operators) or LVVS 622 (Guidance Line for Victims of Sexual Violence). Therefore, Target three is not met as the call takers have not received the catalog of required courses. Further, 65 civilian call taker training records do not document REA 622 or LVVS 622.

For Target 4, PRPB's dedication to upholding a 24-hour hotline is substantiated by the submission of 65 files, encompassing data from April through June 2023. With use of form PPR 118.1 (Gender Violence and Youth Affairs Division) PRPB submitted data that these files comprehensively document essential details including incident date, time, type, call taker, assigned investigator, district, case number, and supervising agent. This thorough documentation unequivocally showcases PRPB's adherence to the mandate of staffing and operating a continuous 24/7 hotline.

As for Target 5, PRPB submitted a list of 82 call takers. These call takers are assigned to 13 areas of Puerto Rico. With two reservists who work remotely. This provides for public access across the state. Additionally, 351 calls were received during this reporting period supporting the manned hotline staffed by trained personnel ensures public access to reporting sex crimes. Additionally, PRPB submitted a 28-page report that thoroughly documents the 24-hour work schedule among agents assigned for coverage to the call line. Agents are on call during the evening and weekends to ensure that there is someone available to answer the phone. Target five is met in this reporting period.

## Pathway Forward

PRPB must maintain its dedication to upholding a 24-hour hotline. It must continue to collect and report incidents as found in this reporting period with meticulously captured crucial details including incident date, time, type, call taker, assigned investigator, district, case number, and supervising agent. Such meticulous documentation unequivocally demonstrates PRPB's commitment to staffing and operating a

continuous 24/7 hotline. Furthermore, for Target five, the manned hotline, staffed by trained personnel, ensures public access to report sex crimes effectively. Moving forward, PRPB must continue prioritizing training critical for the hotline unit to enhance response capabilities and maintain optimal service delivery.

## Paragraphs 97 and 98: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*Paragraphs 97 and 98 are assessed annually and will be reviewed in CMR-11.*

## Paragraph 99: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. | ☒ Met  ☐ Missed |
| **2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph.** | ☒ Met  ☐ Missed |

Note: This Paragraph is assessed with Paragraphs 93, 94, and 98. The conduct envisioned by this Paragraph may also fall within the purview of Paragraph 184.

*Compliance Assessment*

The Monitor's Office received reports of 19 DV cases involving PRPB members during the period from October 1 to December 31, 2023. These reports encompass both criminal and administrative investigation files related to DV incidents with PRPB employees. Certificates and certifications from the Director of the Office of Psychology and Social Work were submitted, detailing interventions by staff with the individuals involved in these incidents. Each case complaint received a SARP case number, indicating that all 19 incidents were subject to SARP investigation. It is worth noting that PRPB consistently follows its policy by initiating an administrative investigation whenever a criminal case implicating a PRPB member arises. In all cases PRPB confiscated weapons and ammunition from the agents, per policy, which was documented with PPRs 618.2 (Authorized Weapons Receipt), 618.3

(Regulation Weapon Receipt), and 618.4. All 19 incidents were documented and referred to the psychological services unit for further assessment and support. No SAs involving PRPB members were reported during this reporting period.

*Pathway Forward*

The policy requires the confiscation of weapons in cases of SA or DV involving PRPB personnel. PRPB must ensure strict compliance with this policy to uphold safety and accountability in these sensitive situations. It is essential to continue to document the initiation of a SARP investigation once a criminal case is generated. Additionally, PRPB referring officers to psychological services can aid in addressing DV issues effectively.

## Paragraph 100: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*Paragraph 100 is assessed annually and will be reviewed in CMR-11.*

# V. Recruitment, Selection, and Hiring

The Monitor's Office determined PRPB to be Partially Compliant overall with the Agreement in the area of Recruitment, Selection, and Hiring. PRPB is in the process of recruiting qualified personnel and developing a Recruitment Plan that has inclusive selection practices, and that better represents the diverse cross-section of the Puerto Rican community. PRPB can still improve in certain areas, such as creating a Recruitment course, offering training on recruitment, and finalizing an official Recruitment Plan.

Recruiting, selecting, and retaining personnel are pivotal for community policing and for the policing profession in general. Recruitment and staffing obstacles continue to appear in law enforcement agencies across the United States. Nevertheless, PRPB provided data that demonstrates a concerted effort both to recruit qualified candidates, and to vet them thoroughly. The most recent Paragraph 13 Committee Meeting showed that PRPB is currently aiming to recruit a maximum of 377 officers.

It should be noted that the Recruitment Division currently uses an INTERBORO platform that expedites the complete recruitment process. The Recruitment Division should also ensure that each recruitment officer in all areas in Puerto Rico be trained in recruitment and the use of the INTERBORO platform. The INTERBORO system makes PRPB more effective and efficient in recruitment and helps automate valuable information and statistics, which has yet to be accomplished.

PRPB, under Puerto Rican law, now permits cadets to enter the Academy at age 18. These cadets will not be commissioned until after they complete the Academy and have been awarded an Associate's Degree. They are given up to three years from the time they enter the Academy to meet these requirements. Once they have graduated from the Academy and possess an Associate's Degree, they may be commissioned.

The Monitor's Office continues to recommend that PRPB:

1.  Clarify that these cadets will not be performing policing duties until they have obtained their Associate's Degree and passed through all other necessary filters; outline the protocols/procedures related to this program; and explain the roles and responsibilities of these cadets from the moment they enter the Academy/Associate's Degree program forward.

2.  Clearly state the requirements for being enrolled in the Associate's Degree program, including the thresholds and minimum expectations for satisfactory progress towards the degree; the decision-making process for determining which candidates do not meet these minimum requirements; the process for terminating cadets; and revise the Recruiter Training curriculum to align these understandings with current policy.

3.  Modify the Recruitment Regulation to include advertisement that aligns with current community policing standards, and for the advertising to clearly explain the required skillsets in order to become a cadet, such as social skills, problem solving, critical thinking, etc.

4. Complete the Recruiter Training curriculum, which should include discrimination and bias and be approved by the Commissioner. This latter step is crucial since training cannot be conducted without an approved curriculum.

5. Ensure that recruited personnel should be representative of what PRPB as an agency will become. Both sworn and civilian personnel should have an active role in recruiting cadets since there are positions for civilians and officers. PRPB should develop a comprehensive and competitive retention plan and success and failure case studies to provide guidance on future policy decisions and assist in communication. PRPB should publicly disseminate recruitment data for comparison.

6. Conduct more outreach to CIC members and the Puerto Rican community for their assistance in planning and executing future recruiting efforts. The Recruitment Regulation should include provisions that PRPB consult with community stakeholders and obtain recommendations to ensure a diverse candidate pool. The Monitor's Office recommends solicitation of recruitment ideas from all demographic groups in Puerto Rico, as was done at the CIC meeting held on March 9, 2024, in Patillas. This meeting provides proof that the Recruitment Regulation was discussed collaboratively with CIC members.

7. Capitalize on Police Week for recruiting while focusing recruiting components on community policing more than traditional policing, given that community policing is to be the future of PRPB.

8. Add more personnel to the Recruitment Division to expedite all parts of the recruiting process. Currently there are not enough people to expedite the hiring of new recruits.

9. Approve the new recruitment video produced by the Recruitment Division in which some cadets including members of the minority community participated.

Overall, PRPB's compliance with the eight Recruitment, Selection, and Hiring paragraphs assessed during this reporting period reflect the same levels of compliance as what was noted in previous CMRs. In CMRs-2, 4, 6, 8, and 10, all paragraphs were assessed as partially compliant. See figure 5.



*Figure 5. Recruitment, Selection, and Hiring: Paragraph Compliance Status*

## Paragraph 101: Recruitment, Selection, and Hiring - General Provisions

*PRPD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. PRPD shall develop a recruitment policy and program that establishes clear guidance and objectives for recruiting police officers and clearly and transparently allocates responsibilities for recruitment efforts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 102-108, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

During the reporting period, PRPB and the Recruitment Division have been diligent in providing information and data on Recruitment to the Monitor's Office. The information and data have included the pertinent regulations, GOs, and tools. The Monitor's Office again recommends that success stories and any failures involving recruitment should be documented in a Recruitment Annual Report so that PRPB has concrete data to review when developing future recruitment strategies. It is also recommended that, in this report, recruitment data be compared to past years, and this information be distributed to all PRPB members. The Recruitment Director has provided necessary data on prospective cadets who have been recruited and vetted. The Recruitment Director told members of the Monitor's

107

Office that PRPB's goal is to add 377 new recruits, which would become Class 235 in 2024. It has not yet been determined where Class 235 will hold their classes since Class 234 has not yet completed their training.

## Education Level of Entering Cadets for Academy Classes

It is apparent that highly educated individuals are being attracted to the police profession in Puerto Rico. PRPB accepted 123 cadets into Class 233 and 391 cadets into Class 234. In Class 233, 37% of the cadets were women and 63% were men. In Class 234, 45% were women and 55% were men. The final attendee numbers for Class 235 have not yet been received by the Monitor's Office.

The Monitor's Office received a spreadsheet reporting that 502 civilians applied to pass through the recruitment process for Class 235. Many of these candidates still have not undergone all of the requirements outlined in Paragraph 106 and GO 501 (Recruitment), such as a psychological test, polygraph test, credit history check, etc. A total of 84 files were sampled and reviewed by the Monitor's Office, and no discrepancies were found between the Agreement, PRPB policy, and the recruitment process for these candidates.

During a meeting held in March 2024, the Monitor's Office was informed that 118 candidates were already approved to begin Class 235. Once the Monitor's Office receives documentation about all of the recruited candidates, a complete assessment will be possible for this paragraph and others. PRPB has 377 available positions approved to enter Class 235 during the current fiscal year.

The Recruitment Director is a proponent of hiring qualified candidates to be part of PRPB. Recently, as reported by the Recruitment Division, the majority of qualified candidates have been female. The current Recruitment Director understands the value and importance of diversity in the workforce. It has been mentioned to the Monitor's Office that in Classes 233 and 234, female candidates have consistently finished amongst the top 5 cadets in the areas of fitness, academics, and practical skills.

The Monitor's Office supports the efforts of PRPB to recruit qualified applicants from a broad cross-section of the Puerto Rican community, and to track recruitment and data thoroughly, so it can be provided to the Monitor's Office and the public.

## Pathway Forward

The Agreement states that inclusive selection practices are a requirement for this area, with the goal of diversifying the PRPB workforce. The Recruitment Division has done outreach to LGBTQIA+ communities, international communities, such as the Dominican inhabitants of the Commonwealth, and has visited districts and precincts across the island aiming to recruit potential cadets. PRPB has been authorized to hire 377 new cadets in the current fiscal year, hopefully continuing the trend of increasing representation of a broad cross section of the Puerto Rican community.

PRPB should prepare an Annual Report on the recruitment process and distribute to all PRPB members and the Puerto Rican community. The recruitment system should become completely automated to ensure accurate tracking of all recruits and the recruitment process. It is also recommended that PRPB train to their latest regulation once the Recruitment Strategic Plan and policy are approved. The approval of this Recruitment Strategic Plan should be completed by CMR-12, which is when these paragraphs will be reassessed. Recruitment in a large organization such as PRPB, if it is to be successful, must be

adequately resourced, both with personnel and funding. Finally, the Monitor's Office recommends that personnel and funding for this effort be enhanced so that greater success may become possible.

## 1. Recruitment Plan

During the reporting period, the Monitor's Office reviewed proposed updates to PRPB's Recruitment Policy (GO 501 - Recruitment) and the 2022/2023 Recruitment Strategic Plan and gave feedback to PRPB. The Monitor's Office has also interviewed members of the Recruitment Division, HR Division, PRPB officers, SAEA employees, and Paragraph 13 Implementation Plan committee members. The Monitor's Office also reviewed all pertinent forms and recruitment materials that are being used by the Bureau. It should be noted that as of March 2024, the new recruitment regulations and GO of the Recruitment Office, which includes the implementation of Law 20, are on hold until further thought and planning on establishing a cadet program are conducted. Under Paragraph 13, a sustainability plan has been submitted to the court. It is hoped by the Monitor's Office that a new Class 235 will be operational by CMR-11 to help fill the void of many retirements. Law 65-2021, which amended articles 1.02, 1.11, and 2.07 of Law 20-2017, is still awaiting implementation. Regulation No. 4216 was also amended and submitted for publication. The Monitor's Office understands that at the end of this reporting period, the Parties are reviewing documentation regarding the implementation of Law 20-2017, as amended, to recruit 18-year-old cadets.

### Paragraph 102: Recruitment, Selection, and Hiring - Recruitment Plan

*PRPD shall develop a recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community. PRPD's recruitment plan shall establish and clearly identify the goals of PRPD's recruitment efforts and the duties of officers and staff implementing the plan.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

#### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies and recruitment plans incorporate all of the requirements of Paragraphs 101-103. | ☑ Met | ☐ Missed |
| 2. Training on recruitment is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in recruitment policies and plans (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4a-d, f. PRPB's recruitment plan was developed, implemented, and evaluated in accordance with approved policies on recruitment. | ☑ Met | ☐ Missed |

| 4e. 85% of activities required by the recruitment plan and directed at recruiting underrepresented groups were implemented, including any missed activities that are reasonably justified. | ☑ Met    ☐ Missed |
|---|---|

*Compliance Assessment*

PRPB provided the Monitor's Office with a current draft copy of the Recruitment Plan for 2023-2024, which notes that one of the division's priorities is to train members of the Community Relations Bureau of the 13 police areas as recruiters. Though PRPB noted that its goal is to fully train recruiting officers throughout Puerto Rico in the future, gaps in training remain for the present reporting period. SAEA has not held a class on *How to be a Recruiter*, and PRPB did not provide evidence for the Monitor's Office to verify that 95% of sampled personnel have been trained and certified on recruitment policies and plans. The Monitor's Office notes that PRPB has not met their goals regarding training during this reporting period.

The Monitor's Office has not yet reviewed a training curriculum for recruitment personnel. However, the Monitor's Office is aware that the strategic plan continues to evolve and is involving other members of PRPB who are not assigned to the Recruitment Division. The Recruitment Office informed the Monitor's Office that a curriculum has been developed in line with the policy to train recruiters on the Recruitment Plan and methods. However, this updated curriculum awaits approval from the Commissioner's Office, and as such cannot serve as evidence of compliance for this reporting period.

The Agreement states that PRPB's recruitment plan must involve steps to solicit and consider stakeholder suggestions in good faith, identify barriers to recruiting underrepresented groups, and include initiatives to overcome those barriers. The Monitor's Office received correspondence during 2024 certifying that the Recruitment Director requested CIC participation for a review of the forthcoming GO. This policy remains at a standstill Law 65-2021, which amended articles 1.02, 1.11, and 2.07 of Law 20-2017, is implemented. The review of the Recruitment Policy (GO 501) is also awaiting a review since it was last approved during 2018.

According to PRPB's self-assessment in March 2024, a Recruitment Committee was established, as required by policy. This Committee has held discussions regarding the Strategic Recruitment Plan draft with CIC members, but the Monitor's Office has not received any other information or documentation regarding the meeting or a subsequent meeting in April 2024 (outside of the reporting period).

During the reporting period documentation was sent to the Monitor's Office confirming that a community policing initiative was sent to all PRPB Community Relations offices. Furthermore, the Recruitment Division submitted documentation certifying their participation in community outreach through various initiatives taken by the Recruitment Division, such as outreach and orientation activities in San Juan, Cataño, Rio Grande, Ponce, and Hormigueros.

The Monitor's Office has been informed of various initiatives by the Recruitment Division for the purpose of attracting minority members to work in PRPB. For example, the Monitor's Office saw a recruiting video that is currently seeking approval in which some cadets directly participated. Among the participating cadets, there were members of minority groups, recent college graduates, parents, military members, etc. The Monitor's Office recognizes the video to be representative of all the inhabitants in the

110

Commonwealth. Other practices had various consulates and CIC members participate in the construction of the Recruitment Plan. However, the Monitor's Office has not received finalized versions of these efforts, therefore this paragraph is still rated Partially Compliant. Also, in March 2024, the Recruitment Director attended a meeting in Patillas with a group of CIC members to seek their help in identifying candidates for PRPB.

Nevertheless, the Monitor's Office concludes that the Recruitment Plan requires modifications to include clear advertisement guidelines in alignment with community policing standards. The plan must highlight potential candidates' demonstrated qualifications or combination of skills in problem solving, critical thinking, leadership, interpersonal skills, mature judgment, communication, and strong ethics. Such modifications would lead to a higher assessment rating.

*Pathway Forward*

The Monitor's Office strongly recommends that a training curriculum be fully developed and approved as soon as possible. Training for recruiters is evolving and the Recruitment Director has mentioned that he has forwarded a proposed training curriculum to the Reform Unit. It is also recommended that the training curriculum be approved by the PRPB Commissioner and the DSP Director.

The Monitor's Office notes that there could be more outreach to CIC members and the Puerto Rican community for their assistance. The Recruitment Plan should include provisions that PRPB consult with community stakeholders and obtain recommendations to ensure a diverse candidate pool, including underrepresented communities in addition to the female population and Dominican nationals. Working together will ensure partnerships and good working relations among all groups in Puerto Rico. The Recruitment Division should also be familiar with the surveys which were given to community members and continue to partner with CIC members.

## Paragraph 103: Recruitment, Selection, and Hiring - Recruitment Plan

*The recruitment plan shall include specific strategies for attracting a diverse pool of applicants including members of groups that have been historically underrepresented in PRPD. A "Recruitment Officer" will be responsible for the development of the plan, together with a working group that includes officers from diverse backgrounds. The working group will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. The plan will include both outreach to the general population and targeted outreach to populations currently underrepresented on the PRPD force including, but not limited to, women and the Dominican population, through media outlets, universities, community colleges, advocacy groups, and other community groups that serve or are likely to reach such populations. The "Recruitment Officer" and his or her staff, as determined by the Superintendent, will be responsible for the implementation of the plan.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | | Annually |

|  Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 102.

*Compliance Assessment*

Although the Recruitment Division does not have an approved Recruitment Plan, it continues to perform inclusive hiring practices. The Recruitment Division has provided examples of ways in which their members have attempted to be inclusive and reach out to currently underrepresented groups in the PRPB workforce, such as females and Dominicans. As an example, the Monitor's Office has received documentation that the Recruitment Division has shared correspondence with Consulates, CIC members, etc. The demographic details in its classes also show a spike in female and international cadets. During the reporting period, the Monitor's Office also received evidence of numerous recruitment efforts throughout the island in San Juan, Carolina, Bayamon, and Ponce. Documentation was provided to the Monitor's Office demonstrating some work with CIC members and staff of various local universities to recruit from a wide range of Puerto Rican society. As an example, there were recruiting trips to the University of Ana G Méndez in February 2024 and a Facebook article published in 2024. Information was provided to the Monitor's Office referencing recruiting events during Police Week in March 2024. In February 2024, the Recruitment Division provided a local program, which was on the Teleonce Channel, explaining the recruitment process. The Recruitment Director mentioned that he has 1,500 new applications from high school seniors interested in serving with the PRPB.

*Pathway Forward*

The Monitor's Office recommends that PRPB should continue to hold conferences for the varied groups to whom it provides verbal and written information to promote the recruitment of candidates of diverse backgrounds. It should also continue to work with the Counsel of the Dominican Republic as well as other consulates and representatives of the LGBTQIA+ community to help promote recruitment in these communities. The Recruitment Division should be representative of the Bureau and be comprised of sworn and non-sworn members. Recruiting at PRPB should be creative and constantly evaluating which strategies are working and which are not, make changes when necessary to adapt, and use new social media tools that are available. It is also recommended that once Law 65-2021, which amended articles 1.02, 1.11 and 2.07 of Law 20-2017, is implemented, PRPB should make recruiting efforts in high schools like U.S. police agencies. The Monitor's Office feels that the above-mentioned recommendations should be added to the Recruitment Plan.

## 2. Hiring Reforms

The Monitor's Office concludes that PRPB has developed and implemented a recruitment selection system that meets most of the policy and practice requirements of Paragraphs 104-107. Nevertheless, PRPB receives only partial compliance on Paragraphs 104-107 due to lack of adequate training for recruitment officers and the unapproved Recruitment Plan. PRPB did not provide evidence demonstrating that SAEA has conducted trainings on *How to be a Recruiter*, and the Monitor's Office

determined that 95% of sampled personnel involved in recruitment had not been trained and certified on recruitment policies and plans. Hopefully, training will be given before CMR-12.

## Paragraph 104: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall develop an objective system to select recruits to enter into UCCJ. The system will establish minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices that comport with generally accepted policing practice and anti-discrimination laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 104-07. | ☑ Met | ☐ Missed |
| 2. Training on the recruit selection process is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in all recruit selection process policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4a. 100% of recruits meet qualifications required by policy. | ☑ Met | ☐ Missed |
| 4b. The recruit selection process was implemented in accordance with approved policies. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed numerous tools that PRPB uses to attract qualified applicants from a broad section of the community during this reporting period, including the current hiring brochure and the draft Strategic Plan for Recruitment and Hiring. PRPB provided lists of cadets for Classes 233 and 234, and potential cadets for Class 235. Based on this data, the Monitor's Office concludes that recruits accepted during the reporting period meet minimum requirement standards outlined in Paragraphs 104 and 105, and that the selection process meets the requirements of Paragraphs 104, 106, and 107.

PRPB provided documentation demonstrating that the Bureau continued to recruit adequate numbers of applicants for Class 235. The documentation provided has demonstrated that candidates are undergoing an assessment before entering the Academy, and that unqualified applicants are rejected. The current PRPB system does establish minimum standards for recruitment and an objective process for selection that comports with generally accepted policing practices.

Information provided by PRPB shows the status of applicants from October 2023 through March 2024. As reported previously, some of the candidates are still undergoing the recruitment process and tests, while others have been accepted or rejected. The various categories include background investigations,

113

polygraphs, psychological examinations, medical examinations, and physical fitness examinations. The Monitor's Office reviewed a sample of 84 files, finding that all of the files complied with policy and Agreement. This information should be made public without the names of the applicants to ensure confidentiality and total transparency.

*Pathway Forward*

PRPB should continue to ensure that their selection processes are consistent with generally accepted policing practices and continue their efforts in anti-bias and anti-discrimination policies. Though recruitment remains strong, PRPB must ensure continued compliance with the requirements of the Agreement by training all personnel on recruitment policies, especially recruitment officers. The Monitor's Office is optimistic that when relevant PRPB personnel are fully trained and operating the INTERBORO platform, their work will allow PRPB to better track information and outcomes for the recruitment process.

It is imperative that a training curriculum be developed for all PRPB members on antidiscrimination and anti-bias and that all members who are acting as recruiters be aware of the issues concerning these two topics.

## Paragraph 105: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall establish and publish qualifications for sworn personnel that are consistent with generally accepted policing practice. PRPD shall continue to require a two-year post-secondary degree, or its equivalent, as part of the requirements for sworn personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 104.

*Compliance Assessment*

Law 65-2021, which amended articles 1.02, 1.11, and 2.07 of Law 20-2017, is still awaiting implementation. Regulation No. 4216 was also amended and submitted for publication. The Monitor's Office understands that at the end of this reporting period, the Parties are reviewing documentation regarding the implementation of Law 20-2017, as amended, to recruit 18-year-old cadets. Although applicants are still required to obtain an Associate's Degree, per the Agreement and law, this change in applicant age presents an opportunity for PRPB to establish a viable cadet program.

114

The Monitor's Office provided PRPB with many examples of cadet programs from police agencies across the country. The Monitor's Office notes that it is a widely accepted policing practice to accept cadets from the age of 18 with key restrictions on the functions they are allowed to perform and specific requirements they must meet on the pathway toward full police officer status. In keeping with the language of the Agreement, the jurisdiction of which supersedes Puerto Rican law, PRPB could explicitly require that cadets who enroll meet all requirements before being sworn in, including attaining a two-year post-secondary degree.

*Pathway Forward*

PRPB's efforts toward establishing a cadet program have been discussed at several status conferences in 2024 and 253 Meetings, but a policy has not been completed by PRPB. The Monitor's Office urges PRPB to consider how a cadet program and lowering the age limit for hiring of police officers, with the stipulations of Paragraph 105 that all recruits attain at minimum a two-year post-secondary degree before being sworn in could serve to align articles 1.02, 1.11, and 2.07 of Act 20-2017.

## Paragraph 106: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall require all candidates for sworn personnel positions to undergo a psychological, medical, and polygraph examination to assess their fitness for employment with PRPD.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 104.

*Compliance Assessment*

PRPB policy requires candidates undergoing the recruitment process to undergo psychological, medical, and polygraph examinations to assess fitness for employment. The Monitor's Office determined these examinations to be consistent with policy and the Agreement after conducting a variety of document reviews including the files of cadets and recruits. The Monitor's Office has not yet reviewed a random sample of candidate files, which are current as of March 2024. These files will be sent by PRPB and cover October 2023 through March 2024. In past reviews of Classes 233 and 234, the Monitor's Office found files where the checklists were not filled out completely. In other cases, notes were written directly on the checklists. In some files, there was no identifying photograph. There should be an identifying photograph even if a candidate is excluded.

115

The Monitor's Office will review a sample of the files of accepted and unaccepted recruits once the candidates for Class 235 are finalized and have been certified. Until then, the Monitor's Office will continue meeting with the Reform Division and will be monitoring the actions conducted by PRPB contributing to the compliance of this paragraph.

### Pathway Forward

PRPB should continue practicing their current recruitment system as the representative samples of recruitment files appear to partially comply with policy. A recruitment curriculum should be developed as soon as possible so that PRPB members in other police areas can conduct generally accepted recruitment policing practices. It is also suggested by the Monitor's Office that all checklists filled out in the recruits' files. Further, a protocol should be developed to ensure that all recruit files contain the same information in the same order.

## Paragraph 107: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall assess and revise its policies and practices to ensure thorough, objective, and timely background investigations of candidates for sworn personnel positions based on generally accepted policing practice. PRPD's suitability determination shall include an assessment of a candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with diverse communities and act without impermissible bias. Favorable suitability determinations shall expire six months after the determination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed together with Paragraph 104.

### Compliance Assessment

The Recruitment Division gives the DSP Office of Safety and Protection the recruit files. The DSP Office of Safety and Protection performs the background investigation of each PRPB candidate. This includes an evaluation of each candidate's credit history, criminal history, employment history, use and abuse of controlled substances, ability to work with various communities, and to carry out duties without prejudice. During past CMRs, USDOJ and the Monitor's Office reviewed the manual used by the Office of Safety and Protection and recommended changes. Among these recommendations, USDOJ and the Monitor's Office suggested that PRPB should request key records from national databases including the Criminal Record Returns from the USDOJ's Bureau of Criminal Identification and Investigation, the FBI Criminal Record Return document, and the USDOJ Firearms Eligibility Clearance Return in a timely

116

manner. A review of the data from candidates' files in this reporting period demonstrates that background investigations are currently being completed in a timely manner. Favorable suitability determinations shall expire six months after the determination. Currently, the Recruitment Director indicates that the system is working but would like to see the results of the background investigations faster.

The compliance of this paragraph is crucial for executing other recruitment efforts and staffing plans. Alongside Paragraph 106, the Monitor's Office is aware of the process that the candidates for Class 235 should be undergoing on the psychological evaluations, polygraph tests, credit/criminal history, etc.

### *Pathway Forward*

The Monitor's Office recommends that PRPB continue to work with the DSP Office of Safety and Protection to implement the recommended revisions to the manual used in conducting background investigations on candidates. The Office of Safety and Protection should establish an information system that would allow it to efficiently request and review Criminal Record Returns. Once these data sources are accessible, their usage should be standardized in a revised manual, which would include changes in policy and procedure. The Monitor's Office will review and assess the timeliness of the background checks, whether they were objective, and all other requirements established by the paragraph.

### Paragraph 108: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD and the UCCJ shall revise and implement policies and practices related to hiring to ensure that PRPD recruits and cadets do not qualify for civil service employment protections until their aptitude and abilities are properly assessed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met  ☐ Missed |
|---|---|
| Note: This Paragraph is assessed, in part, with Paragraph 119. | |

### *Compliance Assessment*

The Monitor's Office has verified that PRPB has reviewed and implemented hiring-related policies and practices to ensure that PRPB recruits and cadets qualify for public service employment protections. These protections are only granted after a thorough evaluation of the candidate's skills and abilities. The Monitor's Office has reviewed the new Recruitment Regulation and found it to comply with the

117

stipulations of the Agreement and with widely accepted policing practices. The Monitor's Office has verified that this regulation has been implemented in training and practice.

PRPB has stated that candidates are subject to a probation period, which is required by PRPB. PRPB specialists review the rights of candidates during the probation period. The Monitor's Office notes that in May 2023, an updated Recruitment Regulation was provided for review; however, the Commissioner or DPS Director have not yet signed this document.

*Pathway Forward*

PRPB should continue to use the system that is in place, which defines the probation period and the rights of candidates. This information is noted in the regulation that establishes the standards and procedures for the recruitment of PRPB members. It is recommended that this same policy be approved by the PRPB Commissioner and the DSP Director as soon as possible. Law 65-2021, which amended articles 1.02, 1.11, and 2.07 of Law 20-2017, is still awaiting implementation. Regulation No. 4216 was also amended and submitted for publication. The Monitor's Office understands that at the end of this reporting period, the Parties are reviewing documentation regarding the implementation of Law 20-2017, as amended, to recruit 18-year-old cadets

## VI. Policies and Procedures

Policies and Procedures is assessed on an annual basis. Paragraphs 109 – 116 were assessed in CMR-9 and will be assessed again in CMR-11.

# VII. Training

The Parties collaborated to develop a Training Plan that received court approval on April 10, 2023. This comprehensive plan has been crucial in addressing various training issues, such as allocating hours, evaluating instructors, revising in-service and pre-service programs, enhancing the Field Training Officer (FTO) program, and implementing the Police Training Management System (PTMS). PRPB has been diligently working on the goals and tasks associated with this plan throughout the reporting period.

A training working group was established during this reporting period that is tasked with advancing the plan's outlined objectives. Developed by PRPB, the plan focuses on four core areas: the Training Program, PTMS, Instructors Program, and FTO Program. The group is committed to addressing previous findings and recommendations to ensure continual improvement. The primary objective of this initiative is to establish training environments that adhere to the highest educational standards. The working group is currently engaged in several key activities, including developing the training track module; creating a structured framework for organizing and delivering training content to officers; conducting a needs assessment; identifying areas for improvement and development within PRPB personnel; revising courses; ensuring existing training courses remain relevant and aligned with best practices; developing instructors; and certifying instructors within PRPB to deliver high-quality instruction. Through these initiatives, the working group aims to enhance the effectiveness and quality of training provided to PRPB personnel, contributing to their professional development and competency.

During this reporting period, PRPB made significant strides in its training efforts. This includes recruiting new instructors to address staffing shortfalls, recognizing the need to enhance the PTMS to collect and report real-time training data, and involving Community Interaction Councils (CICs) in the evaluation and revision of training materials. Additionally, PRPB is actively developing a needs assessment process through its training plan to better understand its current and future training requirements. These initiatives underscore PRPB's commitment to improving its training programs and ensuring they meet the evolving needs of its personnel and the community.

Overall, PRPB's compliance with the 18 Training paragraphs assessed during this reporting period reflects an improvement in levels of compliance compared to what was noted in previous CMRs. In CMR-8 61% of paragraphs (11 paragraphs) were assessed as partially compliant ad 39% of paragraphs (7 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 66% of paragraphs (12 paragraphs) were found to be partially compliant and 11% of paragraphs (2 paragraphs) were found to be substantially compliant. Four paragraphs (22%) moved to fully compliant. See figure 6.



*Figure 6. Training: Paragraph Compliance Status*

## Paragraph 117: Training - General Provisions

*PRPD shall ensure that every PRPD officer and employee receives effective and comprehensive training that ensures they understand their responsibilities, the scope of their authority, and PRPD policy, and are able to fulfill these responsibilities and police effectively. Qualified trainers and instructors shall deliver instruction through generally accepted methods and techniques that are approved by UCCJ and are designed to achieve clear and articulated learning objectives. Trainers and instructors shall utilize generally accepted evaluation methods approved by UCCJ to assess proficiency and competency.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | ☑ Met | ☐ Missed |
| 2. Training for trainers and instructors is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | ☑ Met | ☐ Missed |
| 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | ☐ Met | ☑ Missed |
| 5. Evaluation methods are used and documented in accordance with policy in 95% of selected training course files. | ☑ Met | ☐ Missed |

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 117-134, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

The training policies GO 703 (Training and Retraining) and GO 702 (Pre-Service Training Program), which outline instructor requirements, instructional methods, and evaluation procedures for pre-service and in-service training, were reviewed in October 2023. During this reporting period, the INS 108 Instructor Development course was delivered 3 times, expanding the pool of qualified instructors within PRPB by 40 instructors. Additionally, a report on 24 specialized topics taught in train-the-trainer courses was submitted, enabling instructors to teach these courses to PRPB agents. PRPB also provided the Monitor's Office with an updated list of trainers, their certifications, and the courses they are eligible to teach, meeting Target three requirements.

In June 2023, the Monitor's Office observed the REA 118 course on Investigation of DV Incidents at the Academy, which was delivered according to policy and instructor qualifications. Similarly, in July 2023, in-service training on REA 615R Retraining on Arrests and Informants in Ponce was observed, meeting policy and qualification standards.

However, a random selection of in-person training classes was not conducted during this evaluation period to maintain a 95% compliance rate, as per Target 4. This target is deferred until a 95% compliance rate is achieved and the Monitor's Office can observe additional courses.

The Monitor's Office also received and reviewed full course files for 14 in-service courses, each with course evaluations and documented changes. During the February 2024 site visit, pre-service training evaluations were audited, meeting evaluation process requirements and informing necessary training changes.

*Pathway Forward*

The interviews conducted with training coordinators revealed that the in-service training operations are facing significant challenges due to inadequate support. The recent increase in workload, especially with a larger pre-service Academy and the introduction of new promotions and training processes, has placed a considerable burden on the already understaffed SAEA. Moreover, officers being recruited to other parts of the Bureau from the Academy add to this strain.

It is crucial for PRPB to allocate the necessary resources for training staff, equipment, and reporting processes to meet its training obligations effectively. Neglecting these essential aspects not only impacts the quality of training but also hampers the overall efficiency and effectiveness of PRPB's operations. Addressing these resource allocation issues is vital for ensuring that training operations are adequately supported and can fulfill their objectives. For example, PRPB as outlined in the training plan, should continue the instructional development of personnel to complete training mandates.

## 1. Pre-Service Education and Training

The PRPB Academy plays a crucial role in providing foundational police training, covering areas such as policy, procedures, standards, assessment tools, centralized training records, core curricula, equipment, and technology guidelines. This foundational training, conducted by quality instructors using proper materials directly impacts the structural integrity and success of the entire Bureau.

122

In this annual review the pre-service training conducted by SAEA was found to be doing an adequate job in the policy driven training delivered to the cadets of the Academy. The curricula are being taught by qualified and experienced instructors both internally and externally to the Academy. The training hours are being met. The cadets provide evaluations and feedback on the coursework. Additionally, SAEA is exploring the processes associated with online training.

## Paragraph 118: Training - Pre-Service Education and Training

*UCCJ shall provide pre-service education and training to candidates for sworn personnel positions in PRPD in accordance with its enabling statute and regulations. To the extent that UCCJ will confer Associate or equivalent degrees recognized by nationally or regionally accredited institutions of higher learning in the continental United States, UCCJ shall maintain its license in good standing from the Puerto Rico Council on Education and attain full accreditation from the Middle States Association of Colleges and Schools within two years of the decision to confer such degrees.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 118-121. | ☑ Met ☐ Missed |
| 2. The pre-service training program, including curriculum and related training materials, is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. Training plans and standards are consistent with approved policies. | ☑ Met ☐ Missed |
| 4. 95% of personnel who complete the pre-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with training plans, standards, and policy. | ☑ Met ☐ Missed |
| 5. The pre-service training curriculum is reviewed and revised in accordance with policy. | ☐ Met ☑ Missed |
| 6. Findings and recommendations of bi-annual reviews of the pre-service training curriculum are submitted to the Commissioner in written reports. | ☐ Met ☑ Missed |
| 7. Needs assessments are conducted in accordance with policy. | ☐ Met ☑ Missed |

### *Compliance Assessment*

PRPB is required to conduct a comprehensive needs assessment to pinpoint any disparities between organizational objectives and individual performance goals. This assessment should encompass an evaluation of current skills and knowledge levels pertinent to pre-service training. Recognized gaps may encompass shifts in laws or policies, requirements for new equipment, and/or deficiencies in awareness

123

regarding non-discrimination practices. The overarching aim is to precisely assess training needs and streamline the delivery of knowledge and skills necessary for PRPB officers. The needs assessment has yet to be conducted; however, as per the training plan it is scheduled for December 31, 2024.

