June 2024



# Executive Summary for the Tenth Report of the Federal Monitor, Covering the Period from October 2023 through March 2024

This is the tenth Chief Monitor's Report (CMR-10) outlining the compliance levels of the Commonwealth of Puerto Rico in relation to the Consent Decree entered between the United States and the Commonwealth of Puerto Rico. This report provides the tenth assessment following the four-year capacity building period established by the Consent Decree that ran from June 2014 to October 2018 and covers the period from October 2023 through March 2024.

During the CMR-10 reporting period, the Commonwealth's achievements towards partial and/or substantial compliance with many of the paragraphs significantly improved. This improvement in compliance is largely due to the completion of the various tasks and initiatives related to several implementation plans including Use of Force (UOF), Training, and Supervision and Management. The improvement of tracking and reporting of UOFs, the implementation of a revised performance evaluation process, improvements in the reports of arrests, the publication of crime data, the use of self-monitoring dashboards, and the implementation of important and necessary in-service training are some examples. Although these areas of improvement represent significant progress, much remains to be done to demonstrate substantial compliance. The selection of a Records Management System (RMS) vendor and implementation of a new RMS, with eventual integration of computer-aided dispatch (CAD), GTE, and data specific dashboards; improvements to supervisory training on performance evaluations; the establishment of an Early Intervention System (EIS); continued promotions; improvements to community policing strategies, activities, and tracking of these activities; establishment of an associate's degree program within the Academy; and increases in staffing to the Auxiliary Superintendency of Professional Responsibility (SARP) and the Office of Legal Affairs (OAL) are just a few of the areas that need to be addressed for the Commonwealth to propel forward in compliance with the Agreement.

Over the next few reporting periods, the Commonwealth must continue to work towards addressing these areas along with others outlined in its non-compliance implementation tracker. The Monitor's Office also stresses to the Commonwealth that for it to continue experiencing improvements to training, in particular in-service training, it must begin working towards developing the 2024 Annual Training Plan. Training plans like those produced in Chicago, Illinois and Baltimore, Maryland are just a few examples of comprehensive training plans that include all aspects of the training program along with required community engagement. Failure to establish a Training Plan will again result in regressions in compliance with the conduct of in-service training and unit specific training, which span across all areas of the Agreement.

Allocation of the necessary resources to community policing, SARP, OAL, the Commissioner's Force Review Board (CFRB), and Force Review Board (FRB) is also an area that needs to be addressed and is considered instrumental to progress compliance. Further, as established in Court Order 2644, the Monitor's Office, in collaboration with the Office of the Special Master (OSM) will undertake additional oversight activities to ensure that the promotions process is fair, equitable, and in compliance with the Agreement. Over the next reporting periods the Monitor's Office will work with OSM to complete the required tasks as stipulated in the Court Order.

As noted above, when examining the total paragraphs assessed in this report (N=179) in comparison to the previous CMR in which these sections and paragraphs were assessed (CMR-8; N=179), the Monitor's Office notes that PRPB has achieved significant progress during this reporting period. For example, 94 paragraphs met partial compliance and 19 paragraphs were rated not compliant during this reporting period, in comparison to 83 paragraphs rated as partially compliant and 56 as not complaint in CMR-8. Further, when reviewed comprehensively, almost 88% (N=158) of the paragraphs meet either partial, substantial, or full compliance in CMR-10 in comparison to 68% (N=121) in CMR-8.



Figure 1. Rate of Compliance Over Time

## Monitoring Activities During CMR-10

Over the past six months the Monitor's Office conducted five site visits to PRPB headquarters as well as various regions of the island including Aguadilla, Bayamon, Guayama, and Carolina. At each of these field visits the Monitor's Office visited the area command, district(s) within each area, Highway Patrol Units, and other units at each location. At each location the Monitor's Office met with executive command and PRPB personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF.

These field visits provided an opportunity for the Monitor's Office to hear directly from supervisors and officers on the front line, speak with members of the Commonwealth community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of over

4,000 policies, documents, certifications, audio recordings, and case files and reports provided for review during the CMR-10 reporting period. While on site, team members also participated in five system demonstrations on various systems, including the Inspections Module, Community Engagement Module, Non-Punitive Discipline Module, Tracking Module, ProMedia, and EIS. The Monitor's Office also acquired access to these systems as part of its efforts to streamline monitoring efforts.

During the reporting period, the Monitor's Office also reviewed 51 policies, forms (PPRs), and protocols under Paragraph 229 of the Agreement. The policies included General Orders (GOs) 118 (Domestic Violence), GO 624 (Interactions with Transgender and Transexual Individuals), GO 704 (Monthly Meetings and Newsletters), GO 305 (Transfer Transactions of the Rank System), among others.

The Monitor's Office also observed various community engagements hosted by PRPB and the CICs. The Monitoring Team conducted a community townhall meeting in March 2024. This meeting was attended by over 130 representatives from the community, PRPB, and the Department of Public Safety (DSP). The community meetings hosted by the Monitor's Office are conducted quarterly.

