

December 2025

# Thirteenth Report of the Federal Monitor

Covering the Period from April 2025 through September 2025

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

## Table of Contents

INTRODUCTION ................................................................................................................................. 4

   General Background on the Agreement and Monitoring Process ................................................ 4

   Scope and Methodology ............................................................................................................. 5

   Monitoring Activities During CMR-13 ........................................................................................ 6

   Key Findings of the Monitor's Thirteenth Report ...................................................................... 6

I. PROFESSIONALIZATION ................................................................................................................ 9

   1. Staffing and Community Policing ........................................................................................ 12

   2. Promotions .......................................................................................................................... 14

   3. Commander Corps ............................................................................................................... 24

II. USE OF FORCE ............................................................................................................................ 26

   1. General Provisions ............................................................................................................... 29

   2. Specialized Tactical Units .................................................................................................... 32

   3. Crowd Control Policies and Performance ............................................................................ 38

   4. Force Reporting .................................................................................................................... 43

   5. Force Review, Investigation, and Analysis .......................................................................... 48

   6. Supervisory and FRB Reviews ............................................................................................. 52

   7. FIU Investigations and Force Reviews by SFRB ................................................................... 58

   8. Use of Force Training ........................................................................................................... 66

   9. Responding to Behavioral/Mental Health Crisis ................................................................. 71

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY ................................. 77

   1. Stops, Searches, and Seizures ............................................................................................. 79

   2. Investigatory Stops and Searches ....................................................................................... 81

   3. Arrests ................................................................................................................................. 85

   4. Searches .............................................................................................................................. 97

   5. Training on Stops, Searches, and Seizures ........................................................................ 100

IV. EQUAL PROTECTION AND NON-DISCRIMINATION ................................................................... 104

   1. General Provisions ............................................................................................................. 107

   2. Discriminatory Policing ...................................................................................................... 118

   3. Sexual Assault and Domestic Violence .............................................................................. 130

V. RECRUITMENT, SELECTION, AND HIRING ................................................................................. 144

VI. POLICIES AND PROCEDURES .................................................................................................... 145

VII. TRAINING .............................................................................................................................. 154

VIII. SUPERVISION AND MANAGEMENT ....................................................................................... 155

   1. Duties of Supervisors ........................................................................................................ 158

   2. Supervisor Training ........................................................................................................... 168

   3. Performance Evaluation .................................................................................................... 168

   4. Early Identification System ................................................................................................ 172

   5. Internal Audits and Interagency Feedback ........................................................................ 178

IX. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE .................................... 186

   1. Civilian Complaints ............................................................................................................ 191

   2. Internal Investigations ....................................................................................................... 194

   3. Complaint Intake, Classification, Assignment, and Tracking ............................................. 198

   4. Investigation of Complaints ............................................................................................... 209

5. STAFFING, SELECTION, AND TRAINING REQUIREMENTS ................................................................ 233

6. PREVENTING RETALIATION ........................................................................................................ 236

7. DISCIPLINE ............................................................................................................................... 237

8. OFFICER ASSISTANCE AND SUPPORT ......................................................................................... 242

**X. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION ................................................. 245**

1. COMMUNITY ORIENTED POLICING ............................................................................................ 251

2. COMMUNITY INTERACTION COUNCILS ...................................................................................... 257

3. PUBLIC INFORMATION ............................................................................................................... 270

**XI. INFORMATION SYSTEMS AND TECHNOLOGY ................................................................... 277**

MANAGEMENT, DISCIPLINE, AND CADENCE ................................................................................. 277

DOCUMENT AND ARTIFACT MANAGEMENT .................................................................................. 277

DATA ENTRY AND IT USE ............................................................................................................. 278

LOOKING FORWARD .................................................................................................................... 279

**APPENDIX A: BACKGROUND TO PRP MONITORING MISSION ............................................... 287**

**APPENDIX B: METHODOLOGY .............................................................................................. 289**

COMPLIANCE LEVELS ................................................................................................................... 289

SAMPLING METHODOLOGY ......................................................................................................... 290

CMR-13 SAMPLES ....................................................................................................................... 292

**APPENDIX C: COMPLIANCE STATUS BY PARAGRAPH AND SUB-SECTION ............................. 302**

## Introduction

This report will outline the current compliance status of the Commonwealth of Puerto Rico (hereafter, the "Commonwealth") and the Puerto Rico Police (hereafter, "PRP" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, Parties, and residents of the Commonwealth about implementation status and levels of compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the court, the Parties, and community groups to explain the Monitor's Office's findings and the compliance assessments presented in the report.

### General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRP officers with the tools, guidance, and resources needed to reform unconstitutional policing practices and bring the Bureau into line with generally accepted practices of constitutional policing and effective law enforcement. The Parties recognize that constitutional policing, effective law enforcement, and the community's trust in its police force are interdependent. Accordingly, full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop dynamic leadership and management skills within PRP aimed at transforming the Bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the Parties identified each of the following areas for improvement, enhancement, or reform in PRP:

1. Professionalization;
2. Use of Force (UOF);
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection, and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations, and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, the Commonwealth developed Action Plans for each of the named substantive areas. These Action Plans set forth the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area in detail. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor's Office.

During the capacity-building period, the Monitor's Office assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1 and since October 2018, the Monitor's Office has been assessing PRP's compliance with the Agreement.

## Scope and Methodology

The Chief Monitor's Thirteenth Report covers the period between April and September 2025. CMR-13 covers 9 of the 11 performance areas of the Agreement: 1) UOF, 2) Searches and Seizures, 3) Equal Protection and Non-Discrimination, 4) Policies and Procedures; 5) Professionalization; 6) Supervision and Management, 7) Civilian Complaints, Internal Investigations, and Discipline, 8) Community Engagement and Public Information, and 9) Information Systems and Technology. Per the monitoring methodology agreed on by the Parties, 177 paragraphs were scheduled for assessment in CMR-13, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This CMR excludes the sections of the Agreement covering Recruitment, Selection, and Hiring and Training as well as specific paragraphs throughout other sections that are assessed on an annual basis and were covered in CMR-12.

For each of these areas, the Monitor's Office presents its assessments based on the desk review of data that was provided by the Commonwealth, as well as interviews, questionnaires, site visits, observations, and the current state of IT (see below for more details on the activities conducted during the CMR-13 reporting period). The collection, analysis, reporting, and public dissemination of data regarding the ongoing PRP sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRP. Therefore, the Agreement requires: a) that the Monitor's Office submit timely compliance assessments, as well as achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist the Commonwealth in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitor's Office uses a combination of quantitative and qualitative methods to assess the Commonwealth's compliance with the Agreement in the three areas of performance (policy, training, and practice) selected for this CMR. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRP have incorporated the requirement into an implemented policy; trained all relevant personnel on the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide the Commonwealth with a detailed pathway towards achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's Office's assessment as well as additional detail on the assessment and sampling methodologies are provided in Appendix B.

## Monitoring Activities During CMR-13

Over the past six months the Monitor's Office conducted five site visits to PRP headquarters as well as various regions of the island including Aguadilla, Bayamon, Guayama, and Utuado. At each of these field visits the Monitor's Office visited the area command, district(s) within each area, Highway Patrol Units, and other units at each location. At each location the Monitor's Office met with executive command and PRP personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF.

These field visits provided an opportunity for the Monitor's Office to hear directly from supervisors and officers on the front line, speak with members of the Commonwealth community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of over 8,000 policies, documents, certifications, audio recordings, training materials, and case files and reports provided for review during the reporting period. While on site, team members also participated in three system demonstrations on various dashboards including the Search Warrant Tracking module, Recruitment Module, and GTE. The Monitor's Office also acquired access to these systems as part of its efforts to streamline monitoring efforts.

During the reporting period, the Monitor's Office also reviewed 32 policies, forms (PPRs), and protocols under Paragraph 229 of the Agreement. The policies included GO 628 (Intervention with People in Crisis), GO 642 (Investigation of Serious and/or Fatal Crashes), and GO 801 (CICs), among others.

The Monitor's Office also observed community engagement events hosted by PRP and the CICs. The Monitor's Office also conducted a community townhall meeting in August 2025 in Guayama as part of its efforts to host meetings for the community each quarter. This meeting was largely positive and was attended by nearly 120 community representatives.

During this reporting period, the Monitor's Office participated in a status conference. The July 2025 status conference focused on updates related to the CMR-12 report, the IT Corrective Action Plan (IT CAP), Early Intervention System (EIS), RMS, Reform funding levels, and the Monitor's Office IPSOS Survey Results. The Monitor's Office has continued to work closely with the Parties to monitor the Commonwealth's progress with implementing the various implementation plans filed with the court.

## Key Findings of the Monitor's Thirteenth Report

This is the thirteenth CMR-13 outlining the compliance levels of the Commonwealth of Puerto Rico in relation to the Consent Decree entered between the United States and the Commonwealth of Puerto Rico. This report provides the thirteenth assessment following the four-year capacity building period established by the Consent Decree that ran from June 2014 to October 2018 and covers the period from April through September 2025.

During the reporting period, the Commonwealth's achievements towards partial and/or substantial compliance with many of the paragraphs remained relatively the same as the last reporting period. The standstill in compliance is largely a result of the Puerto Rico Police's (PRP's) continuation of its efforts to implement a Records Management System (RMS), Benchmark Analytics modules, implement in-service

training, and adjust its operational approach to community engagement. The few paragraphs that moved forward in compliance delved into use of force (UOF) reporting and tracking, specifically the tracking of mileage when transporting a suspect to the hospital following a UOF incident.

This continued progress is important to the successful and sustainable implementation of the paragraphs within the Agreement. The Monitor's Office would like to stress that this continued progress is contingent on the Commonwealth's ability to operationalize RMS, implement the modules and tools developed by Benchmark Analytics, its continued work with AH Datalytics, the establishment of ReformSTAT, and more importantly, devoting adequate resources and effort to its training programs. Once RMS and Benchmark Analytics have completed their work, the key to continued and improved compliance will be to ensure that the data gathered and recorded is valid. This will largely be dependent on the Commonwealth's ability to remain committed and engaged with the vendors as they create these systems to ensure these products and tools are developed to meet their needs and the needs of the Agreement along with ensuring that its officers and supervisors have the training and resources (i.e., laptops, internet) needed to use these tools.

Further, while the Commonwealth's leadership changes and completion of the 2025 Training Needs Assessment affected its ability to implement the 2025 in-service training in a timely manner, the Monitor's Office has agreed to allot additional time for it to complete its 2025 in-service training, which should be completed by March 2026. To attain continued compliance with the training requirements in the Agreement, the Commonwealth must reach its 95% compliance threshold with its 2025 in-service training by this date and deliver its 2026 Training Plan to the Monitor's Office for review and approval. Doing so in a timely manner will ensure that the 2026 Training Program begins as scheduled on April 1, 2026 and that the Commonwealth is able to meet its training requirements by the end of 2026, therefore maintaining compliance. Any failure to meet these timelines will result in compliance regressions in CMRs-14 and 15.

The Monitor's Office also notes that during this reporting period, the PRP was separated from the Department of Public Safety (DSP). As a result of this change, the Puerto Rico Police Bureau has updated its organizational name to the Puerto Rico Police (PRP) and the Superintendent is now referred to as the Superintendent. These changes are reflected throughout the CMR.

Finally, the Monitor's Office also notes that although not occurring during the reporting period, promotions to second lieutenant and sergeant were in process during report writing. These promotion cycles will be integral to ensuring adequate staffing as retirement increases are expected. The Monitor's Office will review each step of the promotions processes and provide its assessment in CMR-15, the next reporting period in which Professionalization is assessed.

As noted above, when examining the total paragraphs assessed in this CMR (N=177) in comparison to the previous CMR in which these sections and paragraphs were assessed (CMR-11; N=177), the Monitor's Office notes that the Commonwealth has achieved continued progress during this reporting period. For example, 87 paragraphs met partial compliance and 8 paragraphs were rated not compliant during this reporting period, in comparison to 99 paragraphs rated as partially compliant and 22 as not complaint in CMR-11. Further, when reviewed comprehensively, almost 31% (N=57) of the paragraphs meet either substantial or full compliance in CMR-13 in comparison to 29% (N=51) in CMR-11.

7

In examining compliance more comprehensively across all 212 monitorable paragraphs in the Agreement, we find that full compliance improved by 6%, substantial compliance decreased by 3%, partial compliance decreased by 9%, non-compliance decreased by 6%, and deferred increased by 12% from CMRs 10 and 11 to CMRs 12 and 13.[1]

**Number of Paragraphs by Compliance Rating – Current vs. Previous**
Number of monitorable paragraphs in the Agreement: **212**




| Paragraph Compliance Rating | Previous | | Current |
|---|---|---|---|
| ■ Fully Compliant | 26 | ↗ | 39 |
| ■ Substantially Compliant | 35 | ↘ | 30 |
| ■ Partially Compliant | 124 | ↘ | 105 |
| ■ Deferred | 5 | ↗ | 29 |
| ■ Not Compliant | 22 | ↘ | 9 |

**Data Sources for Previous Compliance Ratings**

CMR 10: Tenth Report of the Federal Monitor, June 2024
*covering the period from October 2023 through March 2024*

CMR 11: Eleventh Report of the Federal Monitor, December 2024
*covering the period from April 2024 through September 2024*

**Data Sources for Current Compliance Ratings**

CMR 12: Twelfth Report of the Federal Monitor, June 2025
*covering the period from October 2024 through March 2025*

CMR 13: Thirteenth Report of the Federal Monitor, December 2025
*covering the period from April 2025 through September 2025*

*Figure 1. Rate of Compliance Over Time*

In the forthcoming report sections, the Monitor's Office provides the assessment and analysis produced by the subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting the Commonwealth in achieving a pathway to compliance.

---

[1] CMRs are produced every 6 months and when combined (i.e., CMR-9 and CMR-10) provide a comprehensive review of compliance for all 212 monitorable paragraphs in the Agreement.

# I. Professionalization

The Monitor's Office concludes that the Commonwealth has maintained the same level of compliance in the area of Professionalization as observed in the previous assessment (CMR-11). The development of policies for promotions, staffing, career development, performance evaluations, recruitment, and integrity audits have been completed or are in progress. Those policies that have been implemented and/or recently finalized incorporate the requirements of the Agreement.

In-service training—both in-person and virtual—continues throughout 2025. To ensure that training aligns with departmental needs and the Agreement, the Commonwealth, in collaboration with V2A Consulting, has completed a Training Needs Assessment, which was approved by the Monitor's Office in September 2025.

This CMR does not include a detailed assessment of Recruitment, Retention, and Hiring, as these areas are reviewed annually and were most recently evaluated in CMR-12. Nonetheless, PRP's ongoing recruitment efforts remain critical to addressing its staffing challenges—an issue faced by many law enforcement agencies nationwide. Contributing factors also include an aging workforce and overall personnel shortages. As part of its Staffing Plan, PRP has re-assigned personnel to better address these challenges and has appointed additional project managers to support compliance and sustain reform initiatives. These actions represent promising steps toward strengthening PRP's overall professional capacity.

In September 2024, the Monitor's Office and the PRP met with representatives from the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) to learn about the accreditation process and its requirements.  Following the meeting, CALEA provided PRP with detailed information on accreditation standards, and a metropolitan law enforcement agency with long-standing CALEA accreditation shared insights from its experience. PRP is currently evaluating its interest in pursuing accreditation. Updated information will be provided in CMR-15.

Throughout this reporting period, the Monitor's Office has continued regular engagement with PRP personnel, including staff from Human Resources, the Promotion Board, and others, as well as interviews with a sample of officers. Based on the information reviewed, the Monitor's Office finds that PRP remains partially compliant with the paragraphs in this section of the Agreement.

Overall, the Commonwealth's compliance with the 10 paragraphs assessed during this reporting period within Professionalization reflects the same levels of compliance as what was noted in previous reports. In CMR-11, all paragraphs were assessed as partially compliant. This holds true for CMR-13. See figure 2.



*Figure 2. Professionalization: Paragraph Compliance Status*

## Paragraph 12: Professionalization - General Provisions

*PRPD shall develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges; consistently and uniformly apply constitutional police practices; build public confidence; and strengthen its institutional structures. PRPD shall promote continuous performance improvement among all PRPD personnel that regularly identifies problems or challenges, assesses causal or contributing factors, and takes reasonable measures to achieve performance expectations in areas related to this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on the code of ethics and conduct is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in the code of ethics and conduct (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of sampled administrative investigation outcomes are within policy. | ☐ Met | ☑ Missed |
| 5. 95% of sampled integrity audit outcomes are within policy. | ☐ Met | ☑ Missed |

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

The Monitor's Office has reviewed GO 617 (Code of Ethics) and found it compliant, though its last review was during 2021. The Monitor's Office suggests PRP should review this policy soon. Additionally the Recruitment policy and administrative complaints policy are compliant. Finally, although the Monitor's Office has not yet reviewed an integrity audits policy, it has been reported by PRP that the policy is passing through its internal review process, and once ready, it will be given to the Monitor's Office. The Monitor's Office strongly encourages PRP to finish this policy and send it to the Monitor's Office for approval.

As of report writing, the Monitor's Office has seen and approved the 2025 ethics training. However, the 2025 training calendar seems to be considerably behind schedule. Thus, Target 2 is met, but Target 3 is missed. The sample of 92 candidate files did not show that candidates have been scheduled for ethics training or have taken the training during 2025. Nonetheless, the Monitor's Office is aware that PRP aims to train all PRP members before the end of 2025. The last time the code of ethics training had been offered by PRP, was during 2020, as the 92 training records show. None of the files received by the Monitor's Office showed that officers were offered the current 2025 Ethics training, nor have they been scheduled for training. The 2025 training schedule was approved to be extended until March 2026. The Monitor's Office will remain vigilant for the trainings that are scheduled and administered. Ethics training is integral for officers to behave uniformly, and in a manner that is justified by the agency, its policy, and law.

In accordance with the Civilian Complaints, Internal Investigations, and Discipline section of this report, PRP did not meet the requirements of Target 4. For more information regarding Target 4, please refer to the following Paragraphs 178-181, 190, and 198-199, which found that PRP does not comply with the 95% threshold for the outcomes outlined by policy after the conclusion of an internal investigation. As these paragraphs also show, the compliance of these outcomes may also be hindered by the issues with the investigation. Target 5, in accordance with the Supervision and Management section of this report, is missed. PRP continues to have no written or operational policy that dictates integrity audits. Integrity audits are a unique and somewhat particular task to operationalize, as was shown to PRP during their visits to the New Orleans, Louisiana, Police Department (NOPD) and the New York, New York, Police Department (NYPD). Integrity audits will help PRP with accountability by rewarding the officers that act according to policy and reviewing the acts of officers that are not justified by policy. PRP was shown that selecting random body-worn camera (BWC) footage may constitute an integrity audit for an officer, if a certain threshold is met. OSM requested more information regarding the status of the Integrity Audits policy, but the Monitor's Office has not been updated on its status. The Monitor's Office is aware that PRP does not conduct integrity audits and does not currently have a binding policy requiring that integrity audits be conducted. In view of this information, Target 5 is missed. The Monitor's Office has not received an integrity audit from PRP, given that none were conducted.

Finally, Paragraph 12 is a global paragraph. The Monitor's Office will grant PRP compliance once it has shown that it maintains compliance with all paragraphs in this section. Thus, given what was mentioned above, PRP remains partially compliant with this paragraph.

*Pathway Forward*

With the acquisition of a RMS and EIS, PRP will hopefully be able to track the behavior of its employees to adequately foresee any issues, and to pinpoint any outstanding and exceptional officers. This system will incorporate integrity audits, complaints, ethics training, and other components.

## 1. Staffing and Community Policing

During the reporting period, the Monitor's Office received a staffing study completed by V2A, which effectively outlines the staffing plan needed for PRP to strengthen its community policing efforts. As in many jurisdictions across the United States, staffing continues to be a significant challenge for law enforcement agencies, and Puerto Rico is no exception.

The Monitor's Office supports PRP's ongoing efforts to improve staffing by integrating both technological and human resource strategies. These efforts are critical to addressing personnel shortages and ensuring that officers are deployed effectively across the island. Recent promotions within PRP have also helped address long-standing supervision challenges, including the presence of de facto or acting supervisors. Strengthening supervisory ranks is essential for improving performance evaluations, fostering accountability, and developing consistent leadership across PRP's units, precincts, and districts.

### Paragraph 13: Professionalization – Staffing and Community Policing

*PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPD shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPD conducted a Staffing Allocation and Resource Study to assess appropriate number of personnel. | ☑ Met | ☐ Missed |
| 2. The Staffing and Resource Allocation Plan is consistent with the requirements of the paragraph and the Staffing Allocation and Resource Study. | ☑ Met | ☐ Missed |
| 3. 95% of sampled units are staffed consistent with the Agreement and the Staffing and Resource Allocation Plan. | ☐ Met | ☑ Missed |

12

| 4. 85% of the initiatives in the Staffing and Resource Allocation Plan are implemented. | ☐ Met ☑ Missed |
|---|---|

*Compliance Assessment*

PRP's August 2025 Consolidated Status Report details various incentives for recruiting more officers, such as increased toll incentives, purchasing uniforms, and increased health plan contributions. Regarding the civilianization project, PRP continues to have open positions, and fulfilling these would relieve officers from performing administrative duties. Such positions include office workers and administrative assistants, among others. However, PRP does not have a clear understanding of how many officers are performing administrative duties, and officers sometimes cannot be re-assigned to policing duties, due to medical, psychological, or physical conditions. Other factors include that civilians quit, or are found to be generally unfit for the job. The Monitor's Office commends PRP for continuing these efforts, though more efforts are still necessary. Through interviews, the Monitor's Office learned that de facto supervisors still exist, which means that an officer without a higher rank is supervising his or her fellow officers, or an officer with a higher rank is supervising officers that are not a part of his or her unit, division, precinct, or district.

The Monitor's Office recommended that PRP conduct a needs assessment prior to offering a promotion. This means knowing how many supervisors are required across all units, divisions, precincts, and districts. Having this type of information would be extremely helpful for identifying deficiencies and noting strengths, thus giving PRP a clear idea of whether a promotion is needed. The Monitor's Office received documentation that PRP implemented semi-monthly meetings to transfer personnel to areas that lack police officers. As documentation shows, the Monitor's Office is unaware whether any meetings regarding Target 4 have been conducted since 2024. The Monitor's Office commends PRP for these efforts, though more work is needed. Without a clear Staffing and Resource Allocation Plan, the Monitor's Office is unable to measure PRP's efforts. For Target 3, the Monitor's Office received the monthly staffing documents, per shift, of various precincts, districts, units, and divisions across the island. Many of the precincts, districts, units, and divisions included in the sample consistently had one officer on shift or none. Further, many of the files reviewed by the Monitor's Office only had agents on many shifts, showing the need for first-line supervisors. Thus, the Monitor's Office finds that none of the reviewed staffing documents comply with the Agreement and policy related to supervision, community engagement, and Paragraph 13.

This paragraph also discusses transfers, which the new RMS should further automate, track, and support. The Monitor's Office will continue monitoring and providing advice regarding human resource allocations to better meet the needs of the citizens of Puerto Rico. The Monitor's Office will meet with the transfers unit to further investigate the qualifications upon which transfers are made regarding overstaffed and understaffed units.

PRP also continues to evaluate its sworn members that have been unarmed due to medical and psychological conditions. Finally, PRP also conducted promotional examinations for the positions of captain, first lieutenant, sergeant, and second lieutenant, therefore fulfilling a supervisory gap in many units, divisions, precincts, and districts.

PRP submitted staffing documents to ensure an adequate amount of officers were available for every shift in every precinct/district and unit/division. In agreement with the areas of Supervision and Management and Community Engagement and Public Information, although some have a sufficient number of officers assigned per shift, others lack the necessary personnel to function adequately, and many, at times, do not have a supervisor on the shift. Through recruitment, PRP aims to solve this problem. The Monitor's Office also noted that some shifts and other areas are more staffed than others. PRP should deliberately choose which areas or shifts need a higher number of staff than others. This can be done by maintaining up-to-date records of criminality on the island, and listening to officers that perform policing functions in the street and assigned to units, divisions, precincts, or districts. Though the Monitor's Office, through its self-monitoring module, shows data on officer allocation, PRP should continue to ensure the validity of its data. Hopefully, these issues can be resolved with the acquisition of an RMS. For all of the above reasons, PRP remains partially compliant.

This paragraph also requires that all paragraphs in the Professionalization section (Paragraphs 12-21) be substantially compliant for this paragraph to be rated as substantially compliant, or through any other way determined by its evaluation methods in the court-approved methodology.

*Pathway Forward*

The Monitor's Office continues to stress the importance of allocating resources and project management staff to this effort. Implementing an updated Staffing Plan will not only improve PRP's compliance with Paragraph 13 but will garner progress in several of the paragraphs related to Supervision and Management. Further, not only will this achieve compliance, but also improve PRP's management of personnel and resources, and improve operations and place PRP on a path towards sustainable reform.

## 2. Promotions

The Monitor's Office acknowledges PRP's improvement in the selection of mid-level management supervisors. It is encouraged by PRP's ongoing commitment to ensuring that all promotions are transparent, fair, and merit-based. The Monitor's Office will continue to closely monitor these processes to ensure they remain consistent with the principles of fairness and integrity across all ranks. PRP's efforts to establish related committees, identify project leads, and begin working on related materials and protocols have begun and will continue to be assessed.

Since CMR-9, PRP has carried out promotional examinations for the ranks of sergeant, captain, and first lieutenant. During this reporting period, PRP announced and administered an exam for the rank of second lieutenant. Throughout these processes, PRP has maintained transparency with the Monitor's Office, which reviewed samples of candidates and examined test materials in advance of each administration. Where necessary, minor revisions were made to clarify or correct ambiguous questions.

The Monitor's Office also observed portions of the examination and scoring process in person and verified PRP's compliance with its established policies and procedures, as outlined in the official "Convocatorias." Candidate reviews conducted by the Monitor's Office included evaluation of factors such as complaint history, training, years of service, and tax compliance, consistent with the established requirements.

14

In addition, the Monitor's Office plans to interview officers who participated in the exams to assess their perceptions of the testing process, including fairness, content relevance, and transparency. Incorporating RMS and EIS into the promotional policy for a more streamlined and automatic process for reviewing promotional candidates will continue to enhance transparency and accountability PRP processes. Further, PRP should prepare and implement a promotion training for all Promotional Board members.

The Monitor's Office has visited CASP headquarters to obtain more information about the status of PRP promotion-related appeals. During that meeting, the Monitor's Office was made aware of the uncertainty of the number of cases that still have not been resolved by CASP. Some of these cases have been under CASP for years, and in some cases, decades.

## Paragraph 14: Professionalization – Promotions

*PRPD's promotion practices shall be merit-based and comply with equal opportunity employment principles.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

PRP demonstrated that its promotional processes were merit-based and complied with equal opportunity and employment principles. The Monitor's Office reviewed the exam announcements, exam requirements, study topics, exam questions, and was able to monitor the revision process. The Monitor's Office assessed the candidates solely on their abilities to fulfill the requirements outlined in the exam announcement and found that PRP was compliant in this matter.

For the second lieutenant's examination, the Monitor's Office reviewed a sample of candidates in-person. The Monitor's Office also virtually reviewed 68 sergeant candidate files. The Monitor's Office sample included candidates that were determined by the Promotional Board as compliant with the requirements to take the exam, and candidates that were determined to be non-compliant. PRP submitted the candidate's performance evaluations, training history, and disciplinary history. Furthermore, the Monitor's Office also assessed an additional sample of files in-person, to assess whether the documentation the candidate submitted complied with the requirements of the announcement, which were the requirements to take the exam. Although training remains a concern for

15

the Monitor's Office given SAEA's 2025 status, the Monitor's Office was alarmed with the disciplinary history shown by the candidates. Although the Monitor's Office is aware that no candidates have been promoted yet, the Monitor's Office will remain vigilant regarding which candidates are promoted according to policy and the Agreement and will review a sample of the files of the promoted officers. This review will include administrative actions, training, and other materials made available. For more information, please refer to Paragraph 179 in the Civilian Complaints, Internal Investigations, and Discipline section.

An outdated record keeping system that can be better handled by an EIS and RMS, which Benchmark Analytics and Axon will play major roles in, remains a concern. All of the disciplinary records shown to the Monitor's Office were physical copies that needed to be scanned. PRP's RMS and EIS, which is monitored by Paragraph 157, is expected to become more efficient once PRP's RMS and EIS are operational and tracking reliable data, upon which the Bureau and the Monitor's Office can measure and track. Based on the information mentioned above, this paragraph will remain in partial compliance. PRP; however, has taken steps to transition into this new RMS and EIS.

The information provided to the Promotional Board should also be placed in an adequate position to make candidate determinations. Hopefully, PRP will be able to provide clear, precise, and complete information to the Promotional Board once the new systems are implemented.

The Monitor's Office will interview promotional candidates to see whether they had a positive perception of the process, and that it was well conducted. PRP policy allows officers with ongoing administrative investigations to pass through the promotional process. However, passing the promotional process does not ensure that officers will be promoted. The promotion of officers with open administrative complaints is contingent on the result of the investigation. The Monitor's Office will monitor this process as well.

Finally, the Monitor's Office also met with the Promotional Board to review the materials for an upcoming sergeant examination. The Monitor's Office submitted feedback including ensuring compliance with local laws regarding veteran preference in counting each candidate's scores, and advice on legal processes regarding each candidate's acceptance or refusal of a promotional offer.

This paragraph is assessed with Paragraph 16. The Monitor's Office considered this when evaluating this paragraph and determined the paragraph to be partially compliant.

### Pathway Forward

The Monitor's Office strongly emphasizes that PRP must capture relevant data points that are necessary for making an adequate and informed promotional decision. This information must be relevant, reliable, and complete for the Promotional Board to evaluate the strengths and weaknesses of an officer seeking a promotion. The information made available to the Promotional Board should include complaints, training, performance evaluations, and integrity audits, among others. As noted above, Benchmark Analytics and Axon will hopefully facilitate this effort through technology solutions.

## Paragraph 15: Professionalization – Promotions

*PRPD shall publish detailed job descriptions for each rank among sworn personnel, specifying the duties, responsibilities, and minimum qualifications for each position. PRPD shall develop the job descriptions in consultation with the TCA based on generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Job descriptions for each rank among sworn personnel are: (a) based on generally accepted policing practices and (b) are detailed, specify duties, responsibilities, and minimum qualifications | ☐ Met | ☒ Missed |
| 2. Job descriptions for each rank among sworn personnel are published. | ☒ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office reviewed a job descriptions manual of PRP ranks. Though the manual is helpful, the Monitor's Office recommends PRP review this manual for its content, and approve it in accordance with local administrative law, to ensure the content is binding for its ranked and civilian employees. Thus, the Monitor's Office recommends PRP develop a policy that details specific duties, obligations, and placement among the rank system. This policy should be made in accordance with local law, and should be binding for all personnel, civilian and sworn.

PRP also submitted various documents for job descriptions of civilian personnel, including the jobs of "economist," "senior economist," "cabinetmaker," "editor," and "supervisor of traffic signals," among others. These policies were not created by PRP. PRP should create the relevant policies it deems appropriate. Further, these policies should be forwarded to the Monitor's Office for approval, and published by PRP.

### Pathway Forward

Although the current copy of the Rank Structure Manual meets compliance with this paragraph, the Monitor's Office recommends that PRP update the Rank Structure policy and specific job descriptions, including civilians, as needed once PRP has implemented a career path policy. Substantial compliance with this paragraph will be contingent on PRP's practical application of the career path and related job descriptions, which should be done in accordance with law.

## Paragraph 16: Professionalization – Promotions

*PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas. PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion. These criteria should account for experience, civil rights and discipline record, training, and skills.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Promotion policies incorporate the requirements of Paragraphs 14, 16-20. | ☒ Met | ☐ Missed |
| 2. All promotion trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled promotions committee personnel are trained and certified in all promotions policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. Selection devices comply with promotion policies. | ☒ Met | ☐ Missed |
| 5. 95% of selected promotion files comply with policy. | ☐ Met | ☒ Missed |
| 6. 95% of interviewed candidates perceive the promotion process as merit-based, fair, non-discriminatory and objective. | ☒ Met | ☐ Missed |

### *Compliance Assessment*

The Monitor's Office reviewed the promotional policy (GO 504) and determined it complied with the Agreement. The Monitor's Office also determined that PRP's current promotional process has been transparent and generally followed good practices.

The Monitor's Office was informed that the Board did receive a promotional training. However, no information or documentation proving that this training was administered was received by the Monitor's Office as of the end of this reporting period. Due to lack of documentation, Target 3 is missed. No concrete documentation was received by the Monitor's Office regarding a promotions training during the reporting period. The Monitor's Office recommends that PRP send over the training materials in a timely manner for review and approval by the Monitor's Office. The Monitor's Office sent information regarding best practices on promotions and training to PRP. The Monitor's Office expects PRP to develop, or outsource, a promotional process training. This gives personnel more adequate knowledge on

18

administering exams and overall best practices, enhancing the PRP promotional operations, and bringing more satisfaction to officers.[2]

For Target 4, the exam announcement contained adequate and compliant requirements for taking the exam, such as taxes, training, complaint history, years of service, and education, among others. The Monitor's Office was granted access to the online program used by the Board to determine each candidate's qualifications, and determined everything to be compliant. As reported in Paragraph 12, all of the files reviewed by the Monitor's Office showed that officers had not received the mandatory courses for the 2025 training plan during this reporting period. Given the training status of the candidates outlined in Paragraph 14, Target 5 is missed. PRP's continued compliance with Target 5 will be made by the Monitor's Office once candidates have been promoted, for purposes of this CMR, they are listed as deferred.

The Monitor's Office will interview candidates for the second lieutenant promotion once the exam has been administered. For previous examinations, candidates had a positive perception on the promotional processes, as documented through interviews. Thus, the Monitor's Office marks Target 6 as met.

During the prior reporting periods, and pursuant to the fact that the Honorable Judge Francisco A. Besosa signed an "Order Finding the Commonwealth Defendants in Civil Contempt and Establishing Immediate Oversight," PRP was ordered to provide additional requirements that the Commonwealth must meet to ensure continued compliance with the Agreement regarding 12 captains that were irregularly promoted during 2024. The Monitor's Office received various performance evaluations and determined there was nothing irregular in those performance assessments. It should be noted that one of these captains has since retired.

*Pathway Forward*

PRP should incorporate RMS and EIS into its promotional policy for a more streamlined and automatic process for reviewing promotional candidates. This will provide more transparency and accountability in the PRP promotional process. Further, PRP should prepare and implement a promotion training for all Promotional Board members.

## Paragraph 17: Professionalization – Promotions

*PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job related and consistent with business necessity. PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2024 – September 2025 |

---

[2] The Commonwealth provided the syllabus, exam, presentation, and training certificates to the Monitor's Office on October 14, 2205, which is after the reporting period for this CMR. These materials will be reviewed and considered in future CMR assessments.

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This paragraph is assessed with Paragraph 16.

## Compliance Assessment

The Monitor's Office was granted access to review the second lieutenant exam. This exam, contrary to other exams, was outsourced to Imagine LLC. The process of selecting the exam questions was compliant, given that Imagine held focus groups, and attempted to select the relevant topics based on officer experience and applicable information. Furthermore, Imagine LLC met with the Board to answer any questions it might have about policies or police practices. The exam questions reviewed by the Monitor's Office were straightforward and clear. The only recommendation made by the Monitor's Office is that the exam questions should be further reviewed with legal staff. However, the Monitor's Office finds PRP to be partially compliant with this paragraph.

The Monitor's Office was able to see how the second lieutenant exam was administered in Gurabo and Aguadilla, including the Board answering challenges to questions and safekeeping of the exam. Candidates were granted reasonable accommodation on a case-by-case basis. For this second lieutenant examination, the Board received a considerable amount of candidate challenges to exam questions, with 1 question receiving 11 challenges. Finally, the Monitor's Office was present when the exam answer sheets were scored.

PRP allowed some candidates that were eligible to take the examination, but could not take the exam at the date established in the Announcement, to take a promotional exam at a later date. For example, if officers were on military leave or had other valid reasons, PRP allowed those candidates to take a promotional exam at a later date. The questions were not the same for these exams. The Monitor's Office commends PRP's efforts to promote fairness, competition, and merit-based promotions.

However, this paragraph is rated partially compliant due to the lack of training for the Promotional Board, required by Paragraph 16, which is assessed with this paragraph. Further, the lack of the required 40 hour in-service training for the promotional candidates also has an effect on the compliance status of this paragraph, given that the candidate files are incomplete on this topic. For more information, please refer to the Training section.

## Pathway Forward

The Monitor's Office will continue to assess the Commonwealth's promotional processes to ensure continued compliance with its policies and procedures and, more importantly, paragraph requirements. The Monitor's Office recommends that exams should be developed by people that are qualified in policing and legal matters, alongside examination development experts.

## Paragraph 18: Professionalization - Promotions

*All appointments to ranks above Captain shall be based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

### *Compliance Assessment*

By the end of the current reporting period, the Monitor's Office had been informed that no promotions above the rank of captain were made during this reporting period.

These ranks, in comparison to lower ranks, are very sensitive due to their nature, and officers should be appointed in accordance with the Agreement. High-ranking officers are essential to a police agency. They offer guidance, and are crucial in decision making for the agency as a whole, and for lower ranking officers. The Monitor's Office is unaware of any promotions made to these ranks, and awaits to see any processes that PRP has in place and executes when making such a determination.

The Monitor's Office, in previous CMRs, had knowledge of the processes formerly implemented by PRP and DSP to promote officers above the rank of captain, but no information has been provided during this reporting period. These processes included background checks, in-person interviews, knowledge of the Reform and important areas of policing generally, such as UOF and supervision, among others. This was captured in an internal memorandum drafted by the Monitor's Office in March 2023. Further, the Monitor's Office found a protocol for promotions ranging from inspector to colonel in PRP's online Virtual Library. However, it has no effective date, and appears to be a non-binding policy for PRP. Given that PRP has not shown adherence to policy or made information available to the Monitor's Office for promotions to these ranks, PRP is partially compliant.

This paragraph is assessed with Paragraph 16. The Monitor's Office considered this when evaluating this paragraph and determined the paragraph to be partially compliant. Once Paragraph 16 is substantially compliant, the Monitor's Office will consider improving this paragraph's rating.

### *Pathway Forward*

PRP should submit documentation regarding promotions above the rank of captain and should review the above mentioned protocol and make it a binding policy for PRP. The policy should be re-assessed, amended as necessary, and given to the Monitor's Office for review.

## Paragraph 19: Professionalization – Promotions

*PRPD shall establish procedures that govern the removal of officers from consideration for promotion for disciplinary action related to serious misconduct.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

### *Compliance Assessment*

The promotions policy allows officers with open administrative cases against them to take the exam and the subsequent trainings. However, these officers cannot be promoted while these cases remain open, as established by PRP policy. Thus, PRP policy creates an absolute bar for the promotion of a sworn member while that member has an open case pending in SARP. During previous reporting periods, the Monitor's Office has been made aware of PRP members who were denied promotion in rank due to the existence of a SARP complaint against them. More specifically, if a candidate has not been promoted because of an ongoing administrative investigation that has surpassed the 5-day, 30-day, or 90-day thresholds, then the Monitor's Office is concerned that there is a cause for potential lawsuits. PRP, in previous reporting periods, has shown a pattern of delays when investigating complaints, mainly because of not properly adjudicating serious complaints that were filed against PRP members, or not substantively collecting the evidence that sustains the determinations of a complaint, whether the determination is that the complaint is sustained or archived. In addition, the Civilian Complaints, Internal Investigations, and Discipline section clearly shows pervasive problems when adequately investigating administrative complaints. These conclusions reinforce the serious concerns raised above.

Further, PRP still has a lot of areas to improve. For example, as mentioned earlier, a better RMS and EIS could alert pertinent officers that some officers still carry a worrisome pattern of complaints. For this second lieutenant exam, a little under 1,000 candidates were granted access to take the exam. The Monitor's Office remains hopeful that in future promotional processes, more data can be obtained when deciding on the qualifications of candidates for promotion. Specifically, the area of complaints is highly relevant, though this does not exclude other areas, such as timeliness on shifts, performance evaluations, and integrity audits, among others.

### *Pathway Forward*

The Monitor's Office will continue to assess PRP's compliance with this paragraph. Previously, officers passed over for promotion due to unresolved administrative complaints could be held back in their

22

careers and PRP could be open to potential litigation for lost lifetime earnings. It is incumbent upon PRP to hire more staff to review and adjudicate cases and determine if the candidate is eligible to take the promotional examination.

## Paragraph 20: Professionalization – Promotions

*PRPD shall establish specific criteria for the promotion of officers in direct supervisory roles. Officers in supervisory roles shall not be rendered ineligible for promotion based solely on the number of civil complaints filed against officers under their supervision. The nature and type of civil complaints, particularly those complaints that are investigated and substantiated by evidence, shall also be weighed when considering an officer for promotion. Promotions of officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall be held in abeyance until the investigation or disciplinary action is resolved.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As reported in Paragraph 14, the Monitor's Office reviewed samples of promotional candidates, which included ethics training, complaints, years of service, and other qualifications. In the case that officers had open administrative investigations against them, they were allowed to take the exam by policy, but they could not be promoted until they were found to be exonerated from the investigation. If a case is concluded in favor of the accused officer, they may be promoted. This aspect of the policy complies with the intent of Paragraph 20. However, the fair execution of this policy is being hampered by delays in concluding internal investigations.

As referenced in Paragraph 14, the Monitor's Office believes that the Promotional Board is not given all of the pertinent, correct, and reliable information needed to make informed decisions for this paragraph to be rated as substantially compliant. This paragraph requires PRP to examine the complaints of each officer, and make an informed and substantiated decision for each candidate. The acquisition of EIS and RMS, through Benchmark Analytics and Axon, will help this process, but more work needs to be done. Also, the Monitor's Office feels that there may be the potential for litigation for lost lifetime earnings due to the unresolved complaints that are years behind schedule (see Paragraph 179 and the Civilian Complaints, Internal Investigations, and Discipline section for more detail).

PRP continues to work on establishing its EIS, which will allow PRP to review the nature and type of civilian complaints and any related disciplinary action more effectively as part of the promotional

23

consideration process. There is no evidence to show that EIS is operational yet. The Monitor's Office has participated in many meetings where PRP's needs and the capabilities of these programs were discussed. More work remains to be done, and the Monitor's Office will stay vigilant.

*Pathway Forward*

The Monitor's Office looks forward to assessing the practical application of EIS developments. The training, use, and practice of these policies and systems will allow the Monitor's Office to assess PRP's compliance with this paragraph more comprehensively. It is incumbent upon PRP to hire more staff to review and adjudicate cases. PRP should incorporate a process that would identify those individuals who have an active, long-term, on-going SARP investigation.

## 3. Commander Corps

As mentioned previously, the policies related to career paths reflect that they are fair, transparent, and free of bias or political interference, which is essential to the creation of a credible, effective, and competent command staff. During the prior reporting period, the Monitor's Office reviewed GO 213 (Professional Career Development Program). PRP's partial compliance with the paragraphs under this subsection is contingent upon its ability to apply its policy into practice. During the reporting period, the Monitor's Office was not provided evidence that the Commander Corps program is being used.

As this CMR shows, the Monitor's Office reviewed samples of promotional candidates, which included ethics training, complaints, and years of service, among other qualifications. A full ethics training assessment will be conducted at the end of the reporting period, once PRP provides its training numbers for the entire reporting period, though the Monitor's Office is aware that SAEA's 2025 training calendar is behind schedule. The officers that did not comply with the requirements established in the promotional announcements were not accepted for promotion. In the case that officers had open administrative investigations against them, they were allowed to take the exam by policy, but they could not be promoted until they were found to be exonerated from the investigation.

### Paragraph 21: Professionalization - Commander Corps

*PRPD shall provide a developmental career path for officers aspiring to the command ranks that emphasizes leadership, ethics, community-oriented policing, educational achievement, and constitutional policing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

24

Note: Deferred. See Jt. Mot., ECF No. 1095 at 9 (proposing Special Master assist developing plan in accordance with Paragraph 21); Order, ECF No. 1102 at 2 (approving same).

### Compliance Assessment

During this reporting period, the Monitor's Office did not receive any relevant data related to this paragraph. The only relevant data obtained during this reporting period was that PRP is developing trainings for the Promotional Board and Recruitment. The Monitor's Office understands that performance evaluations are an effective way for PRP to emphasize and effectively institutionalize leadership, ethics, community policing, educational achievements, and constitutional policing in its officers. Promotions have taken place as well, as the previous paragraphs in this section have reported, which also promote these practices. The Monitor's Office was able to review the exam questions, and PRP welcomed all recommendations.

The Monitor's Office previously reviewed and subsequently approved GO 213 (Professional Career Development Program) in September 2022. PRP must work on reviewing and/or developing the associated training to incorporate aspects of this policy into supervisor training. As such, the career path has not been fully implemented in practice and compliance with Paragraph 21 remains partial.

### Pathway Forward

The Monitor's Office is always willing to provide more information regarding Commander Corps. It should be noted that Benchmark Analytics or Axon may have a system for recording all additional trainings taken by officers, which are skillsets that make more qualified supervisors. It is the first step in the developmental career path for preparing supervisors. Police agencies across the nation have developed career development for officers who aspire to be part of the command ranks. The Monitor's Office expects more initiatives to be taken by PRP in the near future regarding the requirements of this paragraph.

## II. Use of Force

PRP continues to follow its Provisional UOF Plan, which has to date provided accurate UOF numbers Bureau-wide. However, the plan will change with the development and introduction of PRP's new RMS.

In addition, the Commonwealth's contractor, AH Datalytics, continues to help develop, maintain, and improve the various UOF related dashboards. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field. These data dashboards should also assist first-line supervisors with managing workflow and ensuring officer compliance. In addition, information relating to the transport of civilian personnel to the hospital and/or police facilities by PRP personnel (starting and arriving milage) will now be documented in a newly developed dashboard.

During this reporting period, PRP reported 1,150 instances of UOF in 525 incidents. PRP conducts comparative analyses of UOF statistics against prior annual data, including total force applications and incident counts, and evaluates the nature of force employed. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRP's Global Compliance Use of Force Statistics Dashboard is comprehensive. It should be noted that the Monitor's Office has determined that PRP continues to make progress in the preparation and submission of UOF reports (PPR 605.1) in the timeframe outlined in PRP policy. In the 59 UOF reports reviewed by the Monitor's Office, all were prepared and submitted in the timeframe outlined in policy. In addition, as outlined in the policy, supervisors completed their investigation within five business days. These improvements have resulted in continued positive compliance ratings.

It should be noted that 2,244 out of 2,311 (97%) officers from the rank of sergeant to colonel have received REA 601, which includes training on the investigation and review of UOFs. Most PRP officers (96%) have completed the training.

Consistencies in the UOF data largely affect many of the paragraphs in this section. Other topics such as the Force Investigation Unit (FIU), Force Review Boards (FRBs), Crisis Intervention Training (CIT), Special Weapons and Tactics (SWAT), and crowd control procedures also impact PRP's overall compliance with this section. As it relates to FIU, the Monitor's Office has observed that 100% of cases are completed within the established timeline of 60 calendar days. The ability of FIU to maintain its personnel has contributed to improved compliance.

The Monitor's Office's reviewed Superintendent Force Review Board (CFRB) evaluations and found that the evaluations were objective and timely. The CFRB has eliminated the backlog of cases presented before the Board for review and has met the challenge of evaluating the investigations completed by FIU during the reporting period in a timely manner. The Monitor's Office was able to attend CFRB meetings during the reporting period and determined that the CFRB is properly evaluating FIU investigations within the timeline established by policy. The CFRB now has a dedicated office outfitted with computers and an officer assigned as the clerk of the Board with the responsibility of preparing cases for board members and scheduling meetings.

In addition to the above processes, it is critically important to have CIT trained officers throughout the 13 area commands. PRP has made significant progress in the prior three reporting periods and now has coverage in all 13 area commands. By the end of the current reporting period PRP had 294 trained CIT officers, 267 of which are assigned to patrol/CIT functions (91%). It is also important to note that the inspector who leads the CIT expansion efforts has experience in this area, holding a doctoral degree in psychology.

The Commonwealth has demonstrated progress in many of the UOF paragraphs. Much of the efforts made in this reporting period can be attributed to PRP's continued collaboration with AH Datalytics, the Commonwealth's contractor, who has helped PRP develop and maintain several UOF related dashboards, which include "Compliance with Reports", "Use of Force Statistics", "Requests from the Monitoring Team", and "Specialized Tactical Unit Mobilizations." These dashboards are useful to the Monitor's Office as they serve as another tool in assessing PRP's compliance with the Agreement. In addition, PRP's efforts in training members as CIT officers and expanding the CIT Program to all area commands are major steps towards compliance. The positive efforts made in this reporting period have proven beneficial in increasing PRP's compliance with this section.

Only six paragraphs (22, 32, 34, 35, 56, and 57) remain partially compliant; the rest are fully or substantially compliant. The Monitor's Office approved PRP's 2025 in-service training plan for officers, including Crowd Control and Persons in Crisis. If PRP completes this training in the next reporting period, four of the six remaining paragraphs would reach substantial compliance. To address the final challenges, PRP must provide dispatchers with scenario-based, in-person crisis training (Paragraph 57), after which Paragraph 22 should also achieve substantial compliance.

Overall, the Commonwealth's compliance with the 36 paragraphs assessed during this reporting period within UOF reflects some improvement in levels of compliance to what was noted in previous CMRs. In CMR-12, 19% of paragraphs (7 paragraphs) were assessed as partially compliant and 53% (19 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 17% of paragraphs (6 paragraphs) were found to be partially compliant and 50% (18 paragraphs) were found to be substantially compliant. Twelve paragraphs (33%) were rated as fully compliant in comparison to ten (28%) in CMR-12. See figure 3.



*Figure 3. Use of Force: Paragraph Compliance Status*

## Paragraph 22: Use of Force - General Provisions

*PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

As in previous CMRs, the Monitor's Office requested the following information: 1) number of incidents in which force was used and 2) how many officers used force in each incident. In response, PRP provided information attesting that force was used 1,150 times in 525 incidents during this reporting period.

Of the 1,150 UOF incidents that occurred during this reporting period, the Monitor's Office randomly sampled and reviewed 59 UOF reports. An analysis of the reports by the Monitor's Office determined that the UOFs were in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, which prohibit the use of unreasonable force.

Further, during this reporting period, the Monitor's Office reviewed various policies and procedures related to UOF reporting. As previously noted, the Monitor's Office finds that PRP's policies and procedures on UOF enable officers to rely primarily on non-force techniques to effectively police, use force only when necessary, and de-escalate the UOF at the earliest possible moment. Adherence to the policies in practice is also reflected in the Monitor's Office's review of UOF reports which verified that the levels of force were consistent with PRP policies.

### Pathway Forward

Now that PRP has, via its Provisional UOF Plan, provided reliable data relating to UOF numbers, the Monitor's Office can thoroughly analyze a representative sample of the UOFs that occurred during the reporting period. However, PRP should endeavor to develop a permanent system to report accurate UOF incidents, one that is not labor intensive and does not require several layers of review as in the

Provisional UOF Plan to address and correct discrepancies in the data. This improved system should be woven into PRP's efforts to implement its IT Corrective Action Plan (CAP) and its new RMS.

## 1. General Provisions

PRP has met full or substantial compliance with all paragraphs in this section. All policies and training comply with applicable law and comport with generally accepted policing practices related to UOF, including training on less lethal weapons, firearms, and other force technologies. The comprehensive UOF policy requires that PRP categorize all reportable UOFs into multiple levels, grouped by degree of seriousness, and identify all force techniques used by officers. PRP provided the Monitor's Office with the requested case files for review under the applicable paragraphs to ensure that all requirements were being met in practice, including a review of case files to ensure that UOFs were correctly categorized and a training record review to verify that all officers were qualified in "day" and "reduced light fire" on all issued firearms.

CN gas continues to be prohibited with none found during site visit inspections.

### Paragraph 23: Use of Force - General Provisions

*PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRP has prepared comprehensive policies that categorize UOFs into multiple levels, grouped by degree of seriousness. The policies also describe each force level and the options available to officers as outlined in the Agreement and are consistent with generally accepted policing practices relating to UOF. The Monitor's Office reviewed 59 UOF incidents during this reporting period and determined that the force

29

used by officers was accurately categorized into levels grouped by the degree of seriousness. During this reporting period, there were 1,150 UOF applications; of these instances, 524 were level 1 (46%), 247 were level 2 (21%), 320 were level 3 (28%), and 59 were level 4 (5%) UOFs.

## Paragraph 24: Use of Force - General Provisions

*PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met  ☐ Missed |
|---|---|

*Compliance Assessment*

PRP has prepared comprehensive policies and revised them periodically as outlined in the Agreement. The policies are consistent with generally accepted policing practices relating to UOF.

During this reporting period, the Monitor's Office reviewed and provided conditional approval, pending USDOJ approval, on GO 628 (Intervention with Persons in Crisis). The Monitor's Office also reviewed forms and annexes associated with GO 628, GO 602 (Electronic Control Device) and GO 618 (Use and Handling of Firearm).

## Paragraph 25: Use of Force - General Provisions

*PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policy prohibits use of CN gas. | ☑ Met | ☐ Missed |
| 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | ☑ Met | ☐ Missed |
| 3. No supply of CN gas is identified in armories or other locations through inspections. | ☑ Met | ☐ Missed |
| 4. CN gas is never used by STUs. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance by continuing to conduct unannounced visits to armories to check for the presence of CN gas.

## Paragraph 26: Use of Force - General Provisions

*PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | ☑ Met | ☐ Missed |
| 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | ☑ Met | ☐ Missed |
| 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | ☑ Met | ☐ Missed |

31

| | |
|---|---|
| 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | ☑ Met    ☐ Missed |
| 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | ☑ Met    ☐ Missed |

*Compliance Assessment*

The Monitor's Office found that PRP's policies relating to firearm qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the prior reporting period.

To determine compliance, the Monitor's Office requested data relating to yearly firearms training and qualifications. PRP is required to conduct firearms training and qualifications for all sworn members with Bureau issued firearms in both day and reduced light fire every 12 months.

PRP continues the day and reduced light fire training and as of this reporting period 4,277 officers were trained on reduced light and 4,060 were trained on day fire.

The Monitor's Office selected a random sample of 115 officers from the list of those qualified (reduced light and day fire) and requested their certified training records to verify that officers were qualified with their service weapons for this reporting period. A review of the training files and additional documentation confirmed that with the exception of three officers who failed to qualify, all officers were qualified. The three agents who failed the reduced light qualification were still unable to pass after being provided numerous re-training sessions with certified firearms instructors. PRP provided documentation that the three officers were disarmed (both service and personal) and referred to the Superintendent's Office for disciplinary referral.

If PRP continues conducting training in this manner it can expect to continue to meet compliance with the 12-month training requirement. In addition, PRP's IT Bureau and Auxiliary Superintendency for Education and Training (SAEA) are developing a Shooter Module which will generate global reports; however, as of this reporting period, the module was not yet operational and has not been demonstrated to the Monitor's Office. The Monitor's Office anticipates reviewing an improved Shooter Module when it becomes functional.

*Pathway Forward*

PRP needs to continue to qualify all sworn personnel on both day and reduced light fire within a 12-month period and must maintain records of this training in its Global Report. Further, the Monitor's Office stresses the importance of scheduling the training so that both segments are completed during a 12-month period to ensure that all officers are qualified.

## 2. Specialized Tactical Units

PRP has reached full compliance with all paragraphs in this section of the Agreement. The Monitor's Office has concluded that PRP has developed UOF policies for specialized tactical units (STUs) and that these policies are consistent with PRP's Bureau-wide UOF policy. A review of the tactical unit's (DOT) roll call documents verifies continued compliance with these policies. PRP DOT has also provided and completed training on relevant policies. In practice, the Monitor's Office has verified that all STU officers

meet eligibility requirements and that specialized units are not conducting general policing functions except for non-specialized preventive patrols in high crime areas. For these preventive patrols PRP DOT provided documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire.

During this reporting period, the Monitor's Office reviewed documents and case files that attested to STU conducting preventative patrols and other policing activities as outlined in the appropriate policies. In addition, DOT is appropriately documenting its activities and having supervisors review those activities and documentation.

Using the dashboard created by AH Datalytics, the Commonwealth's contractor, PRP now has a centralized database that captures all STU deployments Bureau-wide. This dashboard includes the location of the deployment, number of arrests made, types of evidence or property seized, whether a forcible entry was made, who used force, and whether a person was injured or killed by an STU member. This centralized database will help PRP command staff determine DOT needs Bureau-wide.

## Paragraph 27: Use of Force - Specialized Tactical Units

*PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All use of force training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4. 95% of uses of force by STU officers are within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRP has developed policies on UOFs by STU members. These policies are consistent with PRP's Bureau-wide policy. A review of UOF training involving STUs has determined that it is consistent with PRP policy. Further, a review of training records found that 95% of sampled officers have completed training on UOF

33

policies involving STUs in the required timeframe. The Monitor's Office concludes that all STU personnel meet the special training requirements related to their specialized units.

There were no instances in which DOT was mobilized in an active capacity during the reporting period. All activations were for "standby" status. These deployments were consistent with policies relating to UOFs by specialized units.

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## Paragraph 28: Use of Force - Specialized Tactical Units

*PRPD shall prohibit STUs from conducting general patrol and policing functions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. Training involving STUs is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met ☐ Missed |
| 4. Presentation of data on STU deployments and activations. | ☑ Met ☐ Missed |
| 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | ☑ Met ☐ Missed |
| 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | ☑ Met ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the STU policies and training and found that they meet the requirements outlined in the Agreement, and that training follows approved policies. In addition, 95% of STU officers are trained and certified in STU policies. The Police Training Management System (PTMS) does not allow supervisors to easily track which officers have received which training courses, so DOT supervisors have been maintaining their own internal tracking, which is not conducive to tracking long-term and on-going training requirements. DOT does collaborate with SAEA regarding training needs.

GO 112 (Tactical Operations Divisions) allows DOT officers to be assigned to preventive patrol but precludes DOT from operating as a specialized unit or using tactical gear when conducting patrol

34

functions. It also requires that DOT members always keep specialized weapons and tactical equipment accessible in the event their unit is activated to respond to an authorized DOT event. During the May, July, and September 2025 site visits to Metro DOT, the Monitor's Office verified that officers assigned to preventive patrol continue to keep their specialized equipment in the trunk of their vehicle, accessible to the officers in the event they are mobilized. In addition, PRP has modified PPR 112.2 (Record of Mobilization of STU) to reflect this information as well as wearing the proper uniform. Verification of the changes to PPR 112.2 has been confirmed by the Monitor's Office.

The Monitor's Office has also verified that specialized units are properly documenting their daily assignments in compliance with the Agreement. Specialized units do not conduct general policing functions apart from preventive patrols in high crime areas or at special events. During this reporting period, over 813 preventive patrols or other specialized deployments were conducted. From that number the Monitor's Office requested a random sample of 58 records (7%). The Monitor's Office determined that deployments were consistent with the Agreement and PRP policy.

PRP also provided a list of activations for DOT (225) and SWAT (65). A random sample of 67 were reviewed and found to align with policy.

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## Paragraph 29: Use of Force - Specialized Tactical Units

*PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for evaluation boards is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of evaluation board members are trained. | ☑ Met | ☐ Missed |
| 4. All officers selected to STUs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | ☑ Met | ☐ Missed |

| | |
|---|---|
| 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | ☑ Met   ☐ Missed |

*Compliance Assessment*

The Monitor's Office reviewed the STU policies and training courses and found that they met the requirements of the Agreement, and that training followed approved policies.

PRP provided documentation that there are currently 155 personnel assigned to DOT units throughout the Bureau. The breakdown of those personnel by rank is as follows:

- 1 captain (designated as in command)
- 3 first lieutenants
- 3 second lieutenants
- 20 sergeants (one detached to the Academy)
- 128 agents (one detached to the Academy)

PRP developed GO 112 (Tactical Operations Divisions) and GO 117 (Specialized Weapons and Tactics Division) which outline eligibility criteria and selection processes for specialized units. During the reporting period, no additional officers were assigned to DOT. SWAT had the following personnel assigned:

- 1 first lieutenant
- 3 sergeants – (1 assigned to FURA Maritime)
- 18 agents

The Monitor's Office reviewed DOT and SWAT personnel files for existing members and confirmed that the officers met the requirements for assignment and have the required training. As it relates to DOT and SWAT, as outlined in GO 112 (Tactical Operations Divisions), PRP follows the process for retention. SWAT did not have any members in the retention process during the reporting period. DOT has eight members in the retention process.

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## Paragraph 30: Use of Force - Specialized Tactical Units

*PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

36

| Training: | Implemented | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | ☑ Met | ☐ Missed |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office reviewed the STU policies and training courses and found that they met the requirements of the Agreement, and that training followed approved policies. The activities conducted by STUs, including deployments and activities, are all documented according to the policy.

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## Paragraph 31: Use of Force - Specialized Tactical Units

*PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | ☑ Met | ☐ Missed |
| 2. The STU tracking system is accurate and current; all deployments are tracked. | ☑ Met | ☐ Missed |

37

*Compliance Assessment*

Using the dashboard created by AH Datalytics, the Commonwealth's contractor, in September 2022, PRP now has a centralized database that tracks all STU deployments island wide. This dashboard includes the location of the deployment, number of arrests made, types of evidence or property seized, whether a forcible entry was made, who used force, and whether a person was injured or killed by an STU member. This centralized database will help PRP command staff determine DOT needs Bureau-wide.

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## 3. Crowd Control Policies and Performance

In general, PRP has made continued progress in how it prepares for and operates during demonstrations and protests. The Monitor's Office observed PRP's planning and operations at several demonstrations and protests over the course of this reporting period and found that they have become increasingly consistent with generally accepted policing practices.

In response to demonstrations or protests during this reporting period, DOT participation was in a stand-by status only. This is a significant finding given the number of demonstrations and protests responded to during the reporting period. In those instances where DOT units did not actively engage with demonstrators or protestors, after-action and self-assessment reports were not completed, except for PPR 112.2 (Mobilization of Specialized Tactics). Further, the Monitor's Office found that an incident commander was identified at every demonstration or protest regardless of STU activation status.

To achieve substantial compliance, PRP must train all PRP members on GO 625 (Management and Crowd Control) and continue to maintain an aggregated list of all demonstrations and protests, identifying them as either planned or unplanned, and classifying them as such. Developing a Bureau-wide system/module where all information relating to protests and demonstrations occurring island-wide is stored and available for review will assist PRP in maintaining greater awareness of related operations and determining needed resources throughout the island. DOT supervisors and area commanders must also thoroughly assess all law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd control situation to ensure compliance with applicable laws and PRP policies and procedures.

### Paragraph 32: Use of Force - Crowd Control and Incident Management

*PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

| Training: | Not Implemented | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on crowd control and incident management is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of police responses to unplanned events are within policy. | ☑ Met | ☐ Missed |
| 5. 95% of police responses to planned events are within policy. | ☑ Met | ☐ Missed |
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the crowd control and management policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRP has met the 95% threshold for STU officer training on the relevant crowd control training (REA 625). DOT officers have completed the yearly retraining as required. Training for all sworn officers has just started and is included in the annual 40-hour program.

The Monitor's Office requested a list of all demonstrations and protests Bureau-wide for the reporting period. PRP provided a list of 121 protests – 105 unplanned (87%) and 16 planned (13%). DOT was activated in a standby capacity in six of the demonstrations or protests (5%). PRP identified demonstration and protest cases as planned or unplanned in more than 95% of the cases. Upon review, it is evident that the data is now aggregated. PRP aggregate data on planned and unplanned crowd control events Bureau-wide should be used to analyze and identify possible training needs as well as determine personnel and resource distribution.

The Monitor's Office conducted site visits to Metro DOT during the reporting period and reviewed data provided by the Reform Unit relating to personnel deployments to demonstrations and protests. As it relates to DOT, the Monitor's Office learned that in instances where PRP had determined in advance that the DOT Unit would be activated, an operations plan was developed by the unit. However, in instances where the determination to mobilize the unit was made at the time of the event, DOT prepared no such plan.

The Monitor's Office selected a random sample of 44 crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control).

The Monitor's Office observed continued improvement in PRP's preparation of PPR 625.6 (Evaluation of Strategies for Management or Control of Crowds) in this reporting period. All planned and unplanned demonstrations and protests reviewed had a properly prepared PPR 625.6.

Regarding training on the relevant crowd control policies, PRP provided certification that DOT officers and supervisors are current in these courses. This training requires yearly re-training.

The Monitor's Office reviewed quarterly reports (PPR 618.1) of STU supervisors who conducted inspections of armories as required by the Agreement. In a review of these quarterly reports, the Monitor's Office found them to be within policy and documented.

### Pathway Forward

Although PRP is partially compliant in this area, the Bureau must train all sworn PRP members on GO 625 (Management and Crowd Control) and continue to maintain an aggregated list of all demonstrations and protests, identifying them as either planned or unplanned, and classifying them as such. In addition, PRP should develop a Bureau-wide system/module where all information relating to protests and demonstrations occurring island-wide is stored and available for review and analysis. Maintaining such a list will assist PRPB in maintaining greater awareness of related operations and determining needed resources throughout the island.

### Paragraph 33: Use of Force - Crowd Control and Incident Management

*The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph will be assessed with Paragraph 32.

40

*Compliance Assessment*

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance by reviewing that an incident commander is assigned to and present at all mass demonstrations, civil disturbances, and other crowd control events.

## Paragraph 34: Use of Force - Crowd Control and Incident Management

*The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office reviewed GO 625 (Management and Crowd Control) and found it to be compliant with the Agreement and generally accepted policing practices. The dispersing of unruly protestors after the application of gas or other less-than-lethal weapons should continue to be conducted solely by DOT personnel that have the relevant training. In the random sample selected for this reporting period there were no UOFs reported. In previous reporting periods force was only used in instances where demonstrators or protesters were given lawful orders and failed to comply. Otherwise, demonstrators or protestors were allowed to assemble peacefully and lawfully.

For this reporting period, DOT units were only mobilized in a stand-by or preventive patrol capacity in response to potential needs for crowd control activities.

The Monitor's Office considers this a significant finding, especially since PRP responded to a substantial number of planned and unplanned demonstrations and protests during the reporting period. The use of crowd control techniques was within policy.

*Pathway Forward*

To achieve substantial compliance, PRP needs to continue to categorize all demonstrations and/or protests as planned or unplanned and ensure that all sworn members receive the eight-hour training on crowd control. The Monitor's Office will continue to assess PRP's progress and compliance with policy, crowd control resource deployment, and training through policy reviews and on-site observations.

## Paragraph 35: Use of Force - Crowd Control and Incident Management

*PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph will be assessed with Paragraph 32.

*Compliance Assessment*

The Monitor's Office reviewed numerous documents relating to mass demonstrations, including PPRs 625.3 (Report on Crowd Control and Management), PPR 625.2 (Operations Plan), and PPR 625.6 (Management and Control of Crowds). STUs prepare after-action reports if they actively participated in crowd control, which did not occur during this reporting period.

The Monitor's Office concludes that PRP's actions during demonstrations and protests (planned and unplanned) in the reporting period were consistent with generally accepted policing practices and PRP policy. PRP provided the Monitor's Office with Operation Plans (PPR 625.2) for the various demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Reports (PPR 625.3), which provided basic details of each event. In all cases reviewed, PPR 625.6 (Evaluation of Strategies for the Management and Control of Crowds) was completed and provided to the Monitor's Office.

For this reporting period PRP reported that it responded to 121 demonstrations and/or protests, planned and unplanned. The Monitor's Office selected a random sample of 44 crowd control events (36%) to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). Of the 44 files reviewed, PRP reported that 35 (80%) were identified as unplanned and 9 (20%) were planned. PRP has made considerable progress in this area and needs to continue this effort.

*Pathway Forward*

To achieve substantial compliance, PRP must continue to ensure that DOT supervisors and area commanders thoroughly assess all law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd control situation to ensure compliance with applicable laws and PRP policies and procedures. This issue has been discussed with the Reform Unit previously. A

42

variety of recommendations were provided including criteria to be assessed, debriefings with officers and the demonstrators and/or protestors, and the consistent use of after-action and self-assessment reports. Additionally, reference resources were also provided by the Monitor's Office. PRP must also ensure that all sworn members receive the eight-hour crowd control training.

## 4. Force Reporting

PRP formally implemented its Provisional UOF Plan in July 2022. After more than two years in effect, this plan – along with the increase of sergeants in the field -  has led to more accurate and consistent UOF reporting. Nevertheless, the plan will change with the introduction of PRPB's new RMS.

PRP has continued to provide accurate UOF numbers. The Commonwealth's contractor, AH Datalytics continues to help develop and improve various UOF related dashboards. These tools allow the Reform Unit to better evaluate whether officers are following required procedures and documentation steps in the field.

During this reporting period, PRP reported 1,150 UOFs in 525 incidents. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRP's GTE system is comprehensive. In reviewing compliance with Bureau policy (PPR 605.1), the Monitor's Office found that all 59 UOF reports sampled were completed and submitted within the required timeframes, showing significant improvement.

Additionally, PRP updated its GTE system in June 2025 to ensure that mileage is recorded at the beginning and end of any transport. The Monitor's Office confirmed that these updates are reflected in reports submitted after the system update.

The Monitor's Office continues to stress that adherence to reporting timelines, as established by policy, and proper report writing, including the notation of mileage when someone is transported to a medical facility, are important to ensure PRP moves forward with compliance. Ongoing UOF analysis by SARP, along with adequate staffing, supervision, and accountability, will be key to sustaining these improvements.

### Paragraph 36: Use of Force - Force Reporting

*PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| **Training:** | Implemented | **Assessment Frequency** | Bi-annually |
| **Practice:** | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Polices and forms incorporate all of the requirements of the paragraph. | ☑ Met  ☐ Missed |
| 2. Training on force reporting is consistent with approved policies. | ☑ Met  ☐ Missed |
| 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met  ☐ Missed |
| 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | ☑ Met  ☐ Missed |
| 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | ☑ Met  ☐ Missed |
| 4c. All failures to report use of force are referred to SARP for investigation. | ☑ Met  ☐ Missed |
| 4d. 95% of requests for medical services in connection with a use of force are within policy. | ☑ Met  ☐ Missed |
| 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | ☑ Met  ☐ Missed |
| 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | ☑ Met  ☐ Missed |
| 4g. All use of force reports are stored and maintained by SARP as required by policy. | ☑ Met  ☐ Missed |

### *Compliance Assessment*

The Monitor's Office reviewed UOF policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. The required 40-hour training for all officers was conducted during the reporting period. PRP has committed to training 95% of its sworn force by the end of March 2026. A review of training records at the end of the reporting period reveals that PRP is on track to achieve that goal.

The Monitor's Office reviewed 59 UOF reports during this reporting period, including STUs. In all cases reviewed, the Monitor's Office determined that the level of force reported was consistent with the force used. The following observations are made as a result of this review:

- All reviewed reports were complete.
- In all but one case (2%) the Monitor's Office determined the UOF levels were appropriate. In case (#2025:03-069:002056) the force was reported as "soft hands" level 1; however, the officer used the sweep method to bring the subject to the ground which constitutes a level 2.
- In all instances the officers notified supervisors of a UOF in accordance with policy.
- In all instances where medical aid was warranted, it was provided.
- In all cases a supervisor reviewed the report within five business days, as outlined in the Agreement.

- Supervisors responded to all serious UOFs.
- In most cases (90%) the starting and ending mileage was reported. This began when PRP implemented updates to the GTE system in June 2025.
- As it relates to STUs, all reports were completed in the GTE system within the outlined timelines.
- All STU supervisors completed their investigation within the five-day timeframe identified in policy.

In an effort to prevent discrepancies and errors in UOF data PRP is:

- Holding bi-weekly meetings with the Auxiliary Superintendency of Field Operations (SAOC), Technology and Communications Bureau (NTC), the Reform Unit, FIU, and Command Center directors.
- Providing guidance on how to complete PPR 126.2 (Complaint Card).
- Developing guidelines for when more than one unit is involved in a UOF incident.
- Continuing to improve GTE.
- Incorporating dashboards created by AH Datalytics, the Commonwealth's contractor.

It is clear from the Monitor's Office's review that PRP's implementation of the Provisional UOF Plan has resulted in improvements in UOF reporting quality.

### Pathway Forward

PRP's compliance with this paragraph demonstrates its consistent and valid UOF data collection. PRP's implementation of its Provisional UOF Plan demonstrates it has tools to accurately track its UOFs. PRP must continue to ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. This will ensure that PRP will continue to be able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community. PRP must continue to hold officers and supervisors accountable for entering UOF reports in the timeframes established by policy as well as noting mileage when transport to a medical facility is provided.

### Paragraph 37: Use of Force - Force Reporting

*The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | April 2025 – September 2025 |

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: This paragraph is assessed with paragraph 36.

### Compliance Assessment

PRP policy requires that all officers complete a UOF Report (PPR 605.1) before the end of the shift. PRP has made significant progress in ensuring that UOF incidents are entered into GTE on time. These reports contain information related to an account of the incident, the reason for police presence, the reasons leading to the UOF decision, levels of resistance, and an outline of every type of force used.

As stated in previous CMRs, PRP has taken several positive steps towards reaching compliance with this paragraph, including:

- Implemented the following changes to UOF reporting: 1) when a member of PRP assigned to any specialized unit is involved in a UOF incident, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2) prohibited the use of complaint numbers with the prefix of the specialized unit in UOF incidents; and 3) PRP's IT Bureau has taken corresponding steps to support compliance with the Superintendent's Directive. This will ensure that area commands are aware of each UOF incident in their jurisdiction.
- Implemented into practice that all UOF Reports (PPR 605.1) and Notification of UOF (PPR 605.3) be entered electronically into GTE.
- Adopted the Provisional UOF Plan with input from the Monitor's Office and USDOJ.
- Conducted an IT Needs Assessment.
- Contracted with AH Datalytics to carry out the implementation of the necessary structure identified in the Gap Analysis conducted in May 2021 as part of the PRP reform process.

The Monitor's Office recognizes these actions by PRP as positive steps that factored into the development of a mechanism by which PRP can validate its UOF incident numbers.

### Pathway Forward

PRP's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. PRP currently has the tools to accurately track its UOFs. To continue to accomplish this, PRP must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRP's compliance with the Agreement but also ensures that PRP is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community.

## Paragraph 38: Use of Force - Force Reporting

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, medical aid was provided when warranted. The Monitor's Office also assessed compliance regarding reporting to and from mileage when transporting person(s) for medical aid and found that PRP is documenting the mileage in most instances since the GTE update in June 2025.

*Pathway Forward*

As previously stated, PRP's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection as well as accurate information regarding the starting and ending mileage when transporting a subject. The Monitor's Office has assessed the accuracy of the Provisional UOF Plan and has determined that PRP is able to accurately track its UOFs in this reporting period.

## Paragraph 39: Use of Force - Force Reporting

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |



| Training: | Implemented | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, a UOF report was submitted to the officer's immediate supervisor. The Monitor's Office determined that PRP has made significant progress in submitting reports in the timeframe required by Bureau policy. In the 59 UOF reports reviewed all were submitted in the timeframe outlined in policy. PRP supervisors are also completing their UOF investigation in the timeframe outlined in policy.

Regarding submission to SARP for the tracking and analysis of these UOF reports, PRP has demonstrated that it has the capabilities to provide these functions. The Monitor's Office acknowledges PRP's efforts towards addressing this issue with its Provisional UOF Plan and the work of AH Datalytics, the Commonwealth's contractor; however, PRP must ensure that the data collected is then analyzed. To that end, for this reporting period, PRP has conducted several   analyses of UOF data for 2024. PRP must continue to build and expand these analyses.

*Pathway Forward*

All officers must continue to submit UOF Reports (PPR 605.1) to their immediate supervisor and SARP in GTE for tracking and subsequent analysis. SARP must continue to maintain the data in a central location. PRP has identified the Office of Legal Affairs (OAL) to be the custodian of the UOF data. Additional UOF data analyses of also needs to be conducted moving forward.

## 5. Force Review, Investigation, and Analysis

PRP has successfully met the policy and training requirements of these paragraphs. During the reporting period, most UOF reports were properly completed, included the necessary information, and followed the required procedures established by the Agreement. Reports were appropriately reviewed, verified, and signed, demonstrating continued improvement in documentation and accountability.

FIU Staffing, which has posed challenges in previous reporting periods, has improved significantly. Additionally, the implementation of the Provisional UOF Plan—now in place for over two years—combined with an increased number of field sergeants, has led to better reporting and oversight of UOF incidents.

Despite these advances, PRP is encouraged to develop a more comprehensive and efficient system to replace the current provisional plan. While the existing plan has been effective, it is intended only as a temporary measure. The forthcoming RMS is expected to further strengthen PRP's ability to accurately

track and analyze UOF incidents. Expanding the analysis of UOF data will also help PRP identify trends and inform future policy and training needs.

While PRP has revised its Annual Performance Evaluation of the Rank System (PPR 310.1) form to include criteria for evaluating supervisory reviews of UOFs by members under their command, the performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

## Paragraph 40: Use of Force - Force Review, Investigation, and Analysis

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2025 – September 2025 for Compliance Target 1.<br><br>April 2025 – September 2025 for Compliance Targets 2 and 3. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Target #1 and bi-annually for all other Compliance Targets |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. The policy incorporates all of the requirements of the policy. | ☑ Met | ☐ Missed |
| 2. Training on force reviews and investigations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 43-47 for level 1-3 uses of force.

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 48-52 for level 4 uses of force.

### *Compliance Assessment*

The Monitor's Office has reviewed the policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. PRP has been able to meet the 95% threshold of officers trained and certified in force review and investigation policies in the prescribed timeframe.

Most of the UOF reports in the reporting period, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out following the Agreement. In these reports, pertinent information was included, fields were checked, and the reports were signed.

*Pathway Forward*

As stated in previous CMRs, UOF reports (PPR 605.1) should be consistently reviewed by SARP's FIU for completeness and accuracy as a matter of general practice. UOF reports should be closely scrutinized during the review process to identify possible errors and/or omissions. FIU staffing, which had been a challenge, has improved significantly. An assessment of FIU staffing should be conducted periodically to ensure it has the adequate staffing needed to conduct level 4 UOF investigations and properly conduct quality UOF reviews.

## Paragraph 41: Use of Force - Force Review, Investigation, and Analysis

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Targets #1 and #2; annually for Compliance Target #3; and quarterly for Compliance Target #4 |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☑ Met | ☐ Missed |
| 2. All uses of force are tracked in the tracking system. | ☑ Met | ☐ Missed |
| 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | ☑ Met | ☐ Missed |
| 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRP formally implemented its Provisional UOF Plan in July 2022. The Provisional UOF Plan, which has been in place for over two years, coupled with the increase of sergeants in the field has resulted in improved UOF reporting for the reporting period. Thus, the Monitor's Office has determined that the

50

Provisional UOF Plan has produced accurate numbers Bureau-wide. Nevertheless, PRP is reminded that a more comprehensive, less labor-intensive system or plan needs to be developed. While it has been effective, it is not, nor should it be PRP's final system. The RMS, once developed, will enhance PRP's ability to track its UOFs accurately.

PRP, in an effort to ensure UOF numbers are accurate, delegated AH Datalytics, the Commonwealth's contractor, to verify all UOF numbers beginning in 2023. This has allowed PRP to provide the public with accurate information relating to UOF trends through a regular report. Further, the Monitor's Office learned that AH Datalytics is also working on improvements to the public facing UOF Dashboard that allows community members to interact with UOF data.

At the Monitor's Office's request in the last CMR, PRP conducted several analyses of UOF data for the purpose of identifying trends and/or training deficiencies. The Monitor's Office is encouraged by this progress but notes that PRP needs to expand these analyses as necessary.

### Pathway Forward

PRP's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office has assessed PRP's compliance and implementation of the Provisional UOF Plan in this CMR and will continue to do so to ensure that the improvements made to UOF reporting and tracking are sustainable. Further, the Monitor's Office looks forward to seeing the public UOF Dashboard improvements and additional in-depth analyses of UOF data.

## Paragraph 42: Use of Force - Force Review, Investigation, and Analysis

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations.

### Compliance Assessment

PRP has revised its Annual Performance Evaluation of the Rank System (PPR 310.1) form to include criteria for evaluating supervisory reviews of UOFs by members under their command. The UOF Section of the evaluation (Supervisors Section) addresses what is required in Paragraph 42 of the Agreement. During the reporting period PRP, through AH Datalytics, the Commonwealth's contractor, developed and

51

demonstrated a dashboard which provides supervisors with the ability to identify UOF investigations conducted by supervisors under their review and to determine if investigations were conducted within policy.

*Pathway Forward*

The performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

## 6. Supervisory and FRB Reviews

PRP has reached full or substantial compliance with all paragraphs of this section of the Agreement. Supervisors consistently respond to the scenes of serious UOFs or allegations of excessive force ensuring timely and thorough oversight. The Monitor's Office found that supervisors continue to accurately assess the levels of force used and conduct high-quality reviews of force incidents. These consistent practices have allowed the Monitor's Office to confirm the reliability of UOF data reported by PRP.

All supervisory review timelines are being met, reflecting strong procedural compliance. However, PRP should continue to prioritize consistency and quality in training to maintain these standards over time. Additionally, 95% of FRB members have completed training on GO 502 (Force Review Board), meeting the compliance threshold established by the Agreement.

The Monitor's Office continues to emphasize that PRP needs to develop a unified, comprehensive database for all UOF cases that are evaluated by the 13 area command FRBs. Currently global information on FRB evaluations is prepared upon request of the Monitor's Office for its CMRs. A centralized database would enhance PRP's ability to monitor trends, ensure consistency across commands, and streamline reporting processes.

When reviewing FRB cases, the Monitor's Office determined that the FRBs took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation. PRP policy clearly defines the responsibilities that the FRBs and FIU must take when reporting misconduct to the appropriate investigative unit or to the Puerto Rico Department of Justice (PRDOJ).

### Paragraph 43: Use of Force - Supervisory and FRB Reviews

*A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 48-52.

*Compliance Assessment*

Of the 59 UOF reports (PPR 605.1) reviewed by the Monitor's Office during the reporting period, the Monitor's Office found no instances in which a supervisor failed to respond to a serious UOF. The Monitor's Office acknowledges PRP's efforts towards addressing this issue with the Provisional UOF Plan.

## Paragraph 44: Use of Force - Supervisory and FRB Reviews

*The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | ☑ Met | ☐ Missed |
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | ☑ Met | ☐ Missed |
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |

53

| | | |
|---|---|---|
| 5a. 95% of reviews by Force Review Boards are within policy. | ☑ Met | ☐ Missed |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | ☑ Met | ☐ Missed |
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☑ Met | ☐ Missed |

*Compliance Assessment*

Policies incorporate all requirements of the Agreement. Training on force reviews and investigations for supervisors is also consistent with approved policies and 95% of supervisors are trained and certified.

It should be noted that 2,244 out of 2,311 (97%) officers from the rank of sergeant to colonel have received REA 601, which includes the investigation and review of UOFs. Most PRP officers (96%) have completed the training.

As it relates to supervisors serving on the area command FRBs, over 95% have received training to serve on the Board.

In the 59 UOF reports (PPR 605.1) reviewed by the Monitor's Office, in no instance did a supervisor fail to conform to what was required by policy, which was to complete their investigation of a UOF within 5 business days. As it relates to area command FRBs, the Monitor's Office confirmed that 95% of FRB reviews are within policy. The high level of compliance in properly assessing levels of force and the quality review of force by supervisors in the sampled investigations reviewed allowed the Monitor's Office to verify the accuracy of the information related to UOFs provided by PRP. The Monitor's Office was able to confirm that SARP is analyzing FRB determinations and recommendations per the Agreement.

*Pathway Forward*

As noted in other related paragraphs, compliance with this paragraph is largely contingent on PRP's ability to accurately track all UOFs, ensuring that the Monitor's Office's review of UOFs is representative. The Monitor's Office will continue to assess PRP's compliance with UOF review procedures, ensuring that they contain the appropriate information and justifications.

## Paragraph 45: Use of Force - Supervisory and FRB Reviews

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

| Compliance Status | Assessment Schedule |
|---|---|

54

| Substantially Compliant | | Review Period | April 2025 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

Reviewed reports were conducted within the identified timeline and content aligns with PRP policy and the Agreement. Each review considered if the force used was consistent with policy, that all reports contained the necessary information, and noted whether non-punitive correction actions or training were needed.

*Pathway Forward*

PRP must ensure all UOF incidents are investigated in the time allotted as required by GO 605 (Report and Investigation of UOF Incidents).

The Monitor's Office continues to stress the importance of re-training supervisors on their roles and responsibilities in conducting UOF reviews and increased accountability for failing to adhere to the policy.

## Paragraph 46: Use of Force - Supervisory and FRB Reviews

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |



| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRP provided documentation that 92 ranking officers have received the training to serve on the boards as required by the Agreement. FRB members are of varying assignments and rank. The Monitor's Office's random sample of 23 records included 4 captains, 4 first lieutenants, and 15 second lieutenants. The Monitor's Office requested the training and certification records of the 23 randomly selected officers from this list to determine if they are qualified to serve on these boards as outlined in GO 502 (Evaluation Boards of Incidents of UOF). It should be noted that a review of the records determined that 21 (91%) had the required training to serve on the board. A review of the training and certification records of two PRP members appearing in the random list, a captain  and a first lieutenant did not show any indication they have the training to serve on the Board.

PRP reported that the curriculum relating to the training of area command FRBs was completed in February 2024. As previously stated, training of board members commenced in March 2024, starting with the presidents of the boards of the 13 area commands and CFRB members. The initial training was then followed up with the training of 22 additional members of various area command boards in March 2024.

For the purposes of determining compliance with this paragraph, the Monitor's Office requested a list of all FRB investigations conducted by the 13 area command FRBs for the reporting period. PRP provided a list of 246 UOF cases evaluated by FRBs, of which the Monitor's Office randomly selected 53 cases (22%) for review.  The Monitor's Office determined in the cases reviewed that the FRBs took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation.

The Monitor's Office emphasizes that PRP needs to develop a single source database for all UOF cases that are evaluated by the 13 area command FRBs. Currently global information on FRB evaluations is prepared upon request of the Monitor's Office for its CMRs.

The Monitor's Office offers the following additional assessments of the information provided:

- In one case (2025-7-311-04125; 2%) re-training was ordered.
- In all but one case (98%) the Board's evaluations were unanimous. The exception being case #2025-8-072-3136.
- No cases were returned by the FRB due to missing or incomplete information.
- Levels of force were accurate in all cases evaluated by the Board.

Based on the review of the randomly selected area command FRB files, there were no reported referrals to PRDOJ or NIE, nor was any such need uncovered. It should be noted that the Monitor's Office has seen improvement in area command FRB's UOF evaluations. With the digitization of files, the information and data provided by PRP and its FRBs was very precise.

It should also be noted as per GO 502 (Evaluation Boards of UOF Incidents) that the FRB has 15 days once the meeting convenes to complete their evaluation. This period can be extended by 15 days if the report is returned. Based on the documents provided, the FRBs complied with the timeline to complete their evaluation in most cases. PRP should ensure that area command FRBs complete their evaluations within the timelines provided in GO 502 for each evaluation.

During the reporting period the Monitor's Office conducted site visits to area commands to meet with the FRB presidents. Some of the concerns voiced by the presidents include:

- The on-time preparation of the UOF Report (PPR 605.1). Many of the FRB members had trouble ascertaining when the UOF report was prepared as the date changes each time the report is amended. This issue was brought to the attention of PRP IT by the Monitor's Office after the Monitor's Office experienced similar issues.
- PRP needs to ensure that all required documents are in each case folder.

### *Pathway Forward*

The Monitor's Office will review PRP's updated FRB training and observe training once conducted to ensure that it adheres to the Agreement. Further, the Monitor's Office notes that compliance with this paragraph is also affected by PRP's ability to accurately track and report UOFs, as with many of the paragraphs in this section. PRP needs to ensure that its record keeping relating to FRB UOF evaluations is complete and accurate.

## Paragraph 47: Use of Force - Supervisory and FRB Reviews

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRP policy clearly defines the actions that the FRB and FIU must take when reporting misconduct to the appropriate investigative unit or to PRDOJ. During this reporting period no cases were referred to these entities as there was no need.

## 7. FIU Investigations and Force Reviews by SFRB

PRP has achieved substantial or full compliance with all paragraphs in this section. As indicated in previous CMRs, FIU is required to investigate all serious UOF incidents, among other investigations across Puerto Rico, including intentional and accidental firearm discharges involving PRP personnel.

During this reporting period, the Monitor's Office observed continued progress in the quality and efficiency of FIU investigations. Notable improvements included more effective identification of civilian witnesses, the development of detailed crime scene sketches, and increased use of camera evidence, including body-worn cameras (BWCs), to inform investigations.

The FIU Commanding Officer, in collaboration with the Reform Unit, established new procedures granting FIU access to photographic evidence relating to UOFs. This change has significantly reduced the time needed to complete investigations. In addition, upon completion of their investigation into an accidental discharge, FIU now immediately forwards the case to SARP for administrative investigation.

The Monitor's Office also commends PRP for equipping FIU investigators with digital recording devices to document civilian witness statements, further enhancing transparency and evidence collection.

FIU has also shown considerable progress in meeting its 60-day deadline for completing investigations. PRP documentation indicates that, during this reporting period, 51 of 61 cases reaching the 60-day mark were closed on time, while the remaining cases had not yet reached the threshold. An additional 26 older cases were also completed within the 60-day standard.

To support these improvements, PRP has collaborated with AH Datalytics, the Commonwealth's contractor, to create a color-coded dashboard that tracks the status of all open cases. While limited staffing and reliance on external partners for evidence processing previously caused delays, PRP has since expanded FIU staffing and streamlined access to photographic evidence. These steps have led to a higher number of cases being completed on time.

Finally, the Monitor's Office recognizes the CFRB for completing its evaluations of UOF incidents within the timelines required by GO 502 (Evaluation Boards of Incidents of UOF). PRP should continue to ensure that all evaluations are completed promptly and in accordance with policy to sustain these positive results.

58

## Paragraph 48: Use of Force - FIU Investigations and Force Reviews by SFRB

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for FIU officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4. All officers assigned to FIU meet eligibility requirements. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the UOF policies and found that they meet the requirements of the Agreement. Regarding FIU training, the Monitor's Office conducted multiple site visits to FIU in the reporting period and verified that the training materials employed by PRP are consistent with policy and generally accepted policing practices. All FIU members have completed the required advanced training for conducting investigations (FIUC 8041).

FIU is responsible for investigating serious UOFs, including a) accidental and intentional firearm discharges, b) UOFs by supervisors above the rank of sergeant, c) UOFs at protests and demonstrations; and d) any other UOF deemed appropriate by the Superintendent. The Monitor's Office confirmed through the Reform Unit that all FIU investigators have completed the 40-hour investigative training provided to Criminal Investigative Units (CIC) personnel. This was also verified by the FIU Commanding Officer. While the training will be helpful in providing additional investigative knowledge to FIU personnel, the course needs to be tailored to the specific needs of FIU.

All officers assigned to FIU meet appropriate eligibility requirements.

*Pathway Forward*

PRP should ensure that all FIU members are trained in a timely manner. The Monitor's Office will continue to review training records of newly assigned FIU personnel to ensure that PRP has trained all members in investigating intentional and accidental firearm discharges and all other required training and re-training.

## Paragraph 49: Use of Force - FIU Investigations and Force Reviews by SFRB

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | ☑ Met | ☐ Missed |
| 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | ☑ Met | ☐ Missed |
| 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |
| 3a. 95% of reviews by the Superintendent's Force Review Boards are within policy. | ☑ Met | ☐ Missed |
| 3b. The use of force tracking system includes all Superintendent's Force Review Board reports and underlying documents. | ☑ Met | ☐ Missed |
| 3c. Superintendent's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☑ Met | ☐ Missed |

*Compliance Assessment*

During the reporting period, FIU reported opening 61 investigations, 51 were closed before the 60 days required by policy. The remaining cases had not yet reached 60 days.

The investigation breakdown is as follows:

- 20 firearm discharges (6 involved firing at moving vehicles)
- 14 UOFs by a supervisor above the rank of sergeant

60

- 7 negligent discharges
- 6 grabs by the neck (Level 4)
- 3 apparent criminal conduct
- 3 strike forces
- 2 deaths in custody
- 2 police pursuits
- 2 cases assigned by SARP
- 1 multiple electronic control devices
- 1 negligent taser

## Accidental Discharge Investigations

The Monitor's Office conducted four site visits to FIU from April through September 2025. During the visits, seven accidental discharge files were reviewed. The following is a breakdown of the incidents during the reporting period:

- In two instances (29%) the officer sustained an injury
- In four instances (57%) the officers were off duty
- In three instances (43%) the officers were on duty
- In five instances (71%) the officer carried the weapon without a holster
- All completed investigations have been referred to SARP for an administrative investigation.

The issue of accidental or negligent discharges has been a reoccurring problem identified in previous CMRs. While PRP has taken appropriate actions in these cases it does not appear that it has identified the underlying issues that contribute to the problem, such as training in the securing of authorized weapons. It should be noted that PRP has adopted the Monitor's Office recommendation and is now analyzing the data of negligent discharges for the purpose of identifying possible courses of action. The Monitor's Office also verified with SARP that officers found to have violated Bureau policy as it relates to negligent discharges are receiving a 40-day suspension.

## Closed FIU Investigations

To review cases closed by FIU, the Monitor's Office requested a random sample of 39 (21 mid-period and 18 end period) cases closed by FIU during the reporting period for the purpose of assessing FIU's compliance with the Agreement and PRP policies related to conducting investigations. It should be noted that the Monitor's Office received a certification during the mid-period review that four cases were still identified as open investigations and were not sent. Two other files (case #2025:01-282:002540 and #2025:03-758:006208) were not provided and were replaced by two not selected in the random sample (case #2025-12-027-001225 and #2025-11-038-00357).

During the end period review three cases were requested and not provided (case #2025:01-462:003664, #2025:07-026:004372, and #2025:03-079:006444).

The following are general observations of the cases reviewed:

- PRP is closing all investigations within 60 calendar days as outlined in policy.

61

- FIU continues to show significant improvement in how it conducts its investigations. FIU investigators made numerous efforts to locate cameras in the area and possible witnesses. In addition, sketches were provided on all firearm discharges.
- Accidental discharges are no longer categorized as a UOF by PRP once investigated.
- All FIU UOF reviews and investigations reached reasonably justified conclusions on the officer's conduct in accordance with policy.
- All but one intentional firearm discharge (Level 4) investigation (6%) reviewed by the Monitor's Office were found to be within PRP policy and all required documents were in the files. In one incident (case #2025:01-262:001824) two officers who discharged their weapons at a fleeing vehicle were not within Bureau policy.
- It should be noted that when FIU arrives at a UOF scene that has possible criminal conduct, it does a quick referral to PRDOJ NIE. FIU then conducts a preliminary analysis to proceed with the eventual administrative investigation of the case. An administrative referral is sent directly to SARP to then proceed according to their corresponding procedures. Nonetheless, SARP may wait for PRDOJ to conclude their criminal investigation before they undertake the administrative one.

FIU has made considerable progress in closing cases in the time outlined in the Agreement. The Monitor's Office is encouraged by the efforts of FIU in this regard.

## CFRB Investigations

As it relates to CFRB meetings, many of the cases evaluated by the Board involve serious UOFs. PRP needs to outline the protocol as to how these meetings should be conducted. As previously stated, the Monitor's Office recommends that each CFRB member be fully versed in the details of the incident prior to the board meeting. This will allow for healthy discussion between members. To that end, all CFRB members now have access to FIU investigation files which have been digitized for review purposes. PRP has now provided a designated space, with multiple computers, for the CFRB members to meet and an agent to serve as a clerk for the Board. This has resulted in an improved level of efficiency.

In addition, as previously stated in CMRs, when evaluating cases involving firearm discharges or other force which rises to level 4, FIU representatives should be present or at least available to the Board at the time of the evaluation review.

An area of concern relating to FIU involves the investigation of UOFs by members of the Bureau above the rank of sergeant, which by policy, requires FIU to conduct the investigation. In past CMRs it was stated that the lack of supervisors, specifically sergeants in the field, required lieutenants, to some degree, to carry out the functions of a sergeant, one of which is assisting officers affecting arrests, and in doing so in some instances using lower levels of force. To some extent this has been addressed with the promotion of over 560 sergeants over the course of 2 years. However, the Monitor's Office still recommends that supervisors of a higher rank from the respective area commands investigate lower levels of force by supervisors from the rank of lieutenant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRP Members).

During the reporting period FIU investigated 14 cases (26%) where supervisors above the rank of sergeant used lower levels of force to affect an arrest.

*Pathway Forward*

PRP must ensure that FIU receives prompt notification in cases they will need to investigate. For the most part, this was the case. PRP must also ensure that FIU has adequate personnel to conduct its investigations and that all personnel have completed all necessary training to meet timelines relating to investigating serious UOFs.

FIU has limited personnel to respond and investigate serious force by PRP members throughout the Bureau. A possible option would be, as previously stated, that PRP allow supervisors of a higher rank from the respective area commands to investigate lower levels of force by supervisors from the rank of lieutenant through captain. This would require a change to GO 605 (Reporting and Investigating UOF by PRP Members).

The CFRB must complete its reviews within the time allotted in GO 502 (Evaluation Boards of Incidents of UOF) and document said reviews. Previously, the Monitor's Office recommended having either the FIU Commanding Officer or the FIU Executive Officer attend all CFRB meetings for the purpose of presenting the case to the Board and to answer any questions regarding the cases to be discussed. It is the Monitor's Office's understanding that PRP in some instances follows this process.

It should be noted that the Parties have agreed to develop a compliance measure that is tailored to the specific requirements of Paragraph 49 as part of the compliance plan filed with the court in November 2023. This is intended to ensure that this paragraph is assessed properly.

## Paragraph 50: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

In all cases where FIU determined that the UOF may involve criminal conduct by an officer, PRDOJ was notified along with its investigative arm, NIE. The Monitor's Office confirmed through a review of FIU data that there were no referrals during this reporting period.

### Paragraph 51: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

PRP reported that FIU opened 61 UOF investigations during the reporting period, and of those cases, all that were required to be closed in 60 calendar days were closed. The Monitor's Office can assess that FIU is currently in compliance with this paragraph; however, it should be noted PRP must continue this effort moving forward.

In January 2024, the Parties met with the Monitor's Office to discuss the timeline discrepancy. During the meeting it was agreed upon by the Parties that the 45-day timeline would be amended to 60 days. Subsequently the Parties have agreed to the modification and the methodology changed to reflect same.

In further discussions with FIU, investigators noted that in the past the root cause for failing to complete the investigation in the allotted time was delays in receiving the results of forensic and evidentiary material, such as video, photographs, and other evidence recovered at the scene of serious UOFs in a timely manner. This is the information FIU needs to make its determination. In many of these cases, FIU must rely on other PRP units and DSP to complete their tasks before the investigation can be closed. One major step taken is that FIU investigators now have access to photographic evidence in digital files and no longer must wait to receive the videos and pictures to complete their investigation. This has aided PRP in completing their investigations within policy.

Once an investigation is complete, FIU does prepare the required report for CFRB's review, analysis, and evaluation of the force.

*Pathway Forward*

PRP should ensure that all FIU investigations are completed in 60 days, as agreed upon by the Parties and that FIU has adequate staff and resources to complete these investigations.

## Paragraph 52: Use of Force - FIU Investigations and Force Reviews by SFRB

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

CFRB members have been trained on GO 502 (Force Review Board). The Monitor's Office was informed and provided documentation that the curriculum for training was developed and the training commenced in March 2024. The Monitor's Office requested the training certification records of the four CFRB members, as well as any other person who may have served on the CFRB during the reporting period to determine whether CFRB members are qualified to serve on the Board as outlined in GO 502 (Evaluation Boards of UOF Incidents). PRP provided the Monitor's Office with personnel documentation verifying that the four members of the CFRB were trained.

PRP provided the Monitor's Office with documentation that FIU opened 61 investigations during the reporting period, and 107 cases were forwarded to CFRB for evaluation, including cases from a previous period.

During the reporting period the Monitor's Office requested and received a random sample of 39 cases evaluated by the Board for review. In the cases evaluated by the CFRB, the Monitor's Office determined that the CFRB reviews were objective evaluations, and that the evaluation was completed within the 30 days as outlined by policy.

The following observations are put forth as a result of the review of these cases:

- In all cases the evaluation of the investigation was objective.
- In all cases a review of documentation by the Monitor's Office determined cases were evaluated within timeline as outlined in policy.
- There was no instance where re-training was directed.
- None were returned due to incomplete information.
- In seven cases it was determined by the Board that the force was not consistent with policy and the case was referred to SARP (18%).

The Monitor's Office has worked with PRP to ensure that the CFRB meets the requirements outlined in GO 502 and to that end, PRP has made significant progress. The Monitor's Office understands the complexity of cases evaluated by the CFRB and therefore recommends that while it is important to comply with the timelines, it is also important not to sacrifice review quality. The Monitor's Office has received documentation that the CFRB is submitting completed evaluations to SARP for tracking and analysis.

*Pathway Forward*

Previous issues with the timeliness of these evaluations appear to be resolved. It is imperative that PRP and CFRB members commit to completing these evaluations in the timelines established in policy. PRP should also ensure that all officers serving on the CFRB have training certifications. The Monitor's Office will continue to review the training curriculum developed, and the training provided.

## 8. Use of Force Training

The Monitor's Office finds that PRP is in substantial compliance with the Agreement's UOF training requirements. PRP's training curricula remain consistent with both policy and the Agreement, and documentation provided by PRP demonstrates that training delivery is meeting the required compliance thresholds.

In particular, PRP continues to meet the 95% compliance standard for its mandatory 40-hour in-service training program. However, PRP has not maintained the same level of consistency with other specialized training requirements—such as crowd control and response to persons in crisis—which require regular refresher training. The Monitor's Office understands that PRP plans to provide both trainings to all sworn members during the next reporting period. In addition, the work of the CFRB plays a pivotal role in identifying the training needs of FIU as they evaluate all FIU investigations and are in the best position to uncover training deficiencies.

The Monitor's Office will continue to monitor PRP's progress to ensure that all required training and re-training are delivered in accordance with the Agreement and that all officers maintain the skills necessary to respond safely and effectively in the field.

## Paragraph 53: Use of Force - Use of Force Training

*PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:*

*a) legal standards for reasonable force;*

*b) PRPD's use of force policy;*

*c) reporting use of force, requesting medical service, and preserving evidence;*

*d) scenario-based training and interactive exercises that illustrate proper use of force decision-making;*

*e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;*

*f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning*

*reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

*g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;*

*h) factors to consider in initiating or continuing a foot pursuit; and*

*i) appropriate training on conflict management.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |

### Compliance Assessment

PRP recently updated all UOF policies and, as a result, developed new UOF training curriculums on these policies. The Monitor's Office's previous review of related training on UOF was found to be consistent with the approved policies and requirements of the paragraph. After reviewing a random sample of personnel training records, the Monitor's Office determined that PRP has met the 95% compliance threshold for re-training its officers on all relevant UOF policies. According to documentation provided

by PRP relating to in-service training, the Bureau is on pace to achieve 95% by the end of March 2026. The Agreement states that PRP must re-train it's officers every year; however, 2025 training was extended by three months.

*Pathway Forward*

The Monitor's Office will review the updated UOF training curriculums and ensure continued compliance with this paragraph. The UOF training, specifically the UOF policy, legal standards for UOF, force reporting, preserving evidence, and requesting medical attention, among others, should also be incorporated into in-person scenario-based training to ensure that officers understand the policy requirements and the practical application of such procedures.

## Paragraph 54: Use of Force - Use of Force Training

*PRPD shall provide an appropriate firearm training program that:*

*a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis;*

*b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms;*

*c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program;*

*d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and*

*e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | ☑ Met  ☐ Missed |
| 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | ☑ Met  ☐ Missed |

68

*Compliance Assessment*

The Monitor's Office found that PRP's firearm qualifications policies incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the prior reporting period.

PRP is required to conduct firearms training and qualifications for all sworn members with Bureau issued firearms in both day and reduced light fire every 12 months. To determine compliance with firearms training and qualifications, the Monitor's Office requested data relating to yearly firearms training and qualifications and found that PRP continues the day and reduced light fire training. As of this reporting period, 4,277 officers were trained on reduced light and 4,060 were trained in day fire.

The Monitor's Office selected a random sample of 115 officers from the list of those qualified (reduced light and day fire) and requested their certified training records to verify that officers were qualified with their service weapons for this reporting period. A review of the training files and additional documentation confirmed that except for three officers who failed to qualify (3%), all officers were qualified. The three agents who failed the reduced light qualification after being provided numerous re-training sessions with certified firearms instructors were still unable to pass. PRP provided documentation that the three officers were disarmed (both service and personal) and referred to the Superintendent's Office for disciplinary referral.

If PRP continues conducting training in this manner it can expect to continue to meet compliance with the 12-month training requirement.

*Pathway Forward*

PRP needs to continue to qualify all sworn personnel on both day and reduced light fire within a 12-month period and must maintain records of this training in its Global Report. Further, the Monitor's Office stresses the importance of scheduling the training so that both segments are completed during a 12-month period to ensure that all officers are qualified.

## Paragraph 55: Use of Force - Use of Force Training

*PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:*

*a) requesting medical services and determining the appropriate use of force reporting levels;*

*b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;*

*c) ensuring proper collection of evidence;*

*d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;*

*e) assessing the legality and appropriateness of a detention and subsequent arrest;*

*f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative*

*accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;*

*g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and*

*h) report writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | ☑ Met  ☐ Missed |
| 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | ☑ Met  ☐ Missed |

*Compliance Assessment*

The Monitor's Office verified that 95% of supervisors, FIU personnel, and command personnel have been trained on the relevant courses (REA 601 Rules for UOF and REA 605 Report and Investigation of UOF) within the last year as required by the Agreement.

All FIU personnel have completed advanced training related to investigating intentional firearm discharges (Level 4 UOF). The FIU Commanding Officer informed the Monitor's Office that given the influx of new personnel into FIU, all members were trained on an advanced training course currently provided to CIC personnel. This additional training was in response to the Monitor's Office's previous CMRs and recommendations, which identified significant deficiencies in FIU's firearm discharge investigations (Level 4 UOFs).

*Pathway Forward*

Given the nature of the important work conducted by FIU, it is imperative that they receive all the required training and that this training is periodically updated as needed. The work of the CFRB plays a pivotal role in identifying the training needs of FIU as they evaluate all FIU investigations and are in the best position to uncover training deficiencies. The Monitor's Office will continue to assess training compliance with target two through random training record reviews.

## 9. Responding to Behavioral/Mental Health Crisis

As stated in previous CMRs, it is critically important to have CIT trained officers throughout the 13 area commands. One of the main challenges to achieving this goal was that the 40-hour CIT certification training was initially offered only at the Academy. This created barriers for officers from outlying areas, many of whom faced commutes of up to two hours each way. PRP has largely overcome this challenge. There are now 294 certified CIT officers Bureau-wide, of which 272 (93%) are actively assigned to patrol functions across the 13 area commands. The remaining 22 officers (7%) serve in specialized or support units and are available to assist as needed. However, PRP needs to develop an in-person scenario-based course specific to dispatchers that all dispatchers receive regarding routing crisis calls to on-duty CIT officers.

During the June and August 2025 site visits the Monitor's Office met with the Bureau-wide CIT Coordinator—an inspector with a doctoral degree in psychology and extensive experience in crisis intervention—who reported continued expansion and stability of the program, including:

- All area commands now have CIT officers available on all shifts, ensuring 24/7 coverage. When needed, area commands supplement this coverage using CIT-trained officers from specialized units such as Transit, Drugs, or Hostage Negotiation. Current staffing levels in the 13 area commands are as follows:
  - Aguadilla – 18
  - Aibonito – 24
  - Arecibo – 16
  - Bayamón – 22
  - Caguas – 19
  - Carolina – 25
  - Fajardo – 15
  - Guayama – 20
  - Humacao – 19
  - Mayagüez – 28
  - Ponce – 17
  - San Juan – 32
  - Utuado – 17

The presence of CIT-trained officers across all area commands has strengthened PRP's ability to respond effectively to individuals in crisis, including those subject to "Ley 408" (court-ordered involuntary commitment). PRP currently uses forms PPR 628.1 (Crisis Intervention Incident Report) and PPR 621.2 (Other Information) to identify and document interactions involving individuals in crisis. The Monitor's Office emphasizes the need for PRP to ensure that PPR 628.1 reports are completed in all such incidents.

To improve data tracking, AH Datalytics, the Commonwealth's contractor, has developed a dashboard that identifies interactions with persons in crisis and verifies whether a Crisis Intervention Incident Report (PPR 628.1) and a corresponding UOF report—if applicable—were completed. The dashboard, which updates daily, provides the Reform Office with 24/7 access to data broken down by area command, zone, precinct, and district.

71

PRP must also ensure that all PPR 621.2 (Other Information) reports not associated with a UOF or Ley 408 case are captured in the system and reviewed to determine whether the individual involved was a person in crisis. This has been an ongoing topic of discussion between the Monitor's Office, USDOJ, PRP, and AH Datalytics, the Commonwealth's contractor.

## Paragraph 56: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:*

*a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.*

*b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.*

*c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4.  Training on crisis intervention for CIT officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | ☑ Met | ☐ Missed |
| 6. 100% of all officers assigned to CIT meet eligibility requirements. | ☑ Met | ☐ Missed |
| 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | ☐ Met | ☑ Missed |
| 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the CIT policies and trainings and found that they meet the requirements of the Agreement. PRP has also provided the Monitor's Office with a presentation on virtual dispatcher training developed by the Bureau that was provided to dispatchers; however, this training will not replace the in-person/scenario-based training that dispatchers need to receive. The dispatching of officers to a call involving a person in crisis can be a life and death situation. It is imperative that dispatchers handling these calls are properly trained. That can only happen in an in-person scenario-based environment. Once dispatchers complete this scenario-based in-person training their re-training as required by policy can be virtual.

Approximately 300 dispatchers will be trained on this course when it is available. This will be the initial training, and subsequent trainings will be conducted in person as outlined above.

PRP along with the Monitor's Office understands that establishing CIT teams is vital. The officers selected to be certified as CIT officers (40 hours of training) continue in their normal capacity as patrol officers. PRP now has 272 officers trained and certified as CIT officers throughout the 13 area commands and an additional 22 in specialized units (verified via training records).

During previous reporting periods, USDOJ and the Monitor's Office observed a portion of the REA 628 (CIT) training. The Monitor's Office found the training to be dynamic, knowledge-based, and employed several adult learning techniques, including participation through questions and exercises. While the training has a strong foundation, USDOJ and the Monitor's Office provided some recommendations to further strengthen the training, such as incorporating more experience and scenarios from Puerto Rico and providing attendees with hard copies of the PowerPoint presentation for note taking.

PRP provided documentation that no training of officers on the basic "Intervention with Persons in Crisis" course took place during this reporting period. The Academy similarly reports that all PRP officers have not yet received the eight-hour basic CIT training. As noted in various sections of this CMR, virtual training was halted when issues relating to the integrity of the training were brought forth. However, PRP has now developed a new virtual training course for its sworn members which the Monitor's Office has approved. PRP officers are now slated to receive training on "persons in crisis" in their mandatory 40-hour training in the upcoming reporting period.

During the previous reporting period the Monitor's Office reviewed GO 628 (Crisis Intervention) and its related forms and annexes. The review of the order itself was a re-review of the policy. The review of PPR 628.1 (Crisis Intervention Incident Report) is a result of a PRP modifications to the report. A newly created form PPR 628.2 (Post Intervention Analysis) was also reviewed.

In reviewing the GO, the Monitor's Office observed that PRP, through a policy modification, had changed their position which originally required an officer to prepare a PPR 628.1 when handling a call for a person who is the subject of a Court Ordered Involuntary Commitment (Ley 408) regardless of if the subject was in crisis or not. The Monitor's Office agrees with this change as this new process should provide a more accurate number for PRP relating to persons in crisis.

73

The Monitor's Office has confirmed that all officers currently in a CIT role are trained and re-trained in CIT as required and meet eligibility requirements. To date PRP has provided training records for Academy Classes 227 through 234, verifying that they have successfully completed CIT training; however, the training provided does not meet the requirements necessary to become a certified CIT officer and PRP does not designate them as CIT officers.

For this reporting period, PRP reported 589 cases of interactions with persons in crisis. Of that number 140 (24%) were handled by CIT certified officers, which is below the 95% threshold. A random sample of 55 cases (9%) was selected by the Monitor's Office for review. The source of data for documenting PRP's interactions with persons in crisis consisted of PPR 628.1 (Crisis Intervention Incident Report). As a result of this case review, the Monitor's Office makes the observations below:

- 35 cases (64%) involved Ley 408 (Court Ordered Involuntary Psychiatric Examination).
- In the 55 cases reviewed only 12 (22%) were handled by certified CIT officers.
- In 9 cases (16%) officers used force to subdue the subject. Five involved Level 1 UOFs (56%), two involved level 2 UOFs (22%), and 2 involved level 3 UOFs (22%; one taser application and one pointing of a firearm). This is a significant reduction in force used as compared to previous CMRs. UOF in incidents involving persons in crisis continues to trend downward. PRP should analyze the appropriate data for the purpose of determining the reason for the UOF reduction.
- In 22 cases (50%) the notification of a person in crisis involved Centro Mando.
- In 29 cases (53%) the notification of a person in crisis involved Retenes (Desk Officers).
- In 3 cases (5%) the origin of the call was not indicated.
- Since many notifications of a person in crisis originate through field commands, PRP should consider adding a section to GO 628 (Interventions with Persons in Crisis) that outlines the information that should be obtained before officers are sent on a" person in crisis" call. In addition, this information should be added to the curriculum of the eight-hour course.

*Pathway Forward*

The Monitor's Office looks forward to working with PRP as it expands the number of CIT officers throughout the Bureau.

On this point, the only training currently available to dispatchers is the virtual course provided to personnel. PRP needs to demonstrate it has developed in-person, scenario-based training specific to dispatchers and begin training on the course. It should be tailored specifically to dispatchers regarding how to handle and route crisis calls to on duty CIT officers.

## Paragraph 57: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2025 – September 2025 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. 95% of shifts have at least one CIT-trained and certified officer. | ☑ Met | ☐ Missed |
| 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Training on the CIT program for field operations officers is evaluated as part of the basic behavioral health training in Paragraph 56.

## Compliance Assessment

PRP has implemented a CIT program in all areas. The training for CIT officers took place at the Academy. Officers were required to pass a written exam at which point they could proceed to the scenario-based training segment. The course, Intervention Team in Crisis (CITE 8061), consists of 40 hours of training. PRP provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office. To date, 294 officers have been trained and certified.

PRP has also selected CIT coordinators in all area commands who are currently identifying prospective CIT officers. In addition, a Bureau-wide coordinator has been named. PRP has provided the Monitor's Office with the rating form that PRP uses for prospective candidates to the program. The PRP Superintendent has issued several job postings for uniform agents from the precincts and districts of the 13 police areas who may be interested in becoming a CIT officer. The job postings provided a job description, eligibility requirements, training description, and application instructions. PRP continues to interview officers for the position.

The Monitor's Office is encouraged by the progress PRP has made in establishing a CIT program in all area commands. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner was difficult initially, given that support services may not have been available in the early stage in some areas. However, the presence of CIT trained officers Bureau-wide will enhance PRP's ability to handle calls for service involving persons in crisis, especially those related to Ley 408.

Previously, PRP provided training to field personnel and dispatchers related to CIT; however, the training for dispatchers has now been tailored to their specific roles and responsibilities. This training is more in-line with the daily responsibilities of a dispatcher, including how to collect the appropriate information from the caller to provide to the responding officer. PRP will now need to develop an in-person, scenario-based training course for its dispatchers and subsequently train its dispatchers before it is considered in complete accordance with the Agreement.

75

*Pathway Forward*

The Monitor's Office is aware that PRP is in the process of reinstating its training and will resume the virtual eight-hour basic CIT training course for all sworn members.

The Monitor's Office expects PRP to continue adding to the CIT program Bureau-wide. The training of officers to handle individuals with mental health issues is of paramount importance. Having a trained officer to deal with people in crisis can help minimize those incidents that can escalate into confrontations in which PRP members may be required to use force.

The Monitor's Office expects to see significant progress in the training of PRP personnel in crisis intervention as the CIT program adds more personnel. PRP needs to develop an in-person scenario-based course specific to dispatchers regarding routing crisis calls to on-duty CIT officers. All dispatchers should receive this training. In addition, PRP should also consider adding an additional section to GO 628 (Intervention with People in Crisis) identifying information that should be obtained and provided to officers before sending them to Ley 408 calls. Often officers assigned to the position of Reten (precinct/district desk officer) are approached by family members of subjects of Ley 408 Orders requesting that officers carry out the involuntary commitment order.

## III. Searches and Seizures: Internal Controls and Accountability

An analysis of data indicates that PRP continues to demonstrate steady improvement across several key areas. These include proper documentation of probable cause (PC), accurate reporting of arrests and searches in accordance with policy, and consistent supervisory evaluations of arrest reports. In-service training remains on schedule, with 100% participation achieved for the reporting period. The 2025 in-service training cycle is also progressing as planned and is expected to be completed by March 2026.

Despite these advancements, several paragraphs of the Agreement (including Paragraphs 60–64) remain partially compliant or deferred until the full implementation of the RMS and Benchmark Analytics, anticipated in 2026. These systems are essential not only to achieving compliance within this section but also to meeting the data collection, analysis, and reporting requirements outlined in Paragraph 243. Paragraphs 58 and 59 are similarly dependent on the deployment of these systems to move toward full compliance.

PRP has made progress in implementing the new GTE module, which now requires officers to record mileage when transporting arrestees (Paragraph 67). Supervisors are also responding to arrest scenes in a timely manner (Paragraph 66), while arrest reports and related forms are being properly completed (Paragraph 65). Additionally, feedback committees continue to collaborate with judicial system stakeholders to address issues such as court attendance and officer professionalism (Paragraph 73). Improvements have also been observed in the proper completion of consent forms (Paragraph 77).

However, ongoing challenges remain in certain areas. Issues related to the recording and storage of seized property, as well as the absence of a search warrant tracking system, continue to affect compliance with Paragraphs 72, 74, 75, and 76. In addition, a small number of arrest and search files still lack required documentation, which hinders overall compliance. To address these gaps, PRP should ensure that all final arrest and search files undergo comprehensive review and auditing before submission to the Monitor's Office to confirm that all required forms are accurately completed and included.

The forthcoming implementation of the RMS and Benchmark Analytics' systems is expected to significantly strengthen PRP's data management, oversight, and reporting capabilities, positioning the Bureau to achieve higher levels of compliance in future reporting periods.

Overall, the Commonwealth's compliance with the 22 paragraphs assessed during this reporting period within Searches and Seizures reflects similar levels in compliance to what was noted in previous CMRs. In CMR-11, 14% of paragraphs (3 paragraphs) were assessed as not compliant and 59% (13 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 5% of paragraphs (1 paragraph) was found to be not compliant and 68% of paragraphs (15 paragraphs) were found to be partially compliant. One paragraph moved to fully compliant (5%). See figure 4.



*Figure 4. Searches and Seizures: Paragraph Compliance Status*

## Paragraph 58: Searches and Seizures - General Provisions

*PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

Investigatory stops in Puerto Rico are only permitted for traffic violations with PC. The Agreement mandates that all stops and searches, whether they result in arrest or citation, be tracked, recorded, reviewed, and analyzed under Paragraph 243. PRP is developing automated systems for this purpose, which are expected to be fully operational by mid-2026.

Following the 2024 in-service training on GOs 612 (Searches and Seizures) and 615 (Arrests and Citations), as well as viewing a video regarding articulating probable cause, PRP officers have

documented probable cause with greater detail. Analysis during this reporting period found officers documented probable cause in 64 of 69 arrests, for a 93% compliance rate.

PRP monitors officer engagement with the PC video through the Info Access module, with 9,563 out of 10,495 officers (91%) having viewed it as of March 2025, as reported in PRP's March 2025 Self-Assessment Report. At present, PRP continues its in-service training schedule, which began in the latter part of 2025.

The Monitor's Office received two operational plans from PRP addressing proactive policing for the Arecibo and Manati command areas. Although organized, these plans did not show clear alignment with community priorities. The Monitor's Office noticed in its analysis of arrest and search data that PRP conducts periodic police operations to address crime and quality of life issues, but these operations do not include a clear connection to community input. PRP should submit supporting materials from groups such as Community Interaction Committees (CICs) and local community group meeting notes along with the outcomes of such operations.

*Pathway Forward*

Strict adherence to training schedule and accountability will help PRP improve and maintain compliance with this paragraph. PRP must also provide further documentary evidence that the Bureau is seeking input to address community needs when it conducts operations to impact criminal activity or quality of life issues in neighborhoods. Documentary evidence can include, among others, copies of notes of residents describing their concerns and/or requesting police service for certain areas taken during community meetings and the police response to these requests/concerns. The creation of a graphical dashboards and scorecards (GTE and CAD modules) to track, collect, record, and analyze geographic and demographic stop data points will greatly help PRP comply with this and Paragraph 243 of the Agreement, as well as others in this section.

## 1. Stops, Searches, and Seizures

Consistent adherence to the training schedule and a strong sense of accountability will enhance PRP's ability to achieve and sustain compliance with this paragraph. Additionally, PRP is required to submit further documentary evidence demonstrating that the Bureau actively seeks community input when conducting operations related to criminal activity or quality of life concerns in neighborhoods. Such evidence may include, for example, copies of residents' notes expressing concerns or requesting police services during community meetings, as well as documentation of the police response to those requests or concerns. The development of graphical dashboards and scorecards (GTE and CAD modules) to systematically track, collect, document, and analyze geographic and demographic stop data will significantly support PRP's compliance with this provision, Paragraph 243 of the Agreement, and other related sections.

### Paragraph 59: Searches and Seizures - General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on stops, searches, and arrests; provide training; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy. PRPD policies shall define all terms*

*clearly and provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop, detention, or search.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Implementation is assessed as part of the compliance reviews for Sections B (Paragraphs 60-64), C (Paragraphs 65-73), and D (Paragraphs 74-77) on Investigatory Stops and Searches, Arrests, and Searches, respectively.

Note: The policy requirements of this paragraph is assessed with Paragraphs 65, 72, 74, and 78.

Note: Training is assessed as part of Section E (Paragraphs 78-79) on Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRP policies regarding search, seizure, and arrests are undergoing biennial revision and await the implementation of the Search and Seizure Implementation Plan. The current policies address legal and procedural aspects related to arrests, detentions, and searches. In-service training on these policies was completed by all officers in 2024, and targets have been set for completion of the 2025 in-service training. This training included an instructional video on properly articulating probable cause, which was reviewed by the Monitor's Office and determined to be effective.

Consequently, PRP officers have demonstrated significant progress in articulating PC within their reports. Analysis of the data indicates that 64 out of 69 eligible arrest reports (93%) accurately documented probable cause. However, Paragraph 65 requires 95% compliance with this and other areas of the arrest process. Additionally, other paragraphs, such as 60 to 64, directly affect this paragraph and are deferred pending implementation of IT systems and modules.

*Pathway Forward*

Regular and on-time policy review, training, and implementation are necessary for compliance. PRP has fallen behind on timely policy review and implementation – see the Policies and Procedures section for additional information. PRP conducted in-service training for all officers during 2024 and is scheduled to complete its 2025 in-service training by March 2026, meaning that PRP is not currently in compliance with the training components. Additionally, PRP is responsible for evaluating supervisors if officers submit arrest reports and forms that are not properly completed. Although there has been progress in this area, a few arrest and search files were rated non-compliant due to forms being incomplete or

missing. PRP has also not demonstrated to the Monitor's Office that supervisors are evaluated on this performance area.

## 2. Investigatory Stops and Searches

PRP officers have improved the documentation of PC during stops and searches, resulting in clearer and more detailed reporting and a noticeable reduction in repetitive language. These advancements reflect the positive impact of the in-service training provided to all personnel during the previous year.  PRP is now progressing to the next phase of training to further strengthen officer performance and consistency in documentation practices.

PRP also reported the development of automated systems to support the collection and analysis of demographic and geographic data as of July 2025. However, these systems have not yet been fully implemented. As a result, Paragraphs 60–64 will remain deferred until the Monitor's Office verifies the full implementation and functionality of these systems and confirms the accuracy of data collected through the new RMS once operational.

### Paragraph 60: Searches and Seizures - Investigatory Stops and Searches

*PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

#### *Compliance Targets*

| | |
|---|---|
| 1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. | ☐ Met   ☐ Missed |

81

| | | | |
|---|---|---|---|
| 2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. | | ☐ Met   ☐ Missed | |

Note: PRPB has not authorized investigatory or Terry stops based on reasonable suspicion. For Paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause.

### Compliance Assessment

GO 612 (Searches and Seizures) addresses investigatory stops in general terms (traffic stops based on probable cause).[3] It also addresses the issue of collecting and tracking investigatory stop data, as required by the Agreement.[4]

PRP conducts traffic stops based on PC, but presently only records those resulting in arrest or citation. Automated tracking modules are in development to record and analyze pertinent demographic and geographic data on all stops with a pilot phase beginning in July 2025, as reported by PRP.

Among the randomly selected arrest files, 14 arrests were a result of traffic stops conducted by PRP Highway Patrol Units. All 14 files documented clear PC. While documentation of PC during investigatory stops has been noted, this paragraph will remain deferred until systems are available to collect and analyze geographic and demographic data related to these situations.

### Pathway Forward

This paragraph is deferred until dashboards and scorecards for tracking investigatory stops, including traffic stops leading to arrests or citations, are fully implemented per Paragraph 243 of the Agreement. This ensures that the data can be validated to ensure reliability. A public report must also be submitted to the Monitor's Office for review. Deferral continues until these requirements are met and compliance assessments can occur, as with all paragraphs under Paragraph 60.

### Paragraph 61: Searches and Seizures - Investigatory Stops and Searches

*PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

---

[3] Section III.B.18. and 19.
[4] Section V.B.

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

PRP officers are prohibited from using boilerplate or false information per GO 615 (Arrests and Citations). In 93% of arrest cases (64 of 69), officers clearly stated PC, avoiding boilerplate, repetitive, or conclusory language. Recent re-training, including a video on PC, has helped improve this. This section is deferred until PRP fully implements automated systems to monitor investigatory stops and searches.

*Pathway Forward*

Although GO 615 provides thorough guidance for officers during arrest situations, this paragraph remains deferred for assessment with Paragraph 60 until PRP fully implements proper dashboards and graphical scorecards for collecting, tracking, and analyzing all investigatory stops and searches.

## Paragraph 62: Searches and Seizures - Investigatory Stops and Searches

*A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

All investigatory stops and searches by PRP officers must be based on PC per policy. GO 615 (Arrests and Citations) requires that all investigative stops whether resulting in an arrest or citation be based on PC and the Agreement requires that all such stops be documented and collected with specific demographic

and geographic data for proper analysis and reporting. PRP has created but not yet fully implemented the necessary automated systems to address this issue.

There were 14 random samples of investigatory stops (traffic stops) and searches conducted by officers and analyzed by the Monitor's Office for this reporting period. All 14 showed that officers properly established PC prior to arrest and were reviewed by supervisors, who concluded that no corrective action was warranted in any instance.

However, this paragraph will remain deferred until automated systems are fully implemented as per Paragraph 60.

### Pathway Forward

The full implementation of systems to document and analyze investigatory stops and searches, including traffic stops that do not result in arrest or citation, will undoubtedly help PRP improve compliance. Supervisors are expected to monitor situations where officers may lackPC for an arrest and provide guidance or corrective action as necessary.

### Paragraph 63: Searches and Seizures - Investigatory Stops and Searches

*A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 60.

### Compliance Assessment

Command-level officers reviewed all 14 eligible investigative stops in the randomly selected arrest and search files. Seven reviews met the 3-day deadline, while 7 were late or not done at all.[5] No violations were reported by commanders.

---

[5] See complaint #'s 2025:1-199:002437 and 2025:4-199:000577.

At present, only stops resulting in arrests are documented, which does not allow command-level officers to assess stops that do not lead to arrests or citations. PRP has established systems intended to record all investigative stops; however, these systems are not yet fully in place. Therefore, this paragraph will remain deferred until further implementation.

*Pathway Forward*

Supervisors and commanders must review all stop and detention reports in a timely manner, including traffic stops resulting in arrest, no arrest, or citation. Key demographic and geographic data must be collected for analysis to comply with Paragraph 243 of the Agreement's Outcome Assessments.

### Paragraph 64: Searches and Seizures - Investigatory Stops and Searches

*At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

Paragraph 243 of the Agreement requires that all investigative stops and searches be tracked, recorded, reviewed, and analyzed. Graphical dashboards and scorecards for the collection and analysis of this data have been created but not fully implemented. For this reason, this paragraph will remain deferred.

*Pathway Forward*

PRP will improve compliance in this section once full implementation of automated systems are in place enabling the required data collection and analysis of all investigative stops per this paragraph and Paragraph 243, and the data is validated by the Monitor's Office. Additionally, a timely, published findings report is required for compliance.

## 3. Arrests

Most officers now prepare accurate arrest reports, likely reflecting the positive impact of recent in-service training on arrests and searches. However, some arrest files still continue to show deficiencies, including missing or incomplete forms.

Additionally, limited storage capacity, inadequate or unsuitable equipment, and insufficient ventilation in evidence rooms across the island pose considerable challenges. These conditions may compromise the integrity or quality of evidence, which could in turn affect the outcomes of criminal investigations.

### Paragraph 65: Searches and Seizures - Arrests

*PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. April 2025 – September 2025 for Compliance Targets 2 – 5. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 65-71. | ☒ Met ☐ Missed |
| 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | ☐ Met ☒ Missed |
| 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | ☐ Met ☒ Missed |
| 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | ☐ Met ☒ Missed |
| 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met ☒ Missed |
| 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met ☒ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

GO 615 (Arrests and Citations) conforms to generally accepted policing practices and complies with the Agreement. This policy was last revised and approved in October 2022 and is in the review process as of this CMR, pending the implementation of PRP's Search and Seizure Implementation Plan.

The Monitor's Office reviewed 96 eligible arrest and search files for supervisory and unit commander review form PPR 615.8. Of these, 84 (88%) passed supervisory and unit commander review and 12 did not due to poor review (e.g. #2025-13-022-00181 and #2025-06-400-000216) or no review at all (some

were missing several forms, see #2025-11-17-000921, #2025-3-199-000853E, or #2025-01-38-002923). The compliance rate of 88% is below the required 95% threshold.

As of the introduction of the new GTE module in June 2025, it is mandatory for PRP officers to record mileage when transporting arrestees to police facilities, as per policy. In a review of 114 eligible arrest and search files, mileage reporting was omitted in 54 cases, indicating a 47% rate of non-compliance. However, it was evident that the updated GTE module had an obvious impact, as the rate of mileage reporting was higher for those arrests and searches occurring after June 2025. This is expected to vastly improve for the next reporting period.

Upon arrival at police facilities, PRP policy and the Agreement stipulate that supervisors are responsible for inspecting arrestees for any injuries and ensuring medical assistance is provided as necessary. All relevant information must be documented on the PRP booking sheet, PPR 631.1 (Arrested Person Report). An analysis showed that in 86 of 97 eligible arrest and search cases, supervisors adhered to proper inspection protocols, yielding a compliance rate of 89%, which falls short of the mandated 95% threshold. Among the eleven non-compliant cases, some were missing booking sheets (for example, complaint #s 2025-3-199-000853E and 2025-01-382-002923), while others contained booking sheets without documentation regarding the condition of the arrestee (See complaint #s 2025-7-299-001079 and 2025-8-199-001678).

In cases #2025-13-22-001851 and #2025-06-400-00216, officers failed to establish PC, and supervisors did not address this oversight.

*Pathway Forward*

PRP must ensure arrest files include completed booking sheets (PPR 631.1) and that supervisors check and document any arrestee injuries. Supervisors and commanders must address cases where PC for arrest is lacking. Officers and dispatchers should record mileage to and from police facilities as required on the Complaint Card (PPR 126.2).

## Paragraph 66: Searches and Seizures - Arrests

*PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1.

April 2025 – September 2025 for Compliance Targets 2 – 5. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

Supervisors documented their responses to arrest scenes on forms PPR 615.8 or PPR 621.1, either in person, by phone, or via radio. Of 78 eligible arrest and search cases, supervisors responded in 76 instances (97%). They also responded to 14 of 16 resisting arrest/obstruction of justice cases (88%), with only 2 handled by radio and the rest in person. Supervisors responded 97% of the time overall, above the 95% required. However, per the Agreement, supervisors must respond to all cases involving an arrest for resisting and/or obstruction of justice.

As this paragraph is evaluated in conjunction with Paragraph 65, its status will continue to be classified as partially compliant.

### Pathway Forward

PRP is responsible for ensuring that both dispatchers and officers comply with established policy and appropriately complete PPR 126.2 (Complaint Card) whenever a supervisor is notified of an arrest. Additionally, to support the Monitor's Office in assessing compliance, officers must indicate whether the charged offense constitutes a felony or misdemeanor. The Agreement requires supervisors to respond to arrest scenes involving felonies, assault on an officer, and all cases of obstruction of justice or resisting arrest. Supervisors are also tasked with verifying that officers have established PC prior to making an arrest, and with implementing disciplinary measures as necessary.

## Paragraph 67: Searches and Seizures - Arrests

*When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking.*

| Compliance Status | Assessment Schedule | |
| Not Compliant | Review | |

| | | Period | October 2024 – September 2025 for Compliance Target 1.<br><br>April 2025 – September 2025 for Compliance Targets 2 – 5. |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

## Compliance Assessment

Currently, PRP does not have a method to track officers' travel when transporting arrestees. Additionally, in a review of 114 eligible arrest and search files, mileage reporting was omitted in 54 cases, indicating a 47% rate of non-compliance. However, it was evident that the recently updated GTE module had an obvious impact, as the rate of mileage reporting was higher for those arrests and searches occurring after June 2025 when the GTE module was updated. Mileage reporting is expected to vastly improve for the next reporting period.

The Monitor's Office has noticed that often officers are not completing all required arrest forms by the end of their shift as required by the Agreement.[6] Also, 30 arrest and search files were missing at least one form, most commonly PPR 636.1 (Property/Evidence Form). In other cases, the police report, booking sheet, affidavits and search warrant, or motor vehicle inventory forms were also missing.[7] While listening to recorded police audio, the Monitor's Office also heard many officers giving the arrestee's name and age on the air. The Agreement only requires a basic description of the arrestee, such as gender, race, ethnicity, national origin, and apparent age. Officers should avoid airing names of arrestees, unless it is absolutely necessary.

## Pathway Forward

As of June 2025, PRP has implemented a new updated GTE module to improve the recording of mileage during transportation of arrestees to police facilities. The module is intended to help PRP meet compliance requirements. Dispatchers are required to collect and record this information on PPR 126.2 (Complaint Card) according to policy and the Agreement. However, there were still some forms indicating an arrest was made but failed to list the mileage. Supervisors are responsible for ensuring all required details are documented in police arrest reports and related forms, and that these forms are present in the files before final approval. Supervisors should also advise officers that airing the names of arrestees is not necessary.

---

[6] See #2025-8-245-000621.
[7] See #2025-4-049-000780, #2025-11-038-001345, and #2025-1-182-003572.

## Paragraph 68: Searches and Seizures - Arrests

*At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. April 2025 – September 2025 for Compliance Targets 2 – 5. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

### *Compliance Assessment*

Upon arrival at police facilities, PRP policy and the Agreement stipulate that supervisors are responsible for inspecting arrestees for any injuries and ensuring medical assistance is provided as necessary. All relevant information must be documented on the PRP booking sheet, PPR 631.1 (Arrested Person Report). An analysis showed that in 86 of 97 eligible arrest and search cases, supervisors adhered to proper inspection protocols, yielding a compliance rate of 89%, which falls short of the mandated 95% threshold. Among the eleven non-compliant cases, some were missing booking sheets (complaint #s 2025-3-199-000853E and 2025-01-382-002923), while others contained booking sheets without documentation regarding the condition of the arrestee (#s 2025-7-299-001079 and 2025-8-199-001678).

### *Pathway Forward*

As required by this paragraph, for compliance to move forward PRP supervisors must complete the Booking Sheet PPR 631.1 (Arrested Persons Report) for every arrest, inspect arrestees for injuries, and provide medical assistance when needed.

## Paragraph 69: Searches and Seizures - Arrests

*PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.*

*Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. |
| | | | April 2025 – September 2025 for Compliance Targets 2 – 5. |
| Policy: | Implemented | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Training: | N/A | | |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

GO 615 (Arrests and Citations) requires supervisors to personally review and approve warrantless arrests on PPR 615.8. Supervisors documented their response to arrest scenes on forms PPR 615.8 or PPR 621.1, either in person, by phone, or via radio.

Of 65 eligible arrest cases reviewed, supervisors reviewed 64 (98%) with 1 case having no review (2025-4-049-000780). However, 3 of the 64 reviews (5%) were rated poor due to missing pages (2025-4-199-000577 or, poor documentation of PC (2025-06-400-000353). They also responded to and reviewed 14 of 16 resisting arrest/obstruction of justice cases (88%), with only 2 handled by radio and the rest in person. Supervisors responded 97% of the time overall, above the 95% threshold required. However, per the Agreement, supervisors must respond to and review all cases involving an arrest for resisting and/or obstruction of justice. The supervisors reported no issues regarding these arrests.

Supervisors must review arrests and booking recommendations within 12 hours. However, the spreadsheet listing arrests and searches provided by PRP still does not show dates and times of the incident for most files. Therefore, the Monitor's Office is unable to determine with any precision the 12-hour mandatory review period.

In-service training on GOs 612 (Searches and Seizures) and 615 (Arrests and Summons) was completed by all officers in 2024, and targets have been set for the 2025 in-service training period. The training included an instructional video on properly articulating PC, which was reviewed by the Monitor's Office and determined to be effective. Consequently, PRP officers have demonstrated significant progress in articulating PC in their reports. As a direct result of officers properly articulating PC, the Monitor's Office did not find any evidence of boilerplate or conclusory language, inconsistent information, or other indicators that the information in the reports or forms was not authentic or correct.

*Pathway Forward*

To maintain satisfactory compliance levels, supervisors must continue to review all booking recommendations within the 12-hour period required by this paragraph and ensure that all eligible arrests are properly reviewed and documented. PRP must also ensure that districts and units add the time and date of arrest under column F designated for "FECHA DD-MM-AA" of incident on the sampling spreadsheet submitted to the Monitor's Office for review.

## Paragraph 70: Searches and Seizures - Arrests

*As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1.

April 2025 – September 2025 for Compliance Targets 2 – 5. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Of 69 eligible arrest reports, 64 (93%) clearly documented PC; 2 lacked sufficient documentation .[8] The Monitor's Office also rated supervisory reviews for the latter two cases as poor. The supervisors on these cases did not take any apparent corrective action to address these deficiencies.

According to GO 310 (Performance Evaluations) supervisors are required to evaluate the "…quality of elements to establish PC…" The GO also establishes the grade-point score for each category as follows: Excellent - 4 points; Passing - 3 points; Needs Improvement - 2 points; Fail - 1 point; and N/A for Not Applicable. PRP submitted a large number of officer performance evaluations for all ranks for this reporting period. However, the Monitor's Office had no way to link the names on that list with the supervisors on the sample arrest data.

*Pathway Forward*

PRP supervisors are ensuring compliance by reviewing at least 95% of selected arrests. However, no apparent corrective action is being taken when officers document insufficient PC on arrest reports. As

---

[8] See #s 2025-13-022-001851 and 2025-06-400-000216.

required by Paragraph 69, PRP must also ensure that all warrantless arrests are thoroughly reviewed and that all relevant arrest forms are completed and included in the files. Appropriate disciplinary action should be taken when non-compliance is identified. Any supervisor who fails to address deficiencies in their officers' performance should be held accountable, and this should be reflected in their performance evaluations.

## Paragraph 71: Searches and Seizures - Arrests

*A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. |
| | | | April 2025 – September 2025 for Compliance Targets 2 – 5. |
| Policy: | Implemented | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Training: | N/A | | |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

### *Compliance Assessment*

A total of 90 randomly selected arrest and search files were subject to commanders' review under PPR 615.8 during this reporting period. Of these, 25 reviews (28%) did not meet the required 7-day review period, while 61 (68%) were completed within the designated timeframe. In four cases (4%) commanders failed to submit a review. Supervisors and commanders identified no instances of serious or criminal misconduct in these cases.

### *Pathway Forward*

PRP commanders regularly review arrest reports, maintaining compliance rates above 95%. However, a stronger effort is needed to ensure evaluations of arrests are completed on time, as many have exceeded the seven-day limit set by the Agreement and in some cases no reviews were submitted.

## Paragraph 72: Searches and Seizures - Arrests

*PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1.<br><br>April 2025 – September 2025 for Compliance Targets 2 and 3. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 59 and 72. | ☑ Met  ☐ Missed |
| 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | ☐ Met  ☑ Missed |
| 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | ☑ Met  ☐ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

Per GO 636 (Evidence Rooms), PRP officers must record seized evidence using PPR 636.1 and track property with forms like PPR 636.2. Of 102 eligible cases this reporting period, only 63 had completed PPR 636.1 forms submitted, resulting in a 62% compliance rate—far below the required 95% threshold. The other 39 cases had no forms filed.

PRP's SARP has been diligently investigating and following up on complaints regarding seized property and seized evidence. In August 2025, the Monitor's Office followed up with SARP to check the status of the following administrative complaints. Some listed cases have been completed and some are pending.

- #2024-01274: Firearm not turned into PRP Armory Deposit – Not Sustained onJune 2, 2025.
- #2024-00939: Seized motor vehicle without cause - Investigation completed, case is still at Office of Legal Affairs (OAL) as of August 18, 2025.
- #2024-00855: Controlled substance - quantity of drugs seized was 6 when photo showed 12 - Still at OAL awaiting approval as of August 18, 2025.
- #2024-00965: Unknown where firearms are - Sustained but awaiting Superintendent's approval and signature.

- #2024-00700: Misconduct and illegal seizure of property - Under investigation by area command - Still under investigation and in search of witness as of August 18, 2025.
- #2024-01195: Location of firearms unknown - Investigation held at Evaluation/Adjudication Section - Exonerated on March 19, 2025.
- #2024-01800: New case as of November 2024 - seized property (cellphone, vehicle plates, and department gas card) not properly documented - under investigation: Exonerated on May 5, 2025.
- #2025-00573: Negligence handling evidence (firearms and drugs left unattended/undocumented) - under investigation by the Arecibo area command- Sustained as of August 18, 2025.
- #2025-00629: Negligence handling evidence (weapon used in crime) and personal property – Sustained as of August 18, 2025.

The following new seized property cases will be followed up in  the next reporting period:

- #2025-00981- Firearms not deposited at PRP Firearms Deposit Division (Not documented)
- #2025-01021- Drug Unit Investigations - improper procedures  # 2025-00196- Seized Property   #2025- 00552- Seized vehicle improperly

In addition, the Monitor's Office conducted site visits to multiple evidence rooms in August 2025 and

identified evidence rooms lacking sufficient space for proper evidence storage and missing equipment:

- Aguadilla Criminal Investigations Corp (CIC) reported inadequate space for evidence storage and no cameras installed to secure the evidence room (a request for cameras was submitted over a year ago and they received no response as of this CMR)
- The Guayama CIC evidence room is in very good condition but needs additional shelves for proper evidence storage
- Bayamon CIC has two Evidence  Rooms and their conditions are: one has metal front door, and is well secured; the other has a metal door but no steel grate (steel grate door is on site, but awaiting installation); smoke detector, dehumidifier, and shelves are in place; windows secured with metal grates; new firearm safes are present but still not in use (firearms stored on floor).

The Monitor's Office will follow up on the above issues in future CMRs.

### *Pathway Forward*

PRP officers often neglect to complete PRP 636.1 in arrest cases, and supervisors should ensure compliance with GO 636 (Evidence Rooms) for all arrests and searches involving seized personal property or evidence. Officers commonly mix evidence and personal property on one form, which is not best practice. PRP should separate documentation for incriminating evidence and returnable property. The Monitor's Office advises using one PPR 636.1 for evidence and another for personal property to be returned upon release.

Limited storage capacity, inadequate or unsuitable equipment, and insufficient ventilation in evidence rooms across the island pose considerable challenges. These conditions may compromise the integrity or quality of evidence, which could in turn affect the outcomes of criminal investigations.

## Paragraph 73: Searches and Seizures – Arrests

*PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback. In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Interagency agreements and policies incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB officers seek and obtain feedback from criminal justice agencies and entities as required by approved agreements and policies. | ☑ Met | ☐ Missed |
| 3. 100% of alleged misconduct noted in protocol documentation corresponds with a SARP investigation. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Reform Office submitted an updated Feedback Committee Protocol to the Monitor's Office. This revised Protocol now contains provisions to invite representatives from the Public Defenders' Office to participate in Committee meetings. The Protocol remains fully compliant with the terms of the Agreement.

During this reporting period, the Monitor's Office interviewed committee members from the following police areas: Fajardo, Ponce, Guayama, Aibonito, Carolina, and Arecibo. These committees submitted evidence of their meetings, such as agendas, attendance sheets, and minutes.

The remaining police areas (Humacao, Aguadilla, Bayamon, Caguas, Mayaguez, San Juan, and Utuado) plus the Central Committee submitted documents related to their Feedback Committee meetings for the current reporting period. The submissions included attendance sheets, meeting minutes, and agendas. Invitees and attendees comprised the Administrative Judge (or a designated representative) in each area, District Attorneys or representatives, Public Defenders' Office, PRP Committee members, Municipal Police Department Superintendents, and others. Topics discussed included officers' attendance at court proceedings, dress code, and interagency communication. According to committee members, there has been a reduction in absences and dress code issues have been addressed following these meetings. No misconduct complaints were reported during this reporting period.

## 4. Searches

PRP's review of GO 612 (Searches and Seizures) is pending completion of the Searches and Seizures Implementation Plan. The current policy, updated in March 2022, aligns with accepted standards and complies with federal and local law. Most warrant-based searches were properly executed and documented, with minimal exceptions. However, documentation of consent searches continues to require improvement. Supervision of arrests and searches is generally effective, though occasionally delayed. Recent in-service and video training on PC have strengthened officers' compliance with established policies and the terms of the Agreement.

### Paragraph 74: Searches and Seizures - Searches

*PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. Aril 2025 – September 2025 for Compliance Target 2. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 74-77. | ☑ Met ☐ Missed |
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | ☐ Met ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

The current Search and Seizure policy (GO 612, revised March 2022) follows accepted policing standards and relevant laws. It defines terms, outlines search procedures with or without warrants, and provides instructions for securing and managing seized property and evidence. The policy is on hold until the Searches and Seizures Implementation Plan is enacted.

In the randomly selected sample of 64 eligible searches (both warrant-based and consent), the Monitor's Office evaluated 54 as substantially compliant, resulting in an 84% overall compliance rate, short of the required 95% threshold. Five searches were rated partially compliant due to various issues. An additional five searches were rated non-compliant for missing multiple forms, including the police report, booking

97

sheet, consent search documentation, search warrant return, unsigned search warrant and affidavit, and failure to note the physical condition of arrestees, among others.[9] The sample included 44 searches conducted under search warrants, of which 42 contained affidavits that were reviewed and approved by supervisors before officers applied for the warrant, for a 95% compliance rate. Complaint numbers 2025-09-030-001645 and 2025-08-199-000800 did not include the supervisor's approval.

The data submission included 24 consent search files, some of which also included search by warrant. The Monitor's Office evaluated 18 files (75%) as compliant, which falls well short of the required 95% compliance threshold. Three files were deemed non-compliant due to the absence of multiple forms, including the consent search form, booking sheet, and seized property form.[10] Three additional files were assessed as partially compliant due to incomplete documentation.[11]

### Pathway Forward

PRP supervisors are tasked with ensuring that all search files, including those pertaining to consent searches, contain the requisite search and arrest forms properly completed in accordance with policy. Supervisors are required to review and approve all affidavits prior to their submission before a magistrate. Additionally, supervisors must conduct a thorough review of arrest reports and confirm that officers have provided specific details supporting the determination for arrest during consent searches.

## Paragraph 75: Searches and Seizures - Searches

*PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 74.

### Compliance Assessment

The sample reviewed included 44 searches conducted under search warrants, of which 42 contained affidavits that were reviewed and approved by supervisors before officers applied for the warrant, for a

---

[9] See #s 2025-3-199-000853E, 2025-13-401-000046, 2025-1-182-003572, and 2025-08-116-004521.
[10] See #s 2025-3-199-000853E, 2025-13-401-000046.
[11] See #s 2025-3-401-000058, 2025-11-173-000921, and 2025-01-382-002923.

95% compliance rate. Although in compliance based on the 95% threshold, all affidavits and search warrants must be evaluated by a supervisor before being presented to a magistrate. Complaint numbers 2025-09-030-001645 and 2025-08-199-000800 did not include the supervisor's approval.

*Pathway Forward*

The reviewed data indicates that PRP supervisors reviewed and approved 95% (42 of 44) of affidavits and applications for warrant-based searches. Although in compliance based on the 95% threshold, all affidavits and search warrants must be evaluated by a supervisor before presenting it to a magistrate.

## Paragraph 76: Searches and Seizures - Searches

*PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 3. <br><br> April 2025 – September 2025 for Compliance Target 2. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Target #2. Annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All search warrants are tracked in the tracking system. | ☐ Met | ☑ Missed |
| 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | ☑ Met | ☐ Missed |

Note: Policy content is assessed as part of Paragraph 74. Training is assessed as part of Section E 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

During this reporting period, the Monitor's Office visited PRP CIC and Drug units in Aguadilla, Guayama, Arecibo, Utuado, and Bayamon that handle most search warrant searches for their assigned area. These units organize warrants alphabetically and by year in a file cabinet, but do not formally track or analyze them. PRP intends to resolve this through its upcoming Search and Seizure Implementation Plan scheduled for 2026.

*Pathway Forward*

This paragraph will remain partially compliant until PRP develops and implements a centralized electronic tracking system to collect and analyze search warrant data following the Agreement.

## Paragraph 77: Searches and Seizures - Searches

*PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 74.

### Compliance Assessment

The data submission included 24 consent search files, some of which also included search by warrant. The Monitor's Office evaluated 18 files (75%) as compliant, which falls well short of the required 95% compliance threshold. Three files were deemed non-compliant due to the absence of multiple forms, including the consent search form, booking sheet, and seized property form.[12] Three additional files were assessed as partially compliant due to incomplete documentation.[13]

### Pathway Forward

PRP must ensure that officers properly complete and submit PPR 612.1 (Consent Search Form) for every consent search and include all pertaining forms in the files.

## 5. Training on Stops, Searches, and Seizures

PRP achieved 100% completion of in-service training on GO 612 (Searches and Seizures), covering stops, searches, and seizures for 2024. The 2025 annual training sessions, offered both virtually and in person, are scheduled and expected to be completed by March 2026.

## Paragraph 78: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all PRPD officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all PRPD officers with training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on stops, searches, and seizures as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on*

---

[12] See #s 2025-3-199-000853E and 2025-13-401-000046.

[13] See #s 2025-3-401-000058, 2025-11-173-000921, and 2025-01-382-002923.

*stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the*

*United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding stops, searches, and seizures;*

*b) the Fourth Amendment and related law;*

*c) examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, consent and non-consent searches, and arrests. These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and voluntary consent from mere acquiescence to police authority; and*

*d) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Training on stops, searches and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-78. | ☒ Met | ☐ Missed |
| 2. 95% of officers are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met | ☒ Missed |

### Compliance Assessment

PRP's training policy for stops, searches, and seizures (GO 612) remains consistent with accepted policing standards and constitutional requirements. In-service training based on this policy achieved 100% compliance in 2024 and is scheduled to be completed for 2025 in March 2026. Audits by the Monitor's Office confirm adherence to best practices. PRP plans to maintain compliance with a scheduled training program, including a new virtual training module presented to the Monitor's Office. Scenario-based exercises were also audited and found to meet the required standards.

### Pathway Forward

PRP must ensure that officers of all ranks continue to receive in-person scenario-based training and interactive exercises (role-playing), as required by this paragraph and GO 612. This training is necessary to understand policy requirements and the practical application of such procedures. PRP must also

submit planned training courses to the Monitor's Office for review and evaluation prior to implementation.

## Paragraph 79: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all supervisors and command officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all supervisors and command officers with training on reviewing subordinates' stops, searches, and seizures at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training on stops, searches, and seizures for supervisors and command officers shall include the following topics:*

*a) requesting medical services and questioning detainees and arrestees for pain or injury;*

*b) report writing, including reviewing reports on stops, searches, and seizures for completeness, accuracy, and quality, including recognizing boilerplate language and how to document discrepancies;*

*c) assessing the legality and appropriateness of a stop, search, or seizure;*

*d) legal standards governing searches and seizures, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; and*

*e) recommending and administering proper discipline and non-punitive corrective action related to searches and seizures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Training on stops, searches, and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-77, and 79. | ☑ Met | ☐ Missed |
| 2. 95% of supervisors and commanders are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met | ☑ Missed |

### Compliance Assessment

PRP's training policy for stops, searches, and seizures (GO 612) remains consistent with accepted policing standards and constitutional requirements. In-service training based on this policy achieved 100% compliance for 2024 for officers of all ranks, including commanders, and audits by the Monitor's Office

confirm adherence to best practices. PRP plans to maintain compliance with a scheduled training program for 2025 by March 2026, which will include a new virtual module . Scenario-based exercises were also audited and found to meet the required standards.

*Pathway Forward*

PRP must ensure that officers of all ranks continue to receive in-person scenario-based training and interactive exercises (role-playing), as required by this paragraph and GO 612. This training is necessary to understand policy requirements and the practical application of such procedures. PRP must also submit to the Monitor's Office planned training courses for review and evaluation prior to implementation.

# IV. Equal Protection and Non-Discrimination

PRP and the Parties continue to work collaboratively under the Sexual Assault and Domestic Violence (SA/DV) Plan, which serves as a central framework for strengthening PRP's investigative practices. This plan has guided progress in several key areas, including enhancing training content, improving the organization and quality of investigative files, promoting victim-centered approaches, and refining internal processes related to investigations, supervision, and resource allocation.

The designated SA/DV workgroup remains actively engaged in implementing the tasks outlined in the Plan, which was developed to provide structure and consistency in handling these sensitive cases. As part of these efforts, PRP has introduced an investigative checklist to promote standardization and quality control in case management. The workgroup continues to respond to recommendations from prior CMRs, with the overarching goal of improving investigative effectiveness and victim-centered practices in SA and DV cases.

Specialized training remains a central focus of PRP's reform efforts, ensuring personnel are equipped to respond promptly, professionally, and with trauma-informed sensitivity to incidents of gender-based violence. During the 2024 in-service training cycle, PRP achieved a 95% compliance rate in the virtual course on Interactions with Transgender and Transsexual Individuals (VIGPD 5011). However, additional training areas, including hate crime and NIBRS-related modules, are still under development.

PRP recognizes that a sustained commitment to accessible, comprehensive training—supported by adequate staffing, supervision, and resources—is essential for the effective investigation and resolution of these complex and sensitive incidents. Due to time constraints during the 2024 training cycle and transitional leadership changes, PRP requested—and the Monitor's Office approved—a revised schedule for completing 2025 in-service training requirements across these paragraphs and other relevant sections of the Agreement. These trainings are now scheduled for completion by March 31, 2026. PRP is also encouraged to begin planning for the development and implementation of its 2026 training program.

In summary, the Commonwealth's compliance with the Equal Protection and Non-Discrimination paragraphs reflects some compliance progress to what was previously observed in prior CMRs. In CMR-11 71% (15 paragraphs) of paragraphs assessed were partially compliant and 5% (1 paragraph) of paragraphs assessed were substantially compliant, in comparison to the current reporting period, where 62% of paragraphs (13 paragraphs) were found to be partially compliant and 10% (2 paragraphs) of paragraphs assessed were substantially compliant. One paragraph (5%) moved to fully compliant during this reporting period. See figure 5.



*Figure 5. Equal Protection and Non-Discrimination Paragraph Compliance Status*

## Paragraph 80: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall ensure that police services are delivered equitably, respectfully, and free of unlawful bias, in a manner that promotes broad community engagement and supports effective crime prevention. In conducting its activities, PRPD shall ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation, and in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of Paragraphs 81 – 100, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

### *Compliance Assessment*

PRP is partially compliant with the Equal Protection and Non-Discrimination provisions of the Agreement. While PRP has demonstrated a continued commitment to improving policing practices, several critical areas remain in need of enhancement to ensure services are delivered equitably, respectfully, and free from unlawful bias. PRP is obligated to provide equal protection of the law without

105

discrimination based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity or expression, or political ideology, in accordance with constitutional and statutory protections.

During this reporting period, PRP made progress in several areas, including the continued functionality of COPOP for protective order management. Policies and procedures continue to reflect compliance with statutory requirements and best practices. Nonetheless, persistent deficiencies limit full compliance. Critical training requirements for 2025, including trauma-informed response training, remain unmet due to scheduling delays, instructor shortages, and incomplete adoption of virtual training modules. While a 95% compliance threshold for bias-free policing (VIGPD 5011) has been met, other trainings have not been achieved.

Operational challenges further hinder equitable policing. Reviews of SA and DV cases revealed inconsistencies across regions, highlighting the urgent need for standardized investigative protocols. Agents continue to face high caseloads, insufficient private interview spaces, and limited access to functional technology and vehicles, which constrain their ability to provide trauma-informed, victim-centered services. Moreover, the discontinuation of hospital-managed platforms such as SAFEKIT for tracking forensic evidence has hindered victims' ability to stay informed about their cases. Although PRP does not oversee the SAFEKIT system, it is important to ensure that victims understand that hospitals are responsible for maintaining communication and providing updates on their cases, including how to contact them for information. Deficiencies in National Incident Based Reporting System (NIBRS) reporting, hate crime documentation, and performance evaluation processes also undermine efforts to maintain transparency and accountability in service delivery.

PRP has initiated positive steps to address these challenges by developing a comprehensive Training Plan, the implementation of virtual and in-person training programs, and the planned introduction of a RMS reflect efforts to strengthen data-driven processes, improve documentation, and enhance investigative oversight. These initiatives remain in progress, which limits full verification of effective practice.

### Pathway Forward

To achieve full compliance, PRP must take several coordinated actions. Comprehensive and standardized investigation reports are necessary to ensure equitable treatment and accountability. Program evaluations should consistently reflect community engagement and feedback. Strengthening NIBRS and hate crime reporting, reinstating systems for victim case tracking, and documenting interactions with transgender and transsexual individuals are essential to ensuring respectful, unbiased service delivery. Full implementation of mandated SA and DV training, supported by accurate and accessible records, will further professionalize investigative practices. Infrastructure improvements, including private interview rooms, functional technology, and suitable transportation, are also critical to supporting victim-centered services. Finally, PRP should continue to actively involve the community in the development and delivery of training programs, ensuring transparency, oversight, and adherence to the standards established in the Agreement.

## 1. General Provisions

PRP demonstrate a strong and sustained commitment to advancing bias-free policing and ensuring equal protection under the law. PRP has developed and refined policies that align with legal standards and generally accepted policing practices, providing clear guidance to support fair, accountable, and transparent policing.

During this reporting period, PRP maintained compliance in key areas related to policy implementation and documentation. Policies governing equal protection and non-discrimination remain fully implemented and continue to meet Agreement requirements. PRP also sustained full compliance in the classification and tracking of discrimination-related complaints through the Superintendence Auxiliary for Professional Responsibility (SARP), which ensures transparency and consistency in complaint management. In addition, PRP updated documentation related to officer–civilian interactions to include comprehensive demographic fields, marking a significant step toward improving data quality, equity monitoring, and accountability.

While PRP's policy framework is well established, additional progress is needed to fully implement related training programs. Training on bias-free policing, equal employment opportunity, hate crime identification, and NIBRS procedures has been developed but not yet fully implemented. Similarly, while policies governing recruitment, promotion, and performance evaluation comply with Agreement requirements, incomplete training and recordkeeping currently limit the ability to verify consistent application in practice.

PRP continues to enhance its data collection and reporting capacity through multiple initiatives. These include expanding NIBRS implementation, developing training on hate crimes and bias-free policing, and improving training for promotion and hiring committees. The ongoing development of the new RMS represents a major advancement in PRP's data management infrastructure. Once operational, the RMS will centralize data entry, standardize demographic and crime reporting, and integrate with NIBRS to ensure improved accuracy, timeliness, and reliability of information.

Collectively, these measures reflect PRP's ongoing commitment to strengthening accountability, transparency, and operational capacity. To achieve full and sustained compliance, PRP should continue prioritizing the delivery of training programs, the completion of documentation and verification processes, and the full deployment of the RMS. These steps will further strengthen PRP's ability to ensure fair, equitable, and bias-free policing across all areas of operation.

### Paragraph 81: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing; provide training as described in this Agreement; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2024 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies and procedures comply with applicable law and comport with generally accepted policing practices on bias-free policing. | ☑ Met  ☐ Missed |
| 2. Trainings comply with applicable law and comport with generally accepted policing practices on bias- free policing. | ☐ Met  ☑ Missed |
| 3. 95% of reviewed supervisory and field records indicate that officers are supervised consistently. | ☑ Met  ☐ Missed |

Note: The requirement of this Paragraph regarding PRPB's development of policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing, is assessed together with Paragraphs 87, 88 and 109 of the Agreement.

Note: The requirement of this Paragraph that relates consistent supervision is assessed together with Paragraphs 135 (Supervision and Management), and 140 (Duties of Supervisors).

Note: The requirement of this Paragraph that relates to holding officers accountable for complying with applicable law and policy is assessed together with Paragraph 159 (Civilian Complaints, Internal Investigations, and Discipline).

Note: The requirement of this Paragraph that requires training as described in this Agreement is assessed together with Paragraphs 90, 117 (Training), 118 (Pre- Service Training), 123 (Field Service Training), and 129 (In- Service Training).

### Compliance Assessment

During the reporting period, PRP submitted a report documenting 267 non-punitive cases involving PRP personnel. No new policies or procedures were submitted for review; therefore, Target 1 remains sustained as met.

For Target 2, PRP has not yet delivered the training courses required under this paragraph, nor incorporated the principles of bias-free policing within the designated training timelines. Consequently, Target 2 remains unmet.

Regarding Target 3, PRP provided documentation through PPR 639.1 (Verbal Warning) as evidence of consistent officer supervision during duty hours. The Monitor's Office reviewed 32 files from April to June 2025 and 28 files from July to September 2025. The documentation reviewed demonstrated compliance with policy, reflecting adequate non-disciplinary supervisory action. Each record contained essential details such as the employee's name, ID number, assigned area, and date of the verbal warning. The documentation supports that policies governing supervisory oversight are being implemented effectively.

*Pathway Forward*

To advance compliance, PRP should prioritize the implementation of bias-free policing training, ensuring course content reflects both applicable law and generally accepted policing standards. The Monitor's Office encourages PRP to finalize and deliver this training within the next reporting period and to establish a tracking mechanism to document participation and completion. Continued documentation and submission of supervisory oversight records should also be maintained to sustain consistency and demonstrate PRP's ongoing commitment to fair, unbiased, and accountable policing practices.

### Paragraph 82: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall revise its complaint classification policies to effectively capture and track civilian complaints alleging discriminatory policing, even if the complainant does not specifically label the misconduct as such.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB classification policies comply with the requirements of the Paragraph. | ☒ Met   ☐ Missed |
| 2. PRPB classifies and tracks allegations of discriminatory policing in accordance with policy and this Paragraph. | ☒ Met   ☐ Missed |

Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking).

*Compliance Assessment*

PRP remains in full compliance with the requirements governing the classification and documentation of discrimination allegations. PRP has provided comprehensive documentation and supporting evidence through SARP, demonstrating adherence to established policies and procedures as well as detailed tracking reports, which included 14 SARP cases for October 2024 through September 2025. Each report reflected PRP's systematic approach to capturing critical information such as case number, type, date, status, investigation start date, assigned investigator, disposition, missing information, and the source of the complaint.

During this reporting period, the Monitor's Office examined all reported cases and confirmed that PRP continues to maintain accurate classification and documentation practices consistent with nondiscrimination standards. The level of detail and consistency reflected in PRP's submissions demonstrates the Bureau's sustained commitment to transparency and accountability.

109

## Paragraph 83: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall revise all documentation produced in relation to officer and civilian interactions, including documentation related to arrests, traffic stops, investigatory stops and detentions, searches, property seizures, and civilian complaints, so that it permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. All documentation produced in relation to officer and civilian interactions permits officers to accurately record the demographic information of all involved persons | ☑ Met   ☐ Missed |

Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking).

### Compliance Assessment

PRP submitted documentation including certifications and copies of all PPR forms used to document officer–civilian interactions. The submission included PPR 605.1 (UOF Report), PPR 605.2 (Supplemental Report), PPR 605.3 (UOF Incident Notification), PPR 126.2 (Electronic Complaint Card), PPR 621.1 (Incident Report), and PPR 621.2 (Other Services Report). Each of these forms was reviewed to determine compliance with the requirements of Paragraph 83, which mandates that all documentation of officer–civilian interactions include the accurate recording of demographic information for all involved persons, including alleged subjects and victims.

Based on the review, PRP's submission demonstrates compliance with the paragraph's requirements. The revised forms include comprehensive demographic fields such as race, ethnicity, nationality, gender identity, age, and other identifying characteristics for officers, victims, subjects, and witnesses. The forms collectively cover all categories of police–civilian interactions contemplated under Paragraph 83, including arrests, traffic and investigatory stops, detentions, searches, seizures, and complaints. These revisions demonstrate a significant advancement in ensuring that PRP documentation supports transparency, accountability, and nondiscrimination in law enforcement activities.

However, some procedural elements remain outstanding. The submission does not include documentation confirming the Monitor Office's formal approval of the revised forms or evidence of implementation showing consistent demographic data entry across the Bureau. Verification of operational use and training will be necessary to demonstrate substantial compliance.

110

Looking forward, the RMS implementation may help resolve these challenges by integrating standardized demographic data fields across all operational forms and systems. Additionally, the ongoing work by the Information Technology Compliance Assistance Program (IT CAP) and the Commonwealth's contractor, AH Datalytics, shows promise in enhancing PRP's ability to consistently capture, aggregate, and analyze demographic data. These technological improvements, coupled with continued oversight and training, are expected to strengthen PRP's capacity to maintain and demonstrate full compliance with Paragraph 83 moving forward.

### Pathway Forward

To maintain momentum and achieve full compliance with Paragraph 83, PRP should continue to operationalize the revised reporting forms across all operational areas and ensure their consistent use by sworn personnel. Targeted training must emphasize the proper and complete documentation of demographic data, including race, ethnicity, gender identity, nationality, and age, in all reports of officer–civilian interactions. Supervisors should reinforce these expectations through active review and quality control to ensure that data are entered accurately and reliably at every level.

In addition, the upcoming RMS implementation provides an important opportunity to resolve existing challenges in demographic data collection and analysis. Integrating the revised forms into the RMS will standardize reporting processes and enable PRP to monitor, aggregate, and analyze demographic data more efficiently. The ongoing collaboration among PRP's IT CAP, the Commonwealth's contractor AH Datalytics, and the Monitor's Office will be critical to ensure that the system's architecture supports compliance with equal protection and non-discrimination standards.

Finally, PRP should establish a recurring audit and analytical review process to evaluate the accuracy, completeness, and consistency of demographic data across forms and systems. These reviews should be used not only to verify compliance but also to identify disparities or trends that may warrant further policy attention or training. By institutionalizing these practices, PRP will reinforce its commitment to transparency, fairness, and accountability in all officers–civilian interactions and move closer to achieving substantial compliance with Paragraph 83.

### Paragraph 84: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | September 2024 – October 2025 for Compliance Targets 1, 2, 5 – 10, and 12. |
| Policy: | Implemented | | April 2025 – September 2025 for Compliance Targets 3, 4, and 11. |

| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | ☑ Met ☐ Missed |
| 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☑ Missed |
| 4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met ☑ Missed |
| 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | ☑ Met ☐ Missed |
| 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met ☑ Missed |
| 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☑ Missed |
| 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | ☑ Met ☐ Missed |
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | ☑ Met ☐ Missed |
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met ☑ Missed |
| 11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☑ Met ☐ Missed |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | ☑ Met ☐ Missed |
| Note: The requirement of this Paragraph that require PRPB to incorporate bias-free policing and equal protection into its hiring practices is assessed together with Paragraph 104 (Hiring Reforms). | |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its performance assessment process is assessed together with Paragraph 145 (Performance Evaluation). | |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its promotion assessment process is assessed together with Paragraph 14 (Promotions). | |

*Compliance Assessment*

During the reporting period, the Monitor's Office conducted assessments for all 12 Targets. The Monitor's Office and the Parties have agreed to update the methodology to clarify Targets 3 and 7,

112

removing the reference to the civilian complaint program and replacing with references that are more directly aligned with paragraph requirements. These changes are reflected in this report.

Target 1 is met. PRP's policies and procedures related to hiring comply with the requirements of Paragraph 84 and reflect alignment with Title VII non-discrimination provisions.

Training records reflecting integration of bias-free and equal protection principles within the hiring process have not been provided; therefore, Target 2 is missed.

Target 3 – Both virtual and in person training records for four members of the Promotions Committee were submitted; however, JASC 2061 is not included, this training was scheduled to be offered between September and December 2025. As a result, the target has not been met.

A global list of recruitment candidates was submitted; however, the associated candidate files were incomplete and lacked key documentation necessary to verify adherence to bias-free selection criteria, including interview assessments, scoring justifications, and panel evaluation notes. During the current review period, PRP did not meet the 95% compliance threshold for candidate selection consistent with approved policies on bias-free policing and equal protection. The Monitor's Office found that many candidate files lacked sufficient supporting documentation to verify compliance with recruitment "checkpoints," such as criminal history, tax, credit, and employment reviews. While PRP issued certificates indicating whether candidates passed each requirement, the absence of underlying records—such as criminal background reports or verification forms—prevented full validation of compliance. This deficiency remains a key factor in the determination of missed compliance with Target 4.

Regarding recruitment of historically underrepresented groups, the previous Recruitment Director actively engaged with community and consular organizations to promote diversity within PRP. The newly appointed civilian Recruitment Director has recently assumed this role. The Monitor's Office looks forward to the impact of his leadership on sustaining these initiatives. The Monitor's Office reiterates its recommendation that PRP strengthen documentation and recordkeeping to ensure transparent, verifiable, and bias-free recruitment practices aligned with equal protection standards.

Policies governing the promotion assessment process were reviewed, updated, and signed by the new Superintendent, thus meeting Target 5. Target 6 is missed. While policy foundations are in place, the required training consistent with bias-free policing and equal protection provisions have not been fully implemented. The Monitor's Office notes that although PRP has developed a four-hour Equal Employment Opportunity Re-training (JASC 2061) under the Assistant Superintendency of Education and Training (SAEA), the course has not yet been delivered to the Promotion Examination Evaluation Board.

The JASC 2061 training is designed to ensure that Board members are properly equipped to apply legal and administrative principles in all promotional evaluation processes. The curriculum includes comprehensive instruction on equal employment opportunity concepts, including the Civil Rights Act of 1964, Equal Pay Act, the Americans with Disabilities Act, Age Discrimination in Employment Act, and PRP's internal regulations governing discrimination, harassment, and retaliation. Participants are trained

to analyze and apply these principles within a legal framework to ensure that promotion evaluations are conducted fairly and without bias.

However, as this training has not yet been administered, PRP cannot demonstrate compliance at this time. Full compliance will require completion of the JASC 2061 course by all Promotion Examination Evaluation Board members and submission of corresponding attendance and certification records for verification.

For Target 7, This target has not been met. The training required for members of the Promotion Examination Evaluation Board has not yet been implemented. PRP has developed a four-hour instructional block entitled *Promotion Policies for the Promotion Board* **(**JASC 2061), which includes a formal assessment intended to confirm that Board members are fully prepared to carry out their responsibilities in compliance with applicable laws, internal regulations, and the equal employment opportunity provisions of the Agreement.

PRP certified on April 15, 2025, that this training is scheduled to be offered between September and December 2025 to all personnel comprising the Promotion Examination Evaluation Board. However, as the course remains in the development and scheduling phase and has not yet been delivered, there are no available training or certification records for review during this reporting period.

The Monitor's Office recognizes the effort to design a comprehensive training program addressing equal employment opportunity principles and bias-free evaluation standards; however, PRP must prioritize implementation to achieve compliance. To meet the requirements of this target, PRP should ensure timely rollout of JASC 2061, maintain verifiable attendance and certification records, and establish an ongoing training cycle for newly appointed Board members. Successful delivery and documentation of this course will demonstrate that PRP's promotional evaluation processes are informed by bias-free and equal protection standards consistent with Paragraph 84 of the Agreement.

A review of promotions confirmed adherence to approved policies ensuring bias-free and equitable evaluation standards, meeting Target 8.

Target 9 is met. PRP's performance evaluation policy complies with paragraph requirements and was launched under GO 310 in January 2024; however, Target 10 is missed since training has not been fully operationalized.

Regarding Target 11, and in consensus with Paragraphs 145 and 146 of the Supervision and Management section of the Agreement, while the target is met, the Monitor's Office stresses that PRP should conduct additional trainings, particularly for those tenured supervisors on the requirements of the new performance evaluation system. Although the training has been conducted in practice, the training is not being fully operationalized, and a number of supervisors are not conducting their evaluations in person as required by policy.

A total of 92 performance evaluations were reviewed, and 95% were found to be consistent with approved policies regarding bias-free policing and equal protection. The evaluations demonstrated

114

thoughtful and substantive content, reflecting supervisors' understanding of performance standards and commitment to fair and equitable assessment practices. Thus Target 12 is met.

*Pathway Forward*

To achieve substantial compliance with Paragraph 84, PRP must focus on completing training implementation, strengthening documentation, and standardizing verification processes across hiring, promotion, and performance assessment functions. Priority should be given to finalizing and delivering the Equal Employment Opportunity Re-training and Promotion Policies for the Promotion Board courses (JASC 2061), ensuring all participants are certified and training records are maintained in PTMS. PRP should also standardize recruitment documentation by including complete candidate files with interview assessments, scoring justifications, and evaluation notes to verify adherence to bias-free and equal protection policies. The updated methodology for Targets 3 and 7 should be implemented in the next reporting period to align assessments with paragraph requirements. Additionally, PRP must enhance supervisory compliance with GO 310 (Performance Evaluations) by conducting refresher training and ensuring that performance evaluations are completed in person as required. Strengthening these areas will enable PRP to demonstrate consistent application of bias-free and non-discriminatory practices and move toward substantial compliance in the upcoming reporting period.

## Paragraph 85: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1, 2, and 4.<br><br>April 2025 – September 2025 for Compliance Target 3. |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. NIBRS training are consistent with approved policies and procedures. | ☑ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in NIBRS. | ☐ Met | ☑ Missed |
| 4. PRPB is using the NIBRS to collect and report crime data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRP met Target 1 during this reporting period by. by ensuring that its policies, procedures, and training forms/modules incorporate the requirements outlined in the paragraph. These materials clearly reflect PRP's commitment to implementing standardized processes aligned with Reform mandates.

For Target 2, which focuses on NIBRS training (MISP 3061 – Handling of Police Reports and Services; a 24-hour course), PRP has taken meaningful steps to advance implementation. PRP begun training instructors who will subsequently deliver the NIBRS course to personnel across all regions. In January 2025, while visiting the Academy, the Monitor's Office directly observed the NIBRS instructor course in session. This 40-hour Train-the-Trainer program is designed to equip selected personnel with the skills and knowledge necessary to effectively teach the NIBRS curriculum. Notably, a previous offer of the Train-the-Trainer session included six members from the Criminal Investigation Corps (CIC), whose feedback contributed to refining the course content and delivery. These developments represent a significant and positive step toward Bureau-wide adoption of NIBRS training.

Regarding Target 3, PRP submitted 92 training records for review. Of these, five members successfully completed the MISP 3061 course, while an additional five were still in progress at the close of the reporting period. This represents only a 5.4% completion, which falls substantially below the 95% compliance rate required for this target. Therefore, the target is not met. PRP should continue to prioritize the delivery and completion of the MISP 3061 NIBRS course to all relevant personnel to achieve compliance in upcoming reporting periods. Continued monitoring and documentation of training progress will be essential to demonstrate sustained advancement toward full implementation.

For Target 4, PRP remains in the process of fully implementing the use of NIBRS for data collection and crime reporting. While progress has been made toward system integration and user training, full operational use of NIBRS across all units has not yet been achieved. Continued efforts are needed to ensure that all crime data are consistently collected, entered, and reported through the NIBRS platform in accordance with federal standards.

*Pathway Forward*

PRP should continue advancing its efforts to achieve compliance with the NIBRS-related requirements under this paragraph. As part of this process, PRP should ensure that all relevant personnel complete the MISP 3061 (NIBRS) course to meet the 95% compliance threshold required for training. Expanding course availability, ensuring timely scheduling, and maintaining comprehensive training records will be critical steps toward achieving this objective.

PRP's ongoing rollout of the new RMS will play a key role in supporting compliance. The RMS is designed to streamline data entry, improve reporting accuracy, and ensure that crime data align with NIBRS standards. Once operational, it will allow PRP to capture incident-level data more efficiently and to report crime statistics in accordance with federal requirements. Integration with NIBRS will also help automate data validation and reduce reporting errors. As implementation progresses, PRP can then focus on expanding instructor-led training and strengthening internal monitoring to ensure accurate, complete, and timely reporting across all units.

116

## Paragraph 86: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1, 2, 4, and 5.<br><br>April 2025 – September 2025 for Compliance Target 3. |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #3. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | ☒ Met  ☐ Missed |
| 2. Criminal investigation trainings are consistent with approved policies. | ☐ Met  ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☒ Missed |
| 4. PRPB notifies the FBI of all identified instances of hate crimes. | ☐ Met  ☒ Missed |
| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | ☐ Met  ☒ Missed |

Note: The requirement of this Paragraph that requires PRPB to track hate crimes on an ongoing basis is assessed together with Paragraph 85.

### Compliance Assessment

During this reporting period, PRP maintained policies consistent with Paragraph 86 but has not yet implemented training, certification, or reporting practices sufficient to meet the remaining compliance targets. The Monitor's Office finds that documentation gaps and system limitations prevent accurate classification and timely reporting of hate crimes, leaving Targets 2–5 missed.

For Target 1, the Monitor's Office reviewed PRP's policies governing criminal investigations and found that they incorporate the obligations to identify, collect, and report hate crimes, consistent with federal guidance. The Informative Certification submitted confirms PRP's awareness of these obligations. Evidence supports that Target 1 is met.

The Monitor's Office assessed training documentation for personnel involved in hate crime investigations for Target 2. PRP did not provide materials demonstrating that such training has been

117

developed or delivered. There is no evidence that personnel understand procedures for identifying, classifying, or reporting hate crimes, therefore Target 2 is missed.

Related to Target 3, the Monitor's Office reviewed training and certification records for the reporting period. No records were submitted to confirm that personnel received the required training or were scheduled for it in mid-year reviews. Without documentation, Target 3 is missed.

The Monitor's Office examined PRP's reporting practices and reviewed the Informative Certification. While the certification references Federal Bureau of Investigation (FBI) reporting requirements, no evidence was provided showing that data were transmitted during the reporting period. The certification notes no hate crime investigations occurred from October 2024 to March 2025, but does not verify a "zero-report" submission. Consequently, Target 4 is missed.

For Target 5, the Monitor's Office reviewed data submissions from the Hate Crime Module. Between April 2025 and September 2025, the module recorded three femicide cases; however, the system is not programmed to distinguish femicides from hate crimes. This limitation prevents accurate identification and classification of hate crimes, therefore Target 5 is missed.

### Pathway Forward

While PRP has maintained policies consistent with Paragraph 86, the Bureau must take targeted actions to achieve compliance with all associated targets. Policies for Target 1 are met and should continue to be maintained; however, to address Targets 2–5, PRP must develop and deliver comprehensive training on hate crime identification, classification, and reporting for all relevant personnel, ensuring documentation of attendance, assessments, and certifications. Certification and tracking procedures should verify personnel completion, and regular reviews must confirm ongoing compliance.

Reporting practices should be enhanced to ensure timely and accurate submission of hate crime data, including formal "zero-report" submissions when no incidents occur. Additionally, the Hate Crime Module should be upgraded or configured to allow precise identification and classification of hate crimes, including distinguishing femicides and other relevant offenses, with validation processes to support accurate reporting. Implementing monitoring and documentation systems to track policy adherence, training completion, and reporting accuracy, combined with regular audits to identify and correct gaps, will support PRP's path toward compliance with Paragraph 86.

## 2. Discriminatory Policing

During this reporting period, PRP continued advancing efforts to eliminate discriminatory policing practices, with a particular focus on training implementation, community engagement, and strengthening equal protection measures across the Bureau. PRP's priorities centered on meeting training requirements and improving interactions with vulnerable and historically underserved populations.

PRP made meaningful progress in enhancing services for the transgender and transsexual communities, ensuring that policies governing transportation, processing, housing, and medical treatment are applied

with respect and consistency. These improvements reflect a growing institutional awareness of the importance of equitable treatment and adherence to established procedures.

Despite these advancements, challenges persist in ensuring that all PRP members receive comprehensive and practical training to support appropriate, professional, and stigma-free interactions with these communities. Closing this training gap remains essential for sustaining progress and institutionalizing nondiscriminatory practices across PRP operations.

Overall, PRP's ongoing collaboration with the LGBTQIA+ community and its gradual implementation of related training programs demonstrate meaningful progress toward a more respectful, inclusive, and equitable policing culture. Continued emphasis on specialized training, documentation, and evaluation will be critical to fully institutionalize these improvements and ensure their consistent application across all levels of the Bureau.

## Paragraph 87: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall apply and administer all programs, initiatives, and activities without discriminating based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation. PRPD shall develop policies and practices to prohibit selective enforcement or non-enforcement of the law based on these characteristics. These policies and practices shall comply with applicable law and comport with generally accepted policing practice.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of PRPB programs, initiatives, and activities conform to the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. 95% of selected PRPB programs, initiatives, and activities are consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☑ Missed |

Note: The section of this Paragraph that requires PRPB to develop policies and practices to conform to the requirements of this Paragraph is assessed together with Paragraphs 81, 88, and 109 (Policies and Procedures).

### *Compliance Assessment*

PRP submitted documentation through the Assistant Superintendent of Field Operations (SAOC), certifying that selected command areas—Aguadilla, Arecibo, Guayama, and Humacao—implemented programs, initiatives, and community activities that promote inclusion, equal opportunity, and respect

for diversity. The submission included brochures, educational materials, and community outreach products designed to support equitable policing practices and public engagement.

While the documentation provided examples of community-oriented and educational activities aimed at fostering inclusion, it did not provide sufficient analytical evidence to demonstrate that these initiatives were implemented and administered without discrimination based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation. The materials reflected the intent to promote equality and nondiscrimination but fall short of demonstrating measurable compliance with the paragraph's core requirements—specifically, the prohibition of selective enforcement or non-enforcement of the law based on protected characteristics.

The Monitor's Office reviewed PRP's submission, including certifications from the four areas. Despite the volume of materials, the content did not include a systematic evaluation or content analysis demonstrating how PRP ensures these programs are administered in a nondiscriminatory manner. The absence of such analysis prevents verification that PRP's program implementation aligns with bias-free policing principles and the Bureau's equal protection policies.

Further, PRP has not yet established comprehensive mechanisms for collecting data on non-enforcement interactions, community engagement outcomes, or incidents involving individuals in crisis—key indicators that would enable the Monitor's Office to evaluate bias-free implementation in practice. The lack of such data continues to limit PRP's ability to demonstrate that its programs and initiatives are consistently free from discriminatory practices.

The Monitor's Office acknowledges PRP's submission as an encouraging step toward documentation and transparency, particularly through efforts led by the Community Engagement Division and regional commands. However, the current evidence does not demonstrate full operational compliance with the requirements of Paragraph 87.

### Pathway Forward

To move toward substantial compliance with Paragraph 87, PRP must strengthen its ability to demonstrate, through analysis and measurable data, that all programs, initiatives, and activities are administered without discrimination based on protected characteristics. While PRP has shown progress in organizing community activities that promote inclusion and respect for diversity, the next phase of implementation must focus on substantiating these efforts through systematic evaluation. PRP should develop and submit a comprehensive content analysis of its programs and community engagement initiatives that explicitly assesses whether each activity complies with the requirements of this paragraph. This analysis should include both qualitative and quantitative indicators that measure participation, representation, and outcomes across demographic groups.

As PRP expands the use of its community engagement module through the work being done by Benchmark Analytics, the system should be configured to capture relevant demographic and operational data linked to community activities, non-enforcement interactions, and outreach initiatives. This will allow PRP to identify trends, detect potential disparities, and verify that all programs are administered

equitably across commands. Additionally, PRP should establish a standardized review protocol, led by the Community Engagement Division in coordination with SAOC and the Reform Office, to regularly assess compliance with bias-free and equal protection standards. These internal reviews should include documented evaluations of program materials, outreach activities, and community participation records to ensure consistency and fairness.

By combining improved data collection, systematic content analysis, and internal oversight, PRP will be able to demonstrate how its programs and initiatives are administered without discrimination, as required by Paragraph 87. The analytical framework developed through Benchmark Analytics will enable PRP and the Monitor's Office to assess not only the number and type of activities implemented, but also the extent to which these activities are equitably delivered and align with the principles of bias-free policing and equal protection.

## Paragraph 88: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1, 2, and 4. |
| Policy: | Implemented | | April 2025 – September 2025 for Compliance Target 3. |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB policies complied with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Trainings on discrimination free policing are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in discrimination free policing. | ☑ Met | ☐ Missed |
| 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | ☐ Met | ☑ Missed |
| Note: This Paragraph is assessed together with Paragraphs 81, 87, and 109 (Policies and Procedures). | | |

### *Compliance Assessment*

Policies governing bias-free and non-discriminatory policing remain in effect and are consistent with the provisions of the Agreement, satisfying the requirements of Targets 1 and 2.

121

During the current reporting period, PRP demonstrated measurable progress toward achieving compliance with the first three targets under Paragraph 88. The Monitor's Office reviewed documentation provided by PRP confirming that members completed the VIGPD 5011 (Multi-Themed Equal Protection and Non-Discrimination) course. This training, consistent with approved curricula, supports PRP's continued compliance with the requirement that at least 95% of personnel receive instruction in discrimination-free policing practices.

However, PRP did not submit documentation evidencing the dissemination of its policies regarding immigration-related laws to the public across the island. Aguadilla was the only area during this reporting period where it is reported and documented that immigration law dissemination did occur. This deficiency prevents verification of compliance with Target 4, which requires PRP to work with community advocates and ensure broad public awareness of such policies.

The Monitor's Office notes PRP's ongoing administrative improvements, including efforts to enhance training documentation within the PTMS and the planned implementation of Benchmark Analytics. These measures are expected to strengthen data reliability and ensure that training records are accurately maintained and verifiable in future reporting periods.

### Pathway Forward

To achieve substantial compliance with Paragraph 88, PRP should continue to ensure that all sworn personnel receive training consistent with the VIGPD 5011 course and that these completions are accurately documented within PTMS. PRP should prioritize reconciliation of any missing training records and ensure the seamless integration of existing data into the forthcoming Benchmark Analytics system to improve oversight and verification capabilities.

For compliance with Target 4, PRP must take deliberate and verifiable actions to disseminate its written policies concerning immigration-related laws to the public. This should include the development of a documented dissemination strategy in collaboration with community partners, publication of policies on official PRP communication platforms, and evidence of outreach activities conducted. Copies of materials distributed, records of public postings, and summaries of community engagement efforts should be maintained as supporting documentation. These steps are necessary to demonstrate transparency, promote community trust, and establish substantial compliance in subsequent reporting periods.

### Paragraph 89: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | |

| | | Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 and 4. |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | ☑ Met ☐ Missed |
| 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals. | ☑ Met ☐ Missed |
| 4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals. | ☐ Met ☑ Missed |

### Compliance Assessment

During the reporting period, the Monitor's Office verified that PRP achieved compliance with Compliance Targets 1 through 3. PRP policies guiding officer interactions with transgender and transsexual individuals remain consistent with the requirements of Paragraph 89 and continue to address gender identification, gender expression, transportation, processing, housing, and medical treatment.

Training aligned with these policies has been implemented and verified. Documentation submitted by PRP demonstrated that over 95% of personnel completed the required training programs: VVGS 3061 (Gender Violence) for supervisors and VVGA 3061 (Gender Violence) for agents. These courses incorporated content addressing professional interactions with transgender and transsexual individuals and met the established training standards.

For Target 4, the Monitor's Office reviewed five case files involving interactions with transgender or transsexual individuals. Four of the five files (80%) demonstrated compliance with PRP policy and reflected appropriate victim-centered procedures, including service referrals and adherence to gender identification protocols. One file lacked a victim-centered statement, preventing full compliance with this target. Although documentation for the remaining cases was sufficient, the limited sample size constrains an assessment of consistent policy application across the Bureau.

### Pathway Forward

PRP should maintain compliance with Targets 1 through 3 by ensuring continued implementation of training and policy dissemination on interactions with transgender and transsexual individuals. For Target 4, PRP must strengthen case documentation and ensure that all investigative files include a verified victim-centered statement and required checklists.

123

The forthcoming RMS should be leveraged to improve the capture, classification, and documentation of incidents involving transgender and transsexual individuals. PRP should establish an internal quality control process to review and validate entries for completeness and adherence to established protocols. These measures will enhance documentation accuracy, promote consistent application of policy, and support PRP in achieving compliance with Target 4.

## Paragraph 90: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding biased-free policing;*

*b) community perspectives of discriminatory policing;*

*c) constitutional and other legal requirements related to equal protection and unlawful discrimination;*

*d) the protection of civil rights as a central part of the police mission;*

*e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;*

*f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;*

*g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;*

*h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and*

*i) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 – 4.<br><br>April 2025 – September 2025 for Compliance Target 5. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually for Compliance Target #5. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | ☑ Met | ☐ Missed |

124

| | | |
|---|---|---|
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | ☑ Met | ☐ Missed |
| 5. 95% of sampled PRPB members are trained and certified in bias-free policing. | ☑ Met | ☐ Missed |
| Note: This Paragraph is assessed together with Paragraph 81 and 117 (Training). | | |

## Compliance Assessment

During this reporting period, the Monitor's Office verified that PRP achieved compliance with all five targets under Paragraph 90. VIGPD 5011 (Virtual Course on Interventions with Transgender or Transsexual Individuals) met all requirements outlined in the Agreement and served as the core training module addressing bias-free policing.

For Target 1, the Monitor's Office determined that the VIGPD 5011 curriculum is consistent with PRP's policy framework and the provisions of Paragraph 90. The course comprehensively addresses bias-free policing concepts, including PRP policies, constitutional principles related to equal protection, community perspectives on discriminatory policing, and strategies to prevent arbitrary classifications and stereotyping. The curriculum also emphasizes the application of fair and impartial policing practices during both field interactions and operational planning.

Regarding Target 2, PRP provided training schedules and attendance records confirming that the required training was delivered within the Agreement's frequency parameters. The VIGPD 5011 course was offered and completed during the current reporting period, ensuring that all active PRP personnel received training within the designated two-year interval and meeting the annual training requirement.

For Target 3, the VIGPD 5011 curriculum was formally reviewed by the Monitor's Office in March 2025. The review confirmed that the curriculum satisfies all content requirements under Paragraph 90, including instruction on civil rights protection, community engagement, and constitutional standards governing non-discriminatory policing. The curriculum was approved following this review, and the course design was found to include scenario-based learning and practical exercises promoting the application of policy principles in the field.

In relation to Target 4, the Monitor's Office reviewed the associated testing and evaluation materials for the VIGPD 5011 course. The examination instruments included clear, relevant, and appropriately challenging questions that accurately measured participants' understanding of the required material. Testing protocols require a passing score to obtain certification, and results submitted to the Monitor's Office demonstrated that officers successfully met established competency standards.

Finally, for Target 5, PRP submitted comprehensive training records verifying that 95.6% of personnel completed and were certified in VIGPD 5011 during the reporting period. Attendance rosters, and certified training records were reviewed and found to be consistent and verifiable. These records confirm PRP's adherence to the 95% completion threshold for certification in bias-free policing.

Based on the documentation reviewed, PRP has implemented and sustained effective policy, training, and evaluation practices aligned with the requirements of Paragraph 90. The integration of VIGPD 5011

into PRP's mandatory training cycle demonstrates institutional commitment to bias-free policing, equal protection, and accountability in police interactions with all members of the community.

*Pathway Forward*

To ensure continued compliance with Paragraph 90 of the Agreement, PRP must prioritize the consistent annual delivery of the VIGPD 5011 training. Establishing a structured and recurring training schedule will be essential to ensuring all personnel receive the required instruction within the designated timeframe. Integrating VIGPD 5011 into the broader annual training calendar will help prevent future gaps in delivery and reinforce a culture of bias-free and equitable policing. This paragraph is evaluated in conjunction with Paragraph 81, which has not yet met its training requirements and remains in partial compliance. As a result, Paragraph 90 also remains at partial compliance until progress is made on Paragraph 81.

PRP must also maintain robust documentation and tracking processes through the Benchmark Analytics system, capturing attendance, testing outcomes, and certification renewals. This will support verification of compliance with training frequency and content requirements. Regular curriculum reviews should be conducted to ensure alignment with current legal standards, policy updates, and evolving community priorities.

To sustain long-term compliance, PRP should develop a strategic plan for the ongoing administration of VIGPD 5011, including mechanisms for evaluating training effectiveness and incorporating stakeholder feedback. By institutionalizing these practices, PRP will reinforce its commitment to bias-free policing and ensure sustained adherence to the Agreement's training mandates.

## Paragraph 91: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall assess its operational programs, initiatives, and activities at least every two years to ensure that they are applied or administered in a manner that guarantees equal protection. As part of its assessment, PRPD shall specifically include an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs. PRPD shall also assess its operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. PRPD shall base its assessment of programs, initiatives, and activities on accurate, complete, and reliable data, including data contained in the EIS, stop and detention data, use of force analyses, and operational planning and after-action reports. PRPD shall make this assessment publicly available.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

126

*Compliance Targets*

| | |
|---|---|
| 1. 95% of reviewed programs, initiatives, and activities were assessed by PRPB at least every two years. | ☐ Met   ☐ Missed |
| 2. 95% of reviewed assessments conducted by PRPB included an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs, operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. | ☐ Met   ☐ Missed |
| 3. 95% of reviewed assessments of program initiatives and activities were based on accurate, complete, and reliable data, as required by the Paragraph. | ☐ Met   ☐ Missed |
| 4. 95% of reviewed assessments were made publicly available by PRPB. | ☐ Met   ☐ Missed |

Note: The section of this Paragraph that requires reliance on PRPB assessment of programs, initiatives, and activities on accurate, complete, and reliable data is assessed together with Paragraph 219 (Information Systems and Technology) and 148 (Early Intervention System) as to Use of Force.

Note: The section of this Paragraph that requires that operational programs, initiatives, and activities be reviewed every two years and be made publicly available, shall be assessed together with Paragraph 113 (Policies and Procedures).

*Compliance Assessment*

While meaningful progress has been made, the requirements of Paragraph 91, which call for a comprehensive, data-driven analysis of the effectiveness and equity of PRP's programs, have not yet been fully met.

During this reporting period, PRP took initial steps toward compliance by modifying its forms to include demographic data elements, ensuring that officers collect key information needed to evaluate and monitor the provision of police services for potential disparities. PRP, in coordination with the USDOJ, OSM, and the Monitor's Office, held a series of meetings to define the data points that should be included in Paragraph 91. These meetings have further explored the data collection and analysis capabilities of Axon, Benchmark Analytics, and the forthcoming RMS to establish a framework for future reporting.

Despite these efforts, several key data points required under Paragraph 91 are not currently captured by PRP or its existing systems. Given these limitations, a Paragraph 91 report based on the presently available data would be incomplete and unreliable and therefore would not satisfy the paragraph's requirements for accuracy and analytical rigor. Both the Monitor's Office and the USDOJ have emphasized that a valid Paragraph 91 report must be supported by comprehensive and verifiable data.

The implementation of the new RMS is expected to substantially enhance PRP's capacity to collect, validate, and analyze data necessary to meet Paragraph 91 requirements. Recognizing this, PRP has identified a dedicated team to develop a plan for implementation and continues to hold regular meetings to refine data-gathering and reporting processes.

While Paragraph 91 remains incomplete, PRP's continued coordination with the USDOJ, OSM, and the Monitor's Office, as well as its investment in developing the RMS and improving data capabilities, demonstrate ongoing efforts and incremental progress toward eventual compliance.

127

*Pathway Forward*

PRP should continue strengthening its capacity to collect, validate, and analyze comprehensive evaluation data, which is essential for ensuring that police services are delivered equitably and in accordance with constitutional and equal protection principles. As PRP moves toward Paragraph 91 implementation, it is critical that data collection processes, particularly those involving demographic information, be systematically monitored and validated to ensure accuracy and reliability.

The forthcoming RMS will play a pivotal role in achieving these objectives by providing PRP with improved tools for data integration and analysis. However, interim measures, such as developing proof-of-concept approaches and refining existing data collection processes, will be essential to sustain progress until the RMS becomes fully operational.

While PRP's recent efforts to modify forms and initiate data-gathering activities represent meaningful progress, full compliance with Paragraph 91 will require institutionalizing regular program assessments and conducting a comprehensive review every two years. Compliance will depend not only on the availability of data but also on PRP's ability to analyze and evaluate the effectiveness and equity of its programs. By consistently reviewing outcomes and identifying areas for improvement, PRP will advance both its reform goals and its service to the community.

## Paragraph 92: Equal Protection and Non-Discrimination - Discriminatory Policing

*Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | ☐ Met   ☑ Missed |
|---|---|

*Compliance Assessment*

During this reporting period, PRP considerably improved its capabilities of tracking all cases. As previous CMRs have noted, PRP's underreporting of cases in juvenile institutions was worrisome for the Monitor's Office. Now, PRP responded and recorded 102 cases, and determined 30 constituted abuse and

mistreatment (29%), and were thus reported to PRDOJ and the Department of Family. However, there may be overreporting during this reporting period, as the Department of Corrections recorded less cases. Though challenges are still present, the Monitor's Office has noticed PRP's positive progress and encourages PRP to continue these efforts.

However, some challenges in this paragraph persist. The Monitor's Office and PRP are working on two tasks to help PRP improve their compliance. First, PRP is reportedly working on a new form that will help officers conduct the preliminary investigations required by this paragraph. Secondly, PRP needs to define "abuse and mistreatment." Although PRP is now able to track cases of abuse and mistreatment more accurately, PRP identified that "abuse and mistreatment" occurred in a handful of cases, which they contend are the only cases which constituted "abuse and mistreatment." The Monitor's Office believes that, upon reading the findings of these cases, many cases that PRP determined did not constitute "abuse and mistreatment" did in fact constitute "abuse and mistreatment." The Monitor's Office believes that this is one of the main challenges concerning this paragraph, though considerable improvements have not gone unnoticed, especially in the second half of this reporting period.

A broad understanding of how Paragraph 92 complements local law is necessary. Article 60 of Law 57-2023 instructs PRDOJ to conduct full investigations of cases of institutional abuse and mistreatment in juvenile correctional facilities, and the Department of Family is instructed to prepare the report detailing the institutional abuse and mistreatment that is investigated by PRDOJ. Prior to PRDOJ or the Department of Family formally beginning this process, Paragraph 92 and PRP policy instructs PRP to conduct preliminary investigations of all allegations of abuse and mistreatment and send these preliminary investigations to PRDOJ and the Department of Family. Thus, local law and this Agreement are complementary in resolving these cases.

The process detailed above is hindered if PRP erroneously determines to catalogue cases as not constituting "abuse and mistreatment," and thus not forwarding them to PRDOJ and the Department of Family. Some of these examples include, according to the PRP description, overdoses of minors, juvenile-on-juvenile assaults, and others. Other cases show a pattern of potential negligence or deliberate indifference from the institution, such as employees constantly noticing minors with new tattoos, pervasive drug use among minors, minors constantly showing bodily injuries that were not noticed before, etc. Though PRP now reports more cases to PRDOJ and the Department of Family than it used to, more analysis and clear guidelines are needed for case-by-case analysis.

### *Pathway Forward*

PRP must develop a substantiated and researched definition of abuse and mistreatment, and review GO 635 (Investigation into Abuse and/or Negligence in Juvenile Institutions) and PPR 635.1. This will give officers a clear guideline of which cases to report. Of course, the Agreement does not require PRP to notify the PRDOJ and the Department of Family in cases that do not constitute abuse and mistreatment. However, the Monitor's Office notes that clear guidelines are necessary. If PRP, after concluding its preliminary investigation, is aware that juvenile institution facility, or another public employee pertinent to the incident, already reported the case to the PRDOJ and the Department of Family, PRP should record this information, and notify the Monitor's Office. The duplicity of notifications is unnecessary.

129

## 3. Sexual Assault and Domestic Violence

PRP has demonstrated continued commitment to improving its response to (SA and DV cases, sustaining progress in key areas identified in prior reporting periods. These ongoing efforts reflect PRP's recognition of the importance of effective, victim-centered responses in cases involving gender-based violence.

Despite these efforts, the Monitor's Office notes that several challenges persist, many of which have been identified in prior CMRs. Continued focus is required to strengthen oversight mechanisms, including the tracking and documentation of case information shared with external stakeholders, the consistent delivery and documentation of mandated SA and DV training, and the standardized handling of cases involving PRP personnel. Enhancing these components is essential to achieving greater consistency in investigative procedures, ensuring comprehensive documentation, and reinforcing accountability throughout the investigative process.

### Paragraph 93: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1, 2, and 4. <br><br> April 2025 – September 2025 for Compliance Target 3. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for the remaining Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | ☑ Met | ☐ Missed |
| 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies. | ☑ Met | ☐ Missed |
| 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 94, 98 and 99.

*Compliance Assessment*

For Target 1, related policies are all currently up to date and reviewed SA and DV policies and procedures comply with applicable law and generally accepted policing practices. AEVG 8061 (Investigators from the Specialized Unit on Gender Violence) and VDCG 3081 (Virtual Dispatchers for Crisis Intervention and Gender-Based Violence are consistent with approved policies.

For Target 3, PRP submitted training records for 92 agents. The required courses are VVGA 3061 (Gender Violence) for agents and VVGS 3061 (Gender Violence ) for supervisors, each consisting of 16 hours of instruction. A total of 21 supervisors completed VVGS 3061, and 71 agents completed VVGA 3061. The Monitor's Office has determined that Target 3 has been met and will continue to reassess compliance with this training in the next reporting period.

During this reporting period the Monitor's Office reviewed 29 SA and 147 DV cases and determined that PRP has not achieved the required 95% compliance rate.  PRP must ensure that SA and DV reports are responded to and investigated professionally, effectively, and without gender-based bias. PRP should continue strengthening its capacity to investigate these incidents, maintain close collaboration with community stakeholders, and apply a victim-centered approach throughout the investigative process. Additionally, PRP must ensure that all policies and procedures governing the response to SA and DV, including cases involving PRP officers, remain consistent with applicable law and generally accepted policing practices.

A significant structural change during this reporting period was the reorganization of the SA, DV, and Crimes Against Children investigative units into a single "Umbrella Unit." Under this model, investigative agents are now assigned cases across all three categories, rather than operating within specialized units. While the reorganization may be presented as an effort to streamline operations or demonstrate sufficient staffing, it raises substantial concerns regarding investigative quality, victim care, and overall case management.

This restructuring has created operational challenges, as agents must now prioritize complex and highly sensitive cases that require distinct investigative approaches. The need to triage between SA, DV, and child-related cases has led to delays in case progression and diminished the capacity for in-depth, victim-centered investigations. Agents report that this model does not enhance investigative capacity but instead consolidates caseloads under the appearance of increased manpower. Current case averages are approximately 5 SA cases and 10 DV cases per agent per month, which exceeds best practice standards for trauma-informed and timely investigations.

SA, DV, and crimes against children investigation best practices emphasize maintaining specialized units staffed by trained personnel with dedicated expertise in each area. Such units promote consistent application of trauma-informed practices, improve coordination with victim services, and strengthen prosecutorial outcomes. The current "Umbrella Unit" model diverges from these established standards and poses a risk to both investigative effectiveness and victim well-being. Continued monitoring and

131

reassessment of this structure are warranted to ensure alignment with best practices and to safeguard the integrity of victim-centered investigative work.

## Pathway Forward

PRP should prioritize improving the quality and consistency of SA, DV, and crimes against children investigations to achieve the 95% compliance threshold required under this paragraph. PRP must conduct a comprehensive assessment of the current "Umbrella Unit" structure to evaluate its impact on investigative effectiveness, victim response, and workload distribution, as well as the absence of succession planning within these units. Based on these findings, PRP should consider reinstating or reinforcing specialized investigative teams to align with trauma-informed and victim-centered best practices. Continued training, supervision, and accurate documentation through the Benchmark Analytics system are critical to ensuring accountability and oversight. Regular internal reviews should be implemented to identify patterns of noncompliance and address deficiencies through targeted corrective measures, including refresher training and enhanced supervisory review. Strengthening coordination with community stakeholders and advocacy organizations will further promote professional, unbiased, and victim-focused investigative practices.

## Paragraph 94: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's sexual assault policies and procedures shall provide clear and detailed guidelines for each stage of PRPD's response to a reported sexual assault, including (a) dispatch response; (b) initial officer response; (c) initial and follow-up victim interviews; and (d) on-scene and follow-up investigation. These protocols shall be based on recognized models and guidelines on forensic examinations, such as, for example, the National Protocol for Sexual Assault Medical Forensic Examinations issued by DOJ's Office of Violence Against Women.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. PRPB's sexual assault policies and procedures comply with the requirements of the Paragraph. | ☒ Met | ☐ Missed |
| 2. 95% of reviewed sexual assault investigations complied with requirements of the Paragraph. | ☐ Met | ☒ Missed |

Note: This Paragraph is assessed together with Paragraphs 93, 98 and 99.

*Compliance Assessment*

During the reporting period, the Monitor's Office conducted an in-depth evaluation of 29 SA case files. While improvements were observed in file organization and documentation, substantial inconsistencies remain in investigative practices. Variations persist in victim interview documentation, ranging from handwritten notes to officer-produced transcriptions, and in the level of follow-up on corroborating evidence. In multiple cases, reports of related offenses such as stalking, harassment, or unlawful restraint were not pursued, and investigations were often closed prematurely when victims declined to proceed. These practices reflect a continued gap in victim-centered investigative standards and echo concerns cited in prior CMRs.

PRP's continued use of PPR 118.3 (Investigative Checklist) is a positive development, as it clarifies procedural responsibilities and supports consistency in case handling. In this reporting period, the Monitor's Office's case file analysis found that PRP achieved approximately 52% compliance with the investigative requirements of the Agreement. Approximately 57% of cases reflected elements of a victim-centered approach, while 51% documented the provision of follow-up information or victim resources. Reports contained sufficient investigative details in 87% of the cases reviewed. These figures indicate an advancement towards adherence with best practices.

Interview techniques require significant improvement to align with trauma-informed, victim-centered principles. Case files rarely documented the presence of victim advocates or other support mechanisms and lacked evidence of continued victim contact. Some files included supervisor approval signatures, representing a commendable accountability measure that should be standardized across all units.

Interviews with assigned agents confirmed both progress and persistent challenges. Agents reported receiving an 80-hour specialized training course that enhanced their investigative capabilities and underscored the importance of empathy in victim engagement. However, they also noted excessive caseloads, averaging 12 new cases per month, creating operational strain. Agents recommended procedural adjustments, such as coordinating interviews with prosecutors to minimize repetitive victim recounting and secondary trauma.

On-site observations revealed that SA units frequently lack private, trauma-informed spaces for victim interviews. Many interviews occurred in shared work areas or cubicles, conditions that are inconsistent with national standards and the requirements of a victim-centered response. While the SA/DV Plan includes provisions for constructing private interview rooms, this initiative remains incomplete.

Technological and logistical deficiencies further hinder effective investigations. Agents cited limited access to functional computers, outdated systems, and inadequate vehicle availability, which restricts timely field response and victim assistance. Additionally, persistent staffing shortages among investigators continue to impede operational capacity. The absence of a defined retention and succession plan poses ongoing risks to the sustainability and timeliness of SA investigations.

Overall, while PRP has demonstrated policy implementation and a commitment to improvement, practice remains inconsistent with established standards. Sustained efforts in training, supervision,

infrastructure development, and workforce stability are essential to ensure professional, unbiased, and victim-centered SA investigations.

### Pathway Forward

PRP should strengthen its investigative practices by ensuring consistent application of trauma-informed, victim-centered approaches throughout all stages of SA investigations. Priority should be given to completing the buildout of private interview rooms, addressing technology and vehicle deficiencies, and implementing a structured workforce retention and succession plan to ensure sustained investigative capacity. Enhanced supervisory oversight and the standardized use of the investigative checklist should be reinforced through targeted refresher training and periodic internal audits. PRP should also coordinate with prosecutors and victim advocacy organizations to minimize retraumatization and improve case follow-up. These actions will support compliance with Paragraph 94 and align PRP's investigative practices with nationally recognized standards.

## Paragraph 95: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall re-assess and revise, where needed, its classification protocols for crimes involving sexual assaults. PRPD shall track all reports of felony sexual assault based on the UCR definitions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPB is appropriately classifying crimes involving sexual assault as required by the Paragraph. | ☑ Met ☐ Missed |
| 2. PRPB's classification and tracking of felony sexual assault crimes comply with the Paragraph. | ☑ Met ☐ Missed |

Note: This Paragraph is assessed together with Paragraph 82.

### Compliance Assessment

PRP provided documentation demonstrating that it has re-assessed and revised its classification protocols for SAs. The protocols include GO 118 (Gender-Based Violence and Juvenile Affairs Division), GO 622 (Investigation of Sexual Crime Incidents and Child Abuse), GO 607 (Incidents of Sexual Crimes Committed by PRP Employees), the Criminal Investigation Corps Operational Manual, and the Manual for the Handling of Police Incident or Service Reports (NIBRS). The review logs indicate updates and revisions through 2025, reflecting ongoing efforts to ensure protocols are current. Additionally, the

134

NIBRS manual aligns with UCR/NIBRS standards, indicating that PRP is tracking all reports of felony SA. Based on the documentation provided, Target 1 is met.

For Target 2, PRP demonstrated that it is appropriately classifying Sas and tracking all reports of felony SA in accordance with Paragraph 95. The reviewed SA case files indicate compliance with UCR reporting standards. Based on this documentation, Target 2 is met. Although both targets for this paragraph have been met, it is assessed jointly with Paragraph 82, which remains at partial compliance. Consequently, this paragraph must also remain at partial compliance until Paragraph 82 achieves substantial compliance.

This reporting period marks the first time PRP has met all targets under Paragraphs 95 and 96. It is essential that PRP sustain this level of performance and avoid regression. The Monitor's Office will reassess these targets in the next CMR to confirm continued compliance.

### *Pathway Forward*

The adoption of the new RMS provides PRP with an opportunity to enhance the stability and consistency of its classification protocols for SA crimes in alignment with UCR definitions. The system should be designed to accurately capture and track all relevant data, ensuring statistical reliability that supports transparent public reporting. Maintaining precise and consistent data is essential, and PRP should continue to evaluate and refine its processes to uphold accurate reporting. Leveraging the RMS for classification purposes will help standardize procedures, reduce errors, and establish clear expectations for how SA cases are documented, tracked, and reported. This approach reinforces transparency, accountability, and confidence in PRP's management of this critical area.

### Paragraph 96: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 – 5. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually for the remaining Data Sources. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | ☑ Met    ☐ Missed |

135

| | |
|---|---|
| 2. Training on response to sex crimes related calls is in accordance with approved policy. | ☑ Met ☐ Missed |
| 3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls. | ☑ Met ☐ Missed |
| 4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes. | ☑ Met ☐ Missed |
| 5. The manned hotline provides the public access to the Sex Crimes Investigation Unit. | ☑ Met ☐ Missed |

*Compliance Assessment*

PRP remains in compliance with Targets 1 and 2. The policy governing the Sex Crimes Investigation Unit continues to incorporate all requirements of the paragraph, aligning investigative procedures with approved standards and best practices. The Sexual Crime Victims' Helpline (787-343-0000) remains active and prominently displayed on the PRP website, ensuring accessibility for the public.

In addition, training related to the response to sex crimes–related calls continue to be implemented in accordance with the approved policy, reflecting PRP's ongoing commitment to proper investigative practices and victim-centered approaches. To achieve call taker certification, personnel must complete one of the following approved courses: SEVG 8061 (Supervisors of the Specialized Unit on Gender-Based Violence); LWS 622 (Sexual Violence Victims' Counseling Line); AEVGM 8061 (Operational Module for Officers Assigned to the Gender-Based Violence and Juvenile Affairs Division, DV, Sexual Crimes Units, and COPOP); LWS 6061 (Instructors on the Operation of the Sexual Violence Victims' Counseling Line for UE Personnel from the Sexual Crimes Division and the Protection Order Operations Center); WGA 3061 (Gender-Based Violence for Officers); or WGS 3061 (Gender-Based Violence for Supervisors).

For Target 3, PRP submitted documentation for 18 personnel who successfully completed LVVS 622 (Sexual Violence Hotline Call Center Training), demonstrating continued compliance with established requirements. The hotline remains housed within COPOP, operating 24 hours a day and staffed by 6 civilian contractors assigned by DSP, ensuring non-sworn personnel manage hotline operations.

Regarding Target 4, PRP provided a representative sample of 39 calls for service received between July and September 2025, drawn from a total of 474 calls during that same period. The sample included key data points such as the incident date, time, type, call taker, assigned investigator, district, case number, and supervising agent. This documentation supports PRP's continued compliance with requirements related to 24-hour staffing and continuous hotline operations.

PRP submitted a list of 18 certified call takers assigned across 13 geographic regions in Puerto Rico, ensuring island-wide accessibility to hotline services. From July through September 2025, the hotline received 474 calls, confirming that trained personnel are available and providing appropriate responses to reports of sexual crimes. With the hotline now fully operating under COPOP, effective scheduling practices continue to ensure uninterrupted 24-hour coverage. Accordingly, PRP is found to be compliant with Target 5 for this reporting period.

This reporting period marks the first time PRP has met all targets under Paragraphs 95 and 96. It is essential that PRP sustain this level of performance and avoid regression. The Monitor's Office will reassess these targets in the next CMR to confirm continued compliance.

*Pathway Forward*

Based on the current compliance assessment, PRP should continue sustaining the operational standards that have led to compliance across all assessed targets. Regular evaluation of staffing levels should ensure that the 6 civilian contractors assigned to the hotline remain sufficient to maintain uninterrupted 24-hour coverage. Training for call takers must remain current, with verification that all assigned and reserve personnel have completed the required call taker training.

PRP should continue submitting comprehensive documentation of hotline operations, including incident records and personnel assignments, to demonstrate ongoing compliance. Monitoring call volume, scheduling, and regional access will further strengthen PRP's capacity to provide consistent, victim-centered services and maintain compliance in future assessments.

## Paragraph 97: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of sexual assault investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track sexual assaults by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☑ Met  ☐ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☐ Met  ☑ Missed |

*Compliance Assessment*

During this reporting period, PRP's reporting capabilities regressed. A critical component of Paragraph 100 implementation is the inclusion of comprehensive data in the annual report. PRP is currently establishing reporting parameters for the Annual Report, which will incorporate SA data. The Monitor's Office reviewed a draft of the Annual Report. The implementation of the EIS SA Module facilitated the creation of a comprehensive system report that includes: (a) the status of all SA investigations, regardless

137

of when the incident occurred or the investigation began, and (b) the outcomes of complete investigations. However, this report was not submitted.

For Target 1, PRP submitted the SA Status Report covering October 1, 2024, to April 1, 2025, which reflects a total of 740 cases. The report included complaint number, date of incident, area, precinct, municipality, type of crime, type of investigation, incident status, and resolution. The report did not include key indicators such as arrests, prosecutor charging decisions, convictions, gender of victims, or instances with multiple arrests. PRP does track these additional indicators to meet Paragraph 100 requirements. These data points are reported in the annual report. As a result, Target 1 is met. These critical indicators provide the ability to understand SA incidents and enhance transparency and accountability in PRP's reporting practices.

Although the 2024 Annual Report has not yet been published, the draft demonstrates substantial progress toward compliance with this paragraph. The draft is comprehensive, well-structured, and aligned with reporting standards typical of large metropolitan police departments. It documents legislative developments, institutional reforms, and interagency collaboration supporting a victim-centered and trauma-informed approach. The report also reflects enhanced data collection and analytical capabilities that can inform evidence-based policy decisions. Moving forward, PRP should further strengthen the connection between data trends and operational or policy outcomes, incorporate long-term measures of victim safety and service effectiveness, and integrate legislative, statistical, and institutional components into a cohesive strategic framework. Overall, the draft Annual Report establishes a strong foundation for continued progress, transparency, and accountability in PRP's response to SA and DV.

### Pathway Forward

PRP should finalize and implement the reporting parameters for the Annual Report to ensure compliance with Paragraph 100, including comprehensive SA data. PRP must submit the EIS SA Module-generated report, which captures the status and outcomes of all SA investigations, regardless of when incidents occurred. Additionally, the SA Status Report should be expanded to include critical indicators such as arrests, prosecutor charging decisions, convictions, gender of victims, and cases involving multiple arrests. Inclusion of these indicators is essential for a thorough understanding of SA incidents and for promoting transparency and accountability.

PRP should also strengthen the connection between data trends and operational or policy outcomes, using enhanced reporting to inform evidence-based decisions. Continued development of data collection, analysis, and reporting capabilities will support a victim-centered, trauma-informed approach, improve SA investigation monitoring, and align practices with standards of large metropolitan police departments. Implementing these measures will advance PRP's compliance with Paragraph 100 and reinforce transparency, accountability, and effectiveness in responding to SAs.

### Paragraph 98: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's domestic violence policies and procedures shall clearly delineate the duties of all PRPD officers and staff and provide clear and detailed guidelines for each stage of PRPD's response to a report of domestic violence.*

138

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB's policies and procedures regarding domestic violence meet the requirements of the Paragraph. | ☑ Met   ☐ Missed |
| 2. 95% of reviewed domestic violence investigations complied with requirements of the Paragraph. | ☐ Met   ☑ Missed |

Note: This Paragraph is assessed with Paragraphs 93, 94 and 99.

*Compliance Assessment*

During this reporting period, no new policies were submitted for review under this paragraph. However, the Monitor's Office acknowledges that GO 627 (DV Investigations) along with PPR 701.3–7, PPR 118.1 (DV Case File Comparison Sheet), and GO 154 (Community-Oriented Policing Operations Program), remain approved and consistent with the requirements of this paragraph. These policies continue to reflect recognized policing standards for the management and investigation of DV incidents.

A total of 147 DV case files were reviewed during the reporting period. The Monitor's Office noted continued improvement in the organization and completeness of case documentation. Nonetheless, inconsistencies persist in several key areas, including the quality of interviews and follow-up practices. Interview documentation varied widely across cases, some were handwritten by victims, while others were typed or transcribed by officers, demonstrating the absence of a standardized format. Furthermore, the review identified repeated lapses in follow-up on corroborating evidence, particularly in cases involving related offenses such as stalking or harassment. In multiple instances, investigations were closed prematurely when victims opted not to pursue charges, a recurring issue observed in prior CMRs.

Interviews conducted with investigative agents indicated both strengths and ongoing challenges within the DV investigative units. Agents reported having received extensive training, including an 80-hour specialized course designed to enhance investigative techniques and victim engagement. However, training documentation showed that none of the 92 officers reviewed completed the required AEVG 8061 – Investigations of the Specialized Unit on Gender Violence during this reporting period, resulting in PRP falling short of the 95% training compliance target. Agents emphasized the emotional toll of managing an average of 6 to 10 new cases each month and highlighted that streamlining interview procedures, such as conducting joint interviews with prosecutors, could reduce victim retraumatization.

Despite standardized policies, field practices vary considerably across regions. Four different police report templates were identified in use across Aibonito, Arecibo, Bayamón, and Fajardo. While some reports were digitally produced, the majority were still handwritten, impacting readability and overall quality control. Agents also cited the need for updated technology and reliable computer systems to support digital case management, as well as improved transportation resources. The limited availability of appropriate vehicles continues to hinder the ability of DV units to provide victim relocation support. Many units rely on Dodge Chargers, which are ill-suited for transporting families or their belongings to shelters.

Facility constraints remain a significant obstacle. Site visits revealed that several offices lack private, trauma-informed spaces for victim interviews, with some conducted in shared or cubicle environments. These conditions compromise confidentiality and do not align with victim-centered principles. PRP's SA/DV Plan includes the development of dedicated interview rooms; however, construction and retrofitting efforts remain incomplete.

The review also identified gaps in the consistency of victim advocacy referrals. While some files reflected that investigators provided victims with safety planning information and referrals to shelters or advocacy organizations, this practice was not uniformly documented. Agents acknowledged that initial responders occasionally retraumatize victims by requesting repeated statements. Newly assigned investigators, particularly those with less than one year of experience, expressed the need for consistent, unified training to strengthen trauma-informed practices and ensure procedural alignment across all regions.

The Monitor's Office continues to recognize the positive impact of PPR 118.3 (Investigative Checklist), which clarifies the sequence of investigative actions and helps improve procedural consistency. In the 147 reviewed cases, PRP demonstrated approximately 61% compliance with investigative requirements under the Agreement. Notably, 74% of cases reflected a victim-centered approach, and 93% documented next-step information or resource referrals for victims. Furthermore, 61% of case files contained sufficient investigative details to support case development.

Overall, while PRP has made measurable progress in documentation and victim engagement, critical deficiencies persist in training delivery, technology, infrastructure, and standardized procedures. Sustained focus on training compliance, interview standardization, and trauma-informed practices is necessary to ensure investigations are conducted professionally, effectively, and in a manner that fully supports victims' rights and safety.

### Pathway Forward

To advance compliance with this paragraph, PRP should prioritize the consistent implementation of trauma-informed, victim-centered investigative practices across all DV units. PRP should deliver the required AEVG 8061 – Investigations of the Specialized Unit on Gender Violence training to all assigned agents and ensure full documentation of completion within the Benchmark Analytics system. A standardized interview and reporting format should be adopted island-wide to eliminate regional disparities in documentation, promote accuracy, and enhance supervisory review. PRP must expedite the construction and outfitting of private interview rooms to guarantee confidentiality and a safe environment for victims. Addressing equipment and technology gaps, specifically providing functional

computers and suitable vehicles for family relocation, should be prioritized to support operational readiness.

Additionally, PRP should establish a structured internal review process to monitor case quality, including verification of advocacy referrals and supervisory approval in every file. Refresher training should reinforce best practices for evidence collection and victim communication. Finally, PRP should develop a staffing and succession plan to ensure adequate investigator coverage and reduce burnout, thereby sustaining timely, high-quality investigations. Implementing these targeted measures will strengthen accountability, improve victim trust, and bring PRP closer to substantial compliance with the Agreement's requirements.

## Paragraph 99: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. <br><br> April 2025 – September 2025 for Compliance Target 2. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all other Compliance Targets. |
| Practice: | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. | ☑ Met  ☐ Missed |
| 2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph. | ☑ Met  ☐ Missed |

Note: This Paragraph is assessed with Paragraphs 93, 94, and 98. The conduct envisioned by this Paragraph may also fall within the purview of Paragraph 184.

### *Compliance Assessment*

During this reporting period, the Monitor's Office reviewed 23 cases involving PRP members – 2 SAs and 21 DVs. These reports included both criminal and administrative investigation files related to the incidents. The Director of the Office of Psychology and Social Work submitted certifications detailing staff interventions with the individuals involved. Each complaint was assigned a SARP case number, confirming that all 23 cases were formally investigated by SARP.

PRP followed its policy of initiating an administrative investigation whenever a criminal case involving one of its members was identified. In each case, PRP adhered to established procedures by confiscating the officers involved weapons and ammunition. This was documented through PPRs 618.2 (Authorized Weapons Receipt), 618.3 (Regulation Weapon Receipt), and 618.4 (Certification of Weapons and/or Ammunition Receipt). Additionally, all 23 cases were referred to the Psychological Services Unit for further evaluation and support.

## Paragraph 100: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of domestic violence investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track domestic violence arrests by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☐ Met | ☑ Missed |

### Compliance Assessment

During this reporting period, PRP continued to advance its reporting capabilities. A key component for Paragraph 100 implementation is making DV data available in the Annual Report. PRP is in the process of establishing reporting parameters that will capture this information. The implementation of the EIS DV Module supports the creation of a comprehensive system report that includes a) the status of all DV investigations, regardless of when the initial incident occurred or when the investigation began during the reporting period, and b) the outcomes of all complete investigations.

The DV Status Report for the period of October 1, 2024, to March 30, 2025, reflects a total of 2,638 cases. The report categorizes incidents by region and disposition, providing a systematic and organized approach to data collection and reporting. It also compares current-year incidents to the prior three years, offering a longitudinal view of DV trends. These reporting practices include important indicators, such as gender breakdowns and cases involving multiple arrests, which are essential for understanding DV dynamics and reinforcing transparency and accountability.

During this reporting period, PRP included in its draft annual report data intended to address the criteria of Paragraph 100, which requires tracking the dispositions of DV investigations, including arrests, prosecutorial charging decisions, and convictions. PRP is also required to track DV arrests by gender and incidents involving multiple arrestees, and to report this information in its Annual Report.

Although PRP prepared a draft 2024 Annual Report that includes the required data, the report has not yet been approved for publication. As a result, PRP has not provided official reporting to demonstrate compliance with Paragraph 100. Therefore, Target 2 is missed.

*Pathway Forward*

PRP should prioritize finalizing and publishing the 2024 Annual Report to provide the official data required under Paragraph 100. This includes tracking the dispositions of DV investigations, arrests, prosecutorial charging decisions, convictions, gender-specific arrest data, and incidents involving multiple arrestees. Until the Annual Report is approved and published, PRP cannot demonstrate compliance with these reporting requirements.

In parallel, PRP should continue refining the EIS DV Module and reporting parameters to ensure that future annual reports comprehensively capture all required DV metrics. This includes validating the accuracy and completeness of data, ensuring that supervisors can monitor case progress and outcomes consistently, and incorporating additional demographic indicators where appropriate. Regular review and quality assurance of the data will strengthen transparency, support accountability, and facilitate compliance with Paragraph 100 in subsequent reporting periods.

## V. Recruitment, Selection, and Hiring

Recruitment, Selection, and Hiring is assessed on an annual basis. Paragraphs 101 – 108 were assessed in CMR-12 and will be assessed again in CMR-14.

## VI. Policies and Procedures

The PRP Office for Policies and Procedures typically reviews and approves policies on schedule, though some are delayed at the Superintendent's Office or pending implementation plan execution that is scheduled for 2025. All PRP policies provide clear guidance and instruct personnel to follow Bureau rules, Commonwealth laws, and constitutional rights, specifying consequences for noncompliance or failure to report violations.

New and updated policies are shared with staff and the public via a comprehensive, searchable Virtual Library. Staff continue to receive notifications about policy updates through Policia Informa, Outlook emails, and monthly area trainings (monthly academies). Paragraphs 110 and 111, which require the creation and maintenance of select policy manuals, have received fully compliant ratings in both CMRs-11 and 13 due to the creation of the public Virtual Library mentioned above.

PRP has also created an electronic module, called Info Access, which facilitates the dissemination of new and updated policies to officers. The full deployment of this module, which also tracks when officers access and read emailed policies, along with the operationalization of these policies in the field, are helping to move compliance in a positive direction for some paragraphs.

Additionally, PRP achieved 100% participation with in-service training during this reporting period, and the subsequent phase of annual in-service training for 2025 is progressing and scheduled to end in March of 2026. Furthermore, the development of an effective online policy review calendar is also a positive step forward. However, timely policy review and approval continue to need some improvement.

Overall, the Commonwealth's compliance with the eight paragraphs within Policies and Procedures reflects identical compliance to what was noted in previous CMRs. In CMRs-11 and 13, 75% of paragraphs (6 paragraphs) were assessed as partially compliant and 25% of paragraphs (2 paragraphs) were assessed as fully compliant. See figure 6.



*Figure 6. Policies and Procedures: Paragraph Compliance Status*

## Paragraph 109: Policies and Procedures – General Provisions

*Policies and procedures shall reflect and express PRPD's core values and priorities, and provide clear guidance to ensure that officers and civilian employees lawfully, effectively, and ethically serve the community. PRPD shall develop comprehensive and agency- wide policies and procedures to ensure consistency with, and full*

*implementation of, each requirement of this Agreement. These policies and procedures shall define terms clearly, comply with applicable law, and comport with generally accepted policing practice. PRPD shall apply policies uniformly and hold officers accountable for complying with policies and advancing PRPD's core values and priorities.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 110-116, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

PRP has consistently demonstrated efficiency in developing new policies, as well as reviewing and updating existing policies, forms, guides, and manuals. Its policies define terms clearly and comply with applicable law and generally accepted policing practices.

Twenty-one PRP policies were eligible for review during the reporting period according to the September 2024 PRP Policy Calendar. Only three (GO 600-642, 600-628 and 100-119) were submitted for review to the Monitor's Office, which were deemed compliant and approved.

Further, PRP provided in-service training to 100% of officers during the reporting period, surpassing the 95% compliance threshold. In a review of arrest and search data the Monitor's Office found that PRP officers continue to improve significantly in the preparation of police reports and forms, as well as in the articulation of probable cause. However, full compliance requires continued proper training on policies and better verification of field adherence, as described in the outcome assessments under Paragraph 243.

### *Pathway Forward*

PRP is responsible for ensuring effective implementation of all policies and enhancing its capacity to verify policy compliance in operational settings, as evidenced by outcome assessments conducted pursuant to Paragraph 243. PRP has fallen behind in timely policy review and approval. Additionally, PRP should maintain its practice of using area command monthly training sessions and its virtual training system.

146

## Paragraph 110: Policies and Procedures - General Provisions

*PRPD shall develop and publish a department-wide policy and procedure manual that will include all policies, procedures, and regulations governing all administrative and operational aspects of PRPD. The manual shall be organized by subject-matter and indexed for reference.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. The Policy and Procedures Manual is complete, organized, and indexed, as required by the Agreement. | ☑ Met | ☐ Missed |
| 2. The current Policy and Procedures Manual is accessible to officers in 95% of selected precincts and units. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

PRP's Virtual Library (GO 409), available since late 2021 on the PRP website, provides officers and the public with searchable access to all approved policies, forms, guides, and manuals via computer or smartphone.[14] The Virtual Library serves as the official Policies and Procedures Manual. The Monitor's Office recently confirmed its proper functioning by accessing it on PRP's website and conducting random searches.

## Paragraph 111: Policies and Procedures - General Provisions

*PRPD's unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. PRPD shall develop unit-level policy and procedure manuals for, at a minimum, the following PRPD units or functions:*

*a) Field operations, including patrol, special and tactical operations, field support, special weapons and tactics, canines, supervision task forces, and mass demonstration or event policing;*

*b) SPR, including case and records management, administrative investigations, confidential investigations, parallel criminal and administrative investigations, FIU investigations, audits, and officer drug testing;*

*c) Use of Force Reporting, Investigation, and Review, including both Supervisory and Serious Use of Force Investigations and Review; and In- Custody Death Reviews;*

*d) Criminal investigations, including sub-units assigned to investigate homicides, sexual assaults, domestic violence, narcotics, vice, and illegal firearms; and*

*e) Recruitment and Training, including training provided by UCCJ and in- service training.*

---

[14] See PRPB Certification number 13-11-04-0056, dated April 21, 2025.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Unit-wide policies and procedures are collected in manuals for each of the five areas specified in the Agreement. | ☑ Met | ☐ Missed |
| 2. The current unit-level policy and procedures manual is accessible to officers in 95% of selected precincts and units. | ☑ Met | ☐ Missed |

### Compliance Assessment

In 2021, PRP issued GO 409 to establish a Virtual Library containing all policies, general orders, forms, manuals, and regulations. The Library is accessible online to both officers and the public. The Monitor's Office frequently uses it and finds it easy to search by subject, keyword, or title. All four required unit-level manuals—SARP, SAOC, SAIC, and UOF—are included.[15]

### Paragraph 112: Policies and Procedures - General Provisions

*PRPD shall review each newly developed policy after it is issued and revise the policy as necessary to ensure that it provides effective guidance to PRPD personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies on policy development incorporate the requirements of the paragraphs. | ☑ Met | ☐ Missed |
| 2. Orientation on policy development protocols is consistent with approved protocols. | ☑ Met | ☐ Missed |

---

[15] See PRPB Certification number 13-11-04-0056, dated April 21, 2025.

| | |
|---|---|
| 3. 95% of policies and procedures due for review during the evaluation period are reviewed and, as necessary, revised. | ☐ Met  ☑ Missed |
| 4. Stakeholder comments are reviewed and considered as part of the policy review process. | ☑ Met  ☐ Missed |
| 5. Internal comments and recommendations are reviewed and considered as part of the policy review process. | ☑ Met  ☐ Missed |
| 6. Policies are posted online in a timely manner or otherwise made available to the public as required by approved policies. | ☐ Met  ☑ Missed |

*Compliance Assessment*

Annex A (Policy and Procedure Development Process) of the approved Action Plan describes the protocol PRP follows when creating policies that align with policing standards, Commonwealth laws, and constitutional requirements. The Policies and Procedures Section of the Reform Office, which includes attorneys, sworn personnel, and civilians, is responsible for drafting all policies.

Twenty-one PRP policies were eligible for review during the reporting period according to the September 2024 PRP Policy Calendar. Only three (GO 600-642, 600-628- and 100-119) were submitted for review to the Monitor's Office, which were deemed compliant and approved.

PRP documented that comments from work units on policies are discussed with affected units. They also gather feedback from stakeholders and the public via the Virtual Library and email, where all documents link to a comment page. The Monitor's Office confirmed this process, and that stakeholders are informed of the acceptance or rejection of their suggestions and the reasons.[16]

*Pathway Forward*

The policy review, approval, and posting to the Virtual Library processes need improvement. Timely policy review and approval have fallen behind due to several issues related to pending implementation plans and the development of new IT systems and modules. This delay has affected the publication of up-to-date policies on the Virtual Library, resulting in many outdated policies still being accessed by officers and the public.

## Paragraph 113: Policies and Procedures - General Provisions

*PRPD shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of a policy deficiency, and biannually thereafter. PRPD will develop a schedule for the biannual review. PRPD shall make revisions as necessary to ensure that policies and procedures remain consistent with this Agreement, generally accepted policing practice, and current law. All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner. Reasonable exceptions shall apply to policies and procedures that are law enforcement sensitive.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2024 – September 2025 |

---

[16] See PRPB Certification #13-11-04-0036, dated April 15, 2025.

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed together with Paragraph 112.

### Compliance Assessment

PRP generally creates new policies and reviews existing ones in a timely manner. However, during this reporting period, the review, revision, and approval of several policies have been held back. For example, out of the 21 PRP policies that were eligible for review during the reporting period, only three (GO's 642, 628, and 119) were submitted for review to the Monitor's Office, which were deemed compliant and approved.

PRP provided an online, regularly updated calendar that lists policies scheduled for biennial review (every two years) as required by the Agreement.[17]

As noted in previous paragraphs, PRP's Virtual Library is available to the public and anyone with a computer or smartphone and internet service. It can be searched by subject, title, or keyword. However, to be fully effective and useful, it must be updated with up-to-date policy revisions.

### Pathway Forward

PRP's Virtual Library offers convenient access for officers and the public, but it needs timely updates with current policy revisions to remain effective. The Policies and Procedures Office have reported that approval of several policies has been held back for long periods of time at upper management levels. PRP must improve this process to reach higher compliance with this section.

### Paragraph 114: Policies and Procedures - General Provisions

*Within a reasonable period of time, PRPD shall ensure that all relevant PRPD personnel have received, read, and been trained on all new or amended policies or procedures as necessary to fulfill their role as required by policies and procedures, including the obligation to report any policy or procedure violation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | | Annually |

---

[17] See Certification #13-11-04-0035, dated April 11, 2025.

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate the requirements of the paragraphs. | ☒ Met | ☐ Missed |
| 2. Training on information systems and agency communications is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of selected officers received and opened all agency transmittals with policies that were approved and issued during the evaluation period. | ☐ Met | ☒ Missed |
| 4. 95% of selected precincts or units notified personnel of new or revised policies related to the Agreement that were approved and issued during the evaluation period through monthly academies. | ☐ Met | ☒ Missed |
| 5. 95% of selected personnel received notification of policies advising that they may be subject to discipline, possible criminal prosecution, and/or civil liability for violating PRPB policy. | ☒ Met | ☐ Missed |

Note: Compliance with the training requirements in Paragraphs 114-115 will be based on the assessments for Paragraph 119 regarding pre-service training for new recruits and Paragraph 129 regarding in-service training for existing personnel.

## Compliance Assessment

All policies and procedures established by PRP to date generally meet the requirements specified in the relevant paragraphs. For example, all policies reviewed by the Monitor's Office include notification to officers that they may be subject to discipline, possible criminal prosecution, and/or civil liability for violating PRP policy. This has become standard procedure in policy development. However, PRP has fallen behind in policy review and approval during this reporting period. Out of 21 policies due for review, only three policies were reviewed and approved.

During site visits, the Monitor's Office interviewed front desk officers at several districts and units (including Aguadilla, San Sebastián, Moca, Corozal, Naranjito, and Santurce) to collect information about training on technology and communication systems as well as other topics. Front desk officers are responsible for operating PRP's GTE and CAD systems for complaint and incident report intake. All officers interviewed indicated that they had received training on the new GTE and CAD modules through the virtual training system.

Since 2024, PRP officers have received updates on policies and other matters through the Info Access Platform.[18] Info Access logs officer activity by name and ID, tracking document access, date, time, and compliance. Supervisors can monitor use, including unopened documents. Policia Informa and Outlook email are also used for notifications. Unit commanders confirmed these practices to the Monitor's Office during recent field visits. According to the Info Access data accessed by the Monitor's Office, only about 75% of all officers had received updates on new and/or modified policies as of June 2025, well below the 95% required by the methodology.

PRP completed 100% of in-service training for its officers during this reporting period. Additionally, PRP has recently started the next phase of in-service training through its virtual training system. During visits

---

[18] See Certification #13-12-05-0002, dated September 2024.

to the Police Academy, the Monitor's Office also observed in-person scenario-based and interactive exercises conducted alongside in-service training on policies GO 615 (Arrests and Citations) and GO 612 (Searches and Seizures).

PRP has contracted Benchmark Analytics to develop systems to better track policy review and training, among other improvements. Over the last several months, Benchmark Analytics has made presentations to the Monitor's Office regarding the development and schedule of these systems.

### Pathway Forward

Although PRP is on track for compliance by offering timely in-service training, interactive exercises, and tracking officers' receipt of updated policies, it has fallen behind on policy review and approval. Improvement in this area is necessary to achieve higher compliance. The Monitor's Office expects improvement will be made with the assistance of Benchmark Analytics.

### Paragraph 115: Policies and Procedures - General Provisions

*PRPD shall document that each relevant PRPD officer or other employee has received, read, and been trained appropriately regarding PRPD's policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed together with Paragraph 114.

### Compliance Assessment

Since 2024, PRP officers receive updates on policies and other matters through the Info Access platform.[19] Info Access logs officer activity by name and ID, tracking document access, date, time, and compliance. Supervisors can monitor use, including unopened documents. Policia Informa and Outlook email are also used for notifications. Unit commanders confirmed these practices to the Monitor's Office during recent field visits. However, timely policy review and approval have slowed due to several issues related to pending implementation plans and the development of new IT systems and modules. The contracting of Benchmark Analytics to assist in this area, as well as in training, will help PRP improve compliance.

PRP completed 100% of in-service training for its officers during the reporting period and has recently scheduled the 2025 in-service training. The Monitor's Office also observed in-person scenario-based and

---

[19] See Certification #13-12-05-0002, dated September 2024.

interactive exercises conducted alongside in-service training on GO 615 (Arrests and Citations) and GO 612 (Searches and Seizures).

*Pathway Forward*

With the development and successful implementation of the Info Access Module, and assistance from Benchmark Analytics, the Commonwealth's contractor, in tracking policy review and training, PRP is potentially on the path to compliance with this and other paragraphs in this section. In the meantime, PRP must make an effort to review and bring outdated policies currently posted on the Virtual Library up to date.

## Paragraph 116: Policies and Procedures - General Provisions

*PRPD shall advise all officers that taking police action in violation of PRPD policy may subject officers to discipline, possible criminal prosecution, and/or civil liability.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 114.

*Compliance Assessment*

PRP policies instruct personnel to follow Bureau rules, Commonwealth laws, and constitutional rights. Staff must report any policy violations they witness or know of; failure to comply or report is subject to consequences, as outlined in the "General Dispositions" of each policy (e.g., sections B.9 and 19 of GO 612 on Searches and Seizures). However, because this paragraph is assessed together with Paragraph 114 above, which is rated partially compliant, this paragraph will also remain partially compliant.

*Pathway Forward*

PRP must comply with the requirements under Paragraph 114 to obtain compliance in this section. PRP must also use training or discipline to keep officers and supervisors compliant with its policies.

## VII. Training

Training is assessed on an annual basis. Paragraphs 117 – 134 were assessed in CMR-12 and will be assessed again in CMR-14.

# VIII. Supervision and Management

The Commonwealth has shown continued progress in complying with the Agreement's provisions. PRP has made significant strides in conducting promotions, assigning newly promoted first-line supervisors, and introducing a new evaluation system. During this reporting period, AH Datalytics, the Commonwealth's contractor, created a dashboard to track performance evaluations, training, monthly academies, non-punitive measures, and referrals to SARP and psychological services. They are also developing a secondary dashboard to verify supervisor and agent assignments. PRP conducted the Second Lieutenant exam, 918 sergeants took the test, which resulted in 633 with passing scores. It was reported that a total of 274 will be promoted in February 2026. A Sergeants exam is scheduled for December 2025, demonstrating the Bureau's dedication to leadership and management excellence. A total of 1,280 agents are eligible to take the test.

PRP projects that the Early Intervention System (EIS), provided by Benchmark Analytics, will go live between December 2025 and early 2026. These efforts are aligned with the EIS Charter and the presentation of the project scope to the IT Governance Executive Committee, which included representatives from Puerto Rico Innovation and Technology Service (PRITS). Furthermore, progress was made to prepare datasets for the initial data import into EIS. The Policies and Procedures team, the EIS Unit, and Benchmark Analytics continue to collaborate on the policy and procedure development. The Monitor's Office emphasizes the importance of implementing an internal communication strategy to inform PRP personnel about EIS, its objectives, and relevant policies once the Bureau is ready to roll out the system.

Despite these accomplishments, PRP continues to face challenges related to supervisory accountability, EIS development, performance evaluations, and the completeness of personnel records and statistical data. Addressing these issues consistently will be crucial for PRP to achieve substantial compliance.

The recent promotions across all supervisory levels bring PRP closer to meeting the staffing requirements outlined in the Staffing Plan. However, retirements and resignations have once again led to first-line supervisor shortages. It is recommended that PRP conduct an audit of all supervisors eligible for retirement within the next two years and those who have left the Bureau. While current deficiencies are manageable, they remain a concern.

Inspection and audit systems training within the Inspection Division was concluded and approved by the Monitor's Office. However, there remains a lack of documentation confirming that the Superintendent reviews each audit. The division is actively working to produce reports demonstrating supervisory review and policy compliance.

Ongoing concerns persist regarding the Transfer Unit's assignments, evaluations, vehicle shortages, and limited repair budgets—issues acknowledged by management. Although plans and systems are being developed to address these challenges, proper documentation of related meetings remains lacking. Improvements in these areas are attributed to the recruitment of new supervisors and management's directive to formalize roll call meetings. Continued emphasis on training and documentation of these practices is recommended.

Over 95% of supervisors have completed the required evaluation training curriculum. A review of 100 evaluation records indicated marked improvement in evaluation preparation and justification. Nonetheless, interviews conducted between January and September 2025 revealed that 30% of personnel had not discussed evaluations or career development with their supervisors, and 10% reported only being asked if they agreed with their evaluations. This suggests that the practical execution of the training and policy is lacking, primarily due to supervisor shortages and time constraints. Educating supervisors on the importance of these discussions is vital for morale and personnel development. Recently promoted supervisors received in-person training; however, further comprehensive training emphasizing compliance and its importance is recommended.

Interviews also revealed instances of evaluations conducted by supervisors who did not oversee the evaluated employees directly or worked different shifts. Additionally, acting supervisors continue to perform supervisory duties, although these issues were reported by only 10% of interviewees. The technological enhancements supporting the new evaluation system are detailed in the IT section .

Overall, the Commonwealth's compliance with the 19 Supervision and Management paragraphs assessed during this reporting period reflects similar levels of compliance to what was noted in previous CMRs – the largest change was the movement of all EIS-related paragraphs from Not Compliant to Deferred in CMR-12. In CMR-11, 53% of the 19 paragraphs (10 paragraphs) were assessed as partially compliant and 47% of the 19 paragraphs (9 paragraphs) were assessed as not compliant, in comparison to the current reporting period, where 58% of the 19 paragraphs (11 paragraphs) were found to be partially compliant and 5% of the 19 paragraphs (1 paragraph) was assessed as not compliant. See figure 7.



*Figure 7. Supervision and Management: Paragraph Compliance Status*

## Paragraph 135: Supervision and Management - General Provisions

*PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

Supervision policies remain consistent with accepted policing practices. PRP submits more complete, accurate, and comprehensive reports of operational activities and staffing challenges across the Bureau, supported by more effective reporting and tracking methods. Improved communication between high-ranking officers, frontline officers, the administration, and all personnel has also been reported. The Monitor's Office recognizes and commends these improvements.

However, during the first half of 2025, the Monitor's Office identified recurrent issues that were only partially addressed in prior reporting periods. Acting supervisors continue to be present, and supervisors are not consistently working the same shifts as their supervisees. While the Monitor's Office acknowledges that achieving full compliance may not always be logistically possible, coordination among high-ranking officials is necessary to ensure at least 95% compliance. The promotion of more than 500 first-line supervisors in 2024 was expected to alleviate these issues, particularly the reliance on acting supervisors.

The Monitor's Office recommends that PRP conduct audits to determine how many first-line supervisors were lost to retirements or resignations. PRP conducted the Second Lieutenant exam, which resulted in 274 passing scores. A Sergeants exam is scheduled for December 2025. Promotions to both ranks are expected in early 2026. In the interim, stronger coordination and communication between high-ranking officials and first-line supervisors is needed to address the ongoing challenges. In earlier reporting periods, supervision loads had improved and were expected to reach the 95% compliance threshold by the end of 2024. However, the recurrence of acting supervisors and supervisors not working the same shifts as their personnel prevented the anticipated progress from being realized in the current reporting period. The promoted first-line supervisors are critical to addressing noncompliance issues, including developing the ability to identify, detect, and prevent misconduct; providing direction and guidance to improve officer performance; and ensuring the consistent application of accepted policing practices. These goals cannot be achieved without permanent supervisors consistently working the same shifts as their personnel. Both concerns were confirmed through personnel interviews and meetings with high-ranking officials.

*Pathway Forward*

The Monitor's Office will continue reviewing the 90-day status reports to evaluate the Commonwealth's progress in meeting the staffing and supervision requirements of the Agreement, as well as the initiatives and activities outlined in the Staffing Plan. The Monitor's Office will also continue providing necessary guidance to support the full implementation of the updated Staffing Plan.

The Monitor's Office acknowledges PRP's efforts to provide detailed reporting; however, PRP must further develop a more effective system that produces accurate, timely, and consistent reports. These reports are essential to confirm that officers and supervisors are receiving training, schedules, and assignments in alignment with supervision policies and the Staffing Plan, including the required supervisor-to-officer ratios per unit. Staffing logs must also be updated regularly to ensure the Monitor's Office receives accurate information.

## 1. Duties of Supervisors

As reported in prior CMRs, first-line supervisors must provide effective, clear, and consistent supervision of the subordinates under their command. Supervisors are expected to motivate officers to perform their duties lawfully, safely, and effectively. During this reporting period, supervision continued to show improvement, and PRP remains on a path toward partial compliance with these paragraphs. However, concerns persist. Supervisors were reported as not consistently working the same shifts as their supervisees, and the use of acting supervisors remains common. PRP must also improve supervisor retirement and resignation tracking and establish recurring, effective promotional cycles to ensure sustained compliance beyond the completion of the Agreement.

Reporting practices improved during this CMR, as demonstrated by the dashboard developed by AH Datalytics, the Commonwealth's contractor, to monitor performance evaluations, training, monthly academies, non-punitive corrective measures, and referrals to SARP and psychological services. AH Datalytics is also developing a dashboard to validate shift assignment consistency between supervisors and agents. Once all dashboards are finalized, approved, and implemented, PRP will be able to generate more accurate, updated, and consistent reports confirming that officers and supervisors are receiving proper and consistent training, schedules, and assignments in line with supervision policies. In addition, the EIS must be finalized, trained on, and deployed as soon as possible to provide supervisors and personnel with another essential oversight tool.

### Paragraph 136: Supervision and Management - Duties of Supervisors

*All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | April 2025 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 136-140. | ☑ Met | ☐ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | ☐ Met | ☑ Missed |
| 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | ☑ Met | ☐ Missed |
| 6. 95% of interviewed personnel perceive that supervision is close and effective. | ☐ Met | ☑ Missed |
| 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | ☑ Met | ☐ Missed |

### Compliance Assessment

As reported in prior CMRs, current PRP policies comport with the requirements of Paragraphs 136–140 and with generally accepted policing practices. PRP must continue to provide supervisor training on a yearly basis. The Monitor's Office identified important improvements in officer and supervisor schedules, assignments, and ratios. AH Datalytics, the Commonwealth's contractor, developed a dashboard to track performance evaluations, training, monthly academies, non-punitive corrective measures, and referrals to SARP and psychological services and is working to develop an additional dashboard to validate supervisor and agent assignments.

Promotions at all supervisory levels have positively impacted both supervision and administrative matters, demonstrating PRP's commitment to addressing supervision issues across the Bureau. As in prior reporting periods, measurable improvements were achieved, and this progress should continue in future periods. Following the first anniversary of the most recent promotions, and after completing their initial performance evaluations, personnel interviewed reported noticeable improvements in supervisory abilities. These improvements appear to stem from the guidance and experience supervisors gained through real-time decision-making situations. As a result, supervision has become more consistent and effective.

Despite these improvements, consistent supervision remains an issue. Interviews revealed that some evaluations were conducted by supervisors who were not the direct supervisors of the evaluated employees or who worked different shifts than the evaluated personnel. It was further reported and

confirmed by management that acting supervisors continue to be used, even though PRP previously submitted a Staffing Plan indicating that personnel redistribution had been completed.

Due to the continued use of acting supervisors, the lack of alignment between supervisors and their supervisees' shifts, and the persistent issue of personnel shortages, PRP continues to remain only partially compliant. Expectations are that these challenges will be addressed in future reporting periods.

The most pressing challenge continues to be understaffing. The new Superintendent has publicly acknowledged this issue and stated it will be a top priority. PRP reported in June 2025 that they expect to complete the hiring of 699 civilians by 2026. This hiring initiative will allow sworn officers currently performing civilian duties to return to policing roles, easing some staffing shortages. HR confirmed that communication efforts regarding this initiative are underway. Additionally, PRP reported progress in releasing officers back to duty through medical examination clearances.

PRP also outlined plans to improve recruitment and retention, including developing a system to promote recruitment, create incentives, implement a retention program, and expand professional development strategies to attract and retain qualified and competent personnel. Continued improvements in recruitment methods and the creation of effective incentives are necessary to stabilize staffing levels and strengthen compliance efforts.

*Pathway Forward*

PRP must revise its system to ensure supervisors consistently work the same schedules as their supervisees and to reduce reliance on acting supervisors. The continued use of acting supervisors, the limited percentage of supervisors assigned to the same schedules as their supervisees, and the likelihood of increased retirements due to the recently approved retirement plan create risks of regression. To mitigate these risks and sustain improvements, PRP should re-examine offering the sergeant exam. Additionally, PRP must review and adjust its operational deployment and officer transfer processes to establish more effective schedules and maintain consistent records aligned with best practices in direct supervision. These matters should also be addressed through the upcoming RMS update.

The Monitor's Office will continue to assess PRP's compliance with this paragraph.

## Paragraph 137: Supervision and Management - Duties of Supervisors

*First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2025 – September 2025 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

## Compliance Assessment

During this reporting period, the Monitor's Office reviewed several samples of PPR 373s (Distribution of Personnel) from different areas provided by PRP. The review verified that more than 95% of supervisors are not overseeing more than 10 individuals. Several interviews with supervisors and supervisees confirmed this information. It was also determined that supervisors are not assigned to oversee officers in other area commands outside their territories.

Supervisees reported developing more trust and confidence in supervisors. For consecutive reporting periods, supervisors have reported equitable distribution of supervisees. Based on staffing log reviews and interviews, more than 90% of lieutenants and captains are assigned according to unit needs. However, some units still lack sufficient officers at these ranks. As a result, sergeants have been required to manage units beyond their intended responsibilities, which in turn has prompted continued reliance on acting supervisors. Nevertheless, PRP has demonstrated progress toward more effective assignments. An example of this being that PRP reported 274 sergeants will be promoted during the early part of 2026, alleviating some sergeants' areas of responsibility.

As in prior reporting periods, challenges remain with sergeants not consistently working the same shifts as their supervisees. The PPR 373 were consistent with reports from interviews, which confirmed the continued use of acting supervisors. Beyond these issues, PRP must also address gaps in direct supervision, training, and policy. The Monitor's Office acknowledges the improvements of recently promoted first-line supervisors who have demonstrated stronger knowledge of training and policy requirements as well as improved decision-making under high-stress situations.

PRP reported that AH Datalytics, the Commonwealth's contractor, developed a dashboard to track performance evaluations, training, monthly academies, non-punitive corrective measures, and referrals to SARP and psychological services. A second dashboard is being developed to validate supervisor and agent assignments. Once fully implemented, these systems are expected to produce reliable, validated monthly and annual reports on personnel distributions and recruitment deficiencies for review and approval by the PRP Superintendent.

The Monitor's Office credits PRP for the progress achieved in this area. However, PRP remains only partially compliant with this paragraph, primarily due to the lack of an adequate IT system to support supervision and reporting of accurate staffing data, along with the persistent challenges of acting supervisors and inconsistent scheduling of supervisors on the same shift as their supervisees. PRP has been working with Benchmark Analytics, the Commonwealth's contractor, and the Monitor's Office is

161

beginning to observe improvements in IT systems. Continued improvements in these areas are expected in future CMRs to move PRP toward full compliance.

## Pathway Forward

Progress is being made in addressing challenges related to producing accurate and efficient staffing data, particularly in demonstrating personnel duties and assignments, including the operational assignment of supervisors to ensure consistent oversight and effective patrol planning. These improvements should continue moving forward.

PRP must further conduct in-depth analyses of staffing to achieve a more effective distribution of personnel. Additionally, PRP should continue collaborating with Benchmark Analytics, the Commonwealth's contractor, to develop a consistent and reliable data processing system capable of accurately reflecting staffing duties and assignments. Such a system will provide the Monitor's Office with timely, precise staffing data while equipping PRP with an effective tool to monitor supervision practices, workloads, and overall staffing performance.

The Monitor's Office will continue to assist PRP and Benchmark Analytics. in developing and implementing an automated system capable of generating accurate, real-time reports from all 13 area commands. This system will also support management by offering a comprehensive picture of supervision practices and departmental responsibilities.

## Paragraph 138: Supervision and Management - Duties of Supervisors

*PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

### Compliance Assessment

As reported in prior CMRs, with promotions across all levels of supervision, PRP has largely fulfilled its long-term supervision commitment. These promotions, coupled with strategic assignments, should enable PRP to provide more consistent, effective, and professional supervision, which in turn will help close the compliance gap noted in this paragraph. Achievements of this kind should also support PRP's efforts to rebuild trust and respect with the community.

162

The Monitor's Office confirmed through staffing reports and interviews that a high percentage of supervisors are in place, have received appropriate training, are familiar with applicable policies and responsibilities, and, importantly, that the recently promoted supervisors now have at least one year of experience. This has allowed them to develop the basic skills needed to make sound, effective decisions in their day-to-day duties. However, interviews and meetings with commanders also confirmed that acting supervisors are still being used and that some supervisors are not working the same schedules as their supervisees. PRP leadership must determine whether these issues stem from an ineffective distribution of supervisors or from the need for additional supervisory positions. The Monitor's Office recommends that HR conduct an audit to determine how many first-line supervisors have retired or resigned in the past two years and how many new positions are required to meet operational needs.

PRP reported that 274 sergeants passed the lieutenants' exam, and a new sergeants' exam is scheduled for December 2025. To maintain progress, PRP must avoid practices that risk regression, such as the overuse of acting supervisors, assigning supervisors outside their designated territories, supervisors working different shifts than their supervisees, or failing to account for absences due to vacation or sick leave.

The Monitor's Office recognizes PRP's ongoing commitment to the Staffing Plan and has confidence this commitment will continue. The recent promotions have significantly narrowed the compliance gap; however, consistent promotion cycles remain essential to sustaining progress. While the distribution of the newly promoted supervisors has addressed some staffing challenges, further reviews and adjustments are necessary to resolve the continued reliance on acting supervisors and scheduling misalignments. Finally, the Monitor's Office acknowledges PRP's commitment to raising supervisory staff to the highest professional standards and recognizes the Bureau's efforts to develop an updated, effective, and automated technology system to support accurate personnel data management.

*Pathway Forward*

The absence of a fully functional and effective automated system continues to present a significant challenge, limiting the Bureau's operational efficiency. To address this, PRP is actively collaborating with Benchmark Analytics, the Commonwealth's contractor, to develop a robust system capable of tracking key personnel statistics and ensuring management and staff have access to accurate, timely information. The Monitor's Office will continue to work closely with PRP and Benchmark Anlaytics to support the development and implementation of this system.

This initiative is intended to establish a clear, strategic record-keeping process for personnel assignments and updated policies for replacing supervisors who are transferred, promoted, or on leave (annual or sick). The Monitor's Office recognizes PRP's leadership for its commitment to building a system that accurately reflects supervisors' duties, responsibilities, and assignments across all investigative divisions.

As emphasized in prior CMRs, the successful implementation of a well-designed automated system—paired with comprehensive training—will enhance PRP's efficiency, strengthen its credibility, and improve compliance with the Agreement, while also reinforcing trust between the Bureau and the community.

## Paragraph 139: Supervision and Management - Duties of Supervisors

*Precinct and unit commanders shall closely and effectively supervise the officers under their command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

### *Compliance Assessment*

During this reporting period, the Monitor's Office interviewed a random sample of approximately 11 supervisors and 24 supervisees, and reviewed evaluation documents, staffing logs, and disciplinary records. As previously reported and acknowledged by PRP management, the existing IT system does not allow for a comprehensive analysis of supervision matters based solely on interviews. Nonetheless, based on the available documentation and interviews, the Monitor's Office recognizes PRP's efforts in providing close and effective supervision.

The development of a dashboard by AH Datalytics, the Commonwealth's contractor, is expected to improve the tracking of performance evaluations, training, monthly academies, non-punitive corrective measures, and referrals to SARP and psychological services. In addition, AH Datalytics is designing another dashboard to validate supervisor and agent assignment distributions. If accurate and reliable, these dashboards will provide PRP management with essential data to support compliance and allow the Monitor's Office to conduct more thorough supervision assessments.

The following comments were also made or repeated by interviewees:

- Familiarity with the Agreement

  - Officers reported being familiar with the Agreement, though none stated they had read it in full.The most well-known section remains Use of Force (UOF).

  - Common barriers cited for not reading the Agreement in its entirety included: time constraints, multiple assignments, and personnel shortages.

  - Over 99% expressed positive views of PRP, attributing improvements to the Agreement.

  - Interviewees consistently emphasized that the Agreement has improved professionalism, training, equipment, planning, and community understanding.

- Supervision and Staffing

  - The Staffing Plan and Agreement are credited with evolving PRP into a more effective and respected organization.

  - Supervisors confirmed that they are overseeing no more than 10 officers, leading to fairer and more accurate performance evaluations.

  - The promotion of additional supervisors ensures continuity when vacancies arise due to transfers, retirements, or leave.

  - Concerns remain about evaluations occasionally being conducted by supervisors who do not directly oversee the officers or work different shifts, often due to shortages.

  - Acting supervisors were reported as filling coverage gaps—an issue confirmed by high-ranking officers.

- Light-Duty Assignments

  Concerns over disarmed officers performing civilian tasks while receiving full officer pay continued.

  - Some officers allegedly request light duty by citing personal or emotional issues. The Monitor's Office has repeatedly stressed the need for medical assessments to determine fitness for duty or reassignment with appropriate compensation. PRP stated that most of these officers are being evaluated by a Medical Board to assess return-to-duty eligibility.

- Promotions

  - Many officers remain disinterested in promotions, citing minimal pay increases, heavier responsibilities, and concerns about transfers outside their region.

  - Positively, some noted that recent promotions have kept personnel within their current territories, which may improve interest in advancement.

- Equipment and Resources

  - Over 99% of officers reported satisfaction with personal equipment (tasers, vests, flashlights).

  - Persistent concerns include:

    o Lack of specialized vehicles (e.g., SUVs for difficult terrain).

    o Lack of functional computers in patrol cars, which forces officers to return to offices to file reports and prevents timely access to criminal records—posing safety risks.

    o Heavy reliance on personal cell phones for communication.

    o Officers often pay for repairs on official vehicles due to budget shortfalls.

- Evaluations

- January 2025 marked the second cycle of the new evaluation system. Officers expressed greater interest, relevance, and trust in the process.

- A review of 100 evaluations showed improved ratings and narrative justification, with no evidence of score inflation. Challenges remain, however: 30% of officers reported no career-development discussion with supervisors, and 10% reported being asked only to confirm agreement with the evaluation. Time constraints were cited as the primary barrier to in-depth discussions.

- Transfers

  - Officers unanimously stated that the transfer system does not function as written. Delays, political influence, and favoritism were consistently reported. Regional transfers may take up to 15 years, undermining morale. Despite HR's report that automation was completed in 2024, distrust in the system persists.

- Community Relations

  - Each precinct has personnel assigned to community engagement, but officers reported that broader involvement is limited due to staffing shortages.

  - Leadership has created specialized units for this purpose, allowing other officers to focus on investigative and daily assignments.

- Positive developments noted:

  - The Agreement is seen as necessary and beneficial.

  - Stronger communication and professionalism among supervisors.

  - Improved payment of overtime and progress on better pay structures.

  - Openness to new ideas and reform under current and past Superintendents.

  - Better training opportunities, working conditions, and equipment.

  - Easier scheduling of mandatory 40-hour training.

- Areas needing improvement:

  - Written communication remains limited, with reliance on verbal exchanges.

  - Supply shortages persist and were observed firsthand during precinct visits.

  - Recruitment and retention challenges continue, with calls for better incentives.

  - Ongoing political influence in transfers.

  - Pensions and benefits remain inadequate to attract and retain talent.

  - Insufficient budget for equipment, vehicles, and repairs.

  - Supervisors support virtual training but stress the greater effectiveness of in-person instruction.

  - Officers continue to work extended shifts due to shortages, leading to fatigue and burnout.

- Persistent dissatisfaction with the Judicial System's consistency and effectiveness.
- Lack of recognition for outstanding work.

## Pathway Forward

The Monitor's Office concludes that PRP is making progress in supervision and staffing, but significant challenges remain. Leadership should:

- Prioritize resolving issues with the transfer program, which remains a key morale concern.

- Ensure sufficient budget allocation for vehicle repairs, parts, and new equipment.

- Continue to expand the number of supervisors to reduce reliance on acting supervisors and to strengthen evaluation practices.

- Conduct comprehensive reviews of light-duty assignments to ensure fairness and operational efficiency.

- Enhance written communication, recognition programs, and in-person training opportunities.

The Monitor's Office will continue to assess PRP's progress in implementing the Staffing Plan in accordance with Paragraph 13 of the Agreement.

## Paragraph 140: Supervision and Management - Duties of Supervisors

*All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

## Compliance Assessment

The Monitor's Office reviewed staffing documents submitted electronically and during multiple site visits to the Utuado, Guayama, and Ponce areas. Based on these documents and accompanying interviews, supervision has been assessed at a partial level of compliance. Supervisors are performing their duties and assignments in accordance with their rank and job descriptions. As they gain experience, receive proper training, and benefit from ongoing guidance, they will be better equipped to provide effective

167

leadership, enhance professionalism, prioritize community policing, and develop problem-solving skills. A critical skill for supervisors is the ability to identify, prevent, correct, and address misconduct.

The development of EIS, along with personnel integrity audits and inter-agency feedback mechanisms, is essential for establishing a robust supervision system within PRP and other law enforcement agencies. PRP reported that both the EIS and integrity audits are expected to be implemented by the early part of 2026. The Monitor's Office has attended several PRP-led EIS demonstrations, during which PRP reaffirmed its commitment to developing and implementing the system. The Monitor's Office is confident that PRP will successfully implement an effective EIS program. Once approved and fully operational, this system will bring this area closer to full compliance.

Effective and professional supervision is the cornerstone of any successful organization. PRP supervisors are responsible for ensuring that officers under their command comply with Bureau policies, the Agreement, and applicable laws. Officers interviewed expressed strong support for their supervisors, acknowledging the critical guidance and oversight they provide. Nonetheless, several personnel noted that supervisors could benefit from additional training to further enhance their communication skills, particularly when interacting with higher levels of supervision.

*Pathway Forward*
PRP's digital non-punitive disciplinary application is likely accumulating a substantial amount of data that could be analyzed to generate valuable insights regarding policies, training, supervision, and early intervention. By leveraging this data, PRP can identify gaps and take proactive measures to address them. Such analysis requires dedicated analytical capabilities within the non-punitive disciplinary system and should be conducted regularly, at least quarterly. To strengthen oversight and accountability, PRP should develop a systematic approach for reviewing non-punitive disciplinary cases. This process will help identify deficiencies in training, supervision, and policy, enabling timely corrections and supporting continuous improvement.

## 2. Supervisor Training

*Paragraphs 141 - 144 are assessed annually and will be reviewed in CMR-14.*

## 3. Performance Evaluation

PRP implemented a new evaluation policy with over 95% of supervisors completing the required training curriculum, positioning the Bureau for potential substantial compliance. A review of 100 evaluation records from the January 2025 cycle indicated improvements in performance ratings and the quality of supporting written summaries. However, interviews conducted between January and September 2025 revealed that 30% of personnel had not met with their supervisors to discuss evaluations or career development, and 10% reported being asked only whether they agreed with their evaluation with no further discussions on goals, objectives, performance, and mentorship. Supervisors cited lack of time as the primary reason for not conducting these discussions.

PRP must provide additional training to strengthen supervisors' communication skills, enabling them to effectively convey strategies that promote employee growth, professionalism, and operational

effectiveness. Improved organization and planning are also essential to ensure supervisors provide structured guidance and follow through on performance plans. The Monitor's Office believes that, with appropriate training and guidance, supervisors can cultivate critical leadership skills and become more effective in fulfilling PRP's mission. Moreover, once the Commonwealth establishes a robust auditing system, PRP will be able to more efficiently monitor and oversee performance evaluations.

## Paragraph 145: Supervision and Management - Performance Evaluation

*PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 145-146. | ☑ Met | ☐ Missed |
| 2. Training on performance evaluations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | ☑ Met | ☐ Missed |
| 5. 95% of sampled performance evaluations adhere to approved policies. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

The Monitor's Office will continue overseeing the implementation of GO 310 (Performance Evaluations) and its related forms. Continued training for supervisors and supervisees is essential to ensure that PRP remains effective and professional. A review of training logs and personnel interviews confirmed that supervisory training aligns with established policies. Promoted supervisors completed the mandatory 40-hour Academy training before assuming their duties, and HR reported that over 95% of supervisors completed the required training either in person for new supervisors or virtually for others. PRP must continue prioritizing this training, as performance evaluations are vital for setting expectations, establishing goals, and guiding career progression. With proper training and guidance, personnel will come to view evaluations as integral to their careers and morale.

PRP also needs to continue updating the ProMedia evaluation system to enable executives and HR to monitor and audit performance evaluations according to policy.

Although training on the performance evaluation process has been conducted, the Monitor's Office continues to find gaps in its operational implementation, particularly among tenured supervisors. This was revealed through officer and supervisor interviews, as well as discussions with PRP commanders and HR representatives. The discrepancy may be partly due to new supervisors receiving in-person training while tenured supervisors receiving virtual training. This finding was also made in previous reporting periods.

Interviews conducted from January through September 2025 after the evaluation cycle was underway or completed revealed that some evaluations were conducted by supervisors who did not directly oversee the evaluated employees or were assigned to different shifts. Additionally, 30% of interviewed personnel reported not having a meeting with their supervisor to discuss their evaluation or career development, and 10% stated they were only asked whether they agreed with their evaluation. Meetings with high-ranking officers confirmed that a shortage of supervisors was a primary contributing factor. The new evaluation process mandates annual evaluations, with supervisors required to meet with supervisees in-person to discuss performance and career development, regardless of ratings. Evaluations are expected to cover topics such as constitutional policing, integrity, community engagement, and critical law enforcement functions.

Despite these implementation challenges, no instances of inflated ratings were found in the reviewed evaluations; scores remained consistent with normal and average expectations.

### *Pathway Forward*

The Monitor's Office will continue overseeing the implementation of GO 310 (Performance Evaluations) and its associated forms. Ongoing training for supervisors and supervisees on the evaluation system remains essential for PRP's professionalization and effectiveness. The Monitor's Office recommends additional in-person training through the monthly academies to reinforce the requirement for in-person performance evaluations. Implementing this ahead of the January 2026 evaluation cycle should improve compliance. Continuous review and refinement of policies and procedures will also be critical for successful implementation. Furthermore, PRP must continue developing and updating the ProMedia evaluation system to enable executives and HR personnel to effectively monitor and audit evaluations in accordance with policy.

### Paragraph 146: Supervision and Management - Performance Evaluation

*As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

170



| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 145.

*Compliance Assessment*

The Monitor's Office conducted a review of the performance evaluation system, including sample evaluations and personnel interviews. The review confirmed that evaluations were completed on time and properly formalized. The program would benefit significantly from the implementation of a more advanced automated system. No systemic inflation of evaluation ratings was detected, a finding further supported by interviews. HR reported that over 95% of supervisors completed the designated training curriculum, positioning PRP for potential substantial compliance. A review of 100 evaluation records from the January 2025 cycle showed improvements in both performance evaluation ratings and the written summaries supporting the scores.

As noted in Paragraph 145, although training was conducted, it has not yet been fully operationalized across the Bureau. Interviews conducted from January through September 2025 revealed that 30% of personnel had not met with their supervisors to discuss their evaluations or career development. Additionally, 10% reported that they were only asked whether they agreed with their evaluation. Interviewees indicated that supervisors cited a lack of time as the primary reason for not conducting these discussions. The Monitor's Office believes that addressing these recurring issues and providing additional guidance will enhance the effectiveness of the performance evaluation system. If properly implemented, this system will help PRP become a more professional organization and support its goal of achieving compliance by the end of 2025. Because this paragraph is reviewed and assessed alongside Paragraph 145, compliance is contingent upon the successful implementation and operationalization of the requirements outlined therein.

*Pathway Forward*

The Monitor's Office will continue overseeing the implementation of GO 310 (Performance Evaluations) and its related forms. To strengthen PRP's professionalism, supervisors and supervisees must receive ongoing, effective training on the evaluation system. Regular review and refinement of policies and procedures will be essential to ensure proper implementation. With the right approach, PRP executives and HR personnel will be able to monitor and audit evaluations in accordance with policy. Additionally, as noted in Paragraph 145, the Monitor's Office recommends conducting further in-person training through the monthly academies to reinforce the requirement that evaluations be conducted face-to-face. Implementing this training ahead of the January 2026 cycle should help ensure improved compliance.

## 4. Early Identification System

During this reporting period, PRP reported that the EIS is being developed by Benchmark Analytics, with system demonstrations and requirements-gathering currently in progress. The Bureau estimates that the EIS will go live between December 2025 and early 2026. PRP must provide personnel with clear and updated information on the program, including its purpose and benefits. Additionally, the continued misuse of the EIS acronym by SARP presents a potential issue in effectively communicating the new intervention system and unit to officers.

While PRP may have achieved partial compliance with the technological aspects of the EIS, the operational components of the system, as required in all related paragraphs within this subsection, have not yet been completed. However, because the Commonwealth has demonstrated progress toward acquiring Benchmark Analytics' services to develop the EIS, the Monitor's Office has chosen to defer enforcement of all paragraphs within this subsection.

### Paragraph 147: Supervision and Management - Early Identification System

*PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 147-153. | ☐ Met | ☐ Missed |
| 2. Training on EIS is consistent with approved policies. | ☐ Met | ☐ Missed |
| 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☐ Missed |
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | ☐ Met | ☐ Missed |
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | ☐ Met | ☐ Missed |
| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | ☐ Met | ☐ Missed |

172

*Compliance Assessment*

As previously reported, PRP has not yet fully developed and implemented an EIS. During this reporting period, however, PRP indicated that AH Datalytics, the Commonwealth's contractor, has created a dashboard to track performance evaluations, training, monthly academies, non-punitive corrective measures, and referrals to SARP and psychological services. PRP expects the EIS implementation to go live between December 2025 and early 2026, representing significant progress in this area.

PRP further reported that the Project Charter has been submitted for review by the appropriate parties, and the project scope has been presented to the IT Governance Executive Committee, including representatives from PRITS. Progress has also been made in preparing the required data sets for the initial import into the EIS environment.

Ongoing sessions are being conducted with the Policies and Procedures team, the EIS Unit, and the Benchmark Analytics team to draft the EIS GO and related procedures. The Monitor's Office looks forward to reviewing the EIS Unit's policies, staffing, and associated developments. Overall, the Monitor's Office remains optimistic that PRP will successfully complete the EIS by the end of 2025 or early 2026, achieving compliance with Paragraphs 147–153.

*Pathway Forward*

PRP must expedite the development of an EIS that clearly defines key information and ensures corrective actions are based on appropriate evaluations rather than simply an accumulation of violations. Currently, the EIS module is still under development and remains unavailable for use by supervisors, though it is expected to be operational by the end of 2025 or early 2026. EIS is a critical component of risk assessment and management systems and should be a top priority for PRP. It must provide a non-punitive, proactive approach to identifying officers who may require additional training, counseling, or intervention before misconduct issues arise. PRP should continue refining the platform to ensure supervisors can effectively use EIS data and records. By doing so, EIS can become a valuable supervisory tool that facilitates timely and constructive intervention in a non-punitive manner.

## Paragraph 148: Supervision and Management - Early Identification System

*The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:*

*a) all uses of force;*

*b) injuries to and deaths of persons in custody;*

*c) all complaints and their dispositions;*

*d) data compiled under the stop data collection mechanism;*

*e) all criminal proceedings initiated, as well as all civil or administrative*

*claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;*

*f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;*

*g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;*

173

h) all disciplinary action taken against employees;

i) all non-punitive corrective action required of employees;

j) all awards and commendations received by employees;

k) training history for each employee; and

l) identifying information for each PRPD officer and employee and;

m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 147.

## Compliance Assessment

The ongoing collaboration among the Policies and Procedures team, the EIS Unit, and the Benchmark Analytics team in developing the system, drafting the GO, and establishing procedures for the EIS represents a critical step toward its effective implementation. Benchmark Analytics, together with other key stakeholders, will oversee the development of functional modules, evaluate their performance, and request any necessary programming adjustments to ensure full operational efficiency. PRP has indicated that once the module is fully operational, records and reports will be generated and shared with the Monitor's Office.

At this stage, the Monitor's Office concludes that no finalized policy or system is yet in place; therefore, PRP cannot currently be considered compliant with EIS-related requirements. However, once implemented, the system is expected to constitute significant progress toward compliance.

## Pathway Forward

The Monitor's Office will continue to evaluate PRP's progress and the potential for EIS implementation by the end of 2025 or early 2026. It underscores the critical importance of ensuring that, once developed, the EIS fully complies with the requirements outlined in the Agreement.

## Paragraph 149: Supervision and Management - Early Identification System

PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users.

174

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

The working group, comprising the Policies and Procedures team, the EIS Unit, and the Benchmark Analytics team, marks a significant step toward the creation and implementation of the EIS. Benchmark Analytics, together with other stakeholders, will oversee the development of working modules, assess their functionality, and request programming adjustments as needed to ensure full and efficient operation. The Monitor's Office is hopeful that, once the EIS becomes operational, PRP will advance toward compliance in this area. PRP has indicated that, upon full functionality of the module, records and reports will be generated and shared with the Monitor's Office. Overall, the Monitor's Office remains optimistic that PRP will successfully complete the stated Action Plan, supporting compliance with Paragraphs 147–153.

*Pathway Forward*

The Monitor's Office looks forward to evaluating PRP's progress in this area and will closely track all steps taken until the EIS is fully implemented in accordance with the approved Action Plan. Once the system is developed, its training programs, policies, and personnel will undergo a thorough review by the Monitor's Office.

## Paragraph 150: Supervision and Management - Early Identification System

*PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | | Bi-annually |

175

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 147.

### Compliance Assessment

The Monitor's Office has been informed that PRP supervisors do not always have access to essential equipment such as administrative supplies, laptops or iPads, and computers needed to review and analyze data imperative for a supervisor to have. The Monitor's Office emphasizes that providing this equipment is critical to ensure supervisors can effectively access and review data once the system is fully developed. It is expected that the working group responsible for EIS development and other technological advancements will address this requirement.

Interviews also revealed that most supervisors and agents understand what constitutes an EIS. The Monitor's Office remains hopeful that, once the system becomes functional, PRP will make significant progress toward compliance in this area. PRP has indicated that, upon full operation of the module, records and reports will be generated and shared with the Monitor's Office. Overall, the Monitor's Office remains optimistic that PRP will successfully complete the stated Action Plan, supporting compliance with Paragraphs 147–153.

### Pathway Forward

The Monitor's Office emphasizes that PRP must consider equipment needs as it progresses toward implementing the EIS by the end of 2025 or early 2026. Additionally, PRP should take the necessary steps to keep stakeholders informed about the status of the EIS and ensure that supervisors, commanders, and management have the knowledge and essential equipment to effectively access and use the system.

### Paragraph 151: Supervision and Management - Early Identification System

*PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

176

Note: This Paragraph is assessed with Paragraph 147.

## Compliance Assessment

The working group, composed of the Policies and Procedures team, the EIS Unit, and the Benchmark Analytics team, represents a critical step toward the development and implementation of the EIS. Benchmark Analytics, alongside other stakeholders, will oversee the creation of working modules, evaluate their functionality, and request necessary programming adjustments to ensure full and efficient operation. The Monitor's Office is hopeful that, once functional, the EIS will help PRP advance toward compliance in this area. PRP has indicated that once the module is fully operational, records and reports will be generated and shared with the Monitor's Office. The Monitor's Office remains optimistic that PRP will successfully complete the stated Action Plan, contributing to compliance with Paragraphs 147–153.

## Pathway Forward

The Monitor's Office looks forward to assessing the development of this work in CMR-14.

## Paragraph 152: Supervision and Management - Early Identification System

*PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

Note: This Paragraph is assessed with Paragraph 147.

## Compliance Assessment

The working group, composed of the Policies and Procedures team, the EIS Unit, and the Benchmark Analytics team, represents a significant step toward the creation and implementation of the EIS. Benchmark Analytics, along with other stakeholders, will oversee the development of working modules, evaluate their functionality, and request necessary programming adjustments to ensure full and efficient operation. The Monitor's Office is hopeful that once the EIS becomes functional, PRP will move closer to compliance in this area. PRP has indicated that once the module is fully operational, records and reports

will be generated and shared with the Monitor's Office. The Monitor's Office remains optimistic that PRP will successfully complete the stated Action Plan, contributing to compliance with Paragraphs 147-153.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-14.

### Paragraph 153: Supervision and Management - Early Identification System

*Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 20245 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

The working group, composed of the Policies and Procedures team, the EIS Unit, and the Benchmark Analytics team, represents a significant step toward the creation and implementation of the EIS. Benchmark Analytics, along with other stakeholders, will oversee the development of working modules, evaluate their functionality, and request necessary programming adjustments to ensure full and efficient operation. The Monitor's Office is hopeful that once the EIS becomes functional, PRP will move closer to compliance in this area. PRP has indicated that once the module is fully operational, records and reports will be generated and shared with the Monitor's Office. The Monitor's Office remains optimistic that PRP will successfully complete the stated Action Plan, contributing to compliance with Paragraphs 147-153.

*Pathway Forward*

The Monitor's Office looks forward to assessing the development of this work in CMR-14.

## 5. Internal Audits and Interagency Feedback

Upon reviewing the paragraphs in this subsection, the Monitor's Office determined that PRP consistently conducts audits in a fair, professional, and standardized manner. PRP confirmed that training on inspection and audit systems for the Inspection Division was included in the 2025 In-Service Training Plan. The curriculum was submitted for review and approved, by the Monitor's Office. As of this reporting

period, no documentation demonstrating that officers were in fact trained on this topic was provided. The Monitor's Office expects that such training will be implemented by the end of 2025. The Monitor's Office concludes that the Inspection Division enhances transparency and fosters public trust through accountability, quality assurance, and continuous improvement. The audit system effectively identifies operational deficiencies, analyzes root causes and contributing factors, and implements corrective measures. These audits ensure that all areas of Puerto Rico receive adequate service levels.

The policies reviewed by the Monitor's Office for this subsection comply with paragraph requirements. However, the Monitor's Office found that insufficient staffing and resource allocation have resulted in a limited number of internal audits being conducted during each reporting period.

Consistent with the Civilian Complaints, Internal Investigations, and Discipline section, various components of the criminal justice system have participated in interagency meetings, and all allegations of misconduct or potential criminal activity received from these components are appropriately referred to SARP. However, meeting documentation, including notes and attendance rosters, remain lacking.

## Paragraph 154: Supervision and Management - Internal Audits and Interagency Feedback

*As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 154-156. | ☒ Met | ☐ Missed |
| 2. Training on internal audits and inspections are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. 95% of selected internal audits and inspections comply with policy. | ☐ Met | ☒ Missed |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | ☒ Met | ☐ Missed |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered | ☐ Met | ☒ Missed |

period and (b) is reviewed by the Superintendent and unit commanders to guide corrective action, as appropriate.

*Compliance Assessment*

In evaluating PRP's compliance with this paragraph, the Monitor's Office found that the relevant policies align with the requirements of Paragraphs 154–156. The Inspections Manual and Guide are comprehensive and well-received by PRP supervisors. Both documents were revised and reviewed by the Monitor's Office as part of Paragraph 229, with feedback provided accordingly.

Training in internal audits and inspections is consistent with approved policies. The Monitor's Office noted that 95% of sampled personnel completed the required training and certification on the auditing and inspections system within the designated timeframe for this reporting period. An updated training curriculum was submitted for review and approved by the Monitor's Office.

The Inspection Division personnel reported that they are using the auditing system to identify operational deficiencies, analyze root causes and contributing factors, and implement effective corrective actions. The Monitor's Office reviewed the completed audits and determined that they are thorough, clear, and well-structured. PRP is commended for the inspections completed, as the reports were extensive, comprising hundreds of pages of documentation and analysis.

The Monitor's Office was informed that PRP conducted over 40 inspections. However, the unit was unable to provide the total number of inspections reviewed and approved by the Superintendent. The unit indicated that a new system feature will be implemented to automatically generate and track these statistics upon request. Additionally, the Inspections Annual Report did not include evidence that the Superintendent reviewed and signed each completed inspection.

*Pathway Forward*

The Monitor's Office commends PRP for updating and conducting training on administrative inspections for compliance inspectors and will continue to assess PRP's compliance. It is recommended that further training be conducted on the auditing and inspections systems. The Monitor's Office determined that PRP is effectively using the auditing system to identify operational deficiencies and implement corrective actions. The updated Inspections Manual has led to more comprehensive inspections. However, the Superintendent or representatives of his office must certify all inspections, and the Annual Report by reviewing, approving, and signing the same. PRP should also ensure that all internal audits and inspections are performed in accordance with established policies.

## Paragraph 155: Supervision and Management – Internal Audits and Interagency Feedback

*Paragraph 155 is assessed annually and will be reviewed in CMR-14.*

## Paragraph 156: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non-punitive corrective action or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 154.

*Compliance Assessment*

The Monitor's Office has determined that the Inspection Division consistently plans and conducts audits. Commanders of each precinct or specialized unit reviewed all audit reports concerning personnel under their command and, when appropriate, took non-punitive corrective or disciplinary actions. However, the Monitor's Office has not received documentation confirming that the Superintendent reviews each audit for compliance with policy or for appropriate corrective or disciplinary action.

During the reporting period, PRP completed 114 inspections, of which the Monitor's Office reviewed 33, covering a wide range of units and divisions across the 13 area commands. Findings indicate that issues identified by the Inspection Division were addressed by the responsible personnel within 30 days. Proper advance notice was provided to commanders to prepare for these inspections. Site visits conducted between January and September 2025 included recommendations for additional operational audits during the reporting period.

The Monitor's Office recognizes the efforts of all units in promptly addressing identified issues. The vast majority of divisions successfully corrected violations noted by the Inspection Division. Audits remain a critical tool for identifying areas needing improvement, and the Monitor's Office will continue to acknowledge units that demonstrate initiative in resolving violations.

The Guánica Maritime Division inspection during the CMR-8 reporting period continues to be recommended as a model. This audit was efficient and well-organized due to a streamlined system for tracking information and equipment. All equipment—including portable radios, computers, bulletproof vests, tasers, weapons, vehicles (organized by VIN, model, and make), and ballistic shields—was numbered and recorded in order, allowing for quick identification. Other units are encouraged to adopt a similar system to improve preparedness for future audits.

Recurring violations persist, including missed weekly taser tests, improper uniforms, and vehicle maintenance issues. While PRP generally resolves and documents corrective actions effectively, a permanent solution to prevent recurring issues has not yet been implemented.

*Pathway Forward*

As noted in previous CMRs, the Inspection Division completed a system upgrade that allows inspection results to be sent directly to the Superintendent and Associate Superintendent for evaluation and final approval. However, the Division has not yet provided documentation confirming that the Superintendent or their office has signed all completed audits. The Inspection Division must continue to provide the Monitor's Office with a list of resolved and approved audits. Additionally, strategies and corrective actions should be published to enable other commanders to learn from successful resolutions.

The Monitor's Office recommends that all Annual SARP Audit Reports be read by all PRP supervisors. Furthermore, this information should be incorporated into future promotional examinations for sworn personnel.

The Monitor's Office also emphasizes the need for PRP to implement the roll call concept uniformly. While some units reportedly hold meetings, they remain inconsistent and undocumented. Establishing a standardized roll call process is essential for duty preparation, officer safety, administration of non-punitive discipline, and reinforcing the supervisor's role. When combined with daily inspections, roll calls play a crucial role in ensuring readiness for duty and overall performance.

The Monitor's Office also noted severe understaffing challenges in several divisions responsible for inspections, particularly the Metro Division, which often relies on personnel from other areas to complete scheduled inspections. PRP must address staffing shortages while ensuring personnel have adequate equipment and training. In alignment with Paragraph 13, the Monitor's Office will continue to review the allocation of personnel to these divisions and units.

## Paragraph 157: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☑ Missed |
| 2. Training on integrity audits is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | ☐ Met | ☑ Missed |
| 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRP continues its efforts to develop and implement an effective protocol for conducting integrity audits. A preliminary draft of the Integrity Audit policy and protocol has been submitted, and PRP participated in a meeting with the Parties to discuss the drafts. PRP is currently developing relevant training for its personnel and conducting integrity audits in accordance with the associated policy and protocol. During this reporting period, no data was provided by PRP, as the policy is still under development. Consequently, the Monitor's Office was unable to review a random sample of integrity audits.

As previously reported in 2024, the Monitor's Office, OSM, and PRP conducted a peer-to-peer visit to two police departments on the mainland. This visit exposed PRP to a variety of integrity audit strategies and case presentations, providing valuable insights. The experience was highly informative and productive. PRP should consider adopting similar strategies and technological systems to enhance the effectiveness of its integrity audits.

*Pathway Forward*

The Monitor's Office looks forward to reviewing the implementation of integrity audits in future CMRs. PRP and OSM continue to collaborate on the development of the integrity audit policy, and the Monitor's Office remains optimistic about its timely completion.

## Paragraph 158: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall establish an executive-level liaison committee consisting of high- level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Quarterly |
|-----------|-----|---------------------|-----------|
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Agreements and protocols incorporate all the requirements of this Paragraph. | ☑ Met ☐ Missed |
| 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | ☐ Met ☑ Missed |

### Compliance Assessment

As determined in previous CMRs, PRP met Target 1. Consistent with the Civilian Complaints, Internal Investigations, and Discipline section, various components of the criminal justice system have participated in these meetings, and all allegations of misconduct or potential criminal activity received from these components are appropriately referred to SARP.

During this reporting period, PRP submitted documentation confirming that the Humacao, Ponce, Mayagüez, Bayamón, Caguas, Carolina, Arecibo, and Aibonito area commands conducted compliant meetings. The Monitor's Office also received minutes capturing the discussions among meeting attendees. These meetings provide PRP with the opportunity to solicit feedback from criminal justice components, inform them of PRP initiatives and services, and refer any officer misconduct or potential criminal activity to SARP. The 8 area commands that submitted documentation represent 62% of the 13 required commands.

Of the remaining five area commands: Fajardo submitted an invitation, agenda, and attendance sheet but no meeting notes; Guayama certified that the meeting was suspended due to unavailable components; Aguadilla indicated the meetings were not held; and San Juan and Utuado did not submit any documentation.

PRP should improve attendance tracking to ensure all required representatives are present. Among the area commands that submitted attendance sheets, Humacao, Ponce, Aibonito, Arecibo, and Fajardo either did not count all required representatives or provided unclear information regarding representation. The Monitor's Office encourages PRP to provide clear and thorough documentation to support compliance.

The quality review of meetings depends heavily on detailed documentation. For example, Ponce's meeting included comprehensive notes covering recurring DV cases, community alliances, and educational initiatives for officers. Similarly, Bayamón's meeting was exemplary, with detailed notes on COPOP, restraining orders, and CIT discussions. These examples demonstrate the type of documentation and discussions encouraged by the Monitor's Office.

Based on these observations, Target 2 was not fully achieved, and PRP maintains partial compliance with Paragraph 158.

184

*Pathway Forward*

Documentation is the most critical component for demonstrating compliance with Paragraph 158. The Monitor's Office encourages all PRP area commands to hold these meetings regularly, engage in productive discussions regarding the criminal justice system, and refer any potential officer misconduct or criminal activity to SARP.

The Monitor's Office recommends that PRP continue using established protocols for maintaining meeting documentation. These protocols not only serve to demonstrate compliance with the Agreement but also help record outcomes and action items, ensuring follow-through and accountability. PRP has developed such protocols, and other criminal justice agencies in Puerto Rico have responded to or ratified them.

Moving forward, PRP should develop an automated system to collect copies of agreements, protocols, and related materials from criminal justice committees and verify that they incorporate all necessary requirements to improve compliance. Additionally, the Monitor's Office suggests appointing a PRP member to take concise and comprehensive notes during these meetings along with detailed attendance records to enhance documentation quality and consistency.

# IX. Civilian Complaints, Internal Investigations, and Discipline

PRP efforts continue to improve compliance in multiple areas. A review of documents in the Phase I Analysis shows some noteworthy improvement in SARP internal investigations procedures and methodology.[20] It is important to mention that the most promising cases reviewed were among the most recently concluded SARP investigations. Older cases in the sample were mostly lacking these improvements. Overall, the Monitor's Office performed in-depth analysis of each case from receipt of the complaint to its final internal disposition at the Office of the Police Superintendent.

While PRP's partial and non-compliant cases effectively illustrate some of the latest advancements, the Monitor's Office believes that these recently improved cases are a result of SARP policy and pending rule changes, which have been discussed multiple times at length with the Civilian Complaints, Internal Investigations, and Discipline Working Group.

None of these proposed rule changes were forwarded to the Monitor's Office for review during this reporting period or the previous one. While a few updates have been shared with the Monitor's Office informally during meetings and working group discussions, the Monitor's Office has been unable to review the proposed changes in their entirety. Thus, the Monitor's Office lacks the empirical evidence necessary to assess for improved compliance.  To continue making progress in an efficient manner, PRP policies and rules changes must be reviewed by the Monitor's Office prior to adoption, publication, or presentation of any training to PRP members based upon these new rules or policies.

The Monitor's Office reviewed 44 SARP investigations for a full-spectrum review and analysis of the entire case, beginning from actual receipt of the complaint to its ultimate internal investigative and internally adjudicated resolution.[21] This qualitative review and analysis looked at the overall internal investigative quality, the investigative methodology and tactics used in the investigation, the thoroughness of the investigation, whether the investigator's/fact-finder's conclusion relied upon evidence, and whether the investigator or fact-finder's ultimate conclusion was supported by the "preponderance of the evidence" standard of proof, which is mandated by the Agreement.[22]

This most recent sample of cases indicated some level of improvement in overall SARP investigative practices among certain, though not all, SARP members. Of the 44 cases analyzed by the Monitor's

---

[20] The most conspicuous improvement has been the mention of the accused officer's *historial* by some SARP investigators, as well as the latest case analyses performed by SEAQA. While this is nowhere near a universal practice, multiple cases containing some basic analyses were found in the most recent sample of case files. Most of these analyses of prior conduct were merely quantitative, and only a few looked beyond the mere number of incidents and outcomes. A few SARP investigators appear to be paying more attention to prior allegations against an officer that could offer some evidentiary value or insight into the case being actively investigated. The Monitor's Office expects to see more investigators using this data in the future.

[21] Puerto Rico Organic Law places the authority upon the Superintendent as the ultimate arbiter of internal discipline – subject to judicial and administrative appeals for relief. There are multiple avenues of appeal for internal discipline, including CIPA and CASP, among others. However, none of these entities fall under the purview of the Agreement.  Thus, for the purpose of compliance assessment, the Monitor's Office's analysis and review effectively conclude once the Superintendent has signed the case final resolution.

[22] For the record, none of the 44 cases received in the sample involved simultaneous criminal and administrative investigations of PRP members, which are obligatory under the Agreement. PRP members, including the Civilian Complaints, Internal Investigations, and Discipline Working Group as well as SARP's top commanders have all informed the Monitor's Office that this is not the current practice. The Monitor's Office therefore concludes that PRP is not assigning cases of potential criminal wrongdoing for a concurrent administrative investigation as mandated by the Agreement.

Office, 48% were found in substantial compliance, 43% were found in partial compliance, and 9% were found in non-compliance.

With the level of partial and non-compliance as it is presently – in many cases owing to insufficient and/or untimely performance of its key human resource – its SARP investigators, the Monitor's Office continues to call into question the sufficiency and the division of labor within SARP. Multiple members have described being severely overtasked with administrative caseloads, in some cases juggling 20 or more active cases at a time. Overtasked personnel in any profession are more prone to oversights or errors than those who have a manageable workload.

PRP continues to concede that it does not conduct simultaneous administrative investigations of alleged criminal behavior by officers - despite the fact that the Agreement clearly requires simultaneous investigations to be performed.[23] While SARP leadership continues to promise that they will begin conducting concurrent investigations upon the issuance of a modified GO, the Monitor's Office has yet to see a copy of this proposed GO.[24]

As is the case in all CMRs, the Monitor's Office has interviewed various SARP members who actually assign, conduct, supervise, oversee, direct, and adjudge internal police investigations. Presently, the Monitor's Office has interviewed every identified SARP investigator at least once, and in most cases two or three times over the course of the past five years. The Monitor's Office has a similar record of comprehensive interviews of SEAQA and the Office of the Legal Advisor (OAL) – both responsible for adjudication/verification of complaints in addition to quality assurance.

One of the most concerning areas involves the workload of SARP investigators, especially administrative investigators, many of whom have reported active caseloads in the double digits. This is quite worrisome considering the 90/90-day rule for completion of a SARP administrative investigation. The Monitor's Office sees PRP struggling to keep the administrative timeframe mandated by the Agreement for both investigations and subsequent adjudications. The Monitor's Office continues to see evidence of multiple SARP internal administrative investigations that have exceeded the 180 (90+90) day rule for completion.[25] PRP SEAQA and OAL seem incapable of achieving substantial compliance given current staffing, as a significant number of investigations still lack adjudication and notification of all parties within the 30-day limit post-investigation period.

SARP administrative case workload continues to be spread across the island with some investigators juggling over 20 active and open cases (each with its own 90 + 90-day timeline). The Monitor's Office has seen countless administrative investigations originating in the San Juan Metropolitan area assigned across the island, including to its most remote western points located a considerable drive from San

---

[23] See Paragraph 173 of the Agreement.

[24] Since September 2024 the Monitor's Office has been informed on multiple occasions by the Civilian Complaints, Internal Investigations, and Discipline Working Group and SARP Command that PRP is working on rules/procedural changes that affect a number of critical areas in SARP that fall under the Agreement, including simultaneous administrative investigations, digital recording of SARP interviews, the creation of accurate interview transcripts, and creating internal guidance to prevent additional misuses of Garrity. The Monitor's Office requested a copy of all pending rule changes associated with this section of the Agreement to prevent a non-compliant proposed policy from being enacted, which would require further modification. As of this writing, the Monitor's Office has yet to see any of these "draft" policies.

[25] Please refer to 2023-1680, 2024-1490, 2024-1471, 2024-1304, 2024-1370, and 2024-0677 for examples of SARP administrative investigations that took longer than 180 days to complete.

Juan. The evidence shows that the majority of SARP cases originate in large population centers, including San Juan, Bayamon, and Carolina, with fewer cases originating in Ponce, Mayaguez, and Aguadilla. Meanwhile, in the parts of the island that generate the most internal complaints, local SARP investigators are understaffed. The Monitor's Office recommends that SARP begin recruiting additional administrative investigators to handle the volume of cases in Bayamon, Carolina, and San Juan. Those who apply for this convocatoria must be told that they will be assigned to one of those three SARP delegations for the foreseeable future and that a transfer to another SARP area will not be considered for at least three years. This will help ensure that investigators are assigned to work in areas based on where they are desperately needed - not based upon where the investigator prefers to work.[26]

The Monitor's Office is mindful that some administrative investigations should be assigned outside the area of occurrence to avoid a potential conflict of interest. Six years of review reveals that SARP "ethical dilemma" assignments are the exception, and not the rule. PRP efforts to balance case distributions and SARP workloads across the island have effectively exposed the core problem – a number of administrative investigators are assigned to areas remote from San Juan where far fewer complaints are received. When these underused investigators are assigned to investigate cases located on the other side of the island, they must commute for hours in traffic in a fleet that is just now beginning to show some level of sufficiency and roadworthiness. Investigators from the west often report being assigned cases located far from their assignment, usually in the Metropolitan area. These investigations frequently involve in-person interviews of civilians in other parts of the island, securing transportation to these locations, and then driving back and forth from these sites during the day, often in heavy traffic conditions.[27] Some of these investigators may be reassigned to areas of the highest SARP reporting, such as Carolina, Bayamon, San Juan, or Caguas. If a reassigned investigator refuses the assignment, then SARP must find suitable replacements to assign to the highest-traffic areas.

Most SARP investigators interviewed noted the improved allocation of needed resources, with the glaring exception of human resources. The majority of SARP investigators now report that an adequate fleet of safer, roadworthy vehicles have been assigned to meet their needs.

Due to the adverse impact of assigning metropolitan administrative cases to investigators located on the west of the island,  the Monitor's Office strongly recommends that SARP commanders consider the assigned investigators' travel time to the location, the sufficiency and safety of that person's

---

[26] This raises the issue of SARP member recruitment and retention, which according to most SARP interviewees has been challenging. It should come as no surprise that, in most police agencies on the mainland, officers who perform these investigations are considered among the best and brightest - and are treated accordingly by the agency. In 2013 in Boston for example, a noteworthy portion of the command staff possessed working experience in conducting internal investigations involving Boston Police employees. Experience in conducting internal investigations often lends itself to making better field decisions as a supervisor or command decisions as a higher-ranking officer. To enhance recruitment efforts in places where SARP investigators are desperately needed, PRP should consider offering non-financial incentives in exchange for periods of service in SAR. Some examples from other agencies include flexible work schedules, consideration or extra points in promotional exams, travel stipends, and the ability to select one's next assignment upon conclusion of their honorable service to SARP. Most of these incentives are revenue neutral – without monetary cost to the agency.

[27] From multiple SARP investigator interviews, the Monitor's Office learned that the predominant methodology is for the SARP investigator to travel to interview civilian complainants and witnesses. Conversely, sworn members are required to travel to where the SARP investigator is located for their individual interviews, which also wastes significant amounts of time and resources as these sworn officers crisscross the island unnecessarily.

transportation, the estimated amount of time to be spent away from their assigned area, as well as the number and type of cases presently assigned to that officer before case assignment.

In the absence of an ethical conflict or appearance thereof, assigning a case located hours away from an investigator who is presently carrying a full caseload of 12 or more SARP cases is highly imprudent and counterproductive to increased compliance.

Lastly, it is understood by all that Internal Affairs is the SARP unit responsible for conducting sensitive, clandestine criminal investigations into allegations of criminal misconduct against a PRP member. Presently, as has been reported in every CMR since the beginning of the monitoring phase six years ago, Internal Affairs delegations continue to operate from police areas where everyone knows who their investigators are and what official and private vehicles they operate. PRP will fail to advance in compliance for this area until Internal Affairs Units are relocated into adequate facilities not located within or in proximity to active police installations.

Overall, the Commonwealth's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflects some progressive levels of compliance with what was noted in previous CMRs. In CMR-12, 54% of paragraphs (25 paragraphs) were assessed as partially compliant and 11% (5 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 48% of paragraphs (22 paragraphs) were found to be partially compliant and 15% (7 paragraphs) were found to be substantially compliant. See figure 8.



*Figure 8. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

## Paragraph 159: Civilian Complaints, Internal Investigations, and Discipline - General Provisions

*PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | April 2025 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

The Monitor's Office notes that this paragraph is all-encompassing, and its compliance assessment rests upon dozens of data points. Since many factors come into play to determine compliance, this paragraph will certainly be the last to improve over time. While the Monitor's Office continues to observe that SARP leadership has been diligent in requesting resources from PRP to cure deficiencies previously mentioned by the Monitor's Office, much work remains to improve multiple compliance data points.

For example, according to SEAQA members, they adjudicate approximately 100 SARP cases every month and notify all parties. Given its present staffing level, it seems implausible that anything short of additional resources will improve SEAQA's compliance with the 30-day rule. For its part, OAL has a difficult time halting the revolving door of lawyers and secretaries who first arrive at the unit and then later seek transfer to assignments considered far less demanding, or that pay more money. In the recent past, OAL lawyers have asked to be transferred out of OAL for reasons unknown to the Monitor's Office. PRP must make sustainable adjustments to OAL staffing levels to retain qualified lawyers and secretaries for more than just a few months.[28]

The Monitor's Office also cited issues with use of the *Garrity Rule*, the location of deployed confidential Internal Affairs units, an apparent imbalance between cases assigned for investigations and the number of investigators assigned to certain areas, and the continuing lack of concurrent administrative investigations of criminal PRP misconduct.

### Pathway Forward

PRP must find the resources SARP needs to conduct its investigations and reach its conclusions in a thorough and timely manner in accordance with the timeframes established in the Agreement.

PRP must demonstrate that all SARP members understand the proper use of the *Garrity Rule*. The Monitor's Office recommends that PRP publish a written training bulletin containing instructions on how

---

[28] Insufficient pay, being hired and paid as temporary contractors, a critical and prolonged lack of secretarial staff, and demanding workload are frequently cited by OAL interviewees as strong push factors for people to seek transfers from OAL to assignments considered less demanding.

to use *Garrity* in an administrative investigation. The training bulletin should be reviewed and approved by the Monitor's Office prior to publication.

PRP must relocate confidential Internal Affairs Units to locations away from known police facilities.

PRP must assign all cases concerning alleged criminal wrongdoing to both Internal Affairs and Administrative Investigations within five business days for concurrent investigation.

SARP must link SARP human resource assignments to actual demand for those services in any given area. In areas with less demand for internal investigations, SARP investigators should be transferred to areas with greater demand. Transferring a SARP case from one side of the island to the other should only be done to avoid ethical impropriety or the appearance thereof.

PRP must ensure that all complaints against officers are adequately and thoroughly investigated regardless of the rank they hold. Discipline may never vary between members based upon a member's rank or seniority.

## 1. Civilian Complaints

The Monitor's Office notes that much of the mandated training of the sworn force has been met, depending on the relative paragraph.

The sample of complaints reviewed by the Monitor's Office established that:

- PPR 311.1 (PRP Complaint Form) as presently configured is clearly designed,
- The general public is well aware of the ability to complain about a PRP member's conduct, and
- Multiple, viable complaint entry points are used frequently, with a growing tendency towards Internet complaints.

The Monitor's Office continues to see a significant level of anonymous complaints from both civilians and those suspected of belonging to PRP via the anonymous Internet portal, *Interfaz*.[29]

### Paragraph 160: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2. |
| Policy: | Implemented | | April 2025 – September 2025 for Compliance Targets 3 and 4. |

---

[29] A variety of complaint inputs were observed during the Monitor's Office's current analysis, including physically tendering complaints at a PRP facility, receipt of complaints via telephone, U.S. Mail, and increased reliance on PRP's Internet complaint portal (referred to by PRP as *Interfaz*), where a growing and significant percentage of complaints were registered.

| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
|---|---|---|---|
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 160-162. | ☑ Met ☐ Missed |
| 2. Civilian complaint program trainings are consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☑ Met ☐ Missed |
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | ☑ Met ☐ Missed |

### Compliance Assessment

PRP policy and training on receiving civilian and internal complaints as well as its implementation have not changed since the Monitor's Office's last review where it was found to be compliant with the spirit and letter of the Agreement.

As demonstrated by the sheer volume of complaints received, PRP's use of a variety of mechanisms to inform members of the public about their ability to submit a complaint against a PRP member, either as a named person or anonymously, continues to be very successful. The Monitor's Office observed informational material about the complaint program publicly posted at each of the area commands and precincts visited. The Monitor's Office urges PRP to continue to proactively emphasize this accessibility in its open community meetings held across the island.  PRP's efforts to increase public awareness have been commendable and have resulted in a robust number of complaints received via the Internet (*Interfaz*), which is quickly becoming the number one source of complaints lodged against PRP.

The Monitor's Office's interviews of nearly all SARP investigators show an individual awareness of SARP's shared responsibility to educate and proactively communicate the existence of the PRP civilian complaint program to members of the communities that they serve.

### Pathway Forward

The Commonwealth must continue to ensure its SARP personnel receive the required training and that it continues to carry out its program to inform citizens that they may make complaints regarding the performance of any officer.

### Paragraph 161: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible.*

| Compliance Status | Assessment Schedule |
|---|---|

| Fully Compliant | | Review Period | April 2025 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Content of complaint forms is consistent with civilian complaint program policies. | ☑ Met   ☐ Missed |
| Note: Policies and Trainings is assessed with Paragraph 160. | |

### Compliance Assessment

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## Paragraph 162: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 3.  April 2025 – September 2025 for Compliance Target 2. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | ☑ Met   ☐ Missed |
| 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | ☑ Met   ☐ Missed |

193

| | |
|---|---|
| 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | ☑ Met ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

*Compliance Assessment*

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## 2. Internal Investigations

Caseloads among many administrative investigators are excessive and have a negative impact on unit morale. To reach substantial compliance, additional staff and equipment or reassignment of existing SARP investigators to other locations must be considered.

In terms of human resources, technology may eliminate the need for some of these individuals. To cite one such example, the average SARP investigator spends a significant amount of time interviewing each person and drafting a certified transcript of what the person told them. An accurate transcript of any conversation will take at least as long to produce as it took to have the conversation in the first place, barring use of artificial intelligence. Unless the conversation is recorded and preserved, accuracy will require the investigator to repeatedly check notes of the conversation, which consumes further time. The better option is to use digital recording (where consent has been given) then feeding the recording file into a software program to produce an accurate word-for-word transcript for each and every SARP interview. This ensures the production of an accurate record of what was actually said during the conversation.

The ongoing practice of housing Internal Affairs Units within police facilities bars PRP from further compliance progress. As stated in numerous past CMRs, this practice disincentivizes members of the general public to report criminal misconduct allegedly committed by police officers who may work at that same facility. It also makes effective, clandestine Internal Affairs investigations next to impossible.

Presently, all Internal Affairs Units remain located in police facilities, despite actual and repeated notice that relocation is a required condition for substantial compliance. Confidential units involved in plainclothes surveillance of alleged police wrongdoing are located in the very same building as the police officer subjects they are supposed to surveil. Not only are these special investigators assigned to the same building, but they also share the same parking lot where their personal and confidential vehicles are parked alongside the vehicles of officers that they may be investigating.

Substantial compliance requires PRP to not only procure suitable sites, but to also make them usable and secure for the purpose of conducting full, confidential, and robust Internal Affairs investigations without further delay. [30]

---

[30] Given the size of Internal Affairs and its island-wide responsibilities, the Monitor's Office recommends that three regional, confidential Internal Affairs Offices be established under one command. One office should be located in the metropolitan area and the others assigned to cover the east, west, and southernmost part of the island. Regionality would give Internal Affairs flexibility to help their counterparts in other parts of the island, especially in complicated investigations of police criminal misconduct.

## Paragraph 163: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 and 4. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | ☑ Met | ☐ Missed |

Note: Implementation of the portion of this Paragraph regarding discipline is assessed with Paragraphs 177 (Data Source #4), 198, and 199.

### Compliance Assessment

Universal training components for sworn PRP members as well as the underlying policy regarding complaint reporting procedures have not changed from PRP's previously substantially compliant versions. PRP has demonstrated that it has reached the compliance threshold in training and certification of its personnel on relevant policies and procedures.

The Monitor's Office finds that PRP has shown that reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP and, therefore, achieved the corresponding compliance target.

*Pathway Forward*

PRP must continue to ensure that its personnel are trained, certified, and tested on relevant policies related to their subject matter expertise.

## Paragraph 164: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 – 6. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | ☑ Met | ☐ Missed |
| 2. Training on supervisory review of minor policy violations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of selected supervisory reviews and responses comply with approved policies. | ☑ Met | ☐ Missed |
| 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | ☑ Met | ☐ Missed |
| 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The most current sample of non-punitive discipline incidents shows that PRP continues to rely on non-punitive discipline to address a variety of minor infractions on the part of PRP employees. The latest sample contains multiple instances of non-punitive discipline use for uniform violations, electronic control weapon mishaps/maintenance issues, absences from duty without authorization (AWOL), suboptimal performance, minor behavioral infractions, and reporting failures/deficiencies.

196

Most notably, fewer SARP investigators cited underuse of non-punitive discipline as a current, ongoing problem.

PRP's digital non-punitive disciplinary application continues to amass a wealth of data that likely contains clues concerning the efficacy of PRP policies, training, and supervision. Properly used in an EIS environment, this analysis should help the Bureau uncovers gaps in training, policy, and supervision that could be addressed proactively. This capability requires an analytical capacity within the non-punitive disciplinary system and must be conducted at frequent intervals – no less than quarterly.

### *Pathway Forward*
PRP should develop an analytical capability using developed technology to look at non-punitive disciplinary cases to spot and quantify defects in training, supervision, and policy. This is closely related to the development of an effective EIS.

### Paragraph 165: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 – 6. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*
Note: This Paragraph is assessed with Paragraph 164.

### *Compliance Assessment*
The Monitor's Office's continued review of cases for the current reporting period has revealed a handful of very recent SARP cases where some level of analysis of possible training, policy, or supervisory

197

deficiencies was included in the investigative report. [31] That said, many SARP administrative investigators are carrying sizeable caseloads where this important detail may be overlooked.

The Monitor's Office reviewed at least one recent case that was returned to the investigator by SEAQA because this analysis was missing. The Monitor's Office expects to see wider use of the policy in future samples.

*Pathway Forward*
PRP should circulate the corresponding draft policies to the Monitor's Office while it awaits a decision by the Superintendent. Once the policy is approved for use, follow up study by the Monitor's Office will determine if the inquiry is being used appropriately and accurately.

PRP will fail to advance beyond partial compliance with this paragraph if it does not comply with the above.


## 3. Complaint Intake, Classification, Assignment, and Tracking

Complaint intake, classification, assignment, and tracking continue to be one of the stronger SARP performance areas. SARP's database has been in broad use for many reporting periods and digitally captures and tracks all incoming complaints, investigations, and reporting paperwork. The system now allows the SARP Commander to track timelines including when extensions are granted and when any administrative case has exceeded 180 days of investigation.

### Paragraph 166: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall train all officers in how to properly handle complaint intake.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. <br><br> April 2025 – September 2025 for Compliance Targets 2 and 3. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 166-176. | ☑ Met ☐ Missed |

---

[31] As is always the case, the Monitor's Office reviews trailing data of investigations concluded during the reporting period. Some of these investigations began as early as 2023 - well before any change and related retraining. As such, the Monitor's Office is frequently looking at investigative data that may be six months old or perhaps even older.

| | | |
|---|---|---|
| 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |

*Compliance Assessment*

Records indicate that no changes in policies and related training have been made during this reporting period. The training content on complaint intake, classification, assignment, and tracking continues to be in tenor with the Agreement.

*Pathway Forward*

PRP must ensure that officers continue to be trained and certified on relevant policies related to complaint intake, classification, assignment, and tracking.

Illegible forms or those missing signatures or dates must be rejected by supervisors and sent back for redrafting. Those who repeatedly write illegible reports should be subjected to non-punitive discipline. A computer must be used by all PRP members to draft any report associated with a civilian complaint, including Hojas de Entrevista.

### Paragraph 167: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 for Compliance Target 1. |
| Policy: | Implemented | | April 2025 – September 2025 for Compliance Target 2. |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Target #1. Bi-annually as to Compliance Target #2. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199.

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

Although PRP members are not allowed to discourage, redirect, or refuse to accept complaints against them, there is currently no way to prove such behavior. Without concrete evidence, the Monitor's Office cannot determine if a PRP member failed to accept or tried to obstruct a complaint. Therefore, this paragraph will be deferred until sufficient evidence is available to assess compliance.

As mentioned earlier in this CMR, PRP has stated it will soon revise its questioning of complainants to gather this kind of information. However, the Monitor's Office has yet to see any changes to the written policy.

In cases where officers discourage or redirect complaints to other departments or jurisdictions, complainants often do not report this, especially if the complaint is eventually received and acted upon. It is also important to note that people may have had to travel unnecessarily to different police stations without knowing that their complaint should have been accepted by any PRP officer across the island.

Knowing that a complaint was eventually received and investigated is not enough for compliance. To achieve substantial compliance, the Monitor's Office needs evidence that no PRP member hindered, redirected, or obstructed a complaint. This requires reliable data.

### *Pathway Forward*

Current methodology and practice provide no data to prove or disprove that any given complaint was denied, frustrated, or misdirected by PRP members. As suggested in most past CMRs, the Monitor's Office has recommended adding two questions to the SARP interview "preamble." Answers supplied to these two questions will generate reliable data showing whether this improper conduct is occurring and to what extent.

As part of their interview checklist, SARP investigators must proactively ask each complainant:

- Did any PRP member try to dissuade you from filing this complaint?
- Did any PRP member refuse to accept your complaint?

This short line of questioning will elicit information from those who may have been subjected to discouragement or outright refusal on the part of any PRP member to accept their complaint. Investigators who encounter this accusation from any source should be directed to mention the allegation directly in their investigative report and either address the allegation in the present report or refer the allegation for a separate and thorough investigation.

As required by the Agreement, PRP must identify all cases where a complainant has alleged that his/her complaint was either refused or discouraged by a PRP member and then register and investigate the allegation.

PRP members who have been found to have either discouraged a complainant from filing a complaint or have refused or frustrated any such attempt must be identified and disciplined appropriately.

### Paragraph 168: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2025 – September 2025 |

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| 1. PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | ☐ Met  ☒ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 166.

## Compliance Assessment

The Monitor's Office has consistently observed a significant number of complaints submitted either via U.S. Mail or the Internet (SARP *Interfaz*) in the reviewed samples. Some of these complaints are submitted anonymously either by civilians or insiders/whistleblowers. Interestingly, *Interfaz* complaints have come into broad use by complainants as compared to PRP 311.1 (PRP Complaint Form), which has declining use statistically.

Administrative closure is permitted by PRP, but only under the following narrow and exclusive set of circumstances:

- In cases where the complained against party is not a PRP employee, or
- In cases where the complaint is a duplicate of a complaint that has already been filed, or
- In cases where, even if the allegation were true, it could not possibly have constituted a PRP administrative violation.

A review revealed an array of complaints from anonymous sources, as well as from known individuals – both sworn and civilian. [32] The Monitor's Office notes that the term *rechazada* continues to remain in frequent use, but the term remains undefined and unmentioned in Rule 9088 (Processing of Administrative Complaints), which governs all SARP investigative procedures. This term must be defined in the Rule 9088 glossary and its use limited to the policy contained within the Rule.

In SARP investigations, typewritten or computer-generated hojas de entrevista may be used; however, they must invariably be followed up by a separate, in-person, face-to-face interview of the person - recorded and transcribed with consent of the subject. In these presential interviews, the SARP investigator must put assertions made in any hoja de entrevista to the test during the interview to verify truthfulness.

---

[32] Anonymous complaints or those complaints where the true identity of the complainant is unknown are automatically subjected to a preliminary investigation under PRP Rule 9088 to determine whether the case should be fully investigated or administratively archived. An anonymous complaint should reflect only one of two possible outcomes – either administrative closure for one of three acceptable situations, or a full internal administrative investigation. In the cases warranting a criminal investigation, a separate administrative investigation <u>must</u> be conducted concurrently. See Paragraph 178.

Notwithstanding multiple meetings and consultations with the Civilian Complaints, Internal Investigations, and Discipline Working Group, the Monitor's Office notes no progress whatsoever in PRP's requirement to assign internal complaints of a criminal nature for simultaneous internal administrative investigation within five days of receipt. Investigator interviews uniformly reveal that this practice continues unabated throughout the reporting period, much as it has since the monitoring phase began six years ago.

### *Pathway Forward*

PRP must define the term *rechazada* and establish proper guidelines for its use in an updated Rule 9088 (Processing of Administrative Complaints). In its present configuration, the term *rechazada* is not found within the rule.

Every complaint received by PRP:

- Whether the complainant's identity is either known or unknown,
- Where the conduct is alleged may constitute a crime, and
- Where the complained against is an actual PRP member,

must be assigned within five business days for simultaneous investigation to both DIA (Administrative Investigation) and NAI (Internal Investigations).

The Agreement contains no circumstances that allow PRP to assign a criminal NAI investigator to investigate any case from an administrative perspective.

Criminal Internal investigators must remain separate and apart from administrative internal investigators both in mission and location.[33, 34]

No foreseeable circumstances permit a PRP criminal investigator to use the <u>Garrity Rule</u>.

Failure to cure the foregoing will effectively bar PRP from reaching substantial compliance.

### Paragraph 169: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[33] The bright line established in the <u>Garrity Rule</u> bars sharing certain statements made to administrative investigators with criminal investigators or prosecutors. It is essential that the delegations of these two branches of SARP remain separate and never share office space. It should be noted that, while declarations made by the defendant/accused under Garrity may never be shared with criminal investigators or prosecutors, most other items of evidentiary value may be freely shared, provided of course that it is not a product derivative of the accused's' statement.

[34] For reasons stated elsewhere in this and previous CMRs, criminal internal police investigators may not be based in a known police facility.

| Partially Complaint | | Review Period | April 2025 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Intake protocol was followed in 95% of sampled investigations. | ☑ Met | ☐ Missed |
| 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | ☐ Met | ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | | |

*Compliance Assessment*

The lack of on-site complaint cases in the requested sample could permit the inference that this activity is most likely not occurring. The production of relevant data, however, can eliminate any doubt concerning how on-site complaints are received and handled. PRP should continue to execute its plan to ensure that on-site complaints remain a viable input method and are not discouraged in any way. Previously in this CMR, the Monitor's Office mentioned the growing percentage of *Interfaz* complaints received by PRP, which appears to be trending higher than complaints relying on PPR 311.1 (PPR Complaint Form). In-person complaints still make up a substantial portion of complaints filed with the Bureau.

Several meetings with the Civilian Complaints, Internal Investigations, and Discipline Working Group were held during the reporting period to help make progress on this and other issues.

*Pathway Forward*

PRP has drafted policy changes for the Superintendent to review. These questions, or similar ones, should be asked of the complainant during their SARP interview as a preamble to the interview itself:

- Did any PRP member try to dissuade you from filing this complaint?
- Did any PRP member refuse to accept your complaint?

Once this rule change becomes operational, the Monitor's Office will possess conclusive empirical evidence to conclude whether any PRP officer attempted to undermine, redirect, or discourage the complaint process. Without this empirical evidence, the Monitor's Office is unable to properly assess compliance with intake protocol.

## Paragraph 170: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | ☑ Met | ☐ Missed |
| 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | ☑ Met | ☐ Missed |
| 2b. 95% of such SARP reviews are documented in accordance with approved policies. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 158.

*Compliance Assessment*

Each reporting period, the Monitor's Office receives a list of both civil causes of action and potential acts of criminality allegedly committed by PRP members, all of which have been referred to SARP from either OAL or SAIC for assessment. The Monitor's Office continues to be satisfied with the evidence presented by PRP for this paragraph.

## Paragraph 171: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. SARP administers a centralized numbering and tracking system for all misconduct complaints. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 178.

### *Compliance Assessment*

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

### Paragraph 172: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | ☑ Met  ☐ Missed |
| 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 136, Data Sources #6 and #7.

### *Compliance Assessment*

The Monitor's Office reviewed case samples and confirmed that cases generated by field supervisors were included in the investigation files. Relevant cases were assigned in a timely manner as appropriate.

### Paragraph 173: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | April 2025 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

1. 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies.  ☐ Met  ☒ Missed

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

PRP's SARP case tracking system shows that new SARP cases are assigned for an administrative investigation within the five working day period mandated by the Agreement. Unfortunately, very few of the administrative cases reviewed by the Monitor's Office involved alleged criminal conduct by PRP members.

PRP continues to receive criminal accusations against its members, which are assigned within five days to Internal Affairs for criminal investigation, but are not assigned to Administrative Investigations for a concurrent investigation. No party disputes that this practice continues unabated.

*Pathway Forward*

As pointed out in prior CMRs, there is no justification to delay the assignment of allegations of PRP criminal wrongdoing for a separate, concurrent investigation conducted by a SARP administrative investigator. Since at least September 2024, PRP has reportedly been working on a policy change to make this a reality. The Monitor's Office's understanding is that the change is still awaiting final approval by the Superintendent. In the interest of time and efficiency, the Monitor's Office recommends that these draft policies be circulated in advance to ensure that they remain in compliance with the Agreement.

Every PRP member must be instructed to fill out PPR 311.1 (Administrative Complaint Form) either by using a typewriter or by using legible block letters. Supervisors must reject and remand cursive submissions by any PRP member.

Cases involving possible criminal misconduct by a PRP member coming to the attention of PRP through any source, including but not limited to PRDOJ, USDOJ, civilian complainants, witnesses, anonymous sources, whistleblowers, media accounts, NIE or SAIC investigators, etc., must be concurrently assigned to both a SARP internal criminal investigator as well as a SARP administrative investigator within five business days of complaint receipt.

In internal criminal cases where prosecution is either contemplated or anticipated, PRDOJ or USDOJ may request in either a signed writing or traceable email correspondence to hold any SARP administrative

investigation in abeyance for a defined period of time not to exceed the aggregate period prescribed by the rule, (90+90 days or six months). That correspondence must be contained in both the SARP investigative file and SARP case tracking system.

PRP will not progress in compliance until it meets the requirements of this pathway forward.

## Paragraph 174: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP classifies complaints in accordance with policy. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

All cases involving criminal allegations against a PRP member, regardless of the source of the complaint, should be investigated concurrently from both a criminal and administrative rules violation perspective by two separate branches of SARP – criminal and administrative.

### Pathway Forward

In any complaint where a PRP member has been accused of misconduct that could be criminal in nature, the case must be assigned for full, separate, concurrent criminal and administrative investigations within five business days. Timely administrative interviews of all parties - including the accused - may be conducted by the assigned SARP investigator unless a written and signed correspondence from a USDOJ or PRDOJ prosecutor requesting that the accused officer not be Garrity Interviewed is received. These requests cannot be allowed to exceed the administrative investigative time limit of 90 + 90 days. Copies of any such correspondence(s) must be contained in the file and referenced in the Hoja de Transacciones.

## Paragraph 175: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported*

*incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | ☑ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

### Compliance Assessment

To date, and after having thoroughly reviewed hundreds of SARP investigations, the Monitor's Office has yet to find a case where a PRP member alleged to have been involved in misconduct took an investigative role in the corresponding internal investigation.

### Paragraph 176: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## 4. Investigation of Complaints

While the Monitor's Office has seen some positive developments, several challenges remain that effectively block increased compliance levels. Previously, the Monitor's Office concluded that the preponderance of evidence standard of proof, which under the Agreement is required to be applied in 100% of SARP cases, continues to be misunderstood by some SARP investigators. While the Monitor's Office has seen evidence that this misunderstanding of the standard of proof still occurs, it occurs less frequently than before.

In the most recent cases, some SARP investigators have started to review and comment on an officer's disciplinary history in their investigative report. Correspondingly, a growing number of SARP investigators now report that they review an officer's disciplinary record prior to starting their investigation, which is proper investigative methodology.

The Monitor's Office was pleased to find several examples of SARP investigators and SEAQA evaluators referring to relevant sections of an employee's prior history of complaints, or historial, for similar sustained cases against the accused officer. This practice is still far from universal, and the Monitor's Office infers that the change is due to the latest SARP REA 114 (SARP) and REA 114R (SARP Refresher) training offered over the past year. The Monitor's Office believes that PRP is headed in the right direction, and that increased compliance should be expected in future CMRs.

SARP, working in partnership with their training partner - SAEA, should strive to include practical examples of SARP investigations where circumstantial, historical evidence analysis proved to be persuasive in influencing a case finding. To protect the privacy of the PRP members involved, the case file must be redacted and the names changed.

Any PRP employee who is found, based upon a preponderance of evidence, to have been untruthful during any SARP investigation must be held accountable, regardless of whether the employee was originally cited as a complainant, witness, or accused. Police officers are routinely called to testify honestly about their observations in a variety of settings, including internal matters. The credibility and trustworthiness of the entire Bureau rests upon its collective reputation for honesty, transparency, and candor.

All people investigated by SARP should be treated with respect and dignity regardless of their position, rank, or seniority. No assumption of credibility should be based upon the rank, position, or seniority of any PRP member.

Promotion to a command rank in any police agency does not instantly create an unimpeachable reputation for any officer. Respect for rank must not translate into preference for a higher-ranking

member's version of any incident over that of a lesser-ranking officer's version.[35] SARP questioning of any member allegedly involved in misconduct must be respectful, yet thorough, exhaustive, and complete regardless of status within the Bureau.

## Paragraph 177: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Complaint | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met | ☐ Missed |
| 2. Investigation of complaints trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | ☐ Met | ☒ Missed |

### Compliance Assessment

While the Monitor's Office has seen incremental improvement in the understanding of the legal term, "preponderance of the evidence" and its applicability to SARP cases, PRP must do a better job of ensuring that its investigators, adjudicators, and hearings officers (oficiales examinadores) both understand and apply this legal calculus in every single administrative case of internal discipline regardless of who the accused is.

### Pathway Forward

The Monitor's Office recommends increased emphasis on preponderance of evidence in SARP training. Beginner and in-service training for all the officers mentioned above must include practical examples of

---

[35] The data contained several examples of high ranking PRP figures effectively avoiding responsibility for reported misconduct. See cases 2024-1490, 2025-1114, 2024-0294, and 2024-1388 as examples.

how certain prior documented misconduct may tip the balance in favor of a sustained finding against the officer.

SARP supervisors, area commands, as well as adjudicators in SEAQA and OAL must be on the lookout for close-call cases of repeated misconduct of the same type. SARP supervisors, SEAQA members, OAL lawyers, and hearing officers should be subjected to non-punitive discipline for approving any serious case that fails this legal standard or leaves contradictory statements over a material and relevant fact between sworn officers unchallenged. In short, SARP supervisors must improve supervision and oversight of their teams, which should make the adjudication task by SEAQA and OAL less onerous and time consuming. SEAQA and OAL must also be trained to consider any accused officer's relevant disciplinary record when reaching their findings.[36]

SAEA curriculum developer(s) should devote more attention to defining and distinguishing preponderance of evidence with other commonly used standards of proof used by PRP including, probable cause and guilt beyond a reasonable doubt. Efforts must be made to point out the relevance of prior accusations of remarkably similar conduct by the accused officer, even if those cases were eventually adjudicated as not sustained or archived. Actual case examples should be used to illustrate and delineate these important differences.[37]

### Paragraph 178: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | ☐ Met | ☒ Missed |

---

[36] See SARP case 2024-1490 ibid. Of the 17 cases mentioned, the record indicates that at least 3 cases were exonerated after OAL review. The historical record of this commander's behavior reveals most likely that the adjudicating lawyer should not have recommended an exonerated finding.

[37] Of particular interest are cases where there are no witnesses other than the complainant and the accused, and where the PRP member involved had been accused of remarkably similar misconduct in the past. See footnote 35 above.

211

Note: Policies and trainings are assessed as part of Paragraph 177.

## Compliance Assessment

An administrative investigation must be launched when any employee, sworn or civilian, is alleged to have committed any violation of the U.S. or Puerto Rico Constitutions, federal or state laws relating to their duties, the commission of any crime proscribed by the penal code or special criminal law, regulations, public policy, or procedure established by PRP, whether under color of law or in their personal conduct.

If a review of the content of a complaint does not align with the above criteria, or the complainant is an anonymous one, then pursuant to Rule 9088 (Processing of Administrative Complaints) the complaint is then assigned for a preliminary investigation.[38]

The Agreement between the Parties provides that,

> "*Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.[39]*

The Monitor's Office reviewed a sample of archived cases and found an increased level of compliance with this provision although short of the level required.

The Monitor's Office notes the apparent development of a SARP procedure where a complained against transito officer may be effectively and judiciously handled as an investigacion preliminar, rather than assigning the case for full investigation at the outset.[40] Transito officers figure prominently in the number of complaints received by PRP alleging improper conduct.[41,42]

---

[38] See PRP Rule 9088, Article VI, paragraph 20, Investigación Preliminar.

[39] See Paragraph 178. The inclusion of the language "…among others" should be openly discussed to reveal any other situations agreeable to the Parties where administrative archival should be indicated. One possible example might be the archival of a complaint offered by a known serial complainant who suffers from mental illness, a phenomenon commonly encountered in police internal investigative units.

[40] This methodology would be used only where the accuser and the accused are both known to PRP, the nature of the allegation relates to a traffic stop and is minor in nature, and where body-worn camera (BWC) footage of the alleged incident is promptly available for analysis within a period of a week. In these cases, a SARP administrative investigator receives the case for preliminary investigation. The investigator immediately requests the BWC footage and examines it to either prove or disprove the allegation. If a review of the footage conclusively shows that no misconduct occurred, then the case is archived for Archival Reason #1 – the conduct did occur but could not have violated PRP regulations. If any indication of misconduct remains after the investigator's review of the footage, then the case is assigned for a full SARP administrative investigation with a 90-day timeline. In situations where archival is indicated, the complainant is first cited and allowed to review the footage. Unless further evidence is forthcoming from the complainant at that point, the complaint should be archived according to existing PRP policy. See similar cases involving this particular set of facts, including SARP 2025-0362, 2025-0339, 2025-0387, 2025-0335, 2024-1776, and 2024-0907.

[41] The Monitor's Office has seen an inordinate number of complaints relating to alleged mistreatment of motorists by PRP transito officers. Most of these cases are justly decided in favor of the officer upon a review of camera footage. This problem came into sharper focus because of the Monitor's Office's ongoing discussions with SARP investigators. Most of these investigators cite a common misconception on the part of a significant portion of Puerto Rico's motoring public – that making a complaint against a traffic officer may result in their infractions being dismissed. To counter this attempted manipulation of the system, PRP must make it clear to all potential complainants against transito officers that the only avenue to appeal a traffic infraction is within the judicial process – not in the PRP internal disciplinary process.

[42] The Monitor's Office has recommended a policy modification to deal with the vexing issue of motorists falsely accusing a PRP transito officer of improper conduct in order to avoid paying a traffic fine. The Monitor's Office notes that nearly all members of Transito wear

*Pathway Forward*

Administrative closures are reserved for allegations that – even if proven,

1. Could not possibly constitute a PRP administrative violation, or
2. Cases that are duplicated within the system, or
3. Cases that do not involve a PRP employee.

The Monitor's Office repeats the previously recommended examples of terminology to be used:

a. …upon investigation, the allegations, even if proven to be true, cannot possibly rise to the level of an administrative or criminal violation committed by a PRP member due to…, or
b. …this case is a duplicate of SARP 202x-xxxx, which is registered in EIS, or
c. …the accused is not a PRP member.

Any case sent to SARP command for administrative closure without this specific statement and supporting facts must be returned to the SARP investigator for correction. Cases with insufficient documentation and/or faulty rationale should also be returned to the original investigator with instructions that the archival petition has been denied and that a thorough investigation must be carried out immediately within the original 90-day timeframe. The case must be completed and returned with an appropriate and well-supported finding of sustained, not sustained, exonerated, or unfounded. Once a case advances beyond the archival decision, and barring any future change to the Agreement, only the four agreed-upon administrative findings are acceptable to close such an investigation.

Now that PRP has recently created the capability to better track SARP cases and related data, historial reports - otherwise known as an officer's record of misconduct allegations - must always contain a written reference as to which of the three valid reasons cited above were applied to the facts in a case that has been administratively filed or archived.

Lastly, the Monitor's Office has consistently pointed out that PRP must properly investigate all complaints where the complainant's identity is unknown. Over the past five years, the Monitor's Office has noted the variable quality of internal administrative investigations and findings where the complained against party is an officer of rank. The questioning of higher-ranking employees allegedly involved in these anonymous allegations is often unusually perfunctory and deferential.[43] Some investigators in these types of cases continue to use leading questions with these superior officers, which usually result in very brief yes/no answers. Some officers are permitted to state – at times without any challenge by the investigator - that they have no current memory of certain parts of the incriminating

---

BWCs in their interactions with motorists. Accordingly, the Monitor's Office recommends that upon receipt of a minor complaint resulting from a traffic stop that SARP verifies if footage of the incident is recorded and available, conducts a preliminary investigation by reviewing the footage in its entirety, confirms or rules out that improper conduct occurred during the stop, if no improper conduct occurred, the motorist/complainant is cited to review the footage and be informed why the conduct does not violate PRP rules, administratively files the complaint with a notation that the video did not support the allegations made. If misconduct did occur, the investigator opens a formal SARP administrative investigation. The Monitor's Office cites cases 2024-0907, 2024-1776, 2025-0335 (where the investigator adopted a similar tactic) 2025-0387, 2025-0339, and 2025-0362. Most of these cases could have been adequately handled using the suggested methodology, which would have saved months of investigator time.

[43] See SARP 2024-1490, ibid.

allegations. The frequency of memory issues found in PRP investigations of improper behavior on the part of PRP superior officers is troubling.[44]

The Monitor's Office continues to see cases involving PRP subordinates and named superior officers where SARP has reached an erroneous conclusion.[45] The use of defective or deferential lines of questioning must end. No case should be administratively closed unless it meets PRP's own administrative closure criteria cited above or in footnoted discussion. The continued use of inappropriate techniques, incomplete investigations, cases archived counter to PRP rules, mishandled or poorly investigated anonymous complaints, and the non-concurrence of simultaneous administrative and criminal internal investigations all act to bar substantial compliance with this paragraph.

## Paragraph 179: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | ☒ Met | ☐ Missed |
| 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | ☐ Met | ☒ Missed |
| 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | ☐ Met | ☒ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

---

[44] For this reason, the Monitor's Office has strongly urged that a series of questions be asked to follow up an "I don't recall" response to critical questions posed that concern liability or culpability of any officer involved.

[45] See SARP 2024-1490, ibid.

*Compliance Assessment*

The Monitor's Office continues to find numerous examples where the 90-day investigative deadline rule, or the 3x30-day extension rule were either not appropriately followed or the file lacked evidence of compliance.[46]

SARP case files frequently contain an excessive amount of unnecessary and sometimes repetitive or conflicting forms, which makes it difficult to clearly establish important dates. Some files still contain multiple letters with conflicting dates – some with signatures and dates, and some without signatures or dates at all.

The current iteration of the case tracking system creates multiple, confusing extension annotations in each case history. There are two terms in use by PRP, "extensión" and "prórroga," which creates confusion for the reader. The Monitor's Office has repeatedly seen multiple examples of second extensions erroneously being expressed as the first prórroga, the third as the second, etc., all of which create unnecessary confusion for the reader.[47]

In all previous CMRs, the Monitor's Office has seen incidents of repeated, legitimate requests for extensions that were delayed prior to eventual approval by the SARP command. These repeated delays ranged from a matter of days to well over a week. In fairness, all signs point to the investigator continuing the investigation while awaiting written approval for the extension. There have also been cases where the investigation was passed on to other investigators for reasons that remain unclear to the Monitor's Office. Whether the original investigator or a colleague finishes the case, the 90-day rule and the 3x30-day extensions rule continue to apply. In this reporting period, the Monitor's Office noted fewer of these delayed approval cases in the sample, which is a step closer to a higher level of compliance.

While minor cases of misconduct are adjudicated within SARP by SEAQA, the Monitor's Office has always observed persistent delays in the adjudicative phase of serious complaints, which according to PRP Rule 9088 (Processing of Administrative Complaints), must be conducted by OAL within a 30-day period.[48] OAL and SEAQA are limited to 30 days to adjudicate the case, including notification to the parties about

---

[46] See multiple examples of cases exceeding the 180-day rule: 2023-1680, 2024-1490, 2024-1471, 2024-1304, 2024-1370, and 2024-0677.

[47] According to multiple SARP interviewees, PRP has adopted an ad hoc policy of creating a 45-day time limit after an investigation has been assigned (versus the approved 90-day limit) and requiring supervisory approval to continue investigating beyond the ad hoc 45 day deadline. While it is laudable for front line supervisors to have better control over their subordinates' case flow, especially given the hefty weight of the average NIA investigator caseload, this departure from the established methodology causes confusion. The Monitor's Office has no issue with leaving the ad hoc system in place, provided that PRP is clear that this is not an extension for purposes of the Agreement, of which only 3 are allowed for a total of 180 days. Concluding, only extensions beyond the 90-day limit should be termed as extensions and PRP must accurately provide whether the extension granted is the first, second, or third in tenor with the Agreement.

[48] See PRP Rule 9088, Article XII, s.5.

the disposition of the complaint. Compliance with these deadlines has always been the exception, and never the rule.[49,50]

Over the course of multiple CMRs, the Monitor's Office criticized OAL for having been gutted in terms of legal staffing and support resources. That issue was largely resolved in 2024 when adequate lawyer staffing was assigned to the unit. Recently, the Monitor's Office learned that four lawyers were transferred out of the unit and not replaced, leaving OAL understaffed once again. Turning to SEAQA, which adjudicates minor PRP misconduct, the Monitor's Office surmised that it may require additional adjudicators to handle adjudicative and notification caseloads. The Monitor's Office will continue to measure SEAQA output through SARP compliance with the 30-day adjudication/notification rule in addition to assessing their accuracy. The Monitor's Office learned that SEAQA adjudicates approximately 100 SARP cases a month, on average. PRP should use this figure to assess SEAQA's needs and current output to determine whether more resources, human or otherwise, would help the unit meet compliance with the 30-day rule.

### Pathway Forward
PRP must maintain adequate OAL legal and support staffing and SEAQA sworn staffing to ensure that the 30-day limit for adjudication and notification is met.

## Paragraph 180: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

---

[49] One major contributing factor to this problem is the 15-day period during which an accused officer may apply for a Vista Administrativa (due process hearing on the facts). PRP's interpretation of this rule apparently consumes half of the allotted 30 days for adjudication and notification. With that in mind, the Monitor's Office proposes that OAL adjudicates and sends notice to all the parties within the 30-day period while specifically mentioning that the accused has a Constitutional right to be heard in a future Vista Administrativa. This solution accommodates the rule, protects an individual's Constitutional right, and places all parties on notice that the case finding(s) are subject to review and possible modification.

[50] Interviews of OAL lawyers reveal that the unit, which operates like a mid-sized law firm, is divided into specialties mostly according to the individual skills and experience of the assigned lawyer. OAL lawyer frequently represent the Bureau before CASP, CIPA, EEOC, and even in certain matters involving the Veterans Administration. Still others manage torts and civil causes of action filed against the Bureau or its members. Others review and draft contractual obligations as OAL reabsorbs the procurement work that was previously performed by DSP. Most OAL members describe a small group of four or so lawyers who do little more than analyze and adjudicate SARP cases. All OAL lawyers note the persistent scarcity of secretaries.

*Compliance Targets*

| 1. 95% of selected investigations are thorough and findings are consistent with the facts | ☐ Met  ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor's Office assessed compliance with this paragraph by completing a review of sampled SARP cases originating from the Internal Affairs (criminal), Anti-Discrimination, and Administrative Investigation Bureaus.

The Monitor's Office is aware of proposed PRP policy and procedural changes designed to help PRP comply with this paragraph. Some proposed changes are more dated than others, and most lack a defined written policy approved by the Monitor's Office. These changes include audio recording of all SARP interviewees (upon subject consent), as well as the creation of accurate, certifiable interview transcripts either by transcription experts or AI software, and not - as PRP has insisted in the past – by SARP investigators, many of whom are grossly overtasked.[51]

The Monitor's Office repeats its concern regarding the interviewing techniques employed by a now decreasing number of SARP investigators, specifically as they relate to establishing a conversational rather than legalistic tone. While this activity has diminished over time, some investigators continue this practice, which should continue to be pointed out to all attendees of REA 114R (SARP Annual Re-Trainer).[52]

The Monitor's Office has always been and remains opposed to SARP investigators creating their own official transcripts of SARP interviews. From what the Monitor's Office has gathered in well over 300 private interviews of these investigators, most administrative investigators handle a very high caseload. In fact, it has come to the Monitor's Office's attention that some administrative investigators are handling over two dozen cases at once, with additional cases assigned each week. If one were to multiply this caseload by a minimum of two interviewed witnesses per case, that would require a time commitment of over a week of full-time work merely for the investigator to listen to and transcribe those interviews. To compel a trained, skilled investigator to complete 24 1-hour interviews and afterwards spend at least the same amount of time creating official transcripts is an efficient use of investigative time and resources that PRP cannot afford.

---

[51] SARP in-person interviews consume a substantial part of an investigators' time. If SARP investigators are responsible for producing transcripts of these interviews, then one may easily expect a one-hour interview to take at least an additional hour to listen to, transcribe, and produce an official transcript of the recording. Using this factor to extrapolate transcription workloads placed on SARP investigators, it becomes readily apparent that transcription duties will more than double the amount of investigators' time spent on the interview, with a resulting negative impact on SARP case timelines.

[52] This is another area that relates to investigators preparing their own official transcripts. SARP transcripts are currently prepared by the investigator who must rely on their notes from an interview - and not from an actual recording. As neither an audio recording nor word-for-word transcripts exist for review, the Monitor's Office can only guess whether the investigator is using appropriate techniques to extract information from the interviewee. Words matter, and written transcripts accurately representing what an officer said in an official SARP investigative interview matter a great deal.

*Pathway Forward*

Current SARP members will require substantive in-service training once policy and practice changes are finalized.

Regarding recommended changes, the Monitor's Office continues to assert that:

1. The use of typed – never handwritten - hojas de entrevista is allowed for "locking in" and memorializing the version of any PRP member at any time before an actual in-person SARP interview (either by NAI, NIA, or NAA) is conducted. The interviewer should use any hoja de entrevista prior to and during the in-person interview to follow up on questions and clear up any areas left unclear by the written account of the incident. A hoja de entrevista may never be offered nor accepted as an officer's stand-alone statement in a SARP investigation.

2. While any interviewed officer may at first choose to answer in the narrative during a SARP interview, these statements must always be probed through the investigator's questions. It bears repeating that a PRP member has no right to remain silent in an administrative interview. Every question posed to a PRP member must be answered honestly and to the satisfaction of the investigator.

3. All SARP interviews must be digitally recorded with written consent of the interviewee. Said recordings will be transcribed by a professional transcriber or via translation software, and not by the investigator.

4. SARP interview practices should be respectful, open-ended, and conversational to place the subject at ease. The same interview methodology should be used on all PRP members, with zero exceptions for PRP of higher rank. The term, le pregunto, should be avoided as part of this conversational interview style, but may be employed later in certain interviews to deal with hostile witnesses, to clarify unclear answers, and to eliminate any ambiguity.

5. In cases where there is a preponderance of evidence that a PRP member in any role - complainant, witness, or accused - has attempted to deceive a SARP investigator, the investigator must recommend a sustained finding for untruthfulness, regardless of whether that member was involved in the original misconduct in any way.

6. Anonymous complaints must be investigated as if the person making the complaint is both known and reliable, until such time as the anonymous complainant's reliability has been substantially called into question by known facts.

7. All PRP administrative findings must reflect the preponderance of evidence of all underlying facts and must specifically mention prior accusations of similar misconduct against the employee. Case dispositions from the accused officers' historial de conducta should also be cited.

8. PRP SARP Internal Affairs must be relocated from known police facilities into secure locations unaffiliated with PRP.

## Paragraph 181: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | ☐ Met | ☑ Missed |
| 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

*Compliance Assessment*

While SARP investigator interviews indicate that PRP members show up for interviews and answer most questions posed to them, the actual content of these interviews is quite variable in terms of quality and candor. Occasionally, when a sworn witness to an event is asked a direct question concerning wrongdoing by another officer, many officers claim a memory lapse of the alleged wrongdoing, rather than implicating a coworker or superior officer in any misconduct.[53]

When asked to answer a question that could implicate a fellow officer, or worse – a superior officer - the answer, "I don't recall," is easily the most prevalent manifestation of the notorious code of silence. In the declarant's mind, they have neither directly lied to the investigator nor implicated a fellow officer in misconduct. They are merely being deceptive about their memory of the most critical and damning actions of their colleague or superior. When that very same officer vividly recalls other contemporary, mitigating, or otherwise innocuous facts, this strengthens suspicion of deceitfulness concerning their declarations.

*Pathway Forward*

As mentioned repetitively in this and nearly all previous CMRs, the Monitor's Office recommends that no serious internal misconduct case should be closed, leaving a direct contradiction between officers concerning a material fact.[54]

In the case of those officers whose memory allegedly fails when asked a direct question regarding their observations of another officers' alleged misconduct, the SARP investigator must further question the officers' memory concerning other events that happened contemporaneously. In nearly all cases

---

[53] See cases 2025-1114 and 2024-1490, ibid.
[54] In an administrative scenario, with no apparent criminal exposure (or in the case of <u>Garrity</u>), where there may exist criminal exposure on the part of the declarant, the declarant must answer all questions truthfully or be subject to immediate dismissal from employment.

involving alleged memory faults examined by the Monitor's Office, the "I don't recall", or "I'm not sure" assertion by an officer is frequently accepted at face value and left unchallenged by SARP investigators.

The Monitor's Office knows from experience that a SARP interview of any kind could present an imbalance of power between a superior officer and a lower ranking investigator. This imbalance of power may not only influence an investigator's decision to ask or not ask certain questions of the subject, but it may also prevent the investigator from being more insistent or persistent in an interview. While the Monitor's Office has often noted an unusual level of deference by SARP investigators in interviewing superior officers, declarations of poor or absent memory must always be properly challenged regardless of whether a colonel or an agent is making that assertion.

Example: "Officer, you remember handcuffing the man, so how could you not remember your partner removing the man's watch at the same time?"

Additional follow-up questions may include:

1. Why don't you remember?
2. Is there anything that would refresh your memory on this?
3. Are there any documents that could help you remember?
4. Who might know the answer?
5. How would you get the answer to this question? and
6. Do you have any reason to dispute the complainants' version of the incident?

All of these questions may be used by the investigator to assess the declarant's level of veracity when claiming a lack of memory of certain questions that may incriminate, while at the same time clearly recalling contemporaneous details that are innocuous or exculpatory.

Where two or more PRP officers of any rank offer sworn statements or declarations that are diametrically opposed over a material fact in an investigation involving serious misconduct, the investigator should request a polygraph examination to help evaluate the veracity of an officer's statement. Once any declarant's veracity has been effectively called into question on any material and relevant fact, then the declarant's version of the event in question has been effectively undermined. In the case of an officer failing a SARP polygraph or otherwise caught in a lie, an additional charge of untruthfulness should be made with corresponding discipline imposed.

## Paragraph 182: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |

220

| | | | |
|---|---|---|---|
| Training: | N/A | **Assessment Frequency** | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | ☐ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

PRP submitted an acceptable Garrity warning to the Monitor's Office two years ago, which the Monitor's Office reviewed, edited, and approved for use.

In previous CMRs, the Monitor's Office saw evidence of misunderstanding of the Garrity Rule and how it must be applied. In this reporting period, there were no cases involving Garrity in the sample requested.

Garrity may be used to elicit a statement only in an administrative interview, and not in an interview conducted by criminal investigators - especially those from Internal Affairs, who must be strictly shielded from exposure to Garrity-supplied information. These misuses of Garrity were observed when criminal internal investigators were improperly assigned administrative investigations to complete despite the Monitor's Office's strident and continuing criticism of this practice.

Garrity is used by administrative investigators to compel an officer to answer a question that may incriminate the officer. In exchange for this truthful answer, the government may not use that statement or a derivative of the statement in a criminal proceeding against that officer. The Garrity Rule provides immunity for incriminating yet truthful answers.

The use of Garrity requires strict separation between criminal internal and administrative internal investigators to preserve the integrity and confidentiality of answers provided to administrative investigators under the rule. Under Garrity, there can be no crisscrossing of investigative efforts shared between administrative and internal criminal investigators. It does; however, permit unfettered sharing of most investigative data and findings from criminal investigators to administrative investigators.[55] However, there may be no sharing of Garrity information or derivatives with criminal investigators, including PRP SAIC and Internal Affairs.

*Pathway Forward*

There were no cases found in the sample where Garrity was used.

In March 2025, the Monitor's Office prepared a brief course on the proper use of Garrity and made a presentation to the entire SARP command staff. There seems to be no lingering doubt among SARP

---

[55] Many articles of evidence, including photographs, drawings, videos, official records, non-Garrity statements, ballistics evidence, etc., may be shared between internal criminal and administrative investigators. However, Garrity interviews and information derived from them may not be shared with criminal investigators or criminal prosecutors, no matter what agency they work for.

command over how the rule must be applied. The Monitor's Office looks forward to reviewing future Garrity cases now that SARP commanders possess a much better understanding as to how it must be used.

PRP must re-train its investigators to understand how and when to use the new policy.

The Monitor's Office will request cases where the Garrity Rule was applied to assess compliance in future reporting periods. Further, the Monitor's Office recommends that SARP adjust their module to add a field to capture whether an administrative investigation is also assigned for and undergoing a criminal investigation. This information should be provided in the lists provided to the Monitor's Office to inform compliance assessment.

## Paragraph 183: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

For the entire compliance monitoring phase, the Monitor's Office continues to search for but has yet to uncover a single instance of a PRP member being Mirandized where no possible criminal jeopardy could have arisen from the facts as alleged.

## Paragraph 184: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal*

222

*investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | ☑ Met | ☐ Missed |
| 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The samples provided to the Monitor's Office show no evidence that internal cases of a criminal dimension are being assigned and investigated criminally and administratively by different investigators concurrently within five business days. PRP continues to admit that it fails to do so after six years of monitoring.

Since September 2024, the Monitor's Office has been told by the Civilian Complaints, Internal Investigations, and Discipline Working Group that a new policy of simultaneous internal investigations has been written. The Monitor's Office has yet to see a draft of the new policy. PRP continues to indicate that the policy is awaiting signature by the Superintendent.

*Pathway Forward*

Internal criminal and administrative investigations must be assigned for concurrent investigation by separate corresponding branches of SARP - NAI and NIA. Internal Affairs (NAI) investigators should not conduct administrative investigations of any kind; much less be assigned to re-investigate their own criminal cases from an administrative perspective.

Continuance of this unacceptable practice effectively bars the achievement of any status beyond that of partial compliance.

## Paragraph 185: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement.*

223

*Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor's Office's partial compliance finding is based upon continued lack of agreed-upon policies and procedures implementation.

Only an administrative investigator may use Garrity. Once that Garrity statement has been taken, it may not be shared with criminal investigators or prosecutors, specifically including Internal Affairs.

### Pathway Forward

So long as PRP continues assigning administrative investigations to Internal Affairs investigators, or misusing Garrity, PRP will not progress beyond partial compliance with Paragraph 185.

### Paragraph 186: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| 1. 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | ☐ Met   ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

In the past, the Monitor's Office had seen relatively few instances where circumstantial evidence (especially prior remarkably similar allegations of misconduct on file with PRP), was considered by SARP investigators in their investigations. In a positive development, the Monitor's Office has detected a change with the inclusion of an analysis of the officer's prior complaint history in a limited number of recently concluded files. While current case files show that this approach is far from universal, it indicates that SARP is on the right path. Future cases must contain a short study of the accused employee's history of accusations and discipline (historial) in all relevant SARP inquiries regardless of whether the case was sustained or not. In all cases, details of alleged similar misconduct contained within the officer's disciplinary record must be considered by the fact finder.[56]

SARP investigators frequently accept an officer's assertion of a memory lapse in their internal investigations without added questioning. While pursuing this line of questioning may be uncomfortable for the SARP investigators – especially when the interviewed employee outranks them - it is essential that SARP investigators get to the truth of the matter by whatever legal means possible.

### Pathway Forward

The Commonwealth must consider all relevant evidence, including circumstantial, direct, and physical evidence when conducting its investigations. PRP must continue and expand upon the practice of citing the employee's record of accused misconduct and discipline in their case reports. PRP must continue to make efforts to resolve material inconsistencies between conflicting sworn witness statements as part of its investigative methodology.

### Paragraph 187: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Fully Compliant | Review | April 2025 – September 2025 |

---

[56] See SARP case 2024-1490, ibid.

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| 1. 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | ☑ Met  ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor's Office has yet to observe a SARP case that had been closed because a complaint was withdrawn, the alleged victim failed to cooperate, or the complainant was found guilty of any offense.

The data reviewed during this reporting period contained cases that were sufficiently investigated after the complainant withdrew or expressed disinterest with continuing an investigation.

## Paragraph 188: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a) *"Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;*

b) *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

c) *"Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*

d) *"Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

226

## Compliance Targets

| | |
|---|---|
| 1. Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

## Compliance Assessment

The Monitor's Office has seen several cases in this reporting period where an investigator's incongruous finding was left in place by a supervisor or higher authority. The most common example is a confusion between a not sustained and exonerated finding, though there are other aberrations as well.[57,58] Of the cases sent to the Monitor's Office for review, 14% contained an incongruous finding.

All must understand that the findings of exoneration apply only when the preponderance of evidence reveals that the conduct did occur, and that the conduct was proper in accordance with law, PRP rules, policies, and procedures.

If the evidence casts substantial doubt on whether the alleged incident actually occurred, only then would a finding of unfounded be indicated.

## Pathway Forward

The Monitor's Office urges SARP to continue to clarify the difference between its four factual case findings among all staff during all scheduled training events. SARP supervisors and area commanders are an essential tool to prevent these erroneously decided cases from advancing within the system.

SARP supervisors and area commanders must be subjected to discipline, including non-punitive discipline for approving cases with erroneous or unsupported findings.

## Paragraph 189: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from*

---

[57] An erroneous and unsupported finding of exonerated was left in place at multiple levels of supervision in case 2024-1490, which involved a top-ranking PRP commander. Case 2024-1292 involved yet another top-ranking figure in PRP - an inspector accused of mistreating their subordinate – a civilian secretary. There was no mention made of the 10 eerily similar complaints made by other PRP members at other times. The investigator merely accepted blanket denials from the inspector and never asked for the identity of others who may have overheard the incident in an open police facility and could have commented on its veracity. The preponderance of the evidence points to a sustained finding – not exonerated. In a case where very similar claims were made against a second lieutenant in the past and currently, and which resulted in a justified "sustained" finding, the key difference was the rank of the accused (second lieutenant versus commander or inspector).

[58] Other cases with an erroneous conclusion include case 2024-1346,where a second lieutenant had the finding changed to not sustained and a sergeant was found subjected to orientation. The sergeant had 3 prior cases of a similar nature, while the agent had been involved in 21 separate complaints. It appears that only the agent was disciplined. In case 2024-1490, the investigator apparently missed or ignored repeated occurrences of remarkably similar misconduct on the part of a high-ranking member. In case 2024-0294, an unexplained downward departure on discipline where rank appeared to be a factor is noted. The final resolution consisted of an unexplained abbreviation to what ought to have been lengthy suspensions. Owing to the charges and their past disciplinary records, the sergeant should have been suspended for at least 90 days and the agent for 50-60 days. In case 2025-1114, a lieutenant was accused of mistreating subordinates. The lieutenant had 20 prior SARP complaints against them, many attributable to the same type of misconduct. The investigator failed to challenge a witness who could recount word-for-word what was said by all parties *except* for what was said by the accused lieutenant.

*supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

For a discussion on SARP supervision and area command reviews, please refer to Paragraph 188.

Of the cases sent to the Monitor's Office for review, 14% contained an incongruous finding, which was later improperly approved by superior officers at multiple levels of PRP.

*Pathway Forward*

The Monitor's Office recommends that each case be properly reviewed at the area level to ensure that it contains a properly supported, dated, and signed review/approval from the SARP area supervisor as well as SARP command. All review certifications found in a SARP file must contain the name of the supervisor, the date of execution, and an original signature.

SARP supervisors and area commanders must be subjected to discipline, including non-punitive discipline, for approving cases that are incomplete, or approving cases that contain erroneous, conflicting, or unsupported findings.

Supervisors and commanders who repeat erroneous case approvals after having been advised, retrained, or sanctioned must be removed from the SARP workforce and replaced by competent practitioners who both understand and apply the rules.

## Paragraph 190: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and*

*accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☐ Met | ☒ Missed |
| 1b. The Superintendent reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☐ Met | ☒ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

### Compliance Assessment

In September 2025, the Monitor's Office met with Lt. Colonel Diana Crispin who is currently assigned as the Administrative Associate Superintendent to Superintendent Joseph Gonzalez. She is the Superintendent's designee to review and handle SARP cases for their final resolution process in accordance with Puerto Rico Organic Law.

The Colonel works with unidentified police reservists also assigned to review, analyze, and approve.[59] The Colonel's current position contains an entire portfolio of work aside from reviewing SARP cases.

The Colonel revealed that she personally reviews and signs off on certain cases including:

- Cases adjudicated as unfounded,
- Cases adjudicated as not sustained,
- Cases adjudicated as exonerated, and
- Sustained cases where a suspension of 40 days or less has been recommended.

The Colonel discusses the following types of cases with the Superintendent in person:

- Where a summary suspension of a PRP member equals or exceeds 120 days, or
- Where a case is of a politically sensitive nature.

Most cases are assigned to reservists, beginning with the oldest cases according to the Colonel's workplan. From her assignment as Associate Superintendent earlier this year until mid-September 2025,

---

[59] The Monitor's Office understands that police reservists are retired PRP members who have been called back to work on certain efforts, including to study and recommend adjudications and assist in delivering notice.

she reported that 777 final resolutions were analyzed and executed in this fashion and then returned to SARP for notification of the parties. This translates into 111 cases each month, on average.

According to PRP's own policy, once an investigation has been concluded, OAL (serious misconduct) and SEAQA (minor misconduct) have 30 days to adjudicate said finding and notify the parties. The Monitor's Office's review shows abundant evidence that compliance in this area is the exception and not the rule. PRP admits its present inability to comply with the 30-day rule for adjudication and notification.

Lastly, Colonel Crispin indicated that upon taking responsibility for this function, her attention was called to several aged SARP cases left behind in the Superintendent's Office which involved disciplinary suspensions of command-level officers where no disciplinary action had ever been taken against the offenders.[60]

*Pathway Forward*

Concerning SARP supervisory review and accuracy of findings, please refer to Paragraphs 188 and 189.

The Monitor's Office also recommends that the initial SARP investigator be informed of any change in the case finding at SARP command, OAL, SEAQA, or the Superintendent level, including a very brief rationale for said change.[61] Adding this brief explanation helps investigators follow their investigative results as they are adjudicated and enhance transparency and clarity. In a similar vein, Historiales must also contain the same brief rationale for changes in any investigator findings, or the reason why a case was archived.

## Paragraph 191: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s).*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

---

[60] See prior related discussions of rank disparity in investigations and disciplinary outcomes in Paragraphs 177, 186, and 189.

[61] This does not require a full analysis in the report or in the case archives. Rather, the Monitor's Office recommends a short field in the case tracking system as well as in the Historial to denote the change, who made it, and briefly why this change was made. In the interest of transparency, the investigating SARP officer as well as their chain-of-command should have access to this written rationale.

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 178.

*Compliance Assessment*

The Monitor's Office has examined cases investigated during the reporting period for the inclusion of the following observations on the part of the investigator:

(a) Compliance with training and legal standards;

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome;

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action; or

(d) Whether the incident suggests that PRP should revise its policies, strategies, tactics, or training.

A recent number of SARP cases are starting to mention these observations, which is encouraging. While the number remains small, the Monitor's Office expects it to grow once PRP amends its GOs.

*Pathway Forward*

To continue to improve performance, SARP investigators must be on constant lookout for problems or issues with training, supervision, standards, GOs, and other policies. Many complaints against PRP members may shed light on one or more of these areas. Presently, the Monitor's Office finds most SARP cases lacking this analysis; however, this is beginning to change. A trend of investigators citing some level of case analysis was observed in cases occurring later in the reporting period.[62] The Monitor's Office draws the logical inference that SARP in-service training was a factor in beginning this change.

PRP should include observations (a) through (d) as noted above in every SARP investigative case file. This could be accomplished as part of the cover sheet checklist indicating that the analysis was made and was concluded as negative or not applicable. In the case where the observation was positive, the investigator should elaborate on the observation in their report.

## Paragraph 192: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant*

---

[62] For examples where this analysis was conducted, see cases 2025-0598, 2025-0035, 2024-1623, 2024-1978, 2024-1989, 2024-1216, and 2024-1388. In case 2024-1292, the investigator read and commented on the inspector's lengthy record of remarkably similar allegations of mistreatment of subordinates, but oddly discarded or ignored this evidence when presenting their findings. The defendant was an officer of rank.

*will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | ☑ Met ☐ Missed |
| 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | ☑ Met ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## Paragraph 193: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | ☑ Met ☐ Missed |

232

| 2. PRPB's document retention practices comply with approved policies. | ☑ Met ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor's Office has found continued full compliance during this reporting period and will continue to reassess for paragraph compliance in future reporting periods.

## 5. Staffing, Selection, and Training Requirements

As policies and investigative techniques continue to change, PRP must ensure that all current investigators are familiar with and can demonstrate fluency with new procedures.

All personnel assessments, and those involving SARP investigators and staff in particular, should contain a presential component. Supervisors should not avoid an opportunity to meet with subordinates privately to discuss areas where the subordinate is excelling and areas where a subordinate may improve their performance. In-person, private, advising or coaching is an effective management tool to improve employee performance and job satisfaction.

### Paragraph 194: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2. <br><br> April 2025 – September 2025 for Compliance Targets 3 – 5. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☑ Met ☐ Missed |
|---|---|
| 2. Trainings for the internal investigation unit are consistent with approved policies. | ☑ Met ☐ Missed |
| 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met ☐ Missed |
| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | ☐ Met ☑ Missed |

233

| | | |
|---|---|---|
| 5a. Internal investigation unit personnel serve three-year terms. | ☑ Met | ☐ Missed |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office remains very concerned about the workload of SARP investigators, particularly those assigned to administrative investigations. It is not uncommon to find investigators from outside the San Juan Metropolitan area juggling 20 or more active cases – each with its own 90 + 90-day timeline. In some cases, up to 70% of assigned caseloads originate outside of their area of assignment. This requires an investigator to coordinate visits, secure transportation, and travel to areas far away from their actual assignment.

Current SARP recruiting and assignment priorities are grossly insufficient to meet internal administrative investigative needs in the areas of San Juan, Bayamon, Carolina, and to a slightly lesser extent - Caguas.

The Monitor's Office reviewed recent procurement requests from SARP command and found many instances where some requested personnel and resources had been delivered.

A critical need for off-site Internal Affairs office space, additional administrative investigators, and some limited infrastructure support remain.

### Pathway Forward

The Monitor's Office anticipates that SARP requests for human resources, equipment, and office space are given top priority and that identified resource deficiencies are corrected.

The first priority of any SARP recruitment/assignment decision is to address the Bureau's needs, not those of the investigator. As a majority of SARP cases have their origin in the metropolitan area, SARP must recruit and assign investigators to these specific areas to manage large caseloads in the areas where they allegedly occurred.[63] Special effort should be made to recruit and train administrative investigators in the metropolitan area as opposed to the farthest outposts of the island.

SARP is responsible for procuring adequate and appropriate office spaces for Internal Affairs investigators. Aside from being located outside of any PRP facility, this space must contain adequate infrastructure (securely alarmed premises, secure Internet access, surveillance equipment, secure communications, desks, chairs, cubicles, private interview space, etc.).

### Paragraph 195: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[63] The Monitor's Office understands that valid circumstances may exist to transfer a case to a remote area for investigation due to ethical conflict or the appearance of a conflict of interest. These cases are the exception, and not the rule. The Monitor's Office's case reviews have demonstrated that cases re-assigned for ethical conflict are very few and far between.

| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 – 5. |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 194.

### Compliance Assessment

The Monitor's Office concludes that most investigators, when given a choice, would choose to stay in SARP. Nevertheless, every SARP member should be asked every three years if they would like to be assigned to another part of the Bureau. This relates to employee satisfaction and motivation, as well as preventing employee burnout.

### Pathway Forward

SARP service should also be considered as a career-improvement measure that benefits both the Bureau and the individual. The three-year period could be considered as an opportunity to replace investigators who are either burned out or unmotivated, or merely a chance for the supervisor to check-in with a subordinate to determine if there is anything they need to help improve their performance. Re-appointment of SARP investigators for additional three-year terms should cease to be the default practice.

Just as the Monitor's Office regularly listens to SARP investigators in an interview setting, supervisors ought to use their annual performance review to solicit subordinates' feedback on workplace conditions and morale. Good supervisors are ever mindful of the needs of their subordinates and try to follow up on them.

SARP members, who on their own volition unilaterally transfer out of SARP, ought to do so via an exit interview conducted by the SARP area commander. This interview may help SARP determine what led to the decision to leave the unit. Effective exit interviews are great tools to develop insight into recruitment, unit morale, and employee retention.

To help facilitate SARP recruitment into locations of dire need such as Bayamon, Carolina, and San Juan, the Monitor's Office urges PRP to look at revenue-neutral incentives to attract the best and brightest future SARP investigators to serve there.[64]

---

[64] One such non-monetary incentive could be a flexible work schedule that allows an investigator to serve the exact number of hours assigned, but in a more flexible manner. This would allow SARP administrative investigators to bend their schedules into evening hours when traffic has subsided and complainants are more likely to be home from work.

235

## Paragraph 196: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2. April 2025 – September 2025 for Compliance Targets 3 – 5. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

Records indicate that all SARP investigators have completed or are scheduled to complete REA 114 – the formative investigator's training course and are current or are scheduled for training in the SARP refresher course – REA-114R.

*Pathway Forward*

PRP should continue to conduct REA-114R training as required by the Agreement. Regularly scheduled training is imperative for continued compliance with this paragraph

## 6. Preventing Retaliation

In the present SARP file sample, complaints involving retaliation often appear in a small statistical percentage of cases. There were no such cases in the current sample. For future CMRs, the Monitor's Office may contemplate drawing a purposive sample of SARP cases of this particular nature to ensure a timely and statistically relevant assessment. This sample could also provide a greater understanding as to any disparity in discipline owing to rank, as most cases of this type involve supervisors, superior officers, or both as defendants.

## Paragraph 197: Civilian Complaints, Internal Investigations, and Discipline - Preventing Retaliation

*PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination.*

236

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2. |
| Policy: | Implemented | | April 2025 – September 2025 for Compliance Targets 3 – 5. |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☐ Missed |
| 2. Retaliation trainings are consistent with approved policies. | ☐ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☐ Missed |
| 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | ☐ Met | ☐ Missed |
| 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | ☐ Met | ☐ Missed |

*Compliance Assessment*

The sample of misconduct investigations for this reporting period contained no complaints centered on allegations of retaliation. This absence is likely due to the random nature of the sample where cases are selected blindly using only case number and date.

The Monitor's Office will coordinate with PRP to ensure that the master list of cases contains a reference to the alleged violation (i.e., "retaliation"). This change will ensure that retaliation cases are selected in future samples.

*Pathway Forward*

The Monitor's Office defers assessment of this paragraph until a proper sample of retaliation cases is available for analysis.

## 7. Discipline

The Monitor's Office continues to see that discipline is broadly applied in accordance with the PRP Code of Conduct and related disciplinary matrix but is frequently delayed in cases that extend beyond the 180-day maximum period for SARP investigations. This phenomenon is exacerbated by the continuing SARP practice of conducting Internal Affairs (criminal) investigations without assigning the same case for concurrent administrative investigation. This often results in an internal criminal case taking many months - up to two years in some cases - to investigate criminally before the same case is ever seen by

237

a SARP administrative investigator. Any delay in launching an investigation will cause the subsequent investigation to suffer in terms of content and quality.

## Paragraph 198: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2. April 2025 – September 2025 for Compliance Targets 3 – 5. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 198-199. | ☑ Met | ☐ Missed |
| 2. Discipline trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | ☐ Met | ☑ Missed |
| 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | ☑ Met | ☐ Missed |

### Compliance Assessment

Over multiple reporting periods, the Monitor's Office has found little evidence to disprove that internal discipline has been applied uniformly across all ranks in accordance with the PRP Code of Conduct. The current case sample is different as it contains multiple cases that may indicate a rank-disparity between discipline meted out to those with the rank of sergeant or below, versus that meted out to lieutenants and higher ranking figures.[65] In multiple past CMRs, the Monitor's Office noted an apparent deference in questioning accused officers of higher rank, versus those of lower rank. In the current reporting period, the Monitor's Office began to see evidence that this apparent deference towards higher ranking PRP figures (lieutenants and above) may extend to both assessing responsibility and assigning discipline.[66]

---

[65] See prior related discussions of rank disparity in investigations and disciplinary outcomes in Paragraphs 177, 186, and 189.

[66] The completely random selection of SARP cases for the Monitor's Office's review and analysis can result in a hit-or-miss variety of case contents and types. For instance, retaliation cases were absent from the current and prior samples. The Monitor's Office and the Civilian Complaints, Internal Investigations, and Discipline Working Group are working together with a goal of crafting a more heterogenous sample that may contain statistically relevant percentages of cases pertaining to each section of the Agreement while maintaining a manageable workload for review.

While these anomalous cases represent slightly over 6% of the entire review, they represent over 12% of the sustained cases reviewed by the Monitor's Office. A 12% deviation in disciplinary decisions between higher ranks creates poor morale and discipline among the rank and file.

None of the disciplinary anomalies observed by the Monitor's Office have a written rationale for a deviation from the disciplinary standards adopted by the Bureau. The Monitor's Office continues to urge that, when the Superintendent or his designee deviates from the PRP disciplinary matrix, which most often involves a downward departure on the number of days a member is suspended, a short statement is included in the file as to why that deviation was indicated. The absence of any written rationale for a downward departure in discipline (or for that matter enhanced discipline) lends itself to accusations of favoritism, influence, nepotism, or political interference, every one of which is detrimental to agency morale.

The foregoing does not mean that PRP is any closer to meeting its own rules requirements with respect to adjudication or providing notice to the parties. Both of these continue to be an issue that impedes compliance.

### Pathway Forward

In cases where the final resolution findings depart from the original investigator's findings, the investigator should be able to access these findings online and find a brief, written rationale for the deviation from the SARP investigator's findings.

The Monitor's Office encourages PRP to be mindful of any disparity in assessing discipline to officers of rank. Disciplinary decisions should be based upon a preponderance of evidence in every case. PRP must always adhere to the disciplinary code with no consideration for rank.

### Paragraph 199: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.  April 2025 – September 2025 for Compliance Targets 3 – 5. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 198.

239

*Compliance Assessment*

As noted in the prior paragraph, the Monitor's Office has seen evidence of multiple deviations from disciplinary findings and recommendations, with many files lacking the reason for the lessened discipline or modified findings. The Monitor's Office continues to recommend that, when the final resolution deviates from the PRP disciplinary matrix, there should be a short statement as to why that deviation was indicated. The absence of any rationale – written or otherwise - for lessened discipline (or for that matter enhanced discipline) lends itself to accusations of favoritism, influence, nepotism, or political interference, all of which are devastating to agency morale.

*Pathway Forward*

The Monitor's Office recognizes the sole statutory authority of the Superintendent to impose discipline on a PRP member, nevertheless the Agreement calls for disciplinary deviations to be duly documented with a short, written rationale to be included in the digital case file as well as in the officer's historial.

All disciplinary cases where the original investigator's finding has been changed, or where discipline has been lessened or enhanced, must contain a legible, written rationale for said change.

## Paragraph 200: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 and 4. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB's drug testing program trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | ☐ Met | ☑ Missed |

*Compliance Assessment*

A recent Monitor's Office review of PRP members subjected to drug testing found that nearly 46.5% of the Bureau's population has not been drug screened for over three years. Examination of PRP's random

controlled substance testing shows that in the first half of the reporting period, it tested 417 active members randomly, which if extrapolated into an annual figure would result in less than half the individual drug screenings required to ensure that all PRP members are tested within a three-year window.[67]

With over 11,000 members, slightly over 3,600 PRP members must submit to drug screening each year in order to mathematically ensure that each member is tested every three years. This is far from a simple mathematical exercise; however, considering the size and geographic reach of the Bureau.

The current prevalent methodology used by PRP involves partnering with the Institute for Forensic Science (ICF), traveling to a PRP facility, locking the facility down, and subjecting all PRP members found within to drug screening. This methodology results in some members tested "at random" several times, while others avoid screening for years. This is born out through Monitor's Office's conversations with multiple PRP members who have been asked to submit to not-for-cause, or random "shut down" drug screenings on several occasions in the recent past.

Outside of the above, the Monitor's Office concludes that the drug screening collection and preservation methodologies employed are sufficient in both their design and practical use.

*Pathway Forward*

The Monitor's Office is pleased to see some limited growth in PRP's controlled substance testing program measured by the aggregate number of persons tested annually, though it still falls short of the mark necessary, which is approximately 3,600 sworn individuals screened each year under reliable conditions.

Even if PRP were to deliver 3,600 individual tests each year, that alone would still not be sufficient to achieve substantial compliance. PRP must come up with a methodology to both identify and test the large number of active sworn officers who have not submitted to testing within the last three years. The common practice of traveling out to a PRP facility, shutting it down, and testing all found within the location must be reinvented to achieve the program's goal of maintaining a drug-free workplace.

The Monitor's Office sees substantial evidence that controlled substance testing is being used on PRP applicants prior to being contracted for employment and before entering the Academy, as recommended.[68]

---

[67] PRP records indicate that of the 611 drug tests given by PRP for the first half of the reporting period, a third were given to screen applicants for the Bureau, leaving only 417 active PRP members tested at random for illicit drug use over the course of three months. Further analysis indicates that while 5,783 members had been tested within the past three years, 5,003 members had not. The case for faulty targeting is evidenced by PRP records, which show 1,775 members repeatedly subjected to drug screening over the past three years. This is well over 16% of the sworn population.

[68] While drug testing has a cost in terms of human resources as well as the test itself, that cost is minimal compared to that of a full-spectrum background investigation. To perform such an in-depth investigation only to later discover that the candidate tested positive for a controlled substance implies a less than efficient use of candidate screening resources.

## 8. Officer Assistance and Support

The Monitor's Office continues to find the PAE program to be highly effective and thus in substantial compliance with the Agreement. Where a lower level of compliance is assessed, it is due to the lack of training and not a failure of PAE in any way.

### Paragraph 201: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 – 6. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

#### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 201-204. | ☑ Met | ☐ Missed |
| 2. Officer assistance and support trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | ☑ Met | ☐ Missed |
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | ☑ Met | ☐ Missed |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | ☑ Met | ☐ Missed |

#### Compliance Assessment

PRP continues to provide officers and employees with a range of non-punitive support and services as part of PRP's disciplinary and performance improvement systems. These supports and services include readily accessible confidential counseling services, critical incident debriefings, crisis counseling, mental health evaluations, and stress management training.

*Pathway Forward*

PRP should continue to provide these supports and services to ensure continued compliance with this paragraph.

## Paragraph 202: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 – 6. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

Training has been developed and delivered to PRP.

*Pathway Forward*

PRP should continue to administer this training at regular intervals as outlined in their policies and procedures. The continued implementation of this training will ensure full compliance.

## Paragraph 203: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall involve mental health professionals in developing and providing in- service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2.<br><br>April 2025 – September 2025 for Compliance Targets 3 – 6. |
| Policy: | Implemented | | |
| Training: | Implemented | | |

|  Practice: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

### Compliance Assessment

Training has been developed and delivered to PRP.

### Paragraph 204: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2. April 2025 – September 2025 for Compliance Targets 3 – 6. |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

### Compliance Assessment

PRP ensures that any mental health counseling services provided to PRP employees remain confidential as consistent with the Health Insurance Portability and Accountability Act (HIPPA) and generally accepted practices in the field of mental health care. PRP has achieved full compliance with this paragraph.

# X. Community Engagement and Public Information

This reporting period is the first time that all paragraphs in this section were assessed under the new methodology introduced at the end of the previous reporting period. Under the Monitor's Office's guidance, PRP resumed development of a structured community engagement plan designed to integrate community and problem-oriented policing principles into its management, policies, recruitment, training, personnel evaluations, and accountability systems.

While the process is ongoing, these sessions have produced meaningful progress. PRP has begun developing its first operational pilot plan, which includes representative police areas across the island: Aguadilla, Arecibo, Humacao, and Guayama. In June 2025, the Community Interaction Committee (CIC) policy received the Superintendent's approval, allowing PRP to advance its internal engagement efforts. In August 2025, PRP submitted its pilot implementation plan for the selected areas. The Monitor's Office reviewed the plan and submitted recommendations in September 2025, paving the way for pilot implementation beginning later that month. The plan is scheduled to run through March 2026 (CMR-14).

However, two key policies remain pending approval by the Superintendent: GO 803 (Community Policing) and GO 805 (Public Information and Open Meetings – Encuentros Comunitarios). Approval of these policies is essential for finalizing PRP's Bureau-wide community engagement plan in collaboration with community stakeholders. The full plan will also include the development of supplemental community engagement plans for each of PRP's 13 area commands. These supplemental plans will align personnel deployment with the **S**taffing and Resource Allocation Plan, ensuring consistency with community-oriented policing principles.

Progress in this section remains closely tied to finalizing the Bureau-wide engagement plan, approving the pending policies, and implementing related training and electronic systems. PRP also plans to enhance its community policing data systems under Benchmark Analytics during Phase II, scheduled to begin in December 2025. The scope of Benchmark Analytics' community engagement modules is still being defined, but the Monitor's Office views this phase as a valuable opportunity to institutionalize best practices, strengthen partnerships, and promote measurable improvements in community engagement. Early planning and pilot implementation will be key to identifying challenges and building momentum for effective integration.

During this reporting period, the Monitor's Office also re-reviewed several key documents, including GOs 801 (CICs), 803 (Community Policing), 805 (Community Meetings), PPRs 803.2 and 803.5, and the CIC Rules and Regulations Manual. The Monitor's Office attended CIC Central meetings, Community Safety Council (CSC) meetings, and a community open meeting (Encuentro Comunitario) hosted by the Bayamón Area Command.

Additionally, the Monitor's Office and PRP co-hosted a Town Hall Meeting in Salinas (Guayama Area Command), attended by community members, CSC representatives, local officials, non-profit organizations, direct service providers, and CIC members. Participants shared common public safety concerns and emphasized the importance of PRP's active engagement with local communities.

Community members also acknowledged PRP's positive contributions through programs such as the Police Athletic League for youth engagement and Vuelta a la Vida, a referral program supporting drug rehabilitation services.

For this reporting period, the Monitor's Office reviewed compliance evidence from PRP's community policing operations in San Juan, Bayamón, Utuado, Guayama, and Fajardo. Interviews were conducted with personnel responsible for community engagement, alliance development, outreach, and problem-solving, as well as with community members and CSC representatives. While PRP continues to make progress, the Monitor's Office found that some longstanding implementation challenges remain unresolved, and corrective actions have yet to be fully documented.

In conclusion, the Monitor's Office remains optimistic about PRP's progress as it begins implementing the pilot phase of its community engagement plan. Continued success will depend on PRP's ability to establish a structured and sustainable management system that supports long-term improvement and embeds community policing principles into daily operations across all levels of the Bureau.

Overall, the Commonwealth's compliance with the 13 Community Engagement and Public Information paragraphs assessed during this reporting period reflect similar levels of compliance noted during previous reporting periods. In CMR-12, 38% (5 paragraphs) were found to be partially compliant and 8% (1 paragraph) was found to be not compliant in comparison to the current reporting period where 31% of paragraphs (4 paragraphs) were found to be partially compliant and 15% of paragraphs (2 paragraphs) were found to be not compliant. See figure 9.



*Figure 9. Community Engagement and Public Information: Paragraph Compliance Status*

## Paragraph 205: Community Engagement and Public Information - General Provisions

*PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement. In addition, compliance will be determined on PRPD's ability to establish a department-wide community engagement strategy. This strategy should outline how the department will integrate community and problem-oriented policing principles into its management (Paragraph 140), policies and procedures (Paragraph 109), recruitment (Paragraphs 102-103), training (Paragraphs 120, 123, and 129), personnel evaluations (Paragraph 145), tactics (Paragraph 13), and systems of accountability (Paragraph 159). The Plan should also outline PRPD's priorities for engagement with the community, according to Paragraphs 2017, 214, and 215. The Plan is assessed as part of Paragraph 208.

## Compliance Assessment

Following approval of the new methodology in September 2024, PRP concentrated its efforts on developing a comprehensive, Bureau-wide community engagement implementation plan. Under the Monitor's Office guidance, compliance is assessed based on PRP's capacity to establish a Bureau-wide community engagement plan, as well as to create supplemental, needs-based program plans for each police area in close consultation with area CICs, other community stakeholders, and CSCs. The successful implementation of this plan is essential for meeting additional compliance targets, advancing toward substantial compliance, and ensuring the sustainability of the Commonwealth's efforts.

PRP submitted its preliminary draft to the Monitor's Office in April 2025. Following this submission, working group sessions with the Monitor's Office focused on streamlining the document and giving structure to the plan, outlining functions and responsible parties, and proposing operational implementation strategies. In June 2025, the Superintendent approved the overdue CIC policy, allowing continued progress on the Plan. In July 2025, PRP reviewed the Monitor's Office's recommendation to initiate implementation of the plan under a pilot that would encompass at least four police areas across the island's cardinal points. In August 2025, PRP formally submitted its finalized plan, designating the police areas of Humacao, Guayama, Aguadilla, and Arecibo as the initial pilot locations. The pilot is scheduled to operate through March 2026, with the ability for revision and expansion based on closely monitored progress, and evidence of collaborative efforts, including feedback and recommendations from the Community Relations Bureau, CICs, Central CSC, and community stakeholders.

247

## Community Policing in Policy

Relevant and related policies including GO 803 (Community Policing) and GO 805 (Encuentros Comunitarios), remain overdue pending the Superintendent's approval. These approvals are critical to finalize the Bureau-wide Community Engagement Plan, which includes supplemental plans for each of the 13 police areas in line with community policing principles. The supplemental plans encompass personnel deployments based on the Staffing and Resource Allocation Plan, supporting partnerships/alliances, the implementing problem-solving initiatives through the SARA Model, and continuing comprehensive policing approaches to address crime and safety concerns.

## Community Policing Training

Community policing trainings are scheduled for assessment during the next reporting period. However, during prior reporting periods, PRP incorporated community policing training into its in-service program, achieving over the 95% compliance threshold. Notwithstanding, training in community policing (REA 803) was not included in the 2025 training calendar. It is important to note that, while the Agreement does not require annual training for community policing, the Commonwealth should ensure that community policing principles are integrated into all training activities consistent with its institutionalization and better practices. On the other hand, ancillary training that focuses on the core components of community policing—such as problem solving, alliance development, and stakeholder engagement through group dynamics - is essential for enhanced proficiency and development. This should include the use of supplemental reference materials and practical field training support. Additionally, the Monitor's Office recommends prioritizing training on the newly launched community engagement strategic operational plan. Operational practices that are informed by feedback from stakeholders are crucial for achieving progressive compliance.

## Community Policing in Recruitment

The Monitor's Office notes that this area is assessed during even-numbered CMRs, with the most recent evaluation conducted in CMR-12. As of CMR-12, the 2025 Annual Recruitment Plan remained under development. The Monitor's Office further notes that the recruitment plan should incorporate community participation and support through CICs to foster a workforce reflective of the Puerto Rican community's diversity. It is also noted that although the recruitment policy and plan require community involvement via CIC participation in PRP's recruitment, advertising, and selection processes, there has been limited evidence provided to the Monitor's Office to demonstrate compliance.[69] The Monitor's Office anticipates reviewing the forthcoming plan and evaluating the extent of active community input and participation during the next reporting period.

## Community Policing in Management and Performance Evaluations

Performance evaluations are conducted annually. A review of recent evaluation samples revealed some improvement in the quality of written justifications. However, some interviewed personnel still indicate that supervisors were not always available to discuss evaluations and career development. Management should reinforce the importance of these discussions and ensure adherence to required policy and procedures. Additionally, uniformity in performance appraisal practices has not been consistently observed, despite required performance appraisal discussions. Supervisory written summaries are scant

---

[69] See GO 501 Chapter V.B: Recruitment Advertisement Committee.

or denote little to no written observations relevant to community policing for improvement or continued professional development for those PRP members directly involved in community policing. It is essential that performance guidelines and supervisory assessments align with the supervisee's proficiency in community engagement, proactive policing, critical thinking, problem-solving, and alliance building and sustainment to substantiate performance ratings.

The Monitor's Office stresses the need for PRP to conduct additional training on the requirements of the new performance evaluation system. Although training has been conducted, the training is not being fully operationalized, and several supervisors overlook conducting in-person evaluation discussions as required per policy.

## Community Interaction Committees

The CICs are comprised of community members who have a significant interest in supporting PRP's reform initiatives. Their involvement is essential to maintaining robust community engagement in support of a comprehensive police approach and a sound and successful engagement plan. However, as identified in prior reporting periods, ongoing challenges with recruitment and the availability of training sessions to confirm new members are considered contributing factors to candidates' dissatisfaction and membership decline.

The CIC policy (GO 801) and the CIC Rules and Regulations Manual were finalized and approved by the Superintendent in June 2025. PRP is now in a better position to incorporate strategies for continued community involvement through the committees, including its ability to secure new membership through recruitment, revise required training curriculum for timely delivery, and advance initiatives in support of a comprehensive policing approach to community policing.

## Community Policing and Collaborative Problem Solving

Field support and technical assistance in the core components of community policing—such as problem solving, alliance development, stakeholder engagement and outreach - were delegated to newly designated area coordinators in community policing. These coordinators directly reported to a Central Coordinator who served as a resource in the expansion of community policing implementation practices. However, this assistance, although active by designation, has been stalled pending the Superintendent's approval of the long overdue Community Policing policy (GO 803). The Monitor's Office reiterates that the approval of this policy is fundamental for continued operational field assistance, supervisory coaching, programming, progressive assessment compliance, and improved ratings. Long overdue policy approval has caused substantial delays in implementing community policing practices.

## Public Information

PRP has progressively improved its access to public information and continues demonstrating a strong commitment to ensuring accountability and transparency in its operations to inform the public. In a prior reporting period, it introduced public reports through community dashboards enabling public access to crime statistics and the ability to search crime data using parameters such as month, year, offense type, and police area. These dashboards have been expanded to include Agreement-related topics such as UOF, administrative complaints/commendations, sexual offenses and DV, and more recently, Reform status. PRP also released a dashboard capturing crime incident data under the NIBRS model. The Superintendent continued his initiative to inform the public about crime statistics, trends, and the

Bureau's police work plans' expansion initiatives through weekly press conferences. All of these efforts are highly commendable, and in line with best practices to keep the public informed. However, effective implementation practices rely heavily on the development of robust reporting systems. PRP continues working to enhance its systems including NIBRS reporting, hate crimes identification, and training.

Compliance with public information through open meetings (Encuentros Comunitarios) continues requiring concerted efforts and adequate evidence to assess progress, including integrating the Press Office into community policing practices beyond reporting crime incidents and the publication of a calendar of events.  Although a policy is in place operationalization of these initiatives requires the approval of the overdue policy. Through its approval, area command engagement plans are expected to provide structure and mechanisms for incorporating the Press Office into the policy and support strategies to address crime, inform the public about crime trends, policies, police practices, and communicate PRP's Reform updates.

*Pathway Forward*

Finalizing long overdue policy approvals is a reiterated recommendation for the continued development of the Bureau-wide community engagement plan and individual police area commands' supplemental engagement plans, facilitating implementing a comprehensive community policing approach. The Monitor's Office also reiterates the need to integrate the Press Office and PRP's internal media resources into engagement plans for increased public awareness and education in community policing practices, policies, Agreement-related topics, crime trends including gender and domestic violence, immigration, hate crimes, COPOP, outreach activities, collaborative initiatives for problem-solving, referral services and available resources, and the exchange of resources through informational campaigns, webinars and podcasts.

Aligning recruitment procedures with community policing standards and values, seeking and engaging CICs for input and participation, including recommendations in the selection process, must be reflected in the development of the Bureau's recruitment plans. Progressive compliance in community policing requires allocating resources to meet staffing deployment needs as required in Paragraph 13. This would ensure effective community policing expansion, better practices, and the successful implementation of a sound community engagement plan.

PRP must also resolve issues related to CIC recruitment and provide relevant multi-themed training in a timely and consistent manner, facilitating new membership confirmation and improved membership retention.

Increased efforts to hold community open meetings (Encuentros Comunitarios) to address community concerns, report on Agreement progress, and educate the public on various reform topics as required in the Agreement, should be outlined through streamlined operational practices incorporated into the supplemental engagement plans of each police area including a calendar of events with established mechanisms for timely publication on the Bureau's website. PRP must continue the development of robust reporting systems and enhance its systems including NIBRS reporting, hate crimes identification, and public education.

## 1. Community Oriented Policing

Community outreach and problem-solving are fundamental for effective community-oriented policing. Continued progress in this area depends on the completion of the Bureau-wide community engagement plan, approval of pending policies, completing related training, and expanding community policing tools through Benchmark Analytics. PRP must also ensure that community policing principles are integrated into all training activities, even though annual community policing training is not explicitly required in the Agreement.

With the pilot plan now in operation, PRP is expected to demonstrate that its initiatives and performance measures align with the requirements of the Agreement and the established monitoring methodology. The plan should also include efforts to strengthen training programs—both core and supplementary—to ensure that all personnel have a solid understanding of community policing principles and can apply them effectively in daily operations and interactions with the public.

In addition, it is important for PRP to work closely with its technology vendors to address administrative and technical challenges that affect data collection and analysis.  Enhancing these systems will improve PRP's ability to measure progress, identify areas for improvement, improve required reporting, and maintain transparent communication with community stakeholders and the public.

### Paragraph 206: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem- solving approach.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 206. | ☐ Met | ☐ Missed |
| 2. Community policing and problem solving trainings are consistent with approved policies. | ☐ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | ☐ Met | ☐ Missed |
| 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | ☐ Met | ☐ Missed |

251

| 5. All PRPB Area Commands implement/conduct at least one SARA Model project per year. | ☐ Met  ☐ Missed |
|---|---|

Note: This paragraph is assessed together with Paragraph 13 of the Agreement.

*Compliance Assessment*

Although the standing policy, GO 803 (Community Policing), established in October 2021, met the requirements during this and prior reporting periods, the Superintendent's approval remains pending. Finalizing its approval will facilitate PRP's continued development of a Bureau-wide community engagement plan along with individual area commands' supplemental engagement plans.

Targets 2 and 3 are assessed during even reporting periods; however, it is important to note that, while the Agreement does not require annual training for community policing, the Commonwealth should ensure that community policing principles are integrated into all training activities consistent with its institutionalization and better practices. The Monitor's Office also notes that training in community policing (REA 803) was not included in the 2025 training calendar. Nonetheless, training that focuses on the core components of community policing—such as problem solving, alliance development, and stakeholder engagement through group dynamics - remains essential to effectively implement the strategic Bureau-wide community engagement plan and fulfill compliance targets in this paragraph and superseding ones.

Under the new methodology, each police area must implement at least one SARA Model project annually, rather than one per district or precinct, as in the past. Supplemental police area plans require annual updates to incorporate structured problem-solving initiatives and proactive community policing activities, including outreach and Agreement-related initiatives, that supervisory coaching and designated area coordinators play a fundamental role in during implementation. To comply with the Agreement, the plan should support effective problem-solving, address alliance development for improved trust and communication, focus on community needs, and draw upon resources and expertise from representative community sectors to promote and facilitate ongoing engagement and collaboration. The plan must also specify methods for evaluating the effectiveness of these strategies.

The Monitor's Office notes a significant and progressive decline in the implementation of problem-solving initiatives using the SARA Model since CMR-10.  In CMR-11, PRP aimed to conduct at least one problem-solving project per district or precinct within each area but failed to achieve this goal. In the prior CMR, the Reform Office certified that no SARA Model initiatives were carried out in the sampled police areas. Meanwhile, during this reporting period, no evidence was submitted to the Monitor's Office to determine compliance in support of this paragraph or to meet the compliance targets established in this paragraph, other than a blanket certificate indicating that problem-solving initiatives were part of the supplemental police area plans currently in development.

In October 2025, PRP submitted some evidence in support of problem-solving projects in pilot areas. Most areas have already chosen the municipality where problem solving under the SARA Model will be implemented. Arecibo will be focusing on the municipality of Hatillo, Aguadilla will focus on the municipality of San Sebastian; while Humacao has chosen the municipality of Las Piedras, and Guayama has chosen the municipality of Salinas. Most areas have held at least one or two meetings to determine their course of action, but they are within the very early stages of implementation. Arecibo appears to

have a better-defined plan including stakeholder participation, interagency involvement, and targeted audiences for outreach. Its structure includes community and stakeholder orientations to meet objectives and mission critical issues. The Monitor's Office on the other hand stresses the need for other pilot areas to engage in a needs assessment with community participation, prioritize needs through the scanning process, and review crime statistics and community surveys to develop action plans beyond law-enforcement including objectives, target dates, and definition of potential outcomes/results for the assessment.

Overall, compliance with Targets 4 and 5 requires the resolution of longstanding issues related to resource deployments, specifically to fulfill the full staffing rollout required under Paragraph 13 and implementing problem solving initiatives under the SARA Model. Addressing these issues will support the expansion of community policing, maintain continuity in best practices, facilitate meaningful community discussions, and enhance initiative documentation.

*Pathway Forward*

PRP must prioritize finalizing the approval of GO 803 (Community Policing), which is essential for the continued development and implementation of both Bureau-wide and area-specific community engagement plans. These plans should enable supervisors and community policing coordinators to help officers identify local needs, build appropriate partnerships, and develop joint initiatives that support reducing delinquent behaviors, problem-solving, and strengthening public trust.

PRP must ensure that community policing principles are integrated into all training activities, even though annual community policing training is not explicitly required in the Agreement. Addressing the omission of REA 803 in the 2025-2026 training calendar by incorporating essential supplemental training on problem solving, alliance development, and stakeholder engagement and delivery through community policing area coordinators is stressed and highly recommended. This will support the operationalization of strategic plans for community engagement and help meet compliance targets.

Supervisory coaching and the involvement of area coordinators are critical for ensuring these activities are effectively implemented according to identified community needs. Allocating sufficient resources to problem-solving initiatives will strengthen community policing, support continuity in best practices, and facilitate ongoing collaboration with representative stakeholders.

The Monitor's Office stresses that proactive monitoring and evaluation, combined with ongoing stakeholder involvement, will be essential in restoring and sustaining compliance moving forward.

## Paragraph 207: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Deferred | Review | October 2024 – September 2025 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 207. | ☐ Met | ☐ Missed |
| 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | ☐ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | ☐ Met | ☐ Missed |
| 4. Area specific Community Engagement Plans are updated annually and outline activities related to formal programs, structured problem-solving projects, and proactive community policing activities. The Plans should also include evaluation methods to determine the effectiveness of such activities in reaching a broad cross section of community stakeholders. | ☐ Met | ☐ Missed |
| 5. Area specific Annual Reports documenting activities conducted related to its Community Engagement Plans. | ☐ Met | ☐ Missed |

## Compliance Assessment

While this paragraph is considered deferred, the Monitor's Office offers an overview for this reporting period. GO 803 (Community Policing), established in October 2021, has satisfied the requirements for this and previous reporting periods; however, recent revisions and approval by the Superintendent remain pending. Securing final approval will support PRP's ongoing efforts to develop a comprehensive Bureau-wide community engagement plan, as well as individual supplemental engagement plans for each area command.

Targets 2 and 3 are subject to compliance assessment during the next reporting period.

Target 4 requires the development of area-specific community engagement plans using insights from identified needs, geographic considerations, demographic data, community stakeholders, crime statistics, trends, mapping, and factors affecting quality of life. PRP just finalized its Bureau-wide community engagement plan based on a pilot in Humacao, Guayama, Aguadilla, and Arecibo. This pilot is subject to internal review and evaluation for expansion with supplemental area-specific community engagement plans pending development.

The Monitor's Office underscores that these plans must be updated annually, outlining activities related to programs and initiatives, including structured problem-solving projects, such as proactive community policing activities in collaboration with CICs, CSCs, and other community stakeholders' recommendations. The plans should also include methods to evaluate the effectiveness of implemented activities to reach a wide range of community stakeholders and a combination of strategies for expanded broadcasting to meet Target 5.

Among the sampled alliances reviewed, the Monitor's Office found deficiencies in documenting and executing practices. The significant deficiencies are consistent with the Monitor's Office's findings throughout past reporting periods. Poorly collected data/information yielded failed contacts because contact names were not included, or the information provided was inaccurate (i.e: non-existent telephone numbers/individuals). In other instances, lack of contact for sustainment verification was found through direct interviews and/or information received where responsible parties were no longer associated with the representative organization. These issues have been discussed during PRP's working group meetings. In some instances PRP provided blanket certificates indicating misclassification or agent error in support of compliance justification. Given these cases, the Monitor's Office finds that supplemental training is necessary.

The Monitor's Office recognizes the alliances formed by the Superintendent with Alianza de Autismo and APS as of July 2025.  As reported during a press conference, the primary goal of these alliances is to deliver training to state and municipal police, ensuring that officers are adequately equipped with the tools required to address the needs of individuals identified on the autism spectrum. PRP has also supported MDA through internal efforts aiming to build stronger relationships with the community. However, PRP must ensure that all initiatives and related reports are comprehensive to meet compliance targets in support of the Agreement. Police area coordinators and supervisors should coach PRP members to meet documentation requirements, including:

- Stakeholder name and contact Information
- Relevant PPRs (803.1, 803.4)
- Meeting minutes with clearly outlined objectives
- Planned discussions
- Work/action plans including tasks/activities, timelines/deadlines, and stakeholders involved in the plan
- Relevant content including analysis, resources, and support
- Outcome reports including challenges encountered and success stories

These requirements provide the needed information for semester reports and the annual alliance report.

Evidence of outreach initiatives was not received by the Monitor's Office to determine compliance. Conducting a review through the self-monitoring system was not accurate. Although the system is partially operational, searches per topic through sampled police areas is disabled. The Monitor's Office is aware that electronic systems may not be fully operational until Benchmark Analytics' scheduled implementation under phase II.

*Pathway Forward*

To evaluate future compliance, the Monitor's Office plans to review and track outcomes from meetings and initiatives related to outreach, interagency collaboration, and the development of alliances with various stakeholders. The Monitor's Office notes and reiterates the importance of including the Press Office in engagement plans to extend outreach efforts for education, public information, and crime prevention. This method is intended to align with better community policing practices and address community needs. Similarly, effective implementation practices include facilitating acquiring knowledge

and proficiency through adequate training to implement purposeful programming for sustained engagement.

Establishing working groups, including CICs and CSCs would facilitate the development of area-specific community engagement plans, assist in needs identification, and support program implementation. To promote constructive interactions and resource exchange, the Monitor's Office emphasizes the importance of engaging with federal agencies, academia, non-profit organizations, advocacy, and faith-based groups through outreach and purposeful alliances. The Monitor's Office reiterates that substantial compliance depends on the effectiveness of implemented practices, relevant data, and community feedback.

The Monitor's Office recognizes and underscores the alliances developed by the Superintendent through an MOU with Alianza de Autismo and ASP for PRP's education and training and looks forward to the Bureau's engagement with other community stakeholders.

### Paragraph 208: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Bureau-wide community engagement strategic plan is developed and made publicly available. | ☐ Met | ☐ Missed |
| 2. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | ☐ Met | ☐ Missed |
| 3. PRPB annual reports are made publicly available. | ☐ Met | ☐ Missed |
| 4. Annual report incorporates all the requirements of Paragraph 208. | ☐ Met | ☐ Missed |

### *Compliance Assessment*

Based on the recently implemented pilot and prospective outcomes, PRP may be in a better position to develop its Bureau-wide community engagement plan. Therefore, this paragraph is deferred, allowing

256

PRP ample time to review, modify, expand, or rescind implemented practices. Moreover, as recommended during working group discussions, PRP will broaden community consultations and seek recommendations for proactive participation.

Targets 2 through 4 have been assessed throughout previous reporting periods. As noted in the prior CMR, the standing policy requires that the annual alliances report be made publicly available by January 30 for the preceding year. PRP complied with this requirement by publishing its most recent annual alliance report for 2024 on January 20, 2025. The previous report was released on January 30, 2024, covering 2023. However, it is noted that both reports failed to include detailed information such as the names of the alliances and specific supporting documentation, including:

- Stakeholder/organization
- Nature and scope of the alliance
- Collaborative agreement or MOU
- Issues/concerns/needs addressed through the alliance
- Meeting minutes
- Action plans, including steps taken towards encountered issues requiring resolution
- Key stakeholders, including community members to fulfill efforts and execute the plan
- Encountered challenges/recommendations
- Success stories for replication
- Alliance sustainment mechanisms
- Measuring tools to assess effectiveness

The Monitor's Office also notes that the 2024 report included additional activities—such as outreach and Conversatorios—linked to area command community engagement plans, but these activities are not directly related to the requirements of this paragraph. Considering the above-mentioned missing information, compliance with Targets 2 through 4 are only marginally met.

*Pathway Forward*
PRP needs to approve the Community Policing policy (GO 803) for continued progress. The publication of PRP's annual alliance report should be comprehensive; including clear objectives, actions taken, problems addressed, obstacles faced, solutions applied, supporting evidence, and recommendations with outcome summaries. Additionally, PRP must ensure consistent, accurate, and reliable data collection to establish dependable mechanisms for evaluating and measuring the effectiveness of implemented practices. Whether Benchmark Analytics, AH Datalytics, or both are designated to develop a control and monitoring process to audit data in the community policing electronic modules system, appropriate mechanisms must be developed to measure the effectiveness of alliance development and problem-solving.

## 2. Community Interaction Councils

The CICs consist of volunteers, including professionals from various fields, who represent diverse segments of the community across the 13 police areas. According to GO 801 (CICs), each committee is composed of 11 community representatives from different sectors. They play an essential role in advising, reviewing, and providing recommendations to PRP on numerous matters, including advising

the Superintendent on policies, recruitment processes, and implementing reform-related strategies for increased accountability and transparency in the dissemination of public information. These recommendations derive from experiences and priorities of their respective communities, along with input from community stakeholders and safety councils. Each committee designates a spokesperson within the 13 area commands. These spokespersons, in conjunction with the Community Safety Councils' president, the Executive Director, and a civil rights representative appointed by the Superintendent, constitute the Central CIC.

During this reporting period, the Monitor's Office re-reviewed the existing CIC policy (GO 801), including the Committees' Rules and Regulations Manual, and rendered recommendations. The CICs also had the opportunity to review the policy and submit recommendations to the Reform Office through the Community Relations Bureau. However, the approval of related GO 801 and the Rules and Regulations Manual associated with Paragraphs 209-213 have remained overdue since 2021. As noted in the prior CMR, there was a timeline delay in the approval of these policies. Based on PRP's January 2025 Consolidated Status Report the new date for the cited policy approval and publication was set for April 15, 2025; however, the April 2025 Consolidated Status Report does not address this longstanding issue. By approving this policy, and all other related ones, PRP can better position itself to develop specific engagement plans and implement strategies for ongoing community involvement through the committees. This includes ongoing membership recruitment, consistent training delivery, providing resources for the committees to fulfill their mission, and pursuing joint initiatives to support a comprehensive approach in community policing and meet compliance with the Agreement.

The Monitor's Office also notes that although no methodology changes were made to the paragraphs in this subsection, because all annual paragraphs are now monitored together on an annual basis, a comprehensive review of these paragraphs will be provided in the next CMR. The compliance statuses noted here are carried over from the previous CMR.

## Paragraph 209: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

258

*Compliance Targets*

| | | |
|---|---|---|
| 1. PPRB policies require it maintain the CIC and they meet at least every three months. | ☐ Met | ☑ Missed |
| 2. PRPB maintains CICs as required by this Paragraph. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The CIC policy (GO 801) was approved by the Superintendent in June 2025 and is subject to annual revision. The policy requires the committees to hold monthly meetings to discuss initiatives, develop work plans, and fulfill duty responsibilities relevant to each of the 13 police areas. The Agreement stipulates a minimum of three CIC meetings per police area per semester. The police areas of Utuado, Fajardo, Bayamon, Aibonito, and Guayama were sampled to determine PRP's compliance during this reporting period.

As to Target 1, the Monitor's Office found that out of those five police areas sampled, three held policy required meetings and submitted corresponding evidence in support of those meetings. The evidence included required agendas, meeting minutes, and membership attendance sheets. Most committees exceeded the Agreement requirements by holding their mandated meetings. However, Bayamon and Guayama only submitted evidence of two meetings held. As a result, Target 1 was not met.

CIC representation has continued to fluctuate between reporting periods across most police areas. The Monitor's Office examined evidence related to CIC membership and found that only 2 CIC committees are fully constituted out of the 13 area commands (15%). Most area command CICs include six to seven community members; Aibonito requires one additional community representative to reach full representation. The police area of Humacao needs six more community representatives to complete its committee, while Guayama needs five more. Based on the evidence reviewed, four have LGBTQIA+ representation (31%). In previous reporting periods, LGBTQIA+ community leaders engaged with PRP to express interest in facilitating broader representation throughout all police areas. The status of this initiative is unknown to the Monitor's Office.

Field interviews indicate that difficulties securing new membership were primarily attributed to the lack of the multi-themed workshops provided by PRP to confirm new members. A similar situation was reported during CMR-11, including technical limitations to establish individual accounts for virtual training delivery. These workshops are essential for confirming new members and enabling them to perform their duties as required by policy. This issue was identified as a significant concern by the majority of CIC members interviewed, who also indicated that the informality of the CICs and lack of rigor undermine their efforts to maintain new members. The Monitor's Office notes that PRP has been deficient and inconsistent delivering CIC multi-themed workshops since 2022. Although some improvement was noticeable during the prior reporting period. The Monitor's Office further notes that although virtual training became a viable alternative to facilitate membership confirmation during COVID, it should not be considered permanent. CIC training should be offered in a hybrid format, combining scenario-based exercises related to their roles as described in the policy. These exercises should focus on crime reduction strategies and support collaborative projects outlined in the supplemental community engagement plans for each police area.

Most committees successfully executed their work plans, facilitating and coordinating community dialogues and activities known as "Conversatorios" in coordination with local residents and stakeholders. The CICs demonstrated efficiency in identifying the need to strengthen community knowledge through targeted educational and prevention initiatives. However, it is essential that this effort be jointly undertaken by both the CICs and PRP to ensure ongoing capacity development and long-term sustainability.

While CIC and PRP members noted that most committee meetings continue to be held at police headquarters, the Monitor's Office emphasizes that area commanders and CICs need to actively explore and adopt alternative methods to host meetings at external locations. Such efforts are intended to improve public accessibility and encourage transparent collaboration with community stakeholders. The Monitor's Office recognizes the ongoing collaboration, integration, and exchange between the CSCs and the CICs, with the expectation that such cooperation will be further incorporated into the development of community engagement plans for individual area commands.

Commitment and collaboration across all levels are essential to the effective development and implementation of community engagement plans. Facilitating community dialogues, addressing local needs and concerns through open meetings, and implementing issue-driven initiatives, while fostering transparency and accountability are critical for building trust and advancing reform processes. In sum, Target 2 is in progress.

*Pathway Forward*
The Monitor's Office encourages PRP to develop its supplemental community engagement plans with consideration to the valuable expertise of the CICs related to needs assessments in support of discussions on topics including public policy, non-discriminatory practices, professional responsibility through SARP, COPOP (Centro de Operaciones de Ordenes de Protección) immigration, recruitment, and other Agreement related topics. Additionally, this approach involves incorporating CIC participation in PRP's monthly meetings to enhance police areas' understanding of the committee's function and highlight ways they can contribute to operational improvements.

PRP is responsible for assisting CICs with engaging a wide range of community members at the area command level. This includes holding monthly meetings, coordinating with the Press Office, and using multimedia resources to create recruitment strategies and public awareness initiatives.

The CIC multi-themed workshops are to be regularly available for membership confirmation and sustainment, ensuring Agreement compliance and adherence to policy requirements. Reviewing the CIC multi-themed workshop curriculum for hybrid delivery is recommended to accommodate various learning styles, in alignment with multiple intelligences and adult learning approaches.
The Monitor's Office values the CICs as essential resources in supporting the development of supplemental area command community engagement plans. These plans will assist in structuring initiatives aimed at engaging the community in meaningful discussions and activities to address safety concerns, crime trends, and other topics related to the Agreement, while ensuring alignment with and support for public information efforts.

## Paragraph 210: Community Engagement and Public Information - Community Interaction Councils

*In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | ☑ Met | ☐ Missed |
| 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | ☐ Met | ☑ Missed |

### Compliance Assessment

The CIC policy (GO 801) was approved by the Superintendent in June 2025. The standing policy establishes a mechanism for the selection of CIC members and details the steps necessary to comply with Agreement requirements. According to current guidelines, PRP is required to conduct membership recruitment every two years during June via press releases, mass media, and social media platforms, indicating available opportunities for Puerto Rico residents aged 18 and older. The recruitment announcement must remain accessible for a consecutive 30-day period, with subsequent announcements scheduled biennially from the previous date of publication. Nevertheless, this biennial recruitment process restricts open recruitment for vacancy fulfillment based on immediate needs or demand, leading committees to employ alternative measures to ensure adequate community representation. To demonstrate compliance with this paragraph, a random sample of CIC recruitment strategies and selection mechanisms documentation is required. Such evidence consists of official advertisements and publications required per policy, records of recruitment activities, candidate applications, and details of the selection processes.

During the current reporting period, the Monitor's Office reviewed recruitment efforts for the police areas of Humacao, Caguas, Carolina, San Juan, Aibonito, Guayama, Utuado, and Bayamon finding that despite needed community representatives, five out of the eight areas sampled did not conduct any recruitment (63%). The police areas of Utuado and Guayama reported recruitment efforts but failed to provide evidence in support of those efforts. Bayamon submitted an outcome report without any other evidence; open announcement and advertisement methods were not provided. Membership selection processes did not include information about selection committee participants, nor did it outline selection

261

criteria to comply with the CIC policy (GO 801) or regulations manual as required. Only Mayaguez and Aguadilla provided adequate evidence of recruitment efforts.

A marked CIC membership fluctuation was noted during this reporting period and the two prior ones. The Monitor's Office finds that although PRP ultimately addressed membership recruitment and confirmation through training in December 2024, its inconsistency hindered CICs' continued efforts. The Monitor's Office also noted that evidence submitted to assess compliance revealed predated membership enrollment (October 2025) in Fajardo. The Monitor's Office also noted that no dates have been scheduled for delivering the multi-themed workshop to recruited community representatives this year. Documents reviewed indicate a pending status.

### *Pathway Forward*

The Monitor's Office has consistently recommended that the CIC recruitment policy be reviewed to better address the committee's representative needs. Additionally, the Monitor's Office underscores the importance of facilitating CIC multi-themed workshops in a timely and consistent manner; instituting a calendar with multiple dates to facilitate provision throughout the year is advisable. These approaches will support expedited recruitment and new membership confirmation ensuring full committee representation to meet Agreement requirements and align with policy. This, in turn, would enable the committees to extend their full participation in area commands' community engagement plans, including assistance establishing guidelines to conduct initiatives and deliver activities through coordinated efforts for increased visibility, awareness, education, and community connections. Integrating the Press Office, along with multimedia resources into supplemental police area community engagement plans, can facilitate CIC engagement by creating online resources, and assisting in CIC recruitment. CIC information, resources, functions, activities, and meeting schedules should be easily accessible to the public through PRP's website, the Virtual Library, and social media platforms to generate interest and support membership recruitment efforts.

### Paragraph 211: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2024 – September 2025 for Compliance Targets 1 and 2. |
| Policy: | Implemented | | April 2025 – September 2025 for Compliance Targets 3 and 4. |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies related to CICs incorporate the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. CIC orientation course is consistent with approved policies. | ☐ Met | ☒ Missed |
| **3. PRPB makes CIC orientation available to all members of the CICs.** | ☐ Met | ☒ Missed |
| **4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement.** | ☐ Met | ☒ Missed |

*Compliance Assessment*

The annual assessment frequency for Targets 1 and 2 in this paragraph remains unchanged. Targets 3 and 4 are assessed biannually, all of them subject to assessment in this CMR.

As reported in preceding paragraphs, GO 801 (CICs), obtained the Superintendent's approval in June 2025. The Committee's Rules and Regulations Manual's final revision is complete pending the Superintendent's approval. The policy assists in formulating supplemental police area community engagement plans, which should include the committees' input and recommendations regarding recruitment practices, training reviews, structured discussions such as policy analysis, post visits, Conversatorios, and other relevant initiatives informed by community needs assessments. These efforts aim to support open meetings (Encuentros Comunitarios), outreach activities, partnerships, and facilitate community discussions on public policy, non-discriminatory practices, professional responsibility through SARP, and areas related to the Agreement.

CIC training and orientation must be available in a consistent and timely manner. Unresolved issues regarding the availability of multi-themed workshops to confirm new members prevail. The Monitor's Office finds that although PRP ultimately addressed CIC training needs by facilitating training in December 2024, delivery inconsistencies hindered membership confirmation, contributing to membership decline. Virtual training was developed during COVID to address the ongoing need to facilitate membership confirmation upon recruitment enabling members to perform duties following the policy. However, this practice has not proven effective to facilitate uninterrupted training. Conversely, interviews with CIC member facilitators and other PRP members recommend the review of the multithemed workshops curriculum. This includes delivery under a hybrid model including a combination of scenario-based practices relevant to their functions outlined in the policy, implementing strategies aimed at crime reduction, and content proportionate to the collaborative initiatives within the supplemental community engagement plans for each police area. Moreover, as previously advised, the training curriculum and delivery should include a combination of techniques to address adult learning styles and multiple intelligences. Consideration should be given to recommendations made to include scenario-based training. PRP must provide mechanisms for CIC multi-themed training content evaluation for quality improvement and relevancy. The Monitor's Office further reiterates the recommendation to develop a CIC training schedule to deliver training at least three times per year. PRP should use live streaming capabilities every six months to maximize participation and support membership expansion.

Evidence in support of compliance to satisfy Targets 2 and 3 was not fulfilled for this reporting period. Reviewed evidence revealed pre-dated membership enrollment (October 2025) in Fajardo. The Monitor's Office also noted that no dates were scheduled for delivering the multi-themed workshop to community representatives whose recruitment process was finalized, denoting pending training.

263

The Monitor's Office reviewed the police areas of Aibonito, Fajardo, Bayamon, Guayama, and Utuado to assess compliance with Target 4. This target stipulates that at least 85% of the committees should have the resources, personnel, and access required to carry out their duties and satisfy Agreement requirements. Documents reviewed included certificates signed by area commanders using a blanket form indicating general compliance with the paragraph. The form also stated that all resources were available to CICs. However, the documents did not specify or detail those resources, nor did it include confirmation from the committee's spokesperson through compliance discussions. While the document lists the committee's members, there are no signatures verifying the availability of resources. Ascertaining and fulfilling CIC resources, including equipment, training, and suitable transportation to fulfill their mission is PRP's responsibility. The Monitor's Office has identified training as one of the essential resources that should be accessible to the CICs. Interviews with CIC members, agent facilitators, and/or area command in Utuado reported that the committee requires an in-focus screen and a laptop to fulfil its responsibilities. Additionally, Guayama reported the need for a vehicle and budget allocation for equipment to deliver programming. The Bayamon CIC shared concerns that materials and resources requested at the central level often arrive late and after the fact, such as printed materials and advertisements/promotions.

### Pathway Forward

The CIC training curriculum should be assessed and updated to align with existing policies and required community engagement plans, pursuant to the new methodology. The Monitor's Office recommends that the curriculum and its delivery should use diverse methods that address adult learning styles and multiple intelligences to support effective learning outcomes. The Monitor's Office notes that integrating both in-person and virtual training, complemented by scenario-based exercises, can improve comprehension of police functions and facilitate the identification and development of effective strategies for addressing crime and safety concerns. The integration of live streaming options enables effective training delivery and expedites CIC membership confirmation. Incorporating this approach into the Bureau-wide community engagement plan is advisable. PRP should establish processes enabling members to assess training materials for quality, relevance, and potential improvements. Area commanders must ensure that their area CICs have the resources to fulfill their mission including adequate, consistent, and reliable training. Engaging in comprehensive discussions regarding committee resource needs and PRP's operating budget facilitates the CIC's ability to keep the public informed about PRP's resource allocation with added transparency.

### Paragraph 212: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:*

*a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;*

*b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;*

264

*c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;*

*d) providing information to the community and conveying feedback from the community to PRPD;*

*e) advising the Superintendent on recruiting a qualified, diverse workforce; and*

*f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2024 – September 2025 for Compliance Target 1. <br><br> April 2025 – September 2025 for Compliance Targets 2 and 3. |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | | |
|---|---|---|---|
| 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | ☐ Met | ☑ Missed |
| 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs. | ☐ Met | ☑ Missed |
| 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Under the new methodology only Target 1 is assessed annually. All other targets are subject to biannual assessment.

The implementation of a comprehensive community policing program in collaboration with the CICs across all 13 police areas remains in the early stages of development. It requires developing and implementing a Bureau-wide community engagement plan, supplemented by area command community engagement plans for collaborative efforts to address community needs and improve safety in alignment with policy and the Agreement. Although the CIC policy (GO 801) was approved by the Superintendent in June 2025, other policies are still pending approval, such as community policing (GO 803) and Encuentros Comunitarios (Open meetings; GO 805). As indicated in a Consolidated Status Report, the availability and public broadcasting of these plans was scheduled for April 2025. However, in the October 2025 Consolidated Status Report, PRP noted that the tasks were further postponed until a timeline is established for implementation through Benchmark Analytics. The Monitor's Office finds that there is no need to postpone these tasks pending establishing Benchmark Analytics' timeline. If anything, Benchmark Analytics may assist in providing continuity and support for compliance through the expansion of the electronic modules and current community engagement plans under the pilot. In

the interim, PRP must provide evidence demonstrating collaborative activities with CICs through a) reviewing and assessing the appropriateness and effectiveness of law enforcement priorities and related community policing strategies, resources, and training; b) reviewing and assessing applicable policies and effectiveness, police best practices, Agreement related matters, and victim services; c) reviewing and assessing concerns or recommendations about specific PRP tactics and initiatives; d) conveying community feedback to PRP through the exchange of information with the community; e) advising the Superintendent on recruiting a qualified, diverse workforce; and f) advising the Superintendent on ways to deliver data and information to the public in a transparent and understandable format.

To determine compliance with Target 1 the Monitor's Office attempted assessing evidence of semester plans and any other initiative in support of CIC collaboration only to find that PRP failed to submit any evidence for the first quarter of this reporting period. The evidence submitted for the second quarter was insufficient. PRP certified that based on the police areas under the pilot, Arecibo and Guayama did not engage in any initiatives in support of community interactions in coordination and participation with the CIC. Humacao reported limiting itself to two Radio Talks (Conversatiorios) involving fraud and assault. Those radio talks did not include community participation via Q&A or live phone calls and were held primarily for orientation purposes. Aguadilla held its Conversatorio at a community center in Isabela where interaction with transgender and transexual communities was the topic of discussion. An attendance sheet was included along with the promotion for the event. None of the sampled areas submitted evidence of working closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. Semester reports were not included nor any evidence of joint initiatives within area community engagement plans. Based on the lack of evidence, Target 1 is not met.

As to Target 2, the Monitor's Office reviewed evidence to determine if PRP protects confidential and law enforcement sensitive information in documents it shares with the CICs. During the first quarter, PRP submitted evidence for Bayamon, Mayaguez, San Juan, Utuado, Guayama, Humacao, Aguadilla, Fajardo, and Aibonito. PRP did not submit any evidence for Ponce or Carolina. Bayamon, Guayama, Caguas, Aibonito, and Arecibo certified that they did not share any sensitive information with their CICs during the reporting period. Mayaguez stated that the documents exchanged were related to GOs and community surveys through a lock and key mechanism. San Juan did not report any safeguarding mechanism, asserting that observations were made in the comment section of the drafts, but did not include any documents for review. Utuado and Fajardo provided copies of the confidentiality agreement signed by each CIC member and Aguadilla was the only police area reporting and submitting evidence of masking and redacting draft documents shared with water markings. Therefore, based on the submitted documentation, Target 2 is not met. Streamlined practices should be implemented to safeguard and protect confidential and law enforcement sensitive information in documents shared with the CICs. A uniform control and monitoring system should be in place for accountability and better practices.

To determine compliance with Target 3 PRP must demonstrate that it sought assistance, counsel, recommendations, or participation from the CICs, at least once in all areas specified by the paragraph. Mayaguez, San Juan, and Aguadilla reviewed some policies, but PRP did not include their recommendations.

266

Interviews with CIC members indicate that the committees were invited to observe and review instructor's coursework through SAEA. CIC members from Aibonito, Utuado, and Bayamon asserted having attended. However, PRP failed to submit evidence to determine compliance. Additionally, the CIC engaged in Agreement-related initiatives as highlighted in the CIC Annual Report, including outreach for public awareness and education through "Conversatorios" held in-person and publicly broadcasted through the local radio. PRP did not fully document these initiatives for compliance assessment with Target 3.

On the other hand, the CSCs remain engaged in community activities and outreach to meet independent objectives and support the CICs' mission. However, PRP has not shown consistency at streamlining practices to integrate, capture, or document those efforts. The Monitor's Office recommends capturing their activities through an RMS or through an electronic module as part of a comprehensive community policing strategy. Benchmark Analytics may prove effective at developing better practices.

PRP has yet to resolve a recurrent issue around acknowledging receipt of CIC reviews and recommendations. PRP needs to establish unified mechanisms to track all CIC contributions, including providing feedback on the adoption or rejection of reviewed policies, recruitment practices, community concerns and discussions, needs assessments, and outreach initiatives. This recommendation has not received sufficient attention and has been repeated in each reporting period over the last two years. The Committees' contributions are sound, represent the community's perspective, and must be acknowledged and regarded accordingly.

In summary, based on the insufficient and inconsistent evidence submitted, this paragraph is not in compliance.

### Pathway Forward

The Monitor's Office reiterates the need for PRP to set clear expectations for collaboration with committees and provide guidelines for the committees to assist in supporting a comprehensive police strategy, including area command community engagement plans. These plans must outline how CICs can contribute to recruitment, policy, training, site visits, resource reviews, Conversatorios, open meetings, and other Agreement-related topics such as non-discrimination and professional responsibility via SARP.

PRP must integrate CICs in policy-related responsibilities and the implementation of strategies focusing on crime reduction and quality of life improvement. PRP has fallen short at integrating CIC documented initiatives and efforts to meet policy requirements and fulfill its mission. PRP must consolidate CIC efforts through the most suitable technology vendor for records management tracking or the expansion of the electronic module system to capture PRP's community engagement plans in support of a comprehensive community policing approach.

Issues around acknowledging the receipt of reviews and recommendations made by the committees must be rectified for accountability and better practices. The Monitor's Office restates the need for PRP to establish unified mechanisms to track all CIC contributions, including feedback on the adoption or rejection of reviewed policies, recruitment practices, advice to the Superintendent, community discussions, concerns and shared feedback, needs assessments, and outreach initiatives. Comprehensive area command training is essential to ensure compliance with streamlined practices and guidelines,

including the use of reference manuals recommended in CMR-10. Consistent with prior CMR recommendations, incorporating the RMS into community policing efforts may enhance PRP's capacity to achieve compliance objectives.

## Paragraph 213: Community Engagement and Public Information - Community Interaction Councils

*CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. PRPB published the CIC's annual public report with recommendations included on the PRPB webpages. | ☐ Met  ☑ Missed |
| 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | ☐ Met  ☑ Missed |

### *Compliance Assessment*

Compliance with this paragraph and CIC policy (GO 801) requires that the Executive Director of the Community Relations Bureau, in collaboration with SARP, prepares an annual report documenting all CIC recommendations related to the review of PRP policies, as well as other police practices and initiatives involving the CICs during the previous year.[70] The report compiles the Committees' semester reports (December and June) within each area command to develop the annual report. Both the Agreement and policy require CICs to document their recommendations in an annual public report, which must be made available by January 31 each year at PRP facilities and on the official PRP website, including the Virtual Library. The policy further requires that the report protect the disclosure of any confidential or sensitive law enforcement information, as well as personal and private data.

Based on PRP's website the CICs published their 2024 Annual Report. However, the record does not reflect a publication date. Additionally, the report has not been published in the Virtual Library, PRP's central repository of public and non-confidential documents for public information, knowledge, self-

---

[70] See GO 801: V§6(h).

enrichment, and access to technological resources.[71] Despite this, the report captured all activities and recommendations made by each committee in the 13 police areas during the semiannual reports. However, the Monitor's Office found a significant decrease in the number of policies the committees reviewed. Additionally, the report failed to include recommendations made by the committees to determine compliance as required by the Agreement and policy.

Field interviews with CIC members indicated that the recommendations were not included in the annual report as per the Reform Office's request and were sent directly to the Reform Office according to instructions. The Monitor's Office conducted an informal review of some CICs recommendations, observing that input involving analysis and justifications were provided. However, neither the Monitor's Office nor CIC members know if these recommendations were accepted or rejected, since no feedback has been recorded.

The following is an excerpt from the CIC Annual Report on policies reviewed and the review of brochures and posters for public information on equal protection:

| CIC's | | |
|---|---|---|
| **Capitulo** | **Sección** | **Título** |
| **300** | 305 | Transacciones de Traslado del Sistema de Rango |
| **500** | 503 | Junta de Evaluación De Las Divisiones Tácticas Especializadas |
| **600** | 605 | Informe de Investigación de Uso De Fuerza |
| **800** | 801 | Comités de Interacción Ciudadana |
| **800** | 802 | Reorganización del Cuerpo de Capellanes de la Policía de Puerto rico |
| **800** | 803 | Policía Comunitaria |

Además de las Ordenes Generales se evaluó lo siguiente:

- Opúsculo Comunidad LGBTTIQ
- Opúsculo Crimen de Odio
- Derechos De Las Comunidades Extranjeras
- Personas Con Estatus Migratorio No Definido

*Figure 30. Policies Reviewed by CICs*

The report also captured a total of 209 CIC initiatives conducted during 2024, intended to advance the Reform, assist PRP in developing community connections, and educate the public through multiple outreach activities, community discussions by way of "Conversatorios", and radio talk shows. Notwithstanding, it is PRP's responsibility to demonstrate, execute, and deliver these activities through joint efforts and CIC support to meet compliance.

---

[71] See GO 409.

CICs reiterated concerns about PRP's lack of feedback regarding the recommendations made. The Monitor's Office restates the recommendation made to PRP to establish unified mechanisms to track all CIC contributions, including feedback on the adoption or rejection of reviewed policies and other practices. Additionally, to meet compliance the recommendations made by the committees must be included in the report. Therefore, the Monitor's Office finds that compliance targets for this paragraph are not fully met. Furthermore, the protection of sensitive law enforcement information, a requirement to meet Target 2, was not met.

*Pathway Forward*

PRP holds the responsibility to demonstrate, execute, and deliver community initiatives and outreach activities in collaboration with CICs. The development of police area community engagement plans may assist in bridging the gap and facilitate these efforts to meet compliance. PRP must value CIC field knowledge and expertise to actively consider constructive feedback and adopt effective communication, ensuring community needs are addressed efficiently. PRP must establish unified mechanisms to track all CIC contributions, including feedback on the adoption or rejection of reviewed policies and other practices. The Monitor's Office reiterates previous recommendations such as using a policy feedback form, like the one used for SA/DV policies, to streamline and enhance transparency in the feedback process.

PRP should also add a publication date on its website to demonstrate when its annual reports were published. As it is displayed now, it is difficult for the Monitor's Office to discern the date on which the report was made publicly available. Further adding to this confusion is the discrepancy of the inclusion of the report on the website and within the Virtual Library. PRP must resolve these date challenges to achieve compliance with this paragraph.

## 3. Public Information

PRP continues to make steady progress in improving public access to information and remains strongly committed to transparency and accountability in its operations. Since launching its community dashboards in CMR-10, PRP has expanded these online tools, which allow the public to view crime statistics by month, year, offense type, and police area. These dashboards now include data related to Reform areas such as UOF, administrative complaints and commendations, sexual offenses, and DV. PRP also introduced a dashboard to track Reform progress and another presenting crime data using the NIBRS model.

The Superintendent continues to reinforce these transparency efforts through weekly press conferences that share updates on crime trends, policing strategies, and ongoing initiatives. These actions demonstrate a strong commitment to keeping the public informed and reflect best practices in open communication and public accountability. However, continued progress depends on the development of strong reporting systems. PRP is still refining its data systems for NIBRS reporting, hate crimes identification, and related training to ensure reliable and timely information.

Compliance with public information through open meetings ("Encuentros Comunitarios") also requires more structured efforts and documentation to measure progress effectively. The Monitor's Office notes

that community engagement plans for each police area should clearly define the role of PRP's Press Office in community policing activities. This includes supporting communication efforts through webinars, podcasts, and other media resources to share updates on crime trends, police practices, and Reform progress. While the pilot community engagement plans reviewed during this reporting period did not specify the Press Office's role, future plans are expected to do so.

Further development is also needed in the areas of hate crimes reporting and public education. Training should ensure that hate crime data are accurately identified, classified, and published on PRP's website in a timely and accessible manner. PRP plans to publish annual reports on hate crimes once development is complete. NIBRS implementation remains ongoing, with monthly data submissions required under policy and the Agreement.

Lastly, PRP should continue to promote diversity and inclusion in line with Commonwealth policy, and ensure that website content remains current, accessible, and engaging for the public.

## Paragraph 214: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 215.

*Compliance Assessment*

Open meetings, known as Encuentros Comunitarios, are governed by GO 805. These meetings continue serving as the main forum for PRP's area commands to inform the public on the Reform status, address community issues, and educate the public about topics specified in the Agreement, including 1) individuals' right to decline consent to voluntary searches, 2) submitting administrative complaints and commendations, and 3) statistics on UOF and nondiscriminatory practices, as well as any other relevant topic stemming from the police area's statistics on crime, incidence, trends, or identified community needs.

271

The Agreement and policy require that these meetings be held once per year and be widely publicized at least a week in advance through print media, social platforms, and public service announcements, to secure attendance. PRP has struggled to schedule and document these meetings as required by policy and the Agreement. During the reporting period, the October 2025 Consolidated Status Report reported the review and publication postponement of GO 805 (Encuentros Comunitarios). The policy remains pending approval by the Superintendent. However, PRP is not precluded from holding these meetings because there is a standing policy.

PRP is required to submit evidence of widely publicized meeting announcements through mass media and its website, including the Virtual Library, at least a week prior to each event. PRP must also submit supporting materials related to the event, including an agenda, work plans developed in concert with CICs, crime and administrative complaint statistics, attendance sheets, Q&A sections, written materials (presentation included), and outcome reports. The Monitor's Office sampled the police areas of Mayaguez, Ponce, Bayamon, Arecibo, Aguadilla, Fajardo, and Utuado to determine compliance. Ponce and Aguadilla attempted to meet requirements by submitting evidence of Conversatorios, rather than for open meetings. Per policy, Conversatiorios are activities directly associated with CICs, and not related to open meetings whose requirements are different, and governed by GO 805 (Encuentros Comunitarios).

Mayaguez, Arecibo, Fajardo, Utuado, and Bayamon submitted incomplete documentation. Meeting announcements did not meet publication requirements or were non-existent on official sites. None of the evidence submitted included presentations (except for Fajardo whose presentation advertised information related to cybercrime, elderly fraud, and administrative complaints and commendations, only included a presentation on crime statistics supplemented by pictures of PRP in the police area for community knowledge and familiarization). Fajardo submitted evidence of promotional efforts through local businesses and municipalities. Utuado reported having advertised its open meeting through the local radio station in the municipality of Lares and Utuado but failed to submit appropriate evidence.

The Monitor's Office observed the Bayamon open meeting held in June 2025 at Iglesia Discipulos de Cristo, Cana. The topics discussed were illegal appropriations, drugs, and stolen vehicles. The meeting had CIC and CSC participation.

Compliance targets for this paragraph were partially fulfilled. However, the Monitor's Office found that the chosen venue did not meet suitability standards to attract diverse community members (LGTBQIA+, secular, and non-sectarian communities). Handicap accessibility was not available other than reserved parking. Access to the meeting room included a set of steps not accessible to wheelchairs. Presentations were lecture style without visual aids to cater to multiple learning styles, except for the presentation on drugs. The meeting did not include a sign language interpreter to comply with public policy. There were no reports on the status of the Reform, and although UOF stats were available through printed material there was no report or discussion held; the same applied to administrative complaints/commendations.

Q&A sessions did address community inquiries and concerns; however, no event evaluation occurred. Written materials on DV, immigration, Alerta Rosa (female abduction), and fraud brochures were available at an information table by the registry. The Monitor's Office also notes that although the meeting hosted 45 people besides PRP personnel, its publication was made through social media the day before the event, which does not meet publication and advertisement requirements.

The Monitor's Office finds that incomplete evidence reflects PRP's inability to document and support efforts to meet both compliance targets in this paragraph and GO 805 (Encuentros Comunitarios). Moreover, according to the most recent independent community survey conducted by Ipsos, community awareness and understanding of Reform topics, statistics, community policing, problem solving, partnerships, searches and seizures, UOF, and non-discriminatory practices remain very limited. While there has been progress compared to the 2022 survey, further efforts are needed to enhance knowledge in these areas.

The Monitor's Office finds that PRP must thoroughly review submitted supporting evidence to determine compliance. Effective compliance with this paragraph relies on the quality of evidence produced.

*Pathway Forward*
The Monitor's Office reiterates its recommendation to document open meetings in a distinct and separate module within the community policing system to ensure execution, prevent mixing activities, and enhance data quality. As Benchmark Analytics establishes its processes and schedules for updating or launching a new community engagement module, priority should be given to this recommendation to ensure that open meeting data is incorporated and that a monitoring process is developed to efficiently fulfill Agreement requirements.

## Paragraph 215: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | | Annually |

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | | |
|---|---|---|---|
| 1. Community Outreach and Public Information programs/plans were developed in each of the former thirteen police regions or geographic equivalent. These may be included as part of the area specific community engagement plans. | ☐ Met | ☐ Missed |
| 2. One open meeting was held annually at each area until the end of the Agreement. | ☐ Met | ☐ Missed |
| 3. The annual meetings are widely publicized at least one week before such meeting. | ☐ Met | ☐ Missed |
| 4. In all the meetings that occurred during the reporting period reviewed, the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | ☐ Met | ☐ Missed |
| 5. The Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | ☐ Met | ☐ Missed |
| 6. A sample of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | ☐ Met | ☐ Missed |
| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216. | ☐ Met | ☐ Missed |

### Compliance Assessment

Missed targets for this paragraph affect the following paragraph, as compliance is contingent upon achieving the targets set forth in this paragraph and Paragraph 214. PRP did not provide evidence regarding compliance with this paragraph during the reporting period.

### Pathway Forward

The Monitor's Office emphasizes the need for PRP to continue its efforts to meet compliance with this paragraph and submit the required documentation for the Monitor's Office's review and input. The standing policy outlines implementation duties and responsibilities, serving as a useful tool for creating police area community engagement plans.

## Paragraph 216: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Not Implemented | | |

274

| Training: | N/A | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 215.

### Compliance Assessment

This paragraph requires a review that summaries all audits, reports, policy changes, and actions taken by the Commonwealth. These summaries need to be available to the public during open meetings to facilitate accountability and added transparency.

PRP has been unsuccessful in submitting audit summaries and reports to assess compliance throughout all reporting periods. Effective methods must be established to ensure transparency and accountability through public reporting. The Reform Office is PRP's clearinghouse and holds an integral role in facilitating this process.

### Pathway Forward

The Monitor's Office restates that PRP must establish effective methods to ensure transparency and accountability through public reporting.

## Paragraph 217: Community Engagement and Public Information - Public Information

*PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2025 – September 2025 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB disseminates crime statistics on a monthly basis. | ☑ Met | ☐ Missed |
| 2. PRPB includes hate crimes in its public dissemination of crime statistics. | ☐ Met | ☑ Missed |

Note: The portion of this paragraph that requires that PRPB maintain updated crime statistics is assessed together with Paragraph 219 of the Agreement (Information Systems and Technology), and Paragraph 148 (Early Identification System).

*Compliance Assessment*

To comply with this paragraph, PRP must collect and maintain all data and records necessary to: (a) document the implementation of the Agreement and comply with its terms, including supporting the Monitor's Office in outcome assessments, data collection, and required reporting; (b) conduct ongoing performance improvement activities in the areas addressed by the Agreement; (c) enable transparency and expand public access to information related to PRP's decision making and activities, as permitted within the law; and (d) support officer and civilian safety. Additionally, it requires the implementation of an EIS, as required in Paragraph 148, which has yet to achieve compliance.

Public access to monthly crime statistics has satisfactorily met the compliance requirements for Target 1. However, PRP has been unable to communicate hate crime occurrences to the public as required. Further advancement in hate crime identification, classification, and reporting is necessary, particularly through enhanced training to ensure that statistical information is conveyed clearly and is readily accessible, including timely publication on the PRP website. PRP intends to inform the public about hate crimes via annual reports, which are currently under development. NIBRS implementation is ongoing with monthly data submissions as required to meet both policy and the Agreement. PRP has also introduced a dashboard presenting crime incidence data using the NBBRS model. Notwithstanding, PRP should seek and identify resources to inform and educate the public on the use and benefits of NIBRS in preparation for its eventual transition.

*Pathway Forward*

To keep the public informed of monthly crime statistics, PRP should use its website and social platforms as additional reporting tools. The Citizen Services' Unit in each area command may play a role in distributing information to support police area community engagement plans. Reporting should include data on hate crimes, regardless of occurrence. PRP can identify resources to inform and educate the public about the use and advantages of NIBRS as part of the planned transition, with potential support from the FBI.

The Monitor's Office restates previous recommendations to develop informational campaigns, webinars, and podcasts addressing Agreement related topics including crime reporting, domestic and gender violence, professionalization, immigration, hate crimes, and equal protection among other topics for added transparency and accountability.

276

# XI. Information Systems and Technology

The Commonwealth's focus on the RMS and EIS continued as needed given the importance of both tools. In light of the focus on both RMS and EIS, PRP's legacy IT ratings are being deferred as agreed to until both are implemented. Programmatically, management artifacts continue to be developed and have been made available to the Monitor's Office signaling better discipline and attention to detail by the Bureau of Technology (BT) and Program Management Office (PMO). Regardless of progress thus far PRP must stay focused and leverage its planning efforts to execute its projects and programs as detailed in its plans. As noted in previous CMRs, PRP must also heed the experiences of their support and advisory experts from whom they should draw lessons learned with regard to large scale technology implementations similar to what they are attempting now.

## Management, Discipline, and Cadence

1. Regarding the Information Technology Corrective Action Plan (ITCAP), the Commonwealth should consider more aggressive tiering of its thresholds, targets, and stretch goals in order to implement the best possible versions of IT to ensure functional data capture and analysis and agency review. Currently, many of the accomplishments recorded in the ITCAP too often refer to hygiene activities such as holding meetings rather than completing critical tasks, reaching decisions, or removing obstacles and risks. Doing so skews the accomplishment measures. Further, claims of being on schedule or complete, lack credibility because schedules have been changed to accommodate delays. The Monitor's Office has made recommendations to this effect and strongly recommends that the IT Executive Committee metrics be revised to add granularity, thresholds, actionable tasks, and timelines.
2. The Executive Committee should drive "the plan" and expectations as aggressively as possible.
3. The Monitor's Office provided Data Network Maintenance Plan recommendations to the PMO that included additional details regarding planning, budgeting, risk, etc.
4. Communication between PRP H.Q. and the field must continuously be exercised and improved. The Monitor's Office has referenced this in previous CMRs.
5. Positively, the Master Integrated Plan was finally made available as were the Benchmark Analytics Charter and Axon Data Dictionary. Unfortunately, although requested by the Monitor's Office monthly since March 2025, the Gartner Inc. PMO Assessment was not made available until September 2025.
6. The PMO is fully staffed and much can be expected from its operation.
7. AHDatalytics, the Commonwealth's contractor, continues to fulfill a vital role as data steward in providing data extracts for dashboards. Much can be leveraged from AHDatalytics, including the establishment of data operations, processes and stewardship beyond their current analysis on legacy systems, Axon, and Benchmark Analytics.

## Document and Artifact Management

1. Although completed in March 2025, the PMO did not provide the Gartner Inc. Assessment until September 2025.
2. A clear and distinct portfolio of technical functionality and capabilities is not yet available although noted in prior CMRs. A portfolio is essential for solutioning, planning, and prioritizing.

3. A singular discreet Master Integration Plan was finally established in the summer of 2025.
4. An Enterprise/Systems Architecture is not yet drafted.
5. A clear and distinct plan to combat cyber threats remains unclear.
6. Although raised previously, PRP has yet to formally establish its plan and methodology to validate data, which is critical during the migration from RMS to Axon and EIS to Benchmark Analytics. It also important for sustainability after the Agreement is complete.

The above is essential for long term formalization of PRP's infrastructure and systems architecture.

## Data Entry and IT Use

1. With respect to Axon, FRB members noted that the migration of UOF data was not consistently accurate. The example provided indicated that in one of the system migrations the use of handcuffs was not entered into Axon.
2. Timely data entry in GTE was reportedly impacted by the steps that require a commanding officer (CO) to release a file according to field visit interviews. The example given was that if a sergeant begins an investigation, an officer cannot enter data until the CO assigns the case. This can take several days and, if over a weekend, data entry accuracy can be affected. The applicable GO states that only the CO can initiate and assign the file in GTE. This policy and procedure should be reconsidered. This issue may also be related to training not being as effective or complete as is needed to understand the process. This state could be considered an opportunity for improvement or missed timely implementation in Version 1.0 of Axon.
3. A GTE demonstration indicated that records are only populated if an arrest is being made. While logical, this protocol may not meet the need for gathering traffic stop data where an arrest is not made..
4. GTE does not fully accommodate unique data entry specifics. For example, on PPR 126.2 (Complaint Card), the data is not linked where multiple perpetrators at an incident may be transported in different vehicles going to different locations.
5. Lack of mileage data is related to the procedure that requires Centro Mando to enter mileage.
6. Positively, the Sexual Assault Module timeout issues in Utuado are no longer occurring but were reportedly occurring in Guayama and San Juan. In Bayamon there were unanswered questions about supervisors being notified when a file has been created.

**Technology Assets and Availability –** Positively, during the on-site review in September, the FRB noted that they have ample access to dedicated computers and that adequate workstations were available for general use and training. Further, during the reporting period the Monitor's Office was informed that the radio and BWC inventories were near full, a solid indication of the needed preparation supporting officer and citizen safety.

**Impact to Training -** Observed during the August on-site review and the Virtual Training demonstration provided by PRP, the Monitor's Office confirmed the promising performance of the training system, delivery approach, and content. User acceptance during implementation will be assessed by the Monitor's Office as indications are promising for a successful deployment.

278

## Looking Forward

Confidence is warranted as the Commonwealth has shown progress and improvement during the reporting period. However, PRP must demonstrate ability to formally achieve and sustain the success instrumental to systems and enterprise architecting and long term solutioning. Noting the essential need for continued progress the following recommendations and opportunities for improvement should be considered.

1. Plans and Status Reports could be improved and streamlined by incorporating fewer hygiene details (i.e. meetings held) and focusing on and providing status (i.e. schedules) via Red/Yellow/Green format. Current claims of progress without evidence undermine credibility when resources are limited.
2. A critical component of project decision making, risk management needs to be addressed comprehensively and formally statussed as routinely and often as possible.
3. Continuously minimizing risks will require actively eliminating distractions and low return on investment (ROI) activities. The initial implementation of Axon's RMS has slipped to July 2026 with required solutioning and improvement of the RMS continuing beyond its launch. It is the Monitor's Office's opinion that risk to successful implementation remains high and should be managed as such.
4. The plan for data administration and purification through implementation and beyond for Axon and Benchmark Analytics remains unclear. This concern has been raised in previous CMRs.
5. Contract Management experienced delays. Timely processing must be ensured to avoid work stoppages. Leadership support is critical.
6. Transparency will benefit PRP. Answers to well-intentioned questions must be timely.
7. PRP must stress itself. Sustainability beyond the Agreement will require a willingness to endure failure and to commit appreciable resources. Implementation of Axon and Benchmark Analytics solutions are merely foundational first steps and not the end of the effort.
8. The Cyber Practice and a formally recognized IT Portfolio/Registry are not yet in focus or published.
9. The PMO provided Network Maintenance Plan while a good start, should incorporate more detail and include planning, budgeting, and risks.
10. Management artifacts read more as descriptions of tasks than firm commitments to cost, schedule, and performance. Long term self-management after the Agreement will depend on a high level of management rigor.
11. The Commonwealth would be well served to exercise a lessons learned practice.

Finally, the Monitor's Office urges the Commonwealth to, 1) the fullest extent possible continue to use advisory services and subject matter experts when optimal, 2) embrace third party validation and verification in technology and process development and delivery, 3) prepare for long term sustainability and rely on succession planning and knowledge transfer strategies to staff the IT cadre, 4) continue to employ aggressive and rigorous management and planning practices to ensure optimal and predictable outcomes for the Commonwealth, and 5) dedicate itself to rigorous cyber planning and hardening as well as continuing infrastructure assessments.

Overall, the Commonwealth's compliance with the six Information Systems and Technology paragraphs remains unchanged due to the agreement between the Parties to defer ratings until Axon and Benchmark Analytics implementations are complete. See figure 10.



*Figure 10. Information Systems and Technology: Paragraph Compliance Status*

## Paragraph 218: Information Systems and Technology

*PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

Although there were no substantive changes in the status of IT systems or applications, many are being deferred pending the Axon and Benchmark Analytics implementation, see the table below.

| System | Legacy or "Existing Technology" Compliance[72] | Revised Compliance Guidance | Procedural Compliance, (Practical Fulfilment-218-223), Original Targets Filed 10/30/19 |
|---|---|---|---|
| Project Management System (Asana) | Fully Compliant | Fully Compliant | Fully Compliant |
| Virtual Library | Fully Compliant | Fully Compliant | Fully Compliant |
| CAD/CAD Mobile | Partial | Deferred Pending Axon RMS Implementation | Partial |
| GTE – to be replaced by AXON | Partial | Deferred Pending Axon RMS Implementation | Partial |
| UOF– to be replaced by AXON | Substantial | Deferred Pending Axon RMS Implementation | Substantial |
| EIS  - To be replaced by Benchmark Analytics | Not Compliant | Deferred Pending Benchmark Analytics Implementation | Not Compliant |
| DV and Sex Crimes | Partial | Deferred pending Benchmark Analytics implementation | Partial |
| Supervisory Module | Partial | Deferred pending Benchmark Analytics implementation | Partial |
| Non-Punitive Module | Partial | Deferred pending Benchmark Analytics implementation | Deferred |
| PTMS - To be replaced by Benchmark Analytics | Partial | Deferred Pending Benchmark Analytics Implementation | Partial |
| Promedia Performance Evaluation System - To be replaced by Benchmark Analytics | Partial | Deferred Pending Benchmark Analytics Implementation | Partial |
| SAEC – Computerized Analysis and Statistics - To be replaced by Benchmark Analytics | Substantial | Deferred Pending Benchmark Analytics Implementation | Deferred |
| Crime Mapping | Substantial | Deferred Pending Benchmark Analytics Implementation | Deferred |
| Tracking Module | Deferred | Deferred Pending Benchmark Analytics Implementation | Deferred |
| SARP | Partial | Partial | Partial |
| Legal | Deferred | Deferred | Deferred |
| Inspections – Operational, Investigative, & Administrative | Partial | Deferred | Deferred |

[72] See Appendix B for a definition of compliance ratings.

| | | | |
|---|---|---|---|
| **Recording Devices** | Deferred | Deferred | Deferred |
| **NCIC** | Deferred | Deferred | Deferred |
| **BWC** | Partial | Deferred pending Axon RMS Implementation | Deferred |
| **NIBRS** | Minimally | Deferred | Not Compliant |
| **Formal Community Partnerships/Alliances** | Deferred | Deferred | Deferred |

*Table 1. Information Systems and Technology Systems Reviewed During the Reporting Period*

## Pathway Forward

This is unchanged from CMR-12. Due to the criticality of RMS, EIS, and PTMS, the Commonwealth must maintain its focus on the Axon and Benchmark Analytics launch while also improving its management acumen and planning materials. Collaboration across the spectrum of stakeholders, oversight, and operations is essential during the development and implementation phase to ensure that these platforms are effectively adapted and operationalized. Effective collaboration with Axon and Benchmark Analytics is essential to the successful stand up of these tools and critical to follow on integration of all data, secondary applications, training, and analytics. The post implementation challenge cannot be underestimated.

## Paragraph 219: Information Systems and Technology

*PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | ☐ Met  ☐ Missed |
| 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | ☐ Met  ☐ Missed |

282

| | | |
|---|---|---|
| 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | ☐ Met | ☐ Missed |
| 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | ☐ Met | ☐ Missed |
| 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | ☐ Met | ☐ Missed |

Note: Review frequency, consistent with the periodicity of assessments in areas III through XII and XIV.

## Compliance Assessment

This is unchanged from CMR-12 and relies on data capture in Axon and Benchmark Analytics systems. The Commonwealth's partial success is being revised to deferred while PRP implements Axon and Benchmark Analytics systems. The data to be collected via Axon and Benchmark Analytics is to be defined and must be tested through a validation and verification process as part of effective deployment of the systems. Until that time, this compliance area will be deferred.

## Pathway Forward

This is unchanged from CMR-12. The Commonwealth's partial success is being revised to deferred while PRP implements Axon and Benchmark Analytics systems. The data to be collected via Axon and Benchmark Analytics is to be defined and must be tested through a validation and verification process as part of effective deployment of the systems. Until that time, this compliance area will be deferred.

## Paragraph 220: Information Systems and Technology

*PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2025 – September 2025 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 219.

## Compliance Assessment

This is unchanged from CMR-12. This paragraph is deferred pending the Axon and Benchmark Analytics implementations.

*Pathway Forward*

This is relatively unchanged from CMR-12. Consistent with Paragraph 219, PRP must continue to improve data analysis procedures and master analytical methods developed by AH Datalytics, the Commonwealth's contractor. PRP should adopt best practices and improve its oversight and supervisory rigor. For this reason, the Monitor's Office endorses the activities of AH Datalytics and recommends their continued support to further progress.

## Paragraph 221: Information Systems and Technology

*PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☐ Missed |

*Compliance Assessment*

This is unchanged from CMR-12. Significant effort continues to be put into the RMS replacement through Axon. PRP must stay the course, collaborate, share information, and adapt its processes to the Axon platform.

*Pathway Forward*

This is unchanged from CMR-12. PRP should continue to focus on and maintain the current implementation plan. Optimal use of subject matter experts is urged. As these implementations are large scale and sophisticated, diligence among the Parties and staff performing the implementation must be ensured. Routine progress and status reviews must be supported.

## Paragraph 222: Information Systems and Technology

*PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations.*

| Compliance Status | Assessment Schedule |
|---|---|

| Deferred | | Review Period | October 2024 – September 2025 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☐ Missed |
| 2. Handheld recording device trainings are consistent with approved policies. | ☐ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☐ Missed |
| 4. Complaint and witness statements are recorded in 95% of use of force reviews. | ☐ Met | ☐ Missed |
| 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | ☐ Met | ☐ Missed |
| 6. All sampled units had access to functional handheld recording equipment. | ☐ Met | ☐ Missed |

### Compliance Assessment

This is unchanged from CMR-12. Compliance assessment will be deferred until the new RMS is implemented.

### Pathway Forward

This is unchanged from CMR-12. PRP must provide evidence of its efforts to integrate with Axon and implement a robust recorder infrastructure. The Commonwealth continued to purchase handheld devices. The inventory at this point reached approximately 2,400 units which would satisfy the Agreement with regard to on hand devices. Integration will be verified during Axon implementation.

## Paragraph 223: Information Systems and Technology

*All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2024 – September 2025 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Annually |

285

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

**Compliance Targets**

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☐ Missed |
| 2. NCIC data trainings are consistent with approved policies. | ☐ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☐ Missed |
| 4. NCIC data is considered in 95% of patrol interventions and investigations. | ☐ Met | ☐ Missed |
| 5. All sampled units had access to NCIC data. | ☐ Met | ☐ Missed |
| 6. PRPB safeguards appropriately protect sensitive data. | ☐ Met | ☐ Missed |

*Compliance Assessment*

This is unchanged from CMR-12. As noted, the central commands are relied on heavily for access to NCIC information. Officers that need NCIC information must relay their requests to the central commands.

*Pathway Forward*

This is unchanged from CMR-12. Unless the criteria for success under this paragraph is changed, PRP must continue integrating and implementing NCIC to ensure roll out beyond headquarters and area central commands. Availability to all authorized and trained officers must be achieved and be aligned with NCIC operational use criteria.

## Paragraph 224: Information Systems and Technology

Nothing in this Agreement shall be construed as prohibiting PRPD from contracting services related to technology and data collection, entry, and analysis.

*Compliance Assessment*

As noted in previous CMRs, PRP has adopted the allowances of this paragraph.

## Appendix A: Background to PRP Monitoring Mission

In 2008, USDOJ initiated an investigation of PRP into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures, and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRP accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRP, including: a) tours of police areas; b) interviews with PRP officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; and d) accompanying line officers and supervisors during their respective tours of duty. PRP's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRP, and in recognition of the need to modernize and professionalize its operations, PRP undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRP's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding UOF and a wide range of other substantive areas; 2) the training of all appropriate officers in the new UOF policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to UOF, UOF to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRP's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRP officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRP was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While the Commonwealth did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRP and to discuss numerous reforms already underway at PRP's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of

these good faith negotiations. In July 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the U.S. District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the court approved the selection and hiring of an independent monitor to help PRP and the Commonwealth during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRP and the Commonwealth were expected to develop policies, procedures, and technologies to address serious deficiencies within the Bureau. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRP in its implementation and development efforts, while at the same time providing the public with assurance that PRP's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor's Office and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to measure PRP's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. The Commonwealth, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the 11 performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policies and procedures, UOF, and IT. CMR-1 found broad compliance on policy and procedure and certain areas of UOF but nevertheless found a series of key lapses in UOF investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRP's performance, covering a significantly larger number of Consent Decree paragraphs. The format and comprehensiveness of our CMRs have evolved with each report. CMR-5 represents the first full comprehensive assessment and report and the first report in which PRP's status in the implementation of policy, training, and practice was documented. As such, CMR-5 provided a model for Monitor's reports going forward. As some areas, and paragraphs, of the Agreement are only assessed biannually, CMR-6 along with CMR-7 jointly provide the most comprehensive assessment provided by the Monitor's Office thus far.

## Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative research methods to assess the Commonwealth's compliance with the Agreement in the areas of performance selected for this report. These methods include but are not limited to 1) document reviews of forms that PRP uses in the daily conduct of its activities; 2) content analysis of policies, training materials, internal investigation files, and other documents that provide detailed evidence of PRP's efforts to comply with the Agreement; 3) interviews with sworn and civilian PRP personnel, members of the public who can directly verify PRP's community outreach and public information activities, personnel from other criminal justice components within Puerto Rico, and additional stakeholders in the reform process; 4) site visits to PRP facilities, patrol locations, crowd control incidents, CIC meetings, and public information sessions; and 5) analysis of PRP's data systems and the knowledge management practices that make use of these systems.[73]

### Compliance Levels

Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRP have incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. PRP and the Commonwealth's status in the implementation of policy, training, and practice are noted for each paragraph assessed, see figure 11. For those paragraphs where training is not a requirement of the paragraph training is listed as not applicable (N/A).



*Figure 12. Implementation Status: Policy, Training, Practice*

The compliance levels are defined as follows:

- **Fully Compliant**: Where PRP has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;

---

[73] The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

- **Substantially Compliant**: Where PRP has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;
- **Partially Compliant**: Where PRP has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant**: Where PRP has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Rating Deferred**: Where the Monitor's Office has not obtained sufficient evidence to reach a determination as to compliance status with a given paragraph, due to no fault on the part of PRP.

The court draws a clear distinction between a deferred rating and a rating of not compliant due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRP and the Commonwealth failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRP or the Commonwealth, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

## Sampling Methodology

The Monitor's Office uses a variety of sampling methods to draw valid and representative samples for the data sources noted above. These sampling methods include the following:

1. Simple random sampling: Used for large datasets such as arrest reports and search/seizure incidents that occur in very large volumes each reporting period.
2. Stratified random sampling: Used for large but varied datasets such as training, performance, and disciplinary records for sworn PRP personnel who are stratified by rank.
3. Purposive sampling: Used for datasets that require intentional selection to investigate key topics and cover all stakeholders over the course of successive CMRs, such as interviews with CIC members, training and counseling staff, and PRP personnel assigned to specialized units.
4. Full enumeration: Used for sources that must be reviewed exhaustively, such as revisions to policies and training curricula, exemplars of forms that PRP uses to interact with the public, and records for critical incidents such as deployment of chemical agents to disperse crowds.

In addition, the Monitor's Office uses a rolling sampling method for key data sources that require analyzing significant amounts of data on a tight deadline, such as arrests and searches, internal investigations, UOF incidents, etc. These data sources present a significant workload for the Monitor's Office, and for PRP, because the relevant incidents either occur in large volumes during each reporting period or involve large amounts of documentation per incident. The Monitor's Office has addressed the

tradeoff between sample frequency, sample size, and margin of error, by adapting a "rolling" sampling method that the U.S. Census Bureau has developed for the American Community Survey.[74]

Using this method, the Monitor's Office draws quarterly samples for large data sources that are reviewed biannually. Sample sizes are calculated for each quarter by examining the past six months of incidents and drawing a proportional number of cases for the present quarter. Sample size is determined so that the margin of error for two years of combined data (consistent with the above definition of full compliance) is under 5%, allowing the Monitor's Office to state confidently whether PRP has maintained substantial compliance on a given paragraph for the past two years and has therefore achieved full compliance. As such, the sample sizes below were determined not only on the number of cases stated for the present CMR, but on the basis of the past two years of data inclusively.

As an example, Figure 2 outlines the population sizes and sample sizes required for two years of UOF incidents using conventional random sampling instead of rolling random sampling.[75] As the chart demonstrates, a rolling method that calculates sample size based on two continuous years of performance saves significant effort for PRP in terms of document production, as well as for the Monitor's Office in terms of data review, without sacrificing the generalizability of the random samples to the actual compliance levels. For the 4,650 UOF incidents that occurred during the CMR-10 – 13 reporting periods, the Monitor's Office would have requested 1,476 incidents using conventional independent random samples, but only requested 301 incidents using a rolling sampling method.



*Figure 4. Sample Size Comparison for UOF Data*

---

[74]   United States Census Bureau, American Community Survey Design and Methodology, January 2014, https://www.census.gov/history/pdf/acsdesign-methodology2014.pdf

[75] All sample sizes are calculated using a 5% margin of error and a 95% confidence interval for a 1-tailed test. The Parties have not authorized the Monitor's Office to mark PRP as compliant with a target based on the statistical possibility that the compliance rate in the full universe of data *might* be higher than the compliance rate of the sample. Therefore, a p-value for a single-tailed test is used to calculate sample size as a labor and cost-saving measure, given that the Monitor's Office is only concerned with the possibility that the actual compliance rate for any data source is significantly lower than the rate presented in the sample.

## CMR-13 Samples

The Monitor's Office requested the following samples from PRP for CMR-13:

| Paragraph(s) | Primary Section | Data Source |
|---|---|---|
| **Common** | Common | Training records for a random sample of 10 in-service trainings conducted during the reporting period, drawn from a population of 14. PRP provided 60% of the request. |
| **Common** | Common | Training records (PTMS) for a random sample of 92 sworn personnel, drawn from a population of 10,761. PRP provided 100% of the request. |
| **Common** | Common | Electronic records and materials for a purposive sample of 34 in-service trainings provided during the reporting period, drawn from a population of 0. PRP provided 100% of the request. |
| **Common** | Common | Training records for a random sample of 68 civilian personnel, drawn from a population of 821. PRP provided 100% of the request. |
| **12, 177-179, 190, 192, 193, 198-199** | Professionalization; Civilian Complaints, Internal Investigations, and Discipline | SARP investigation files and related data for a sample of 34 closed misconduct investigations, drawn from a population of 768. PRP provided 100% of the request. |
| **13, 81, 136-140** | Professionalization; Equal Protection and Non-Discrimination; Supervision and Management | Two months of staffing documents for a random sample of 51 PRP precincts and units, demonstrating that all agents report to a single supervisor, and supervisors manage no more than 10 agents, drawn from a population of 307. PRP provided 100% of the request. |
| **16-20** | Professionalization | Interviews with a random sample of 68 promotion candidates, drawn from a population of 847. 100% of the population interviewed. |
| **16-20, 84** | Professionalization; Equal Protection and Non-Discrimination | Training records for a random sample of five personnel on the promotions committee, drawn from a population of five. PRP provided 80% of the request. |
| **16-20, 84** | Professionalization; Equal Protection and Non-Discrimination | Training, performance, and disciplinary record for a random sample of 68 promotion candidates, drawn from a population of 847. PRP provided 100% of the request. |

| 25, 32-35 | Use of Force | Inspection reports for a random sample of 14 armory inspections, drawn from a population of 26. PRP provided 90% of the request. |
|---|---|---|
| 26, 54 | Use of Force | Weapons training certificates for a random sample of 116 officers, demonstrating that each officer successfully qualified with all weapons that they are authorized to carry, drawn from a population of 8,759. PRP provided 100% of the request. |
| 26 | Use of Force | A sample of 5 documents that would demonstrate that officers who fail to qualify after re-test on the same day are relieved of operational duty, disarmed of all authorized firearms (including personal firearms), and summoned for re-training as required by policies, drawn from a population of 850. PRP provided 100% of the request. |
| 26 | Use of Force | Disciplinary referrals for three officers who failed to qualify on firearms after retraining, including documentation of the resolution of those referrals, drawn from a population of three. PRP provided 100% of the request. |
| 27, 28, 29, 32-35, 145-146 | Use of Force; Supervision and Management | Training records, performance evaluations, disciplinary records, and any SARP investigations, for a random sample of 42 officers assigned to STUs and STU evaluation boards, drawn from a population of 191. PRP provided 100% of the request. |
| 28 | Use of Force | Activation/deployment records (including PPR 112.2) for a random sample of 58 STU deployments for preventive patrol and policing functions, drawn from a population of 813. PRP provided 100% of the request. |
| 28 | Use of Force | Deployment records for a random sample of 84 STU officers, drawn from a population of 382. PRP provided 90% of the request. |
| 30 | Use of Force | Activation/deployment records for a random sample of 67 STU activations, drawn from a population of 282. PRP provided 100% of the request. |
| 32-35 | Use of Force | Incident reports and after-action reports (including PPRs 625.1-625.6) for a random sample of 44 planned and unplanned incidents involving crowds, drawn from a population of 121. PRP provided 100% of the request. |
| 32-35, 44-47, 55, 79, 84, 136-153, 164-165, 222 | UOF; Searches and Seizures; Supervision and Management | Training records, performance evaluations, disciplinary records, and any SARP investigations, for a random sample of 92 supervisors and command officers, drawn from a population of 10,761. PRP provided 100% of the request. |
| 36-39, 41, 44-47 | Use of Force | Forms PPR 605.1, PPR 605.2, PPR 605.3, and PPR 126.2 for a random sample of 52 UOF incidents, as well as PPR 113.2 for any UOF incidents investigated by FIU, drawn from a population of 871. PRP provided 100% of the request. |

| 40, 48, 55 | Use of Force | Training records, performance evaluations, and disciplinary records of 16 FIU investigators, drawn from a population of 32. PRP provided 100% of the request. |
|---|---|---|
| 41, 49, 51, 52 | Use of Force | Investigation files for a random sample of 39 FIU investigations, including all PPRs 113.1, PPRs 113.2, and PPRs 113.3 available for the sampled investigations, drawn from a population of 102. PRP provided 80% of the request. |
| 41, 49-52 | Use of Force | Evaluation files (including PPRs 502.7 and 502.8) for a random sample of 39 CFRB reviews, drawn from a population of 107. PRP provided 100% of the request. |
| 44-47 | Use of Force | Training records and certificates for a sample of 23 FRB members to determine whether all board members are fully trained and certified to serve on the FRB, drawn from a population of 92. PRP provided 100% of the request. |
| 44-47, 222 | Use of Force; Information Systems and Technology | FRB evaluation files (including PPR 502.1 and PPR 502.2) for a random sample of 55 UOF incidents classified as Level 2-3 with injuries, drawn from a population of 256. PRP provided 100% of the request. |
| 56 | Use of Force | Incident reports for a random sample of 55 incidents involving persons in mental health crisis, drawn from a population of 589. PRP provided 100% of the request. |
| 57 | Use of Force | Training certificates for a random sample of 52 CIT-trained dispatchers, drawn from a population of 318. PRP provided 90% of the request. |
| 60-64, 74-76 | Searches and Seizures | Incident reports, search warrants, property seizure receipts and storage documentation (where relevant), and related documents and CAD data for a random sample of 64 consensual searches and searches based on probable cause, drawn from a population of 921. PRP provided 100% of the request. |
| 60-64, 84, 145-146 | Searches and Seizures; Equal Protection and Non-Discrimination; Supervision and Management | Performance evaluations and disciplinary record for a random sample of 192 sworn personnel, drawn from a population of 10.761. PRP provided 100% of the request. |
| 65-72, 223 | Searches and Seizures; Information Systems and Technology | Arrest reports and related incident reports for a random sample of 71 arrests, drawn from a population of 9,719. PRP provided 100% of the request. |

| 72 | Searches and Seizures | Investigation files for a random sample of eight administrative investigations involving seized property, drawn from a population of eight. PRP provided 100% of the request. |
|---|---|---|
| 72, 154-156 | Searches and Seizures; Supervision and Management | Records and reports for a random sample of 38 operational audits, assessments, and inspections, including evidence that the auditing system identifies operational deficiencies, analyses causal and contributing factors, and implements effective remedial action, drawn from a population of 114. PRP provided 100% of the request. |
| 73 | Searches and Seizures | Interviews with a purposive sample of 33 personnel who can attest to whether PRP seeks and obtains feedback from criminal justice agencies and entities as required by approved agreements and policies, drawn from a population of 131. 21% were interviewed. |
| 77, 160 | Civilian Complaints, Internal Investigations, and Discipline; Community Engagement and Public Information | Documents for a sample of 7 community outreach and public information meetings demonstrating that PRP is incorporating community engagement into officer accountability practices, drawn from a population of 13. PRP provided 60% of the request. |
| 81, 164-165, 177-178 | Equal Protection and Non-Discrimination; Civilian Complaints, Internal Investigations, and Discipline | Incident forms and any related materials for a random sample of 55 non-punitive disciplinary incidents, drawn from a population of 505. PRP provided 100% of the request. |
| 82, 170, 181, 193-196 | Searches and Seizures; Equal Protection and Non-Discrimination; Civilian Complaints, Internal Investigations, and Discipline | Interviews with a purposive sample of 27 SARP investigators and supervisors, drawn from a population of 110. 89% were interviewed. |
| 82, 197 | Equal Protection and Non- | Investigation files for a random sample of 14 misconduct complaints involving allegations of unequal protection, including allegations of |

295

| | | |
|---|---|---|
| | Discrimination; Civilian Complaints, Internal Investigations, and Discipline | discriminatory policing and retaliation, drawn from a population of 41. PRP provided 100% of the request. |
| **84, 102-107** | Equal Protection and Non-Discrimination; Recruitment, Selection, and Hiring | Training records for a random sample of 46 personnel involved in recruitment and hiring, drawn from a population of 240. PRP provided 90% of the sample. |
| **84, 104-107** | Equal Protection and Non-Discrimination; Recruitment, Selection, and Hiring | Recruitment office files for a random sample of 98 recruited candidates, as well as an exemplar of the polygraph questionnaire and psychological exam administered to recruits as part of the selection process, drawn from a population of 907. PRP provided 90% of the request. |
| **86** | Equal Protection and Non-Discrimination | Investigation files for a sample of four hate crimes, including documentation that the FBI was notified of each incident, drawn from a population of four. PRP provided 80% of the request. |
| **88** | Equal Protection and Non-Discrimination | Documents for a sample of 7 community outreach and public information meetings demonstrating that PRP seeks the assistance of community advocates to widely disseminate pertinent policies on immigration-related laws to the public, drawn from a population of 13.PRP provided 100% of the request. |
| **88, 160, 206** | Equal Protection and Non-Discrimination; Civilian Complaints, Internal Investigations, and Discipline; Community Engagement and Public Information | Semi-structured interviews with a purposive sample of 51 PRP personnel who can attest to PRP's public outreach efforts, drawn from a population of 304. 100% were interviewed. |

| | | |
|---|---|---|
| **88, 160, 206, 207, 208** | Civilian Complaints, Internal Investigations, and Discipline; Equal Protection and Non-Discrimination; Community Engagement and Public Information | Interviews with a sample of 15 community advocates/partners engaged in the activities/initiatives outlined in the annual community engagement plans, drawn from a population of 28. 100% were interviewed. |
| **89** | Equal Protection and Non-Discrimination | Reports from a random sample of seven reported PRP interactions with transgender or transsexual individuals, drawn from a population of seven. PRP provided 100% of the request. |
| **90, 117** | Equal Protection and Non-Discrimination; Training | Site visits to a purposive sample of 10 live in-service training classes provided during the reporting period, drawn from a population of 14. PRP provided 100% of the request. |
| **92** | Equal Protection and Non-Discrimination | Investigation files for a sample of 28 incidents involving allegations of abuse and mistreatment originating in secure correctional facilities, drawn from a population of 102. PRP provided 100% of the request |
| **93, 94, 100** | Equal Protection and Non-Discrimination | Investigation files for a random sample of 29 SA investigations, including supplemental reports and/or the prosecutor's findings, drawn from a population of 141. PRP provided 100% of the request. |
| **93, 98** | Equal Protection and Non-Discrimination | Investigation files for a random sample of 147 DV investigations, including supplemental reports and/or the prosecutor's findings, drawn from a population of 4,737. PRP provided 100% of the request. |
| **95, 97, 100** | Equal Protection and Non-Discrimination | Interviews with a purposive sample of 47 relevant personnel who can attest to whether: (a) classification protocols for crimes involving SAs are being assessed and revised as needed, and (b) PRP tracks felony SAs based on the UCR definitions, drawn from a population of 248. 41% were interviewed. |
| **96** | Equal Protection and Non-Discrimination | Call records for a sample of 70 hotline complaints, drawn from a population of 830. PRP provided 100% of the request. |

| 96 | Equal Protection and Non-Discrimination | Training records and selection documents for a sample of 12 PRP personnel who attend the 24-hour hotline for sexual crimes, drawn from a population of 18. PRP provided 100% of the request. |
|---|---|---|
| 99 | Equal Protection and Non-Discrimination | SARP and SAIC Investigation files for a random sample of 23 SARP investigations involving allegations of SA and DC against PRP personnel., drawn from a population of 33. PRP provided 100% of the request. |
| 112-113 | Policies and Procedures | Interviews with a purposive sample of seven personnel who can attest to PRP's protocols and practices for reviewing, revising, and publishing policies as required by the Agreement, drawn from a population of nine. 100% were interviewed.) |
| 114-116 | Policies and Procedures | Agency transmittal receipts for policies and procedures emailed to a random sample of 184 sworn personnel, drawn from a population of 10,761. PRP provided 100% of the request. |
| 114-116, 132 | Policies and Procedures; Training | Documents demonstrating that a purposive sample of 51 precincts and units held monthly academies and/or in-service training meetings delivered at the beginning of shifts or tours of duty, drawn from a population of 307. PRP provided 100% of the request. |
| 114-116, 136-140, 147-153, 197, 207 | Common | Interviews with a random sample of 92 sworn and civilian PRP personnel, drawn from a population of 10,761. 40% of the sample was interviewed. |
| 145-146 | Supervision and Management | Training records, performance evaluations, disciplinary records, and any SARP investigations, for a random sample of 92 officers assigned to specialized units, drawn from a population of 10,761. PRP provided 100% of the request. |
| 154-156 | Supervision and Management | Training records for a random sample of 14 operational auditors (Compliance Inspectors), indicating that all auditors have received training on internal audits and inspections, drawn from a population of 25. PRP provided 100% of the request. |
| 160, 166, 177, 194-196 | Civilian Complaints, Internal Investigations, and Discipline | Training records, performance assessments, and disciplinary records for a sample of 27 members of the internal investigation unit, drawn from a population of 110. PRP provided 100% of the request. |
| 163-165, 168-170, 172-175, 180-189 | Civilian Complaints, Internal Investigations, and Discipline; Information | Supervisory reviews and initial investigation files for a random sample of 58 misconduct complaints that have completed their initial investigation, drawn from a population of 861. PRP provided 100% of the request. |

| | Systems and Technology | |
|---|---|---|
| **164-165, 168, 169, 172, 173** | Civilian Complaints, Internal Investigations, and Discipline | All available data for a random sample of 80 complaints received through the SARP complaint intake module, drawn from a population of 1,823. PRP provided 100% of the request. |
| **170** | Civilian Complaints, Internal Investigations, and Discipline | Semi-structured interviews with a purposive sample of 17 OAL lawyers and legal advisors who are assigned with reviewing/adjudicating misconduct investigations, as well as with OAL examiners who are assigned with holding informal and/or administrative hearings, drawn from a population of 36. 41% were interviewed. |
| **170, 182** | Civilian Complaints, Internal Investigations, and Discipline | SARP investigation files, criminal investigation files, and related data and communications for a purposive sample of 15 civil lawsuits and criminal prosecutions filed involving PRP personnel, drawn from a population of 81. PRP provided 100% of the request. |
| **194-196, 219-220, 223** | Civilian Complaints, Internal Investigations, and Discipline; Information Systems and Technology | Structured interviews with a purposive sample of 14 personnel who can attest to whether data and records are maintained to support the implementation of this Agreement, drawn from a population of 25. 100% were interviewed. |
| **200** | Civilian Complaints, Internal Investigations, and Discipline | Test results and related records for a random sample of 48 PRP personnel who were drug tested during the reporting period, drawn from a population of 1,283. PRP provided 100% of the request. |
| **201-204** | Civilian Complaints, Internal Investigations, and Discipline | Interviews with a purposive sample of 13 personnel responsible for administering and providing mental health training and counseling services to PRP personnel and their families, drawn from a population of 20. 100% were interviewed. |
| **206** | Community Engagement and Public Information | Documentation for a sample of four command areas demonstrating that all command areas implement at least one SARA Model project per year, including planning and development materials and documentation of activities conducted under the SARA project, drawn from a population of four. PRP provided 100% of the request. |
| **208** | Community Engagement | Materials for a sample of 15 alliances that demonstrate that PRP is tracking community partnerships and assessing the effectiveness of |

| | and Public Information | its problem-solving strategies, drawn from a population of 28. PRP provided 100% of the request. |
|---|---|---|
| **209** | Community Engagement and Public Information | Documents demonstrating that a sample of 10 CICs held meetings every three months during the reporting period, including meeting agendas and minutes, attendance sheets, workplans, outcome reports etc., drawn from a population of 28. PRP provided 100% of the request. |
| **210** | Community Engagement and Public Information | Recruitment plans and selection mechanisms for a sample of 10 CICs, drawn from a population of 14. PRP provided 100% of the request. |
| **211** | Community Engagement and Public Information | Documents that would demonstrate that PRP has offered a multi-themed workshop and orientation to all members of a sample of 10 CICs, drawn from a population of 14. PRP provided 100% of the request. |
| **211** | Community Engagement and Public Information | Documents that would demonstrate that a sample of 10 CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement, drawn from a population of 14. PRP provided 100% of the request. |
| **211, 212** | Community Engagement and Public Information | Semi-structured interviews with a purposive sample of 42 PRP personnel, CIC members, and other pertinent community advocates who can attest to PRP's work with CICs, drawn from a population of 193. 29% were interviewed. |
| **212** | Community Engagement and Public Information | Documents that would demonstrate that PRP safeguards all confidential and sensitive law enforcement data before sharing documents with 10 CICs, drawn from a population of 14. PRP provided 100% of the request. |
| **212** | Community Engagement and Public Information | Documents that would demonstrate that PRP sought assistance, counsel, recommendations, and general collaboration from a sample of 5 CICs to address community safety concerns, obtain community feedback, facilitate recruitment and share information, drawn from a population of 14. PRP provided 100% of the request. |
| **213** | Community Engagement and Public Information | Copies of the most recent public reports prepared by 15 CICs, and supporting materials, drawn from a population of 28. PRP provided 100% of the request. |
| **214-216** | Community Engagement and Public Information | Documents memorializing the content of a sample of 7 open community outreach meetings, drawn from a population of 13. PRP provided 100% of the request. |
| **214-216** | Community Engagement | Advertisements for each of a sample of 7 public outreach meetings demonstrating that the meeting was advertised at least one week in |

| | | |
|---|---|---|
| | and Public Information | advance, drawn from a population of 13. PRP provided 100% of the request. |
| **214-216** | Civilian Complaints, Internal Investigations, and Discipline; Community Engagement and Public Information | Site visit to a purposive sample of 15 Community Outreach and Public Information program meetings, drawn from a population of 27. PRP provided 100% of the request. |

*Table 3. CMR-13 Data Samples*

## Appendix C: Compliance Status by Paragraph and Sub-Section

The following sections were assessed in this report:

### I. Professionalization

| Professionalization Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Staffing & Community Policing | 0 | 1 | 0 | 0 |
| Promotions | 0 | 7 | 0 | 0 |
| Commander Corps | 0 | 1 | 0 | 0 |
| **Total** | **0** | **10** | **0** | **0** |

### II.  Use of Force

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 3 | 1 | 1 | 0 | 0 |
| Specialized Tactical Units | 5 | 0 | 0 | 0 | 0 |
| Crowd Control | 1 | 0 | 3 | 0 | 0 |
| Force Reporting | 0 | 4 | 0 | 0 | 0 |
| Force Review & Investigation | 0 | 3 | 0 | 0 | 0 |
| Supervisory and FRB Reviews | 2 | 3 | 0 | 0 | 0 |
| FIU Investigations & SFRB Reviews | 1 | 4 | 0 | 0 | 0 |
| Use of Force Training | 0 | 3 | 0 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 0 | 2 | 0 | 0 |
| **Total** | **12** | **18** | **6** | **0** | **0** |

### III.  Searches & Seizures

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 2 | 0 | 0 |
| Investigatory Stops and Searches | 0 | 0 | 0 | 0 | 5 |
| Arrests | 1 | 0 | 7 | 1 | 0 |
| Searches | 0 | 0 | 4 | 0 | 0 |
| Training on Stops, Searches, and Seizures | 0 | 0 | 2 | 0 | 0 |
| **Total** | **1** | **0** | **15** | **1** | **5** |

### IV. Equal Protection and Non-Discrimination

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully | Substantially | Partially | Not | Rating |

| | Compliant | Compliant | Compliant | Compliant | Deferred |
|---|---|---|---|---|---|
| General Provisions | 1 | 0 | 4 | 2 | 0 |
| Discriminatory Policing | 0 | 0 | 4 | 1 | 1 |
| Sexual Assault and Domestic Violence | 1 | 2 | 5 | 0 | 0 |
| **Total** | **2** | **2** | **13** | **3** | **1** |

## V. Policies and Procedures

| Consent Decree Section/Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | **2** | **0** | **6** | **0** | **0** |

## VI. Supervision and Management

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 1 | 0 | 0 |
| Duties of Supervisors | 0 | 0 | 5 | 1 | 0 |
| Performance Evaluation | 0 | 0 | 2 | 0 | 0 |
| Early Identification System | 0 | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 0 | 0 | 3 | 1 | 0 |
| **Total** | **0** | **0** | **10** | **9** | **0** |

## VII. Civilian Complaints, Internal Investigations, and Discipline

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 1 | 0 | 0 |
| Civilian Complaints | 2 | 0 | 0 | 0 | 0 |
| Internal Investigations | 0 | 2 | 1 | 0 | 0 |
| Complaint Intake & Handling | 5 | 1 | 3 | 1 | 1 |
| Investigation of Complaints | 4 | 0 | 12 | 0 | 1 |
| Staffing, Selection, & Training Requirements | 0 | 1 | 2 | 0 | 0 |
| Preventing Retaliation | 0 | 0 | 0 | 0 | 1 |
| Discipline | 0 | 0 | 3 | 0 | 0 |
| Officer Assistance and Support | 2 | 2 | 0 | 0 | 0 |
| **Total** | **13** | **7** | **22** | **1** | **3** |

## VIII. Community Engagement and Public Information

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |

| | | | |
|---|---|---|---|
| General Provisions | 0 | 0 | 0 | 1 |
| Community Oriented Policing | 0 | 0 | 0 | 3 |
| Community Interaction Councils | 0 | 3 | 2 | 0 |
| Public Information | 0 | 1 | 0 | 3 |
| **Total** | **0** | **4** | **2** | **7** |

## IX.    Information Systems and Technology

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 0 | 6 |