December 2025



## Executive Summary for the Thirteenth Report of the Federal Monitor, Covering the Period from April 2025 through September 2025

This is the thirteenth Chief Monitor's Report (CMR-13) outlining the compliance levels of the Commonwealth of Puerto Rico in relation to the Consent Decree entered between the United States and the Commonwealth of Puerto Rico. This report provides the thirteenth assessment following the four-year capacity building period established by the Consent Decree that ran from June 2014 to October 2018 and covers the period from April through September 2025.

During the reporting period, the Commonwealth's achievements towards partial and/or substantial compliance with many of the paragraphs remained relatively the same as the last reporting period. The standstill in compliance is largely a result of the Puerto Rico Police's (PRP's) continuation of its efforts to implement a Records Management System (RMS), Benchmark Analytics modules, implement in-service training, and adjust its operational approach to community engagement. The few paragraphs that moved forward in compliance delved into use of force (UOF) reporting and tracking, specifically the tracking of mileage when transporting a suspect to the hospital following a UOF incident.

This continued progress is important to the successful and sustainable implementation of the paragraphs within the Agreement. The Monitor's Office would like to stress that this continued progress is contingent on the Commonwealth's ability to operationalize RMS, implement the modules and tools developed by Benchmark Analytics, its continued work with AH Datalytics, the establishment of ReformSTAT, and more importantly, devoting adequate resources and effort to its training programs. Once RMS and Benchmark Analytics have completed their work, the key to continued and improved compliance will be to ensure that the data gathered and recorded is valid. This will largely be dependent on the Commonwealth's ability to remain committed and engaged with the vendors as they create these systems to ensure these products and tools are developed to meet their needs and the needs of the Agreement along with ensuring that its officers and supervisors have the training and resources (i.e., laptops, internet) needed to use these tools.

Further, while the Commonwealth's leadership changes and completion of the 2025 Training Needs Assessment affected its ability to implement the 2025 in-service training in a timely manner, the Monitor's Office has agreed to allot additional time for it to complete its 2025 in-service training, which should be completed by March 2026. To attain continued compliance with the training requirements in the Agreement, the Commonwealth must reach its 95% compliance threshold with its 2025 in-service training by this date and deliver its 2026 Training Plan to the Monitor's Office for review and approval. Doing so in a timely manner will ensure that the 2026 Training Program begins as scheduled on April 1, 2026 and that the Commonwealth is able to meet its training requirements by the end of 2026, therefore

1

December 2025

maintaining compliance. Any failure to meet these timelines will result in compliance regressions in CMRs-14 and 15.

The Monitor's Office also notes that during this reporting period, the PRP was separated from the Department of Public Safety (DSP). As a result of this change, the Puerto Rico Police Bureau has updated its organizational name to the Puerto Rico Police (PRP) and the Superintendent is now referred to as the Superintendent. These changes are reflected throughout the CMR.

Finally, the Monitor's Office also notes that although not occurring during the reporting period, promotions to second lieutenant and sergeant were in process during report writing. These promotion cycles will be integral to ensuring adequate staffing as retirement increases are expected. The Monitor's Office will review each step of the promotions processes and provide its assessment in CMR-15, the next reporting period in which Professionalization is assessed.

As noted above, when examining the total paragraphs assessed in this CMR (N=177) in comparison to the previous CMR in which these sections and paragraphs were assessed (CMR-11; N=177), the Monitor's Office notes that the Commonwealth has achieved continued progress during this reporting period. For example, 87 paragraphs met partial compliance and 8 paragraphs were rated not compliant during this reporting period, in comparison to 99 paragraphs rated as partially compliant and 22 as not complaint in CMR-11. Further, when reviewed comprehensively, almost 31% (N=57) of the paragraphs meet either substantial or full compliance in CMR-13 in comparison to 29% (N=51) in CMR-11.

In examining compliance more comprehensively across all 212 monitorable paragraphs in the Agreement, we find that full compliance improved by 6%, substantial compliance decreased by 3%, partial compliance decreased by 9%, non-compliance decreased by 6%, and deferred increased by 12% from CMRs 10 and 11 to CMRs 12 and 13.[1]

---

[1] CMRs are produced every 6 months and when combined (i.e., CMR-9 and CMR-10) provide a comprehensive review of compliance for all 212 monitorable paragraphs in the Agreement.

December 2025

**Number of Paragraphs by Compliance Rating – Current vs. Previous**
Number of monitorable paragraphs in the Agreement: **212**





| Paragraph Compliance Rating | Previous | | Current |
|---|---|---|---|
| Fully Compliant | 26 | ⬈ | 39 |
| Substantially Compliant | 35 | ⬊ | 30 |
| Partially Compliant | 124 | ⬊ | 105 |
| Deferred | 5 | ⬈ | 29 |
| Not Compliant | 22 | ⬊ | 9 |



**Data Sources for Previous Compliance Ratings**

**CMR 10:** Tenth Report of the Federal Monitor, June 2024
*covering the period from October 2023 through March 2024*

**CMR 11:** Eleventh Report of the Federal Monitor, December 2024
*covering the period from April 2024 through September 2024*

**Data Sources for Current Compliance Ratings**

**CMR 12:** Twelfth Report of the Federal Monitor, June 2025
*covering the period from October 2024 through March 2025*

**CMR 13:** Thirteenth Report of the Federal Monitor, December 2025
*covering the period from April 2025 through September 2025*

*Figure 1. Rate of Compliance Over Time*

## Monitoring Activities During CMR-13

Over the past six months the Monitor's Office conducted five site visits to PRP headquarters as well as various regions of the island including Aguadilla, Bayamon, Guayama, and Utuado. At each of these field visits the Monitor's Office visited the area command, district(s) within each area, Highway Patrol Units, and other units at each location. At each location the Monitor's Office met with executive command and PRP personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF.