PRPB is no longer in an MOU agreement with the University College of Criminal Justice (UCCJ) and has taken over the delivery of pre-service training internally, without academic oversight. Efforts are underway to initiate an academic process for conferring Associate or equivalent degrees for pre-service training, although no official partnership with a university has been established yet. However, during this reporting period, the Monitor's Office noted that PRPB's ability to provide Associate degree-level education is closely being formalized with an institution of higher education. This will provide PRPB the ability to move forward with the academic offering of courses to meet the Associate degree requirements. The PRPB pre-service curriculum remains consistent with approved and updated policies. During this reporting period the curriculum update report indicated no changes were made. Therefore, Target two is met. Training plans and standards continue to align with policy, although several policy updates were received during this reporting period that should trigger corresponding curriculum changes. PRPB achieved a 95% threshold for pre-service training compliance, delivering education that adheres to training plans, standards, and policy. The Monitor's Office received training schedules and delivery plans that are in line with current policies. The Monitor's Office received a certification where PRPB self-reports that the semiannual review of the pre-service program has not been completed. Although proposed as part of the Training Plan, no training needs assessment was initiated during this reporting period. Overall, PRPB maintains compliance with reporting curriculum changes, with curriculum adjustments typically implemented upon the approval of new policies or procedures.

### *Pathway Forward*

PRPB, to manage its training responsibilities better, must conduct bi-annual curriculum reviews. To manage its training responsibilities effectively, PRPB is in the process of implementing a comprehensive needs assessment process. This assessment is crucial for identifying gaps between organizational and individual performance goals, particularly in pre-service training. It involves measuring current skills and knowledge levels, addressing changes in laws or policies, identifying equipment needs, and enhancing awareness of non-discrimination practices. The goal is to improve the accuracy and efficiency of training delivery to ensure PRPB officers have the necessary knowledge and skills for their roles.

### Paragraph 119: Training - Pre-Service Education and Training

*Once candidates meet all educational requirements and eligibility criteria, UCCJ shall establish and provide a pre-service training program for PRPD cadets consisting of at least 900 hours of instruction that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |

124

| Training: | Implemented | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

*Compliance Assessment*

During this reporting period, PRPB's pre-service training program remained robust, spanning 1,310 hours, which surpasses the mandated minimum of 900 hours. Both the curriculum and associated training materials were found to be consistent with approved policies throughout the reporting period. The instruction provided aligned with generally accepted policing practices, meeting the quality and content standards stipulated in the Agreement.

It is important to note that PRPB operates the Academy through SAEA, which is responsible for delivering the necessary training. PRPB has taken over all implementation and compliance responsibilities that were previously assigned to UCCJ. While PRPB was negotiating an academic relationship with the University of Puerto Rico (UPR) for online academic delivery, this partnership did not materialize. Currently, SAEA engages UPR instructors through individual contractual arrangements for specific training needs.

*Pathway Forward*

To maintain compliance with requirements, PRPB is required to submit the complete training schedule for the pre-service training Academy to the Monitor's Office for review. This submission includes a review of any newly added topics to ensure quality content. Additionally, observation of the training sessions allows the Monitor's Office to witness the training in practice, providing PRPB with an opportunity to demonstrate operational implementation of the training program as outlined in the relevant paragraph.

## Paragraph 120: Training - Pre-Service Education and Training

*PRPD and UCCJ shall review and revise its pre-service training curriculum to ensure quality, consistency, and compliance with applicable law, PRPD policy, and this Agreement. PRPD and UCCJ shall conduct regular subsequent reviews, at least semi-annually, and submit their findings and recommendations in written reports to the Superintendent.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | | Annually |

125

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

*Compliance Assessment*

PRPB reported (certificate dated October 16, 2023) that it had not conducted a bi-annual curriculum review of its pre-service training. However, during the April 2024 site visit (outside of the reporting period), the Monitor's Office obtained documentation indicating that revisions were indeed carried out, particularly in the areas of community policing training and UOF (INS 601R). This new information warrants further investigation and follow-up to ascertain the discrepancy between the reported status and the actual revisions made to the training curriculum.

*Pathway Forward*

To achieve full compliance PRPB must establish an academic oversight relationship with an institution of higher education, which PRPB is currently working towards. This could provide PRPB with an affiliation that can assist in an outside review process. This is important because an institution of higher education can provide a research foundation to improve lawfulness and legitimacy in policing activities, learned through training and education. During the pre-service training program, this is essential to the development of an officer's ability and authority to perform effectively with community members.

## Paragraph 121: Training - Pre-Service Education and Training

*PRPD and UCCJ shall develop an appropriate training plan and standards including, but not limited to, establishing appropriate passing criteria, attendance, and participation requirements, and valid evaluation methods, to ensure that cadets and officers attain necessary knowledge, skills, and competencies to implement all requirements in this Agreement. PRPD and UCCJ shall conduct regular needs assessments to ensure that training related to the implementation of this Agreement is responsive to the knowledge, skills, and abilities of the cadets and officers being trained.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

126

*Compliance Assessment*

PRPB self-reports that a needs assessment was not conducted during this reporting period. However, in the Training Plan submitted to the court on March 31, 2023, PRPB states its commitment to conducting a thorough needs assessment of its training capabilities by December 31, 2024. PRPB is currently working to conduct this needs assessment. This demonstrates an intended effort to address this aspect within the specified timeframe outlined in the Training Plan. PRPB recognizes the necessity for the development of a training needs assessment to effectively guide training priorities and objectives on an annual basis. This assessment will be particularly beneficial in fulfilling in-service training obligations.

*Pathway Forward*

PRPB is currently and will continue to develop a needs assessment to identify where gaps exist between organizational and individual performance goals. The assessment must also include a measurement of current skills and knowledge levels for pre-service training. Assessment of police training needs can provide critical information on the practical tools and curriculum needed for PRPB officers to be the most responsive to citizens. The goal is to assess training needs more accurately, and efficiently provide the clarifications and skills needed by PRPB officers.

## Paragraph 122: Training - Pre-Service Education and Training

*PRPD and UCCJ shall select and train qualified officer and academic instructors and shall ensure that only mandated objectives and approved lesson plans are taught by instructors. Instructors shall engage students in meaningful dialogue, role playing, and test taking, as appropriate, regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | ☑ Met | ☐ Missed |
| 2. Training for trainers and instructors is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | ☑ Met | ☐ Missed |
| 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB should maintain its current methods and practices to ensure that training aligns with mandated objectives, and that approved lesson plans are delivered by qualified instructors. The Training Sustainability Plan developed by PRPB addresses the need for additional training personnel, emphasizing the importance of rigorous selection to secure the best instructors for relevant topics. It is crucial for PRPB not to resort to quick fixes by hiring just anyone to teach, as this would not provide agents with the depth of knowledge and engagement that skilled instructors offer. Skilled instructors are adept at facilitating meaningful dialogue, conducting role-playing exercises, and testing on actual incidents involving PRPB officers. These methods aim to educate students on the legal and tactical aspects of such scenarios. During this reporting period PRPB conducted five sessions of the Instructor Training Course (INS 108). Each course had approximately 30 officers. This action will significantly help PRPB address the instructor shortfall. The availability of these instructors will be determined after they each take numerous train the trainer courses. This is designed so an instructor is available to teach any course that is needed.

*Pathway Forward*

PRPB should continue these methods and practices to ensure that training meets mandated objectives and approved lesson plans are taught by qualified instructors. PRPB's Training Plan addresses the need for additional training personnel, which PRPB is starting to meet. Moving forward, PRPB must continue its rigorous selection of obtaining the best instructors for the applicable topic. PRPB must not fall into a quick fix of just finding anyone to teach. That approach will not provide agents with the meaningful knowledge that skilled instructors would provide, such as engaging students in meaningful dialogue, role playing, and testing on actual incidents involving PRPB officers, with the goal of educating students regarding the legal and tactical issues raised by such scenarios.

## 2. Field Training Program

PRPB has developed a comprehensive Field Training Officer (FTO) Program for all new agents, recognizing it as an important and essential program within the Bureau. The mission of PRPB's FTO Program is to provide training that can lead to transformational change within the Bureau, fostering professionalism, ethics, and a commitment to the common good of society. This program, initiated in 2019, addresses the need for structured training for apprentice agents, building upon the foundation of the PRPB Code of Ethics (GO 617).

The FTO Program aims to improve the overall quality of police officers by providing practitioner training and evaluation oversight to probationary officers. It assesses the performance level of probationary officers and documents decisions regarding their retention in the Bureau. FTOs are authorized to train apprentice agents, focusing on post-Academy and on-the-job training, guided by a standardized curriculum for initial orientation and field training. The curriculum is designed to assist FTOs in helping apprentice officers transition their knowledge from the Academy to competent performance of general law enforcement duties in the field. It also addresses management responsibilities and legal issues raised by the courts, emphasizing the need for hiring and retaining only qualified employees to avoid legal liabilities.

128

A notable concern is the lack of compensation or incentives for FTOs, despite their significant time, attention, accountability, and mentoring responsibilities. While incentivization guidelines are not outlined in policy GO 701 (FTO Program), incentivizing the FTO program is a generally accepted policing practice and as of the latest reporting period, no FTOs have received incentives, raising concerns about the sustainability of the program.

Despite this concern, PRPB's FTO Program has expanded its coverage to five districts, demonstrating progress and commitment to new agent development. Plans are underway to provide FTO training in additional areas in 2024. The program's inclusion in the Training Plan submitted to the court reflects its importance in achieving the objectives of continued post-Academy training and development.

## Paragraph 123: Training - Field Training Program

*PRPD shall develop a field training program that consists of at least 800 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the substantive requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 123, 126. | ☐ Met | ☑ Missed |
| 2. The field training program, including curriculum and related training materials, is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of personnel who complete the field training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

The Monitor's Office received and reviewed GO 701 (FTO Program) in January 2023, but it had not received agency final approval by the end of the reporting period. The Monitor's Office submitted comments regarding the issue of compensation for FTOs. The Monitor's Office notes that while incentivization in the FTO program is not required per the Agreement, it is a general policing practice and thus we continue to stress the importance of integrating this as part of the policy and program. The policy as submitted was not approved, although other sections of the policy support PRPB's development and application of the Field Training Program in accordance with the Agreement's requirements. The FTO Program curriculum reflects generally accepted policing practices and is based on PRPB's model, with elements from the San Jose Field Training Program, a national standard.

129

*Pathway Forward*

PRPB is committed to continually improving the professionalism of its officers and providing the necessary resources to support the mission of the FTO Program. It is encouraging that PRPB aims to achieve this level of validation in its field training practices within three years. Despite this success, the Monitor's Office notes that compliance with this paragraph is contingent on PRPB's ability to meet general policing practices by incorporating incentives for FTOs. This also affects compliance with Paragraph 126.

## Paragraph 124: Training - Field Training Program

*PRPD's policies and procedures on field training shall delineate the criteria and methodology for selecting Field Training Officers ("FTOs"). PRPD shall permit only qualified officers to serve as FTOs. To determine qualifications, PRPD shall consider officer experience, disciplinary history, and demonstrated leadership skills, among other factors. PRPD shall strive to assemble FTOs that represent a broad cross-section of the community.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Selection devices used by the FTO evaluation boards are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Selected FTOs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 4. All FTOs who do not maintain eligibility are removed as FTOs in accordance with approved policies. | ☑ Met | ☐ Missed |

*Compliance Assessment*

During this reporting period, the Monitor's Office found that PRPB's FTO selection processes follow policy. PRPB self-reports it has 307 FTOs assigned to conduct training. The Monitor's Office received and reviewed GO 701 (FTO Program) in January 2023, but it has not received agency final approval. The policy satisfactorily provides the criteria of the selection process and requirements of being selected as an FTO. However, comments were submitted that addressed FTO compensation.

A review of 53 personnel folders contained eligibility documentation of officers proposed to serve in the FTO Program. These folders contained training completion documents, performance evaluations, and administrative complaints, internal investigations, and discipline files for each FTO candidate. After selection they are trained with a 40-hour FTO curriculum. The FTO curriculum is still up to date and no

130

curriculum changes have been made during this reporting period. It is upon completion of that training that they are assigned an apprentice agent.

There is a system in place to remove an FTO if needed. The removal process is initiated at the supervisory level and is then moved up to the commander rank. The Police Commissioner has final authority on the removal of an FTO from service. During this reporting period there were no FTO removals reported.

Overall, and in accordance with the documentation provided and reviewed, all FTOs meet eligibility requirements and PRPB has had no incidences in which FTOs needed to be removed from the program.

## Paragraph 125: Training - Field Training Program

*PRPD shall ensure that all FTOs receive training in the following areas: management and supervision; community-oriented policing; effective problem solving techniques; and field communication, among others. FTOs shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing community-oriented policing, and solving problems effectively.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Training for FTOs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of personnel who complete the training for FTOs are certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies | ☑ Met | ☐ Missed |

### Compliance Assessment

During the reporting period, both the FTO Program curriculum and associated processes were found to be compliant with the Agreement. The FTO curriculum adheres to generally accepted policing practices. PRPB reports that no curriculum changes were implemented during this reporting period, thus satisfying target two. PRPB ensures that FTOs receive essential training on topics necessary for properly mentoring apprentice agents. Document and file folder reviews of 63 FTOs assigned in Bayamon, Caguas, Carolina, Fajardo, and San Juan revealed completion of training in management/supervision, community-oriented policing, problem-solving, and field communications. Furthermore, the reviewed files contained certification of completion of FTO training, meeting the requirements outlined in the Agreement.

## Paragraph 126: Training - Field Training Program

*PRPD shall ensure that recruits in the field training program are trained in a variety of geographic areas within Puerto Rico; in a variety of shifts; and with several FTOs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 123.

### *Compliance Assessment*

PRPB recognizes the significance of apprentice agents training and does follow GO 701 (FTO Program) in the coordination and delivery of the program. During the December 2023 site visit to the FTO administrative office in Centro Mando, the Monitor's Office reviewed 31 apprentice agent files. These apprentices are assigned to the five regions conducting FTO training: Bayamon (12), Caguas (2), Carolina (5), Fajardo (2), and San Juan (11). The Monitor's Office found that the files thoroughly documented the entire training period and followed policy driven processes.

### *Pathway Forward*

PRPB should continue to follow the FTO policy and procedures in place to maintain compliance. Using the monthly FTO meetings for information exchanges between ranks can be beneficial. The Monitor's Office stresses the importance of resolving the issue of FTO incentives, as neglecting it can impact morale, staffing, and the overall effectiveness of PRPB's FTO Program. Although not currently stipulated in PRPB policy, as noted in Paragraph 123, incentives for FTOs should be prioritized by the Bureau in order for it to achieve compliance with the Agreement.

## Paragraph 127: Training - Field Training Program

*PRPD shall develop a program to assess FTO performance using appropriate evaluation tools. PRPD shall review and evaluate the performance of FTOs, with re-certification dependent on strong prior performance and feedback from other staff. Any recommendation from a FTO to terminate a trainee during their field training program shall be reviewed and evaluated by the chain of command.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Fully Compliant | Review | April 2023 – March 2024 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. The FTO performance assessment program incorporates all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for supervisors evaluating the performance of FTOs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of performance assessments for selected FTOs are within policy. | ☑ Met | ☐ Missed |
| 4. 95% of personnel files for selected FTOs who were recertified to serve as FTOs are within policy. | ☑ Met | ☐ Missed |
| 5. 95% of recommendations by FTOs to terminate a trainee from the field training program are reviewed and evaluated by the chain of command. | ☑ Met | ☐ Missed |

## Compliance Assessment

During this reporting period, PRPB reported that 307 FTOs were trained and actively working. Specifically, FTO 9061 training was attended by 335 FTOs, while FTOS 2061 was attended by 68 supervisors. The Monitor's Office conducted a review of a sample of 63 FTO personnel folders and concluded that the performance assessment required for this paragraph has been satisfactorily met. PRPB assesses its FTOs through supervisor evaluations, as stipulated in the Agreement. Upon reviewing FTO evaluations, it was determined that the FTOs are selected and re-certified satisfactorily. The FTO Program is currently meeting best practices and has been implemented across five area commands. As set out in the Training Plan, SAEA is prepared to integrate 200 hours of FTO training into the curriculum of the upcoming Academy class. Consequently, the FTO Program will consist of four phases conducted in the field.

## Paragraph 128: Training - Field Training Program

*PRPD shall create a mechanism for recruits to provide confidential feedback regarding the quality of their field training and their FTO, including the extent to which their field training was consistent with what they learned, and suggestions for changes to training based upon their experience in the FTO program.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | | Annually |

133

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for relevant personnel includes training on the feedback mechanism. | ☑ Met | ☐ Missed |
| 3. All relevant personnel are trained on the feedback mechanism. | ☑ Met | ☐ Missed |
| 4. Feedback and suggestions of recruits is considered when reviewing and revising the field training program. | ☑ Met | ☐ Missed |

*Compliance Assessment*

During this reporting period, the Monitor's Office reviewed 117 apprentice agent evaluation forms (PPR 701.5 - Evaluation by Apprentice Agent on their Assigned FTO), to gather confidential feedback regarding the apprentice agents' experiences during their FTO training. These evaluation forms request information from the apprentices regarding the consistency of their FTO training with what they learned in the Academy, as well as any recommendations for improvement based on their personal experiences in the FTO Program. The feedback provided by the apprentices was documented and found in their files. Subsequently, the feedback forms are reviewed by the FTO Commanding Officer and staff to assess whether any elements of the FTO Program need revision. Additionally, the Monitor's Office conducted interviews with FTO leadership to ascertain if comments and suggestions from apprentice agents are taken into consideration when reviewing and modifying the FTO Program. Notably, no recommendations for program enhancement were offered during this reporting period.

## 3. In-Service Training

Per paragraph 129, PRPB is required to conduct annual in-service training of at least 40 hours for all officers. During the CMR-6 reporting period PRPB presented various training pauses largely due to COVID-19, resulting in a low number of personnel receiving the required in-service training. However, PRPB responded with the development of some online courses to meet this challenge. In the CMR-8 reporting period, PRPB continues to deliver a low number of in-service training hours. The Monitor's Office's assessment of PRPB's compliance with training is based on the training documents submitted by PRPB and interviews with staff assigned to the Academy and others involved in the development/delivery of in-service training. Over the last year, PRPB has had to adjust its training delivery due to the larger than usual pre-service Academy - Class #233 which had over 400 cadets. The immediate training course development and delivery of the new sergeants' course to over 500 new sergeants were addressed in an expedited manner. There continues, however, to be a lack of sufficient training personnel available to meet the overall PRPB training responsibilities.

It is imperative that PRPB conduct the 40-hour annual training requirement for all agents. PRPB has stated it can achieve this requirement through online training. However, during the reporting period, PRPB self-reported that it is no longer in negotiations with UPR for the development phase of the virtual online training platform. The training would have been conducive to a 24-hour a day 7-day a week availability. Academy staff reports that online courses will be developed in-house and that it is in

discussion/collaboration with PRPB IT personnel to move in this direction. Online training is a viable method to support PRPB in required training mandates; however, the IT Bureau already has a high-work load, and it is not known if this objective is a priority.

Once the virtual training is established it will assist in achieving compliance. Completed training documentation, annual in-service training plans, instructor evaluations, and a substantive curriculum development process, with stakeholder feedback, are all still at a critical juncture for PRPB in its delivery of in-service training. PRPB must expand its pedagogical process to include these important points to ensure the quality, liability, and accountability measures are in accordance with the Agreement.

## Paragraph 129: Training - In-Service Training

*PRPD shall establish a mandatory annual in-service training program that consists of at least 40 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | | |
| Practice: | Not Implemented | Assessment Frequency | Annually |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 129-131. | ☒ Met | ☐ Missed |
| 2. The in-service training program, including curriculum and related training materials, is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of personnel who complete the in-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | ☒ Met | ☐ Missed |
| 4. The in-service training program includes training tracks in accordance with approved policies and the Agreement. | ☒ Met | ☐ Missed |
| 5. Reviews and revisions of the in-service training program are based on multiple factors in accordance with approved policies and the Agreement. | ☐ Met | ☒ Missed |

*Compliance Assessment*

PRPB has established a mandatory annual in-service training program spanning 40 hours, aligning with generally accepted policing practices in terms of quality and content, and reflecting the requirements outlined in the Agreement. Presently, PRPB has achieved the 95% compliance threshold for in-service training. While a training track model is currently in draft form, ongoing reviews and revisions are underway. This process includes the integration of community feedback mechanisms to ensure that the training remains effective and responsive to the needs of both officers and the communities they serve.

135

The review of feedback mechanisms is in place with various steps in soliciting attendees, auditing the training, feedback review, and implementation (if determined necessary) to the curriculum. However, during this reporting period only two courses were submitted to the Monitor's Office for review that contained documentation demonstrating the above feedback mechanism. The other trainings submitted for review during the reporting period only provided documentation demonstrating training delivery, not the feedback mechanism. PRPB also reports that 16 courses are in various stages of review or revision, which the Monitor's Office is unable to review at this point. Additional documentation is needed for compliance, highlighting the importance of ongoing monitoring and improvement in training documentation and delivery.

*Pathway Forward*

PRPB has successfully established a mandatory annual in-service training program spanning 40 hours, which aligns with generally accepted policing practices in terms of quality and content, and reflects the requirements outlined in the Agreement. Presently, PRPB has achieved a 95% compliance threshold for in-service training. This should be sustained as measurably as possible. Full use of the training track document scheduled for 2025 is essential for accurately tracking officer professional development. Ongoing curriculum reviews and revisions are underway. This process includes the integration of community feedback mechanisms to ensure that the training remains effective and responsive to the needs of both officers and the communities they serve.

## Paragraph 130: Training - In-Service Training

*PRPD shall create in-service training tracks for the following groups, including, but not limited to, command staff; lieutenants and sergeants; detectives; narcotics and vice investigators; specialized units; and professional responsibility investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 129.

*Compliance Assessment*

In this reporting period PRPB created a through in-service training track document tailored to various groups, including but not limited to command staff, lieutenants, sergeants, detectives, narcotics and vice investigators, and specialized units. This document aims to provide structured and targeted training programs to enhance the skills and effectiveness of personnel across different roles within the Bureau.

136

*Pathway Forward*

PRPB should continue to build upon its progress in this reporting period by further developing and implementing the comprehensive in-service training track document designed for diverse groups within the Bureau. These groups include command staff, lieutenants, sergeants, detectives, narcotics and vice investigators, and specialized units. The purpose of this document remains focused on delivering structured and tailored training programs aimed at improving the skills and performance of personnel across various roles within PRPB. Having a training track in place is not only beneficial but also considered a good standard for officer development.

## Paragraph 131: Training - In-Service Training

*PRPD shall identify critical in-service training topic areas based on an analysis of factors that include but are not limited to officer safety issues, community concerns, use-of-force statistics, internal affairs statistics, court decisions, research reflecting the latest law enforcement trends, individual precinct needs, and input from members at all levels of the Department, the Superintendent's Citizens' Interaction Committee ("CIC") and members of the community.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 129.

*Compliance Assessment*

The Monitor's Office received and reviewed 26 training course files, including those for REA 111 (Human Rights training). These files contain comprehensive documentation such as syllabi, presentations, administrative documents, evaluations, and revision records. They demonstrate PRPB's thorough analysis of various factors including officer safety issues, community concerns, UOF statistics, internal affairs statistics, court decisions, and the latest law enforcement trends. Additionally, input from members at all levels of the Bureau is considered. Although not explicitly noted in the documents, information obtained from a site visit in February 2024 revealed that the Superintendent's CIC and members of the community are actively solicited and accommodated to attend the training sessions to evaluate their methodology. This proactive engagement demonstrates PRPB's commitment to compliance with this paragraph. However, external stakeholders other than CICs did not engage in the committee's work, training design, or delivery. PRPB informs the Monitor's Office that for the next Committee Session on April 29, 2024 the CICs will be invited for training material suggestions. The Women's Advocate will be invited for the May 31, 2024, Committee Session. Additionally, Paz para la Mujer and the Specialized Prosecutors

of the Department of Justice are both invited to the Committee Session May 24, 2024, to assist in training design and delivery.

The Monitor's Office received two courses for review. However, to substantiate compliance with this paragraph fully, PRPB needs to provide additional courses for review. These courses should address the identified factors and demonstrate PRPB's efforts to align training content and methods with the evolving needs and standards of law enforcement.

*Pathway Forward*

Moving forward, PRPB must demonstrate a comprehensive analysis of various factors, including officer safety issues, community concerns, UOF statistics, internal affairs statistics, court decisions, and the latest law enforcement trends. Input from members at all levels of the Bureau should be actively sought and considered in this analysis. Furthermore, PRPB's proactive engagement with the Superintendent's CIC and community members during training sessions, as observed during a site visit in February 2024, reflects a commitment to compliance with this paragraph. PRPB should continue to solicit and accommodate input from these stakeholders to evaluate and improve training methodologies.

## Paragraph 132: Training - In-Service Training

*PRPD shall develop a comprehensive training program to supplement the 40-hour formal in-service training that is delivered at the beginning of shifts or tours of duty for all officers. Training may include special topics selected by UCCJ and precinct or unit Commanders that address constitutional policing, officer safety, readiness, community concerns, or departmental procedural matters.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Monthly meetings are consistent with approved policies and the Agreement. | ☒ Met | ☐ Missed |
| 3. 95% of selected monthly meetings comply with approved policies. | ☐ Met | ☒ Missed |

*Compliance Assessment*

During the reporting period, the Monitor's Office received and reviewed 75 files containing supporting documents and related materials for monthly training and informational purposes. These meetings, known as roll call training meetings, are intended to complement the mandatory 40-hour formal in-service training delivered at the beginning of shifts or tours of duty for all officers. However, despite their

existence, no training hours have been submitted for credit. The files did contain key documents such as agendas, sign-in rosters, and teaching objectives. After review of these materials, it is recommended that PRPB move towards providing training credit time to supplement the 40-hour training requirement.

PPR 704.1 (Agenda for the Monthly Meetings) is the designated form used to document these meeting elements. However, it was observed that PPR 704.1 is not consistently filled out to accurately reflect the time of the training. Specifically, the time field is often left blank, resulting in an absence of notation regarding the meeting's duration. This oversight leads to the inaccurate recording of training credit hours. Additionally, these monthly meetings are not reported to SAEA or PTMS to supplement the 40-hour formal in-service training, highlighting a need for better integration and reporting mechanisms to ensure comprehensive training documentation and credit allocation.

*Pathway Forward*

PRPB conducts monthly meetings, and these are well documented. Moving forward, it is imperative for SAEA to implement a structured and standardized process for documenting roll call training meetings to ensure accurate recording of training hours and comprehensive reporting to PTMS. This includes revising and enforcing guidelines for completing PPR 704.1 (Agenda for the Monthly Meetings) to include the date, time, and duration of each meeting. Additionally, SAEA should establish a protocol for reporting these meetings to PTMS to supplement the 40-hour formal in-service training and ensure proper credit allocation. Incorporating automated reminders and checks within PTMS can help maintain consistency and accuracy in meeting documentation, ultimately improving training record management and compliance.

## 4. Training Records

Training plays a crucial role in shaping the knowledge and skills of officers, ranks, and units within PRPB. While liability concerns should not overshadow all police matters, they do represent a significant aspect that must be carefully managed. PRPB must prioritize establishing a robust training record management process to ensure accuracy and completeness. Failure to maintain precise training records can expose PRPB to negligence, while diligent record-keeping helps mitigate liability risks.

Currently, PRPB relies solely on PTMS as its training record repository, but PTMS's functionality is limited in this regard. A comprehensive training management system should enable both administrators and officers to track, measure, and evaluate training modules effectively. However, the integration of training information between PTMS and the old system has not been completed, leading to a lack of a unified repository for all PRPB training hours. It is imperative for PRPB to expedite the migration of training systems to establish one general repository location for comprehensive training record management, thereby enhancing accountability and training effectiveness.

### Paragraph 133: Training - Training Records

*PRPD shall electronically maintain complete and accurate records of current curricula, lesson plans, and other training materials in a central, commonly-accessible, and organized file system.*

| Compliance Status | Assessment Schedule |
|---|---|

139

| Partially Compliant | | Review Period | April 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on the storage and preservation of training records and materials is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Training records and materials are stored and preserved in accordance with approved policies in 95% of selected courses. | ☐ Met | ☑ Missed |

## Compliance Assessment

SAEA presently employs the PTMS to house a standardized electronic training record. Within PTMS, comprehensive information such as course curricula and related teaching materials are stored. SAEA has communicated its ongoing efforts towards implementing an enhanced training platform aimed at facilitating improved tracking, maintenance, and reporting of detailed training records and statistics in real-time. This upgraded platform will encompass vital information including course descriptions and durations, curriculum details, training locations, instructor identities, attendance records, testing outcomes, and electronic copies of all training documentation. The Monitor's Office conducted an audit of administered training courses in 2023. Nineteen in-service courses associated with the 2023 training calendar were found to have all the required curriculum data. The audit successfully found PRPB stores and preserves its training materials in a manner consistent with approved policies. However, this did not include pre-service curricula or any other training as part of the Agreement, therefore not achieving the 95% compliance threshold. PRPB also informed the Monitor's Office that this was not a complete list of the courses offered in 2023.

## Pathway Forward

Moving forward, it is imperative for SAEA to capitalize on the robust capabilities of PTMS to enhance training efficiency and effectiveness. Leveraging PTMS's comprehensive features, such as centralized storage of course curricula, teaching materials, attendance records, and testing outcomes, will streamline administrative processes and ensure data accuracy. Furthermore, SAEA should explore integrating advanced functionalities within PTMS, such as real-time progress tracking, interactive learning modules, and automated reporting tools, to foster continuous improvement in training delivery and outcomes. Embracing these advancements will not only optimize resource use but also empower instructors and trainees with cutting-edge tools for a more agile and impactful training experience.

## Paragraph 134: Training - Training Records

*PRPD shall track, maintain, and report detailed, real-time training records and statistics. PRPD shall develop an electronic database to create and maintain records for each recruit and each sworn and unsworn member of the PRPD, including a standard electronic training record and electronic copies of certificates and other materials. The training records shall include the following information: the course description and duration, curriculum, location of training, and name of instructor. PRPD will provide the Superintendent with annual reports, or more often as needed, on training attendance and testing results.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The electronic database accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All training records and statistics are tracked in the electronic database. | ☐ Met | ☑ Missed |
| 3. Training reports provide current and accurate information to the Commissioner. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB has successfully instituted a mandatory annual in-service training program, comprising a minimum of 40 hours, which aligns with established policing standards in terms of both quality and content. This program reflects the requirements outlined in the Agreement, with PRPB boasting a compliance rate of over 95% in the current reporting period. PTMS is being updated with the specifications to track, maintain, and report detailed, real-time training records and statistics.

The annual training report provided to the Commissioner is still in development and once complete will provide the Commissioner with the course, training attendance, and testing results of each course offering. This report is expected to be complete by June 2024. The current report submitted to the Commissioner does not include the specific requirements in this paragraph but did include courses not offered in 2023. The new template will provide an accurate and timely report to the Commissioner. Further, PRPB continues to use two methods to document training credits in the areas. The training coordinators use both PTMS and Excel documents to document training credits. PRPB should use one platform for documentation. Using two systems doubles work hours and is not efficient.

*Pathway Forward*

PRPB has successfully instituted a mandatory annual in-service training program, comprising a minimum of 40 hours, which aligns with established policing standards in terms of both quality and content. SAEA continues efforts towards implementing an enhanced training platform (PTMS) aimed at facilitating

141

improved tracking, maintenance, and reporting of detailed training records and statistics in real-time. This initiative is essential for providing the Commissioner with real-time training data that accurately reflects the requirements outlined in the Agreement. By leveraging PTMS's capabilities, SAEA can ensure seamless integration of training programs with organizational goals and compliance standards, thereby enhancing overall training effectiveness and accountability.

## VIII. Supervision and Management

During this reporting period, the Commonwealth demonstrated significant improvement leading to increased compliance with this section of the Agreement. Among its accomplishments during this reporting period were: promotions, expected promotions during 2024, a new evaluation system, and the assignments of promoted first line supervisors. Despite the fact that the Commonwealth promoted a considerable number of supervisors, it still struggled to follow through with supervisory accountability and failed to develop and institutionalize adequate information technology systems to support supervision (i.e., Early Intervention System (EIS), personnel assignments records, statistical accomplishments), continuing to interfere with PRPB's progress towards substantial compliance.

A total of 91 officers passed the Captain's examination and attended the 40 hour training offered at the Police Academy on February 26, 2024. These promotions are expected to take place in August 2024. This achievement will bring PRPB closer to the number of supervisors outlined in the Staffing Plan. In addition, PRPB is also currently working to promote 1st and 2nd lieutenants by October 2024. The Monitor's Office looks forward to reviewing the complete promotional process.

The development of EIS continues to be dependent on the implementation of the IT Corrective Action Plan (CAP). Inspections and audits also continue to be a concerning issue due to lengthy inspection completion and certification times. It was reported that the Commonwealth is still working with the OSM to draft policies and protocols related to Integrity Audits.

During officer and supervisor interviews, concerns regarding the transfer unit, assignments, evaluations, shortages of vehicles, and low budgets for vehicle repairs were raised. Personnel responsible for Staffing Plan updates, human resources personnel, and high-ranking officials, confirmed that they were aware of these concerns and noted that they are working on correcting them. PRPB is showing improvement in providing proper supporting documentation demonstrating its commitment towards the areas of concerns noted by the Monitor's Office. During this reporting period an improvement in roll call meetings was identified during the interviews. Several officers reported that some meetings or roll calls are taking place before taking over their shifts but stated that these meetings are not being documented. They credited the accomplishment to the number of new supervisors. PRPB needs to continue pushing for training meetings and roll calls, while ensuring they are documented. It should be required to meet with personnel before taking over a shift.

PRPB implemented the new evaluation policy in January 2024, however, it has yet to provide proper and effective training on the policy even though the system is in place and over 95% of personnel have received their evaluations. The Monitor's Office reviewed 92 samples of evaluations and the scores were consistent. At this point, based on the samples and interviews, no inflation of scores was detected. During several meetings with HR, it was reported that training for the new evaluation system will take place during 2024. HR and Staffing Plan personnel provided videos and PowerPoint presentations to current supervisors on how to use the technology that is part of the evaluation, which the Monitor's Office reviewed. It was determined that the videos and PowerPoint presentations were effective in teaching the system. However, an effective and more complete training should teach supervisors how to determine fair and effective scores and, more importantly, how to write the summaries supporting the scores. This training is imperative to the success of the new policy.

Overall, the Commonwealth's compliance with the 24 Supervision and Management paragraphs assessed during this reporting period reflects improved levels of compliance to what was noted in previous CMRs. In CMR-8, 25% of the 24 paragraphs (6 paragraphs) were assessed as partially compliant and 58% of the 24 paragraphs (14 paragraphs) were assessed as not compliant, in comparison to the current reporting period, where 50% of the 24 paragraphs (12 paragraphs) were found to be partially compliant and 33% of the 24 paragraphs (8 paragraphs) were assessed as not compliant. Two paragraphs (8%) moved to fully compliant. See figure 7.



*Figure 7. Supervision and Management: Paragraph Compliance Status*

## Paragraph 135: Supervision and Management - General Provisions

*PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243.

144

*Compliance Assessment*

PRPB supervision policies set clear expectations and requirements for supervisors that are consistent with generally accepted policing practices. During this reporting period, PRPB started to provide a more complete, accurate, and real-time understanding of operational activities and staffing challenges across the Bureau, demonstrating improvement with reporting and tracking. Based on interviews with high-ranking officers and entry level officers, there has been an improvement in communication amongst themselves, the administration, and personnel. The Monitor's Office recognizes this improvement but recommends that effective communication continues to improve and that the concerns and needs provided by the high-ranking officials in the field be taken into consideration.