During this reporting period, Gartner Inc., contracted by the Monitor's Office continued its work with the Commonwealth. The current contract includes support for the acquisition and implementation of the new Record Management System (RMS) and the Project Management Office (PMO). The Commonwealth also finalized and submitted its status updates on the Implementation Plans. Further, during this reporting period, the Commonwealth and the Monitor's Office began conducting biweekly compliance status updates for each of the areas of the Agreement. Conversations on modifications to the methodologies of various areas were also conducted during this reporting period, though no changes have been formally submitted to the court as of the end of the reporting period.

It should be noted that while not scheduled for assessment, Professionalization Paragraphs 16 and 17 of the Agreement went from partially compliant to not compliant based on DSP's actions as it relates to arbitrarily awarding points without merit to 12 applicants who failed the 2015 captains' examination. This was done for the purpose of obtaining a passing grade.

In addition, during the reporting period, the Monitor's Office participated in one status conference. The January 2024 status conference focused on updates related to the CMR-9 report, the IT Corrective Action Plan (CAP), and the Supervision and Staffing Plan. The Monitor's Office continues to work closely with the Parties to monitor the Commonwealth's progress with implementing the various plans filed with the court.

## Looking Forward to CMR-11

The Monitor's Office is pleased with the Commonwealth's progress as noted throughout the CMR. It is hopeful that continued progress will be made in CMR-11 and future reports. Much of what remains to achieve partial and/or substantial compliance is going to be reliant on the Commonwealth's continued work in implementing the various tasks and initiatives within its implementation plans, in sustaining its

in-service training program, selection of an RMS vendor, implementation of a PMO, implementation of an EIS, and additional resources in SARP and OAL.

The Monitor's Office will continue to review documents produced by PRPB and the Commonwealth in demonstration of compliance, conduct additional field visits, observe related training sessions, observe PRPB's community engagement efforts, and conduct interviews with both PRPB personnel and community stakeholders. Further, during the reporting period, the Monitor's Office hopes to continue to conduct additional Townhall Community Meetings across the island to share the Reform status and hear directly from the broader Puerto Rican Community.

## Summary of Compliance by Section

The following summary provides an overview of the Monitor's Office's compliance assessment for each area of the Agreement.

## 1. Use of Force

PRPB formally implemented its Provisional Use of Force (UOF) Plan in July 2022. The Provisional UOF Plan, which has been in place for nearly two years, coupled with the increase of sergeants in the field, has resulted in improved reporting of UOF incidents in the reporting period. Thus, the Monitor's Office has determined that the Provisional UOF Plan has produced accurate numbers Bureau-wide. Nevertheless, the plan will change with the introduction of PRPB's new records management system (RMS).

In addition, the Commonwealth's contractor, AH Datalytics, continues to help develop and improve the various UOF related dashboards. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field. These data dashboards should also assist first-line supervisors with managing workflow and ensuring officer compliance.

During this reporting period, PRPB reported 1,029 instances of UOFs in 509 incidents. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRPB's GTE system is comprehensive. It should be noted that the Monitor's Office has determined that PRPB continues to make progress in the preparation and submission of UOF reports (PPR 605.1) in the timeframe outlined in PRPB policy. In the sample of 79 UOF reports (PPR 605.1) reviewed by the Monitor's Office all but 1 (1%) was prepared and submitted in the timeframe outlined in policy. In addition, as stipulated in the policy, supervisors completed their investigation within five business days. These improvements have resulted in continued positive compliance ratings.

Improved consistencies in the UOF data largely affect many of the paragraphs in this section. Other topics such as the Force Investigation Unit (FIU), Force Review Boards (FRBs), Crisis Intervention Training (CIT), SWAT, and crowd control procedures also impact PRPB's overall compliance with this section. As it relates to FIU, the Monitor's Office has observed significant improvement in meeting established timelines. The Parties and the Monitor's Office have agreed to temporarily update the 45 calendar days

requirement that FIU has to complete UOF investigations for CMRs-10 and 11 to 60 calendar days. With the timeframe update for completing FIU investigations, the Monitor's Office observed that 98% of cases were completed within the agreed upon timeframe of 60 days. The additional personnel recently added to FIU have and will continue to contribute to improved compliance.

In the Monitor's Office's review of Commissioner Force Review Board (CFRB) evaluations over the course of its CMRs, while the evaluations were objective, they were not timely. To address this issue during the reporting period, PRPB modified the process by updating and creating new forms associated with the FIU (PPR 113.1 through PPR 113.12). PRPB has also created new forms, PPR 502.7 (Review of Field Investigations of UOF Incidents Investigated by the FIU Use of Force Investigations Division) and PPR 502.8 (Final Determination of the Incident).

To address the backlog of cases with the CFRB for review (114 cases), PRPB has created additional temporary boards headed by board members from the original CFRB who have received training on GO 502 and have been designated as presidents of these newly formed boards. The remaining members of these boards are drawn from the area commands' command staff who have also received the training. PRPB has indicated that the existence of these boards is for the sole purpose of reducing the backlog of cases. A review of the backlogged cases conducted by the Monitor's Office indicates that all cases have been closed. PRPB has yet to outline how they intend to maintain compliance in this area moving forward.