These field visits provided an opportunity for the Monitor's Office to hear directly from supervisors and officers on the front line, speak with members of the Commonwealth community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of over 8,000 policies, documents, certifications, audio recordings, training materials, and case files and reports provided for review during the reporting period. While on site, team members also participated in three system demonstrations on various dashboards including the Search Warrant Tracking module,

3

December 2025

Recruitment Module, and GTE. The Monitor's Office also acquired access to these systems as part of its efforts to streamline monitoring efforts.

During the reporting period, the Monitor's Office also reviewed 32 policies, forms (PPRs), and protocols under Paragraph 229 of the Agreement. The policies included GO 628 (Intervention with People in Crisis), GO 642 (Investigation of Serious and/or Fatal Crashes), and GO 801 (CICs), among others.

The Monitor's Office also observed community engagement events hosted by PRP and the CICs. The Monitor's Office also conducted a community townhall meeting in August 2025 in Guayama as part of its efforts to host meetings for the community each quarter. This meeting was largely positive and was attended by nearly 120 community representatives.

During this reporting period, the Monitor's Office participated in a status conference. The July 2025 status conference focused on updates related to the CMR-12 report, the IT Corrective Action Plan (IT CAP), Early Intervention System (EIS), RMS, Reform funding levels, and the Monitor's Office IPSOS Survey Results. The Monitor's Office has continued to work closely with the Parties to monitor the Commonwealth's progress with implementing the various implementation plans filed with the court.

## Summary of Compliance by Section

The following summary provides an overview of the Monitor's Office's compliance assessment for each area of the Agreement.

## 1. Professionalization

The Monitor's Office concludes that the Commonwealth has maintained the same level of compliance in the area of Professionalization as observed in the previous assessment (CMR-11). The development of policies for promotions, staffing, career development, performance evaluations, recruitment, and integrity audits have been completed or are in progress. Those policies that have been implemented and/or recently finalized incorporate the requirements of the Agreement.

In-service training—both in-person and virtual—continues throughout 2025. To ensure that training aligns with departmental needs and the Agreement, the Commonwealth, in collaboration with V2A Consulting, has completed a Training Needs Assessment, which was approved by the Monitor's Office in September 2025.

This CMR does not include a detailed assessment of Recruitment, Retention, and Hiring, as these areas are reviewed annually and were most recently evaluated in CMR-12. Nonetheless, PRP's ongoing recruitment efforts remain critical to addressing its staffing challenges—an issue faced by many law enforcement agencies nationwide. Contributing factors also include an aging workforce and overall personnel shortages. As part of its Staffing Plan, PRP has re-assigned personnel to better address these challenges and has appointed additional project managers to support compliance and sustain reform initiatives. These actions represent promising steps toward strengthening PRP's overall professional capacity.

December 2025

In September 2024, the Monitor's Office and the PRP met with representatives from the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) to learn about the accreditation process and its requirements. Following the meeting, CALEA provided PRP with detailed information on accreditation standards, and a metropolitan law enforcement agency with long-standing CALEA accreditation shared insights from its experience. PRP is currently evaluating its interest in pursuing accreditation. Updated information will be provided in CMR-15.

Throughout this reporting period, the Monitor's Office has continued regular engagement with PRP personnel, including staff from Human Resources, the Promotion Board, and others, as well as interviews with a sample of officers. Based on the information reviewed, the Monitor's Office finds that PRP remains partially compliant with the paragraphs in this section of the Agreement.

Overall, the Commonwealth's compliance with the 10 paragraphs assessed during this reporting period within Professionalization reflects the same levels of compliance as what was noted in previous reports. In CMR-11, all paragraphs were assessed as partially compliant. This holds true for CMR-13. See figure 2.



*Figure 2. Professionalization: Paragraph Compliance Status*

## 2. Use of Force

PRP continues to follow its Provisional UOF Plan, which has to date provided accurate UOF numbers Bureau-wide. However, the plan will change with the development and introduction of PRP's new RMS.

In addition, the Commonwealth's contractor, AH Datalytics, continues to help develop, maintain, and improve the various UOF related dashboards. This assistance provides the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field. These data dashboards should also assist first-line supervisors with managing workflow and ensuring officer compliance. In addition, information relating to the transport of civilian personnel to the hospital and/or police facilities by PRP personnel (starting and arriving milage) will now be documented in a newly developed dashboard.

5

December 2025

During this reporting period, PRP reported 1,150 instances of UOF in 525 incidents. PRP conducts comparative analyses of UOF statistics against prior annual data, including total force applications and incident counts, and evaluates the nature of force employed. A cross check of various units' data by the Monitor's Office determined the accuracy of the data and that the information from PRP's Global Compliance Use of Force Statistics Dashboard is comprehensive. It should be noted that the Monitor's Office has determined that PRP continues to make progress in the preparation and submission of UOF reports (PPR 605.1) in the timeframe outlined in PRP policy. In the 59 UOF reports reviewed by the Monitor's Office, all were prepared and submitted in the timeframe outlined in policy. In addition, as outlined in the policy, supervisors completed their investigation within five business days. These improvements have resulted in continued positive compliance ratings.

It should be noted that 2,244 out of 2,311 (97%) officers from the rank of sergeant to colonel have received REA 601, which includes training on the investigation and review of UOFs. Most PRP officers (96%) have completed the training.

Consistencies in the UOF data largely affect many of the paragraphs in this section. Other topics such as the Force Investigation Unit (FIU), Force Review Boards (FRBs), Crisis Intervention Training (CIT), Special Weapons and Tactics (SWAT), and crowd control procedures also impact PRP's overall compliance with this section. As it relates to FIU, the Monitor's Office has observed that 100% of cases are completed within the established timeline of 60 calendar days. The ability of FIU to maintain its personnel has contributed to improved compliance.

The Monitor's Office's reviewed Commissioner Force Review Board (CFRB) evaluations and found that the evaluations were objective and timely. The CFRB has eliminated the backlog of cases presented before the Board for review and has met the challenge of evaluating the investigations completed by FIU during the reporting period in a timely manner. The Monitor's Office was able to attend CFRB meetings during the reporting period and determined that the CFRB is properly evaluating FIU investigations within the timeline established by policy. The CFRB now has a dedicated office outfitted with computers and an officer assigned as the clerk of the Board with the responsibility of preparing cases for board members and scheduling meetings.