Interviews with personnel, supervisors, and supervisees again confirmed that supervision loads have improved across 95% of the Bureau. It is expected that by FY2024 PRPB should reach 100% compliance, which would be reflected during the CMR-11 reporting period. The promotion of a considerable number of first-line supervisors should address issues currently identified as non-compliant, such as: supervisors developing the ability to identify, detect, and prevent misconduct, to provide better direction and guidance to assist officers in becoming more effective in performing their duties, and the successful application of accepted policing practices.

*Pathway Forward*

The Parties and the Monitor's Office will continue to work on the implementation of the updated Staffing Plan. The Monitor's Office will continue to review the 90-day status reports to assess the Commonwealth's progress to achieve compliance with the staffing and supervision requirements of the Agreement and the initiatives and activities noted in the Staffing Plan.

PRPB has shown some improvement with reporting, but it needs to continue to work on providing more accurate, updated, and consistent reports to confirm that officers and supervisors are receiving trainings, schedules, and assignments consistent with supervision policies and the Staffing Plan, which specifies the ratio of officers and supervisors per unit. Documentation, such as staffing logs, should be provided to the Monitor's Office.

## 1. Duties of Supervisors

As reported in other reporting periods, first-line supervisors must provide effective, clear, and consistent supervision of subordinates under their command. Supervisors should be able to motivate their officers to perform their duties lawfully, safely, and effectively. During this reporting period, supervision levels and in-person training continue to improve. With the substantial amount of first-line supervisor promotions, PRPB will be able to provide effective management over officers in the field across all shifts in all area commands once appropriate experience is achieved until then more experienced supervisors should mentor new supervisors. As in the prior reporting period PRPB continues to move towards partial compliance with these paragraphs. However, PRPB needs to continue to have a plan in motion to establish recurring and effective promotional cycles to achieve and maintain substantial levels of compliance even after the Agreement is complete. HR must also provide training on how to effectively document and discuss performance evaluation following the new system that was implemented in January 2024.

PRPB must develop and implement an updated and effective automated technology system to support the accurate, updated, and consistent reporting of statistical records of its personnel to confirm that officers and supervisors are receiving trainings, schedules, and assignments consistent with supervision policies. EIS must also be finalized, trained on, and deployed to allow for a holistic supervision approach.

## Paragraph 136: Supervision and Management - Duties of Supervisors

*All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 136-140. | ☑ Met | ☐ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | ☑ Met | ☐ Missed |
| 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | ☑ Met | ☐ Missed |
| 6. 95% of interviewed personnel perceive that supervision is close and effective. | ☐ Met | ☑ Missed |
| 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

Based on the Staffing Plan and the approval and implementation of GO 310 (Performance Evaluations), it was determined that current policies incorporate all requirements established in Paragraphs 136-140. This was also confirmed during interviews with a random sample of PRPB supervisors. The supervision training curriculum has been reviewed by the Monitor's Office and has been implemented by PRPB and is consistent with approved policies. The required mandatory supervision trainings will improve the Bureau's quality of supervision. The Agreement stipulates that supervisors must receive approved training before they are allowed to assume their positions in PRPB. PRPB reported that all first line

146

supervisors have attended the mandatory 40-hour training at the Academy, consistent with approved policies. PRPB must continue to offer supervisor trainings on a yearly basis.

During the reporting period, the Monitor's Office identified an improvement in officer and supervisor schedules, assignments, and ratios. PRPB provided a Staffing Plan status report that stated the redistribution of personnel has been completed. With the recent promotion of first-line supervisors, the overload of assignments, morale issues, and lack of effective supervision reported by PRPB members, and the Bureau as a whole should be addressed, making the agency a more professional, respectful, and effective organization.

With the considerable number of first-line supervisors and captains promoted during the reporting period, PRPB has made considerable progress in achieving compliance with this paragraph. However, PRPB is still only partially compliant due to the recognized issue of lack of personnel throughout the reporting period. As soon as the recently promoted supervisors acquire and develop the necessary experience to perform at high levels, the challenges should be addressed, including the inability for PRPB supervisors to work the same days and shifts as their supervisees. PRPB personnel are recognizing this improvement as noted during interviews and conversations. It is expected that during future CMRs, these challenges should continue to decrease.

The overall understaffing of personnel is the biggest challenge to address. The provided Staffing Plan reported that the Fiscal Oversight Board approved a total of 377 cadets during the current fiscal year which should help address the lack of officers. DSP and the PRPB Police Commissioner approved the recent graduates in January 2024. In addition, in March 2024, 38 civilians were hired, releasing 37 police officers from performing administrative functions and re-assigning them to their official duties. HR advised that their goal is to hire 500 civilians by the end of 2024 and another 500 by the end of 2025. These hirings will allow DSP and PRPB to approve the reassignments of officers performing civilian jobs, addressing the understaffing. HR reported that they have initiated communication regarding this initiative.

PRPB also reported the development of a system to promote recruitment and create incentives, retention, and professional development strategies to increase the number and quality of personnel. PRPB needs to continue to work towards improving recruitment methods to attract candidates to the organization and create incentives to retain current officers.

*Pathway Forward*

DSP and PRPB promoted a large number of first-line supervisors and high-ranking officers demonstrating their commitment to address the lack of supervisors and administrative issues in PRPB. These improvements were reflected during this reporting period and will have further impacts during future reporting periods. However, a high percentage of interviewed personnel expressed that the promoted first line supervisors need better guidance from experienced supervisors. This guidance in conjunction with experience acquired during real-time decision-making situations, will make them more effective supervisors. DSP and PRPB should begin succession planning for the possibility of a large number of officers retiring due to the recently approved retirement plan. The Monitor's Office will continue to evaluate PRPB's compliance within this paragraph.

## Paragraph 137: Supervision and Management - Duties of Supervisors

*First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

### Compliance Assessment

With the promotion of first-line supervisors and high-ranking officials, as well as with the expected 2024 promotion of captains, 1st, and 2nd lieutenants, PRPB will be heading towards compliance and, more importantly, towards making a major impact on the Bureau's supervision system.

PRPB provided the Monitor's Office with PPR 373s (Distribution of Personnel) samples for several areas demonstrating that over 95% of supervisors are not supervising more than 10 individuals. During interviews, supervisors and supervisees are confirming that most supervisors do not supervise more than 10 officers. In addition, in the past it was reported that supervisors supervised officers in at least three different area commands, but during this reporting period, no one reported this issue, showing improvement. Some supervisees reported having concerns with the new supervisors due to their lack of experience during decision making situations.

Supervisors interviewed during this reporting period reported equality in assigned supervisees. Also, during this reporting period, no lieutenant or captain was assigned to the same unit when other units had none assigned, this was also confirmed during the review of the staffing logs. This demonstrates that PRPB has made improvement towards better and more effective assignments.

During this reporting period it was determined that most sergeants are consistently working the same shift as the officers they supervise. The PPR 373s (Distribution of Personnel) are consistent with what is being reported by interviewed personnel. The Monitor's Office expects to see continued improvement in this area in future CMRs that will result in compliance with this paragraph. However, PRPB still must

continue to address issues related to supervision, training, and policy. In addition to supervisors getting familiar with trainings and policies, it is imperative for them to be exposed to high pressure situations in their day-to-day work, so they can become well rounded supervisors. PRPB created dashboards connecting Kronos HR/T&A and SITA; however during IT presentations, it was reported that the dashboards have not been finalized. It is expected that once the information technology systems are in place, these dashboards will be fully functional, reliable, and validated. The systems will enable PRPB to produce monthly reports regarding the distribution of personnel and recruitment reporting deficiencies as well as recommendations to DSP and the PRPB Commissioner for their approval. The Monitor's Office recognizes PRPB for the improvement in this paragraph, but still finds that PRPB is only partially compliant with Paragraph 137 mainly due to the lack of an adequate information technology system to support supervision, especially as is relates to reporting accurate and efficient staffing data.

### *Pathway Forward*

PRPB continues to show minimal improvement in IT systems. The Monitor's Office recognizes some improvement, but PRPB continues to have issues identifying accurate and efficient staffing data. During the Monitor's Office site visits, IT demonstrations were presented to the team; however, while several demonstrated improvements, others did not. PRPB needs to develop a consistent and effective data processing system that enables them to provide the Monitor's Office with more accurate and efficient staffing data. An effective data system will assist PRPB with the monitoring of supervision practices and workloads and will aid upper management with the overall supervision system of the Bureau. The Monitor's Office, DSP, and PRPB management continue to work with Gartner Inc. to develop and implement an accurate automated system that should provide PRPB with the ability to generate accurate and real-time data reports from the 13 area commands to account for their personnel, including management responsibilities for each of the departments.

### Paragraph 138: Supervision and Management - Duties of Supervisors

*PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

149

*Compliance Assessment*

With the promotion of first-line supervisors and high-ranking officers, in addition to the expected promotion of captains, 1st, and 2nd lieutenants during 2024, PRPB will be achieving a long-term goal in their commitment. With these promotions, as well as their strategic assignments, PRPB will be able to provide and demonstrate a more consistent, effective, and professional supervision, which should close the gap to compliance for this paragraph. This accomplishment will promote much-needed security and respect from the community. As soon as these supervisors are in place, well trained, familiarized with policies, and most importantly, have developed the necessary experience to make correct, effective, and sound decisions during the day-to-day duties, PRPB will accomplish one of the most critical elements in a law enforcement agency. PRPB leadership will have sufficient first-line supervisors to cover supervisory absences and the need for acting supervisors covering first-line supervisor duties will not be necessary. DSP and PRPB have worked together and demonstrated their commitment to the Staffing Plan.

The Monitor's Office recognizes the dedication by DSP and PRPB to implement this effective strategy to ensure that supervision in PRPB reaches the highest possible levels. The promotions awarded at all levels of supervision have significantly closed the gap to compliance with this paragraph. PRPB submitted an official distribution of the promoted supervisors to comply with staffing needs. The Monitor's Office also recognizes the commitment to bring the supervisory staff up to the required levels that will make PRPB effective, efficient, credible, and will earn the needed community admiration and respect. DSP and PRPB management have never had any issues recognizing the need for an updated and effective automated technology system in support of statistical records of their personnel, but this system is still in the development stages. This automatic system will include the assignment and duties for supervisors substituting in for absent supervisors to ensure consistency within the affected unit.

*Pathway Forward*

The Monitor's Office continues to identify the lack of an updated and effective automated system within the Bureau. PRPB needs to track statistics that will keep the Bureau's personnel and information updated and accurate. The Monitor's Office, DSP, and PRPB are currently working and coordinating with Gartner Inc. to develop and implement an effective automated system. DSP and PRPB recognize the need and are aggressively working to establish an effective system that will help them correctly account for information, statistics, workload, and crime analysis data for all investigative divisions. This automated system will enable the Bureau to be effective, efficient, and credible in addition to complying with the Agreement.

The Monitor's Office recognizes that PRPB has made some improvements in capturing and tracking UOF reporting as a result of the Staffing Plan. The Monitor's Office will continue to work with PRPB as it implements the initiatives identified in the Staffing Plan.

## Paragraph 139: Supervision and Management - Duties of Supervisors

*Precinct and unit commanders shall closely and effectively supervise the officers under their command.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2023 – March 2024 |

150

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

## Compliance Assessment

During this reporting period, the Monitor's Office interviewed a random sample of approximately 15 supervisors and 52 supervisees, and reviewed limited documentation of evaluations, staffing logs, and disciplinary records. Due to the lack of an adequate information technology system the Monitor's Office cannot provide a comprehensive analysis based solely on interviews and the limited documentation provided by PRPB. However, based on the information strictly developed through documentation and interviews, the Monitor's Office will give PRPB some credit as to providing close and effective supervision. The Monitor's Office will be able to provide a more complete and comprehensive analysis at the time of the new technology system implementation. The recently promoted supervisors, even with their lack of supervision experience, reviews of logs, performance evaluations, and the non-punitive module, support this conclusion. Common themes discussed during these interviews continued to be very similar to what has been reported in past CMRs. Additional new comments were in relation to the lack of experience of the new supervisors and that experienced supervisors are not very knowledgeable of the new evaluation system. The following comments were also made or repeated by interviewees:

### The Agreement

Officers advised being familiar with the Agreement, but no one reported completely reading the Agreement. One common comment made was that they reported being familiar with the UOF section. The main reasons provided for not reading or being familiar with the entire Agreement was a lack of time, and too many assignments and responsibilities due to the shortage of personnel. Furthermore, again over 99% of interviewees expressed favorable and positive comments on the entire PRPB organization, giving credit to the Agreement. Consistent statements made by officers as well as supervisors include the following:

"The Agreement has made us a professional organization, has provided more effective and better guidance for management as well as for officers. Among the skills developed are better decision making, training, equipment, organizing and planning. The communities are understanding and accepting our responsibilities, risks, and dedication to serve and protect. We feel supported by our management and our communities. Sections of the Agreement most commonly discussed during the monthly meetings is the UOF section."

### Consistent Supervision

The promotions at all levels of supervision are providing PRPB with the ability to comply with the Staffing Plan, the Agreement, and become a more effective and well-respected organization. Interviewed

151

supervisors expressed that the promotion of new sergeants has released them from additional duties allowing them to be more effective and only responsible for no more than 10 officers. They also advised that evaluating 10 or fewer officers will give them adequate time to conduct a more fair and effective evaluation of each officer. In addition, they will only evaluate officers that they directly supervise. Supervisors will now have someone to take over supervisory duties when a supervisor retires, transfers, goes on sick leave, or vacation. The Monitor's Office believes that with the recent promotions, supervision at PRPB will reach a more consistent and effective level leading to compliance with the Agreement.

The issues identified with the shortage of supervision should greatly improve in future reporting periods and sergeants will not have to work long hours on the streets, making them more effective in performing their official duties. However, at any point, sergeants should be able to provide assistance in the field. The new supervisors should also eliminate the need for acting supervisors. Addressing these issues will improve the lack of communication among high-ranking officers, which was previously reported as a challenge. Instructions or directives will be provided in time and properly, which will minimize mistakes and increase compliance with orders.

As in the past several reporting periods, interviewees reported issues with disarmed officers assigned to civilian administrative work getting paid regular officer salary. Among the assignments are physical maintenance, building repairs, and vehicle maintenance. Interviewees reported that this issue is well known by management, especially with some of those officers reporting having emotional or personal problems to purposely be put on light duty, while still getting their regular pay. The Monitor's Office has expressed several times that this system needs to be reviewed and managed in a way that officers abusing the system can be correctly identified and medically assessed to determine when they can return to duty or if incapable of performing law enforcement duties, be re-assigned to a civilian position, and be compensated accordingly. The Monitor's Office believes this is fundamentally unfair to all those concerned and is a significant issue for morale within PRPB. In the Staffing Plan, it was reported that approximately 674 officers have been identified as having medical issues and assigned to administrative duties. It was also reported that during 2024, 323 of these officers (48%) will be examined by a Medical Board to determine their capability to return to officer duties.

## Promotions

A significant number of interviewed officers stated no interest in seeking a promotion. The main reasons provided for the lack of interest continued to be the same: supervisors not motivating personnel, low salary increases with more responsibilities, and most importantly, the fear of being transferred out of their current region. However, some officers recognized that a high percentage of the recently promoted personnel were assigned in their territory. This action by PRPB administration will diminish the concerns of being assigned out of their territories if promoted. Qualified and competent officers will gain interest in promotions, helping PRPB to get the best and most competent candidates for supervision.

## Equipment

All interviewed officers reported being pleased with their personal equipment (tasers, bullet-proof vests, flashlights, etc.). However, officers continue to express the need for specialized vehicles such as SUVs to cover difficult terrains in their territories. Most officers continue to advise that most of the patrol cars

do not contain computers, or if they have computers, they do not properly work, forcing officers to return to their offices to complete reports.

Not having working computers in the vehicles prevented officers from accessing vehicle and personnel records during traffic stops that can, on some occasions, turn into a safety issue. Officers have to call the office or "Centro de Mando", which can take up to 30 minutes and can upset the civilian, turning into a safety issue. They also stated there have been situations where after issuing a ticket, officers do not know if the driver or others had an arrest warrant or a criminal record, which is another security issue. Like in the past, officers advised that their personal cell phones are the most reliable communication tool. All interviewed personnel reported that officers use their own money to repair official vehicles. Such repairs included brake pads, air conditioning systems, tires, and other minor repairs. Also, some repairs are done by the officers themselves. Officers reported that the reason for this situation is due to budget constraints. They stated that sometimes disabled vehicles can be parked for months, years, or sometimes forever.

## Evaluations

During this reporting period the new evaluation system was implemented. Officers again stated not having any interest in the performance evaluation system and believe that the evaluations have no relevance to their job or future careers. Most stated that they just agree and sign their evaluation. However, officers did advise that supervisors discussed the evaluations with them regardless of the score, as required by the new system. Over 95% of officers interviewed advised that they received evaluation ratings between 3 and 4. During this reporting period, PRPB provided 92 performance evaluation samples. For the first time the Monitor's Office determined that a score inflation was not detected. However, during the interviews, officers reported that they felt that the supervisors were not very knowledgeable of the new evaluation system. Officers explained that supervisors emailed them their evaluations for signature and then they had a one-on-one meeting. Several meetings with HR in January and February 2024 revealed that PRPB did provide a PowerPoint presentation and videos on how to use the new system but did not provide any training or guidance on the implementation, writings, discussions, and justification of scores. HR advised that training will be developed and provided during 2024, before the next evaluations are scheduled for January 2025.

## Transfers

All interviewed officers believe that the transfer system is not what the policy promotes. Officers continue to report that they believe transfers take too long and that it continues to be influenced by friendships, connections, and politics. They have no faith in the program. Interviewees believed that the transfer program is one of the biggest morale problems among officers. Regional transfers can take up to 15 years. Interviewees stated that it is well known that some officers are being transferred from the bottom of the seniority list. Over 95% of the officers expressed that the transfer policies are a problem that needs to be acknowledged and handled by upper management. HR advised that the automation of the transfer system started the first phase in November 2023 and the second phase in January 2024.

## Community Relations

Officers acknowledged that each department or precinct has designated personnel to engage with the community. Several of the interviewed officers believe that it is solely this designated personnel's

153

responsibility to participate and represent PRPB during any community events. Officers advised that due to personnel shortages, they have too many responsibilities and assignments to directly participate in community activities. Officers advised that it was the upper administrative leaders who created specialty units or assignments to represent PRPB in the community, taking the responsibility away from officers so that they can dedicate their time to daily investigative work.

## General Observations

- Positive areas that were mentioned:
  - The Agreement is seen as a positive and a necessity;
  - Communication among officers;
  - Younger supervisors are becoming more professional and committed;
  - Payment for overtime hours has improved;
  - Steps to get better pay has improved;
  - Supervisors are open to considering new ideas and change;
  - Approval of the Commissioner;
  - Increased and enhanced professional instruction from supervisors;
  - Working conditions, training, and equipment have improved; and
  - The required 40-hour training, when available, has become easier to schedule.
- Areas needing improvement that were mentioned:
  - Written communication: Most interviewees stated that communication was primarily verbal. The perception is that written communications can be an issue for supervisors;
  - Supply shortages were not only reported but noted during precinct visits;
  - Increased and enhanced recruitment and retention programs to help with the lack of personnel;
  - Removal of political influence from PRPB, especially relating to transfers;
  - Improvement of the pension plan and benefits, which will in turn attract better candidates;
  - Some of those interviewed stated that cars and equipment are somewhat accessible, but PRPB needs to increase the budget for the purchasing of equipment, car parts, and the ability of repairing cars as quick as possible to better equip officers;
  - Shortage of qualified police candidates. Good incentives have to be in place to attract better candidates;
  - Supervisors are supportive of virtual training but believe that in-person training is needed and more effective;
  - Officers reported working additional shifts or hours to cover the lack of officers. In many cases, the lack of officers is causing PRPB members to be overworked, affecting morale, and causing burnout;
  - Supervisors and officers complained about the Judicial System, which they feel needs to be more consistent and effective in the application of the law; and
  - Recognition of outstanding work sometimes does not occur.

## Pathway Forward

PRPB executive leadership should recognize and validate the officers' feedback. These officers are the ones involved in the day-to-day operations, they are the face of the Bureau and should have the best

available tools at their disposal. PRPB leadership should correct and improve the identified deficiencies and continue to promote their strengths. Officers as well as some supervisors believe that upper management have issues with being criticized and will respond with retaliations. During this reporting period, DSP and PRPB addressed supervisory staffing shortages by promoting sergeants, captains, and high-ranking officials. In addition, they anticipate promoting 1st and 2nd lieutenants during 2024. These promotions will increase accountability and make supervision more effective and professional. The Monitor's Office will continue to assess PRPB as they continue to implement efforts related to the Staffing Plan, per Paragraph 13.

## Paragraph 140: Supervision and Management - Duties of Supervisors

*All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

The Monitor's Office reviewed examples of staffing documents submitted electronically and during several site visits for the areas of Utuado, Carolina, Bayamon, Fajardo, and Aguadilla. Based on the documents reviewed and officers and supervisors interviewed, supervision is reaching a level of compliance. Supervisors have returned to normal activities and assignments in accordance with their job descriptions. Supervisors are developing experience in addition to receiving proper training that will lead them to provide better guidance and improving professionalism, prioritizing community policing, and problem solving. One of the most important skills that supervisors must develop is the ability to identify, correct, and prevent misconduct.

PRPB needs to develop the EIS program, conduct personnel integrity audits, and ensure the implementation of inter-agency feedback systems. The Monitor's Office had the opportunity to attend several PRPB demonstrations of EIS during 2023. However, PRPB has not implemented policy, training, or practice of the EIS. As soon as the EIS is approved and implemented, this paragraph will approach compliance. Effective and professional supervision is the backbone of any successful organization. PRPB supervisors are expected to be responsible for officers under their command complying with Bureau policy, the Agreement, and the law. Interviewed officers fully support their supervisors and believe that they provide effective and necessary supervision, guidance, and support to comply with Bureau policy,

155

the Agreement, and the law. However, most of the personnel interviewed stated that their supervisors could benefit from more effective training that will make them better communicators, especially with the next level of supervision. They also expressed that even when they fully support their supervisors, they still have concerns with the inexperience of the recently promoted supervisors.

*Pathway Forward*

Seasoned and new supervisors must acquire a better and more effective understanding of the evaluation system. The new evaluation system was implemented in January 2024, but only training to access and operate the system was provided. No additional training on writing and discussing the evaluation was given. HR reported that a training addressing those issues will be developed and offered at the Academy before the next scheduled evaluation period in January 2025. Training on GO 310 (Performance Evaluations) needs to be developed and provided. Supervisors must understand that their writeups must justify the scores. The supervisor should refer to cases, duties, and specific roles during investigations. Supervisees should also receive credit for any additional accolades during the evaluation period. Officers need to give importance to the evaluations and understand that the scores need to be earned. Furthermore, communication with upper management at all levels of management needs to be clear and consistent to be effective.

## 2. Supervisor Training

The 40 hours of in-service training for current and recently promoted supervisors provided by PRPB complies with the accepted policing practices in leadership and management. PRPB complies with the Agreement and recognizes the benefit of instilling professionalism for the Bureau. PRPB will ensure that all future supervisors receive the required training before taking over their responsibilities. PRPB should continue to promote and develop additional yearly training to keep all supervisors up to date with successful management methodologies used by other government agencies as well as in the private industry. To achieve full compliance with this section, PRPB must fully develop and deploy EIS. Training on how to use EIS and how important it is for their agents must be developed and required for all supervisors.

### Paragraph 141: Supervision and Management - Supervisor Training

*Each supervisor shall receive mandatory management, supervisory, leadership, and command accountability training, tailored to each level of supervision and command, of no fewer than 40 hours in duration, prior to assuming supervisory responsibilities. Each supervisor shall receive no fewer than 40 hours of in-service training annually thereafter.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | | Annually |

156

| 🛡 Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 141-143. | ☑ Met | ☐ Missed |
| 2. Supervisor trainings are consistent with Paragraphs 141-143. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in supervision requirements (or scheduled for training, in the case of mid-year reviews). With respect to Paragraph 142, 100% of PRPB personnel serving as supervisors on or before July 17, 2013, were trained and certified in supervision requirements by October 8, 2018. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office conducted a comprehensive analysis of supervisor training policies and determined that the training materials are consistent with policy and generally accepted policing practices. These training materials include training on management, supervision, leadership, and command accountability that is tailored to each level of supervision. PRPB provided records showing that current as well as new supervisors have received the supervisor training developed pursuant to the Agreement. Interviewees during this reporting period confirmed that officers are not permitted to take on new supervisory roles without completing the required trainings.

### Pathway Forward

Based on the newly promoted supervisors it was determined that the policies and trainings were conducted and implemented accordingly. Currently, based on the identified staffing needs, with the current number of supervisors, PRPB should not have any need for agents to take on the role of acting supervisor. New supervisors will acquire the necessary experience that, in combination, with the received training and familiarization with policies, will lead PRPB to sustained compliance with this paragraph.

### Paragraph 142: Supervision and Management - Supervisor Training

*All current PRPD supervisors shall receive the supervisor training developed pursuant to this Agreement within 18 months after it is developed and first implemented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – March 2024 |
| 📝 Policy: | Implemented | | |
| 👥 Training: | Implemented | Assessment Frequency | One-Time Compliance |
| ✓ Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 141.

*Compliance Assessment*

The Monitor's Office assessed and reviewed all provided supervision training records for current and newly promoted supervisors and determined that all received the required and approved training before taking their positions. The Monitor's Office's reviewed and approved the required training.

## Paragraph 143: Supervision and Management - Supervisor Training

*The supervisory training program shall include, but not be limited to, instruction in the following topics:*

*a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;*

*b) de-escalating conflict;*

*c) evaluation of written reports;*

*d) investigating officer uses of force;*

*e) responding to and investigating allegations of officer misconduct;*

*f) risk assessment and risk management;*

*g) evaluating officer performance;*

*h) appropriate disciplinary sanctions and non-punitive corrective action; and*

*i) using EIS to facilitate close and effective supervision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 141.

*Compliance Assessment*

The Monitor's Office determined that current and recently promoted supervisors have received training in most of the above-listed topics. However, over 90% of the interviewed officers and supervisors were not familiar with EIS. Upper management must acknowledge that EIS has not been used properly. This must be a priority and it should be a continued effort to explain and clarify how EIS is meant to be used and how important it is for their agents. This is a program that has proven to be effective for law enforcement agencies nationwide.

158

*Pathway Forward*

EIS should be fully developed and implemented as soon as possible. Every level of supervision needs to be trained and have complete knowledge of the related policies, use of the system, and what it means for the organization. The Monitor's Office welcomes the opportunity to review this training and provide the necessary recommendations to PRPB.

## Paragraph 144: Supervision and Management - Supervisor Training

*Officers appointed to the rank of Lieutenant Colonel, Colonel, commanding officer to a PRPD superintendency or unit, and any other supervisors must receive Equal Employment Opportunity ("EEO") training on PRPD's policies and federal and Commonwealth anti-discrimination laws. This training shall include protocols for supervisors to follow in the event they are made aware of complaints involving discrimination and/or harassment. The training shall also include instruction on PRPD policies prohibiting retaliation against any individual opposing the alleged discrimination or harassment and/or participating in a proceeding or investigation of discrimination or harassment. Supervisors receiving the EEO training shall be evaluated in part based on their knowledge and implementation of the policies, guidance, and laws covered in that training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in EEO and anti-discrimination laws (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Supervisor evaluations and SARP investigations indicate that supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office conducted a review of all provided related policies, training curricula, and training certificates specifically related to supervision. A random proportional sample of 92 sworn personnel was reviewed by the Monitor's Office. The below table shows the full breakdown of the random sample by rank:

| Rank | Number | % of Sworn Personnel | Proportional Sample Size |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **Coronel** | 15 | 0.13% | **1** |
| **Teniente Coronel** | 28 | 0.24% | **1** |
| **Comandante** | 25 | 0.21% | **1** |
| **Teniente I** | 129 | 1.13% | **2** |
| **Agente** | 8,759 | 76.85% | **67** |

*Table 1: Sample by Rank*

The Monitor's Office requested all training and disciplinary records for the sampled officers, as well as the new personnel evaluation system covering the reporting period. Information on the sampling frame used can be found in Appendix B.

The Monitor's Office reviewed all related policies and found that they incorporate the requirements of this paragraph and that the supervisory training is consistent with the approved policies. Also, based on an assessment of personnel records and documentation provided by PRPB, the Monitor's Office found that 95% of sampled personnel are trained and certified in equal employment opportunity (EEO) and anti-discrimination laws. PRPB also provided documentation related to supervisory evaluations and SARP investigations, which indicate that supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files.

## 3. Performance Evaluation

PRPB implemented the new performance evaluation system in January 2024. The performance evaluation system will take place annually and supervisors are mandated to meet with their personnel regardless of score. The Monitor's Office understands that the new ProMedia system will be a very effective tool for the Bureau when the proper training is provided. In addition to the annual evaluation and mandatory meetings, the expansion of the measured performance categories will be essential in providing clearer and detailed justifications for each element of the evaluation process. PRPB has yet to implement the proper training nor put the system into practice. Supervisors in general need to acquire the proper knowledge of criteria, policies, and procedures and develop better communication skills to communicate strategies that will help employees improve, making them more professional and effective. Supervisors need to develop better organization and planning skills that will help them provide clear plans to follow through with their guidance. The Monitor's Office believes that with the proper training and guidance, supervisors will develop all the necessary supervisory skills making them effective and better prepared to accomplish the Bureau's mission. In addition, when the Commonwealth develops and institutionalizes an adequate information technology auditing system, PRPB will be able to effectively monitor evaluations.

### Paragraph 145: Supervision and Management - Performance Evaluation

*PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 145-146. | ☑ Met | ☐ Missed |
| 2. Training on performance evaluations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | ☑ Met | ☐ Missed |
| 5. 95% of sampled performance evaluations adhere to approved policies. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Through the review of training logs and conducting personnel interviews, the Monitor's Office determined that supervisory trainings are consistent with policies and that newly promoted supervisors attended the 40-hour mandatory training at the Academy before taking over their duties. However, it was reported that performance evaluations are still an issue for both supervisors and employees. The lack of training and knowledge of the system is noticeable for both. During this review cycle performance review meetings took place between supervisors and employees regardless of the score, which had not happened prior. Inflated ratings were not detected during the sample evaluation review, which was also a first. Scores were consistent with normal and average evaluations.

The Monitor's Office confirmed that GO 310 (Performance Evaluations) was implemented in January 2024. The new performance evaluations will occur annually, and it is a requirement that every PRPB supervisor meets with their supervisees in-person to discuss the evaluations regardless of the rating. Evaluation topics include constitutional policing, integrity, community policing, and critical police functions, among others. However, during several meetings with HR, it was determined that no training or guidance has yet to be developed or approved. HR only reported that videos and PowerPoint presentations were provided to the supervisors on how to access the new program, but no additional training or instructions were provided. HR reported that training will be provided before the next scheduled evaluations in January 2025. PRPB must make this training a high priority, the performance evaluation system is the most effective way to discuss performances, expectations, respective goals, and career paths. Without the proper training and guidance, the updated GO 310 (Performance Evaluations) will not be effective and personnel within the Bureau will continue to view evaluations as unimportant.

161

*Pathway Forward*

The Monitor's Office will continue to monitor the recently implemented GO 310 (Performance Evaluations) and related forms. Supervisors and supervisees need continued training, including on the valuation system, to make the Bureau more effective and professional. The revision of these policies and procedures is crucial for the implementation of this paragraph. PRPB needs to understand and update the ProMedia evaluation system so that executives and HR can monitor and audit the evaluations according to policy.

## Paragraph 146: Supervision and Management - Performance Evaluation

*As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 145.

*Compliance Assessment*

A review of the newly implemented performance evaluation system samples and interviews were conducted by the Monitor's Office. The review revealed that the performance evaluations were completed on time and formalized. This new program will greatly benefit from the implementation of a better automated system. The systemic inflation of evaluation ratings was not detected during the review of the new system, which was confirmed through interviews and a review of 92 evaluation samples.

However, HR reported that they only provided training to supervisors on how to use the system, which was provided via PowerPoint presentations and videos. Training on writing score justifications and how to verbally discuss the evaluation with the officer will be offered during 2024 before the next scheduled evaluations in January 2025. The Monitor's Office believes that after the proper training and guidance is approved and provided, the performance evaluation system will be effective, helping the Bureau become a more professional institution and will lead PRPB to reach compliance by January 2025.

*Pathway Forward*

The Monitor's Office will continue to monitor the implementation GO 310 (Performance Evaluation) and related forms. Supervisors and supervisees must receive effective trainings, including on the newly

162

implemented evaluation system to make the Bureau more professional. The revision of these policies and procedures is crucial for the implementation of this paragraph. With the correct implementation, the executives and HR can monitor and audit the evaluations according to policy.

## 4. Early Identification System

During this reporting period, PRPB continued its work on the technical development of the EIS and provided the Monitor's Office with a system demonstration in March 2024. Although the system has been created, it is not yet operational. The related policy GO 407 needs to be updated. Before that, PRPB must also identify and/or develop related resources and processes for the operational aspect of the system and unit, such as identifying where within the organization the unit will be housed, what resources will be available to officers needing intervention, and internal communications about the EIS. Further, the continued misuse of the acronym EIS by SARP presents a potential problem in how this new intervention system and unit are communicated with officers. So, while PRPB may have achieved partial compliance with the technological aspects of EIS, it is still not compliant with the operational aspects of the system and as such all related paragraphs within this subsection.

### Paragraph 147: Supervision and Management - Early Identification System

*PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 147-153. | ☐ Met | ☑ Missed |
| 2. Training on EIS is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | ☐ Met | ☑ Missed |
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | ☐ Met | ☑ Missed |

163

| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | ☐ Met  ☑ Missed |
|---|---|

*Compliance Assessment*

As noted above and in previous CMRs, there currently is no EIS developed and/or in use by PRPB. In the past, PRPB was misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB has noted that it is awaiting recommendations from the IT CAP and results of C2S, the Commonwealth's contractor's, work to begin developing EIS. EIS will be heavily reliant on the data and modules that are currently being reviewed and/or developed as part of these two projects. As such, it is most efficient for PRPB to wait until these projects have been completed until it begins delving into EIS development. It should be noted that in a certification provided by PRPB, PRPB stated that an EIS Division was created. However, PRPB's April Self-Assessment Report, which covers the period of January 1 through March 31, 2024, stated there was no EIS Division created during this reporting period. The report committed to creating an EIS Division by April 2024. If PRPB complies, it will be reported on in CMR-12. The Monitor's Office looks forward to reviewing the EIS Division's policy, members, etc.

In an Action Plan approved by the Parties on September 5, 2023, PRPB noted that the efforts that would bring Paragraphs 147-153 into compliance completely rely on the acquisition and implementation of an RMS. As happens in other areas, some targets and paragraphs remain at a standstill regarding their compliance until PRPB executes the steps that it has committed to in acquiring, implementing, and testing an RMS. As reported in their Self-Assessment Report, PRPB submitted an RFP during this reporting period, and is currently evaluating the proposals put forward by potential vendors. The Monitor's Office remains optimistic that PRPB will adequately complete the steps outlined in the aforementioned Action Plan, contributing to the compliance of Paragraphs 147-153.

*Pathway Forward*

PRPB must develop an EIS that encompasses a range of clearly defined information and ensures that corrective action is based on appropriate evaluation, and not reserved for a mere accumulation of violations. Currently, the EIS module is under development and is not available for use by supervisors. EIS is a critical component of risk assessment and management systems and should be a priority for PRPB. PRPB must ensure that EIS provides a non-punitive, proactive method for identifying agents that may need training, counseling, or other intervention before issues arise involving agent misconduct. PRPB should continue to develop the platform so that supervisors can use the information from EIS data and records. This will mean that EIS can become an effective supervisory tool that addresses potentially problematic behavior in a timely and non-punitive manner.