Adding to the extensive workload currently undertaken by the CFRB, in an effort to reduce the number of open investigations from previous periods, the FIU has closed a number of older cases adding to the case load of the CFRB.

In the area of Responding to Behavioral/Mental Health Crisis it is critically important to have CIT trained officers throughout the 13 area commands. Since the conclusion of the pilot project in November 2020, PRPB had lagged in expanding its CIT coverage outside of Arecibo until the last reporting period. PRPB made significant progress in CMR-9, adding personnel, and expanding the program to five additional areas. By the end of the current reporting period PRPB had trained an additional 111 officers as CIT officers bringing the total of trained officers to 189 and expanded the CIT program to all 13 areas.

PRPB also reported that during the month of February 2024 a new CIT Bureau Coordinator who holds the rank of Inspector was assigned to lead the expansion efforts to other area commands. The assigned inspector has experience in this area, holding a doctoral degree in Psychology.

Notwithstanding the issues noted above, the Commonwealth has demonstrated progress in many of the UOF paragraphs. Much of the efforts made in this reporting period can be attributed to PRPB's continued collaboration with AH Datalytics, the Commonwealth's contractor, who has helped PRPB develop several UOF related dashboards, which include "Compliance with Reports", "Use of Force Statistics", "Requests from the Monitoring Team", and "Specialized Tactical Unit Mobilizations." These dashboards are useful to the Monitor's Office as they serve as another tool in assessing PRPB's compliance with the Agreement. In addition, PRPB's efforts in training members as CIT officers and in expanding the CIT Program to all

area commands has been identified by the Monitor's Office as a major step. The positive efforts made in this reporting period have proven beneficial in increasing PRPB's compliance ratings in this section.

Overall, the Commonwealth's compliance with the 36 paragraphs assessed during this reporting period within UOF reflects substantial improvement in levels of compliance to what was noted in previous reports. In CMR-9, 61% of paragraphs (22 paragraphs) were assessed as partially compliant and 31% (11 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 28% of paragraphs (10 paragraphs) were found to be partially compliant and 61% (22 paragraphs) were found to be substantially compliant. Three paragraphs (8%) were rated as fully compliant, and one paragraph was rated as deferred (3%). See figure 2.



*Figure 2. Use of Force: Paragraph Compliance Status*

## 2. Searches and Seizures

A preliminary analysis of CMR-10 data revealed that PRPB officers are now consistently articulating probable cause in arrest reports. It also shows that a high number of reports found not compliant due to poor documentation of probable cause are being returned to officers for correction, an indication that officers and supervisors are being held accountable. Still, there is a minimal number of poorly written reports that supervisors must address. Incomplete arrest files continue to be of some concern, although not on the scale of past CMRs. Properly describing probable cause in arrest situations has led to the almost complete elimination of the use of boilerplate, conclusive, and repetitive language in most cases.

PRPB supervisors are also being held accountable for their responsibilities, as evidenced by their performance in the areas of arrest reviews, crime scene response during felony arrests, and properly inspecting arrestees for injuries.

Investigatory stops, searches, and traffic stops are not yet tracked, collected, and reviewed by PRPB, as required by the Agreement. However, PRPB has submitted to the court and the Monitor's Office a Search and Seizure Implementation Plan that promises to start addressing these issues by the end of 2024.

Seized Property Forms (PPR 636.1) are still missing from some arrest files, and some officers continue to improperly ask arrestees to sign these forms listing potentially incriminating evidence, an action that could lead to a claim of 5th Amendment violations.

During this reporting period, the Monitor's Office inspected several temporary property/evidence rooms housed in police district stations and two permanent evidence rooms (CIC and Drug Unit evidence rooms that hold evidence for much longer terms) and found all district property/evidence rooms to be compliant. However, one major evidence room lacked proper ventilation and the commanders from both specialized units complained that the space provided was too small, given the amount of evidence stored. In addition, video-recording devices were not functioning properly in both units at the time of inspection.

Supervisors and commanders continue to properly review and approve search warrant applications and arrests. Officers continue to properly complete consent search forms; however, in a couple of cases in this sample, the forms were not included in the file folders submitted. The progress in this area can be directly attributed to the fact that PRPB has caught up with its in-service training schedule in arrest and search and seizure courses, reaching 99% of officers.

Overall, the Commonwealth's compliance with the 18 paragraphs assessed during this reporting period within Searches and Seizures reflects the significantly improved levels of compliance to what was noted in previous CMRs. In CMR-8, 83% of paragraphs (15 paragraphs) were assessed as not compliant and 17% (3 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 11% of paragraphs (2 paragraphs) were found to be not compliant and 56% of paragraphs (10 paragraphs) were found to be partially compliant. See figure 3.



*Figure 3. Searches and Seizures: Paragraph Compliance Status*

## 3. Equal Protection and Non-Discrimination

Typically, specific targets within these paragraphs are assessed biannually. The compliance targets reviewed in this reporting period are bolded within the paragraphs. The targets mainly revolve around PRPB's initiatives concerning the implementation of training and procedures related to hiring, the civilian complaint system, performance evaluations, juvenile case management reporting, hate crime reporting, and bias-free policing training.