In addition to the above processes, it is critically important to have CIT trained officers throughout the 13 area commands. PRP has made significant progress in the prior three reporting periods and now has coverage in all 13 area commands. By the end of the current reporting period PRP had 294 trained CIT officers, 267 of which are assigned to patrol/CIT functions (91%). It is also important to note that the inspector who leads the CIT expansion efforts has experience in this area, holding a doctoral degree in psychology.

The Commonwealth has demonstrated progress in many of the UOF paragraphs. Much of the efforts made in this reporting period can be attributed to PRP's continued collaboration with AH Datalytics, the Commonwealth's contractor, who has helped PRP develop and maintain several UOF related dashboards, which include "Compliance with Reports", "Use of Force Statistics", "Requests from the Monitoring Team", and "Specialized Tactical Unit Mobilizations." These dashboards are useful to the Monitor's Office as they serve as another tool in assessing PRP's compliance with the Agreement. In addition, PRP's efforts in training members as CIT officers and expanding the CIT Program to all area

6

December 2025

commands are major steps towards compliance. The positive efforts made in this reporting period have proven beneficial in increasing PRP's compliance with this section.

Only six paragraphs (22, 32, 34, 35, 56, and 57) remain partially compliant; the rest are fully or substantially compliant. The Monitor's Office approved PRP's 2025 in-service training plan for officers, including Crowd Control and Persons in Crisis. If PRP completes this training in the next reporting period, four of the six remaining paragraphs would reach substantial compliance. To address the final challenges, PRP must provide dispatchers with scenario-based, in-person crisis training (Paragraph 57), after which Paragraph 22 should also achieve substantial compliance.

Overall, the Commonwealth's compliance with the 36 paragraphs assessed during this reporting period within UOF reflects some improvement in levels of compliance to what was noted in previous CMRs. In CMR-12, 19% of paragraphs (7 paragraphs) were assessed as partially compliant and 53% (19 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 17% of paragraphs (6 paragraphs) were found to be partially compliant and 50% (18 paragraphs) were found to be substantially compliant. Twelve paragraphs (33%) were rated as fully compliant in comparison to ten (28%) in CMR-12. See figure 3.



*Figure 3. Use of Force: Paragraph Compliance Status*

## 3. Searches and Seizures

An analysis of data indicates that PRP continues to demonstrate steady improvement across several key areas. These include proper documentation of probable cause (PC), accurate reporting of arrests and searches in accordance with policy, and consistent supervisory evaluations of arrest reports. In-service training remains on schedule, with 100% participation achieved for the reporting period. The 2025 in-service training cycle is also progressing as planned and is expected to be completed by March 2026.

Despite these advancements, several paragraphs of the Agreement (including Paragraphs 60–64) remain partially compliant or deferred until the full implementation of the RMS and Benchmark Analytics, anticipated in 2026. These systems are essential not only to achieving compliance within this section but also to meeting the data collection, analysis, and reporting requirements outlined in Paragraph 243.

December 2025

Paragraphs 58 and 59 are similarly dependent on the deployment of these systems to move toward full compliance.

PRP has made progress in implementing the new GTE module, which now requires officers to record mileage when transporting arrestees (Paragraph 67). Supervisors are also responding to arrest scenes in a timely manner (Paragraph 66), while arrest reports and related forms are being properly completed (Paragraph 65). Additionally, feedback committees continue to collaborate with judicial system stakeholders to address issues such as court attendance and officer professionalism (Paragraph 73). Improvements have also been observed in the proper completion of consent forms (Paragraph 77).

However, ongoing challenges remain in certain areas. Issues related to the recording and storage of seized property, as well as the absence of a search warrant tracking system, continue to affect compliance with Paragraphs 72, 74, 75, and 76. In addition, a small number of arrest and search files still lack required documentation, which hinders overall compliance.  To address these gaps, PRP should ensure that all final arrest and search files undergo comprehensive review and auditing before submission to the Monitor's Office to confirm that all required forms are accurately completed and included.

The forthcoming implementation of the RMS and Benchmark Analytics' systems is expected to significantly strengthen PRP's data management, oversight, and reporting capabilities, positioning the Bureau to achieve higher levels of compliance in future reporting periods.

Overall, the Commonwealth's compliance with the 22 paragraphs assessed during this reporting period within Searches and Seizures reflects similar levels in compliance to what was noted in previous CMRs. In CMR-12, 14% of paragraphs (3 paragraphs) were assessed as not compliant and 59% (13 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 5% of paragraphs (1 paragraph) was found to be not compliant and 68% of paragraphs (15 paragraphs) were found to be partially compliant. One paragraph moved to fully compliant (5%). See figure 4.



*Figure 4. Searches and Seizures: Paragraph Compliance Status*

December 2025

## 4. Equal Protection and Non-Discrimination

PRP and the Parties continue to work collaboratively under the Sexual Assault and Domestic Violence (SA/DV) Plan, which serves as a central framework for strengthening PRP's investigative practices. This plan has guided progress in several key areas, including enhancing training content, improving the organization and quality of investigative files, promoting victim-centered approaches, and refining internal processes related to investigations, supervision, and resource allocation..

The designated SA/DV workgroup remains actively engaged in implementing the tasks outlined in the Plan, which was developed to provide structure and consistency in handling these sensitive cases. As part of these efforts, PRP has introduced an investigative checklist to promote standardization and quality control in case management.. The workgroup continues to respond to recommendations from prior CMRs, with the overarching goal of improving investigative effectiveness and victim-centered practices in SA and DV cases.

Specialized training remains a central focus of PRP's reform efforts, ensuring personnel are equipped to respond promptly, professionally, and with trauma-informed sensitivity to incidents of gender-based violence. During the 2024 in-service training cycle, PRP achieved a 95% compliance rate in the virtual course on Interactions with Transgender and Transsexual Individuals (VIGPD 5011). However, additional training areas, including hate crime and NIBRS-related modules, are still under development.