## Paragraph 148: Supervision and Management - Early Identification System

*The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:*

*a) all uses of force;*

*b) injuries to and deaths of persons in custody;*

*c) all complaints and their dispositions;*

*d) data compiled under the stop data collection mechanism;*

*e) all criminal proceedings initiated, as well as all civil or administrative*

164

claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;

f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;

g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to

suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;

h) all disciplinary action taken against employees;

i) all non-punitive corrective action required of employees;

j) all awards and commendations received by employees;

k) training history for each employee; and

l) identifying information for each PRPD officer and employee and;

m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

In July 2023, the Monitor's Office received a certification from the Reform Office stating that an EIS module has been created and is in testing. PRPB stated that they are working on the identification of suitable people to form the EIS Unit. The EIS Unit will be in charge of working on the module, examining its operation, and requesting required changes in programing and functionality for its full and effective operation. PRPB states that once the module is fully operational, records and reports will be generated and shared with the Monitor's Office. As such, the Monitor's Office concludes that there is no related policy and no related system and PRPB cannot be considered compliant with any paragraphs related to EIS.

In March 2024, the Monitor's Office attended a presentation prepared by C2S, the Commonwealth's contractor, that showed a preliminary version of an EIS. However, the Monitor's Office has not received any additional information or documentation about any components of this system. Furthermore, the Monitor's Office was informed that the system still does not capture the necessary data to be

Substantially Compliant, nor has the data passed through a validation process. Because of this reason, this paragraph remains Not Compliant.

As mentioned in Paragraph 147, this paragraph relies on various steps that PRPB must perform regarding the acquisition of an RMS. As reported in their Self-Assessment Report, PRPB submitted an RFP during this reporting period, and is currently evaluating the proposals put forward by potential vendors. The Monitor's Office remains optimistic that PRPB will adequately complete the following steps outlined in the aforementioned Action Plan, contributing to the compliance of Paragraphs 147-153.

### *Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-11, and stresses to PRPB the importance of ensuring that EIS, once developed, captures the requirements of this paragraph.

### Paragraph 149: Supervision and Management - Early Identification System

*PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

### *Compliance Assessment*

As noted above, there is an EIS module that has been created and is in testing. PRPB has not provided the Monitor's Office with a list of identified personnel that will lead EIS development efforts and its related policies and procedures. As noted above, any work related to this has been placed on hold until the IT CAP and C2S, the Commonwealth's contractor's, work is completed. The results and recommendations from these two projects will be used to expedite EIS development.

In January 2024, the Reform Office indicated that they had selected 6 candidates to be the initial EIS team. The Monitor's Office is encouraged by these selections and looks forward to working with this initial unit.

As mentioned in Paragraph 147, this paragraph relies on various steps that PRPB must perform regarding the acquisition of an RMS. As reported in their Self-Assessment Report, PRPB submitted an RFP during this reporting period, and is currently evaluating the proposals put forward by potential vendors. The

166

Monitor's Office remains optimistic that PRPB will adequately complete the steps outlined in the aforementioned Action Plan, contributing to the compliance of Paragraphs 147-153.

### Pathway Forward

The Monitor's Office looks forward to assessing PRPB's progress in this area as part of its implementation of the IT CAP. The Monitor's Office will remain vigilant of any steps that PRPB completes in the IT CAP or the Action Plan approved by the Parties regarding EIS. Once developed, the training, policy, and personnel will be assessed by the Monitor's Office.

### Paragraph 150: Supervision and Management - Early Identification System

*PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 147.

### Compliance Assessment

PRPB has made some progress in the development of an EIS module, but most of the supervisors and agents who were interviewed were unaware of what constitutes an EIS. Those that know how to use EIS nevertheless report not being able to access the system. The Monitor's Office has been told in interviews that equipment such as logbooks, administrative supplies, laptops/iPads, and computers are not available for PRPB supervisors to use to access and review EIS data. The Monitor's Office notes that investment in such equipment is a prerequisite for providing supervisors with a mechanism for accessing and reviewing EIS once its development is completed.

As mentioned in Paragraph 147, this paragraph relies on various steps that PRPB must perform regarding the acquisition of an RMS. As reported in their Self-Assessment Report, PRPB submitted an RFP during this reporting period, and is currently evaluating the proposals put forward by potential vendors. The Monitor's Office remains optimistic that PRPB will adequately complete the steps outlined in the aforementioned Action Plan, contributing to the compliance of Paragraphs 147-153.

### Pathway Forward

The Monitor's Office notes that PRPB must take equipment needs into consideration as it works towards promoting new supervisors in the coming months. Further, PRPB should leverage the IT Needs

167

Assessment and CAP to inform the status of its ability to provide supervisors and commanders with the equipment necessary to access supervisory and management systems like EIS.

## Paragraph 151: Supervision and Management - Early Identification System

*PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

### *Compliance Assessment*

There currently is an EIS module that has been created and is in testing, but PRPB still does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

As mentioned in Paragraph 147, this paragraph relies on various steps that PRPB must perform regarding the acquisition of an RMS. As reported in their Self-Assessment Report, PRPB submitted an RFP during this reporting period, and is currently evaluating the proposals put forward by potential vendors. The Monitor's Office remains optimistic that PRPB will adequately complete the steps outlined in the aforementioned Action Plan, contributing to the compliance of Paragraphs 147-153.

### *Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-11.

## Paragraph 152: Supervision and Management - Early Identification System

*PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is an EIS module that has been created and is in testing, but PRPB still does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

As mentioned in Paragraph 147, this paragraph relies on various steps that PRPB must perform regarding the acquisition of an RMS. As reported in their Self-Assessment Report, PRPB submitted an RFP during this reporting period, and is currently evaluating the proposals put forward by potential vendors. The Monitor's Office remains optimistic that PRPB will adequately complete the steps outlined in the aforementioned Action Plan, contributing to the compliance of Paragraphs 147-153.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-11.

## Paragraph 153: Supervision and Management - Early Identification System

*Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is an EIS module that has been created and is in testing, but PRPB still does not have an EIS that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered compliant with any paragraphs related to EIS.

As mentioned in Paragraph 147, this paragraph relies on various steps that PRPB must perform regarding the acquisition of an RMS. As reported in their Self-Assessment Report, PRPB submitted an RFP during this reporting period, and is currently evaluating the proposals put forward by potential vendors. The Monitor's Office remains optimistic that PRPB will adequately complete the steps outlined in the aforementioned Action Plan, contributing to the compliance of Paragraphs 147-153.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-11.

## 5. Internal Audits and Interagency Feedback

In review of the paragraphs within this subsection, the Monitor's Office found that PRPB ensures that audit work is conducted in a consistent, fair, and professional manner. The Audit Division provides transparency and gains public trust through accountability, quality, and continuous improvement. The audit system identifies operational deficiencies, analyzes the causes and contributing factors, and implements effective corrective measures. These audits help ensure that all areas of Puerto Rico receive adequate levels of service delivery. Policies reviewed by the Monitor's Office related to this subsection meet paragraph requirements. The Monitor's Office notes that in the past the lack of staff and resource allocation has resulted in a low number of internal audits being conducted each reporting period.

### Paragraph 154: Supervision and Management - Internal Audits and Interagency Feedback

*As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2023 – March 2024 |

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 154-156. | ☑ Met | ☐ Missed |
| 2. Training on internal audits and inspections are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of selected internal audits and inspections comply with policy. | ☐ Met | ☑ Missed |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | ☑ Met | ☐ Missed |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | ☐ Met | ☑ Missed |

## Compliance Assessment

In assessing PRPB's compliance with this paragraph, the Monitor's Office finds that related policies incorporate the requirements of Paragraphs 154-156. Trainings on internal audits and inspections are consistent with approved policies. However, the Monitor's Office finds that 95% of sampled personnel have completed the required training and certification on the auditing and inspections system in the required timeframe for this reporting period, though the most recent round of training on Operational and Administrative Inspections for Compliance Inspectors (Inspecciones Operacionales y Administrativas para Inspectores de Cumplimiento) was conducted in 2020.

Based on conversations with members of the Inspection Division in January 2024, PRPB is using the auditing system to identify operational deficiencies and their causes and contributing factors so that effective remedial action may be implemented. The Monitor's Office notes that the Inspections Manual and Guide is comprehensive and has been well received by PRPB supervisors. It should also be noted that these two documents were revised and have been reviewed by the Monitor's Office as part of Paragraph 229 and comments were provided.

The details from the Monitor's Office review of completed audits are included under Paragraph 156. These audits were comprehensive, clear, and concise. PRPB is commended for the inspections that were completed – the reports were extensive and involve hundreds of pages of documentation and analysis.

Nearing the culmination of the reporting period, the Monitor's Office was informed that PRPB conducted 42 total inspections. The Commissioner certified 4 inspections out of the 28 reviewed inspections (14%). For this reason, and because of Paragraphs 155 and 156, Target four is missed. Furthermore, regarding Target six, the Inspections Annual Report did not contain any proof that the Commissioner reviewed and signed it.

*Pathway Forward*

The Monitor's Office commends PRPB for its work to update and conduct a new round of training on administrative inspections for compliance inspectors and will continue to assess PRPB's compliance. Based on this review, PRPB is found to be using the auditing system to identify operational deficiencies, so that effective remedial action may be implemented. The revised Inspections Manual has resulted in more comprehensive inspections. Further training should be conducted on the auditing and inspections systems and PRPB should ensure that its internal audits and inspections are conducted according to policy.

## Paragraph 155: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop a protocol for conducting operational audits related to the material terms of this Agreement. The protocol shall establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Command Areas. Audits shall assess, where appropriate, operational consistency among similar units throughout PRPD to ensure that all geographic areas are provided with appropriate levels of service delivery. PRPD shall summarize in an annual report the conclusions and recommendations of audits conducted during the time period covered by the report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 154.

*Compliance Assessment*

As noted above, PRPB provided information to the Monitor's Office regarding the results of individual sampled audits completed during the reporting period. The audits are scheduled regularly for all PRPB units, locations, and personnel.

The Inspection Division has documented the conclusions and recommendations of all audits conducted. This will help other areas prepare for their audit and make use of the data that comes from previous audits. This information will also help other supervisors review management, supervisory, and other practices to ensure they follow PRPB policies and goals.

*Pathway Forward*

The Monitor's Office recommends that PRPB's Manual of Operational and Administrative Inspections be revised with new policies, regulations, and guidelines, as determined by PRPB. After the revisions are completed, it is recommended by the Monitor's Office that a revised training curriculum and class be

172

developed based on the Manual of Operational and Administrative Inspections. This manual should be required reading for all supervisors, both at the administrative and operational levels, and the information should be used in new promotional examinations.

## Paragraph 156: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 154.

*Compliance Assessment*

The Monitor's Office has received information from the Inspection Division indicating that audits are consistently planned and conducted. The Monitor's Office has not been provided with documentation to demonstrate that the Commissioner reviews each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. Documentation was provided to demonstrate that the commander of each precinct or specialized unit reviewed all audit reports regarding employees under their command and, if appropriate, took non-punitive corrective or disciplinary action.

During the reporting period, PRPB provided documentation showing that they had completed 42 inspections. The Monitor's Office sample size was 28 and the locations included a wide array of units and divisions across the 13 area commands.

Although some divisions and units had considerably fewer violations than others, the Monitor's Office acknowledges the efforts made by each division and unit in rectifying their violations, especially when the audits were completed in a timely manner. The audits show that most of the divisions and units were able to correct the violations reported by the Inspection Division, and the Monitor's Office recognizes the initiative taken by PRPB personnel. Audits are important for PRPB divisions and units because they pinpoint the areas that need attention, and the Monitor's Office will continue to acknowledge the divisions and units that display initiative in correcting their violations.

173

During the January and February 2024 site visits, the Monitor's Office recommended that more operational audits should be completed during the reporting period. The Monitor's Office appreciates the work that was done by the Inspection Division on the 28 sampled audits.

It is noted by the Monitor's Office that those in charge of each of the 28 locations resolved all issues identified by the Inspection Division within 30 days. In each of these inspections, proper advance notice was given to those in command in preparation for their efforts.

Further, the Monitor's Office recommends that the inspection of the Guánica Maritime Division completed during the CMR-8 reporting period continue to be used as a model. This inspection audit was streamlined and very efficient due to the organized methods used to track the information and equipment. Specifically, all equipment was numbered, and the records were organized by numerical order to easily identify the corresponding equipment. This included equipment such as portable radios, computer equipment, bullet proof vests, tasers, weapons, vehicles-organized by VIN, model, and make, ballistic shields, etc. It is hoped by the Monitor's Office that the other areas could review and establish a similar tracking system to prepare for future audits.

During previous assessments of this paragraph, the Monitor's Office has found a continuous pattern of repetition in the violations committed by the various inspected units/divisions and this reporting period is no exception. These violations include no weekly taser tests, faulty/no picture, improper uniform, vehicle upkeep violations, among others. Although the Monitor's Office understands that PRPB has generally been effective in solving and documenting the initiatives taken to solve these violations once they are identified, PRPB has not found and implemented an effective resolution to remedy this pattern.

*Pathway Forward*

PRPB should work on developing an automated system whereby the Commissioner and commanders produce memos or other evidence to track and demonstrate that they have thoroughly read relevant audits and have developed strategies and corrective actions based on the results of those audits. These strategies and corrective actions should be published so that other commanders can see successful resolutions. The Monitor's Office has been provided with the 2024 Annual SARP Audits Report normally issued in January. However, each audit was not signed off by the Commissioner. The Monitor's Office suggests that the 2024 Annual SARP Audits Report be required reading for all supervisors in PRPB, and this information be included in future promotional examinations of sworn personnel.

It is again recommended by the Monitor's Office that the roll call concept be instituted uniformly across the Bureau. This is important for proper preparation for duty, officer safety, and formalizing the role of the supervisor. The roll call setting and the ad hoc inspections process is beneficial to ensure readiness for duty and performance. The practice of having a formal roll call and ad hoc inspections will assist in better preparing officers for duty, help with administration of non-punitive discipline, and ultimately assist with officer safety.

Finally, the Monitor's Office is aware of the severe understaffing problems suffered by many of the divisions/units assigned to conduct inspections. The Metro Division, for example, is probably the division where the understaffing problem is most noticeable. This division regularly relies on the participation of personnel from other areas to comply with its yearly scheduled inspections. The Monitor's Office is also aware of the equipment allocation and training initiatives that PRPB must provide the different divisions/units assigned to inspections once new personnel are assigned to alleviate this understaffing.

Along with Paragraph 13, the Monitor's Office will continue to review the allocation of personnel to these divisions/units.

## Paragraph 157: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☑ Missed |
| 2. Training on integrity audits is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | ☐ Met | ☑ Missed |
| 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB is currently developing a plan for organizing and executing regular, targeted, and random integrity audits (the protocol to perform integrity tests), in conjunction with OSM. In September 2022, PRPB submitted a preliminary draft of its Integrity Audit policy and protocol and participated in a meeting with the Parties to discuss the drafts and assistance from OSM. As such, PRPB has not begun training relevant personnel and conducting integrity audits based on the associated policy and protocol.

No data was provided by PRPB during the reporting period due to the policy still being in development; therefore, the Monitor's Office was unable to complete a review of a random sample of integrity audits.

OSM is currently working on the policy with PRPB.

OSM indicates that they will be finalizing comments and then recommending the policy move forward through the Paragraph 229 review process.

On March 4, 2024, members of the Monitor's Office, OSM, and PRPB travelled to New Orleans for a peer-to-peer visit. Integrity tests were discussed and the visit was very informative.

As has been mentioned in other paragraphs, an Action Plan that was approved by the Parties on September 5, 2023, thoroughly details the necessary steps to contribute to the compliance of this paragraph. As stated in this Action Plan, PRPB should have approved policies related to integrity audits incorporating the requirements of the paragraph during this reporting period. However, the Monitor's Office has not received the finalized and approved version of the aforementioned policy, thus making the due dates for action items outlined in this Action Plan past due. However, as has been noted above, the Monitor's Office is aware of the steps that PRPB has taken in achieving compliance with this paragraph, its compliance targets, and the steps in the Action Plan.

### *Pathway Forward*
The Monitor's Office looks forward to the implementation of these materials during a future CMR. PRPB and OSM are continuing to collaborate on the development of the integrity audit policy and the Monitor's Office is hopeful that it will be completed soon.

### Paragraph 158: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall establish an executive-level liaison committee consisting of high- level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Quarterly |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Agreements and protocols incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | ☐ Met | ☑ Missed |

176

*Compliance Assessment*

As has been determined in previous CMRs, PRPB meets Target one. Aligning with the Civilian Complaints, Internal Investigations and Discipline area, various components of the criminal justice system have stepped forward to partake in these meetings, and all allegations of misconduct and potential criminal activity it receives from these components are properly referred to SARP.

During this reporting period, PRPB submitted documentation confirming that the area commands of Humacao, Ponce, Mayagüez, Bayamón, Caguas, Carolina, Arecibo, and Aibonito carried out compliant communications through meetings. The Monitor's Office also received minutes that captured the conversations between the attendees of the meetings held in these area commands. These meetings are for PRPB to solicit feedback from criminal justice components, inform them of the services and initiatives done by PRPB, and refer any misconduct/potential criminal activity by any of its officers to SARP. The aforementioned area commands comprise 8 of the 13 areas (62%), all of which are required to comply with this paragraph. Out of the five remaining area commands, Fajardo only submitted an invitation document, an agenda, and an attendance sheet, with no meeting notes, Guayama submitted a document certifying that the meeting was suspended because not all of the components were available to attend, and Aguadilla submitted documents informing that the meetings were not held. The following area commands did not submit any documentation related to this paragraph.

- San Juan
- Utuado

Another possible area of improvement for PRPB is ensuring that all required attendees are present at these meetings. Out of the area commands that submitted attendance sheets, the areas of Humacao, Ponce, Aibonito, Arecibo, and Fajardo did not count all of the required representatives or were unclear about the representation of each component. The Monitor's Office encourages PRPB to provide clear and adequate documentation aiming towards compliance. In addition, the Monitor's Office is aware that the quality assessment of these meetings is reliant on its ample documentation and note taking. For example, the meeting held in Ponce demonstrated adequate note taking, and there were discussions on the recurring theme of DV cases across the island, possible alliances with certain communities, and providing educational content for officers. The Monitor's Office encourages these types of discussions and this documentation approach. Bayamón exhibited another exemplary meeting because of its discussion and documentation. The notes showed that COPOP, restraining orders. and CIT were discussed. Because of the reasons outlined above, Target 2 is missed, maintaining Partial Compliance with Paragraph 158.

*Pathway Forward*

Documentation is the most important component for compliance in Paragraph 158. The Monitor's Office encourages all PRPB area commands to perform these meetings frequently and hold productive discussions related to the criminal justice system and refer possible misconduct/criminal activity to SARP.

The Monitor's Office recommends that PRPB continue to use protocols for maintaining related documentation not only as a means of demonstrating compliance with the Agreement, but more broadly to document the outcomes and action items from these meetings to ensure follow-through and

177

accountability. A protocol has been developed and other criminal justice agencies in Puerto Rico have responded to or ratified the protocols developed by PRPB. Now, PRPB should develop an automated system to obtain copies, agreements, and protocols related to criminal justice committees and verify that these materials incorporate all requirements to improve compliance. It is also suggested by the Monitor's Office that a PRPB member be appointed to take concise and complete notes during these meetings.

# IX. Civilian Complaints, Internal Investigations, and Discipline

Under its own policy, which was approved by the court and supervised by the Monitor's Office, the Office of Legal Affairs (OAL) has a 30-day limit for the analysis, recommendation, and determination of administrative complaints and must give actual notice to both to the complainant and accused.[7] As indicated in past CMRs, this policy has not once been in substantial compliance. In November 2023 the Commonwealth informed the Monitor's Office that it had hired and assigned seven attorneys to OAL and executed a plan to eliminate the adjudication backlog within months. The Monitor's Office has found progress towards eliminating the backlog of adjudications, which according to PRPB amounted to just over 800 at the beginning of the project. The Monitor's Office will continue to review the progress and work products of OAL lawyers as it applies to the Agreement.

Twenty current OAL lawyers have been interviewed and the Monitor's Office is currently interviewing all newly hired lawyers. The interviews probed the qualifications and certifications of each hired lawyer, who the hiring authority was, the salary offered, and whether the lawyer is considered an employee or contractor. The interviews were also used to determine whether the established goals and timelines are reasonable and whether resources, both human and otherwise, were sufficient to meet those goals and timelines. The interviews have shed light on working conditions, operating policy, and further OAL resource needs at OAL.  It has become clear that additional support staff are urgently needed to properly support the incoming staff. Presently, the Monitor's Office is aware of only two secretaries assigned to OAL. An increase in the number of lawyers in OAL creates an urgent need for more support staff and supplies.

The Monitor's Office continues to find that many internal investigations were conducted well and eventually adjudicated in accordance with facts uncovered by the investigator. Notwithstanding this finding, the Monitor's Office also sees multiple recurrences of shortcomings that have been well-documented repeatedly over the course of CMRs 2 through 9. Recent specific cases have been added to this CMR to add context and depth. Improvements must be made to achieve the overall goal of substantial compliance.

Reliable and current training records have been submitted to the Monitor's Office, which puts them on the path to substantial compliance. The vast majority of SARP personnel assigned to investigations will likely be unfamiliar with very recent and substantial changes in policy, investigative methodology, protocol, and practice. Due to these comprehensive changes, the Monitor's Office recommended a minimum of two full days of "in-service" training for each SARP member for this first iteration of SARP in-service training. This extended class time will be needed to address the large volume of changes made by PRPB. Furthermore, this training must be in person and incorporate practical and participative pedagogy. In the future, annual re-trainers to address changes in SARP methodology, rules, and procedures, could possibly be delivered remotely via eLearning, if feasible and if the subject matter lends itself to virtual learning.

The Monitor's Office is pleased to report that the once-dire circumstances of the FIU, especially regarding its human resource component, have in large part been remedied. While this is indeed good

---

[7] See PRPB Rule 9088, Page 40, paragraph 3.

news, the lack of human resources across SARP and SARP-support entities other than FIU continues to be a major concern to the Monitor's Office.

As of this CMR, the Monitor's Office has interviewed over 150 current and former SARP investigators. The majority of active SARP investigators have expressed concerns over case workload and a deficiency in human resources needed to effectively manage their individual caseloads. The impact of the problem ranges from minor to severe, depending upon the unit. The Monitor's Office discovered that in some offices, it is not uncommon for one investigator to have over a dozen cases open at any given time. Some of these cases may have been reported in other units, meaning that the investigator or witnesses must travel across jurisdictions to conduct interviews. The lack of human resources across SARP entities, with the noteworthy exception of FIU, continues to concern the Monitor's Office. The Monitor's Office notes the amount of time any given PRPB member is away from duty. Every member of the agency is contractually entitled to take frequent, multiple leaves for vacation, military service/deployment, holidays, illnesses, etc. In the case of SARP investigators, this time spent away from SARP duties must be analyzed to determine the extent of its impact on productivity. If a study indicates that human resources are lacking, SARP human resources must be adjusted upward to ensure both timeliness and accuracy in all SARP investigations and reports.  If sufficient investigative resources do not exist, then PRPB should begin offering overtime to investigators as needed to keep all cases within the timelines that they themselves established.

In each open case assigned to an investigator there is a 90-day limit, with possible justified extensions not exceeding another 90 days. It is important to understand that under SARP rules, 'case overload' may not be used as an excuse to grant any extension. Unrealistic expectations may hamper the investigator's ability to focus on the overall quality of an investigation.    The Monitor's Office encourages SARP command to meet regularly with its field investigators and supervisors – not just its area commanders - in much the same way as the Monitor's Office has, to gain insight into their needs for resources, both human and otherwise.

Not one Internal Affairs Bureau (NAI) has been relocated away from police facilities despite the Monitor's Office's multiple and longstanding findings that this practice must end without further delay. The Monitor's Office takes notice that SARP has been proactive in its ongoing efforts to identify suitable locations for NAI units in settings not associated in any way with law enforcement. Site identification; however, is only the first step in the process and must be followed up by contracting and procurement. Contracting and procurement, along with many other administrative functions of PRPB, have all been absorbed by the DSP. DSP must act immediately to move beyond partial compliance.

Overall, the Commonwealth's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflects progression in compliance to what was noted in previous reports. In CMR-9, 52% of paragraphs (24 paragraphs) were assessed as partially compliant and 15% (7 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 48% of paragraphs (22 paragraphs) were found to be partially compliant and 30% (14 paragraphs) were found to be substantially compliant. See figure 8.



*Figure 8. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

## Paragraph 159: Civilian Complaints, Internal Investigations, and Discipline - General Provisions

*PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

The Monitor's Office bifurcates the analysis of SARP investigation files into Phase I and Phase II, the former an assessment of compliance with respect to the internal investigation itself, the latter an assessment of the adjudication process that ends with the Commissioner's final resolution. This analysis model allows the Monitor's Office to assess any recent improvements in SARP investigations in close to real time, while also allowing the Monitor's Office to contrast SARP performance in much older investigations. The Phase II analysis allows the Monitor's Office to assess the adjudicative process from

the end of an investigation through various levels of internal management and legal review, up to its final resolution.

The Monitor's Office continues to note that while SARP leadership has been quite diligent in requesting equipment, vehicles, tools, and human resources from PRPB to cure deficiencies previously mentioned by the Monitor's Office, much remains to be done, especially in OAL. The Monitor's Office has noted some limited improvement in the allocation of new resources such as adding investigators to the once-critically understaffed FIU. The Monitor's Office has observed that several new FIU investigators have been assigned to that unit and that other candidates were being interviewed as late as Spring 2023.

*Pathway Forward*

PRPB, working with DSP as its procurement authority, must deliver the resources SARP needs to conduct its investigations and reach legally defensible conclusions in a thorough and timely manner, to include the Commissioner's final resolution of any given case. Moving forward, where and when delays in this procurement process occur, the Monitor's Office will determine and point out where the delay occurred so that the Commonwealth may take decisive action to remedy it.

# 1. Civilian Complaints

In all paragraphs mentioning an obligatory training component, PRPB has either not forwarded the evidence required or the documentation produced indicated a subpar level of training compliance. The Monitor's Office urges PRPB to use every effort to achieve the training requirements of either 95% of the sworn force or 95% of the unit membership as required, depending on the relative paragraph.

The cross section of actual complaints reviewed by the Monitor's Office demonstrates that public awareness of the ability to submit a complaint concerning a PRPB member, the clarity of the complaint form, and the existence and use of multiple viable complaint entry mechanisms are all in accordance with the Agreement.[8]

## Paragraph 160: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

---

[8] A variety of complaint inputs were observed during the Monitor's Office's current analysis, including physically tendering complaints at a PRPB facility, receipt of complaints via telephone, U.S. Mail, and PRPB's Internet complaint portal (commonly referred to as *Interfaz*).

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 160-162. | ☑ Met | ☐ Missed |
| 2. Civilian complaint program trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB policy and training on receiving civilian complaints and internal complaints as well as its implementation have not changed since the Monitor's Office's last review where it was found to be compliant with the spirit and letter of the Agreement.

PRPB has demonstrated the required 95% compliance threshold of training and certification of Press Office and SARP personnel as required by this paragraph.

As demonstrated by the form and number of actual complaints received, PRPB's use of a variety of mechanisms to inform members of the public about their ability to submit a complaint against a PRPB member, either as a named person or anonymously, continues to be successful. The Monitor's Office observed informational material about the complaint program publicly posted at each of the area commands and precincts visited. The Monitor's Office urges PRPB to continue to proactively emphasize this accessibility in its open community meetings held across the island.

The Monitor's Office's interviews of nearly all SARP investigators shows an awareness of SARP's shared responsibility to educate and proactively communicate the existence of the PRPB civilian complaints program to members of the communities that they serve.

*Pathway Forward*

PRPB must continue to demonstrate that it has provided its Press Office and SARP personnel with training and certification on all policies related to the civilian complaint program.

## Paragraph 161: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Content of complaint forms is consistent with civilian complaint program policies. | ☑ Met | ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-9 and as such is no longer conducting assessments of this paragraph.

## Paragraph 162: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | ☑ Met | ☐ Missed |
| 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | ☑ Met | ☐ Missed |
| 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | ☑ Met | ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

184

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-9 and as such is no longer conducting assessments of this paragraph.

## 2. Internal Investigations

SARP leadership continues to pay close attention to areas where the Monitor's Office has made recommendations of training, policy, and procedural changes.

For SARP to reach its goal, additional staff and equipment are still needed. The Monitor's Office has seen some responses to SARP procurement requests for both human and tangible resources, but much more is needed to achieve substantial compliance.

SARP NAI is still hampered by its present location within police facilities, which creates a strong disincentive for a citizen to report a crime alleged to have been committed by a police officer who may work at that same facility. Past discussions with SARP revealed that suitable NAI locations have being identified across the island, but no evidence of any new office locations has been provided to the Monitor's Office. The Monitor's Office expects DSP to not only procure suitable sites, but to also make them secure for the purpose of conducting the NAI mission without further unnecessary delay.

SARP's adjudicative process for serious violations of the Code of Conduct relies upon OAL, which not only performs the key legal analysis of the facts and conclusions of a given case, but also assists the Office of the Police Commissioner (OPC) in making final disciplinary decisions, which by statute pertain solely to OPC.

### Paragraph 163: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | ☑ Met ☐ Missed |
| 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | ☑ Met ☐ Missed |

Note: Implementation of the portion of this Paragraph regarding discipline is assessed with Paragraphs 177 (Data Source #4), 198, and 199.

*Compliance Assessment*

Universal training components for sworn PRPB members as well as underlying policy regarding complaint reporting procedures have not changed from PRPB's previously substantially compliant versions. PRPB has demonstrated that it has reached the 95% compliance threshold in training and certification of its personnel concerning relevant policies and procedures.

The Monitor's Office finds that PRPB has met the burden of showing that reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP and, therefore, achieve the corresponding compliance target.

*Pathway Forward*

PRPB must continue to ensure that its personnel are trained and certified on relevant policies related to reporting and internal investigations.

## Paragraph 164: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

186

| 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | ☑ Met   ☐ Missed |
|---|---|
| 2. Training on supervisory review of minor policy violations is consistent with approved policies. | ☑ Met   ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | ☑ Met   ☐ Missed |
| 4. 95% of selected supervisory reviews and responses comply with approved policies. | ☑ Met   ☐ Missed |
| 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | ☑ Met   ☐ Missed |
| 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | ☑ Met   ☐ Missed |

*Compliance Assessment*

In previous CMRs, the Monitor's Office has been critical concerning the underuse of non-punitive discipline to address minor disciplinary issues across the island. Multiple interviews of SARP investigators highlight the fact that they receive administrative complaints for investigations that should first have been handled non-punitively. The number of SARP investigators reporting this prior to the current reporting period continues to decline, which is a sign of improvement.

Current data submitted by PRPB indicates that its supervisors are using non-punitive discipline for a wide range of conduct or actions that do not – at least at first - rise to the level of a punishable offense within the Bureau. While early data indicated that female officers were subjected to non-punitive discipline at a rate far greater than that of their male counterparts, this phenomenon is now in decline. A study of this data indicates that the statistical anomaly of female officers subjected to non-punitive discipline in PRPB was indeed transitory in nature. The Monitor's Office will continue to analyze these incidents to ensure that the disparate impact the Monitor's Office has seen does not result in discrimination against a protected class. The most likely explanation for these gender disparities seems to lie in a new rule created to address uniform and appearance standards. Enforcement of this rule appears to have had a disparate impact on female PRPB members, as they apply to grooming standards for hair length, jewelry, fingernail polish, visible tattoos, etc.[9]

More needs to be done; however, to use the data produced by this system to uncover gaps in training, policy, and supervision. This requires an analytical capability for those who monitor the data produced by the non-punitive disciplinary system. This analysis should be conducted at frequent intervals. With under a year of use, PRPB most likely has not had sufficient time to study existing data produced by platform. Once a year has passed, the system should be able to add more valuable clues concerning policies, trainings, and supervision that could be used to cure defects that are identified. Decisions regarding those solutions are best based upon a broad and robust data set.

---

[9] These uniform violations are not exclusive to female officers. The Monitor's Office has learned of several anecdotal examples of cisgender male officers receiving this form of discipline for loose long hair. The rule establishes traditional appearances for all PRPB, with items such as nail polish restricted for all genders, not just for females. PRPB has made strides to ensure that this policy implementation remains as gender neutral as possible.

Lastly, the Monitor's Office awaits proof of whether this new system is effective at discerning non-punitive sanctionable behavior from that which should be investigated, proven, and acted upon by PRPB.

*Pathway Forward*

PRPB should develop an analytical capability to look at non-punitive disciplinary cases with an eye towards correcting defects in training, supervision, and policy.

### Paragraph 165: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 164.

*Compliance Assessment*

The Monitor's Office's continuing review of all cases for the current reporting period has revealed only a handful of SARP cases where specific tactical, training, policy, or procedural deficiencies were mentioned, either at the unit, area, or SARP command level. It is accepted as fact that many SARP investigators are overtasked with their caseloads. Notwithstanding this overload, each case should be analyzed to answer the following questions:

- Could a fault in training be a contributing cause or factor in this complaint?
- Was this complaint caused by or aggravated by a defective PRPB policy?
- Was inadequate (or non-existent) supervision a contributing cause or factor in this complaint?

*Pathway Forward*

PRPB is expected to address identified training, policies and procedures, or supervisory shortcomings as they may apply to each complaint.

188

## 3. Complaint Intake, Classification, Assignment, and Tracking

Complaint intake, classification, assignment, and tracking continues to be one of the best areas of SARP performance. SARP's database digitally captures and tracks all incoming complaints, investigations, and reports. It has been in broad use for many reporting periods. This system now allows the SARP Commander to track timelines including when extensions are granted and when any given case is overdue for completion.

### Paragraph 166: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall train all officers in how to properly handle complaint intake.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 166-176. | ☒ Met | ☐ Missed |
| 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |

*Compliance Assessment*

Records clearly indicate that accepted policies and related training curricula are unchanged from previous CMRs. The training content on complaint intake, classification, assignment, and tracking as previously approved by the Monitor's Office continues to be consistent with policies.

PRPB has met the 95% compliance threshold for training related to this paragraph.

*Pathway Forward*

PRPB must ensure that officers are trained and certified on relevant policies related to complaint intake, classification, assignment, and tracking.

### Paragraph 167: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline.*

189

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Target #1. Bi-annually as to Compliance Target #2. |
| Practice: | Implemented | | |

### Compliance Targets

Note: Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199.

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

The Monitor's Office has not seen a case in the present CMR where a complainant claims to have been discouraged or turned away from filing a complaint. The Monitor's Office had seen several such examples in the past which was cause for concern.

In cases where a police officer discourages or "redirects" a case to another area or jurisdiction, the complainant will often not mention this so long as the complaint is eventually received and acted upon by the agency. The citizen may have had to needlessly travel to a different police station, without knowing that their complaint should have been accepted by any PRPB member.

Knowing that a misconduct complaint was ultimately received and investigated thoroughly is not enough. The Monitor's Office requires that assurances be built into the system to detect possible hindrances of and/or redirection of complaints against PRPB officers.

### Pathway Forward

PRPB must identify all cases where a complainant has alleged that his/her complaint was either refused or discouraged by a PRPB member and then register and investigate the allegation. The Monitor's Office strongly recommends that SARP investigators proactively ask each complainant at the beginning of their interview, "Did any PRPB member try to dissuade you from filing this complaint?" and "Did any PRPB member refuse to accept this complaint?" This short line of questioning is useful to elicit information from those who may have been subjected to discouragement or outright refusal on the part of any PRPB member to accept their complaint. Investigators who encounter this accusation from any source should be directed to mention the allegation directly in their investigative report and either address the allegation in the present report, or in the alternative, refer the allegation for a separate and thorough investigation.

PRPB members who have been found, based upon a preponderance of evidence, to have either discouraged a complainant from filing a complaint or to have refused to accept a complaint must be identified and disciplined appropriately.

190

## Paragraph 168: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

### *Compliance Assessment*

Within the general sample of Phase I and Phase II analyses, the Monitor's Office has consistently observed a significant number of complaints submitted either via U.S. Mail or the Internet (SARP *Interfaz*) within the review samples. Some of these complaints are submitted anonymously either by civilians or more often by anonymous insiders or whistleblowers. The Monitor's Office requests special lists of all Phase I cases where the identity of the complainant is unknown for each CMR.

While there has been some level of improvement with respect to anonymous complaints, there are still SARP members who have a difficult time with investigating anonymous cases. Whether the complaint came from an anonymous civilian or an insider, the person submitting the complaint has placed their trust in the system.