The Parties collaborated on a Sexual Assault and Domestic Violence (SA/DV) Plan, which received court approval on September 5, 2023. This plan has proven instrumental in addressing various issues such as training enhancements, improvements in the quality of investigation files, adoption of victim-centered practices, enhancements in supervision, refining internal investigation procedures, and staffing and resource-related challenges.

The working group responsible for this section is currently progressing through the associated tasks outlined in the SA/DV Plan. Developed by PRPB, this plan has led to the creation of an investigation checklist. The workgroup remains dedicated to addressing findings and recommendations from previous CMRs. The primary objective of this initiative is to establish investigative procedures that enhance PRPB's responsiveness in handling SA and DV cases. To achieve this, it is crucial for PRPB to maintain its commitment to improving SA and DV training for its personnel. This specialized training equips the team with the necessary skills for an effective initial response to such incidents. However, in this reporting period, PRPB falls short of meeting its training compliance target of 95%. Ensuring the continued provision of training opportunities, resources, and support is paramount in the mission to effectively investigate these types of crimes.

Overall, the Commonwealth's compliance with the 10 Equal Protection and Non-Discrimination paragraphs reflects marginal progress in levels of compliance to what was noted in previous CMRs. In CMR-8 60% (6 paragraphs) of the 10 paragraphs assessed were partially compliant, in comparison to the current reporting period, where 60% of the 10 paragraphs (6 paragraphs) were found to be partially compliant and 10% of the 10 paragraphs (1 paragraph) was found to be substantially compliant. See figure 4.



*Figure 4. Equal Protection and Non-Discrimination Paragraph Compliance Status*

## 4. Recruitment, Selectin, and Hiring

The Monitor's Office determined PRPB to be Partially Compliant overall with the Agreement in the area of Recruitment, Selection, and Hiring. PRPB is in the process of recruiting qualified personnel and developing a Recruitment Plan that has inclusive selection practices, and that better represents the diverse cross-section of the Puerto Rican community. PRPB can still improve in certain areas, such as creating a Recruitment course, offering training on recruitment, and finalizing an official Recruitment Plan.

Recruiting, selecting, and retaining personnel are pivotal for community policing and for the policing profession in general. Recruitment and staffing obstacles continue to appear in law enforcement agencies across the United States. Nevertheless, PRPB provided data that demonstrates a concerted effort both to recruit qualified candidates, and to vet them thoroughly. The most recent Paragraph 13 Committee Meeting showed that PRPB is currently aiming to recruit a maximum of 377 officers.

It should be noted that the Recruitment Division currently uses an INTERBORO platform that expedites the complete recruitment process. The Recruitment Division should also ensure that each recruitment officer in all areas in Puerto Rico be trained in recruitment and the use of the INTERBORO platform. The INTERBORO system makes PRPB more effective and efficient in recruitment and helps automate valuable information and statistics, which has yet to be accomplished.

PRPB, under Puerto Rican law, now permits cadets to enter the Academy at age 18.  These cadets will not be commissioned until after they complete the Academy and have been awarded an Associate's Degree. They are given up to three years from the time they enter the Academy to meet these requirements. Once they have graduated from the Academy and possess an Associate's Degree, they may be commissioned.

The Monitor's Office continues to recommend that PRPB:

1. Clarify that these cadets will not be performing policing duties until they have obtained their Associate's Degree and passed through all other necessary filters; outline the protocols/procedures related to this program; and explain the roles and responsibilities of these cadets from the moment they enter the Academy/Associate's Degree program forward.

2. Clearly state the requirements for being enrolled in the Associate's Degree program, including the thresholds and minimum expectations for satisfactory progress towards the degree; the decision-making process for determining which candidates do not meet these minimum requirements; the process for terminating cadets; and revise the Recruiter Training curriculum to align these understandings with current policy.

3. Modify the Recruitment Regulation to include advertisement that aligns with current community policing standards, and for the advertising to clearly explain the required skillsets in order to become a cadet, such as social skills, problem solving, critical thinking, etc.

4. Complete the Recruiter Training curriculum, which should include discrimination and bias and be approved by the Commissioner. This latter step is crucial since training cannot be conducted without an approved curriculum.

5. Ensure that recruited personnel should be representative of what PRPB as an agency will become. Both sworn and civilian personnel should have an active role in recruiting cadets since there are positions for civilians and officers. PRPB should develop a comprehensive and competitive retention plan and success and failure case studies to provide guidance on future policy decisions and assist in communication. PRPB should publicly disseminate recruitment data for comparison.

6. Conduct more outreach to CIC members and the Puerto Rican community for their assistance in planning and executing future recruiting efforts. The Recruitment Regulation should include provisions that PRPB consult with community stakeholders and obtain recommendations to ensure a diverse candidate pool. The Monitor's Office recommends solicitation of recruitment ideas from all demographic groups in Puerto Rico, as was done at the CIC meeting held on March 9, 2024, in Patillas. This meeting provides proof that the Recruitment Regulation was discussed collaboratively with CIC members.