PRP recognizes that a sustained commitment to accessible, comprehensive training—supported by adequate staffing, supervision, and resources—is essential for the effective investigation and resolution of these complex and sensitive incidents. Due to time constraints during the 2024 training cycle and transitional leadership changes, PRP requested—and the Monitor's Office approved—a revised schedule for completing 2025 in-service training requirements across these paragraphs and other relevant sections of the Agreement. These trainings are now scheduled for completion by March 31, 2026.. PRP is also encouraged to begin planning for the development and implementation of its 2026 training program.

In summary, the Commonwealth's compliance with the Equal Protection and Non-Discrimination paragraphs reflects some compliance progress to what was previously observed in prior CMRs. In CMR-11 71% (15 paragraphs) of paragraphs assessed were partially compliant and 5% (1 paragraph) of paragraphs assessed were substantially compliant, in comparison to the current reporting period, where 62% of paragraphs (13 paragraphs) were found to be partially compliant and 10% (2 paragraphs) of paragraphs assessed were substantially compliant. One paragraph (5%) moved to fully compliant during this reporting period. See figure 5.

December 2025



*Figure 5. Equal Protection and Non-Discrimination Paragraph Compliance Status*

## 5. Policies and Procedures

The PRP Office for Policies and Procedures typically reviews and approves policies on schedule, though some are delayed at the Superintendent's Office or pending implementation plan execution that is scheduled for 2025. All PRPB policies provide clear guidance and instruct personnel to follow Bureau rules, Commonwealth laws, and constitutional rights, specifying consequences for noncompliance or failure to report violations.

New and updated policies are shared with staff and the public via a comprehensive, searchable Virtual Library. Staff continue to receive notifications about policy updates through Policia Informa, Outlook emails, and monthly area trainings (monthly academies). Paragraphs 110 and 111, which require the creation and maintenance of select policy manuals, have received fully compliant ratings in both CMRs-11 and 13 due to the creation of the public Virtual Library mentioned above.

PRP has also created an electronic module, called Info Access, which facilitates the dissemination of new and updated policies to officers. The full deployment of this module, which also tracks when officers access and read emailed policies, along with the operationalization of these policies in the field, are helping to move compliance in a positive direction for some paragraphs.

Additionally, PRP achieved 100% participation with in-service training during this reporting period, and the subsequent phase of annual in-service training for 2025 is progressing and scheduled to end in March of 2026. Furthermore, the development of an effective online policy review calendar is also a positive step forward. However, timely policy review and approval continue to need some improvement.

Overall, the Commonwealth's compliance with the eight paragraphs within Policies and Procedures reflects identical compliance to what was noted in previous CMRs. In CMRs-11 and 13, 75% of paragraphs (6 paragraphs) were assessed as partially compliant and 25% of paragraphs (2 paragraphs) were assessed as fully compliant. See figure 6.

December 2025



*Figure 6. Policies and Procedures: Paragraph Compliance Status*

## 6. Supervision and Management

The Commonwealth has shown continued progress in complying with the Agreement's provisions. PRP has made significant strides in conducting promotions, assigning newly promoted first-line supervisors, and introducing a new evaluation system. During this reporting period, AH Datalytics, the Commonwealth's contractor, created a dashboard to track performance evaluations, training, monthly academies, non-punitive measures, and referrals to SARP and psychological services. They are also developing a secondary dashboard to verify supervisor and agent assignments. PRP conducted the Second Lieutenant exam, 918 sergeants took the test, which resulted in 633 with passing scores. It was reported that a total of 274 will be promoted in February 2026. A Sergeants exam is scheduled for December 2025, demonstrating the Bureau's dedication to leadership and management excellence. A total of 1,280 agents are eligible to take the test.

PRP projects that the Early Intervention System (EIS), provided by Benchmark Analytics, will go live between December 2025 and early 2026. These efforts are aligned with the EIS Charter and the presentation of the project scope to the IT Governance Executive Committee, which included representatives from Puerto Rico Innovation and Technology Service (PRITS). Furthermore, progress was made to prepare datasets for the initial data import into EIS. The Policies and Procedures team, the EIS Unit, and Benchmark Analytics continue to collaborate on the policy and procedure development. The Monitor's Office emphasizes the importance of implementing an internal communication strategy to inform PRP personnel about EIS, its objectives, and relevant policies once the Bureau is ready to roll out the system.

Despite these accomplishments, PRP continues to face challenges related to supervisory accountability, EIS development, performance evaluations, and the completeness of personnel records and statistical data. Addressing these issues consistently will be crucial for PRPB to achieve substantial compliance.

The recent promotions across all supervisory levels bring PRP closer to meeting the staffing requirements outlined in the Staffing Plan. However, retirements and resignations have once again led to first-line supervisor shortages. It is recommended that PRP conduct an audit of all supervisors eligible for retirement within the next two years and those who have left the Bureau. While current deficiencies are manageable, they remain a concern.

December 2025

Inspection and audit systems training within the Inspection Division was concluded and approved by the Monitor's Office. However, there remains a lack of documentation confirming that the Superintendent reviews each audit. The division is actively working to produce reports demonstrating supervisory review and policy compliance.

Ongoing concerns persist regarding the Transfer Unit's assignments, evaluations, vehicle shortages, and limited repair budgets—issues acknowledged by management. Although plans and systems are being developed to address these challenges, proper documentation of related meetings remains lacking. Improvements in these areas are attributed to the recruitment of new supervisors and management's directive to formalize roll call meetings. Continued emphasis on training and documentation of these practices is recommended.

Over 95% of supervisors have completed the required evaluation training curriculum. A review of 100 evaluation records indicated marked improvement in evaluation preparation and justification. Nonetheless, interviews conducted between January and September 2025 revealed that 30% of personnel had not discussed evaluations or career development with their supervisors, and 10% reported only being asked if they agreed with their evaluations. This suggests that the practical execution of the training and policy is lacking, primarily due to supervisor shortages and time constraints. Educating supervisors on the importance of these discussions is vital for morale and personnel development. Recently promoted supervisors received in-person training; however, further comprehensive training emphasizing compliance and its importance is recommended.