From past CMRs, whistleblower cases often have a criminal dimension in addition to an administrative one. There remains some SARP investigators who insist on using subjective, one-sided, handwritten "hoja de entrevista," which is an unchallenged written declaration of an officer's version of the events. To remove any lingering doubt or confusion, hojas de entrevista may be used, but they must always be followed up by a separate face-to-face interview of the person, ideally recorded and transcribed. These declarations are rarely followed up upon or challenged in a face-to-face interview setting. The Monitor's Office has found and continues to find a reticence to interview the accused officer(s) in these types of important cases. The Monitor's Office is left with no choice but to find less-than-optimum change in PRPB's compliance with this paragraph.

There are still cases where SARP fails to assign the case for simultaneous internal criminal and internal administrative investigation within the five-day period stipulated. The Monitor's Office's interviews of SARP investigators indicates that the prior practice of having the same criminal investigation followed by the administrative investigation on the same set of facts persists, though not as prevalent as in the past.

*Pathway Forward*

In all cases where the identity of the complainant is unknown and the alleged conduct involves either potential criminal and/or serious administrative violations, SARP investigators from their respective Bureaus - Internal Affairs, Anti-Discrimination, and Administrative Affairs must conduct in-person interviews of all parties involved, including PRPB members who are under accusation and all members who may have witnessed the alleged conduct. The use of an "hoja de entrevista," by itself, is not an acceptable investigative tool in this category of internal investigation either by administrative or criminal internal investigators. Cases of a purported criminal nature must be investigated simultaneously by both NIA (Administrative Investigation) and NAI (Internal Investigations) within five days of receipt. Under no circumstances should an NAI investigator be assigned to investigate a case administratively once his/her criminal investigation into the same incident has concluded.

## Paragraph 169: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Complaint | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Intake protocol was followed in 95% of sampled investigations. | ☑ Met ☐ Missed |
| 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | ☑ Met ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

192

*Compliance Assessment*

Within the case files examined, the Monitor's Office has yet to see evidence of an "on-site" complaint against a PRPB officer or a case where a supervisor was summoned to accept such a complaint. The absence of such cases in the Monitor's Office's review samples supports the conclusion that this is most likely not occurring. PRPB should continue to use proactive steps to ensure that "on-site" complaints are actually a viable input method and are not discouraged in any way.

*Pathway Forward*

The finding of substantial compliance with this paragraph should not be interpreted by PRPB as a sign that its work is complete in terms of complaint intake protocol. Ongoing efforts must be taken to ensure that no PRPB member refuses to accept a complaint or otherwise attempts to dissuade a person from filing a complaint. Even though the PRPB member allegedly involved in dissuasion has not been cited by the complainant as one of the parties complained against, in all cases where this activity is alleged to have occurred by any individual, the investigator must either amplify and amend the case, or in the alternative file a separate case to investigate the alleged PRPB wrongdoing.

The Monitor's Office has recommended a measure in Paragraph 167, which is designed to proactively identify any case where a PRPB officer has either allegedly refused to accept a complaint or attempted to dissuade a person from filing a complaint. If that conduct has been proven to have occurred based upon a preponderance of evidence, then the officer(s) involved must be disciplined accordingly.

## Paragraph 170: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | ☑ Met | ☐ Missed |
| 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | ☑ Met | ☐ Missed |
| 2b. 95% of such SARP reviews are documented in accordance with approved policies. | ☑ Met | ☐ Missed |

193

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 158.

*Compliance Assessment*

PRPB's management of incoming civil causes of action and its corresponding action taken continues to demonstrate robust compliance with this provision. In the case of a civil cause of action, OAL appears to be informing SARP upon receipt of service of process. In the case of a criminal allegation involving a PRPB member, the Superintendency of Crime Investigations (SAIC) investigator also appears to be informing SARP of potential criminal wrongdoing, which would allow a corresponding SARP investigation of administrative misconduct to proceed without delay.

The Monitor's Office received a list of both civil causes of action and potential acts of criminality allegedly committed by PRPB members, all of which have been referred to SARP from either OAL or SAIC for assessment.

*Pathway Forward*

While the Monitor's Office has seen evidence to indicate that SARP is being informed of civil lawsuit and criminal allegations from OAL, PRDOJ, and SAIC, it remains to be seen whether SARP's criminal and administrative investigations are being conducted simultaneously as a default measure,[10] and that information is being shared between investigators appropriately.

Any lawsuit by a PRPB member against any other fellow member, especially one in which the complainant alleges any irregularity whatsoever in SARP or any reprisal from within the PRPB or DSP structure, may be analyzed by the Monitor's Office for future analysis and comment.[11]

## Paragraph 171: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

---

[10] The Monitor's Office has proposed one exception to this general rule. In cases where a PRDOJ or USDOJ prosecutor has requested a delay via a **signed writing**, a limited delay for the concurrent administrative investigation of criminal conduct is acceptable.

[11] Such an analysis will include whether the facts of said cases support or undermine a compliance finding not only with respect to this paragraph, but also with Paragraphs 173, 175, 180, 186, 192, and 197.

*Compliance Targets*

| | |
|---|---|
| 1. SARP administers a centralized numbering and tracking system for all misconduct complaints. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 178.

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-8 and as such is no longer conducting assessments of this paragraph.

## Paragraph 172: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | ☑ Met   ☐ Missed |
| 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 136, Data Sources #6 and #7.

*Compliance Assessment*

The analysis of current case files and cases overall shows that PRPB regularly forwards complaints to SARP within the prescribed timeframe, usually via internal processes. Cases generated by field supervisors were included in the investigative files received during the reporting period. In these cases, supervisors forwarded relevant information and evidence to SARP in a timely manner. The Monitor's Office's minor concern in this paragraph has been a few situations where PPR 311.1 (Master Complaint Form) were used for internal SARP complaints instead of non-punitive discipline. These instances were related to the Monitor 's Office anecdotally during SARP investigator interviews.

In the case of rudimentary and minor violations of the PRPB Code of Conduct, such as repeated absence, instances of not following orders, lateness, uniform violations, and other very minor disciplinary issues, supervisors must first turn to non-punitive discipline to help the employee adequately address these deficiencies instead of passing this responsibility to SARP. The Monitor's Office expects to see increasingly fewer incidents of this nature due to the addition of hundreds of new field supervisors with access to a new, digital non-punitive disciplinary process.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future CMRs.

### Paragraph 173: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | ☐ Met   ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

PRPB has implemented a digital timestamp solution that clearly indicates that the agency is assigning new SARP cases for investigation within the five working day period mandated by the Agreement. Unfortunately, most of these cases were for mere administrative violations, and not for purported criminal conduct by PRPB members. The Monitor's Office sees multiple cases of a criminal nature being investigated solely by NAI and not referred to an administrative investigator (NIA) for concurrent investigation within the same five-day rule. At present, there seems no apparent justification to delay the assignment of allegations of PRPB criminal wrongdoing for a separate concurrent investigation conducted by an administrative investigator.[12]

---

[12] There is one exception to the general rule - cases where a USDOJ or PRDOJ criminal prosecutor has requested a pause of the concurrent administrative investigation in a signed writing.

Any delay in proceeding on both fronts simultaneously brings certain risks - facts can be forgotten, witnesses may decline to testify, physical evidence may be lost, and witnesses may be difficult to locate.

*Pathway Forward*

Cases of a criminal nature involving possible misconduct by a PRPB member, which come to the attention of PRPB through any source, including but not limited to PRDOJ, USDOJ, civilian complainants, witnesses, anonymous sources, whistleblowers, media accounts, NAI investigators, etc., must be concurrently assigned to a SARP administrative investigator within five days of receiving this information, unless the prosecution requests in a signed writing to hold the administrative investigation in abeyance for a defined period of time.

### Paragraph 174: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. SARP classifies complaints in accordance with policy. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

*Compliance Assessment*

As mentioned in Paragraph 173, the Monitor's Office continues to see cases in which alleged criminal misconduct is first sent for internal criminal investigation and, only after that criminal investigation has concluded, are assigned for administrative investigation. There is no indication in the file as to whether a PRDOJ prosecutor has requested a delay in the administrative investigation of a criminal matter, so the Monitor's Office is left to conclude that there was no such request from the prosecutor's office.[13] All cases involving both criminal and administrative violations, irrespective of the source of the complaint, should be classified and investigated concurrently from both a criminal and rules violation perspective by two separate branches of SARP – NAI and NIA.

---

[13] It is with this reason in mind that the Monitor's Office requires a signed writing from a PRDOJ (or US Attorney) requesting that SARP forego the administrative investigation for a renewable period of 90 days. Without any such letter, it is near impossible for PRPB to show full compliance.

*Pathway Forward*

In the absence of a written and signed correspondence from a USDOJ or PRDOJ prosecutor a PRPB member that alleges misconduct that could be classified as both criminal and administrative in nature, the case must be assigned for separate and concurrent criminal and administrative investigation in accordance with established timelines.

## Paragraph 175: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | ☑ Met ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

The Monitor's Office has yet to find a case where a PRPB member alleged to have been involved in misconduct has taken an investigative role in the corresponding internal investigation.

### Pathway Forward

The Monitor's Office will review this area for continued substantial compliance.

## Paragraph 176: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement.*

| Compliance Status | Assessment Schedule |
|---|---|

198

| Fully Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| 1. SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | ☑ Met   ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-8 and as such is no longer conducting assessments of this paragraph.

## 4. Investigation of Complaints

The Monitor's Office has had the opportunity to measure SARP investigative performance trends over time. While there have been some positive developments, the Monitor's Office remains concerned about the conduct of administrative investigations as well as the average SARP investigator caseload.

The Monitor's Office has consistently encountered SARP cases that were closed with minimal, if any, effort to resolve direct and material contradictions in members' individual versions of the same incident. In previous CMRs, the Monitor's Office has made note of SARP administrative investigators alleging interference, collusion, retaliation, and possible cover-ups of administrative investigations against their immediate supervisor and perhaps even higher figures within PRPB. These allegations involved a multitude of alleged internal misconduct of a particularly alarming nature. The Monitor's Office will continue to follow these investigations in future Phase I/Phase II analyses.

When sworn police witnesses offer diametrically opposed versions of material fact(s) in a case involving an allegation of grave police misconduct, such a case should not be closed without interviewing all witnesses and the accused. These irreconcilable differences demand exhaustive attempts, including polygraph examination(s), on the part of the investigator to reconcile these diametrically opposing versions. There is no possible scenario where the Monitor's Office can find substantial compliance with the Agreement as long as this practice continues unchecked. Any PRPB employee who is found, based upon a preponderance of evidence, to have been untruthful during any SARP investigation must be held accountable, irrespective of whether the employee was originally cited as a complainant, witness, or accused. Police officers are routinely called to testify honestly about their observations in a variety of settings, including internal matters. The credibility and trustworthiness of all PRPB officers rests upon an established reputation for honesty and candor.

199

After interviewing nearly all active SARP investigators, the Monitor's Office is now convinced that the 'preponderance of evidence' standard of proof, which under the Agreement is required to be applied in 100% of SARP cases, continues to be somewhat misunderstood by a significant percentage of SARP investigators. This manifests itself when SARP investigators indicate unwillingness to look at an officer's disciplinary history until after their investigation had concluded. When asked why, the overwhelming majority responded that they wanted to avoid prejudicing themselves against the officer.

An officer's previous record can offer important evidence, especially in closely decided cases. PRPB must work with SARP, SAEA, and OAL to make it clear how and when this sort of evidence should be reviewed. Practical examples of cases where this evidence proved to be pivotal should be provided to investigators through both formative and in-service training.

## Paragraph 177: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Complaint | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☑ Met | ☐ Missed |
| 2. Investigation of complaints trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

Except for a SARP Internal Affairs (criminal) case, the standard of proof to be applied to any given administrative case is that of a "preponderance of evidence." This standard is well delineated throughout SARP formative training as well as the Instructor's Manual. Despite the frequent mention of this standard, there remains a persistent level of confusion among SARP investigators over the practical

200

application of a concept that is basic and yet difficult for many SARP investigators to grasp. The simplest way to explain a preponderance of evidence is to describe it numerically as 50.1 versus 49.9.

*Pathway Forward*

The Monitor's Office is aware that all SARP investigators have received REA 114R, a re-trainer consisting of 16 hours of training, which the Monitor's Office has not reviewed prior to use. The Monitor's Office strongly urges PRPB to have a closer look at the standard of proof and begin using practical examples of how prior conduct could move the needle from Not Sustained to Sustained. Practical training using multiple examples of the "preponderance of evidence" standard of proof is the key to curing this notable defect. The curriculum developer(s) should devote more attention to define and distinguish "preponderance of evidence," with other commonly used standards of proof used by PRPB including, "probable cause" and "guilt beyond a reasonable doubt." Efforts must be made to point out the relevance of prior accusations of remarkably similar conduct by the accused officer, even if the case was eventually adjudicated as "not sustained." Actual case examples should be used to illustrate and delineate these important differences.[14]

## Paragraph 178: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

As a general rule, an administrative investigation by PRPB must be launched when any employee, sworn or civilian, is alleged to have committed any violation of the U.S. or Puerto Rico Constitutions, federal or

---

[14] Of particular interest are cases where there are no witnesses other than the complainant and the accused, and where the PRPB member involved had been accused of strikingly similar misconduct in the past.

state laws relating to their duties, the commission of any crime proscribed by the penal code or special criminal law, regulations, public policy or procedure established by PRPB, under color of law or in their personal conduct.[15]

If a review of the content of a complaint does not indicate a violation of U.S. or Puerto Rico Constitutions, state or federal law regarding functions, regulations, public policy, or procedure established by PRPB, whether under color of law or in their personal conduct, then pursuant to Rule 9088 the complaint is then assigned for a preliminary investigation.[16]

The Agreement between the parties provides that, "…*(A)dministrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*[17]

The Monitor's Office is still seeing officers with a clear history of sustained cases involving remarkably similar gravely inappropriate conduct towards others - both members of the public and other PRPB members. The Monitor's Office has seen cases "preliminarily investigated," and/or "filed" when they ought to have been fully investigated and decided upon the objective facts of that investigation.[18]

## Pathway Forward

If the subject of anonymous or administratively filed complaints were the only measure of compliance under this paragraph, then the Monitor's Office would have made a sweeping not compliant assessment for PRPB's repeated failure to comply with previous recommendations. Over the past three years, an outsized portion of these complaints has been handled poorly by PRPB.

It bears repeating that no case should be sent for preliminary investigation where the complaint alleges conduct on the part of any PRPB member, sworn or civilian, that could constitute a violation of U.S. or Puerto Rico Constitutions, state or federal law regarding functions, regulations, public policy, or procedure established by PRPB, whether under color of law or in their personal conduct.

Administrative closures are reserved only for allegations that – even if proven,

1. Could not possibly constitute a PRPB administrative violation, or
2. Cases that are duplicated within the system, or
3. Cases that do not involve a PRPB employee.

Furthermore, any case that is administratively closed by SARP must contain a reference to the applicable rule above, as well as explain in detail why this case has been administratively closed. Recommended examples would contain the following or similar terminology:

a. …upon investigation, the allegations, even if proven to be true, cannot possibly rise to the level of an administrative or criminal violation committed by a PRPB member due to…, or,
b. …this case is an exact duplicate of SARP 20xx-xxxx, which is registered within EIS, or,

---

[15] PRPB Rule 9088, Article VI, paragraph 19, *Investigación Administrativa*.

[16] PRPB Rule 9088, Article VI, paragraph 20, *Investigación Preliminar*.

[17] See Agreement between USDOJ and the Commonwealth of Puerto Rico, Paragraph 178.

[18] See examples, SARP Cases 2023-0645, 2022-0208, and 2023-0648.

c.  …the accused is not a member of PRPB.

Any case sent to SARP command for administrative closure without these specific statement and facts establishing the truth of the matter must be reviewed by SARP command immediately and returned to the original investigator with instructions that the archival of this case has been denied and that a thorough investigation must be launched immediately within the timeframe stipulated by the Parties. That case must be returned in a timely manner with an appropriate and supported finding of sustained, not sustained, exonerated or unfounded.

From this date onward, *historial* entries containing reference to administrative closure from CMR-10 forward must contain a reference as to which of the three valid reasons cited above were applied to the facts in every case that has been administratively closed.

The mere fact that the complainant's identity is unknown to PRPB is never an acceptable reason or motive to administratively file or otherwise archive any complaint against a PRPB member.

Lastly, the Monitor's Office has consistently pointed out that PRPB must properly investigate all complaints where the complainant's identity is unknown. Any investigation not meeting any of the three administrative closure criteria above must be investigated immediately by SARP NIA (and possibly NAI if there is a plausible criminal dimension to the complaint) as if the complainant were a known individual with some level of credibility. No case of either administrative or criminal misconduct should be administratively closed unless it meets PRPB's own administrative closure criteria cited above.

The continued use of inappropriate techniques, incomplete investigations, cases archived counter to PRPB rules, mishandled or poorly investigated anonymous complaints, and the non-concurrence of administrative and criminal internal investigations each act as an effective bar to achieving substantial compliance with this paragraph.

## Paragraph 179: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | ☐ Met | ☑ Missed |
| 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | ☐ Met | ☑ Missed |
| 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | ☐ Met | ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

## Compliance Assessment

Phase I/Phase II analysis allows the Monitor's Office to accurately assess, in close to real time, SARP's adherence to investigative deadlines.

There continues to be some marginal improvement in timelines. However, the Monitor's Office found multiple examples where either the 5-day assignment rule, the 90-day investigative deadline rule, or the 3x30-day extension rule were either not appropriately followed or the file lacked evidence of compliance. There were also cases that lacked the paperwork that memorialize these deadlines in the case file.[19] Unfortunately, the number of these cases encountered was greater than the 5% threshold.[20]

As for the 90-day rule and the extension mechanism, and where the entire record of a case file is complete, the record shows that the majority of SARP investigators are cognizant of these deadlines and most seek extensions where indicated. Notwithstanding, there have been multiple incidents of repeated, legitimate requests for extensions that were delayed prior to eventual approval by the SARP command. These repeated delays ranged from a matter of days to well over a week. In fairness, all signs point to the investigator continuing the investigation in earnest while awaiting written approval for the extension. There have also been cases where the investigation passed through other investigators for reasons that are unclear to the Monitor's Office. Whether the original investigator or a colleague finishes the case, the 90-day rule and the extensions rule still both apply.

While minor cases of misconduct are adjudicated within SARP by SEAQA, the Monitor's Office has observed persistent delays in the adjudicative phase of serious complaints, which according to PRPB Rule 9088 (Processing of Administrative Complaints), must be conducted by OAL within a 30-day period.[21] OAL and SEAQA are limited to 30 days to adjudicate the case. The 30 days includes notification to the parties about the disposition of the underlying complaint.[22] Compliance with these self-imposed deadlines has been the exception, and not the rule.

---

[19] See 2023-1279, 2023-1092, 2023-0858, 2023-0450, and 2023-0445.
[20] See examples of 2023-1047 and 2022-0208.
[21] See PRPB Rule 9088, Article XII, s.5.
[22] ibid, Article XII, s.2. Also, see previous comments on the superfluous practice of notifying officers in hand via PPR 441.

In November 2023 DSP hired or transferred lawyers to OAL to address the massive backlog in adjudications. As noted in the introduction to this section, PRPB has made progress in addressing this backlog over the past few months. The Monitor's Office expects to see significant improvement in OAL's adjudications beginning with CMR-11.[23]

For nearly two years, the Monitor's Office has criticized PRPB OAL for having been effectively gutted in terms of its staffing and resources. It has also come to the Monitor's Office's attention that SEAQA, (the SARP Bureau that adjudicates less-serious offenses) may also be understaffed and overtasked.

*Pathway Forward*

As the agency responsible for PRPB Human Resources and Procurement, DSP must maintain adequate staffing of PRPB OAL and SARP-SEAQA to ensure that the self-imposed 30-day limit for adjudication and notification is met. Compensation of OAL lawyers and paralegals must be commensurate with and reflective of their professional and academic achievements in addition to their work responsibilities.

## Paragraph 180: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of selected investigations are thorough and findings are consistent with the facts | ☐ Met | ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

*Compliance Assessment*

This is a difficult and complex portion of the Agreement as it relies on several factors to help promote improvement. As such, the Monitor's Office expects to see modest and incremental improvement over each successive CMR until PRPB reaches a level of substantial compliance. That will not be reached in CMR-10 and requires several ongoing changes.

---

[T]The well over 700 backlogged adjudications did not arise overnight. DSP should be mindful of future OAL staffing to ensure that this backlog phenomenon never repeats itself. Towards that end, the Monitor's Office recommends leaving the new OAL lawyers in place, backfilling any vacancies that may arise without delay, and ensuring that proper staff and equipment is assigned to OAL immediately.

The Monitor's Office is aware of policy and procedural changes made to help achieve compliance with this paragraph. These changes include audio recording of all interviews (upon consent), as well as the creation of a faithful and accurate transcript by transcription experts, and not - as PRPB has suggested – by its already overtasked and overburdened SARP investigators.

The Monitor's Office repeats its concern with the interviewing techniques employed by many SARP investigators, specifically as they relate to establishing a conversational rather than legalistic tone. This activity persists in current cases and should have been pointed out to attendees of REA 114R (SARP Re-Training).[24]

Internal Affairs investigators still periodically rely upon a variant of a "hoja de entrevista,"[25] which is a form frequently handed out to a PRPB witness to compose an unchallenged statement of the facts in their own hand. Hojas de entrevista have also been used less frequently to memorialize an investigator's version of a PRPB witnesses' statement. These handwritten statements are often illegible and have little investigative use beyond freezing an officer's contemporaneous and individual version of the event.  The Monitor's Office continues to object to the use of "hojas de entrevista" as a stand-alone tool for conducting any interview of any kind, especially SARP interviews.

Lastly and for the record, the Monitor's Office is forthrightly opposed to the suggested practice of having PRPB SARP investigators create their own transcripts of recorded SARP interviews. From what the Monitor's Office has gathered in over 150 private interviews, most SARP investigators presently handle a very robust caseload. In fact, it has come to the Monitor's Office's attention that some investigators are handling over a dozen open cases at once, with additional cases assigned each week.

Multiply this caseload of 12 by a factor of at least 2 witnesses per case and a time commitment of well over a week of full-time work merely for the investigator to listen to and transcribe these interviews has been reached. To compel a trained and skilled investigator to complete 24 1-hour interviews and then spend at least the same amount of time creating accurate transcripts is an unacceptable misuse of investigative resources.

### *Pathway Forward*

Current SARP members will require substantive in-service training once policy and practice changes are finalized.

Regarding recommended changes, the Monitor's Office continues to recommend that:

1. The use of *hojas de entrevista* only for "locking in" and memorializing the version of a PRPB member at any time before an actual in-person interview (either by NAI, NIA, or NAA) of the same subject. Hojas de entrevista must be typewritten and not handwritten. The interviewer should use the *hoja de entrevista* prior to and during the in-person interview to ask questions and to clear up any areas left unclear or in doubt.

---

[24] See 2023-0648  and 2023-0645 - use of "le pregunto", 2023-0518 - officer has extensive record of prior similar misconduct which was not mentioned by the investigator, 2023-0329 - officer's poor memory left untested and investigator leading witnesses, 2023-1289 - subpar questioning of another officer with memory issues, 2022-0403 - subpar questioning of a sworn officer witness.

[25] *Hojas de Entrevista* also refer to a one-sided, unchallenged written version of the subject's account of the incident, which has been observed frequently in Internal Affairs (internal criminal) investigations in the past. This particular use of *hojas de entrevista* was previously and stridently criticized by the Monitor's Office for having little to no investigative value.

2. All SARP interviews should be digitally recorded with written consent of the interviewee. Said recordings should be transcribed by a professional transcriber and not the investigator.

3. SARP interview practice must be rooted in an open style rather than legalistic style. Open-ended questioning must predominate, especially in the first part of the interview, to place the subject at ease. The words, *le pregunto*, should be avoided as part of the conversational interview style, but could be employed later in the interview to deal with recalcitrant/hostile witnesses, or to clarify answers and thus eliminate ambiguity.

4. In cases where there is a preponderance of evidence that a PRPB member, whether complainant, witness, or accused, has attempted to deceive a SARP investigator, that member must receive a 'sustained' finding for untruthfulness, irrespective of whether the PRPB member was involved in the misconduct alleged in the complaint in any way.[26]

5. Anonymous whistleblower complaints must be investigated as if the person making the complaint is both known and reliable, at least until such time as the complainant's reliability has been substantially called into question by known facts.

## Paragraph 181: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | ☑ Met | ☐ Missed |
| 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

---

[26] See example Case 2023-0278 where it appears that a PRPB member was untruthful to the investigator with no consequences attached to that untruthfulness.

*Compliance Assessment*

While SARP investigator interviews indicate that PRPB officers show up for interviews, the content of these interviews often varies in terms of quality. Occasionally, when asked direct questions that go to the heart of wrongdoing by another officer, some officers may claim a faulty memory of the event itself, seemingly to avoid implicating that officer in alleged misconduct. "I don't recall," is perhaps the most common contemporary take on the notorious code of silence, as the officer feels as if s/he has neither lied to the investigator nor implicated a fellow officer in misconduct.[27] In some of the worst examples, directly contradicting information between fellow officers in serious cases are left unreconciled.

*Pathway Forward*

As mentioned repetitively in this and previous CMRs, the Monitor's Office recommends that no case be closed when officers directly contradict one another concerning a material fact in a serious internal misconduct case of any kind.[28] In the case of those officers whose memory allegedly fails when asked a direct question regarding their observations of another officers' alleged misconduct, the SARP investigator should employ some additional questioning to test just how poor the officers' memory is concerning other events that happened contemporaneously. In nearly all the cases involving memory examined by the Monitor's Office, including several more recent cases, this "poor memory," or "I'm not sure," assertion by an officer is invariably left untested by the investigator.

These declarations must be properly challenged, e.g., "Officer, you remember handcuffing the man, so how could you not remember your partner removing the man's watch at the same time?" Additional follow up questions may include:

1. "Why don't you remember?"
2. "Is there anything that would refresh your memory on this?"
3. "Are there any documents that could help you remember?"
4. "Who might know the answer?"
5. "How would you get the answer to this question?" and
6. "Do you have any reason to dispute the complainants' version of the incident?"

Negative answers to some or all these questions may be used by the investigator to determine the declarant's level of veracity when claiming a lack of memory to answer certain questions and not others that may be exculpatory to the officer or his/her peer(s).

Where two or more PRPB officers offer statements that are diametrically opposed over a material fact in an investigation involving very serious misconduct, the investigator should request a polygraph interview and examination to help further indicate the reliability of an officer's statement of material fact. Once any declarant's veracity has been effectively called into question on any question of material fact, then the declarant's version of the event in question is effectively undermined.

---

[27] For examples of officers having untested memory problems concerning their own misconduct or that of their peers, see 2023-0648, 2023-0329, and 2023-1289.

[28] In an administrative scenario, with no apparent criminal exposure (or in the case of Garrity, where there *may* exist criminal exposure on the part of any party), the declarant must answer all questions truthfully, or otherwise be subject to dismissal from the agency.

## Paragraph 182: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | ☐ Met   ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

Working closely with the Monitor's Office, PRPB has crafted an acceptable Garrity policy and Garrity Warning, which the Monitor's Office reviewed and edited over a year ago. The Monitor's Office is working with PRPB to further revise its data requests processes to ensure that cases requiring Garrity are adequately sampled for review. As such the Monitor's Office is deferring its assessment of this paragraph until these data requests can be finalized and proper data be produced.

### Pathway Forward

SARP has demonstrated to the Monitor's Office that they now possess an acceptable Garrity policy, which is the condition precedent for achieving any level of compliance in the future. That policy was written over a year ago.

PRPB must now train its investigators to understand how and when to use the new policy, it must also train the PRPB workforce on what to expect from this dramatic change in its GOs.

## Paragraph 183: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating.*

| Compliance Status | Assessment Schedule |
|---|---|
| | |

209

| Substantially Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| 1. Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | ☑ Met   ☐ Missed |
|---|---|
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

For the entire compliance monitoring phase, including CMR-1 to CMR-9, the Monitor's Office has not uncovered a single instance of a PRPB member being Mirandized where no possible criminal jeopardy could have arisen from the facts as alleged.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future CMRs.

### Paragraph 184: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | ☒ Met  ☐ Missed |
| 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | ☐ Met  ☒ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

While the Monitor's Office has seen and approved changes to PRPB policy and procedure to make this practice standard in most cases, the Monitor's Office has yet to see conclusive evidence that internal cases are investigated criminally and administratively at the same time by different investigators.

*Pathway Forward*

Internal criminal and administrative investigations must be conducted concurrently and by separate corresponding branches of SARP, e.g., NAI and NIA. Internal Affairs (NAI) investigators should not conduct administrative investigations of any kind, much less be assigned to re-investigate their own cases from an administrative angle. Continuance of this unacceptable practice prevents achieving any status beyond that of partial compliance.

## Paragraph 185: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | ☐ Met  ☒ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

211

*Compliance Assessment*

SARP has developed a policy and procedure in tenor with <u>Garrity</u>. As of this date, the Monitor's Office has seen no evidence that the SARP investigative workforce has been trained on said policy. The Monitor's Office is also unaware as to when the policy will be effectively implemented. The Monitor's Office's partial compliance finding is based upon continued non-use of agreed upon policies and procedures.

*Pathway Forward*

All SARP investigators must be trained on the new rule, whereupon the Monitor's Office will look for compliance based upon the investigative file reviews.

### Paragraph 186: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

Based upon multiple interviews of SARP investigators and analysis of case samples, the Monitor's Office has seen only a few examples that circumstantial evidence (especially prior remarkably similar allegations of misconduct on file with PRPB), is being routinely considered by SARP investigators.

Additionally, most SARP investigators accept an officer's assertion of a memory lapse in their internal investigations without further questioning. While pursuing this line of questioning may be uncomfortable for the SARP investigators, it is essential that the SARP investigator get to the truth of the matter.

212

*Pathway Forward*

The Monitor's Office expects to see ample and practical discussion of the standard of proof used and the types of circumstantial information that may tilt the balance away from a tie and towards a finding in favor of either party.

SARP investigators must be trained to analyze a member's *historial* in a closely decided case to determine whether the accused's alleged misconduct in the past is uncannily like the case presently under investigation. This is especially important when this evidence may push the probability of occurrence from 50-50 to 51-49 or higher, which should then result in a sustained finding against the member.

A SARP investigator must never blindly accept a declaration of, "I do not recall," from a PRPB member in response to a question of material fact in a SARP investigation. Instead, the investigator should question that member's level of recall with a series of follow up questions.[29]

## Paragraph 187: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor's Office has yet to observe a case that had been closed because a complaint was withdrawn, the alleged victim failed to cooperate, or the complainant was found guilty of any offense.

---

[29] See Paragraph 181 for examples.

## Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future CMRs.

## Paragraph 188: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

*a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;*

*b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

*c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*

*d) "Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor's Office has seen several cases in this reporting period where the SARP investigator, the Area Commander, and the SARP Commander left an incongruous finding in place. This commonly manifests itself as a confusion between a "not sustained" and "exonerated" finding, though there are other variations as well.[30]

All must understand that the findings of exoneration apply only when the preponderance of evidence reveals that the conduct did occur, and that the conduct was proper (in accordance with PRPB rules, policies, and/or procedures). If there is substantial doubt that the incident occurred, then the appropriate finding would be "unfounded."

---

[30] See 2023-0329, 2023-1092, and 2023-0498.

*Pathway Forward*

The Monitor's Office urges SARP to clarify the difference between its four factual case findings among all staff during all scheduled training events since confusion among SARP members continues.

## Paragraph 189: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor's Office learned during the reporting period that digital signatures and time stamps have now been incorporated into current SARP cases under investigation and entered into the EIS. Notwithstanding this change, documents corroborating this important supervisory review are often left without a signature or date or are not included in the file at all.[31]

### Pathway Forward

The Monitor's Office recommends that each case be reviewed to ensure that it contains a properly endorsed review/approval from both the area command as well as CARP (or their lawful authorized delegate).

---

[31] The Monitor's Office can provide the specific case numbers in which these findings were made upon request.

## Paragraph 190: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☑ Met | ☐ Missed |
| 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor's Office finds that the OPC eventually reviews and resolves complaints in tenor with the paragraph in at least 95% of the cases examined. However, there remains no doubt that the chronic severe understaffing of both OAL and SEAQA had an impact on the timing of these results by the Commissioner. Indeed, the Monitor's Office has found numerous examples of cases that took months, even years to adjudicate after the case was originally forwarded to OAL or SEAQA. OAL claims to have adjudicated just under half of the reported backlog of 779 delayed cases, sending 284 cases to the Commissioner for a "final resolution," effectively shifting the backlog from one part of the agency to another. The Monitor's Office has no data on whether the parties to these cases were notified, in writing, which is the final stage of this procedure.

According to PRPB's own policy, once an investigation has been concluded, then either OAL (in serious matters) and SEAQA (in less-serious matters) has 30 days to reaffirm said finding and notify the parties. The Monitor's Office's review clearly indicates that compliance in this area is more the exception than the rule.

216

*Pathway Forward*

If DSP and PRPB fail to eliminate this resolution lag once and for all, it will become impossible for PRPB to achieve substantial compliance. Lawyers assigned or transferred to OAL must either remain assigned to OAL or be immediately replaced by DSP if moved.

The Monitor's Office recommends that, when a finding is changed at the SARP command, OAL, or the OPC levels, that the initial investigator not only be informed of such a change, but also receive a brief rationale for said change. To add a brief explanation to the file and to grant access to these findings permits the investigators to follow their investigative results as they are adjudicated and helps to instill transparency and clarity in findings. Historiales should also contain a brief rationale for changes in any findings at the OPC level.

## Paragraph 191: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s).*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 178.

*Compliance Assessment*

The Monitor's Office has examined cases investigated during the reporting period for the inclusion of the following observations on the part of the investigator:

(a) Compliance with training and legal standards;

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome;

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action; or

217

(d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

The results of this analysis are clear. In virtually all SARP cases reviewed for this reporting period, the investigator did not mention any of these observations in their final report.

### Pathway Forward

To improve its performance, SARP investigators must be mindful of existing PRPB training, legal standards, rules and procedures, GOs, and policies. Many complaints against PRPB members by members of the public relate to one or more of these causal factors. Presently, the Monitor's Office finds that the majority of SARP investigators are not analyzing their cases to identify possible causal factors.

PRPB must include observations (a) through (d) as noted above in every case file. This could be accomplished on their cover sheet "checklist" as checked boxes indicating that the analysis was made and was concluded as "negative" or "not applicable." In the case where the observation was made in the investigation, the investigator must specifically elaborate on the observation in his/her report.

### Paragraph 192: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | ☑ Met  ☐ Missed |
| 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor's Office has found this paragraph to be fully compliant as of CMR-7 and as such is no longer conducting assessments of this paragraph.

218

## Paragraph 193: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | ☑ Met | ☐ Missed |
| 2. PRPB's document retention practices comply with approved policies. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-9 and as such is no longer conducting assessments of this paragraph.

## 5. Staffing, Selection, and Training Requirements

As policies and investigative techniques continue to change, PRPB must ensure that all current investigators are familiar with and can demonstrate their familiarity with all these new procedures.

All personnel assessments in general, and those involving SARP investigators and staff in particular, should contain a presential component. Supervisors should meet with subordinates to privately discuss areas where the subordinate is excelling, and areas where a subordinate may improve their performance. Specific advice or coaching should always be given to the subordinate with the goal of improving the employee's performance and job satisfaction.

## Paragraph 194: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations.*

219

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met  ☐ Missed |
| 2. Trainings for the internal investigation unit are consistent with approved policies. | ☒ Met  ☐ Missed |
| 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | ☒ Met  ☐ Missed |
| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | ☐ Met  ☒ Missed |
| 5a. Internal investigation unit personnel serve three-year terms. | ☒ Met  ☐ Missed |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | ☒ Met  ☐ Missed |

*Compliance Assessment*

From extensive interviews with SARP members, the Monitor's Office continues to find that the decision process to extend an investigator's service period appears to be ad hoc in practice, but there are signs that this is changing.

The Monitor's Office has reviewed recent procurement requests from SARP command and has found that some of the requested personnel and resources have been delivered. However, there is still a desperate need for off-site NAI office space, additional investigators, infrastructure support, and improvements to the vehicular fleet.

*Pathway Forward*

The Monitor's Office expects DSP to address SARP requests for human resources, equipment, and office space at its highest priority and to deliver these resources without any unnecessary further delay.