7. Capitalize on Police Week for recruiting while focusing recruiting components on community policing more than traditional policing, given that community policing is to be the future of PRPB.

8. Add more personnel to the Recruitment Division to expedite all parts of the recruiting process. Currently there are not enough people to expedite the hiring of new recruits.

9. Approve the new recruitment video produced by the Recruitment Division in which some cadets including members of the minority community participated.

Overall, PRPB's compliance with the eight Recruitment, Selection, and Hiring paragraphs assessed during this reporting period reflect the same levels of compliance as what was noted in previous CMRs. In CMRs-2, 4, 6, 8, and 10, all paragraphs were assessed as partially compliant. See figure 5.



*Figure 5. Recruitment, Selection, and Hiring: Paragraph Compliance Status*

## 5. Training

The Parties collaborated to develop a Training Plan that received court approval on April 10, 2023. This comprehensive plan has been crucial in addressing various training issues, such as allocating hours, evaluating instructors, revising in-service and pre-service programs, enhancing the Field Training Officer (FTO) program, and implementing the Police Training Management System (PTMS). PRPB has been diligently working on the goals and tasks associated with this plan throughout the reporting period.

A training working group was established during this reporting period that is tasked with advancing the plan's outlined objectives. Developed by PRPB, the plan focuses on four core areas: the Training Program, PTMS, Instructors Program, and FTO Program. The group is committed to addressing previous findings and recommendations to ensure continual improvement. The primary objective of this initiative is to establish training environments that adhere to the highest educational standards. The working group is currently engaged in several key activities, including developing the training track module; creating a structured framework for organizing and delivering training content to officers; conducting a needs assessment; identifying areas for improvement and development within PRPB personnel; revising courses; ensuring existing training courses remain relevant and aligned with best practices; developing instructors; and certifying instructors within PRPB to deliver high-quality instruction. Through these initiatives, the working group aims to enhance the effectiveness and quality of training provided to PRPB personnel, contributing to their professional development and competency.

During this reporting period, PRPB made significant strides in its training efforts. This includes recruiting new instructors to address staffing shortfalls, recognizing the need to enhance the PTMS to collect and report real-time training data, and involving Community Interaction Councils (CICs) in the evaluation and revision of training materials. Additionally, PRPB is actively developing a needs assessment process through its training plan to better understand its current and future training requirements. These initiatives underscore PRPB's commitment to improving its training programs and ensuring they meet the evolving needs of its personnel and the community.

Overall, PRPB's compliance with the 18 Training paragraphs assessed during this reporting period reflects an improvement in levels of compliance compared to what was noted in previous CMRs. In CMR-8 61% of paragraphs (11 paragraphs) were assessed as partially compliant ad 39% of paragraphs (7 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 66% of paragraphs (12 paragraphs) were found to be partially compliant and 11% of paragraphs (2 paragraphs) were found to be substantially compliant. Four paragraphs (22%) moved to fully compliant. See figure 6.



*Figure 6. Training: Paragraph Compliance Status*

## 6. Supervision and Management

During this reporting period, the Commonwealth demonstrated significant improvement leading to increased compliance with this section of the Agreement. Among its accomplishments during this reporting period were: promotions, expected promotions during 2024, a new evaluation system, and the assignments of promoted first line supervisors. Despite the fact that the Commonwealth promoted a considerable number of supervisors, it still struggled to follow through with supervisory accountability and failed to develop and institutionalize adequate information technology systems to support supervision (i.e., Early Intervention System (EIS), personnel assignments records, statistical accomplishments), continuing to interfere with PRPB's progress towards substantial compliance.

A total of 91 officers passed the Captain's examination and attended the 40 hour training offered at the Police Academy on February 26, 2024. These promotions are expected to take place in August 2024. This

achievement will bring PRPB closer to the number of supervisors outlined in the Staffing Plan. In addition, PRPB is also currently working to promote 1st and 2nd lieutenants by October 2024. The Monitor's Office looks forward to reviewing the complete promotional process.

The development of EIS continues to be dependent on the implementation of the IT Corrective Action Plan (CAP). Inspections and audits also continue to be a concerning issue due to lengthy inspection completion and certification times. It was reported that the Commonwealth is still working with the OSM to draft policies and protocols related to Integrity Audits.

During officer and supervisor interviews, concerns regarding the transfer unit, assignments, evaluations, shortages of vehicles, and low budgets for vehicle repairs were raised. Personnel responsible for Staffing Plan updates, human resources personnel, and high-ranking officials, confirmed that they were aware of these concerns and noted that they are working on correcting them. PRPB is showing improvement in providing proper supporting documentation demonstrating its commitment towards the areas of concerns noted by the Monitor's Office. During this reporting period an improvement in roll call meetings was identified during the interviews. Several officers reported that some meetings or roll calls are taking place before taking over their shifts but stated that these meetings are not being documented. They credited the accomplishment to the number of new supervisors. PRPB needs to continue pushing for training meetings and roll calls, while ensuring they are documented. It should be required to meet with personnel before taking over a shift.