Interviews also revealed instances of evaluations conducted by supervisors who did not oversee the evaluated employees directly or worked different shifts. Additionally, acting supervisors continue to perform supervisory duties, although these issues were reported by only 10% of interviewees. The technological enhancements supporting the new evaluation system are detailed in the IT section .

Overall, the Commonwealth's compliance with the 19 Supervision and Management paragraphs assessed during this reporting period reflects similar levels of compliance to what was noted in previous CMRs – the largest change was the movement of all EIS-related paragraphs from Not Compliant to Deferred in CMR-12. In CMR-11, 53% of the 19 paragraphs (10 paragraphs) were assessed as partially compliant and 47% of the 19 paragraphs (9 paragraphs) were assessed as not compliant, in comparison to the current reporting period, where 58% of the 19 paragraphs (11 paragraphs) were found to be partially compliant and 5% of the 19 paragraphs (1 paragraph) was assessed as not compliant. See figure 7.

December 2025



*Figure 7. Supervision and Management: Paragraph Compliance Status*

## 7. Civilian Complaints, Internal Investigations, and Discipline

PRP efforts continue to improve compliance in multiple areas. A review of documents in the Phase I Analysis shows some noteworthy improvement in SARP internal investigations procedures and methodology.[2] It is important to mention that the most promising cases reviewed were among the most recently concluded SARP investigations. Older cases in the sample were mostly lacking these improvements. Overall, the Monitor's Office performed in-depth analysis of each case from receipt of the complaint to its final internal disposition at the Office of the Police Superintendent.

While PRP's partial and non-compliant cases effectively illustrate some of the latest advancements, the Monitor's Office believes that these recently improved cases are a result of SARP policy and pending rule changes, which have been discussed multiple times at length with the Civilian Complaints, Internal Investigations, and Discipline Working Group.

None of these proposed rule changes were forwarded to the Monitor's Office for review during this reporting period or the previous one. While a few updates have been shared with the Monitor's Office informally during meetings and working group discussions, the Monitor's Office has been unable to review the proposed changes in their entirety. Thus, the Monitor's Office lacks the empirical evidence necessary to assess for improved compliance.  To continue making progress in an efficient manner, PRP policies and rules changes must be reviewed by the Monitor's Office prior to adoption, publication, or presentation of any training to PRP members based upon these new rules or policies.

The Monitor's Office reviewed 44 SARP investigations for a full-spectrum review and analysis of the entire case, beginning from actual receipt of the complaint to its ultimate internal investigative and

---

[2] The most conspicuous improvement has been the mention of the accused officer's *historial* by some SARP investigators, as well as the latest case analyses performed by SEAQA. While this is nowhere near a universal practice, multiple cases containing some basic analyses were found in the most recent sample of case files. Most of these analyses of prior conduct were merely quantitative, and only a few looked beyond the mere number of incidents and outcomes. A few SARP investigators appear to be paying more attention to prior allegations against an officer that could offer some evidentiary value or insight into the case being actively investigated. The Monitor's Office expects to see more investigators using this data in the future.

December 2025

internally adjudicated resolution.[3] This qualitative review and analysis looked at the overall internal investigative quality, the investigative methodology and tactics used in the investigation, the thoroughness of the investigation, whether the investigator's/fact-finder's conclusion relied upon evidence, and whether the investigator or fact-finder's ultimate conclusion was supported by the "preponderance of the evidence" standard of proof, which is mandated by the Agreement.[4]

This most recent sample of cases indicated some level of improvement in overall SARP investigative practices among certain, though not all, SARP members. Of the 44 cases analyzed by the Monitor's Office, 48% were found in substantial compliance, 43% were found in partial compliance, and 9% were found in non-compliance.

With the level of partial and non-compliance as it is presently – in many cases owing to insufficient and/or untimely performance of its key human resource – its SARP investigators, the Monitor's Office continues to call into question the sufficiency of and the division of labor within SARP. Multiple members have described being severely overtasked with administrative caseloads, in some cases juggling 20 or more active cases at a time. Overtasked personnel in any profession are more prone to oversights or errors than those who have a manageable workload.

PRP continues to concede that it does not conduct simultaneous administrative investigations of alleged criminal behavior by officers - despite the fact that the Agreement clearly requires simultaneous investigations to be performed.[5] While SARP leadership continues to promise that they will begin conducting concurrent investigations upon the issuance of a modified GO, the Monitor's Office has yet to see a copy of this proposed GO.[6]

As is the case in all CMRs, the Monitor's Office has interviewed various SARP members who actually assign, conduct, supervise, oversee, direct, and adjudge internal police investigations. Presently, the Monitor's Office has interviewed every identified SARP investigator at least once, and in most cases two or three times over the course of the past five years. The Monitor's Office has a similar record of

---

[3] Puerto Rico Organic Law places the authority upon the Superintendent as the ultimate arbiter of internal discipline – subject to judicial and administrative appeals for relief. There are multiple avenues of appeal for internal discipline, including CIPA and CASP, among others. However, none of these entities fall under the purview of the Agreement. Thus, for the purpose of compliance assessment, the Monitor's Office's analysis and review effectively conclude once the Superintendent has signed the case final resolution.

[4] For the record, none of the 44 cases received in the sample involved simultaneous criminal and administrative investigations of PRP members, which are obligatory under the Agreement. PRP members, including the Civilian Complaints, Internal Investigations, and Discipline Working Group as well as SARP's top commanders have all informed the Monitor's Office that this is not the current practice. The Monitor's Office therefore concludes that PRP is not assigning cases of potential criminal wrongdoing for a concurrent administrative investigation as mandated by the Agreement.

[5] See Paragraph 173 of the Agreement.

[6] Since September 2024 the Monitor's Office has been informed on multiple occasions by the Civilian Complaints, Internal Investigations, and Discipline Working Group and SARP Command that PRP is working on rules/procedural changes that affect a number of critical areas in SARP that fall under the Agreement, including simultaneous administrative investigations, digital recording of SARP interviews, the creation of accurate interview transcripts, and creating internal guidance to prevent additional misuses of Garrity. The Monitor's Office requested a copy of all pending rule changes associated with this section of the Agreement to prevent a non-compliant proposed policy from being enacted, which would require further modification. As of this writing, the Monitor's Office has yet to see any of these "draft" policies.