Having absorbed the procurement function of PRPB, DSP must now procure adequate office spaces to house NAI investigators. Aside from being located outside of any PRPB facility, this space must contain adequate infrastructure (securely alarmed premises, sufficient Internet access, secure communications, desks, chairs, cubicles, private interview space, etc.). These are all prerequisites for a substantial compliance finding for this paragraph.

## Paragraph 195: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

### *Compliance Assessment*

Very few SARP investigators describe a conversation with their superior(s) regarding whether they would choose to stay in SARP or transfer to another section after their three years of service. After interviewing virtually every SARP investigator, the Monitor's Office concludes that most investigators, if given a choice, would choose to stay in the unit. Nevertheless, every SARP member should be asked every three years if they would like to be assigned to another part of the Bureau.

### *Pathway Forward*

Re-appointment of SARP investigators for additional three-year terms should not be an automatic practice, but rather one based upon a series of objective performance reviews. The three-year period should be looked at as an opportunity to shift out investigators who are burned out or unmotivated. It should also be looked at as a career-improvement measure. If SARP asks its highly productive members if they are content, those members invariably will provide needed insight into workplace conditions and morale. SARP members who on their own volition unilaterally transfer out of SARP should do so via an exit interview conducted by the Area Commander. This interview may help SARP determine what, if anything, led to the investigator's decision to voluntarily leave the unit. Exit interviews develop actionable information on recruitment, morale, and retention of investigators.

## Paragraph 196: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

## *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

## *Compliance Assessment*

Records indicate that all SARP investigators have completed REA 114 – the formative investigator's training course. Although PRPB has met compliance with the areas of this paragraph because its methodology is contingent on progress made in Paragraph 194, compliance is found to be partial.

## *Pathway Forward*

SARP and SAEA should work together to address any of the following areas of observation made by a SARP investigator in any SARP report:

> (a) Compliance with training and legal standards, or

> (b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome, or

> (c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action, or

> (d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

## 6. Preventing Retaliation

In the present SARP file sample requests, complaints specifically involving retaliation usually comprise a small percentage of cases within the given sample. The Monitor's Office has some concerns regarding multiple ongoing investigations and will be scrutinizing these cases very carefully once they are declared to be complete. The Monitor's Office reserves the right in the future to draw a purposive sample of SARP cases that specifically feature such allegations to ensure a statistically relevant assessment for future CMRs.

## Paragraph 197: Civilian Complaints, Internal Investigations, and Discipline - Preventing Retaliation

*PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.*

222

*Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☒ Met | ☐ Missed |
| 2. Retaliation trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | ☐ Met | ☒ Missed |
| 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | ☒ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office will be meticulously examining high profile cases of an internal nature, which often involve possible retaliation, to ensure that they were properly and thoroughly investigated, that the outcome and findings were adequately supported by the facts, and that the findings were adjudicated expeditiously in accordance with PRPB policy. There were only a handful of this type of case within the sample requested. The Monitors Office will consider a broader sample of these complaints for CMR-11 to better judge compliance.

### Pathway Forward

SARP investigators must review the accused officer's history in every case, especially those cases that involve repeated allegations of remarkably similar behavior involving similar complainants. Irrespective of whether this analysis supports a finding of sustained or not sustained, the investigator should mention an officer's past record of having been accused of remarkably similar conduct by similar types of people. The investigator must also determine whether their investigation and the record of prior similar accusations by similar complainants reaches the 50.1% burden of proof required for a sustained finding or not.

As retaliation cases often have an acutely negative impact on morale at all levels of a police agency, SARP investigators must exhaustively investigate these allegations. No investigation involving reprisal within PRPB should be closed administratively, nor should any such case ever be considered complete when untested and diametrically opposing versions of the facts remain between sworn PRPB members. In

223

these serious cases, which have severe implications for both institutional morale and discipline, every legal tool must be employed to determine who is being truthful and who is not – irrespective of the ranks of the people involved. Only once every legal avenue to the truth has been tested may such a case be considered completed and closed.

## 7. Discipline

The use of a Phase I/Phase II analysis has assisted the Monitor's Office in focusing on the adjudicative and resulting disciplinary process of many types of complaints. The Monitor's Office has discovered a disturbing practice of delay in adjudicating serious allegations of PRPB misconduct in the time prescribed by their own rule. These delays are considerably beyond the 30-day limit, and in many cases the Monitor's Office has seen frequent delays of months to beyond three years. During this period, the accused officer is effectively barred from promotion. The Monitor's Office has been informed of civil lawsuits filed against the Commonwealth by those unjustly passed over for promotion under a due process theory of recovery.

The Monitor's Office continues to see that discipline is applied in accordance with the PRPB Code of Conduct and related disciplinary matrix.

As is the case with many other areas contained within this section and mentioned previously, training records must be provided to the Monitor's Office to show proof that the requisite number of PRPB members have been appropriately trained.

### Paragraph 198: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 198-199. | ☑ Met | ☐ Missed |
| 2. Discipline trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |

224

| | | |
|---|---|---|
| 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | ☑ Met | ☐ Missed |
| 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office bases its assessment on a Phase II examination of multiple closed cases, each of which received a final resolution during the reporting period. While this group of cases was far more dated than those subjected to a Phase I analysis, the Monitor's Office may conclude that PRPB is using its disciplinary matrix as it was designed to be used. This does not mean that PRPB is close to meeting its own rules requirements with respect to adjudication or notice to the parties, as has been repeatedly stated in this and previous CMRs.

The Monitor's Office continues to see that discipline is generally applied in accordance with the PRPB Code of Conduct and related disciplinary matrix. There have been several cases however that fall outside of this disciplinary scheme.

The Monitor's Office continues to suggest that, when the OPC deviates from the PRPB disciplinary matrix, most often involving a downward departure on the number of days an implicated party is suspended, then there should be a short reason as to why such a deviation was made. The absence of any explanation for lessened discipline (or for that matter enhanced discipline) lends itself to accusations of favoritism, influence, nepotism, or political interference, each of which is devastating to institutional morale.

*Pathway Forward*

No internal investigative case either of a serious criminal or administrative nature should be closed when the investigation leaves in place a direct contradiction between versions of sworn PRPB officials of any rank without first exhausting all attempts to reconcile the discrepancy.

In cases where the final resolution findings depart from the original investigator's findings, the investigator should be able to access these findings online and find a brief, written rationale for the deviation from the SARP investigator's findings. This helps maintain transparency within SARP while providing helpful feedback for investigators.

## Paragraph 199: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |

225

| | | | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 198.

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-8 and as such is no longer conducting assessments of this paragraph.

## Paragraph 200: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB's drug testing program trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | ☑ Met | ☐ Missed |

*Compliance Assessment*

Examination of PRPB's random controlled substance testing shows a minor improvement from the previous reporting period. For this 6-month reporting period, PRPB performed screenings of 1,727 persons versus 1,549 persons last reporting period, versus 1,849 for CMR-8. PRPB must trend closer towards 4,000 random screenings a year to help ensure that every active PRPB member is screened at random at least once every 3 years, which is a best practice.

Interestingly, this renewed focus on random drug testing appears to have increased the level of scrutiny concerning a few PRPB members. For this reporting period, at least five individuals' test results appear to have been passed along for further lab analysis to confirm results. This is a greater number of possible positive tests than the Monitor's Office has seen before in any given reporting period. One could put forth the notion that increased levels of testing members may be yielding incrementally greater numbers of possible positive test results, many of which may not have been detected without resorting to the testing of larger amounts of PRPB employees.

The Monitor's Office had an opportunity to observe the test collection and preservation in-person during a visit to the Aguadilla area command during this reporting period. The Monitor's Office was struck by the discipline and methodical nature of the PRPB/ICF partnership during these proceedings. The Monitor's Office concludes that the collection and preservation methodologies employed are sufficient in both their design and practical use.

*Pathway Forward*

The Monitor's Office is pleased to see a return to progress in PRPB's controlled substance testing program relating to the aggregate number of persons tested annually.

From the tables supplied by PRPB, and except for cadets and cadet candidates, it is impossible to determine how long active PRPB members had gone without prior testing. The Monitor's Office continues to recommend that PRPB prioritize testing sworn officers who have not been tested in the last five years. It is unclear from the data whether PRPB is doing this.

The Monitor's Office recommends that, wherever possible, controlled substance testing be performed on all applicants for any position within PRPB prior to being contracted for employment and certainly before entering the Academy.[32]  The Monitor's Office also reaffirms that the aggregate number of tests conducted annually be increased to approximately 4,000 members, including active and incoming cadets. Extrapolating the data supplied, PRPB is again trending towards the goal of 4,000 persons annually. The Monitor's Office remains open to suggestions from and collaboration with PRPB to make this process more innovative, efficient, and effective.

## 8. Officer Assistance and Support

The Monitor's Office continues to find the PAE program to be highly effective and thus in substantial compliance with the Agreement. Where a lower level of compliance is assessed in the foregoing, it is due to the lack of training held in the subject matter area, and not a failure of PAE in any way.

### Paragraph 201: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports*

---

[32] While drug testing has a cost in terms of human resources as well as the test itself, that cost is minimal compared to performing a full-spectrum background investigation. To perform such an in-depth investigation only to later discover that the candidate tested positive for a controlled substance implies a less than efficient use of candidate screening resources.

*and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

## Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 201-204. | ☑ Met | ☐ Missed |
| 2. Officer assistance and support trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | ☑ Met | ☐ Missed |
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | ☑ Met | ☐ Missed |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | ☑ Met | ☐ Missed |

## Compliance Assessment

PRPB currently provides officers and employees with a range of non-punitive support and services to address and correct problem behavior, as part of PRPB's disciplinary and performance improvement systems. These supports and services include readily accessible confidential counseling services, critical incident debriefings, crisis counseling, mental health evaluations, and stress management training.

## Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future CMRs.

## Paragraph 202: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.*

| Compliance Status | Assessment Schedule |
|---|---|

228

| Substantially Compliant | | Review Period | October 2023 – March 2024 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

PRPB currently trains management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor's Office will continue to reassess PRPB's continued compliance in future CMRs.

## Paragraph 203: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall involve mental health professionals in developing and providing in- service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

The Monitor's Office has found this paragraph to be fully compliant as of CMR-9 and as such is no longer conducting assessments of this paragraph.

229

## Paragraph 204: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

### Compliance Assessment

PRPB ensures that any mental health counseling services provided to PRPB employees remain confidential as consistent with HIPPA and generally accepted practices in the field of mental health care. PRPB has achieved substantial compliance with this paragraph.

### Pathway Forward

The Monitor's Office will continue to assess this paragraph to ensure that it meets the requirements of the Agreement.

230

# X. Community Engagement and Public Information

Community Engagement, which integrates Community Policing and Public Information, is governed by 13 paragraphs in the Agreement (paragraphs 205 through 217). These paragraphs underwent a comprehensive review in CMR-8 and are reassessed in the current reporting period.

Assessment compliance in this reporting period focuses on PRPB's transition from an administrative and operational capacity-building phase to effectively demonstrating the implementation of community engagement and public information practices. These practices include diverse workforce recruitment with community involvement through CICs, performance appraisals, personnel deployment for community engagement and policing, collaborative problem-solving using the S.A.R.A. Model and community alliances, and community outreach activities aimed at awareness, education, and prevention, ultimately improving community quality of life through strategic planning and sustainable connections.

Informing the public is pivotal in community policing to dispel misconceptions and enhance transparency. Citizens need information on policies, procedures, and crime trends to understand how law enforcement operates and to provide well-informed feedback. These relationships, along with outreach programs, enable collaboration between community members and the police, resulting in solutions tailored to specific community needs.

The Community Engagement and Public Information section of the Agreement entails disseminating accurate and updated crime statistics, policies, and community programs to address concerns. Using internal resources through media and social platforms and engaging the community in group discussions to develop problem-solving strategies are crucial for improving community quality of life, ensuring public safety, and promoting transparency and accountability.

The public should be involved in prioritizing and addressing public safety issues. Partnering with direct service providers, educational institutions, and community-based organizations can effectively identify relevant issues for problem-solving. Better technology systems and objective data can enhance operational efficiency and meet the public's demand for accountability and transparency.

PRPB made progress in achieving compliance with the Agreement during this reporting period, addressing challenges in various areas, including competency development in community policing. Although in-service training partially compensated for some shortcomings, sustaining consistent training plans aligned with policies and the Agreement remains challenging. Efforts are needed to prioritize the development and maintenance of meaningful alliances, adopt a comprehensive police approach, and conduct open public information meetings across all police areas. To address these challenges, PRPB has developed a plan focusing on 62 paragraphs, 8 of which involve community policing. Bi-weekly meetings with the Monitor's Office commenced in January 2024 to progressively address these issues, aiming for completion by June 2025.

During this reporting period, the Monitor's Office reviewed GOs 801 (Community Interaction Committee (CICs)), 803 (Community Policing) and corresponding PPRs, 805 (Community Meetings), and conducted interviews with PRPB members involved in community policing across various levels. Interviews spanned

231

9 police areas, 2 specialized units, 2 Auxiliary Superintendencies, and CIC members from all 13 police areas. The Monitor's Office also participated in a Central CIC meeting in San Juan and an open meeting in Las Piedras for the Humacao police area. Additionally, the Monitor's Office observed a train-the-trainer session conducted by SAEA on community policing which emphasized the module system, information recording, and validation practices.

There has been significant progress in securing CIC membership across all 13 police areas during this reporting period. CICs play a vital role in providing recommendations to PRPB on policies, recruitment, and strategies based on the perspectives and needs of their communities. This achievement is largely due to internal campaigns and self-referrals by the committees. However, PRPB needs to expand joint efforts with the community to develop a comprehensive community policing approach that addresses crime and safety issues in collaboration with CICs.

Key areas of non-compliance with community outreach practices outlined in the Agreement include 1) reaching out to the community and delivering information to the public through open meetings (Encuentros Comunitarios) to address issues of community concerns, 2) reporting on Agreement progress, and 3) educating the public on topics outlined by the Agreement, including crime statistics, UOF, nondiscriminatory practices, administrative complaints and commendations, and individuals' rights to decline consent to voluntary searches, among other topics. PRPB's attempts to deliver these meetings remain insufficient, with evidence showing that only one police area held its open meeting during the reporting period. Additionally, documentation submitted for assessment did not meet compliance targets, as they were initiatives carried out by CICs, not by PRPB as required.

During this reporting period, PRPB launched a redesigned website aimed at providing the public with enhanced access to information and services. The website integrates public reports and features weekly safety tip banners and a Virtual Library. Crime statistics reports have been expanded including domestic and gender violence, sexual abuse, and hate crimes.

Overall, the Commonwealth's compliance with the 13 Community Engagement and Public Information paragraphs has improved compared to previous reporting periods. In CMR-8, 38% of paragraphs (5 paragraphs) were assessed as partially compliant and 61% of paragraphs (8 paragraphs) were assessed as not compliant in comparison to the current reporting period where 77% of paragraphs (10 paragraphs) were found to be partially compliant and 23% of paragraphs (3 paragraphs) were found to be not compliant. See figure 9.



*Figure 9. Community Engagement and Public Information: Paragraph Compliance Status*

## Paragraph 205: Community Engagement and Public Information - General Provisions

*PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

### *Compliance Assessment*

The Monitor's Office assessed the following aspects of community policing relevant to Paragraph 205 during the reporting period.

233

## Community Policing in Policy

The policy for Community Policing (GO 803) has been in effect since October 31, 2021, with a requirement for revision every two years. It was due for revision during the prior reporting period and remains overdue to date.

## Community Policing Training

PRPB has made significant strides in implementing Community Policing training, with 95% of members receiving training on community policing as part of its in-service training program. However, additional training is needed for CIC facilitators, focusing on their duties and responsibilities, pursuant to GO 801 (CICs). During the CMR-8 reporting period, three police areas were scheduled for Technical Assistance Program training, while six areas awaited Cycle III training. Plans for specialized units' training were underway but ceased during the prior reporting period pending administrative review. The Monitor's Office stresses the importance of leveraging the coordinators to ensure the continuation of this program, as it has been instrumental in expanding community policing. PRPB must develop and submit training schedules and materials for evaluation to ensure compliance and effective practices to demonstrate that it has leveraged these coordinators to continue this program.

## Community Policing in Recruitment

During the CMR-8 reporting period, the Monitor's Office identified deficiencies in PRPB's recruitment plan, emphasizing the need for alignment with community policing values and broader stakeholder engagement and participation. PRPB's improvements to CIC and community stakeholders' involvement in recruitment began during this reporting period to comply with GO 501 and several paragraphs in the Agreement. In March 2024, PRPB drafted an update to the plan and shared it with the CICs via its central spokesperson seeking recommendations to attract a diverse group of applicants. Its promotion committee was also updated, including active and direct CIC participation. These projects are on the agenda for internal discussions and implemented practices, subject to compliance determination during the next reporting period.

PRPB could enhance stakeholders' collaboration with colleges, universities, and community groups to diversify its workforce, leveraging MOUs or collaboration agreements for recruitment.[33] PRPB can also integrate the Press Office in recruitment campaigns and multi-media outreach. Implementing these adjustments will strengthen PRPB's commitment to community engagement in recruitment practices.

## Community Policing in Management and Performance Evaluations

In accordance with GO 310 (Performance Evaluations) performance evaluations were revised to include additional measures related to community engagement. These changes took effect in January 2024, covering performance from January 1, 2023, onward. However, the lack of supervisory training on implementing these changes may hinder the Bureau's ability to assess performance effectively. Supervisors need training to link evaluations to community policing principles and ensure they align with job descriptions. Clear guidelines for performance, incentives, and promotions should support problem-

---

[33] GO 501 Chaps. IV § Sec. B (e); VI.

solving, proactive policing, community alliances, and stakeholder satisfaction, with scores reflecting these factors.

## Community Interaction Committees

PRPB has made significant strides in recruiting CIC members for each police area, but GO 801 (CICs), initiated in 2021, is still pending approval. According to the policy, each committee should comprise 11 community representatives from various sectors, yet most committees during this reporting period had 6 to 10 members. While most CIC members completed required training, their involvement in comprehensive community policing efforts within their areas remains limited due to insufficient evidence and engagement plans. PRPB needs to expand collaborative efforts with the community to develop and implement strategies addressing specific needs, crime, and safety issues in each area command. CIC input should be sought in all policy-instituted functions, including policing practices, recruitment, victim services, community feedback, training, reform initiatives, and public information dissemination, which will enhance transparency and advance accountability.

## Community Policing and Collaborative Problem Solving

During the reporting period, PRPB continued its efforts to implement at least one problem-solving project per district/precinct per area, aiming to address various safety concerns. However, this objective has not been fully achieved. Implementation deficiencies persist in documenting and executing practices for outreach, alliance development/sustainment, and problem-solving, as identified in previous reporting periods. PRPB must ensure that all related reports are comprehensive to determine successful compliance. To address these issues and align with Agreement requirements, PRPB appointed police area coordinators to support community policing efforts. An execution plan in line with these practices should be developed and submitted for evaluation. Practices should involve community stakeholders in identifying problems and collaborating on effective responses, with supervisory accountability ensuring effective implementation. Compliance in collaborative problem-solving remains partially achieved, mainly due to delays in fully rolling out staffing allocations despite revisions in previous CMRs, including ancillary training on implementation practices.

## Public Information

PRPB introduced a redesigned website and integrated public reports to enhance public access to information. PRPB made significant improvement in providing crime statistics to the public. However, concerns about PRPB's need to become a NIBRS certified agency is a longstanding issue in need of addressing.

PRPB can enhance compliance by improving public awareness of community policing practices through the structured integration of the Press Office. Targeted campaigns should inform the public about community participation, crime trends, gender and domestic violence including services and resources, UOF policies, and non-discriminatory practices. Partnering with community stakeholders for awareness, education, and referrals is essential for effective engagement.

*Pathway Forward*

The Monitor's Office emphasizes the need for PRPB to submit a recruitment plan aligned with community policing standards and inclusive of broader stakeholder participation. Modifications to align the plan with policy are in discussion but pending approval. PRPB should increase efforts to partner with colleges, universities, and community stakeholders to ensure a diverse workforce. Seeking assistance from local consulates enhances communication and referrals, which should be continued and updated during each reporting period. Involving CIC members in recruitment campaigns per policy and using the Press Office for advertising enhances these efforts. The Press Office could be integrated into recruitment efforts through advertising campaigns and multi-media resources. Better practices in community policing involve engaging community stakeholders to identify problems and collaborating on effective responses. Supervisors should ensure accountability in developing and executing initiatives aimed at crime prevention and problem-solving, enhancing competencies aligned with community policing principles.

Supervisory training is essential for effectively implementing the new performance evaluation module aligned with community policing practices. Performance guidelines should support problem-solving activities, proactive policing, and stakeholder satisfaction, with ratings reflecting these criteria. PRPB must complete the staffing allocation roll-out to facilitate the expansion of community policing. Revisions during the prior reporting period fell short even though Paragraph 13 implementation indicators were considered in alignment with community-oriented policing principles and supportive of systematic use of partnerships and problem-solving techniques. PRPB must incorporate staffing requirements for proactive community policing into the updated Paragraph 13 Supervision and Staffing Plan.

PRPB is actively working on plans aimed at improving its reporting systems to keep the public informed for increased transparency and accountability in its policing practices. Using internal resources through the Press Office and multimedia can assist PRPB in overcoming technological challenges and meeting Agreement requirements. Educational campaigns, webinars, podcasts, and community evaluations are essential for informing the public and reporting progress on reform initiatives.

## 1. Community Oriented Policing

Progress towards supporting problem-solving activities, outreach, alliances, and quality of life improvements is ongoing but primarily at the capacity-building stage. Improved operational data collection quality and reliable auditing practices are essential for demonstrating compliance with these paragraphs and others in the Agreement. To address this, PRPB developed a self-monitoring module through AH Datalytics, the Commonwealth's contractor, which mirrors all data collected within its module system for internal analysis and enhanced practices. These efforts show promise in resolving challenges related to consistent data collection and increasing the Bureau's capacity for data tracking and analysis, leading to improved data quality for reliable measurement and ongoing progress.

In mid-February 2024, PRPB appointed police area coordinators to facilitate and serve as points of contact for area facilitators, providing training, support, and assistance in community policing practices. Per standing policy, their responsibilities include identifying potential community stakeholders,

organizing problem-solving activities, and assisting facilitators with developing community initiatives aimed at improving quality of life. These coordinators report to a central coordinator recently designated by the Reform Office, who is responsible for reporting to the Commissioner on secured and sustained alliances and outreach efforts across all assistant superintendencies. They also oversee the development and submission of the annual alliances' report as required by policy and the Agreement. The Monitor's Office considers these operational implementations positively as they could help bridge gaps in community policing practices at the district and precinct levels where expansion has been limited. However, PRPB has not provided timelines for the full rollout of these new designations or a detailed description of responsibilities. Field interviews with district and precinct directors and supervisors revealed that many were unaware of these designations. The Monitor's Office understands that since these appointments took place towards the end of this reporting period, operational objectives will be finalized and in place in the near future.

## Paragraph 206: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem- solving approach.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 206. | ☑ Met | ☐ Missed |
| 2. Community policing and problem solving trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | ☐ Met | ☑ Missed |
| 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | ☐ Met | ☑ Missed |
| 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | ☐ Met | ☑ Missed |
| Note: This paragraph is assessed together with Paragraph 13 of the Agreement. | | |

237

*Compliance Assessment*

GO 803 (Community Policing) was established in October 2021. Although the policy was scheduled for revision during the prior reporting period, the updates are still pending approval. While the policy met Target 1 requirements during the CMR-8 reporting period, the overdue revisions are still pending review.

During the reporting period, PRPB aimed to resume the delivery of the mandatory 40-hour annual in-service training, including community policing. Despite the outdated policy, PRPB continued training through SAEA on the current policy, showing commendable progress in developing training programs for compliance with community policing standards. PRPB met the 95% threshold for the in-service training for community policing. 2024 training will be assessed as part of CMR-11.

During the CMR-8 reporting period, PRPB submitted an updated staffing plan to the court, but the full implementation continued to fall short during the current reporting period. Most police areas still report limited PRPB assigned to community policing duties while handling other responsibilities on post. Despite alignment with community-oriented policing principles, staffing requirements outlined in Paragraph 13 remain unchanged.

PRPB has enhanced its community policing module system, introducing a self-paced resources module and a self-monitoring section through contracted services with AH Datalytics, the Commonwealth's contractor. This internal review mechanism is currently undergoing administrative evaluation and holds promise for effectively measuring implemented practices as required in the Agreement. Additionally, PRPB designated police area coordinators in mid-February 2024 to provide training, support, and assistance on community policing practices. These coordinators, along with area facilitators, will serve as resources to field officers and report to the Commissioner on secured alliances and outreach efforts.

Despite these initiatives, PRPB has not provided timetables for the full roll-out of these designations or structured objectives and functions. Field interviews revealed a lack of awareness among district and precinct directors and supervisors. The Monitor's Office recommends establishing a working group to assist in refining processes and ensuring user feedback is incorporated into system improvements.

The Monitor's Office in collaboration with the Parties have been working on revisions to the methodology for several paragraphs within this section. These changes will hopefully streamline the efforts of PRPB and achieve sustainable reform.

During this reporting period, the Monitor's Office observed a significant decrease in the implementation of problem-solving initiatives using the S.A.R.A. Model. PRPB's self-monitoring module, developed by AH Datalytics, the Commonwealth's contractor, indicated that nine initiatives were recorded during this reporting period. Among these, five (56%) were classified as in process, three (33%) were completed, and one (11%) was in the initial stages. Notably, all these activities originated from the Assistant Superintendency of Field Operations (SAOC), which includes all districts and precincts, with none attributed to SAIC, SARP, SAOE, or SAEA. It is imperative that such efforts involve all auxiliary superintendencies to meet the 95% threshold for districts, precincts, and units across the Bureau, ensuring compliance with Target 5 outlined in Paragraph 206. Reviewed problem-solving activities primarily focused on police interventions targeting illegal auto-repair shops, unlicensed technicians, and drug raids, but lacked evidence of community involvement. To address this, strategies need to be

implemented to deter incidents (crime analysis), improve community satisfaction (victimization data), and enhance the quality of life (support services and resources). However, deficiencies in documenting and executing practices for outreach, alliance development/sustainment, and problem-solving identified in previous CMRs persist. PRPB must ensure that reports on problem-solving, alliances, and outreach are comprehensive and include all relevant data, including work plans, meeting minutes, referral evidence, outcome/results reports, and stakeholders involved. Supervisors and certifying officers should not only support execution but also review and discuss with their supervisees whether the practices meet the criteria for model implementation. Ultimately, they are responsible for developing and implementing initiatives and strategies to support problem-solving efforts, and they must provide coaching to identify barriers and effective responses to ensure better practices in community policing within their units.

## *Pathway Forward*

The Monitor's Office suggests establishing a working group comprising facilitators, field officers, and validation officers/supervisors to identify needs, address shortcomings, and offer feedback to coordinators based on users' experiences. These coordinators should be empowered to help officers identify potential community stakeholders, create internal directories, foster relationships, identify problem-solving needs, and develop initiatives to improve quality of life. PRPB has not yet met the requirements of target 4 under Paragraph 13, resulting in some police areas having limited PRPB members directly assigned to community policing. To make progress in community policing and problem-solving, PRPB must implement a comprehensive geographic deployment of resources through a full Staffing Plan rollout. Addressing these deficiencies is crucial for ensuring data quality and effective implementation practices. The Monitor's Office stresses the importance of community participation and other resources for proactive problem-solving. Supervisors should be accountable for their unit's development and execution of initiatives supporting problem-solving and providing guidance to identify barriers and effective responses, thus fostering better practices in community policing.

## Paragraph 207: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all the requirements of Paragraph 207. | ☑ Met  ☐ Missed |
|---|---|
| 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | ☑ Met  ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | ☑ Met  ☐ Missed |
| 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | ☐ Met  ☑ Missed |

*Compliance Assessment*

GO 803 (Community Policing) was established in October 2021, with a requirement for biennial revision and is currently overdue for revision. Despite this, the existing policy meets the requirements outlined in this paragraph.

During this reporting period, PRPB achieved notable progress in providing training to meet the mandatory 40-hour in-service training requirement for community policing. PRPB trained 95% of its members on community policing during in-service training. However, additional training is needed for CIC facilitators, focusing on their duties and responsibilities, pursuant to GO 801 (CICs).

The current policy requires PRPB to form alliances through outreach in public/private sectors, faith-based groups, academia, and the media to a) improve its relationship with the community, b) strengthen support and social networks, c) consolidate initiatives to improve quality of life, d) reduce criminal activity, and e) increase crime resolution rates. The Agreement requires reaching out to stakeholders to establish problem-solving partnerships and develop collaborative strategies that facilitate mutual respect and trusting relationships. Based on PRPB's self-monitoring reports, PRPB conducted 6,263 outreach activities during this reporting period; documenting a total of 5,323. These activities were recorded for the auxiliary superintendencies of SAOC (4,893), SAIC (612), SAOE (426), SAEA (117); and none for SARP. A total of 4,749 were classified as outreach for education. These initiatives included 26 orientations on Civil rights held in 10 out of the 13 police areas; 29 on immigration law held in the police areas of Arecibo, Fajardo, Utuado, Mayaguez, Ponce, and San Juan; and 10 on transgender policy in the area commands of Mayaguez, Ponce, San Juan, and Utuado. Notably, the 13 police areas conducted 233 orientations on domestic violence and 40 on protective orders. However, there were no orientations held on hate crimes, nor was that subsection listed in the self-monitoring module. The Monitor's Office also notes that among recorded activities randomly selected for compliance assessment, were the delivery of t-shirts[34] for a school patrol, pictures for community safety councils' identifications[35], a visit to a mayor for a recreational activities equipment request (LAP),[36] police services on a citizen complaint [37], and unspecified field trips. As in previous reporting periods, the Monitor's Office notes that these activities do not fully qualify as community outreach efforts aimed at direct prevention, awareness, and education to the public hindering the reliability of the Bureau's available data for effective implementation measurement. Similarly, the deficiencies in supporting evidence (i.e., presentations and

---

[34] See Control No. 16687.
[35] See Control No. 16701.
[36] See Control No. 16672.
[37] See Control No. 17724.

outcome reports) of implemented practices for outreach on meaningful topics prevail despite significant outreach activities recorded.[38]

PRPB must aim to proactively seek and expand stakeholders to facilitate outreach and rely less on on-demand requests from local schools and community safety councils, where trending topics about cybercrime, cyberbullying, child exploitation, illegal appropriations, fraud, and service health fairs could be delivered. Other relevant topics for outreach must include transgender policies, hate crimes, COPOP's role, stalking, violence during courtship, administrative complaints and commendations, UOF, and trending topics such as elderly fraud, carjacking, community policing, and the Reform. Other activities recorded in the outreach module included unspecified cultural and recreational activities, socialization with the community humanitarian activities, and sports activities. Those activities are positive and must be reinforced to strengthen relationships and increase the community's trust in the police.

PRPB's formal alliances totaled 31 during this reporting period. It should be noted that recorded initiatives spanned from October 1, 2023 through March 19, 2024 because the self-monitoring module did not display any initiatives beyond that date at the time of review. Alliances recorded were attributed to (SAOC - 17, SAEA - 1, SAOE - 4, SAIC – 1, DSP – 8, and SARP - 0). However, this information contradicts PRPB's annual alliance report[39], where only 9 alliances were reported spanning the entire Bureau from January 1, 2023, through January 31, 2024.[40] Poor documentation hinders PRPB's ability to assess practices effectively. Supervisors should review practices to ensure alignment with alliance development requirements. Area coordinators may assist in bridging gaps and supporting improved practices. Connecting with service providers and community-based organizations is effective for problem-solving and alliance development.

Efforts should focus on delivering structured initiatives to various sectors, demonstrating PRPB's commitment to community engagement. Substantial compliance depends on the quality of implemented practices, supported by data and community feedback. The Monitor's Office recommends each police area actively engages local stakeholders to establish cooperative strategies.

*Pathway Forward*

Partnering with service providers, colleges, universities, and community-based organizations can help identify relevant issues and support effective problem-solving and alliance development. PRPB should strategically deliver initiatives to various sectors, including the public and private sectors, faith-based groups, academia, and the media. Using available resources, PRPB can engage directly with the community, sustain constructive interactions, and exchange resources for crime prevention and education. It is crucial for PRPB to demonstrate its commitment to working with the community on prevention, education, and intervention efforts. The Monitor's Office emphasizes the importance of partnering with federal agencies for resource exchanges and programming, reiterating its previous recommendation.

---

[38] See supporting documentation and classification for Control Nos. 11964, 11995, 12001, 12091, 12683-12685, and 12693.
[39] Based on the self-monitoring module 87 alliances were recorded for the entire year.
[40] Pursuant to GO 803: Chap.V§B2(f).

## Paragraph 208: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | ☑ Met | ☐ Missed |
| 2. 100% of PRPB annual reports are made publicly available. | ☐ Met | ☑ Missed |
| 3. Annual report incorporates all the requirements of Paragraph 208. | ☐ Met | ☑ Missed |

### Compliance Assessment

GO 803 (Community Policing) went into effect in October 2021, and was due for revision during the prior reporting period; however, it is still awaiting revision and final approval. The current policy already includes all the requirements outlined in this paragraph. It emphasizes the importance of developing and maintaining community alliances as key components of community policing. The policy also mandates the documentation of all outreach activities through its electronic module system, including the establishment of both formal and informal alliances, as well as the implementation of problem-solving practices using the S.A.R.A. Model.

The Agreement also requires the implementation of mechanisms to evaluate community partnerships and problem-solving strategies and assess their effectiveness. It also requires the publication of an annual report detailing PRPB's community partnerships, meetings, and problem-solving activities, including specific issues addressed and the steps taken by both PRPB and the community to resolve them. Additionally, the report should identify any obstacles encountered and provide recommendations for future improvement.

PRPB introduced its community policing module, Sistema de Policia Comunitaria (Community Policing System), during the CMR-8 reporting period following its initial internal introduction in 2021. Through these modules, the Bureau records and evaluates various initiatives and programs, including formal alliances, outreach efforts, quality of life concerns, informal alliance reports, and problem-solving

242

activities using the S.A.R.A. Model. PRPB's goal is to ensure compliance with the requirements outlined in the Agreement, where the development and sustainability of community partnerships, as well as the effectiveness of outreach and problem-solving practices, can be measured. However, establishing data quality controls, protocols, and guidelines, as well as internal technological mechanisms for self-monitoring to ensure data accuracy, are still in the developmental stages.

The Monitor' s Office recommends forming a working group comprising facilitators and validation officers/supervisors to assist in identifying needs and providing feedback on the development of the auditing methodology and data quality protocols for effective measurement. While PRPB has engaged AH Datalytics, the Commonwealth's contractor, to develop its self-monitoring module and is responsible for conducting its own audits to ensure data reliability and compliance, seeking assistance from colleges or universities through alliances to objectively analyze the empirical data is advisable.

PRPB published its annual alliance report on January 30, 2024. The previous report was issued in 2021, covering the year 2020. As per policy, these reports must be accessible to the public by January 30 of the current year for the preceding calendar year.

Upon reviewing the 2024 annual report, which encompasses alliances formed from January 2023 to January 2024, the Monitor's Office noted that it listed 9 alliances spanning the entire Bureau. However, the report lacked substantive information, missing required partnership meetings or evidence of problem-solving activities. It did not detail Agreement requirements, including issues addressed, steps taken for resolution, encountered obstacles, or recommendations for improvement. Only a few of the reported alliances had supporting Memoranda of Understanding (MOUs), and only two were certified as required by policy. Moreover, from the nine alliances listed in the report, an alliance reported based on the control number[41] assigned could not be found or does not exist, while another, for the area of Ponce[42] is no longer active.

Compliance Targets 2 and 3 require that 100% of PRPB annual reports be publicly available and that they incorporate all the requirements of this paragraph. PRPB published the 2023 annual report on its website, though as previously noted, additional work is needed to ensure that it comprehensively meets the requirements of this paragraph. Further the report provided information located within the self-monitoring module, which requires registration to access. Access to these sections of the module, if considered supplementary to the report, should be made available to the public as appropriate.

Further, the Monitor Office's review of the self-monitoring module listed 83 alliances developed throughout the 13 police areas, differing from the information in the annual report. Reliability of the recorded data could not be determined, leading to inconsistencies.