PRPB implemented the new evaluation policy in January 2024, however, it has yet to provide proper and effective training on the policy even though the system is in place and over 95% of personnel have received their evaluations. The Monitor's Office reviewed 92 samples of evaluations and the scores were consistent. At this point, based on the samples and interviews, no inflation of scores was detected. During several meetings with HR, it was reported that training for the new evaluation system will take place during 2024. HR and Staffing Plan personnel provided videos and PowerPoint presentations to current supervisors on how to use the technology that is part of the evaluation, which the Monitor's Office reviewed. It was determined that the videos and PowerPoint presentations were effective in teaching the system. However, an effective and more complete training should teach supervisors how to determine fair and effective scores and, more importantly, how to write the summaries supporting the scores. This training is imperative to the success of the new policy.

Overall, the Commonwealth's compliance with the 24 Supervision and Management paragraphs assessed during this reporting period reflects improved levels of compliance to what was noted in previous CMRs. In CMR-8, 25% of the 24 paragraphs (6 paragraphs) were assessed as partially compliant and 58% of the 24 paragraphs (14 paragraphs) were assessed as not compliant, in comparison to the current reporting period, where 50% of the 24 paragraphs (12 paragraphs) were found to be partially compliant and 33% of the 24 paragraphs (8 paragraphs) were assessed as not compliant. Two paragraphs (8%) moved to fully compliant. See figure 7.



*Figure 7. Supervision and Management: Paragraph Compliance Status*

## 7. Civilian Complaints, Internal Investigations, and Discipline

Under its own policy, which was approved by the court and supervised by the Monitor's Office, the Office of Legal Affairs (OAL) has a 30-day limit for the analysis, recommendation, and determination of administrative complaints and must give actual notice to both to the complainant and accused. As indicated in past CMRs, this policy has not once been in substantial compliance. In November 2023 the Commonwealth informed the Monitor's Office that it had hired and assigned seven attorneys to OAL and executed a plan to eliminate the adjudication backlog within months. The Monitor's Office has found progress towards eliminating the backlog of adjudications, which according to PRPB amounted to just over 800 at the beginning of the project. The Monitor's Office will continue to review the progress and work products of OAL lawyers as it applies to the Agreement.

Twenty current OAL lawyers have been interviewed and the Monitor's Office is currently interviewing all newly hired lawyers. The interviews probed the qualifications and certifications of each hired lawyer, who the hiring authority was, the salary offered, and whether the lawyer is considered an employee or contractor. The interviews were also used to determine whether the established goals and timelines are reasonable and whether resources, both human and otherwise, were sufficient to meet those goals and timelines. The interviews have shed light on working conditions, operating policy, and further OAL resource needs at OAL. It has become clear that additional support staff are urgently needed to properly support the incoming staff. Presently, the Monitor's Office is aware of only two secretaries assigned to OAL. An increase in the number of lawyers in OAL creates an urgent need for more support staff and supplies.

The Monitor's Office continues to find that many internal investigations were conducted well and eventually adjudicated in accordance with facts uncovered by the investigator. Notwithstanding this finding, the Monitor's Office also sees multiple recurrences of shortcomings that have been well-documented repeatedly over the course of CMRs 2 through 9. Recent specific cases have been added

to this CMR to add context and depth. Improvements must be made to achieve the overall goal of substantial compliance.

Reliable and current training records have been submitted to the Monitor's Office, which puts them on the path to substantial compliance. The vast majority of SARP personnel assigned to investigations will likely be unfamiliar with very recent and substantial changes in policy, investigative methodology, protocol, and practice. Due to these comprehensive changes, the Monitor's Office recommended a minimum of two full days of "in-service" training for each SARP member for this first iteration of SARP in-service training. This extended class time will be needed to address the large volume of changes made by PRPB. Furthermore, this training must be in person and incorporate practical and participative pedagogy. In the future, annual re-trainers to address changes in SARP methodology, rules, and procedures, could possibly be delivered remotely via eLearning, if feasible and if the subject matter lends itself to virtual learning.

The Monitor's Office is pleased to report that the once-dire circumstances of the FIU, especially regarding its human resource component, have in large part been remedied. While this is indeed good news, the lack of human resources across SARP and SARP-support entities other than FIU continues to be a major concern to the Monitor's Office.

As of this CMR, the Monitor's Office has interviewed over 150 current and former SARP investigators. The majority of active SARP investigators have expressed concerns over case workload and a deficiency in human resources needed to effectively manage their individual caseloads. The impact of the problem ranges from minor to severe, depending upon the unit. The Monitor's Office discovered that in some offices, it is not uncommon for one investigator to have over a dozen cases open at any given time. Some of these cases may have been reported in other units, meaning that the investigator or witnesses must travel across jurisdictions to conduct interviews. The lack of human resources across SARP entities, with the noteworthy exception of FIU, continues to concern the Monitor's Office. The Monitor's Office notes the amount of time any given PRPB member is away from duty. Every member of the agency is contractually entitled to take frequent, multiple leaves for vacation, military service/deployment, holidays, illnesses, etc. In the case of SARP investigators, this time spent away from SARP duties must be analyzed to determine the extent of its impact on productivity. If a study indicates that human resources are lacking, SARP human resources must be adjusted upward to ensure both timeliness and accuracy in all SARP investigations and reports.  If sufficient investigative resources do not exist, then PRPB should begin offering overtime to investigators as needed to keep all cases within the timelines that they themselves established.