December 2025

comprehensive interviews of SEAQA and the Office of the Legal Advisor (OAL) – both responsible for adjudication/verification of complaints in addition to quality assurance.

One of the most concerning areas involves the workload of SARP investigators, especially administrative investigators, many of whom have reported active caseloads in the double digits. This is quite worrisome considering the 90/90-day rule for completion of a SARP administrative investigation. The Monitor's Office sees PRP struggling to keep the administrative timeframe mandated by the Agreement for both investigations and subsequent adjudications. The Monitor's Office continues to see evidence of multiple SARP internal administrative investigations that have exceeded the 180 (90+90) day rule for completion.[7] PRP SEAQA and OAL seem incapable of achieving substantial compliance given current staffing, as a significant number of investigations still lack adjudication and notification of all parties within the 30-day limit post-investigation period.

SARP administrative case workload continues to be spread across the island with some investigators juggling over 20 active and open cases (each with its own 90 + 90-day timeline). The Monitor's Office has seen countless administrative investigations originating in the San Juan Metropolitan area assigned across the island, including to its most remote western points located a considerable drive from San Juan. The evidence shows that the majority of SARP cases originate in large population centers, including San Juan, Bayamon, and Carolina, with fewer cases originating in Ponce, Mayaguez, and Aguadilla. Meanwhile, in the parts of the island that generate the most internal complaints, local SARP investigators are understaffed. The Monitor's Office recommends that SARP begin recruiting additional administrative investigators to handle the volume of cases in Bayamon, Carolina, and San Juan. Those who apply for this convocatoria must be told that they will be assigned to one of those three SARP delegations for the foreseeable future and that a transfer to another SARP area will not be considered for at least three years. This will help ensure that investigators are assigned to work in areas based on where they are desperately needed - not based upon where the investigator prefers to work.[8]

The Monitor's Office is mindful that some administrative investigations should be assigned outside the area of occurrence to avoid a potential conflict of interest. Six years of review reveals that SARP "ethical dilemma" assignments are the exception, and not the rule. PRP efforts to balance case distributions and SARP workloads across the island have effectively exposed the core problem – a number of administrative investigators are assigned to areas remote from San Juan where far fewer complaints are received. When these underused investigators are assigned to investigate cases located on the other side of the island, they must commute for hours in traffic in a fleet that is just now beginning to show some level of sufficiency and roadworthiness. Investigators from the west often report being assigned

---

[7] Please refer to 2023-1680, 2024-1490, 2024-1471, 2024-1304, 2024-1370, and 2024-0677 for examples of SARP administrative investigations that took longer than 180 days to complete.

[8] This raises the issue of SARP member recruitment and retention, which according to most SARP interviewees has been challenging. It should come as no surprise that, in most police agencies on the mainland, officers who perform these investigations are considered among the best and brightest - and are treated accordingly by the agency. In 2013 in Boston for example, a noteworthy portion of the command staff possessed working experience in conducting internal investigations involving Boston Police employees. Experience in conducting internal investigations often lends itself to making better field decisions as a supervisor or command decisions as a higher-ranking officer. To enhance recruitment efforts in places where SARP investigators are desperately needed, PRP should consider offering non-financial incentives in exchange for periods of service in SAR. Some examples from other agencies include flexible work schedules, consideration or extra points in promotional exams, travel stipends, and the ability to select one's next assignment upon conclusion of their honorable service to SARP. Most of these incentives are revenue neutral – without monetary cost to the agency.

cases located far from their assignment, usually in the Metropolitan area. These investigations frequently involve in-person interviews of civilians in other parts of the island, securing transportation to these locations, and then driving back and forth from these sites during the day, often in heavy traffic conditions.[9] Some of these investigators may be reassigned to areas of the highest SARP reporting, such as Carolina, Bayamon, San Juan, or Caguas. If a reassigned investigator refuses the assignment, then SARP must find suitable replacements to assign to the highest-traffic areas.

Most SARP investigators interviewed noted the improved allocation of needed resources, with the glaring exception of human resources. The majority of SARP investigators now report that an adequate fleet of safer, roadworthy vehicles have been assigned to meet their needs.

Due to the adverse impact of assigning metropolitan administrative cases to investigators located on the west of the island,  the Monitor's Office strongly recommends that SARP commanders consider the assigned investigators' travel time to the location, the sufficiency and safety of that person's transportation, the estimated amount of time to be spent away from their assigned area, as well as the number and type of cases presently assigned to that officer before case assignment.

In the absence of an ethical conflict or appearance thereof, assigning a case located hours away from an investigator who is presently carrying a full caseload of 12 or more SARP cases is highly imprudent and counterproductive to increased compliance.

Lastly, it is understood by all that Internal Affairs is the SARP unit responsible for conducting sensitive, clandestine criminal investigations into allegations of criminal misconduct against a PRP member. Presently, as has been reported in every CMR since the beginning of the monitoring phase six years ago, Internal Affairs delegations continue to operate from police areas where everyone knows who their investigators are and what official and private vehicles they operate. PRP will fail to advance in compliance for this area until Internal Affairs Units are relocated into adequate facilities not located within or in proximity to active police installations.

Overall, the Commonwealth's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflects some progressive levels of compliance with what was noted in previous CMRs. In CMR-12, 54% of paragraphs (25 paragraphs) were assessed as partially compliant and 11% (5 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 48% of paragraphs (22 paragraphs) were found to be partially compliant and 15% (7 paragraphs) were found to be substantially compliant. See figure 8.

---

[9] From multiple SARP investigator interviews, the Monitor's Office learned that the predominant methodology is for the SARP investigator to travel to interview civilian complainants and witnesses. Conversely, sworn members are required to travel to where the SARP investigator is located for their individual interviews, which also wastes significant amounts of time and resources as these sworn officers crisscross the island unnecessarily.