The Monitor's Office values PRPB's effort to publish its report but emphasizes the importance of full accessibility to the public. The report should detail Agreement required meetings and activities conducted, problems addressed, obstacles encountered, steps taken toward resolution, and recommendations for improvement. Reviewing PRPB's Alliances Annual Report in the Virtual Library

---

[41] See Control No. 259.
[42] See Control No. 276.

revealed that the previous report was published on January 10, 2020, and should serve as future guidance.

In an Action Plan approved by the Parties on September 15, 2023, PRPB committed to doing various detailed tasks with deadlines. If completed, these initiatives will achieve a substantially compliant rating for this paragraph, which was rated as Not Compliant in CMR-8. The first task was improving the technological components for this area, which it did, according to the assessment of Target 1 for this paragraph. Furthermore, as outlined in PRPB's Action Plan, PRPB intended to use the Annual Report published during the reporting period as a definitive model for all forthcoming annual reports; however, since the report does not meet Agreement requirements, it cannot be used in that manner.

*Pathway Forward*

This paragraph requires PRPB to demonstrate consistent, accurate, and reliable data collection to develop adequate standards to measure implementation effectiveness. Compiling substantive information and evidence, including activities conducted in support of initiatives, defined objectives, problems addressed, obstacles encountered, steps taken towards resolution of problems, and recommendations gathered for improvement or replication, including outcome reports are the foundation for a comprehensive alliance report to meet compliance.

## 2. Community Interaction Councils

The Community Interaction Councils (CICs) comprise volunteers, many of whom are professionals from various fields, representing diverse segments of the community across the 13 police areas. According to GO 801 (CICs), each committee consists of 11 community representatives spanning different sectors. They play a vital role in advising, reviewing, and offering recommendations to PRPB on various matters, including policies, recruitment, and implemented strategies. These recommendations stem from the experiences and priorities of their respective communities, in conjunction with input from community stakeholders and safety councils they engage with. Additionally, as per policy, the CICs provide guidance to the Commissioner on ways to enhance public awareness of policies, recruit a diverse workforce, implement police practices, and increase transparency in disseminating public information. Each CIC has a spokesperson representing the 13 police areas at the central level. These spokespersons, along with the president of the Community Safety Council, the Executive Director, and a representative from a civil rights organization appointed by the Commissioner, form the Central CIC.

During the CMR-8 reporting period, the committees faced challenges due to a significant decline in community representation and struggles in recruiting new members. However, there has been notable progress in securing CIC membership representation across all police areas during the current reporting period. PRPB conducted CIC training sessions to certify members, enabling them to fulfill their roles effectively. Nonetheless, there is a need for proactive organizational commitment to establish a comprehensive police approach in all 13 police areas to achieve substantial compliance with the Agreement. PRPB should develop strategies to leverage field knowledge and CIC expertise to achieve sustainable reform.

## Paragraph 209: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | | |
|---|---|---|---|
| 1. PPRB policies require it maintain the CIC and they meet at least every three months. | ☑ Met | ☐ Missed |
| 2. PRPB maintains CICs as required by this Paragraph. | ☐ Met | ☑ Missed |

*Compliance Assessment*

GO 801 (CICs) requires annual revision. The current policy, approved in November 2021, is overdue for revision. It mandates monthly meetings to discuss initiatives and work plans pertinent to each of the 13 police areas. Conversely, the Agreement stipulates a minimum of three CIC meetings per police area per semester.

Although PRPB did not provide sufficient evidence supporting the CICs' meetings, the Monitor's Office was able to secure the information through field interviews with CIC members, agent facilitators, and the annual report, yielding promising results. Most committees exceeded the Agreement requirements by holding their mandated meetings, with only two falling short. Eleven committees convened between 6 to 12 meetings during this reporting period. The Monitor's Office acknowledges the dedication of these community representatives to police reform and expects PRPB to leverage the CICs' expertise for improved implementation practices in community policing.

Most committees effectively implemented their work plans, coordinating and facilitating community dialogues and activities, known as "Conversatorios," in collaboration with local stakeholders and the community. The CICs efficiently identified the need to enhance community knowledge through direct education and prevention efforts. However, this endeavor must be a shared responsibility between the CICs and PRPB to demonstrate progressive capacity and sustainability.

The CICs' annual report revealed that selected topics were relevant, based on crime trends and the Agreement, such as immigrants' rights, interactions with the LGBTTQ+ community, gender violence, and recruitment. While insufficient evidence was received from the Reform Office through publicity, work plans, presentations, or outcome results, the CIC annual report reviewed by the Monitor's Office

245

captured these efforts. However, the Bayamon and Guayama CICs did not comply with the policy as they did not hold any "Conversatorios" during this reporting period. Nevertheless, Bayamon engaged in other activities. The committees also identified the need to extend their participation through PRPB's monthly meetings at precincts, districts, and units. The CICs aim to expand community knowledge about their role as community representatives and contribute strategies and resources toward successful Reform implementation. The Monitor's Office encourages PRPB to use CIC resources to facilitate discussions on public policy, non-discriminatory practices, and professional responsibility, among other topics, to improve the community's quality of life.

Regarding compliance with target 2, full community representation through CICs fluctuates across the 13 police areas. However, most areas have secured substantial membership representation. Only two police areas are fully represented, while Bayamon has the lowest representation. Additionally, only two CICs hold their meetings away from police headquarters, a practice that should be adopted by the remaining areas. Area commanders should support and assist the committees in securing meeting spaces outside headquarters to promote public access and collaboration with community stakeholders. Despite accessibility to resources within police headquarters, public access may be hindered by diffidence.

*Pathway Forward*

The revised policy should clearly outline the expectations for collaborative efforts between CICs and PRPB, providing guidelines to direct their work and activities. The Monitor's Office encourages PRPB to harness the valuable resources offered by CICs to facilitate discussions on various topics such as public policy, non-discriminatory practices, professional responsibility through SARP, and COPOP (Centro de Operaciones de Ordenes de Proteccion). This includes involving CICs in PRPB's monthly meetings to help police areas understand the committee's role and how they can contribute to improving operations.

PRPB must actively engage with the community through CICs, supporting their recruitment efforts. This involves leadership at all ranks actively participating in recruitment by leveraging their community relationships to refer potential members to CICs' recruitment committees. Additionally, PRPB should explore using web resources and the Press Office to promote CIC functions and facilitate recruitment, including online mechanisms for community representation.

Encouraging police areas to hold meetings at communal centers, public schools, or city halls can enhance public access and collaboration with community stakeholders. The Monitor Office's recommendations from previous CMRs should be considered and incorporated into this effort, emphasizing the use of CIC resources to foster purposeful discussions and promote trust, transparency, and accountability within the community.

## Paragraph 210: Community Engagement and Public Information - Community Interaction Councils

*In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | ☒ Met   ☐ Missed |
| 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | ☐ Met   ☒ Missed |

*Compliance Assessment*

GO 801 (CICs) requires annual revision, yet the standing policy has not undergone the necessary updates, despite recommendations and revisions being submitted.

The policy dictates mechanisms for selecting CIC members and outlines procedures to meet its requirements. It mandates the publication of openings through press and mass media every two years in June, specifying available positions for Puerto Rico residents aged 18 and older. However, since recruitment occurs biennially, committees must rely on their own resources to fill vacancies between open recruitment periods, posing challenges to membership retention and recruitment efforts. Despite this, the Monitor's Office did not receive documents regarding CIC candidate referrals, and interviews revealed reliance on informal referrals, CIC Conversatorios, and internal efforts to address membership gaps.

A primary concern for CICs is limiting community representation from all community sectors within each committee, despite Agreement mandates. While CMR-8 noted a decrease in community participants and recruitment challenges, improvement was seen in securing membership representation during this reporting period; however, the membership sustainment challenge remains. Most committees were able to secure 6 to 10 members per police area, with Mayaguez and Ponce fully represented, and Bayamon having the least representation. However, committees worry about policy amendments that may limit community representation solely for Agreement compliance. To promote public interest and aid in membership recruitment, CIC information, resources, functions, activities, and meeting calendars should be readily accessible through PRPB's website, the Virtual Library, and social media platforms.

*Pathway Forward*

Over the past three reporting periods, the Monitor's Office has consistently recommended modifying the CIC recruitment protocol to align membership recruitment with the representation needs of the committees. This recommendation is reiterated for this CMR, as it would enable CICs to address gaps in achieving comprehensive community representation and develop more effective solutions. The revised

247

policy should outline expectations for collaboration between CICs and PRPB, including the development of guidelines to guide their work and activities in coordination and support with PRPB. Additionally, CIC information, resources, functions, activities, and meeting schedules should be easily accessible to the public through PRPB's website, the Virtual Library, and social media platforms to generate interest and support membership recruitment efforts. PRPB should take proactive steps to assist and support the committees in recruiting new candidates through outreach activities, community alliances, and open meetings (Encuentros Comunitarios).

## Paragraph 211: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies related to CICs incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. CIC orientation course is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. PRPB makes CIC orientation available to all members of the CICs. | ☑ Met | ☐ Missed |
| 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | ☐ Met | ☑ Missed |

### Compliance Assessment

GO 801 (CICs) was approved during the CMR-6 reporting period and was found to have met the requirements outlined in the paragraph. However, this policy has not been reviewed since 2021, despite being due for review during the CMR-8 reporting period and remains overdue to date. The Monitor's Office emphasizes the importance of reviewing policies as mandated by the Agreement and stipulated in agency policy.

During this reporting period, PRPB conducted CIC training orientation through multi-themed workshops, which are an essential component of the resources available to CICs through PRPB. According to the evidence provided, 84% of CIC members completed these workshops, while 14% were scheduled to begin training and 1% had already started. This completion rate enabled the confirmation of membership as required by the policy, and certified members were issued official identification cards, facilitating their

248

ability to fulfill their mission. This marks a significant milestone for PRPB, considering that CIC training had not been offered for over three years. However, the challenge now lies in sustaining CIC training orientations as membership expands and ensuring that training is consistently delivered in a timely manner and in accordance with policy guidelines.

Out of the five sampled police areas, the Reform Office submitted certificates attesting CICs means and access to fulfill their mission for 4 police areas. Based on the submitted evidence, these police areas demonstrated full resource allocation and availability for its committee. Further, the Monitor's Office is aware through interviews with committee members that several committees remain in need of equipment and supplies to carry out their mission. As only four of the five CICs were found to have the means and access to fulfill their mission, the Monitor's Office assesses compliance with this related target as missed.

PRPB reported during the CMR-8 reporting period that there is no operating budget in place for CICs. However, as in previous reporting periods, the Monitor's Office notes that it is PRPB's responsibility to consult CICs when discussing and revising the Bureau's operating budget. This practice promotes transparency and enables CICs to inform the public about PRPB's resource allocations, particularly for equipment, vehicles, training, and projected resources for community policing initiatives, outreach programs, problem-solving efforts, and community encounters through open meetings. Adequate resources, including staffing, access, equipment, supplies, and training are fundamental elements in the development of a comprehensive community policing approach. PRPB must also support CICs in securing meeting spaces away from command headquarters to enhance public participation. Currently, only two police areas hold their meetings away from headquarters: Guayama and Caguas. Other area commands should encourage and facilitate this practice to increase community accessibility.

Further, although no budget is allocated to the CIC, PRPB should continue to ensure that they have adequate resources to carry out their mission and objectives.

*Pathway Forward*
Area commanders must take proactive steps to ensure that CICs have the resources necessary to fulfill their mission. Discussing committee resource needs with the spokesperson and the area commander ensures facilitating the committees' mission, supports engagement, and aligns with the development of a comprehensive policing approach with CICs. These committees serve as the direct link with communities, acting as ambassadors and genuine liaisons for PRPB. It is also crucial for PRPB to review policies regularly as required by the Agreement and stipulated in agency policy. PRPB faces the challenge of maintaining CIC training as membership expands. Training must be delivered consistently, in a timely manner, and in alignment with policy guidelines. The virtual training approach has proven effective and should be continued, supplemented with scenario-based training to enhance community understanding and sensitivity to police functions. The Monitor's Office also emphasizes the importance of revising and discussing the Bureau's operating budget with the CICs. This practice promotes transparency and enables the CICs to inform the public about PRPB's resource allocations.

## Paragraph 212: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:*

*a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;*

*b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;*

*c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;*

*d) providing information to the community and conveying feedback from the community to PRPD;*

*e) advising the Superintendent on recruiting a qualified, diverse workforce; and*

*f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | ☐ Met | ☑ Missed |
| 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs.. | ☐ Met | ☑ Missed |
| 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | ☑ Met | ☐ Missed |

### Compliance Assessment

PRPB is still in the process of developing and implementing a comprehensive community policing approach in collaboration with CICs. However, as in previous reporting periods, the Monitor's Office did not receive sufficient, relevant, and detailed evidence supporting this approach. According to the Agreement, PRPB is required to engage in collaborative efforts with CICs through various practices, including a) reviewing and assessing the appropriateness and effectiveness of law enforcement priorities and related community policing strategies, resources, and training; b) reviewing and assessing relevancy

250

and effectiveness on policies, police best practices, Agreement related matters and victim services; c) reviewing and assessing concerns or recommendations about specific PRPB's tactics and initiatives; d) providing information to the community and conveying community's feedback to PRPB; e) advising the Commissioner on recruiting a qualified, diverse workforce; and f) advising the Commissioner on ways to deliver data and information to the public in a transparent and public-friendly format.

During this reporting period, PRPB provided incomplete evidence of joint efforts with CICs in several police areas, such as Guayama, Carolina, Utuado, and Caguas. However, this evidence was limited to the number of policies reviewed without further supporting information. No work plans, structured initiatives, or joint activities were submitted for assessment. This indicates that compliance with target 3 has only marginally been met.

Interviews conducted by the Monitor's Office revealed that most area commands limit CIC participation to policy reviews and recommendations. CIC members and Community Safety Council representatives reported a lack of feedback from PRPB regarding their recommendations and limited involvement in training and public outreach activities as required by policy. While CICs have engaged in community initiatives and disseminated information about the Agreement, these efforts have not been documented or integrated into a comprehensive community policing approach by PRPB.

PRPB must expand and document its collaborative efforts with the community to develop and deliver a comprehensive community policing approach. This includes involving CICs in all relevant functions outlined in policy, addressing safety concerns, and implementing strategies to reduce crime. Improved practices should prioritize transparency, community involvement, and adherence to the Agreement's requirements.

### Pathway Forward

The Monitor's Office observes that PRPB underestimates the valuable resources offered by the committees, including their academic and professional backgrounds, as well as their perspectives representing various sectors of the community. These committees can play a crucial role in developing strategies and plans to educate the public about implemented practices, policies, and initiatives in alignment with the Reform. PRPB should create an engagement plan that incorporates input and active participation from the committees, involving them in recruitment practices, training reviews, community discussions, and open meetings to meet the requirements of the Agreement and advance community policing principles. Improving in this area is vital for PRPB to enhance transparency, accountability, and compliance with its policies.

To achieve this, PRPB should develop and implement a reference manual containing established guidelines and specific training on engaging with CICs for each area command. Additionally, implementing a unified mechanism to track CIC recommendations to the Bureau and communicate responses would be a best practice in developing a comprehensive approach to community policing. It is also advisable to review the mechanism established by the DV Unit for policy tracking. This would contribute to streamlining processes and ensuring effective communication and accountability in PRPB.

## Paragraph 213: Community Engagement and Public Information - Community Interaction Councils

*CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB published 100% of CICs annual public report with recommendations included are available on web pages of the Commonwealth of Puerto Rico and the PRPB. | ☐ Met | ☑ Missed |
| 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

GO 801 (CICs) mandates that the Executive Director, in collaboration with SARP, produces an annual report documenting all recommendations put forth by the committees. These recommendations pertain to the review of PRPB's policies, as well as other police practices and activities in which the CICs were involved during the preceding year.[43] Both the Agreement and the policy stipulate that CICs must document their recommendations in an annual public report, which should be accessible at PRPB facilities and on official web pages of the Commonwealth of Puerto Rico, including PRPB's Virtual Library. This report must ensure the protection of confidential or sensitive law enforcement information and safeguard personal or private data.

Additionally, the annual report must compile all activities and recommendations made by each committee during the semiannual reports (December and June) throughout the 13 police areas. These reports should detail the challenges and obstacles encountered in achieving their objectives. Furthermore, the policies reviewed by the CICs and the recommendations they made must be included in this annual report. The Monitor's Office found that the CICs published their annual report on January 30, 2024, as mandated by the policy. The report captured all activities and recommendations made by each committee in the 13 police areas during the semiannual reports. However, the recommendations made by the committees were not included in the report, as required in the Agreement and policy. Interviews with CIC members revealed that these recommendations were excluded from the annual

---

[43] See GO 801: V§6(h).

report and were instead sent directly to the Reform Office as instructed. Further review for assessment compliance reveals that the CICs reviewed the following policies:

| CIC's Aguadilla | | |
|---|---|---|
| **Capitulo** | Sección | título |
| **700** | 701 | Programa de Adiestramiento de Campo |
| **700** | 702 | Programa de Adiestramiento Previo al Servicio |
| **700** | 703 | Adiestramiento y Readiestramiento |
| **700** | 704 | Reuniones Mensuales y Boletines Informativo |
| **800** | 803 | Policía Comunitaria |
| **CIC's Aibonito** | | |
| **No emitió recomendaciones** | | |
| **CIC's Arecibo** | | |
| **No emitió recomendaciones** | | |
| **CIC's Bayamón** | | |
| **Ordenes Generales revisadas sin recomendaciones 603-604.** | | |
| **Ordenes Generales revisadas con recomendaciones 801-803-805.** | | |
| **CIC's Caguas** | | |
| **No emitió recomendaciones** | | |
| **CIC's Carolina** | | |
| **600** | 615 | PPR 615.1 - 615.11  - Arrestos y Citaciones |
| **600** | 624 | Interacción con Personas Transgénero y Transexuales |
| **600** | 626 | Intervención con Personas Extranjeras |
| **800** | 801 | Comités de Interacción Ciudadana |
| **CIC's Fajardo** | | |
| **No emitió recomendaciones** | | |

*Figure 20. Policies Reviewed by CICs*

| CIC's Guayama | | |
|---|---|---|
| No emitió recomendaciones | | |
| **CIC's Humacao** | | |
| **300** | 308 | Programa de Ayuda al Empleado |
| **CIC's Mayagüez** | | |
| No emitió recomendaciones | | |
| **700** | 703 | Adiestramiento y Readiestramiento |
| **CIC's Ponce** | | |
| **300** | 308 | Programa de Ayuda al Empleado |
| **600** | 602,603 y 604 | Dispositivo de Control Eléctrico, Baton Expandible y Gas Pimienta |
| **600** | 624 | Interacción con Personas Transgénero y Transexuales |
| **600** | 626 | Intervención con Personas Extranjeras |
| **CIC's San Juan** | | |
| No emitió recomendaciones | | |
| **CIC's Utuado** | | |
| No emitió recomendaciones | | |

*Figure 10. Policies Reviewed by CICs*

CIC members expressed concerns about PRPB's lack of feedback regarding the recommendations they made. They also noted a lack of clarity on whether these recommendations are accepted or rejected by PRPB. Despite investing significant effort and analysis into these recommendations, the committees often find that their suggestions are overlooked or omitted. Consequently, some committees have ceased making recommendations altogether, feeling that PRPB is unresponsive to their input.

Despite the publication of the annual report, the Monitor's Office determined that the compliance thresholds for this paragraph have not been met. Furthermore, the protection of sensitive law enforcement information, a requirement for Target two, has not been achieved. This is because the report failed to include any recommendations, as mandated by both policy and the Agreement. This longstanding issue needs to be addressed without further delay. PRPB should establish a consistent and efficient mechanism for tracking CIC recommendations and PRPB's responses. The Monitor's Office suggests adopting a model similar to the one used by the DV Unit for its policy review process.

*Pathway Forward*

The CICs have consistently shown their commitment and engagement through volunteer participation. PRPB needs to develop practices that leverage the field knowledge and expertise of the CICs, recognizing the value of their collaborative efforts in driving sustainable reform. It is fundamental for PRPB to actively seek and consider constructive feedback from the CICs and establish transparent communication channels to address any gaps and ensure effective police practices.

In 2023 alone, the CICs demonstrated their dedication by participating in over 160 activities, including outreach events, community dialogues, radio talk shows, and "Conversatorios," all aimed at advancing the reform process. However, it is PRPB's responsibility to execute and deliver these activities with the assistance of the CICs, showcasing best practices in self-sufficiency, sustainability, and accountability to meet compliance standards. Unfortunately, PRPB has failed to document and provide supporting evidence for these efforts.

Improving communication with the committees, including updating them on the status of recommendations and soliciting feedback on their participation, is crucial for PRPB to keep the community informed about changes and improvements in police practices. The Monitor's Office recommends implementing practices such as using a policy feedback form, similar to the one used for SA/DV policies, to streamline and enhance transparency in the feedback process.

## 3. Public Information

Throughout this reporting period, PRPB has actively focused on enhancing its reporting systems to promote transparency and accountability in its police practices. In the CMR-8 reporting period, PRPB launched the Virtual Library, serving as a centralized repository for various documents, including policies, public reports, compliance methodologies, and community event calendars. This initiative aimed to provide easy access to essential information for the public, including PRPB's open meetings known as "Encuentros Comunitarios."

In the CMR-9 reporting period, PRPB introduced community dashboards to offer public access to criminal statistics and UOF reports as required by the Agreement. Additionally, PRPB incorporated a sign language interpreter into the Commissioner's messages to align with diversity and inclusion policies. These efforts aimed to ensure that the public remains informed about important matters and best practices.

During this reporting period, PRPB unveiled a redesigned website aimed at providing the public with enhanced access to information and services, with the goal of fostering closer community engagement and improving service delivery. PRPB merged its public reports into the website to streamline access for the public. Furthermore, PRPB introduced a weekly safety tips banner and integrated the Virtual Library into the website to enhance user accessibility. However, there are areas of non-compliance with community outreach practices outlined in the Agreement, including insufficient efforts in holding open meetings to address community concerns, reporting on Agreement progress, and educating the public on various reform topics. PRPB's current efforts in these areas are inadequate, requiring the integration of internal resources such as the Press Office and multimedia platforms to improve public education and community awareness regarding participation in community policing initiatives.

### Paragraph 214: Community Engagement and Public Information - Public Information

*PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | ☐ Met | ☑ Missed |
| 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | ☐ Met | ☑ Missed |
| 3. 95% of the meetings were widely publicized at least one week before such meeting. | ☐ Met | ☑ Missed |
| 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | ☐ Met | ☑ Missed |
| 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | ☐ Met | ☑ Missed |
| 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | ☐ Met | ☑ Missed |
| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in Worksheets # 3. | ☐ Met | ☑ Missed |

## *Compliance Assessment*

GO 805 (Community Meetings) was approved in January 2023, with a requirement for revision every two years.

PRPB's compliance with reaching out to the community and disseminating information through open meetings remains an unmet challenge. According to policy, these meetings serve as a fundamental mechanism for PRPB to report progress on meeting Agreement requirements, addressing community concerns, and educating the public on various topics outlined in the Agreement and on identified needs in each police area. However, evidence submitted in support of these open meetings during this reporting period remains insufficient. While some events were documented, they did not align with the requirements for open meetings as specified in the policy. None of the associated control numbers reviewed were for open meetings. There were 1)"Conversatorio" held and carried out by Ponce CIC; not directly organized by the area command; 2) a Safety Council meeting held in Catano, for the police area of Bayamon; 3) a CIC multi-themed workshop for Aguadilla, 4) a Safety Council meeting held in Yauco for the police area of Ponce, and 5) a meeting held in Ponce (District of Yauco) lacked supporting evidence throughout, as required by the Agreement.

256

The Monitor Office's review of the Virtual Library's "Encuentros Comunitarios" and PRPB's screen captured calendar images submitted revealed limited open meetings. Out of the 13 police areas, there was only 1 significant meeting held in Ponce on November 9, 2023, and others scheduled for the police areas of San Juan, Guayama, and Mayaguez. However, the associated calendar's announcement lacked details about the events. The meeting scheduled for Ponce, only contained an FBI brochure on the topic. Additionally, during a Community Encounter observed by the Monitor's Office on December 7, 2023, Agreement and policy requirements such as wide publicity and community feedback evaluation were not met. Noteworthy, this open meeting was not published in the calendar. Additionally, although the topic and content of the meeting were deemed appropriate, the absence of CIC membership and a community Q&A session raised concerns about compliance with policy requirements.

PRPB's compliance tracking submission of outcome reports or evidence supporting these events has been lacking throughout. According to both the Agreement and policy, these open meetings must be held annually in each of the 13 police areas and widely publicized to ensure public attendance. The current level of compliance with these requirements falls short, indicating a need for improvement in PRPB's community engagement efforts.

Moreover, PRPB has yet to submit an implementation plan outlining resources and participation to ensure the program's alignment with defined objectives. While some police areas, such as Aguadilla during the CMR-6 reporting period, have demonstrated exemplary compliance with meeting requirements, there is a need for PRPB to replicate such practices across all area commands. The Monitor's Office recommends PRPB replicate successful practices emphasizing the importance of sustaining efforts to meet Agreement requirements consistently across all police areas.

As outlined in the Action Plan, PRPB has committed to reviewing and publishing the policies for this paragraph during this reporting period. However, the Monitor's Office has not received any evidence in support of completion. Additionally, compliance of superseding Paragraphs 215 and 216 is contingent upon the tasks outlined for this paragraph.

### *Pathway Forward*

PRPB needs to submit an implementation plan detailing resource participation to ensure that program execution aligns with the defined objectives outlined in this paragraph. The existing policy outlines clear and comprehensive objectives and participation necessary to meet Agreement requirements, providing a framework for implementation and execution. Once design and implementation are finalized, the plan should incorporate a control and monitoring process to ensure sustainability across all 13 police areas.

The Monitor's Office emphasizes previous recommendations to develop a streamlined and uniform presentation through SAEA, in collaboration with the Reform Office, based on the targeted principles and requirements of the Agreement and policy. This standardized presentation could assist PRPB in delivering local presentations, supplemented with relevant information from area commands, including a) area's statistics on crime, b) chosen discussion topics and resources, c) CIC and CSC participation, d) information on outreach activities, community alliances developed within the area, and e) facilitate a forum for open community discussions.

Additional training delivery by the newly appointed area coordinators in community policing could prove beneficial in helping area commands attain the necessary competencies to meet the requirements outlined in this paragraph. The Monitor's Office reiterates previous recommendations for PRPB to leverage the structured policy in place to implement the Encounters and engage with the community as mandated by the Agreement.

## Paragraph 215: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

### *Compliance Assessment*

As mentioned in Paragraph 214, the evidence provided to support "Community Encounters" (Encuentros -Open meetings) is insufficient for the Monitor's Office to assess required compliance. PRPB did not furnish any evidence of open meetings held in other police areas. The calendar outlining programming for these events to inform the public lacked detailed information and it was inconsistent with the limited supporting evidence submitted. While the reviewed calendar on the Virtual Library contains announcements for future potential Encounters, their occurrence as scheduled will be subject to compliance assessment in the next CMR. The Monitor's Office anticipates evaluating PRPB's supporting evidence for this paragraph during CMR-11 to determine progress towards substantial compliance.

### *Pathway Forward*

The Monitor's Office reiterates recommendations from previous CMRs. Assistance in developing a detailed work plan for scheduling, through the Reform Office, area coordinators, and the Press Office, could be beneficial. This work plan should include proposed dates, locations, and discussion topics for the Encounters. The calendar should be accessible to the public and updated accordingly through PRPB's Virtual Library and internal resources, including multimedia platforms and the Press Office, to aid PRPB

in achieving compliance going forward. The Press Office and PRPB's multimedia platforms should publicize these events for all 13 police areas, regardless of where the event is being held.

## Paragraph 216: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 214.

### Compliance Assessment

During the CMR-7 reporting period, only 2 out of the 13 police areas (15%) conducted the mandated Community Encounters. In the CMR-8 reporting period, PRPB submitted only a general list of the Community Encounters, some of them comingled with listings for Conversatorios (CIC sponsored activities) per police area without providing sufficient details for the Monitor's Office to assess compliance. The prior reporting period showed similar findings, with only one police area (Humacao) holding the required Community Encounters, but failing to meet compliance requirements for public information meetings due to the lack of documentation provided for review. To determine compliance, evidence regarding public education on Reform progress and individuals' right to decline consent to voluntary searches, as outlined in Paragraph 77 of the Agreement, is essential. Additionally, the Monitor's Office observed that neither meeting included summaries of all audits and reports completed, including reports on policy revisions or any other significant actions taken by PRPB throughout these reporting periods.

### Pathway Forward

PRPB's compliance with this paragraph requires summaries of all audits and reports, policy changes, and actions taken by PRPB. Those summaries should be available to inform the public of open meetings to demonstrate accountability through better practices. PRPB has been unsuccessful at submitting audit summaries and reports to assess compliance. The Reform Office holds a relevant role in facilitating this process.

## Paragraph 217: Community Engagement and Public Information - Public Information

*PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB disseminates crime statistics on a monthly basis. | ☑ Met | ☐ Missed |
| 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | ☑ Met | ☐ Missed |
| 3. 100% of hate crimes were publicly disseminated once they occurred. | ☑ Met | ☐ Missed |
| 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | ☐ Met | ☑ Missed |

Note: The portion of this paragraph that requires that PRPB maintain updated crime statistics is assessed together with Paragraph 219 of the Agreement (Information Systems and Technology), and Paragraph 148 (Early Identification System).

### Compliance Assessment

During this reporting period, PRPB launched a redesigned website aimed at providing the public with improved access to information and services, seeking to foster closer ties with the community and enhance its services. The website now integrates PRPB's public reports for easier access, as recommended. Additionally, PRPB introduced a weekly safety tips banner and integrated the Virtual Library into the website, streamlining both systems.

To address the need to report hate crimes as per policy, PRPB has a category in the crime data dashboard that filters out hate crime data. It is important to recognize the inherent challenges in capturing hate crime data, a challenge that many agencies across the country are facing as most times hate crimes are captured and reported as other types of crime. See the Equal Protection and Non-Discrimination section for more information on the broader challenges in the categorization and reporting of hate crime.

PRPB has also demonstrated its commitment to transparency beyond the requirements of the Agreement and has recently begun developing a public dashboard on DV incidents. It expects to release this dashboard in May 2024.

260

Further, while the public posting of this data is important, PRPB must also ensure that its community engagement activities work towards keeping the public informed about crime statistics through other avenues, such as meetings, reports, and informational materials/presentations.

On the other hand, the Monitor's Office emphasizes the importance of Bureau compliance with certification to NIBRS reporting to the FBI. PRPB personnel must be trained and certified following this certification. This paragraph transitioned from not compliant in CMR-9 to partially compliant in CMR-10, with Targets 3 and 4 remaining unmet.

*Pathway Forward*

PRPB should enhance its efforts in developing informational campaigns, leveraging platforms including webinars and podcasts, and conducting evaluations to assess its engagement with the community. By using improved technology systems and objective data, the Bureau can streamline its operations and address the public's demand for accountability and transparency. Additionally, integrating the Press Office and multimedia services to disseminate information on various topics such as crime statistics, domestic and gender violence, non-discriminatory practices, UOF policies, searches and seizures, and the reform process, as required by the Agreement, could lead to better outcomes in compliance assessments in the future. Establishing robust and sustainable systems to support procedures for NIBRS reporting ensures accurate and comprehensive recording of incidents including hate crimes documentation reported to the FBI.

## XI. Information Systems and Technology

The Commonwealth made reasonable progress during the reporting period, although struggles were encountered early with regard to maintaining the Gartner schedule, RMS action, and Project Management Office (PMO). This activity was of primary focus and heightened interest during the reporting period. Initial workshops and meetings were not adequately staffed jeopardizing progress. Fortunately, with involvement from the Governor's Office, PRPB was able to recover schedule and preparation of RMS acquisition documents. In order to do so USDOJ, the Monitors Office, and Gartner endorsed a delay in the release of key acquisition documents so that proper staffing could be coordinated leading into vendor evaluations in April and May 2024. Having to react in this way indicated an insufficient appreciation of the discipline required to execute these critical projects.

Throughout the reporting period the Commonwealth continued with its developments and demonstrated progress with several applications/modules. Notably, the Asana Project Management and Monitoring Tool, Community Partnerships, and Non-Punitive Discipline module. While progress continues to be made, reminders are evident that achievements are needed in the field. For example, most recently while in Fajardo in March 2024, although the availability of technology tools clearly benefits agents and staff, the shortage of available computers and training, along with an instability of the network resulting in system, application, and network disconnects that disrupt GTE use impact the staff's effectiveness and results in the loss of draft reports and notations thereby requiring personnel to reload their content.

### Observations

As seen in IT demonstrations throughout the reporting period, progress was observed with four applications/modules advancing as did the RMS and PMO initiatives. Vendor selection for RMS replacement was slated to occur in April 2024 with an ambitious forward-facing schedule. Gartner's participation continues to be critical. Although their participation in the IT requirements analysis, RMS replacement, and PMO establishment has been timely and continuous, the Commonwealth's decision not to option Gartner for continuing support is concerning. As a result of the Commonwealth's decision, coupled with their reliance on AHDatalytics, the Commonwealth's contractor, as a proxy for Gartner, significant risk in the RMS vendor selection has been introduced as this area of consultancy is not a mission strength area for AHDatalytics.

With respect to operational readiness, the Monitor's Office encountered inconsistencies on the part of PRPB regarding their claims of operational implementation for the Community Engagement Dashboard SA, and DV Modules. Although the Monitor's Office was told the applications were "operational", demonstrations showed that they were still in development, not adequately supported with training, and had not been rigorously tested.  AH Datalytics, the Commonwealth's contractor, agreed and that the data quality could not be verified, also bringing into question whether the modules were properly reconciled. Finally, when reviewed with the Chief Information Officer (CIO), it was learned that due to their functional and data architectures, the SA and DV Modules could not share data. The questionable functionality and disconnected architecture are likely due to the Reform Office scoping the requirements instead of an operational unit which again highlights PRPB's lack of formal requirements management and change control processes. Although requested on multiple occasions for demonstration, the EIS

functional status remains unclear. The Monitor's Office has noted repeatedly that the EIS as described appears to be a case management tool instead of an Early Intervention System.

Positively, successive PRPB demonstrations of the Non-Punitive Module showed interesting detail with regard to the complaint data and its distribution of incidents across the agent population and its skewing amongst the female agent population.

### Areas of Concern

Areas of concern noted during this reporting period, include:

- Lack of NIBRS and hate crime reporting to the FBI indicating an incomplete process.
- No plan to conduct a cyber security assessment or a plan for hardening its enterprise.
- Lack of a definitive data purification and deconfliction plan.
- Inadequacy of predictable training by SAEA

Overall, the Commonwealth's compliance with the six Information Systems and Technology paragraphs remains the same from CMR-9 where 67% of paragraphs (4 paragraphs) were found to be partially compliant and 33% of paragraphs (2 paragraphs) were found to be not compliant. See figure 11.



*Figure 11. Information Systems and Technology: Paragraph Compliance Status*

## Paragraph 218: Information Systems and Technology

*PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |

263

| | Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|---|
| | Practice: | Not Implemented | | |

## Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243.