In each open case assigned to an investigator there is a 90-day limit, with possible justified extensions not exceeding another 90 days. It is important to understand that under SARP rules, 'case overload' may not be used as an excuse to grant any extension. Unrealistic expectations may hamper the investigator's ability to focus on the overall quality of an investigation.   The Monitor's Office encourages SARP command to meet regularly with its field investigators and supervisors – not just its area commanders - in much the same way as the Monitor's Office has, to gain insight into their needs for resources, both human and otherwise.

Not one Internal Affairs Bureau (NAI) has been relocated away from police facilities despite the Monitor's Office's multiple and longstanding findings that this practice must end without further delay. The Monitor's Office takes notice that SARP has been proactive in its ongoing efforts to identify suitable locations for NAI units in settings not associated in any way with law enforcement. Site identification; however, is only the first step in the process and must be followed up by contracting and procurement. Contracting and procurement, along with many other administrative functions of PRPB, have all been absorbed by the DSP. DSP must act immediately to move beyond partial compliance.

Overall, the Commonwealth's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflects progression in compliance to what was noted in previous reports. In CMR-9, 52% of paragraphs (24 paragraphs) were assessed as partially compliant and 15% (7 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 48% of paragraphs (22 paragraphs) were found to be partially compliant and 30% (14 paragraphs) were found to be substantially compliant. See figure 8.



*Figure 8. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

## 8. Community Engagement and Public Information

Community Engagement, which integrates Community Policing and Public Information, is governed by 13 paragraphs in the Agreement (paragraphs 205 through 217). These paragraphs underwent a comprehensive review in CMR-8 and are reassessed in the current reporting period.

Assessment compliance in this reporting period focuses on PRPB's transition from an administrative and operational capacity-building phase to effectively demonstrating the implementation of community engagement and public information practices. These practices include diverse workforce recruitment with community involvement through CICs, performance appraisals, personnel deployment for community engagement and policing, collaborative problem-solving using the S.A.R.A. Model and community alliances, and community outreach activities aimed at awareness, education, and

prevention, ultimately improving community quality of life through strategic planning and sustainable connections.

Informing the public is pivotal in community policing to dispel misconceptions and enhance transparency. Citizens need information on policies, procedures, and crime trends to understand how law enforcement operates and to provide well-informed feedback. These relationships, along with outreach programs, enable collaboration between community members and the police, resulting in solutions tailored to specific community needs.

The Community Engagement and Public Information section of the Agreement entails disseminating accurate and updated crime statistics, policies, and community programs to address concerns. Using internal resources through media and social platforms and engaging the community in group discussions to develop problem-solving strategies are crucial for improving community quality of life, ensuring public safety, and promoting transparency and accountability.

The public should be involved in prioritizing and addressing public safety issues. Partnering with direct service providers, educational institutions, and community-based organizations can effectively identify relevant issues for problem-solving. Better technology systems and objective data can enhance operational efficiency and meet the public's demand for accountability and transparency.

PRPB made progress in achieving compliance with the Agreement during this reporting period, addressing challenges in various areas, including competency development in community policing. Although in-service training partially compensated for some shortcomings, sustaining consistent training plans aligned with policies and the Agreement remains challenging. Efforts are needed to prioritize the development and maintenance of meaningful alliances, adopt a comprehensive police approach, and conduct open public information meetings across all police areas. To address these challenges, PRPB has developed a plan focusing on 62 paragraphs, 8 of which involve community policing. Bi-weekly meetings with the Monitor's Office commenced in January 2024 to progressively address these issues, aiming for completion by June 2025.

During this reporting period, the Monitor's Office reviewed GOs 801 (Community Interaction Committee (CICs)), 803 (Community Policing) and corresponding PPRs, 805 (Community Meetings), and conducted interviews with PRPB members involved in community policing across various levels. Interviews spanned 9 police areas, 2 specialized units, 2 Auxiliary Superintendencies, and CIC members from all 13 police areas. The Monitor's Office also participated in a Central CIC meeting in San Juan and an open meeting in Las Piedras for the Humacao police area. Additionally, the Monitor's Office observed a train-the-trainer session conducted by SAEA on community policing which emphasized the module system, information recording, and validation practices.

There has been significant progress in securing CIC membership across all 13 police areas during this reporting period. CICs play a vital role in providing recommendations to PRPB on policies, recruitment, and strategies based on the perspectives and needs of their communities. This achievement is largely due to internal campaigns and self-referrals by the committees. However, PRPB needs to expand joint

efforts with the community to develop a comprehensive community policing approach that addresses crime and safety issues in collaboration with CICs.