December 2025



*Figure 8. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

## 8. Community Engagement and Public Information

This reporting period is the first time that all paragraphs in this section were assessed under the new methodology introduced at the end of the previous reporting period. Under the Monitor's Office's guidance, PRP resumed development of a structured community engagement plan designed to integrate community and problem-oriented policing principles into its management, policies, recruitment, training, personnel evaluations, and accountability systems.

While the process is ongoing, these sessions have produced meaningful progress. PRP has begun developing its first operational pilot plan, which includes representative police areas across the island: Aguadilla, Arecibo, Humacao, and Guayama. In June 2025, the Community Interaction Committee (CIC) policy received the Superintendent's approval, allowing PRP to advance its internal engagement efforts. In August 2025, PRP submitted its pilot implementation plan for the selected areas. The Monitor's Office reviewed the plan and submitted recommendations in September 2025, paving the way for pilot implementation beginning later that month. The plan is scheduled to run through March 2026 (CMR-14).

However, two key policies remain pending approval by the Superintendent: GO 803 (Community Policing) and GO 805 (Public Information and Open Meetings – Encuentros Comunitarios). Approval of these policies is essential for finalizing PRP's Bureau-wide community engagement plan in collaboration with community stakeholders. The full plan will also include the development of supplemental community engagement plans for each of PRP's 13 area commands. These supplemental plans will align personnel deployment with the **S**taffing and Resource Allocation Plan, ensuring consistency with community-oriented policing principles.

Progress in this section remains closely tied to finalizing the Bureau-wide engagement plan, approving the pending policies, and implementing related training and electronic systems. PRP also plans to enhance its community policing data systems under Benchmark Analytics during Phase II, scheduled to begin in December 2025. The scope of Benchmark Analytics' community engagement modules is still being defined, but the Monitor's Office views this phase as a valuable opportunity to institutionalize best

17

December 2025

practices, strengthen partnerships, and promote measurable improvements in community engagement. Early planning and pilot implementation will be key to identifying challenges and building momentum for effective integration.

During this reporting period, the Monitor's Office also re-reviewed several key documents, including GOs 801 (CICs), 803 (Community Policing), 805 (Community Meetings), PPRs 803.2 and 803.5, and the CIC Rules and Regulations Manual. The Monitor's Office attended CIC Central meetings, Community Safety Council (CSC) meetings, and a community open meeting (Encuentro Comunitario) hosted by the Bayamón Area Command.

Additionally, the Monitor's Office and PRP co-hosted a Town Hall Meeting in Salinas (Guayama Area Command), attended by community members, CSC representatives, local officials, non-profit organizations, direct service providers, and CIC members. Participants shared common public safety concerns and emphasized the importance of PRP's active engagement with local communities. Community members also acknowledged PRP's positive contributions through programs such as the Police Athletic League for youth engagement and Vuelta a la Vida, a referral program supporting drug rehabilitation services.

For this reporting period, the Monitor's Office reviewed compliance evidence from PRP's community policing operations in San Juan, Bayamón, Utuado, Guayama, and Fajardo. Interviews were conducted with personnel responsible for community engagement, alliance development, outreach, and problem-solving, as well as with community members and CSC representatives. While PRP continues to make progress, the Monitor's Office found that some longstanding implementation challenges remain unresolved, and corrective actions have yet to be fully documented.

In conclusion, the Monitor's Office remains optimistic about PRP's progress as it begins implementing the pilot phase of its community engagement plan. Continued success will depend on PRP's ability to establish a structured and sustainable management system that supports long-term improvement and embeds community policing principles into daily operations across all levels of the Bureau.

Overall, the Commonwealth's compliance with the 13 Community Engagement and Public Information paragraphs assessed during this reporting period reflect similar levels of compliance noted during previous reporting periods. In CMR-12, 38% (5 paragraphs) were found to be partially compliant and 8% (1 paragraph) was found to be not compliant in comparison to the current reporting period where 31% of paragraphs (4 paragraphs) were found to be partially compliant and 15% of paragraphs (2 paragraphs) were found to be not compliant. See figure 9.

December 2025



*Figure 10. Information Systems and Technology: Paragraph Compliance Status*

## 9. Information Systems and Technology

The Commonwealth's focus on the RMS and EIS continued as needed given the importance of both tools. In light of the focus on both RMS and EIS, PRP's legacy IT ratings are being deferred as agreed to until both are implemented. Programmatically, management artifacts continue to be developed and have been made available to the Monitor's Office signaling better discipline and attention to detail by the Bureau of Technology (BT) and Program Management Office (PMO). Regardless of progress thus far PRP must stay focused and leverage its planning efforts to execute its projects and programs as detailed in its plans. As noted in previous CMRs, PRP must also heed the experiences of their support and advisory experts from whom they should draw lessons learned with regard to large scale technology implementations similar to what they are attempting now.

### Management, Discipline, and Cadence

1. Regarding the Information Technology Corrective Action Plan (ITCAP), the Commonwealth should consider more aggressive tiering of its thresholds, targets, and stretch goals in order to implement the best possible versions of IT to ensure functional data capture and analysis and agency review. Currently, many of the accomplishments recorded in the ITCAP too often refer to hygiene activities such as holding meetings rather than completing critical tasks, reaching decisions, or removing obstacles and risks. Doing so skews the accomplishment measures. Further, claims of being on schedule or complete, lack credibility because schedules have been changed to accommodate delays. The Monitor's Office has made recommendations to this effect and strongly recommends that the IT Executive Committee metrics be revised to add granularity, thresholds, actionable tasks, and timelines.
2. The Executive Committee should drive "the plan" and expectations as aggressively as possible.
3. The Monitor's Office provided Data Network Maintenance Plan recommendations to the PMO that included additional details regarding planning, budgeting, risk, etc.
4. Communication between PRP H.Q. and the field must continuously be exercised and improved. The Monitor's Office has referenced this in previous CMRs.