## Compliance Assessment

PRPB remained partially compliant overall although they moved forward in the four technology areas shown in the table below. Procedural and data inconsistencies continue but progress is positive and course corrections incorporated when exposed through operational demonstrations. Essential focus was placed on the RMS replacement initiative and stand up of the PMO during this reporting period.

| System | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|
| Project Management System | Fully Compliant -- ↑ | Fully Compliant -- ↑ |
| CAD/CAD Mobile | Partial | Partial |
| NIBRS | Minimally Partial | Not Compliant |
| NCIC – National Crime Information Center | Minimally | Not Compliant |
| GTE | Partial | Partial |
| Promedia (Performance Evaluation System) | Partial | Partial |
| PTMS – Store digitized files, records, curricula and Teaching Plans | Partial | Partial |
| Formal Community Partnerships / Alliances – distribute data and information | Minimally | Not Compliant |
| EIS | Deferred | Not Compliant |
| Supervisory Module | Partial | Not Compliant |
| Domestic Violence and Sex Crimes | Substantial | Substantial |
| Non-Punitive Module | Substantial -- ↑ | Partial |
| Tracking Module | Deferred | Deferred |
| CFRB | Deferred | Deferred |
| FRB | Deferred | Deferred |
| Inspections – Operational, Investigative & Administrative | Substantial | Deferred |
| Legal Affairs | Deferred | Deferred |
| SARP | Deferred | Deferred |
| Crime Mapping | Substantial | Partial |
| SAEC – Computerized Analysis and Statistics | Substantial | Deferred |
| Virtual Library – publish policies, procedures, forms, implement n PRPB Website | Fully Compliant -- ↑ | Fully Compliant -- ↑ |
| UOF | Substantial -- ↑ | Substantial -- ↑ |
| Recording Devices | Partial | Deferred |
| Body Worn Camera | Partial | Deferred |

*Table 2. Information Systems and Technology Systems Reviewed During the Reporting Period*

## Pathway Forward

During CMR-11, because much is at stake, PRPB must succeed at identifying and beginning implementation of its RMS replacement, and stand up the PMO. In addition, progress must continue to be made with respect to the IT tools and applications above. The Monitor's Office and USDOJ urge PRPB to finalize a systems migration plan.

## Paragraph 219: Information Systems and Technology

*PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | ☑ Met | ☐ Missed |
| 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | ☑ Met | ☐ Missed |
| 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | ☑ Met | ☐ Missed |
| 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | ☐ Met | ☑ Missed |
| 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | ☐ Met | ☑ Missed |

Note: Review frequency, consistent with the periodicity of assessments in areas III through XII and XIV.

### Compliance Assessment

The Commonwealth achieved more success gathering and analyzing data during the reporting period due to the increase in IT application functionality; however, full success requires process control, procedural clarity, and supervisory discipline to ensure procedural repeatability. Ultimately, data reconciliation must be conducted in order to ensure data precision and relevance. With regard to training, it is unclear that SAEA can support the CIO and Bureau of Technology's (BT) training demands.

265

## Pathway Forward

These expectations are unchanged from the prior CMR and are still applicable. PRPB must continue to improve data collection procedures, resolve staffing shortages, master and further the data analytic methods developed by AH Datalytics, the Commonwealth's contractor, and improve its management oversight and supervisory rigor. For this reason, the Monitor's Office endorses the activities of AH Datalytics and recommends their continued support in order to continue making progress.

Finally, worthy of note, from CMR-9, the following remains salient:

*"PRPB must also improve administrative management and control practices, maintain its inventory of documentation, and revise artifacts like the Data Dictionary to ensure currency and alignment with progress to date and to prepare for future revisions. Modernization and future capabilities and functional definition will rely on a well-managed data inventory baseline and properly managed and configured technical and requirement artifacts. The IT CAP must be resourced and implemented."*

## Paragraph 220: Information Systems and Technology

*PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 219.

## Compliance Assessment

Relatively unchanged from the prior CMR, PRPB continues to be partially compliant with regard to technology reporting and data publishing (see Paragraph 218). The procedural operationalization of said technology remains largely not compliant or deferred.

## Pathway Forward

Unchanged from the prior CMR, PRPB must complete the development of tools and protocols for collecting, analyzing, and reporting the information required by the Agreement. Promising progress has been made with community policing, but NIBRS and EIS must be fully operationalized before credible data can reliably be extracted for publishing.

266

## Paragraph 221: Information Systems and Technology

*PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | Aoril 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☑ Missed |

*Compliance Assessment*

Significant effort was put into RMS replacement during the reporting period. Although early coordination and task missteps were encountered, they were overcome. Follow through during CMR-11 to identify an RMS provider is crucial.

*Pathway Forward*

Vendor selection and the start of RMS implementation is critical.

## Paragraph 222: Information Systems and Technology

*PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met  ☐ Missed |

267

| | | |
|---|---|---|
| 2. Handheld recording device trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaint and witness statements are recorded in 95% of use of force reviews. | ☐ Met | ☑ Missed |
| 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | ☐ Met | ☑ Missed |
| 6. All sampled units had access to functional handheld recording equipment. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

The Commonwealth did not provide the required documentation for the Monitor's Office to adequately assess the progress on this paragraph. The Monitor's Office recommends that the Commonwealth make a concerted effort to demonstrate its progress in this area.

### *Pathway Forward*

As noted in previous CMRs, PRPB must provide evidence of their efforts to comply with the Agreement. PRPB should prepare for and brief its plan for development, operations, training, and support to the Monitor's Office. Operational evidence will require that archiving and retrieval of data and audio is consistent and repeatable.

### Paragraph 223: Information Systems and Technology

*All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. NCIC data trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. NCIC data is considered in 95% of patrol interventions and investigations. | ☐ Met | ☑ Missed |
| 5. All sampled units had access to NCIC data. | ☐ Met | ☑ Missed |
| 6. PRPB safeguards appropriately protect sensitive data. | ☐ Met | ☑ Missed |

268

*Compliance Assessment*

This assessment has not changed from the previous CMR. As noted, the Central Commands are relied on heavily for access to National Crime Information Center (NCIC) information. Officers that need NCIC information must relay their requests to the Central Commands and although relay of information is usually timely, the Monitor's Office observed most recently in Fajardo that administration of NCIC access by the Central Commands is unchanged.

*Pathway Forward*

Unless the criteria for success under this paragraph is changed, PRPB must continue integrating and implementing NCIC to ensure roll out beyond headquarters and area Central Commands. Availability to all authorized and trained officers must be achieved and be in alignment with NCIC operational use criteria. Additionally, effective training throughout PRPB is required from SAEA and BT.

## Paragraph 224: Information Systems and Technology

Nothing in this Agreement shall be construed as prohibiting PRPD from contracting services related to technology and data collection, entry, and analysis.

*Compliance Assessment*

The Commonwealth must consider contracting with other external sources for subject matter experts in the cyber security and hygiene areas as well as program management and support staff for the execution and implementation of the IT CAP. Progress to date with respect to BT staffing and selecting contractors for the PMO has proceeded slowly.

As noted in previous CMRs, PRPB is compliant with the allowances of this paragraph.

# Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures, and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; and d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRPB, and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding UOF and a wide range of other substantive areas; 2) the training of all appropriate officers in the new UOF policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to UOF, UOF to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While the Commonwealth did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of

these good faith negotiations. In July 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the U.S. District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB and the Commonwealth during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB and the Commonwealth were expected to develop policies, procedures, and technologies to address serious deficiencies within the Bureau. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. The Commonwealth, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the 11 performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policies and procedures, UOF, and IT. CMR-1 found broad compliance on policy and procedure and certain areas of UOF, but nevertheless found a series of key lapses in UOF investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB's performance, covering a significantly larger number of Consent Decree paragraphs. The format and comprehensiveness of our CMRs has evolved with each report. CMR-5 represents the first full comprehensive assessment and report and the first report in which PRPB's status in the implementation of policy, training, and practice was documented. As such, CMR-5 provided a model for Monitor's reports going forward. As some areas, and paragraphs, of the Agreement are only assessed biannually, CMR-6 along with CMR-7 jointly provide the most comprehensive assessment provided by the Monitor's Office thus far.

## Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative research methods to assess the Commonwealth's compliance with the Agreement in the areas of performance selected for this report. These methods include but are not limited to 1) document reviews of forms that PRPB uses in the daily conduct of its activities; 2) content analysis of policies, training materials, internal investigation files, and other documents that provide detailed evidence of PRPB's efforts to comply with the Agreement; 3) interviews with sworn and civilian PRPB personnel, members of the public who can directly verify PRPB's community outreach and public information activities, personnel from other criminal justice components within Puerto Rico, and additional stakeholders in the reform process; 4) site visits to PRPB facilities, patrol locations, crowd control incidents, CIC meetings, and public information sessions; and 5) analysis of PRPB's data systems and the knowledge management practices that make use of these systems.[44]

### Compliance Levels

Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. PRPB and the Commonwealth's status in the implementation of policy, training, and practice are noted for each paragraph assessed, see figure 11. For those paragraphs where training is not a requirement of the paragraph training is listed as not applicable (N/A).



*Figure 12. Implementation Status: Policy, Training, Practice*

The compliance levels are defined as follows:

- **Fully Compliant**: Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;

---

[44] The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

- **Substantially Compliant**: Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;
- **Partially Compliant**: Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant**: Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Rating Deferred**: Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with a given paragraph, due to no fault on the part of PRPB.

The court draws a clear distinction between a deferred rating and a rating of not compliant due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB and the Commonwealth failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRPB or the Commonwealth, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

## Sampling Methodology

The Monitor's Office uses a variety of sampling methods to draw valid and representative samples for the data sources noted above. These sampling methods include the following:

1. Simple random sampling: Used for large datasets such as arrest reports and search/seizure incidents that occur in very large volumes each reporting period.
2. Stratified random sampling: Used for large but varied datasets such as training, performance, and disciplinary records for sworn PRPB personnel who are stratified by rank.
3. Purposive sampling: Used for datasets that require intentional selection to investigate key topics and cover all stakeholders over the course of successive CMRs, such as interviews with CIC members, training and counseling staff, and PRPB personnel assigned to specialized units.
4. Full enumeration: Used for sources that must be reviewed exhaustively, such as revisions to policies and training curricula, exemplars of forms that PRPB uses to interact with the public, and records for critical incidents such as deployment of chemical agents to disperse crowds.

In addition, the Monitor's Office uses a rolling sampling method for key data sources that require analyzing significant amounts of data on a tight deadline, such as arrests and searches, internal investigations, UOF incidents, etc. These data sources present a significant workload for the Monitor's Office, and for PRPB, because the relevant incidents either occur in large volumes during each reporting period or involve large amounts of documentation per incident. The Monitor's Office has addressed the

tradeoff between sample frequency, sample size, and margin of error, by adapting a "rolling" sampling method that the U.S. Census Bureau has developed for the American Community Survey.[45]

Using this method, the Monitor's Office draws quarterly samples for large data sources that are reviewed biannually. Sample sizes are calculated for each quarter by examining the past six months of incidents and drawing a proportional number of cases for the present quarter. Sample size is determined so that the margin of error for two years of combined data (consistent with the above definition of full compliance) is under 5%, allowing the Monitor's Office to state confidently whether PRPB has maintained substantial compliance on a given paragraph for the past two years and has therefore achieved full compliance. As such, the sample sizes below were determined not only on the number of cases stated for the present CMR, but on the basis of the past two years of data inclusively.

## CMR-10 Samples

The Monitor's Office requested the following samples from PRPB for CMR-10:

| Paragraph(s) | Primary Section | Data Source |
|---|---|---|
| **Common** | Common | Training records for a random sample of 27 in-service trainings conducted during the period, drawn from a population of 43. PRPB provided 44% of the request. |
| **Common** | Common | Training records (PTMS) for a random sample of 92 sworn personnel, drawn from a 11,397. PRPB provided 100% of the request. |
| **Common** | Common | Performance evaluations and disciplinary record for a random sample of 92 sworn personnel, drawn from a population of 11,397. PRPB provided 95% of the request. |
| **Common** | Common | Training records, performance evaluations, disciplinary records, and any SARP investigations, for a random sample of 92 supervisors and command officers, from a population of 11,397. PRPB provided 100% of the request. |
| **Common** | Common | Electronic records and materials for a purposive sample of 18 in-service trainings provided during the evaluation period from a population of 31. PRPB provided 100% of the request. |
| **84, 136-140, 144-153** | Common | Training records for a random sample of 64 civilian personnel, drawn from a population of 626. PRPB provided 100% of the request. |
| **16-20, 84** | Professionalization; Equal Protection and Non-Discrimination | Promotion files for a random sample of 30 promotion candidates, drawn from a population of 102. PRPB provided 100% of the request. |

---

[45]    United States Census Bureau, American Community Survey Design and Methodology, January 2014, https://www.census.gov/history/pdf/acsdesign-methodology2014.pdf

| 23-24, 27, 32-35 | Use of Force | PPR 605.1 (UOF Report) and PPR 605.2 for a random sample of 11 UOF incidents by STU officers, drawn from a population of 16. PRPB provided 100% of the request. |
|---|---|---|
| 25, 32-35 | Use of Force | Inspection reports for a random sample of 14 armory inspections, drawn from a population of 26. PRPB provided 100% of the request. |
| 26, 54 | Use of Force | Weapons training certificates for a random sample of 137 officers, as well as documents providing summary statistics on all firearm training completed over the past calendar year, drawn from a population of 6,280. PRPB provided 100% of the request. |
| 27, 28, 29, 32-35, 145-146 | Use of Force, Supervision and Management | Training records, performance evaluations, disciplinary records, and any SARP investigations for a random sample of 43 officers assigned to STUs and STU evaluation boards, drawn from a population of 203. PRPB provided 100% of the request. |
| 28 | Use of Force | Activation/deployment records for a random sample of 108 STU deployments for preventive patrol and policing functions, drawn from a population of 1,070. PRPB provided 70% of the request. |
| 28 | Use of Force | Deployment records for a random sample of 43 STU officers. Records should identify the nature of each deployment for each officer, including assignment to general patrol and policing functions, drawn from a population of 203. PRPB provided 77% of the request. |
| 30 | Use of Force | Activation/deployment records for a random sample of 58 STU activations. Records should include the operational plans and after-action reports prepared by the STUs for each activation/deployment, drawn from a population of 288. PRPB provided 74% of the request. |
| 32-35 | Use of Force | Incident reports and after-action reports for a random sample of 34 planned and unplanned incidents involving crowds drawn from a population of 117. PRPB provided 100% of the request. |
| 36-39, 41, 44-47 | Use of Force | PPR 605.1 (UOF Report), PPR 605.2, PPR 605.3, and PPR 126.2 (Complaint Card) for a random sample of 75 UOF incidents, as well as PPR 113.2 (UOF Incident Investigation Report) for any UOF incidents investigated by FIU, drawn from a population of 1,029. PRPB provided 100% of the request. |
| 40, 48, 55 | Use of Force | Training records, performance evaluations, and disciplinary records of 17 FIU investigators, drawn from a population of 37. PRPB provided 100% of the request. |
| 41, 49, 51, 52 | Use of Force | Investigation files for a random sample of 35 FIU investigations, including all PPR 113.1 (Preliminary Notification of UOF Incidents), PPR 113.2 (UOF Incident Investigation Report), and PPR 113.3 (Evaluation of the UOF Report) forms available for the sampled investigations, drawn from a population of 152. PRPB provided 100% of the request. |

| 41, 49-52 | Use of Force | Evaluation files (including forms PPR 502.1 (Assessment of Incidents of UOF) and PPR 502.2) for a random sample of 55 CFRB reviews, drawn from a population of 195. PRPB provided 91% of the request. |
|---|---|---|
| 44-47 | Use of Force | Training records and certificates for a sample of 22 FRB members to determine whether all board members are fully trained and certified to serve on the FRB, drawn from a population of 78. PRPB provided 100% of the request. |
| 44-47, 222 | Use of Force; Information Systems and Technology | FRB evaluation files (including PPR 502.1(Assessment of Incidents of UOF) and PPR 502.2) for a random sample of 59 UOF incidents classified as Level 2-3 with injuries, drawn from a population of 181. PRPB provided 97% of the request. |
| 56 | Use of Force | Training records and additional relevant data for 19 CIT officers/coordinators demonstrating that the personnel met all eligibility criteria drawn from a population of 47. PRPB provided 100% of the request. |
| 56 | Use of Force | Incident reports for a random sample of 117 incidents involving persons in mental health crisis, drawn from a population of 752. PRPB provided 99% of the request. |
| 60-64, 74-76 | Searches and Seizures | Incident reports, search warrants, property seizure receipts, storage documentation (where relevant), and related documents and CAD data for a random sample of 68 consensual searches and searches based on probable cause, drawn from a population of 882. PRPB provided 99% of the request. |
| 60-64, 154-156 | Searches and Seizures; Supervision and Management | Records and reports for a random sample of 28 operational audits, assessments, and inspections, including evidence that the auditing system identifies operational deficiencies, analyses causal and contributing factors, and implements effective remedial action, drawn from a population of 41. PRPB provided 100% of the request. |
| 65-72, 223 | Searches and Seizures; Information Systems and Technology | Arrest reports and related incident reports for a random sample of 59 arrests, drawn from a population of 7,456. PRPB provided 100% of the request. |
| 72 | Searches and Seizures | Investigation files for a random sample of 11 administrative investigations involving seized property, drawn from a population of 11. PRPB provided 100% of the request. |
| 78, 79, 129-131 | Equal Protection and Non-Discrimination; Training | Reports and supporting materials from the most recent review of a sample of 14 in-service trainings, drawn from a population of 16. PRPB provided 36% of the request. |

| **84, 104-107** | Equal Protection and Non-Discrimination; Recruitment, Selection, and Hiring | Recruitment office files for a random sample of 86 recruited candidates, drawn from a population of 502. PRPB provided 99% of the request. |
|---|---|---|
| **89** | Equal Protection and Non-Discrimination | Reports from a random sample of one reported PRPB interactions with transgender or transsexual individuals, drawn from a population of one. PRPB provided 100% of the request. |
| **92** | Equal Protection and Non-Discrimination | Investigation files for a sample of 10 incidents involving allegations of abuse and mistreatment originating in secure correctional facilities, drawn from a population of 10. PRPB provided 80% of the request. |
| **96** | Equal Protection and Non-Discrimination | Call records for a sample of hotline complaints. |
| **96** | Equal Protection and Non-Discrimination | Training records and selection documents for a sample of 22 PRPB personnel who attend the 24-hour hotline for sexual crimes, drawn from a population of 72. PRPB provided 91% of the request. |
| **99** | Equal Protection and Non-Discrimination | SARP and SAIC Investigation files for a random sample of 19 SARP investigations involving allegations of sexual assault and domestic violence against PRPB personnel, drawn from a population of 27. PRPB provided 100% of the request. |
| **114-116, 132** | Policies and Procedures; Training | Documents demonstrating that a purposive sample of 42 precincts and units held monthly academies and/or in-service training meetings delivered at the beginning of shifts or tours of duty, drawn from a population of 189. PRPB provided 90% of the request. |
| **117, 122** | Training | Training records and selection documents for a sample of 47 trainers, including documents detailing selection device and criteria for new trainers, drawn from a population of 246. PRPB provided 100% of the request. |
| **117, 129-131, 133** | Training | Completed course evaluations from the most recent session of a sample of 18 in-service trainings, drawn from a population of 31. PRPB provided 67% of the request. |
| **118-121** | Training | Pre-service training records, credentials, certificates, and/or state licenses for a sample of 30 mentees in the FTO program, demonstrating that each cadet is trained and certified in accordance with training plans, standards, and policy, drawn from a population of 120. PRPB provided 100% of the request. |

| 118-121, 205 | Training; Community Engagement and Public Information | Materials for a sample of 6 pre-service trainings to be conducted during the assessment period, including lesson plans and standards, tests, course evaluation forms, course evaluation results from the most recent training, and other related training materials, drawn from a population of 44. PRPB provided 83% of the request. |
|---|---|---|
| 123, 126, 127, 128 | Training | Apprenticeship files for a sample of 30 mentees in the FTO program, drawn from a population of 120. PRPB provided 100% of the request. |
| 124, 125, 127, 128 | Training | Training records, performance evaluations, disciplinary records, and additional documents for a random sample of 53 FTOs that would demonstrate that FTOs meet eligibility criteria or are removed as FTOs as required by policy, drawn from a population of 335. PRPB provided 100% of the request. |
| 136-140, 205 | Supervision and Management; Community Engagement and Public Information | Two months of staffing documents for a random sample of 42 PRPB precincts and units, demonstrating that all agents report to a single supervisor, and supervisors manage no more than 10 agents, drawn from a population of 189. PRPB provided 93% of the request. |
| 154-156 | Supervision and Management | Training records for a random sample of 14 operational auditors, indicating that all auditors have received training on internal audits and inspections, drawn from a population of 23. PRPB provided 79% of the request. |
| 12, 163-165, 168-170, 172-175, 180-189 | Civilian Complaints, Internal Investigations, and Discipline; Information Systems and Technology | Supervisory reviews and initial investigation files for a random sample of 67 misconduct complaints that have completed their initial investigation, drawn from a population of 900. PRPB provided 75% of the request. |
| 206 | Community Engagement and Public Information | PPR forms and related materials that would demonstrate that each indicated precinct/unit in a sample of 42 used the SARA Model to identify recurring quality of life problems and collaborate with the community on problem-solving activities, drawn from a population of 189. PRPB provided 100% of the request. |
| 207 | Community Engagement and Public Information | Documents for a list sample of 128 PRPB programs, initiatives, and activities demonstrating that PRPB collaborated with a broad cross-section of community stakeholders to establish problem solving strategies, develop stronger relationships, consolidate initiatives, educate, and reduce criminal activity, drawn from a population of 4,141. PRPB provided 97% of the request. |

*Table 3. CMR-10 Data Samples*

278

# Appendix C: Compliance Status by Paragraph and Sub-Section

The following sections were assessed in this report:

## I.  Use of Force

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 2 | 2 | 0 | 0 |
| Specialized Tactical Units | 1 | 4 | 0 | 0 | 0 |
| Crowd Control | 1 | 0 | 3 | 0 | 0 |
| Force Reporting | 0 | 3 | 1 | 0 | 0 |
| Force Review & Investigation | 0 | 2 | 0 | 0 | 1 |
| Supervisory and FRB Reviews | 0 | 5 | 0 | 0 | 0 |
| FIU Investigations & SFRB Reviews | 0 | 4 | 1 | 0 | 0 |
| Use of Force Training | 0 | 2 | 1 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 0 | 2 | 0 | 0 |
| **Total** | **3** | **22** | **10** | **0** | **1** |

## II.  Searches & Seizures

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Investigatory Stops and Searches | 3 | 1 | 1 | 0 |
| Arrests | 2 | 5 | 1 | 0 |
| Searches | 1 | 3 | 0 | 0 |
| **Total** | **6** | **10** | **2** | **0** |

## III. Equal Protection and Non-Discrimination

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 2 | 0 |
| Discriminatory Policing | 0 | 3 | 1 | 0 |
| Sexual Assault and Domestic Violence | 1 | 2 | 0 | 0 |
| **Total** | **1** | **6** | **3** | **0** |

279

## IV. Recruitment, Hiring, and Retention

| Consent Decree Section/Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Recruitment Plan | 0 | 2 | 0 | 0 |
| Hiring Reforms | 0 | 5 | 0 | 0 |
| **Total** | **0** | **8** | **0** | **0** |

## V. Training

| Training Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 1 | 0 | 0 |
| Pre-Service Education and Training | 0 | 2 | 3 | 0 | 0 |
| Field Training Program | 4 | 0 | 2 | 0 | 0 |
| In-Service Training | 0 | 0 | 4 | 0 | 0 |
| Training Records | 0 | 0 | 2 | 0 | 0 |
| **Total** | **4** | **2** | **12** | **0** | **0** |

## VI. Supervision and Management

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 1 | 0 | 0 |
| Duties of Supervisors | 0 | 0 | 5 | 0 | 0 |
| Supervisor Training | 2 | 1 | 1 | 0 | 0 |
| Performance Evaluation | 0 | 0 | 2 | 0 | 0 |
| Early Identification System | 0 | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 0 | 1 | 3 | 1 | 0 |
| **Total** | **2** | **2** | **12** | **8** | **0** |

## VII. Civilian Complaints, Internal Investigations, and Discipline

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 1 | 0 | 0 |
| Civilian Complaints | 2 | 0 | 0 | 0 | 0 |
| Internal Investigations | 0 | 2 | 1 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| Complaint Intake & Handling | 2 | 5 | 4 | 0 | 0 |
| Investigation of Complaints | 2 | 2 | 11 | 1 | 1 |
| Staffing, Selection, & Training Requirements | 0 | 0 | 3 | 0 | 0 |
| Preventing Retaliation | 0 | 0 | 1 | 0 | 0 |
| Discipline | 1 | 1 | 1 | 0 | 0 |
| Officer Assistance and Support | 1 | 3 | 0 | 0 | 0 |
| **Total** | **8** | **14** | **22** | **1** | **1** |

## VIII.   Community Engagement and Public Information

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Community Oriented Policing | 0 | 3 | 0 | 0 |
| Community Interaction Councils | 0 | 5 | 0 | 0 |
| Public Information | 0 | 1 | 3 | 0 |
| **Total** | **0** | **10** | **3** | **0** |

## IX.   Information Systems and Technology

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 4 | 2 | 0 |

281

# Appendix D: Professionalization Paragraphs 16 and 17

## Paragraph 16: Professionalization – Promotions

*PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas. PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion. These criteria should account for experience, civil rights and discipline record, training, and skills.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Promotion policies incorporate the requirements of paragraphs 14, 16-20. | ☐ Met | ☑ Missed |
| 2. All promotion trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled promotions committee personnel are trained and certified in all promotions policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Selection devices comply with promotion policies. | ☐ Met | ☑ Missed |
| 5. 95% of selected promotion files comply with policy. | ☐ Met | ☑ Missed |
| 6. 95% of interviewed candidates perceive the promotion process as merit-based, fair, non-discriminatory, and objective. | ☐ Met | ☑ Missed |

On April 16, 2024, the Monitor's Office filed an Informative Motion with the U.S. District Court for the District of Puerto Rico through General Counsel. The Motion noted that the court had previously required the defendants to show cause on or before March 31, 2024, why the Court should not permanently enjoin the defendants from enforcing the settlement agreements already executed with some of the appellants, considering that some of those agreements might be inconsistent with Paragraph 16.

The Motion noted that the defendants, through DSP, had executed settlement agreements with the 12 officers who had administratively appealed the 2015 captain promotions exam and that the defendants had already admitted that the agreement did not conform to Paragraph 16.

The Motion further noted that the defendants had stated in their Motion that the court should still approve the promotions because PRPB had chosen a pedagogically unsuitable textbook to test the candidates on such topics.

The Motion also noted that the defendants proposed adjudicating questions so that 10 of the 12 officers would pass the exam. In addition, the defendants recommended promoting the two officers who would still not pass the exam. As part of their Motion, the defendants presented a proposal that would probationally promote all 12 candidates, followed by close supervision, training, and other safeguards.

The Monitor's Office concluded that PRPB's plan still failed to comply with Paragraph 16 of the Agreement and stated that the lack of compliance would be disclosed in the CMR-10 report.

The Monitor's Office also found that by deciding that the administration textbook was pedagogically unfit and adjudicating all administrative related questions from the 2015 exam eight years after the fact that PRPB is accepting that the 2015 exam was unfair to the 53% who passed the exam and all those who failed it and did not appeal.

The Monitor's Office also noted that Paragraph 16 bounds PRPB to the requirement of Paragraph 17 ("to evaluate qualifications that are job related and consistent with business necessity") when Paragraph 16 states that it "shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas."

Further, since DSP decided to adjudicate all questions related to management and administration, the Monitor's Office concluded that the defendants are failing to objectively ascertain the ability of the candidates to supervise and manage others independent of their prior in-field supervisory experience.

Finally, the Monitor's Office concluded that the fault for the 8-year delay in rendering a decision lies with the defendants rather than the appealing officers and recommended that the 12 officers may be promoted subject to additional training, a post-training exam that allows earning points, evaluation of these newly promoted captains quarterly for 2 years and being subject to a 1-year probationary period.

On April 26, 2024, the Honorable Judge Francisco A. Besosa signed an "Order Finding the Commonwealth Defendants in Civil Contempt and Establishing Immediate Oversight."

The court found the Commonwealth defendants in civil contempt for violations of Paragraphs 16 and 17 and established alternative curative measures. The court found that points were added arbitrarily to the scores of the appealing lieutenants, that the points were added to settle appeals before the Public Service Appeals Commission (CASP), and that the added points allowed the appealing lieutenants to pass the exam allowing the Commonwealth to promote them and avoid further litigation. CASP entered the settlement agreements as final resolutions in October and November 2023.

The order further noted that the USDOJ, the Monitor's Office, and OSM first learned on November 20, 2023, that the 12 lieutenants had failed the exam and appealed in 2015. The appeals to CASP remained unresolved for eight years through no fault of the defendants.

In addition, the order stated, "By awarding points to 12 lieutenants for promotion to the rank of captain in an arbitrary, capricious, or discriminatory manner, Commonwealth defendants violated the Consent Decree, hindered the selection of qualified supervisors at PRPB, and undermined confidence in current and future promotions at all levels."

The court noted that the Commonwealth defendants do not dispute the facts presented in CMR-9 regarding the points awarded to the 12 lieutenants and concluded that the Commonwealth defendants have not shown good cause why they should not be permanently enjoined from enforcing the CASP agreements.

The court adopted the alternative curative measures proposed by the United States, as reviewed and revised by the court:

1. Commonwealth defendants are held in civil contempt for violation of Paragraphs 16 and 17 by awarding points in an arbitrary manner to the 12 lieutenants.

2. Commonwealth defendants may proceed to execute the settlement agreements with CASP, including promoting the 12 lieutenants, provided that the 12 lieutenants demonstrate satisfactory performance as captains:

   a. Eighty hours of training regarding duties, responsibilities, and expectations of captains prior to assuming their duties as captains. The training curriculum and plan must be submitted to, reviewed, and approved by the United States, the Monitor's Office, and OSM prior to administering the expanded training.

   b. The 12 lieutenants must take and pass an examination on the 80 hours of training prior to assuming the duties of captains. The examination and all related materials must be submitted to, reviewed, and approved by the United States, the Monitor's Office, and OSM prior to administration of the exam. The results and scores must be reviewed similarly.

   c. Performance evaluations of the 12 lieutenants must be increased to 4 times per year for no less than 2 years after the date of their promotions to captain.

   d. Once the 12 lieutenants are promoted to captain, their probationary period shall be extended from 6 months to 12 months.

   e. Commonwealth defendants shall submit written reports on at least a quarterly basis for the two years from the date of this order or as otherwise directed by the court, to the United States, the Monitor's Office, and OSM, including:

      i. All new appeals involving PRPB promotions through the rank of captain.

      ii. The status of all appeals involving all PRPB promotions through the rank of captain, including notices of default, contempt motions filed, and contempt orders issued.

      iii. The final resolution of such appeals.

3. The court empowered the Monitor's Office and OSM to have immediate authority for two years from the date of the Order to:

   a. Oversee the actions taken to adjudicate challenges to promotion examination questions by current and future promotion committees that are established under approved policies to administer all promotion examinations administered for all ranks through the rank of captain.

   b. Require that current or future promotion committees produce for inspection all documents, materials, and information considered by the promotion committees to adjudicate challenges submitted by candidates who took promotion examinations for all ranks through the rank of captain or by the candidates' authorized representatives.

   c. Require that current or future promotion committees prepare written reports, memoranda, or letters justifying actions taken to adjudicate challenges to all promotion examinations for all ranks through the rank of captain.

   d. Review all adjudication decisions by current or future promotion committees involving the awarding or deducting of points to any candidate who took an examination for promotion to all ranks through the rank of captain, to determine whether to approve, reject, or modify the promotion committees' decisions.

   e. Review all Commonwealth decisions to modify the passing score set forth in approved policies or protocols for any examinations for promotion to any rank through the rank of captain, to determine whether to approve, reject, or modify the decisions.

   f. Monitor the case management of all appeals to CASP or other appellate entities involving PRPB promotions for all ranks through the rank of captain, to determine whether Commonwealth defendants take timely action to resolve the appeals in accordance with the Consent Decree and this court's related orders.

4. The Monitor's Office and OSM may each designate a member of their teams to lead or assist in carrying out the supplemental authorities contained in this Order. The Monitor's Office and OSM may also request additional necessary resources to carry out the supplementary authorities contained in this Order in accordance with the Consent Decree and this court's related orders.

5. The Monitor's Office, in coordination with OSM, shall include a description of work performed under the supplementary authorities conferred by this Order, including any findings, recommendations, or opinions regarding Commonwealth defendants' compliance with the Consent Decree and this Order in the Monitor's Office's six-month reports prepared in accordance with Paragraphs 215 and 252 of the Consent Decree.

6. If a party disagrees with a requirement or determination made by the Monitor's Office in coordination with OSM under the supplemental authorities set forth in this Order, the party may seek this court's intervention, provided that the party has notified the Monitor's Office and OSM in writing regarding the disagreement and has conferred in good faith with the other party and the Monitor's Office and OSM to resolve the matter prior to petitioning the court.

7. The Honorable Judge Besosa also stated that nothing in this Order is intended to alter or modify the Consent Decree.

Based on the Honorable Judge Besosa's Order it is the opinion of the Monitor's Office that the status of Paragraph 16 is not compliant.

## Paragraph 17: Professionalization – Promotions

*PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job related and consistent with business necessity. PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2023 – March 2024 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

As reported in CMR-9 the Monitor's Office became aware of the Commonwealth's settlement agreements with the 12 officers who had administratively appealed the 2015 captain promotions exam and that the Commonwealth had already admitted that the settlement agreements did not conform to Paragraph 16.

On April 16, 2024, the Monitor's Office filed an Informative Motion with the U.S. District Court for the District of Puerto Rico through General Counsel. The Motion noted that the court had previously required the defendants to show cause on or before March 31, 2024, on why the court should not permanently enjoin the defendants from enforcing the settlement agreements already executed with the appellants, considering that some of those agreements might be inconsistent with Paragraph 17. The Commonwealth stated in their response motion that the court should still approve the promotions because PRPB had chosen a pedagogically unsuitable textbook to test the candidates on such topics.

The Monitor's Office concluded that PRPB's plan still failed to comply with Paragraph 17. The Chief Federal Monitor found that by deciding that the administration textbook was pedagogically unfit and adjudicating all administrative related questions from the 2015 exam eight years after the fact, that PRPB is accepting that the 2015 exam was unreliable and unfair to the 53% who passed the exam and all those who failed it and did not appeal.

Further, the Monitor's Office noted that Paragraph 17 requires that the exam be designed "to evaluate qualifications that are job related and consistent with business necessity," which includes the administration and management component. By adjudicating all questions related to management and

administration, the Monitor's Office concludes that the defendants are failing to objectively ascertain the ability of the candidates to supervise and manage others independent of their prior in-field supervisory experience. The Monitor's Office also made note that the fault for the eight-year delay in rendering a decision lies with PRPB rather than the appealing officers. On April 26, 2024, the Honorable Judge Francisco A. Besosa signed an "Order Finding the Commonwealth Defendants in Civil Contempt and Establishing Immediate Oversight."

The court also found the Commonwealth in civil contempt for violations of Paragraphs 16 and 17 and established alternative curative measures. The court found, among other things, that points were added arbitrarily to the scores of the appealing lieutenants, that the points were added to settle appeals before CASP.

The Monitor's Office has raised concerns about violations of Paragraph 17's requirement of "generally accepted professional standards for test validity" since no substantive criteria were taken into consideration when granting the additional points. In other words, appellants were arbitrarily granted a passing grade and awarded additional points for fear of unfavorable fiscal effects. OSM and the court concur with the Monitor's Office.

As a result, the court adopted the alternative curative measures as reviewed and revised by the court.

The court empowered the Monitor's Office and OSM to have immediate authority for two years from the date of the Order to:

a. Oversee the actions taken to adjudicate challenges to promotion examination questions by current and future promotion committees that are established under approved policies to administer all promotion examinations administered for all ranks through the rank of captain.

b. Require that current or future promotion committees produce for inspection all documents, materials, and information considered by the promotion committees to adjudicate challenges submitted by candidates who took promotion examinations for all ranks through the rank of captain or by the candidates' authorized representatives.

c. Require that current or future promotion committees prepare written reports, memoranda, or letters justifying actions taken to adjudicate challenges to all promotion examinations for all ranks through the rank of captain.

d. Review all adjudication decisions by current or future promotion committees involving the awarding or deducting of points to any candidate who took an examination for promotion to all ranks through the rank of captain, to determine whether to approve, reject, or modify the promotion committees' decisions.

e. Review all Commonwealth decisions to modify the passing score set forth in approved policies or protocols for any examinations for promotion to any rank through the rank of captain, to determine whether to approve, reject, or modify the decisions.

f. Monitor the case management of all appeals to CASP or other appellate entities involving PRPB promotions for all ranks through the rank of captain, to determine whether

287

Commonwealth defendants take timely action to resolve the appeals in accordance with the Consent Decree and this court's related orders.

Based on the Honorable Judge Besosa's Order it is the opinion of the Monitor's Office that the status of Paragraph 17 is not compliant.