Key areas of non-compliance with community outreach practices outlined in the Agreement include 1) reaching out to the community and delivering information to the public through open meetings (Encuentros Comunitarios) to address issues of community concerns, 2) reporting on Agreement progress, and 3) educating the public on topics outlined by the Agreement, including crime statistics, UOF, nondiscriminatory practices, administrative complaints and commendations, and individuals' rights to decline consent to voluntary searches, among other topics. PRPB's attempts to deliver these meetings remain insufficient, with evidence showing that only one police area held its open meeting during the reporting period. Additionally, documentation submitted for assessment did not meet compliance targets, as they were initiatives carried out by CICs, not by PRPB as required.

During this reporting period, PRPB launched a redesigned website aimed at providing the public with enhanced access to information and services. The website integrates public reports and features weekly safety tip banners and a Virtual Library. Crime statistics reports have been expanded including domestic and gender violence, sexual abuse, and hate crimes.

Overall, the Commonwealth's compliance with the 13 Community Engagement and Public Information paragraphs has improved compared to previous reporting periods. In CMR-8, 38% of paragraphs (5 paragraphs) were assessed as partially compliant and 61% of paragraphs (8 paragraphs) were assessed as not compliant in comparison to the current reporting period where 77% of paragraphs (10 paragraphs) were found to be partially compliant and 23% of paragraphs (3 paragraphs) were found to be not compliant. See figure 9.



*Figure 9. Community Engagement and Public Information: Paragraph Compliance Status*

18

## 9. Information Systems and Technology

The Commonwealth made reasonable progress during the reporting period, although struggles were encountered early with regard to maintaining the Gartner schedule, RMS action, and Project Management Office (PMO). This activity was of primary focus and heightened interest during the reporting period. Initial workshops and meetings were not adequately staffed jeopardizing progress. Fortunately, with involvement from the Governor's Office, PRPB was able to recover schedule and preparation of RMS acquisition documents. In order to do so USDOJ, the Monitors Office, and Gartner endorsed a delay in the release of key acquisition documents so that proper staffing could be coordinated leading into vendor evaluations in April and May 2024. Having to react in this way indicated an insufficient appreciation of the discipline required to execute these critical projects.

Throughout the reporting period the Commonwealth continued with its developments and demonstrated progress with several applications/modules. Notably, the Asana Project Management and Monitoring Tool, PTMS, Community Partnerships, and Non-Punitive Discipline module. While progress continues to be made, reminders are evident that achievements are needed in the field. For example, most recently while in Fajardo in March 2024, although the availability of technology tools clearly benefits agents and staff, the shortage of available computers and training, along with an instability of the network resulting in system, application, and network disconnects that disrupt GTE use impact the staff's effectiveness and results in the loss of draft reports and notations thereby requiring personnel to reload their content.

Observations

As seen in IT demonstrations throughout the reporting period, progress was observed with four applications/modules advancing as did the RMS and PMO initiatives. Vendor selection for RMS replacement was slated to occur in April 2024 with an ambitious forward-facing schedule. Gartner's participation continues to be critical. Although their participation in the IT requirements analysis, RMS replacement, and PMO establishment has been timely and continuous, the Commonwealth's decision not to option Gartner for continuing support is concerning. As a result of the Commonwealth's decision, coupled with their reliance on AHDatalytics, the Commonwealth's contractor, as a proxy for Gartner, significant risk in the RMS vendor selection has been introduced as this area of consultancy is not a mission strength area for AHDatalytics.

With respect to operational readiness, the Monitor's Office encountered inconsistencies on the part of PRPB regarding their claims of operational implementation for the Community Engagement Dashboard SA, and DV Modules. Although the Monitor's Office was told the applications were "operational", demonstrations showed that they were still in development, not adequately supported with training, and had not been rigorously tested. AH Datalytics, the Commonwealth's contractor, agreed and that the data quality could not be verified, also bringing into question whether or not the modules were properly reconciled. Finally, when reviewed with the Chief Information Officer (CIO), it was learned that due to their functional and data architectures, the SA and DV Modules could not share data. The questionable functionality and disconnected architecture are likely due to the Reform Office scoping the requirements instead of an operational unit which again highlights PRPB's lack of formal requirements management and change control processes. Although requested on multiple occasions for

demonstration, the EIS functional status remains unclear. The Monitor's Office has noted repeatedly that the EIS as described appears to be a case management tool instead of an Early Intervention System.

Positively, successive PRPB demonstrations of the Non-Punitive Module showed interesting detail with regard to the complaint data and its distribution of incidents across the agent population and its skewing amongst the female agent population.

Areas of Concern

Areas of concern noted during this reporting period, include:
- Lack of NIBRS and hate crime reporting to the FBI indicating an incomplete process.
- No plan to conduct a cyber security assessment or a plan for hardening its enterprise.
- Lack of a definitive data purification and deconfliction plan.
- Inadequacy of predictable training by SAEA

Overall, the Commonwealth's compliance with the six Information Systems and Technology paragraphs remains the same from CMR-9 where 67% of paragraphs (4 paragraphs) were found to be partially compliant and 33% of paragraphs (2 paragraphs) were found to be not compliant. See figure 10.



*Figure 10. Information Systems and Technology: Paragraph Compliance Status*

20