December 2025

5. Positively, the Master Integrated Plan was finally made available as were the Benchmark Analytics Charter and Axon Data Dictionary. Unfortunately, although requested by the Monitor's Office monthly since March 2025, the Gartner Inc. PMO Assessment was not made available until September 2025.

6. The PMO is fully staffed and much can be expected from its operation.

7. AHDatalytics, the Commonwealth's contractor, continues to fulfill a vital role as data steward in providing data extracts for dashboards. Much can be leveraged from AHDatalytics, including the establishment of data operations, processes and stewardship beyond their current analysis on legacy systems, Axon, and Benchmark Analytics.

## Document and Artifact Management

1. Although completed in March 2025, the PMO did not provide the Gartner Inc. Assessment until September 2025.

2. A clear and distinct portfolio of technical functionality and capabilities is not yet available although noted in prior CMRs. A portfolio is essential for solutioning, planning, and prioritizing.

3. A singular discreet Master Integration Plan was finally established in the summer of 2025.

4. An Enterprise/Systems Architecture is not yet drafted.

5. A clear and distinct plan to combat cyber threats remains unclear.

6. Although raised previously, PRP has yet to formally establish its plan and methodology to validate data, which is critical during the migration from RMS to Axon and EIS to Benchmark Analytics. It also important for sustainability after the Agreement is complete.

The above is essential for long term formalization of PRP's infrastructure and systems architecture.

## Data Entry and IT Use

1. With respect to Axon, FRB members noted that the migration of UOF data was not consistently accurate. The example provided indicated that in one of the system migrations the use of handcuffs was not entered into Axon.

2. Timely data entry in GTE was reportedly impacted by the steps that require a commanding officer (CO) to release a file according to field visit interviews. The example given was that if a sergeant begins an investigation, an officer cannot enter data until the CO assigns the case. This can take several days and, if over a weekend, data entry accuracy can be affected. The applicable GO states that only the CO can initiate and assign the file in GTE. This policy and procedure should be reconsidered. This issue may also be related to training not being as effective or complete as is needed to understand the process. This state could be considered an opportunity for improvement or missed timely implementation in Version 1.0 of Axon.

3. A GTE demonstration indicated that it is only populated if an arrest is being made. While logical, this protocol may not meet the need for gathering traffic stop data where an arrest is not made.

4. GTE does not fully accommodate unique data entry specifics. For example, on PPR 126.2 (Complaint Card), the data is not linked where multiple perpetrators at an incident may be transported in different vehicles going to different locations.

5. Lack of mileage data is related to the procedure that requires Centro Mando to enter mileage.

December 2025

6. Positively, the Sexual Assault Module timeout issues in Utuado are no longer occurring but were reportedly occurring in Guayama and San Juan. In Bayamon there were unanswered questions about supervisors being notified when a file has been created.

**Technology Assets and Availability –** Positively, during the on-site review in September, the FRB noted that they have ample access to dedicated computers and that adequate workstations were available for general use and training. Further, during the reporting period the Monitor's Office was informed that the radio and BWC inventories were near full, a solid indication of the needed preparation supporting officer and citizen safety.

**Impact to Training -** Observed during the August on-site review and the Virtual Training demonstration provided by PRP, the Monitor's Office confirmed the promising performance of the training system, delivery approach, and content. User acceptance during implementation will be assessed by the Monitor's Office as indications are promising for a successful deployment.

## Looking Forward

Confidence is warranted as the Commonwealth has shown progress and improvement during the reporting period. However, PRP must demonstrate ability to formally achieve and sustain the success instrumental to systems and enterprise architecting and long term solutioning. Noting the essential need for continued progress the following recommendations and opportunities for improvement should be considered.

1. Plans and Status Reports could be improved and streamlined by incorporating fewer hygiene details (i.e. meetings held) and focusing on and providing status (i.e. schedules) via Red/Yellow/Green format. Current claims of progress without evidence undermine credibility when resources are limited.
2. A critical component of project decision making, risk management needs to be addressed comprehensively and formally statussed as routinely and often as possible.
3. Continuously minimizing risks will require actively eliminating distractions and low return on investment (ROI) activities. The initial implementation of Axon's RMS has slipped to July 2026 with required solutioning and improvement of the RMS continuing beyond its launch. It is the Monitor's Office's opinion that risk to successful implementation remains high and should be managed as such.
4. The plan for data administration and purification through implementation and beyond for Axon and Benchmark Analytics remains unclear. This concern has been raised in previous CMRs.
5. Contract Management experienced delays. Timely processing must be ensured to avoid work stoppages. Leadership support is critical.
6. Transparency will benefit PRP. Answers to well-intentioned questions must be timely.
7. PRP must stress itself. Sustainability beyond the Agreement will require a willingness to endure failure and to commit appreciable resources. Implementation of Axon and Benchmark Analytics solutions are merely foundational first steps and not the end of the effort.
8. The Cyber Practice and a formally recognized IT Portfolio/Registry are not yet in focus or published.
9. The PMO provided Network Maintenance Plan while a good start, should incorporate more detail and include planning, budgeting, and risks.

December 2025

10. Management artifacts read more as descriptions of tasks than firm commitments to cost, schedule, and performance. Long term self-management after the Agreement will depend on a high level of management rigor.

11. The Commonwealth would be well served to exercise a lessons learned practice.

Finally, the Monitor's Office urges the Commonwealth to, 1) the fullest extent possible continue to use advisory services and subject matter experts when optimal, 2) embrace third party validation and verification in technology and process development and delivery, 3) prepare for long term sustainability and rely on succession planning and knowledge transfer strategies to staff the IT cadre, 4) continue to employ aggressive and rigorous management and planning practices to ensure optimal and predictable outcomes for the Commonwealth, and 5) dedicate itself to rigorous cyber planning and hardening as well as continuing infrastructure assessments.

Overall, the Commonwealth's compliance with the six Information Systems and Technology paragraphs remains unchanged due to the agreement between the Parties to defer ratings until Axon and Benchmark Analytics implementations are complete. See figure 10.



*Figure 10. Information Systems and Technology: Paragraph Compliance Status*